## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

## DECLARATION OF STEPHEN A. WELCH, CHIEF TRANSFORMATION OFFICER, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Stephen A. Welch, declare under penalty of perjury:

1.     I am the Chief Transformation Officer for the businesses owned by the above-captioned debtors (collectively, the "***Debtors***") and their non-debtor affiliates (the "***Non-Debtor Affiliates***" and together with the Debtors, "***Mallinckrodt***").  Mallinckrodt operates a global specialty biopharmaceutical company that produces and sells both generic and branded products.  Mallinckrodt plc, the lead Debtor, is an Irish public limited company and is the publicly-traded, ultimate parent of the Mallinckrodt global enterprise headquartered in Dublin, Ireland.

2.     The Mallinckrodt global enterprise operates two separate businesses.  The "***Specialty Brands***" business, operated by various Debtors and Non-Debtor Affiliates, conducts its global external manufacturing operations in Dublin, Ireland, and has its principal U.S. offices in Bedminster Township, New Jersey, with a significant corporate administrative office in Hazelwood, Missouri, near St. Louis.  "***Specialty Generics***" is the business primarily comprised of Debtors Mallinckrodt LLC, Mallinckrodt Enterprises LLC ("***Enterprises***"), SpecGx Holdings

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

LLC, SpecGx, LLC ("*SpecGx*"), and Mallinckrodt APAP LLC, in addition to certain other Debtors and Non-Debtor Affiliates that act as foreign distributors.  Specialty Generics' principal U.S. offices are in Webster Groves, Missouri, also just outside St. Louis.  Combined, the Debtors and their Non-Debtor Affiliates employ approximately 3,300 people in the United States and abroad, who manage, support, and execute on Mallinckrodt's core corporate missions.

3.      I have worked for Mallinckrodt for over seven years, having joined the company in November 2012 in anticipation of its June 2013 spin-off from its predecessor parent.  My previous pharmaceutical industry experience includes leadership roles within the finance departments of Human Genome Science (2010-2012) and PharMerica Corporation (2007-2010).  I spent the first six years of my career at PricewaterhouseCoopers LLP (2001-2007) focused on corporate tax matters for a broad array of clients in various industries.  I hold a Juris Doctorate from Georgetown University Law Center (2001) and received a bachelor's degree in Political Science from the California State University, Bakersfield (1998).   I have held several prominent roles at Mallinckrodt, including a three-year stint as Chief of Staff to the President and CEO of the company (2016-2019).   As Vice President, Corporate Transactions (2018-2019) and Vice President, Corporate Strategy (2019), I had responsibility for overseeing planning for the announced, but ultimately suspended, spin-off of the Specialty Generics business.  Shortly after announcing in August 2019 that we were suspending our plans to spin-off the business, I assumed my present role as Chief Transformation Officer and became accountable for overseeing the operations of the Specialty Generics business, in particular, while maintaining day-to-day responsibility for shepherding the Debtors' collective restructuring efforts.

4.      I am generally familiar with the Debtors' businesses, operations, financial matters, operating results, business plans, actual and projected cash flows, and underlying books and

records.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management, employees, and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

5.      On the date I am filing this Declaration (the "*Petition Date*"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware.

6.      I submit this Declaration to describe the Debtors' businesses and background, the circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these cases.  I also submit this Declaration in support of relief the Debtors have requested in certain of the "first day" applications and motions filed with the Court (collectively, the "*First Day Pleadings*").

7.      This Declaration is divided into four parts.  **Part I** describes the Debtors' business, organizational structure, and prepetition indebtedness.  **Part II** describes the circumstances leading to the commencement of these chapter 11 cases.  **Part III** describes the path forward that the Debtors have charted for these chapter 11 cases.  Finally, **Part IV** summarizes the First Day Pleadings and explains why the relief requested is appropriate and necessary.

## PRELIMINARY STATEMENT

8.      Mallinckrodt has a long and important history in the U.S. healthcare system.  Its story traces back to two brothers founding the chemical company G. Mallinckrodt & Co. in 1867 to supply local pharmacists with much-needed drugs.  The business has experienced many owners and evolved through a multitude of transactions over the years, with the current, standalone

3

Mallinckrodt enterprise coming into being in 2013 through a spin-off from Covidien plc ("*Covidien*") (which itself was later acquired by Medtronic plc). At the time of the spin-off, Mallinckrodt's business was focused primarily on generic pharmaceuticals and contrast media and nuclear medical imaging. Since then, Mallinckrodt has grown considerably, including through strategic acquisitions of branded pharmaceutical and device products and its own research and development, all inspired by its mission to be an innovation-driven biopharmaceutical company focused on improving outcomes for underserved patients with severe and critical conditions.

9.     That mission has many manifestations. For example, Specialty Brands' product INOmax (a nitric oxide gas for inhalation) is used to treat hypoxic respiratory failure in newborns, helping to increase oxygen levels in the blood and lowering the risk of permanent damage caused by low oxygen levels. Similarly, Specialty Brands' product Acthar Gel ("*Acthar*") is used in the treatment of infantile spasms, lupus, rheumatoid arthritis, and certain ophthalmic conditions such as uveitis, helping reduce the long-term effects associated those conditions and increasing a patient's quality of life.

10.     Most recently, Mallinckrodt has been directly engaged in the fight against COVID-19. First, Mallinckrodt is engaging with the U.S. Food and Drug Administration (the "*FDA*"), the National Institutes of Health, and the U.S. Biomedical Advanced Research and Development Authority ("*BARDA*") regarding the possible benefits of using INOmax in the treatment of COVID-19 associated lung complications. Second, Specialty Generics is the only U.S. producer of acetaminophen, which helps alleviate certain symptoms of COVID-19 and is in high demand in light of reported complications arising from the use of ibuprofen with COVID-19 patients. Third, in response to the increased demand for certain controlled substances used to treat COVID-19 patients, including for those requiring intubation and ventilation, the U.S. Drug

4

Enforcement Administration (the "**DEA**") has increased its aggregate production quota on certain molecules, temporarily increased inventory levels that companies can hold, and responded quickly to requests for increased opioid manufacturing and procurement quota to address the increased demand. Mallinckrodt manufactures many of these critical products, including fentanyl, hydromorphone, morphine, codeine and other controlled substance APIs, to meet the critical need.[2] As one of the largest domestic manufacturers of these products, Mallinckrodt plays a vital role in the pharmaceutical supply chain required to combat the pandemic; and it has adjusted its manufacturing plans to meet COVID-19 patient need and has taken smart, consistent steps to keep its workers safe and healthy and its plants productive. Fourth, in an embodiment of the company's collective mission, Mallinckrodt employees at the company's St. Louis plant took the initiative early in the pandemic to produce hand sanitizer given supply shortages and to date have donated approximately 16,000 gallons to governments and addiction treatment centers in 47 states.

11.    But now, enterprise-threatening litigation on multiple fronts has left Mallinckrodt with no choice but to seek to restructure the claims against it to survive and continue to produce the medications and therapies that help patients and a population in need. The Debtors commence these cases with a path to just that result—a restructuring transaction that will resolve all the major litigation against them while simultaneously deleveraging their capital structure by more than $1,000,000,000, all with the support of over 80 percent of their fulcrum class of noteholders, 50 attorneys general, representatives of more than 1,000 other plaintiffs in the nationwide opioid litigation against the Debtors, and the United States Department of Justice.

---

[2]    *See* Drug Enforcement Administration Headquarters, *DEA takes additional steps to allow increased production of controlled substances used in COVID-19 care*, Press Release (April 7, 2020), https://www.dea.gov/press-releases/2020/04/07/dea-takes-additional-steps-allow-increased-production-controlled.

*Specialty Generics' Opioid Liabilities*

12.     Certain Mallinckrodt entities, primarily associated with the Specialty Generics business, have been named in over 3,000 lawsuits stemming from the Debtors' production and sale of opioid medications.  Mallinckrodt believes it has strong defenses against these claims; but since 2017, the Debtors have burned through more than $100,000,000 defending these suits and spent $30,000,000 in cash and products to settle just two cases in October 2019.  Litigation expenses defending the opioid actions exceed a million dollars a week, which does not even include work associated with upcoming trials, as discussed further below.  Projected into the future, the cost of this litigation and resultant, growing drag on Mallinckrodt's ability to finance all of its businesses are staggering.

13.     While the opioid suits piled on, however, the Debtors did not sit idly by.  In February 2020, after many months of negotiation, the Debtors announced the principal terms of a comprehensive opioid settlement supported by more than forty Attorneys General representing states, Washington D.C., and three U.S. territories, and the court-appointed Plaintiffs' Executive Committee (as defined below) in the national opioid multi-district litigation.  In the time since that announcement, the Debtors, the Plaintiffs' Executive Committee, an ad hoc group of the Debtors' noteholders (the "***Unsecured Notes Ad Hoc Group***"), and each of their advisors have negotiated the final terms of the comprehensive opioid settlement (the "***Opioid Settlement***"), which are generally consistent with the principal terms announced in February 2020.  The Debtors also engaged with a proposed future claims representative and his team of advisors over several months and have been working to address his questions and feedback, with the hope of garnering his support during these cases.

6

14.     The Opioid Settlement will result in the creation of one or more trusts (the "***Opioid Trust***") for the benefit of opioid claimants, to be funded with (a) $1,600,000,000 in structured cash payments, with a prepayment option for the first year after emergence that could significantly accelerate funding if exercised by the Debtors, (b) warrants to acquire 19.99% of the public common stock of the Mallinckrodt group's ultimate parent, Debtor Mallinckrodt plc—a substantial opportunity for the plaintiffs to join in the benefits to all of Mallinckrodt's businesses from eliminating opioid-related overhang—and (c) certain other assets of the Debtors.  Any and all opioid-related claims against the Debtors or any of their affiliates are to be channeled to the Opioid Trust.  The Opioid Settlement also dramatically reduces future risks to the Debtors' opioid business by establishing certain agreed to go-forward parameters for the operation of Debtors' opioid business.

15.     The terms of the Opioid Settlement are included as part of a comprehensive restructuring support agreement, a copy of which is attached hereto as **Exhibit A** (the "***RSA***"). The RSA, which is discussed further below, is signed by the Debtors; unsecured noteholders holding more than 84 percent of the fulcrum unsecured notes class; 50 Attorneys General of states, Washington, D.C., and U.S. territories with respect to their opioid claims; and the members of the Plaintiffs' Executive Committee, who will recommend that the more than 1,000 plaintiffs they represent in the national multidistrict opioid litigation support the Opioid Settlement and the RSA.[3] This level of plaintiff support behind the RSA, against this particular backdrop of thousands of sprawling lawsuits by state and local governments, Native American tribal governments, insurers, hospital systems, and individuals, is noteworthy.

---

[3]   The opioid claimants that have executed the RSA as of the Petition Date are referred to herein as the "***Supporting Opioid Plaintiffs***."

16.     That backdrop also makes it critical that the Debtors be permitted to focus on this chapter 11 process and implement the Opioid Settlement contained in the RSA and that the Supporting Opioid Plaintiffs be relieved of the concern that other plaintiffs could "jump the line" by continuing to pursue their lawsuits.  Indeed, a race among plaintiffs to seek judgments against the Debtors would not only create costs and confusion, it would likely undo the entire RSA.  To that end, the Debtors shortly will be seeking injunctive relief from the Court staying all opioid-related litigation against any Mallinckrodt entity, including litigation by governmental units.

17.     When first agreed upon in February 2020, the Opioid Settlement contemplated a surgical, Specialty Generics-only chapter 11 filing.  After that time, however, the combination of adverse developments in Specialty Brands' litigations, the coronavirus pandemic, and difficulties in refinancing the Mallinckrodt's indebtedness reached a tipping point and changed the trajectory of the Debtors' strategic planning.

***Specialty Brands' Litigations***

18.     Specialty Brands faces its own challenges in the form of more than 25 material litigations and government investigations, which if not dealt with may result in both short-term severe financial implications and long-term changes in future revenue-generating capacity and market competition.  The most publicized of these are litigations with the U.S. government regarding Medicaid rebates for sales of Acthar.

19.     Acthar had been the subject of a rebate pricing dispute with the Centers for Medicare and Medicaid Services ("***CMS***") since 2016.  That dispute led Debtor Mallinckrodt ARD LLC ("***ARD***"), which sells Acthar in the United States, to file suit and seek a declaratory judgment that the rebates it had been paying the states under Medicaid in connection with sales of Acthar to Medicaid participants were in the correct amount.  In March 2020—just as Mallinckrodt had

8

publicly announced the opioid-related settlement and begun pursuing initial steps toward a surgical, Specialty Generics-only chapter 11 filing—the court issued a summary judgment ruling, the effect of which would be to establish an approximately $650,000,000 near-term liability, retroactively increasing back to 2013 the Medicaid rebates paid by ARD to state Medicaid programs.

20.     Shortly before that ruling, the United States Department of Justice (the "*DOJ*") had intervened in a *qui tam* action under the False Claims Act that was filed in 2018.  The premise of the suit is the same pricing dispute at issue in the CMS suit described above, but with the additional allegations that ARD was knowingly using an incorrect rebate calculation for Acthar.  The suit suffers from numerous factual and legal defects—but the risk is potentially huge because of the False Claims Act's provision for treble damages.  In addition, fourteen other Acthar related litigations collectively could result in more than $15 billion in alleged damages and penalties.

21.     Mallinckrodt believes each of these suits is premised on numerous frailties and timely appealed the March 2020 summary judgment ruling accordingly.  However, given the size of the potential risks associated with these litigations, Mallinckrodt determined to engage with the DOJ around settlement of both of the federal government cases described above (as well as other Acthar-related claims asserted by the federal government).

22.     With these mounting Acthar-related liabilities, Mallinckrodt began re-evaluating its go-forward strategic plan, its capital structure, and the viability of a Generics-only chapter 11 filing (as was initially contemplated) as a means to a healthy enterprise—and it seemed that the Debtors' creditors were doing the same.  Support for an intended new-money refinancing and exchange offer evaporated in March 2020, leading the Debtors to address an April 2020 maturity through a private exchange and repayment of more than $100,000,000 of unsecured notes in cash.

This swing alone, from new money in to extra cash out, represented a nearly $300,000,000 loss of projected liquidity from just a few weeks earlier.

23.    In light of these developments, and while the Debtors were negotiating with the DOJ, they also began discussions with the Unsecured Notes Ad Hoc Group, an ad hoc group of the Debtors' term loan lenders (the "***Term Loans Ad Hoc Group***"), an ad hoc group of the Debtors' revolving lenders (the "***Revolver Ad Hoc Group***"), and the administrative agent under the Debtors' credit facility (the "***Administrative Agent***").  After extensive diligence and negotiations over the course of several months, the Debtors and the Unsecured Notes Ad Hoc Group reached an agreement on the comprehensive restructuring set out in the RSA.  The RSA, as described in more detail herein, calls for reinstatement of the Debtors' secured debt and the issuance of new second lien notes and equity interests in reorganized Mallinckrodt to holders of the Debtors' fulcrum unsecured notes, in addition to incorporating the terms of the Opioid Settlement.  Importantly, the RSA contemplates that Specialty Brands and Specialty Generics will both continue to be owned and operated by the applicable Mallinckrodt Debtors and Non-Debtor Affiliates, so that they may continue to provide vital products and therapies for patients.

24.    While neither secured lender group is currently party to the RSA, it is critical to note that the Debtors have reached agreement with these parties on the terms of the Debtors' use of cash collateral during these chapter 11 cases.  Furthermore, the milestones contemplated by the cash collateral agreement will allow the Debtors ample time to continue to negotiate with the Term Loan Ad Hoc Group, the Revolver Ad Hoc Group, and the Administrative Agent around the treatment for claims arising under the Debtors' credit agreement and secured notes.

25.    In the midst of the ultimately-successful RSA negotiations, the Debtors accomplished yet another breakthrough:  they reached a settlement in principle with the DOJ to

resolve most of the government's pending Acthar-related claims, including without limitation the retroactive-rebates sought by CMS and the Acthar-related False Claims Act litigation. That settlement calls for payment of $260,000,000 over a period of seven years following the Debtors' emergence from chapter 11, the terms of which are reflected in an exhibit to the RSA.

26.    The careful balance struck by all these agreements forms a strong base on which the Debtors will build to their reorganization. With that foundation, the Debtors hope to begin the chapter 11 plan process swiftly and to direct these cases to even broader consensus. I believe that, based on the RSA, the Debtors' reorganization is likely to succeed. But first things first: in the opening days of this case, the Debtors aim to transition smoothly into operating in chapter 11, shore up the stay of litigation affecting their estates with a preliminary injunction from the Court,[4] and seek the setting of bar dates for claims other than opioid claims to facilitate refinement and finalization of the Debtors' restructuring plan.

## I.    BACKGROUND

### A.    History of the Debtors

27.    Mallinckrodt[5] was founded in 1867 in St. Louis, Missouri and, at the time, was the only chemical company west of Philadelphia. For more than 150 years, Mallinckrodt has been a leader in the fields of science and medicine. Today, the company sells a range of medical and pharmaceutical products critical to patient care, including rare disease treatments, immunotherapy products, acute care products, opioid and non-opioid pain treatment products like acetaminophen, and addiction treatment medications.

---

[4]    Certain of the Debtors also intend to commence recognition proceedings in respect of these chapter 11 cases in Canada, where additional litigation is pending against them.

[5]    Historical references to Mallinckrodt in this paragraph and the following paragraph do not refer specifically to any of the current legal entities of Mallinckrodt, including the Debtors, but rather to the business that has historically operated under the name.

28.     Mallinckrodt's history has been marked by social and civic responsibility.  In 1883, Mallinckrodt began offering its employees healthcare benefits.  During World War II, the United States Army called on Mallinckrodt to produce morphine for Allied troops in battle, and Mallinckrodt also played an important role processing uranium for the Manhattan Project.  When the Three Mile Island nuclear reactor experienced a partial meltdown in 1979, Mallinckrodt produced 250,000 doses of potassium iodide, a chemical that helps protect the body from radiation, at the request of the FDA.

29.     Even today, Mallinckrodt remains motivated by addressing unmet patient needs and being a socially responsible community partner, including through its charitable giving, addiction treatment medicines, employee matching gifts, volunteer programs, and corporate social responsibility goals.  Further, Mallinckrodt strives to make quality healthcare available to every patient who needs it, whether by advocating for policies that promote new drug discovery, removing barriers to treatment, or focusing on patient care.

**B.      The Debtors' Corporate Structure**

30.     The Debtors here are all subsidiaries of Debtor Mallinckrodt plc, which is a publicly-owned Irish entity, the shares of which are traded on the New York Stock Exchange under the ticker symbol MNK.  As described above, Mallinckrodt plc was formed in 2013 when the businesses constituting Mallinckrodt were spun off from Covidien.

31.     The subsidiaries of Mallinckrodt plc are divided into two business segments: (a) Specialty Brands and (b) Specialty Generics.  In these chapter 11 cases, the Debtors represent the U.S. and certain international assets and operations of Specialty Generics and Specialty Brands. Each of the two segments is, in its own right, a truly global business, with Specialty Brands developing, manufacturing, marketing, and distributing specialty pharmaceutical products and therapies focused on improving outcomes for underserved patients with severe and critical

12

conditions, and Specialty Generics developing, manufacturing and selling affordable complex generic and active pharmaceutical ingredient products to treat pain, substance abuse, and attention deficit hyperactivity disorder ("**ADHD**").

32.    The two businesses are fundamentally distinct and are operated accordingly.  The segments share limited corporate services and insurance coverage, are combined for U.S. tax reporting purposes (in returns filed by Debtor MEH, Inc.), and use some of the same physical facilities, all on documented, market-based terms.  But beyond these aspects, any other business overlap (such as common vendor relationships and the like) is *de minimis*.  Each of Specialty Brands and Specialty Generics has its own management team directing core decision-making and driving their respective successes, as well as separate boards of directors or managers (as applicable), including different independent board members for Mallinckrodt plc and for the Specialty Generics Debtors.

33.    A detailed organizational chart, including all the Debtors and Non-Debtor Affiliates, is attached hereto as **<u>Exhibit B</u>**. The following is a simplified version to depict the legal and operating structure as relevant to the Debtors:[6]

---

[6]    This simplified version is illustrative and does not purport to depict every legal entity or corporate relationship between entities.  The chart in **<u>Exhibit B</u>** is a complete and accurate version.



C.    **The Debtors' Business Operations**

1.    **Business Lines**

34.    As noted, Mallinckrodt is split into two separate businesses run by different sets of legal entities—Specialty Brands and Specialty Generics.  For the fiscal year ended December 27, 2019, Specialty Brands accounted for $2,423.8 million in net sales, while Specialty Generics accounted for $738.7 million.

a.    **Specialty Brands**

35.    Specialty Brands is owned and operated by the Debtors and certain foreign Non-Debtor Affiliates and focuses on autoimmune and rare diseases in specialty areas like neurology, rheumatology, nephrology, pulmonology and ophthalmology, as well as immunotherapy and neonatal respiratory critical care therapies and non-opioid analgesics. Specialty Brands promotes its branded products directly to physicians in their offices, hospitals,

and ambulatory surgical centers (including neurologists, rheumatologists, nephrologists, pulmonologists, ophthalmologists, neonatologists, surgeons and pharmacy directors) with its own direct sales force of approximately 300 sales representatives.

36.    Specialty Brands currently produces, markets, and sells the following branded products, among others:

- Acthar, an injectable drug approved by the FDA for use in 19 indications, including, among others, monotherapy for the treatment of infantile spasms in infants and children under 2 years of age; The currently approved indications of Acthar are not subject to patent or other exclusivity;

- INOmax, a vasodilator marketed as part of the INOmax Total Care Package, which includes the drug product, proprietary drug-delivery systems, technical and clinical assistance, 24/7/365 customer service, emergency supply and delivery and on-site training;

- Ofirmev, a proprietary intravenous formulation of acetaminophen;

- Therakos, a global leader in autologous immunotherapy delivered through extracorporeal photopheresis ("***ECP***"), provided by a proprietary medical device and related consumables, providing the only integrated ECP system in the world; and

- Amitiza, a global leader in the branded constipation market.

37.    Each of these branded products provides significant revenue to Specialty Brands:

| Specialty Brands Net Sales FY 2019 | |
| --- | --- |
| **Product** | **Net Sales (in millions)** |
| Acthar | $952.7 |
| INOmax | $571.4 |
| Ofirmev | $384.0 |
| Therakos | $246.9 |
| Amitiza | $208.5 |
| Other[7] | $60.3 |
| *Total* | *$2,423.8* |

38.    As with all pharmaceutical companies, Specialty Brands faces an increasingly competitive market.  As a result of a recent U.S. Court of Appeals decision upholding a lower

---

[7]    Other includes BioVectra, which was sold in November 2019.

court's decision to invalidate certain patents, Specialty Brands now faces direct competition for INOmax in the U.S. market.  Further, a competitor recently announced it was seeking approval from the FDA to reintroduce a direct competitor to the Debtor's most valuable product, Acthar.  The highly competitive environment of the Specialty Brands segment requires the Debtors to continually seek out new products to treat diseases and conditions in areas of high unmet medical need, to create technological innovations, and to market their products effectively.

### b.    Specialty Generics

39.    Specialty Generics offers a portfolio of over twenty specialty generic product families, most of which are controlled substances regulated by the DEA.  Altogether, Specialty Generics operates one of the largest controlled substance pharmaceutical businesses in the U.S., offering generic products for pain management, substance abuse disorders, and ADHD, as well as active pharmaceutical ingredients ("*APIs*").  Notably, it is the only producer of acetaminophen in the North American and European regions.

40.    Within Specialty Generics, the Debtors manufacture both (a) finished dosage products, meaning the product (whether in the form of a tablet, capsule, or liquid) that the patient ultimately receives, and (b) APIs, which are then used to create finished products.  Unlike Specialty Brands, Specialty Generics does not promote its finished products directly to physicians, hospitals, or ambulatory surgical centers.  Rather, the Debtors sell finished products primarily to distributors who subsequently sell the products to retail pharmacy chains, independent pharmacies, government entities, hospitals, hospice providers, and long-term care providers; while APIs, on the other hand, may be used by the Debtors themselves to manufacture their finished products or may be sold to other manufacturers for use in a variety of therapeutic areas.

41.     Specialty Generics' revenues are well-diversified, with roughly half of its revenue

coming from APIs, and the other half from finished dosage pharmaceutical products:

| Specialty Generics Net Sales FY 19 | |
| --- | --- |
| Product | Net Sales (in millions) |
| Hydrocodone (API) and hydrocodone-containing tablets | $76.3 |
| Oxycodone (API) and oxycodone-containing tablets | $74.9 |
| Acetaminophen (API) | $189.9 |
| Other Controlled Substances | $352.5 |
| Other | $45.1 |
| *Total* | *$738.7* |

42.     At a high level, for fiscal year 2019, the Debtors' hydrocodone and oxycodone

products (categories of opioids) accounted for approximately 20 percent of Specialty Generics'

total sales; Specialty Generics' other "Controlled Substances," including medication for ADHD,

treatments for addiction, and other controlled substances, accounted for approximately 48 percent

of Specialty Generics' total sales; acetaminophen accounted for approximately 26 percent of

Specialty Generics' total sales; and approximately 6 percent came from other products and contract

manufacturing operations.

## 2.     Research and Development

43.     The Debtors devote significant resources to research and development ("**R&D**").

The R&D group consists of a number of highly experienced, trained, and skilled individuals, nearly

35 percent of whom hold either Ph.D., Pharm.D., or M.D. degrees.

### a.     Specialty Brands

44.     Specialty Brands' R&D investments center on building a diverse, durable portfolio

of innovative therapies that provide value to patients, physicians and payers.  This strategy focuses

on growth, including pipeline opportunities related to early- and late-stage development products

to meet the needs of underserved patient populations, where the Specialty Brands Debtors execute

17

on the development process and perform clinical trials to support regulatory approval of new products.

45.     Within Specialty Brands' robust pipeline are innovative products that, if approved, will give more patients suffering from difficult-to-treat and often overlooked conditions better treatment options.  This includes terlipressin, one of two treatments being developed for patients suffering from advanced liver disease.  Terlipressin is used to treat hepatorenal syndrome type 1 ("*HRS-1*"), an acute, rare and life threatening condition requiring hospitalization, with no currently approved therapy in the U.S. or Canada.  Expectations for a 2020 launch of terlipressin were set back on September 12, 2020, when the FDA issued the company a Complete Response Letter ("*CRL*") regarding the New Drug Application ("*NDA*") seeking approval for the product.  The CRL stated that, based on available data, the FDA could not approve the terlipressin NDA in its submitted form and requires more information to support a positive risk-benefit profile for patients with HRS-1.  Setbacks like this are common in the industry but highlight the challenges of the drug development process:  the Specialty Brands R&D team will meet with the FDA in the near future to further discuss the clinical data and determine an appropriate path forward.  The pipeline also includes StrataGraft®, an investigative regenerative skin tissue therapy developed as a biologic and in partnership with BARDA through Project BioShield, that is used for the treatment of severe burns and may reduce the need for autografting in certain patients.  StrataGraft is among the first products to be designated as a Regenerative Medicine Advanced Therapy by the FDA under the provisions of the 21st Century Cures Act, and in August the FDA accepted our Biologics License Application ("*BLA*") for review.  The Debtors are also developing Adrabetadex for Niemann-Pick Type C disease, a high mortality rare disease affecting children and adolescents; and, as previously mentioned, exploring the potential use of INOmax as a treatment for pulmonary

complications in COVID-19 patients.  Mallinckrodt also holds an equity investment in Silence Therapeutics as part of a collaboration to develop and commercialize novel RNA interference (RNAi) therapeutics for the treatment of serious diseases, including autoimmune diseases.

46.     Specialty Brands' significant investment in R&D is paving the way for the future of the business, with multiple products in various stages of development, which the Debtors believe will provide long-term organic growth and diversification.

### b.      Specialty Generics

47.     Specialty Generics' R&D objective is to use their proven development, formulation, and material characterization capabilities to develop hard-to-manufacture complex generic pharmaceuticals with difficult-to-replicate characteristics, such as their release, absorption, or metabolism profiles (among other things).  In particular, the Debtors are developing a number of non-opioid and non-controlled complex generic pharmaceutical products, some of which will take advantage of their API and drug product manufacturing capabilities.

### 3.      Regulatory Matters

48.     As are all manufacturers of controlled substances, pharmaceutical products, and medical devices, the Debtors are subject to regulatory oversight by numerous governmental entities around the world.  In the U.S., the Debtors must comply with laws, regulations, guidance documents and standards promulgated by the FDA, the Department of Health and Human Services, the DEA, the Environmental Protection Agency, the Customs Service, and state boards of pharmacy.  In particular, the Debtors interact with the FDA and DEA on a regular basis in connection with, among other things, new drug applications, biologics license applications, 510(k) applications, abbreviated new drug applications, monitoring of production facilities, and the DEA quota necessary to manufacture certain controlled substances.  The Debtors also interact with state

agencies regarding their manufacturing and selling of controlled substances.  These relationships are discussed further below.

49.     Outside the U.S., the Debtors must comply with laws, guidelines and standards promulgated by other regulatory authorities that regulate the development, testing, manufacturing, distribution, marketing and selling of pharmaceuticals and medical devices, including, but not limited to, Health Canada, the Medicines and Healthcare Products Regulatory Agency in the U.K., the Irish Medicines Board, the European Medicines Agency, and member states of the E.U. Although international harmonization efforts continue, many laws, guidelines and standards differ by region or country.

### 4.      Facilities

50.     Mallinckrodt is a global enterprise, and the Debtors and Non-Debtor Affiliates have facilities in Ireland, the United Kingdom, the United States, and Japan.  Specifically, the Debtors own the facility that houses their global enterprise headquarters in Dublin, Ireland.  This facility also operates as a state-of-the-art manufacturing and R&D facility, which houses the Specialty Brands global external manufacturing operations where the Debtors manufacture Acthar and conduct R&D for biologics and medical device engineering, including the next generation of INOmax products.

51.     Within the U.S., the Specialty Brands Debtors own one production facility in Port Allen, Louisiana, and lease another production facility in Madison, Wisconsin.  The Specialty

Brands principal U.S. office is located in leased offices in Bedminster Township, New Jersey,[8]

and many of its corporate and administrative functions are located in Hazelwood, Missouri.[9]

52.     The Specialty Generics Debtors own four production facilities located in St. Louis,

Missouri; Raleigh, North Carolina; Greenville, Illinois; and Hobart, New York.   Specialty

Generics also leases a multipurpose commercial production facility and pilot plant in Webster

Groves, Missouri, which also serves as the principal U.S. office of Specialty Generics and houses

its R&D operations.  In 2018, the facility was converted for use as both a pilot and manufacturing

facility, which can manufacture commercial quantities of product in small batch sizes.

### 5.     Employees

53.     The Debtors employ 2,870 people in the United States in support of the Specialty

Brands and Specialty Generics businesses.  The Debtors also employ approximately 130 people

outside of the U.S., with Debtor Mallinckrodt Pharmaceuticals Ireland Limited as the statutory

employer in Ireland, and Debtors Mallinckrodt Pharmaceuticals Limited, Mallinckrodt Group

S.a.r.l., and Mallinckrodt Group S.a.r.l. Luxembourg (LU), Zweigniederlassung Neuhausen am

Rheinfall Branch serving as statutory employers in the United Kingdom, Luxembourg, and

Switzerland, respectively.  Within the U.S., Debtor ST Shared Services LLC serves as the statutory

employer for approximately 1,290 people working in Specialty Brands across the Specialty Brands

principal U.S. office, certain shared facilities with Specialty Generics, and two production

facilities.  Enterprises serves as the statutory employer for approximately 1,580 people working in

Specialty Generics across the Specialty Generics combined principal U.S. office and R&D facility,

---

[8]     Enterprises, part of Specialty Generics, leases the Bedminster Township office space from a third party, but
        Specialty Brands reimburses Enterprises for the rent and occupies the facility.

[9]     Debtor Mallinckrodt LLC, part of Specialty Generics, owns the corporate shared services facility in Hazelwood,
        Missouri.  Specialty Brands, through Debtor ST Shared Services LLC, leases the relevant space from Mallinckrodt
        LLC under an arms-length, negotiated and documented lease agreement.

and four other production facilities. Approximately 300 employees in Specialty Generics are members of collective bargaining units, and no employees in Specialty Brands are members of collective bargaining units.

54.    As with most large, global enterprises, the Debtors have derived efficiencies and cost savings through the shared services utilized by multiple Debtors and Non-Debtor Affiliates. These shared services are charged to Debtors and Non-Debtor Affiliates in the ordinary course based on allocation methodologies depending on the functional area and, in certain instances, governed by formal agreements. For example, in the ordinary course, Debtor ST Shared Services LLC and Mallinckrodt PLC, charge a quarterly fee for services provided on behalf of Debtor and Non-Debtor affiliates. Furthermore, certain costs incurred by Debtors are allocated and charged to affiliate entities. For instance, Debtors ST Shared Services LLC, SpecGx, Enterprises, and MEH, Inc. provide certain corporate and operational services to each other and other Debtors pursuant to a shared services agreement.

**D.    The Debtors' Prepetition Capital Structure**

55.    As of the Petition Date, the Debtors had funded debt outstanding of approximately $5.283 billion. The following table summarizes the Debtors' prepetition indebtedness and capital structure:

| Governing Document | Facility/Issuance | Borrower/Issuer | Outstanding Principal as of the Petition Date |
|---|---|---|---|
| Credit Agreement | Revolving Credit Facility maturing February 2022 | Mallinckrodt CB LLC  Mallinckrodt International Finance S.A. | $900,000,000.00 |
| | Term Loan due September 2024 | | $1,505,211,683.76 |
| | Term Loan due February 2025 | | $399,488,946.81 |
| 2020 First Lien Notes Indenture | 10.000%% First Lien Senior Secured Notes due April 2025 | Mallinckrodt CB LLC  Mallinckrodt International Finance S.A. | $495,032,000.00 |

22

| Governing Document | Facility/Issuance | Borrower/Issuer | Outstanding Principal as of the Petition Date |
|---|---|---|---|
| 2019 Second Lien Notes Indenture | 10.000% Second Lien Senior Secured Notes due April 2025 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $322,868,000.00 |
| 2013 Indenture | 4.750% Senior Notes due April 2023 | Mallinckrodt International Finance S.A. | $133,657,000.00 |
| 2014 Indenture | 5.75% Senior Notes due August 2022 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $610,304,000.00 |
| 2015 Indenture | 5.500% Senior Notes due April 2025 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $387,207,000.00 |
| 5.625% Senior Notes Indenture | 5.625% Senior Notes due October 2023 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $514,673,000.00 |
| Legacy Debentures Indenture | 9.50% Debentures due May 2022 | Ludlow LLC | $10,388,000.00 |
| | 8.00% Debentures due March 2023 | Ludlow LLC | $4,450,000.00 |

## 1. *Revolving Credit Facility and Term Loans*

56.     Debtor Mallinckrodt plc, as parent, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as borrowers, Deutsche Bank AG New York Branch, as administrative agent (the "***Agent***"), and the lenders party thereto (the "***Secured Lenders***" and, together with the Agent, the "***First Lien Secured Parties***"), are parties to that certain Credit Agreement, dated as of March 19, 2014, as amended by Incremental Assumption Agreement No. 1, dated August 14, 2014, Refinancing Amendment No. 1 and Incremental Assumption Agreement No. 2, dated August 28, 2015, Refinancing Amendment No. 2 and Incremental Assumption Agreement No. 3, dated February 28, 2017, and Incremental Assumption Agreement no. 4, dated February 13, 2018, and Amendment, dated as of February 21, 2018 (as further modified, amended,

or supplemented from time to time, the "***Credit Agreement***"). The Credit Agreement provides three separate credit facilities: (a) a revolving credit facility maturing in 2022, (b) a term loan due 2024, and (c) a term loan due 2025. As of the Petition Date, the aggregate outstanding principal of (a) the revolving credit facility was $900,000,000.00, (b) the term loan due 2024 was $1,505,211,683.76, and (c) the term loan due 2025 was $399,488,946.81.

57.    In connection with the Credit Agreement, each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided an unconditional guaranty of all obligations under the Credit Agreement, and entered into security documents providing for first-priority liens on substantially all assets, including all accounts, chattel paper, cash and deposit accounts, documents, equipment, fixtures, general intangibles (including, without limitation, all intellectual property), instruments, inventory, investment property, letters of credit and letter of credit rights, commercial tort claims, books and records, customer lists, credit files, programs, printouts and other computer materials and records pertaining to foregoing, as well as all proceeds, supporting obligations and products of any and all of the foregoing.

### 2.    *2020 First Lien Notes*

58.    In connection with a private exchange for Mallinckrodt's then-outstanding unsecured notes due April 2020 consummated in April 2020 (the "***2020 Private Exchange***"), Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $495,032,000 in aggregate principal amount of 10.000% First Lien Senior Secured Notes due 2025 pursuant to that certain Indenture, dated as of April 7, 2020 (as modified, amended, or supplemented from time to time, the "***First Lien Notes Indenture***"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, Wilmington Savings Fund Society, FSB, as trustee (the "***First Lien Trustee***"), and Deutsche Bank

AG New York Branch, as collateral agent.  The 2020 Private Exchange resulted in the exchange of approximately $495 million of the 4.875% Senior Notes due 2020 for approximately $495 million of new 10.00% First Lien Senior Secured Notes due 2025.

59.    In connection with the First Lien Notes Indenture, each of the Debtors (other than Mallinckrodt Holdings GmbH, Mallinckrodt Group S.à r.l., and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided an unconditional guaranty of all obligations under the First Lien Notes Indenture and entered into security documents providing for first-priority liens on substantially the same collateral as secures the obligations under the Credit Agreement.  As of the Petition Date, the aggregate outstanding principal of the 10.000% First Lien Senior Secured Notes due 2025 was $495,032,000.00.

### 3.    *2019 Second Lien Notes*

60.    In connection with an exchange offer for Mallinckrodt's outstanding unsecured notes consummated in December 2019 (the "***2019 Exchange Offer***"), Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $322,868,000.00 in aggregate principal amount of 10.000% Second Lien Senior Secured Notes due 2025 pursuant to that certain Indenture, dated as of December 6, 2019 (as modified, amended, or supplemented from time to time, the "***Second Lien Notes Indenture***"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Wilmington Savings Fund Society, FSB, as trustee (the "***Second Lien Trustee***") and collateral agent.  The 2019 Exchange Offer resulted in the exchange of $83.2 million of the 4.875% Senior Notes due 2020, $52.9 million of the 5.75% Senior Notes due 2022, $216.4 million of the 4.750% Senior Notes due 2023, $144.7 million of the 5.625% Senior Notes due 2023, and $208.9 million of the 5.500% Senior Notes due 2025 for $322.9 million of 10.000% Second Lien Senior Secured Notes due 2025.

61.     In connection with the Second Lien Notes Indenture, each of the Debtors (other than Mallinckrodt Holdings GmbH, Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided an unconditional guaranty of all obligations under the Second Lien Notes Indenture and entered into security documents providing for second-priority liens on substantially the same collateral as secures the obligations under the Credit Agreement.  As of the Petition Date, the aggregate outstanding principal of the 10.000% Second Lien Senior Secured Notes due 2025 was $322,868,000.00.

### 4.     *2013 Indenture*

62.     In April 2013, Debtor Mallinckrodt International Finance S.A. issued (a) $300,000,000.00 in aggregate principal amount of 3.500% Senior Notes due 2018, which, for the avoidance of doubt, have been fully redeemed, and (b) $600,000,000.00 in aggregate principal amount of 4.750% Senior Notes due 2023 pursuant to that certain Indenture, dated as of April 11, 2013, as amended by that certain Supplemental Indenture, dated as of June 28, 2013 (as further modified, amended, or supplemented from time to time, the "*2013 Indenture*") by and among Mallinckrodt International Finance S.A., as issuer, Debtor Mallinckrodt plc (in replacement of Covidien International Finance S.A.), as guarantor, and Deutsche Bank Trust Company Americas, as trustee.  No other Debtors are guarantors of the 4.750% Senior Notes due 2023.  As of the Petition Date, the aggregate outstanding principal of the 4.750% Senior Notes due 2023 was $133,657,000.00.

### 5.     *2014 Indenture*

63.     In August 2014, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $900,000,000 in aggregate principal amount of 5.75% Senior Notes due 2022 pursuant to that certain Indenture, dated as of August 13, 2014 (as modified, amended, or supplemented from time to time, the "*2014 Indenture*"), by and among Mallinckrodt International

26

Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Deutsche Bank Trust Company Americas, as trustee.  Each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided, jointly and severally, on an unsecured, unsubordinated basis, a guaranty of all obligations under the 2014 Indenture.  As of the Petition Date, 2020, the aggregate outstanding principal of the 5.75% Senior Notes due 2022 was $610,304,000.00.

### 6.    *2015 Indenture*

64.    In April 2015, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued (a) $700,000,000 in aggregate principal amount of 4.875% Senior Notes due 2020 and (b) $700,000,000 in aggregate principal amount of 5.500% Senior Notes due 2025 pursuant to that certain Indenture, dated as of April 15, 2015 (as modified, amended, or supplemented from time to time, the "***2015 Indenture***"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Deutsche Bank Trust Company Americas, as trustee.  Each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided, jointly and severally, on an unsecured, unsubordinated basis, a guaranty of all obligations under the 2015 Indenture.  As part of the 2019 Exchange Offer and the 2020 Private Exchange, the 4.875% Senior Notes due 2020 were exchanged for 2019 Second Lien Notes, 2020 First Lien Notes, or paid in full, and as a result there are no outstanding 4.875% Senior Notes due 2020.  As of the Petition Date, the aggregate outstanding principal of the 5.500% Senior Notes due 2025 was $387,207,000.00.

### 7.    *5.625% Senior Notes Indenture*

65.    In September 2015, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $750,000,000 in aggregate principal amount of 5.625% Senior Notes

due 2023 pursuant to that certain Indenture, dated as of September 24, 2015 (as modified, amended, or supplemented from time to time, the "*5.625% Senior Notes Indenture*"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Deutsche Bank Trust Company Americas, as trustee.  Each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided, jointly and severally, on an unsecured, unsubordinated basis, a guaranty of all obligations under the 5.625% Senior Notes Indenture.  As of the Petition Date, the aggregate outstanding principal of the 5.625% Senior Notes due 2023 was $514,673,000.00.

### 8.    *Legacy Debentures*

66.    In April 1992, Tyco Laboratories, a predecessor to Debtor Ludlow LLC issued $200,000,000 in aggregate principal amount of 9.50% Debentures due 2022 pursuant to that certain Indenture, dated as of April 30, 1992 (as modified, amended, or supplemented from time to time, the "*Legacy Debentures Indenture*"), with Security Pacific National Trust Company (New York), as trustee, and that certain First Supplemental Indenture, also dated April 30, 1992, with Security Pacific National Trust Company (New York).  As of the Petition Date, the aggregate outstanding principal of the 9.50% Debentures due May 2022 was $10,388,000.00.

67.    In March 1993, the same predecessor to Debtor Ludlow LLC issued $50,000,000.00 in aggregate principal amount of 8.00% Debentures due 2023 pursuant to the Legacy Debentures Indenture and a Second Supplemental Indenture, dated as of March 8, 1993, with BankAmerica National Trust Company (successor by merger to Security Pacific National Trust Company (New York)), as trustee.  As of the Petition Date, the aggregate outstanding principal of the 8.00% Debentures due March 2023 was $4,450,000.00.

## II.   EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

68.    The Debtors commence this chapter 11 proceeding following a years-long onslaught of litigation regarding Specialty Generics' production and sale of opioid medications, as well as more than 25 litigations and government investigations involving Specialty Brands.  The Debtors believe they have meritorious defenses to these claims, but given the extreme cost, risk, and uncertainty of litigating thousands of cases across the country, the Debtors must now seek bankruptcy protection to address runaway costs, eliminate the uncertainty associated to these cases, and prevent a proverbial race to the courthouse that would come at the expense of all the Debtors' stakeholders.

### A.   Opioid Medications & DEA-Regulated Supply Chain

69.    For decades, health care providers have trusted opioid medications to treat patients with long-term cancer pain, debilitating chronic pain, acute pain after injury or surgery, and end-of-life pain management.   These medications are well-known for providing relief from excruciating pain and are recognized by health care providers as a necessary component of modern healthcare.  However, opioid medications also carry significant risks that are well-documented and well-known—and have been for decades.  Responsible health care providers are required to use their expertise to carefully balance these known risks against the pain-relieving benefits and closely evaluate each individual patient's history and circumstances before writing an opioid prescription.  Indeed, the FDA, throughout the opioid crisis, has stood by its determination that therapeutic benefits of approved opioid products, including each of Mallinckrodt's opioid products, outweigh their risks.  As recently as May 2019, the Commissioner of the FDA affirmed the FDA's view that opioids are an important and effective pain treatment option, including for chronic pain.

70.    Once any opioid product, including a Mallinckrodt opioid product, is approved by the FDA, it is closely regulated by the DEA pursuant to the Controlled Substances Act ("***CSA***").[10] Every year the DEA determines how much opioid product is necessary to meet legitimate medical, scientific, research, industrial, and export needs of the U.S.—known as the "aggregate production quota"—and then allocates specific manufacturing and raw material procurement quotas to each manufacturer (like SpecGx), determining the amount of opioids that manufacturer can produce. Mallinckrodt has consistently strived to be a model producer within this ecosystem and believes its current and historical order-monitoring and security practices to be rigorous and effective.

71.    SpecGx sells its finished dosage opioid products only to entities specifically licensed by the DEA, primarily pharmaceutical distributors and national distribution centers for retail chain pharmacies. Often, those shipments go directly to a distributor's national distribution center, which then forwards the product to one of its regional distribution centers. From there, the regional distribution center sells the product to pharmacies and other dispensing entities. Although SpecGx sells certain addiction treatment products directly to addiction treatment clinics, it does not sell opioid products to independent pharmacies, physicians, or patients.

### B.    SpecGx's Generic Opioid Products

72.    As described above, SpecGx primarily manufactures and sells ***generic*** opioid dosage products, including oxycodone, hydrocodone, oxymorphone, hydromorphone, methadone, fentanyl, and morphine. Of all of its opioid sales, 99.9 percent (by volume) are generic products.[11]

---

[10]    The CSA places various drugs and chemicals (like narcotics and stimulants) into Schedules I-V, based on the substance's medical use, potential for abuse, and safety or dependence liability. For instance, Schedule I substances have no accepted medical use in the U.S. and cannot be made available to the public even under a prescription. Schedule II-V substances, on the other hand, have recognized medical uses and may be manufactured, distributed and used in accordance with the CSA and its implementing regulations.

[11]    The branded opioid products historically promoted by the Debtors were Magnacet (2007-2009), Exalgo (2010-2014), and Xartemis (2014-2015), which collectively constituted only a tiny sliver—no more than 0.03 percent—

Importantly, generic medication is not prescribed with any specific manufacturer's product in mind; rather, physicians write a prescription for the active ingredient (*e.g.*, oxycodone 15MG) without specifying the manufacturer, and pharmacies fill the prescription with the applicable generic product that happens to be on their shelves. As a result, unlike the manufacturers of branded pharmaceuticals, SpecGx does not have a field sales force promoting its generic products. Instead, it competes for customers primarily on price and reliability of supply.

### C.    Mallinckrodt Has Long Been a Committed Leader in the Fight Against Opioid Abuse and Diversion

73.    As noted, the Debtors have consistently maintained an industry-leading anti-diversion program. That program has at its foundation a suspicious order monitoring program led by Specialty Generics' controlled substance compliance group in coordination with legal and other regulatory compliance groups, which assesses incoming orders from customers and includes a wide range of controls and safeguards. Notably, this comprehensive cross-disciplinary approach has won Mallinckrodt praise from the DEA. After auditing the Debtors' facility in 2009, a DEA Diversion Investigator in New York was "content and impressed" with Mallinckrodt's suspicious order monitoring program. In 2010, a DEA Diversion Program Manager declared that the Debtors' program was "the best" he had seen to date and "what he expected from Mallinckrodt as an industry leader."

74.    The Debtors also take great pride in their close partnership with law enforcement to combat opioid abuse and promote safer communities across the U.S., and have sponsored drug take-back programs designed to collect unused medications so that they cannot be diverted and used illegally. In addition, the Debtors have purchased and donated over two million drug

---

of the national opioid market. These products were exclusively sold by Debtors Mallinckrodt LLC and SpecGx LLC and are no longer promoted or sold by them or any Debtor.

deactivation pouches to community groups, law enforcement, schools, patients, and families across the U.S.  Furthermore, the Debtors also support active diversion investigations, assisting police and investigators in catching wrongdoers and holding them accountable.  These efforts include providing testimony and affidavits in connection with prosecutions of those accused of diverting opioid products, among other things.

### D. Thousands of Lawsuits Have Been Filed Across the Country in Connection with SpecGx's Production and Sale of Opioid Products

75.     The nation remains in the midst of an illicit opioid abuse and overdose crisis.  For almost a decade, the number of opioid prescriptions has consistently decreased; but the number of overdoses caused by opioids has increased, due to more frequent use of illicit opioids like heroin, fentanyl, and deadly carfentanil, often imported from China and Mexico.  Local governments have struggled to respond to the growing threat of illicit opioids, and as communities suffer, political pressure to cast blame has increased.  Against this backdrop, Mallinckrodt—through Mallinckrodt LLC and SpecGx—has become an outsized target.

76.     Over the last three years, certain of the Debtors and their ultimate parent Debtor Mallinckrodt plc have been dragged into an all-consuming tidal wave of litigation concerning the production and sales of its opioid products.  The numbers are staggering: 3,034 cases in 50 states and Puerto Rico filed against the Debtors, with 2,785 cases in federal court and 249 cases in state court as of October 7, 2020. The federal cases have been, and continue to be, largely consolidated into a multi-district litigation in Cleveland, Ohio—*In re National Opioid Litigation,* MDL No. 2804 (the "***MDL***").  But the cases in state court have proliferated and progressed with alarming speed, as depicted in the graphic below.  State court judges have set various schedules for litigating different causes of action involving different discovery and different plaintiffs.  As a result, Mallinckrodt is fighting lawsuits in 136 different state courts, with 8 trial dates currently scheduled

or expected to begin in the next year in state or federal forums.  The barrage of litigation continues weekly with no end in sight.



77.    Although the plaintiffs and claims vary across lawsuits, two common theories run through the majority of plaintiffs' complaints.  First, plaintiffs allege that the Debtors, along with other opioid manufacturers, engaged in misleading marketing that overstated the benefits of opioid products and understated their risks.  Plaintiffs claim that manufacturers' allegedly misleading marketing caused health care providers to prescribe opioids inappropriately, increasing addiction, misuse, and abuse.   Second, plaintiffs allege that the Debtors, along with other opioid manufacturers and distributors, did not comply with their suspicious order monitoring obligations under federal and state law.  Plaintiffs claim that, as a result, manufacturers, distributors, and pharmacies flooded the market with opioids, increasing diversion of opioid products and thus increasing addiction, misuse, and abuse.

78.    Plaintiffs bringing the lawsuits include U.S. states, counties, cities, towns and other governmental persons or entities, Native American tribes, third-party payers, hospitals, health

systems, unions, health and welfare funds, individuals, and others.  The lawsuits assert a variety of claims, including, but not limited to, public nuisance, negligence, civil conspiracy, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act or similar state laws, violations of state Controlled Substances Acts or state False Claims Acts, product liability, consumer fraud, unfair or deceptive trade practices, false advertising, insurance fraud, unjust enrichment and other common law and statutory claims arising from the manufacturing, distribution, marketing and promotion of opioids.  Generally, the plaintiffs seek restitution, damages, abatement, injunctive and other relief, and attorneys' fees and costs.

79.    In addition to certain Specialty Generics Debtors, the Debtors' ultimate corporate parent, Debtor Mallinckrodt plc, is a named defendant in the majority of these cases, and certain other Debtors are also named defendants in various lawsuits.  Based on Mallinckrodt's understanding of the suits, the theories of liability asserted against Mallinckrodt plc and these other named Debtors include "alter ego," agency, and other forms of vicarious liability.

80.    To date, Mallinckrodt's motions to dismiss, like those of other opioid manufacturers, have generally been unsuccessful.  Mallinckrodt has filed approximately 93 motions to dismiss (or similar dispositive motions):  approximately 41 of those motions have been denied (in whole or in part); 6 have been granted; and the remainder are pending.  A few courts have recognized that the plaintiffs' claims are legally deficient on the face of the complaint, but most have allowed claims to proceed to further, burdensome stages of litigation.

81.    In addition to the onslaught of civil lawsuits, the number of federal and state investigations of Mallinckrodt also continues to grow.  The company has received and responded to investigative subpoenas from the DOJ Consumer Protection Branch; the U.S. Attorney's Office for the Eastern District of New York; eleven state attorneys general, including one acting on behalf

RLF1 24138532v.2

of a multistate coalition; the New York State Department of Financial Services, and two state Boards of Pharmacy.  It has also responded to two Congressional inquiries and a number of third-party subpoenas.

82.     The Debtors have raised many strong defenses to the opioid plaintiffs' claims.  In addition to the specific legal shortcomings of plaintiffs' theories, the fundamental facts of SpecGx's business support their defense.[12]  First and foremost, SpecGx did not promote its generic products to doctors at all—much less in a misleading fashion.  SpecGx is a provider of low-cost, **generic** opioid medications.  SpecGx does not market or promote its products to physicians, other prescribers, patients, or the public and does not have a field sales force.  Instead, it competes for customers (pharmaceutical distributors, wholesalers, and chain pharmacies—not patients or physicians) based on price, quality, and reliability of supply, and not on brand recognition.  Furthermore, SpecGx only produces the amount of opioid product that the DEA grants it quota to produce, sells prescription opioids only to customers registered with the DEA, and reports each and every sale of relevant prescription opioids to the DEA.  Finally, Debtors have been and continue to be industry leaders in the effort to detect and prevent the diversion, misuse, and abuse of opioids.  But despite the Debtors' strong defenses, the vast costs of litigating these suits in hundreds of state and federal courts over decades to come is simply not sustainable.

83.     At this point, it has become impossible to withstand the legal expense of the tidal wave of lawsuits and investigations.  Though Mallinckrodt was able to reach a settlement agreement with the two plaintiffs in an early bellwether trial in late 2019, at least 8 cases are proceeding towards trial dates in 2020 and 2021—and thousands more promise to follow.  Each

---

[12]   The defenses described in this paragraph highlight certain of the Debtors' defenses, but is not a complete list of defenses available to or asserted by the Debtors in these lawsuits.

day, more state cases enter active discovery, requiring the collection, review, and production of millions of documents, dozens of employee depositions, and the retention of numerous expert witnesses. While Mallinckrodt believes strongly in its defenses, its ability to withstand the sheer onslaught of cases has reached an end.

### E.   Specialty Brands' Litigations

#### 1.   *Acthar-Related Litigations*

84.   On the Specialty Brands side, the Debtors are faced with more than 25 litigations and government investigations, which combined expose the Debtors to over $15 billion in alleged potential damages. The majority of these litigations are related to Acthar, and of that group, among the most publicized cases are the declaratory judgement action in the United States District Court for the District of Columbia (now on appeal to the United States Court of Appeals for the District of Columbia Circuit) and the False Claims Act action in the United States District Court for the District of Massachusetts based on the same fact pattern but asserting treble damages, which could be crippling to the Debtors.

85.   These two actions regard the calculation of rebates that the Debtors pay to state Medicaid programs. Since 2016, ARD and CMS have been in a dispute regarding the appropriate base date Average Manufacturer Price (a "***Base Date AMP***") for Acthar, which is used in the calculation of rebates. In 2016, CMS notified ARD that it believed Acthar was not eligible for the Base Date AMP in use since 2013, which CMS had previously approved in connection with Acthar's use in treating infantile spasms. In May 2019, CMS notified ARD that unless it updated the Base Date AMP for Acthar within 14 days, it would be declared "out of compliance" with the Drug Data Reporting for Medicaid system, forcing ARD to file a complaint in the United States District Court for the District of Columbia seeking injunctive relief and a determination that CMS'

new position was unlawful (the "**CMS Action**"). That suit led ultimately to a summary judgment against ARD in March 2020, which ARD timely appealed.

86. Further, in March 2020, the DOJ intervened in a *qui tam* lawsuit under the False Claims Act filed in 2018 against ARD in the United States District Court for the District of Massachusetts (the "**FCA Action**"),[13] accusing Mallinckrodt of **knowingly** using an incorrect Base Date AMP for Acthar. Mallinckrodt disputes the DOJ's allegations and believes it has strong defenses, but because of the False Claims Act's provision for treble punitive damages, the Debtors are exposed to a potential judgment that could result in more than $1.9 billion in liabilities.

### 2. *Other Litigations*

87. In addition to the CMS Action and the FCA Action, the Debtors are involved in an additional False Claims Act litigation, multiple putative class actions, private actions, and securities litigations, including:

- ARD is a defendant in another *qui tam* False Claims Act litigation in the Eastern District of Pennsylvania, in which the DOJ has intervened, relating to Acthar payments made through charitable foundations;[14]

- ARD is a defendant in multiple private actions and putative class actions brought on behalf of public and private payers related to the pricing of Acthar. The plaintiffs in these cases allege, among other things, that ARD engaged in (a) anti-competitive acts, (b) violations of consumer protection laws and unfair trade practices, and (c) unjust enrichment;[15] and

---

[13] The FCA Action is *United States of America et al. ex rel. Landolt v. Mallinckrodt Pharmaceuticals Inc*., No. 18-11931-PBS (D. Mass.).

[14] This case is *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC*, Case No. 12-175-BMS (E.D. Penn.)

[15] These cases are *City of Rockford v. Mallinckrodt ARD, Inc., et al.*(N.D. of IL); *MSP Recovery Claims, Series II, LLC, et al. v. Mallinckrodt ARD, Inc., et al.* (N.D. of IL); *Humana Inc. v. Mallinckrodt ARD LLC, et al.* (C.D. of CA); *Acument Global Technologies, Inc., v. Mallinckrodt ARD Inc., et al.* (TN State Court); *Int'l Union of Operating Engineers Local 542 v. Mallinckrodt ARD Inc., et al.* (PA State Court); *United Association of Plumbers & Pipefitters Local 322 Of Southern New Jersey v. Mallinckrodt ARD, LLC, et al.* (D. of NJ); *Steamfitters Local Union No. 420 v. Mallinckrodt ARD, LLC, et al.* (E.D. of PA); and *City of Marietta v. Mallinckrodt ARC LLC* (N.D. of GA).

- Mallinckrodt plc is a defendant in multiple securities class actions and derivative litigations alleging, among other things, false and misleading statements related to Acthar.[16]

## III.    ANTICIPATED RESTRUCTURING AND LOOKING AHEAD

### A.    Opioid Settlement Negotiations and Summary of Terms

88.    Mallinckrodt has taken an active role in settlement discussions in the opioid cases. For more than two years, it has engaged in settlement discussions with numerous States Attorneys General, as well as the court-appointed plaintiffs' executive committee in the national opioid multidistrict litigation ("***Plaintiffs' Executive Committee***").   In August 2019, Mallinckrodt engaged directly with the plaintiffs in two "Track One" bellwether trials that were scheduled in the multidistrict litigation in October 2019.  After several weeks of discussions, Mallinckrodt and those two plaintiffs—two counties in northern Ohio—agreed to settle the suits for cash payment in the amount of $24 million and contribution of generic products, including addiction treatment products, worth $6 million.

89.    Mallinckrodt then engaged in intensive discussions with a committee of certain key counsel from the Plaintiffs' Executive Committee, as well as certain State Attorneys General. Discussions were fruitful from the start, and Debtor Mallinckrodt plc and certain of the Specialty Generics Debtors agreed to pay for professionals (subject to reasonable terms) to advise the plaintiffs' negotiating committee in settlement negotiations with Mallinckrodt.

90.    Months of discussions, collaboration, and negotiation followed.  Although the sides started very much apart, after the holiday season, in February 2020, the Specialty Generics Debtors, Debtor Mallinckrodt plc, and the plaintiff committee announced they had finally reached the core economic terms set out in the Opioid Settlement; but that was only the first step to getting

---

[16]    These cases are *Shenk v. Mallinckrodt Plc, et al.* (D.D.C); *Strougo v. Mallinckrodt Plc, et al.* (D.N.J.); *Solomon v. Mallinckrodt Plc, et al.* (D.D.C.); and *Brandhorst v. Mark Trudeau, et al.* (D.D.C.)

to these chapter 11 cases.  From that point, all the parties embarked on a laborious, but ultimately fruitful process of communicating and rallying support from opioid plaintiffs and noteholders and documenting terms of support and the process by which the settlement and the overall restructuring would be implemented.  It is only through those considerable efforts that the RSA carries broad-based, meaningful support.

91.     Absent settlement, the Debtors face years, perhaps decades, of litigation and hundreds of millions of dollars of litigation expense, even putting aside any judgments and ad hoc settlements.  On top of that, judgments in particular could quickly aggregate into the billions or tens of billions of dollars if even a fraction of plaintiffs are successful in winning all the damages they seek.  In short, from a financial and operational perspective, the litigation route would prove ruinous in fairly short order.

92.     Importantly, ad hoc settlements are not a solution and are simply not sustainable. Because of the scope of the opioid litigation, the Debtors must achieve a means of implementing *one* economic settlement structure that resolves *all* of the opioid-related cases, not just select ones. And for the Debtors' part, they have determined that the value-maximizing path to a globally binding resolution is through these chapter 11 cases.

93.     In addition to establishing global economic terms for payment of all outstanding opioid-related liabilities, the settlement accomplishes a second critical objective:  it establishes certain agreed go-forward operational parameters for the Debtors' opioid business, compliance with which will dramatically reduce the risk to that business going forward.

94.     After agreeing to the Opioid Settlement in early 2020, the Debtors began to prepare a chapter 11 strategy through which the Opioid Settlement would become binding on all opioid claimants.  As part of this effort and to facilitate the implementation of the Opioid Settlement

through a chapter 11 plan structure, the Debtors entered into an engagement letter with Roger Frankel of Frankel Wyron LLP on February 24, 2020 to serve as a proposed future claims representative (the "***Proposed FCR***") to represent the interests of individuals who may in the future assert opioid-related claims against the Debtors.  The Proposed FCR retained multiple advisors, including counsel, an investment banker, a claims estimator, special litigation counsel, and a medical advisor (collectively, the "***FCR Advisors***").  Together with the FCR Advisors, the Proposed FCR initiated an extensive diligence process into the Debtors' businesses and the pending opioid litigations, subject to confidentiality agreements.  The Debtors have worked constructively with the Proposed FCR and the FCR Advisors throughout this process by providing access to a comprehensive data room and responses to numerous information requests, as well as by attending diligence conference calls, among other things.[17]

95.    The end result of all of these efforts is the Opioid Settlement contemplated by the RSA.  Pursuant to the Opioid Settlement, the plan will provide for the establishment of the Opioid Trust, which will receive on the plan effective date (the "***Effective Date***") cash in the amount of $450,000,000 (the "***Initial Cash Payment***"); warrants to acquire the number of shares of Reorganized Mallinckrodt plc that would represent 19.99% of all such outstanding shares at a strike price reflecting an aggregate equity value for the Reorganized Debtors of $1.551 billion;[18] the right to receive certain deferred cash payments[19] that, when combined with the Initial Cash

---

[17]  The Debtors intend to seek the appointment of Mr. Frankel as the future claimants' representative.  Given the knowledge of the Debtors' businesses and claims that Mr. Frankel and the FCR Advisors gained during the prepetition diligence process, the Debtors believe his appointment will result in efficiencies that benefit all creditors and the estates.

[18]  As further described in the RSA, the warrants are subject to dilution from equity reserved under the management incentive plan, among other things.

[19]  The opioid trust will receive rights to deferred cash payments in the following amounts and on the following dates:  (a) $200,000,000 on each of the first and second anniversaries of the Effective Date; and (b) $150,000,000 on each of the third through seventh anniversaries of the Effective Date; *provided*, that at any time prior to the first anniversary of the Effective Date, the Reorganized Debtors shall have the right to prepay, in full or in part,

Payment, amount to $1.6 billion in aggregate cash consideration, and certain other assets.  Through these chapter 11 cases, the Opioid Settlement will allow the Debtors to achieve all of their core objectives for Specialty Generics' opioid business.

### B.    The Acthar Settlement Negotiations and Terms

96.    Simultaneous with ongoing negotiations with opioid plaintiffs and multiple groups of lenders and noteholders, the Debtors actively engaged with the DOJ to try to settle ARD's Acthar-related liabilities.  Starting in late spring of 2020, these discussions included providing the DOJ with considerable financial diligence and several rounds of offers and counteroffers.

97.    Finally, in September 2020, the Debtors reached an agreement in principle with the DOJ, contingent upon a chapter 11 filing by Mallinckrodt plc, to resolve most Acthar-related claims and investigations of the federal government against the Debtors (the "***Acthar Settlement***"), including certain of the matters described above.  As described in the RSA, the terms of the settlement will be effectuated through the Debtors' chapter 11 plan.  The deal, in short, calls for the Debtors to make cash payments in eight installments, beginning on the plan's effective date and on each of the first seven anniversaries thereof, totaling $260,000,000, to the Department of Justice and various states.  In return, the Debtors will be released by the relevant governmental agencies for these Acthar-related claims.

### C.    Comprehensive Financial and Liability Restructuring

98.    As it became clear that the Debtors would need to pursue a whole-company chapter 11, the Debtors opened discussions with the Term Loans Ad Hoc Group, the Revolver Ad

---

the Deferred Cash Payments, at a price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x)(i) the present value of the Deferred Cash Payments at the prepayment date plus (ii) $450,000,000 to equal (y)(i) the present value of the payments under the Original Payments Schedule at the prepayment date (excluding the initial $300,000,000 payment provided for in the Original Payments Schedule), discounted at a discount rate of 12% per annum, *plus* (ii) $300,000,000.

Hoc Group, and the Unsecured Notes Ad Hoc Group in an effort to address near-term maturities and to set an appropriate and sustainable capital structure for the reorganized Debtors. The Debtors spent considerable time and effort responding to expanded diligence requests from all parties involved, as well as conducting extensive, multifaceted discussions. All the while, the Debtors' discussions with the DOJ and the opioid claimants were progressing, too; and each development in those discussions in turn affected the gives and takes with the lender and noteholder groups. In the end, while not all the Debtors' creditor groups are currently party to the RSA, the Debtors and the Unsecured Notes Ad Hoc Group were able to reach an agreement on the terms of a financial restructuring to be consummated through a chapter 11 plan, which is memorialized in the RSA. As of the Petition Date, holders of approximately 84 percent of the Debtors' unsecured notes (other than the 4.750% unsecured guaranteed only by Mallinckrodt plc and the debentures under the Legacy Debentures Indenture) have executed the RSA.

99.    The RSA contemplates that (a) claims under the Debtors' Credit Agreement will be reinstated, (b) the Debtors' secured notes will be reinstated, (c) holders of the Debtors' unsecured notes will be given 100 percent of the equity of reorganized Mallinckrodt (subject to dilution on account of the warrants issued as part of the Opioid Settlement and the management incentive plan) and new second lien notes, and (d) holders of general unsecured claims will receive an allocated share of a $100,000,000 cash pool, other than certain trade creditors who will receive a greater recovery in exchange for providing appropriate post-emergence trade terms.

100.    Importantly, the Opioid Settlement and the Acthar Settlement will not dilute the allocated recoveries for general unsecured creditors. Rather, each will be implemented separately on its terms upon the Debtors' emergence from chapter 11, with the Opioid Trust to be established

for the benefit of opioid claimants and with the Debtors' plan evidencing their structured payment obligations under both the Opioid Settlement and the Acthar Settlement.

101.    Much remains to be done, and the Debtors have time to achieve even greater consensus with their emergence milestone under the RSA set for fifteen months and their outside date for cash collateral use being in April 2022.  With the RSA as a starting point, the Debtors believe they will achieve a value-maximizing restructuring that will eliminate the cloud of litigation surrounding their businesses and allow them to return to focusing all of their energy on their operational objectives.

## IV.    SUPPORT FOR CERTAIN FIRST DAY PLEADINGS

102.    To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file upon scheduling of a further hearing by this Court, the motions and applications described below.[20]

103.    Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to reorganize and conduct these cases efficiently, thus permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

104.    Several of the First Day Pleadings request authority to pay prepetition claims.  I am told by the Debtors' advisors that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days

---

[20]    Capitalized terms used in this Part IV of the Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this exception, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

### A.    Motions Related to Case Management

#### 1.    Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases

105.    The Debtors seek entry of an order directing joint administration of the chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Mallinckrodt plc.

106.    As described above in Section I.B, Mallinckrodt plc directly or indirectly owns or controls twenty percent (20%) or more of the outstanding voting securities of each of the other Debtors as direct or indirect parent. Given the integrated nature of certain of the Debtors' functions, including their complementary strategies and operational roles, synergistic overhead sharing, and a shared focus on their corporate mission, I believe that joint administration of these chapter 11 cases would provide significant administrative convenience without harming the substantive rights of any parties in interest. Many of the motions, hearings, and orders in these cases will affect each Debtor, and joint administration would eliminate the need for duplicate pleadings, notices, and orders in each of the respective dockets. This, in turn, would save the Court, the Debtors, and other parties in interest substantial time and expense when preparing and filing such documents. Further, joint administration would protect any parties in interest by

ensuring that they will be apprised of the various motions filed with the Court with respect to each of the Debtors' cases.

107.    Because the Debtors seek only administrative, not substantive consolidation of the estates, I do not believe joint administration would adversely affect the Debtors' respective constituencies.  The relief requested in this motion will not only preserve individual creditors' rights, but will also provide those creditors the benefit of the cost reductions associated with joint administration.

108.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 2.    Motion of Debtors for Order Extending Time for Filing Schedules and Statements

109.    The Debtors seek entry of an order extending the initial twenty-eight (28) day deadline by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (the "***Schedules and Statements***") by forty-five (45) days, through and including December 24, 2020.

110.    The Debtors have tens of thousands of creditors and other parties in interest.  To prepare their Schedules and Statements, I understand the Debtors must compile a significant amount of financial information from books, records, and documents relating to their assets, contracts, and claims of creditors, in addition to information of parties involved in the several thousand ongoing opioid-related and other litigations against the Debtors.  I believe this information is voluminous, and assembling the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors, the difficulty of which I understand is compounded as access to the information necessary to prepare the Schedules and Statements has been hampered by the global COVID-19 pandemic,

which has forced the Debtors and their advisors to work remotely with more limited access to files and information than typically would be available.  I believe the magnitude of that task, when taken together with the Debtors' transition into chapter 11 and the ongoing burdens of operating the Debtors' businesses day to day, supports an extension of the deadline set forth in the Bankruptcy Code and Bankruptcy Rules for filing the Schedules and Statements.

111.    Moreover, I believe the relief requested therein will not prejudice or adversely affect the rights of the Debtors' creditors or other parties in interest.  Rather, I believe the extension requested therein will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of the Chapter 11 Cases.

112.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 3.    Motion of Debtors for Interim and Final Orders Authorizing Certain Procedures Regarding Notice and Personally Identifiable Information for Individuals

113.    The Debtors seek entry of interim and final orders (a) approving the implementation of certain notice procedures by which the Debtors shall, or by which the Debtors shall direct the Claims Agent to, send certain required notices, mailings, and other communications related to the chapter 11 cases, including service of certain notices and other documents relating to the Debtors' adversary proceeding seeking injunctive relief, to such known counsel of record for the Opioid Claimants and Asbestos Claimants (together, the "*O/A Claimants*") in lieu of sending such communications to the O/A Claimants themselves; and (b) authorizing the Claims Agent to (i) redact or suppress certain personally identifiable information of individual claimholders and interest holders (including the personally identifiable information of O/A Claimants and employees) in the Debtors' creditor matrix, Schedules/Statements, claims register, and affidavits

46

of service filed throughout the chapter 11 cases, and (ii) withhold publication of individuals' proofs of claim that may contain medical or personally identifiable information.

114.    In recent years, as described in further detail in <u>Section II</u> above, certain of the Debtors have been subject to an increasing number of lawsuits in the United States concerning their manufacturing and sale of opioid products.  In addition to lawsuits brought by the Opioid Claimants, certain of the Debtors are subject to, in aggregate, thousands of asbestos-related lawsuits, primarily relating to legacy operations of predecessor companies.  As of the Petition Date, these Debtors are parties to more than 11,700 asbestos-related lawsuits brought by various Asbestos Claimants.

115.    Due to the diverse nature of these mass tort claims against the Debtors and the existence of a significant number of tort creditors, and to ensure the confidentiality of personally identifiable information of the O/A Claimants that may be protected by the Health Insurance Portability and Accountability Act of 1996 ("*HIPAA*"), the Debtors generally have tracked individual O/A Claimants by maintaining a database that lists their names, but not their addresses. Instead of plaintiff addresses, the Debtors typically track the address information of the counsel and/or law firm of record for the O/A Claimants and conduct all communications regarding the opioid or asbestos litigation through such counsel.  The Debtors wish to continue the practice of conducting all communications with O/A Claimants through their respective litigation counsels through the O/A Claimants Notice Procedures (subject to certain exceptions as set forth in the motion).

116.    Furthermore, given the large number of potential individual claimants in this case, in order to protect the identities and privacy of individuals and to prevent identity theft, the Debtors seek authority for the Debtors or their Claims Agent to (a) redact or suppress from the creditor

matrix, Schedules/Statements, claims register, and affidavits of service (i) home address information of the Debtors' individual creditors and interest holders, including, but not limited to, the O/A Claimants; (ii) names and address information in respect of individuals protected by the European General Data Protection Regulation; and (b) withhold the publication of claims filed by individual claimants.

117.    I believe that by implementing the O/A Claimants Notice Procedures, the actual notice that O/A Claimants will receive via their counsel will be equally sufficient to the notice that the O/A Claimants would receive if the Debtors were to attempt to deliver notices and other communications directly to such claimants.  The O/A Claimants Notice Procedures not only allow for more accurate notice to O/A Claimants, but I also believe they better apprise the O/A Claimants of the matters before the Court and better presents to them an opportunity to be heard thereon.  In addition, the addresses and e-mail addresses for counsel to the O/A Claimants is more likely to remain unchanged over time.  Thus, I believe the O/A Claimants Notice Procedures represent a fair and appropriate process that ensures that reasonable notice and due process is achieved for the O/A Claimants.

118.    I believe that the O/A Claimants Notice Procedures would significantly ease the Debtors' administrative burden and provide for less burdensome and costly, but also more timely, services of Court papers.  In my opinion, the O/A Claimants Notice Procedures would maximize the efficiency and orderly administration of these chapter 11 cases and benefit the Debtors' estates and creditors, while still ensuring that appropriate notice is provided.

119.    Here, multiple factors demonstrate the need to redact or suppress certain personally identifiable information from the creditor matrix, Schedules/Statements, claims register, and affidavits of service.  First, given the fact that the Debtors manufacture and sell prescription drugs,

the Debtors and the Claims Agent are sensitive to the privacy concerns of individuals who may file claims containing medical or other sensitive information without realizing that the Debtors and Claims Agent are obligated to publish such information in whole no matter the content, including any personally identifiable information protected by HIPAA. I believe that disclosing the names and residential addresses of individuals affected by these chapter 11 cases would pose an undue risk to such individuals' privacy and personal safety.

120.    Second, as described above, the address of each individual O/A Claimant is not readily available to the Debtors and, when disclosed in conjunction with certain other information, may also be protected by HIPAA. I believe that collecting the individual addresses and reviewing such information to ensure compliance with HIPAA would require a massive manual review of the Debtors' files and time-consuming diligence.

121.    Third, the release of names and addresses of individuals would create an undue risk of identity theft.

122.    With respect to the Debtors' request to withhold publication of proofs of claim, given the large number of potential individual claimants in this case, there is a substantial risk that individual claimants will file proofs of claim without redacting their protected health information or other personally identifiable information. Without an order from this Court, the Debtors and the Claims Agent would be required to publish the claims with such information.

123.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

4.      **Motion of Debtors for Interim and/or Final Order(s) (a) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stocks and (b) Establishing a Record Date for Notice and Sell-Down Procedures for Transferring Claims Against the Debtors**

124.    The Debtors seek entry of interim and final orders: (a) establishing Stock Procedures to protect the potential value of the Debtors' net operating loss carryforwards ("***NOLs***"), carryforwards of disallowed business interest expense, carryforwards of unused general business credits, and other tax benefits (collectively, the "***Tax Attributes***") for use in connection with the reorganization of the Debtors and in future periods and authorizing application of such Stock Procedures to direct and indirect ownership of ordinary shares (being the equivalent under Irish law of the common stock of a U.S. corporation) of Mallinckrodt plc (the "***Ordinary Shares***") and any options or similar rights (within the meaning of applicable sections of title 26 of the Code of Federal Regulations) to acquire such shares (the "***Options***"); and (b) solely in the final order, establishing a record date (the "***Record Date***") for notice and sell-down procedures for transferring the direct and indirect ownership of prepetition claims (each, as defined in section 101(5) of the Bankruptcy Code, a "***Claim***") against one or more of the Debtors.

125.    MEH, Inc., one of the Debtors in these chapter 11 cases, is the parent of a U.S. federal consolidated income tax group that includes its direct and indirect subsidiaries which are classified as U.S. corporations for federal income tax purposes (the "***Debtor US Tax Group***"). The taxable year of the Debtor US Tax Group ends on the last Friday of September each year.[21]

126.    As of September 27, 2019, the Debtor US Tax Group estimates that it has the following Tax Attributes: approximately $982.3 million in estimated NOLs (some of which may be subject to certain existing limitations); approximately $292.6 million in federal disallowed

---

[21]    All references to a particular year refer to the taxable period ending in that year (for example, the 2019 taxable year refers to the taxable year ending September 27, 2019).

business interest expense carryforwards under section 163(j) of the Internal Revenue Code ("***IRC***"); approximately $2.5 million of foreign tax credit carryforwards; approximately $70.9 million in unused general business credits, and may have substantial unrealized built-in losses in its assets.  Tax Attributes are expected to be generated with respect to the taxable year ending September 25, 2020, and additional Tax Attributes may be generated prior to the effective date.  I have been informed that The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or directly offset federal tax liability in future years.   In addition, I understand that the Debtors may be able to utilize such Tax Attributes to offset taxable income or federal tax liability generated by transactions consummated during and after these chapter 11 cases.  As such, I believe that the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

127.    I have been told that certain transfers of Ordinary Shares effected before the effective date of the Debtors' emergence from chapter 11 protection may trigger an "ownership change" for IRC purposes, severely endangering the ability of the Debtor US Tax Group to utilize the Tax Attributes, and causing substantial damage to the Debtors' estates.  To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief (or the "***Stock Procedures***," which is set forth in greater detail in the motion) that will enable them to closely monitor certain transfers of Ordinary Shares so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the Tax Attributes.

128.    Furthermore, I have been told that a chapter 11 plan that contemplates a reorganization of the Debtors may involve the issuance of new ordinary shares in Mallinckrodt plc

(or any successor to Mallinckrodt plc) and the distribution of such stock to certain creditors on account, in whole or in part, of their respective Claims.  Such an issuance and distribution could also potentially result in an ownership change.  In such event, I have been told that it is possible that the special relief afforded by section 382($l$)(5) of the IRC could be both available and beneficial to the Debtors; the Debtors, in that circumstance, may seek to qualify the restructuring for such relief.  Such relief, however, may become unavailable to the Debtors if the trading and accumulation of certain Claims prior to the effective date of a chapter 11 plan is left unattended. Thus, the Debtors seek to establish, in the final order, a Record Date for notice and sell-down procedures for transferring the direct and indirect ownership of a Claim against one or more of the Debtors.

129.     Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**B.     Motions Related to Financing Operations**

**1.     Motion of Debtors for Interim and Final Orders (a) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (b) Authorizing Continuation of Existing Deposit Practices, (c) Waiving Certain U.S. Trustee Guidelines, (d) Authorizing Continuation of Intercompany Transactions, and (e) Granting Superpriority Status to Postpetition Intercompany Claims**

130.     The Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms; (b) authorizing, but not directing, the Debtors to continue their existing deposit practices; (c) granting the Debtors a waiver of certain bank account and related guidelines of the Office of the United States Trustee for the District of Delaware and the requirements of section 345(b) of the Bankruptcy Code, to the extent inconsistent with the Debtors' practices under their existing

cash management system or other actions described in the motion; (d) authorizing, but not directing, the Debtors to continue certain ordinary course intercompany transactions, including honoring and paying prepetition intercompany claims; (e) granting superpriority status to postpetition intercompany claims arising from certain of those transactions; and (f) authorizing the Debtors to open and close bank accounts.

131.    In the ordinary course of their businesses, the Debtors maintain a complex Cash Management System that includes concentration accounts, operating accounts, disbursement accounts, collection accounts, and investment accounts, and is integral to the operation and administration of the Debtors' businesses.  Specifically, the Cash Management System allows the Debtors to (a) monitor and control all of their cash receipts and disbursements, (b) identify their cash requirements, (c) transfer cash as needed in light of those cash requirements, and (d) track intercompany cash transfers.  The Debtors believe that the Cash Management System is similar to those used by other companies of similar size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.

132.    The Cash Management System is managed by financial personnel located in St. Louis, Missouri, Bedminster Township, New Jersey, Dublin, Ireland, and Feuerthalen, Switzerland, where they oversee the administration of the various bank accounts, including the collection, disbursement, and transfer of cash within the U.S. and abroad, as well as among and between the Debtors and their foreign non-Debtor affiliates.  The Debtors' supervision of the Cash Management System enables the Debtors to, among other things, (a) accurately forecast and report their cash flow requirements and (b) monitor the collection and disbursement of funds to and from the Bank Accounts (as defined below).

133.     As of the Petition Date, the Debtors maintain 96 Bank Accounts with Citibank, Deutsche Bank, PNC, US Bank, Citizens, State Street, and ING.  The majority of accounts within the United States are held at either Citibank, PNC, or US Bank, all financially stable institutions that are insured by the FDIC (up to an applicable limit per Debtor per institution) and are parties to Uniform Depository Agreements with the U.S. Trustee.  However, some of the foreign Debtors also hold accounts in the U.S. at Citizens and Deutsche Bank Trust Company Americas, likewise financially stable institutions that are insured by the FDIC (up to an applicable limit per Debtor per institution).  The Debtors' foreign Bank Accounts are held at Citibank, Deutsche Bank, State Street, and ING, all highly-rated, global financial institutions that are widely recognized as well-capitalized and financially stable.  Further, all of the Debtors' foreign Bank Accounts are held in jurisdictions with depository insurance or guarantee schemes.

134.     The Debtors pay the Banks ordinary course Bank Fees and Expenses in connection with maintaining and operating the Bank Accounts, typically by authorizing the Banks to deduct them from the relevant Bank Accounts in accordance with the applicable bank agreements.  The Debtors estimate that they owe approximately $50,000 in Bank Fees and Expenses, all to be paid within twenty-one (21) days of the Petition Date.

135.     The Debtors hold all of their cash in the Bank Accounts and, with the exception of certain escrow accounts, maintain no other accounts holding cash.

136.     <u>The Pool Accounts</u>.  The Cash Management System has two main components: (a) cash collection and concentration; and (b) cash disbursement.  The Debtors manage cash on a global basis primarily utilizing four cash pools: one for the Specialty Brands entities in the United States at Debtor ST US Pool LLC, one for Specialty Generics entities in the United States at SpecGx LLC, and two for certain Debtors and non-Debtor affiliates operating outside the United

States at Debtor Mallinckrodt International Finance S.A. and Debtor Mallinckrodt Group S.à r.l. (which maintains concentration accounts in six different currencies).  Through the Cash Management System, the Debtors' treasury personnel are able to track and account for cash and transactions at any given time.

137.    The Debtors use the Cash Management System to facilitate the flow of funds from numerous receipt accounts to their Pool Accounts.  Substantially all of the Debtors' revenues are collected in various Receipt Accounts, which are swept manually as appropriate or periodically to the Pool Accounts.  The Debtors disburse funds from the Pool Accounts or Receipt Accounts to disbursement and operating accounts, which are used to satisfy their ordinary course operating expenses and financial obligations.  The Disbursement Accounts are typically funded by the Pool Accounts on a daily basis in the amount of upcoming disbursements.

138.    The Debtors pay their U.S. payroll and other compensation primarily from two separate designated payroll accounts—one account for Specialty Brands maintained by ST Shared Services LLC and one account for Specialty Generics maintained by Mallinckrodt Enterprises LLC—and internationally, disburse payroll and other compensation primarily from operating accounts or, in the case of Mallinckrodt Pharmaceuticals Limited, a designated payroll account in the United Kingdom.  For domestic and Canadian payroll, prior to payday, the Debtors' treasury personnel typically fund the applicable accounts.  Domestically, on payday the Debtors' payroll provider, ADP, debits the applicable domestic accounts for taxes and garnishments while the Debtors' domestic payroll personnel issue checks and direct deposits to the Debtors' employees. In Canada, typically two days prior to payday, ADP debits the applicable Canadian account for net pay, taxes, and all deductions paid on behalf of the Debtors (including pension and other benefit deductions), and issues checks and direct deposits to the Debtors' and non-Debtor Affiliates'

Canadian employees on behalf of the Debtors.

139.    Foreign payroll is processed on a monthly basis.  Prior to payday, the applicable accounts are typically funded by the Debtors' treasury personnel, and the Debtors payroll personnel pay salaries and wages on the pay date in each country.  Third party payments such as taxes, social security, pension contributions, mandatory health contributions, and others are also paid by the Debtors on the appropriate date in each country or directly debited by the relevant authority.

140.    <u>Standalone and Investment Accounts</u>.  In addition, certain Debtors that are not participants in the Pool Accounts maintain separate Standalone Accounts, none of which are automatically swept into the Pool Accounts.  The Standalone Accounts are used to deposit miscellaneous local receipts, receive or make intercompany transfers, and make external payments for payroll, operating expenses, rent payments, taxes, utilities, or professional service fees.

141.    Further, Debtors Mallinckrodt US Pool LLC, ST US Pool LLC, and SpecGx LLC each maintain one investment account with Citibank in the United States, Debtor Mallinckrodt Group S.à r.l.  maintains two investment accounts with Citibank in New York and London (one in U.S. Dollars and one in British Pound Sterling), and Debtor MIFSA maintains two investment accounts in New York and Ireland with Citibank and State Street, respectively.  Under the Debtors' investment practices, the Debtors typically manually invest excess cash in money market funds that invest solely in United States Treasury bills and United States Treasury Notes owned directly or through repurchase agreements, and the Debtors regard such money market funds as cash equivalents.

142.    <u>Intercompany Transactions</u>.  The Debtors conduct various business transactions among themselves and with their non-Debtor affiliates (the "***Intercompany Transactions***"),

including moving cash within the Cash Management System between different Debtors and to and from non-Debtor affiliates.  With the help of the Cash Management System, Enterprise Resource Planning tool, and the Debtors' treasury personnel, the Debtors are able to track and account for each Intercompany Transaction and the resulting Intercompany Claims.

143.    The Intercompany Transactions rely largely on the Pool Accounts.    All Intercompany Transactions and Intercompany Claims related to the Cash Management Agreements and pooling of the Debtors' cash, including deposits, withdrawals, borrowed amounts, and interest accrued or owing on account thereof, are appropriately recorded in each applicable Debtor's books and records.

144.    Before the commencement of these chapter 11 cases, the Debtors and their non-Debtor affiliates engaged in many types of Intercompany Transactions in the ordinary course of business.  These included, without limitation, (a) the cash transfers pursuant to the Cash Management Agreements described above, (b) cash transfers between Standalone Accounts for operational purposes; (c) payments by a Debtor on behalf of another Debtor due to certain cash management relationships, and (d) transfers and setoffs related to (i) sales and purchases of goods, (ii) Shared Services (as defined below), (iii) general corporate services, (iv) operational expenses, including the payment of wages and benefits, (v) royalties, (vi) management fees, (vii) intercompany foreign exchange transactions, and (viii) intercompany term loans.

145.    I believe that the benefits of these Intercompany Transactions ultimately inure to the Debtors' estates, and the failure to honor prepetition Intercompany Transactions and to continue them in the ordinary course postpetition would negatively impact the Debtors' ability to manufacture, sell, and deliver products to their customers.  In my opinion, ceasing Intercompany

Transactions could also render the Debtors' tax efficient structure ineffective and subject the Debtors to considerable tax increases, ultimately reducing the value of their estates.

146.     Further, each of Specialty Brands and Specialty Generics make corporate cost allocations and charges to the various domestic and foreign Debtors and non-Debtor affiliates in respect of their proportional shares of collective corporate expenses for Specialty Brands and Specialty Generics, respectively, including, management & corporate services costs, research and product development costs, marketing costs, and royalties for use of intellectual property (for Specialty Brands only).  The fees are allocated and charged to the Debtors and non-Debtor affiliates within each business based upon established methodologies and include also cost centers across segments such as IT, Employees & Human Resources, Finance, Legal and other corporate overhead.

147.     Importantly, Enterprises, SpecGx, Debtor ST Shared Services LLC, and Debtor MEH, Inc. are party to a Shared Services Agreement, which provides the Participants and certain other Debtors with access to shared corporate, management, and administrative services, resulting in efficiencies and reduced costs.  I believe that the Shared Services are of vital importance to the Debtors as, without the Shared Services, the Debtors would be unable to perform basic functions necessary to run their businesses.

148.     The Debtors incur certain expenses arising from their participation in the Shared Services, which are paid as a quarterly fee pursuant to the Shared Services Agreement.  Pursuant to the Specialty Generics US Cash Management Agreement, SpecGx is authorized to pay, on behalf of and with the consent of the applicable Specialty Generics Debtor, any Shared Services Expenses that come due and owing.  Similarly, pursuant to the Specialty Brands US Cash Management Agreement, US Pool is authorized to pay, on behalf of and with the consent of the

applicable Specialty Brands Debtor, any Shared Services Expenses that come due and owing. At the conclusion of each fiscal year, the Participants conduct a reconciliation of paid quarterly fees and actual total costs of the Shared Services. Since January 1, 2020, the average monthly amount of Shared Services Expenses incurred by the Debtors collectively was approximately $1,300,000.

149.    The Debtors also maintain a documented system of prepetition intercompany term loans (the "***Intercompany Term Loans***") between and among the Debtors. The Intercompany Term Loans serve to support the Debtors' debt financing and promote tax-efficient financing structures. However, the Debtors are not currently seeking any relief related to the Intercompany Term Loans.

150.    I believe that the Intercompany Transactions ensure the smooth functioning and operation of the Debtors' businesses and are administratively beneficial to the Debtors' operations, including by facilitating the operations of non-Debtor affiliates supporting the Specialty Brands and Specialty Generics businesses; without them, many of the Debtors could lose the services of employees and shared corporate management, and their operations could grind to a halt, stifling the Debtors' reorganization efforts.

151.    <u>Business Forms</u>.   In the ordinary course, the Debtors use checks, invoices, letterhead, purchase orders, and other forms and correspondence (the "***Business Forms***"). The Debtors' existing Business Forms are not marked with any designation referencing their status as debtors in possession. I have been informed that certain changes to the Business Forms would be required to comply with the U.S. Trustee Guidelines.

152.    I believe that changing the Debtors' existing checks, correspondence, and other Business Forms would be expensive, unnecessary, and burdensome to the Debtors' estates. In my opinion, these changes would disrupt the Debtors' business operations, may create friction with

their customers and vendors, and would not confer any benefit upon parties that transact with the Debtors.

153.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### C.    Motions to Pay Certain Prepetition Obligations and Maintain Certain Business Practices and Programs

#### 1.    Motion of Debtors for Interim and Final Orders Authorizing the Debtors to (a) Pay Certain Employee Compensation and Benefits, (b) Maintain and Continue Such Benefits and Other Employee-Related Programs, (c) Pay Prepetition Claims of Contracted Labor, and (d) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims

154.    The Debtors seek entry of interim and final orders authorizing the Debtors to:

(a)    satisfy their Prepetition Employee Obligations and Prepetition Contracted Labor Obligations (each as defined below);

(b)    satisfy their Employee Benefit Obligations (as defined below); and

(c)    in their discretion, agree to modify the automatic stay under section 362 of the Bankruptcy Code with respect to the Workers' Compensation Claims to allow Workers' Compensation Claims to proceed under the applicable Workers' Compensation Policy and to allow the Debtors, their affiliates, their insurance providers, and/or their third party administrators to negotiate, settle, and/or litigate Workers' Compensation Claims, and pay resulting amounts, whether such claims arose before or after the Petition Date (each as defined below).

155.    The Debtors employ approximately 3,000 people (the "*Employees*") in the United States and abroad, who, together with approximately 300 individuals employed by Non-Debtor Affiliates, manage, support, and execute on Mallinckrodt's core corporate objectives.

156.    As of the Petition Date, approximately 1,600 Employees work in the Specialty Generics business (the "*Specialty Generics Employees*") and approximately 1,400 Employees work in the Specialty Brands business (the "*Specialty Brands Employees*"). The Employees are primarily based in the United States, but due to the global nature of the Debtors' businesses, approximately 130 Employees work in various locations outside of the United States, including,

but not limited to, Canada, Ireland, Luxembourg, Switzerland, and the United Kingdom. Generally, the non-U.S. Employees work in various roles such as sales and distribution, manufacturing, and R&D in connection with the Debtors' Specialty Brands business.

157.    Also, in the ordinary course of their businesses, the Debtors maintain an Expatriate Program.  Pursuant to the Expatriate Program, and as of the Petition Date, three (3) Expatriates are currently assigned to work outside their home country, in the United States and the United Kingdom.

158.    Approximately 2,100 of the current Employees are Salaried Employees and approximately 900 are Hourly Employees.  As of the Petition Date, 2,970 of the Employees work full-time and 30  Employees work part-time.  Except for the non-U.S. Employees, all of the U.S. Specialty Generics Employees are employed by Enterprises and all of the U.S. Specialty Brands Employees are employed by STSS.  The non-U.S. Employees are employed by certain of the Foreign Debtor Employers, depending on the applicable jurisdiction.

159.    The Debtors believe twelve (12) of the Employees constitute "insiders" as the term is defined in section 101(31) of the Bankruptcy Code.  Certain of the Employees have the title of Vice President or above (such Employees, the "***Senior Employees***").  The Debtors submit that not all of the Senior Employees are Insiders.

160.    Approximately 300 Union Employees are represented by local branches of certain unions located in the United States.  The Union Employees that work for the Specialty Generics business are represented by the following unions: the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, U.A.W.; International Brotherhood of Teamsters; Independent Guards Union; the Service Employees International Union; and the International Union of Operating Engineers.  Each of the local branches is party with the Debtors

to a collective bargaining agreement. All of the U.S. Union Employees are located at the Debtors' production site in St. Louis, Missouri, with the exception of Teamsters, whose Union Employees are located in Greenville, Illinois. The remaining approximately 2,700 Employees are not represented by any union.

161.    The Employees perform a variety of critical functions throughout the Debtors' businesses, including, among other things, operating and managing the Debtors' production facilities across the country, procuring raw materials, developing new and varied products and processes, establishing and growing sales relationships with customers, and providing necessary administrative, managerial, and financial support services from the Specialty Generics and Specialty Brands headquarters and elsewhere.

162.    The Debtors also utilize the services of Contracted Labor from time to time to provide a variety of services. The Debtors engage Contracted Labor as various capacities such as independent contractors, temporary staff, or independent consultants, providing interim or specialty services.

163.    Additionally, the Debtors use the services of SafeguardWorld International Limited and/or certain of its subsidiaries ("*Safeguard*") for certain outsourced labor services. Specifically, the Debtors use Safeguard (via Mallinckrodt FMIL) to provide a small number of Outsourced Staffing providing sales-related services in connection with the Specialty Generics businesses outside the United States. Generally, the Debtors reimburse Safeguard on a monthly basis for any obligations incurred on behalf of the Outsourced Staffing.[22]

---

[22]    For the avoidance of doubt, Mallinckrodt FMIL serves as payment agent with respect to the Outsourced Staffing on behalf of the Debtors but does not employ any of the Outsourced Staffing. By this Motion, the Debtors seek authority to make payments to  or set off amounts owed by, Mallinckrodt FMIL, as reimbursement for amounts paid by Mallinckrodt FMIL or the other Debtors on behalf of the applicable Debtor(s) in connection with the Outsourced Staffing.

164.    As of the Petition Date, there are approximately 240 individuals engaged as Contracted Labor with the Debtors.  Contracted Labor fills immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner.

165.    I believe that the Debtors' very ability to run their businesses safely and productively depends entirely on the expertise and continued enthusiasm and service of the Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the continuity and competence of the Workforce would be jeopardized if the relief requested is not granted.  Furthermore, as previously mentioned, the Debtors and their Non-Debtor Affiliates rely on Enterprises, STSS, and the Foreign Debtor Employers to provide Employees for the benefit of their entire global businesses.  I believe that the continued and uninterrupted service of the Employees is thus essential to the Debtors' ongoing operations and their successful reorganization.

166.    Moreover, if the Debtors fail to pay the Prepetition Employee Obligations or the Prepetition Contracted Labor Obligations in the ordinary course of business, I believe that the Workforce may suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  In my opinion, this would have a highly negative impact on Workforce morale and productivity and would risk immediate and irreparable harm to the Debtors' continuing operations and their estates.  Accordingly, the Debtors have determined, and I believe, that paying those obligations and continuing all of the compensation and benefits programs described in this motion are each vital to preventing the loss of key members of the Workforce during the pendency of the chapter 11 cases and to maintaining the continuity and stability of the Debtors' operations.

167.    In the ordinary course, the Debtors incur a number of obligations to, or for the benefit of, their Workforce, which include: (i) Employee Compensation Obligations; (ii) Employee Benefit Obligations; (iii) Contracted Labor Obligations; (iv) Payroll Taxes; (v) Other Payroll Deduction Obligations; and (vi) Garnishments.

168.    In the United States, in the ordinary course, either Enterprises or STSS, as applicable, pay the Employee Compensation Obligations, and MEH pays for the Employee Benefit Obligations.  Enterprises maintains the Debtors' workers' compensation insurance policies on the Debtors' behalf.  Either Enterprises or STSS, as applicable, pay for the remaining Prepetition Employee Obligations.  In turn, generally, all of these amounts are allocated and charged to the other applicable Debtors (and any applicable Non-Debtor Affiliates) through intercompany book entries and a shared services agreement (subject to certain exceptions for, among other things, certain legacy and other post-employment benefits).

169.    Outside the United States, in the ordinary course, each of the Foreign Debtor Employers pays for all Prepetition Employee Obligations for any Employees located in the relevant Foreign Debtor Employer's respective jurisdiction (except for the Expatriates, as further described in the motion).  For example, Debtor Mallinckrodt Pharmaceuticals Ireland Limited ("*MPIL*") pays the Employee Compensation Obligations, Employee Benefit Obligations, and any remaining Prepetition Employee Obligations for Employees located in Ireland.  The other Foreign Debtor Employers generally operate their respective payment systems in a similar manner.

170.    The Debtors estimate that, as of the Petition Date and before the final hearing on this Motion, Prepetition Employee Obligations and Prepetition Contracted Labor Obligations totaling an aggregate amount of approximately $15,492,000 (the "***Interim Amount***") will become due and owing.  By this Motion, the Debtors seek authorization to pay the following approximate

outstanding amounts on account of various categories of their Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations, which are summarized in the following table and further discussed below:

| Prepetition Employee Obligations and Prepetition Contracted Labor Obligations | Requested Interim Order Amount | Requested Final Order Amount |
|---|---|---|
| Wage and Salary Obligations | $6,762,000 | $16,842,000 |
| *Employees* | $1,320,000 | $1,320,000 |
| *Contracted Labor* | $3,140,000 | $3,140,000 |
| *Payroll Deduction Obligations* | $2,290,000 | $12,370,000 |
| *Garnishments* | $12,000 | $12,000 |
| Payroll Processing Services | $22,000 | $22,000 |
| Other Compensation Programs | $355,000 | $550,000 |
| *Employee Incentive Programs* | $0 | $0 |
| *Non-Insider Retention Programs* | $0 | $0 |
| *Recognition Program* | $355,000 | $550,000 |
| *Leave Program* | $0 | $0 |
| *Compensation of Independent Directors* | $0 | $0 |
| Severance | $0 | $0 |
| Expense Reimbursements | $1,109,000 | $1,591,000 |
| *Company Credit Card Expenses* | $335,000 | $335,000 |
| *Relocation Expenses* | $118,000 | $600,000 |
| *Vehicle Program Expenses* | $630,000 | $630,000 |
| *Immigration Assistance Program Expenses* | $26,000 | $26,000 |
| *Miscellaneous Expenses* | $0 | $0 |
| Health and Welfare Benefits | $5,990,000 | $6,220,000 |
| Other Benefit Programs | $0 | $200,000 |
| Savings, Pension, and Other Retirement Obligations | $310,000 | $310,000 |
| *401(k)* | $310,000 | $310,000 |
| *Pension Plans* | $0 | $0 |

| Prepetition Employee Obligations and Prepetition Contracted Labor Obligations | Requested Interim Order Amount | Requested Final Order Amount |
|---|---|---|
| *Rabbi Trust* | $0 | $0 |
| *Other Retirement Benefit Obligations* | $0 | $0 |
| Workers' Compensation | $125,000 | $5,000,000 |
| Union Dues | $29,000 | $29,000 |
| Payments to Administrators | $550,000 | $550,000 |
| Expatriate Program | $240,000 | $1,600,000 |

### a. Wage and Salary Obligations

#### (1) United States

171.    In the United States, pay periods differ for Salaried Employees and Hourly Employees. Salaried Employees are paid bi-weekly on Fridays, with an aggregate average payroll each pay period of approximately $12,100,000. Hourly Employees are paid weekly on Thursdays, with an aggregate average payroll each pay period of approximately $1,400,000. Generally, Salaried Employees are paid current through the Sunday immediately following the payroll date, and Hourly Employees are paid through either the Saturday or Sunday before the payroll date.

172.    In the ordinary course of business, deductions are taken from Employees' paychecks for the Payroll Deduction Obligations. Generally, each Debtor is charged for the actual amount of Payroll Taxes and Union Dues for all Employees working for the applicable Debtor.

173.    With respect to benefits-related costs, as previously discussed, MEH pays for the actual costs of the Employee Benefit Obligations on behalf of the other Debtors. In turn, the other Debtors are charged a flat rate of $1,200 per Employee per month for these costs (subject to adjustments based on prior claims experience and other factors, such as in the event of catastrophic or other significant claims against self-insured benefits) (the "***PEPM Charge***"). These costs are

then allocated via the PEPM Charge to Enterprises and STSS and reconciled through an intercompany process.

174.    The average bi-weekly Payroll Deduction Obligations charged to the Debtors for Salaried Employees are, in the aggregate, approximately $4,800,000.  The average weekly Payroll Deduction Obligations charged to the Debtors for Hourly Employees are, in the aggregate, approximately $540,000.    As of the Petition Date, the Debtors estimate that they owe approximately $2,290,000  in accrued but unpaid obligations on account of the Payroll Deduction Obligations, including Payroll Taxes and amounts withheld from Employees and not yet remitted, all of which will become due and owing before the final hearing on this Motion.[23]

175.    In the ordinary course of processing payroll checks for the Employees, applicable law may require the withholding of certain amounts for various Garnishments, such as tax levies, child support, and other court-ordered obligations.  When required, Garnishments are withheld from the applicable Employees' paychecks and remitted the same to the appropriate governmental authorities on a bi-weekly or weekly basis, as applicable, depending on their classification. Garnishments amount to an average of approximately $77,000  per month.  As of the Petition Date, the total accrued but unpaid obligations owed in connection with the Garnishments are approximately $12,000, all of which will become due and owing before the final hearing on this Motion.

---

[23]    In accordance with a recently-enacted federal law, the Coronavirus Aid, Relief, and Economic Security Act (the "*CARES Act*"), the Debtors began deferring certain of the portion of their Payroll Taxes in the total amount of approximately $12 million for the fiscal year ending 2020.  The Debtors estimate that approximately half (or approximately $6 million) of these deferred Payroll Taxes will come due in December 2021 and the remaining half will come due in December 2022.  Further, the Debtors estimate that they will owe approximately $10,080,000 on account of accrued prepetition amounts in connection with such deferred Payroll Taxes, which they seek relief to pay in the ordinary course when due and payable pursuant this Motion.  For the avoidance of doubt, the Debtors anticipate that no amounts due on account of the aforementioned CARES Act-related deferrals will become due and owing before a final hearing on the Motion.

(2)    Outside the United States

176.    Outside the United States, the Foreign Debtor Employers' payroll processes generally operate in a similar manner to one another.  Generally, non-U.S. Employees are paid on a monthly basis by their applicable Foreign Debtor Employer.  In the ordinary course of business, deductions are taken from non-U.S. Employees' paychecks for any Payroll Deduction Obligations, including applicable statutory deductions (e.g., benefits-in-kind), depending on the jurisdiction. Also on a monthly basis, the Foreign Debtor Employers generally pay any amounts owing on account of the Payroll Deduction Obligations directly to the applicable governmental authorities in arrears.  Additionally, the Foreign Debtor Employers generally pay for any applicable Health and Welfare Benefits directly to the applicable third-party provider on behalf of their respective Employees on a monthly basis.

### b.    Payroll Processing Services

177.    In the United States and Canada, payroll is administered through Workday, Inc. Additionally, ADP, Inc. administers the payment of any Payroll Taxes, and Garnishments.

178.    Outside the United States and Canada, payroll is administered through Safeguard. In addition, Safeguard provides certain administrative services with respect to the Foreign Debtor Employers' Payroll Taxes.  The Foreign Debtor Employers pay all of their applicable Payroll Taxes directly to the applicable governmental authorities.

179.    The ongoing services of the Payroll Administrators are imperative to the smooth functioning of the Debtors' operations and payroll processing.  In the aggregate, on an annual basis, the Debtors pay annual fees of approximately $900,000  for the Payroll Administrators' services, which amounts are paid out of the Debtors' accounts payable.  As of the Petition Date, the Debtors estimate that they owe approximately $22,000  in accrued but unpaid obligations on

68

account of the Payroll Administrators' services, all of which will become due and owing before the final hearing on this Motion.

### c.    Other Compensation Programs

#### (1)    Employee Incentive Programs

180.    In the ordinary course of business, in order to encourage and reward outstanding performance, eligible Employees may earn bonuses under various bonus and incentive programs, specifically, as further described in the motion, the Short Term Incentive Programs and the LTIP (collectively, the "***Employee Incentive Programs***") based on individual and business targets.  The Employee Incentive Programs include:

- On a global basis, four (4) performance compensation programs for field sales managers and representatives in the Specialty Generics business, each of which targets outstanding performance in a different cross-section of the Specialty Generics customer market (the "***Generics FSCPs***")[24]  Annually, the Debtors pay approximately $740,000 on account of the Generics FSCPs.

- On a global basis, six (6) incentive compensation programs for field sales managers and representatives in the Specialty Brands business, each of which targets outstanding sales performance in a different cross-section of the Specialty Brands customer market (the "***Brands SICPs***," and together with the Generics FSCPs, collectively, the "***ICPs***"); provided, however, that no opioid-related sales are eligible for any ICPs.  Annually, the Debtors pay approximately $29,350,000 on account of the Brands SICPs.

- On a global basis, in the ordinary course of business, a signing bonus program (the "***Signing Bonus Program***"), pursuant to which the Debtors provide bonuses to certain new recruits upon joining the Debtors' Workforce.  In the aggregate, outstanding awards under this program total $415,000.  The structure of the signing bonuses varies, but typically consists of either (a) a one-time cash payment that is paid to the recipient thirty (30) days after such recipient commences employment or (b) an upfront cash payment, which varies depending on the circumstances, but generally ranges from 30% to 50% of their aggregate award under this Signing Bonus Program and the remaining amount after 6 or 12 months of their hire date, depending on the applicable structure.  The signing bonuses under the

---

[24]    Certain of the Outsourced Staffing are eligible, pursuant to their respective agreements with Safeguard, for performance bonuses through their Safeguard agreements, which are based on substantially similar criteria as the Generics FSCPs applicable for their relevant cross-section of the Specialty Generics customer market.

Signing Bonus Program are subject to a 12 to 24-month payback clause and subject to continued employment.  As of the Petition Date, currently eligible recipients under the Signing Bonus Program will receive their outstanding awards between December 2020 and July 2021.

- The Non-Insider KEIP, as defined and further described in Section III.B of the motion;[25] and

- The LTIP, as defined and further described in Section III.C of the motion.

(2)    Non-Insider KEIP

181.    In the ordinary course of business, the Debtors, with input from its advisors, adopted and implemented a global employee bonus program (the "***KEIP***") for fiscal year 2020 for approximately 2,490 eligible non-Insider Employees (the "***KEIP Participants***").  On April 24, 2020, the Plc Board, with the support of certain senior management and the Debtors' legal counsel and financial advisors, reviewed, commented on, and ultimately approved the KEIP.  In the aggregate, the bonus payments to KEIP Participants under the KEIP are approximately $58.6 million.  Under the KEIP, each KEIP Participant is entitled to a cash bonus payable in three installments, following the completion of each of (x) the first half of fiscal 2020; (y) the third quarter of fiscal 2020 (25%) of the award), and (z) the fourth quarter of fiscal 2020 (25%) of the award), subject to the terms and conditions of each KEIP Participant bonus letter.  Payouts to the KEIP Participants are based on certain performance measures related to the operational and financial performance of the overall business.  Specifically, the performance metrics for all three performance periods consist of operating cash flow (weighted at 60%), net sales revenue (weighted at 25%), and operational metrics related to a successful product launch (weighted at 15%).  While the goals specific to each of these categories vary by measurement period, such goals are met by achieving the specified level of performance.

---

[25]    The "***Short Term Incentive Plans***" means, collectively, the ICPs, the Signing Bonus Program, and the Non-Insider KEIP.

182.    I believe that the potential payments that could be made under the KEIP are reasonable and appropriate under the circumstances of their chapter 11 cases, and satisfy the standard for approval of key employee incentive plans.  I believe that the KEIP Participants are critical to the success of these chapter 11 cases.  In addition, in my opinion the continued presence of the KEIP Participants is necessary to maintain successful business operations, as the KEIP Participants interface directly with the Debtors' vendors, customers, and other parties integral to the Debtors' business operations on a regular basis.

183.    Furthermore, I believe the KEIP Participants have valuable institutional knowledge regarding, among other things, the Debtors' operations, assets, and liabilities.   It is my understanding that the KEIP was designed with meaningful and significant performance measures to appropriately incentivize the KEIP Participants to maximize the value of the Debtors' estates and diligently pursue value-creating outcomes for the benefit of the Debtors' stakeholders. Accordingly, I believe that the KEIP is reasonable and a sound exercise of the Debtors' business judgment, and therefore, should be approved.

(3)    Long-Term Incentive Plan

184.    On a global basis, the Debtors have obligations under a long-term incentive program (the "*LTIP*") consisting of awards of restricted stock units (performance-based and time-based) (the "*RSUs*") which settle in shares of Debtor Mallinckrodt plc, non-qualified stock options, and cash based awards (the "*Cash LTIP*").

185.    The stock options granted under the LTIP have a weighted average exercise price of $22.16, with the lowest exercise price being $13.10 and as a result it is not expected that any stock options will be exercised.  There are approximately i) 6,600; (ii) 302,600, (iii) 238,300, and (iv) 95,500 of time vesting RSUs that are scheduled to vest in 2020, 2021, 2022, and 2023 respectively, of which approximately 149,800  are held by Insiders. No performance vesting RSUs

are expected to vest.  Under the terms of the RSUs upon vesting a number of shares of the Debtor

Mallinckrodt plc equal to the number of RSUs that vest are delivered to the participant.

186.    The Debtors are required to pay the employer portion of any employment taxes and

to withhold and deposit employee income taxes on the value of the shares delivered in settlement

of the RSU and the difference between the exercise price paid and the fair market value of any

stock options that are exercised.  That tax withholding is accomplished by withholding delivery of

the number of shares with a value equal to the required amount for employees the company

designates insiders; and shares are sold to cover the tax value for all other employees.  As such,

the Debtors will incur a liability for such employment taxes and the deposit of the income taxes

withheld upon settlement of the RSUs and the exercise of any stock options.  The amount of such

liability, however, depends upon the value of Debtor Mallinckrodt plc shares at that time and

therefore cannot be estimated.

187.    The Debtors have incurred a total of $6,758,800  in outstanding Cash LTIP awards.

Certain Cash LTIP awards will vest in 2020 in the estimated amount of approximately $3,379,400

and in the estimated amount of approximately $3,379,400 in 2021.

188.    As of the Petition Date, the Debtors estimate that they have no outstanding

obligations owed on account of the Employee Incentive Programs.

(4)    Non-Insider Retention Programs

189.    <u>United States</u>.  In the United States, in the ordinary course of business, the Debtors

offer various retention programs instituted prepetition to certain eligible Employees, none of whom

are Insiders (collectively, the "***U.S. Retention Programs***").[26]  The U.S. Retention Programs are

summarized as follows:

---

[26]    In the interest of full disclosure, separate from and unrelated to the retention programs described in the motion, the Debtors paid retention bonuses to certain Insiders on or about September 3, 2020 in the aggregate amount of

- **2019 General Non-Insider Retention Program**. Ninety-one (91) Employees are eligible for awards under this retention program. In the aggregate, the awards under this retention program total approximately $5,420,000. The awards range from 35 percent to 70 percent of a recipient's annual salary, with the amounts determined based on various factors such as the recipient's band level, performance, criticality to the Debtors' businesses, and their targeted retention period. Each recipient received an upfront payment of 25 percent of their aggregate award under this retention program in November 2019. In addition, each recipient received 25 percent of their aggregate award under this retention program in July 2020 and will receive the remaining 50 percent in May 2021.

- **2020/21 General Non-Insider Retention Program**. Fifty-one (51) Employees are eligible for awards under this retention program. In the aggregate, the awards under this retention program total $7,940,000. The awards range from approximately 30 percent to 80 percent of a recipient's annual salary, with the amounts determined based on various factors such as the recipient's band level, performance, criticality to the Debtors' businesses, and their targeted retention period. Subject to continued employment, the awards will be paid on May 15, 2022 or, if earlier, the date the Debtors emerge from bankruptcy or following a recipient's termination without cause, subject to the recipient executing a general release of claims.

- **U.S. Specialty Brands Non-Insider Retention Program**. Twenty-four (24)of the U.S. Employees are eligible for awards under this retention program. In the aggregate, the awards under this retention program total approximately $950,000. The awards range from 14 percent to 90 percent of a recipient's annual salary, with the amounts determined based on various factors such as Band level, criticality to the business and retention risk. The structure of these retention bonuses varies, but typically each recipient will receive their aggregate award in two parts. The applicable payout dates vary depending on the applicable recipient, but generally the recipient will receive an initial payout of either 30 percent or 50 percent of their aggregate award in 2020 and the remaining amount (either 70 percent or 50 percent, as applicable) in 2021.

- **Specialty Brands Sales Non-Insider Retention Program**. Fifty-one (51) of the Specialty Brands Employees are eligible for cash awards in lieu of equity under this retention program. In the aggregate, the awards under this retention program total approximately $1,650,000. Amounts are determined based on various factors such as Band level, criticality to the

---

approximately $5,235,000, as disclosed in the Form 8-K of Mallinckrodt plc, dated Sept. 8, 2020. In addition, on or around the same time, the Debtors paid retention bonuses to certain other Insiders not disclosed in the aforementioned 8-K in the aggregate amount of approximately $2,644,000. By this Motion, the Debtors do not seek approval or authorization from the Court or any other relief with respect to such payments, which were made prior to the Petition Date.

RLF1 24138532v.2

business and retention risk.  Each recipient will receive the total reward value in April 2021.

190.    In the aggregate, the awards under the U.S. Retention Programs total approximately $15,960,000.  For the avoidance of doubt, eligibility for bonuses under all of the U.S. Retention Programs is subject to the condition that the participating Employee does not terminate voluntarily or is not terminated by the Debtors for cause before such date.

191.    <u>Outside the United States</u>.  Most of the Foreign Debtor Employers offer various retention programs to eligible Employees, none of whom are Insiders (collectively, the "***Foreign Retention Programs***, and together with the U.S. Retention Programs, the "***Non-Insider Retention Programs***").  The ranges of potential awards available under the Foreign Retention Programs are substantially the same as those offered under the U.S. Retention Programs described above.  Similar to the U.S. Retention Programs, criteria for determining the awards with respect to the Foreign Retention Programs are based on various factors depending on the specific Foreign Retention Program, such as the recipient's band level, performance, criticality to the Debtors' businesses, and their targeted retention period.  As with the U.S. Retention Programs, eligibility for bonuses under the Foreign Retention Programs is subject to the condition that he or she does not terminate voluntarily or is not terminated by the Debtors for cause before such date.  The various non-Insider Foreign Retention Programs are summarized as follows: [27]

- **Ireland**.  Debtor MPIL offers (2) Foreign Retention Programs for eligible Employees, one for eligible non-Senior Employees and another for eligible Senior Employees.  Each of the Irish Foreign Retention Programs' payment structures is generally similar to the 2019 General Non-Insider Retention Program described above, with the participant receiving their aggregate award in three (3) parts (25 percent in November 2019; the next 25 percent in July 2020; and the remaining 50 percent in May 2021).  In addition, Debtor MPIL offers a 2020/21 Foreign Retention Program with a similar

---

[27]    There is no Foreign Retention Program currently available for any Employees in Canada.  Also, as of the Petition Date, there are no participants in the Foreign Retention Program offered by Debtor MNK Group S.a.r.l. to eligible Employees in Luxembourg.

structure to that of the 2020/21 General Non-Insider Retention Program described above.  In the aggregate, the awards under these retention programs total approximately $910,000.

- **Switzerland**.  Debtor MNK Group S.a.r.l.[28] offers a Foreign Retention Program to eligible Employees whose payment structure is substantially similar to the 2019 General Non-Insider Retention Program, as described above. The eligible recipient received an upfront payment of 25 percent of their aggregate award under this retention program in August 2020.  In addition, each recipient will receive another 25 percent of their aggregate award under this retention program in December 2020 and will receive the remaining 50 percent in September 2021.  In the aggregate, awards under these retention programs total approximately $90,000.

- **United Kingdom**.  Debtor Mallinckrodt Pharmaceuticals Limited offers two (2) Foreign Retention Programs for eligible Employees, one for eligible non-Senior Employees and another for eligible Senior Employees. The payment structures for the U.K. Foreign Retention Programs are substantially similar to the Irish Foreign Retention Programs described above.  In addition, Debtor Mallinckrodt Pharmaceuticals offers a 2020/21 Foreign Retention Program with a similar structure to that of the 2020/21 General Non-Insider Retention Program described above.  In the aggregate, the awards under these retention programs total approximately $250,000.

192.    As of the Petition Date, the Debtors estimate that they have no outstanding obligations owed on account of the Foreign Retention Programs.  Nonetheless, out of an abundance of caution, by this Motion the Debtors request authority to pay any prepetition amounts that are later determined to be owed on account of such obligations.

(5)    Recognition Program

193.    The Debtors offer, on a global basis, an employee recognition program and service award program (the "***Recognition Program***"), which is administered by Workhuman.  Pursuant to the Recognition Program, eligible Employees may give and receive "recognitions" to other Employees in the form of recognition points.  The recognition points are charged to the recognized Employee's cost center.  Generally, the recognition points may be redeemed for merchandise, gift

---

[28]    Specifically, the Swiss branch of Debtor MNK Group S.a.r.l.

cards or services by the recognized Employee, items valued in the range of approximately $35 to $900.  Spot bonuses, with cash awards in the range of $2,500 to $5,000, may also be awarded on a very limited and infrequent basis under this Recognition Program. Any spot bonuses awarded are paid through payroll.

194.    As of the Petition Date, the Debtors estimate that they owe approximately $550,000 in accrued but unpaid obligations on account of the Recognition Program (inclusive of any amounts owed to Workhuman), of which approximately $355,000 will become due and owing before the final hearing on this Motion.  For the avoidance of doubt, no recipient of any amounts under the Recognition Program authorized to be paid under this Motion is or will be an Insider.

(6)    Leave Policies

195.    Qualified Employees also receive other forms of compensation, including: paid time off pursuant to the Debtors' applicable policies, such as vacation, sick leave, and personal leave (collectively, the "***PTO***") and certain other paid and unpaid leave (collectively, the "***Non-PTO***"), such as parental leave, caregiver leave, holidays, civic duties leave, and bereavement days, which give rise to the Debtors' paid time off obligations (collectively, the "***PTO Obligations***"). These forms of compensation are, in certain cases, required by statute and, in all cases, usual, customary, and necessary if the Debtors are to retain qualified Employees to operate their businesses.  Thus, failure to provide these benefits could contravene applicable law and harm Employee morale and encourage the premature departure of Employees.  The Debtors, therefore, request authority to continue to honor their PTO Obligations in connection with these programs in the ordinary course of business during these chapter 11 cases.

196.    <u>COVID-19 Related Measures</u>.  In response to the ongoing COVID-19 global pandemic, the Debtors have initiated a variety of temporary Employee-related measures and/or made certain temporary adjustments to existing Health and Welfare Benefits for eligible U.S.

76

Employees.[29]   For example, key COVID-19-related measures the Debtors have implemented include:

- **Temporary Pay Relief** – this COVID Program provides full or partial salary continuation for eligible U.S. Employees unable to perform their work duties from home due to the nature of their job and cannot come to work for reasons related to the COVID-19 pandemic, such as quarantine, child or elder care issues, or compromised immune system issues.

- **Employee Health Care Professional Volunteer Policy** – this global COVID Program provides eligible Employees who meet certain qualifications, including active certification as a health care professional, with paid leave for approved periods to permit such Employees to volunteer their services in the community in support of the COVID-19 pandemic.

197.    I believe it is important to implement these measures to manage the impact of the crisis, ensure public health and safety, and support needs associated with the crisis during these challenging and unusual circumstances.

198.    <u>Non-Union Employees</u>.  In the United States, as part of their overall compensation, U.S. Non-Union Employees are eligible, in certain circumstances, to receive PTO for vacation and sick days.  Non-Union Employees are entitled to an annual PTO allowance depending on length of service, earned on a weekly or bi-weekly basis, as follows:  (a) Non-Union Employees with one to four years of tenure are entitled to up to twenty days of PTO per year; (b) Non-Union Employees with five to nineteen years of service are entitled to up to twenty-five days of PTO per year; and (c) Non-Union Employees with twenty or more than twenty years of service are entitled to up to thirty days of PTO per year.  PTO accrues per pay period on a weekly or bi-weekly basis up to the

---

[29]   Out of an abundance of caution, to the extent this Court considers any COVID-19-related adjustments to the Prepetition Employee Obligations and Prepetition Contracted Labor Obligations to be non-ordinary course, the Debtors request authority, but not direction, to make such adjustments as necessary in the Debtors' sole discretion, without the need for further Court approval.

applicable annual PTO limit, depending on whether the Non-Union Employee is classified as hourly or salaried.

199.     Further, Non-Union Employees may accrue up to one-hundred and fifty percent (150%) of the annual PTO amount.  Once a Non-Union Employee reaches this maximum percent of their annual PTO allowance, the Non-Union Employee may not accrue any additional PTO time until the Non-Union Employee takes PTO and the Non-Union Employee's PTO balance drops below the maximum percent threshold.  In response to the COVID-19 pandemic, the Debtors have temporarily increased the maximum PTO accrual for eligible U.S. Non-Union employees from 150 percent to 200 percent through September 27, 2020.  From and after September 28, 2020, the maximum PTO accrual for eligible U.S. Non-Union Employees will be reinstated to 150 percent, though Employees may have accrued in excess of such amount during the aforementioned temporary increase in the PTO accrual cap.  From and after January 1, 2021, any accrued and unused PTO above the 150% maximum accrual amount will be forfeited and will not be paid out unless required by applicable non-bankruptcy law.

200.     In addition to the above, Non-Union Employees receive certain Non-PTO, which varies by the business segment in which the Non-Union Employees work.  In the United States, such Non-PTO generally includes twelve (12) paid holidays per year (consisting of eight scheduled holidays and four floating holidays), civic duty, and bereavement leave, regardless of length of service (though certain eligible Employees may receive additional paid leave related to certain public scheduled holiday periods).  In the United States, Non-PTO does not rollover on an annual basis.

201.     Additionally, Non-Union Employees in the United States may borrow up to forty (40) hours of Borrowed PTO.  In response to COVID-19, the Debtors have temporarily increased

the maximum amount of Borrowed PTO available for eligible Non-Union Employees from forty (40) hours to eighty (80) hours, which temporary change will remain effective through March 15, 2021.  From and after March 16, 2021, the maximum amount of Borrowed PTO will be reinstated to 40 hours, though Employees may have accrued in excess of such amount during the aforementioned temporary increase.  Non-Union Employees who take Borrowed PTO must pay the Borrowed PTO back with future accrued PTO.

202.    Upon termination or retirement, Non-Union Employees receive payment on account of any accrued and unused PTO hours, subject to the applicable carry-over restrictions and exceptions for Borrowed PTO.  Specifically, any unpaid Borrowed PTO incurred before a Non-Union Employee's termination or retirement will be deducted from the Non-Union Employee's final paycheck.

203.    Outside the United States, the Debtors provide certain forms of paid and unpaid leave to qualified non-U.S. Employees, and as required in many instances by the various jurisdictions in which the Debtors operate, including, but not limited to (depending on the applicable jurisdiction) vacation, sick days, and other leave (such as scheduled public holidays). In addition to providing any statutorily required leave, certain applicable Foreign Debtor Employers offer eligible Employees in Ireland and the United Kingdom additional paid leave under certain circumstances, specifically for maternity/adoption leave, parental leave, among other types of leave.

204.    The Debtors submit that any aggregate accrued but unpaid amount of PTO does not represent a true "cash" liability for the Debtors, as the Debtors anticipate that Employees will use

most of their PTO in the ordinary course of business.  Further, eligible Employees only receive cash payments on account of accrued but unused PTO upon termination or resignation.[30]

205.    <u>Union Employees</u>.  Union Employees who have a minimum of six months of service are eligible for vacation pay depending on length of service and the terms of the applicable CBA.  On January 1 of each calendar year, St. Louis-based Union Employees receive the full amount of their individual vacation allocations to which they are entitled for the applicable year.  Greenville-based Union Employees receive the full amount of their individual vacation allocations on the anniversary of their employment.  Union Employees forfeit their unused vacation days at the end of the applicable 12-month period.

206.    In addition, certain St. Louis-based Union Employees who have a minimum of one year of service are eligible for paid sick and personal days depending on length of service and the terms of the applicable CBA.  At the end of the calendar year, certain eligible Union Employees receive payment on account of any unused sick and/or personal days granted during the previous calendar year (except for SEIU and IUOE Union Employees, who are not eligible to receive payments on account of any unused sick days).  Greenville-based Union Employees are eligible for personal days, which are granted at the start of each contract year, and are allowed to accumulate and carry forward unused personal time into the next contract year.  In addition to the foregoing vacation, sick and/or personal days, Union Employees receive other paid leave, which varies according to the applicable CBA, but generally consists of twelve (12) paid holidays per

---

[30]    It is the Debtors' understanding that one of their Employees has recently passed away.  The Debtors estimate that, as of the Petition Date, the deceased former Employee (who is not an Insider) is owed amounts on account of certain Prepetition Employee Obligations, including prepetition wages, accrued PTO, and a pro-rated bonus, in the total aggregate amount of approximately $20,000, which amounts the Debtors intend to pay to the deceased former Employee's applicable beneficiary or beneficiaries (collectively, the "***Beneficiary***").  If not for the clerical need for a properly-submitted W-9, the Debtors believes that such amounts would have already been paid. Accordingly, and given these unforeseen and unfortunate circumstances, the Debtors seek authority to make such payments in full on an interim basis, in their sole discretion, to the applicable Beneficiary on behalf of the individual deceased Employee.

year, civic duty, and bereavement leave.  Upon termination or retirement, Union Employees do not receive payment on account of any unused sick or personal days.

207.    Because the PTO Obligations constitute an essential feature of the employment package provided to the Debtors' Employees, and failure to provide this benefit would harm Employee morale and encourage the premature departure of valuable Employees, the Debtors request authority to honor all of their PTO Obligations as and when they come due in the ordinary course of business.

(7)    Compensation of Independent Directors

208.    The Debtors are indirect, wholly-owned subsidiaries of Debtor Mallinckrodt plc. The Plc Board includes nine (9) non-Employee directors (the "***Plc Non-Employee Directors***"), who are each compensated with an annual cash retainer of $336,000 and supplemental cash retainers for the chairman of the Plc Board and committees (ranging from $15,000-$139,600) and $5,000 for each committee a board member serves on (if not the chair).  Retainers are paid quarterly in arrears.  The Plc Non-Employee Directors are also reimbursed for reasonable out-of-pocket business expenses, for each meeting attended in the performance of their duties as independent directors (such expenses, together with the Plc Non-Employee Directors' compensation, the "***Plc Non-Employee Directors' Compensation***").  The Plc Non-Employee Directors are also covered by the Debtors for Business Travel Insurance (defined below).

209.    In addition, the respective boards of the Specialty Generics Debtors include two (2) independent managers (the "***Independent Managers,***" and together with the Plc Non-Employee Directors, the "***Independent Directors***").[31]  Pursuant to management agreements (collectively, the

---

[31]    Specifically, the boards of each of the following Debtors include Independent Managers: Mallinckrodt LLC; Mallinckrodt APAP LLC; Mallinckrodt ARD Finance LLC; Mallinckrodt Enterprises Holdings, Inc.; Mallinckrodt Enterprises LLC; Mallinckrodt Equinox Finance Inc.; SpecGx LLC; SpecGx Holdings LLC; and WebsterGx Holdco LLC.

"***Management Agreements***"), the Independent Managers are each compensated between $30,000 to $45,000 per month (subject to additional compensation that may be awarded at the discretion of the board of Debtor Mallinckrodt LLC),[32] in addition to expense reimbursements for all reasonable and documented out-of-pocket business expenses, for each meeting attended in the performance of their duties as independent managers (the "***Independent Manager Compensation,***" and together with the Plc Non-Employee Directors' Compensation, the "***Independent Directors' Compensation***").

210.    I believe that the services of the Independent Directors are necessary for the continued management of the Debtors, and, accordingly, it is essential that the Debtors be authorized to pay any amounts owed to the Independent Directors as and when they come due.  As of the Petition Date, there are no accrued but unpaid obligations outstanding with respect to the Independent Directors' Compensation.[33]  The Debtors request the authority, solely pursuant to the proposed Final Order, to pay the Independent Directors' Compensation as it comes due in the ordinary course of business.

### d.    Severance

#### (1)    United States

211.    <u>Non-Union Employees</u>.    Certain Non-Union Employees, including Senior Employees, are eligible for severance benefits in the United States pursuant to certain severance

---

[32]    By this Motion the Debtors seek authority to pay, on a final basis, any discretionary amounts that may be awarded pursuant to the terms of the Management Agreements subject to the prior approval of the United States Trustee and any official committee of unsecured creditors appointed in these chapter 11 bankruptcy cases.

[33]    The compensation structure of the Plc Non-Employee Directors in prior fiscal years has included equity grants in addition to an annual cash retainer and supplemental cash retainers described above.  For fiscal year 2020, the retainers were increased to reflect that, the Plc Non-Employee Directors will not be compensated with any equity grants.  Moreover, as of the Petition Date, there are no accrued but unpaid obligations outstanding on account of any equity grants awarded to Plc Non-Employee Directors from prior fiscal years.  While the Debtors believe there are no accrued and unpaid prepetition amounts owed on account of the Independent Directors' Compensation as of the Petition Date, out of an abundance of caution, by this Motion the Debtors request authority to pay any prepetition amounts that are later determined to be owed on account of such obligations, if any.

plans (collectively, the "***U.S. Non-Union Severance Plans***").  The U.S. Non-Union Severance Plans apply to eligible Non-Union Employees upon a qualifying termination of employment or other qualifying event.  Eligible Non-Union Employees may receive a single lump-sum payment equal to the relevant Non-Union Employee's base salary for each full year of service (subject to certain exclusions and an applicable formula for calculating).  Depending on the relevant U.S. Non-Union Severance Plan, this lump-sum payment is subject to either certain time-based limits or a severance multiplier (for eligible Senior Employees). In addition, if the relevant Non-Union Employee had elected medical or dental coverage as of their termination date, the Non-Union Employee receives a single lump sum payment with respect to COBRA coverage.

212.    Also, eligible Non-Union Employees are entitled to notice pay or pay in lieu of notice, as applicable, regardless of whether they receive severance benefits.  Notice pay means continued payment of a pro-rata portion of the Non-Union Employee's base salary (subject to certain exclusions) during a certain period of time after notice of termination under the terms of the applicable U.S. Non-Union Severance Plan.  Alternatively, under certain circumstances, the Debtors provide the eligible Non-Union Employee with pay in lieu of notice calculated as a pro-rata portion of the Non-Union Employee's base salary (subject to certain exclusions) for a certain period of time after termination, based on when such Non-Union Employee was terminated. Participating Non-Union Employees may also be eligible for outplacement services.  Participating Non-Union Employees may also be eligible for certain bonus-related payments depending on the applicable U.S. Non-Union Severance Plan.  Participating Senior Employees may also be eligible to exercise certain equity-related awards they held upon termination.

213.    As of the Petition Date, the Debtors estimate that they have no outstanding obligations owed on account of any severance obligations to any former Non-Union Employees.

214.    <u>Union Employees</u>.  Certain eligible Union Employees who have a minimum of one year of continuous full-time employment immediately prior to the date of termination are eligible for a severance payment upon termination pursuant to the applicable CBA.  As of the Petition Date, the Debtors have no accrued and outstanding obligations on account of any severance obligations to former Union Employees.

(2)    Outside the United States

215.    Similarly, the Debtors also participate in various severance plans for eligible non-U.S. Employees, all of whom are Non-Union Employees in their applicable jurisdictions abroad and none of whom are Insiders (collectively, the "***Foreign Severance Plans***").  The Foreign Severance Plans are provided in accordance with applicable statutory schemes in each respective jurisdiction.  An overview of the Foreign Severance Plans follows.

- **Canada**.  In accordance with applicable statutory schemes, eligible Employees in Canada may be entitled to statutorily required notice, pay in lieu of notice, or a combination of notice and pay, if they have a prescribed minimum period of service and their employment is terminated without cause, which depends on various factors, including the amount of time the relevant recipient has worked for the Debtors.  The Debtors provide the statutory minimums required by such laws.

- **Ireland**.  In accordance with applicable statutory schemes, eligible Employees in Ireland may be entitled to severance pay generally calculated according to the recipient's years of service, among other factors. The Debtors provide the statutory minimums required by such laws.  In addition, recipients are offered up to four (4) weeks of salary per year of service, with a pro-rated bonus up to the date of termination (in the discretion of the applicable Foreign Debtor Employer).

- **Luxembourg**.  In accordance with applicable statutory schemes, eligible Employees in Luxembourg may be entitled to severance pay that is generally calculated according to the recipient's years of service, among other factors.  The Debtors provide the statutory minimums required by such laws.  In addition, in the applicable Foreign Debtor Employers' discretion, recipients may receive an ex-gratia payment of double the applicable notice period.

- **United Kingdom.**  In accordance with applicable statutory schemes, eligible Employees in the United Kingdom may be entitled to severance pay that is

generally calculated according to the recipient's years of service and salary, among other factors, according to a statutory calculation. The Debtors provide the statutory minimums required by such laws. In addition, recipients are offered up to four (4) weeks of salary per year of service, with a pro-rated bonus up to the date of termination (in the discretion of the applicable Foreign Debtor Employer).

- **Switzerland**. In accordance with applicable statutory schemes, eligible Employees in Switzerland may be entitled to severance pay that is generally calculated according to the recipient's years of service, among other factors, according to a statutory calculation. The Debtors provide the statutory minimums required by such laws. In addition, in the applicable Foreign Debtor Employers' discretion, recipients may receive an ex-gratia payment of double the applicable notice period.

216. I believe it is important that they honor their severance commitments. In doing so, the Debtors will show their current Employees that they fulfill the promises they make to their Employees, on which the Employees have relied in contributing their time and hard work to the global enterprise. I feel such assurances are invaluable not only to maintain and boost the morale of the current Employees, but also to attract and retain new Employees. These severance benefits are typically provided in exchange for a general release of liability from the terminated Employees in favor of the Debtors. Accordingly, I believe that it is important that they have the flexibility to maintain their current practice of honoring their severance program for Employee retention and morale.

217. As of the Petition Date, the Debtors estimate they have no outstanding obligations owed on account of any severance obligations to any former foreign Employees.

### e. Expense Reimbursements

218. The Debtors, in the ordinary course of business, pay for a variety of ordinary, necessary, and reasonable business-related expenses (or pay for reimbursement of such expenses) that the Employees incur on behalf of the Debtors in the scope of their employment (all such obligations described in this section , the "***Expense Reimbursements***"). Expense Reimbursements may include expenses for business travel (including lodging, automobile rentals, meals, and

internet charges), business-related transportation and mileage costs, and other general business-related expenses.  Employees are expected to use sound judgment and good business sense when incurring such expenses.

(1)    Company Credit Card Expenses

219.    In certain instances, Employees may be issued corporate credit cards to pay for Expense Reimbursements.  Such Employees are issued a company credit card through Citibank, N.A. ("*Citi*") to be utilized for travel and other business-related expenses.  Expenses on each credit card are reconciled through the reporting software Concur. The Debtors ultimately pay for the obligations owed to Citi on behalf of the Employees, and there is cash collateral posted to Citibank to support the card program.  Approximately 1,700 Employees have a company credit card, and the average aggregate monthly reimbursable amount incurred on the company credit cards is approximately $1,600,000.  As of the Petition Date, the Debtors estimate that they owe approximately $335,000 in accrued but unpaid obligations on account of the Expense Reimbursements, all of which will become due and owing before the final hearing on this Motion.

(2)    Relocation Expenses

220.    In the ordinary course of business the Debtors cover relocation expenses if an Employee relocates at the request of the Debtors in the United States (the "*Relocation Expenses*").  As of the Petition Date, the total accrued but unpaid obligations owed in connection with the Relocation Expenses are approximately $600,000, of which approximately $118,000 will become due and owing before the final hearing on this Motion.

(3)    Vehicle Program Expenses

221.    In certain instances, the Debtors offer eligible Employees in the United States and abroad the opportunity to participate in a vehicle program.  In the United States, most Employees that participate in this vehicle program are provided a company car leased by the Debtors. The

other participating U.S. Employees receive a monthly vehicle allowance to use their own vehicles for business-related travel. The company cars are leased by the Debtors from Enterprise Rent-A-Car and/or certain of its affiliates. Participants may use a leased car or submit business-related vehicle expenses to the Debtors for reimbursement. Outside the United States, in certain foreign jurisdictions, participating Employees may submit certain eligible expenses related to leasing or using a car for business purposes for reimbursement by the Debtors on a monthly basis.

222.    As of the Petition Date, approximately 500 U.S. Specialty Brands Employees participate in the U.S. vehicle program and approximately three (3) U.K. and Irish Employees participate in their respective vehicle programs.

223.    As of the Petition Date, the Debtors estimate that they owe approximately $630,000 in accrued but unpaid obligations on account of these reimbursements, all of which will become due and owing before the final hearing on this Motion.

(4)    Immigration Assistance Program Expenses

224.    In the ordinary course of business, the Debtors maintain an immigration and work visa program (the "***Immigration Assistance Program***"), pursuant to which the Debtors provide immigration-related assistance to Employees who require temporary non-immigrant work visas and authorizations and related services for certain non-citizen and non-permanent resident Employees in connection with their job. The Debtors use the services of Squire Patton Boggs and Arthur Cox (Ireland) to administer the Immigration Assistance Program.[34] The Debtors estimate that they incur approximately $26,000 on average on monthly basis related to the Immigration Assistance Program.

---

[34]    For the avoidance of doubt, the Debtors the Debtors do not seek authority to pay any outstanding prepetition amounts owed to Squire Patton Boggs and/or Arthur Cox (Ireland) in connection with their Immigration Assistance Program services by this Motion.

225.     As of the Petition Date, the Debtors estimate that they owe approximately $26,000 in accrued but unpaid obligations on account of the Immigration Assistance Programs, all of which will become due and owing before the final hearing on this Motion.

(5)     Miscellaneous Expenses

226.     Employees may also receive reimbursement for certain other miscellaneous programs and benefits (the "*Miscellaneous Reimbursement Programs*").  Generally, the Debtors, at the discretion of the eligible Employee's applicable business unit, may reimburse, pay directly for, or provide a monthly stipend for items such as broadband internet expenses, parking expenses, professional license fees or dues, subscriptions, and other miscellaneous business expenses.

227.     As of the Petition Date, the Debtors estimate that they have no outstanding obligations owed on account of the Miscellaneous Reimbursement Programs.  Nonetheless, out of an abundance of caution, by this Motion the Debtors request authority to pay any prepetition amounts that are later determined to be owed on account of such obligations.

**f.      Health and Welfare Benefits**

228.     Eligible Employees may elect from a portfolio of benefits, including medical and prescription drug coverage, dental coverage, vision coverage, health savings accounts, COBRA coverage, flexible spending accounts, life insurance, disability insurance and other benefit programs provided to Employees in the ordinary course of business (the health and welfare benefits obligations described in this section of the Motion, the "*Health and Welfare Benefits*").

(1)     General

229.     In the United States, all Employees who are scheduled to work twenty or more hours per week and are on a U.S. domestic payroll are eligible to receive Health and Welfare Benefits through MEH, which acts as the control sponsor for all related programs.  MEH, Inc., as sponsor of the benefits plans and on behalf of the other Debtors, pays for the costs of the Health

and Welfare Benefits to applicable third-party providers.  Enterprises and STSS are then allocated and charged a PEPM Charge for the cost of the Health and Welfare Benefits for the Employees. A true up of actual costs is then allocated to the other Debtors based on headcount.  The estimated average monthly total cost of Health and Welfare Benefits for U.S. Employees is approximately $3,500,000 based on total Employee payroll.

230.    Outside the United States, arrangements for non-U.S. Employees' Health and Welfare Benefits vary depending on the applicable jurisdiction.  Specifically, depending on the jurisdiction, eligible non-U.S. Employees are entitled to receive Health and Welfare Benefits either through their respective Foreign Debtor Employer (which also acts as the control sponsor in such circumstances for applicable coverage), or through applicable statutory coverage, as further summarized below.

231.    As of the Petition Date, the Debtors estimate that they owe approximately $6,220,000 in accrued but unpaid obligations on account of the Employee Benefit Obligations, of which approximately $5,990,000 will become due and owing before the final hearing on this Motion.

(2)      Medical and Dental Plans

232.    <u>United States</u>.  All eligible U.S. Employees have the opportunity to obtain basic medical, prescription drug, vision, and dental coverage, and related benefits (the "***U.S. Medical and Dental Benefits***").  U.S. Medical and Dental Benefits are provided through self-insured programs administered by third parties, such as (a) UnitedHealthcare ("***United***"), which administers the medical programs, (b) Express Scripts Holding Company, which administers

89

prescription drug coverage via the Willis Towers Watson Rx Collaborative[35], and (c) Delta Dental of Missouri ("*Delta*"), which administers dental coverage.[36]

233.    Generally, Employees may choose between two health plan alternatives (subject to exceptions for certain Union Employees):  PPO Choice, a PPO health plan; and HSA Health Savings plan, a high deductible health plan with a health savings account (collectively, the "*U.S. Medical Plan*").  As of the Petition Date, approximately 2,510 Employees participate in the U.S. Medical Plan.

234.    All eligible Employees may also obtain dental benefits through a dental plan administered by Delta (the "*U.S. Dental Plan*").   Under the U.S. Dental Plan, participating Employees may select from two coverage options:  the basic option or the enhanced option.  As of the Petition Date, approximately 2,550 Employees participate in the U.S. Dental Plan.

235.    The U.S. Medical Plan and U.S. Dental Plan are self-insured, including with respect to prescription drug coverage.  Accordingly, after the applicable Administrator provides a discount to invoices received from providers and determines the eligibility of expenses, the participating Employee pays any required deductibles, co-insurance, or co-pays, and MEH pays all eligible remaining costs (including through the intercompany process with respect to the PEPM Charge, as further described in the motion).

236.    <u>Outside the United States</u>.    Outside the United States, all eligible non-U.S. Employees obtain basic medical, vision, and dental coverage and related benefits (the "*Foreign*

---

[35]    In addition to the services described in the motion, Willis Towers Watson plc and/or its subsidiaries and affiliates (collectively, "*Willis Towers Watson*") provide various services to the Debtors in the ordinary course, including, but not limited to, health and welfare consulting services and executive compensation consulting services.  For the avoidance of doubt, the Debtors intend to seek authority to pay any outstanding prepetition amounts owed to Willis Towers Watson in connection with their services pursuant to the Debtors' motion for entry of an order authorizing employment and payment of ordinary course professionals, which the Debtors intend to file in due course.

[36]    Certain affiliates and/or subsidiaries of Kaiser Permanente provide certain healthcare insurance coverage for one (1) Employee located in Hawaii.

*Medical and Dental Benefits*").  Coverage varies depending on the applicable jurisdiction.  An overview of the Foreign Medical and Dental Benefits follows.

- **Canada**.  The eligible Employee is entitled to receive medical coverage through the relevant provincial health insurance program pursuant to applicable law.  In addition, the eligible Employee may choose to claim medical and dental coverage through an applicable portion of a general benefits allowance that the Foreign Debtor Employer provides to the eligible Employee on a monthly basis, in the total amount of approximately CAD$1,147 a month.

- **Ireland**.  Eligible Employees may obtain medical and dental coverage through programs provided by the applicable Foreign Debtor Employer and administered by certain Administrators, such as Laya Healthcare Limited ("*Laya*"), which administers the medical programs, and DeCare Dental Insurance Ireland DAC, which administers dental coverage.

- **Luxembourg**. Eligible Employees are entitled to receive medical and dental coverage through the state healthcare system pursuant to applicable law.

- **Switzerland**.  Eligible Employees are entitled to receive medical and dental coverage through the state healthcare system pursuant to applicable law.

- **United Kingdom**. Eligible Employees may obtain medical and dental coverage through programs provided by the applicable Foreign Debtor Employer and administered by certain Administrators, such as AXA PPP Healthcare ("*AXA*"), which administers the medical programs, and Cigna, which administers dental coverage.

237.    With respect to the Foreign Medical and Dental Benefits offered by the Foreign Debtor Employers in Ireland and the United Kingdom, the Foreign Debtor Employers are obligated to pay, among other things, certain premiums, deductibles, reimbursement obligations, fees, expenses, and related costs to the applicable Administrator on behalf of the relevant Employees. In the ordinary course, the Foreign Debtor Employers in Ireland and the United Kingdom maintain certain insurance policies and programs in connection with Foreign Medical and Dental Benefits on behalf of their respective non-U.S. Employees, which are administered through various Administrators.

(3)    Vision Plans

238.    In the United States, all eligible Employees have the option to enroll in vision benefits through a vision plan insured by Vision Service Plan Insurance Company ("*VSP*") (the "*U.S. Vision Plan*").  Under the U.S. Vision Plan, participating Employees may select from two coverage options: the basic plan or the enhanced plan.  The U.S. Vision Plan generally covers Employees' routine eye exams, eyeglass frames and lenses, and contact lenses, to varying degrees depending on the service and whether the provider is within VSP's network or is outside the network (the latter option being subject to higher costs to the Employee).  As of the Petition Date, approximately 2,310  Employees participate in the U.S. Vision Plan.

239.    Outside the United States, depending on the applicable jurisdiction, eligible Employees may obtain vision benefits through vision plans, either through the relevant Foreign Debtor Employer or through applicable state coverage (collectively, the "*Foreign Vision Plans*," and with the U.S. Vision Plan, the "*Vision Plans*").  In Canada, the Employee may choose to claim vision coverage through the applicable portion of the general benefits allowance previously described.  In Luxembourg and Switzerland, eligible Employees may avail themselves of available vision benefits through their respective state healthcare systems.  In Ireland, eligible Employees have the option to claim vision benefits through health insurance plan insured by Laya.  In the United Kingdom, eligible Employees may choose to claim vision benefits through a health insurance plan insured by AXA.

(4)    Pre-Tax Contribution Health Savings Accounts and
Flexible Spending Accounts

240.    <u>United States</u>.  All eligible U.S. Employees have the opportunity to contribute, through pre-tax compensation deductions, to tax savings programs, either to a health care flexible spending account ("*FSA*") for PPO Choice participants or a health savings account ("*HSA*") for

participants in the HSA Health Savings plan to be used for healthcare-related expenses. Participants in the HSA Health Savings plan are also eligible for a limited purpose FSA for dental and vision-related expenses. These tax-savings programs are not covered by an intercompany allocation process. Instead, the Debtors maintain FSA contributions in a recharge account, which is funded on an as-needed basis. Any HSA contributions are managed by United (through Optum) on behalf of participating Employees.

241.    The Debtors, through MEH, Inc. contribute between $500 and $1,000 annually on a bi-weekly basis to the HSA for each employee enrolled in the HSA Health Savings plan based on whether the Employee elected employee-only coverage or covers dependents, through employee payroll. Each participating Employee may then contribute a portion of his or her eligible earnings each year on a pre-tax basis to his or her HSA, subject to limits imposed by federal law, which amount is deducted through payroll. A participating Employee may only use his or her HSA for eligible medical expenses. The HSAs are administered by United (through Optum) which receives an administrative fee of approximately $820 per month.

242.    Also on bi-weekly basis, participating Employees contribute a total of approximately $35,000 to HSAs. On behalf of such participating Employees, contributions into HSAs are charged to the Payroll Deductions created by, and held in the name of, each participating U.S. Employee. As of the Petition Date, the Debtors estimate that they are obligated to make payments on account of HSA deductions of approximately $77,000.

243.    Any eligible Employees (except for UAW Union Employees and SEIU Union Employees) have the opportunity to contribute, through pre-tax compensation deductions, to FSAs to be used for healthcare-related expenses, commuter expenses, and dependent care expenses, subject to limits imposed by applicable federal law. FSA deductions are taken from Employees'

93

paychecks. To be reimbursed for these expenses, claims are adjudicated automatically, or Employees may submit eligible claims to United. United administers such claims under the FSAs and remits reimbursements to the relevant provider and/or Employee(s), as applicable. As of the Petition Date, the Debtors estimate that they owe approximately $146,000 in accrued but unpaid obligations on account of such FSA deductions.

244.    <u>Outside the United States</u>. Outside the United States, there are no health savings accounts or similar programs available to any non-U.S. Employees.

(5)    Life and Disability Insurance

245.    Eligible Employees receive, at the Debtors' cost, short-term disability ("***STD***") coverage, long-term disability ("***LTD***") insurance, accidental death and dismemberment ("***AD&D***") insurance, and life insurance through various plans (the "***Life and Disability Programs***"). Employees' eligibility to receive, and the scope of, certain Life and Disability Programs varies depending on various factors, such the Employee's classification as Non-Union or Union and, with respect to Union Employees, the terms of the applicable CBA.

246.    In the United States, MEH is the insured party with respect to the Life and Disability Programs. MEH pays any premiums and fees for the Life and Disability Programs to the applicable third-party administrator and reconciles such amounts via an intercompany process in connection with the PEPM Charge, as further described in the motion. The premiums for any voluntary term life and AD&D insurance purchased by U.S. Employees are then deducted from the applicable Employee's paychecks and reimbursed to the Debtors. As of the Petition Date, the Debtors estimate that they owe approximately $140,000 in accrued but unpaid obligations on account of voluntary term life and AD&D insurance premiums for U.S. Employees.

247.    Outside the United States, coverage varies depending on the applicable jurisdiction, as further described below. With respect to Luxembourg and Switzerland, any life, disability, and

94

similar programs are offered to eligible Employees through state coverage pursuant to applicable statutory schemes, and accordingly are not further addressed in the motion.  With respect to Ireland and the United Kingdom, each respective Foreign Debtor Employer is the insured party with respect to the relevant Life and Disability Programs for their respective jurisdictions.  With respect to Canada, any life, long-term disability, and similar programs the Employee, subject to eligibility, may choose to apply an applicable portion of the general benefits allowance to such coverage, as previously described in the motion.

248.    <u>Life and Accidental Death and Dismemberment Insurance</u>.  The Debtors provide eligible Employees with basic life and basic accidental death and dismemberment ("***AD&D***") insurance coverage in the event of serious illness, injury or death through various third-party providers in the United States, Ireland, and the United Kingdom.  In Canada, the Employee, subject to eligibility, may choose to apply a portion of general benefits allowance previously described in section VI.B. to obtain basic life and AD&D insurance coverage.

249.    <u>Short-Term and Long-Term Disability Insurance</u>.  The Debtors provide eligible Employees short-term disability coverage ("***STD Coverage***").  In the United States, STD Coverage is a self-insured benefit administered by Cigna and/or certain of its affiliates and subsidiaries (collectively, "***Cigna***").  The U.S. STD Coverage allows eligible Employees to receive pay continuation for up to twenty-six (26) weeks (or up to fifteen months for UAW and Guards Union Employees, pursuant to their respective CBAs) for an approved medical condition that requires the eligible Employee to be out of work.  Outside the United States, the applicable Foreign Debtor Employers in Ireland and the United Kingdom provide STD Coverage or similar programs to eligible Employees in their respective jurisdictions.  Any available short-term disability or similar

coverage is provided to eligible Employees in Canada, Luxembourg, and Switzerland pursuant to applicable statutory schemes.

250.    The Debtors also provide eligible Employees long-term disability insurance ("***LTD Insurance***") through various third-party providers in the United States, Canada, Ireland, and the United Kingdom.  Additionally, the Debtors offer voluntary supplemental executive disability insurance to certain eligible U.S. Employees (the "***Supplemental Executive Insurance***").  Any Supplemental Executive Insurance Policies are held between the individual Employee and the insurance carrier Unum Group, but the Debtors arrange for and pay for (through MEH) the Supplemental Executive Insurance on the applicable Employee's behalf.

(6)    Employee Assistance Programs and Health Incentive Program

251.    The Debtors provide eligible Employees with counseling services through employee assistance programs through applicable third-party providers.  Additionally, in the United States, the Debtors provide eligible U.S. Employees with an incentive program to encourage healthy activities (the ***"Well-being Solutions 360"***), which is administered by third-party administrator Limeade, Inc..  Each eligible Employee and their respective spouse or partner who successfully participates in the Well-Being Solutions 360 may receive a contribution incentive credit or incentive, as applicable, which the Debtors contribute to the respective Employee's health plan (thus reducing the cost of insurance to the Employee).

(7)    Business Travel Insurance

252.    The Debtors also provide, on a global basis, certain AD&D coverage to eligible Employees who are injured or experience a medical emergency while traveling on qualifying and/or approved trips.  Specifically, the Debtors (through MEH) carry business travel accident insurance ("***Business Travel Insurance***") through third-party provider Chubb, Inc., and or its

applicable affiliates and subsidiaries (collectively, "*Chubb*").  The Debtors offer the Business Travel Insurance to Employees at no cost, which the Debtors pay in full.

(8)    Voluntary Benefits Program

253.    In the United States, the Debtors (through MEH) offer a voluntary benefits program (the "***Voluntary Benefits Program***") to eligible Employees that is administered by YouDecide, Inc. ("***YouDecide***").  Any applicable deductions through the Voluntary Benefits Program are deducted from participating Employees' paychecks and remitted to Youdecide.  The Voluntary Benefits Program allows participating Employees to participate in a variety of discounted benefits, such as consumer services, automobile services, pet insurance, financial services, attorney referrals, and legal services, certain of which may be deducted from the Employee's pay.  The Voluntary Benefits Program also includes voluntary long-term care insurance for eligible Employees, which is provided by Transamerica Corporation and/or its applicable affiliates and subsidiaries.

254.    As of the Petition Date, the Debtors estimate that they have no outstanding obligations owed on account of the Voluntary Benefits Program.  Nonetheless, out of an abundance of caution, by this Motion the Debtors request authority to pay any prepetition amounts that are later determined to be owed on account of such obligations.

**g.     Other Benefit Programs**

255.    Various other customary benefits are available to eligible Employees.  These benefits include tuition reimbursement, adoption assistance, an employee matching gift program, and health advocacy services (collectively, the "***Other Benefit Programs***").  The Other Benefit Programs also include customary benefits only available to members of the Debtors' U.S. executive committee, which include a physical examination program and a financial planning program, subject to a maximum annual amount.  With respect to the employee matching gift

97

program, the Debtors match the qualifying contributions of eligible participants (all active U.S. full-time and part-time Non-Union Employees and members of the Plc Board are eligible) to qualified charitable organizations up to a maximum of $2,500 per eligible individual on an annual basis.

256.     The Other Benefit Programs also include benefits only available to certain Union Employees, such as employee reimbursement program for the UAW Union Employees and a perfect attendance program for IUOE Union Employees and SEIU Union Employees, all as pursuant to the terms of the applicable CBAs. As of the Petition Date, the Debtors estimate they owe approximately $200,000 in accrued but unpaid obligations on account of the Other Benefit Programs, none of which will become due before the final hearing on this Motion.

### h.        Savings, Pension, and Other Retirement Obligations

#### (1)       United States

257.     401(k).  Eligible U.S. Employees automatically participate in the Mallinckrodt Pharmaceutical Retirement Savings and Investment Plan, a qualified defined contribution plan (the "***401(k) Plan***"), for retirement savings for eligible Employees pursuant to section 401 of the Internal Revenue Code.  The Debtors pay for a contribution to each Employee's eligible plan on a per pay period basis in the amount of 3 percent of the Employee's eligible earnings and will match any voluntary contributions by the Employee up to another 4 percent of earnings (collectively, the "***401(k) Contributions***").  Employees may contribute up to the federal statutory cap of $19,500 per year (or $26,000 per year for those Employees age 50 or over).  Employees may also contribute up to an additional $10,000 per year (subject to adjustments) on an after-tax basis that is not subject to the federal statutory cap.

258.     Costs attributable to the 401(k) Plan are allocated, with each cost center charged a 6.3% of payroll fee per Employee, per month (subject to adjustments), or an estimated monthly

charge in the amount of $5,910,000 based on total U.S. Employee payroll. The 401(k) Plan is administered by Fidelity. As of the Petition Date, the Debtors estimate they owe approximately $310,000 in accrued but unpaid obligations on account of the 401(k) Contributions, all of which will become due and owing before the final hearing on this Motion.

259.    Pension Plans. The Debtors have incurred certain obligations with respect to legacy U.S. pension programs (maintained through Enterprises), all of which programs are currently terminated. All liabilities under these programs are supported with annuity contracts obtained by Enterprises from the Principal Financial Group. The Debtors believe there are no unfunded pension obligations not covered by these annuity contracts but are disclosing these potential obligations in an abundance of caution.[37]

260.    Rabbi Trust. In addition to the pension programs, the Debtors maintain the Mallinckrodt Umbrella Rabbi Legacy Trust (the "*Rabbi Trust*"), a "rabbi trust" for the benefit of certain retirees, which was assumed from predecessors to the Debtors (by merger or otherwise), which funds obligations under various legacy non-qualified retirement plans, split endorsement life insurance, and certain benefit(s) under a certain salary protection plan (collectively, the "*Legacy Plans*").

261.    As of the Petition Date, approximately $75,000,000 in cash and life insurance policies with approximately $44,000,000 in cash surrender value were being held in the Rabbi Trust to support the Debtors' obligations under the Legacy Plans. The Debtors estimate that their total obligations under the Legacy Plans are approximately $28,000,000, with typical monthly

---

[37]    Mercer LLC and/or its applicable affiliates and subsidiaries (collectively, "*Mercer*") provides services to the Debtors in connection with a global health & welfare consulting services, a benefits audit related to the legacy U.S. pension programs described above, and other actuarial services related to certain other post-employment benefits described in the motion. Out of an abundance of caution, by this Motion, the Debtors request authority to pay any prepetition amounts that are later determined to be owed on account of such obligations, if any; and authority to pay any accrued and unpaid prepetition amounts owed to Mercer in connection therewith.

payments of $93,000 paid on account of supplemental pension payments for the benefit of certain retirees.  No further obligations are being incurred under the Legacy Plans.  The Debtors do not seek relief for the Legacy Plans pursuant to this Motion.

262.    <u>Supplemental Savings and Retirement Plan</u>.  In the United States, certain U.S. Employees participate in a non-qualified supplemental savings and retirement plan (the "*U.S. SSRP*").  Under the U.S. SSRP, participating Employees may defer up to 75 percent of their base salary and annual performance-based bonuses to a retirement account, and certain Employees are eligible for a matching credit of up to 3 percent of their deferrals as well as a 3-percent credit on pay above the 401(a)(17) compensation limits.  If a participating Employee retires on or after his or her U.S. SSRP retirement eligibility date[38] with a U.S. SSRP account of $20,000 or more, he or she may be paid annually for between two and fifteen years, according to distribution elections made by the Employee. Participating Employees may also elect to be paid out over a term of years before his or her U.S. SSRP retirement eligibility date.  Otherwise, the U.S. SSRP account balance is paid in a lump sum in the year after retirement.  The Debtors' contributions attributable to the U.S. SSRP are allocated on a U.S. company-wide basis via the 6.3% of payroll fee per Employee per month, as with the 401(k) Plan described above.

263.    The Debtors do not seek relief with respect to the U.S. SSRP pursuant to this Motion.

---

[38]    SSRP retirement eligibility means that one must be at least 55 years old, with one's age plus years of service equaling at least 60 years.

(2)     Outside the United States

264.    Outside the United States, various savings, pension, and other non-medial retirement-related programs and benefits are available to eligible non-U.S. Employees depending on the jurisdiction.  An overview follows:

- **Canada**.  The Eligible Employee may receive a registered retirement savings plan allowance (the "***RRSP Allowance***") in the amount of 6% of eligible pay in a lump sum on a biweekly basis, which the Employee may use to establish or apply to a personal registered retirement savings plan.

- **Ireland**.  Eligible Employees may participate in a retirement savings plan offered by the Debtors (the "***Irish Retirement Plan***").  The Irish Retirement Plan, which is provided in accordance with applicable Irish statutory law, is a voluntary pension scheme pursuant to which participating Employees may contribute a certain percentage of their salary (5% annually) through their payroll deductions, on a monthly basis (subject to statutory and certain age-related limits).  Further, the relevant Foreign Debtor Employer contributes to participating Employee's pensions under the Irish Retirement Plan under one of two schemes based on the participant's seniority level.  Specifically, the Foreign Debtor Employer contributes 7.5% of any participating non-senior Employee's base salary on an annual basis and 10% of any participating senior Employees' base salary on an annual basis.

- **Luxembourg**.  Eligible Employees may obtain retirement pensions under applicable statutory schemes if certain requirements are met, including legal age and paid contribution requirements.  The Debtors do not offer any private retirement plans for Employees in Luxembourg.

- **Switzerland**.  There are several components to the pension scheme in Switzerland.  The Debtors provide the statutory minimums required by such laws.  The Debtors work with Administrator AXA to administer the pension scheme for their Employees in Switzerland.  The Debtors make an initial prepayment for statutorily required employer contributions in a lump sum at the beginning of the fiscal year.  For fiscal year 2020, the required employer contribution was approximately 12% of each eligible Employee's eligible salary.  Access, on behalf of the Debtors, makes any required payments to the applicable governmental authorities.  At the end of the fiscal year, Access invoices the Debtors for any outstanding balance, and the Debtors pay any such remaining outstanding amounts as they come due.

- **United Kingdom**.  Eligible Employees may participate in a retirement savings plan. The retirement plan, which is provided in accordance with applicable statutory law, is a pension scheme pursuant to which participating Employees may contribute a certain percentage of their salary

(up to a max of 6% annually) through their payroll deductions, on a monthly basis (subject to statutory rules).  Further, the relevant Foreign Debtor Employer contributes to participating Employee's pensions under the Retirement Plan under one of two schemes based on the participant's seniority level.  Specifically, the Foreign Debtor Employer contributes 1.5 times the Employee's contribution of any participating non-senior Employee's base salary on an annual basis and 2 times that of any participating senior Employees' base salary on an annual basis.

265.    As of the Petition Date, the Debtors estimate they have no outstanding obligations owed on account of their non-U.S. savings, pension, and other retirement obligations.  Nonetheless, out of an abundance of caution, by this Motion the Debtors request authority to pay any prepetition amounts that are later determined to be owed on account of such obligations.

(3)    Other Retirement Benefit Obligations

266.    The Debtors maintain various other health and welfare benefit programs for retirees (and certain eligible Specialty Generics Employees) including, for example, medical, prescription drug, dental, retiree reimbursement, vision benefits, and a legacy life insurance program, and the Debtors incur obligations (the "***Other Retirement Benefit Obligations***") under these programs.

267.    As of the Petition Date, the Debtors carry a reserve of approximately $23,080,000, which amount reflects their estimate of future costs under these programs.  The Debtors are aware of no unpaid prepetition requests for reimbursement or other payments under any of these programs as of the Petition Date.  Nonetheless, out of an abundance of caution, the Debtors request authority to honor any such prepetition amounts that are later determined to be owed on account of such obligations.

**i.    Workers' Compensation**

268.    The Debtors carry workers' compensation insurance that provides coverage for employee-related injuries, disability, or death, as prescribed by state and federal workers' compensation laws and other statutes.   In connection with these requirements, the Debtors

maintain workers' compensation insurance policies (collectively, the "***Workers' Compensation Policies***"), depending upon the state or other non-U.S. jurisdiction in which the covered Employees work.

(1)    Workers' Compensation Insurance Policies

269.    The Debtors maintain no-deductible workers compensation policies for Ohio and Washington, which are monopolistic states, through state-specific funds (the "***Monopolistic Workers' Compensation Policies***").  The Debtors purchase Monopolistic Workers' Compensation Policies directly from each of these applicable monopolistic states.  The Debtors pay any related premiums directly to the applicable monopolistic state, each of which also manages its own respective claims.  Third-party administrator ESIS, Inc., a wholly owned subsidiary of Chubb Inc., manages all other workers' compensation claims asserted by the Employees in connection with any workers' compensation policies in non-monopolistic states (the "***Non-Monopolistic Workers' Compensation Policies***").

270.    The Non-Monopolistic Workers' Compensation Policies are provided by certain subsidiaries and/or affiliates of American International Group, Inc. (collectively, "***AIG***").  The Debtors pay any related premiums to AIG indirectly, through the Debtors' insurance broker, through the Debtors' insurance broker, Marsh Inc. and its applicable subsidiaries and affiliates (collectively, "***Marsh***").  Under these policies, AIG provides insurance for workers' compensation claims in excess of the $1,000,000 deductible per accident.  The Debtors' obligations under the Non-Monopolistic Workers' Compensation Policies are backed by an approximately $8,250,000 letter of credit issued by Deutsche Bank AG on behalf of Debtor Mallinckrodt International Finance S.A., as applicant, for the benefit of the Debtors.[39]

---

[39]    For the avoidance of doubt, by this Motion, the Debtors seek authority to honor any obligations allocable to the Debtors for the Workforce with respect to the $8.25 million letter of credit addressed in the motion.  The Debtors

271.    Also, the Debtors maintain foreign voluntary workers' compensation policies (the "***Foreign Voluntary Workers' Compensation Policies***," and together with the Non-Monopolistic Workers' Compensation Policies and the Monopolistic Workers' Compensation Policies, collectively, the ***"Workers' Compensation Policies"***).    The Foreign Voluntary Workers' Compensation Policies are provided by Chubb.    Under these policies, Chubb provides insurance for workers' compensation claims for eligible U.S. Employees who are working outside of their home country in certain qualifying circumstances.    The Debtors pay any related premiums to Chubb indirectly, through Marsh.    Chubb manages the Foreign Workers' Compensation Policies on behalf of the Debtors.

272.    The Debtors have also incurred certain obligations with respect to legacy workers' compensation claims pursuant to certain legacy workers' compensation policies.    These legacy workers' compensation policies are provided by Zurich North America and administered by Sedgewick Claims Management Services.    As of the Petition Date, the Debtors estimate the total outstanding obligations on account of the legacy workers' compensation claims are approximately $600,000, none of which will become due and owing before the final hearing on this Motion.    As of the Petition Date, there are approximately six (6) legacy Workers' Compensation Claims open against the Debtors.

273.    In fiscal year 2019, the Debtors paid approximately $800,000 on account of claims for and relating to workers' compensation (collectively, the "***Workers' Compensation Claims***"), all of which represented deductibles for Non-Monopolistic Workers' Compensation Policies. Under the Shared Services Agreement, each of the applicable Debtors are allocated and charged

---

have separately sought authority to honor their non-Workforce obligations under the aforementioned letter of credit in the *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to (A) Pay Their Prepetition Insurance Programs Obligations and (B) Maintain Their Postpetition Insurance Programs* (the "***Insurance Motion***"), filed contemporaneously herewith.

for their respective portions of the Workers' Compensation Claims and the associated premiums for the Workers' Compensation Policies, made on a monthly basis, which amounts are then reconciled through an intercompany process in the ordinary course of business.

274.    As of the Petition Date, there are approximately 40 current Workers' Compensation Claims open against the Debtors.[40]  The Debtors estimate that, as of the Petition Date, they owe approximately $4,400,000 in accrued but unpaid obligations on account of the current Workers' Compensation Claims, of which approximately $125,000 will become due and owing before the final hearing on this Motion.

### j.    Union Dues

275.    As part of the CBAs, union dues are withheld from participating Union Employees' paychecks (collectively, the "***Union Dues***"). This calculation is based both on the number of hours the Union Employee works and their earnings for the applicable pay period.  The monthly amount withheld from the Union Employees has averaged approximately $29,000 over the twelve months prepetition.  As of the Petition Date, the Debtors estimate that they owe approximately $29,000 in accrued but unpaid obligations on account of the Union Dues, all of which will become due and owing before the final hearing on this Motion.

### k.    Payments to Administrators

276.    In addition to payroll processing services described above, the Debtors rely on certain third-party providers or administrators to administer and deliver other payments and benefits to the Employees (the "***Administrators***")[41], all as described in the motion.  The manner in

---

[40]    To the best of the Debtors' knowledge, this Motion accurately reflects all current outstanding obligations relating to Workers' Compensation Claims.  Nonetheless, out of an abundance of caution, to the extent that any formerly closed Workers' Compensation Claims are re-opened during the pendency of the Debtors' chapter 11 cases, the Debtors also seek authority, by this Motion, to apply the relief requested in section IX of the Motion to such claims.  The Debtors reserve all rights related thereto.

[41]    For the avoidance of doubt, the term "***Administrators***" includes any Payroll Administrators.

which the Debtors pay the Administrators varies.  With respect to certain of the Administrators, the Debtors pay the Administrators directly.  With respect to certain other of the Administrators, the Debtors make payments to the applicable Administrator on account of the remaining Debtors. The costs are then allocated via the PEPM Charge to Enterprises and STSS, which is reconciled through an intercompany process.

277.    In conjunction with the Debtors' payment of their prepetition Workforce obligations and continued performance under Workforce programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary, to ensure uninterrupted delivery of certain benefits to the Workforce. The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  If the Debtors were required to replace the Administrators postpetition, it likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, the Debtors submit that paying claims owed to the Administrators is in the best interest of the Debtors' estates.

278.    As of the Petition Date, the Debtors estimate that they owe approximately $550,000 in accrued but unpaid obligations on account of payments to Administrators, all of which is expected to become due and owing before the final hearing on this Motion.

### l.    Expatriate Program

279.    Under the Expatriate Program, certain of the Debtors' Non-Union Employees, who must be management level or higher to be eligible (collectively, the "***Expatriates***"), are assigned to work outside their home country to another location on a temporary basis. The durations of the Expatriate Program's assignments vary depending on the applicable assignment but generally

106

range from two to three year terms.  The Expatriate Program offers the Expatriates customary compensation and other benefits, which align with competitive industry standards for the international assignment industry.  Debtor MEH sponsors a global Health and Welfare Benefits plan for the Expatriates, which supplements the Health and Welfare Benefits coverage the Expatriates receive in their respective home countries.   In addition, the Debtors rely on Administrators PwC and NEI Global Relocation (and/or certain of its affiliates and subsidiaries, as applicable) to administer and provide certain benefits and related services in connection with the Expatriate Program.

280.    Customary benefits offered by the Expatriate Program include, but are not limited to: certain tax-related services (e.g., tax equalization services and hypothetical tax services), relocation services, housing, vehicle/transportation assistance, and dependent education assistance.  The Debtors also incur various expenses on account of the Expatriate Program, including, without limitation, expenses related to international assignments, relocation, and transportation, among other expenses.  Expatriate compensation is calculated based on a well-accepted "balance sheet" approach, which uses various cost-of-living-related factors to minimize any cost differential for, *inter alia*, housing, goods and services, and income taxes at the Expatriate's assignment location and home country.

281.    Under the Expatriate Program, certain of the Debtors' Non-Union Employees, who must be management level or higher to be eligible (collectively, the "***Expatriates***"), are assigned to work outside their home country to another location on a temporary basis. The durations of the Expatriate Program's assignments vary depending on the applicable assignment but generally range from two to three year terms.  The Expatriate Program offers the Expatriates customary compensation and other benefits, which align with competitive industry standards for the

RLF1 24138532v.2

international assignment industry.  Debtor MEH sponsors a global Health and Welfare Benefits plan for the Expatriates, which supplements the Health and Welfare Benefits coverage the Expatriates receive in their respective home countries.  In addition, the Debtors rely on Administrators PwC and NEI Global Relocation (and/or certain of its affiliates and subsidiaries, as applicable) to administer and provide certain benefits and related services in connection with the Expatriate Program.

282.    Customary benefits offered by the Expatriate Program include, but are not limited to: certain tax-related services (e.g., tax equalization services and hypothetical tax services), relocation services, housing, vehicle/transportation assistance, and dependent education assistance.  The Debtors also incur various expenses on account of the Expatriate Program, including, without limitation, expenses related to international assignments, relocation, and transportation, among other expenses.  Expatriate compensation is calculated based on a well-accepted "balance sheet" approach, which uses various cost-of-living-related factors to minimize any cost differential for, *inter alia*, housing, goods and services, and income taxes at the Expatriate's assignment location and home country.

283.    As of the Petition Date, the Debtors estimate that they owe approximately $1,600,000 in accrued but unpaid obligations on account of the Expatriate Program, of which approximately $240,000 will become due and owing before the final hearing on this Motion.

284.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**2.      Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Continue Customer Programs**

285.    The Debtors seek entry of interim and final orders granting them authority, in their discretion, to (a) fulfill and honor (through payment, credit, setoff, or otherwise) their Customer

Obligations as they deem appropriate and (b) continue, renew, replace, implement new and/or terminate their Customer Programs and any other customer practices as they deem appropriate, without further application to the Court.

286.    Similar to other pharmaceutical manufacturers, the Debtors' direct customers for their Products are primarily Distributors that sell the Products directly to pharmacies, hospitals, and other healthcare providers and organizations, some of which are subject to governmental contracts.  Certain Specialty Generics Products are also sold to Addiction Treatment Clinics that dispense them to patients.  The Debtors also contract directly with Payers and Pharmacy Benefit Managers to ensure coverage and reimbursement for certain Specialty Brands Products to patients that are prescribed these products by their physicians.  As for the APIs, in addition to using the APIs themselves, the Debtors also sell APIs to third-party customers, including (a) Pharmaceutical Companies, (b) Contract Manufacturers, (c) Other Industrial Customers, and (d) API Distributors.

287.    For the fiscal year ending December 27, 2019, the Debtors generated net sales of approximately (a) $2,423.8 million from the Specialty Brands Products, (b) $364.9 million from Specialty Generics Products, and (c) $337.1 million from APIs.  Sales in Specialty Generics are concentrated among three major distributors, with AmerisourceBergen Corporation, McKesson Corporation, and Cardinal Health, Inc., individually representing approximately 51%, 33%, and 10%, respectively, of the total gross sales of the Specialty Generics Products during fiscal year 2019.    Specialty Brands' sales are less concentrated, with Curascript, Inc. representing approximately 40% of total gross sales of the Specialty Brands Products during fiscal year 2019, but the next largest distributors, AmerisourceBergen Corporation and Cardinal Health, Inc. each representing only approximately 6%.

288.    To preserve the Debtors' critical relationships with their Customers and maximize Customer loyalty, in the ordinary course of business, the Debtors provide certain Customer Programs to their Customers. While I believe the Customer Programs are essential to the success of both Specialty Brands and Specialty Generics, their relevance to the Debtors' bottom line is particularly seen on the Specialty Generics side, where the Debtors are competing more directly on price (along with quality and reliability of supply).

289.    The Debtors estimate that the aggregate value of accrued prepetition Customer Obligations is approximately $357,852,000. This sum is comprised of (a) $132,220,000 in accrued Chargebacks, (b) $96,910,000 in accrued Rebates and Fees, (c) $9,790,000 in accrued Prompt Pay Discounts, (d) $24,860,000 in accrued Product Returns, (e), $132,000 in accrued Co-Pay Reimbursements, and (f) $93,940,000 in Other Customer Programs.

290.    <u>Chargeback Programs</u>. The Debtors negotiate Chargeback Agreements with their Customers, which govern the terms of sale of the Debtors' Products by Distributors to certain eligible Dispensers. In addition, certain of the Customers may also negotiate agreements to establish contract pricing and/or distribution arrangements directly with the Debtors. Based on the existence of certain Chargeback Agreements or statutory rights, Distributors may be entitled to sell the Debtors' Products to certain eligible Dispensers at a special discounted rate or may be entitled to shelf stock adjustments based on price changes for existing stocked Products. The special discounted rate is less than the wholesale acquisition cost ("**WAC**") that the Distributors pay the Debtors. Thus, when the Distributors sell the Products to eligible Dispensers at a rate lower than WAC, the Debtors are subject to an obligation to compensate the Distributor for the deficiency (a "**Chargeback**"). Similarly, if a Distributor has a Product in stock and the WAC of such Product is adjusted lower, a Chargeback is accrued.

291.    When the Distributors ship Products to certain eligible Dispensers, they submit a Chargeback request to the Debtors, which the Debtors promptly review and pay.  However, due to standard invoicing terms, the Debtors do not receive payment in the amount of the WAC from the Distributors for approximately thirty (30) to sixty (60) days after the Products are shipped to the Distributors, even though a Chargeback may be generated before such payment.  Due to the Debtors' long relationships with most of their Customers, the Customers typically deduct the amount of the Chargeback from payments against outstanding accounts receivable, and the Debtors then review and honor such Chargeback deductions through setoffs within the Debtors' own accounting system.  In some limited instances, the Debtors pay the Chargebacks through checks or wire transfers directly to the Distributors.

292.    In particular, Specialty Generics competes in a price-sensitive market and, therefore, the Chargebacks are particularly important in maintaining competitiveness in the market.  On average, the Debtors accrue approximately $140,000,000 in Chargebacks every month for Specialty Generics Products and approximately $10,000,000 in Chargebacks every month for Specialty Brands Products.  The Debtors estimate that the aggregate amount of Chargebacks accrued and owing as of the Petition Date under the Chargeback Program is $132,220,000.  The Debtors estimate that the aggregate amount of prepetition Chargebacks so honored during the interim period will be $132,220,000.

293.    Rebate and Fee Program.  The Debtors also negotiate certain Rebates and Fees with their Customers, including volume price rebates and Medicare Part D rebates.  These Rebates and Fees are mostly part of arrangements that also contain pricing terms and Chargebacks, but are also a part of agreements with Payers or the federal government.  For APIs, Rebates and Fees are

accrued for API Distributors in exchange for certain sales data, as well as for baseline raw material price changes which are passed on to the API Customers.

294.     The Debtors have entered into several contracts with private insurers with Medicare Part D business lines and with the CMS to cover certain of their Products, including Acthar and certain of the Specialty Generics Products, pursuant to which the Debtors agreed to pay the private insurers or their representatives which administer the program or CMS certain rebates related to the Medicare Part D program.  Rebates under Medicare Part D are generally paid in cash to the private insurers or their representatives or CMS on a monthly or quarterly basis.

295.     Rebates and Fees (other than Medicare Part D rebates) may be deducted by the Customers from payments against outstanding accounts receivable, which the Debtors then review and honor such Rebates and Fees deductions through setoffs within the Debtors' accounting system through the issuance of credits against then-outstanding accounts receivable, but the Debtors primarily pay the Rebates and Fees, including Medicare Part D rebates and certain other per unit rebates, through checks or wire transfers directly to the Customers or CMS.  On average, the Debtors accrue approximately $25,000,000 in Rebates and Fees every month for Specialty Generics Products and approximately $26,600,000 in Rebates and Fees every month for Specialty Brands Products, of which approximately $2,500,000 is on account of Medicare Part D rebates for all covered Products.  The Debtors estimate that the aggregate amount of Rebates and Fees accrued and owing as of the Petition Date (a) for the Specialty Generics Products is $44,770,000 and (b) for the Specialty Brands Products is $52,140,000, of which approximately $3,100,000 is on account of Medicare Part D rebates for all covered Products.  The Debtors estimate that the aggregate amount of prepetition Rebates and Fees so honored during the interim period will be $76,400,000.

296.    <u>Prompt Pay Discount Program</u>.  The Debtors also negotiate payment terms as part of most Purchase Agreements, often including Prompt Pay Discounts for Product and API purchases by the Customers.  Prompt Pay Discounts offer Customers a reduction in the sales price if the Customers pay the amounts owed earlier than their agreed upon payment terms require and within certain early payment windows.  The Prompt Pay Discount Program is implemented through a write-off to a specific reserve in the Debtors' accounting system established when Products are purchased, and does not require a cash outlay from the Debtors.

297.    On average, the Debtors accrue approximately $4,700,000 in Prompt Pay Discounts every month for Specialty Generics Products, approximately $1,000,000 in Prompt Pay Discounts every month for Specialty Brands Products, but do not generally accrue any amounts in Prompt Pay Discounts for APIs.  The Debtors estimate that the aggregate amount of Prompt Pay Discounts accrued as of the Petition Date is (a) for the Specialty Generics Products is $8,580,000, (b) for the Specialty Brands Products is $1,220,000, and (c) no accrued amounts for the APIs.  The Debtors estimate that the aggregate amount of prepetition Prompt Pay Discounts so honored during the interim period will be $9,800,000.

298.    <u>Product Return Program</u>.  Similar to other pharmaceutical manufacturers, certain of the Debtors' Specialty Generics Products, APIs, and Specialty Brands Products are eligible for expired product returns and failed or damaged product returns.  For API products, the Debtors accept returns for products that are damaged or do not meet product specifications.  As with Chargebacks and Rebates and Fees, Product Returns may be deducted by Customers from payments against outstanding accounts receivable.  The Debtors review and honor such deductions through setoffs through the issuance of credits against then-outstanding accounts receivable.  In

some instances, however, the Debtors pay the Product Returns through checks or wire transfers directly to the Customers.

299.     The Product Return Program is administered by Medturn, Inc., an Inmar company ("**Inmar**").  The Debtors pay Inmar certain fees for the administration of the Product Return Program, including the processing, sorting, and disposition of the Product Returns.  On average, the Debtors accrue approximately $1,200,000 in Product Returns for Specialty Generics Products every month and approximately $800,000 in Product Returns for Specialty Brands Products every month.  The Debtors also paid Inmar approximately $300,000 in the fiscal year ending December 27, 2019 on account of its administrative obligations under the Product Return Program.

300.     The Debtors estimate that the aggregate amount of the Product Returns accrued and owing as of the Petition Date (a) for the Specialty Generics Products is $19,910,000 and (b) for the Specialty Brands Products is $4,950,000.  The Debtors estimate that the aggregate amount of prepetition Product Returns so honored during the interim period will be $5,600,000 and the aggregate amount of fees paid to Inmar during the interim period will be $23,000.

301.     Specialty Brands Co-Pay Reduction Program.  The Debtors provide certain patients with co-pay assistance for Acthar to offset their out-of-pocket costs (the "**Co-Pay Reduction Program**").  The Co-Pay Reduction Program is designed to improve access to and the affordability of Acthar by reducing or eliminating out of pocket expenses for eligible patients up to $25,000 per calendar year. These out-of-pocket expenses represent copays through a commercial health insurance plan.

302.     The Co-Pay Reduction Program is administered by PSKW, LLC d/b/a ConnectiveRX ("**ConnectiveRX**").  The Debtors prefund the Co-Pay Reduction Program with sufficient funds to cover approximately three weeks of reimbursements.  When a patient purchases

Acthar at the pharmacy, the pharmacy submits prescription level detail and co-pay values to ConnectiveRX, who then processes and pays the claims from the Prefunded Amounts. Semi-monthly, ConnectiveRX reports the Co-Pay Reimbursements during the previous semi-monthly period and invoices the Debtors to ensure the Prefunded Amount remains at a level sufficient to cover three weeks of Co-Pay Reimbursements. In addition to the Co-Pay Reimbursements, the Debtors pay ConnectiveRX certain fees for the administration of the Co-Pay Reduction Program. For the fiscal year ending December 27, 2019, the Debtors paid ConnectiveRX approximately $1,030,000 in Co-Pay Reimbursements and approximately $480,000 on account of its administrative obligations under the Co-Pay Reduction Program.

303.    The Debtors estimate that as of the Petition Date, approximately $100,000 has accrued but has not been invoiced or paid for Co-Pay Reimbursements and fees. The Debtors estimate that the aggregate amount of prepetition Co-Pay Reimbursements so honored during the interim period will be $100,000 and the aggregate amount of fees paid to ConnectiveRX during the interim period will be $40,000.

304.    <u>Other Customer Programs</u>. The Debtors' Other Customer Programs include (a) rebates and refunds in connection with Medicaid and the 340B Program, (b) allowances that the Debtors negotiate with their customers along with pricing, Chargebacks, and Rebates and Fees, such as stocking allowances for new products or products added to an existing contract, certain allowances for inventory on hand at the Customer or in-transit to a Distributor in the event of decreases in WAC or contract price, and certain other negotiated price protections related to increases in contract price, and (c) three Patient Assistance Programs. Payments on account of Other Customer Programs for Medicaid, the 340B Program, and Patient Assistance Programs are paid by check or wire, while allowances to Customers are generally honored by setoffs within the

Debtors' accounting system through the issuance of credits against then-outstanding accounts receivable.

305.    Medicaid covers a number of the Debtors' Products under a designated rebates program (the "***Medicaid Rebates Program***").  Pursuant to the Medicaid Rebates Program, the Debtors entered into a national rebate agreement with the Secretary of Health and Human Services in exchange for Medicaid coverage of the Products.  Under its agreement with CMS for Medicaid and relevant statutes, the Debtors are required to comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "***340B Program***").  In the event that a 340B Customer purchases the Debtors' Products at a price greater than the prices established under the Act due to a retroactive price restatement, the Debtors are required to issue a refund directly to such 340B Customer.  The Debtors use Apexus, LLC ("***Apexus***") to administer the 340B Refunds under the 340B Program.  If a 340B Refund is required, the Debtors transfer the 340B Refund amounts to Apexus, who processes and issues the 340B Refunds to the 340B Customers.  Apexus is paid a per transaction fee for these services.  Failure to comply with the 340B Program or failing to issue the 340B Refunds may result in fines and penalties, and exclusion from other federal programs.

306.    On average, the Debtors currently accrue approximately $26,800,000 in Medicaid Rebates every month, while 340B Refunds are only accrued upon the occurrence of a retroactive price restatement of a Product.  As of the Petition Date, the Debtors estimate that approximately $79,310,000 has accrued but has not yet been invoiced for the Medicaid Rebates Program and 340B Program, of which $26,800,000 will come due in the interim period.

307.    Specialty Brands and Specialty Generics each have their own Patient Assistance Program, with Specialty Brands maintaining two separate Patient Assistance Programs.  The first

Specialty Brands' Patient Assistance Program is administered by The Assistance Fund, Inc., a 501(c)(3) tax exempt charitable organization (the "**Fund**").  Pursuant to a Donor Agreement, the Debtors donate $10 million per year to the Fund in eleven (11) monthly installments.  The Fund provides critically or chronically ill individuals whose household income is below the federal poverty level with access to advanced therapies through a continuum of services and programs, including education and financial aid, based on disease indication.  While the use of the donation is solely at the discretion of the Fund, including which medications patients are able to receive assistance for, the Debtors direct their donations to be used for specific disease indications that their Products are designed to treat.

308.    The second Specialty Brands' Patient Assistance Program is the Acthar Patient Assistance Program, which consists of the Free Goods Program and the Starter Program.  The Free Goods Program provides Acthar free of charge to qualifying patients with limited incomes or insurance coverage that would not otherwise be able to access Acthar needed for their care.  The Starter Program is designed to allow eligible patients with a valid on-label prescription for Acthar for certain approved indications quick access to Acthar before commercial or private insurance approves the use of Acthar.

309.    McKesson Specialty Pharmacy, LP ("**McKesson**") administers the patient application process for the Acthar Patient Assistance Program and dispenses free product to eligible and enrolled patients.  After screening and meeting the eligibility requirements, Acthar is provided to the patient under the Free Product Program for up to one calendar year free of charge, while the Starter Program provides therapy-naive patients with commercial or private insurance a maximum of five vials of Acthar free of charge.  Charges for this program are divided into administrative fees for costs related to the administration of the program and pharmacy fees for

costs related to the actual dispensing of product. For the fiscal year ending December 27, 2019, the Debtors donated $1,614,000 in Acthar and paid McKesson $2,087,000 on account of its obligations under the Acthar Patient Assistance Program.

310.   The Specialty Generics' Patient Assistance Program is administered by Pharmacy Providers of Oklahoma, Inc., d/b/a MaxCare Prescription Benefit Services ("*MaxCare*"). MaxCare provides certain individuals whose household income is at or below 200% of the federal poverty level and who have no insurance coverage with a prescription drug card that allows them to receive certain of the Debtors' Specialty Generics Products with a $20 co-payment by the patient. The dispensing pharmacy charges MaxCare for such products, who in turn are reimbursed by the Debtors. For the fiscal year ending December 27, 2019, the Debtors paid MaxCare approximately $2,700,000 on account of its administrative obligations under the Specialty Generics Patient Assistance Program.

311.   The Debtors estimate that the aggregate amount of Other Customer Programs accrued and owing as of the Petition Date is $93,940,000, the majority of which are on account of the Medicaid Rebates Program. The Debtors estimate that the aggregate amount of prepetition Other Customer Programs obligations so honored during the interim period will be $28,100,000, the aggregate amount of fees paid to McKesson during the interim period will be $100,000, and the aggregate amount of fees paid to MaxCare during the interim period will be $200,000.

312.   I believe that the requested relief in this motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' businesses. If the Debtors are prohibited from honoring the Customer Obligations and maintaining their Customer Programs consistent with their past business practices, I believe their Customers may lose confidence in the Debtors' ability to provide the Products on competitive terms, and will

likely cause some of the Customers to seek other generic manufacturers or other alternatives to the Debtors' Specialty Brands Products to meet their demand.  In my opinion, the Debtors risk losing market share, harming their future business and revenue growth, and reducing the recoveries of the Debtors' creditors by failing to honor the Customer Programs, the damages of which far exceeds the cost associated with honoring prepetition obligations and continuing these practices. I believe that the relief requested therein will protect the Debtors' goodwill with their Customers during this critical time and enhance the Debtors' ability to generate revenue.  Consequently, it is my opinion that all of the Debtors' creditors will benefit if the requested relief is granted.

313.    Further, I believe that failing to obtain the relief sought in the motion—indeed, even being forced to advise Customers that further judicial relief is necessary—could result in the Debtors losing a portion of their customer base and severe harm to the estates.  Such disruption and value degradation could, in my opinion, undermine the Debtors' reorganization efforts.

314.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**3.    Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors**

315.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition obligations (the "***Critical Vendor Claims***") of certain critical vendors (the "***Critical Vendors***") in the ordinary course.

316.    Several aspects of the Debtors' businesses require the Debtors to maintain relationships with a variety of vendors and underscore the importance of the relief requested in this motion.  To ensure that only those vendors that provide goods and services that are actually essential to the Debtors' businesses are the subject of the relief requested this motion, the Debtors, with the advice and input of their advisors and counsel, conducted an extensive analysis and review

of their immediate trade and service needs and supplier base.  The Debtors' Critical Vendors may be broadly grouped into five categories – Materials Critical Vendors, Devices Critical Vendors, Clinical Research Critical Vendors, System Infrastructure Critical Vendors, and Maintenance Services Critical Vendors – each such category is further described and defined below.

317.    <u>Materials Critical Vendors</u>.  Materials Critical Vendors provide materials that are crucial to the manufacture and production of the Debtors' pharmaceutical drug products. Specifically, the Debtors rely on the Materials Critical Vendors to provide the requisite volume of (a) raw materials and APIs that go into the Debtors' products, (b) the drug plastics, glass, all necessary packaging, and device components that hold and affect delivery of the products, (c) systems to transport the products, and (d) the fully manufactured drug product.  The raw materials, APIs, and packaging supplied by the Materials Critical Vendors are necessary to operate the Debtors' businesses.  Certain of the Materials Critical Vendors are sole source providers of their respective materials to the Debtors because they are the only sources capable of producing and shipping the volume and specification of materials required for the Debtors' operations and cannot be replaced by smaller suppliers or at competitive prices.

318.    Moreover, the raw materials, API, and packaging and transportation systems supplied by the Materials Critical Vendors are highly regulated by the state and federal agencies. Indeed, the Debtors' products are subject to extensive quality control, and the quality is tested at multiple stages in the production process.  In cases where a Materials Critical Vendor is not a sole source provider, due to the highly regulated environment in which the Debtors operate, the Debtors cannot quickly or efficiently substitute the raw materials or API of another vendor.  Indeed, any substitution, alteration, or other change could impact the purity and regulatory compliance of the

Debtors' product and, therefore, the Debtors' ability to run their business and supply the drug to the market, and for certain products, no viable alternative therapy is available.

319.     Further, each aspect of the Debtors' packaging, from the drug's final formulation down to the label and type of ink used, is also subject to regulatory review and approval.  Packaging itself is a critical part of the Debtors' product, as the form and material construction of package chosen for each drug affects the stability of the final dosage form, which can be impacted by a number of variables including oxygen transmittance and temperature fluctuation.  For such reasons, and similar to their raw materials and API vendors, the Debtors cannot readily change certain of their drug product and packaging vendors.

320.     The Debtors also utilize systems to transport products safely and within applicable regulations, including qualified temperature monitors to monitor the temperature during the shipment of certain products.  Thus, due to these regulatory hurdles and the need to engage in additional testing, any change of Materials Critical Vendors would take several months, on the low end, to upwards of three years, on the high end, before the Debtors would be authorized to manufacture and distribute affected products.  Such an extended timeline leaves the Debtors in a difficult situation because if they fail to pay the Critical Vendor Claims owed to the Materials Critical Vendors on a timely basis, I believe that existing relationships would be strained and many, if not all, of the Materials Critical Vendors would stop shipping entirely.

321.     <u>Devices Critical Vendors</u>.  Devices Critical Vendors provide and assemble critical sub-components for the Debtors' medical device business.  In addition to the production and manufacture of pharmaceutical drugs, the Debtors also produce and manufacture certain medical device products.  The Devices Critical Vendors (a) manufacture the highly specialized component parts, such as such as pump alarms, blood lines, and centrifuge bowls, that go into the Debtors'

medical devices, (b) assemble the many component parts to form the medical devices, and (c) customize the medical devices to serve the critically ill patients that utilize the Debtors' medical device products. Notably, many of the medical devices manufactured and sold by the Debtors are highly specialized and customized, an important distinction that requires the specialized skills of the Devices Critical Vendors.

322.    As with the Materials Critical Vendors, the products and services supplied by the Devices Critical Vendors are highly regulated by the federal government. The Debtors' medical device products are similarly subject to extensive quality control, which are also tested at multiple stages in the production process. In the cases where a Devices Critical Vendors is not a sole source provider, due to the highly regulated environment in which the Debtors operate, the Debtors similarly could not quickly substitute the materials or product service another vendor in a short time period. Furthermore, some of the Devices Critical Vendors own certain of the intellectual property rights that are utilized in the production, manufacturing and customization process of the Debtors' medical devices. Without payment on account of their Critical Vendor Claims, I believe that some of these Devices Critical Vendors could withhold access to this important intellectual property, which could prevent the Debtors from bringing their medical device products to market.

323.    Clinical Research Critical Vendors. Clinical Research Critical Vendors provide the Debtors with research and clinical trial services that allow the Debtors (a) to bring new products to market and (b) to develop new uses or indications for existing products. The work conducted by the Clinical Research Critical Vendors is also required by numerous global regulatory regimes that govern the Debtors' development of new drug products and the Debtors' commercialization and sale of existing products.

324.    The services provided by the Clinical Research Critical Vendors are also highly regulated by multiple governmental agencies in each of the countries in which the Debtors operate and sell their products.  Many of clinical trials that are being facilitated by the Clinical Research Critical Vendors take years to complete and analyze, and certain of the Debtors' clinical trials are at advanced stages in the process.  Given the highly regulated and specialized nature of these clinical trials, the Debtors would be unable to quickly substitute many of the Clinical Research Critical Vendors because alternate vendors would lack the institutional knowledge required to quickly replace current Clinical Research Critical Vendors and would need to meet certain regulatory hurdles, which could similarly take prolonged periods of time.  In the meantime, patients participating in the clinical trials would be denied access to vital drug therapies.

325.    The services of the Clinical Research Critical Vendors are also fundamental to the Debtors' creation and preservation of intellectual property rights, marketing and sales efforts and, ultimately, patient outcomes.  The research and clinical trial results are key factors in both a medical provider's decision to prescribe or use the Debtors' products and a payer's decision to reimburse the cost of the Debtors' products.  And the Clinical Research Critical Vendors' services are also integral to the creation and preservation of the Debtors' intellectual property rights in their products.

326.    <u>System Infrastructure Critical Vendors</u>.   The Debtors engage with System Infrastructure Critical Vendors to provide certain services that are critical to the Debtors' upkeep of their business infrastructure.  Specifically, the System Infrastructure Critical Vendors provide services that, among other things, test and track the quality and location of the all components of the Debtors' supply chain, from delivery of the raw materials to the packaging and sale of the finished goods.

327.    Because of the highly regulated industry in which the Debtors operate, the Debtors are required to continually test and maintain certain quality control standards during all stages of production.  The Debtors must also be able to test quality, record and track all aspects of the production and sale of their therapies.  The System Infrastructure Critical Vendors' services are essential for compliance with the multitude of ongoing regulatory requirements, including tracking and reporting obligations and product quality testing.  The Debtors estimate that changing to new System Infrastructure Critical Vendors could take years and cost multiple millions of dollars, due to the significant logistical and data migration undertaking needed to transfer to any alternate vendor.

328.    <u>Maintenance Services Critical Vendors</u>.  Maintenance Services Critical Vendors provide essential maintenance services with respect to the manufacturing, global regulatory compliance, and other operational needs of the Debtors.  Certain of the Maintenance Services Critical Vendors provide preventative maintenance and critical repair services for the Debtors' manufacturing equipment, including custom equipment.  Other Maintenance Services Critical Vendors are engaged by the Debtors to preserve and repair the Debtors' information technology systems, which are indispensable to protecting confidential and proprietary information and supporting supply chain processes, quality assurance, regulatory reporting, and other day-to-day operations.  Still other Maintenance Services Critical Vendors provide equipment calibration services, which are required to ensure regulatory compliance for product component specifications during the manufacturing process.

329.    The Maintenance Services Critical Vendors have long-term specialized knowledge of the Debtors' highly complex and customized equipment and systems, and the Debtors would be unable to quickly replace such vendors, particularly in a scenario requiring immediate critical

repairs.  An interruption in services from such vendors would, in my opinion, significantly disrupt the Debtors' supply chain processes, adversely impact the Debtors' global regulatory compliance, and jeopardize the confidential and proprietary information that define the Debtors' competitive business position.

330.    The Critical Vendor Claims account for approximately 9 percent of the monthly amounts payed to vendors and suppliers.  As of the Petition Date, the Debtors estimated that the Critical Vendor Claims totaled approximately $8.2 million.  Without authority to pay the Critical Vendors, I believe the Debtors would be unable to conduct their businesses and fulfill obligations to their customers.  In my opinion, such a result would be detrimental to the Debtors' reputation and businesses.

331.    The Critical Vendors provide goods and services that I believe are vital to the continued operation of the Debtors' businesses.  Failure to pay the Critical Vendors would, in my opinion, strain existing relationships with the Critical Vendors, run the risk that such vendors will stop providing goods and services, and have an immediate and deleterious effect on the Debtors' businesses and the value of their estates.  Without the Critical Vendors' goods and services, I believe the Debtors could be forced to halt their business operations and potentially forgo existing favorable trade terms.

332.    I further believe that payment of Critical Vendor Claims is necessary to ensure continued operation of the Debtors' businesses and, in turn, preserve and enhance the value of the Debtors' estates.  The Debtors have carefully reviewed their accounts payable and undertaken a process to identify vendors, suppliers, and service providers essential to ongoing operations. Without the Critical Vendors' goods and services, I believe that the Debtors may be forced to halt most, if not all, ongoing business immediately while they search for substitute vendors, if any even

exist, and the Debtors could be forced to forego existing favorable trade terms.  In my opinion, the payment of the Critical Vendor Claims as provided in the motion is necessary to the success of their reorganization and to help maximize the value of their estates.

333.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

> **4.    Motion of Debtors for Interim and Final Orders (a) Authorizing Payment of Lienholder Claims and (b) Authorizing Payment of Section 503(b)(9) Claims**

334.    The Debtors seek entry of interim and final orders (a) authorizing the Debtors, in their discretion, to pay certain prepetition claims of Lienholders in the ordinary course, and (b) authorizing the Debtors, in their discretion, to 503(b)(9) Claims of certain 503(b)(9) Vendors entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code in the ordinary course.

335.    <u>Lienholders</u>.  The Debtors utilize the services of a number of Lienholders, including Common Carriers, Warehouses, Toll Processors, Mechanics and Freight Forwarders, who by the nature of their business and the work that they perform for the Debtors, may be able to assert that prepetition amounts owed to them are secured by contractual, common law, statutory, or other liens on property of the Debtors that is either in the possession of the service provider or that has been improved upon by the provider.  In addition, the claims of certain providers of goods to the Debtors may be entitled to priority under section 503 of the Bankruptcy Code because such goods were delivered to the Debtors within twenty days prior to the Petition Date.  In order to continue the operation of their business uninterrupted postpetition, the Debtors seek to pay the prepetition claims of certain of these claimants, each of which may be entitled to priority over general unsecured creditors.

336.    In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of third-party operated Common Carriers, including ocean freight, trucking services, air transport, and rail carriers, to receive shipments of raw materials from their vendors and transport materials and products throughout the manufacturing process.  As a result of the services they provide, the Common Carriers regularly possess certain of the Debtors' raw materials, goods, and equipment in the ordinary course of the Debtors' operations.

337.    Payments to certain Common Carriers are managed through TranzAct Technologies Inc., the Third Party Payor.  For all accounts managed by the Third Party Payor, the Common Carriers send invoices to the Third Party Payor, which then notifies the Debtors of the amounts due.  On a weekly basis, and prior to the applicable due date for such invoices, the Debtors transfer the outstanding invoiced amounts to the Third Party Payor, who thereafter makes payment to the applicable Common Carrier prior to the applicable due date on account of such invoices.

338.    The Debtors also supplement their own storage and distribution facilities with third-party Warehouses to store goods.  The Debtors have multiple Warehouses across the globe, including in the United States, Canada, the United Kingdom, the Netherlands, and Belgium.  The Warehouses regularly possess products and materials owned by the Debtors.

339.    In the ordinary course of business, the Debtors also utilize, the services of certain third-party Toll Processors and manufacturers with respect to the Debtors' finished products.  As is typical for most toll processing arrangements, the Debtors supply the formula, raw materials and, in certain cases, equipment or other property to the Toll Processors, which the Toll Processors then use to blend, package, and/or produce the Debtors' final products.  The Debtors either provide their active pharmaceutical ingredients directly to the Toll Processors or indirectly through a third party.  The Debtors utilize the Toll Processors for current commercialized products and for pipeline

development projects where the drug has not yet come to market.  In certain cases, the Debtors have a co-development agreement with the Toll Processors or utilize the Toll Processors' specialized equipment that is paramount for the production of the Debtors' products.

340.    The Debtors also require maintenance and repair work with respect to their equipment, and in some cases, rely on outside Mechanics to perform maintenance and repair work.

341.    Further, the Debtors utilize the services of two Freight Forwarders to handle the import of the Debtors' raw materials and the export of the Debtors' products.  The Freight Forwarders provide vital services that enable the relevant Debtors to comply with the complex customs laws and regulations of the United States when importing materials from outside the United States.  Among other things, the Freight Forwarders provide the back-office services necessary for customs clearance, prepare import summaries, facilitate exportation of the Debtors' products, obtain tariff numbers, pay duties and taxes, and perform numerous other critical services for the Debtors.  The relevant Debtors pay the Freight Forwarders for their services and reimburse the Freight Forwarders for any funds advanced on behalf of the Debtors to pay fees to the United States Customs Service, as well as for charges of certain ocean, air, and land shippers, and certain miscellaneous storage and handling expenses.

342.    Payments to certain Freight Forwarders are managed through the Third Party Payor. For those accounts, the Freight Forwarders send invoices to the Third Party Payor, which then notifies the Debtors of the amounts due.  On a weekly basis, and prior to the applicable due date for such invoices, the Debtors transfer the outstanding invoiced amounts to the Third Party Payor. The Third Party Payor thereafter makes payment to the applicable Freight Forwarder prior to the applicable due date on account of such invoices.

RLF1 24138532v.2

343.    It is essential for the Debtors' continuing business viability and for the success of their restructuring efforts that they maintain the reliable and efficient flow of raw materials, goods, and products through their distribution system.  The Debtors estimate that at any given time, a material amount of the Debtors' property is in the hands of the third-party Lienholders.  The Debtors' are dependent on the Common Carriers and Warehouses, and Freight Forwarders for the delivery and storage of finished products, raw materials, equipment, supplies, and other goods, the Mechanics for repair and maintenance services, and the Toll Processors for processing their products for distribution.  In addition, the Debtors do not believe that there are timely alternatives to replace the Lienholders.

344.    To the extent their claims remain unpaid, it is my understanding that the Lienholders may assert a lien on the goods in their possession, refuse to deliver goods to the Debtors or their customers, or refuse to continue to do business with the Debtors in the future, which likely would cause irreparable harm to the Debtors' businesses.  In my opinion, even a short delay in the Debtors' supply chain could undermine the Debtors' ability to fulfill their customers' needs and adversely impact relationships with their customers.  As a result, I believe the Debtors' ability to effect a successful restructuring may be jeopardized.  This risk is only heightened by the fact that the Debtors' customers may be tempted to source their business needs elsewhere due to the Debtors' commencement of these chapter 11 cases.  Therefore, I believe the Debtors should be granted authority to pay, in their discretion, any of the Lienholder Claims.

345.    As of the Petition Date, the Debtors estimate that the Lienholders Claims total approximately $5.6 million.

346.    The 503(b)(9) Vendors.  As of the Petition Date, the Debtors estimate that the 503(b)(9) Claims total approximately $18.7 million.

347.    I believe the Debtors seek should have the ability to pay certain 503(b)(9) Claims as they come due in the ordinary course, instead of satisfying these claims upon confirmation of a chapter 11 plan.  By altering the timing of payments that certain 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments can induce the individual 503(b)(9) Vendors to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.  I believe that this relief is in the best interests of the Debtors' estates because (a) favorable trade terms will prevent the contraction of the Debtors' liquidity, and (b) this Court's time and resources will not be burdened with motions from individual 503(b)(9) Vendors requesting payment on account of their 503(b)(9) Claims or seeking reclamation of goods received by the Debtors in the twenty days prior to the Petition Date.

348.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 5.    Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors

349.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition Foreign Vendor Claims of certain Foreign Vendors in the ordinary course.

350.    As set forth above in <u>Section I</u>, the Debtors and their non-debtor affiliates, are a global specialty pharmaceutical company that produces, markets and sells generic and branded products.  The Debtors and their non-debtor affiliates operate numerous manufacturing facilities and distribution centers in foreign countries.  The Debtors maintain offices and employ hundreds of employees throughout the United Kingdom, Ireland and Luxembourg.  In the ordinary course of their business, the Debtors regularly transact with non-U.S. vendors and service providers.  Among other things, these Foreign Vendors supply the Debtors with valuable goods and raw

materials, provide critical administrative and operational services to the Debtors, and conduct certain global sales and marketing efforts. Accordingly, the successful operation of the Debtors' businesses requires the Debtors to regularly obtain the valuable goods and services provided by the Foreign Vendors. As of the Petition Date, the Debtors estimate that the Foreign Vendor Claims total approximately $6.1 million.

351.   The Debtors' Foreign Vendors may be broadly grouped into three categories: (a) Foreign Suppliers, (b) Foreign Service Vendors, and (c) Foreign Distributors.

352.   <u>Foreign Suppliers</u>.  In order to manufacture pharmaceuticals, the Debtors need to purchase certain materials from certain limited source Foreign Suppliers because such materials (a) are the product of manufacturing processes that are not employed or are restricted or entirely prohibited in the United States, (b) are governed by exclusivity agreements within the United States that limit their availability from a domestic supplier, or (c) only grown in specific geographic and climate regions not found within the United States (or the quality is significantly inferior if grown within the United States).  The Foreign Suppliers supply the Debtors with raw materials, finished goods, equipment, and testing that are essential to the Debtors' products, some of which are only available through the Foreign Suppliers.  In addition, certain of the Debtors' active pharmaceutical ingredients are only available through Foreign Suppliers because the innovators of such products have exclusivity within the United States.

353.   <u>Foreign Service Vendors</u>.  In order to maintain their offices and active operations in the United Kingdom, Ireland and Luxembourg, the Debtors contract with numerous locally-based administrative and operational Foreign Service Vendors who provide integral services to the Debtors on a daily basis.  The Foreign Service Vendors provide critical informational technology (IT) services, outsourcing support services, facility and landscaping services, security services,

utility services and general administrative support, among other things. These services are necessary in order for the Debtors to maintain their business operations and administrative infrastructure in their European locations.

354.   <u>Foreign Distributors</u>.  The Debtors also use certain Foreign Distributors to sell and solicit customer orders for, and, in some cases, promote the Debtors' products for a defined territory outside of the United States where we the Debtors do not have an established presence or salesforce.   The Foreign Distributors are paid a commission for orders placed and fulfilled based on the invoiced sale multiplied by the contracted commission rate.   Payment to the Foreign Distributors is calculated and paid on a quarterly basis and paid via the Debtors' accounts payable processes.

355.   Given the importance and value of international operations to the Debtors and their estates, I believe that payment of the Foreign Vendor Claims is vital to the continued operation of the Debtors' businesses (both domestically and internationally) and to maintain the flow of goods and services from, and continuing business relationships with, the Foreign Vendors.   Absent prompt and full payment of the Foreign Vendor Claims, I believe that the Foreign Vendors may refuse to provide the equipment, supplies, and services—which are available from a limited number of suppliers and service providers—that are required by the Debtors and their affiliates during the pendency of the chapter 11 cases.   Even if they do not take such drastic action, it is likely that the Foreign Vendors will, absent payment, delay providing critical sourced goods, equipment, supplies, and services and thereby expose the Debtors' estates to significant economic harm.  Without the timely provision of goods and services by all of the Foreign Vendors, I believe that the Debtors' operations could suffer from a lack of raw materials or other supplies and services to the detriment of the Debtors and their stakeholders.

356.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**6.    Motion of Debtors for Interim and Final Orders Authorizing the Debtors to (a) Pay Their Prepetition Insurance Programs Obligations and (b) Maintain Their Postpetition Insurance Programs**

357.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to:  (a) pay or setoff prepetition claims arising under their ordinary course Insurance Programs (as defined below), if any, and (b) maintain their Insurance Programs in the ordinary course postpetition.

358.    <u>Insurance Policies</u>.  In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by various insurers (the "***Insurers***"), which provide coverage to the Debtors for, among other things, third-party liability (including but not limited to products hazard, completed operations hazard, and general liability), crime, casualty, cargo, worker's compensation and employer's liability, directors' and officers' liability, first-party property losses, and various other liability and property losses, liabilities, and claims (such insurance policies issued for the policy periods that include the filing date are referred to collectively as the "***Insurance Policies***").  The majority of the Insurance Policies are held in the name of Debtor Mallinckrodt plc and cover both the Debtors and their non-Debtor affiliates as subsidiaries of Mallinckrodt plc, but certain insurance policies are held by other Debtors directly.

359.    The Debtors' Brokers—Aon and Marsh—assist in obtaining comprehensive insurance coverage and provide related services, including procuring and negotiating the Insurance Policies on advantageous terms and at competitive rates.  The Aon Broker Contracts provide for fees payable to Aon of (a) $175,000 under the Aon Policy Contract paid in two equal installments and (b) $73,000 payable at contract renewal *plus* reimbursable expenses paid at the end of the contract term under the Aon Services Contract.  For the current service years, the Debtors have

incurred approximately $160,500 in costs related to fees under the Aon Broker Contracts.  The Marsh Broker Contract provides for an annual fee of $200,000, payable in equal quarterly installments to Marsh.  From June 28, 2020 through the Petition Date, the Debtors have incurred $50,000 in costs related to this fee.

360.    In order to maintain certain of the Insurance Policies, the Debtors have certain risk engineering services audits and inspections performed by third-parties One CIS Insurance Company and Westport Insurance Corporation, a subsidiary of Swiss Re AG (the "***Insurance Services Providers***").  For these services, the Debtors pay (i) One CIS Insurance Company $28,400 per year and (ii) Westport Insurance Corporation $100,000 per year.  Failure to pay the obligations owed to the Insurance Services Providers could result in the Debtors being noncompliant with certain Insurance Policies and state and local laws, each of which could cause the Debtors to lose coverage under their Insurance Policies or cause the Debtors to shut down operations within those jurisdictions.

361.    For Insurance Policies held in the name of a Debtor other than Mallinckrodt plc, the named insured Debtor pays the applicable Broker or Insurer directly, and for the Insurance Policies that are held in the name of Debtor Mallinckrodt plc, Mallinckrodt plc pays the Insurer or Broker and is then reimbursed (either directly or indirectly) for the other Debtors' and the non-Debtor affiliates' allocated share of such amounts.

362.    The Insurance Policies renew at various times throughout each year, and the majority of the Insurance Policies were renewed on June 28, 2020, but certain Insurance Policies were renewed on September 28, 2020 (the "***September Policies***").  For most Insurance Policies, including the September Policies, the Debtors pay all of the annual premiums due for each of the policies at the beginning of each particular policy period, although certain Insurance Policies from

time to time may permit monthly premium payments as negotiated at renewal. Due to certain invoicing and payment terms, the Debtors have not yet paid all the applicable premiums for the September Policies, but anticipate paying such premiums totaling approximately $150,000 during the interim period. With the exception of the premiums for the September Policies and the fees payable to One CIS, the Debtors are not aware of any pending requests for payment under the Insurance Policies or Broker Contracts.

363.    <u>Bonding Program</u>.  In the ordinary course of business, the Debtors are required by certain applicable statutes, rules, and regulations to maintain bonds in favor of certain third parties to secure the Debtors' payment or performance of certain Covered Obligations, often to governmental units or other public agencies (the "***Bonding Program***").

364.    As of the Petition Date, the Debtors' outstanding surety bonds were issued by three sureties: One Beacon Insurance Company, Liberty Mutual Insurance Companies, and Tokio Marine Europe S.A. (the "***Sureties***").  The premiums for the surety bonds are generally determined on an annual basis and are paid directly by the Debtors when the bonds are issued and annually upon renewal.  The total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $90,000.  As of the Petition Date, the Debtors believe that all premium payments due and owing under the Bonding Program have been paid in full and the Debtors are not aware of any pending requests for payment by the Sureties.

365.    <u>Letters of Credit</u>.  The Debtors have outstanding seven (7) Letters of Credit totaling approximately $14,900,000 that cover a range of obligations, including, among other things, obligations related to single-source suppliers, environmental obligations, regulatory requirements, and insurance related obligations.  As of the Petition Date, the Debtors do not believe there are any

payments due and owing on account of the Letters of Credit and the Debtors are not aware of any pending requests for payment on the Letters of Credit.

366.     Collateral.  With respect to certain components of their Insurance Programs, the Debtors have posted collateral, or will need to post new collateral, in favor of and as required by relevant Insurers, Sureties, banks issuing the Letters of Credit, to secure certain of their obligations thereunder.  The Debtors expect to post an additional collateral in favor of Allianz in support of the International Casualty General Liability policy (policy no. BOWCI2000421) during the interim period.   As of the Petition Date, the Debtors have posted in the aggregate approximately $25,000,000 in collateral in various escrow or trust accounts to secure such obligations under their Insurance Programs.

367.     I believe that the Insurance Programs are typical in scope and amount for businesses within the Debtors' industry.  In my opinion, payment of the Prepetition Insurance Programs Obligations is necessary to the success of their reorganization and to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Programs, and to maintain good relationships with the Insurers, the Brokers, the Insurance Services Providers, and the Sureties.  If any of those risks were to materialize, I believe they could cause substantial disruptions and expose the Debtors to liabilities significantly greater than the amount of the obligations to be paid.

368.     Further, the Debtors' failure to take all actions necessary to honor their obligations to and preserve their relationships with the Insurers could have disastrous consequences for the Debtors' estates, as many of the required insurance policies cannot be directly purchased by the Debtors and can only be placed through a broker.  Should the Brokers terminate the Broker Contracts and their relationships with the Debtors,  the Debtors would be in the unfavorable

position of having to find a new broker while in chapter 11, likely at greater expense and resulting in additional costs and inefficiencies.  In my opinion, these consequences could derail the Debtors' restructuring efforts.  For similar reasons, I also believe that maintaining the Insurance Programs and honoring postpetition obligations arising thereunder and under the Broker Contracts is a sound exercise of the Debtors' business judgment.

369.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

> **7.    Motion of Debtors for Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities, and (c) Establishing Procedures for Resolving Requests for Additional Adequate Assurance**

370.    The Debtors seek entry of interim and final orders:  (a) prohibiting the Debtors' utility service providers (the "***Utility Companies***") from altering, refusing, or discontinuing service to, or discriminating against, the Debtors, (b) approving an adequate assurance deposit as adequate assurance of postpetition payment to the Utility Companies, and (c) establishing procedures for resolving any subsequent requests by the Utility Companies for additional adequate assurance of payment.

371.    The Debtors obtain electricity, gas, water, sewer, waste, telephone and internet services, and other similar services (collectively, the "***Utility Services***") from the Utility Companies to operate their business.  As of the Petition Date, approximately 76 Utility Companies provide Utility Services to the Debtors at their U.S. headquarters, production sites, and other locations.  In the United States, certain of the Debtors' Utilities accounts, including certain electricity, gas, water, sewer, and waste services accounts, are managed through Cass Information Systems, Inc., in combination with Schneider Summit Services, Inc. (together, the "***Third Party Payors***").  The Third Party Payors manage approximately 70 percent of the Debtors' Utility

137

Services and the Debtors manage the remaining approximately 30 percent. For all Utility accounts managed by the Third Party Payors, the Utility Companies remit invoices to the Third Party Payors. The Third Party Payors then submit a request for funding on account of such invoiced amounts to the Debtors multiple times a week. Multiple times on a weekly basis, and prior to the applicable due date for such invoices, the Debtors directly transfer the outstanding invoiced amounts to the Third Party Payors. The Third Party Payors thereafter make payment to the applicable Utility Company prior to the applicable due date. Generally, payments for Utility Services are made in arrears after receiving a periodic funding request from the Third Party Payors on account of applicable Utility Companies' outstanding invoices. Over the past 12 months, the Debtors have incurred obligations totaling an average of approximately $1,995,000 per month for Utility Services.

372.    It is my understanding that to the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to invoices for prepetition Utility Services as of the Petition Date. The Debtors intend to pay, or direct the payment of, any postpetition obligations to the Utility Companies in the ordinary course and in a timely fashion. The Debtors have budgeted for the payments and believe that cash on hand and cash generated through operations will be sufficient to satisfy their obligations to the Utility Companies in the ordinary course on a postpetition basis. Nevertheless, I have reviewed the Proposed Adequate Assurance and I believe that it provides Utility Companies with adequate assurance of payment, and I do not believe that any other or further assurance of payment to Utility Companies for postpetition Utility Services is necessary. However, I understand that the Debtors have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

RLF1 24138532v.2

373.     The Debtors' ongoing operations require uninterrupted Utility Services.  Should any Utility Provider refuse or discontinue service, even for a brief period, I believe that the Debtors' business operations could be severely disrupted, and such disruption could jeopardize the Debtors' ability to manage their reorganization efforts and could negatively impact recoveries for the Debtors' creditors.  In addition to the Utility Deposit, the Debtors' ability to pay for future Utility Services in the ordinary course of business, including paying certain Utility Companies in advance consistent with past practice, supports approval of the Debtors' Proposed Adequate Assurance.  In my opinion, the Utility Companies are adequately assured against any risk of nonpayment for future services by the Proposed Adequate Assurance.  Further, I believe that the Adequate Assurance Procedures are reasonable and appropriate, and they ensure that all parties will act in good faith when exercising their rights under the Bankruptcy Code.

374.     Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 8.     Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees

375.     The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to make payments to, and set off amounts owed from, certain non-Debtor affiliates or the other Debtors, on account of prepetition taxes and fees to certain international, federal, state, and local governmental and quasi-governmental units.

376.     In the ordinary course of their businesses, the Debtors incur various tax liabilities and fees including customs duties, franchise taxes, gross receipt taxes, income taxes, license and reporting taxes, net wealth taxes, and regulatory taxes, real and personal property taxes, sales and use taxes, stamp duties, VAT taxes, and any other types of taxes, fees, assessments, or similar charges and any penalty, interest, or similar charges in respect of such taxes and fees (collectively,

the "*Taxes and Fees*") owed certain international, federal, state, and local governmental entities. As of the Petition Date, the Debtors estimate that they have accrued liabilities, which are not yet due and outstanding, in the approximate amount of $50,240,000 on account of Taxes and Fees.

377.    As further described in the Motion, the manner in which the Debtors' Taxes and Fees are paid varies.  With respect to certain Taxes and Fees, the Debtors pay the applicable Authority directly; with respect to other Taxes and Fees, certain of the Debtors pay the applicable Authority on behalf of certain other Debtors and/or non-Debtor affiliates; and with respect to yet other Taxes and Fees, the Debtors directly or indirectly (on behalf of themselves and other applicable Debtors and/or non-Debtor affiliates), contract with third-party Administrators to administer and deliver payments to the applicable Authorities.

378.    I believe that Payment of the prepetition Taxes and Fees is critical to the Debtors' continued, uninterrupted operations.  If the Debtors do not pay their prepetition Taxes and Fees, I understand that the respective Authorities may prevent the Debtors from conducting business in applicable jurisdictions, subject the Debtors to audits, seek to lift the automatic stay, and perhaps impose liens or personal liability on the Debtors' directors, officers, and executives, all of which would disrupt the Debtors' operations and harm all parties in interest.  Failure to pay the prepetition Taxes and Fees could also negatively impact the Debtors' existing licenses, which, in my opinion, could imperil the Debtors' very ability to continue operations and sales in jurisdictions where the Taxes and Fees are not paid.  Even where the consequences are not so severe, the potential for disruption, distraction, and incurring unnecessary costs is very real and could thwart the Debtors' efforts to maximize value and reorganize successfully.

379.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.


[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information and belief, and after reasonable inquiry, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 12, 2020
      Hazelwood, Missouri

/s/ Stephen A. Welch
Stephen A. Welch
Chief Transformation Officer

[*Signature Page to First Day Declaration*]

**<u>Exhibit A</u>**

**Restructuring Support Agreement**

Execution Version

*THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***RSA***" and, together with the Term Sheet (as defined below), this "***Agreement***"), dated as of October 11, 2020, is entered into by and among the following parties:[1]

(i)        Mallinckrodt plc (the "***Parent***") and each of its subsidiaries listed on **Annex 1** hereto (each, including the Parent, a "***Company Entity***," and collectively, the "***Company***" or the "***Debtors***"; and the Company, together with any subsidiaries or affiliates of the Parent not identified on **Annex 1** hereto, "***Mallinckrodt***");

(ii)        the undersigned holders of Guaranteed Unsecured Notes, and such additional holders of Guaranteed Unsecured Notes who become party hereto from time to time pursuant to a Joinder Agreement (collectively, the "***Supporting Unsecured Noteholders***"); and

(iii)        the Plaintiffs' Executive Committee (defined below), the undersigned Governmental Entities, and any additional Governmental Entities holding Opioid Claims who become party hereto from time to time pursuant to a Joinder Agreement (collectively, the "***Supporting Governmental Opioid Claimants***," and together with the Supporting Unsecured Noteholders, the "***Supporting Parties***," and the Supporting Parties together with the Company, the "***Parties***").[2]

**WHEREAS**, the Parties have in good faith and at arm's length negotiated and agreed to the terms of a restructuring (the "***Restructuring***") as set forth on the term sheet attached hereto as **Exhibit A** (including the Opioid Settlement Term Sheet (as defined below), the "***Term Sheet***," and the chapter 11 plan based thereon, together with all exhibits, annexes, and schedules thereto, as each may be amended, restated, amended and restated, supplemented, or otherwise modified in accordance with its terms and this Agreement, the "***Plan***") intended to be consummated through (a) voluntary cases under chapter 11 of the Bankruptcy Code (as defined below) (the "***Chapter 11***

---

[1]  Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 or the Term Sheet, as applicable.

[2]  For the avoidance of doubt, the term "Parties" or "Party" as and when used in this Agreement refers to the individual signatories to this Agreement, and not the Supporting Governmental Opioid Claimants, the Supporting Unsecured Noteholders, the Company or the Supporting Parties as a whole or in their capacity as groups.

*Cases*") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on the terms set forth in this Agreement, (b) the examinership proceedings to be commenced by the directors of the Parent or any other Company Entity under the laws of Ireland (the "***Irish Examinership Proceedings***"), and (c) the Recognition Proceedings;

**WHEREAS**, the Company and the Supporting Governmental Opioid Claimants have in good faith and at arm's length negotiated and agreed to the terms of a global settlement of all Opioid Claims against the Company to be facilitated through the Chapter 11 Cases as set forth on the settlement term sheet attached to the Term Sheet as **Schedule 1** (the "***Opioid Settlement Term Sheet***," and the settlement based thereon, the "***Opioid Settlement***");

**WHEREAS**, the Parties intend that additional Governmental Entities holding Opioid Claims, other Opioid Claimants (or representatives thereof), and holders of Guaranteed Unsecured Notes will be encouraged to join this Agreement and/or otherwise support the Opioid Settlement and the Restructuring, in accordance with the terms hereof; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     **Certain Definitions.**  Capitalized terms used but not defined in this Agreement have the meanings ascribed to them in the Term Sheet (including the Opioid Settlement Term Sheet).  As used in this Agreement, the following terms have the following meanings:

    a.     "***105(a) Order***" means an order under section 105(a) of the Bankruptcy Code preliminarily enjoining any Person (or unit thereof) from pursuit of any Opioid Claim against Mallinckrodt, the form of which must be acceptable to the Governmental Plaintiff Ad Hoc Committee, and the Required Supporting Unsecured Noteholders.

    b.     "***Agreement Effective Date***" means the date on which (i) counterpart signature pages to this Agreement shall have been executed and delivered to Latham & Watkins LLP by (A) each Company Entity, (B) the holders of at least 66.67% in outstanding principal amount of Guaranteed Unsecured Notes, and (C) at least 40 States and the Plaintiffs' Executive Committee, either directly or through authorized counsel; and (ii) the Company Parties shall have paid all Restructuring Expenses that have been invoiced by no later than October 7, 2020.

    c.     "***Alternative Transaction***" means any dissolution, winding up, liquidation, reorganization, receivership (or otherwise any enforcement of security over any of the shares or assets of any of the Company Entities), examinership, assignment for the benefit of creditors, merger, transaction, takeover, offer, reverse takeover, consolidation, business combination, joint venture, partnership, sale of assets or equity, financing (debt or equity), restructuring, settlement of Opioid Claims, or similar transaction of or by any of the Company Entities, other than the transactions contemplated by and in accordance with this Agreement.

d.      "***Bankruptcy Code***" means title 11 of the United States Code.

e.      "***Business Day***" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in New York City, New York.

f.      "***Cash Collateral***" has the meaning set forth in section 363(a) of the Bankruptcy Code.

g.      "***Cash Collateral Order***" means an order entered by the Bankruptcy Court authorizing the Debtors' use of Cash Collateral, and all exhibits and schedules thereto, including any budget.

h.      "***Claim***" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code.

i.      "***CMS***" means the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services.

j.      "***CMS/DOJ/States Settlement***" means the settlement between Mallinckrodt, the United States of America and the States (excluding, for this purpose, any territories of the United States) resolving the Acthar-related litigations and government investigations disclosed in the Company's Form 10-K for 2019, including *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC* (E.D. Penn.); *United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC* (D. Mass.); and *Mallinckrodt ARD LLC v. Verma et al.* (D.D.C.), and related matters, the terms of which are set forth on **Schedule 2** to the Term Sheet.

k.      "***CMS/DOJ/States Settlement Agreement***" means the definitive settlement agreements memorializing the CMS/DOJ/States Settlement, which shall be consistent with the terms set forth on **Schedule 2** to the Term Sheet.

l.      "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

m.      "***Definitive Documents***" means, with respect to the Restructuring, all material documents (including any related Bankruptcy Court or other judicial or regulatory orders, agreements, schedules, pleadings, motions, filings, or exhibits) that are contemplated by this Agreement and that are otherwise necessary or desirable to implement the Restructuring, including (as applicable): (i) the Plan; (ii) Disclosure Statement; (iii) any other operative documents and/or agreements relating to the Plan (including any documents necessary to implement the distributions contemplated thereunder) and/or the Disclosure Statement; (iv) the Disclosure Statement Order; (v) the Confirmation Order; (vi) the Plan Supplement; (vii) the MIP; (viii) the Scheme of Arrangement and any other substantive pleadings submitted in the Irish Examinership Proceedings; (ix) an order of the High Court of Ireland confirming the Scheme of Arrangement; (x) the Exit Financing Documents, including all intercreditor agreements; (xi) the New Governance Documents; (xii) pleadings commencing the Recognition Proceeding and any substantive pleadings filed therein, including the order(s) granting recognition to the Chapter 11 Cases and relief granted therein; (xiii) all documents memorializing the Opioid Settlement;

(xiv) the Opioid Trust Documents; (xv) the New Opioid Warrants; (xvi) the Cash Collateral Order; (xvii) the First Day Pleadings; (xviii) any new key employee incentive and retentive based compensation programs to be proposed after the Petition Date; and (xix) all agreements to settle (A) administrative, priority, or tax claims (other than claims held by a Debtor or Non-Debtor Affiliate against a Debtor) in the Chapter 11 Cases or in connection with the Restructuring in excess of $20 million or (B) General Unsecured Claims (other than claims held by a Debtor or Non-Debtor Affiliate against a Debtor) in the Chapter 11 Cases or in connection with the Restructuring in excess of $50 million.

n.      "*Disclosure Statement*" means the disclosure statement related to the Plan and any exhibits, schedules, attachments, or appendices thereto, in each case as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms herein and therein.

o.      "*Disclosure Statement Order*" means the order approving the Disclosure Statement.

p.      "*Examiner*" means the examiner(s) to be appointed to the Parent or any other Company Entity by order of the High Court of Ireland on the commencement of the Irish Examinership Proceedings.

q.      "*Exit Financing Documents*" means any agreements, indentures, commitment letters, documents, or instruments relating to any exit financing facility or facilities to be entered into by the reorganized Company, including with respect to the Takeback Second Lien Notes.

r.      "*Finally Determined*" means the amount of cash taxes paid or refund or overpayment realized by the Debtors, as may be adjusted in connection with the filing of an amended tax return or pursuant to a "determination" (as defined in Section 1313 of the Code, or analogous provision of state, local or non-U.S. tax law).

s.      "*First Day Pleadings*" means the motions, petitions, pleadings, and draft orders that the Company files at the commencement of the Chapter 11 Cases. First Day Pleadings include orders as entered by the Bankruptcy Court.

t.      "*Governmental Entity*" means the United States and any department, agency, or instrumentality of the United States and any State, Municipality, political subdivision or Native American Tribe and in each case, any department, agency, or instrumentality thereof.

u.      "*Governmental Plaintiff Ad Hoc Committee*" means the ad hoc group of Governmental Entities holding Opioid Claims (or representatives thereof, including the Plaintiffs' Executive Committee) represented by, among others, Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, Brown Rudnick LLP, William Fry, and Houlihan Lokey Capital, Inc.

v.      "*Guaranteed Unsecured Notes*" means, individually and collectively, the Company's 5.75% Senior Notes due 2022, 5.500% Senior Notes due 2025, and 5.625% Senior Notes due 2023.

w.    "*Interest*" means an equity interest, including the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any of the Parent or its affiliates, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any of the Parent or its affiliates (whether or not arising under or in connection with any employment agreement).

x.    "*Joinder Agreement*" means the form of joinder agreement attached hereto as **Exhibit B**.

y.    "*Make-Whole Claims*" means any Claim, whether secured or unsecured, derived from or based upon any make-whole, applicable premium, redemption premium, prepayment premium, or other similar payment provisions due upon acceleration as provided for by Section 6.02 of each of the Secured Notes Indentures.

z.    "*Make-Whole Reservation of Rights*" means the reservation of rights of each Party hereto set forth in <u>Section 23</u> hereof.

aa.    "*Mandatory Offer Requirement*" means a requirement to make a mandatory cash offer for the Company under Rule 9 of the Irish Takeover Panel Act, 1997, Takeover Rules, 2013 of Ireland.

bb.    "*MDL*" means that certain opioid multi-district litigation captioned *In re National Prescription Opiate Litigation*, MDL No. 2804, Case No. 17-md-02804 (N.D. Ohio).

cc.    "*Municipality*" means any governmental unit (or division or agency thereof) that is not a State or Native American Tribe.

dd.    "*Native American Tribe*" means any Native American tribe within the borders of the United States of America.

ee.    "*Net Prepetition Cash Tax Liability*" means (a) the cash tax owed by the Debtors after the Petition Date (including any cash taxes owed to a taxing authority in connection with an audit, assessment, examination or other tax proceeding), less (b) refunds or overpayments of taxes realized by the Debtors received after the Petition Date (or credited against taxes in a taxable period (or portion thereof) ending after the Petition Date), in each case, with respect to a taxable period or portion thereof ending on or prior to the Petition Date, as Finally Determined; provided, that the determination of Net Prepetition Cash Tax Liability shall not include any tax liability which is attributable to any action requested or consented to by the Required Supporting Unsecured Noteholders or the Governmental Plaintiff Ad Hoc Committee.  For taxable periods beginning on or prior to and ending after the Petition Date, the applicable cash taxes, refunds or overpayments shall be apportioned to the portion of the taxable period ending on the Petition Date (i) in the case of a property or other ad valorem tax, by multiplying the total amount of such tax by a fraction, the numerator of which is the number of days in the period ending on the Petition Date, and the denominator of which is the total number of days in the taxable period or (ii) in the case of all other taxes, based on an interim closing of the books as of the close of business on the Petition Date (except that exemptions, allowances or deductions that are calculated on annual basis, such as depreciation, shall be apportioned on a pro rata basis).

ff.     "*New Governance Documents*" means any organizational or constitutional documents, operating agreements, warrant agreements, option agreements, management services agreements, shareholder and member-related agreements, registration rights agreements or other governance documents for the reorganized Company Entities.

gg.     "*Non-Debtor Affiliates*" means the Parent's subsidiaries and affiliates (as defined in section 101(2) of the Bankruptcy Code) that are not debtors in the Chapter 11 Cases.

hh.     "*Noteholder Consent Fee*" means cash in an amount equal to 1.5% of par value of the applicable Supporting Unsecured Noteholder's Guaranteed Unsecured Notes as of the Determination Date (as defined below).

ii.     "*Notes Issuers*" means Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC.

jj.     "*Person*" means an individual, firm, corporation (including any non-profit corporation), partnership, limited partnership, limited liability company, joint venture, association, trust, governmental entity, or other entity or organization.

kk.     "*Petition Date*" means the date on which the Company commences the Chapter 11 Cases.

ll.     "*Plaintiffs' Executive Committee*" means the court-appointed Co-Lead Counsel Paul J. Hanly, Jr., Joseph Rice, and Paul T. Farrell, Jr. on behalf of the court-appointed plaintiffs' executive committee in the MDL, solely in their capacities as such and not in any individual capacities.

mm.     "*Plan Effective Date*" means the date on which the Plan becomes effective in accordance with its terms.

nn.     "*Plan Supplement*" means one or more supplemental appendices to the Plan, which shall include, among other things, draft forms of documents (or terms sheets thereof), schedules, and exhibits to the Plan, in each case subject to the provisions of this Agreement and as may be amended, modified, or supplemented from time to time on or prior to the Plan Effective Date, including the following documents: (i) the New Governance Documents, (ii) the indenture evidencing the Takeback Second Lien Notes, (iii) the Exit Financing Documents, (iv) the Opioid Trust Documents, (v) the CMS/DOJ/States Settlement Agreement (if any), (vi) to the extent known and determined, the identity of the members of the board of the reorganized Company, and (vii) such other documents as may be specified in the Plan.

oo.     "*Representatives*" means, with respect to any Person, such Person's affiliates and its and their directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors, investment advisors, managed accounts or funds, management companies, fund advisors, advisory board members, professionals and other representatives, in each case, solely in their capacities as such.

pp.     "*Required Supporting Parties*" means, as of any date of determination, the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee.

qq.     "***Required Supporting Unsecured Noteholders***" means, as of any date of determination, Supporting Unsecured Noteholders holding at least a majority in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to this Agreement.  Guaranteed Unsecured Notes held by any (i) Mallinckrodt entity, (ii) holder of Opioid Claims and (iii) entity or person whose vote has been "designated" by the Bankruptcy Court in the Chapter 11 Cases (including pursuant to section 1126(e) of the Bankruptcy Code), shall not be included (either in the numerator or the denominator), and shall not be considered outstanding Guaranteed Unsecured Notes Claims, for purposes of calculating (x) the Required Supporting Unsecured Noteholders or (y) any other threshold applicable to the Supporting Unsecured Noteholders under this Agreement.

rr.     "***Scheme of Arrangement***" means the scheme(s) of arrangement based on and consistent in all respects with the Term Sheet and the Plan to be formulated and proposed by the Examiner in respect of the Parent or any other Company Entity, and submitted for confirmation to the High Court of Ireland.

ss.     "***Secured Notes Indentures***" means (a) that certain Indenture, dated as of April 7, 2020 (as modified, amended, or supplemented from time to time), by and among the Notes Issuers, as issuers, the guarantors party thereto from time to time, Wilmington Savings Fund Society, FSB, as first lien trustee, and Deutsche Bank AG New York Branch, as first lien collateral agent; and (b) that certain Indenture, dated as of December 6, 2019 (as modified, amended, or supplemented from time to time), by and among the Notes Issuers, as issuers, the guarantors party thereto from time to time, and Wilmington Savings Fund Society, FSB, as second lien trustee and second lien collateral agent.

tt.     "***Specified Claims and Interests***" means: (a) with respect to the Supporting Governmental Opioid Claimants, Opioid Claims; (b) with respect to Supporting Unsecured Noteholders, Claims based on the Guaranteed Unsecured Notes; and (c) with respect to any other Supporting Party, such Claims and/or Interests held by a Supporting Party in the Company solely in the capacity in which such Supporting Party executes this Agreement.

uu.     "***State***" means a state or territory of the United States of America.

vv.     "***Support Period***" means, with respect to any Party, the period commencing on the later of (a) the Agreement Effective Date and (b) the date such Party becomes party hereto and ending on the earlier of (x) the date on which this Agreement is terminated by or with respect to such Party in accordance with Section 6 hereof and (y) the Plan Effective Date.

ww.     "***Target Net Prepetition Cash Tax Liability***" means 104,851,000 dollars ($104,851,000).

xx.     "***Unsecured Noteholders***" means the holders of Guaranteed Unsecured Notes.

yy.     "***Unsecured Notes Ad Hoc Group***" means that certain ad hoc group of holders of certain Guaranteed Unsecured Notes represented by, among others, Paul, Weiss, Rifkind, Wharton & Garrison LLP and advised by, among others, Perella Weinberg Partners LP.

2.     **Restructuring Process.**  Where the provisions of this Agreement and the Term Sheet refer or apply to the Chapter 11 Cases, the Bankruptcy Court, and/or the Plan (including the Definitive Documents and any other documentation relating or relevant thereto) or events, circumstances, or procedures in the United States (the "***US Process***") but do not equally reference or apply to (a) the Irish Examinership Proceedings, the High Court of Ireland, and/or the Scheme of Arrangement (including the Definitive Documents or any other documentation relating or relevant thereto) or equivalent events, circumstances, or procedures in Ireland (the "***Irish Process***") or (b) the Recognition Proceedings, the Ontario Superior Court of Justice (Commercial List), and/or the order(s) recognizing the Plan in Canada (including the Definitive Documents or any other documentation relating or relevant thereto) or equivalent events, circumstances, or procedures in Canada (the "***Canadian Process***"), those provisions relating to the US Process shall be deemed to apply or refer equally to the Irish Process and the Canadian Process (and, if necessary, this Agreement and the Term Sheet will be deemed to include provisions relating to the Irish Process and Canadian Process which correspond to provisions relating to the US Process) to ensure that the rights and obligations of the Parties under this Agreement apply equally to the Irish Process and Canadian Process in the same way as the US Process, to the fullest extent necessary in order to implement the Restructuring in accordance with the terms, spirit, and intent of this Agreement and the Term Sheet.

3.     **Definitive Documents.**  Except for Definitive Documents for which consent rights are addressed in the Term Sheet, each Definitive Document shall be consistent with this Agreement and otherwise reasonably acceptable to the Company, the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee, including as they may be modified, amended, or supplemented in accordance with this Agreement.  The Parties agree that the Definitive Documents are intended to provide tax efficiency to (x) the Company, including with respect to the availability, location, and timing of tax deductions, and (y) to the Opioid Claimants, including with respect to the tax classification of the Opioid Trust.

4.     **Agreements of the Supporting Parties.**

a.     Restructuring Support.  During the Support Period, subject to the terms and conditions hereof, each Supporting Party agrees, severally and not jointly (solely in its capacity as a holder of Specified Claims and Interests, and in no other capacity), solely as long as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any Specified Claims and Interests against and/or in the Company held by it, that it shall use commercially reasonable efforts:

(i)     to not oppose or otherwise object to the Restructuring, including by (A) timely voting all its Specified Claims and Interests (or directing the beneficial owner of the Claims and Interests on whose behalf it has executed this Agreement to timely vote) to accept the Plan and Scheme of Arrangement (to the extent such Claims and Interests are entitled to vote thereunder) and not changing or revoking its vote (subject to receipt of a Bankruptcy Court-approved Disclosure Statement), provided, that such vote shall be deemed immediately revoked and void *ab initio* upon termination of this Agreement in accordance with the terms hereof before the consummation of the Plan, and (B) not exercising any right to "opt out" of the third-party releases contained in the Plan; provided, that, with respect to the Supporting Governmental Opioid Claimants, such support will only be with respect to such entity's Opioid Claims and not with

respect to any other Claims or Interests; provided, further, that the Plaintiff's Executive Committee need only recommend that all Opioid Claimants in the MDL take the actions contemplated by (A) and (B) above;

(ii)    to not oppose or otherwise object to (A) the petition to be presented by the directors of the Parent or any other Company Entity before the High Court of Ireland for appointment of the Examiner to the Parent or any other Company Entity for the purposes of or in connection with the implementation of the Restructuring, (B) any ancillary applications brought before the High Court of Ireland relating to such petition, including for the appointment of the Examiner to the Parent or any other Company Entity on an interim basis pending the hearing of the petition and/or the appointment of the Examiner to any Company Entity as a "related company" (within the meaning of Section 2 of the Companies Act 2014 of Ireland), and/or (C) any application(s) for recognition or other proceedings by any Company Entity under the Canadian Companies' Creditors Arrangement Act to the extent necessary to implement the Restructuring;

(iii)    to not oppose or otherwise object to the Company's application to the Bankruptcy Court for entry of the 105(a) Order;

(iv)    to not oppose or otherwise object to the Company's application to appoint a Future Claimants Representative;

(v)    to not oppose or otherwise object to, and not directly or indirectly interfere with (or instruct or encourage any other Person to directly or indirectly interfere with), the CMS/DOJ/States Settlement and/or the implementation thereof (including any motion or other request for entry of an order of the Bankruptcy Court, which may be the Confirmation Order, approving the CMS/DOJ/States Settlement);

(vi)    to not oppose or otherwise object to any key employee incentive and retentive based compensation programs in existence prior to the Agreement Effective Date;

(vii)    not to solicit, support or take any action to initiate or implement any Alternative Transaction with respect to the Company;

(viii)    not to take any action to advance the pursuit or prosecution of any Opioid Claims against Mallinckrodt (including seeking any discovery from Mallinckrodt in respect thereto); provided, that, nothing herein shall prevent any Supporting Party from continuing (x) to pursue or prosecute any claims against non-Mallinckrodt third-parties, including co-defendants of Mallinckrodt or to take discovery from non-Mallinckrodt parties in connection with those third-party claims or (y) to take discovery from Mallinckrodt solely in furtherance of such claims against non-Mallinckrodt third parties;

(ix)    not to take any action to advance the pursuit or prosecution of any Specified Claims and Interests against any Non-Debtor Affiliates;

(x)    to reasonably cooperate with each other and the Company in good faith in connection with the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents;

(xi)    to negotiate with the other Parties in good faith appropriate additional or alternative provisions to address any impediment to the Restructuring that may arise;

(xii)    not to transfer its Specified Claims and Interests to any other Person except as provided in this Agreement; and

(xiii)    not to take any action that would trigger a Mandatory Offer Requirement.

Nothing in this Agreement shall prohibit any Supporting Party from (1) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases, (2) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documents, (3) effecting a Transfer or purchasing, selling, or entering into transactions with respect to Specified Claims and Interests, subject to compliance with Section 4(b) below, (4) asserting or raising any objection not prohibited under or inconsistent with this Agreement in connection with the Restructuring, (5) failing to vote to support the Plan or withdrawing a vote in the support of the Plan, in each case from and after the termination of this Agreement, (6) taking any action which is required by applicable law or declining to take any action which is prohibited by applicable law, (7) retaining the benefit of any applicable legal professional privilege, (8) making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like, (9) taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence or priority of its Claims against or Interests in Mallinckrodt (including the filing of a proof of claim against any Company Entity), (10) taking any action that is not inconsistent with this Agreement, (11) consulting with other parties in interest in the Chapter 11 Cases, or (12) taking any action in furtherance of any Claims or Interest in Mallinckrodt other than Specified Claims and Interests, including exercising its rights under or taking action in connection with the Make-Whole Reservation of Rights. For the avoidance of doubt, the exercise of any rights under or taking action in connection with the Make-Whole Reservation of Rights is not inconsistent with a Supporting Unsecured Noteholders' obligations hereunder. Without limiting the foregoing, nothing in this Agreement shall limit or restrict any Supporting Party from asserting positions or objections to the Plan, the Restructuring, or any other matter in the Chapter 11 Cases in such Supporting Party's capacity as a holder of a Claim or Interest in Mallinckrodt other than Specified Claims and Interests. Each Party agrees that a Supporting Party's entry into, execution, or performance of this Agreement (including without limitation a Supporting Party's vote in favor of the Plan) shall not be referenced, used, or held in any way against the Supporting Party in its capacity as a holder of a Claim or Interest in Mallinckrodt other than Specified Claims and Interests.

b.    Transfers.

(i)    During the Support Period, each Supporting Party that holds any Claim against or Interest in Mallinckrodt agrees, solely with respect to itself, that it shall not sell, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a ***Transfer***," provided, however, that any pledge, lien, security interest, or other encumbrance in favor of a bank or broker dealer at which a Supporting Party maintains an account, where such bank or broker dealer holds a security interest in or other encumbrances over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder) any ownership (including any

beneficial ownership)[3] in its Specified Claims and Interests, or any option thereon or any right or interest therein (including by granting any proxies or depositing any interests in such Specified Claims and Interests into a voting trust or by entering into a voting agreement with respect to such Specified Claims and Interests), unless (A) the intended transferee is another Supporting Party, or (B) the intended transferee executes and delivers to counsel to the Company a Joinder Agreement before, or substantially contemporaneously with, the time such Transfer is effective (it being understood that any Transfer shall not be effective as against Mallinckrodt until notification of such Transfer and a copy of the executed Joinder Agreement (as applicable) is received by counsel to the Company, in each case, on the terms set forth herein) (such transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***"). Upon satisfaction of the foregoing requirements in this <u>Section 4(b)</u>, (X) the Permitted Transferee shall be deemed to be a Supporting Party hereunder and, for the avoidance of doubt, a Permitted Transferee is bound as a Supporting Party under this Agreement with respect to any and all Specified Claims and Interests, whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee and is deemed to make all of the representations and warranties of a Supporting Party set forth in this Agreement and be entitled to the applicable rights of a Supporting Party hereunder, and (Y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Notwithstanding the foregoing, this <u>Section 4(b)</u>, as applied to the Supporting Governmental Opioid Claimants, shall only apply to such claimants' Opioid Claims.

(ii)     This Agreement shall in no way be construed to preclude any Supporting Party from acquiring additional Claims against or Interests in Mallinckrodt; <u>provided</u>, that (A) all Supporting Parties shall file a statement with the Bankruptcy Court as required by Rule 2019 of the Federal Rules of Bankruptcy Procedures, including revised holdings information for such Supporting Party, as applicable, (B) any acquired Claims or Interests shall, solely to the extent they are Specified Claims and Interests, automatically and immediately upon acquisition by a Supporting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given), and (C) no Supporting Party shall acquire any Interests or take other action that would trigger a Mandatory Offer Requirement; <u>provided</u>, <u>further</u>, that the acquisition of additional Specified Claims and Interests by a Supporting Party shall in no way affect or dilute (X) the recoveries of other Supporting Parties contemplated under the Plan or (Y) any rights contemplated by this Agreement, the Term Sheet, or the Opioid Settlement Term Sheet.

(iii)     This <u>Section 4(b)</u> shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Supporting Party to Transfer any Claims or Interests. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information (each such executed agreement, a "***Confidentiality Agreement***"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

---

[3]  As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the rights and the disposition of, the applicable Claims or Interests or the right to acquire such Claims or Interests.

(iv)     Any Transfer made in violation of this <u>Section 4(b)</u> shall be void *ab initio*.

(v)     A Supporting Party that transfers any right, title, or interest in a Specified Claim and Interest in accordance with the terms of this <u>Section 4(b)</u> shall (A) be deemed to relinquish its rights and be released from its obligations under this Agreement solely to the extent of such Transferred Specified Claims and Interests and (B) not be liable to any Party to this Agreement for the failure of the transferee to comply with the terms and conditions of this Agreement.

c.     <u>Marketmaking.</u>

(i)     Notwithstanding anything to the contrary herein, a Supporting Party may Transfer any ownership in its Specified Claims and Interests, or any option thereon or any right or interest therein, to a Qualified Marketmaker (as defined below) that acquires Claims against or Interests in Mallinckrodt with the purpose and intent of acting as a Qualified Marketmaker for such Claims or Interests, and such Qualified Marketmaker shall not be required to execute and deliver to counsel to any Party a Joinder Agreement in respect of such Claims or Interests if (A) such Qualified Marketmaker subsequently Transfers such Claims or Interests within ten (10) Business Days of its acquisition to an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor of such Qualified Marketmaker, (B) the transferee otherwise is a Permitted Transferee (including any requirement hereunder that such transferee execute a Joinder Agreement), and (C) the Transfer otherwise is a Permitted Transfer. To the extent that a Supporting Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in any Specified Claims and Interests that such Supporting Party acquires in its capacity as a Qualified Marketmaker from a holder of such Claims or Interests who is not a Supporting Party without regard to the requirements set forth in <u>Section 4(b)</u> hereof. As used herein, the term "Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against Mallinckrodt (or enter with customers into long and short positions in claims against Mallinckrodt), in its capacity as a dealer or market maker in claims against Mallinckrodt and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(ii)     The Company understands that certain of the Supporting Parties are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Company acknowledges and agrees that, to the extent a Supporting Party expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s) and/or business group(s) of the Supporting Party that principally manage and/or supervise the Supporting Party's investment in Mallinckrodt, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Supporting Party so long as they are not acting at the direction or for the benefit of such Supporting Party or such Supporting Party's investment in Mallinckrodt; <u>provided</u> that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that executes this Agreement.

(iii)    Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Supporting Party that is a Qualified Marketmaker before the occurrence of conditions giving rise to the effective date for the obligations and the support hereunder, such Supporting Party shall be a Supporting Party hereunder solely with respect to the Specified Claims and Interests listed on such signature pages and shall not be required to comply with this Agreement for any other Claims or Interests in Mallinckrodt that it may hold from time to time in its role as a Qualified Marketmaker.

d.    <u>Negative Covenants</u>.  Each Supporting Party agrees (solely in its capacity as a holder of Specified Claims and Interests, and in no other capacity), severally and not jointly, that, for the duration of the Support Period, it shall not take any action directly (nor encourage any other Person to take any action) that is materially inconsistent with, or omit to take any action required by, this Agreement, the Plan (as applicable), or any of the other Definitive Documents.

e.    <u>Ad Hoc Group Composition</u>.  No less frequently than every forty-five (45) days commencing on the Agreement Effective Date, counsel to each of the Unsecured Notes Ad Hoc Group and the Governmental Plaintiff Ad Hoc Committee shall provide counsel to the Company and to each other, on a professionals' eyes only basis, with a list showing each member of such counsel's respective ad hoc group and, in the case of members of the Unsecured Notes Ad Hoc Group, the aggregate holdings of Guaranteed Unsecured Notes and other claims based on funded indebtedness of the Company (including on account of the Company's secured notes, term loans, and revolving credit facility) or interests of the Company; <u>provided</u>, that counsel to the Governmental Plaintiff Ad Hoc Committee shall only be required to provide such a list if the members of the Governmental Plaintiff Ad Hoc Committee have changed since the last time such a list was provided.

f.    Notwithstanding anything to the contrary herein, nothing in this Agreement shall:

(i)    affect the ability of any Supporting Party to consult with any other Supporting Party, the Company Entities, or any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee);

(ii)    impair or waive the rights of any Supporting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring;

(iii)    prevent any Supporting Party from enforcing this Agreement or any other Definitive Document (to the extent it has rights thereunder), or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents;

(iv)    prevent any Supporting Party from taking any customary perfection step or other action as is necessary to preserve or defend the validity or existence of its Claims and Interests in the Company (including the filing of proofs of claim);

(v)    prevent any Supporting Party from taking any action in furtherance of any Claims or Interests in Mallinckrodt other than Specified Claims and Interests; or

(vi)    limit or otherwise restrict the regulatory, police, or other governmental functions of any Supporting Governmental Opioid Claimant, or limit or otherwise restrict any other Supporting Governmental Opioid Claimant's rights, in each case other than in connection with Opioid Claims.

5.    **Agreements of the Company.**

a.    <u>Restructuring Support</u>.  During the Support Period, subject to the terms and conditions hereof, each Company Entity agrees that it shall use commercially reasonable efforts:

(i)    to implement the Restructuring in accordance with the terms and conditions set forth herein and in accordance with the Milestones (as defined below);

(ii)    to take any and all commercially reasonable and appropriate actions necessary or reasonably requested by a Supporting Party to consummate the Restructuring and the CMS/DOJ/States Settlement, and satisfy any conditions thereto, in accordance with the terms hereof;

(iii)    to support and take all commercially reasonable actions necessary to facilitate the solicitation, confirmation, approval, and consummation of the Plan and the Scheme of Arrangement, as applicable, and the transactions contemplated thereby, including by commencing the Irish Examinership Proceedings and Recognition Proceedings as soon as reasonably practicable;

(iv)    to prepare and deliver to the Supporting Parties draft copies of all Definitive Documents and any motions, pleadings, declarations, exhibits, and proposed orders related thereto (each of which shall contain terms and conditions consistent with the terms of this Agreement), and afford the Supporting Parties a reasonable opportunity to review and comment in advance of any filing thereof, to the extent practicable, and consider any such comments in good faith;

(v)    to deliver to counsel to the Supporting Unsecured Noteholders and counsel to the Ad Hoc Governmental Plaintiff Group, copies of all notices, reporting and other documents delivered to the Prepetition Secured Parties (as defined in the Cash Collateral Order) pursuant to paragraphs 4(h) and 5(h) of the Cash Collateral Order, on the same terms and conditions (with respect to confidentiality and otherwise) applicable to the Prepetition Secured Parties under the Cash Collateral Order;

(vi)    to take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including obtaining all governmental, regulatory, licensing, or other approvals (including any necessary or appropriate third-party consents) necessary to consummate the Restructuring;

(vii)    not to offer or provide any consideration or treatment to any Opioid Claimant that is not acceptable to the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders;

(viii)    not to seek or solicit, or instruct and direct their respective Representatives to seek or solicit, any discussions or negotiations with respect to any Alternative Transaction; provided, that (A) if any of the Company Entities receive a proposal or expression of interest regarding any Alternative Transaction, the Company Entities shall be permitted to discuss or negotiate the terms of such proposal or expression of interest and shall notify within two (2) business days of the receipt of such proposal or expression of interest counsel to the Unsecured Notes Ad Hoc Group and counsel to the Governmental Plaintiff Ad Hoc Committee, orally and in writing, of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, and (B) contemporaneously with such notification, the Company Entities shall furnish counsel to the Unsecured Notes Ad Hoc Group and counsel to the Governmental Plaintiff Ad Hoc Committee with copies of any written offer, oral offer, proposal, expression of interest, or any other information that they receive relating to the foregoing and shall within two (2) business days inform counsel to the Unsecured Notes Ad Hoc Group and counsel to the Governmental Plaintiff Ad Hoc Committee of any material changes to such proposals; provided, that any information shared with or furnished to counsel to the Unsecured Notes Ad Hoc Group or counsel to the Governmental Plaintiff Ad Hoc Committee in accordance with this Section 5(a)(vii), shall be provided on a "professional eyes only" basis unless otherwise agreed to by the parties in writing;

(ix)    to (A) prepare, or cause to be prepared, the Definitive Documents and any related motions, pleadings, declaration, exhibits, proposed orders, and applications, each of which, for the avoidance of doubt, shall contain terms and conditions consistent with this Agreement, (B) provide draft copies of all Definitive Documents to counsel to the Unsecured Notes Ad Hoc Group and Governmental Plaintiff Ad Hoc Committee at least two (2) Business Days or as soon as reasonably practicable prior to the date when the Company intends to file or execute such document, (C) reasonably cooperate with the Supporting Parties in good faith in connection with the negotiation, drafting, execution (to the extent the Company is a party thereto), and delivery of the Definitive Documents and (D) consult in good faith with the Unsecured Notes Ad Hoc Group and the Governmental Plaintiff Ad Hoc Committee regarding the form and substance of the Definitive Documents and any proposed filing thereof with the Bankruptcy Court. Nothing in this Section 5(a)(viii) shall limit the Company's obligations under Section 3 herein. The Company will also provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to counsel to the Unsecured Notes Ad Hoc Group and counsel to the Governmental Plaintiff Ad Hoc Committee at least two (2) Business Days or as soon as reasonably practicable prior to filing such pleading, to the extent reasonably practicable, and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading;

(x)    to file such "first day" motions and pleadings determined by the Company to be necessary and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee, from the Bankruptcy Court approving the relief requested in such "first day" motions;

(xi)    to timely file a formal objection, in form and substance reasonably acceptable to the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad

Hoc Committee, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; (C) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (D) dismissing the Chapter 11 Cases;

(xii)    to, upon reasonable request of any of the Supporting Parties, inform the respective advisors and counsel to the Supporting Parties as to: (A) the material business and financial (including liquidity) performance of Mallinckrodt; (B) the status and progress of the Restructuring, including progress in relation to the negotiations of the Definitive Documents; and (C) the status of obtaining any necessary or desirable authorizations (including any consents) from any Supporting Party, competent judicial body, Governmental Entity, or any stock exchange;

(xiii)    to (A) operate the business of the Company and its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement, past practices, and to preserve intact the Company's business organization and relationships with third parties (including lessors, licensors, suppliers, distributors and customers) and employees and (B) subject to applicable non-disclosure agreements and the terms thereof, keep counsel and advisors to the Unsecured Notes Ad Hoc Group and the Governmental Plaintiff Ad Hoc Committee reasonably informed about the operations of the Company and its direct and indirect subsidiaries;

(xiv)    to inform the respective advisors and counsel to the Supporting Parties within no more than two (2) Business Days after becoming aware of: (A) any matter or circumstance which they know, or reasonably expect is likely, to be a material impediment to the implementation or consummation of the Restructuring; (B) any notice of commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Entity; (C) a material breach of this Agreement by any Company Entity; (D) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; (E) any notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring; and (F) any notice, including from any governmental authority, of any material proceeding commenced or of any material complaints, litigations, investigations, or hearings, or, to the knowledge of the Company Entities, threatened in writing against the Company Parties, relating to or involving the Company Entities (or any communications regarding the same that may be contemplated or threatened);

(xv)    to negotiate with the Supporting Parties in good faith appropriate additional or alternative provisions to address any impediment to the Restructuring that may arise;

(xvi)    to maintain good standing (or a normal status or its equivalent) under the laws of the jurisdiction or state in which each Company Entity is incorporated or organized;

(xvii) to keep the Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee reasonably informed from time to time on the status of the CMS/DOJ/States Settlement, including, to the extent reasonably requested by the Supporting Unsecured Noteholders or the Governmental Plaintiff Ad Hoc Committee, providing copies of any written materials related thereto to the counsel to the Unsecured Notes Ad Hoc Group and the Governmental Plaintiff Ad Hoc Committee on a professional eyes only basis; and

(xviii) to (A) object to and oppose any motion seeking standing to assert claims or objections belonging to the Company's bankruptcy estates against any Supporting Party in respect of its Specified Claims and Interests and (B) in the event any objection to the Specified Claims and Interests is filed by another party in interest, seek to adjourn any hearing on such objection for so long as this Agreement remains effective as to the holder or holders of the Specified Claims and Interests subject to such objection.

b.    <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall not (i) take any action directly or indirectly (nor encourage any other person to take any action ) that is materially inconsistent with, or that would reasonably be expected to prevent, interfere with, delay, or impede the consummation of the Restructuring, or omit to take any action required by, this Agreement, the Plan (as applicable), or any of the other Definitive Documents, (ii) object to, delay, impede, or take any other action or inaction that could reasonably be expected to materially interfere with or prevent acceptance, approval, implementation, or consummation of the Restructuring, (iii) except as agreed by the Required Supporting Unsecured Noteholders and counsel for the Governmental Plaintiff Ad Hoc Committee, file any pleading, motion, declaration, supporting exhibit or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or other Definitive Documents, or that could reasonably be expected to frustrate or materially impede the implementation and consummation of the Restructuring, is inconsistent with the Term Sheet in any material respect, or which is otherwise in substance not reasonably satisfactory to the Required Supporting Unsecured Noteholders, and the Governmental Plaintiff Ad Hoc Committee, (iv) engage in any material merger, consolidation, disposition, asset sale, equity sale, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business with a third party other than the Restructuring, or (v) commence, support, or join any litigation or adversary proceeding against any of the Supporting Parties relating to the Specified Claims and Interests; <u>provided</u>, that nothing in this Agreement shall: (i) impair or waive the rights of any Company Entity to assert or raise any objection, or take any position, permitted under this Agreement in connection with the Restructuring, or (ii) prevent any Company Entity from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

c.    <u>Chapter 11 Operating Injunction</u>.  Within one week after the Petition Date, the Company Entities shall file with the Bankruptcy Court a motion, in form and substance reasonably satisfactory to the Company Entities, the Governmental Plaintiff Ad Hoc Committee, and the Required Supporting Unsecured Noteholders, seeking to impose a voluntary injunction on the Company Entities to enjoin them from engaging in certain conduct related to the manufacture, marketing, sale, and distribution of opioids effective as of the Petition Date (the "***Chapter 11 Operating Injunction***").

6.        **Termination of Agreement.**

a.        <u>Supporting Party Termination Events</u>.  This Agreement may be terminated by Supporting Unsecured Noteholders with the consent of no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to this Agreement (solely as to the Supporting Unsecured Noteholders), or the Governmental Plaintiff Ad Hoc Committee (solely as to the Supporting Governmental Opioid Claimants), by the delivery to the other Parties of a written notice in accordance with <u>Section 20</u> hereof, upon the occurrence and continuation of any of the following events (each, a "***Supporting Party Termination Event***"):

(i)        the breach by any Company Entity of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Company Entity set forth in this Agreement, in each case, in any material respect and which breach remains uncured (to the extent curable) for a period of fifteen (15) Business Days following the Company's receipt of any notice pursuant to <u>Section 20</u> hereof;

(ii)        any representation or warranty in this Agreement made by any Company Entity shall have been untrue in any material respect when made or, if required to be true on an ongoing basis, shall have become untrue in any material respect, and such breach remains uncured (to the extent curable) for a period of fifteen (15) Business Days following the Company's receipt of any notice pursuant to <u>Section 20</u> hereof;

(iii)        any Company Entity files any motion, pleading, or related document with the Bankruptcy Court that is inconsistent with this Agreement , the Term Sheet (including the Opioid Settlement Term Sheet) or the Definitive Documents (in each case, solely to the extent that the terminating Supporting Party(s) have consent rights over such document), and such motion, pleading, or related document has not been withdrawn within fifteen (15) Business Days of the Company receiving written notice in accordance with <u>Section 20</u> that such motion, pleading, or related document is inconsistent with this Agreement;

(iv)        (A) any Definitive Document filed by the Company or the Examiner, or any related order entered by the Bankruptcy Court in the Chapter 11 Cases, the High Court of Ireland in the Irish Examinership Proceedings, or the Ontario Superior Court of Justice (Commercial List) in the Recognition Proceedings, in each case, is inconsistent with this Agreement, including the Supporting Parties' consent rights under this Agreement (in each case implicating a Definitive Document, solely to the extent that the terminating Supporting Party or Supporting Parties have consent rights over such Definitive Document), or is otherwise not in accordance with this Agreement in any material respect, or (B) any of the terms or conditions of any of the Definitive Documents are waived, amended, supplemented, or otherwise modified in any material respect with respect to the Supporting Unsecured Noteholders' or Supporting Governmental Opioid Claimants' respective rights under this Agreement without the prior written consent of the Required Supporting Unsecured Noteholders or the Governmental Plaintiff Ad Hoc Committee, as applicable (or such parties as may be required by the terms of such Definitive Document, if then effective), in each case, which remains uncured for fifteen (15) Business Days after the receipt by the Company of written notice delivered in accordance herewith;

(v)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of any material portion of the Restructuring or rendering illegal the Plan or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Entity, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance;

(vi)    any Company Entity (A) withdraws the Plan or Scheme of Arrangement, (B) publicly announces its intention not to support the Plan, the Scheme of Arrangement, or the Restructuring, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction, or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document executed by a Company Entity) or publicly announces its intent to pursue an Alternative Transaction;

(vii)    the Examiner withdraws the Scheme of Arrangement and applies to the High Court of Ireland for directions pursuant to Section 535(1) of the Companies Act 2014 of Ireland;

(viii)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) terminating any Company Entity's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan), or (E) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement; provided, that, with respect to clauses (B) and (C) above, except where the dismissal or conversion is for a Debtor that, at the time of such dismissal, has dormant business activities and a fair market value of less than $250,000;

(ix)    the Company exercises its "fiduciary out" in accordance with Section 6(b)(iii) hereof;

(x)    an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the Company Entities or that would materially and adversely affect the ability of any of the Company Entities to operate its businesses in the ordinary course;

(xi)    leave is granted by the High Court of Ireland permitting a party to commence or continue proceedings against the Parent (or any other Company Entity subject to the protection of the High Court of Ireland) after the commencement of the Irish Examinership Proceedings;

(xii)    the Examiner consents to any action, claim, or step being taken against the Parent (or any other Company Entity subject to the protection of the High Court of Ireland) pursuant to Section 520(4) of the Companies Act 2014 of Ireland after the commencement of the Irish Examinership Proceedings;

(xiii)   the Bankruptcy Court enters an order denying confirmation of the Plan;

(xiv)   the Confirmation Order is reversed or vacated;

(xv)   any court of competent jurisdiction has entered a judgment or order declaring this Agreement to be unenforceable;

(xvi)   the Company enters into the CMS/DOJ/States Settlement on terms materially different than the terms set forth on **Schedule 2** to the Term Sheet;

(xvii)   an order is entered by the Bankruptcy Court granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure on the same) on any of the Company's assets (other than with respect to assets having a fair market value of less than $10,000,000 in the aggregate);

(xviii)  the Company terminates any of its obligations under this Agreement in accordance with Section 6(b);

(xix)   the Governmental Plaintiff Ad Hoc Committee or the Supporting Unsecured Noteholders terminate any of their respective obligations under this Agreement in accordance with Section 6(a); or

(xx)   the Net Prepetition Cash Tax Liability exceeds the Target Net Prepetition Cash Tax Liability by at least $125,000,000;

(xxi)   the Bankruptcy Court enters an order granting or sustaining any objection or challenge to the Guaranteed Unsecured Notes Claims that is reasonably likely to render the Plan unconfirmable;

(xxii)  the Debtors, the Supporting Unsecured Noteholders and the Supporting Governmental Opioid Claimants shall not have agreed upon the Additional Insurance Rights by the time of the filing of the Plan and Disclosure Statement; or

(xxiii) any of the following events (the "***Milestones***") have not been achieved, extended, or waived by no later than 11:59 pm New York City time on the dates set forth below, underlined provided that any such time and date may be extended with the consent of the Required Supporting Parties (which consent may be provided by email):

A.   a final Cash Collateral Order is entered on or prior to the date that is forty-five (45) days after the Petition Date;

B.   a final order granting authority for the Debtors to pay all reasonable and documented fees and expenses of the professionals and advisors referenced in Section 25, subject to any applicable terms in their respective engagement letters or fee reimbursement letters, is entered on or prior to the date that is sixty (60) days after the Petition Date;

C.    the Debtors' filing of the Plan and Disclosure Statement on or prior to the date that is four (4) months after the Petition Date;

D.    the Plan is confirmed on or prior to the date that is eleven (11) months after the Petition Date;

E.    a Scheme of Arrangement consistent with this Agreement is approved by the Irish Court on or prior to the date that is fourteen (14) months after the Petition Date; and

F.    the Plan Effective Date has not occurred on or prior to the date that is fifteen (15) months after the Petition date.

Notwithstanding the foregoing, this Agreement may not be terminated as to the Supporting Unsecured Noteholders or the Governmental Plaintiff Ad Hoc Committee on account of any Supporting Party Termination Event that is caused by any Supporting Unsecured Noteholder or Supporting Governmental Opioid Claimant, respectively.

b.    Company Termination Events.  This Agreement may be terminated as to all Parties (except to the extent otherwise set forth in Sections 6(b)(i) and 6(b)(ii) below) by the Company by the delivery to counsel to all Supporting Parties of a written notice in accordance with Section 20 hereof, upon the occurrence and continuation of any of the following events (each, a "*Company Termination Event*"):

(i)    the breach in any material respect by Supporting Unsecured Noteholders that would result in non-breaching Supporting Unsecured Noteholders holding less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes, in each case with respect to any of the representations, warranties, or covenants of such Supporting Unsecured Noteholders set forth in this Agreement and which breach remains uncured for a period of fifteen (15) Business Days after the receipt by the applicable Supporting Unsecured Noteholder from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach; provided, that any such termination by the Company pursuant to this Section 6(b)(i) shall result in the termination of this Agreement solely as to the Supporting Unsecured Noteholders; and provided, further, that, the Company may, at its option, terminate this Agreement solely as to any Supporting Unsecured Noteholder that breaches, in any material respect, its representations, warranties or covenants set forth in this Agreement (to the extent breach remains uncured for a period of fifteen (15) Business Days after receipt by the applicable Supporting Unsecured Noteholder from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach), whether or not such breach would entitle the Company to terminate this Agreement with respect to all Supporting Unsecured Noteholders in accordance with this Section 6(b)(i) (the right of the Company under this proviso, the "*Company Individual Noteholder Termination Right*");

(ii)    the breach in any material respect by (A) any Supporting Governmental Opioid Claimant that would result in non-breaching, Supporting Governmental Opioid Claimants consisting of less than 32 States, or (B) the Plaintiffs' Executive Committee, in each case with respect to any of the representations, warranties, or covenants of such Supporting

Governmental Opioid Claimants set forth in this Agreement (such breaching Supporting Party, a "***Breaching Governmental Plaintiff***") and which breach remains uncured for a period of fifteen (15) Business Days after the receipt by the applicable Breaching Governmental Plaintiff from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach; provided, that any such termination by the Company pursuant to this Section 6(b)(ii) shall result in the termination of this Agreement solely as to the Supporting Governmental Opioid Claimants; provided, further, that, the Company may, at its option, instead terminate this Agreement solely as to any Supporting Governmental Opioid Claimant that breaches, in any material respect, its representations, warranties or covenants set forth in this Agreement (to the extent breach remains uncured for a period of fifteen (15) Business Days after receipt by the applicable Breaching Governmental Plaintiff from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach), whether or not such breach would entitle the Company to terminate this Agreement with respect to all Supporting Governmental Opioid Claimants in accordance with this Section 6(b)(ii) (the right of the Company under this proviso, the "***Company Individual Governmental Entity Termination Right***");

(iii)    the board of directors or managers or similar governing body, as applicable, of any Company Entity determines that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties, or duties as directors, in each case under applicable law (as reasonably determined by such board or body in good faith after consultation with legal counsel); provided, that, the Company provides prompt written notice (within two (2) Business Days thereof) to counsel to each of the Supporting Parties of such determination; and provided, further, that to the extent any Supporting Party seeks an expedited hearing to determine if the Company has validly exercised this clause, the Company consents to such expedited hearing, it being understood that all Parties reserve all rights with respect of the underlying relief;

(iv)    the Governmental Plaintiff Ad Hoc Committee or the Supporting Unsecured Noteholders terminate any of their respective obligations under this Agreement in accordance with Section 6(a);

(v)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of any material portion of the Restructuring or rendering illegal the Plan or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Entity, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance;

(vi)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order over an objection by the Company pursued in good faith (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement; provided, that the Company shall not

be entitled to exercise the foregoing termination right to the extent entry of such order was requested by the Company;

        (vii)    the Debtors, the Supporting Unsecured Noteholders and the Supporting Governmental Opioid Claimants shall not have agreed upon the Additional Insurance Rights by the time of the filing of the Plan and Disclosure Statement;

        (viii)    the Bankruptcy Court enters an order denying confirmation of the Plan; or

        (ix)    any court of competent jurisdiction has entered a judgment or order declaring this Agreement to be unenforceable.

For the avoidance of doubt, no verdict, judgment, order, or settlement in any opioid-related litigation in which no Supporting Party is a party to can give rise to or serve as a basis for any Company Termination Event.

Notwithstanding the foregoing, this Agreement may not be terminated on account of any Company Termination Event if such Company Termination Event is caused by the Company.

        c.    <u>Mutual Termination</u>.  This Agreement may be terminated, as to all Parties, in writing by mutual agreement of the Company Entities, the Required Supporting Unsecured Noteholders, and the Governmental Plaintiff Ad Hoc Committee (a "***Mutual Termination Event***").

        d.    <u>Individual Termination</u>.  Upon ten (10) days' notice, any individual Supporting Party may terminate this Agreement, as to itself only, by the delivery to counsel to the Company and the other Supporting Parties of a written notice in accordance with <u>Section 20</u> hereof, in the event that (i) any waiver, modification, amendment or supplement of this Agreement materially adversely affects the economics, recoveries, or treatment applicable to the Specified Claims and Interests of such Supporting Party or (ii) any Definitive Document is filed with the Bankruptcy Court or later amended in such a way that materially adversely affects the economics, recoveries, or treatment applicable to the Specified Claims and Interests of such Supporting Party without such Supporting Party's consent (each such event, an "***Individual Termination Event***"); provided, that, such Supporting Party shall not object to the Company's efforts to seek an expedited hearing to adjudicate whether an Individual Termination Event has occurred.

        e.    <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice upon the occurrence of the Plan Effective Date (collectively with the Supporting Party Termination Events, the Company Termination Events, the Mutual Termination Event, and the Individual Termination Event, the "***Termination Events***").

        f.    <u>Effect of Termination as to All Parties</u>.  Subject to <u>Section 21(b)</u>, upon a termination of this Agreement as to all Parties, this Agreement shall forthwith become null and void and of no further force or effect as to any Party, and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether

with respect to the Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under Section 15 hereof.  Subject to Section 21(b), upon such termination, any and all consents, agreements, undertakings, waivers, forbearances, votes, or ballots tendered by the Parties before such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by any of the Parties in connection with the Chapter 11 Cases.

g.    Effect of Termination as to Individual Parties.  Subject to Section 21(b), upon the termination of this Agreement that is limited in its effectiveness as to an individual Party or Parties in accordance with this Section 6: (i) this Agreement shall become null and void and of no further force or effect with respect to the terminated Party or Parties, who shall be immediately released from its or their liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it or they would have had and such Party or Parties shall be entitled to take all actions, whether with respect to the Plan or otherwise, that it or they would have been entitled to take had it or they not entered into this Agreement; provided, that (i) the terminated Party or Parties shall not be relieved of any liability for breach or non-performance of its or their obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under Section 15 hereof; and (ii) this Agreement shall remain in full force and effect with respect to all Parties other than the terminated Party or Parties.  Subject to Section 21(b), upon such termination, any and all consents, agreements, undertakings, waivers, forbearances, votes, or ballots tendered by the terminating Party or Parties before such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by any of the Parties in connection with the Chapter 11 Cases.

h.    Automatic Stay.  The Company Entities acknowledge that, after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any other Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, and the Company Entities hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided; provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

**7.    Representations and Warranties; Execution By Counsel to Supporting Governmental Opioid Claimants.**

a.    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Supporting Party becomes a party hereto):

(i)    (A) such Party (I) is validly existing and, to the extent applicable, is in good standing under the laws of its jurisdiction of incorporation or organization, (II) has all requisite corporate, partnership, limited liability company, governmental, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its

obligations contemplated hereunder (other than, in the case of the Company, any required approvals or authorizations of the Bankruptcy Court and the Scheme of Arrangement), and (B) the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, governmental, or other similar action on its part (other than, in the case of the Company, any required approvals or authorizations of the Bankruptcy Court and the Scheme of Arrangement);

(ii)    the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, its charter, its constitution, or its bylaws (or other similar governing documents) in any material respect, or (B) conflict with, result in a breach of, or constitute a default under any material contractual obligation to which it is a party in any material respect (provided, however, that with respect to the Company, it is understood that commencing the Chapter 11 Cases may result in a breach of or constitute a default under such obligations);

(iii)    the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent, or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body, except such registrations or filings, consents, approvals, notices, or other actions as may be necessary and/or required by the Bankruptcy Court or this Agreement;

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court; and

(v)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; provided, however, that a Supporting Unsecured Noteholder may be or become a party to a separate agreement with the Debtors in connection with the Make-Whole Reservation of Rights.

b.    Each Supporting Unsecured Noteholder severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Supporting Unsecured Noteholder becomes a party hereto), such Supporting Unsecured Noteholder (i) is the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate principal amount of Specified Claims and Interests set forth besides its name on **Annex 2** hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Unsecured Noteholder that becomes a Party hereto after the date hereof), (ii) has, with respect to the beneficial owners of such Specified Claims and Interests (as may be set forth on a schedule to such Supporting Unsecured Noteholder's signature page hereto), (A) sole investment or voting discretion with respect to such Specified Claims and Interests, (B) full power and authority to vote on and consent to matters concerning such Specified Claims and Interests, or to exchange, assign, and transfer such Claims or Interests, and (C) full power and authority to bind or act on the behalf of, such beneficial owners, and (iii) such Specified Claims

and Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Supporting Unsecured Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

c.      To the extent counsel executes this Agreement on behalf of any Supporting Governmental Opioid Claimants, such counsel represents and warrants that it is has been duly authorized by such Supporting Governmental Opioid Claimants to execute this Agreement on their behalf and that (i) such Supporting Governmental Opioid Claimants constitute Supporting Parties hereunder, and (ii) such Supporting Governmental Opioid Claimants are deemed to have made the representations and warranties set forth in <u>Section 7(a)</u> above as of the date of counsel's execution of this Agreement (or, if later, the date on which such Supporting Governmental Opioid Claimants (either directly or through counsel) execute a Joinder Agreement).  This Agreement shall constitute the legally valid and binding obligation of each Supporting Governmental Opioid Claimant, enforceable in accordance with its terms.

## 8.      <u>Fiduciary Duties.</u>

a.      Notwithstanding anything to the contrary herein, nothing in this Agreement shall require a Company Entity or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this <u>Section 8</u> shall not be deemed to constitute a breach of this Agreement (other than solely for the purpose of establishing the occurrence of an event that may give rise to a termination right).  The Company shall give prompt written notice to the Supporting Parties of any determination made in accordance with this subsection. This subsection shall not impede any Party's right to terminate this Agreement pursuant to <u>Section 6</u> of this Agreement.

b.      Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company or the Supporting Parties, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

c.      Nothing in this Agreement shall (i) impair or waive the rights of the Company to assert or raise any objection permitted under this Agreement in connection with the Restructuring or (ii) prevent the Company from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

## 9.      <u>Filings and Public Statements</u>.  The Company and the Parent shall submit drafts to counsel, on a professional eyes only basis, to the Unsecured Notes Ad Hoc Group and the

26

Governmental Plaintiff Ad Hoc Committee, of any press releases, public documents, and any and all filings with the U.S. Securities and Exchange Commission, the Bankruptcy Court, or otherwise that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days or as soon as reasonably practicable prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall consider any such comments in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company on the one hand, and any Supporting Party, on the other hand, no Party or its advisors (including counsel to any Party) shall disclose to any person (including other Supporting Parties) other than the Company and the Company's advisors, the principal amount or percentage of any Specified Claims and Interests or any other securities of or Claims against the Company held by any other Party, in each case, without such Party's prior written consent; provided that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (including by way of a protective order) (the expense of which, if any, shall be borne by the relevant disclosing Party) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Specified Claims and Interests held by all the Supporting Parties collectively. Any public filing of this Agreement, with the Bankruptcy Court, the SEC or otherwise, shall not include the executed signature pages to this Agreement. Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Supporting Party.

## 10. **Amendments and Waivers**.

a. This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 10.

b. During the Support Period, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Company, the Required Supporting Unsecured Noteholders, and the Governmental Plaintiff Ad Hoc Committee; provided, that: (a) any waiver, modification, amendment, or supplement to Section 4(f)(v), Section 6(d), Section 6(e), Section 6(f), Section 6(g), Section 7(a), Section 7(b), Section 8(b), Section 10, Section 17, Section 21, Section 22 or the definition of "Specified Claims and Interests" shall require the prior written consent of each Party; (b) any waiver, modification, amendment, or supplement to the definitions of "Required Supporting Unsecured Noteholders," or "Governmental Plaintiff Ad Hoc Committee," shall require the prior written consent of each applicable Supporting Party that is a member of such constituencies; (c) any waiver, modification, amendment, or supplement of the Opioid Settlement or the CMS/DOJ/States Settlement that is materially adverse to the Supporting Unsecured Noteholders shall require the consent of no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to this Agreement; and (d) any waiver, modification, amendment or supplement requiring any Supporting Party to make any investment, including in any Mallinckrodt entity, may not be made without the prior written consent of such Supporting Party. Notwithstanding the foregoing, in no event shall Section 6(d) be amended as to any Supporting Party without the consent of each such Supporting Party.

c.      Amendments to any Definitive Document shall be governed as set forth in such Definitive Document.  Any consent required to be provided pursuant to this <u>Section 10</u> may be delivered by email from counsel.   Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 10</u> shall be ineffective and void *ab initio*.

11.     **Noteholder Consent Fee**.  Supporting Unsecured Noteholders who have executed and delivered counterpart signature pages to this Agreement to counsel to the Company by no later than of 11:59 P.M., prevailing Eastern time, on October 11, 2020 (the "***Determination Date***"), shall earn the Noteholder Consent Fee as set forth herein and in the Plan, which shall be payable in cash on the Plan Effective Date; <u>provided</u>, that the Noteholder Consent Fee shall only be payable if holders of no less than 66.67% in principal amount of the Guaranteed Unsecured Notes execute and deliver counterpart signature pages to this Agreement by the Determination Date; <u>provided</u>, <u>further</u>, that the Noteholder Consent fee shall only be payable to such Supporting Unsecured Noteholders having executed and delivered counterpart signature pages by the Determination Date notwithstanding any Transfer of Guaranteed Unsecured Notes after the Determination Date.

12.     **Effectiveness.**  This Agreement shall become effective and binding on the Parties on the Agreement Effective Date, and not before such date.

13.     **Governing Law; Jurisdiction; Waiver of Jury Trial.**

a.      This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflicts of law principles thereof.

b.      Each of the Parties irrevocably agrees that, for so long as the Chapter 11 Cases are pending, any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Bankruptcy Court, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding.  Otherwise, each of the Parties, other than Parties that are States, agrees that any such legal action, suit, or proceeding shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York and each of the Parties, other than Parties that are States, hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above, other than (i) proceedings involving Parties that are States commenced while the Chapter 11 Cases are not pending in which case such State's rights are fully reserved and (ii) proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement, (A) any Claim that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (B) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service

of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (C) that (I) the proceeding in any such court is brought in an inconvenient forum, (II) the venue of such proceeding is improper, or (III) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

c.      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**14.      Specific Performance/Remedies.**

a.      The Parties agree that irreparable damage may occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law, or in equity.

b.      Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover on the basis of anything in this Agreement, any punitive, special, indirect or consequential damages or damages for lost profits, in each case against any other Party to this Agreement.

**15.      Survival.**  Notwithstanding any Transfer of any Claims against or Interests in the Company in accordance with Section 4(b) or the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties set forth in the following Sections: 6(f), 6(g), 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

**16.      Headings.**  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**17.      No Third-Party Beneficiaries; Successors and Assigns; Severability; Several Obligations.**  This Agreement is intended to bind and inure solely to the benefit of the Parties and

their respective successors, permitted assigns, heirs, executors, and administrators and, unless expressly stated or referred to herein, no other person or entity shall be a third-party beneficiary hereof; provided, that nothing contained in this Section 17 shall be deemed to permit Transfers of interests in any Specified Claim and Interests other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, several and neither joint nor joint and several.  For the avoidance of doubt, the obligations arising out of this Agreement are several and not joint with respect to each Supporting Party, in accordance with its proportionate interest hereunder, and the Parties agree not to proceed against any Supporting Party for the obligations of another.

18.    **Prior Negotiations; Entire Agreement.**    This Agreement, including the exhibits and schedules hereto (including the Term Sheet and the Opioid Settlement Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Supporting Party shall continue in full force and effect in accordance with its terms.

19.    **Counterparts; Email Consent.**    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

20.    **Notices**.    All notices hereunder shall be given by electronic mail, certified mail (return receipt requested), or courier to, and shall be deemed effective when actually received by, the following addresses:

a.    If to the Company, to:

Mallinckrodt plc
675 James S. McDonnell Boulevard
Hazelwood, Missouri 63042

Attention:  Mark Casey & Donald Lohman
      (Corporate.Secretary@mnk.com)

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention:  George Davis (george.davis@lw.com)
      Anupama Yerramalli (anu.yerramalli@lw.com)
      Andrew Sorkin (andrew.sorkin@lw.com)

 – and –

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Attention:  Jeff Bjork (jeff.bjork@lw.com)

 – and –

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
      Jason Moehlmann (jason.moehlmann@lw.com)

 – and –

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention:  Philip Mindlin (PMindlin@wlrk.com)
      Neil (Mac) M. Snyder (NMSnyder@wlrk.com)

   b.  If to the Supporting Unsecured Noteholders, to the addresses set forth below each Supporting Unsecured Noteholder's signature to this Agreement (if any), as the case may be, and if such Supporting Unsecured Noteholder is a member of the Unsecured Notes Ad Hoc Group, with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Andrew N. Rosenberg (arosenberg@paulweiss.com)
      Alice Belisle Eaton (aeaton@paulweiss.com)

31

Claudia R. Tobler (ctobler@paulweiss.com)
Neal Paul Donnelly (ndonnelly@paulweiss.com)

c.      If to a Supporting Governmental Opioid Claimant, to the addresses set forth below each Supporting Governmental Opioid Claimant's signature to this Agreement (if any), as the case may be, and if such Supporting Governmental Opioid Claimant is a member of the Governmental Plaintiff Ad Hoc Committee, with a copy (which shall not constitute notice), to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention:      Kenneth H. Eckstein (keckstein@kramerlevin.com)
                Daniel M. Eggermann (deggermann@kramerlevin.com)

– and –

Brown Rudnick LLP
Seven Times Square
New York, New York 10019
Attention:      David J. Molton (dmolton@brownrudnick.com)
                Steven D. Pohl (spohl@brownrudnick.com)

– and –

Gilbert LLP
1100 New York Ave., NW
Suite 700
Washington, D.C. 2005
Attention:      Scott D. Gilbert (gilberts@gilbertlegal.com)
                Kami E. Quinn (quinnk@gilbertlegal.com)

**21.    Reservation of Rights; No Admission.**

a.      Nothing contained herein shall (i) limit the ability of any Party to consult with other Parties; or (ii) limit the ability of any Supporting Party to sell or enter into any transactions in connection with the Specified Claims and Interests, or any other claims against or interests in the Company, subject to the terms of this Agreement; or (iii) constitute a waiver or amendment of any provision of any applicable credit agreement or indenture or any agreements executed in connection with such credit agreement or indenture.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company.

b.      Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed

by the Company or any of its affiliates and subsidiaries. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. If the Restructuring is not consummated, or if this Agreement is terminated as to all Parties for any reason, the Parties fully reserve any and all of their rights. If this Agreement is terminated as to any Party or group individually, such Party or group fully reserves any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

22. **Relationship Among the Supporting Parties**. It is understood and agreed that no Supporting Party has any fiduciary duty, duty of trust or confidence in any kind or form with any other Supporting Party, the Company, or any other stakeholder of the Company and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Supporting Party may trade in the Claims and Interests of the Company without the consent of the Company or any other Supporting Party, subject to applicable securities laws, the terms of this Agreement, and any Confidentiality Agreement entered into with the Company; provided that no Supporting Party shall have any responsibility for any such trading by any other Person by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Supporting Parties shall in any way affect or negate this understanding and agreement.

23. **Make-Whole Reservation of Rights**. Neither this Agreement nor the Term Sheet provide for the treatment of the Make-Whole Claims, and all Parties' rights related thereto are fully reserved. Notwithstanding anything to the contrary in this Agreement, it is expressly understood and agreed that a Supporting Unsecured Noteholder (a) may hold First Lien Credit Agreement Claims, First Lien Notes Claims, and/or Second Lien Notes Claims in addition to its Specified Claims and Interests, and (b) that the entry into this Agreement does not limit, waive, impair, or otherwise affect any Supporting Unsecured Noteholder's right to negotiate for and seek allowance of, or to object to and seek disallowance of, any Make-Whole Claims in the Chapter 11 Cases or the Restructuring, whether in such Unsecured Noteholder's capacity as an Unsecured Noteholder or otherwise. Nothing contained herein, limits, waives, impairs, or otherwise affects the Company's right to object to, or seek disallowance of, any Make-Whole Claims in the Chapter 11 Cases or Restructuring and any such actions taken in connection with defending or objecting to the Make-Whole Claims is not inconsistent with the Company's obligations under this Agreement. Any settlement and/or compromise of any Make-Whole Claim shall be acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders, and any documents evidencing such settlement and/or compromise shall be in form

and substance acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders.

24. **No Solicitation; Representation by Counsel; Adequate Information.**

a. This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases. The acceptances of the Supporting Parties with respect to the Plan will not be solicited until such Supporting Parties have received the Disclosure Statement and related ballots and solicitation materials.

b. Each Party acknowledges that it, or its advisors, has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. Each Supporting Party hereby further confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company, and without reliance on any statement of any other Party (or such other Party's financial, legal or other professional advisors), other than such express representations and warranties of the Company set forth in Section 7.

25. **Fees and Expenses.** The Company shall reimburse all reasonable and documented fees and out-of-pocket expenses including success fees (regardless of whether such fees and expenses were incurred before or after the Petition Date and, in each case, in accordance with any applicable engagement letter or fee reimbursement letter with the Company) of the following professionals and advisors: (a) Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, as legal counsel to the Governmental Plaintiff Ad Hoc Committee; (b) William Fry, as Irish counsel to the Governmental Plaintiff Ad Hoc Committee; (c) Houlihan Lokey, Inc., as investment banker and financial advisor to the Governmental Plaintiff Ad Hoc Committee; (d) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee and the Debtors shall reasonably agree from time to time; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Unsecured Notes Ad Hoc Group; (f) Landis Rath & Cobb LLP, as Delaware counsel to the Unsecured Notes Ad Hoc Group; (g) Perella Weinberg Partners LP, as investment banker to the Unsecured Notes Ad Hoc Group; (h) Reed Smith LLP, as regulatory counsel to the Unsecured Notes Ad Hoc Group; (i) Matheson as Irish counsel to the Unsecured Notes Ad Hoc Group; (j) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time; and (k) to the extent not identified above, three local counsel (one for the Chapter 11 Cases, one for the Irish Examinership Proceedings, and one for the Recognition Proceedings) for each of the Governmental Plaintiff Ad Hoc Committee and Unsecured Notes Ad Hoc Group; provided, that to the extent that the Company terminates this Agreement under Section 6(b), the Company's reimbursement obligations under this Section 25 shall survive with respect to any and all fees and expenses incurred on or prior to the date of termination. In furtherance of the foregoing (x) simultaneously with the effectiveness of this Agreement, the Company shall pay all such fees and out-of-pocket expenses incurred or accrued at any time prior to the Agreement Effective Date; (y) the Company shall pay any accrued but unpaid amounts owing under such engagement letter and/or fee reimbursement letters to the extent

required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination of this Agreement (other than termination of this Agreement as a result of the occurrence of the Plan Effective Date); and (z) notwithstanding anything to the contrary herein, the Company shall also be required to reimburse all reasonable and documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee on or after the Effective Date in connection with the implementation of the Plan (excluding, for the avoidance of doubt, the expenses of the administration of the Opioid Trust).

26.    **Enforceability of Agreement.**  The Parties hereby acknowledge and agree: (a) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code, (b) each of the Parties to the extent enforceable waives any right to assert that the exercise of any rights or remedies under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising any rights or remedies under this Agreement to the extent the Bankruptcy Court determines that such relief is required, (c) that they shall not take a position to the contrary of this Section 26 in the Bankruptcy Court or any other court of competent jurisdiction, and (d) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 26 is illegal, invalid or unenforceable, in whole or in part.

27.    **Conflicts.**  In the event of any conflict among the terms and provisions of this RSA and of the Term Sheet, the terms and provisions of the Term Sheet shall control.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers or other authorized persons, solely in their respective capacity as officers or other authorized persons of the undersigned and not in any other capacity, as of the date first set forth above.

*[Signature pages follow]*

[Signature Pages Redacted]

[*Signature Page to Restructuring Support Agreement*]

# Annex 1

## Company Entities

| Name |
| --- |
| Mallinckrodt plc |
| Acthar IP Unlimited Company |
| IMC Exploration Company |
| Infacare Pharmaceutical Corporation |
| INO Therapeutics LLC |
| Ludlow LLC |
| MAK LLC |
| Mallinckrodt APAP LLC |
| Mallinckrodt ARD Finance LLC |
| Mallinckrodt ARD Holdings Inc. |
| Mallinckrodt ARD Holdings Limited |
| Mallinckrodt ARD IP Unlimited Company |
| Mallinckrodt ARD LLC |
| Mallinckrodt Brand Pharmaceuticals LLC |
| Mallinckrodt Buckingham Unlimited Company |
| Mallinckrodt Canada ULC |
| Mallinckrodt CB LLC |
| Mallinckrodt Critical Care Finance LLC |
| Mallinckrodt Enterprises Holdings, Inc. |
| Mallinckrodt Enterprises LLC |
| Mallinckrodt Enterprises UK Limited |
| Mallinckrodt Equinox Finance LLC |
| Mallinckrodt Group S.à r.l. |
| Mallinckrodt Holdings GmbH |
| Mallinckrodt Hospital Products Inc. |
| Mallinckrodt Hospital Products IP Unlimited Company |
| Mallinckrodt International Finance SA |
| Mallinckrodt International Holdings S.à r.l. |
| Mallinckrodt IP Unlimited Company |
| Mallinckrodt LLC |
| Mallinckrodt Lux IP S.à r.l. |
| Mallinckrodt Manufacturing LLC |
| Mallinckrodt Pharma IP Trading Unlimited Company |
| Mallinckrodt Pharmaceuticals Ireland Limited |
| Mallinckrodt Pharmaceuticals Limited |

| |
|---|
| Mallinckrodt Quincy S.à r.l. |
| Mallinckrodt UK Finance LLP |
| Mallinckrodt UK Ltd |
| Mallinckrodt US Holdings LLC |
| Mallinckrodt US Pool LLC |
| Mallinckrodt Veterinary, Inc. |
| Mallinckrodt Windsor Ireland Finance Unlimited Company |
| Mallinckrodt Windsor S.à r.l. |
| MCCH LLC |
| MEH, Inc. |
| MHP Finance LLC |
| MKG Medical UK Ltd |
| MNK 2011 LLC |
| MUSHI UK Holdings Limited |
| Ocera Therapeutics, Inc. |
| Petten Holdings Inc. |
| SpecGx Holdings LLC |
| SpecGx LLC |
| ST Operations LLC |
| ST Shared Services LLC |
| ST US Holdings LLC |
| ST US Pool LLC |
| Stratatech Corporation |
| Sucampo Holdings Inc. |
| Sucampo Pharma Americas LLC |
| Sucampo Pharmaceuticals, Inc. |
| Therakos, Inc. |
| Vtesse LLC |
| WebsterGx Holdco LLC |

## **Annex 2**

**Supporting Unsecured Noteholder Holdings**

[Supporting Unsecured Noteholder Holdings Redacted]

## Exhibit A

**Term Sheet**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## Mallinckrodt Restructuring Term Sheet

This Term Sheet, which is <u>Exhibit A</u> to the Restructuring Support Agreement dated October 11, 2020, by and among the Company and the Supporting Parties party thereto, describes the proposed terms of the Company's Restructuring. The Debtors will implement the Restructuring through the Plan, which shall be consistent with the terms of this Term Sheet, the RSA and the exhibits and schedules annexed hereto and thereto, including the Opioid Settlement Term Sheet, which is <u>Schedule 1</u> hereto (as each may be amended or supplemented from time to time in accordance with the terms of the RSA), in the Chapter 11 Cases to be commenced in the Bankruptcy Court, the Scheme of Arrangement based on the Plan in the Irish Examinership Proceedings, and the Recognition Proceedings (as defined herein) in which the Canadian Court (as defined herein) shall recognize in Canada the Chapter 11 Cases. This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the RSA or the Opioid Settlement Term Sheet, as applicable.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the other Definitive Documents, or the Scheme of Arrangement and the Irish Examinership Proceedings, which remain subject to negotiation in accordance with the RSA. Consummation of the transactions contemplated by this Term Sheet is subject to (a) the negotiation and execution of the Definitive Documents evidencing and related to the Restructuring contemplated herein, (b) satisfaction or waiver of all of the conditions in any Definitive Document evidencing the transactions comprising the Restructuring, (c) entry of the Confirmation Order and the satisfaction or waiver of any conditions to the effectiveness thereof, (d) approval of the Scheme of Arrangement by the High Court of Ireland and the satisfaction or waiver of any conditions to the effectiveness thereof, and (d) entry of an order recognizing the Confirmation Order in the Recognition Proceedings. The Definitive Documents shall satisfy the requirements of all applicable securities laws, the Bankruptcy Code, this Term Sheet, the Opioid Settlement Term Sheet, the Scheme of Arrangement, the Companies Act 2014 of Ireland governing the Irish Examinership Proceedings, and the Canadian Companies Arrangement Act governing the Recognition Proceedings. The Definitive Documents will contain terms and conditions that are dependent on each other, including those described in this Term Sheet and the Opioid Settlement Term Sheet.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| Type of Claim | Treatment | Impairment / Voting |
|---|---|---|
| **Administrative, Tax, Other Priority and Other Secured Claims** | All such claims shall be paid in full in cash on the Plan Effective Date, or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, and the Governmental Plaintiff Ad Hoc Committee.<br><br>Administrative expense claims shall be paid on the Plan Effective Date and shall include Restructuring Expenses (as defined below). | Unimpaired |
| **First Lien Credit Agreement Claims** | All allowed First Lien Credit Agreement Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **First Lien Notes Claims** | All allowed First Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Second Lien Notes Claims** | All allowed Second Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Guaranteed Unsecured Notes Claims** | Holders of allowed Guaranteed Unsecured Notes Claims shall receive their *pro rata* share of:<br><br>i. $375 million of new secured takeback second lien notes due 7 years after emergence (the *"Takeback Second Lien Notes"*), which shall contain economic terms consistent with those set forth in <u>Annex 2</u> hereto; and<br><br>ii. 100% of New Mallinckrodt Common Shares, subject to dilution on account of the New Opioid Warrants and the MIP (each as defined below). | Impaired; entitled to vote |
| **4.75% Unsecured Notes Claims** | No property will be distributed to the Holders of allowed 4.75% Unsecured Notes Claims. | Impaired; deemed to reject; not |

| | | entitled to vote |
|---|---|---|
| **Legacy Debentures Claims** | No property will be distributed to the Holders of allowed Legacy Debentures Claims. | Impaired; deemed to reject; not entitled to vote |
| **General Unsecured Claims (Not Otherwise Classified)** | Holders of allowed General Unsecured Claims shall receive their *pro rata* share, at the applicable Debtor, of up to $100 million to be allocated among the Debtors (the "***General Unsecured Recovery Cash Pool***"). | Impaired; entitled to vote |
| **Trade Claims** | As consideration for maintaining trade terms consistent with those practices and programs most favorable to the Debtors in place during the 12 months before the Petition Date or such other favorable terms as the Debtors and the Trade Claimants may mutually agree on, holders of allowed Trade Claims shall receive their *pro rata share* of up to $50 million; *provided that*, any amounts not allocated to allowed Trade Claims up to $50 million shall be allocated to the General Unsecured Recovery Cash Pool. | Impaired; entitled to vote |
| **Opioid Claims** | As of the Plan Effective Date, the Opioid Trust will be formed and shall receive the Opioid Trust Consideration as set forth in the Opioid Settlement Term Sheet.<br><br>All Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust as more fully set forth in the Opioid Settlement Term Sheet.<br><br>Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. | Impaired; entitled to vote |

| Intercompany Claims | No property will be distributed to the Holders of allowed Intercompany Claims. Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
|---|---|---|
| Intercompany Interests | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
| Equity Interests | All existing Equity Interests shall be discharged, cancelled, released, and extinguished. | Impaired; deemed to reject; not entitled to vote |
| **OTHER TERMS OF THE RESTRUCTURING** | | |
| Case Financing | The Chapter 11 Cases will be financed by existing cash and use of cash collateral on terms and conditions subject to the reasonable consent of the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee and any cash collateral order will provide that any periods in which creditors are required to challenge any Debtor stipulations or claims against any of the Debtors (including the claims of lenders/bondholders) shall automatically be tolled with respect to the Supporting Governmental Opioid Claimants while the RSA remains in effect with respect to the Supporting Governmental Opioid Claimants. Any such challenge periods applicable to a Supporting Governmental Opioid Claimant would begin to run only after termination of the RSA by or against such Supporting Governmental Opioid Claimant. | |
| Executory Contracts and Unexpired Leases | Except as otherwise provided in this Term Sheet or the RSA, the Debtors shall assume all executory contracts and unexpired leases other than those executory contracts and unexpired leases to be identified on a schedule of rejected executory contracts and unexpired leases included in the Plan Supplement or otherwise rejected pursuant to an order of the Bankruptcy Court, in each case as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee. For the avoidance of doubt, assumption of executory contracts and unexpired leases shall be consistent with | |

|  | the RSA and this Term Sheet, including as specified in "Employee Matters" and "Indemnification of Prepetition Directors, Officers, Managers, et al." |
|---|---|
| **Opioid Trust** | Opioid Claims shall be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust. Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of the Plan and the Opioid Settlement Term Sheet. <br><br> The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Released Party. |
| **CMS/DOJ/State Settlement** | The Plan will provide for the implementation of a settlement between Mallinckrodt, the United States, and the States resolving Acthar-related litigations and government investigations disclosed in the Company's Form 10-K for 2019, including United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC (E.D. Penn.); United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC (D. Mass.); and Mallinckrodt ARD LLC v. Verma et al. (D.D.C.), and related matters, the terms of which are set forth on Schedule 2 hereto. |
| **Corporate Governance** | The Reorganized Debtors' board shall consist of at least 7 directors including, the Debtors' Chief Executive Officer. As of the Plan Effective Date, the members of the initial Reorganized Debtors' board shall be designated by the Required Supporting Unsecured Noteholders; *provided that*, the members of the Reorganized Debtors' board, other than the Debtors' Chief Executive Officer, shall be independent under NYSE/NASDAQ listing standards and shall be independent of the Supporting Unsecured Noteholders, unless the Governmental Plaintiff Ad Hoc Committee and the Debtors otherwise consent. No parties shall be afforded special rights under any charter, constitutions or bylaws or similar governing foundational document of any Reorganized Debtor; *provided, that*, the foregoing shall not be deemed to limit certain information, registration or similar rights to be afforded to the Governmental Plaintiff Ad Hoc Committee in other agreements with the Reorganized Debtor, including, pursuant to the New Opioid Warrants. |
| **Employee Matters** | Substantially all employees of the Debtors to be retained by the Reorganized Debtors. The Reorganized Debtors shall assume any employment, confidentiality, and non-competition agreements, |

| | |
|---|---|
| | bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | The Plan shall provide that, consistent with applicable law all indemnification provisions currently in place (whether in the by-laws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former direct and indirect sponsors, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated (to the extent required) and remain intact and irrevocable and shall survive effectiveness of the Restructuring. |
| **MIP** | On the Plan Effective Date, the Reorganized Debtors shall adopt the management incentive plan (the "*MIP*") which shall provide for the issuance to management, key employees and directors of the Reorganized Debtors of 10% of the fully diluted New Mallinckrodt Common Shares (for the avoidance of doubt, after giving effect to the exercise of the New Opioid Warrants) not later than thirty (30) days after the Plan Effective Date at least half of the MIP shares will be granted and shall vest in accordance with the terms set forth in Annex 3 hereto, and the remaining amount of which shall be reserved for future issuance as determined by the Reorganized Debtors' board; provided, that the MIP may be modified or amended by the mutual agreement of the Debtors and the Required Supporting Noteholders prior to the Plan Effective Date, with the consent of the Governmental Plaintiff Ad Hoc Committee (such consent not to be unreasonably withheld). The final terms of the MIP (including any amendments or modifications, if any) shall be included in the Plan Supplement. |
| **Exit Capital Raise** | Exact terms, if any, to be agreed upon by the Debtors and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement, with the consent of the Governmental Plaintiff Ad Hoc Committee to the extent that any such terms could reasonably be expected to have an adverse effect, |

| | |
|---|---|
| | in any material respect, on the treatment, rights, or entitlements of the holders of Opioid Claims under the RSA. |
| **Tax Issues** | The Debtors and the Supporting Parties shall cooperate in good faith to structure the Restructuring and related transactions in a tax-efficient manner. |
| **Restructuring Transactions** | Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the RSA and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Plan Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. All such actions necessary or appropriate to consummate and implement the provisions of the Plan shall be set forth in the Plan Supplement, may include one or more mergers, consolidations, restructures, conversions, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the RSA and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**"); *provided that* any Restructuring Transactions shall not adversely affect the recoveries under the Plan of holders of Guaranteed Unsecured Notes Claims without the consent of the Required Supporting Unsecured Noteholders or the holders of Opioid Claims without the consent of the Governmental Plaintiff Ad Hoc Committee. |
| **Company Status Upon Emergence** | On or as soon as reasonably practicable after the Plan Effective Date, the New Mallinckrodt Common Shares shall be listed for trading on The NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange; *provided however that*, in any event, on the Plan Effective Date, the Reorganized Debtors shall have governance standards as though they were listed on any such exchange. |

| | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests, shall be canceled and/or updated to record such cancellation and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Plan Effective Date, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued or make, or cause to be made, such entries in its books and records pursuant to the Restructuring.  The Parties shall use reasonable efforts to make securities issued under the Plan DTC eligible. |
| **Fees and Expenses of the Restructuring Support Agreement Parties** | The Debtors shall pay all reasonable and documented fees and out of pocket expenses of : <ul><li>(a) primary counsel to the Unsecured Notes Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) one Delaware counsel to the Unsecured Notes Ad Hoc Group, (c) one Irish counsel to the Unsecured Notes Ad Hoc Group, (d) one regulatory counsel to the Unsecured Notes Ad Hoc Group and (e) one financial advisor to the Unsecured Notes Ad Hoc Group, Perella Weinberg Partners LP, (f) one Canadian counsel to the Unsecured Notes Ad Hoc Group, and (g) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time;</li><li>(a) primary counsel to the Governmental Plaintiff Ad Hoc Group, Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, (b) one local counsel to the Governmental Plaintiff Ad Hoc Group, (c) one Irish counsel to the Governmental Plaintiff Ad Hoc Committee, (d) one investment banker to the Governmental Plaintiff Ad Hoc Committee, Houlihan Lokey, Inc., and (e) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee  and the Debtors shall reasonably agree from time to time; and</li><li>indenture trustee fees.</li></ul>In each case, that are due and owing after receipt of applicable invoices with non-privileged summaries of services rendered, without any requirement for the filing of fee or retention applications in the Chapter 11 Cases, and in accordance with the terms of the applicable engagement letters, if any, with any balance(s) paid on the |

| | |
|---|---|
| | Plan Effective Date (collectively, the "***Restructuring Expenses***"). |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Releases** | The exculpation provisions, Debtor releases, third-party releases and injunction provisions to be included in the Plan will be consistent with <u>Annex 4</u> hereto in all material respects, to the fullest extent permissible under applicable law.<br><br>In addition, the Plan will include separate release and channeling injunction provisions with respect to Opioid Claims. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the RSA. |
| **Conditions Precedent to the Plan Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following:<br><br>• the RSA shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;<br><br>• the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the RSA and such order shall be a Final Order;<br><br>• the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;<br><br>• all conditions precedent to the consummation of the Opioid Settlement and related transactions, including the establishment of the Opioid Trust and authorization for the payment of the Opioid Trust Consideration, have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms of the Opioid Trust Documents;<br><br>• the final version of the Plan, Plan Supplement, the Opioid Trust Documents, and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the RSA;<br><br>• the Canadian Court shall have issued an order recognizing the Confirmation Order in the Recognition Proceedings and giving full force and effect to the Confirmation Order in Canada and such recognition order shall have become a Final |

|  | Order; |
|---|---|
|  | • the High Court of Ireland shall have made an order confirming the Scheme of Arrangement in the Irish Examinership Proceedings and the Scheme of Arrangement shall have become effective in accordance with its terms (or shall become effective concurrently with effectiveness of the Plan); |
|  | • the Irish Takeover Panel shall have either: (a) confirmed that an obligation to make a mandatory general offer for the shares of the Parent pursuant to Rule 9 of the Irish Takeover Rules will not be triggered by the implementation of the Scheme of Arrangement and the Plan; or (b) otherwise waived the obligation on the part of any Person to make such an offer; |
|  | • any civil or criminal claims asserted by or on behalf of the Department of Justice (other than those resolved pursuant to the CMS/DOJ/State Settlement) have been resolved on terms reasonably acceptable to the Debtors, the Required Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee; |
|  | • the Debtors shall have paid in full all professional fees and expenses of the Debtors' retained professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | • the Debtors shall have paid the Restructuring Expenses in full, in cash; |
|  | • the Debtors shall have paid the Noteholder Consent Fee on the Plan Effective Date; and |
|  | • the Restructuring to be implemented on the Plan Effective Date shall be consistent with the Plan and the RSA. |

## Annex 1

## Certain Definitions

| | |
|---|---|
| ***1992 Legacy Debentures Indenture*** | That certain Indenture, dated as of April 30, 1992, by and among Ludlow Corporation as issuer, Security Pacific National Trust Company (New York), as trustee, and the guarantors party thereto from time to time, and that certain a First Supplemental Indenture, dated April 30, 1992, with Security Pacific National Trust Company (New York) (each as modified, amended, or supplemented from time to time). |
| ***1993 Legacy Debentures Indenture*** | That certain Indenture, dated as of March 8, 1993, by and among Ludlow Corporation as issuer, BankAmerica National Trust Company (successor by merger to Security Pacific National Trust Company (New York)), as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***2013 Notes Indenture*** | That certain Indenture, dated as of April 11, 2013, by and among Mallinckrodt International Finance S.A. as issuer, and Deutsche Bank Trust Company Americas, as trustee (as modified, amended, or supplemented from time to time). |
| ***2014 Notes Indenture*** | That certain Indenture, dated as of August 13, 2014, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***2020 First Lien Notes Indenture*** | That certain Indenture, dated as of April 7, 2020, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as trustee, Deutsche Bank AG New York Branch, as collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***2019 Second Lien Notes Indenture*** | That certain Indenture, dated as of December 6, 2019, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as trustee and collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***4.75% Senior Notes due 2023*** | The 4.75% senior notes due 2023 pursuant to the 2013 Notes Indenture. |
| ***4.75% Unsecured Notes*** | Any Claim arising under or based upon the 4.75% Unsecured Notes |

| *Claims* | or the 2013 Notes Indenture. |
|---|---|
| *5.50% Senior Notes 2025* | The 5.50% senior notes due 2025 pursuant to the April 2015 Notes Indenture. |
| *5.625% Senior Notes due 2023* | The 5.625% senior notes due 2023 pursuant to the September 2015 Notes Indenture. |
| *5.75% Senior Notes due 2022* | The 5.75% senior notes due 2022 pursuant to the 2014 Notes Indenture. |
| *8.00% Debentures due March 2023* | The 8.00% debentures due 2023 pursuant to the 1993 Legacy Debentures Indenture. |
| *9.50% Debentures due May 2022* | The 9.50% debentures due 2022 pursuant to the 1992 Legacy Debentures Indenture. |
| *Affiliate* | As defined in section 101(2) of the Bankruptcy Code. |
| *April 2015 Notes Indenture* | That certain Indenture, dated as of April 15, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *Avoidance Actions* | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| *Canadian Court* | The Ontario Superior Court of Justice (Commercial List) |
| *Causes of Action* | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |
| *Class* | Each class of Holders of Claims or Equity Interests established under the Plan pursuant to section 1122(a) of the Bankruptcy Code. |

| | |
|---|---|
| ***Confirmation Date*** | The date on which the Confirmation Order is entered by the Bankruptcy Court. |
| ***Consummation*** | The occurrence of the Plan Effective Date. |
| ***Current Opioid PI Claim*** | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, other than a Future Opioid PI Claim. |
| ***Entity*** | As defined in section 101(15) of the Bankruptcy Code. |
| ***Equity Interest*** | Any issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, or other instrument evidencing an ownership interest in Mallinckrodt plc, whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Plan Effective Date. |
| ***Exculpated Party*** | In each case, in its capacity as such: (a) the Debtors (and their Representatives); (b) the Reorganized Debtors (and their Representatives); and (c) the Future Claimants Representative. |
| ***Existing Credit Agreement*** | That certain Credit Agreement, dated as of March 19, 2014, by and among Mallinckrodt plc, as the parent, Mallinckrodt International Finance S.A., as Lux borrower, Mallinckrodt CB LLC, as co-borrower, the First Lien Agent, the First Lien Lenders (as modified, amended, or supplemented from time to time). |
| ***Final Order*** | An order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for |

| | certiorari, further review, reargument, stay, or rehearing is pending. |
|---|---|
| ***First Lien Agent*** | Deutsche Bank AG New York Branch, in its capacity as administrative agent under the Existing Credit Agreement or, as applicable, any successor thereto. |
| ***First Lien Notes*** | The 10.00% first lien senior secured notes due 2025 pursuant to the 2020 First Lien Notes Indenture. |
| ***First Lien Notes Claim*** | Any Claim arising under or based upon the First Lien Notes or the 2020 First Lien Notes Indenture. |
| ***First Lien Credit Agreement Claims*** | Any claim held by the First Lien Agent or the First Lien Lenders derived from or based upon the Existing Credit Agreement or theFirst Lien Credit Facility, including claims for all principal amounts outstanding, interest, fees, expenses, costs, indemnification and other charges arising under or related to the First Lien Credit Facility or the Existing Credit Agreement. |
| ***First Lien Credit Facility*** | The credit facility evidenced by the Existing Credit Agreement. |
| ***First Lien Lenders*** | The banks, financial institutions, and other lenders party to the Existing Credit Agreement from time to time |
| ***Future Opioid PI Claims*** | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, which could not be discharged by confirmation of a plan of reorganization if the Bankruptcy Court did not appoint a future claimants representative in the Chapter 11 Cases and which claim is to be addressed by the Opioid Trust to assume the liabilities of the Debtors for damages allegedly caused by the use of opioid products. |
| ***Future Opioid PI Claimants*** | Individuals holding Future Opioid PI Claims. |
| ***Future Claimants Representative*** | The legal representative for Future Opioid PI Claimants. |
| ***General Unsecured Claims*** | Any Unsecured Claim (other than a Guaranteed Unsecured Notes Claim, a Trade Claim, an Opioid Claim, an Administrative, Tax, Other Priority or Other Secured Claim, or (subject to effectiveness of the CMS/DOJ/State Settlement) a Claim resolved by the CMS/DOJ/State Settlement), including without limitation (a) Claims arising from the rejection of unexpired leases or executory contracts, (b) Claims arising from any litigation or other |

| | |
|---|---|
| | court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor in connection therewith, and (c) Claims related to asbestos exposure or products containing asbestos. |
| ***Guaranteed Unsecured Notes*** | The 5.75% Senior Notes due 2022, the 5.500% Senior Notes Due 2025 and the 5.625% Senior Notes Due 2023. |
| ***Guaranteed Unsecured Notes Claims*** | Any Claim arising under or based upon the Guaranteed Unsecured Notes or the Guaranteed Unsecured Notes Indentures. |
| ***Guaranteed Unsecured Notes Indentures*** | Collectively, the 2014 Notes Indenture, the April 2015 Notes Indenture and the September 2015 Notes Indenture. |
| ***Holder*** | An Entity holding a Claim or Equity Interest, as applicable. |
| ***Impaired*** | With respect to any Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| ***Intercompany Claim*** | A prepetition Claim held by a Debtor or non-Debtor against a Debtor. |
| ***Intercompany Interest*** | An Interest in any Debtor other than Mallinckrodt Plc. |
| ***Irish Takeover Panel*** | The Irish Takeover Panel constituted under Irish Takeover Panel Act 1997. |
| ***Irish Takeover Rules*** | The Irish Takeover Panel Act 1997, Takeover Rules 2013. |
| ***Legacy Debentures Claims*** | Any Claim arising under or based upon the 1992 Legacy Debentures Indenture or 1993 Legacy Debentures Indenture. |
| ***Lien*** | A lien as defined in section 101(37) of the Bankruptcy Code. |
| ***New Mallinckrodt Common Shares*** | Common equity interests or ordinary shares in the Reorganized Debtor, Mallinckrodt plc. |
| ***New Opioid Warrants*** | The warrants contemplated under the Opioid Settlement and Opioid Trust Documents, which shall be consistent with the terms set forth in the Opioid Settlement Term Sheet. |
| ***Recognition Proceedings*** | The proceedings commenced by the Debtors under Part IV of the Canadian Companies Arrangement Act in the Canadian Court to recognize in Canada the Chapter 11 Cases and to recognize in Canada certain Orders of the Bankruptcy Court. |

| | |
|---|---|
| *Reinstated* | With respect to Claims and Equity Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| *Reorganized Debtors* | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| *Required Supporting Second Lien Noteholders* | Holders of at least two-thirds in outstanding principal amount of Second Lien Notes. |
| *Released Party* | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' (i) predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such and (ii) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including attorneys retained by any director in his or her capacity as such), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as such), consultants, experts and other professionals of the persons described in clauses (a) through (d)(i); (e) each member of the Unsecured Notes Ad Hoc Group in their capacity as such, (f) each Supporting Unsecured Noteholder in their capacity as such, (g) the Opioid Trust, (h) each member of the Governmental Plaintiff Ad Hoc Committee in their capacity as such, (i) each Supporting Governmental Opioid Claimant in their capacity as such; (j) the Secured Parties and (k) with respect to each of the foregoing Persons in clauses (e) through (j), each such Person's Representatives. Notwithstanding anything to the contrary herein, Medtronic plc and its related parties will not be Released Parties. |
| *Second Lien Notes* | The 10.00% second lien senior secured notes due 2025 pursuant to the 2019 Second Lien Notes Indenture. |
| *Second Lien Notes Claim* | Any Claim arising under or based upon the Second Lien Notes Indenture or the 2019 Second Lien Notes Indenture. |
| *Secured Parties* | The Prepetition Secured Parties, as defined in the Cash Collateral Order. |
| *September 2015 Notes Indenture* | That certain Indenture, dated as of September 24, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as |

|  | modified, amended, or supplemented from time to time). |
|---|---|
| *Trade Claim* | An Unsecured Claim held by a Trade Claimant. |
| *Trade Claimant* | Trade creditors, service providers and other vendors who provide goods and services necessary for the Debtors continued operations, including those creditors described in (a) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors*, (b) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors*, and (c) *Motion of Debtors for Interim and Final Orders (A) Authorizing Payment of Lienholder Claims and (B) Authorizing Payment of Section 503(b)(9) Claims*. |
| *Unimpaired* | With respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| *Unsecured Claim* | A Claim that is not secured by a Lien on property in which one of the Debtors' estates has an interest. |

**<u>Annex 2</u>**

**Takeback Second Lien Notes Summary Terms**

| Amount | • Approximately $375 million |
|---|---|
| **Notes** | • Senior Secured Second Lien Notes |
| **Issuers** | • Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC |
| **Obligors** | • Same as the obligors on the Deferred Cash Payments, *provided that* any obligations on account of the Takeback Second Lien Notes shall (i) be guaranteed by the same entities that guarantee the First Lien Notes and (ii) comply with the terms of the Debtors' existing funded indebtedness |
| **Coupon** | • Payable in cash at 10.00% |
| **Maturity** | • Seven (7) years following the Plan Effective Date |
| **Collateral/Priority** | • *Pari passu* with the second lien security interests as with existing Second Lien Notes |
| **Put** | • Puttable to the issuer at 101% of par upon a change of control |
| **Equity Claw** | • Company may redeem up to 40% of Takeback Second Lien Notes at a redemption price of 110% of par with the proceeds of an equity offering |
| **Call Protections** | • Non-callable for 4 years<br><br>• 105 call in year 5<br><br>• 102.5 in year 6<br><br>• Par thereafter |
| **Affirmative and Negative Covenants** | • To generally match the 2020 First Lien Notes Indenture, as adjusted to reflect new Takeback Second Lien Notes structure |

## Annex 3

**Term Sheet for Mallinckrodt Pharmaceuticals Management Incentive Plan**

The following term sheet summarizes the principal terms of a management incentive plan (the "**MIP**") that certain creditors receiving equity securities (the "**Investors**") of New Mallinckrodt (the "**Company**" and together with its controlled subsidiaries, the "**Company Group**") will adopt effective upon emergence (the "**Closing**").

Capitalized terms used but not defined herein shall have the meanings set forth in the Restructuring Support Agreement and the Restructuring Term Sheet attached thereto as Exhibit A both dated October 11, 2020, to which this term sheet is attached as *Annex 2* (the "**RSA**"). The terms outlined in this Term Sheet assume New Mallinckrodt will be a publicly traded company shortly following Closing consistent with the RSA.

| | |
|---|---|
| **Plan Reserve:** | A number of New Mallinckrodt Common Shares representing 10% of all equity interests in the Company outstanding immediately after the Closing on a fully diluted basis, taking into account the Plan Reserve and any equity securities issued and outstanding at the Closing, and any warrants or securities convertible, exercisable or exchangeable therefor, will be reserved for issuance pursuant to the MIP (such securities issued pursuant to the MIP, the "**Award Shares**").[1] |
| **Eligibility:** | Company employees, non-employee consultants and outside Directors of the Company Group will be eligible to participate in the MIP. Each person who receives an award pursuant to the MIP is hereinafter referred to as a "**Participant**". |
| **Initial Grant:** | Not less than 50% of the Plan Reserve shall be granted in the form of restricted shares, restricted share units or options over New Mallinckrodt Common Shares (the "**Restricted Shares**") within 30 days following Closing with the allocation of such grants to be approved by the Compensation Committee of the Company based upon the recommendations of the Company's CEO (the "**Initial Grants**"). No more than 25% of the Initial Grants shall be in the form of options. |

---

[1]     Plan Reserve subject to adjustment in connection with share split, reverse share split, share dividend or other distribution (whether in the form of cash, shares, other securities or other property), extraordinary cash dividend, recapitalization, merger, consolidation, split-up, spin-off, reorganization, combination, repurchase or exchange of shares or other securities or similar corporate transaction or event.

**Vesting of
Initial Grants:**     The Initial Grants will vest as determined in good faith by the Compensation Committee in consultation with the Company's CEO over a period not exceeding 3 years.

If a Participant's employment is terminated by the Company without "Cause" or by the Participant for "Good Reason" (to be defined in the MIP), all unvested awards  that would otherwise vest during the 12 months following such termination, will vest upon termination, subject to the Participant's execution of a reasonable and customary general release of claims in favor of the Company that becomes effective within 60 days after such termination and continued material compliance with the terms of any non-competition or non-solicitation restrictive covenants to which the Participant is subject.

The MIP will contain other terms consistent with public company equity incentive plans and awards within the Company's peer group.

**Change in Control:**     Upon the occurrence of a "Change in Control" (to be defined in the MIP), to the extent awards are not assumed or substituted, all awards under the MIP shall become fully vested and payable.

**Restrictive Covenants:**     To the extent a Participant is not already subject to non-compete, non-solicitation or other restrictive covenants, then such Participant will be required to enter into a covenant consistent with Mallinckrodt's current Non-Competition, Non-Solicitation, and Confidentiality Agreement, but with a non-compete/non-solicitation period not to exceed 12 months.

**Annex 4**

**Plan Release, Exculpation and Injunction Provisions**

**Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and the Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, by the Debtors and the Estates (the "Debtor Release") from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Opioid Trust, Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement,

or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to any of the foregoing; provided however that the Debtors do not release, and the Opioid Trust shall retain, all Assigned Third-Party Claims; provided, further, that the Debtors do not release, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding anything to the contrary in the foregoing, the releases by the Debtors set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

The Reorganized Debtors and the Opioid Trust shall be bound, to the same extent the Debtors are bound, by the releases set forth in Article [___] of the Plan.  For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article [___] of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article [___] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article [___] of the Plan.

**Releases by Holders of Claims and Equity Interests**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, except as otherwise explicitly provided herein, by

2

(a) the holders of all Claims who vote to accept the Plan, (b) the holders of all Claims that are Unimpaired under the Plan, (c) the holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth herein, (d) the holders of all Claims or Equity Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, and (e) all other holders of Claims and Equity Interests to the maximum extent permitted by law, in each case, from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to any of the foregoing, other than Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any

other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article  [___] of the Plan.  Notwithstanding anything to the contrary in the foregoing, the releases by the Holders of Claims and Equity Interests set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall (x) release, discharge, or preclude the enforcement of any liability of a Released Party to a Governmental Unit arising out of, or relating to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act or (y) solely as to any Supporting Governmental Opioid Plaintiff, release or discharge a consultant or expert having been retained to provide strategic advice for sales and marketing of opioid products who has received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Equity Interests set forth in Article  [__] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article  [__] of the Plan.

**Exculpation**

Effective as of the Plan Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person for any claims or Causes of Action arising prior to or on the Plan Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, filing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Opioid Settlement, the Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, or any contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Disclosure Statement or

Confirmation or Consummation of the Plan, the Opioid Settlement or the Opioid Trust Documents, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Causes of Action arising from actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

**Permanent Injunction**

Except as otherwise expressly provided in the Confirmation Order, Plan or Opioid Trust Documents, from and after the Plan Effective Date all Persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from: (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, or subrogation of any kind; and (d) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person so released, discharged or exculpated (or the property or estate of any Person so released, discharged or exculpated).  All injunctions or stays provided in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force until the Plan Effective Date.

## <u>Schedule 1</u>

**Opioid Settlement Term Sheet**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE UNDER THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## Mallinckrodt Opioid Settlement Term Sheet

This Opioid Settlement Term Sheet, which is <u>Schedule 1</u> to the Term Sheet (the "***Restructuring Term Sheet***") annexed as <u>Exhibit A</u> to the Restructuring Support Agreement, dated October 11, 2020, by and among the Company and the Supporting Parties, describes the proposed treatment of Opioid Claims in connection with the Restructuring contemplated by the Restructuring Support Agreement, as well as certain related implementation and other matters being resolved pursuant to the Opioid Settlement. This Opioid Settlement Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Certain capitalized terms used herein are defined in the glossary attached hereto; capitalized terms used but not otherwise defined in this Opioid Settlement Term Sheet have the meanings assigned in the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable.

This Opioid Settlement Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the Opioid Settlement and broader Restructuring of claims against and interests in the Debtors, which remain subject to negotiation in accordance with the Restructuring Support Agreement.

| TERMS OF THE PLAN AND THE RESTRUCTURING | |
|---|---|
| **Overview** | The Opioid Settlement and Restructuring will be implemented through the Plan, consistent with the terms of (a) this Opioid Settlement Term Sheet, (b) the Restructuring Term Sheet and (c) the Restructuring Support Agreement, through the Chapter 11 Cases to be commenced in the Bankruptcy Court. |
| | The Plan will provide for the establishment of the Opioid Trust, which will receive the Trust Consideration (as defined below), including certain cash payments, the New Opioid Warrants, and certain other assets. All Opioid Claims will be assumed by the Opioid Trust and be discharged, released, and enjoined as to the Company and the other Released Parties. |
| **Treatment of Opioid Claims** | As of the Plan Effective Date, Mallinckrodt's liability for all Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to and assumed by the Opioid Trust, as described herein. Each Opioid Claim shall be resolved in |

|  | accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of this Term Sheet. The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party. |
|---|---|
| **Opioid Trust** | On the Plan Effective Date, the Opioid Trust will receive (the "***Trust Consideration***"):<br><br>• cash in the amount of $450,000,000;<br><br>• the New Opioid Warrants;<br><br>• the right to receive cash payments (the "***Deferred Cash Payments***") in the following amounts and on the following dates:  (a) $200,000,000 on each of the first and second anniversaries of the Plan Effective Date; and (b) $150,000,000 on each of the third through seventh anniversaries of the Plan Effective Date; *provided*, that at any time prior to the first anniversary of the Plan Effective Date, the Reorganized Debtors shall have the right to prepay, in full or in part, the Deferred Cash Payments, at a price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x)(i) the present value of the Deferred Cash Payments at the prepayment date plus (ii) $450,000,000 to equal (y)(i) the present value of the payments under the Original Payments Schedule at the prepayment date (excluding the initial $300,000,000 payment provided for in the Original Payments Schedule), discounted at a discount rate of 12% per annum, *plus* (ii) $300,000,000 (such option, the "***Prepayment Option***");[1] *provided, further*, that to the extent the Reorganized Debtors seek to prepay only a portion of the Deferred Cash Payments in accordance with the Prepayment Option, such prepayment shall (x) be funded solely from the net proceeds of an equity raise by the Reorganized Debtors; and (y) prepay Deferred Cash Payments in accordance with the above in inverse order beginning with the payment due on the seventh anniversary of the Plan Effective Date;<br><br>• the Assigned Third-Party Claims; and |

---

[1]    **Annex A** sets forth the prepayment cost as of the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of a month, the prepayment cost shall be calculated in accordance with the above formula.

|  | • the Assigned Insurance Rights. |
|--|--|
|  | The cash payments described above include amounts to be determined by the Governmental Plaintiff Ad Hoc Committee for reimbursement of plaintiffs'/claimants attorneys' fees and costs (not including (i) Restructuring Expenses, which shall be paid directly by the Debtors, and (ii) any reasonable, documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee on or after the Plan Effective Date in connection with implementation of the Plan (excluding, for the avoidance of doubt, the expenses of administration of the Opioid Trust (the "***Trust Expenses***")), which shall be paid directly by the Reorganized Debtors), and will be joint and several obligations (or be subject to an economically similar arrangement, e.g., one effected by guarantees, subject to tax considerations) of all of the current and future borrowers, issuers, pledgers and guarantors of the Debtors' funded indebtedness from time to time; *provided*, that for so long as the First Lien Notes, Second Lien Notes or Takeback Second Lien Notes remain outstanding, in no event shall the cash payments described above be guaranteed by an entity that does not also guarantee the First Lien Notes, Second Lien Notes or Takeback Second Lien Notes. |
| **Asset Sales; Mandatory Prepayments to Opioid Trust** | The Plan and Confirmation Order will also provide that, after any sale of (i) Mallinckrodt Enterprises Holdings, Inc. and its subsidiaries (including, for the avoidance of doubt, its successors and assigns) or (ii) a material portion of their assets or businesses (including as a result of a merger, equity sale, or asset sale), subject to compliance with the Debtors' covenants under their funded indebtedness (as may be modified from time to time), fifty percent (50%) of the "net proceeds" of such sale (after, for the avoidance of doubt, compliance with then-existing covenants) shall be paid to the Opioid Trust; and the amount of such net proceeds actually conveyed to the Opioid Trust will be deemed a ratable repayment against the remaining structured payments described above that the Opioid Trust is entitled to receive.  For the avoidance of doubt, the Debtors will not be under any obligation to undertake any such sale on any particular timeframe. |
| **Tax Matters** | The Opioid Settlement shall be implemented with the objective of maximizing tax efficiency to (i) Mallinckrodt, including with respect to the availability, location and timing of tax deductions and (ii) to the Opioid Claimants, including with respect to the tax classification of the Opioid Trust. |
|  | The Opioid Trust will be treated as a qualified settlement fund for tax purposes. |

| | |
|---|---|
| | The Parties intend that payments to the Opioid Trust will constitute "restitution" within the meaning of Section 162(f) of the Internal Revenue Code, and will be so characterized for U.S. federal income tax purposes to the extent such payments are made to or at the direction of government or governmental entities and to the extent allowed by applicable law. |
| **Certain Insurance Matters** | In implementing the assignment of the Assigned Insurance Rights, the Debtors or the Reorganized Debtors, on the one hand, and the Governmental Plaintiff Ad Hoc Committee or the Opioid Trust, on the other hand, shall cooperate and negotiate in good faith concerning (i) treatment of unsatisfied self-insured retentions under the applicable policies with the objective of minimizing adverse consequences to Mallinckrodt, Reorganized Mallinckrodt, and the Opioid Trust (it being understood that the foregoing obligation shall not require the Debtors or Reorganized Debtors to satisfy all or any portion of any such self-insured retentions) and (ii) any actions by the Debtors, Reorganized Debtors, or the Opioid Trust to pursue or preserve the insurance policies relating to the Assigned Insurance Rights.  The Debtors and the Reorganized Debtors will use their reasonable best efforts to provide to the Opioid Trust all documents, information, and other cooperation that is reasonably necessary for the Opioid Trust to pursue the Assigned Insurance Rights. |
| **Opioid Trust Documents** | The Opioid Trust Documents will comply with the requirements of the Bankruptcy Code.  The material terms of the Opioid Trust Documents will be described in the Disclosure Statement and forms of the Opioid Trust Documents shall be included in the Plan Supplement, with such summaries and forms of documents to be acceptable to the Governmental Plaintiff Ad Hoc Committee and reasonably acceptable to the Debtors and the Required Supporting Unsecured Noteholders. |
| **New Opioid Warrants Agreement** | The agreement governing the New Opioid Warrants shall constitute Definitive Documentation under the Restructuring Support Agreement and will: <ul><li>contain terms and conditions, including, without limitation, cashless exercise option (as far as legally permissible), anti-dilution protection (including, without limitation, against stock splits, stock dividends and similar events) and Black Scholes protections to be agreed, in each case, as customary for transactions of this type and otherwise acceptable to the Debtors and the Governmental Plaintiff Ad Hoc Committee;</li><li>provide for a registration rights agreement satisfactory to the Governmental Plaintiff Ad Hoc Committee with respect to the New Opioid Warrants and the stock issuable upon</li></ul> |

| | exercise of the New Opioid Warrants providing for, among other things, a resale shelf registration statement and customary demand and piggyback rights; and |
|---|---|
| | • contain enhanced information rights and a covenant requiring Mallinckrodt to, upon request by the Opioid Trust on reasonable notice and subject to reimbursement by the Trust of Mallinckrodt's reasonable and documented out-of-pocket costs and expenses (provided, however, that such notice and reimbursements obligations of the Opioid Trust shall be on terms no less favorable to the Opioid Trust than any such obligations of any other shareholder of the Reorganized Debtors with similar rights), reasonably cooperate in good faith with any private sale by the Opioid Trust of the New Opioid Warrants or any shares received as a result of the exercise of the New Opioid Warrants. |
| **Channeling Injunction** | The Plan and the Confirmation Order will contain (i) a release by holders of Opioid Claims and (ii) an injunction channeling all Opioid Claims against the Protected Parties to the Opioid Trust, in each case, substantially on the terms set forth on **Exhibit 1** hereto. |
| | In addition, and for the avoidance of doubt, the Plan and Confirmation Order will also provide for customary releases by the Company and by other holders of claims and interests, exculpation provisions, and related injunctive provisions, in each case consistent with <u>Annex 4</u> to the Restructuring Term Sheet. |
| **Operating Injunction** | The Company shall seek entry of an injunctive order to be effective on the Petition Date, defining the manner in which the Debtors' opioid business may be lawfully operated by the Debtors or any successors thereto on a going-forward basis during the pendency of the Chapter 11 Cases, on the terms set forth on **Exhibit 2** hereto (the "**Chapter 11 Operating Injunction**"). |
| | The Confirmation Order (or a separate order of the Bankruptcy Court or another court of competent jurisdiction, if so agreed by the Company, the Governmental Plaintiff Ad Hoc Committee) will extend the Chapter 11 Operating Injunction to govern the Reorganized Debtors' operations after the Plan Effective Date (the "**Post-Plan Effective Date Operating Injunction**" together with the Chapter 11 Operating Injunction, the "**Operating Injunctions**"). |
| | The Operating Injunctions shall be acceptable to the Debtors and the Governmental Plaintiff Ad Hoc Committee, and reasonably acceptable to the Required Supporting Unsecured Noteholders. |

| | |
|---|---|
| **Assigned Claims Cooperation** | During the pendency of the Chapter 11 Cases, the Debtors shall reasonably cooperate with counsel to the Governmental Plaintiff Ad Hoc Committee in connection with the investigation and preservation of the Assigned Third-Party Claims and Assigned Insurance Rights, including by providing non-privileged information (including, without limitation, documents, emails and access to individuals with information), at the reasonable request of counsel to the Governmental Plaintiff Ad Hoc Committee. The Debtors shall, at the reasonable request of the Unsecured Notes Ad Hoc Group, inform counsel to the Unsecured Notes Ad Hoc Group of the status and scope of any such cooperation. |
| | The Debtors shall use reasonable efforts to provide all readily available, non-privileged information relating to the Assigned Third-Party Claims and Assigned Insurance Rights to counsel to the Governmental Plaintiff Ad Hoc Committee during the Debtors' bankruptcy cases; provided, however, that such information shall be provided prior to entry of the Confirmation Order. |
| | On and after the Plan Effective Date, the Reorganized Debtors shall provide reasonable cooperation to the Opioid Trust in connection with the Opioid Trust's investigation, preservation and pursuit of the Assigned Third-Party Claims and Assigned Insurance Rights. The terms and conditions of such cooperation shall be mutually agreed by the Debtors, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders and set forth in the Plan Supplement and included in the Confirmation Order. The Opioid Trust shall reimburse the Reorganized Debtors for their documented and reasonable out-of-pocket costs and expenses incurred in connection with such reasonable cooperation from and after the Plan Effective Date. |
| | Any request by the Opioid Trust or the Governmental Plaintiff Ad Hoc Committee for cooperation by the Debtors and Reorganized Debtors shall be on reasonable advance notice, and provided during normal business hours and otherwise in a manner that does not disrupt commercial operations. |
| **Other Terms of Plan and Confirmation Order** | The Plan and/or Confirmation Order will provide for, among other things, the following:<br>• Mallinckrodt will be required to participate in an industry-wide document disclosure program (if any) by disclosing publicly a subset of its litigation documents, subject to scope and protocols to be negotiated in good faith with the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders; |

- any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Assigned Third-Party Claims and Assigned Insurance Rights shall be transferred to the Opioid Trust and shall vest in the Opioid Trust, and the Debtors or the Reorganized Debtors, as the case may be, and the Opioid Trust shall take all necessary actions to effectuate the transfer of such privileges; provided, that (a) such privileges shall be transferred to the Opioid Trust for the sole purpose of enabling, and to the extent necessary to enable, the Opioid Trust to investigate and/or pursue such Assigned Third-Party Claims and Assigned Insurance Rights and (b) no documents or communications subject to a privilege shall be publicly disclosed by the Opioid Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, unless such disclosure or communication is reasonably necessary to preserve, secure, prosecute, or obtain the benefit of the Assigned Third-Party Claims and Assigned Insurance Rights; provided, further, that the Confirmation Order shall provide that the Opioid Trust's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates;

- the Opioid Trust shall be authorized to conduct Rule 2004 examinations, to the fullest extent permitted thereunder, to investigate the Assigned Third-Party Claims and Assigned Insurance Rights, without the requirement of filing a motion for such authorization; provided, however, that no such Rule 2004 examinations shall be taken of the Debtors, the Reorganized Debtors, or any of their respective then-current employees, officers, directors or representatives, without further order of the Bankruptcy Court after notice and an opportunity to object and be heard;

- the exercise of remedies (including, without limitation, rights of setoff and/or recoupment) by non-Mallinckrodt third parties against Mallinckrodt on account of any Assigned Third-Party Claims shall be enjoined and barred, to the extent permitted by applicable law; and

- the covenants and enforcement rights with respect to Mallinckrodt's deferred payment obligations owed to the Opioid Trust in form and substance reasonably acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders in light

7

| | of the nature, duration and form of the deferred payment obligations. |
|---|---|

Execution Version

**Glossary of Key Defined Terms**

| Term | Meaning |
|---|---|
| Additional Insurance Rights | Additional rights in respect of insurance and/or other consideration, to be agreed to by the Debtors, the Supporting Governmental Opioid Claimants and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement. |
| Assigned Insurance Rights | (a) Any and all claims, demands, entitlements to proceeds, payments, benefits, or Causes of Action of the Debtors under any and all general liability and products liability insurance policies that do or may afford the Debtors with rights, benefits, defense, indemnity, or insurance coverage with respect to any Opioid Claim, and (b) the Additional Insurance Rights. |
| Assigned Medtronic Claims | All Causes of Action of the Debtors against Medtronic plc and/or its subsidiaries, and each of their predecessors, successors, and assigns, including, without limitation, all Avoidance Actions of the Debtors against such parties |
| Assigned Third-Party Claims | (a) All Causes of Action of the Debtors arising out of Opioid Claims, including, without limitation, all Avoidance Actions arising out of Opioid Claims, but excluding any Causes of Action against Parent or any of its subsidiaries, or any Released Party, and (b) the Assigned Medtronic Claims. |
| Avoidance Actions | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| Causes of Action | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |
| New Opioid Warrants | Warrants to acquire the number of New Mallinckrodt Common Shares that would represent 19.99% of all such outstanding shares after giving effect to the exercise of the New Opioid Warrants, subject to dilution from equity reserved under the MIP, at a strike |

| Term | Meaning |
| --- | --- |
| | price reflecting an aggregate equity value for the Reorganized Debtors of $1.551 billion, which warrants shall be exercisable at any time on or prior to the seventh anniversary of the Plan Effective Date; *provided*, that if the Reorganized Debtors exercise the Prepayment Option and prepay the Deferred Cash Payments in full, such warrants shall be exercisable only through and including the fifth anniversary of the Plan Effective Date. |
| Opioid Claim | Claims and causes of action, whether existing now or arising in the future, and whether held by a Governmental Entity or private party, against Mallinckrodt in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against Mallinckrodt on account of payments or losses in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including Future Opioid PI Claims; *provided, that* Mallinckrodt shall agree to comply with the terms of the Chapter 11 Operating Injunction as of the Petition Date, and that "Opioid Claims" shall not include any claims in any way arising, in whole or in part, from a violation of the Chapter 11 Operating Injunction |
| Opioid Claimant | A holder of an Opioid Claim |
| Opioid Trust | The trust that is to be established in accordance with the Plan, the Confirmation Order, and the Opioid Trust Documents, which trust will satisfy the requirements of section 468B of the Internal Revenue Code and the Treasury Regulation promulgated thereunder (as such may be modified or supplemented from time to time); provided, however, that nothing contained herein shall be deemed to preclude the establishment of one or more trusts as determined by the Opioid Claimants to be reasonably necessary or appropriate to provide tax efficiency to the Opioid Trust and Opioid Claimants (and all such trusts shall be referred to collectively as the "Opioid Trust"), so long as the establishment of multiple trusts is not reasonably expected to result in any adverse tax consequences for Mallinckrodt. |
| Opioid Trust Documents | The documents governing: (i) the Opioid Trust; (ii) any sub-trusts or vehicles that comprise the Opioid Trust; (iii) the flow of consideration from the Debtors' estates to the Opioid Trust or any sub-trusts or vehicles that comprise the Opioid Trust; (iv) submission, resolution, and distribution procedures in respect of all Opioid Claims; and (v) the flow of distributions, payments or flow of funds made from the Opioid Trust or any such sub-trusts or vehicles after the Plan Effective Date. |

| Term | Meaning |
|---|---|
| Original Payment Schedule | The schedule for deferred cash payments under the February 2020 agreement in principle reached between certain state attorneys general and the Debtors, providing for the following payments on the following dates: |

| Date | Payment Amount |
|---|---|
| Plan Effective Date | $300,000,000 |
| Each of 1st and 2nd anniversaries of Plan Effective Date | $200,000,000 |
| Each of 3rd through 8th anniversaries of Plan Effective Date | $150,000,000 |

| Term | Meaning |
|---|---|
| Parent | Mallinckrodt plc |
| Protected Party | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts and other professionals, provided that, solely as to any Supporting Governmental Opioid Plaintiff, consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date. |

**Exhibit 1**

**Channeling Injunction/Opioid Claimant Release**

**Releases by Holders of Opioid Claims**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Opioid Claimant (in its capacity as such) is deemed to have released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, each Debtor, Reorganized Debtor, and Protected Party from any and all Claims (including Opioid Claims), counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims asserted, or assertable on behalf of the Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Opioid Claims, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement, the Disclosure Statement, the Plan, any Restructuring Transaction, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Protected Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective

Date obligations of any party or Entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release by Opioid Claimants.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this release by Opioid Claimants, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that this release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the third-party release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any Opioid Claimant asserting any claim or Cause of Action released pursuant to this release.

**Channeling Injunction**

*Terms.*  Pursuant to section 105(a) of the Bankruptcy Code, from and after the Plan Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims shall be to the Opioid Trust pursuant to this section [_____] of the Plan and the Opioid Trust Documents, and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Plan Effective Date, all present and future Opioid Claimants shall be permanently and forever stayed, restrained, barred, and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Opioid Claim other than from the Opioid Trust pursuant to the Opioid Trust Documents:

- commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; or

- proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Opioid Trust, except in conformity and compliance with the Opioid Trust Documents.

*Reservations.*  The foregoing injunction shall not stay, restrain, bar, or enjoin (a) the rights of Opioid Claimants to assert Opioid Claims against the Opioid Trust in accordance with the Plan and the Opioid Trust Documents; and (b) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Opioid Trust.

**Exhibit 2**

**Operating Injunction**

## MALLINCKRODT INJUNCTIVE RELIEF
## DRAFT TERM SHEET

## I. DEFINITIONS

A.    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

B.    "Cancer-Related Pain Care" shall mean care that provides relief from pain resulting from a patient's active cancer or cancer treatment, as distinguished from treatment provided during remission.

C.    "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

D.    "Chapter 11 Cases" means the proceedings to be commenced by Mallinckrodt Enterprises LLC, Mallinckrodt LLC, and SpecGX LLC and certain of their affiliates under chapter 11 of the United States Bankruptcy Code.

E.    "Chapter 11 Plan" shall mean the plan of reorganization under chapter 11 of the United States Bankruptcy Code that includes Mallinckrodt Enterprises LLC, Mallinckrodt LLC and SpecGx LLC.

F.    "Confirmation Order" shall mean the order of the Bankruptcy Court (or other court of competent jurisdiction) confirming the Chapter 11 Plan.

G.    "Downstream Customer Data" shall mean transaction information that Mallinckrodt collects relating to its direct customers' sales to downstream customers, including but not limited to chargeback data tied to Mallinckrodt providing certain discounts, "867 data," and IQVIA data.

H.    "Effective Date" shall mean the date on which the Chapter 11 Plan goes effective.

I.    "End-of-Life Care" shall mean care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

J.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, practice, hospital, clinic or pharmacy.

K.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

L.    "Lobby" and "Lobbying" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

M.    "Mallinckrodt" shall mean Mallinckrodt Enterprises LLC, Mallinckrodt LLC, and SpecGX LLC, and each of their current and former subsidiaries, predecessors, successors, joint ventures, divisions and assigns.  It shall also mean officers, directors, independent contractors, consultants, agents, employees, partners, and principals, provided that they are acting within the scope of their engagement or employment.

N.    "Mallinckrodt's Opioid Business" shall mean Mallinckrodt's business operations relating to the manufacture and sale of Opioid Product(s) in the United States and its territories.

O.    "Opioid(s)" shall mean all naturally occurring, synthetic, or semisynthetic substances that interact with opioid receptors and act like opium.

P.    "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act, including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, morphine, oxycodone, oxymorphone, tapentadol, and tramadol. The term "Opioid Products(s)" shall not include medications with a FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage"; methadone 5 and 10 mg tablets, to the extent they are sold to addiction treatment facilities; or raw materials, active pharmaceutical ingredients and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials, active pharmaceutical ingredients and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United States or its territories.

Q.    "OUD" shall mean opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

R.    "Petition Date" shall mean the date on which the Chapter 11 Cases are commenced.

S.    "Promote," "Promoting," and "Promotion" shall mean dissemination of information or other practices intended or that could be reasonably anticipated to increase sales, prescriptions, the utilization of prescription products, or that attempt to influence prescribing practices or formulary decisions in the United States.

T.    "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

U.      "Settling State" means any State that becomes a party to a restructuring support agreement with respect to the Chapter 11 Plan or otherwise votes to accept the Chapter 11 Plan.

V.      "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous state laws and regulations.

W.      "Third Party" shall mean any person or entity other than Mallinckrodt or a government entity.

X.      "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

Y.      "Unbranded Information" shall mean any information that does not identify one or more specific products.

## II. SCOPE AND ENFORCEMENT

A.      All of the provisions of this Agreement shall apply both while Mallinckrodt is in bankruptcy and after Mallinckrodt emerges from bankruptcy, and they shall apply to the operation of Mallinckrodt's Opioid Business by any subsequent purchaser (regardless of whether Mallinckrodt is sold through the bankruptcy process or after bankruptcy, and regardless whether the purchaser buys all or just a portion of Mallinckrodt's Opioid Business).  For the avoidance of doubt, nothing in this Agreement applies to the operation of a subsequent purchaser(s)' pre-existing opioid business.

B.      The provisions of this Agreement will not apply to Mallinckrodt's parent or its parent's subsidiaries, other than those subsidiaries included in the above definition of Mallinckrodt, so long as Mallinckrodt's parent agrees in a legally binding manner that neither it, nor any of its other subsidiaries, will be involved in the sale or distribution of opioids classified as DEA Schedule II–IV drugs in the future.

C.      In connection with its Chapter 11 Cases, Mallinckrodt consents to the entry of a final judgment or consent order upon the Effective Date imposing all of the provisions of this Agreement in state court in each of the Settling States.  During the pendency of the Chapter 11 Cases, this Agreement is enforceable in the Bankruptcy Court.  After the Effective Date, this Agreement is enforceable in state court in each of the Settling States. Mallinckrodt agrees that seeking entry or enforcement of such a final judgment or consent order will not violate any other injunctions or stays that it will seek, or that may otherwise apply, in connection with its Chapter 11 Cases or the confirmation of its Chapter 11 Plan.

D.      **Term**

1.      Unless addressed in Section II.D.2–3, each provision of this Agreement shall apply for 8 years from the Petition Date.

3

2.    The provisions of Section III.A ("Ban on Promotion"), Section III.B ("No Financial Reward or Discipline Based on Volume of Opioid Sales"), Section III.F ("Ban on Prescription Savings Program"), Section III.G ("Monitoring and Reporting of Direct and Downstream Customers"), Section III.H ("General Provisions"), Section III.I ("Compliance with All Laws and Regulations Relating to the Sale Promotion and Distribution of Any Opioid Product"), and Section V ("Public Access to Documents") shall not be subject to any term.

3.    The provisions of Section VI ("Independent Monitor") shall apply for five years from the Petition Date.  If, at the conclusion of the Monitor's five-year term, the Settling States determine in good faith and in consultation with the Monitor that justifiable cause exists, the Monitor's engagement shall be extended for an additional term of up to two years, subject to the right of Mallinckrodt to commence legal proceedings for the purpose of challenging the decision of the Settling States and to seek preliminary and permanent injunctive relief with respect thereto.  For purposes of this paragraph "justifiable cause" means a failure by Mallinckrodt to achieve and maintain substantial compliance with the substantive provisions of this Agreement.

**E.    Notice and Cure**

1.    For the purposes of resolving disputes with respect to compliance with this Agreement, should any State Attorney General have reason to believe that Mallinckrodt has violated a provision of this Agreement subsequent to the Petition Date, then such Attorney General shall notify Mallinckrodt in writing of the specific objection, identify with particularity the provisions of this Agreement that the practice appears to violate, and give Mallinckrodt 30 days to respond to the notification.

2.    Upon receipt of written notice from such State Attorney General, Mallinckrodt shall provide a written response, containing either a statement explaining why Mallinckrodt believes it is in compliance with this Agreement or a detailed explanation of how the alleged violation occurred and a statement explaining how and when Mallinckrodt intends to remedy or has remedied the alleged violation.

3.    Such State Attorney General may not take any action concerning the alleged violation of this Agreement during the 30-day response period.  Nothing shall prevent such State Attorney General from agreeing in writing to provide Mallinckrodt with additional time beyond the 30 days to respond to the notice.  However, such State Attorney General may take any action, including, but not limited to legal action to enforce compliance with the consent judgment specified by Section II.C, without delay if such State Attorney General believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

4.    Such State Attorney General may bring an action against Mallinckrodt to enforce the terms of the consent judgment specified by Section II.C, but only after

providing Mallinckrodt an opportunity to respond to the notification as described above or within any other period as agreed to by Mallinckrodt and such State Attorney General.

5.      Nothing in this Agreement shall be interpreted to limit any State Attorney General's Civil Investigative Demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable state law, and Mallinckrodt agrees to comply with a CID or investigative subpoena issued pursuant to such authority.

6.      Nothing herein shall be construed to exonerate any failure to comply with any provision of this Agreement after the Petition Date, or to compromise the authority of any State Attorney General to take action for any failure to comply with this Agreement.

### III.  INJUNCTIVE RELIEF

**A.      Ban on Promotion**

1.      Mallinckrodt shall not engage in the Promotion of Opioids or Opioid Products, including but not limited to, by:

   a.      Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients or to persons that influence or determine the Opioid Products included in formularies;

   b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

   c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to Opioids or Opioid Products;

   d.      Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

   e.      Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

   f.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and

        providing hyperlinks or otherwise directing internet traffic to advertisements; and

g.     Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

2.     Notwithstanding Section III.A.1, III.A.5, and III.C, Mallinckrodt may:

a.     Maintain a corporate website;

b.     Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

c.     Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in the state where the information is provided;

d.     Provide the following by mail, electronic mail, on or through Mallinckrodt's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in the state where the information is provided;

e.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011, as updated or amended by the FDA) and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009, as updated or amended by the FDA);

f.     Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.    Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018*)*, as updated or amended by the FDA;

h.    Provide information, through a product catalog or similar means, related to an Opioid or Opioid Product, including, without limitation, pricing information, weight, color, shape, packaging size, type, reference listed drug, National Drug Code label, and such other descriptive information (including information set forth in a standard Healthcare Distribution Alliance Form or technical data sheet and the FDA approval letter) sufficient to identify the products available, to place an order for a product, and to allow the product to be loaded into a customer's inventory and ordering system or a third party pricing compendia;

i.    Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy (REMS) program or other federal or state law or regulation applicable in the state where the program is provided through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of Mallinckrodt;

j.    Provide Unbranded Information in connection with managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to: the use of Opioids for managing such pain, as long as the Unbranded Information identifies Mallinckrodt as the source of the information;

k.    Promote medications with a FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage" or methadone 5 and 10 mg tablets, to the extent they are sold to addiction treatment facilities;

l.    Promote raw materials, active pharmaceutical ingredients and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such raw materials, active pharmaceutical ingredients and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United States or its territories; And, notwithstanding this exception, Mallinckrodt will not promote raw materials, active pharmaceutical ingredients and/or immediate precursors to Healthcare Providers or patients; and

m.    Provide rebates, discounts, and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying

Groups, Group Purchasing Organizations, and Pharmacy Benefit Managers, except as prohibited by Section III.G.

3.   Mallinckrodt shall not engage in the following specific Promotional activity relating to any products for the treatment of Opioid-induced side effects (for the avoidance of doubt, "Opioid-induced side effects" does not include addiction to Opioids or Opioid Products):

a.   Employing or contracting with sales representatives or other persons to Promote products for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b.   Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of products for the treatment of Opioid-induced side effects;

c.   Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to products for the treatment of Opioid-induced side effects;

d.   Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

e.   Engaging in any other Promotion of products for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

4.   Notwithstanding Section III.A.3 directly above, Mallinckrodt may engage in other Promotional activity for products that may be used for the treatment of Opioid-induced side effects but also have non-Opioid related indications, so long as such Promotion does not explicitly or implicitly associate the product with Opioids or Opioid Products, except for linking to the FDA label associated with that product.

5.   Treatment of Pain

a.   Mallinckrodt shall not, either through Mallinckrodt or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that directly or indirectly encourages the utilization of Opioids or Opioid Products.

b.   Mallinckrodt shall not, either through Mallinckrodt or through Third Parties, Promote the concept that pain is undertreated in a manner that

directly or indirectly encourages the utilization of Opioids or Opioid Products.

c.     Mallinckrodt shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or generates leads for sales of Opioid Products.

6.     To the extent that Mallinckrodt engages in conduct permitted by Sections III.A.2 and A.4 above, Mallinckrodt shall do so in a manner that is:

a.     Consistent with the CDC Guideline Recommendations, as applicable; and

b.     Truthful, non-misleading, accurate, non-deceptive, and does not omit any relevant information.

## B.     No Financial Reward or Discipline Based on Volume of Opioid Sales

1.     Mallinckrodt shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products.  Notwithstanding the foregoing, this provision does not prohibit financial incentives (*e.g.*, customary raises or bonuses) based on the performance of the overall company or Mallinckrodt's generics business, as measured by EBITDA, revenue, cash flow or other similar financial metrics.

2.     Mallinckrodt shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to or from any person in return for the prescribing or use of an Opioid Product.  For the avoidance of doubt, this shall not prohibit the provision of rebates and/or chargebacks to the extent  permitted by Section III.A.2.m.

3.     Mallinckrodt's compensation policies and procedures shall be designed to ensure compliance with this Agreement and other legal requirements.

## C.     Ban on Funding/Grants to Third Parties

1.     Mallinckrodt shall not directly or indirectly provide financial support or In-Kind Support to any Third Party that Promotes or is for education about Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, including educational programs or websites that Promote Opioids, Opioids Products, or products intended to treat Opioid-related side effects but excluding financial support otherwise allowed by this Agreement or required by a federal or state agency.

2.     Mallinckrodt shall not create, sponsor, provide financial support or In-Kind Support to, operate, or control any medical society or patient advocacy group

relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

3.    Mallinckrodt shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

4.    Mallinckrodt shall not use, assist, or employ any Third Party to engage in any activity that Mallinckrodt itself would be prohibited from engaging in pursuant to this Agreement.

5.    Mallinckrodt shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.    Mallinckrodt shall not compensate or support Health Care Providers, other than Mallinckrodt employees, or organizations to advocate for formulary access or treatment guideline changes that would have the effect of increasing access to any Opioid Product by third-party payers, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. Nothing in this provision affects the limitations on Mallinckrodt employees set forth in Section III.A. Notwithstanding anything to the contrary in this Agreement, this provision does not prohibit the payment of customary rebates or other pricing concessions to third party payors, including state Medicaid programs, as part of an overall pricing agreement, except as prohibited by Section III.F.

7.    No director, officer, or management-level employee of Mallinckrodt may serve as a director, board member, employee, agent, or officer of any entity, other than Mallinckrodt plc or a wholly owned subsidiary thereof, that not incidentally engages in Promotion relating to Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects. Any director, officer, or management-level employee of Mallinckrodt that serves as a director, board member, employee, agent or officer of any entity shall recuse himself or herself from any decisions in that capacity that are related to the Promotion of Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

8.    Mallinckrodt shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that not incidentally engages in Promotion relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

9.    The prohibitions in Section III.C shall not apply to engagement with Third Parties based on activities related to (1) medications with a FDA-approved label that lists

only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage" or methadone 5 and 10 mg tablets, to the extent they are sold to addiction treatment facilities; (2) raw materials, active pharmaceutical ingredients and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials, active pharmaceutical ingredients and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United States or its territories; or (3) education warning about drug abuse or promoting prevention or treatment of drug misuse.

10.     Mallinckrodt will be in compliance with Sections III.C.2 and III.C.3 with respect to support of an individual Third Party to the extent that the Independent Monitor or the Settling States determines that such support does not increase the risk of the inappropriate use of Opioids and that Mallinckrodt has not acted for the purpose of increasing the use of Opioids.

**D.     Lobbying Restrictions**

1.     Mallinckrodt shall not Lobby for the enactment of any provision of any federal, state, or local legislation or promulgation of any provision of any rule or regulation that:

   a.     encourages or requires Health Care Providers to prescribe Opioid Products or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

   b.     would have the effect of limiting access to any non-Opioid alternative pain treatments; or

   c.     pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.     Mallinckrodt shall not Lobby against the enactment of any provision of any federal, state or local legislation or promulgation of any provision of any rule or regulation that supports:

   a.     The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

   b.     The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

   c.     The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

   d.     The limitation of initial prescriptions of Opioids to treat acute pain;

e.    The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f.    The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

g.    Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h.    The implementation or use of Opioid drug disposal systems.

3.    Mallinckrodt shall not Lobby against the enactment of any provision of any federal, state or local legislation or promulgation of any provision of any rule or regulation creating or expanding the operation or use of PDMPs, including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter. For the avoidance of doubt, Mallinckrodt may Lobby in support of a particular PDMP proposal.

4.    Notwithstanding the foregoing restrictions in Sections III.D.1–3, III.A, and III.C, the following conduct is not restricted:

a.    Lobbying against the enactment of any provision of any state, federal, municipal, or county taxes, fees, assessments, or other payments;

b.    Challenging the enforcement of, or suing for declaratory or injunctive relief with respect to legislation, rules or regulations referred to in Section III.D.1;

c.    Communications made by Mallinckrodt in response to a statute, rule, regulation, or order requiring such communication;

d.    Communications by a Mallinckrodt representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

e.    Responding, in a manner consistent with this Agreement, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Mallinckrodt from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

f.  Communicating with a federal or state agency in response to a Federal Register or similar notice or an unsolicited federal or state legislative committee request for public comment on proposed legislation; and

g.  Responding to requests from the DEA, the FDA, or any other Federal or state agency and/or participating in FDA or other agency panels at the request of the agency.

h.  Participate in meetings and other proceedings before the FDA, FDA advisory committee or other FDA committee in connection with the approval, modification of approval, or oversight of its own products.

5.  Mallinckrodt shall require all of its officers, employees, and agents engaged in Lobbying to certify in writing or by appropriate electronic means to Mallinckrodt that they are aware of and will fully comply with the provisions of this Agreement with respect to Lobbying on behalf of Mallinckrodt.

**E.  Ban on Certain High Dose Opioids**

1.  Mallinckrodt shall not commence manufacturing, promoting, or distributing any Opioid Product that exceeds 30 milligrams of oxycodone per pill.

**F.  Ban on Prescription Savings Programs**

1.  Mallinckrodt shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

2.  Mallinckrodt shall not directly or indirectly provide financial support to any Third Party that offers coupons, discounts, rebates or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

3.  Mallinckrodt shall not directly or indirectly assist patients, Health Care Providers, or pharmacies regarding the claims and/or prior authorization process required for third-party payers to approve claims involving any Opioid Product.

**G.  Monitoring and Reporting of Direct and Downstream Customers**

1.  Mallinckrodt shall operate an effective monitoring and reporting system in compliance with 21 C.F.R. § 1301.71(a), 21 C.F.R. §1301.74(b), 21 U.S.C. § 823(d) and Section 3292 of the SUPPORT for Patients and Communities Act, that shall include processes and procedures that:

a.  Utilize all reasonably available transaction information to identify a Suspicious Order of an Opioid Product by a direct customer;

b.    Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product;

c.    Utilize all information Mallinckrodt receives that bears upon a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by Mallinckrodt's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

d.    Upon request (unless otherwise required by law), report to any requesting State Attorney General or State controlled substances regulatory agency any direct customer or downstream customer in such requesting State Attorney General's or agency's State identified as part of the monitoring required by (a)-(c), above, and any customer relationship in such State terminated by Mallinckrodt relating to diversion or potential for diversion. These reports shall include the following information, to the extent known to Mallinckrodt:

  i.    The identity of the downstream registrant and the direct customer(s) identified by Mallinckrodt engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number;

  ii.   The dates of reported distribution of controlled substances by direct customers to the downstream registrant during the relevant time period;

  iii.  The drug name, drug family or NDC and dosage amounts reportedly distributed;

  iv.   The transaction or order number of the reported distribution; and

  v.    A brief narrative providing a description of the circumstances leading to Mallinckrodt's conclusion that there is a risk of diversion.

2.    Mallinckrodt shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless Mallinckrodt's DEA Compliance Department investigates and finds that the order is not suspicious. Where Mallinckrodt has investigated a potentially Suspicious Order and determined that the order is not suspicious, Mallinckrodt must document the bases for its determination, and provide such documentation to any State Attorney General, or State controlled substances regulatory agency, upon request.

3.    Upon request, Mallinckrodt shall provide full cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or

suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices.

4. Mallinckrodt agrees that it will refrain from providing an Opioid Product directly to a retail pharmacy location or Health Care Provider. Nothing in this provision, however, prevents Mallinckrodt from (i) acting as a distributor of medications relating to (x) the treatment of opioid use disorders; (y) the treatment of opioid abuse, addiction, dependence, or overdose, including medication-assisted treatment for opioid addiction; and (z) rescue medications for opioid overdose; or (ii) providing an Opioid Product directly to a mail order pharmacy, distribution center serving a chain pharmacy, or pharmacy provider that exclusively serves long-term care or hospice providers and their patients.

## H.   General Terms

1. To the extent that any provision in this Agreement conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail. To the extent that any provision in the Agreement is in conflict with federal or relevant state law such that Mallinckrodt cannot comply with both the statute or regulation and a provision of this Agreement, Mallinckrodt may comply with such statute or regulation. Mallinckrodt will provide advance written notice to the affected State Attorney(s) Generals of the statute or regulation that Mallinckrodt intends to comply under this paragraph, and the provision of this Agreement that is in conflict with the statute or regulation. In the event any State Attorney General disagrees with Mallinckrodt's interpretation of the conflict, such State Attorney General reserves the right to pursue any remedy or sanction that may be available regarding compliance with this Agreement.

2. Mallinckrodt shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, deceptive or unconscionable. For purposes of this paragraph, "Opioid Product" shall also include medications with a FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage" as well as methadone 5 and 10 mg tablets.

3. Mallinckrodt shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have. For purposes of this paragraph, "Opioid Product" shall also include medications with a FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage" as well as methadone 5 and 10 mg tablets.

4. For the avoidance of doubt, nothing in this Agreement is intended to or shall be construed to prohibit Mallinckrodt in any way whatsoever from taking legal or factual positions with regard to its Opioid Product(s) in defense of litigation or other legal proceedings or investigations.

5.    Upon the request of any State Attorney General, Mallinckrodt shall provide the requesting State Attorney General with copies of the following, within 30 days of the request:

   a.    Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Mallinckrodt's Opioid Product(s); and

   b.    Warning or untitled letters issued by the FDA regarding Mallinckrodt's Opioid Product(s) and all correspondence between Mallinckrodt and the FDA related to such letters.

**I.    Compliance with All Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1.    Mallinckrodt shall comply with all laws and regulations that relate to the sale, promotion, distribution, and disposal of any Opioid Product including but not limited to:

   a.    State controlled substances acts, including all guidance issued by applicable state regulator(s), and related regulations;

   b.    The Federal Controlled Substance Act, including all guidances issued by the DEA;

   c.    The Federal Food, Drug and Cosmetic act, or any regulation promulgated thereunder;

   d.    FDA Guidances;

   e.    State consumer protection and unfair trade practices acts; and

   f.    State laws and regulations related to opioid prescribing, distribution and disposal.

**J.    Compliance Deadlines**

1.    As of the Petition Date, Mallinckrodt must be in full compliance with the provisions included in this Agreement with the exception of the provisions in Section V ("Public Access to Mallinckrodt Documents").

**K.    Training**

1.    Mallinckrodt shall provide regular training, at least once per year, to relevant employees on their obligations imposed by this Agreement.

## IV.  CLINICAL DATA TRANSPARENCY

16

A.    **Data to Be Shared**

1.    Mallinckrodt shall share the following clinical data through a third-party data archive that conforms to the requirements defined below to increase the transparency of its clinical research.

   a.    Mallinckrodt shall make available all previously disclosed data and/or information regarding Mallinckrodt Opioid Products;

   b.    Mallinckrodt shall make available all previously unreleased data regarding Mallinckrodt Opioid Products, for both approved and unapproved indications, including:

      i.    Full analyzable data set(s) (including individual participant-level data de-identified by an independent biostatistician);

      ii.    The clinical study report(s) redacted for commercial or personal identifying information;

      iii.    The full protocol(s) (including the initial version, final version, and all amendments); and

      iv.    Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

   c.    Mallinckrodt shall make available the above information for all studies for any new Mallinckrodt Opioid Product or new indications that are approved within 30 days after regulatory approval or 18 months after study completion, whichever occurs later.

B.    **Third-Party Data Archive**

1.    Mallinckrodt shall share the above information via a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal.

2.    The data archive shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

3.    The panel may exclude research proposals with a commercial interest.

C.    **Non Interference**

1.    Mallinckrodt shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

**D.     Data Use Agreement**

1.     Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for Mallinckrodt's pharmacovigilance staff.  Every agreement shall require the lead qualified researcher to inform Mallinckrodt's pharmacovigilance staff within 24 hours of any determination that research findings could detrimentally impact the risk-benefit assessment regarding the product.  The lead Qualified Researcher may also inform regulatory authorities of the safety signal impacting the risk-benefit assessment.  Mallinckrodt's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying regulatory authorities or the public.

**E.     Cost**

1.     Mallinckrodt shall bear all costs for making data and/or information available.

### V.  PUBLIC ACCESS TO MALLINCKRODT DOCUMENTS

**A.     Documents Subject to Public Disclosure**

1.     The following documents shall be produced by Mallinckrodt to each Settling State and are subject to public disclosure in perpetuity as part of an industry-wide document disclosure program, except for the redactions authorized by Section V.B:

     a.     All documents, indices, and privilege logs Mallinckrodt produced to any of the Settling States prior to the Petition Date, including in litigation and in response to investigative demands or other formal or informal requests related to opioids.

     b.     All documents, indices, and privilege logs Mallinckrodt produced in the Opioid Multi-District Litigation (*In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio)) and the New York litigation (*In re Opioid Litigation*, 400000/2017 (Suffolk County)) prior to the Petition Date.

     c.     All documents, indices, and privilege logs Mallinckrodt has produced in other litigation related to opioids, excluding patent litigation.

     d.     All filings, motions, orders, court transcripts, deposition transcripts, and exhibits in the possession, custody, or control of Mallinckrodt from litigation related to opioids, excluding patent litigation.

2.     All documents produced under this provision shall be provided in electronic format with all related metadata.  Mallinckrodt and the Settling States will work cooperatively to develop technical specifications for the productions.

**B.      Information That May Be Redacted**

1.      The following categories of information are exempt from public disclosure:

a.      Information subject to trade secret protection.  A "trade secret" is information, including a formula, pattern, compilation, program, device, method, technique or process, that (a) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure and use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Even if the information falls within the definition, "trade secret" does not include information reflecting sales or promotional strategies, tactics, targeting, or data, or internal communications related to sales or promotion.

b.      Confidential personal information.  "Confidential personal information" means individual Social Security or tax identification numbers, personal financial account numbers, passport numbers, driver license numbers, home addresses, home telephone numbers, personal email addresses, and other personally identifiable information protected by law from disclosure.  "Confidential personal information" does not include the names of Mallinckrodt's officers, directors, employees, agents, or attorneys.

c.      Information that is inappropriate for public disclosure because it is subject to personal privacy interests recognized by law (*e.g.*, HIPAA), or contractual rights of third parties that Mallinckrodt may not abrogate.

d.      Information regarding Mallinckrodt employees' personal matters unrelated to Mallinckrodt, including emails produced by Mallinckrodt custodians discussing vacation or sick leave, family, or other personal matters.

**C.      Redaction of Documents Containing Protected Information**

1.      Whenever a document contains information subject to a claim of exemption pursuant to Section V.B, Mallinckrodt shall produce the document in redacted form.  Such redactions shall indicate that trade secret and/or private information, as appropriate, has been redacted.  Redactions shall be limited to the minimum redactions possible to protect the legally recognized individual privacy interests and trade secrets identified above.

2.      Mallinckrodt shall produce to each Settling State a log noting each document redacted.  The log shall also provide fields stating the basis for redacting the document, with sufficient detail to allow an assessment of the merits of the assertion.  The log is subject to public disclosure in perpetuity.  The log shall be

produced simultaneously with the production of documents required by Section V.F.

3.     In addition to the redacted documents, Mallinckrodt shall, upon any Settling State's request, also produce all documents identified in Section V.A above in unredacted form to such Settling State at the same time.  The redacted documents produced by Mallinckrodt may be publicly disclosed in accordance with Section V.E below.  The unredacted documents produced by Mallinckrodt to a Settling State shall be available only to such State unless Mallinckrodt's claim of exemption under Section V.B is successfully challenged in accordance with Section V.C.4 or the trade secret designation expires in accordance with Section V.D.

4.     Anyone, including members of the public and the press, may challenge the appropriateness of redactions by providing notice to Mallinckrodt.  If the challenge is not resolved by agreement, it must be resolved in the first instance by a third party jointly appointed by the Settling States and Mallinckrodt to resolve such challenges.  The decision of the third party may be appealed to a court with enforcement authority over this Agreement.  If not so appealed, the third party's decision is final.  In connection with such challenge, a Settling State may provide copies of relevant unredacted documents to the parties or the decisionmaker, subject to appropriate confidentiality and/or in camera review protections, as determined by the decisionmaker.

**D.     Review of Trade Secret Redactions**

1.     Ten years after Mallinckrodt completes the production of its documents in accordance with Section V, Mallinckrodt shall review all trade secret assertions made in accordance with Section V.B.1 and all non-manufacturing trade secret designations shall expire.  The newly unredacted documents may then be publicly disclosed by a Settling State in accordance with Section V.E.  Mallinckrodt shall produce to each Settling State an updated redaction log justifying its designations of the remaining trade secret redactions as manufacturing trade secrets.

**E.     Public Disclosure through a Document Repository**

1.     Each Settling State may publicly disclose all documents covered by Section V through a public repository maintained by a governmental, non-profit, or academic institution.  Each Settling State may specify the terms of any such repository's use of those documents, including allowing the repository to index and make searchable all documents subject to public disclosure, including the metadata associated with those documents.  When providing the documents covered by Section V to a public repository, no Settling State shall include or attach within the document set any characterization of the content of the documents.  For the avoidance of doubt, nothing in this paragraph shall prohibit any Settling State from publicly discussing the documents covered by Section V.

**F.      Timeline for Production**

1.    Mallinckrodt shall produce all documents required by Section V.A within nine months from the Petition Date.

**G.      Costs**

1.    Mallinckrodt shall be responsible for its allocable share of all reasonable costs and expenses associated with the public disclosure and storage of Mallinckrodt's documents through any public repository.

**H.      Suspension**

1.    Mallinckrodt's obligation in Section V shall be suspended on the nine-month anniversary of the Petition Date, unless and until two corporate defendants in opioid-related litigation other than Mallinckrodt have agreed or been ordered to publicly disclose opioid-related documents.  For the avoidance of doubt, Insys Therapeutics, Inc. shall constitute one of the two necessary defendants based on the "Liquidating Trustee Disclosure Requirement" provisions of the Second Amended Joint Chapter 11 Plan of Liquidation confirmed by the United States Bankruptcy Court for the District of Delaware on January 16, 2020.

## VI.  INDEPENDENT MONITOR

**A.      Appointment of Monitor**

1.    Mallinckrodt agrees that it will retain an outside, independent individual (the "Monitor") to evaluate and monitor Mallinckrodt's compliance with this Agreement.

2.    Experience with internal investigations or the investigative process (which may include prior monitorship or oversight experience) and expertise in the pharmaceutical industry, relevant regulatory regimes, and internal controls and compliance systems may be considered in selecting the Monitor.

3.    Within 30 days of the Petition Date, Mallinckrodt and the Settling States shall exchange pools of recommended candidates based in part on the above qualification and considerations to serve as the Monitor.  The pools shall each contain the names of three individuals, groups of individuals or firms.

4.    After receiving the pools of Monitor candidates, Mallinckrodt and the Settling States shall have the right to meet with the candidates and conduct appropriate interviews of the personnel who are expected to work on the project. Mallinckrodt and the Settling States may veto any of the candidates, and must do so in writing within 30 days of receiving the pool of candidates.  If all three candidates within a pool are rejected by either Mallinckrodt or the Monitor States,

the party who rejected the three candidates may direct the other party to provide up to three additional qualified candidates within 15 days of receipt of said notice.

5. If Mallinckrodt or the Settling States do not object to a proposed candidate, Mallinckrodt or the Settling States shall so notify the other in writing within 30 days of receiving the pool of candidates. If more than one candidate remains, the Settling States shall select the Monitor from the remaining candidates. Mallinckrodt and the Settling States shall jointly seek the Bankruptcy Court's approval of the selected Monitor candidate.

6. Unless justifiable cause exists, the Monitor appointed by the Bankruptcy Court shall continue to serve after the Effective Date. For purposes of this paragraph, justifiable cause exists if the Monitor resigns or a court finds that the Monitor: (a) develops a conflict of interest that would undermine public confidence in the objectivity of his or her work; (b) has unreasonably failed to fulfill his or her material obligations under this Agreement or pursuant to the Work Plan (as defined in Section VI.B3), (c) has engaged in any act of dishonesty, misappropriation, embezzlement, intentional fraud, or similar conduct; or (d) has engaged in an intentional act of bias or prejudice in favor or against either party. Justifiable cause shall not include Mallinckrodt's or the Settling States' disagreements with the decisions of the Monitor pursuant to this Agreement, unless there is a clear pattern in the Monitor's decisions that demonstrates that the Monitor has not been acting as an independent third party in rendering decisions.

7. If a new Monitor must be appointed, Mallinckrodt and the Settling States shall follow the procedures and timeline set out above in subparagraphs 3-5. Court approval shall not be sought if Mallinckrodt is no longer under the Bankruptcy Court's jurisdiction..

## B.    Monitor's Responsibilities

1. Between the Petition Date and the Effective Date, the Monitor's duties shall be as follows:

   a. The Monitor shall perform its duties according to the terms of this Agreement and shall be vested all rights and powers reasonably necessary to carry out such powers, duties, and responsibilities enumerated herein.

   b. The Monitor shall work with all diligence perform his or her duties in a manner that does not unreasonably disrupt the operation of Mallinckrodt's business to confirm and oversee  compliance with this Agreement.

   c. The Monitor shall review and provide reports as outlined below.

   d. Subject to any legally recognized privilege and as reasonably necessary to perform his or her duties hereunder, the Monitor shall have full and complete access to Mallinckrodt's personnel, books, records, and

facilities, and to any other relevant information, as the Monitor may request. Mallinckrodt shall develop such information as the Monitor may request and shall fully, completely and promptly cooperate with the Monitor. The Monitor may raise with the Bankruptcy Court any issues relating to any failure of or delay in such cooperation for an expedited resolution by the Bankruptcy Court.

e.      The Monitor shall serve, without bond or other security, at the cost and expense of Mallinckrodt, with the Monitor's fees subject to final approval by the Bankruptcy Court. The Monitor shall have the authority to employ, upon written consent from Mallinckrodt, such consent not to be unreasonably withheld, delayed or conditioned, and upon Court approval, at the cost and expense of the Debtors' estates, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's responsibilities. Requests to employ such individuals should be directed to Mallinckrodt's General Counsel, and will be decided upon no later than ten (10) days from their receipt. The Monitor will work in good faith with Mallinckrodt to ensure such approved consultants will follow Mallinckrodt's policies and procedures with respect to any payments remitted directly by Mallinckrodt.

f.      The Monitor shall have no obligation, responsibility, or liability for the operations of Mallinckrodt.

g.      The Monitor shall sign onto any Protective Order entered by the Bankruptcy Court, and any confidentiality agreement consistent with any Protective Order as deemed necessary by the parties, and each of the Monitor's consultants, accountants, attorneys and other representatives and assistants shall also sign onto any Protective Order entered by the Court, and any confidentiality agreement consistent with any Protective Order as deemed necessary by the parties; provided, however, that nothing shall restrict the Monitor from providing any information to the Court and the parties consistent with the terms of any Protective Order.

h.      The Monitor shall promptly seek an order from the Bankruptcy Court requiring compliance or such other remedies as may be appropriate under the circumstances should Mallinckrodt not comply with this Agreement.

i.      The Monitor shall make a good faith effort to leverage Mallinckrodt's existing compliance mechanisms when reviewing Mallinckrodt's compliance with this Agreement.

j.      The Monitor shall make a good faith effort to perform his or her duties in a manner that does not unreasonably disrupt Mallinckrodt's business operations. In this regard, Mallinckrodt shall designate senior officials within the Office of the General Counsel to serve as the primary points of

23

contact for the Monitor in order to facilitate the Monitor's access to documents, materials, or staff necessary to review Mallinckrodt's compliance with this Agreement.  The Monitor shall communicate any request for documents, materials, or access to staff to the designated contacts, unless otherwise instructed.  For the avoidance of doubt, nothing in this paragraph shall be interpreted to prohibit the Monitor from speaking with a current or former employee of Mallinckrodt.

2.   **Reporting**:

a.   Within 45 days of the Petition Date, Mallinckrodt shall file a report with the Bankruptcy Court regarding its compliance with the terms of this Agreement (the "Mallinckrodt Compliance Report").  To the extent permissible by law, this report (in whole or in part) may be filed under seal or subject to such other confidentiality restrictions contained in a Protective Order.

b.   The Monitor must file a report with the Bankruptcy Court regarding compliance by Mallinckrodt with the terms of this Agreement no later than 45 days after the Work Plan (as defined in Section VI.B.3) is finalized, and then additional reports every 90 days thereafter (the "Monitor Reports").  The Court may, in response to such reports, provide further direction to the Monitor as it deems appropriate.  To the extent permissible by law, these reports (in whole or in part) may be filed under seal or subject to such other confidentiality restrictions contained in a Protective Order.  The content of Monitor Reports shall be set forth in the Work Plan.  The frequency of Monitor Reports may decrease to every 180 days after the Effective Date.

c.   Prior to issuing any Monitor Report, the Monitor shall confer with Mallinckrodt regarding its preliminary findings and the reasons for those findings.  Mallinckrodt shall have the right to submit written comments to the Monitor, which shall be appended to the final version of the Monitor Report.

d.   In the event the Monitor Report identifies a potential violation of this Agreement, Mallinckrodt shall have the right to cure any potential violation within 30 days.

3.   **Work Plan**:  The manner in which the Monitor will carry out his or her compliance responsibilities under this Agreement, the general scope of information that the Monitor will seek to review in fulfilling his or her duties and, where applicable, the methodologies to be utilized shall be set forth in a work plan (the "Work Plan").  Within 30 days after the Monitor's appointment by the Bankruptcy Court, the Settling States and Mallinckrodt shall agree with the Monitor on the Work Plan.  If the Monitor, the Settling States, and Mallinckrodt fail to reach agreement on the Work Plan within the designated time frame, the

Monitor, Settling States, and Mallinckrodt will submit any disputed issues to the Bankruptcy Court for resolution.

4.    **Post-Emergence**:  Before the Effective Date, the parties will work in good faith to establish procedures for resolving disputes (including disputes over the Work Plan) and overseeing the Monitor's obligations after Bankruptcy Court approval of the Plan, and to make any other adjustments the parties agree to be reasonably necessary.  The parties expect and agree that the principal obligations and conditions imposed by Section VI.B will otherwise remain in effect.  After the Effective Date, all reasonable and necessary fees and costs of the Monitor shall be paid by Mallinckrodt.

**Annex A**

**Prepayment Cost of Deferred Cash Payments at Various Months After Plan Effective Date[1]**

| Months after Plan Effective Date (end of month) | Prepayment Cost of Deferred Cash Payments |
|:---:|:---:|
| 0 | $679,648,516 |
| 1 | $687,520,879 |
| 2 | $695,467,941 |
| 3 | $703,490,411 |
| 4 | $711,589,005 |
| 5 | $719,764,445 |
| 6 | $728,017,460 |
| 7 | $736,348,785 |
| 8 | $744,759,166 |
| 9 | $753,249,350 |
| 10 | $761,820,096 |
| 11 | $770,472,168 |
| 12 | $779,206,338[2] |

---

[1] Amounts shown in annex above show the prepayment cost at the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of the month, the prepayment cost shall be calculated as of such prepayment date pursuant to the formula set forth in the Opioid Settlement Term Sheet.

[2] Prepayment right may be exercised prior to the first anniversary of the Plan Effective Date. Month twelve is illustratively shown and includes $200,000,000 payment due at such time.

## Schedule 2

### DOJ Settlement Terms re: Boston (Medicaid Rebates) and EDPA False Claims Act Matters, and related issues

- <u>Resolved Matters.</u>  Mallinckrodt and the United States (including CMS, DOJ ), the applicable states, and *qui tam* relators agree to fully and finally resolve the Acthar-related government litigations disclosed in Mallinckrodt's Form 10-K for 2019, including *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC* (E.D. Penn.); *United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC* (D. Mass.); and *Mallinckrodt ARD LLC v. Verma et al. (D.D.C.)*, and related matters (such matters, collectively, the "***Resolved Matters***") on the terms set forth in this Schedule, which will be memorialized in a definitive DOJ Settlement Agreement, and settlement agreements with the States, and incorporated into the Plan.

- <u>Settlement Payments.</u>  In full and final satisfaction of all claims at issue in the "Resolved Matters", Mallinckrodt shall make cash payments to the US and State governments totaling $260 million in the aggregate in accordance with the following schedule, with deferred payments bearing interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020:

| Payment Date | Payment Amount |
|---|---|
| Plan Effective Date | $15,000,000 |
| First Anniversary of Plan Effective Date | $15,000,000 |
| Second Anniversary of Plan Effective Date | $20,000,000 |
| Third Anniversary of Plan Effective Date | $20,000,000 |
| Fourth Anniversary of Plan Effective Date | $32,500,000 |
| Fifth Anniversary of Plan Effective Date | $32,500,000 |
| Sixth Anniversary of Plan Effective Date | $62,500,000 |
| Seventh Anniversary of Plan Effective Date | $62,500,000 |

- <u>Releases.</u>  Effective as of the date on which the Settlement Agreement is fully executed, Mallinckrodt, on the one hand, and DOJ and the States, on the other hand, will have exchanged mutual releases, as specified in the Settlement Agreements relating to the Resolved Matters.

- <u>CMS/DOJ/State Settlement Agreement; Additional Terms and Conditions.</u>  Without limiting or affecting in any way the rights of the Supporting Parties under the RSA, the

DOJ Settlement Agreement shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and DOJ on the other hand, may agree.  Without limiting or affecting in any way the rights of the Supporting Parties under the RSA, the State Settlement Agreements shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and the States, on the other hand, may agree.

## Exhibit B

**Joinder Agreement**

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Agreement***")[1] dated as of [ ● ], 2020 by and among (i) Mallinckrodt plc and each of its subsidiaries listed on **Annex 1** to the Agreement, (ii) the Supporting Unsecured Noteholders, and (iii) the Supporting Governmental Opioid Claimants and agrees to be bound as a Supporting Party by the terms and conditions thereof binding on the Supporting Parties with respect to all Claims/Interests held by the undersigned.

The undersigned hereby makes the representations and warranties of the Supporting Parties set forth in the Agreement to each other Party, effective as of the date hereof.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

Date: _____, 2020

**[SUPPORTING PARTY]**

By:_____

Name:_____

Title:_____

Address:_____

Claims/Interests under the [_____]:[2]          $_____

Other Claims/Interests:          $_____

Opioid related Claims/Interests:[3]          [Description]

---

[1]    Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

[2]    [To be used by Supporting Unsecured Noteholders for holdings of Guaranteed Unsecured Notes]

[3]    [To be used by Supporting Governmental Opioid Claimants for Opioid Claims]

## **Exhibit B**

### **Detailed Organizational Chart**

