## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | Re:  ECF Nos. 103, 213, 247 |
| | **Hearing Date: November 10, 2020 at 11:00 a.m. ET**<br>**Objection Deadline: November 3, 2020 at 4:00 p.m. ET** |

## LIMITED OBJECTION OF THE MULTISTATE GOVERNMENTAL
## ENTITIES GROUP TO DEBTORS' MOTION TO USE CASH COLLATERAL

The Multistate Governmental Entities Group ("**MSGE Group**"), by and through its undersigned counsel, hereby submits this limited objection to the *Motion of the Debtors for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, and Bankruptcy Rules 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief*, dated October 12, 2020 (D.I. 103) ("**Cash Collateral Motion**").  The grounds supporting this limited objection are as follows.

## PRELIMINARY STATEMENT

Within a year of their bankruptcy filings, two of the Debtors exchanged unsecured notes they had issued previously for notes secured by liens on substantially all of the Debtors' assets, including cash and deposit accounts.  In particular, the second round of these note exchanges

---

[1]    According to the Debtors, a complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt.  The Debtors assert that their mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

occurred only six months before the Debtors' chapter 11 filings, after the Debtors had announced the principal terms of their Opioid Settlement, which contemplated putting at least the Specialty Generics business into bankruptcy. In other words, with bankruptcy on the horizon, the Debtors improved the position of their preexisting noteholders by granting blanket liens in the noteholders' favor. Now, in exchange for the secured noteholders' "consent" to use newfound "cash collateral," the Debtors, through their Cash Collateral Motion, are proposing to lavish substantial benefits on these noteholders as "adequate protection," in the form of periodic cash payments, replacement liens, and superpriority claims. Had the Debtors not granted the liens in their run-up to bankruptcy, these noteholders would not have had any claim to such benefits.

An investigation is warranted into the details of the note exchanges and the granting of liens to assess whether the Debtors' estates hold causes of action to unwind those transactions and potentially obtain a monetary recovery. If the estates do hold such causes of action and if it is appropriate to do so, those causes of action should be brought and pursued by authorized representatives of the Debtors' estates. Nevertheless, the interim cash collateral order contains provisions that are intended to discourage and deter any action or challenge against the liens and other interests of the secured noteholders. Accordingly, for the reasons explained below, any final order granting the Cash Collateral Motion should contain the following changes to those provisions: (1) the period for investigation and for filing a motion to obtain standing to bring a "Challenge" should be extended to 75 days after entry of the *final* cash collateral order; (2) the provision prohibiting the Debtors' estates from funding a "Challenge" should be removed, as the Debtors reportedly have little, if any, unencumbered cash available; (3) the Debtors' estates should not be required to pay the fees and costs of secured noteholders or their agents to defend against a "Challenge"; and (4) the waiver of § 551 of the Bankruptcy Code should be stricken.

## FACTUAL BACKGROUND

The MSGE Group consists of approximately 1,318 entities—1,245 counties, cities and other municipalities, 9 tribal nations, 13 hospital districts, 16 independent public school districts, 33 medical groups, and two funds—across 38 states and territories.  These entities hold claims based on, arising from, or attributable to opioid products manufactured or sold by one or more of the Debtors.  Collectively, the MSGE Group represents a constituency of more than 60 million individuals across the United States.  The MSGE Group and its constituent members are not parties to any restructuring support agreement.

### *Prepetition Exchange of Unsecured Notes for Secured Notes*

This limited objection pertains to two transactions that occurred within a year of the Debtors' bankruptcy filings—transactions referred to by the Debtors as the consummated 2019 Exchange Offer and the 2020 Private Exchange.[2]  As a result of the 2019 Exchange Offer consummated in December 2019, Debtors Mallinckrodt International Finance S.A. ("**Mallinckrodt Finance**") and Mallinckrodt CB LLC ("**Mallinckrodt CB**") exchanged approximately $706 million of *unsecured* notes for approximately $323 million of second-lien *secured* notes due 2025 ("**Second Lien Notes**").[3]  In accordance with the Second Lien Notes Indenture, most of the Debtors and certain non-Debtor guarantors provided an unconditional guaranty of all obligations under that indenture and granted second-priority liens on substantially

---

[2]   *See* Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions ¶¶ 58, 60 (D.I. 128) ("**Welch Decl.**").  Unless otherwise defined herein or quoted from the Interim Order (defined below), all initially capitalized terms have the meanings ascribed to them in Mr. Welch's declaration.

