## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Obj. Deadline:  Nov. 30, 2020 at 4:00 p.m. (ET)**<br>**Hearing Date:  Dec. 7, 2020 at 10:00 a.m. (ET)** |

## DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO PAY THE REASONABLE AND DOCUMENTED FEES AND EXPENSES OF THE RSA PARTY PROFESSIONALS AND GRANTING RELATED RELIEF

The debtors in possession in the above-captioned cases (collectively, the "***Debtors***") hereby move (this "***Motion***") and respectfully state as follows:

## RELIEF REQUESTED

1.      By this Motion the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"), authorizing but not directing the Debtors to pay the reasonable and documented fees and expenses of the RSA Party Professionals (as defined herein) in accordance with their respective engagement letters and reimbursement agreements and annexed hereto as **Exhibits B-1, B-2, B-3, B-4 and Exhibits C-1, C-2, C-3, C-4, C-5** (collectively, the "***Engagement/Reimbursement Agreements***"), and the reasonable and documented expenses of the members of the Governmental Plaintiff Ad Hoc Committee and the members of the MSGE Group (as defined herein) to the extent applicable, without the need for further motion, fee application or order of the Court, but subject to the review process described in the Proposed Order.

---

[1]      A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63043.

## JURISDICTION

2.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to

28 U.S.C. § 157(b), and, under Rules 2002 and 7008 of the Federal Rules of Bankruptcy Procedure

(the "***Bankruptcy Rules***"), the Debtors consent to the entry of a final order by the Court in

connection with this Motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.  Venue of these cases and this Motion in this district is proper

under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested

herein are sections 105(a), 362, 363(b), 525, and 541 of the Bankruptcy Code (as defined below).

## PRELIMINARY STATEMENT

3.        The filing of these cases was precipitated by unique circumstances.  In particular,

certain of the Debtors had been involved in a large number of all-consuming opioid-related

litigations over the last three years—approximately 3,034 cases in 50 states and Puerto Rico, with

2,785 cases in federal court and 249 cases in state court as of October 7, 2020.[2]  The Debtors also

maintained over $1.6 billion in guaranteed unsecured note liabilities set to come due in mid-2022

and beyond.  Given the many uncertainties facing the Debtors as a result of the deluge of litigation

claims asserted against them as well as the initial impact of the coronavirus pandemic, in early

spring 2020 it became clear that the Debtors would be unable to refinance their debt obligations

without seeking protection under chapter 11 of the Bankruptcy Code.  Despite these and other

---

[2]    The federal cases have been largely consolidated into a multi-district litigation in Cleveland, Ohio, *In re National Opioid Litigation,* MDL No. 2804 (the "***MDL***"), in which a court-appointed plaintiffs' executive committee (the "***Plaintiffs' Executive Committee***") was created.

2

challenges, prior to the commencement of these cases, the Debtors were able to successfully negotiate and enter into a restructuring support agreement (the "***RSA***") with two of their key creditor constituencies:  the Governmental Plaintiff Ad Hoc Committee and the Unsecured Notes Ad Hoc Group (each as defined below).

4.      Entry into the RSA was no easy feat given the Debtors' large and diverse creditor base.  For more than a year prior to the Petition Date, the Debtors engaged in hard-fought negotiations with counsel representing the Attorneys General of numerous States and U.S. Territories as well as the Plaintiffs' Executive Committee in the MDL (together, the "***Governmental Plaintiff Ad Hoc Committee***") regarding the resolution of a number of the Debtors' opioid-related litigations.  Ultimately, in February 2020, the Debtors announced the principal terms of a comprehensive opioid settlement in principle with counsel to the Governmental Plaintiff Ad Hoc Committee.  That settlement contemplated that only the Debtor entities comprising the Debtors' specialty generics business would become chapter 11 debtors.  As a result of the extensive efforts of the Debtors and the Governmental Plaintiff Ad Hoc Committee, Attorney Generals for 47 U.S. States and Territories and the Plaintiffs' Executive Committee provided their support for the February 2020 opioid settlement in principle.

