IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

Case No. 20-12522 (JTD)

IN RE: MALLINCKRODT PLC., *et al*[1]

Debtors.

Chapter 11
Jointly Administered

**Rel. Dkt. Nos. 305, 307**
**Hearing Date: 12/7/2020 at 10:00 a.m.**
**Objection Deadline: 11/30/2020**

### AD HOC COMMITTEE'S JOINDER MOTION FOR ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE PURSUANT TO SECTION 1102 OF THE BANKRUPTCY CODE

The Ad Hoc Committee of Equity Holders of Mallinckrodt plc ("Ad Hoc Committee")[2] joins the pending request and moves (the "Joinder Motion") this Court for an order, substantially in the form attached hereto as Exhibit A, directing the Office of the United States Trustee (the "U.S. Trustee") to appoint an official committee of equity holders (an "Equity Committee") in these Chapter 11 cases filed by Mallinckrodt plc ("Mallinckrodt plc") and its subsidiaries (collectively, the "Debtors"), pursuant to section 1102(a)(2) of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"). In support of this Joinder Motion, the Ad Hoc Committee respectfully represents as follows:

### PRELIMINARY STATEMENT

1. The facts and circumstances of these bankruptcy cases give rise to a compelling need for the appointment of an Equity Committee pursuant to section 1102(a)(2) of the Bankruptcy Code. The appointment of an Equity Committee will facilitate the adequate representation of

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.
[2] The Ad Hoc Committee consists of the holders of Equity Interests identified on Exhibit B.

thousands of Mallinckrodt plc's equity interest holders, who are key constituents to these proceedings and whose interests are clearly lacking in representation.

2.     The Bankruptcy Code itself affords no test for determining "adequate representation" under section 1102. The analysis is determined on a case-by-case basis, but courts have generally applied the following set of factors in analyzing the adequacy of representation and whether the appointment of an equity committee is warranted:

a)   Whether the debtor is not "hopelessly insolvent" so that shareholders appear to have a real economic interest at stake;

b)   Whether the interests of the shareholders are not otherwise adequately represented;

c)   Whether the costs of an equity committee are warranted;

d)   Whether the case is large and complex;

e)   Number of shareholders; and

f)   Whether the timing is appropriate.

3.     While considering these factors, courts tend to focus on the likelihood of recovery to stockholders. But, courts have discretion in determining whether to appoint an equity committee and the unique factors of a case may warrant the appointment of a committee and thus, valuation alone is not the determining factor. *See* John A. Pintarelli and Jordon A Wishnew, *Equitable or Equity Committees: Lessons From Recent Cases*, ABI Journal, pp. 32, 33, 67 (March 2017), attached as Ex. B.[3]

---

[3] Cases discussed in the article include: *Horsehead Holdings Corp.*, 16-10287 (Bankr. Del. May 13, 2016) (court appointed an equity committee based in part on "the drastically different pre- and post-petition valuations" and that "'something doesn't smell right to the court'"); *In re Energy XXI Ltd.*, No 16- 31928 (Bankr. S.D. Tex. June 15, 2016) (equity committee appointed where the court was particularly focused on prepetition disclosures and subsequent representations of value); and *In re Breitburn Energy Partners LP*, No. 16-11390 (Bankr. S.D.N.Y. Oct. 14, 2016) (equity committee appointed, with the court focusing on the pre-petition disclosures as well as its disclosures during the case to conclude that the debtors were not hopelessly insolvent).

4.     Here, management negotiated a Restructuring Support Agreement ("RSA") that increases their equity ownership interest in the Mallinckrodt plc from about 1.0% prepetition, to 10% of a company with a massively delivered balance sheet, on the Effective Date.  At the same time, the contemplated Plan of Reorganization will cancel, release and extinguish 84.6 million shares of common stock ("Equity Interests") held by thousands of individuals.  Management's self-interested negotiations will result in a massive benefit to management at the expense of equity, upon whose back the company was built, without equity holders having a seat at the table to fight/negotiate for themselves.

5.     Additionally, the terms of the RSA disregard the Debtors' corporate structure, a structure designed to reduce risk through segmented business operations.  As explained below, the Debtors operate two separate business lines: – Specialty Generics and Specialty Brands, through distinct legal entities.  The Opioid related claims arise solely out of the operations of the Specialty Generics business, and any recovery on those claims must be from entities that operated the Generics business.  In addition, the principal Acthar claims in the pending litigations are asserted against Mallinckrodt ARD LLC, the marketing and distribution entity that licenses the rights from other Achter entities, and the allege mispricing activities.  As such, the Debtors' suggestion that the Acthar litigation claims would cripple Mallinckrodt, plc is wildly overstated.

