# Exhibit B

# Feature

By John A. Pintarelli, Jordan A. Wishnew, Michael Kizer and Rahman Connelly

# Equitable or Equity Committees: Lessons from Recent Cases



*John A. Pintarelli*
Morrison & Foerster LLP
New York



*Jordan A. Wishnew*
Morrison & Foerster LLP
New York

John Pintarelli is a partner, Jordan Wishnew is Of Counsel and Rahman Connelly is an associate in Morrison & Foerster LLP's Business Restructuring and Insolvency Group in New York. Michael Kizer is a vice president with GLC Advisors & Co. in San Francisco.

The second half of 2016 saw a surge in the number of requests to form official equity committees, especially in commodity-related restructurings. This most recent restructuring cycle began in August 2015 and remains active. At the start of this cycle, the price of oil was $44 per barrel, down from a $100 per barrel in July 2015. In January 2016, the price of oil began to recover from its low of $28 per barrel and steadily climbed to $53 per barrel by the start of 2017. During the same period, other commodity prices followed a similar trend. Not surprisingly, with the improvement in volatile commodity prices, equityholders became more vocal in restructurings.

This article focuses on five commodity-related restructurings from the past year — Horsehead Holdings, Energy XXI, Breitburn, Sandridge Energy and CJ Holding — and examines the particular factors that shaped the courts' decisions to grant (or deny) the request for appointment of an equity committee. What has become apparent is that valuation alone will not carry the day. However, even if it is not entirely clear that equityholders will receive a recovery through a chapter 11 plan, a bankruptcy court may choose to appoint an equity committee in order to ensure that value is preserved for such parties-in-interest. As will be discussed in greater detail, bankruptcy courts (as courts of equity) will exercise their discretion and appoint an equity committee under the right set of circumstances, but the courts will carefully manage an estate's administrative costs and deny an equityholder's request if the court does not believe that the movant will "add something" to the case.

## Legal Standard

A bankruptcy court's authority to appoint an official equity committee stems from 11 U.S.C. § 1102(a)(2), which provides:

> On [the] request of a party-in-interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure [the] adequate representation of creditors or of equity security holders.[1]

The statute does not define "adequate representation," and a bankruptcy court "retains the discretion to appoint an equity committee based on the facts of each case."[2] Courts in the Southern District of New York and District of Delaware generally consider similar factors, which include (1) whether debtors are likely to prove solvency, (2) whether equity is adequately represented by stakeholders already at the table, (3) the complexity of the debtors' cases, and (4) the likely cost to the debtors' estates of an equity committee.[3] The U.S. Bankruptcy Court for the Southern District of Texas also added "a practical fifth" factor: whether an official committee would "add something to the case."[4]

## Factual Background

### *Horsehead Holding*[5]

In May 2016, two shareholders sought appointment of an equity committee while arguing the case of an inexplicable loss of hundreds of millions of dollars in equity value in the months leading up to the chapter 11 case. The company's pre-petition public filings disclosed sufficient liquidity to carry it through 2016, but the debtors claimed to be cash poor shortly after obtaining bankruptcy protection and responded that historical financial statements were not a basis upon which shareholders could carry their burden to establish solvency. The figures in the company's financial statements were dated, and the book value of the shareholders' equity did not account for operational challenges within one of their facilities.

Hon. **Christopher S. Sontchi** appointed the committee, but not because there was a substantial likelihood of recovery for the equityholders. Rather, in light of the drastically different pre- and post-petition valuations, he noted that "something doesn't smell right to the court."

### *Energy XXI*[6]

One month later, an ad hoc committee of equityholders argued that the debtors' management "created the perception of massive insolvency by downgrading their 'Proved Undeveloped Reserves' to 'Provable Reserves,'" which created a write-down of nearly $2.68 billion of enterprise

---

1  11 U.S.C. § 1102(a)(2).

