**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| | ) |
| | ) Chapter 11 |
| In re: | ) |
| | ) Case No. 20-12522 (JTD) |
| MALLINCKRODT PLC, *et al.*, | ) |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |
| | ) Hearing Date: Dec. 22, 2020 at 10:00 a.m. |
| | ) Objection Deadline: Dec. 15, 2020 at 4:00 p.m. |
| | ) |
| | ) **Re: Docket Nos. 652, 694** |
| | ) |

## DEBTORS' OBJECTION TO MOTION OF FIRST LIEN ADMINISTRATIVE AGENT FOR RELIEF FROM THE AUTOMATIC STAY

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

# **Table of Contents**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

ARGUMENT .............................................................................................................9

I.   THE AUTOMATIC STAY PREVENTS THE ADMINISTRATIVE AGENT FROM
     DELIVERING THE NOTICE. ...............................................................................9

     A.  Delivery of the Notice would violate the automatic stay under Section 362(a)(6). ..........10

     B.  Delivery of the Notice would violate the automatic stay under Section 362(a)(3). ..........13

II.  THE ADMINISTRATIVE AGENT HAS FAILED TO SHOW CAUSE TO LIFT
     THE AUTOMATIC STAY TO PERMIT DELIVERY OF THE NOTICE. ..........................14

     A.  The Debtors would suffer significant prejudice if the stay were lifted. ..............................15

     B.  The harm to the First Lien Lenders from maintaining the automatic stay does not
         considerably outweigh the harm to the Debtors from lifting the stay. ...............................18

     C.  The Administrative Agent has not shown a likelihood of success on the merits. .............20

          1.  The First Lien Lenders cannot penalize the Debtors for filing for bankruptcy. ..........20

          2.  The First Lien Lenders are not entitled to ABR-rate interest under
              Section 506(b). ..............................................................................................23

III. ANY RELIEF GRANTED SHOULD NOT BE EFFECTIVE WHEN THE MOTION
     WAS FILED. .....................................................................................................25

CONCLUSION .........................................................................................................26

## Table of Authorities

**Cases**

*Castro* v. *United States*,
540 U.S. 375 (2003).......................................................................................... 10 n.9

*In re AMR Corp.*,
485 B.R. 279 (Bankr. S.D.N.Y. 2013)............................................................... 10, 13

*In re AMR Corp.*,
730 F.3d 88 (2d Cir. 2013) ................................................................................. 14

*In re Bownetree, LLC*,
2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009)........................................ 24, 25

*In re Brown*,
851 F.2d 81 (3d Cir. 1988) ................................................................................. 12 n.10

*In re Chateaugay Corp.*,
102 B.R. 335 (Bankr. S.D.N.Y. 1989)................................................................ 11

*In re Chedick*,
1996 WL 762329 (Bankr. D.D.C. Mar. 22, 1996).............................................. 22

*In re Denby-Peterson*,
941 F.3d 115 (3d Cir. 2019) ............................................................................... 13, 14

*In re Downey Fin. Corp.*,
428 B.R. 595 (Bankr. D. Del. 2010); ................................................................. 15, 18

*In re EBC I, Inc.*,
356 B.R. 631 (Bankr. D. Del. 2006) ................................................................... 17

*In re Elmira Litho, Inc.*,
174 B.R. 892 (Bankr. S.D.N.Y. 1994)................................................................ 15

*In re Energy Future Holdings Corp.*,
533 B.R. 106 (Bankr. D. Del. 2015) .................................................................. passim

*In re EP Energy Corp.*,
No. 19-35654, (Bankr. S.D. Tex. Mar. 6, 2020), Dkt. No. 1025......................... 17

*In re Franco*,
606 B.R. 90 (Bankr. D.N.M. 2019) .................................................................... 25

*In re Frenville Co.*,
744 F.2d 332 (3d Cir. 1984) ............................................................................... 12

*In re G-I Holdings, Inc.*,
   568 B.R. 731 (Bankr. D.N.J. 2017) ...................................................................... 11

*In re Grossman's Inc.*,
   607 F.3d 114 (3d Cir. 2010) ............................................................................... 12

*In re James Cable Partners, L.P.*,
   154 B.R. 813 (M.D. Ga. 1993) ........................................................................... 17

*In re Johns-Manville Corp.*,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984) ................................................................... 15

*In re Kalian*,
   178 B.R. 308 (Bankr. D.R.I. 1995) ...................................................................... 24

*In re Milham*,
   141 F.3d 420 (2d Cir. 1998) ............................................................................... 23

*In re MPM Silicones, LLC*,
   531 B.R. 321 (S.D.N.Y.2015) ............................................................................. 19

*In re Myers*,
   491 F.3d 120 (3d Cir. 2007) .......................................................................... 15, 25

*In re New Century TRS Holdings, Inc.*,
   465 B.R. 38 (Bankr. D. Del. 2012) ...................................................................... 11

*In re Nixon*,
   404 F. App'x 575 (3d Cir. 2010) ......................................................................... 23

*In re Railway Reorganization Estate, Inc.*,
   133 B.R. 578 (Bankr. D. Del. 1991) ........................................................... 3, 21, 22

*In re Residential Cap., LLC*,
   508 B.R. 851 (Bankr. S.D.N.Y. 2014) ................................................................. 24

*In re Reynard*,
   250 B.R. 241 (Bankr. E.D. Va. 2000) ........................................................... 12 n.10

*In re Rickel Home Ctrs., Inc.*,
   209 F.3d 291 (3d Cir. 2000) ............................................................................... 20

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del.2006) ..................................................................... 15

*In re Rodriguez*,
   629 F.3d 136 (3d Cir. 2010) ............................................................................... 11

*In re Route One W. Windsor Ltd. P'ship*,
    225 B.R. 76 (Bankr. D.N.J. 1998) ........................................................................ 23

*In re Solutia Inc.*,
    379 B.R. 473 (Bankr. S.D.N.Y. 2007) ............................................................ 10, 14

*In re THDL Liquidating LLC*,
    2020 WL 6818442 (Bankr. D. Del. July 7, 2020) ................................................. 14

*In re THGH Liquidating LLC*,
    2020 WL 5409002 (D. Del. Sep. 9, 2020) ............................................................. 14

*In re Trans World Airlines, Inc*.,
    275 B.R. 712 (Bankr. D. Del. 2002) ..................................................................... 11

*In re Vest Assocs.*,
    217 B.R. 696 (Bankr. S.D.N.Y. 1998) ............................................................ 23, 24

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ......................................................................... passim

*In re Wilson*,
    116 F.3d 87 (3d Cir. 1997) ................................................................................... 14

*Taylor* v. *First Fed. Savings & Loan Ass'n of Monessen*,
    843 F.2d 153 (3d Cir. 1988) ................................................................................. 12

*United States* v. *Sineneng-Smith*,
    140 S. Ct. 1575 (2020) .................................................................................. 10 n.9

*Westmoreland Human Opportunities, Inc.* v. *Walsh*,
    246 F.3d 233 (3d Cir. 2001) ................................................................................. 13

