**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, et al., | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Proposed Hearing Date: January 14, 2021 at 2:00 p.m. (ET)**<br>**Proposed Obj. Deadline: January 12, 2021 at 12:00 p.m. (ET)** |

## MOTION OF THE DEBTORS TO ASSUME AND/OR ENTER INTO REIMBURSEMENT AGREEMENTS WITH RSA PARTY PROFESSIONALS

The debtors in possession in the above-captioned cases (collectively, the "***Debtors***") hereby move (this "***Motion***") and respectfully state as follows:

### RELIEF REQUESTED

1.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"), authorizing the Debtors, subject to the terms and conditions set forth in the Proposed Order, (A) to assume the prepetition Reimbursement Agreements pursuant to section 365(a) of the Bankruptcy Code (as amended, the "***Prepetition Reimbursement Agreements***"), and (B) to enter into postpetition Reimbursement Agreements pursuant to section 363(b) of the Bankruptcy Code (the "***New Reimbursement Agreements***" and, together with the Prepetition Reimbursement Agreements, the "***Reimbursement Agreements***").

---

[1]     A complete list of the Debtors in these Bankruptcy Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

## JURISDICTION

2.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rules 2002 and 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 363(b) and 365(a) of the Bankruptcy Code (as defined below).

## PRELIMINARY STATEMENT

3.     Long before the Petition Date, the Debtors recognized the importance of engaging with organized, sophisticated ad hoc groups in order to advance their efforts to address the opioid-related litigation against them (approximately 3,034 cases in 50 states and Puerto Rico as of October 2020) and de-lever their balance sheet, including addressing over $1.6 billion in guaranteed unsecured note liabilities.  There are simply too many stakeholders in these cases, representing too many diverse interests, for the Debtors to have had any hope of building the necessary consensus through one-off creditor negotiations.  To that end, the Debtors agreed to reimburse the reasonable fees and expenses of the advisors to the Governmental Ad Hoc Committee, MSGE Group and the Unsecured Notes Ad Hoc Group, who collectively represent a broad array of creditors whose support for any restructuring would be essential.

US-DOCS\119980567.15RLF1 24547943v.1

4.      The history of the Debtors' prepetition restructuring efforts and these cases demonstrates that the Debtors' business decision to enter into these reimbursement arrangements was correct.  The Debtors' hard-fought negotiations with the three ad hoc groups that, in the case of the Governmental Plaintiff Ad Hoc Committee, began over a year prior to the Petition Date, yielded significant, concrete benefits at every turn; first, the February 2020 opioid settlement between the Debtors, on the one hand, and the attorneys general of 47 states and territories and the Plaintiffs' Executive Committee, on the other; and ultimately, a revised opioid settlement and comprehensive restructuring that was memorialized in the RSA and term sheets annexed thereto. In addition, the intervening events in the Spring of 2020 made clear that the Debtors needed to address their capital structure more broadly and led to the formation of the Unsecured Notes Ad Hoc Group.  The hard fought, multi-party negotiations led to the proposed restructuring embodied in the RSA.

5.      That RSA– which reflects support from attorneys general for fifty (out of fifty-six) U.S. states and territories (representing more than 95% of the national population), more than 1300 municipalities, Indian tribes, and other public opioid claimants, and over 84% of the Debtors' fulcrum funded debt securities – allowed the Debtors to smoothly transition into chapter 11 with a positive, confidence-inspiring message for their key operational stakeholders (vendors, employees and customers) that the Debtors' bankruptcy filing had clear direction and would produce a stronger company than the one that entered bankruptcy.  It also avoided costly and fractious litigation at the outset of these cases between and among sovereign States and the Debtors over this Court's power to stay what is, in the states' view, mission critical litigation on behalf of their citizens.

US-DOCS\119980567.15RLF1 24547943v.1

6.    The Debtors have, therefore, already benefited tremendously from the organization of, and cooperation by, each of the Governmental Plaintiff Ad Hoc Committee, MSGE Group and Unsecured Notes Ad Hoc Group.  However, these cases are far from over, and it remains just as critical now that the Debtors maintain the framework for negotiation and constructive collaboration that allowed the Debtors to realize those benefits – which is only possible if the Debtors receive authority to assume and/or enter into the various reimbursement agreements with the ad hoc groups' professionals as requested in this Motion.  Recognizing the importance of their ad hoc groups and the need for them to be compensated for their work in advancing these cases, the Debtors agreed in the RSA to seek this relief.  *See* RSA, § 25.

7.    By way of example, the Debtors will require continued cooperation and engagement from the RSA Parties[2] on a variety of matters that are critical to their ability to minimize disputes and litigation and progress their plan in accordance with the RSA.  These include, among others, (a) ongoing negotiations with the Ad Hoc Term Lender Group and Ad Hoc Revolving Lenders concerning their plan treatment (in which the ad hoc groups, all of which represent constituencies that will have stakes in the reorganized Debtors, will play a particularly important role), (b) working with the OCC and the UCC to garner their support for the RSA transactions and (c) finalizing other key deal points that were deferred at the time the RSA was executed (for example, corporate governance, potential exit capital, the treatment of certain

---

[2]    The "***RSA Parties***" are comprised of: (a) the Ad Hoc Committee of Governmental Claimants (consisting of the Plaintiffs' Executive Committee appointed in the opioid multi-district litigation and seven states), and the additional 43 states and territories who are signatories to the RSA (collectively, the "***Governmental Plaintiff Ad Hoc Committee***"), (b) the Multi-State Governmental Entities Group (the "***MSGE Group***," which consists of consists of over 1,300 entities—1,245 counties, cities and other municipalities; 9 tribal nations; 13 hospital districts; 16 independent public school districts; 33 medical groups; and two funds—across 38 states and territories), and (c) holders of more than 84 percent in principal amount of the Debtors' guaranteed unsecured notes (the "***Unsecured Notes Ad Hoc Group***").