[3]   *Id.* ¶ 60.  The interest rates on the original unsecured notes ranged from 4.75% to 5.75%, and the notes were due at some point between 2020 and 2025.  *Id.*  The interest rate on the Second Lien Notes is 10%.

all assets, including cash and deposit accounts.[4]  As of the Petition Date, the aggregate outstanding principal of the Second Lien Notes was approximately $323 million.[5]

In connection with the 2020 Private Exchange consummated in April 2020, Mallinckrodt Finance and Mallinckrodt CB made a par exchange of approximately $495 million of *unsecured* notes for first-lien *secured* notes due 2025 ("**First Lien Notes**").[6]  Under the First Lien Notes Indenture, most of the Debtors and certain non-Debtor guarantors provided an unconditional guaranty of all obligations under that indenture and granted first-priority liens on substantially all assets, including cash and deposit accounts.[7]  As of the Petition Date, the aggregate outstanding principal of the First Lien Notes was approximately $495 million.[8]

The 2020 Private Exchange occurred *after* the principal terms of the Opioid Settlement was announced in February 2020.[9]  According to the Debtors, "[w]hen first agreed upon in February 2020, the Opioid Settlement contemplated a surgical, Specialty Generics-only chapter 11 filing."[10]

### *Cash Collateral Motion and Interim Order*

The Debtors filed for chapter 11 reorganization on October 12, 2020.  That same day, the Debtors filed their Cash Collateral Motion, which embodies the agreement reached between the Debtors and the secured lender groups, including the holders of First Lien Notes and Second Lien Notes, regarding the consensual use of cash collateral.

---

[4]   *Id*. ¶ 57, 61.

[5]   *Id*. ¶ 61.

[6]   *Id*. ¶ 58.  The original notes had an interest rate of 4.875% and were due in April 2020.  *Id*. The interest rate on the First Lien Notes is 10%.

[7]   *Id*. ¶¶ 57, 59.

[8]   Welch Decl. ¶ 59.

[9]   *See id*. ¶ 13.

[10]   *Id*. ¶ 17.

On October 14, 2020, following the hearing on "first-day" motions, this Court issued the Interim Order Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, and Bankruptcy Rules 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Creditors; (III) Modifying Automatic Stay; and (IV) Granting Related Relief (D.I. 213) ("**Interim Order**").  The Interim Order contains the following provisions relevant to this limited objection:

- In the Interim Order, the Debtors "admit, stipulate and agree," *inter alia*, that the obligations evidenced by the First Lien Notes are "secured by valid, binding, perfected, and enforceable first-priority security interests in and liens on the Prepetition Collateral . . . ."[11]  The Debtors further "admit, stipulate and agree" that "no portion of the Prepetition First Lien Notes Liens or Prepetition First Lien Notes Indebtedness is subject to any challenge, cause of action, or defense including . . . avoidance . . . ."[12]

- Similarly, the Debtors "admit, stipulate and agree," *inter alia*, that the obligations evidenced by the Second Lien Notes are "secured by valid, binding, perfected, and enforceable second-priority security interests in and liens on the Prepetition Collateral . . . ."[13]  The Debtors also "admit, stipulate and agree" that "no portion of the Prepetition Second Lien Notes Liens or Prepetition Second Lien Notes Indebtedness is subject to any challenge, cause of action, or defense including . . . avoidance . . . ."[14]

- The above-mentioned stipulations of the Debtors are subject "only to the rights of parties in interest specifically set forth in paragraph 20 of this Interim Order," which, *inter alia*,

---

[11]  Interim Order ¶ E(b)(iii).

[12]  *Id*. ¶ E(b)(iv).

[13]  *Id*. ¶ E(c)(iii).

[14]  *Id*. ¶ E(c)(iv).

provides the terms and conditions by which a "Challenge" may be made to "the validity, enforceability, extent, priority or perfection of the mortgages, security interests, and liens" securing the First Lien Notes and the Second Lien Notes.[15]

- Under paragraph 20(a), the MSGE Group and other similarly situated parties have only 75 days after entry of the Interim Order, or until December 28, 2020, to file a motion seeking standing to commence a contested matter or adversary proceeding asserting a Challenge.[16] If no such motion is filed by December 28, 2020, the applicable time for the MSGE Group and similarly situated parties to make a Challenge will have expired.