5.      Due to events that transpired in the late winter/early spring of 2020, the Debtors determined that a global, comprehensive restructuring of all of the Debtors was necessary and appropriate for the Debtors to achieve a comprehensive resolution of the material financial and operational challenges facing the Debtors, and thereby maximize the value of the Debtors.  As a result, the Debtors and the Governmental Plaintiff Ad Hoc Committee continued their opioid-related negotiations within the context of a comprehensive restructuring of the Debtors.  Those negotiations culminated in a revised settlement (the "***Opioid Settlement***") governing the treatment

of Opioid Claims (as defined in the RSA) as well as the terms of a chapter 11 plan of reorganization (the "**Plan**") the main terms of which are attached as exhibits to the RSA (the "**Plan Term Sheet**").

6.      Due to their extensive, tireless efforts, the Debtors and the Governmental Plaintiff Ad Hoc Committee and their respective Professionals were able to deliver signatures to the RSA from the Attorney Generals for 50 U.S. States and Territories and the Plaintiffs' Executive Committee.  As a result, the Debtors commenced their bankruptcy cases with an RSA supported by Attorneys General representing *more than 95% of the national population.*  This level of support is unprecedented in mass tort bankruptcy cases, and as described in further detail below, would not have been possible without the efforts of the Governmental Plaintiff Ad Hoc Committee and their respective Professionals.

7.      Furthermore, the Debtors reached an agreement on the Plan Term Sheet and the Opioid Settlement not only with the Governmental Plaintiff Ad Hoc Committee but also with holders of more than 84 percent in principal amount of the Debtors' guaranteed unsecured notes (the "**Unsecured Notes Ad Hoc Group**").  Like the negotiations with the Governmental Plaintiff Ad Hoc Committee, the negotiations between the Debtors and the Unsecured Notes Ad Hoc Group that resulted in the RSA were hard-fought and involved various concessions on both sides.

8.      During this time before the bankruptcy filing, counsel for the Debtors also discussed the upcoming bankruptcy filing with counsel for the Multi-State Governmental Entities Group (the "**MSGE Group**").  The MSGE Group consists of approximately 1,318 entities that maintain opioid-related claims against certain of the Debtors—1,245 counties, cities and other municipal entities, 9 tribal nations, 13 hospital districts, 16 independent public school districts, 33 medical groups, and 2 funds—across 38 States and Territories and collectively represents a constituency of more than 60 million individuals.  Those discussions lead to an intensive pre- and

post-petition discovery and due diligence process by the MSGE Group starting on October 2, 2020—a process that ultimately culminated in the MSGE Group's agreement to the terms of the RSA and its coming into the RSA alongside with the Governmental Plaintiff Ad Hoc Committee.

9.        As RSA parties, (a) the Plaintiffs' Executive Committee, as a member of the Governmental Plaintiff Ad Hoc Committee will recommend that the more than 1,000 plaintiffs that they represent in the MDL support the Opioid Settlement, the RSA and the Plan, (b) the Attorneys General for 50 U.S. States and Territories have committed to vote to accept the Plan, (c) the MSGE Group has committed to recommending that the more than 1,300 MSGE Group entities vote to support the Plan and also commit to do so over the next 60 days, and (d) the members of the Unsecured Notes Ad Hoc Group (who collectively hold guaranteed unsecured notes in excess of the two-thirds supermajority required under section 1126(c) for class acceptance) have committed to vote to accept the Plan.  Thus, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Unsecured Notes Ad Hoc Group have provided a path to the Debtors' successful and timely emergence from these cases.

10.        Execution of the RSA required a Herculean effort by all parties, and it is integral to the Debtors' efforts to achieve a holistic, efficient, and value-maximizing restructuring.  The RSA brings structure and direction to complicated chapter 11 cases.  However, it is just the beginning. To implement the agreed restructuring contemplated by the RSA, the Debtors will require the continued support of the Governmental Plaintiff Ad Hoc Committee, the MSGE Group and the Unsecured Notes Ad Hoc Group.  That support will be jeopardized if the relief requested herein is not granted, as each such group will have the right to terminate the RSA if an order authorizing the Debtors to pay the RSA Party Professionals is not entered by December 11, 2020.  As such, the Debtors now seek authority to pay the reasonable and documented fees and expenses of the

RSA Party Professionals in accordance with the RSA and the Engagement/Reimbursement Agreements.