6.     Using publicly available data, and reasonable assumptions, the Ad Hoc Committee has preliminarily determined that if Opoiod and Acthar liabilities are properly assigned, categorized and valued, Mallinckrodt plc has an substantial equity value – believed to be at least in excess of $500 million - and possibly much greater than that amount.  The Debtors are not hopelessly insolvent.  Indeed, in February of this year, the planned bankruptcy proceedings were structured to respect the separate business lines and legal existence and impact only the Generics business.  The

stated reasoning for the shift to the transactions contemplated by the RSA and the plan of reorganization does not justify wiping out Equity Interests, especially when no one was looking out for their interests when these transactions were negotiated; management negotiated for themselves, as did the noteholders and opioid claimants.

7.      Post-petition, Equity Interests will continue to be unprotected unless an Equity Committee is formed.  Management has shown their willingness to put their interest ahead of equity and none of the other committees (ad hoc or official) can act as fiduciaries for Equity Interests. Accordingly, the Ad Hoc Committee requests that an Equity Committee be appointed to provide the holders of Equity Interests with an ability to participate meaningfully in these bankruptcy proceedings.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Ad Hoc Committee consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      The statutory predicate for the relief requested herein is section 1102(a) of the Bankruptcy Code.

## RELIEF REQUESTED

10.     By this Motion, the Ad Hoc Committee seeks entry of an order, substantially in the form attached hereto as Exhibit A, (i) directing the U.S. Trustee to appoint an Equity Committee, and (ii) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.

## FACTUAL BASIS FOR THE RELIEF REQUESTED

11.     On October 12, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

12.     The Debtors are a global specialty biopharmaceutical company that operates two separate and fundamentally distinct businesses – branded and generic products.  "Specialty Brands" involves innovative specialty pharmaceutical brands that are operated by various Debtors and Non-Debtor Affiliates.  According to the Debtors, the 2019 Net Sales for Specialty Brands was approximately $2.4 billion.  "Specialty Generics" involves niche specialty generic drugs and active pharmaceutical ingredients that are operated by Debtors Mallinckrodt LLC, Mallinckrodt Enterprises LLC ("Enterprises"), SpecGx Holdings LLC, SpecGX LLC ("SpecGX"), and Mallinckrodt APAP LLC, in addition to certain other Debtors and Non-Debtor Affiliates that act as foreign distributors.  The 2019 Net Sales for Specialty Generics was approximately $739 million.

13.     On October 11, 2020, the day before the Petition Date, the Debtors entered into the RSA[4] with the Supporting Unsecured Noteholders, and the Supporting Governmental Opioid Claimants.  The material terms of the RSA are as follow:

a) Claims under the Debtors' Credit Agreement will be reinstated,

b) The Debtors' secured notes will be reinstated,

c) Holders of the Debtors' unsecured notes will be given 100 percent of the equity of reorganized Mallinckrodt (subject to dilution on account of the warrants issued as part of the Opioid Settlement and the management incentive plan) and new second lien notes,

d) Settlement of the Opioid Related Litigation and Achter Gel Related Litigation.

e) Holders of general unsecured claims will receive an allocated share of a $100,000,000 cash pool, other than certain trade creditors who will receive a greater recovery in exchange for providing appropriate post-emergence trade terms,

f) All existing Equity Interests (84.6 million common shares) shall be discharged, cancelled, released, and extinguished;

g) A management incentive plan ("MIP") that provides for the issuance to management, key employees and directors of the Reorganized Debtors ten percent (10%) of the fully diluted New Mallinckrodt Common Shares;

h) Indemnification to the fullest extent allowed by applicable law for the prepetition directors, officers, managers, *et al.*; and

---

[4] Capitalized terms not defined herein are as defined in the RSA.

i) Extremely broad and generous exculpation provisions, Debtors releases, third-party releases and injunction provisions.

*See* Mallinckrodt Restructuring Term Sheet attached to RSA (Dkt. 128).

14.     The RSA contains milestones for the progress of the Chapter 11 Cases (the "Milestones") which include the dates by which the Debtors are required to, among other things, obtain certain orders of the Court and consummate the Debtors' emergence from bankruptcy. The RSA contemplates that the Court shall have entered an order confirming the Plan no later than eleven months after the Petition Date [September 12, 2021] and that the Debtors shall have emerged from bankruptcy no later than fifteen months after the Petition Date [January 12, 2022], among other stated deadlines.