2  *In re Williams Commc'ns Grp. Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002).
3  *Id.* at 220; *In re Kalvar Microfilm Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996).
4  *In re Sandridge Energy Inc.*, No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016), Hr'g Tr. at 94:10-12 (hereinafter "*Sandridge Tr.*").
5  *In re Horsehead Holding Corp.*, No. 16-10287 (Bankr. D. Del. May 2, 2016), Hr'g Tr. at 100:25-101:1 (hereinafter "*Horsehead Tr.*").
6  *In re Energy XXI Ltd.*, No. 16-31928 (Bankr. S.D. Tex. June 15, 2016), Hr'g Tr. at 164:9 (hereinafter "*Energy XXI Tr.*").

value. The equityholders complained about the unfairness of the plan proposed by the second-lien noteholders and the management team — especially in light of the proposed release of avoidance actions and derivative claims against the management team. The debtors argued that Generally Accepted Accounting Principles (GAAP) write-downs before the bankruptcy and asset impairments, which are matters of book value, have no bearing on a determination of fair value that should be used when determining solvency. The debtors further argued that the creditors' committee was a sufficient watchdog for the proposed reorganization because its incentives were in line with an equity committee.

Hon. **Marvin Isgur** disagreed and granted the motion. While the court considered the issue of solvency, it was particularly focused on the alleged disconnect between pre-petition PV-10[7] disclosures and subsequent representations of value. "Something stinks," Judge Isgur noted. "No one is going to look at [the representations regarding valuation] unless we have an equity committee."

### Sandridge Energy[8]

In July 2016, an ad hoc group argued that their preliminary valuation indicated a "possible value range well above the Debtors' estimates," which "generates significant concern as to the underestimating of the Debtors' valuation being presented, thereby requiring the appointment of an equity committee." Sandridge responded that its PV-10 reserves were worth only $1.3 billion, whereas its outstanding debt and preferred stock exceeded $4 billion and traded on public exchanges at fractions of face value.

Hon. **David R. Jones** denied the shareholders' request on the basis of the four factors and queried whether the equity committee would add something to the case. He sympathized with the shareholders' loss of value, but did not feel that adding another layer of cost to the estates was the answer.

### Breitburn[9]

In August 2016, certain equityholders argued for a committee because the debtors' pre-petition books and records reflected $1 billion of equity value after certain write-downs. In addition, the upward trend in oil and gas prices in the fall of 2016 made it unlikely that there would be further write-downs of asset values, and the form of equity (*i.e.*, master limited partnership units) potentially created adverse tax consequences for the equityholders that resulted from income that was generated by the cancellation of debt. Accordingly, a sufficient prospect for the debtors' solvency warranted an independent committee to protect the equityholders' unique interests. In response, the debtors cited to the subpar market value of publicly traded debt as evidence that the equityholders were not solvent, and also argued that GAAP book value was not indicative of the fair market value of the assets.

Hon. **Stuart M. Bernstein** was not persuaded by either side's competing valuation reports. Rather, he focused on the debtors' pre-petition impairment analysis in its Securities and Exchange Commission (SEC) filings, as well as its disclosures during the bankruptcy case, to conclude that the debtors had a $4 billion valuation (which exceeded their outstanding debt) and therefore were not hopelessly insolvent.

### CJ Holding[10]

In late October 2016, after the debtors filed a reorganization plan providing for a distribution conditioned on equityholders' acceptance of the plan, certain equityholders sought formation of an official equity committee in order to evaluate the reasonableness of the debtors' proposal. In opposition, the debtors not only argued that their enterprise valuation fell woefully short of the outstanding funded debt, they argued that the movants had independent means to represent their own equity interests without burdening the estate with the cost of subsidizing the fight. Judge Jones denied the request, held that the movants did not meet their burden and noted that the request was a "strategic maneuver" that "borders on bad faith," although no bad-faith finding was made.