**Statutes**

11 U.S.C. § 101(5)(A) ................................................................................................ 11, 12

11 U.S.C. § 362(a) ............................................................................................ 10, 11, 13

11 U.S.C. § 362(d)(1) ..................................................................................................... 14

11 U.S.C. § 362(g)(2) ..................................................................................................... 15

11 U.S.C. § 363(*l*) ..................................................................................................... 21, 22

11 U.S.C. § 365(e) .......................................................................................................... 21

11 U.S.C. § 501 ............................................................................................................... 11

11 U.S.C. § 502 ................................................................................................ 11

11 U.S.C. § 506(b) ....................................................................................... passim

11 U.S.C. § 541(a)(1) ....................................................................................... 13

11 U.S.C. § 541(c)(1) ....................................................................................... 21

11 U.S.C. § 1124(2)(C)-(D) ............................................................................. 25

**Other Authorities**

3 Collier on Bankruptcy ¶ 365.05[4] (15th ed. 1999) .................................... 21

Michael Bellucci and Jerome McCluskey,
   *The LSTA's Complete Credit Agreement Guide* (2d ed. 2017) ............................................. 7, 8

The debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby object to the *Motion of Deutsche Bank AG New York Branch, as Administrative Agent, for Limited Relief from Automatic Stay in Order to Send Notice to Debtors* [D.I. 652] (the "Motion") and respond to *The Ad Hoc First Lien Term Lender Group's Joinder and Statement in Further Support of Motion of Deutsche Bank AG New York Branch, as Administrative Agent, for Limited Relief from Automatic Stay in Order to Send Notice to Debtors* [D.I. 694]  (the "Joinder").  The Debtors respectfully state as follows:

## **PRELIMINARY STATEMENT**[2]

1.       Contrary to the assertions of the Administrative Agent, the relief sought in the Motion is not "technical," "limited" or "unnecessary."  *See* Motion ¶¶ 1, 2.  The premise of the Motion is that, solely as a result of the Debtors' bankruptcy filing, the First Lien Lenders should be permitted to require the Debtors to pay them a materially higher interest rate.  Specifically, based solely on the *ipso facto* bankruptcy default in the Credit Agreement, the lenders want to ratchet up the applicable interest rate from a LIBOR-based rate of approximately 2.41% to 3.75% to an ABR-based rate of 4.5% to 5.25% (based on current rates), a change that would cost the Debtors a total of approximately $47 million per year.

2.       To take this punitive action, however, the First Lien Lenders need to deliver a Notice to the Debtors.  Indeed, as the Motion acknowledges, the higher interest rate "is contingent upon the delivery of the Notice."  *Id.* ¶ 22.  Delivery of the Notice, accordingly, would not merely "preserve" the lenders' current position (*id*. ¶¶ 1, 3) — rather, it would

---

[2]   Capitalized terms not defined have the meanings ascribed to them in the Motion or the Credit Agreement, as applicable.

*improve* the lenders' position, at the expense of the Debtors' estates, by satisfying a necessary condition to imposing a much higher interest rate.

3.      The Administrative Agent recognizes that, to deliver the Notice, it needs relief from the automatic stay.[3]  The Motion, however, cites no precedent for granting stay relief in these circumstances.  In contrast, multiple decisions from this District — including Judge Sontchi's decision in *EFH*[4] — confirm that there is no "cause" for such relief.

4.      As a threshold matter, the balance of harms weighs decisively against the relief being sought.  Granting stay relief would prejudice the Debtors' estates, as it would aid the First Lien Lenders in seeking to impose a much higher interest rate on the Debtors based solely on their bankruptcy filing  — an impermissible and inequitable result.  By contrast, the absence of stay relief would not prejudice the First Lien Lenders in any cognizable way:  Those lenders (unlike others in the market) did not negotiate for an automatic adjustment from LIBOR to ABR upon a default, and they thus assumed the risk that the automatic stay would prevent them from increasing the interest rate in response to a bankruptcy filing.  In a similar situation, Judge Sontchi held that the balance of harms "weigh[ed] heavily" against lifting the stay to allow secured lenders to deliver a post-petition notice aimed at increasing recoveries under a pre-petition loan agreement.  *EFH*, 533 B.R. at 117-24.

5.      Beyond the balance of harms, the Administrative Agent has failed to show a likelihood of success on the merits, even if the Notice were permitted to be served.  Under longstanding case law in this District, financial creditors such as the First Lien Lenders may not

---

[3]  In contrast, the Ad Hoc First Lien Term Lender Group asserts that the lenders do not need stay relief. As shown in Point I, *infra*, that position is at odds with controlling law.

[4]  *In re Energy Future Holdings Corp.*, 533 B.R. 106, 117-24 (Bankr. D. Del. 2015) ("*EFH*"), *aff'd*, 2016 WL 627343 (D. Del. Feb. 16, 2016), *rev'd on other grounds*, 842 F.3d 247 (3d Cir. 2016).

use *ipso facto* bankruptcy defaults as a tool to increase their claims under pre-petition loan agreements. *In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012) ("W.R. Grace"); *In re Railway Reorganization Estate, Inc.*, 133 B.R. 578, 580-83 (Bankr. D. Del. 1991) ("Railway"). And in any event, even if the *ipso facto* clause in the Credit Agreement were given effect, the First Lien Lenders would still need to persuade the Court — in the exercise of its discretion under Section 506(b) of the Bankruptcy Code — to impose an increased rate on the Debtors, despite the negative effect on other creditors. The Administrative Agent has not even tried to show that it is likely to prevail on the merits. For those reasons and others, the Motion should be denied.

## BACKGROUND

6.      As of the Petition Date, the Debtors had funded debt outstanding of approximately $5.283 billion. Of that amount, as of the Petition Date, the Debtors owed approximately $2.8 billion to the First Lien Lenders, including (a) $900,000,000.00 on the revolving credit facility, (b) $1,505,211,683.76 on the term loan due 2024, and (c) $399,488,946.81 on the term loan due 2025. *See* Decl. of Stephen A. Welch (D.I. 128) ("Welch Decl.") ¶¶ 55-56.

7.      The Debtors filed these cases with broad support from their stakeholders for a comprehensive restructuring and settlement of opioid-related claims. In the Restructuring Support Agreement ("RSA"), unsecured noteholders and over one thousand governmental entities, among others, agreed to support the Debtors' restructuring. Welch Decl. ¶¶ 11, 98. The RSA contemplates that the claims of the First Lien Lenders will be reinstated and rendered unimpaired; in other words, the First Lien Lenders will receive payment in full on the same

terms they would have received absent these cases.  RSA, Ex. A at 2; Welch Decl. ¶ 99.  The

Debtors expect to file a plan reinstating the claims of the First Lien Lenders in the near future.