US-DOCS\119980567.15RLF1 24547943v.1

insurance policies under the plan, and negotiation of covenants to protect the opioid trust with respect to the deferred payment stream it is contemplated to receive).

8.　　In the near term, the Debtors will require the support of the Governmental Plaintiff Ad Hoc Committee and MSGE Group to finalize the allocation of the fixed pool of opioid settlement consideration among governmental and private opioid claimants.  Allocation presents an immediate hurdle to the Debtors' advancement of a plan of reorganization that comprehensively resolves their opioid-related exposure.  The Governmental Ad Hoc Group and MSGE Group professionals include experienced practitioners in mass tort bankruptcies – professionals that were instrumental in achieving a multi-party resolution in months'-long allocation mediation the *Purdue Pharma* case.  *See In re Purdue Pharma LP,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2020), Sep. 30, 2020 Hr'g Tr. At 25:16-20 ("It's rare – perhaps unprecedented – to have the level of consensus that occurred in the mediation occur in this country.  And it is due, not only to the mediators, but also as the mediators recognized in their report, the good faith and hard efforts of the parties [to the mediation].").[3]

9.　　The Debtors fully expect that these professionals will be able to achieve a similarly successful result here, assuming they participate fully in the Debtors' planned mediation.  But those professionals need certainty that they will be compensated for their work before undertaking the intensive multi-week effort necessary to effectively mediate allocation issues.  Absent the relief requested herein, they will not have that certainty, and the Debtors, in turn, will bear a substantial risk that the governmental RSA Parties, without the support of their advisors, decline to participate in the allocation mediation (rendering it pointless) and/or terminate the RSA, as is their right if no

---

[3]　Last week, the *Purdue* Court authorized the payment of allocation-related fees of the professionals to the governmental ad hoc group in that case.  *See In re Purdue Pharma, LP*, No. 19-23649 (RDD) [Docket No. 2190].

order authorizing reimbursement of their fees and expenses is entered in these cases. *See* RSA, § 6(a)(xxiii)(B). The Debtors have a substantial interest in seeing the restructuring that they have been pursuing for over a year completed without undue delay. The Debtors need the opioid allocation issues to be resolved in order to be able to present a plan that makes clear to opioid claimants what consideration will be available to them. Without meaningful participation and engagement by the Governmental Ad Hoc Group and MSGE Group, these cases will not advance and could easily devolve into unnecessary and complex estimation litigation and confirmation battles.

10. The Debtors worked closely with the RSA Parties in the wake of the Court's ruling (the "***Fee Motion Ruling***") on the Debtors' initial motion seeking authority to pay the RSA Parties' fees [Docket No. 523] (the "***Initial Fee Motion***") to respond to the concerns raised by the Court in that ruling and request this relief in a manner that comports with the legal standards and analysis set forth therein. *First*, the Debtors are seeking the straightforward assumption of the Prepetition Reimbursement Agreements under section 365(a) of the Bankruptcy Code. *Second*, the Debtors are seeking authority to enter into New Reimbursement Agreements under section 363(b) of the Bankruptcy Code. *Third*, the Debtors and RSA Parties have agreed to various safeguards, incorporated into the proposed order granting this Motion (the "***Proposed Order***"), including that reasonable and documented fees and expenses of the professionals payable under the Proposed Order will be subject to the Fee Guidelines and review by any fee examiner appointed in the Debtors' cases.

11. Although reimbursement of allocation-related fees and expenses was deferred in *Purdue*, the Debtors feel strongly that excluding allocation-related fees is not warranted and would be detrimental to the case here. The governmental RSA Parties' active engagement in and

leadership of the negotiation and mediation of those issues is essential to the Debtors' efforts to resolve allocation issues and represents the requisite "benefit to the estate" that the Court needs to prospectively authorize reimbursement of such fees and expenses.

12.     Put simply, the relief sought herein has a sound statutory basis (*i.e.*, sections 365 and 363 of the Bankruptcy Code), meets the legal standard articulated by the Court in its Fee Motion Ruling, and should be granted so that these cases can continue on their positive trajectory.

## BACKGROUND

### A.     General Background

13.     On October 12, 2020 (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

14.     On October 27, 2020, the Office of U.S. Trustee appointed an official committee of unsecured creditors (the "***UCC***") [Docket No. 306] and an official committee of opioid claimants (the "***OCC***" and together with the UCC, the "***Committees***") [Docket No. 308].

15.     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "***Welch Declaration***") [Docket No. 128] filed on the Petition Date, which is fully incorporated herein by reference.  The Debtors also incorporate herein by reference the *Declaration of Randall S. Eisenberg in Support of Debtors' Motion for*

*Order Authorizing Debtors to Pay the Reasonable and Documented Fees and Expenses of the RSA Party Professionals and Granting Related Relief* [Docket No. 714].[4]

**B.     The Initial Fee Motion**

16.     On November 16, 2020, the Debtors filed the Initial Fee Motion [Docket No. 523], requesting that the Court authorize the Debtors to pay the reasonable and documented expenses of the RSA Party professionals in accordance with the terms set forth in each of their respective engagement letters and reimbursement agreements. The Debtors did not seek authority to assume any engagement letters or reimbursement agreements (or any other contract, including the RSA) under the Initial Fee Motion.

17.     On November 30, 2020, four objections were filed to the Initial Fee Motion by the U.S. Trustee [Docket No. 670], the Ad Hoc First Lien Term Lender Group [Docket No. 671], the UCC [Docket No. 672], and the OCC [Docket No. 686]. Prior to the December 7, 2020 hearing on the Initial Fee Motion, the Debtors and each of the Committees agreed to further changes to the proposed order granting the Initial Fee Motion. These changes, which generally imposed additional procedural requirements on the RSA Parties' requests for reimbursement, resolved the allocation-based objections, and reserved all of the Committees' rights with respect to the RSA more generally, were sufficient to resolve the Committee's objections to the relief sought in the Initial RSA Party Fee Motion.