- If a Challenge is authorized and filed, none of the Cash Collateral "may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person" to prosecute the Challenge, including "asserting, commencing, or prosecuting any claims or causes of action whatsoever (including, without limitation, any Avoidance Actions) related to the Prepetition Secured Indebtedness or the Prepetition Liens[.]"[17] The Debtors appear to have no other sources of unencumbered cash sufficient to pay such fees, disbursements, costs, and expenses. According to the Debtors' financial advisor and restructuring consultant, "substantially all of the Prepetition Loan Parties' cash is encumbered, and substantially all of the cash to be generated in the short term will also be derived from Prepetition Collateral (primarily inventory

---

[15]   *Id*. ¶¶ E, 20(a).

[16]   *Id*. ¶ 20(a).  Although subject to a different time period for filing a motion seeking standing, statutory creditors' committees appointed on October 27, 2020 also have until December 28, 2020 to file such a motion unless they are able to negotiate a longer time period.  *See id*.

[17]   Interim Order ¶ 21.  The Interim Order does provide a carve-out of $100,000 that "may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any Committee to investigate potential Challenges."  *Id*.

and receivables)."[18]   Moreover, "the Debtors do not have sufficient unencumbered assets to maintain their business operations."[19]

- Nevertheless, if a Challenge is timely and properly filed, the "Prepetition Secured Parties," including the holders of First Lien Notes and Second Lien Notes and their respective agents, will be entitled to payment from the Debtors' estates of their reasonable and documented costs and expenses, including attorneys' fees, incurred in defending themselves against the Challenge.[20]

- If the first-priority liens securing the obligations under the First Lien Notes Indenture were successfully avoided through a Challenge, the "Second Lien Adequate Protection Liens and Second Adequate Protection Superpriority Claims" would not be subject or junior to those first-priority liens avoided and preserved for the benefit of the Debtors' estates under § 551 of the Bankruptcy Code.[21]

## ARGUMENT

Less than a year before their chapter 11 filings, Debtors Mallinckrodt Finance and Mallinckrodt CB exchanged unsecured notes for secured notes and caused the Debtors to grant blanket liens to secure the obligations under those new notes.  Moreover, about six months before their chapter 11 filings, the Debtors granted liens to secure the First Lien Notes, after publicly announcing that at least the Specialty Generics business was heading into bankruptcy.  Thus, in the run-up to their chapter 11 filings, the Debtors decided to grant preferential treatment to one

---

[18]   Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief ¶ 18 (D.I. 135).

[19]   *Id.* ¶ 19.

[20]   Interim Order ¶ 20(c).

[21]   *Id.* ¶ 5(i).

group of voluntary creditors—*i.e.*, unsecured noteholders—at the expense of involuntary creditors—chiefly, governmental entities holding many billions of dollars of opioid-related claims. As a result of that treatment, the holders of the First Lien Notes and Second Lien Notes are having an "adequate protection" windfall lavished on them under the Interim Order, in the form of periodic cash payments, replacement liens, and superpriority claims—benefits they would not have received had they not been granted new liens to secure what essentially was old debt, within a year of bankruptcy.

This generous but suspect treatment warrants an investigation into its particulars and an assessment of whether the Debtors' estates hold claims or causes of action to unwind the transactions and potentially obtain a monetary recovery. If the estates do hold such claims or causes of action and if it is appropriate to do so, those claims or causes of action should be brought and pursued by authorized representatives of the Debtors' estates. But the Interim Order contains provisions designed to deter and discourage the filing and pursuit of such claims or causes of action. These provisions should be modified or removed for purposes of any final order granting the Cash Collateral Motion ("**Final Order**"), as follows:

*First*, the period for investigation and for preparing and filing a motion to obtain standing should be changed from 75 days after entry of the Interim Order (*i.e.*, up to and through Monday, December 28, 2020) to 75 days after entry of the *Final Order* (*i.e.*, up to and through Monday, January 25, 2021). This will allow for a more meaningful investigation, particularly where the MSGE Group or similarly situated creditors will be dependent on the cooperation of the Debtors and other parties to obtain the information needed. The shorter time period, as it stands now, opens the door to discovery stonewalling and filibustering to run out the clock on a creditor's ability to investigate and mount a viable Challenge. Moreover, the approaching Thanksgiving and end-of-

year holidays effectively make the existing Challenge period even shorter. Indeed, the current December 28th deadline is the first business day after Christmas. It is not appropriate to start the Challenge period on entry of the *Interim Order*, which was issued on very short notice and without input from unsecured creditors such as the MSGE Group. The 75-day Challenge period should therefore start upon entry of the Final Order.