11.    Maintaining the support of the RSA parties is critical, but far from the only reason the Debtors are seeking the relief requested herein.  The Debtors also benefit greatly from having organized negotiation counterparties in light of the sheer volume of individual creditors with whom they would otherwise need to negotiate on a one-off basis, and payment of those groups' respective professional fees facilitates that organization and promotes efficiency in the Debtors' restructuring negotiations.  An additional complication is the fact that the United States Trustee has consistently argued that governmental units are ineligible to sit or vote on statutory creditors' committees.  Thus, based upon ample prepetition experience, the Debtors do not believe it would have been feasible to successfully negotiate the RSA, Opioid Settlement or Plan Term Sheet if the Debtors were constrained to individually negotiate with the attorneys general of all U.S. States and Territories, the representatives of thousands of municipal and other litigants, and counsel to each individual unsecured noteholders.  It would similarly not be feasible to successfully progress the Plan in these cases without the continued engagement and support of the RSA parties, who speak for a substantial portion of the Debtors' unsecured creditors.[3]  To ease the administrative burden on the Debtors' estates, and to maximize the likelihood of reaching broad consensus, the Debtors requested that the numerous governmental settling parties and the unsecured noteholders negotiate through organized ad hoc committees, and in exchange agreed to pay the fees of those ad hoc committees' advisors—those ad hoc committees are the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Unsecured Notes Ad Hoc Group.

---

[3]    While the RSA currently enjoys the support of almost all of the states and representatives of more than 2,300 other governmental claimants, the Debtors remain committed to garnering support from the representatives of other important constituencies (including the OCC and the UCC (each as defined herein), to support the Plan Term Sheet, Opioid Settlement and restructuring framework as set forth in the RSA.

12.     Here, the RSA Party Professionals, who were selected by the members of the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Unsecured Notes Ad Hoc Group due to their substantial knowledge and experience in navigating large and complex restructurings, including those involving similar circumstances and repeat players, have already played a significant role in these chapter 11 cases, as evidenced by entry into the RSA, Plan Term Sheet and Opioid Settlement.  It is customary for ad hoc groups delivering support for a plan to have their professional fees paid in consideration of that support, and this case is no different.

13.     The necessity of negotiating with two counterparties on behalf of governmental entities instead of more than 50 individual States and Territories, and over 1200 municipalities, is already apparent.  After filing the motion and supplemental motion for a preliminary injunction,[4] the Debtors engaged with the Governmental Plaintiff Ad Hoc Committee to address concerns raised by numerous States and Territories about the injunctive relief sought therein.  The Governmental Plaintiff Ad Hoc Committee was able to act as a representative for those States and Territories and negotiate modifications to the proposed preliminary injunction orders that avoided fifty-five States and Territories filing individual objections to the motions that the Debtors would have to respond to.  The Debtors also engaged with the MSGE Group, which likewise acted as a representative as to the over 1,300 counties, cities, other municipal entities, tribal nations, hospital districts, independent school districts, medical groups and funds that comprise that group.

14.     Finally it is important to note that, given the size and complexity of the Debtors' chapter 11 cases, the Debtors may be able to utilize the knowledge and expertise of the highly sophisticated legal and financial advisors to the Governmental Plaintiff Ad Hoc Committee, the

---

[4]     *See Debtors' Motion for Injunctive Relief Pursuant to 11 U.S.C. Section 105* [Docket No. 2 in Adv. Pro. No. 20-50850] and *Debtors' Supplemental Motion for Injunctive Relief Pursuant to 11 U.S.C. Section 105* [Docket No. 14 in Adv. Pro. No. 20-50850].

7

MSGE Group and the Unsecured Notes Ad Hoc Group to assist with building future creditor support for the Plan (including among similarly situated creditors who are not currently party to the RSA). Indeed the Governmental Plaintiff Ad Hoc Committee Professionals (as defined below) have already assisted in engaging with the MSGE Group Professionals (as defined below) as part of the MSGE Group's due diligence process and thus assisted in obtaining support for the RSA from the MSGE Group. Importantly, on November 13, 2020 counsel to the MSGE Group executed a Joinder Agreement to the RSA (the "***Joinder***"),[5] under which the MSGE Group agreed to use best efforts to get the municipalities they represent to execute the RSA and otherwise receive rights and undertake obligations that track those of the governmental entities who were already party to the RSA. As such the Debtors can now expect that the MSGE Group members will support and vote in favor of the Plan. This represents a major milestone for the Debtors and substantially bolsters the likely success and confirmation of the Plan.