15.     To support the chapter 11 filings and the various first day motions, the Debtors filed the Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions [Dkt. 128] ("Welch Declaration"). The Welch Declaration was submitted to describe the Debtors' businesses and background, the circumstances that led to the chapter 11 filings, the Debtors' goals in these cases, and in support of First Day Pleadings.

16.     The Welch Declaration describes in detail the extensive negotiations with all creditor parties, but there is no mention of any discussions (or even contact) with any holders of Equity Interests. *See* Welch Declaration at pp. 6-11. However, it should be emphasized that the Welch Declaration is mysteriously silent on the discharge, cancellation, release and extinguishment of all Equity Interests (approximately, 84.6 million common shares) and the MIP that provides management, key employees and directors of the Reorganized Debtors, with ten percent (10%) of the fully diluted New Mallinckrodt Common Shares in the RSA.[5]

---

[5] The Restructuring Support Agreement and Restructuring Term Sheet are attached as exhibits to the Welch Declaration.

17.     On October 27, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Dkt. 306] (the "Creditors Committee"), and an official committee of opioid related claimants [Dkt. 308] (the "Opioid Claimants Committee").  The U.S. Trustee did not appoint an official committee of equity holders on that date.  No trustee or examiner has been requested in these cases.

18.     Since the Petition Date, other ad hoc committees/groups have made appearances in these bankruptcy cases: (i) the Governmental Plaintiff Ad Hoc Committee [Dkt. 40] ("Governmental Plaintiff Committee"), (ii) the Ad Hoc Committee of NAS Children [Dkt. 138] ("NAS Children Committee"), (iii) Ad Hoc First Lien Term Lender Group [Dkt. 194], (iv) Unsecured Notes Ad Hoc Group [Dkt. 272], and (v) Ad Hoc Group Personal Injury Victims [Dkt. 338] in these chapter 11 cases.

19.     Also since the Petition Date, there has been a flood of letters by equity holders filed with the Court objecting to the proposed treatment of Equity Interests under the RSA and requesting the appointment of an official committee of equity holders [Dkt. Nos. 268, 285, 286, 292, 293, 294, 305, 349, 350, 398, 399, 402, 403, 404, 413, 416, 423, 424, 425, 432, 472, 494, 515 and 527].  Upon information and belief, at least one equity holder has requested that the U.S. Trustee appoint an official committee of equity holders.

20.     On October 27, 2020, the Court, recognizing one of those letters as a Motion for Appointment of Equity Committee, set the hearing on same for December 7, 2020 at 10:00 a.m. [Dkt. 307], and required any objections be filed by November 30, 2020.

21.     Shortly thereafter, the U.S. Trustee advised undersigned counsel that it would not appoint an official committee of equity holders but would await the Court's decision on December 7, 2020.

22.     On November 19, 2020, the U.S. Trustee conducted the meeting of creditors under section 341 of the Bankruptcy Code.  The meeting of creditors was adjourned because the Debtors have not filed their schedules and statement of financial affairs; however, before adjournment, numerous shareholders voiced their objection to the RSA and the self-interested agreement reached by management on behalf of the Debtors.

23.     These bankruptcy cases are in their initial stages.  To date, the Debtors have not filed a motion to approve the RSA, any disclosure statement or any plan of reorganization.  None of the key Milestones set forth in the RSA have passed either.

24.     For the reasons set forth below, the Ad Hoc Committee files this Joinder Motion seeking an order directing the U.S. Trustee to appoint an official committee of equity holders.

## LEGAL BASIS FOR THE RELIEF REQUESTED

25.     The statute governing appointment of an additional committee, including a committee of equity holders, focuses initially on "adequate representation."  Section 1102(a)(2) of the Bankruptcy Code, which provides the authority for the Court to order the appointment, states:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States Trustee shall appoint any such committee.

11 U.S.C. § 1102(a)(2).

26.     Based on the language of the statute, the court must first determine whether the movants are already adequately represented or whether appointment of an additional committee is necessary to assure adequate representation.  Congress recognized the vulnerability of public investors in chapter 11 bankruptcy cases when it provided for the ability to seek appointment of equity committees.  The legislative history of section 1102 indicates that Congress understood the

important purpose an equity committee could serve "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." S.REP. NO. 95-989, at 10 (1978), reprinted in 1978 U.S. C.C.A.N. 5787, 5796. H.R. Rep. No. 595, 95th Cong., 1st Sess. 401 (1977). *See In re Drexel Burnham Lambert Group, Inc.*, 118 B.R. 209, 211 (Bankr. S.D.N.Y. 1990).