## Discussion

In considering whether an appointment of an official equity committee is warranted, courts typically adhere to a set of relatively well-established principles. While these recent cases generally follow suit, they also demonstrate that unique circumstances may warrant deviating from these principles. In doing so, the cases underscore the notion that bankruptcy courts retain broad discretion when determining whether to appoint an official equity committee.

### Circumstances May Warrant Appointment, Even When There Is No Substantial Likelihood of Solvency

Typically, courts treat the likelihood of a recovery to equityholders as the preeminent factor in their analysis. As one court recently explained, "If the debtor is solvent or appears to be solvent, the concern is that a creditors' committee will negotiate a plan based on a conservative estimate of the debtor's worth that captures all of the value of the reorganized entity, including value possibly in excess of the unsecured claims."[11] However, "the stockholders of a 'hopelessly insolvent' estate have no economic interest in the case," and courts have recognized that under such circumstances "the estate should not have to bear the expense of negotiating with an Equity Committee over what amounts to a gift."[12] In *CJ Holding* and *Sandridge*, the bankruptcy court firmly adhered to this principle and declined requests to appoint equity committees where the movants' solvency arguments were dubious.[13]

Notwithstanding these bedrock principles, rulings in *Breitburn*, *Horsehead* and *Energy XXI* each demonstrated that exceptional circumstances may make solvency — or the likelihood of solvency — less important to the overall analysis. In *Breitburn*, the debtor was organized as a master limited partnership. The movants argued that in the event that the court were to confirm a chapter 11 plan that resulted

---

7   PV-10 is the present value of future oil and gas revenues, minus estimated expenses and discounted at a 10 percent annual rate.
8   *Sandridge Tr.* at 94:7-10.
9   *In re Breitburn Energy Partners LP*, No. 16-11390 (Bankr. S.D.N.Y. Oct. 14, 2016), Hr'g Tr. at 67:17-68:3 (hereinafter "*Breitburn Tr.*").

10  *See In re CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex. Nov. 4, 2016), Hr'g Tr. at 205:1-4 (hereinafter "*CJ Holding Tr.*").
11  *In re SunEdison Inc.*, 556 B.R. 94, 102 (Bankr. S.D.N.Y. 2016).
12  *Id.* at 103.
13  *See CJ Holding Tr.* at 205:10-12; *Sandridge Tr.* at 94:7-10.

continued on page 67

### Equitable or Equity Committees: Lessons from Recent Cases
from page 33

in the cancellation of debt (COD), federal tax laws would likely require Breitburn equityholders to incur COD income (CODI) — resulting in a potentially significant tax liability. In appointing the equity committee, the court emphasized that "[e]ven if Breitburn is insolvent, and Equity receives no distribution, it [might] be possible to structure a plan that minimizes or eliminates the possibility of CODI."[14] This unique factor supported the court's conclusion that "equity's interests [were] not adequately represented by the Debtors' management or the Unsecured Creditors Committee."[15]

Likewise, and perhaps more striking, equity committees were appointed in *Horsehead* and *Energy XXI* — even though the courts expressly ruled that they could not conclude that there was a substantial likelihood of solvency.[16] Rather, both courts emphasized that public statements made by management regarding valuation immediately prior to bankruptcy were inconsistent with the valuation that the management advanced during the pendency of the bankruptcy — either in response to the equity committee motion, or in connection with a proposed reorganization plan and disclosure statement. Both courts concluded that an equity committee could add value by challenging the debtors' valuation thesis and determining whether management's pre-bankruptcy and post-bankruptcy remarks were intentionally misleading, or, if management's remarks were truthful, what accounted for the sharp decline in enterprise value.