8.      In the Credit Agreement that is the subject of the Motion,[5] the Borrowers

bargained for the ability to make periodic elections between two different interest rates.  If the

Borrowers designate the loans as Eurocurrency Borrowings, the interest rate for the relevant

Interest Period is the Adjusted LIBO Rate (a LIBOR-based rate) plus an Applicable Margin (as

defined in the Credit Agreement).  If they designate the loans as ABR Borrowings, the interest

rate would be calculated as the ABR, often described as a "prime" rate, plus an Applicable

Margin.  *See* Credit Agreement §§ 2.13(a)-(b), 2.07.  The Adjusted LIBO Rate and ABR are

each defined in the Credit Agreement using formulas, with the Adjusted LIBO Rate keyed off a

rate published by the ICE Benchmark Administration and ABR keyed off the then-effective

Federal Funds Effective Rate or Prime Rate.  Credit Agreement at 3, 5 (definitions).  The

Applicable Margin varies depending upon (i) the particular tranche of loans under the Credit

Agreement at issue and (ii) whether the loans have been designated as Eurocurrency Borrowings

or ABR Borrowings.  Credit Agreement at 7-8 (definitions).

9.      As noted in the Declaration of Brendan Hayes of Guggenheim Securities, LLC

("Hayes Decl."), investment banker to the Debtors, the Debtors have designated all their

borrowings as Eurocurrency Borrowings rather than ABR Borrowings.  Hayes Decl. ¶ 11.  They

have done so because, for the Debtors, the difference between LIBOR-based Eurocurrency

Borrowings and ABR Borrowings is quite substantial.  Indeed, if the Debtors were required to

convert to ABR Borrowings, they would bear an additional interest cost, on an annual basis, of

---

[5]  The Credit Agreement is attached to the Declaration of Erin Rosenberg in support of the Motion.  *See* D.I. 653.

approximately $47 million based on current rates.  *Id.* ¶ 15.   As shown in the Hayes Declaration, the divergence between LIBOR-based rates and ABR-based rates is consistent with the marketplace more broadly, where LIBOR-based interest rates are substantially lower than ABR-based rates.  *Id.* ¶¶ 17-21.

10.    The following chart from the Hayes Declaration (¶ 16) illustrates the economic effects of electing LIBOR-based rates rather than ABR-based rates over a one-year period:

| MNK Illustrative Credit Agreement Interest Calculations | | | | | | ($MM) |
|---|---|---|---|---|---|---|
| | | Rate | | | | Annual Cash Interest |
| | Maturity | LIBOR / ABR | Applicable Margin | Effective Rate | Principal Amount | |
| **LIBOR Interest** | | | | | | |
| Revolver | 2/28/22 | 0.16% | 2.25% | 2.41% | $    900 | $    22 |
| 2017 Term Loan | 9/24/24 | 0.75% | 2.75% | 3.50% | 1,505 | 53 |
| 2018 Term Loan | 2/24/25 | 0.75% | 3.00% | 3.75% | 399 | 15 |
| **Total** | | | | | **$  2,805** | **$    89** |
| | | | | | | |
| **ABR Interest** | | | | | | |
| Revolver | 2/28/22 | 3.25% | 1.25% | 4.50% | $    900 | $    41 |
| 2017 Term Loan | 9/24/24 | 3.25% | 1.75% | 5.00% | 1,505 | 75 |
| 2018 Term Loan | 2/24/25 | 3.25% | 2.00% | 5.25% | 399 | 21 |
| **Total** | | | | | **$  2,805** | **$   137** |

11.    Here, therefore, if the Debtors were prevented from paying LIBOR-based rates, their annual interest burden would increase by over 50%, from (approximately) $89 million to $137 million.  Based solely on a bankruptcy default, and subject to the Court's application of Section 506(b) of the Bankruptcy Code, they could be required to pay default-based interest separate from (and potentially additive to) the 2% default interest provided for in Section 2.13(c) of the Credit Agreement.

12.     While the Administrative Agent contends that the Borrowers may designate borrowings as Eurocurrency Borrowings only "[i]n the absence of an Event of Default" (*see* Motion ¶ 6), that is *not* what the Credit Agreement says.  The Credit Agreement does *not* deprive the Borrowers of their ability to choose the applicable interest rate based solely on the occurrence of an Event of Default.  Rather, under Section 2.07(e) of the Credit Agreement, *two things* have to happen before the Borrowers can be forced to pay more interest:  an Event of Default has to occur, *and* the Administrative Agent (at the direction of the Required Lenders) has to provide a written notice to the Borrowers of the Event of Default and conversion of Eurocurrency Borrowings to ABR Loans.[6]

13.     In the Credit Agreement, the First Lien Lenders thus expressly agreed that, before they could require the Borrowers to convert to ABR Borrowings, they would have to send a notice to the Borrowers.  This is in contrast to other provisions of the Credit Agreement, under which the consequences of a default are purportedly automatic.  For example, Section 2.13(c) of the Credit Agreement provides that default interest (an additional 2%) is automatically payable when there is a payment default, and Section 7.01 provides that principal of the loans "shall automatically become due and payable" upon a bankruptcy filing.  The notice requirement in Section 2.07(e) is also in contrast to other credit agreements in the market, under which the conversion from LIBOR to ABR loans is automatic following any default[7] or, alternatively, any

---

[6]  *See* Credit Agreement § 2.07(e) ("if an Event of Default has occurred and is continuing *and* the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, *so notifies the Borrowers*, then, so long as an Event of Default is continuing . . . each Eurocurrency Borrowing shall be converted to an ABR Borrowing . . . at the end of the Interest Period applicable thereto" (emphases added)).

[7]  *See, e.g.*, Term Loan Credit Agreement, dated as of March 2, 2020, among Vertiv Intermediate Holding II Corporation, Vertiv Group Corporation, the lenders party thereto from time to time and Citibank, N.A., as administrative agent, § 2.09(v),
https://www.sec.gov/Archives/edgar/data/1674101/000162828020002714/exhibitno101termloancred.htm
("no Interest Period for a LIBO Rate Term Loan may be selected at any time when an Event of Default is

bankruptcy-related default.[8]  A leading guide on loan agreements, "The LSTA's Complete Credit

Agreement Guide," confirms that — while some loan agreements (like the one in this case)

---

then in existence . . .."); Second Amended And Restated Credit Agreement, dated as of November 22, 2019, among Northern Oil And Gas, Inc., Wells Fargo Bank, National Association, As Administrative Agent, And The Lenders Party Hereto From Time To Time, § 2.04(e), https://www.sec.gov/ Archives/edgar/data/1104485/000119312519301271/d822048dex102.htm ("(i) if an Event of Default has occurred and is continuing: (A) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (B) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto . . . ."); Amended and Restated Revolving Credit Agreement, dated as of June 20, 2019, among Peloton Interactive, Inc., the lenders party thereto from time to time and JPMorgan Chase Bank, N.A., as Administrative Agent, § 2.05(e), https://www.sec.gov/Archives/ edgar/data/1639825/000119312519230923/d738839dex1011.htm ("if an Event of Default has occurred and is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto."); Credit Agreement, dated as of May 28, 2019, among Rattler Midstream Operating LLC, the lenders party thereto from time to time, Wells Fargo Bank, National Association, as Administrative Agent, § 2.04(e), https://www.sec.gov/Archives/ edgar/data/1748773/000119312519159754/d751257dex102.htm ("if an Event of Default has occurred and is continuing: (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.")