18.     On December 14, 2020, the Court issued its Fee Motion Ruling, sustaining the remaining objections and denying the Initial Fee Motion without prejudice, including to the Debtors' ability to seek to assume the RSA, the Engagement/Reimbursement Agreements (as defined in the Initial RSA Party Fee Motion), or another post-petition reimbursement agreement

---

[4]     The Debtors reserve the right to file additional declarations (or otherwise offer evidence and/or testimony) in support of this Motion.

entered into with the RSA Parties under section 365(a) of the Bankruptcy Code. *See* Dec. 14, 2020 Hr'g Tr. at 38:12-18.

### C.  The Prepetition Reimbursement Agreements

19.     As described in the Initial Fee Motion (*see* ¶¶ 18-21), certain Debtors were parties to Prepetition Reimbursement Agreements that were critical to advancing the Debtors' restructuring to this point.

20.     *First*, on September 11, 2019, Debtors Mallinckrodt LLC, Mallinckrodt plc and SpecGX LLC, and Gilbert LLP, Kramer Levin Naftalis & Frankel LLP and Brown Rudnick LLP, each as legal counsel to the Governmental Plaintiff Ad Hoc Committee, executed a reimbursement agreement (the "***Ad Hoc US Counsel Reimbursement Agreement***").  The Ad Hoc US Counsel Reimbursement Agreement is attached hereto as **Exhibit B-1**.

21.     Under this agreement, the Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, and the reasonable and documented expenses of the members of the Governmental Plaintiff Ad Hoc Committee, in connection with the diligence, negotiation and implementation of a potential global resolution of opioid-related claims against certain Debtors through a bankruptcy proceeding.

22.     By its terms, the Ad Hoc US Counsel Reimbursement Agreement excludes from its scope any fees and expenses preparing for, commencing, or prosecuting, litigation against the Debtors.  Prior to the Petition Date, the Debtors performed its obligations under the Ad Hoc US Counsel Reimbursement Agreement and paid the fees and expenses due thereunder.

23.     *Second*, on October 17, 2019, Debtors Mallinckrodt LLC, Mallinckrodt plc and SpecGX LLC and Houlihan Lokey Capital, Inc., as investment banker and financial advisor to the Governmental Plaintiff Ad Hoc Committee executed a reimbursement agreement (the "***Ad Hoc***

9

*Investment Banker Reimbursement Agreement*") under which those Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Houlihan Lokey Capital, Inc. in connection with the diligence, negotiation and implementation of a potential settlement of opioid-related claims through a "Transaction" (as defined in the Ad Hoc Investment Banker Reimbursement Agreement). The Ad Hoc Investment Banker Reimbursement Agreement is attached hereto as **Exhibit B-2**. This agreement was contemplated as part of the September 2019 Ad Hoc US Counsel Reimbursement Agreement.

24. *Third*, on February 25, 2020, Debtors Mallinckrodt LLC, Mallinckrodt plc and SpecGX LLC and William Fry, as Irish counsel to the Governmental Plaintiff Ad Hoc Committee executed a reimbursement agreement (the "*Ad Hoc Irish Counsel Reimbursement Agreement*") under which those Debtors agreed to, among other things, pay the reasonable and documented fees expenses of William Fry in connection with the diligence, negotiation and implementation of a global resolution. The Ad Hoc Irish Counsel Reimbursement Agreement is attached hereto as **Exhibit B-3**.

25. *Fourth*, on May 26, 2020, Debtor Mallinckrodt plc entered into an agreement with Paul Weiss, Rifkind, Wharton & Garrison LLP ("*Paul Weiss*"), on behalf of a group of unsecured noteholders that became the Unsecured Notes Ad Hoc Group (the "*Noteholder Counsel Reimbursement Agreement*"), under which the Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Paul Weiss in connection with a potential restructuring of the senior guaranteed unsecured notes. The Noteholder Counsel Reimbursement Agreement is attached hereto as **Exhibit B-4**.

26. *Fifth*, on August 4, 2020, Debtor Mallinckrodt plc entered into an agreement with Perella Weinberg Partners LP, as financial advisor to the Unsecured Notes Ad Hoc Group

(the "***Noteholder FA Reimbursement Agreement***") under which the Debtors agreed to, among other things, pay the reasonable and documented fees and expenses of Perella Weinberg Partners LP in connection with a potential restructuring of the senior guaranteed unsecured notes. The Noteholder FA Reimbursement Agreement is attached hereto as **Exhibit B-5**.

27.     *Sixth*, on October 7, 2020, Debtors Mallinckrodt LLC, Mallinckrodt plc, and SpecGX LLC entered into a supplement to the Ad Hoc US Counsel Reimbursement Agreement (the "***Ad Hoc US Counsel Reimbursement Supplement***" and together with the Ad Hoc US Counsel Reimbursement Agreement, the Ad Hoc Investment Banker Reimbursement Agreement and the Ad Hoc Irish Counsel Reimbursement Agreement, the "***Ad Hoc Reimbursement Agreements***") under which Mallinckrodt agreed to, among other things, provide retainers to (a) Gilbert LLP, (b) Kramer Levin Naftalis & Frankel LLP, (c) Brown Rudnick LLP, (d) Houlihan Lokey Capital, Inc., (e) William Fry and (f) Morris James LLP (the agreed upon local Delaware counsel to the Governmental Plaintiff Ad Hoc Committee). The Ad Hoc US Counsel Reimbursement Supplement is attached hereto as **Exhibit B-6**.

28.     Each of the Prepetition Reimbursement Agreements provides for reimbursement by the Debtors of the reasonable and documented monthly and hourly (as applicable) fees of the relevant professionals, and, in the case of the investment banker engagement letters with Houlihan Lokey and Perella Weinberg: (x) potential back-end/transaction fees of up to $9,000,000 (in the case of Houlihan) and $5,250,000 (in the case of Perella) (such fees, "***Transaction Fees***"), and (y) indemnification by the Debtors, subject to the terms and conditions set forth therein.[5]

---

[5]     As discussed below, the Debtors are not seeking authority to pay such Transaction Fees at this time.