*Second*, the prohibition against using cash collateral to pay the fees and costs incurred to prosecute a Challenge should be stricken from the Final Order. According to the Debtors' financial advisor, substantially all of the Debtors' cash is encumbered, and the Debtors do not have unencumbered assets sufficient enough to maintain business operations, much less to pay the fees and costs of bankruptcy-related litigation. Since any Challenge authorized by this Court would be for the benefit of the Debtors' estates and creditors, the Debtors' estates should be permitted to fund such a Challenge.[22]

*Third*, the Debtors' estates should not be paying the legal fees and costs of the "Prepetition Secured Parties" to defend against a Challenge, as paragraph 20(c) of the Interim Order currently provides. This provision is improper as it is clearly designed to discourage or deter unsecured creditors from prosecuting a Challenge against the "Prepetition Secured Parties." The provision is also inappropriate given that the granting of liens to secure the First Lien Notes and Second Lien Notes was blatantly preferential treatment and, at least with respect to the First Lien Notes, was

---

[22]   In addition, the $100,000 carve-out that is available to pay the professional fees and costs of a statutory committee to investigate potential Challenges should also be made available to pay the professional fees and costs of any creditor or creditor group authorized by the Court to investigate potential Challenges. *See supra* note 17.

done when a bankruptcy filing was being planned.  Accordingly, this provision should be stricken from the Final Order.[23]

*Fourth*, § 551 of the Bankruptcy Code should not be waived or nullified.  Currently, paragraph 5(i) of the Interim Order provides in relevant part that "the Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims [granted in favor of the holders of Second Lien Notes] . . . shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code."  In other words, if an estate representative were successful in avoiding the liens granted in favor of the First Lien Notes, those avoided liens would be subordinate to the Second Lien Adequate Protection Liens *and* the Second Adequate Protection Superpriority Claims, even though the avoided liens were originally first priority.  This is contrary to § 551, which provides: "Any transfer avoided under . . . this title . . . is preserved for the benefit of the estate but only with respect to property of the estate."  Pursuant to § 551, "a trustee who avoids an interest succeeds to the priority that interest enjoyed over competing interests."  *In re Van de Kamp's Dutch Bakeries*, 908 F.2d 517, 519 (9th Cir. 1990) (footnote omitted).  "The principal reason for the preservation of avoided liens [under § 551] . . . is to prevent 'junior lienors from improving their position at the expense of the estate when a senior lien is avoided.'"  5 COLLIER ON BANKRUPTCY ¶ 551.01 (16th ed. 2020) (quoting H.R. Rep. No. 95-595 (1977)).[24]  Paragraph 5(i) of the Interim Order, however, undercuts that very purpose.  The preservation of avoided liens under § 551 is automatic, and there

---

[23]    In the alternative, paragraph 20(c) should be modified so that defending secured parties would receive payment of their reasonable and documented fees and costs only if they prevailed in a Challenge.

[24]    *See also In re Blanks*, 64 B.R. 467, 469 (Bankr. E.D.N.C. 1986) ("Section 551 is intended to prevent the windfall to junior lienors that would otherwise result when a trustee in bankruptcy successfully avoids a senior lien on property."  (quoting *In re Appalachian Energy Indus., Inc.,* 25 B.R. 515, 516 (Bankr. M.D. Tenn. 1982))).

is no "unless the court orders otherwise" exception in the text of that statute.  There is no basis for granting the second lien noteholders a priming lien—and a priming superpriority claim—that will spring into effect if and when the first-priority liens in favor of the first lien noteholders are avoided.  The second lien noteholders cannot "draft around" § 551 to nullify its effect.  Accordingly, this provision in paragraph 5(i) should be stricken from any Final Order.

## CONCLUSION

The secured noteholders should not be permitted to use a Final Order on cash collateral to build a fortress around liens granted to them in the run-up to bankruptcy.  For the reasons set forth above, the MSGE Group requests that this Court sustain this limited objection, modify any Final Order in the manner requested above, and grant such other and further relief as this Court deems just and appropriate.

Dated: November 3, 2020

Respectfully submitted,

*/s/ James S. Green, Jr.*
R. Karl Hill (DE 2747)
James S. Green, Jr. (DE 4406)
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-0600/Fax: (302) 888-0606
khill@svglaw.com
jsgreen@svglaw.com

Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq. (admitted *pro hac vice*)
Jeffrey A. Liesemer, Esq. (*pro hac vice* pending)
Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 862-5000/Fax: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com
jliesemer@capdale.com

*Counsel to the Multi-State Governmental Entities Group*