## BACKGROUND

15.     On October 12, 2020 (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"). The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

16.     On October 27, 2020, the Office of U.S. Trustee appointed an official committee of unsecured creditors (the "***UCC***") [Docket No. 306] and an official committee of opioid claimants (the "***OCC***") [Docket No. 308].

17.     The factual background regarding the Debtors, including their business operations,

---

[5]    See *Notice of Filing of Joinder Agreement with the Multi-State Governmental Entities Group Relating to the Restructuring Support Agreement, Dated as of October 11, 2020* [Docket No. 505].

their capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "**Welch Declaration**") [Docket No. 128] filed on the Petition Date, which is fully incorporated herein by reference.

## THE ENGAGEMENT/REIMBURSEMENT AGREEMENTS, THE RSA AND THE JOINDER

### I.    The Ad Hoc Reimbursement Agreements

18.    The Governmental Plaintiff Ad Hoc Committee was initially formed on September 11, 2019.[6] On that date, the Debtors Mallinckrodt LLC, Mallinckrodt plc and SpecGX LLC, and Gilbert LLP, Kramer Levin Naftalis & Frankel LLP and Brown Rudnick LLP, each as legal counsel to the Governmental Plaintiff Ad Hoc Committee executed a reimbursement agreement (the "***Ad Hoc US Counsel Reimbursement Agreement***") under which those Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, and the reasonable and documented expenses of the members of the Governmental Plaintiff Ad Hoc Committee, in connection with the diligence, negotiation and implementation of a potential global resolution (a "***Global Resolution***") of opioid-related claims against certain Debtors through a bankruptcy proceeding. The Ad Hoc US Counsel Reimbursement Agreement is attached hereto as **Exhibit B-1**.

19.    On October 17, 2019, Debtors Mallinckrodt LLC, Mallinckrodt plc and SpecGX LLC and Houlihan Lokey Capital, Inc., as investment banker and financial advisor to the Governmental Plaintiff Ad Hoc Committee executed a reimbursement agreement (the "***Ad Hoc Investment Banker Reimbursement Agreement***") under which those Debtors agreed to, among

---

[6]    The First Amended Bankruptcy Rule 2019 statement for the Governmental Plaintiff Ad Hoc Committee Professionals is filed at Docket No. 496.

US-DOCS\118424683.8RLF1 24321773v.1

other things, pay the reasonable and documented fees and expenses of Houlihan Lokey Capital, Inc. in connection with the diligence, negotiation and implementation of a potential settlement of opioid-related claims through a "Transaction" (as defined in the Ad Hoc Investment Banker Reimbursement Agreement). The Ad Hoc Investment Banker Reimbursement Agreement is attached hereto as **Exhibit B-2**. The Ad Hoc Investment Banker Reimbursement Agreement includes a "Deferred Fee" of up to $9,000,000 subject to the terms and conditions set forth in the Ad Hoc Investment Banker Reimbursement Agreement. *See* Ad Hoc Investment Banker Reimbursement Agreement § 2(b).

20.    On February 25, 2020, Debtors Mallinckrodt LLC, Mallinckrodt plc and SpecGX LLC and William Fry, as Irish counsel to the Governmental Plaintiff Ad Hoc Committee executed a reimbursement agreement (the "***Ad Hoc Irish Counsel Reimbursement Agreement***") under which those Debtors agreed to, among other things, pay the reasonable and documented fees expenses of William Fry in connection with the diligence, negotiation and implementation of the Global Resolution. The Ad Hoc Irish Counsel Reimbursement Agreement is attached hereto as **Exhibit B-3**.

21.    On October 7, 2020, Debtors Mallinckrodt LLC, Mallinckrodt plc, and SpecGX LLC executed into a supplement to the Ad Hoc US Counsel Reimbursement Agreement (the "***Ad Hoc US Counsel Reimbursement Supplement***" and together with the Ad Hoc US Counsel Reimbursement Agreement, the Ad Hoc Investment Banker Reimbursement Agreement and the Ad Hoc Irish Counsel Reimbursement Agreement, the "***Ad Hoc Reimbursement Agreements***") under which Mallinckrodt agreed to, among other things, provide retainers to (a) Gilbert LLP, (b) Kramer Levin Naftalis & Frankel LLP, (c) Brown Rudnick LLP, (d) Houlihan Lokey Capital, Inc., (e) William Fry and (f) Morris James LLP. The Ad Hoc US Counsel Reimbursement