27.    Adequate representation during the Chapter 11 proceedings is not defined in the Code and the statute affords the court discretion in determining whether to appoint an additional committee, courts have developed several criteria to assist in making the determination including (1) the number of shareholders, (2) the size and complexity of the case, and (3) whether the cost of the additional committee outweighs the concern for adequate representation. *In Re Pilgrim's Pride Corp.*, 407 B.R. 211 (Bankr. N.D. Tex. 2009)(adding whether Debtors are likely to prove solvent to the tripartite test); *In re Wang Lab., Inc.*, 149 B.R. 1, 2 (Bankr. MA 1992); *In re Johns-Manville Corp.*, 68 Bankr. 155, 160 (S.D.N.Y. 1986); *In re Beker Indus Corp*, 55 B.R. 945, 949( Bankr. S.D.N.Y. 1985). *See also In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996).

28.    The Ad Hoc Committee is well aware of the high bar set by this Court in *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009). In that case, this Court adopted the tripartite test set forth above with two additional criteria: (i) whether the Debtors are hopelessly insolvent or there is a substantial likelihood that equity holders will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) whether they

are unable to represent their interests in the bankruptcy case without an official committee. Under the facts of the cases, the Ad Hoc Committee can meet its burden.[6]

### *The Tripartite Test Is Satisfied*

29.    The tripartite test is satisfied in these bankruptcy cases.

30.    **The number of shareholders is significant.**  As recognized by the Debtors in the *Motion of Debtors for an Order Authorizing the Debtors to Modify the Requirements to File A List of All Equity Holders* [Dkt. No. 13], the Debtors have 84.6 million common shares outstanding held by thousands of holders in numerous countries around the world.

31.    **The chapter 11 filings by the Debtors and affiliates represent large and complex bankruptcy cases**.  Mallinckrodt plc is the parent Debtor with numerous Debtor and non-debtor subsidiaries.  The chapter 11 bankruptcy filings capture sixty-three (63) Debtor subsidiaries, but there are numerous other non-debtor subsidiaries.  The Debtors admit in their public filings that "Mallinckrodt plc and its subsidiaries operate a complex global business with an optimized multinational legal entity structure… [and] was developed to conduct business, control risks, and manage tax liability arising from the manufacturing and distribution of pharmaceuticals through Company's Specialty Brands and Specialty Generics business segments."  *See* Mallinckrodt Pharmaceuticals Discussion materials dated October 2020, attached as Exhibit C.[7]

32.    **The cost of the additional committee does not outweigh the concern for adequate representation.**  While the Debtors will undoubtedly argue that the cost of an equity committee outweighs the concern for adequate representation, it is simply not the case.  As discussed below,

---

[6] The arguments herein are based on information that has been publicly disclosed.  The Ad Hoc Committee reserves the right to amend/supplement its arguments after receiving additional relevant information it may seek from the Debtors.

[7] While this exhibit is labeled as being confidential settlement communications, it is publicly available. https://advancingmnk.com/wp-content/uploads/2020/10/2020.10.11-MNK-Investor-NDA-Materials-vPosting.pdf

Mallinckrodt is not "hopelessly insolvent" and there is potential for value for Equity Interests. Equity Interests need represenation to protect their interests and none of the other committees (ad hoc or official) are in a position to protect the Equity Interests holders.  While acting to advance and protect the interests of the Equity Interest holders, the equity committee, if appointed, would not duplicate the efforts of other committees, thus its efforts would be additive and not duplicative.

33.     The costs of an equity committee in these cases should not bar appointment here. *See In re McLean Industries*, 70 B.R. 852, 860 (Bankr. S.D.N.Y 1987) ("Cost alone cannot, and should not, deprive...security holders of representation."); *In re Enron Corp.*, 279 B.R. 671, 694 (Bankr. S.D.N.Y. 2002) ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted."). The cost to the estates for adequate representation of the equity holders would be a mere fraction of the $31 million the Debtors have budgeted to spend on restructuring professionals in the first 13 weeks of these cases.  [Dkt. No. 535-1][8]

34.     Given the lack of representation of the holders of Equity Interests, it would be disingenuous at this point for the Debtors to argue that it would be unduly burdensome for the Debtors to be liable for the professional fees and expenses of the holders of the Equity Interests – the parties on whose back (and capital) the Company was built upon.