### Book Value Might Be an Appropriate Metric in Calculating Solvency in Certain Circumstances

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."[17] Fair value is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.[18] Accordingly, bankruptcy courts have traditionally held that "book values" or other calculations utilizing GAAP are not measures of actual economic value.[19]

However, in some instances, book value may provide a rough approximation of market value. In *Breitburn*, the movants' valuation thesis flowed from the fact that the debtors' initial operating report, and other contemporaneous documents containing balance sheet figures, showed more than $1 billion in equity value. While the movants conceded that book value is ordinarily not probative of market value, shortly before filing for bankruptcy, the debtors wrote down the book value of their oil and gas assets to reflect the decline in commodity prices for the year ending 2015 ($2.4 billion).[20]

As the notes to the debtors' financial statements explained, and as the court concluded, through the impairment process, the debtors sought to determine the fair value of their principal assets; that is, impairment was warranted because the debtors concluded that the carrying value of their principal assets exceeded their fair value.[21] Moreover, as Judge Bernstein noted, the relevant accounting rules do not permit a "write up" of asset value if market conditions improve and the undiscounted cash flows exceed the carrying costs. Thus, in the court's view, use of post-impairment book value as a benchmark for fair value was "inherently conservative,"[22] and because the debtors' consolidated balance sheet showed equity value in excess of $1 billion, there was a substantial likelihood that equityholders would be entitled to meaningful distributions.

### Appointment of an Equity Committee Does Not Necessarily Result in Recovery for Equity

While the movants have had some limited success in forming official equity committees, the foregoing cases demonstrate that this does not necessarily result in a meaningful recovery for equity. Plans that provide for no recovery for equity have been confirmed in both *Energy XXI* and *Horsehead*.[23] The court has also confirmed a plan in *Sandridge*, which, unsurprisingly, provides for no distribution to equityholders.[24] Ironically, and by contrast, in *CJ Holding* the court recently confirmed a plan that provides for minor distribution to equityholders.[25]

### Conclusion

The solvency and valuation of levered companies with earnings before interest, taxes, depreciation and amortization that is closely linked to the price of commodities can change rapidly. Although the recent downturn in the energy and commodities markets has resulted in a high volume of new bankruptcy filings, parties seeking to form official equity committees are presumably speculating that their equity interests will have value once the pendulum swings back and the markets rebound.

Recent cases demonstrate that unique circumstances may warrant appointment of an official equity committee, even without strong evidence that the equity will receive a meaningful distribution. In a market experiencing significant valuation swings due to volatile commodity pricing, courts have shown that they will look beyond traditional standards in deciding whether to appoint an official equity committee if no other party will look after equityholders' interests. While equityholders have had limited success in forming official committees, the cases also demonstrate that the appointment of an equity committee does not guarantee recovery for equityholders. **abi**

---

14 *Breitburn Tr.* at 71:16-18.
15 *Id.* at 71:6-9.
16 *Horsehead Tr.* at 100:21-23 ("I'm not basing my decision on a determination as to whether there's a substantial likelihood of a recovery to equity."); *Energy XXI Tr.* at 163:12-17 ("The evidentiary record ... demonstrates that ... the ... assets of the company ... have a value far below the amount of the debt.").
17 11 U.S.C. § 101(32)(A).
18 *SunEdison, Inc.*, 556 B.R. at 104 (quoting *Lawson v. Ford Motor Co.* (*In re Roblin Indus. Inc.*), 78 F.3d 30, 35 (2d Cir. 1996)).
19 *See, e.g., In re Trans World Airlines Inc.*, 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994).
20 *Breitburn*, D.I. 334. The SEC permits reporting companies to classify undeveloped reserves as "proved" if the company provides a development plan for drilling within five years of booking.
21 *See also* Breitburn Energy Partners LP Annual Report for the Year Ended Dec. 31, 2015, at 32 (assets impaired when projections "indicate a reduction of the estimated useful life or estimated future cash flows of our assets").
22 *Breitburn Tr.* at 68:11-12.
23 *Energy XXI*, D.I. 1809, and *Horsehead*, D.I. 1695. As of January 2017, a plan had yet to be filed in *Breitburn*.
24 *Sandridge*, D.I. 878.
25 *CJ Holding*, D.I. 1057.