[8]  First Amendment to Term Loan Credit Agreement, dated as of May 4, 2020, among CDK Global, Inc., the lenders party thereto from time to time, and Bank of America, N.A., as  Administrative Agent, § 2.05(e), https://www.sec.gov/Archives/edgar/data/1609702/000095014220001323/ eh2000731_ex1001.htm ("if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower (provided, that, no such notice shall be required in the case of [certain Events of Default relating to bankruptcy and similar events]), then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and (ii) unless repaid, each LIBOR Borrowing shall, at the end of the Interest Period applicable thereto, be converted to an ABR Borrowing."); Credit Agreement, dated as of January 17, 2020, among Leidos, Inc., the other loan parties party thereto from time to time, the lenders party thereto from time to time and Citibank N.A., as Administrative Agent, § 2.07(e), https://www.sec. gov/Archives/edgar/data/1336920/000133692020000004/ex101-creditagreement.htm ("if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower (provided that no such notice shall be required in the case of [certain Events of Default relating to bankruptcy and similar events]), then, so long as an Event of Default is continuing, no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and, unless repaid, each LIBOR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto."); Amendment No. 2, dated as of October 25, 2017, among Tailored Brands, Inc., the other loan parties party thereto from time to time, the lenders party thereto from time to time and JPMorgan Chase Bank, N.A., as Administrative Agent, § 2.08(d), https://www.sec.gov/Archives /edgar/data/884217/000155837017009217/tlrd-20171028ex1011baa08.htm ("if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so

require a notice by lenders to convert from LIBOR loans to ABR loans — "[m]any credit agreements provide that whenever an event of default exists, LIBOR loans are no longer available or, if available, are available only for one-month periods."  Michael Bellucci and Jerome McCluskey, *The LSTA's Complete Credit Agreement Guide* at 78 (2d ed. 2017).  In short, the First Lien Lenders could have negotiated for an automatic cutoff of LIBOR borrowings upon default, but did not do so.

14.    Importantly, neither the Administrative Agent nor any lender has asserted that there is any Event of Default under the Credit Agreement besides the Debtors' bankruptcy filing. To the contrary, the Motion only invokes Section 7.01(i) of the Credit Agreement, under which an "Event of Default" occurs if certain of the Borrowers "voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code."  Motion ¶ 7.  Thus, for purposes of this Motion, there can be no dispute that the First Lien Lenders want to take steps to capture more of the estates' value, at the expense of other creditors, based *solely* on the Debtors' filing of these chapter 11 cases.

15.    Not only are the First Lien Lenders seeking to enforce an *ipso facto* default, but they are doing so in a context where they are already receiving monthly interest payments, as well as reimbursement of fees and expenses, under the Cash Collateral Order (D.I. 586).  Under Section 4(d) of the Cash Collateral Order, the Debtors are authorized to pay the First Lien Lenders at the rate for Eurocurrency Borrowings plus 2%, with all parties reserving rights as to the correct amount of interest to be paid.  In addition, under Section 4(g) of the Cash Collateral

---

notifies the Borrower Representative (provided that no such notice shall be required in the case of [certain Events of Default relating to bankruptcy and similar events]), then, so long as an Event of Default is continuing (i) no outstanding Revolving Borrowing may be converted to or continued as a Eurodollar Borrowing or CDOR Rate Borrowing, (ii) unless repaid, each Eurodollar Revolving Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto . . . .").

Order, the Debtors are required to pay the professional fees of the legal and financial advisors (at least five law firms and two financial advisors) to the Administrative Agent and two ad hoc groups of first lien lenders, including the group that filed the Joinder.

16.    The relief sought thus is not needed to compensate the First Lien Lenders for the costs of these cases or other actual losses. It is simply an attempt to procure a greater recovery, on oversecured debt that the Debtors intend to reinstate and treat as unimpaired, solely because the Borrowers filed for bankruptcy.

## ARGUMENT

## I.    THE AUTOMATIC STAY PREVENTS THE ADMINISTRATIVE AGENT FROM DELIVERING THE NOTICE.

17.    The Administrative Agent does not argue that it can deliver the Notice without relief from the automatic stay. Instead, the Motion seeks relief from the automatic stay, and asks the Court to apply the governing standard for such relief. By contrast, in the later-filed Joinder, the Ad Hoc First Lien Term Lender Group contends that "the automatic stay does not apply to the act of delivering the Notice and is thus permitted." Joinder ¶ 2.

18.    The Joinder is procedurally deficient insofar as it seeks the equivalent of a declaration (that the stay does not apply) without an adversary proceeding or even a properly-noticed motion seeking that relief. Given that *the Motion* does not argue that the stay is inapplicable, the Joinder is not really a "joinder" or a "statement in support" — it is instead a request for new and different relief that the Administrative Agent (the only movant) did not consider justified or available.[9] In any event, the Joinder's position regarding the automatic stay

---

[9] As the Supreme Court has stated, "our system 'is designed around the premise that [parties represented by counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *United States* v. *Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *Castro* v. *United States*, 540 U.S. 375, 386 (Scalia, J., concurring)) (alteration in *Sineneng-Smith*).

is meritless.  Sending a notice to the Debtors for the purpose of seeking to increase the amount

payable under a pre-petition Credit Agreement would violate multiple sub-sections of Section

362(a) of the Bankruptcy Code.

> **A.    Delivery of the Notice would violate the automatic stay
> under Section 362(a)(6).**

19.    Section 362(a)(6) bars a creditor from taking "any act to collect, assess, or recover

a claim against the debtor that arose before the commencement of the case under this title."  11

U.S.C. § 362(a)(6).

20.    Here, given that delivery of the Notice is intended to facilitate recovery of interest

at the higher ABR based rate, such delivery is facially an "act" to "recover" on a claim under the

Credit Agreement.  Likewise, since delivery of the Notice is necessary to *increase* the size of the

lenders' claim under the Credit Agreement, such delivery is also an act to "assess" a claim

against the Debtors.  In *Solutia*, the Court found that delivery of a notice intended to de-

accelerate debt, so that a make-whole amount would be payable in addition to other amounts,

was "precisely" an act to "assess" the debtor by determining that it owed a larger amount.  *In re

Solutia Inc.*, 379 B.R. 473, 485 n.8 (Bankr. S.D.N.Y. 2007); *see also In re AMR*, 485 B.R. 279,

294 (Bankr. S.D.N.Y. 2013) (delivery of notice of de-acceleration "would have the effect of

assessing the Debtors with a Make-Whole not currently ow[ing]").

21.    The Joinder does not dispute that the Notice would be an act to collect, assess or

recover from the Debtors.  Instead, it asserts that the First Lien Lenders' entitlement to increased

interest "arose" only *post*-petition rather than *pre*-petition, so that delivery of the Notice is not an

act to "recover a claim against the debtor that arose *before the commencement of the case under

this title*," as required by Section 362(a)(6).  Joinder ¶¶ 5-6 (emphasis in Joinder).