### D. The New Reimbursement Agreements

29. The Debtors did not have executed prepetition reimbursement agreements with certain other RSA Party professionals whose fees and expenses the Debtors had agreed to reimburse under the RSA, specifically: (a) Matheson LLP, Reed Smith LLP, and Landis Rath & Cobb LLP, as Irish counsel, regulatory counsel, and Delaware counsel (respectively), to the Unsecured Notes Ad Hoc Group (collectively, the "*Unsecured Notes Ad Hoc Group Counsel*"), and (b)(i) Caplin & Drysdale, Chartered, as legal counsel to the MSGE Group, (ii) Seitz, Van Ogtrop & Green, P.A. as Delaware legal counsel to the MSGE Group, and (iii) FTI Consulting, as financial advisor to the MSGE Group (collectively, the "*MSGE Group Advisors*").

### E. The Proposed Path Forward

30. Following the Court's Fee Motion Ruling, the Debtors and the RSA Parties engaged in extensive discussions concerning the implications of the ruling. Ultimately, and in recognition of the Court's concerns about the agreements under which the RSA Parties' fees would be reimbursed not having been before the Court in connection with the Initial Fee Motion, the Debtors and RSA Parties decided to file this Motion requesting authority to assume the Prepetition Reimbursement Agreements pursuant to section 365(a) of the Bankruptcy Code, as amended pursuant to the Proposed Order, and to enter into New Reimbursement Agreements with the Unsecured Notes Ad Hoc Group Counsel and MSGE Group Advisors pursuant to section 363(b) of the Bankruptcy Code, which are attached hereto as **Exhibits C-1 and C-2**, respectively. The New Reimbursement Agreements are consistent with the Debtors' prepetition arrangements with the relevant professionals concerning fee reimbursement and memorialize the Debtors' agreement to continue performing in accordance with such terms.

US-DOCS\119980567.15RLF1 24547943v.1

31.     In seeking this relief, the Debtors needed comfort that they would not be bound to continue paying the fees of the RSA Parties' professionals if the RSA terminated and cooperation among the parties breaks down.  The Debtors also recognized that the Transaction Fees would need to be subject to approval by further Court order at the appropriate time.  As a result, the Debtors and the RSA Parties agreed to amend (by the inclusion of superseding terms in the Proposed Order) the Prepetition Reimbursement Agreements, to the extent necessary, in two key respects:

- Each such reimbursement letter will be terminable by the Debtors upon termination of the RSA as to the relevant creditor group (*see* Proposed Order, ¶ 2); and

- The Debtors' obligations to pay any Transaction Fees payable under the Reimbursement Agreements shall not arise unless and until the Court enters a further order authorizing the payment of such Transaction Fees (*see* Proposed Order, ¶ 5).

The New Reimbursement Agreements contain (or are otherwise subject to) identical limitations and protections through the Proposed Order.

32.     In addition to the foregoing, the RSA Parties' entitlement to reimbursement under *all* Reimbursement Agreements will be subject to the other limitations and safeguards contained in the Proposed Order.  These additional limitations include the following: (a) express requirement that all reimbursed fees and expenses are reasonable and documented and in furtherance of the diligence, negotiation, documentation and implementation of a comprehensive restructuring of the Debtors, (b) exclusion of reimbursement of fees and expenses of any internal counsel retained by an individual RSA Party and any fees and expenses incurred preparing for, commencing or prosecuting, litigation against the Debtors, (c) requiring all RSA Party professionals' invoices to be subject to the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 770] (the "**Interim Compensation Order**"), and (d)

requiring all RSA Party professionals' invoices to be subject to review by the fee examiner appointed in the Debtors' cases.

## BASIS FOR RELIEF

**I.**    **The Debtors May Enter into and Assume the Reimbursement Agreements Pursuant to Sections 365(a) and 363(b) (As Applicable) of the Bankruptcy Code**

33.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  When a debtor seeks to assume an executory contract,[6] it must assume the contract in its entirety—*cum onere*. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (a debtor must assume an executory contract "*cum onere*") (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996 (3d Cir. 1951)); *In re CellNet Data Systems, Inc.*, 327 F.3d 242, 249 (3d Cir. 2003); *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001).

34.    If the debtor determines that the assumption of the executory contract in its entirety is advantageous to the estate, the debtor must obtain the court's approval before it can assume the contract. *See* 11 U.S.C. § 365(a).  Under the business judgment standard, courts will generally not second-guess a debtors' business judgment regarding whether assumption will benefit the debtor's estate and grant authority to assume executory contracts absent a showing of bad faith or an abuse of discretion.  *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992); *In re Fed. Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003); *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182 (Bankr. E.D. Pa. 2010).

---

[6]    Although section 365 of the Bankruptcy Code does not define the term "executory contract," the legislative history refers with approval to the following definition developed by Professor Countryman:  "[An executory contract is a] contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  H.R. Rep. No. 95–595, at 347 (1977); S. Rep. No. 95–989, at 58 (1978); *Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 318 n.5 (3d Cir. 2003).