Supplement is attached hereto as **Exhibit B-4**.  In sum, the Governmental Plaintiff Ad Hoc Committee's Professionals consist of (a) Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, as legal counsel to the Governmental Plaintiff Ad Hoc Committee; (b) William Fry, as Irish counsel to the Governmental Plaintiff Ad Hoc Committee; (c) Houlihan Lokey Capital, Inc., as investment banker and financial advisor to the Governmental Plaintiff Ad Hoc Committee; and (d) pursuant to Section 25 of the RSA, such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee and the Debtors shall reasonably agree from time to time, including Morris James LLP, who the Governmental Plaintiff Ad Hoc Committee retained as Delaware counsel (collectively, the "***Governmental Plaintiff Ad Hoc Committee Professionals***").

## II.   The MSGE Reimbursement Agreement

22.     As set forth more fully in Section V, below, the Debtors and the MSGE Group have entered into a Joinder that likewise provides for the engagement of the MSGE Group Professionals.

## III.   The Noteholder Reimbursement Agreement

23.     On May 26, 2020, Debtor Mallinckrodt plc entered into an agreement with Paul Weiss, Rifkind, Wharton & Garrison LLP ("***Paul Weiss***"), on behalf of a group of unsecured noteholders that became the Unsecured Notes Ad Hoc Group (the "***Noteholder Counsel Reimbursement Agreement***"), under which the Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Paul Weiss in connection with a potential restructuring of the senior guaranteed unsecured notes.  The Noteholder Counsel Reimbursement Agreement is attached hereto as **Exhibit C-1**.[7]

---

[7]     Under the Noteholder Counsel Reimbursement Agreement Debtor Mallinckrodt plc also agreed to pay the reasonable and documented fees and expenses of Paul Weiss incurred in connection with a potential restructuring of certain of the Debtors' secured first lien notes (the "***Secured Notes***").  The Debtors do not seek authority to

24.    The Unsecured Notes Ad Hoc Group was officially formed in June 2020. [8]

25.    On August 4, 2020, Debtor Mallinckrodt plc entered into an agreement with Perella Weinberg Partners LP, as financial advisor to the Unsecured Notes Ad Hoc Group (the *"Noteholder FA Reimbursement Agreement,"* together with the Noteholder Counsel Reimbursement Agreement, the *"Noteholder Reimbursement Agreements"*), under which the Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Perella Weinberg Partners LP in connection with a potential restructuring of the senior guaranteed unsecured notes.  The Noteholder FA Reimbursement Agreement is attached hereto as **Exhibit C-2**.  The Noteholder FA Reimbursement Agreement includes a "Transaction Fee" of up to $5,250,000 subject to the terms and conditions set forth in the Noteholder FA Reimbursement Agreement.  *See* Noteholder FA Reimbursement Agreement § 2(b).

26.    On September 11, 2020, Paul Weiss finalized an agreement with Matheson LLP (the *"Noteholder Irish Counsel Reimbursement Agreement"*) which provides that, among other things, the Debtors shall pay the reasonable and documented fees expenses of Matheson LLP in connection with the diligence, negotiation and implementation of an Irish Examinership to be implemented in connection with these chapter 11 cases.  The Noteholder Irish Counsel Reimbursement Agreement is attached hereto as **Exhibit C-3**.[9]

27.    On September 23, 2020, Paul Weiss finalized an agreement with Reed Smith LLP (the *"Noteholder Regulatory Counsel Reimbursement Agreement"*) which provides that, among other things, the Debtors shall pay the reasonable and documented fees expenses of Reed

---

[8]    pay the reasonable and documented fees and expenses of Paul Weiss, Rifkind, Wharton & Garrison LLP incurred in connection their representation of holders of the Secured Notes pursuant to this Motion.

[8]    The Bankruptcy Rule 2019 statement for the Unsecured Notes Ad Hoc Group is filed at Docket No. 272.

[9]    Noteholder Irish Counsel Reimbursement Agreement has not been executed by any Debtor.