### *Mallinckrodt plc Is Not Hopelessly Insolvent*

35.     In appointing an official equity committee, the inquiry is not whether the debtor is insolvent, but whether the debtor "appears to be *hopelessly* insolvent."  *See Williams Commc'ns,*

---

[8] Debtors have also agreed to pay the professional fees and expenses of many other parties in interest. Under the RSA, the Debtors have agreed to pay for multiple sets of professionals engaged by the Unsecured Notes Ad Hoc Group and the Governmental Plaintiff Ad Hoc Group.  *See* Restructuring Term Sheet at p. 8 [Dkt No. 128]. The Debtors have also agreed to pay the professional fees and expenses of the professionals engaged by the Legal Representative for the proposed Future Claimants Representative, Roger Frankel [Dkt. Nos. 372, 373, 374, 376 and 377], and the professional fees and expenses incurred by the Prepetition Secured Parties under the cash collateral order [Dkt. No. 213].  Finally, the Debtors are statutorily liable for the professional fees and expenses incurred by the two official committees appointed by the U.S. Trustee – the Creditors Committee and the Opioid Claimants Committee.  The Debtors have basically agreed to pay the fees and expenses of every major constituting in the bankruptcy cases except for equity.

281 B.R. at 220-21; *see also In re Wang Labs., Inc.,* 149 B.R. 1, 4 (Bankr. D. Mass. 1992) (emphasis added) (appointing an equity committee when a debtor was operating, "albeit at a loss, and is not hopelessly insolvent").   "[T]here is no clear litmus test" in determining a debtor's solvency."  *See Williams Commc'ns,* 281 B.R. at 220.  Instead, it is a "practical conclusion, based on a confluence of factors."  *See id.* at 221.

36.     As set forth above, Mallinckrodt legally and functionally operates two separate and fundamentally distinct businesses – branded and generic products.  "Specialty Brands" involves innovative specialty pharmaceutical brands that are operated by various Debtors and Non-Debtor Affiliates.  According to the Debtors, the 2019 Net Sales for Specialty Brands was approximately $2.4 billion. "Specialty Generics" involves niche specialty generic drugs and active pharmaceutical ingredients that are operated by Debtors Mallinckrodt LLC, Enterprises, SpecGx Holdings LLC, SpecGX  ("SpecGX"), and Mallinckrodt APAP LLC, in addition to certain other Debtors and Non-Debtor Affiliates that act as foreign distributors.

37.     The 2019 Net Sales for Specialty Generics was approximately $739 million. Mallinckrodt's Specialty Generic Segment and the Specialty Brand Segment are also separate units, and a bankruptcy filing of the Generic Brand Segment does not necessarily affect the Specialty Brand segment.   Indeed, Mallinckrodt spent months negotiating a "comprehensive settlement supported by more than forty Attorneys General representing states, Washington, D.C. and three U.S. territories, and the court appointed Plaintiffs' Executive Committee [] in the national opioid multi-district litigation.[9]   In fact, when first agreed upon in February 2020, the Opioid Settlement contemplated **a surgical, Specialty Generics-only chapter 11 filing."**[10]  Mallinckrodt claims that the primary reason for the failure of that plan was the potential magnitude of the Acthar-

---

[9] *See* Stephen A. Welch Declaration, dated October 12, 2020, ("Welch Dec."), p. 13.
[10] Welch Dec. ¶ 8 (emphasis added).

related False Claims Act litigation, although any detail supporting that claim is missing from Mallinckrodt's analysis

38.     The Debtors still recognize that the claims arising from the Opioid litigation and Government litigation arises out of the Debtors' operations of the Generics Brands business, and the sale and distribution of Opioid productions.  As described in the Welch Declaration, "entities, primarily associated with the Specialty Generics business have been named in over 3,000 lawsuits stemming from the Debtors production and sale of opioid medications."

39.     As such, the liabilities associated with that litigation should be limited to recoveries from the Generic Brands business, as was apparently contemplated back in February 2020, and not all of the Debtors.  As far as the Ad Hoc Committee members are aware the Opioid claimants and the Government Claimants have not been successful in pursuing Opioid related litigation against the Parent, Mallinckrodt, plc, or any subsidiary that did not conduct the Generics business.

40.     The Ad Hoc Committee has not had access to the material prepared in February 2020, and it is not aware of any analysis put forth by the Debtors that would value the Generics Brands and the Special Brands business separately. In preparing this motion, the Ad Hoc Committee has worked with consultants and conducted its own preliminary valuation of the two businesses based upon the publicly available information.

41.     The Debtors claim the reason for the shift in the Debtors' filing was the recent increase in litigation involving Acthar Gel, the Debtors' highest selling Specialty Brand product, and the claims against Mallinckrodt ADR, the legal entity in the business of selling Achtar in the United States, and other related Specialty Brand entities.  Acthar is the Debtors' most valuable and largest income-producing product, according to the Debtors' recent filings.