22.     That is plainly wrong.  Section 501 of the Bankruptcy Code sets forth the process for recovering on a "claim" existing as of the petition date, and Section 502 deals with allowance and disallowance of such a "claim."   In Section 101(5)(A), "claim" is defined as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

23.     Consistent with the statutory language, the Third Circuit has made clear that the Bankruptcy Code defines claim "very broadly" and held that a lender's post-petition recalculation of an escrow required under a pre-petition "loan document" was a pre-petition "claim," despite being "contingent" as of the petition date.  *In re Rodriguez*, 629 F.3d 136, 138, 142 (3d Cir. 2010) ("the contingent nature of the right to payment does not change the fact that the right to payment exists" under the loan agreement); *accord In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 45 (Bankr. D. Del. 2012) (claim "based upon" pre-petition mortgage note arose prior to the petition date).

24.     Courts in this District have likewise held that a claim under a pre-petition contract "*exists once [the] contract is executed*, although it may be inchoate and contingent. . . .  Once the contingency occurs, even if it occurs post-petition, the contingent claim simply becomes a liquidated one; it, however, is not thereby elevated to the status of a post-petition claim."  *In re Trans World Airlines, Inc*., 275 B.R. 712, 723 (Bankr. D. Del. 2002) (emphasis added) (citing *In re Chateaugay Corp.*, 102 B.R. 335, 352 (Bankr. S.D.N.Y. 1989)); *see also, e.g*., *In re G-I Holdings, Inc.*, 568 B.R. 731, 766 (Bankr. D.N.J. 2017) ("[I]f the contract was executed prior to the petition date, any damages arising from the contract constitute 'claims' within the meaning of the Bankruptcy Code").

25.     Application of these principles to this case is straightforward:   The First Lien Lenders' asserted "right to payment" of interest at the ABR rate is based on a pre-petition credit agreement and is at most a pre-petition claim.  Under Section 101(5)(A) of the Bankruptcy Code and the case law, the fact that the asserted right to payment was contingent and unliquidated as of the Petition Date, because the requisite notice had not been served, does not change that result.

26.     In arguing that the First Lien Lenders had no pre-petition claim for ABR interest, the Joinder cites decisions that are totally inapposite, as they involved post-petition credit or services, rather than attempts to increase amounts owed under pre-petition agreements.[10]  The Joinder also cites decisions that, beyond being inapposite, rely on overruled case law. Specifically, it cites to *Taylor* v. *First Federal Savings & Loan Association of Monessen* (involving a state agency's filing of a judgment to secure *post*-petition welfare payments) for the proposition that "the automatic stay is not intended to bar proceedings for post-petition claims that could not have been commenced before the petition was filed."  843 F.2d 153, 154 (3d Cir. 1988).  The Joinder acknowledges that *Taylor* relies on *In re Frenville Co.*, 744 F.2d 332, 335 (3d Cir. 1984), but suggests that *Frenville* was overruled on "other grounds."  Joinder ¶ 4 n.4. *Frenville* was not overruled on "other grounds."  The en banc Third Circuit in *In re Grossman's Inc.* overruled *Frenville* on the basis that it "impose[d] too narrow an interpretation of a 'claim' under the Bankruptcy Code."  607 F.3d 114, 121 (3d Cir. 2010) (en banc).  The Ad Hoc Group's position is thus at odds not only with the statutory text but also with controlling case law.

---

[10]   *See In re Brown*, 851 F.2d 81, 85-86 (3d Cir. 1988) (letter from credit union informing borrower that it would not extend future credit services to debtor did not violate stay); *In re Reynard*, 250 B.R. 241, 244-45 (Bankr. E.D. Va. 2000) (request for payment of homeowner association fees solely for post-petition periods did not violate stay).

**B.    Delivery of the Notice would violate the automatic stay under Section 362(a)(3).**

27.    Section 362(a)(3) states that the filing a bankruptcy petition "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

28.    Section 541(a)(1) of the Bankruptcy Code defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." This is an "expansive . . . definition [that] encompasses rights and interests arising from ordinary contractual relationships."  *Westmoreland Human Opportunities, Inc.* v. *Walsh*, 246 F.3d 233, 242 (3d Cir. 2001).  The Third Circuit has defined the term "control," in relevant part, to include "[t]he fact or power of directing and regulating the actions of people or things; direction, management; command."  *In re Denby-Peterson*, 941 F.3d 115, 125 (3d Cir. 2019), *petition for cert. filed sub nom. Denby-Peterson* v. *NU2U Auto World*, No. 19-1063 (U.S. Jan. 14, 2020).

29.    Multiple courts have held that delivery of a post-petition notice in order to affect a debtor's contractual rights with respect to a secured claim — such as through limiting the debtor's contractual flexibility to repay the claim at a lower amount —  is an act to control property of the estate.  For example, in a decision arising out of American Airlines' chapter 11 proceeding, the bankruptcy court considered whether a lender could serve a notice after the petition date that would deaccelerate loan maturities and "have the effect of assessing the Debtors with a Make-Whole not currently owed under the Indentures."  *In re AMR Corp.*, 485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013).  The bankruptcy court concluded that delivery of the notice would violate the automatic stay, and the Second Circuit affirmed.  The Second Circuit explained that, "[a]s of the filing of its bankruptcy petition on November 29, 2011, American had

the contractual right, pursuant to the Indentures, to repay its accelerated debt without Make-Whole Amount." *In re AMR Corp.*, 730 F.3d 88, 102-03 (2d Cir. 2013). The Court thus "agree[d] with the bankruptcy court that any attempt . . . to rescind acceleration now — after the automatic stay has taken effect — is an effort to affect American's contract rights, and thus the property of the estate." *Id.* In *Solutia*, a bankruptcy court reached the same result, holding that "where the indenture provides for automatic acceleration any attempt at deacceleration," including through delivery of a notice, "would violate the automatic stay." 379 B.R. at 484-85.

30. This case is no different. The Administrative Agent seeks to deliver the Notice not to "merely retain the same possession and control over the Debtor's pre-petition property" but rather to engage in an "affirmative act[] to exercise control over post-petition property of the estate" by taking away the Debtors' entitlement to choose and pay LIBOR-based interest rates. *THDL Liquidating LLC* v. *Azar (In re THDL Liquidating LLC)*, 2020 WL 6818442, at *2 (Bankr. D. Del. July 7, 2020) (citing *Denby-Peterson*, 941 F.3d at 126); *accord In re THGH Liquidating LLC*, 2020 WL 5409002, at *4 (D. Del. Sep. 9, 2020), *appeal docketed*, No. 20-3291 (3d Cir. Dec. 1, 2020). That type of "affirmative act" is subject to the automatic stay. *Id.*

## II.    THE ADMINISTRATIVE AGENT HAS FAILED TO SHOW CAUSE TO LIFT THE AUTOMATIC STAY TO PERMIT DELIVERY OF THE NOTICE.

31. The Bankruptcy Code authorizes bankruptcy courts to grant relief from the automatic stay for "cause," 11 U.S.C. § 362(d)(1). "Section 362(d)(1) does not define 'cause,' leaving courts to consider what constitutes cause based on the totality of the circumstances in each particular case." *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997). The decision whether to lift the stay is "committed to the bankruptcy court's discretion." *In re Myers*, 491 F.3d 120, 128 (3d Cir. 2007).