US-DOCS\119980567.15RLF1 24547943v.1

35.     When a debtor assumes an executory contract, all defaults must be cured and all expenses and costs incurred in performing the contract (including any provisions providing for the payment of attorneys' fees) are entitled to priority treatment as an administrative expense and are not subject to further limitation by section 503(b) of the Bankruptcy Code. *See In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25-26 (2d Cir. 1996); *In re Vision Metals, Inc.*, 311 B.R. 692, 699-700 (Bankr. D. Del. 2004); *In re Monroeville Dodge, Ltd.*, 166 B.R. 264, 267 (Bankr. W.D. Pa. 1994); *In re Pearson*, 90 B.R. 638, 642 (Bankr. D.N.J. 1988). Courts routinely require a debtor to pay a prepetition creditor's attorney's fees and expenses as a condition to assumption if the underlying contract to be assumed provides for the payment of such fees and expenses. *See*, *e.g.*, *In re Williams*, No. 10-11108, 2011 WL 2533046 at *1 (Bankr. D. Del. June 4, 2011); *In re Crown Books Corp.*, 269 B.R. 12, 15-20 (Bankr. D. Del. 2001).[7]

36.     Here, the Prepetition Reimbursement Agreements are executory contracts under the Countryman definition—*i.e.*, the Debtors' obligations (*i.e.*, payment of fees and expenses) and the Governmental Plaintiff Ad Hoc Committee's and Unsecured Notes Ad Hoc Group's performance (*i.e.*, the negotiation, documentation and implementation of a restructuring) remain unperformed. The Debtors are now moving for the assumption of the Prepetition Reimbursement Agreements. The Debtors' decision to assume the Prepetition Reimbursement Agreements is a sound exercise of their business judgment—there is no evidence, or even suggestions, of bad faith or an abuse of discretion. To the contrary, assumption of the Prepetition Reimbursement Agreements is not only

---

[7]     Notably, this line of cases does not subject the creditor's attorney's fees to scrutiny under section 503(b) of the Bankruptcy Code and often involve instances where the fees and expenses are incurred by the creditor in the creditor's own interest that is adverse to the estate. Nor would such scrutiny be appropriate—a debtor cannot assume a contract under section 365(a) and refuse to comply with or unilaterally modify provisions therein providing for the payment of attorney's fees without running afoul of Supreme Court and Third Circuit precedent requiring a debtor to assume the contract in its entirety—*cum onere*. *See Bildisco & Bildisco*, 465 U.S. at 531; *CellNet Data Systems*, 327 F.3d at 249; *Cinicola*, 248 F.3d at 119.

US-DOCS\119980567.15RLF1 24547943v.1

a proper exercise of the Debtors' business judgment but is critical to advancing these chapter 11 cases to a successful resolution.

37.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363(b) provides the statutory basis for a debtor to enter into a postpetition agreement, as the Debtors propose to do with the New Reimbursement Agreements, and to reimburse professional fees pursuant thereto.  *See e.g. in re Panda Temple Power, LLC, et. al.*, No. 17-10839 (LSS) (Bankr. D. Del. Oct. 5, 2017) [Docket No. 365]; *see also* Dec. 14, 2020 Hr'g Tr. at 34:1-5 ("I agree with the debtors that Section 363 provides the procedural mechanism for a debtor to seek the authority to make payments to unsecured creditor groups that if the group, itself, sought payment it would need to be made pursuant to Section 503.").

38.     Courts in this and other jurisdictions have approved the assumption of agreements providing for payment of unsecured creditors' professional fees under sections 365(a) and/or 363 of the Bankruptcy Code.  *See In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan 18, 2013) [Docket No. 317] (approving the debtors' assumption of a prepetition agreement to pay certain professional fees of an ad hoc committee of unsecured noteholders); *see also In re Hercules Offshore, Inc.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [Docket No. 95] (approving payment of unsecured creditors' professional fees in connection with the assumption of a restructuring support agreement); *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [Docket No. 215] (approving, over the objection of the United States Trustee, assumption of prepetition restructuring support agreement that provided for payment of unsecured debt holders' fees, finding that it was a proper exercise of the debtors' business judgment); *In re*

*Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) [Docket No. 217] (approving payment of unsecured noteholders' professional fees in connection with the assumption of a restructuring support agreement as an exercise of the debtors' business judgment); *In re William Lyon Homes*, No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) [Docket No. 105] (same); *accord Genco Shipping & Trading*, 509 B.R. at 463-64 (approving payment of counsel to an ad hoc group of unsecured noteholders' professional fees pursuant to a prepetition restructuring support agreement assumed under section 365 of the Bankruptcy Code and paid in accordance with the debtors' business judgment). Courts have, similarly, authorized debtors to perform under such agreements under section 363. *See In re Purdue Pharma, LP*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) (authorizing debtors to "perform the Reimbursement Agreement pursuant to section 363 of the Bankruptcy Code.").

39.     Per the Fee Motion Ruling, in determining whether to grant the relief requested herein, the Court will seek to ensure "that payments c[an] only be made for work that benefit[s] the estate as a whole, not individual creditors" *See* Dec. 14, 2020 Hr'g Tr. 36:2-5; *see also In re RCS Capital Corporation, et. al.*, Case No. 16-10223 (MFW) (Bankr. D. Del. March 16, 2016), Mar. 16, 2016 Hr'g Tr. 40:14-41:12  (authorizing payment of secured and unsecured creditor professional fees in connection with assumption of a restructuring support agreement based on finding that the agreement to be assumed was "of great benefit to the Debtor.").

40.     The Court need not wait until the end of the case (or confirmation of a plan) to approve such fees.  As Judge Walrath noted in authorizing payment of unsecured creditors' professional fees under a similar "benefit to the estate" standard in *RCS Capital*:

> I disagree with the United States Trustee that I need to wait and see if the plan is confirmed before I can approve such fees.  Getting the Debtor stabilized and on track to an exit; whether it is ultimately approved in that form is not necessary.  I do rely on the *O'Brien* case for that.  The *O'Brien* case did not rule that I have to

> wait and see the success of the sale; whether the stalking horse or another wins the sale before I can approve any breakup fee. I can approve a breakup fee, in advance, if I determine that is necessary to allow the sale to proceed and, in this case, to allow a plan to proceed . . . .