US-DOCS\118424683.8RLF1 24321773v.1

Smith LLP in connection with the regulatory advice concerning the Medicaid rebate program and related government pricing issues in connection with the Unsecured Notes Ad Hoc Group's evaluation of a restructuring of the Debtors.  The Noteholder Regulatory Counsel Reimbursement Agreement is attached hereto as **Exhibit C-4**.[10]

28.     On September 24, 2020, Paul Weiss finalized an agreement with Landis Rath & Cobb LLP (the "***Noteholder Delaware Counsel Reimbursement Agreement***" and together with the Noteholder Counsel Reimbursement Agreement, the Noteholder FA Reimbursement Agreement, the Noteholder Irish Counsel Reimbursement Agreement, the Noteholder Regulatory Counsel Reimbursement Agreement, the "***Noteholder Reimbursement Agreements***") which provides that, among other things, the Debtors shall pay the reasonable and documented fees expenses of Landis Rath & Cobb LLP in connection with their representation of the Unsecured Notes Ad Hoc Group's in these cases.  The Noteholder Delaware Counsel Reimbursement Agreement is attached hereto as **Exhibit C-5**.[11]

29.     In sum, the Unsecured Notes Ad Hoc Group Professionals consist of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Unsecured Notes Ad Hoc Group, (b) Landis Rath & Cobb LLP, as Delaware counsel to the Unsecured Notes Ad Hoc Group; (c) Perella Weinberg Partners LP, as financial advisor to the Unsecured Notes Ad Hoc Group, (d) Reed Smith LLP, as regulatory counsel to the Unsecured Notes Ad Hoc Group, (e) Matheson as Irish counsel to the Unsecured Notes Ad Hoc Group, and (f) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the

---

[10]    Noteholder Regulatory Counsel Reimbursement Agreement has not been executed by any Debtor.

[11]    Noteholder Delaware Counsel Reimbursement Agreement has not been executed by any Debtor.

Debtors shall reasonably agree from time to time (collectively, the "*Unsecured Notes Ad Hoc Group Professionals*").

## IV.    The RSA

30.    The Debtors, the Supporting Governmental Opioid Claimants (as defined in the RSA) and the Unsecured Notes Ad Hoc Group entered into the RSA on October 11, 2020.  At that time the Governmental Plaintiff Ad Hoc Committee represented eight States and the Plaintiffs Executive Committee in the MDL, which represents over 1,000 governmental plaintiffs in that litigation, and had gained the support of the RSA by an additional 42 States and Territories, and the Unsecured Notes Ad Hoc Group represented holders of 84 percent of the Debtors' guaranteed unsecured noteholder class.   Moreover, the MSGE Group, which represents over 1,300 governmental and other entities, has entered into a Joinder to the RSA as described in Section V below.

31.    Pursuant to the RSA and the Joinder, the Debtors agreed to file a motion requesting payment of the fees and expenses of the RSA Party Professionals and the reasonable and documented expenses of the members of the Governmental Plaintiff Ad Hoc Committee and the members of  the MSGE Group.  See RSA § 25.  Under section 6(a)(xxiii)(B) of the RSA, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group and the Unsecured Notes Ad Hoc Group may terminate the RSA if an order authorizing the Debtors' payment of the RSA Party Professionals' fees is not entered within 60 days of the Petition Date (i.e. December 11, 2020). *See* RSA § 6(a)(xxiii)(B).

32.    While the Debtors acknowledge that there is still much work that needs to be done prior to the confirmation of the Plan, the entry into the RSA represents an important milestone in these chapter 11 cases.  The Debtors believe that the Plan contemplated by the RSA represents the

best path forward for the Debtors, their estates and all parties in interest, and that such Plan requires the continued support and backing of the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Unsecured Notes Ad Hoc Group.  The Debtors have already been working closely and will continue to work closely with the Governmental Plaintiff Ad Hoc Committee, the MSGE Group and the Unsecured Notes Ad Hoc Group to expeditiously file a Plan consistent with the terms of the RSA, and to negotiate, finalize, and file the definitive documentation implementing the Plan.

## V.   The Joinder

33.     The MSGE Group was initially formed on or about October 2018.[12]

34.     In the late summer and early fall of 2020 the MSGE Group and the Debtors entered into discussions regarding these cases, and those discussions lead to an intensive pre- and post-petition discovery and due diligence process by the MSGE Group starting on October 2, 2020.

35.     On November 13, 2020 counsel to the MSGE Group signed the Joinder.  Under section 5 of the Joinder, the Debtors agreed to pay the reasonable and documented fees and expenses of the MSGE Group Professionals (as defined below) pursuant to the terms of section 25 of the RSA.  See Joinder § 5.