42.     The Debtors, however, vigorously dispute any liability related to the Acthar litigations, and they have denied liability and insisted that they have not acted improperly with respect to the marketing and sale of Acthar.  The subject of the Acthar litigation has taken center stage with respect to the preliminary injunction motion filed in this Court seeking to enjoin the Acthar related litigation.  Like the Equity Holders, the private Acthar Plaintiffs were excluded from the negotiations involving the RSA.

43.     The Ad Hoc Committee submits that purported existential threat of billions of dollars in liabilities associated with the Acthar litigation is an excuse and not a reason for the Debtors' filing and proposed elimination of all Equity Interests.  There has not been an adjudication of liability in the pending cases, and the Debtors contend the claims are without merit.  The fact that motions to dismiss these claims in certain cases was denied, provides no basis to conclude that the liabilities associated with these claims will be crippling to the company.  As explained above, the Acthar litigation is against specific Mallinckrodt subsidiaries that have limited assets or available resources to satisfy significant claims.  Moreover, as part of the RSA, the Debtors have reached a settlement of $260 million of the pending governmental litigations and investigations.

44.     The Ad Hoc Committee performed an assessment using public information and the foregoing assumptions, using primarily the Company's projections.[11]  Unlike the spin-off that was attempted earlier in 2020, where the debt was assumed to be split between the two segments,[12] all of the debt is assumed to be borne by the Specialty Brand segment.

45.     Based upon its preliminary analysis, the Specialty Brand segment, on a stand-alone basis, even with all of the debt assigned to that business segment, and despite the range of values

---

[11] Mallinckrodt Pharmaceutical: Discussion Materials, October 2020, p. 25.
[12] Mallinckrodt Pharmaceuticals, JP Morgan Healthcare Conference, January 7, 2019, p. 7.  The Specialty Brands segment planned on more than $1 billion in debt reduction as a result of the spin-off of Specialty Generics.

for the Specialty Brands Segment on a stand-alone basis, this is a clear indication that the equity of Mallinckrodt should have significant value, potentially far greater than $500 million, or at almost $6.0 per share.[13]

46.     The Debtors' corporate structure undeniably supports segregating the Opioid claims as proposed.  As described in the Welch Declaration:

*       "The Debtors here are all subsidiaries of Debtor Mallinckrodt plc, which is a publicly owned Irish entity, the shares of which are traded on the New York Stock Exchange under the ticker symbol MNK. (Welch Dec. ¶30.)

*       "The **subsidiaries** of Mallinckrodt are divided into two business segments: (a) Specialty Brands and (b) Specialty Generics." (Welch Dec. ¶31(emphasis added).)

*       Each of the two segments is, in its own right, a truly global business, with Specialty Brands developing, manufacturing, marketing and distributing specialty pharmaceutical products and therapies focused on improving outcomes for underserved patients with severe and critical conditions, and Specialty Generics developing, manufacturing and selling affordable complex generic and active pharmaceutical ingredient products to treat pain, substance abuse, and attention deficit hyperactivity disorder ("ADHD"). (Welch Dec. ¶31.)

*       The two businesses are fundamentally distinct and are operated accordingly. The segments share limited corporate services and insurance coverage, are combined for U.S. tax reporting purposes (in returns filed by Debtor MEH, Inc.), and use some of the same physical facilities, all on documented, market-based

---

[13] Based on 84,604,862 shares outstanding as of October 30, 2020.  *See* Mallinckrodt, SEC Form 10-Q for the quarterly period ended September 25, 2020.

terms.  But beyond these aspects, any other business overlap (such as common vendor relationships and the like) **is *de minimis*.** (Welch Dec. ¶ (emphasis added).)

\*        As noted, Mallinckrodt is split into two separate businesses run by different sets of legal entities – Specialty Brands and Specialty Generics.  For fiscal year ended December 27, 2019, Specialty Brands accounted for $2,423.8 million in net sales, while Specialty Generics accounted for $738.7 million.

\*        "[The] Specialty Generics [] business is the business primarily comprised of Debtors Mallinckrodt LLC, Mallinckrodt Enterprises LLC …, SpecGx Holdings, LLC, SpecGx, LLC … and Malinckrodt APAP LLC, . . . ."(Welch Dec. ¶2.)

\*        At a high level, for fiscal year 2019, the Debtors' hydrocodone and oxycodone products (categories of opioids) accounted for approximately 20 percent of Specialty Generics' total sales. (Welsh Dec. ¶42.)

\*        As described above, SpecGx primarily manufactures and sells **generic** opioid dosage products, including oxycodone, hydrocodone, oxymorphone, hydromorphone, methadone, fentanyl, and morphine. (Welch Dec. ¶72.)