32.     In deciding whether to lift the stay, courts in this Circuit have considered:

"(1) whether any great prejudice to either the bankrupt estate or the debtor will result from a

lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay

considerably outweighs the hardship to the debtor; and (3) the probability of the creditor

prevailing on the merits." *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010);

*accord EFH*, 533 B.R. 106.

33.     Before the Debtors have any burden of proof under 11 U.S.C. § 362(g)(2), the

movant has the burden to make a *prima facie* case in favor of relief.  *EFH*, 533 B.R. at 117; *In re

RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *aff'd*, 359 F. App'x 352 (3d

Cir. 2010).  "A *prima facie* case requires a showing by the movant of 'a factual and legal right to

the relief that it seeks.'" *RNI*, 348 B.R. at 299 (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892,

902 (Bankr. S.D.N.Y. 1994)).  "Failure to prove a *prima facie* case requires denial of the

requested relief." *EFH*, 533 B.R. at 117.  In this case, the Administrative Agent has failed to

make a *prima facie* case for stay relief and in any event is not entitled to such relief.

**A.     The Debtors would suffer significant prejudice if the stay were lifted.**

34.     In evaluating the first *Downey* factor — harm to the estate, 428 B.R. at 609 — the

Court should consider the interests of "all creditors" and other stakeholders.  *EFH*, 533 B.R. 118

(quoting *In re Johns-Manville Corp.*, 36 B.R. 727, 735 (Bankr. S.D.N.Y. 1984)).

35.     Here, the estate and its creditors would suffer clear prejudice if relief from the

stay were granted.  The whole point of the Notice is to increase the estate's obligations under a

pre-petition agreement, by amounts in the range of $47 million per year.  *See* Hayes Decl. ¶ 15.

Although the Debtors could (and will) oppose payment of those amounts based on Section

506(b) of the Bankruptcy Code and other grounds, there is no doubt that the estate and creditors

are worse off if the Notice has been served, because a prerequisite to the bumped-up interest rate

will have been satisfied and the First Lien Lenders will have been relieved from the bargain they struck, under which they accepted the requirement that a notice be served and assumed the risk that the automatic stay would prevent such service.

36.     In *EFH*, the Court denied relief from the stay on similar facts.  In that case, as in the *AMR* case, the lenders sought to serve a notice of de-acceleration on the debtors so that they could require the debtors to pay a make-whole that arguably was not due on accelerated debt. Judge Sontchi concluded that "great prejudice" would result from delivery of the notice, because the asserted make-whole (if later allowed) would "substantially reduce the value of other . . . stakeholder recoveries."  533 B.R. at 118.  Movants seek to distinguish *EFH* on the basis that it involved a notice of deacceleration aimed at triggering a makewhole payment, rather than a notice aimed at increasing interest.  Motion ¶ 17.  But this is a distinction without a difference. In both cases, the lenders are seeking to serve a notice outside of court, in response to a bankruptcy filing, that they believe will enhance their recovery under pre-petition agreements.

37.     In asserting that the Debtors will suffer "no prejudice" from delivery of the Notice, the Administrative Agent misstates the purpose and effect of the Notice it wishes to deliver.  The point of the Notice is not to "inform the Debtors of what they already know," namely that their chapter 11 filing is a default under the Credit Agreement.  Motion ¶ 15. Rather, under the terms of the Credit Agreement, and as in *EFH*, the delivery of the Notice has contractual and economic significance, because the notice is itself a prerequisite to preventing the Borrowers from electing the lower rate.   *See* Credit Agreement § 2.07(e).  Accordingly, delivery of the Notice does not just "preserve" the status quo (Motion ¶ 16); it would change the status quo to the detriment of the Debtors' estates.

38.    The argument that the Debtors will not be prejudiced, because the notice will simply respect asserted contractual entitlements (*id.* ¶ 16), fares no better.  In rejecting a similar argument, the *EFH* court explained that "the automatic stay prohibits creditors from exercising their state law contract rights against the estate," and that granting relief from the stay merely because creditors seek to vindicate their "state law contract rights" would "nullify the automatic stay" and permit creditors to take post-petition actions to increase their recoveries, precisely what the stay is intended to prevent.  *EFH*, 533 B.R. at 119.

39.    Finally, in evaluating the harm to the Debtors from stay relief, it is highly significant that the Motion does not assert any default other than the *ipso facto* bankruptcy default.  Indeed, the notice the Administrative Agent wishes to send is indistinguishable from a notice seeking to impose a bankruptcy fee on the Debtors.  This kind of harm to an estate is particularly disfavored.  As numerous decisions recognize, "basic bankruptcy policy [] abhors the operation of so-called 'ipso facto' clauses [that] trigger a default, forfeiture or termination upon the happenstance of bankruptcy."  *In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) (quoting *In re James Cable Partners, L.P.*, 154 B.R. 813, 816 (M.D. Ga. 1993)); *see W.R. Grace*, 475 B.R. at 154 ("Congress recognized that *ipso facto* clauses generally have the effect of 'hamper[ing] rehabilitation efforts' in bankruptcy."); *In re EP Energy Corp.*, No. 19-35654, (Bankr. S.D. Tex. Mar. 6, 2020) (Isgur, J.), Dkt. No. 1025, Tr. at 15 ("there's no question in my mind that a charge that is imposed solely upon the filing of a bankruptcy case is inconsistent with the public policy of the country").  The Court can and should take into account this fundamental bankruptcy policy as it determines, in the exercise of its discretion, whether to permit oversecured lenders to take an action for the sole purpose of penalizing the Debtors for filing these cases.

**B.      The harm to the First Lien Lenders from maintaining the automatic stay does not considerably outweigh the harm to the Debtors from lifting the stay.**

40.      The second *Downey* factor is "whether the hardship to the non-bankrupt party by maintenance of the stay *considerably outweighs* the hardship to the debtor." *Downey*, 428 B.R. at 609 (emphasis added).  Here, to the extent the First Lien Lenders are suffering any cognizable harm by virtue of the automatic stay, it is at most equal to — and does not outweigh — the harm to the Debtors from lifting the stay, let alone considerably.

41.      While it may be true that maintaining the stay will prevent the First Lien Lenders from further increasing their par-plus-interest recovery, that is not a hardship that should be given weight.  As discussed above, the Debtors in this case bargained for the right to elect their interest rate unless the Administrative Agent has served a notice; by contrast, the Administrative Agent and First Lien Lenders did *not* bargain for an automatic conversion from LIBOR to ABR upon a bankruptcy or other default.  Specifically, despite having bargained for automatic acceleration of debt upon a bankruptcy and for automatic imposition of default interest upon a payment default[11] — and despite credit technology in the marketplace that provides for automatic conversion of LIBOR-based to ABR interest — the First Lien Lenders did not bargain for an automatic conversion of LIBOR-based interest to ABR-based interest.  *See supra* ¶ 13.