*RCS Capital*, Mar. 16, 2016 Hr'g Tr. 40:24-41:9. Similarly, in authorizing payment of professional fees and expenses of an unsecured noteholder ad hoc group and indenture trustee pursuant to the plan in *Extraction Oil & Gas* just last week, Judge Sontchi recognized the importance of debtors retaining flexibility to pay such amounts if doing so serves their business or reorganization interests:

> I would generally agree with this concept that 363 allows you to do anything unless it's controverted by the code in another provision. The whole point, of course, of having a debtor-in-possession with the authority to operate a business is for the Court to limit its interference in the operation of that business to points where it matters. It's just like the concept under *Butner v. United States* in the '30s that state law governs unless the Bankruptcy Code specifically takes over.

> So I don't think necessarily that 503 is exclusive on these issues, and I certainly have a world of respect for former Judge Gerber and what he did in Adelphia.

*In re Extraction Oil & Gas, Inc.,* No. 20-11548 (CSS) (Bankr. D. Del. Dec. 22, 2020), Dec. 22, 2020 Hr'g Tr. at 84:7-25.

41.     These cases make clear that creditor fees may be authorized on a prospective basis to the extent payment of such fees is necessary to facilitate progress in the cases for the benefit of the estate and all constituents. Such prospective relief is particularly appropriate (and important) here given the extent of the cooperation and assistance that the Debtors will require from the RSA Parties in the near term to advance their cases, as discussed in greater detail in <u>Section II</u> below. *See In re Purdue Pharma, LP*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 27, 2019) [Docket No. 550], Nov. 26, 2019 Hr'g. Tr. At 163:3-7 ("The Debtor just can't put a chest of money out on the street and say come and get it. Instead, the parties-in-interest need to approach the problems

this case presents in a very thoughtful and creative way. *That takes time and it takes money.*")
(emphasis added).

## II. Assumption of/Entry Into the Reimbursement Agreements Will Benefit the Debtors' Estates as a Whole

42.     The Debtors' request to assume and enter into (as applicable) the Reimbursement Agreements is consistent with section 365(a) of the Bankruptcy Code, Third Circuit precedent applying section 365(a) of the Bankruptcy Code, section 363(b) of the Bankruptcy Code, and this Court's Fee Motion Ruling. The Debtors require continued support and engagement from the RSA Parties – comprised of three organized groups who collectively represent *thousands* of governmental Opioid Claimants and a substantial portion of the Debtors' unsecured creditors – in order to advance their plan formulation process. It was for this reason that the Debtors determined in their business judgment to enter into the Prepetition Reimbursement Agreements (or otherwise reimburse their ad hoc groups' fees) prepetition. As discussed above, that decision has already borne fruit. Given the considerable work that remains to be done in these cases, and the important roles the RSA Parties will play in completing it, the Debtors' decision to request the relief herein is supported by an equally sound business justification.

43.     *First*, as described in the Initial Fee Motion and related briefing, and as the Court recognized in the Fee Motion Ruling, "[t]he ability to work with the ad hoc group[s] of creditors rather than trying to negotiate with vast numbers of individual creditors clearly provides for a more streamlined and convenient way to move toward completing a successful reorganization." Dec. 14, 2020 Hr'g Tr. 29:2-6. Assumption and entry into the Reimbursement Agreements facilitates the continued existence of and engagement from the three ad hoc groups, as well as their retention of skilled and experienced advisors (many of whom have had significant involvement in advancing

the *Purdue* case) to assist the Debtors in their efforts to progress their plan, garner additional support for that plan, and work through and resolve the remaining issues.

44.     The efficiency of working with the Governmental Plaintiff Ad Hoc Committee, MSGE Group and the Unsecured Notes Ad Hoc Group has already been on display in these chapter 11 cases.  For example, the Governmental Plaintiff Ad Hoc Committee and MSGE Group were able to coordinate a largely consensual resolution of the Debtors' injunction motions, sparing this Court and the appellate courts extended debates on questions of federalism and state sovereignty.[8]  The professionals employed by the Governmental Plaintiff Ad Hoc Committee have been instrumental in pausing continued litigation over the bar date and future claims representatives with the OCC, and two ad hoc groups comprised of private opioid claimants.

45.     *Second,* the Debtors cannot progress the plan contemplated by the RSA on their own; they will require continuous and active involvement by the RSA Parties on a host of issues in order to do so.  For example, the Unsecured Notes Ad Hoc Group, which would hold the vast majority of the reorganized Debtors' equity assuming consummation of the plan contemplated by the RSA, will need to play a central role in negotiating all issues affecting the reorganized Debtors. These issues include resolving disputes concerning the treatment of secured claims against the Debtors, establishing a workable post-emergence corporate governance structure, addressing the Debtors' exit financing or capital needs, and tying up the remaining "loose ends" under the heavily-negotiated deal memorialized in the RSA (including negotiating covenants with the opioid claimants to protect the Opioid Trust's deferred payment stream).

---

[8]     Indeed, the Governmental Plaintiff Ad Hoc Committee was able to assist the Debtors in resolving disputes under the injunction motions with certain states that were not RSA signatories and with the states in sovereign capacities unrelated to opioids.

46.     The governmental RSA Parties (which, through the warrants contemplated to be distributed to the Opioid Trust, will also have an interest in the reorganized Debtors), will need to play an important role on several of these matters, as well as others of particular importance to the broader universe of opioid claimants, including structuring the opioid trust, selecting administrators and professionals for the trust, developing trust distribution procedures, and more. Addressing these matters will affect (and benefit) a universe of case constituents that extends far beyond the RSA Parties, and the Debtors cannot get to that resolution alone; they will need the help of the RSA Parties represented by experienced and skilled professionals, and those professionals have reasonably requested some assurance of payment.