36.     The MSGE Group Professionals consist of: (a) Caplin & Drysdale, Chartered, as legal counsel to the MSGE Group; (b) Seitz, Van Ogtrop & Green, P.A. as Delaware legal counsel to the MSGE Group; (c) FTI Consulting, as financial advisor to the MSGE Group; and (d) such other legal, consulting, financial, and/or other professional advisors to which the MSGE Group and the Debtors shall reasonably agree from time to time (collectively, the "***MSGE Group***

---

[12]    The Bankruptcy Rule 2019 statement for the MSGE Group is filed at Docket No. 337.

*Professionals*" and, together with the Governmental Plaintiff Ad Hoc Committee Professionals, and the Unsecured Notes Ad Hoc Group Professionals, the "***RSA Party Professionals***").

## BASIS FOR RELIEF

I.    **Section 363(b) of the Bankruptcy Code Justifies the Debtors' Payment of the Reasonable and Documented Fees and Expenses of the RSA Party Professionals.**

37.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the debtor, generally, is only required to "show that a sound business purpose" justifies the proposed use of property outside of the ordinary course of business. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 ("Transactions under § 363 must be based upon the sound business judgment of the debtor or trustee." (citation omitted)); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).

38.    Once a debtor articulates a valid business justification in this regard, the strong presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Dura Auto. Sys.*, 2007 WL 7728109, at *92 (quoting *In re Integrated Res.*, 147 B.R. at 656 (citations omitted)); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties

opposing the transaction."). Under the business judgment standard, a debtor's business decision should be approved unless that decision goes "so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *In re Tower Air, Inc.*, 416 F.3d at 238 (citing *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) (*en banc*)). Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)).

39.     The Debtors request authority to pay the reasonable and documented fees and expenses of the RSA Party Professionals and the reasonable and documented expenses of the members of the Governmental Plaintiff Ad Hoc Committee and the members of the MSGE Group, and believe that doing so is a sound exercise of the Debtors' business judgment under section 363(b) of the Bankruptcy Code.

40.     <u>First</u>, payment of the RSA Party Professionals' fees is critical to the Debtors' ability to maintain the Governmental Plaintiff Ad Hoc Committee's, the Unsecured Notes Ad Hoc Group's and the MSGE Group's support for the RSA. It is an express requirement of the RSA and the Joinder that an order granting the Debtors authority to pay the RSA Party Professionals' fees is entered within 60 days of the Petition Date. *See* RSA § 6(a)(xxiii)(B); *see* Joinder §5. If the Debtors do not obtain the authority to pay the fees and expenses of the RSA Party Professionals, the Governmental Plaintiff Ad Hoc Committee, the Unsecured Notes Ad Hoc Group and the MSGE Group would each have the ability to terminate the RSA and the Joinder (as applicable). Such a result would be disastrous for the Debtors and their estates. Absent the continued support and existence of the Governmental Plaintiff Ad Hoc Committee, the Unsecured Notes Ad Hoc

Group and the MSGE Group, the Debtors could be forced back to square one, *i.e.*, renegotiating the terms of a plan with a large number of diverse and differently motivated creditors and with no restructuring framework agreement in hand. Being in such a position would impede the Debtors' reorganization efforts, increase the length and scope of these cases and their associated expense. The possibility of prolonged chapter 11 cases could threaten the Debtors' operations, their customer and vendor relationship and, ultimately, undermine their ability to successfully emerge from these restructuring proceedings.

41. <u>Second</u>, while the RSA serves as an important and necessary building block for the Plan, significant work remains to be done, including the eventual negotiation of definitive documents, and (hopefully) the expansion of creditor support for the forthcoming Plan. In fact, the Governmental Plaintiff Ad Hoc Committee played an important role in obtaining the support of the MSGE Group for the RSA. The Debtors are already working closely with the parties to the RSA to negotiate and finalize the Plan and definitive documents, and intend to work with the RSA parties to garner additional creditor support for the forthcoming Plan. Thus, the Debtors recognize that any plan that is eventually confirmed in these chapter 11 cases will need to enjoy broad support among the Debtors' unsecured creditors and the RSA parties will continue play a significant roles in allowing the Debtors to efficiently negotiate with, and gain the support of, those constituencies.