47.        The Debtors offer pretextual reasons for the RSA and filing of bankruptcy by all of the Debtors.  First, while acknowledging that the Opioid litigation has been brought principally against the Special Generics Debtors, the Debtors' ultimate parent, Mallinckrodt plc, is a named defendant in the majority of these cases, and certain other Debtors are also named defendants in various lawsuits.  The Debtors claim, without any analysis that "the theories of liability asserted against Mallinckrodt plc and these other named Debtors include 'alter ego,' agency, and the other forms of vicarious liability."

48.     Second, the Debtors point to the Acthar-Related Litigations as having been asserted against the Specialty Brands Debtors.  The Achar-Related litigation relates to the calculations of rebates that the Debtors pay to state Medicaid programs.  According to the Debtors, the claims asserted seek billions in potential damages, but there is no analysis whatsoever as to the value of the potential claim, or which of the many Acthar subsidiaries would be liable for any judgment that might be obtained.  The only litigation for which the Ad Hoc Committee believes there has been an adverse ruling on summary judgment is litigation against Mallinckrodt ARD LLC.  As explained above, the Mallinckrodt ARD LLC markets and distributes Acthar, but it is not the entity that owns the intellectual property.  As such, the Acther governmental and civil litigants have limited sources of any recovery in that litigation.

49.     Nonetheless, as part of the RSA, the Debtors agreed to pay $260 million over seven years and to reset Acthar Gel's Medicaid rebate calculation as of July 1, 2020, in order to resolve all of the claims asserted in the Medicaid Lawsuit, the associate FCA Lawsuit in Boston, and in the Eastern District of Pennsylvania relating to Acthar's previous owner's interference with an independent charitable foundation.  Even this settlement appears excessive given the proper defendants.

50.     From the discussion of settlement negotiations among the relevant constituents it appears that no effort was made whatsoever to represent equity in the negotiations and to seek any recovery on the billions on value lost by the Debtors' bankruptcy filings.[14]  Nor is there any discussion of the business values and any attempt to create value for the Equity Interests. Significantly, rather than use the complex corporate structure intended to reduce risk and preserve equity, the Company management simply abandoned it and lined their own pockets.

---

[14] At its highest in 2015, the common stock of Mallinckrodt was trading at approximately $132 per share.

51.    As explained above, the Specialty Brands business has substantially more value than the Specialty Generics Brands business.  The Opioid litigation is properly asserted only against the Specialty Generics Debtors and not the Specialty Brands Debtors or the Parent, Mallinckrodt, plc.  As such, the Specialty Brand Debtors and the Parent are not even close to being hopelessly insolvent.

52.    Certainly, given disparate valuation of the Special Brands and Specialty Generics Business, Equity Interest holders were entitled to a representative bargaining for at least a share of the value being transferred to Opioid and other litigants, whose right to any recovery was uncertain at best.  Mallinckrodt plc is profitable and generates a significant positive cash flow and holds about $900 million in cash or cash equivalents.  Instead of engaging in that negotiation, management chose to "throw in the towel" and ultimately negotiate benefits for itself only.

### *Equity Interests are Not Able to Adequately Represent Themselves if an Official Committee of Equity Holders is not Appointed*

53.    As a general matter, a debtor's officers and directors have a duty to maximize debtor's estates to the benefit of shareholders as well as creditors. *See Commodity Futures Trading Comm'n v, Weintraub*, 471 U.S. 343, 355 (1985).  However, that dual obligation is often in conflict and maximizing the value of assets here does not equate to adequate representation of shareholders. As noted in the legislative history of section 1102, an equity committee is necessary protection against "the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business at the expense of small and scattered investors." S.Rep. No. 989, 95 Cong., 2d Sess.10 (1978). The influence of the large secured creditors over the short history of these cases is undeniable.

54.    In those circumstances where the interests of the board and management do not align with those of the debtors' non-insider equity holders, a statutory equity committee provides

a meaningful counterweight and warrants appointment.  *See In re Oneida Ltd.*, No.060120 0489, 2006 WL 1288576, at *2 (Bankr. S.D.N.Y. May 4, 2006) (ordering appointment of statutory equity committee upon a finding that "certain checks and balances" were not present).

55.     Furthermore, it is generally acknowledged that equity holders cannot rely on a creditors committee and unsecured claimholders to represent their interests through valuation and plan process. *See Pilgrim's Pride* 407 B.R. at 217 n.17 ("[W]hen it comes to valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds."); *In re Saxon Indus.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) ("the two committees are separate and distinct entities with the members of the unsecured creditors and equity. . . classes possessing variant priorities and interests with respect to their relationship with the debtors."). Creditors and creditors' committees do not owe any duties to shareholders. A creditors committee is more likely to accept a strategy that provides the maximum recovery for its constituents in the short term than hold out for increased value that inures to the benefit of equity holders over a longer period.  In sum, a creditors committee does not represent the interests of equity holders.