42.      Again, *EFH* is on point.  There, in concluding that the second *Downey* factor weighed "heavily" against the lenders, Judge Sontchi concluded that the lenders had "bargained for the automatic acceleration of debt in the event of a bankruptcy default and must live with the consequences of their bargain.  They did not bargain for a make-whole premium in the event  of

---

[11]  The Debtors reserve all rights, and fully intend, to contest any claim for recovery of default interest or other claims or remedies predicated on the Debtors' bankruptcy filings.  The point here is simply that the First Lien Lenders knew how to bargain for provisions under which their recoveries would automatically increase, including upon a bankruptcy, without further action on their part.

an automatic acceleration following an event of default as a result of a bankruptcy filing by the

EFIH Debtors, but they could have.  True, the Noteholders also bargained for the right to rescind

acceleration, *but that right was blocked by the automatic stay*."  *EFH*, 533 B.R. at 124 (emphasis

added).  Thus, while it would "cause harm to the [debtors'] expectations to now lift the automatic

stay to allow the [lenders] to increase their claim," the lenders had no legitimate expectation that

such stay relief would be granted.  *Id*. at 125 (quoting and citing *In re MPM Silicones, LLC*, 531

B.R. 321, 338, n.12 (S.D.N.Y.2015) ("[A]ll contracts signed among the parties operate against

the backdrop of the relevant Bankruptcy Code provisions. The potential for an automatic stay . . .

upon the filing of a bankruptcy case is a part of the bargain to which the parties agreed.").

43.     The same is true here:  the First Lien Lenders did not bargain for an ability to

increase the Debtors' interest rate notwithstanding the automatic stay, and they have no reason to

expect the Court to allow them to take steps to impose greatly increased obligations on the

estates in response to the filings of these cases.

44.     Even if the alleged harm to the First Lien Lenders were cognizable, it would not

support the relief sought.  The maximum harm to the lenders is quantifiable:  it can be *no greater*

than the harm to the Debtors if the stay were lifted and the claim amount increased.  The First

Lien Lenders, if they cannot compel an increase in the applicable interest rate as a result of these

cases being filed, will recover approximately $47 million per year less than if they could achieve

that result.  *See* Hayes Decl. ¶ 15.  By contrast, if the First Lien Lenders can cause the rate

increase, the Debtors will have to pay an additional $47 million per year.  Accordingly, as the

Court held in *EFH*, "the harms resulting from lifting or maintaining the automatic stay are, in the

best case for the [lenders], *in equipoise* and . . . the harm to the moving party (here the

[Administrative Agent]) does not 'considerably outweigh' the harm to the" Debtors, as required for stay relief. *EFH*, 533 B.R. at 119 (emphasis added).

### C. The Administrative Agent has not shown a likelihood of success on the merits.

45.     The Court does not have to reach the likelihood of success on the merits given the balance of harms.  In *EFH*, the Court held that, in the circumstances presented, "cause does not exist to lift the automatic stay even if it is likely the [creditor] would succeed on the merits." *EFH*, 533 B.R. at 125.  Here, likewise, regardless of the merits, there is no reason for the Court to exercise its discretion to allow those lenders to deliver a notice that will benefit them at the expense of the estate and other creditors.

46.     But if the Court were to reach the merits, the Administrative Agent has shown no likelihood of success.  To the contrary, even if the Notice were delivered, the Agent would face two insurmountable obstacles in recovering ABR-based interest:  (A) the unenforceability of the *ipso facto* clause in the Credit Agreement; and (B) the Court's equitable discretion, under Section 506(b) of the Bankruptcy Code, not to impose default interest.

### 1. The First Lien Lenders cannot penalize the Debtors for filing for bankruptcy.

47.     As the District Court in Delaware has held, it is "well-established" that *ipso facto* clauses — contractual modifications, penalties or terminations triggered by a debtor's bankruptcy, insolvency or related events — are generally "unenforceable as a matter of law under the Bankruptcy Code."  *W.R. Grace*, 475 B.R. at 152; *see also In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) ("The Code . . . prevents enforcement of so-called *ipso facto* clauses that trigger a default upon a bankruptcy filing or upon 'events or conditions that are likely to occur or exist around the time that a case is commenced.'" (quoting 3 Collier on Bankruptcy ¶ 365.05[4] (15th ed. 1999))).

48.     This bar on *ipso facto* clauses is reflected in three Bankruptcy Code provisions. Section 541(c)(1) disables *ipso facto* clauses from preventing "an interest of the debtor in property [from] becom[ing] property of the estate."  11 U.S.C. § 541(c)(1).  Section 363(*l*) then provides that, once property is in the estate, the estate may continue to use that property notwithstanding any *ipso facto* defaults that effect "a forfeiture, modification, or termination of the debtor's interest in such property."  11 U.S.C. § 363(*l*).  And Section 365(e)(1) renders unenforceable *ipso facto* defaults that "terminat[e] or modif[y]" executory contracts or "terminat[e] or modif[y]" "any right or obligation under such contract[s]."  11 U.S.C. § 365(e)(1).  The prohibition on *ipso facto* clauses has in any event "been interpreted to be much broader than the confines" of these statutory provisions.  *W.R. Grace*, 475 B.R. at 153; *accord Railway*, 133 B.R. at 583.

49.     Here, the Administrative Agent alleges that it is entitled to serve the Notice based solely on the *ipso facto* bankruptcy default in Section 7.01(i) of the Credit Agreement.  *See Motion* ¶¶ 2, 24.  But that bankruptcy default is unenforceable based on the anti-forfeiture provisions of Section 363(*l*) and Section 541(c)(1), as well as the Bankruptcy Code's general policy against enforcing such clauses.  Section 363(*l*) in particular has been applied to bar enforcement of *ipso facto* clauses in highly analogous contexts involving secured debt.  In *Railway*, the creditor had a "springing lien" — namely, a lien that supposedly came into effect on bankruptcy.  The *Railway* court denied enforcement of the clause under Section 363(*l*), holding that expanding a lien on the basis of an *ipso facto* clause amounted to depriving the estate of an interest in property.  *Railway*, 133 B.R. at 581.

50.     The logic of *Railway* has also been applied to *ipso facto* clauses that require a debtor to pay additional amounts on account of its bankruptcy.  Specifically, in *In re Chedick*,

the court held that a fee payable to a secured lender upon a debtor's bankruptcy filing was unenforceable under Section 363(*l*) because the clause effected a "modification of the debtor's interest in property" that interfered with the trustee's ability to use the property during the bankruptcy case.  *In re Chedick*, 1996 WL 762329, at *3 (Bankr. D.D.C. Mar. 22, 1996).

51.    Here, as in *Chedick*, the Administrative Agent seeks to recover more from the Debtors — thus increasing its collateral position and imposing on the Debtors' use of the collateral — based solely on the Debtors' bankruptcy filing.  And as in *Railway*, the Administrative Agent's position is that the effect of the bankruptcy was to increase the lenders' claim and thus the scope of their lien on the Debtors' property.