47.     *Third,* the Debtors require the immediate assistance of the governmental RSA Parties in advancing the largest current impediment to progressing their plan – building consensus around an allocation of the Opioid Trust (as defined in the RSA) assets, particularly as between governmental and private opioid claimants.  This issue will be the primary focus of the mediation (the "***Mediation***") that the Debtors previewed on December 14th in announcing their agreement with various parties, including the OCC, to conditionally adjourn the hearings concerning appointment of a future claimants' representative and the OCC's motion to establish an opioid claims bar date.

48.     There is a reason the Debtors will separately seek authority to retain the preeminent mass tort mediator in the United States, Kenneth Feinberg, to mediate the allocation issue:  its resolution is extremely valuable ***to the Debtors***.[9]  Specifically, resolution of allocation issues is

---

[9]     On December 14, the Debtors read into the record the terms and conditions of an agreed upon stipulation (the "***Adjournment Agreement***") adjourning the Debtors' motion to retain a future claims representative, and the OCC's motion to compel the Debtors to establish an opioid claims bar date.  As mentioned by the Debtors during the hearing on December 22, the Debtors have needed to work with the OCC and other parties to make changes to the agreed upon stipulation, and have done so.  By this Motion, the Debtors are representing that they have agreed with the OCC and the RSA Parties to a number of modifications to the December 14 Adjournment Agreement.  Specifically, to the extent the relief requested herein is granted, allocation

essential to the Debtors' ability to propose a plan that makes clear to opioid claimants of all types (governmental and private, present and future, and so on) what consideration will be made available to the holders of opioid claims that are ultimately determined to be entitled to recover under the Debtors' plan. Without that clarity, any plan that the Debtors file will, at a minimum, invite significant litigation, and the Debtors may face hindrances in soliciting votes on any plan given the uncertainty concerning opioid claimant recoveries.

49. The Debtors do not believe that mediation involving allocation issues is practicable absent the relief requested herein. The Governmental Plaintiff Ad Hoc Committee and MSGE Group are expected to take on leadership roles in that mediation. These groups are not simply a subset of many parties who will be involved and fighting to maximize their own recoveries. They are represented by professionals with deep experience in complex mass tort bankruptcies and recently played integral roles in the multi-month allocation mediation in *Purdue*. As a result, these professionals understand the central issues here in a way few others do and have a proven ability to facilitate deals and build consensus on allocation of a finite pot of consideration among tort claimants with diverse interests, priorities and concerns. The Debtors are confident that a similarly successful resolution of the allocation dispute is within their grasp in this case – but only with the active involvement of the Governmental Ad Hoc Group and MSGE Group.

50. *Finally,* as the Court is already aware, failure to obtain the relief sought herein will jeopardize the Debtors' RSA and the important commitments of the RSA Parties contained therein – including locked-in support from a broad group of opioid claimants and holders of over 84% of

---

negotiations will commence immediately upon such relief (with the motion to appoint Mr. Feinberg as mediator be filed no later than January 21, 2021). The Adjourned Motions will be rescheduled to on or about February 28, 2021, subject to this Court's availability. All references in the Adjournment Agreement (including, without limitation, with respect to Mediation dates) to (a) January 28, 2021 and February 28, 2021, respectively, are changed to February 28, 2021 and March 28, 2021, respectively. All other terms of the Adjournment Agreement remain unchanged.

the Debtors' fulcrum security for the plan contemplated thereby. It is an express requirement of the RSA that an order granting the Debtors authority to pay the RSA Party Professionals' fees is entered within 60 days of the Petition Date (a milestone that has since come and gone). *See* RSA § 6(a)(xxiii)(B).[10] While the RSA Parties have, to this point, refrained from terminating the RSA to provide the Debtors with another opportunity to obtain the relief required by the RSA with respect to reimbursement of professional fees, they have every reason to believe that if their second effort is unsuccessful, termination (by at least one, if not all, of the ad hoc groups party to the RSA) will occur.

51. Although the Debtors do not propose to assume the RSA, that does not diminish in any way the many benefits to the estate of maintaining the RSA, as discussed at length in the Debtors' papers filed in connection with the Initial Fee Motion. Make no mistake: the Debtors stand behind the RSA, and intend to honor their obligations thereunder as though that agreement were assumed. The only reason that the Debtors have *not* moved to assume the RSA is that by doing so, they would be inviting premature and unnecessary litigation from the OCC, the UCC and others over the efficacy of the RSA and confirmability of the plan contemplated thereby. Although the Debtors firmly believe that their plan is confirmable, confirmation issues will be addressed in due course; the Debtors' efforts in the near term are better directed toward working with constituents "outside the deal" – and particularly their two official committees – to build further support for their chosen path and continue to close out issues with those who oppose it.

---

[10] By agreement of the Debtors and the RSA Parties, this milestone was extended (in advance of the Fee Motion Ruling) from December 11, 2020 to December 18, 2020. It has not been further extended as of the filing of this Motion. It is important that this milestone be satisfied (or waived by the RSA Parties) so that the RSA remains in place in its current form, without creating an opportunity for parties to re-negotiate the RSA more broadly.

US-DOCS\119980567.15RLF1 24547943v.1

52.     For all of these reasons, the Debtors and their estates will secure substantial benefits through assumption of (or entry into) the Reimbursement Agreements and maintain the positive trajectory with which the Debtors commenced these cases.  Maintaining that trajectory and stability has been, and will continue to be, critical to the Debtors' ability to instill confidence in the vendors, employees, and customers on whom their businesses depend, and ultimately, to maximize the value of these estates.  These are precisely the sort of generalized estate benefits that supported reimbursement of the professional fees of the unsecured creditor RSA parties in *RCS Capital*:

> I find sufficient evidence to support that ruling, based on the testimony and the course of this bankruptcy case, to prove that this entire agreement is of great benefit to the Debtor.  It has already stabilized the Debtors' business.  There has been no termination of Debtors' business operations, either by regulators or by a loss of the Debtors' principal asset which is the investment advisor network.  It has also locked a lot of creditors into approval of the plan that, again, allows a swift exit.  Those are substantial benefits to the estate.