42. <u>Third</u>, the efficiency of working with the Governmental Plaintiff Ad Hoc Committee, the Unsecured Notes Ad Hoc Group and the MSGE Group has already been on display in these chapter 11 cases, as the Debtors and Governmental Plaintiff Ad Hoc Committee and the Unsecured Notes Ad Hoc Group were able to memorialize the Opioid Settlement and Plan Term Sheet and successfully execute the RSA, and the MSGE Group had some input into those documents prepetition, conducted due diligence on behalf of its extensive and diverse constituents,

and has now entered into the Joinder.  The extensively negotiated deal struck in the RSA provides the framework for the Plan, which is already in process, and which will be the key to the Debtors' expedient emergence from chapter 11.

43.    Fourth, the Debtors have ample liquidity with which to make the contemplated professional fee payments, and the fees to be reimbursed pursuant to the Proposed Order will be subject to review for reasonableness, not only by the Debtors, but the U.S. Trustee's office, the OCC, and the UCC as well.  All such parties will have an adequate opportunity to object to the payment of the RSA Party Professionals' invoices, with any unresolved disputes being subject to resolution by the Bankruptcy Court.

44.    Finally, Courts have approved the payment of professional fees of unsecured creditors pursuant to section 363(b) in connection with the court's approval of a debtor's assumption of or entry into a fee letter or restructuring support agreement.  *See e.g. In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) [Docket No. 553] (approving payment of Governmental Plaintiff Ad Hoc Committee's fees in connection with assumption of a reimbursement agreement); *In re Hercules Offshore, Inc.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [Docket No. 95] (approving payment of professional fees for unsecured creditors as part of assumption of restructuring support agreement); *In re Dendreon Corporation*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [Docket No. 215] (same); *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) [Docket No. 217] (same); *In re William Lyon Homes*, No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) [Docket No. 105] (same); *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 18, 2013) [Docket No. 317] (approving payment of unsecured creditors' professional fees as part of assumption of prepetition fee agreement); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) [Docket No.

US-DOCS\118424683.8RLF1 24321773v.1

4652] (approving payment of an ad hoc group of unsecured creditors' professional fees pursuant to a fee letter approved under section 363(b)); *In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming the ruling of the district court and bankruptcy court to approve payment of bidders' due diligence and work fees requested pursuant to section 363); *U.S. Trustee v. Bethlehem Steel Corp.*, No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003) (affirming bankruptcy court's approval of reimbursement of creditors' counsel's costs and expenses pursuant to sections 363(b) and 105(a)).

45.     Thus, it is in the Debtors' best interest at this early but pivotal stage of these chapter 11 cases to pay the fees and expenses of the RSA Party Professionals and the reasonable and documented expenses of the members of the Governmental Plaintiff Ad Hoc Committee and the members of the MSGE Group, to ensure the Governmental Plaintiff Ad Hoc Committee's, the Unsecured Notes Ad Hoc Group's and the MSGE Group's continued support for RSA and forthcoming Plan, which the Debtors believe presents the best pathway to a value-maximizing plan and emergence.

## RESERVATION OF RIGHTS

46.     Nothing in this Motion shall be deemed: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

## **NOTICE**

47.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Unsecured Notes Ad Hoc Group; (c) the agent under the Debtors' secured term and revolving financing facilities; (d) counsel to the ad hoc group of holders of the Debtors' unsecured notes; (e) the indenture trustees for the Debtors' outstanding notes; (f) counsel to the Governmental Plaintiff Ad Hoc Committee; (g) counsel to the official committee of unsecured creditors; (h) counsel to the official committee of opioid claimants; (i) counsel to the MSGE Group, (j)  the United States Attorney's Office for the District of Delaware; (k) the attorneys general for all 50 states and the District of Columbia; (l) the United States Department of Justice; (m) the Internal Revenue Service; (n) the Securities and Exchange Commission; (o) the United States Drug Enforcement Agency; (p) the United States Food and Drug Administration; and (q) all parties entitled to notice pursuant Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

## **NO PRIOR MOTION**

48.     The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other court.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: November 16, 2020

*/s/ Michael J. Merchant*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    merchant@rlf.com
    steele@rlf.com
    schlauch@rlf.com

- and -

George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:    george.davis@lw.com
    george.klidonas@lw.com
    andrew.sorkin@lw.com
    anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:    jeff.bjork@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:    jason.gott@lw.com

US-DOCS\118424683.8RLF1 24321773v.1