56.     Here, management has abandoned the Equity Interests holders.  Instead, management has negotiated a RSA that discharges, cancels, releases and extinguishes all existing Equity Interests (84.6 million shares), but on emergence from bankruptcy provides for the issuance to management, key employees and directors of the Reorganized Debtors ten percent (10%) of the new Mallinckrodt Common share.  The RSA also provides this conflicted management within overly broad releases and indemnity.  It is very likely that no one has investigated whether there may be valid claims against management, yet management wants those potential claims released.

57.     Finally, the Mallinckrodt plc shareholders cannot depend upon the Ad Hoc Committee to represent its interests. Several courts have recognized that an unofficial committee of equity holders does not have a fiduciary duty to act on behalf of shareholders. *See In Re Beker Industries Corp.*, 55 B.R. 945 (Bankr. S.D.N.Y. 1985). The *Beker* court stated:

> Here it is clear that the holders of Debentures and stock need to be represented by separate official committees. Most importantly, the public debt here is widely held. While a significant portion, particularly of the public debt, may be held for their own account by institutions having the financial interest and means to represent themselves, the presence of at least 400 holders of small amounts indicates the need for their representation through an official committee having the fiduciary responsibility of acting on their behalf. The same is true of the shareholders. The position that some members of the class may have resources sufficient to protect their interests is of little significance, in our judgment, at least where the security is widely held. They do not have the fiduciary duty to represent their fellow security holders.

*See also*, *In re Johns-Manville Corp.*, 68 B.R. 155, 159 (Bankr. S.D.N. Y 1986) ("Although some shareholders might have the resources to protect their own interests, the shareholders -- in contrast to official committee members -- do not have a fiduciary duty to represent the interests of other shareholders."). In the case of Mallinckrodt plc, there are over 760 individual holders of record, most of whom hold a small number of shares and a number of institutional holders.

58.     A statutory committee offers equity holders assurance of adequate representation. An official committee also assists the restructuring by facilitating a unified voice against myriad competing interests. *See In re Finley Kumble*, 85 B.R. 13, 16 (Bankr. S.D.N.Y. 1988) ("The committee structure provided for in Chapter 11 cases offers substantial benefits to the court and the Debtor in the form of a centralized body to be heard and met with."). One of the important roles of a committee is to use the expertise of its members and from the differing views of the constituents, to fashion a coherent position that will be accepted through a plan vote. Neither the

Ad Hoc Committee nor individual holders can take on that role in negotiations and insure a consensual plan.

### ***Other Factors Favor of the Appointment of an Equity Committee***

59.     Finally, the request is timely.  To date, the Debtors have not filed their schedules and statements of financial affairs and the bankruptcy cases are in their early stages.  According to the Milestones in the RSA, the appointment of an official committee of Equity Holders will not delay these bankruptcy cases in any way.  None of the Milestones related to the Disclosures Statement or Plan have passed.  In fact, the Plan is not required to be confirmed until September 12, 2021.

## RESERVATION OF RIGHTS

60.     The Ad Hoc Committee reserves its rights to supplement the Joinder Motion as it has only had access to publicly available information and discovery has not begun in these bankruptcy cases.

## CONCLUSION

For the facts and reasons stated above, the Ad Hoc Committee respectively requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, directing the U.S. Trustee to appoint an Official Committee of Equity Holders, and granting such other and further

relief as is just or appropriate.

Dated: November 23, 2020

SMITH KATZENSTEIN & JENKINS LLP

By: ___/s/ Kathleen M. Miller_____
Kathleen M. Miller (DE ID 2898)
Robert K. Beste (DE ID 3931)
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, Delaware 19801
kmiller@skjlaw.com
rbeste@skjlaw.com
302-652-8400

Lawrence P. Eagel
Bragar Eagel & Squire, P.C.
810 Seventh Avenue, Suite 620
New York, NY   10019
Telephone:  212-308-5858
Fax:  212-214-0506
E-mail:  eagel@bespc.com

and

Brent B. Barriere, LA Bar No. 2818
Tristan Manthey, LA Bar No. 24539
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana  70170-4600
Telephone:  504-586-5252
Fax:  504-586-5250
E-mail:  tmanthey@fishmanhaygood.com
E-mail:  bbarriere@fishmanhaygood.com

*Counsel for the Ad Hoc Committee of Equity Holders*