52.    Even without the express language of Section 363(*l*) and the decisions applying that section, bankruptcy policy would prevent the result sought by the First Lien Lenders.  In *W.R. Grace*, a creditor alleged a default based merely on debtor's filing for bankruptcy and claimed that it was owed a default-interest rate as a result.  *W.R. Grace*, 475 B.R. at 152.  The District Court refused to enforce the default, finding that it was an unenforceable *ipso facto* forfeiture.  *Id.* at 155.  Notably, the court in *W.R. Grace* also concluded that lenders were not entitled to require Grace to switch to an ABR-rate during its bankruptcy, even after a purported payment default, because the switch would "punish[] Grace for seeking the bankruptcy relief to which it is lawfully entitled." *Id.* at 161 n.133.

53.    *W.R. Grace* is thus squarely at odds with the First Lien Lenders' position here. As in *W.R. Grace*, if the Debtors were compelled to start paying ABR interest now, they would incur a material penalty simply for initiating these voluntary cases, in contravention of bankruptcy law and policy.  *Id.* at 156, 161 n.133.

### 2. The First Lien Lenders are not entitled to ABR-rate interest under Section 506(b).

54.     Even if an *ipso facto* clause could potentially serve as the basis for imposing a higher interest rate, the Administrative Agent has failed to show that, in the circumstances presented, this Court should or would exercise its discretion under Section 506(b) to permit recovery of such additional interest.

55.     Under Section 506(b), oversecured creditors are entitled to post-petition interest. 11 U.S.C. § 506(b).  However, such creditors are not necessarily entitled to default interest, let alone a double default interest (in the form of ABR-based interest plus other default interest); rather, bankruptcy courts have discretion in determining the appropriate post-petition interest rate.  *See In re Nixon*, 404 F. App'x 575, 579 (3d Cir. 2010); *accord In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998).

56.     Potential harm to other creditors is a core consideration for courts determining whether to award default-based interest.  "In most bankruptcy cases undersecured and unsecured creditors receive less than the full amount due, and often they receive nothing.  In such circumstances equity will not ordinarily favor allowing oversecured creditors default interest rates."  *In re Route One W. Windsor Ltd. P'ship*, 225 B.R. 76, 90–91 (Bankr. D.N.J. 1998); *see also In re Vest Assocs.*, 217 B.R. 696, 703 (Bankr. S.D.N.Y. 1998) (denying default interest absent evidence of solvency:  the "potential harm to general unsecured creditors weighs in favor of denial of default interest").   In this case, unsecured creditors are expected to receive substantially less than a full recovery, meaning that payment of default-based interest to the First Lien Lenders would decrease the recoveries of other creditors.

57.     In addition, courts consider whether default rates are in fact "penalties . . . instead of compensation for injuries that the lender incurred."  *In re Vest Assocs.*, 217 B.R. at 702.

While default rates can serve as a mechanism "to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments," they are disfavored when the lender has limited or no "costs" or "expenses" as a result of a default. *Id.* at 701, 704. Here, an ABR-based rate does not compensate First Lien Lenders for any particular costs or expenses. The only alleged default is the bankruptcy default, the First Lien Lenders are continuing to receive interest payments (at a negotiated rate above the contract rate), and their professional fees are being paid currently. Thus, the "bankruptcy process [has] protected the creditor from all the risks and costs that might support enforcement of an increased interest rate." *Id.* at 703-04 (denying default interest because, among other things, "[t]here was no cognizable risk that the creditor would go unpaid or even underpaid" and was "receiving adequate protection payments") (citing *In re Kalian*, 178 B.R. 308, 316-317 (Bankr. D.R.I. 1995)). In addition, the Debtors intend to reinstate the Credit Agreement debt and cure any default; in that context, allowance of default-based interest would again be inequitable. *See In re Bownetree*, *LLC*, 2009 WL 2226107, at *4 (Bankr. E.D.N.Y. July 24, 2009) ("[A]pplication of the default rate under these circumstances would be inequitable because the default, if any, was cured.").

58.    These equitable considerations are especially salient in the context of a pure *ipso facto* default. Even if the *ipso facto* clause were not *per se* unenforceable, courts generally exercise their discretion not to award default-based interest on such a clause. For example, in *In re Residential Capital, LLC*, Judge Glenn denied default interest for the post-petition period prior to a payment default, holding that "bankruptcy policy should not penalize a debtor for filing by awarding default interest when the only default was the filing itself." 508 B.R. 851, 862 (Bankr. S.D.N.Y. 2014). Tying the award of default-based interest to compensation for actual harm also aligns with Section 1124 of the Bankruptcy Code, which limits compensation for nonmonetary

obligations on reinstated debt to "actual pecuniary loss" or "damages incurred as a result of any reasonable reliance." 11 U.S.C. § 1124(2)(C)-(D). In these circumstances, awarding ABR-rate interest would simply punish the Debtors for filing these cases, so the award "would be inequitable." *Bownetree*, 2009 WL 2226107, at *5.

### III.    ANY RELIEF GRANTED SHOULD NOT BE EFFECTIVE WHEN THE MOTION WAS FILED.

59.    The Administrative Agent has argued that, if the Motion were granted, the automatic stay should be deemed lifted as of the date the Motion was filed, November 27. The Administrative Agent fails to support this request for retroactive relief.

60.    In the Third Circuit, the standard for retroactive relief from the automatic stay is: "(1) whether the creditor was aware of the filing or encouraged violation of the automatic stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced." *EFH,* 533 B.R. at 117 n.6 (citing *In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007)). Retroactive relief to November 27 is unwarranted here, where the Administrative Agent and First Lien Lenders were well aware of the commencement of these cases, and yet did not seek relief for weeks. *See In re Franco*, 606 B.R. 90, 95 (Bankr. D.N.M. 2019) ("the creditor seeking nunc pro tunc relief must file the motion promptly"). Accordingly, the request for relief retroactive to November 27 should be denied. Any relief should be effective no earlier than December 14, 2020.[12]

### CONCLUSION

The Debtors respectfully request that the Court deny the Motion.

---

[12]  In connection with the scheduling of the hearing on the Motion, the Debtors and certain other constituencies agreed not to object to the contested relief, if granted, becoming effective as of the original date of the hearing, December 14, 2020.

Dated: December 15, 2020

| | | |
|---|---|---|
| */s/ Michael J. Merchant* | */s/ George A. Davis* | */s/ Emil A. Kleinhaus* |

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:   collins@rlf.com
     merchant@rlf.com
     steele@rlf.com
     schlauch@rlf.com

George A. Davis
George Klidonas
Andrew Sorkin
Anupama Yerramalli
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  george.davis@lw.com
     george.klidonas@lw.com
     andrew.sorkin@lw.com
     anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeff.bjork@lw.com

- and -

Jason B. Gott
**LATHAM & WATKINS LLP**
330 North Wabash Avenue,
Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9767
Email:  jason.gott@lw.com

Philip Mindlin
Emil A. Kleinhaus
Neil M. Snyder
Michael H. Cassel
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212)  403-1000
Facsimile:  (212) 403-2000
Email:  pmindlin@wlrk.com
     eakleinhaus@wlrk.com
     nmsnyder@wlrk.com
     mhcassel@wlrk.com

*Co-Counsel for Debtors and Debtors in Possession*