*In re RCS Capital Corporation, et. al.*, Mar. 16, 2016 Hr'g Tr. 40:14-23.

## III.    Safeguards in the Proposed Order and Reimbursement Agreements Ensure That Only Estate-Beneficial Expenses Will Be Reimbursed

53.     In the Fee Motion Ruling, the Court expressed its desire to see various limitations imposed under the reimbursement order in *Purdue*, which the Court viewed as ensuring that payments made pursuant to such reimbursement agreements benefit the debtors' estates, imposed in any order authorizing reimbursement of professional fees.  *See* Dec. 14, 2020 Hr'g Tr. 38:6-11 ("[T]he relief sought by the debtors goes well beyond the restrictions imposed by Judge Drain in *Purdue* to ensure that any payments are made solely to benefit the estate rather than individual creditors.  Any agreement to make such payments and any order approving those payments would need to ensure those protections.").  Specifically, the Court identified six such limitations:

- requiring that any reimbursable expenses be reasonable, documented, and reimbursable under the applicable reimbursement agreement;

- excluding reimbursement of fees incurred by an individual ad hoc group member for professionals retained by that member (including internal counsel);

- excluding reimbursement of fees and expenses of an individual ad hoc group member for filing objections to other creditors' claims or advancing or prosecuting the member's own claim;

- prohibiting payment of allocation-related fees and expenses until the earlier of RSA execution by all parties or confirmation of a plan;

- requiring certification by counsel that requested fees and expenses do not relate to allocation; and

- requiring reimbursement to be subject to the interim compensation order.

*See* Dec. 14, 2020 Hr'g Tr. 35:7-36:1.

54.     The *first* and *second* of these limitations were included in the proposed order relating to the Initial Fee Motion, and are again included in the Proposed Order.  *See* Proposed Order, ¶ 2 (providing only for reimbursement of "reasonable, documented" fees in accordance with the reimbursement agreements); ¶ 3 (excluding from reimbursable out of pocket costs, fees for services rendered by a professional, including internal advisors, retained or employed by ad hoc group members).

55.     With respect to the *sixth* limitation, the Proposed Order provides that the RSA Parties' professionals will comply with the Interim Compensation Order [Docket No. 770], including by filing regular fee statements and applications and subjecting their fees to 20% holdbacks.  *See* Proposed Order, ¶ 4.  These revisions will result in the RSA Party professionals' fees and expenses being subject to the same level of scrutiny as estate professionals who receive current payment of their fees as administrative expenses (including review by the fee examiner).

56.     The *third* limitation, relating to fees incurred in connection with objections to other creditors' claims or the prosecution or advancement of individual group members' own claims, is adequately addressed.  The Proposed Order: (a)  limits the scope of reimbursable fees to those

incurred "in furtherance of the diligence, negotiation, prosecution, documentation and implementation of a comprehensive restructuring of the Debtors in accordance with the terms and conditions of the Engagement/Reimbursement Agreements"; and (b) excludes other fees, including those incurred in furtherance of litigation against the Debtors, the filing of claim objections by ad hoc group members, and the prosecution of group members' individual claims. *See* Proposed Order, ¶ 2. As a result, "in-scope" fees will necessarily relate to work associated with implementing the hard-fought settlements and the RSA transactions that the Debtors have already reached, which will minimize litigation and pave the way for an efficient restructuring of the Debtors, to the benefit of the estates. The Debtors and the RSA Parties formulated the scope this way to ensure that the RSA Parties do not bear the risk that other parties may assert that actions taken in connection with implementation of the RSA – including, by way of example, asserting that the plan can reinstate the Debtors' secured debt – runs afoul of the *Purdue* restrictions on "advancement" of the RSA Parties' own claims or "objections" to the claims of other creditors.

57. The *fourth* and *fifth* limitations, which would defer consideration of reimbursement of allocation-related fees, is also inappropriate in the context of these cases. As discussed above, resolving allocation issues is critical to the Debtors' ability to advance these cases. The Debtors will be unable to achieve such resolution without the leadership that the governmental RSA Parties are prepared to provide in the allocation mediation. As a predicate, the Debtors need to provide assurance that they will be authorized to provide compensation for this time-intensive and important work. This leadership – by many of the same professionals – has recently borne fruit in *Purdue*, and the Debtors expect no less favorable an outcome here.

58. The Debtors' reimbursement obligations are, therefore, limited in scope, and professionals' requests for reimbursement will be subject to robust scrutiny by the Court and

parties in interest. These protections ensure that the fees and expenses to be paid under the Reimbursement Agreements are those that will benefit the estate as a whole, and not just the creditors receiving reimbursement – consistent with the Fee Motion Ruling.

## NOTICE

59. Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Unsecured Notes Ad Hoc Group; (c) the agent under the Debtors' secured term and revolving financing facilities; (d) counsel to the ad hoc group of holders of the Debtors' unsecured notes; (e) the indenture trustees for the Debtors' outstanding notes; (f) counsel to the Governmental Plaintiff Ad Hoc Committee; (g) counsel to the official committee of unsecured creditors; (h) counsel to the official committee of opioid claimants; (i) counsel to the MSGE Group, (j) the United States Attorney's Office for the District of Delaware; (k) the attorneys general for all 50 states and the District of Columbia; (l) the United States Department of Justice; (m) the Internal Revenue Service; (n) the Securities and Exchange Commission; (o) the United States Drug Enforcement Agency; (p) the United States Food and Drug Administration; and (q) all parties entitled to notice pursuant Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

*[Remainder of page intentionally left blank]*

US-DOCS\119980567.15RLF1 24547943v.1

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: December 30, 2020

*/s/ Michael J. Merchant*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com


- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:          george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com
                anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:          jeff.bjork@lw.com

- and -

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:          jason.gott@lw.com

*Counsel to the Debtors and the Debtors in Possession*

US-DOCS\119980567.15RLF1 24547943v.1