**THE DISCLOSURE STATEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS IN ACCORDANCE WITH THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES FROM THE VERSION FILED HEREWITH. THE PARTIES RESERVE ALL RIGHTS TO AMEND, MODIFY, OR SUPPLEMENT THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT.**

**THE PLAN AND THIS DISCLOSURE STATEMENT ARE BEING SUBMITTED FOR APPROVAL BUT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE PLAN AND THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE[2]

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:        george.davis@lw.com

---

[1]    A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]    This Disclosure Statement remains subject to continuing negotiations in accordance with the terms of the Restructuring Support Agreement and the final version may contain material differences from the version filed herewith. The parties reserve all rights to amend, modify, or supplement this Disclosure Statement in accordance with the terms of the Restructuring Support Agreement.

Email:          collins@rlf.com                          george.klidonas@lw.com
                merchant@rlf.com                         andrew.sorkin@lw.com
                steele@rlf.com                           anu.yerramalli@lw.com
                schlauch@rlf.com                 - and -

                                                 Jeffrey E. Bjork (admitted *pro hac vice*)
                                                 **LATHAM & WATKINS LLP**
                                                 355 South Grand Avenue, Suite 100
                                                 Los Angeles, California 90071
                                                 Telephone:    (213) 485-1234
                                                 Facsimile:    (213) 891-8763
                                                 Email:        jeff.bjork@lw.com

                                                 - and -

                                                 Jason B. Gott (admitted *pro hac vice*)
                                                 **LATHAM & WATKINS LLP**
                                                 330 North Wabash Avenue, Suite 2800
                                                 Chicago, Illinois 60611
                                                 Telephone:    (312) 876-7700
                                                 Facsimile:    (312) 993-9767
                                                 Email:        jason.gott@lw.com

*Counsel to the Debtors and Debtors in Possession*
Dated:  June 8, 2021

**THE VOTING DEADLINE IS 4:00 P.M. PREVAILING EASTERN TIME ON [AUGUST 16], 2021 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).**

**FOR YOUR VOTE TO BE COUNTED, YOU MUST RETURN YOUR PROPERLY COMPLETED BALLOT TO THE NOTICE AND CLAIMS AGENT OR YOUR NOMINEE, AS APPLICABLE, SO THAT YOUR BALLOT, NOTES MASTER BALLOT, OR NON-NOTES MASTER BALLOT, AS APPLICABLE, IS ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT, PRIME CLERK LLC BEFORE THE VOTING DEADLINE.**

**EACH OF THE AFOREMENTIONED BALLOTS CONTAIN DETAILED VOTING INSTRUCTIONS AND SETS FORTH, AMONG OTHER THINGS, THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS.**

---

**RECOMMENDATION BY THE DEBTORS AND RELATED SUPPORT**

**The Debtors believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders.  All creditors entitled to vote on the Plan are urged to vote in favor of the Plan.**

**The Board of Directors of Mallinckrodt plc and the board of directors or managers, members, or partners, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.**

**The Supporting Term Lenders, who, together with other Supporting Parties, hold approximately 70% in principal amount of the Debtors' First Lien Term Loan Claims, support the Plan.**

**Fifty (50) U.S. States and Territories and the Plaintiffs' Executive Committee in the Multi-District Litigation, including the members of the Governmental Plaintiff Ad Hoc Committee, that each maintain or represent Opioid Claims against certain of the Debtors, support the Plan.[3]**

**The MSGE Group, representing 1,318 entities that maintain Opioid Claims against certain of the Debtors, including 1,245 counties, cities and other municipal entities, 9 tribal nations, 13 hospital districts, 16 independent public school districts, 33 medical groups, and 2 funds, supports the Plan.**

**The Guaranteed Unsecured Notes Ad Hoc Group, who, together with the other Supporting Parties hold approximately 84% in principal amount of the Debtors' Guaranteed Unsecured Notes Claims, supports the Plan.**

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

[3]    Without limitation of the rights under the Restructuring Support Agreement, the Governmental Plaintiff Ad Hoc Committee's support for the Plan is conditioned upon, among other things, a resolution acceptable to the Governmental Plaintiff Ad Hoc Committee with respect to the following issues: (1) the treatment of the U.S. Government Opioid Claims; (2) Additional Insurance Rights; and (3) all other open items in the Plan, including the forms of the Definitive Documents.

Mallinckrodt plc and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules thereto, and as maybe amended, modified, or supplemented from time to time, the "**Plan**"). A draft of the Plan is attached hereto as **Exhibit A**. All capitalized terms used but not otherwise defined herein have the definition given to them in the Plan; to the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX BELOW, THE PLAN ATTACHED AS EXHIBIT A, AND THE PLAN SUPPLEMENT BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN.**

**HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.**

**The voting deadline to accept or reject the Plan is 4:00 p.m. Eastern Time on [August 16], 2021, unless extended by the Debtors (the "*Voting Deadline*").**

**To be counted, your Ballot, Notes Master Ballot, or Non-Notes Master Ballot, as applicable, must be properly completed and returned to the Notice and Claims Agent, Prime Clerk LLC, in accordance with the voting instructions on such Ballot and actually received by the Notice and Claims Agent, via regular mail, overnight courier, or personal delivery at the appropriate address, via email, or via the Notice and Claims Agent's ballot upload site, by the Voting Deadline.**

A summary of the voting instructions is set forth in Section [I.D] of this Disclosure Statement and the Disclosure Statement Order [Docket No. [ ● ]]. More detailed instructions are also contained in the Ballots distributed to the creditors entitled to vote on the Plan.

This Disclosure Statement, the Plan, the Plan Supplement, and any attachments, exhibits, supplements and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan, and also may not be relied upon for any purpose other than to determine how to vote on the Plan (except with respect to any Plan Supplement documents that may be relied upon for purposes other than to determine how to vote on the Plan). Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements or annexes attached hereto. If given or made, such information or representation may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors. The delivery of this Disclosure Statement will not under any circumstances represent that the information herein is correct as of any time after the date hereof.

This Disclosure Statement shall not constitute an offer to sell, or solicitation of an offer to buy, nor will there be any distribution of, any of the securities described herein until the Effective Date of the Plan.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, the Debtors will file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' document website located online at https://restructuring.primeclerk.com/mallinckrodt no later than [August 2], 2021 (*i.e.*, twenty-one (21) days before the Voting Deadline).

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.  The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date.  The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan.  This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors.  Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors believe that the solicitation of votes on the Plan made in connection with this Disclosure Statement, and the offer of certain new securities that may be deemed to be made pursuant to the solicitation of votes on the Plan, are exempt from registration under the Securities Act of 1933, as amended (the "***Securities Act***") and related state statutes by reason of the exemption provided by section 1145(a)(1) of the Bankruptcy Code and expect that the offer and issuance of the securities under the Plan will be exempt from registration under the Securities Act and related state statutes by reason of the applicability of section 1145(a)(1) of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act.

The effectiveness of the Plan is subject to material conditions precedent.  See Article V.H below and Article VIII of the Plan.  There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Equity Interests in, the Debtors (including without limitation those Holders who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan, but excluding holders who are entitled to, and do, opt out), will be bound the by the terms of the Plan and the transactions contemplated thereby, including the third-party releases contained therein.

## IMPORTANT NOTICES REGARDING THIRD-PARTY RELEASES BY HOLDERS OF EQUITY INTERESTS AND CLAIMS OTHER THAN OPIOID CLAIMS

**If you are a Holder of a Claim other than for Opioid Claimants, you may be deemed to be granting releases to third parties under the Plan.  Specifically, pursuant to Article IX.C of the Plan, each Holder of a Claim other than Opioid Claimants are deemed to grant a third-party release if (a) such Holder votes to accept the Plan, (b) such Holder is Unimpaired under the Plan, (c) such Holder whose**

vote to accept or reject the Plan is solicited (i) abstains from voting on the Plan and (ii) does not opt out of granting the releases set forth in the Plan, (d) such Holder votes, or is deemed, to reject the Plan but does not opt out of granting the releases set forth in the Plan, and (e) to the maximum extent otherwise permitted by law.  This release is discussed further in Article [V.I] of this Disclosure Statement.  Instructions for opting out of the third-party releases are set forth in the Solicitation Package distributed in connection with this Disclosure Statement.

### IMPORTANT NOTICES REGARDING RELEASES OF OPIOID CLAIMS

If you are an Opioid Claimant, you will be deemed to be granting releases to the Debtors, the Reorganized Debtors and certain third parties referred to as Protected Parties under the Plan with respect to such Opioid Claims (including Opioid Demands).  Pursuant to Article IX.D of the Plan, as of the Effective Date, each Opioid Claimant (in its capacity as such) will be deemed to have released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, each Debtor, Reorganized Debtor, and Protected Party from any and all Claims (including Opioid Claims and Opioid Demands).

Further, pursuant to Article IX.G of the Plan, from and after the Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims (including Opioid Demands) based upon or arising from the Debtors' pre-confirmation conduct or activities shall be to the Opioid MDT II or the Opioid Creditor Trusts, and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claims (including Opioid Demands) against any Protected Party or any property or interest in property of any Protected Party.

Each Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the Opioid MDT II Documents or the Opioid Creditor Trust Documents, as applicable, and shall receive a recovery, if any, from the Opioid MDT II or Opioid Creditor Trusts, as applicable, and solely in accordance with the Opioid MDT II Documents or the Opioid Creditor Trust Documents, as applicable.  The Opioid MDT II Documents or Opioid Creditor Trust Documents are binding on the Holders of all Opioid Claims (including Opioid Demands).  The Opioid MDT II Documents and Opioid Creditor Trust Documents shall be filed with the Plan Supplement.  Additional matters related to the Opioid MDT II are discussed in Article V of this Disclosure Statement.

### FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Article IX.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws.  This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission or any securities

exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

## **<u>QUESTIONS AND ADDITIONAL INFORMATION</u>**

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact the Debtors' Notice and Claims Agent, Prime Clerk LLC by visiting the Debtors' document website at https://www. restructuring.primeclerk.com/Mallinckrodt.

**TABLE OF CONTENTS**

**Page**

I. EXECUTIVE SUMMARY ............................................................................................. 1

    A.    Purpose and Effect of the Plan ................................................................. 1
    B.    Classification and Treatment of Claims and Interests Under the Plan ................................ 3
    C.    Filing of the Plan Supplement ................................................................. 20
    D.    [Solicitation Procedures] ......................................................................... 21
    1.    The Solicitation and Voting Procedures ................................................. 21
    2.    The Notice and Claims Agent ................................................................. 21
    3.    Holders of Claims Entitled to Vote on the Plan ..................................... 21
    4.    The Voting Record Date ........................................................................... 23
    5.    Contents of the Solicitation Package ....................................................... 24
    6.    Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan ........................................................................... 24
    7.    Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims ........................................................... 25
    8.    Additional Distribution of Solicitation Documents ................................ 27
    E.    Voting Procedures .................................................................................... 27
    1.    The Voting Deadline ................................................................................ 27
    2.    Types of Ballots ...................................................................................... 28
    3.    Voting Instructions .................................................................................. 29
    4.    Voting Procedures ................................................................................... 29
    a.    Voting Procedures with Respect to Holders of Class 3 – First Lien Notes Claims, Class 4 – Second Lien Notes Claims, Class 5 – Guaranteed Unsecured Notes Claims, and Class 6(d) - Legacy Unsecured Notes Claims ............................... 30
    b.    Voting Procedures with Respect to Holders of Claims in Classes 6(a) (Acthar Claims); 6(b) (Generics Price Fixing Claims); 6(c) (Asbestos Claims); 6(e) (Environmental Claims); 6(f) (Other General Unsecured Claims); and 10 (Settled Federal/State Acthar Claims) ................................................................... 31
    c.    Voting Procedures with Respect to Holders of Opioid Claims in Classes 8(a) (State Opioid Claims); 8(b) (Municipal Opioid Claims); 8(c) (Tribe Opioid Claims); 8(d) (U.S. Government Opioid Claims); 9(a) (Third-Party Payor Opioid Claims); 9(b) (PI Opioid Claims); 9(c) (NAS PI Opioid Claims); 9(d) (Hospital Opioid Claims); 9(e) (Other Opioid Claims); 9(f) (NAS Monitoring Opioid Claims); 9(g) (Emergency Room Physicians Opioid Claims); and 9(h) (Other Opioid Claims) ........................................................ 32
    d.    Voting Procedures with Respect to Holders of Claims in All Other Voting Classes ............................................................................... 33
    5.    Tabulation of Votes ................................................................................. 34
    F.    Confirmation of the Plan ......................................................................... 35
    1.    The Confirmation Hearing ...................................................................... 35
    2.    The Deadline for Objecting to Confirmation of the Plan ....................... 35
    3.    Effect of Confirmation of the Plan .......................................................... 37
    G.    The Plan Releases .................................................................................... 37
    H.    Consummation of the Plan ...................................................................... 38
    I.    Risk Factors ............................................................................................. 38

II. **BACKGROUND TO THE CHAPTER 11 CASES** ............................................. 39

A.      The Debtors' Corporate Structure..................................................................39
B.      The Debtors' Business Operations.................................................................40
C.      The Debtors' Prepetition Capital Structure...................................................43

III. KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES ...................46

A.      The Opioid Litigations...................................................................................46
B.      The Opioid Settlement Negotiations and Summary of Terms.......................47
C.      Litigation......................................................................................................50
1.      Acthar Related Litigations ............................................................................50
2.      Other Litigations ...........................................................................................50
D.      The Federal/State Acthar Settlement Agreement.........................................51
E.      The Restructuring Support Agreement .........................................................52
1.      The DOJ/CMS/States Settlement...................................................................53
2.      The Management Incentive Plan ...................................................................53
F.      Prepetition Retention Payments...................................................................54
G.      Retention of the Debtors' Advisors ..............................................................55
H.      The Specialty Generics Independent Directors.............................................55

IV. EVENTS DURING THE CHAPTER 11 CASES ..............................................................56

A.      Commencement of Chapter 11 Cases ...........................................................56
B.      First Day Motions .........................................................................................56
C.      Injunctive Motions........................................................................................56
D.      Procedural Motions ......................................................................................57
E.      Appointment of Unsecured Creditors' Committee .......................................57
F.      Appointment of Opioid Claimants' Committee.............................................57
G.      Bar Date Motion ...........................................................................................57
H.      Approval of Certain Intercompany Restructuring Transactions ...................58
I.      The Debtors' Professional Advisor Retentions..............................................58
J.      The Voluntary Injunction and Appointment of the Monitor...........................59
K.      [Opioid Claimant Mediation]........................................................................61
1.      Proposed Settlement Amongst Certain Parties to the Mediation ..................62
L.      First Lien Term Lender Joinder and Mandatory Prepayment..........................63
M.      Exclusivity ....................................................................................................64
N.      The Key Employee Incentive Plan .................................................................64
O.      Appointment of a FCR...................................................................................65
P.      The Debtors' Diligence Related to the Plan Releases.....................................66
Q.      Extension of the Challenge Period Under the Cash Collateral Order..............67
1.      Potential Estate Causes of Action .................................................................68
R.      The SEC Letter Regarding the Debtors' Releases Under the Plan ..................69
S.      Acthar Claims Related Litigation in these Chapter 11 Cases .........................69
1.      Class Proof of Claim Objections....................................................................70
2.      Discharge and Related Claim Litigation ........................................................71
3.      The Humana Claims Motions ........................................................................72
4.      Acthar Administrative Claims and the Setting of an Administrative Claim Bar
        Date and Post-Reorganization Liabilities ......................................................73
T.      Generics Price Fixing Litigation....................................................................74
1.      Generics Price Fixing Lift Stay Motion..........................................................74
U.      The Administrative Claims Bar Date..............................................................75
V.      Contingent Claims Asserted Against the Debtors...........................................75

W.     [The Opioid Trusts] ........................................................................................... 76
1.      [The Private Opioid Creditor Trusts] ............................................................... 76
2.      [The Public Opioid Creditor Trusts] ................................................................ 80
X.      The Opioid Noticing Program ........................................................................ 83
1.      The Opioid Notice Plan - Direct Notice ......................................................... 83
2.      The Opioid Notice Plan - Media and Community Outreach Strategy ............ 84
Y.      The Canadian Recognition Proceedings ......................................................... 85
Z.      The Irish Examinership Proceedings ............................................................... 87
1.      Petition Hearing .............................................................................................. 87
2.      Approval of Proposals for the Scheme of Arrangement ................................. 87
3.      Approval by the High Court of Ireland ........................................................... 87
AA.    Disclosure Statement Objections .................................................................... 88

V. SUMMARY OF THE PLAN ........................................................................................ 94

A.      Classification and Treatment of Claims and Interests under the Plan ............. 94
B.      Acceptance or Rejection of the Plan; Effect of Rejection of Plan .................... 95
C.      Means of Implementation of the Plan .............................................................. 97
D.      Matters Related to the Opioid MDT II and Opioid Creditor Trusts .............. 103
E.      Treatment of Executory Contracts and Unexpired Leases; Employee Benefits;
        and Insurance Policies .................................................................................... 111
F.      Provisions Governing Distributions ............................................................... 116
G.      Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or
        Interests ......................................................................................................... 119
H.      Conditions Precedent to the Effective Date ................................................... 122
I.       Release, Injunction, and Related Provisions .................................................. 124

VI. CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF REORGANIZED
     DEBTORS ................................................................................................................. 135

A.      Summary of Capital Structure of Reorganized Debtors ................................. 135
B.      Corporate Governance and Management of the Reorganized Debtors ........... 142

VII. CONFIRMATION OF THE PLAN ........................................................................... 144

A.      Confirmation Hearing .................................................................................... 144
B.      Confirmation ................................................................................................. 146
C.      Classification of Claims and Interests ........................................................... 151
D.      Consummation ............................................................................................... 151
E.      Exemption from Certain Transfer Taxes ....................................................... 151
F.      Dissolution of Committees ............................................................................ 152
G.      Modification of Plan ...................................................................................... 152
H.      Revocation or Withdrawal of the Plan; Reservation of Rights ....................... 152
I.       Post-Confirmation Jurisdiction of the Bankruptcy Court .............................. 152

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............... 155

A.      Continuation of Chapter 11 Cases ................................................................ 155
B.      Liquidation under Chapter 7 .......................................................................... 155
C.      Dismissal of Chapter 11 Cases. ..................................................................... 156

IX. RISK FACTORS TO CONSIDER BEFORE VOTING ................................................................. 156

    A.    Certain Bankruptcy Law Considerations ......................................................... 156
    B.    Risks Relating to the Capital Structure of the Reorganized Debtors ............................. 160
    C.    Risks Relating to the Debtors' Business Operations and Financial Conditions ............. 163
    D.    Certain Risk Factors Related to the Irish Examinership Proceedings............................ 169
    E.    Certain Risk Factors Related to the Canadian Recognition Proceedings ...................... 171
    F.    Additional Factors ......................................................................................... 171

X. SECURITIES LAW MATTERS .............................................................................................. 172

    A.    Issuance & Transfer of 1145 Securities ......................................................... 172

XI. CERTAIN U.S. INCOME TAX CONSEQUENCES OF THE PLAN ............................................. 175

    A.    Introduction................................................................................................... 175
    B.    U.S. Federal Income Tax Consequences to the U.S. Tax Group and the Trusts ........... 176
    C.    U.S. Federal Income Tax Consequences to Holders of Certain Claims ........................ 181

XII. IRELAND INCOME TAX CONSEQUENCES ........................................................................ 199

    A.    Irish Tax Consequences To The Plan ............................................................. 199

XIII. LUXEMBOURG INCOME TAX CONSEQUENCES .............................................................. 202

    A.    Luxembourg Tax Consequences To The Plan ................................................. 202

XIV. CONCLUSION AND RECOMMENDATION........................................................................ 206

## EXHIBITS

EXHIBIT A:    Plan

EXHIBIT B:    Restructuring Support Agreement

EXHIBIT C:    Corporate Structure Chart

EXHIBIT D:    Financial Projections

EXHIBIT E:    Liquidation Analysis

EXHIBIT F:    Valuation Analysis

> **THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

# I.
# EXECUTIVE SUMMARY

The Debtors in the Chapter 11 Cases pending in the United States Bankruptcy Court for the District of Delaware submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes on the *Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated May [ ● ], 2021.  A copy of the Plan is attached hereto as **Exhibit A**.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in this Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of this Disclosure Statement and/or the Plan.

This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the Chapter 11 Cases;

- the significant events that have occurred during the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan;

- certain risk factors relating to the Debtors, the Reorganized Debtors and confirmation of the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

## A.    **Purpose and Effect of the Plan**

### 1.    **Plan of Reorganization Under Chapter 11 of the Bankruptcy Code**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.

A bankruptcy court's confirmation of a plan binds the debtors, any entity acquiring property under the plan, any holder of a claim or equity interest in the debtors, and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

### 2.  Restructurings Under the Plan

The Plan contemplates that on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may, consistent with the terms of the Restructuring Support Agreement, take all actions as may be necessary to effectuate the Plan, including:

- the execution and delivery of appropriate agreements or other documents of sale, merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law;

- the creation of a NewCo and/or any NewCo Subsidiaries (if any) that may, at the Debtors' or Reorganized Debtors' option in consultation with the Supporting Parties, acquire all or substantially all the assets of one or more of the Debtors;

- the execution and delivery of an equity and asset transfer agreement (if applicable) and any other appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan;

- the creation of certain opioid trusts where all Opioid Claims will be channeled to in accordance with the terms of the Plan and the applicable trust documents (to be filed with the Plan Supplement);

- the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other organizational documents with the appropriate governmental authorities pursuant to applicable law; and

- all other actions that the Reorganized Debtors determine are necessary or appropriate.

The Plan further contemplates the treatment of Allowed Claims and Interests as set forth in the below table of "*Summary Of Expected Recoveries*".

With respect to implementing the Restructuring Transactions under the Plan, the Debtors intend to disclose the precise steps to be taken in the Restructuring Transactions in the Plan Supplement and will make those transactions public with sufficient time for all voting creditors to consider them before submitting their Ballots.

### 3.  The General Unsecured Claims Cash or Equity Preference Indication

The Plan provides that Holders of General Unsecured Claims are entitled to indicate their preference, via a duly-submitted Ballot, to receive New Mallinckrodt Ordinary Shares as a portion of their distribution under the Plan.  The proportion of the distributions made to such Holders in the form of New Mallinckrodt Ordinary Shares will be equal to the proportion of the Ballots submitted by Holders of General Unsecured Claims indicating the requisite election, calculated using the amount of General Unsecured Claims attributed to each such Ballot for purposes of voting on the Plan under the Disclosure Statement Order.

B.        **Classification and Treatment of Claims and Interests Under the Plan**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE, INCLUDING BASED ON THE LIQUIDATION OF CLAIMS CURRENTLY ASSERTED AS UNLIQUIDATED. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE IX BELOW. THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

**FOR HOLDERS OF APPLICABLE GENERAL UNSECURED CLAIMS IN EACH OF CLASSES 6(A)-(F), THE FOLLOWING RECOVERY RANGES TAKE INTO CONSIDERATION CONTINGENT CLAIMS THAT ARE EITHER ALLOWED IN FULL OR DISALLOWED IN FULL. THESE CATEGORIES OF CONTINGENT CLAIMS ARE DESCRIBED FURTHER IN ARTICLE [IV.V] BELOW. EACH CREDITOR REVIEWING THIS DISCLOSURE STATEMENT SHOULD REVIEW ARTICLE [IV.V] BELOW CAREFULLY TO UNDERSTAND THE IMPACT OF CONTINGENT LITIGATION CLAIMS ON THEIR RESPECTIVE DISTRIBUTIONS.**

**Further, based on the Debtors' diligence and analysis prepared in early Q1 2021, the Debtors believe Holders of Trade Claims and General Unsecured Claims in Classes 6 and 7, respectively, in the aggregate, would be entitled to approximately $34 million, as a midpoint, in the absence of any of the settlements embodied in the Restructuring Support Agreement and in a strict application of the absolute priority rule under the Bankruptcy Code, applied entity-by-entity among all the Debtors and Non-Debtor Affiliates. Moreover, such Holders would recover less than $7 million in the aggregate in a chapter 7 liquidation, as demonstrated in the Debtors' Liquidation Analysis attached to this Disclosure Statement. Accordingly, the Debtors believe the Plan provides such creditors with multiples more than their entitlements by making available $150 million for these claimants. The Debtors will substantiate these creditors' entitlements in connection with the Confirmation Hearing.**

**Further, the Plan is based on the Debtors' conclusion that the Guaranteed Unsecured Notes have a structurally senior position to the vast majority of General Unsecured Claims, due to the guarantees that support the Guaranteed Unsecured Notes from, among other Debtors, the Debtors that owned substantially all of the Specialty Brands' intellectual property as of the Petition Date. In addition, holders of First Lien Revolving Credit Facility Claims, 2024 First Lien Term Loan Claims, 2025 First Lien Term Loan Claims, First Lien Notes Claims, and Second Lien Notes Claims have Secured Claims against such Debtors, among others.**

The following "*Summary of Expected Recoveries*" chart refers to the "*Filed Amount*", which is the aggregate of all liquidated amounts asserted in filed Proofs of Claim, *less* any redundant Proofs of Claim filed by the same creditor(s) that assert(s) substantially identical disputed, unliquidated, or contingent Claims against multiple Debtors, *plus* any unmatched prepetition amounts reflected in the Debtors' books and records as of the fiscal month ended April 23, 2021. The "*Filed Amount*" does not include any provision for Proofs of Claim as unliquidated and with no asserted amounts and settled claims to be exempted from the claims register. Further, for Classes 6(a)-(f), references below to the "*scheduled amount*" refers to the

Debtors' Schedules of Assets and Liabilities and reference to the "*books and records amounts*" means as of the fiscal month ended April 23, 2021.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Secured Claims<br><br>Filed Amount: $[2,200,000.00] | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor, shall (i) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such Claim Unimpaired, in each case, as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and following consultation with the Supporting Term Lenders. | 100% |
| 2(a) | First Lien Revolving Credit Facility Claims<br><br>Expected Principal Amount: $900,000,000.00 | All Allowed First Lien Revolving Credit Facility Claims shall be repaid in full in Cash, in each case, at par plus accrued and unpaid interest, accounting for adequate protection payments (which, notwithstanding anything to the contrary in the Cash Collateral Order, shall be retained by the First Lien Revolving Lenders and not recharacterized as principal payments). For the avoidance of doubt, the foregoing treatments shall not be, and shall not be deemed, a distribution or payment in respect of Shared Collateral. | 100% |
| 2(b) | 2024 First Lien Term Loan Claims<br><br>Expected Principal Amount (as of April 23, 2021): $1,407,557,343.72[5] | All Allowed 2024 First Lien Term Loan Claims shall receive, on the Effective Date, in full and final satisfaction, settlement, release and discharge of such Claims, at the Debtors' option either (a) the New Takeback Term Loans *plus* repayment in full in Cash of the First Lien Term Loans Accrued and Unpaid Interest *plus* the Term Loan Exit Payment or (b) repayment of such Claims in full in Cash in an amount equal to the 2024 First Lien Term Loans Outstanding Amount *plus* the First Lien Term Loans Accrued and Unpaid Interest *plus* the Term Loan Exit Payment. For the avoidance of doubt, neither of the foregoing treatments or any component thereof are, nor shall such | Treatment in clause (a): N/A<br><br>Treatment in clause (b): 100% |

---

[4]    The Debtors are currently in the process of reconciling Claims. As such, the ranges contained in this summary may not be exact and are subject to further change. For the avoidance of doubt, this summary does not reflect contingent and unliquidated Claims that will ultimately be liquidated as part of the reconciliation process.

[5]    Allowed 2024 First Lien Term Loan Claims also include First Lien Term Loans Accrued and Unpaid Interest plus any other accrued and unpaid First Lien Obligations directly or ratably applicable to the 2024 First Lien Term Loan Claims. Pro forma for the Effective Date per the Valuation Analysis, the 2024 First Lien Term Loan Claims is $1,403,891,829.81.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | treatments or any component thereof be deemed, a distribution or payment in respect of Shared Collateral. | |
| 2(c) | 2025 First Lien Term Loan Claims<br><br>Expected Principal Amount (as of April 23, 2021): $373,591,066.61[6] | All Allowed 2025 First Lien Term Loan Claims shall receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, at the Debtors' option either (a) the New Takeback Term Loans *plus* repayment in full in Cash of the First Lien Term Loans Accrued and Unpaid Interest *plus* the Term Loan Exit Payment or (b) repayment of such Claims in full in Cash in an amount equal to the 2025 First Lien Term Loans Outstanding Amount *plus* the First Lien Term Loans Accrued and Unpaid Interest *plus* the Term Loan Exit Payment. For the avoidance of doubt, neither of the foregoing treatments or any component thereof are, nor shall such treatments or any component thereof be deemed, a distribution or payment in respect of Shared Collateral. | Treatment in clause (a): N/A<br><br>Treatment in clause (b): 100% |
| 3 | First Lien Notes Claims<br><br>Principal Amount: $495,032,000.00 | If at the time of Confirmation (i) the First Lien Notes Makewhole Claims are not Allowed and (ii) the Allowed First Lien Notes Claims may be reinstated without the First Lien Notes Makewhole Claims being Allowed, all Allowed First Lien Notes Claims shall be Reinstated. Otherwise, all Allowed First Lien Notes Claims shall receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, the Cram-Down First Lien Notes in a face amount equal to the amount of such Allowed First Lien Notes Claims. | 100% |
| 4 | Second Lien Notes Claims<br><br>Principal Amount: $322,868,000.00 | If at the time of Confirmation (i) the Second Lien Notes Makewhole Claims are not Allowed and (ii) the Allowed Second Lien Notes Claims may be reinstated without the Second Lien Notes Makewhole Claims being Allowed, all Allowed Second Lien Notes Claims shall be Reinstated. Otherwise, all Allowed Second Lien Notes Claims shall receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, the Cram-Down Second Lien Notes in a face amount equal to the amount of such Allowed Second Lien Notes Claims. | 100% |

---

[6]    Allowed 2025 First Lien Term Loan Claims also include First Lien Term Loans Accrued and Unpaid Interest plus any other accrued and unpaid First Lien Obligations directly or ratably applicable to the 2025 First Lien Term Loan Claims. Pro forma for the Effective Date per the Valuation Analysis, the 2025 First Lien Term Loan Claims is $372,628,203.04.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 5 | Guaranteed Unsecured Notes Claims<br><br>Principal Amount:<br><br>5.75% Senior Notes $610,304,000.00<br><br>5.625% Senior Notes $514,673,000.00<br><br>5.50% Senior Notes $387,207,000.00 | Except to the extent that a Holder of an Allowed Guaranteed Unsecured Notes Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Guaranteed Unsecured Notes Claim, on the Effective Date (or as soon as practicable thereafter), each Holder of an Allowed Guaranteed Unsecured Notes Claim shall receive its Pro Rata Share of (i) the Takeback Second Lien Notes and (ii) 100% of New Mallinckrodt Ordinary Shares, subject to dilution on account of the New Opioid Warrants, the Management Incentive Plan, and any General Unsecured Claims Distribution in the form of New Mallinckrodt Ordinary Shares. | 57 - 86%[7] |
| 6(a) | Acthar Claims<br><br>Filed Amount:[8] $2.8 billion | Except to the extent that a Holder of an Allowed Acthar Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Acthar Claim, each Holder of an Allowed Acthar Claim shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 0.8%[9]<br><br>If Class 6 Claims are Allowed in amount equal to Debtors' books and records: 0.0% ($0 Allowed) |

---

[7] Assumes First Lien Notes Makewhole Claims and Second Lien Notes Makewhole Claims are not Allowed. To the extent such Claims are Allowed, the Cram-Down First Lien Notes and Cram-Down Second Lien Notes would be issued in a face amount of up to approximately 121% of the principal amounts shown, or an incremental face amount of up to $170 million. As a result, the Guaranteed Unsecured Notes projected recovery would be approximately 47% to 76%.

[8] Class 6(a) Acthar Claims for Filed Amounts exclude Claims currently subject to pending objections filed by the Debtors.

[9] The recovery rate of 0.8% for Claims in each of Classes 6(a)-(f) is based on the Debtors' review of the Claims register and takes into account de-duplication of substantially identical disputed, unliquidated, or contingent Claims filed by the same creditor against multiple Debtors.  To the extent any such Claims were Allowed against multiple Debtors, this recovery rate would decrease accordingly. Likewise, to the extent any Claims filed in unliquidated amounts were Allowed in liquidated amounts, this recovery rate would decrease accordingly.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|-------|----------------------|-----------------------------------|----------------------------------|
| 6(b) | Generics Price Fixing Claims<br><br>Filed Amount: $4.0 billion | Except to the extent that a Holder of an Allowed Generics Price Fixing Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Generics Price Fixing Claim, each Holder of an Allowed Generics Price Fixing Claim shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 0.8%<br><br>If Class 6 Claims are Allowed in amount equal to Debtors' books and records: 0.0% ($0 Allowed) |
| 6(c) | Asbestos Claims<br><br>Filed Amount: $4.5 billion | Except to the extent that a Holder of an Allowed Asbestos Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Asbestos Claim, each Holder of an Allowed Asbestos Claim shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 0.8%<br><br>If Class 6 Claims are Allowed in an amount equal to Debtors' books and records: 34.1% ($17.5 million Allowed) |
| 6(d) | Legacy Unsecured Notes Claims<br><br>Filed Amount(s): $152,098,338.00 | Except to the extent that a Holder of an Allowed Legacy Unsecured Notes Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Legacy Unsecured Notes Claim, each Holder of an Allowed Legacy Unsecured Notes Claim shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 0.8%<br><br>If Class 6 Claims are Allowed in an amount equal to Debtors' books and records: 34.1% ($152,098,338 Allowed) |

**SUMMARY OF EXPECTED RECOVERIES[4]**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 6(e) | Environmental Claims<br><br>Filed Amount: $306,000,000.00 | Except to the extent that a Holder of an Allowed Environmental Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Environmental Claim, each Holder of an Allowed Environmental Claim shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 0.8%<br><br>If Class 6 Claims are Allowed in an amount equal to Debtors' books and records: 34.1% ($52.2 million Allowed)[10] |
| 6(f) | Other General Unsecured Claims<br><br>Filed Amount: $238,000,000.00 | Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 0.8%<br><br>If Class 6 Claims are Allowed in an amount equal to Debtors' books and records: 34.1% ($71.6 million Allowed)[11] |

---

[10]  Environmental Claims of $52.2 million reflect books and records amounts of $61.8 million, net of financial assurance of $9.6 million.

[11]  Reflects Class 6(f) claims based on the books and records as of April 23, 2021, before consideration of potential Executory Contract Cure payments.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 7 | Trade Claims<br><br>Filed Amount: $78,000,000.00 | Except to the extent that a Holder of an Allowed Trade Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Trade Claim and as consideration for maintaining Favorable Trade Terms, each Holder of an Allowed Trade Claim that votes to accept the Plan and agrees to maintain Favorable Trade Terms in accordance with the requirements set forth in the Disclosure Statement Order shall receive its Pro Rata Share of the Trade Claim Cash Pool up to the Allowed Amount of such Claim. If the Holder of an Allowed Trade Claim votes to reject the Plan or does not agree to maintain Favorable Trade Terms in accordance with the requirements set forth in the Disclosure Statement Order, such Holder shall receive its General Unsecured Claims Distribution. | If all Filed Amounts are Allowed in full at the greater of the Filed Amount, scheduled amount, or the Debtors' books and records amounts: 64%<br><br>If Class 7 Claims are Allowed in an amount equal to Debtors' books and records: 92% ($54 million Allowed)[12] |
| 8(a) | State Opioid Claims | As of the Effective Date, all State Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for State Opioid Claims shall be assumed by, the NOAT II. Each State Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the NOAT II Documents and shall receive a recovery, if any, from the State and Municipal Government Opioid Claims Share. The NOAT II shall be funded in accordance with the provisions of this Plan. The sole recourse of any State Opioid Claimant on account of its State Opioid Claim shall be to the NOAT II, and each such State Opioid Claimant shall have no right whatsoever at any time to assert its State Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such State Opioid Claims, and may not proceed in any manner against any Protected Party on account of such State Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. Distributions made by the NOAT II in respect of State Opioid Claims shall be used solely for Approved Uses, in accordance with the NOAT II Documents. | N/A |

---

[12] Reflects Class 7 claims based on the books and records as of April 23, 2021, before consideration of potential Executory Contract Cure payments.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 8(b) | Municipal Opioid Claims | As of the Effective Date, all Municipal Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Municipal Opioid Claims shall be assumed by, the NOAT II. Each Municipal Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the NOAT II Documents and shall receive a recovery, if any, from the State and Municipal Government Opioid Claims Share. The NOAT II shall be funded in accordance with the provisions of this Plan. The sole recourse of any Municipal Opioid Claimant on account of its Municipal Opioid Claim shall be to the NOAT II, and each such Municipal Opioid Claimant shall have no right whatsoever at any time to assert its Municipal Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Municipal Opioid Claims, and may not proceed in any manner against any Protected Party on account of such Municipal Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. Distributions made by the NOAT II in respect of Municipal Opioid Claims shall be used solely for Approved Uses, in accordance with the NOAT II Documents. | N/A |

10

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 8(c) | Tribe Opioid Claims | As of the Effective Date, all Tribe Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Tribe Opioid Claims shall be assumed by, the TAFT II; provided, however, for the avoidance of doubt, for all purposes of this Plan, all Tribe Opioid Claims shall be channeled only to the Tribe entity constituting a trust under State law (and not to any limited liability companies or other Person included within the definition of TAFT II).  Each Tribe Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the TAFT II Documents and shall receive a recovery, if any, from the Tribe Opioid Claims Share.  The TAFT II shall be funded in accordance with the provisions of this Plan.  The sole recourse of any Tribe Opioid Claimant on account of its Tribe Opioid Claim shall be to the TAFT II, and each such Tribe Opioid Claimant shall have no right whatsoever at any time to assert its Tribe Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Tribe Opioid Claims, and may not proceed in any manner against any Protected Party on account of such Tribe Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum.  Distributions made by the TAFT II in respect of Tribe Opioid Claims shall be used solely for Approved Uses, in accordance with the TAFT II Documents. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 8(d) | U.S. Governmental Opioid Claims | As of the Effective Date, all U.S. Government Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for U.S. Government Opioid Claims shall be assumed by, the Opioid MDT II. Each U.S. Government Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the Opioid MDT II Documents and shall receive a recovery, if any, from the U.S. Government Opioid Claims Share. The Opioid MDT II shall be funded in accordance with the provisions of this Plan. The sole recourse of any U.S. Government Opioid Claimant on account of its U.S. Government Opioid Claim shall be to the Opioid MDT II, and each such U.S. Government Opioid Claimant shall have no right whatsoever at any time to assert its U.S. Government Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such U.S. Government Opioid Claims, and may not proceed in any manner against any Protected Party on account of such U.S. Government Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9(a) | Third-Party Payor Opioid Claims | As of the Effective Date, all Third-Party Payor Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Third-Party Payor Opioid Claims shall be assumed by, the Third-Party Payor Trust. Each Third-Party Payor Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the Third-Party Payor Trust Documents and shall receive a recovery, if any, from the Third-Party Payor Opioid Claims Share, from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan. The Third-Party Payor Trust shall be funded in accordance with the provisions of this Plan, and distributions to the Third-Party Payor Trust shall be made in three equal payments, the first payment made within 5 business days of the date that is 180 days after the Effective Date, and the second and third payments made on the first and second anniversaries of the first payment. The sole recourse of any Third-Party Payor Opioid Claimant on account of its Third-Party Payor Opioid Claim shall be to the Third-Party Payor Trust, and each such Third-Party Payor Opioid Claimant shall have no right whatsoever at any time to assert its Third-Party Payor Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Third-Party Payor Opioid Claims, and may not proceed in any manner against any Protected Party on account of such Third-Party Payor Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. Distributions made by the Third-Party Payor Trust shall be used solely for Approved Uses, in accordance with the Third-Party Payor Trust Documents, and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9(b) | PI Opioid Claims | As of the Effective Date, all PI Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for PI Opioid Claims shall be assumed by, the PI Trust. Each PI Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the PI Trust Documents and shall receive a recovery, if any, from the PI Opioid Claims Share, from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan. The PI Trust shall be funded in accordance with the provisions of this Plan. The sole recourse of any PI Opioid Claimant on account of its PI Opioid Claim shall be to the PI Trust, and each such PI Opioid Claimant shall have no right whatsoever at any time to assert its PI Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such PI Opioid Claims, and may not proceed in any manner against any Protected Party on account of such PI Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum, and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | To be determined in accordance with applicable Opioid Creditor Trust Documents |
| 9(c) | NAS PI Opioid Claims | As of the Effective Date, all NAS PI Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for NAS PI Opioid Claims shall be assumed by, the NAS PI Trust. Each NAS PI Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the NAS PI Trust Documents and shall receive a recovery, if any, from the NAS PI Opioid Claims Share, from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan. The NAS PI Trust shall be funded in accordance with the provisions of this Plan. The sole recourse of any NAS PI Opioid Claimant on account of its NAS PI Opioid Claim shall be to the NAS PI Trust, and each such NAS PI Opioid Claimant shall have no right whatsoever at any time to assert its NAS PI Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such NAS PI Opioid Claims, and may not proceed in any manner against any Protected Party on account of such NAS PI Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum, and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | To be determined in accordance with applicable Opioid Creditor Trust Documents |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9(d) | Hospital Opioid Claims | As of the Effective Date, all Hospital Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Hospital Opioid Claims shall be assumed by, the Hospital Trust. Each Hospital Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the Hospital Trust Documents and shall receive a recovery, if any, from the Hospital Opioid Claims Share, from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan.  The Hospital Trust shall be funded in accordance with the provisions of this Plan.  The sole recourse of any Hospital Opioid Claimant on account of its Hospital Opioid Claim shall be to the Hospital Trust, and each such Hospital Opioid Claimant shall have no right whatsoever at any time to assert its Hospital Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Hospital Opioid Claims, and may not proceed in any manner against any Protected Party on account of such Hospital Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum.  Distributions made by the Hospital Trust shall be used solely for Approved Uses, in accordance with the Hospital Trust Documents, and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9(e) | Ratepayer Opioid Claims | As of the Effective Date, all Ratepayer Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Ratepayer Opioid Claims shall be assumed by, the Ratepayer Account. The Ratepayer Account will receive a distribution of $3 million in cash from the Opioid MDT II on the Opioid MDT II Initial Distribution Date, which amount shall be gross of applicable Private Opioid Creditor Trust Deductions and Holdbacks, and from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan. The sole recourse of any Ratepayer Opioid Claimant on account of its Ratepayer Opioid Claim shall be to the Ratepayer Account, and each such Ratepayer Opioid Claimant shall have no right whatsoever at any time to assert its Ratepayer Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Ratepayer Opioid Claims and may not proceed in any manner against any Protected Party on account of such Ratepayer Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. Distributions made by the Ratepayer Account shall be used solely for Approved Uses (which shall include, solely for the Ratepayer Account, contributions to the Truth Initiative Foundation), and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|-------|----------------------|-----------------------------------|----------------------------------|
| 9(f) | NAS Monitoring Opioid Claims | As of the Effective Date, all NAS Monitoring Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for NAS Monitoring Opioid Claims shall be assumed by, the NAS Monitoring Trust. Each NAS Monitoring Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the NAS Monitoring Trust Documents. The NAS Monitoring Trust will receive a distribution of $1.5 million in cash from the Opioid MDT II on the Opioid MDT II Initial Distribution Date, which amount shall be gross of applicable Private Opioid Creditor Trust Deductions and Holdbacks, and from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan. The sole recourse of any NAS Monitoring Opioid Claimant on account of its NAS Monitoring Opioid Claim shall be to the NAS Monitoring Trust, and each such NAS Monitoring Opioid Claimant shall have no right whatsoever at any time to assert its NAS Monitoring Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such NAS Monitoring Opioid Claims, and may not proceed in any manner against any Protected Party on account of such NAS Monitoring Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. Distributions made by the NAS Monitoring Trust shall be used solely for Approved Uses, in accordance with the NAS Monitoring Trust Documents, and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9(g) | Emergency Room Physicians Opioid Claims | As of the Effective Date, all Emergency Room Physicians Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Emergency Room Physicians Opioid Claims shall be assumed by, the Emergency Room Physicians Trust. Each Emergency Room Physicians Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the Emergency Room Physicians Trust Documents. The Emergency Room Physicians Trust will receive a distribution of $4.5 million in cash from the Opioid MDT II on the Opioid MDT II Initial Distribution Date, which amount shall be gross of applicable Private Opioid Creditor Trust Deductions and Holdbacks, and from which shall be deducted any attorneys' fees paid in accordance with Article IV.X.7 of the Plan. The sole recourse of any Emergency Room Physicians Opioid Claimant on account of its Emergency Room Physicians Opioid Claim shall be to the Emergency Room Physicians Trust, and each such Emergency Room Physicians Opioid Claimant shall have no right whatsoever at any time to assert its Emergency Room Physicians Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Emergency Room Physicians Opioid Claims, and may not proceed in any manner against any Protected Party on account of such Emergency Room Physicians Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. Distributions made by the Emergency Room Physicians Trust shall be used solely for Approved Uses, in accordance with the Emergency Room Physicians Trust Documents, and shall be subject to the Private Opioid Creditor Trust Deductions and Holdbacks. | N/A |

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9(h) | Other Opioid Claims | As of the Effective Date, all Other Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Other Opioid Claims shall be assumed by, the Opioid MDT II and satisfied solely from the Other Opioid Claims Reserve. Each Other Opioid Claim shall be resolved solely in accordance with the terms, provisions, and procedures of the Opioid MDT II Documents and shall receive its Pro Rata Share of the Other Opioid Claims Share up to [●]% of the Allowed Amount of such Claim.  The Opioid MDT II and the Other Opioid Claims Reserve shall be funded in accordance with the provisions of this Plan.  The sole recourse of any Other Opioid Claimant on account of its Other Opioid Claim shall be to the Other Opioid Claims Reserve, and each such Other Opioid Claimant shall have no right whatsoever at any time to assert its Other Opioid Claim against any Protected Party, shall be enjoined from filing against any Protected Party any future litigation, Claims or Causes of Action arising out of or related to such Other Opioid Claims, and may not proceed in any manner against any Protected Party on account of such Other Opioid Claims in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum. | TBD |
| 10 | Settled Federal/State Acthar Claims<br><br>Expected Amount: Approximately $650 million | Except to the extent that a Holder of an Allowed Settled Federal/State Acthar Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Settled Federal/State Acthar Claim, each Holder of an Allowed Settled Federal/State Acthar Claim shall be resolved in accordance with the terms, provisions, and procedures of the Federal/State Acthar Settlement Agreements. | 28.4%[13] |

---

[13]   The recovery rate of 28.4% for Settled Federal/State Acthar Claims in Class 10 is based on the fair value of the $260 million Acthar Settlement amount.  The Acthar Settlement, in sum and substance, provides that the Debtors will make cash payments in eight installments, beginning on the Plan's Effective Date and on each of the first seven anniversaries thereof, totaling $260 million, to the DOJ and various states; provided that the Federal/State Acthar Deferred Cash Payments shall bear interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020.  As set forth in the Financial Projections, the fair value reflects the post-emergence Federal/State Acthar Deferred Cash Payments of $170 million plus the Initial Federal/State Acthar Settlement Payment of $15 million, which equals a fair value of $185 million.  That amounts to 28.4% of the $650 million civil judgment awarded to Holders of Settled Federal/State Acthar Claims.

## SUMMARY OF EXPECTED RECOVERIES[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 11 | Intercompany Claims<br><br>Expected Amount: TBD | No property will be distributed to the Holders of allowed Intercompany Claims.  Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Required Supporting Unsecured Noteholders, the Supporting Term Lenders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group. | N/A |
| 12 | Intercompany Interests<br><br>Expected Amount: N/A | No property will be distributed to the Holders of allowed Intercompany Interests.  Unless otherwise provided for under the Plan, each Intercompany Interest will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group. | N/A |
| 13 | Subordinated Claims<br><br>Expected Amount: Unliquidated | Subordinated Claims shall be discharged, cancelled, and extinguished on the Effective Date.  Each Holder of Subordinated Claims shall receive no recovery or distribution on account of such Subordinated Claims. | 0% |
| 14 | Equity Interests<br><br>Expected Amount: [N/A] | Holders of Equity Interests shall receive no distribution on account of their Equity Interests.  On the Effective Date, all Equity Interests will be canceled and extinguished and will be of no further force or effect. | 0% |

### C.    Filing of the Plan Supplement

The Debtors will file the Plan Supplement at least twenty-one (21) days prior to the Voting Deadline, or by [August 2], 2021.  The Debtors will transmit a copy of the Plan Supplement to the Distribution List (as defined below).  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Notice and Claims Agent at 877-467-1570 (Toll-Free) (US/Canada); 347-817-4093 (International); (b) writing to Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or mallinckrodtinfo@primeclerk.com; and/or (c) visiting the Debtors' restructuring website at: https://restructuring.primeclerk.com/mallinckrodt. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include all exhibits and Plan schedules, including the Opioid MDT II Documents and the Opioid Creditor Trust Documents, that were not already filed as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

As used herein, the term "***Distribution List***" means (a) the United States Trustee; (b) counsel to the agent under the Debtors' secured term and revolving financing facilities, (c) counsel to the ad hoc group of the Debtors' prepetition first lien term lenders; (d) the indenture trustees for the Debtors' outstanding notes; (e) counsel to the ad hoc group of holders of the Debtors' guaranteed unsecured notes; (f) counsel to the

Governmental Plaintiff Ad Hoc Committee; (g) counsel to the MSGE Group; (h) counsel to the official committee of unsecured creditors; (i) counsel to the official committee of opioid claimants; (j) the FCR (as defined herein) and counsel to the FCR; (k) the United States Attorney's Office for the District of Delaware; (l) the attorneys general for all 50 states and the District of Columbia; (m) the United States Department of Justice; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the United States Drug Enforcement Agency; (q) the United States Food and Drug Administration; and (r) all parties that, as of the applicable date of determination, have filed requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

## D.    [Solicitation Procedures][14]

### 1.    The Solicitation and Voting Procedures

On [ ● ], 2021 the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan. [Docket No. [ ● ]].

The discussion of the procedures below is a summary of the solicitation and voting process. Detailed voting instructions will be provided with each Ballot and are also set forth in greater detail in Disclosure Statement Order.

**PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SO THAT YOUR VOTE MAY BE COUNTED.**

### 2.    The Notice and Claims Agent

The Debtors have retained Prime Clerk LLC to, among other things, act as the Notice and Claims Agent. [Docket No. 219].

Specifically, the Notice and Claims Agent will assist the Debtors with: (a) mailing Confirmation Notices (as defined in the Disclosure Statement Order); (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on Ballots and Master Ballots cast for or against the Plan by Holders of Claims and Interests against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, this Disclosure Statement, the Ballots or Master Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors and interest holders regarding the Plan and their Ballots.

### 3.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and

---

[14]    **THIS ENTIRE SECTION I.D OF THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVIEW AND REVISION.    THIS SECTION WILL BE UPDATED TO CONFORM TO THE DEBTORS' LATEST SCHEDULING MOTION AND SOLICITATION PROCEDURES.**

voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class) under the Plan:

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2(a) | First Lien Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |
| 2(b) | 2024 First Lien Term Loan Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 2(c) | 2025 First Lien Term Loan Clams | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 3 | First Lien Notes Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 4 | Second Lien Notes Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 5 | Guaranteed Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(a) | Acthar Claims | Impaired | Entitled to Vote |
| 6(b) | Generics Price Fixing Claims | Impaired | Entitled to Vote |
| 6(c) | Asbestos Claims | Impaired | Entitled to Vote |
| 6(d) | Legacy Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(e) | Environmental Claims | Impaired | Entitled to Vote |
| 6(f) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Trade Claims | Impaired | Entitled to Vote |
| 8(a) | State Opioid Claims | Impaired | Entitled to Vote |
| 8(b) | Municipal Opioid Claims | Impaired | Entitled to Vote |
| 8(c) | Tribe Opioid Claims | Impaired | Entitled to Vote |
| 8(d) | U.S. Government Opioid Claims | Impaired | Entitled to Vote |
| 9(a) | Third-Party Payor Opioid Claims | Impaired | Entitled to Vote |
| 9(b) | PI Opioid Claims | Impaired | Entitled to Vote |
| 9(c) | NAS PI Opioid Claims | Impaired | Entitled to Vote |
| 9(d) | Hospital Opioid Claims | Impaired | Entitled to Vote |
| 9(e) | Ratepayer Opioid Claims | Impaired | Entitled to Vote |
| 9(f) | NAS Monitoring Opioid Claims | Impaired | Entitled to Vote |
| 9(g) | Emergency Room Physicians Opioid Claims | Impaired | Entitled to Vote |
| 9(h) | Other Opioid Claims | Impaired | Entitled to Vote |
| 10 | Settled Federal/State Acthar Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 13 | Subordinated Claims | Impaired | Deemed to Reject |
| 14 | Equity Interests | Impaired | Deemed to Reject |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Classes 2(b), 2(c), 3, 4, 5, 6(a)-(f), 7, 8(a)-(d), 9(a)-(g), and 10 (the "***Voting Classes***"), including by acting through a Voting Representative, because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.

There are Voting Classes that are presumed to accept or entitled to vote on the Plan depending on their ultimate treatment under the Plan.  Specifically, Class 2(b) is either (a) Impaired if receiving the New

Takeback Term Loans, and Holders of 2024 First Lien Term Loan Claims are entitled to vote to accept or reject the Plan or (b) Unimpaired if repaid in full in Cash, and Holders of 2024 First Lien Term Loans are conclusively presumed to have accepted the Plan.  Class 2(c) is either (a) Impaired if receiving the New Takeback Term Loans, and Holders of 2025 First Lien Term Loan Claims are entitled to vote to accept or reject the Plan or (b) Unimpaired if repaid in full in Cash, and Holders of 2025 First Lien Term Loans are conclusively presumed to have accepted the Plan.

With respect to Class 3, if at the time of Confirmation (i) the First Lien Notes Makewhole Claims are not Allowed and (ii) the Allowed First Lien Notes Claims may be reinstated without the First Lien Notes Makewhole Claims being Allowed, all Allowed First Lien Notes Claims shall be Reinstated.  Otherwise, all Allowed First Lien Notes Claims shall receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, the Cram-Down First Lien Notes in a face amount equal to the amount of such Allowed First Lien Notes Claims.[15]

With respect to Class 4, if at the time of Confirmation (i) the Second Lien Notes Makewhole Claims are not Allowed and (ii) the Allowed Second Lien Notes Claims may be reinstated without the Second Lien Notes Makewhole Claims being Allowed, all Allowed Second Lien Notes Claims shall be Reinstated. Otherwise, all Allowed Second Lien Notes Claims shall receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of such Claims, the Cram-Down Second Lien Notes in a face amount equal to the amount of such Allowed Second Lien Notes Claims.[16]

Notwithstanding anything to the contrary herein, each Claim in Class 8(a)-(d) and Class 9(a)-(h) shall be accorded one (1) vote and valued at One Dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such Claim is disputed.

The Debtors are not soliciting votes on the Plan from (a) Holders of Claims and Interests in Classes 1 and 2(a) because such parties are conclusively presumed to have accepted the Plan, (b) Holders of Claims and Interests in Classes 13 and 14 because such parties are conclusively presumed to have rejected the Plan, and (c) Claims and Interests in Classes 11 and 12 because such parties are conclusively presumed to have accepted the Plan or conclusively presumed to have rejected the Plan (collectively, the "***Non-Voting Classes***").  In lieu of a Solicitation Package, the Non-Voting Classes will receive a certain Notice of Non-Voting Status (as defined in the Disclosure Statement Order).

### 4.    The Voting Record Date

The Bankruptcy Court has approved [June 8], 2021 as the voting record date (the "***Voting Record Date***") with respect to all Claims and Equity Interests other than Opioid Claims in Voting Classes 8(a)-(d) and 9(a)-(h) .  The Voting Record Date is the date on which it will be determined: (a) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order and (b) which Holders of Claims and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.  Notwithstanding the aforementioned, the Voting Record Date shall not apply to Opioid Claimants in Voting Classes 8(a)-(d) and 9(a)-(h).

---

[15]   This language has not yet been agreed to by the Guaranteed Unsecured Notes Ad Hoc Group and remains subject to its approval.

[16]   This language has not yet been agreed to by the Guaranteed Unsecured Notes Ad Hoc Group and remains subject to its approval.

### 5.    Contents of the Solicitation Package

The following documents and materials will collectively constitute the "***Solicitation Package***":

- with respect to Holders of Claims in the Voting Classes (but subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order)): a cover letter describing the contents of the Solicitation Package and an enclosed USB flash drive containing the below, and instructions for obtaining (free of charge) printed copies of the following materials provide in electronic format:

  - o  the Confirmation Hearing Notice (as defined in the Disclosure Statement Order) and attached as **Exhibit 4.1** to the Disclosure Statement Order;
  - o  the Disclosure Statement with all exhibits, including the Plan with its exhibits (to the extent such exhibits are filed with the Court before the Solicitation Date);
  - o  the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order;
  - o  the Disclosure Statement Order (without exhibits);
  - o  subject to the Non-Notes Master Ballot Solicitation Procedures, an appropriate Ballot or Master Ballot and voting instructions for the same;
  - o  subject to the Non-Notes Master Ballot Solicitation Procedures, a pre-addressed, return envelope for completed Ballots or Master Ballots;
  - o  subject to the Non-Notes Master Ballot Solicitation Procedures, solely for Holders of contingent, unliquidated, or disputed Claims that are not subject to an objection filed by the Debtors, the Notice of Limited Voting Status (as defined in the Disclosure Statement Order); and
  - o  letters from the Official Committee of Opioid-Related Claimants, Official Committee of Unsecured Creditors, and the FCR (if permanently appointed), respectively, expressing each of their views on the Plan attached as Exhibits [ ● ] to the Disclosure Statement Order;

- with respect to Holders of Claims and Interests in Non-Voting Classes (or Claims in Voting Classes that, as of the deadline set forth in the Disclosure Statement Order, are subject to a pending objection or are otherwise deemed not entitled to vote in the Plan): (a) the Confirmation Hearing Notice and (b) the applicable Notice of Non-Voting Status;

- with respect to Holders of Claims in Voting Classes 8(a)-(d) and 9(a)-(h), the Opioid Claimant Notice attached as **Exhibit 4.11** to the Disclosure Statement Order and (subject to the Non-Notes Master Ballot Solicitation Procedures) the materials listed above;

- with respect to the United States Trustee, a copy of each document contained in each version of the Solicitation Packages, which may include non-customized Ballots or Master Ballots and a non-customized Notice of Non-Voting Status; and

- any other materials ordered by the Court to be included as part of the Solicitation Package.

### 6.    Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan

With the assistance of the Notice and Claims Agent, the Debtors intend to distribute Solicitation Packages to the applicable parties (other than Holders of Opioid Claims) no later than Five (5) Business Days after entry of the Disclosure Statement Order, and complete distribution as soon as reasonably practical thereafter (the *"Solicitation Mailing Date"*).  The Debtors submit that the timing of such distribution will provide

such Holders of Claims and Interests with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).  The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Classes receive no more than one Solicitation Package.  If a Holder holds Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate Ballots which must be used for each separate Class of Claims.

Notwithstanding anything to the contrary herein and subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order)), all Holders of Opioid Claims in Voting Classes 8(a)-(d) and 9(a)-(h) shall be entitled to obtain a Solicitation Package (with a Ballot) and vote on the Plan. All materials included in the Solicitation Package for Opioid Claimants shall be made available free of charge online at [the Opioid Claimant Webpage]. The [Opioid Claimant Webpage] shall contain an online portal(s) whereby Opioid Claimants may request (and immediately obtain) and submit a Ballot.

### 7.    Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages and, instead, will receive the appropriate notice and an Opt-Out Form:

- <u>Unimpaired Claims – Deemed to Accept</u>.  Other Secured Claims and First Lien Revolving Credit Facility Claims in Classes 1 and 2(a), respectively, are Unimpaired under the Plan and their Holders are conclusively presumed to have accepted the Plan.  As such, Holders of such Claims will receive, in lieu of a Solicitation Package, the applicable Notice of Non-Voting Status attached as **Exhibit 4.4** to the Disclosure Statement Order.

- <u>Impaired Claims – Deemed to Reject</u>.  Holders of Subordinated Claims and Equity Interests in Classes 13 and 14 are receiving no distribution under the Plan on account of such Claims and Equity Interests and, therefore, are conclusively presumed to reject the Plan.  The Holders of Subordinated Claims and Equity Interests in Classes 13 and 14 will receive the applicable Notice of Non-Voting Status attached as **Exhibits 4.5** and **4.6** to the Disclosure Statement Order.

- <u>Unimpaired or Impaired Claims – Deemed to Accept or Reject</u>.  Intercompany Claims in Class 11 and Intercompany Interests in Class 12 are either deemed to accept or reject the Plan (as applicable) and are held by other Debtors and not entitled to vote on the Plan.  The Holders of Intercompany Claims in Class 11 and Intercompany Interests in Class 12 will receive the applicable Notice of Non-Voting Status.

- <u>Disputed Claims</u>.

  - If any party in interest with appropriate standing has filed an objection to a Claim on or before [**July 19], 2021 at 4:00 p.m. (prevailing Eastern Time)** (such claim, a "***Disputed Claim***"), such Disputed Claim (or the portion thereof that is Disputed) is temporarily disallowed for voting purposes, except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors (in consultation with the Supporting Parties) and approved or as may be otherwise ordered by the Court prior to or concurrent with entry of an order confirming the Plan, including pursuant to an order on any Rule 3018 Motion (as described below) filed regarding such Claim; *provided that* if the objection seeks to reclassify or reduce the allowed amount of such Claim, then such Claim is temporarily

allowed for voting purposes in the reduced amount and/or as reclassified, except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors (in consultation with the Supporting Parties) and approved or as may be otherwise ordered by the Court prior to or concurrent with entry of an order confirming the Plan. Such Holders of Disputed Claims will receive a "Notice of Non-Voting Status To Holders of Disputed Claims," attached as **Exhibit 4.7** to the Disclosure Statement Order, which notice will explain this designation as well as the Holder's rights with respect thereto.

o   If any claimant seeks to challenge the disallowance of its Claim for voting purposes, such claimant must file a motion with the Court for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes (a "***Rule 3018 Motion***") on or before [**August 2], 2021 at 4:00 p.m. (prevailing Eastern Time)** (the "***Rule 3018(a) Motion Filing Deadline***"), unless such deadline is extended by agreement of the Debtors (in consultation with the Supporting Parties). Upon the filing of a timely Rule 3018 Motion, the Notice and Claims Agent will provide such claimant with a Ballot or Master Ballot or a new Ballot or Master Ballot with an updated voting amount (as applicable).  For purposes of filing the Voting Report, if the Rule 3018 Motion is resolved by order of the Court, stipulation, or settlement by the business day before the deadline to file the Voting Report, the Notice and Claims Agent will tabulate (or not tabulate, as applicable) such vote according to any aforementioned resolution. Otherwise, the Notice and Claims Agent will treat the vote with respect to such Claim as disallowed for voting purposes to the extent provided above for the purposes of tabulating (or not tabulating) votes in connection with preparation and filing of the Voting Report. The vote with respect to such Claim shall be treated as disallowed for voting purposes to the extent provided above for purposes of confirmation of the Plan except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors (in consultation with the Supporting Parties) and approved or as may be otherwise ordered by the Court prior to or concurrently with entry of an order confirming the Plan, including pursuant to an order on any Rule 3018 Motion.

o   If a Claim for which a Proof of Claim has been timely filed is wholly contingent, unliquidated, or disputed (based on the face of such Proof of Claim or as determined upon the review of the Debtors), such Claim is accorded one (1) vote and valued at One Dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such Claim is a Disputed Claim as set forth above.  Such Holders will receive (a) a Solicitation Package that contains the applicable Ballot or Master Ballot, (b) a Confirmation Hearing Notice and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," in the form attached as **Exhibit 4.8** to the Disclosure Statement Order, which notice informs such Person or Entity that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00.

o   If a Claim is listed on a timely filed Proof of Claim as contingent, unliquidated, or disputed in part, such Claim is temporarily allowed in the amount that is liquidated, noncontingent and undisputed, unless such Claim is a Disputed Claim as set forth above.  Such Holders will receive (a) a Solicitation Package that contains the applicable Ballot or Master Ballot, (b) a "Confirmation Hearing Notice," (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," attached as **Exhibit 4.8** to the Disclosure Statement Order.

o   Notwithstanding anything to the contrary herein, each Claim in Classes 8(a)-(d) and 9(a)-(h) shall be accorded one (1) vote and valued at One Dollar ($1.00) for voting purposes

only, and not for purposes of allowance or distribution, unless such Claim is disputed as set forth pursuant to the terms of this paragraph.  Opioid Claims may only be disputed and subject to disallowance on non-substantive grounds under the Local Rules (*i.e.*, duplicative, wrong case or wrong class, amended or superseded, etc.), and may not be disputed or subject to disallowance on non-substantive grounds pertaining to late filed claims and claims that do not have a basis in the Debtors' books and records.  For the avoidance of doubt, (a) any Claim in Classes 8(a)-(d) and 9(a)-(h) shall not be required to file a Proof of Claim for such Opioid Claims to be temporarily allowed for voting purposes and (b) any Claim in Classes 8(a)-(d) and 9(a)-(h) that is disputed and subject to disallowance but is otherwise temporarily allowed for voting purposes shall be accorded one (1) vote and valued at One Dollar ($1.00) for voting purposes only, and may not be disallowed for voting purposes for any reason other than as set forth in this paragraph;

- <u>Contract and Lease Counterparties</u>.  Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have scheduled Claims or Claims based upon Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection.  Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, to ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtors' Executory Contracts and Unexpired Leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Party Notice" attached as **Exhibit 4.9** to the Disclosure Statement Order.

## 8. Additional Distribution of Solicitation Documents

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Classes, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the Voting Record Date with this Disclosure Statement, Disclosure Statement Order, and Plan.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of this Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Notice and Claims Agent at 877-467-1570 (Toll-Free) (US/Canada); 347-817-4093 (International); (b) writing to Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or mallinckrodtinfo@primeclerk.com; and/or (c) visiting the Debtors' restructuring website at: https://restructuring.primeclerk.com/mallinckrodt. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

All Holders of Claims and Interests are advised to read the Disclosure Statement Order and all attachments thereto, including the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order, which sets forth in greater detail the information disclosed in this section I.D of this Disclosure Statement.

## E. Voting Procedures

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order and all attachments thereto, including the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

## 1. The Voting Deadline

The Bankruptcy Court has approved **4:00 p.m. prevailing Eastern Time on [August 16], 2021** as the Voting Deadline.  The Voting Deadline is the date by which all Ballots (or opt-out forms), Notes Master Ballots, and Non-Notes Master Ballots, must be properly executed, completed and delivered to the Notice and Claims Agent in order to be counted as votes to accept or reject the Plan.

2.    **Types of Ballots**

The Debtors will provide the following Ballots, Notes Master Ballots, and Non-Notes Master Ballots, as applicable, to Holders of Claims in the Voting Classes (*i.e.*, Classes 2(b), 2(c), 3, 4, 5, 6(a)-(f), 7, 8(a)-(d), 9(a)-(h), and 10):

## SUMMARY OF BALLOTS

| Class | Claim/Equity Interest | Ballot |
|---|---|---|
| 2(b) | 2024 First Lien Term Loan Claims | Class 2(b) – 2024 First Lien Term Loan Claims Ballot |
| 2(c) | 2025 First Lien Term Loan Clams | Class 2(c) – 2025 First Lien Term Loan Claims Ballot |
| 3 | First Lien Notes Claims | Class 3 – First Lien Notes Beneficial Holder Ballot |
| | | Class 3 – First Lien Notes Master Ballot |
| 4 | Second Lien Notes Claims | Class 4 – Second Lien Notes Beneficial Holder Ballot |
| | | Class 4 – Second Lien Notes Master Ballot |
| 5 | Guaranteed Unsecured Notes Claims | Class 5 – Guaranteed Unsecured Notes Beneficial Holder Ballot |
| | | Class 5 – Guaranteed Unsecured Notes Master Ballot |
| 6(a) | Acthar Claims | Subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Disclosure Statement Order), the applicable individual Ballot for the applicable class, and attached to the Disclosure Statement Order as **Exhibits 1.8 and 1.9** |
| 6(b) | Generics Price Fixing Claims | |
| 6(c) | Asbestos Claims | |
| 6(d) | Legacy Unsecured Notes Claims | Class 6(d) – Legacy Unsecured Notes Claims Beneficial Holder Ballot |
| | | Class 6(d) – Legacy Unsecured Notes Claims Master Ballot |
| 6(e) | Environmental Claims | Subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Disclosure Statement Order), the applicable individual Ballot or Non-Notes Master Ballot for the applicable class, and attached to the Disclosure Statement Order as **Exhibits 1.8 and 1.9** |
| 6(f) | Other General Unsecured Claims | |
| 7 | Trade Claims | Class 7 – Trade Claims Ballot |
| 8(a) | State Opioid Claims | Subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Disclosure Statement Order), the applicable individual Ballot or Non-Notes Master Ballot for the applicable class, and attached to the Disclosure Statement Order as **Exhibits 1.13 and 1.14** |
| 8(b) | Municipal Opioid Claims | |
| 8(c) | Tribe Opioid Claims | |
| 8(d) | U.S. Government Opioid Claims | |
| 9(a) | Third-Party Payor Opioid Claims | Subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Disclosure Statement Order), the applicable individual Ballot or Non-Notes Master Ballot for the applicable class, and attached to the Disclosure Statement Order as **Exhibits 1.15 through 1.18** |
| 9(b) | PI Opioid Claims | |
| 9(c) | NAS PI Opioid Claims | |
| 9(d) | Hospital Opioid Claims | |
| 9(e) | Ratepayer Opioid Claims | |
| 9(f) | NAS Monitoring Opioid Claims | |
| 9(g) | Emergency Room Physicians Opioid Claims | |
| 9(h) | Other Opioid Claims | |
| 10 | Settled Federal/State Acthar Claims | Class 10 – Settled Federal/State Acthar Claims Ballot |

| | | Class 10 – Settled Federal/State Acthar Claims Master Ballot |

To be counted as votes to accept or reject the Plan, votes must be submitted on the appropriate ballot (each, a "***Ballot***") or master ballot. There are two types of master ballots. First, there is a notes master ballot (the "***Notes Master Ballot***") that will be used to solicit votes from Nominees (as defined below) that are the registered holders of notes-related Claims in Classes 3, 4, 5, and 6(d) of the Plan. Second, there is a non-notes master ballot (the "***Non-Notes Master Ballot***", together with the Notes Master Ballots, the "***Master Ballots***") that will be used to solicit votes from Classes 6(a)-(c) and (e)-(f), 8(a)-(d), 9(a)-(h), and 10 pursuant to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Solicitation Procedures).

### 3.    Voting Instructions

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot or Master Ballot, as applicable, and returning it to the Notice and Claims Agent prior to the Voting Deadline. Each Ballot (other than the Ballots for Opioid Claimants in Classes 8(a)-(d) and Classes 9(a)-(h)) will include an option to affirmatively opt out of the Releases by Non-Debtor Releasing Parties Other than Opioid Claimants contained in Article IX.C of the Plan.

All Holders of Opioid Claims in Voting Classes 8(a)-(d) and 9(a)-(h) shall be entitled to obtain a Solicitation Package (with a Ballot) and vote on the Plan. The [Opioid Claimant Webpage] shall contain an online portal(s) whereby Opioid Claimants may request (and immediately obtain) and submit a Ballot.

Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.

To be counted as votes to accept or reject the Plan, all Ballots or Master Ballots (which will clearly indicate the appropriate return address), as applicable, must be properly executed, completed, dated and delivered by following the instructions set forth on the Ballot or Master Ballot, so that they are actually received on or before the Voting Deadline by the Notice and Claims Agent. If you have any questions on the procedures for voting on the Plan, please call the Notice and Claims Agent at: 877-467-1570 (Toll-Free) (US/Canada); 347-817-4093 (International).

### 4.    Voting Procedures

> **THE DISCLOSURE STATEMENT ORDER IS ACCOMPANIED BY A BALLOT OR MASTER BALLOT TO BE USED FOR VOTING TO ACCEPT OR REJECT THE PLAN FOR THOSE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**
>
> **PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOTS FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

If you are a Holder of a Claim in Class 2(b) – 2024 First Lien Term Loan Claims, Class 2(c) – 2025 First Lien Term Loan Claims, Class 3 – First Lien Notes Claims, Class 4 – Second Lien Notes Claims, Class 5 – Guaranteed Unsecured Notes Claims, Class 6(a) - Acthar Claims, Class 6(b) - Generics Price Fixing Claims, Class 6(c) - Asbestos Claims, Class 6(d) - Legacy Unsecured Notes Claims, Class 6(e) - Environmental Claims, Class 6(f) - Other General Unsecured Claims, Class 7 - Trade Claims, Class 8(a) -

State Opioid Claims, Class 8(b) – Municipal Opioid Claims, Class 8(c) - Tribe Opioid Claims, Class 8(d) - U.S. Government Opioid Claims, Class 9(a) - Third-Party Payor Opioid Claims, Class 9(b) - PI Opioid Claims, Class 9(c) - NAS PI Opioid Claims, Class 9(d) - Hospital Opioid Claims, Class 9(e) – Ratepayer Opioid Claims, Class 9(f) – NAS Monitoring Opioid Claims, Class 9(g) – Emergency Room Physicians Opioid Claims, Class 9(h) – Other Opioid Claims, or Class 10 - Settled Federal/State Acthar Claims, you may vote to accept or reject the Plan by completing the Ballot, Notes Master Ballot, or Non-Notes Master Ballot, as applicable, and returning it in accordance with the Solicitation Procedures attached as Attachment 1 to the Disclosure Statement Order, or returning it in the pre-addressed, postage pre-paid return envelopes provided to the Notice and Claims Agent or your Nominee, as applicable, or via the Notice and Claims Agent's online balloting portal.

If you are entitled to vote to accept or reject the Plan, a Ballot(s) or Master Ballot has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your Ballot(s) or Master Ballot in accordance with the instructions accompanying your Ballot or Master Ballot.

Prior to voting on the Plan, you should carefully review (a) the Plan and the Plan Supplement, (b) this Disclosure Statement, (c) the Disclosure Statement Order and the Solicitation Procedures annexed thereto, (d) the Confirmation Hearing Notice, and (e) the detailed instructions accompanying your Ballot or Master Ballot. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

Each Ballot and Master Ballot has been coded to reflect the Class of Claims it represents unless it's a Ballot or Master Ballot for which a Proof of Claim has not been filed. Ballots or Master Ballots for Opioid Claims will not reflect a pre-populated code. In voting to accept or reject the Plan, you must use only the coded Ballot(s) or Master Ballot(s), if applicable, sent to you with this Disclosure Statement. If you (a) hold Claims in more than one voting Class, or (b) hold multiple Claims within one Class, including if you (i) are the beneficial owner of Claims held under the name of your broker, bank, dealer, or other agent or nominee (each, a "*Nominee*") (rather than under your own name) through one or more than one Nominee, (ii) are the beneficial owner of Claims registered in your own name as well as the beneficial owner of Claims registered under the name of your Nominee (rather than under your own name), or (iii) are represented by an attorney and hold Claims in Classes 6(a)-(c) and (e)-(f), 8(a)-(d), 9(a)-(h), and 10, you may receive more than one Ballot or your attorney may receive a Master Ballot to vote on your behalf.

If the Notice and Claims Agent receives more than one timely, properly completed Notes Master Ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the vote recorded on the last timely, properly completed Notes Master Ballot, as determined by the Notice and Claims Agent, received last with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot or Master Ballot, received a damaged Ballot or Master Ballot, or lost your Ballot or Master Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the Master Ballot, or the procedures for voting on the Plan, please contact the Notice and Claims Agent at the phone numbers or email address listed in section I.D.8 above or your Nominee or attorney.

        **a.**        **Voting Procedures with Respect to Holders of Class 3 – First Lien Notes Claims, Class 4 – Second Lien Notes Claims, Class 5 –**

**Guaranteed Unsecured Notes Claims, and Class 6(d) - Legacy Unsecured Notes Claims**

The Debtors believe that all Holders of Claims in Class 3 (First Lien Notes Claims), Class 4 (Second Lien Notes Claims), Class 5 (Guaranteed Unsecured Notes Claims), and Class 6(d) - Legacy Unsecured Notes Claims hold their Claims through Nominees.  As a result, for votes with respect to such Classes' Claims to be counted, Class 3, 4, 5, and 6(d) Ballots and Notes Master Ballots must be mailed to the appropriate Nominees at the addresses on the envelopes enclosed with the such Class Ballots and Notes Master Ballots (or otherwise delivered to the appropriate Nominees in accordance with such Nominees' instructions) so that such Nominees have sufficient time to record the votes of such beneficial owner on a Notes Master Ballot aggregating votes of Beneficial Holders) and return such Notes Master Ballot so it is actually received by the Notice and Claims Agent by the Voting Deadline.

All Notes Master Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Notes Master Ballot and **actually received** from the Nominee no later than the Voting Deadline (i.e., [**August 16], 2021 at 4:00 p.m. (prevailing Eastern Time)**) by the Notice and Claims Agent through one of the following means:

| | |
|---|---|
| Mail, Courier, or Personal Delivery: | Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 |
| Electronic Mail: | mallinckrodtinfo@primeclerk.com |
| Online Upload: | E-Ballot voting platform on Prime Clerk's website by visiting https://restructuring.primeclerk.com/mallinckrodt, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website. |

Detailed instructions for completing and transmitting the Ballots and Notes Master Ballots are included with the Ballots and Notes Master Ballots, respectively, provided in the Solicitation Package.

**b.      Voting Procedures with Respect to Holders of Claims in Classes 6(a) (Acthar Claims); 6(b) (Generics Price Fixing Claims); 6(c) (Asbestos Claims); 6(e) (Environmental Claims); 6(f) (Other General Unsecured Claims); and 10 (Settled Federal/State Acthar Claims)**

The Debtors intend to seek approval for an attorney representing Holders of Claims in Classes 6(a)-(c) and (e)-(f) and Class 10 to submit the votes of its clients through the Non-Notes Master Ballot so long as such attorney follows specified procedures set forth in the Solicitation Procedures, the Solicitation Directive Notice and Solicitation Directive attached as **Attachment 1**, **Exhibits 2.1** and **2.2**, respectively, to the Disclosure Statement Order. An attorney electing to utilize such procedure will be required to collect and record the votes of its clients through customary and accepted practices, or obtain authority to procedurally cast such clients' votes. If your attorney has indicated that your vote will be submitted by a Non-Notes Master Ballot, but you prefer to vote by means of an individual Ballot, you may contact the Notice and Claims Agent at (a) 877-467-1570 (Toll-Free) (US/Canada); 347-817-4093 (International); (b) writing to Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or mallinckrodtinfo@primeclerk.com; and/or (c) visiting the Debtors' restructuring website at: https://restructuring.primeclerk.com/mallinckrodt. The Non-Notes Master Ballot must be delivered pursuant to the instructions set forth on each applicable Non-Notes Master Ballot.

If you are a holder of a Claim in Classes 6(a)-(c) and (e)-(f) or 10 and are represented by an attorney, you may be eligible to have your attorney vote to accept or reject the Plan on your behalf via the Non-Notes Master Ballot Solicitation Method (as defined in the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order). In such case, your attorney will be required to collect and record your vote through customary and accepted practices, or obtain authority to procedurally cast your vote. In the event that your attorney votes to accept or reject the Plan on your behalf via the applicable Non-Notes Master Ballot and you also submit an individual Ballot to accept or reject the Plan, your individual Ballot will control over any duplicate vote on the applicable Non-Notes Master Ballot.

Please carefully review the Disclosure Statement Order and the Solicitation Procedures attached thereto as "**Attachment 1**," including the voting procedures identified as the "Non-Notes Master Ballot Solicitation Procedures," for more details concerning the procedures to vote on the Plan.

> c.  **Voting Procedures with Respect to Holders of Opioid Claims in Classes 8(a) (State Opioid Claims); 8(b) (Municipal Opioid Claims); 8(c) (Tribe Opioid Claims); 8(d) (U.S. Government Opioid Claims); 9(a) (Third-Party Payor Opioid Claims); 9(b) (PI Opioid Claims); 9(c) (NAS PI Opioid Claims); 9(d) (Hospital Opioid Claims); 9(e) (Other Opioid Claims); 9(f) (NAS Monitoring Opioid Claims); 9(g) (Emergency Room Physicians Opioid Claims); and 9(h) (Other Opioid Claims)**

For Holders of Opioid Claims in Classes 8(a)-(d) and 9(a)-(h), please carefully review the Disclosure Statement Order and the Solicitation Procedures attached thereto as "**Attachment 1**" and the "*Notice to Opioid Claimants*" attached thereto as **Exhibit 4.11** for more details concerning the procedures to vote on the Plan.

Although a majority of the funds in the opioid trusts under the Plan will be used to fund abatement of the opioid crisis, certain Holders of Opioid Claims may be entitled to receive money from one of the opioid trusts established under the Plan.  If the Plan is approved by the Bankruptcy Court, Holders of Allowed Opioid Claims will be entitled to assert their Opioid Claims directly against the applicable opioid trust at a later time.  Holders of Opioid Claims **do NOT need to file an official Proof of Claim form in order to assert their Opioid Claims against any of the opioid trusts.**  Holders of Opioid Claims will be notified of how to assert their Opioid Claims against one of the opioid trusts at a later date.

All Holders of Opioid Claims in Voting Classes 8(a)-(d) and 9(a)-(h) shall be entitled to obtain a Solicitation Package (with a Ballot) and vote on the Plan. All materials included in the Solicitation Package for Opioid Claimants shall be made available free of charge online at [the Opioid Claimant Webpage].

There are many ways Holders of Opioid Claims in Voting Classes 8(a)-(d) and 9(a)-(h) may cast a vote on the Plan.

First, Holders of Opioid Claims in Classes 8(a)-(d) and 9(a)-(h) may visit the [Opioid Claimant Webpage] where there is an online portal whereby Opioid Claimants may request (and immediately obtain) and submit a Ballot to vote on the Plan.

Second, Holders of Opioid Claims in Classes 8(a)-(d) and 9(a)-(h) may also vote on the Plan by the following:

(a)  Contact the Notice and Claims Agent, Prime Clerk LLC, by: (a) calling 877-467-1570 (US/Canada) or 347-817-4093 (International) or (b) writing to (i) Mallinckrodt plc Ballot Processing, c/o Prime

Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (ii) mallinckrodtinfo@primeclerk.com.  You should also contact your attorney if you have one.

(b)    Then request from the Notice and Claims Agent (a) a copy of the Plan and Disclosure Statement and (b) an individual Opioid Claims Ballot.

(c)    Carefully review the Plan, the Disclosure Statement, and Ballot (and the instructions on the Ballot). You may wish to consult a lawyer on how your rights, if any, may be affected by the Plan.

(d)    Complete and sign the Ballot according to the instructions on the Ballot.  **A failure to follow the instructions on the Ballot may result in the vote being disqualified.**

(e)    Submit the completed and signed Ballot back to the Notice and Claims Agent so that it is <u>actually received</u> by **4:00 p.m. (prevailing Eastern Time) on [August 16], 2021**.  Ballots received after that time will **<u>NOT</u>** be counted.

Third, Holders of Opioid Claims in Classes 8(a)-(d) and 9(a)-(h) may authorize their lawyer, if they have one or choose to engage one, to complete and cast their vote on the Plan on their behalf.  If a lawyer completes the Ballot on the Opioid Claimant's behalf, the Opioid Claimant still must sign and certify the Ballot as required by the Ballot's instructions.

Finally, the Debtors intend to seek approval for an attorney representing Holders of Claims in Classes 8(a)-(d) and 9(a)-(h) to submit the votes of its clients through the Non-Notes Master Ballot so long as such attorney follows specified procedures set forth in the Solicitation Procedures, the Solicitation Directive Notice and Solicitation Directive attached as **Attachment 1**, **Exhibits 2.1** and **2.2**, respectively, to the Disclosure Statement Order. An attorney electing to utilize such procedure will be required to collect and record the votes of its clients through customary and accepted practices, or obtain authority to procedurally cast such clients' votes. If your attorney has indicated that your vote will be submitted by a Non-Notes Master Ballot, but you prefer to vote by means of an individual Ballot, you may contact the Notice and Claims Agent at (a) 877-467-1570 (Toll-Free) (US/Canada); 347-817-4093 (International); (b) Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or mallinckrodtinfo@primeclerk.com; and/or (c) the Debtors' restructuring website at: https://restructuring.primeclerk.com/mallinckrodt. The Non-Notes Master Ballot must be delivered pursuant to the instructions set forth on each applicable Non-Notes Master Ballot.

If you are a holder of a Claim in Classes 8(a)-(d) and 9(a)-(h) and are represented by an attorney, you may be eligible to have your attorney vote to accept or reject the Plan on your behalf via the Non-Notes Master Ballot Solicitation Method (as defined in the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order). In such case, your attorney will be required to collect and record your vote through customary and accepted practices, or obtain authority to procedurally cast your vote. In the event that your attorney votes to accept or reject the Plan on your behalf via the applicable Non-Notes Master Ballot and you also submit an individual Ballot to accept or reject the Plan, your individual Ballot will control over any duplicate vote on the applicable Non-Notes Master Ballot.

### d.    Voting Procedures with Respect to Holders of Claims in All Other Voting Classes

Voting Holders of Class 2(b) – 2024 First Lien Term Loan Claims, Class 2(c) – 2025 First Lien Term Loan Claims, and Class 7 – Trade Claims, should provide all of the information requested by their Ballots, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage paid envelope provided with each such Ballot to the Notice and Claims Agent, or (b) submit a Ballot electronically via

the E-Ballot voting platform on Prime Clerk's website by visiting https://restructuring.primeclerk.com/mallinckrodt, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

**HOLDERS OF CLAIMS IN VOTING CLASSES THAT ARE PERMITTED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM ARE STRONGLY ENCOURAGED TO DO SO.**

> ### 5.    Tabulation of Votes

> **THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS ACTUALLY RECEIVED ON OR BEFORE THE VOTING DEADLINE BY THE NOTICE AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, SUBJECT TO THE NON-NOTES MASTER BALLOT PROCEDURES, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- ANY BALLOT THAT IS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS, IN CONSULTATION WITH THE SUPPORTING PARTIES, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SOLELY FOR EXTENSIONS FOR CLASSES 5, 6, AND 7 AND THE OFFICIAL COMMITTEE OF OPIOID-RELATED CLAIMANTS SOLELY FOR EXTENSIONS FOR CLASSES 8 AND 9, HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT.

- Additionally, the following Ballots Will Not be Counted:

  - any Ballot received after the Voting Deadline unless the Debtors, in consultation with the Supporting Parties, and the Official Committee of Unsecured Creditors solely for extensions for Classes 5, 6, and 7 and the Official Committee of Opioid-Related Claimants solely for extensions for Classes 8 and 9, shall have granted an extension of the Voting Deadline in writing with respect to such Ballot;

  - any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  - any Ballot cast by or on behalf of a Person or Entity that does not hold a Claim in one of the Voting Classes;

  - any Ballot cast for a Claim that is not listed on the Schedules, or that is scheduled at zero, in an unknown amount, or, in whole or in part, as unliquidated, contingent, or disputed, and for which no proof of claim was timely filed; *provided, however,* that this specific provision shall not apply to Opioid Claimants;

o   any Ballot that is properly completed, executed and timely filed, but (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

o   any Ballot submitted by facsimile, telecopy or electronic mail (other than the Notice and Claims Agent's online portal when applicable or the via the [Opioid Claimant Website]);

o   any unsigned Ballot;

o   any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors; or

o   any Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order, Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order, or Solicitation Directive attached as **Exhibit 2.2** to the Disclosure Statement Order, if applicable.

All Holders of Claims and Interests are advised to read the Disclosure Statement Order and all attachments thereto, including the Solicitation Procedures attached as **Attachment 1** to the Disclosure Statement Order, which sets forth in greater detail the information disclosed in this section I.E of this Disclosure Statement.

F.   **Confirmation of the Plan**

1.   **The Confirmation Hearing**

The Confirmation Hearing will take place on [August 27], 2021 at 10:00 a.m. (prevailing Eastern Time) before the Honorable John T. Dorsey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street North, 3rd Floor, Wilmington, DE 19801, and such hearing shall be conducted either by teleconference or videoconference via Zoom.   The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

2.   **The Deadline for Objecting to Confirmation of the Plan**

The Plan Objection Deadline is [August 16], 2021 at 4:00 p.m. (prevailing Eastern Time).  Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the nature of the Claim or Equity Interest of such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received no later than the Plan Objection Deadline by the parties set forth below (the "***Notice Parties***").

(a) Counsel to the Debtors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George Davis (George.Davis@lw.com), George Klidonas (George.Klidonas@lw.com), Anupama Yerramalli (Anu.Yerramalli@lw.com), and Andrew Sorkin (Andrew.Sorkin@lw.com)), Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, California 90071 (Attn: Jeffrey Bjork (Jeff.Bjork@lw.com)), Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 (Attn: Jason Gott (Jason.Gott@lw.com)), and Richards,

Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins (collins@rlf.com) and Michael J. Merchant (merchant@rlf.com));

(b) Counsel to the Guaranteed Unsecured Notes Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Andrew N. Rosenberg (arosenberg@paulweiss.com), Alice Belisle Eaton (aeaton@paulweiss.com), Claudia R. Tobler (ctobler@paulweiss.com), and Neal Paul Donnelly (ndonnelly@paulweiss.com)), and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Richard S. Cobb (cobb@lrclaw.com)), co-counsel for the ad hoc group of holders of the Debtors' unsecured notes;

(c) Counsel to the Governmental Plaintiff Ad Hoc Committee, Kramer Levin Naftalis & Frankel LLP 1177 Avenue of the Americas, New York, New York 10036 (Attn: Kenneth H. Eckstein (keckstein@kramerlevin.com) and Daniel M. Eggermann (deggermann@kramerlevin.com)), Brown Rudnick LLP Seven Times Square New York, New York 10019 (Attn: David J. Molton (dmolton@brownrudnick.com) and Steven D. Pohl (spohl@brownrudnick.com)), and Gilbert LLP 700 Pennsylvania Ave., SE, Suite 400, Washington, D.C. 20003 (Attn: Scott D. Gilbert (gilberts@gilbertlegal.com) and Kami E. Quinn (quinnk@gilbertlegal.com));

(d) Counsel to the MSGE Group, Caplin & Drysdale, Chartered, One Thomas Circle, NW, Suite 1100, Washington D.C. 20005 (Attn: Kevin C. Maclay (kmaclay@capdale.com), Todd E. Phillips (tphillips@capdale.com), and Ann Weber Langley (alangley @capdale.com));

(e) Counsel to the Ad Hoc First Lien Term Lender Group, Gibson, Dunn & Crutcher LLP 200 Park Avenue New York, New York 10166 (Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com) and Michael J. Cohen (mcohen@gibsondunn.com)), and Troutman Pepper Hamilton Sanders LLP Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attn: David M. Fournier (david.fournier@troutman.com) and Kenneth A. Listwak (ken.listwak@troutman.com));

(f) The Office of the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov)); and

(g) Counsel to the Official Committee of Unsecured Creditors, Cooley LLP; 1299 Pennsylvania Avenue, NW, Washington D.C. 20004 (Attn: Cullen D. Speckhart (cspeckhart@cooley.com)), Cooley LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Cathy Hershcopf (chershcopf@cooley.com), Michael Klein (mklein@cooley.com), and Lauren A. Reichardt (lreichardt@cooley.com), and Robinson & Cole LLP, 1201 N. Market Street, Suite 1406, Wilmington, Delaware 19801 (Attn: Natalie D. Ramsey (nramsey@rc.com) and Jamie L. Edmonson (jedmonson@rc.com));

(h) Counsel to the Future Claims Representative, Young Conaway Stargatt & Taylor, LLP; Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: James L. Patton, Jr. (jpatton@ycst.com)) and Frankel Wyron LLP; 2101 L St., NW, Suite 800, Washington, DC 20037 (Attn: Richard Wyron (rwyron@frankelwyron.com); and

(i) Counsel to the Official Committee of Opioid Related Claimants, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Arik Preis (apreis@akingump.com), Mitchell P. Hurley (mhurley@akingump.com), and Sara L. Brauner (sbrauner@akingump.com)) and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Justin R. Alberto (jalberto@coleschotz.com)).

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

### 3.   Effect of Confirmation of the Plan

Article IX of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain Holders of Claims, and each of their respective Related Persons, and (c) exculpation of certain parties.  It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.

---

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN**

---

### G.   <u>The Plan Releases</u>

The Plan contains two separate, non-overlapping releases that will bind certain holders of Claims and Interests.  Various parties have asserted that the Plan is unconfirmable because of its release provisions, but the Debtors believe these provisions comply fully with applicable law.  The following summary of those provisions is subject in all respects to the Plan itself.

Article IX.C of the Plan provides that the Non-Debtor Releasing Parties will be deemed to have released the Released Parties from Claims and Causes of Action relating to the Debtors and their restructuring and Chapter 11 Cases, among other things.  The Released Parties include, without limitation, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, their directors, officers, employees, and advisors, the parties to the Restructuring Support Agreement, the Debtors' secured lenders and noteholders, the Opioid MDT II and the Opioid Creditor Trusts, and their respective, advisors and representatives.

The Debtors' position is that this "third party release" is consensual under prevailing practice in the Bankruptcy Court because applicable Holders of Claims and Interests, other than those that are Unimpaired under the Plan, have the ability to "opt out" of the release by timely submitting an opt out election.  This structural element of the Plan, combined with the Debtors' anticipated solicitation and noticing process, justify deeming any applicable Holder of a Claim or Interest to have consented to the release.  For the avoidance of doubt, the Debtors also believe the "third party release" is justified as a non-consensual release under applicable legal precedent.

Importantly, Article IX.C of the Plan does **not** apply to Holders of Opioid Claims in their capacity as such.  Instead, such Holders, in that capacity, are subject to Article IX.D of the Plan, which provides for a non-consensual release of the Protected Parties from any Claims and Causes of Action relating to the Debtors and their restructuring and Chapter 11 Cases, among other things.  The Protected Parties include, without limitation, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, and their directors, officers, employees, and advisors; but the Protected Parties generally do not include any third party lenders or other creditors.

The Debtors' position is that this "opioid claimant release" is justified as non-consensual under applicable legal precedent and as a further effectuating mechanism for the Channeling Injunction of Opioid Claims to the Opioid MDT II and the Opioid Creditor Trusts, which is provided under Article IX.G of the Plan. These Chapter 11 Cases are the first ever reorganization of a defendant in the nationwide opioid litigation that will not come to be owned by opioid claimant trusts, and which involves secured and unsecured funded debt and material, non-opioid businesses. The unprecedented circumstances of these cases and of the opioid abuse epidemic, as well as the substantial contributions to the Debtors' restructuring made by the Protected Parties, will be demonstrated by the Debtors at the Confirmation Hearing in support of the Plan.

Finally, the Released Parties also would be released from any Claims and Causes of Action held by the Estates under the Plan. The Debtors, through independent board members and counsel, are conducting two separate diligence processes—one for Specialty Generics and one for all the other Debtors—to evaluate whether granting those releases by implementing the Plan is consistent with the Debtors' fiduciary duties. The Specialty Generics process is being conducted by the independent directors of Specialty Generics, Sherman Edmiston and Marc Beilinson, with their counsel Katten Muchin Rosenman LLP and financial advisor PJT Partners, and the second process is being conducted by two independent directors of Mallinckrodt plc, Anne Whitaker and Paul Carter, with the assistance of the Debtors' counsel, Latham & Watkins LLP and Richards Layton & Finger, P.A., and the Debtors' restructuring advisors AlixPartners LLP. Importantly, if any board of any Debtor determines that these releases, as currently constructed, would not be consistent with such Debtor's or such board's fiduciary duties, the Restructuring Support Agreement can be terminated by the Debtors' board. Please see section IV.P of this Disclosure Statement titled "The Debtors' Diligence Related to the Plan Releases" for more information regarding these diligence processes.

Additionally, from and after the Effective Date, Security Holders who have not validly opted out of the third party release under the Plan will be barred from proceeding with Claims against any Released Party, regardless of the extent of available insurance coverage. From and after the Effective Date, Security Holders will be barred from proceeding with claims against the Debtors, regardless of the extent of available insurance coverage.

All Holders of Claims and Interests are advised to read the Article IX of the Plan which sets forth in greater detail the information disclosed in this section I.G of this Disclosure Statement.

##### H.   Consummation of the Plan

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article VIII of the Plan. Following confirmation, the Plan will be consummated on the Effective Date.

##### I.   Risk Factors

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim in a Voting Class should consider carefully all of the information in this Disclosure Statement, including the Risk Factors described in Section [IX] herein titled, "*Risk Factors to Consider Before Voting*."

## II.
## BACKGROUND TO THE CHAPTER 11 CASES

### A.       The Debtors' Corporate Structure

Prior to our filing for Chapter 11, our ordinary shares were traded on the NYSE under the ticker symbol "MNK." On October 13, 2020, the NYSE filed a Form 25 with the SEC to delist the ordinary shares, $0.20 par value, of the registrant from the NYSE. The delisting became effective October 26, 2020. The deregistration of the ordinary shares under Section 12(b) of the Exchange Act became effective on January 11, 2021, at which point the ordinary shares were deemed registered under Section 12(g) of the Exchange Act. The registrant's ordinary shares began trading on the OTC Pink Marketplace on October 13, 2020 under the symbol "MNKKQ."

The subsidiaries of Mallinckrodt plc are divided into two business segments:  (a) Specialty Brands and (b) Specialty Generics.  The two businesses are fundamentally distinct and are operated accordingly.  The segments share limited corporate services and insurance coverage, are combined for U.S. tax reporting purposes (in returns filed by Debtor MEH, Inc.), and use some of the same physical facilities, all on documented, market-based terms.  But beyond these aspects, any other business overlap (such as common vendor relationships) is *de minimis*. Each of Specialty Brands and Specialty Generics has its own management team directing core decision-making and driving their respective successes, as well as separate boards of directors or managers (as applicable), including different independent board members for Mallinckrodt plc and for the Specialty Generics Debtors.

A detailed organizational chart, including all the Debtors and Non-Debtor Affiliates, is attached hereto as **Exhibit C**. The following is a simplified version to depict the legal and operating structure as relevant to the Debtors, with blue boxes depicting Debtor entities and white boxes depicting Non-Debtor Affiliates:[17]

---

[17]   This simplified version is illustrative and does not purport to depict every legal entity or corporate relationship between entities, and is subject to further updates by the Debtors as changes are made to the Debtors' corporate structure.  The chart in **Exhibit C** to this Disclosure Statement is a complete and accurate version.



**B.    The Debtors' Business Operations**

       1.    **Business Segments**

As described above, Mallinckrodt is split into two separate business segments – Specialty Brands and Specialty Generics – operated by different sets of legal entities.  For the fiscal year ended December 25, 2020, Specialty Brands accounted for $2,059.6 million in net sales, while Specialty Generics accounted for $689.8 million.

       a.    **Specialty Brands**

Specialty Brands is owned and operated by the Debtors and certain foreign Non-Debtor Affiliates and focuses on autoimmune and rare diseases in specialty areas like neurology, rheumatology, nephrology, pulmonology and ophthalmology, as well as immunotherapy and neonatal respiratory critical care therapies and non-opioid analgesics.

Specialty Brands currently produces, markets, and sells the following branded products, among others:

- Acthar, an injectable drug approved by the FDA for use in 19 indications, including, among others, monotherapy for the treatment of infantile spasms in infants and children under 2 years of age. The currently approved indications of Acthar are not subject to patent or other exclusivity;

- INOmax, an inhaled gas delivered by a proprietary delivery device, which is a pulmonary vasodilator marketed as part of the INOmax Total Care Package, which includes the drug product, drug-delivery device, technical and clinical assistance, 24/7/365 customer service, emergency supply and delivery and on-site training;

- Ofirmev, a proprietary intravenous formulation of acetaminophen, a non-opioid analgesic used for post-operative pain management;

- Therakos, a global leader in autologous immunotherapy delivered through extracorporeal photopheresis ("*ECP*"), provided by a proprietary medical device and related consumables, providing the only integrated ECP system in the world; and

- Amitiza, a global leader in the branded constipation market.

Specialty Brands' revenues from its branded products are as follows:

| Specialty Brands Net Sales FY 20 | |
|---|---|
| **Product** | **Net Sales (in millions)** |
| Acthar Gel | $767.9 |
| INOmax | 574.1 |
| Ofirmev | 276.5 |
| Therakos | 238.6 |
| Amitiza | 188.8 |
| Other | 13.7 |
| *Total* | *$2,059.6* |

### b.    Specialty Generics

Specialty Generics offers a portfolio of over twenty specialty generic product families, most of which are controlled substances regulated by the DEA. Altogether, Specialty Generics operates one of the largest controlled substance pharmaceutical businesses in the U.S., offering generic products for pain management, substance abuse disorders, and attention deficit hyperactivity disorder (ADHD), as well as active pharmaceutical ingredients ("*APIs*") used by other pharmaceutical manufacturers to produce finished dosage pharmaceutical products. Notably, it is the only producer of the API for acetaminophen in the North American and European regions.

Specialty Generics' revenues are well-diversified, with roughly half of its revenue coming from APIs, and the other half from finished dosage pharmaceutical products:

| Specialty Generics Net Sales FY 20 | |
|---|---|
| **Product** | **Net Sales (in millions)** |
| Acetaminophen API | $213.0 |
| Hydrocodone (API) and hydrocodone-containing tablets (finished dosage) | $98.0 |
| Oxycodone (API) and oxycodone-containing tablets (finished dosage) | $68.4 |

| | |
|---|---|
| Other Controlled Substances[18] | $289.9 |
| Other | $20.5 |
| *Total* | *$689.8* |

### 2.    Research and Development

The Debtors devote significant resources to research and development ("**R&D**").

#### a.    Specialty Brands

Specialty Brands' R&D investments center on building a diverse, durable portfolio of innovative therapies that provide value to patients, physicians and payers. This strategy focuses on growth, including pipeline opportunities related to early- and late-stage development products to meet the needs of underserved patient populations, where the Specialty Brands Debtors execute on the development process and perform clinical trials to pursue regulatory approval of new products.

Within Specialty Brands' pipeline are innovative products that, if approved, will give more patients suffering from difficult-to-treat and often overlooked conditions better treatment options. This includes StrataGraft®, an investigative regenerative skin tissue therapy developed as a biologic and in partnership with BARDA through Project BioShield, that is used for the treatment of severe burns and may reduce the need for autografting in certain patients. StrataGraft is among the first products to be designated as a Regenerative Medicine Advanced Therapy by the FDA under the provisions of the 21st Century Cures Act, and in August the FDA accepted our Biologics License Application ("**BLA**") for review.

The Debtors also hold an equity investment in Silence Therapeutics as part of a collaboration to develop and commercialize novel RNA interference (RNAi) therapeutics for the treatment of serious diseases, including autoimmune diseases.

Specialty Brands' significant investment in R&D is paving the way for the future of the business, with multiple products in various stages of development, which the Debtors believe will provide long-term organic growth and diversification.

#### b.    Specialty Generics

Specialty Generics' R&D objective is to use their proven development, formulation, and material characterization capabilities to develop hard-to-manufacture complex generic pharmaceuticals with difficult-to-replicate characteristics, such as their release, absorption, or metabolism profiles (among other things). In particular, the Specialty Generics Debtors are developing a number of non-opioid and non-controlled substance complex generic pharmaceutical products, some of which will take advantage of their API and drug product manufacturing capabilities and expertise.

---

[18]    The net sales of the opioid medication, Methadose, is included in Other Controlled Substances.

### C.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had funded debt outstanding of approximately $5.283 billion.  The following table summarizes the Debtors' that prepetition indebtedness and capital structure:

| Governing Document | Facility/Issuance | Borrower/Issuer | Outstanding Principal as of the Petition Date |
|---|---|---|---|
| Credit Agreement | Revolving Credit Facility maturing February 2022 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $900,000,000.00 |
| | Term Loan due September 2024 | | $1,505,211,683.76 |
| | Term Loan due February 2025 | | $399,488,946.81 |
| First Lien Notes Indenture | 10.000%% First Lien Senior Secured Notes due April 2025 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $495,032,000.00 |
| Second Lien Notes Indenture | 10.000% Second Lien Senior Secured Notes due April 2025 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $322,868,000.00 |
| 2013 Indenture | 4.750% Senior Notes due April 2023 | Mallinckrodt International Finance S.A. | $133,657,000.00 |
| 2014 Indenture | 5.75% Senior Notes due August 2022 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $610,304,000.00 |
| 2015 Indenture | 5.500% Senior Notes due April 2025 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $387,207,000.00 |
| 5.625% Senior Notes Indenture | 5.625% Senior Notes due October 2023 | Mallinckrodt CB LLC<br><br>Mallinckrodt International Finance S.A. | $514,673,000.00 |
| Legacy Debentures Indenture | 9.50% Debentures due May 2022 | Ludlow LLC | $10,388,000.00 |
| | 8.00% Debentures due March 2023 | Ludlow LLC | $4,450,000.00 |

### 1.    Revolving Credit Facility and Term Loans

Debtor Mallinckrodt plc, as parent, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as borrowers, Deutsche Bank AG New York Branch, as administrative agent (the "*Agent*"), and the lenders party thereto (the "*Secured Lenders*" and, together with the Agent, the "*First Lien Secured Parties*"), are parties to that certain Credit Agreement, dated as of March 19, 2014, as amended by

Incremental Assumption Agreement No. 1, dated August 14, 2014, Refinancing Amendment No. 1 and Incremental Assumption Agreement No. 2, dated August 28, 2015, Refinancing Amendment No. 2 and Incremental Assumption Agreement No. 3, dated February 28, 2017, and Incremental Assumption Agreement no. 4, dated February 13, 2018, and Amendment, dated as of February 21, 2018 (as further modified, amended, or supplemented from time to time, the "***Credit Agreement***"). The Credit Agreement provides three separate credit facilities: (a) a revolving credit facility maturing in 2022, (b) a term loan due 2024, and (c) a term loan due 2025. As of the Petition Date, the aggregate outstanding principal of (a) the revolving credit facility was $900,000,000.00, (b) the term loan due 2024 was $1,505,211,683.76, and (c) the term loan due 2025 was $399,488,946.81.

In connection with the Credit Agreement, each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided an unconditional guaranty of all obligations under the Credit Agreement, and entered into security documents providing for first-priority liens on substantially all assets, including all accounts, chattel paper, cash and deposit accounts, documents, equipment, fixtures, general intangibles (including, without limitation, all intellectual property), instruments, inventory, investment property, letters of credit and letter of credit rights, commercial tort claims, books and records, customer lists, credit files, programs, printouts and other computer materials and records pertaining to foregoing, as well as all proceeds, supporting obligations and products of any and all of the foregoing.

## 2. First Lien Notes

In connection with a private exchange for Mallinckrodt's then-outstanding unsecured notes due April 2020 consummated in April 2020 (the "***2020 Private Exchange***"), Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $495,032,000 in aggregate principal amount of 10.000% First Lien Senior Secured Notes due 2025 pursuant to that certain Indenture, dated as of April 7, 2020 (as modified, amended, or supplemented from time to time, the "***First Lien Notes Indenture***"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, Wilmington Savings Fund Society, FSB, as trustee (the "***First Lien Trustee***"), and Deutsche Bank AG New York Branch, as collateral agent. The 2020 Private Exchange resulted in the exchange of approximately $495 million of the 4.875% Senior Notes due 2020 for approximately $495 million of new 10.00% First Lien Senior Secured Notes due 2025.

In connection with the First Lien Notes Indenture, each of the Debtors (other than Mallinckrodt Holdings GmbH, Mallinckrodt Group S.à r.l., and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided an unconditional guaranty of all obligations under the First Lien Notes Indenture and entered into security documents providing for first-priority liens on substantially the same collateral as secures the obligations under the Credit Agreement. As of the Petition Date, the aggregate outstanding principal of the 10.000% First Lien Senior Secured Notes due 2025 was $495,032,000.00.

## 3. Second Lien Notes

In connection with an exchange offer for Mallinckrodt's outstanding unsecured notes consummated in December 2019 (the "***2019 Exchange Offer***"), Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $322,868,000.00 in aggregate principal amount of 10.000% Second Lien Senior Secured Notes due 2025 pursuant to that certain Indenture, dated as of December 6, 2019 (as modified, amended, or supplemented from time to time, the "***Second Lien Notes Indenture***"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Wilmington Savings Fund Society, FSB, as trustee (the "***Second Lien Trustee***") and collateral agent. The 2019 Exchange Offer resulted in the exchange of $83.2 million of the 4.875% Senior Notes due 2020, $52.9 million of the 5.75% Senior Notes due 2022, $216.4 million of the

4.750% Senior Notes due 2023, $144.7 million of the 5.625% Senior Notes due 2023, and $208.9 million of the 5.500% Senior Notes due 2025 for $322.9 million of 10.000% Second Lien Senior Secured Notes due 2025.

In connection with the Second Lien Notes Indenture, each of the Debtors (other than Mallinckrodt Holdings GmbH, Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided an unconditional guaranty of all obligations under the Second Lien Notes Indenture and entered into security documents providing for second-priority liens on substantially the same collateral as secures the obligations under the Credit Agreement. As of the Petition Date, the aggregate outstanding principal of the 10.000% Second Lien Senior Secured Notes due 2025 was $322,868,000.00.

### 4.    2013 Indenture

In April 2013, Debtor Mallinckrodt International Finance S.A. issued (a) $300,000,000.00 in aggregate principal amount of 3.500% Senior Notes due 2018, which, for the avoidance of doubt, have been fully redeemed, and (b) $600,000,000.00 in aggregate principal amount of 4.750% Senior Notes due 2023 pursuant to that certain Indenture, dated as of April 11, 2013, as amended by that certain Supplemental Indenture, dated as of June 28, 2013 (as further modified, amended, or supplemented from time to time, the "*2013 Indenture*") by and among Mallinckrodt International Finance S.A., as issuer, Debtor Mallinckrodt plc (in replacement of Covidien International Finance S.A.), as guarantor, and Deutsche Bank Trust Company Americas, as trustee. No other Debtors are guarantors of the 4.750% Senior Notes due 2023. As of the Petition Date, the aggregate outstanding principal of the 4.750% Senior Notes due 2023 was $133,657,000.00.

### 5.    2014 Indenture

In August 2014, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $900,000,000 in aggregate principal amount of 5.75% Senior Notes due 2022 pursuant to that certain Indenture, dated as of August 13, 2014 (as modified, amended, or supplemented from time to time, the "*2014 Indenture*"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Deutsche Bank Trust Company Americas, as trustee. Each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided, jointly and severally, on an unsecured, unsubordinated basis, a guaranty of all obligations under the 2014 Indenture. As of the Petition Date, the aggregate outstanding principal of the 5.75% Senior Notes due 2022 was $610,304,000.00.

### 6.    2015 Indenture

In April 2015, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued (a) $700,000,000 in aggregate principal amount of 4.875% Senior Notes due 2020 and (b) $700,000,000 in aggregate principal amount of 5.500% Senior Notes due 2025 pursuant to that certain Indenture, dated as of April 15, 2015 (as modified, amended, or supplemented from time to time, the "*2015 Indenture*"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Deutsche Bank Trust Company Americas, as trustee. Each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided, jointly and severally, on an unsecured, unsubordinated basis, a guaranty of all obligations under the 2015 Indenture. As part of the 2019 Exchange Offer and the 2020 Private Exchange, the 4.875% Senior Notes due 2020 were exchanged for Second Lien Notes, First Lien Notes, or paid in full, and as a result there are no outstanding 4.875% Senior Notes due 2020. As of the Petition Date, the aggregate outstanding principal of the 5.500% Senior Notes due 2025 was $387,207,000.00.

### 7. 5.625% Senior Notes Indenture

In September 2015, Debtors Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC issued $750,000,000 in aggregate principal amount of 5.625% Senior Notes due 2023 pursuant to that certain Indenture, dated as of September 24, 2015 (as modified, amended, or supplemented from time to time, the "**5.625% Senior Notes Indenture**"), by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, the guarantors party thereto from time to time, and Deutsche Bank Trust Company Americas, as trustee.  Each of the Debtors (other than Mallinckrodt Group S.à r.l. and Mallinckrodt Canada ULC) and the non-Debtor guarantors party thereto provided, jointly and severally, on an unsecured, unsubordinated basis, a guaranty of all obligations under the 5.625% Senior Notes Indenture.  As of the Petition Date, the aggregate outstanding principal of the 5.625% Senior Notes due 2023 was $514,673,000.00.

### 8. Legacy Debentures

In April 1992, Tyco Laboratories, a predecessor to Debtor Ludlow LLC issued $200,000,000 in aggregate principal amount of 9.50% Debentures due 2022 pursuant to that certain Indenture, dated as of April 30, 1992 (as modified, amended, or supplemented from time to time, the "**Legacy Debentures Indenture**"), with Security Pacific National Trust Company (New York), as trustee, and that certain First Supplemental Indenture, also dated April 30, 1992, with Security Pacific National Trust Company (New York).  As of the Petition Date, the aggregate outstanding principal of the 9.50% Debentures due May 2022 was $10,388,000.00.

In March 1993, the same predecessor to Debtor Ludlow LLC issued $50,000,000.00 in aggregate principal amount of 8.00% Debentures due 2023 pursuant to the Legacy Debentures Indenture and a Second Supplemental Indenture, dated as of March 8, 1993, with BankAmerica National Trust Company (successor by merger to Security Pacific National Trust Company (New York)), as trustee.  As of the Petition Date, the aggregate outstanding principal of the 8.00% Debentures due March 2023 was $4,450,000.00.

### III.
### KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

### A. The Opioid Litigations

Over the three years prior to the Petition Date, certain of the Debtors and their ultimate parent Debtor Mallinckrodt plc have been involved in 3,034 cases in 50 states and Puerto Rico filed against the Debtors—with 2,785 cases in federal court and 249 cases in state court as of October 7, 2020—concerning the production and sales of its opioid products.  The federal cases have been, and continue to be, largely consolidated into a multi-district litigation in Cleveland, Ohio—*In re National Prescription Opiate Litigation*, MDL No. 2804 (the "**MDL**").  But the cases in state court proliferated and progressed with alarming speed, as depicted in the graphic below.  Prior to the Petition Date, state court judges had set various schedules for litigating different causes of action involving different discovery and different plaintiffs.  As a result, prior to the Petition Date, Mallinckrodt was fighting lawsuits in 136 different state courts, with 8 trial dates scheduled or expected to begin within the year after the Petition Date in state or federal forums.  Until the Petition Date, new litigation against the Debtors continued to be filed weekly.



Complaints, investigations, and inquiries as of October 2, 2020

Plaintiffs bringing the lawsuits include U.S. states, counties, cities, towns and other governmental persons or entities, Native American tribes, third-party payers, hospitals, health systems, unions, health and welfare funds, individuals, and others.  The lawsuits assert a variety of claims, including, but not limited to, public nuisance, negligence, civil conspiracy, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act or similar state laws, violations of state Controlled Substances Acts or state False Claims Acts, product liability, consumer fraud, unfair or deceptive trade practices, false advertising, insurance fraud, unjust enrichment and other common law and statutory claims arising from the manufacturing, distribution, marketing and promotion of opioids.  Generally, the plaintiffs seek restitution, damages, including punitive damages and penalties, abatement, injunctive and other relief, and attorneys' fees and costs.

## B.    The Opioid Settlement Negotiations and Summary of Terms

For more than two years, Mallinckrodt engaged in settlement discussions with numerous States Attorneys General, as well as the court-appointed plaintiffs' executive committee in the national opioid MDL ("***Plaintiffs' Executive Committee***").  In August 2019, Mallinckrodt engaged directly with the plaintiffs in two "Track One" bellwether trials that were scheduled in the multidistrict litigation in October 2019.  After several weeks of discussions, Mallinckrodt and those two plaintiffs—two counties in northern Ohio— agreed to settle the suits for cash payment in the amount of $24 million and contribution of generic products, including addiction treatment products, worth $6 million.

Mallinckrodt then engaged in months of intensive discussions with a committee of counsel from the Plaintiffs' Executive Committee, as well as certain State Attorneys General.  Discussions were fruitful from the start, and Debtor Mallinckrodt plc and certain of the Specialty Generics Debtors agreed to pay for professionals (subject to reasonable terms) to advise the plaintiffs' negotiating committee in settlement negotiations with Mallinckrodt.

In February 2020, the Specialty Generics Debtors, Debtor Mallinckrodt plc, and the plaintiff committee announced they had finally reached the core economic terms of a settlement (the "***Opioid Settlement***").  In addition to establishing global economic terms for payment of all outstanding opioid-related liabilities, the

Opioid Settlement accomplishes a second critical objective: it establishes certain agreed go-forward operational parameters for the Debtors' opioid business, largely codifying previously established practices and procedures, compliance with which will dramatically reduce the risk to that business going forward.

After agreeing to the Opioid Settlement in early 2020, the Debtors began to prepare a chapter 11 strategy through which the Opioid Settlement would become binding on all opioid claimants. As part of this effort and to facilitate the implementation of the Opioid Settlement through a chapter 11 plan structure, the Debtors entered into an engagement letter with Roger Frankel of Frankel Wyron LLP on February 24, 2020 to serve as a proposed future claims representative (the "*FCR*") to represent the interests of individuals who may in the future assert opioid-related claims against the Debtors.[19] The FCR retained multiple advisors, including counsel, an investment banker, a claims estimator, special litigation counsel, and a medical advisor (collectively, the "*FCR Advisors*"). Together with the FCR Advisors, the FCR initiated an extensive diligence process into the Debtors' businesses and the pending opioid litigations, subject to confidentiality agreements.

However, events that occurred in the Spring of 2020 – including adverse events in certain Specialty Brands-related litigations (described in section C below), the financial impact of the emergent COVID-19 pandemic, and the termination of negotiations around a potential recapitalization transaction – made clear that the Debtors needed to address their capital structure more broadly, including potentially seeking protection under chapter 11 of the Bankruptcy Code. Ultimately, the Debtors determined that the most value-maximizing path forward was a chapter 11 filing of both of the Debtors' business divisions, Specialty Brands and Specialty Generics.

Following their determination to file both the Specialty Brands and Specialty Generics business divisions, the Debtors engaged in hard fought, multi-party negotiations within the context of a comprehensive restructuring of the Debtors with the plaintiff negotiating committee comprised of the Plaintiffs' Executive Committee and certain State Attorneys General, as well as the Guaranteed Unsecured Notes Ad Hoc Group, who collectively hold over 84% of the Debtors' fulcrum funded debt securities. These negotiations culminated in the proposed restructuring embodied in the Restructuring Support Agreement and included a revised Opioid Settlement that largely adhered to the terms of the February 2020 agreement in principle.

The principal terms of the revised Opioid Settlement contained in the Restructuring Support Agreement are as follows:

- The Plan will provide for the establishment of the Opioid MDT II, which will receive the following "*Opioid MDT II Consideration*":

  - cash in the amount of $450,000,000;

  - the New Opioid Warrants;

  - the right to receive cash payments (the "*Deferred Cash Payments*") in the following amounts and on the following dates: (a) $200,000,000 on each of the first and second anniversaries of the Plan Effective Date; and (b) $150,000,000 on each of the third through seventh anniversaries of the Plan Effective Date; provided, that at any time prior to the first anniversary of the Plan Effective Date, the Reorganized Debtors shall have the right to

---

[19] As described in more detail in this Disclosure Statement, on March 16, 2021, the Bankruptcy Court appointed Roger Frankel as the FCR for the purposes of permitting him to participate in an ongoing mediation over the allocation of the Opioid MDT II assets. The Debtors' motion for the appointment of the FCR on a permanent basis remains pending.

prepay, in full or in part, the Deferred Cash Payments, at a price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x)(i) the present value of the Deferred Cash Payments at the prepayment date plus (ii) $450,000,000 to equal (y)(i) the present value of the payments under the Original Payments Schedule at the prepayment date (excluding the initial $300,000,000 payment provided for in the Original Payments Schedule), discounted at a discount rate of 12% per annum, plus (ii) $300,000,000 (such option, the "***Prepayment Option***"); provided, further, that to the extent the Reorganized Debtors seek to prepay only a portion of the Deferred Cash Payments in accordance with the Prepayment Option, such prepayment shall (x) be funded solely from the net proceeds of an equity raise by the Reorganized Debtors; and (y) prepay Deferred Cash Payments in accordance with the above in inverse order beginning with the payment due on the seventh anniversary of the Plan Effective Date;

 o the Assigned Third-Party Claims; and

 o the Assigned Insurance Rights, which includes Additional Insurance Rights, remains subject to discussion among the Supporting Parties and the Debtors in accordance with the Restructuring Support Agreement.

- All Opioid Claims will be assumed by the Opioid MDT II and be discharged, released, and enjoined as to the Debtors and the other Released Parties.

- As of the Plan Effective Date, Mallinckrodt's liability for all Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to and assumed by the Opioid MDT II.

- Each Opioid Claim shall be resolved in  accordance with the terms, provisions, and procedures of the Opioid MDT II Documents.

- The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid MDT II, and solely in accordance with the Opioid MDT II Documents, and each such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party.

- The Plan and the Confirmation Order will contain (a) a release by holders of Opioid Claims and (b) an injunction channeling all Opioid Claims against the Protected Parties to the Opioid MDT II.

- The Debtors shall seek entry of an injunctive order to be effective on the Petition Date, defining the manner in which the Debtors' opioid business may be lawfully operated by the Debtors or any successors thereto on a going-forward basis during the pendency of the Chapter 11 Cases.  The Confirmation Order will extend the Opioid Operating Injunction to govern the Reorganized Debtors' operations after the Plan Effective Date.

The recoveries to Holders of Opioid Claims and other terms set forth in the Opioid Settlement term sheet are the result of months of hard-fought negotiations.  The Debtors believe these terms are well within the range of reasonableness applicable to settlements under Bankruptcy Rule 9019.  Furthermore, the terms are justified by the potential amount and nature of the Opioid Claims, their corresponding entitlements, potential Avoidance Actions relating to the Specialty Generics Debtors, and the terms of the Plan itself, which release and channel Opioid Claims away from ***all*** of the Debtors and Non-Debtor Affiliates, including Specialty Brands Debtors and non-Debtors.

Settlement payments relating to the Opioid Settlement and the Plan's treatment of Opioid Claims will generally be funded from balance sheet cash and cash from operations, subject to the Debtors' right to exercise the Prepayment Option with proceeds of an equity raise and to the Debtors' right generally to prepay any amounts with the proceeds of a capital raise.

### C.    Litigation

#### 1.    Acthar Related Litigations

As of the Petition Date, the Specialty Brands Debtors faced more than 25 litigations and government investigations, which exposed the Debtors to over $15 billion in aggregate alleged potential damages. The majority of these litigations are related to Acthar® Gel ("**Acthar**"), and of that group, among the most publicized cases are the declaratory judgement action in the United States District Court for the District of Columbia (now on appeal to the United States Court of Appeals for the District of Columbia Circuit) and the False Claims Act action in the United States District Court for the District of Massachusetts based on the same fact pattern but asserting treble damages, which could be crippling to the Debtors. These two actions related to the calculation of rebates that the Debtors pay to state Medicaid programs. Since 2016, Debtor Mallinckrodt ARD LLC ("**ARD**") and the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services ("**CMS**") have been in a dispute regarding the appropriate base date Average Manufacturer Price (a "**Base Date AMP**") for Acthar, which is used in the calculation of rebates.

In 2016, CMS notified ARD that it believed Acthar was not eligible for the Base Date AMP in use since 2013, which CMS had, in two separate written communications (including communications to predecessors to ARD), previously authorized in connection with Acthar's use in treating infantile spasms. In May 2019, CMS notified ARD that unless it updated the Base Date AMP for Acthar within 14 days, it would be declared "out of compliance" with the Drug Data Reporting for Medicaid system, forcing ARD to file a complaint in the United States District Court for the District of Columbia seeking injunctive relief and a determination that CMS's changed position was unlawful (the "**CMS Action**"). That suit led ultimately to a summary judgment against ARD in March 2020, which ARD timely appealed.

Further, in March 2020, the Department of Justice (the "**DOJ**") intervened in a *qui tam* lawsuit under the False Claims Act filed in 2018 against ARD in the United States District Court for the District of Massachusetts (the "**FCA Action**"),[20] accusing Mallinckrodt of **knowingly** using an incorrect Base Date AMP for Acthar. Mallinckrodt disputes the DOJ's allegations and believes it has strong defenses, but because of the False Claims Act's provision for treble punitive damages, the Debtors are exposed to a potential judgment that could result in more than $1.9 billion in liabilities.

#### 2.    Other Litigations

In addition to the CMS Action and the FCA Action, the Debtors are involved in an additional False Claims Act litigation, multiple putative class actions, private actions, and securities litigations, including:

---

[20]    The FCA Action is *United States of America et al. ex rel. Landolt v. Mallinckrodt Pharmaceuticals Inc.*, No. 18-11931-PBS (D. Mass.).

- ARD is a defendant in another *qui tam* False Claims Act litigation in the Eastern District of Pennsylvania, in which the DOJ has intervened, relating to Acthar payments made through charitable foundations;[21]

- ARD is a defendant in multiple private actions and putative class actions brought on behalf of public and private payers related to the pricing of Acthar.  The plaintiffs in these cases allege, among other things, that Debtors Mallinckrodt plc and ARD engaged in (a) anti-competitive acts, (b) violations of consumer protection laws and unfair trade practices, and (c) unjust enrichment (the "***Prepetition Acthar Actions***").[22]  All Prepetition Acthar Actions are stayed indefinitely against the Debtors pursuant to Bankruptcy Code Section 362, and all Prepetition Acthar Actions are stayed as against co-defendants Express Scripts, Inc. and its affiliates for at least 270 days from November 25, 2021, pursuant to this Court's order under Bankruptcy Code Section 105.

- Mallinckrodt plc is a defendant in multiple securities class actions and derivative litigations alleging, among other things, false and misleading statements related to Acthar;[23] and

- Mallinckrodt Inc. has been named as a defendant in several private putative class actions filed against dozens of pharmaceutical companies alleging antitrust violations with respect to generic pharmaceutical pricing that have been consolidated in a multi-district litigation in the Eastern District of Pennsylvania.[24]  In addition, Mallinckrodt Inc., Mallinckrodt LLC, and Mallinckrodt plc have been named as defendants in a government lawsuit brought nearly 50 states alleging antitrust violations related to generic pharmaceutical pricing as well in the District of Connecticut (collectively, the "***Generics Price Fixing Actions***").

### D.    The Federal/State Acthar Settlement Agreement

Simultaneous with ongoing negotiations with opioid plaintiffs and multiple groups of lenders and noteholders, the Debtors actively engaged with the DOJ to try to settle ARD's Acthar-related liabilities in connection with the CMS Action and beyond.  Starting in late spring of 2020, these discussions included providing the DOJ with considerable financial diligence and several rounds of offers and counteroffers.

In September 2020, the Debtors reached an agreement in principle with the DOJ, contingent upon a chapter 11 filing by Mallinckrodt plc, to resolve most Acthar-related claims and investigations of the federal government against the Debtors (the "***Acthar Settlement***"), including certain of the matters described

---

[21]   This case is *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC*, Case No. 12-175-BMS (E.D. Penn.)

[22]   The Prepetition Acthar Actions include, among others, *City of Rockford v. Mallinckrodt ARD, Inc., et al.*(N.D. Ill.); *MSP Recovery Claims, Series II, LLC, et al. v. Mallinckrodt ARD, Inc., et al.* (N.D. Ill.); *Humana Inc. v. Mallinckrodt ARD LLC, et al.* (C.D. Calif.); *Acument Global Technologies, Inc., v. Mallinckrodt ARD Inc., et al.* (Tenn. Cir. Ct.); *Int'l Union of Operating Engineers Local 542 v. Mallinckrodt ARD Inc., et al.* (Pa. Ct. Common Pleas); *United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey v. Mallinckrodt ARD, LLC, et al.* (D. N.J.); *Steamfitters Local Union No. 420 v. Mallinckrodt ARD, LLC, et al.* (E.D. Pa.); and *City of Marietta v. Mallinckrodt ARD LLC* (N.D. Ga.).

[23]   These cases are *Shenk v. Mallinckrodt Plc, et al.* (D.D.C); *Strougo v. Mallinckrodt Plc, et al.* (D.N.J.); *Solomon v. Mallinckrodt Plc, et al.* (D.D.C.); and *Brandhorst v. Mark Trudeau, et al.* (D.D.C.)

[24]   These cases are consolidated in the MDL captioned as *In re: Generic Pharmaceuticals Pricing Antitrust MDL*, 16-MD-2724 (E.D. Pa.).

above.[25]  The terms of the agreement in principle were set forth in the Restructuring Support Agreement. As described in the Restructuring Support Agreement, the terms of the settlement will be effectuated through the Debtors' Plan.  The deal, in short, calls for the Debtors to make cash payments in eight installments, beginning on the Plan's Effective Date and on each of the first seven anniversaries thereof, totaling $260,000,000, to the DOJ and various states.  In return, the Debtors will be released by the relevant governmental agencies for these Acthar-related claims.

The Debtors' negotiations with CMS and the DOJ lasted several months, and the settlement reached was the product of those hard-fought negotiations.  The Debtors believe the settlement satisfies applicable standards under Bankruptcy Rule 9019 and section 1129 of the Bankruptcy Code because the governmental creditors that hold the settled claims are uniquely situated from any of the Debtors' other creditors, and also serve as the Company's regulators.  After the March 2020 summary judgment against ARD in favor of CMS, the Debtors' obligations for back-rebates owed to various state Medicaid agencies were calculated to be approximately $650 million, and the DOJ thereafter intervened in a False Claims Act suit that would have trebled those damages, resulting in as much as approximately $1.95 billion in claims for the state and federal governments.  The Debtors will demonstrate at Confirmation that the Plan and the Acthar Settlement do not result in unfair discrimination against General Unsecured Creditors.

Settlement payments relating to the Acthar Settlement and the Settled Federal/State Acthar Claims will generally be funded from balance sheet cash and cash from operations in the amounts and at the dates set forth in the Plan.

### E.    The Restructuring Support Agreement

As it became clear that the Debtors would need to pursue a whole-company chapter 11, the Debtors opened discussions with the Ad Hoc First Lien Term Lender Group, an ad hoc group of Holders of First Lien Revolving Facility Claims, and an ad hoc group of Holders of Guaranteed Unsecured Notes Claims in an effort to address near-term maturities and to set an appropriate and sustainable capital structure for the Reorganized Debtors.  The Debtors spent considerable time and effort responding to diligence requests from all parties involved, as well as conducting extensive, multifaceted discussions.  In the end, while not all the Debtors' creditor groups are party to the Restructuring Support Agreement, the Debtors and the ad hoc group of Holders of Guaranteed Unsecured Notes Claims were able to reach an agreement on the terms of a financial restructuring, which is memorialized in the Restructuring Support Agreement and the terms of which are reflected in the Plan.  The Opioid Settlement and the Acthar Settlement are also included as part of the Restructuring Support Agreement and the terms of which are reflected in the Plan.

As of the Petition Date, the Restructuring Support Agreement was signed by the Debtors; unsecured noteholders holding more than 84 percent of the Guaranteed Unsecured Notes Claims; 50 Attorneys General of states, Washington, D.C., and U.S. territories with respect to their opioid claims; and the members of the Plaintiffs' Executive Committee, who will recommend that the more than 1,000 plaintiffs they represent in the MDL support the Opioid Settlement and the Restructuring Support Agreement.  After the Petition Date, the MSGE Group, including more than 1,300 governmental opioid claimants, and the Supporting Term Lenders (as detailed below) joined the Restructuring Support Agreement.

The agreements reflected in the Supporting Term Lenders Joinder Agreement are the product of extensive negotiations among the Debtors and Supporting Parties regarding several complex disputes related to the

---

[25]    Specifically, the Debtors and the United States (including CMS and DOJ) reached a settlement in principle with respect to two Acthar related qui tam litigations: *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC* (E.D. Pa.) and *United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC* (D. Mass.); and *Mallinckrodt ARD LLC v. Verma et al. (D.D.C.),*and all related matters.

allowance of various components of the First Lien Term Loan Claims (including the rate of postpetition interest and issues related to principal repayments due under the First Lien Credit Agreement) and the treatment of such Claims under the Plan, particularly whether such Claims could be reinstated under the Bankruptcy Code. These agreements comprise an integrated and non-severable compromise and settlement of these several disputes, which compromise and settlement is reflected in the Plan and certain orders of the Bankruptcy Court, is fair and reasonable, and falls well above the lowest point in the range of reasonableness.

Specifically, as provided for in Article IV.S of the Plan and pursuant to the negotiated terms of the Restructuring Support Agreement, on the Effective Date, the Reorganized Debtors agreed to pay the Noteholder Consent Fee and the Term Loan Exit Payment. The Debtors' paying the Term Loan Exit Payment and Noteholder Consent Fee is justified as a sound business judgment of the Debtors, in light of such payment being a condition to the support of the applicable Supporting Parties for the Plan and the Restructuring Transactions and to Consummation of the Plan. Failure to make such payments would jeopardize the Debtors' ability to effectuate the Plan and emerge from these Chapter 11 Cases. Moreover, the Term Loan Exit Payment is the product of an integrated settlement of multiple disputes with respect to the First Lien Term Loan Claims and the entitlements of the First Lien Term Lenders, which were the subject of litigation in the Chapter 11 Cases. Recognizing that payment of the Term Loan Exit Payment is necessary to preserve such settlement and the corresponding estate benefits reflected in the Supporting Term Lenders Joinder Agreement, the Debtors sought the Bankruptcy Court's approval of the Term Loan Exit Payment and certain other relief, and the Bankruptcy Court granted such relief pursuant to the *Order (I) Modifying Cash Collateral Order With Respect To Adequate Protection Terms, (II) Permitting The Debtors To Pay Certain Amounts, And (III) Granting Related Relief* [Docket No. 2021].

### 1. The DOJ/CMS/States Settlement

In parallel with the Restructuring Support Agreement, CMS, the Debtors, the DOJ, and the States (excluding, for this purpose, any territories of the United States) agreed to the material terms of a settlement agreement in connection with the Federal/State Acthar Settlement, to be incorporated into the Plan. Under the settlement in principle, in full and final satisfaction of all claims at issue in connection with the Federal/State Acthar Settlement, Mallinckrodt plc and ARD agreed to make cash payments to the United States of America and the States (excluding, for this purpose, any territories of the United States other than the District of Columbia and Puerto Rico) totaling $260 million in the aggregate in accordance with the below schedule, with deferred payments bearing interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020:

| Payment Date | Payment Amount |
| --- | --- |
| Plan Effective Date | $15,000,000 |
| First Anniversary of Plan Effective Date | $15,000,000 |
| Second Anniversary of Plan Effective Date | $20,000,000 |
| Third Anniversary of Plan Effective Date | $20,000,000 |
| Fourth Anniversary of Plan Effective Date | $32,500,000 |
| Fifth Anniversary of Plan Effective Date | $32,500,000 |
| Sixth Anniversary of Plan Effective Date | $62,500,000 |
| Seventh Anniversary of Plan Effective Date | $62,500,000 |

### 2. The Management Incentive Plan

As part of the good-faith hard fought negotiations of the Restructuring Support Agreement, the Debtors and the Supporting Parties also agreed on the provision of the Management Incentive Plan. The Management

Incentive Plan is an integral part of the Chapter 11 Plan and is necessary to the success of the Reorganized Debtors and, by extension, the completion of the distributions and structured payments contemplated by the Plan.    The Debtors operate, and the Reorganized Debtors will operate, in the highly competitive biopharmaceutical industry, where standard practice is for officer compensation to include significant proportions of equity awards and equity-based incentives, which will be reflected in the Management Incentive Plan.    Failure to provide for the Management Incentive Plan would, therefore, jeopardize the Reorganized Debtors' ability to attract, retain, and incentivize talented management personnel for the go-forward business.    Moreover, the Management Incentive Plan most directly affects the recovery of the Holders of Guaranteed Unsecured Notes Claims, who are otherwise receiving all or nearly all of the New Mallinckrodt Ordinary Shares on the Effective Date.    A substantial majority of those Holders are Supporting Parties (*i.e.*, parties to the Restructuring Support Agreement) and, therefore, support the Management Incentive Plan contemplated by the Plan.

## F.    Prepetition Retention Payments

The Debtors' management team's immediate goal prior to filing the Chapter 11 Cases was to maintain stability with their workforce, vendors, customers and distributors.

On September 1, 2020, the below referenced named executive officers ("*NEOs*") of the Debtors entered into award agreements issued pursuant to the 2020/2021 executive retention bonus program ("*2020/2021 ERBP*") for cash-based retention bonus awards.    The Human Resources and Compensation Committee of the Debtors' Board of Directors (the "*HRCC*"), following extensive consultation with their compensation and legal advisors, approved the 2020/2021 ERBP, including the cash retention bonuses made thereunder (each, a "*Retention Bonus*") and a form of retention bonus agreement (the "*Retention Bonus Agreement*").    The full Board approved Mr. Mark Trudeau's Retention Bonus.    The Retention Bonus amounts reflect each named executive officer's base salary multiplied by 1.5.

The 2020/2021 ERBP was implemented to demonstrate the Debtors' support for its employees, including certain members of the management team.    The Retention Bonuses enabled the Debtors to retain and motivate certain executives through the volatile and uncertain environment affecting the Debtors' business. The Retention Bonuses under the 2020/2021 ERBP were paid on September 3, 2020 and are subject to the executive's obligation to repay the net after-tax bonus in the event that he resigns, retires, voluntarily terminates employment or is terminated by the Debtors for cause prior to the earlier of (x) May 15, 2022, and (y) the date the Debtors emerge from bankruptcy.    The aggregate amount of the Retention Bonuses paid to the NEOs was approximately $5.2 million.    The Retention Bonuses received by the Debtors' executive officers are set forth in the table below.

| Name | Title | Retention Bonus |
|---|---|---|
| Mark Trudeau | President and Chief Executive Officer | $1,575,000 |
| Mark Casey | Executive Vice President, Chief Legal Officer | $900,000 |
| Hugh O'Neill | Executive Vice President, Chief Commercial Officer | $930,000 |
| Bryan Reasons | Executive Vice President, Chief Financial Officer | $900,000 |
| Steven Romano | M.D., Executive Vice President, Chief Scientific Officer | $930,000 |

The Retention Bonuses were announced in the Debtors' Current Report on Form 8-K, filed with the SEC on September 8, 2020.    The Debtors do not believe any of the foregoing transactions constitute a fraudulent conveyance, preference, or would otherwise be subject to avoidance under the Bankruptcy Code.

### G.    Retention of the Debtors' Advisors

The Debtors have needed to engage various advisors in connection with the Opioid Litigations (and the MDL), the Opioid Settlement, the Specialty Brands litigations, the Acthar Settlement, the Restructuring Support Agreement, and these Chapter 11 Cases.  Specifically, the Debtors' primary professional advisors include (a) AlixPartners LLP ("*AlixPartners*"), restructuring consultant and financial advisor to the Debtors; (b) Latham & Watkins LLP ("*Latham*"), legal co-counsel to the Debtors; (c) Richards, Layton & Finger, P.A. ("*RLF*"), legal co-counsel to the Debtors; (d) Wachtell, Lipton, Rosen and Katz ("*Wachtell*"), legal co-counsel to the Debtors; (e) Ropes & Gray LLP ("*Ropes*"), special litigation counsel to the Debtors; (f) Guggenheim Securities, LLC ("*Guggenheim Securities*"), investment banker to the Debtors; (g) Prime Clerk LLC ("*Prime Clerk*"), claims and noticing agent to the Debtors; (h) Hogan Lovells US LLP ("*Hogan Lovells*"), as special counsel to the Debtors; and (i) Arnold & Porter Kaye Scholer LLP ("*A&P*"), as special counsel to the Debtors related to regulatory, antitrust and litigation matters.  All of the aforementioned advisors have been retained in these Chapter 11 Cases, as set forth in Section IV below.

### H.    The Specialty Generics Independent Directors

Further, on August 30, 2019, certain boards of directors of the Specialty Generics Debtors, acting by unanimous written consent in lieu of a special meeting, appointed Marc Beilinson and Sherman Edmiston III as disinterested managers (the "*Disinterested Managers*") of the Specialty Generics Debtors.  The Disinterested Managers were subsequently appointed to additional boards of directors of the Specialty Generics Debtors.  On December 17, 2019, the Disinterested Managers engaged legal counsel, Katten Muchin Rosenman LLP ("*Katten*"), to render legal services at the direction of the Disinterested Managers.

In connection with ongoing restructuring efforts, the boards of directors of the Specialty Generics Debtors delegated certain authority to the Disinterested Managers pursuant to certain resolutions adopted via unanimous written consent in lieu of a special meeting, dated February 27, 2020 (the "*Delegating Resolutions*").  Pursuant to the Delegating Resolutions, the boards of directors of the Specialty Generics Debtors delegated to the Disinterested Managers certain rights, authority and powers in connection with reviewing and acting upon any matter arising in or related to, among other things, intercompany balances, intercompany agreements and intercompany transactions between the Specialty Generics Debtors and affiliates (collectively, the "*Intercompany Matters*").

On November 2, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order Authorizing The Employment And Retention Of Katten Muchin Rosenman LLP As Counsel To The Specialty Generics Debtors, At The Sole Direction Of The Disinterested Managers, Effective Nunc Pro Tunc To The Petition Date* [Docket No. 381] (the "*Katten Retention Application*").  Pursuant to the Katten Retention Application, the Specialty Generics Debtors determined that the retention of independent counsel, acting at the sole direction of the Disinterested Managers, was necessary to the Disinterested Managers fulfilling their fiduciary duties in these Chapter 11 Cases, including with respect to investigating and assessing the Intercompany Matters, and that the employment of Katten would be in the best interest of the Specialty Generics Debtors' estates.

On November 19, 2020, the Bankruptcy Court entered the *Order Granting Debtors' Application For Entry Of An Order Authorizing The Employment And Retention Of Katten Muchin Rosenman LLP As Counsel To The Specialty Generics Debtors, At The Sole Direction Of The Disinterested Managers, Effective Nunc Pro Tunc To The Petition Date* [Docket No. 561] approving the Disinterested Directors' engagement of Katten.

# IV.
# EVENTS DURING THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

After the execution of the Restructuring Support Agreement, also on October 12, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue managing their operations in the ordinary course pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course (the "*First Day Motions*"). Such relief was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth reorganization through the chapter 11 process, and minimizing disruptions to the Debtors' businesses.  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits and processing workers' compensation claims [Docket No. 510];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 552];

- Continue insurance programs [Docket No. 509];

- Continue the Debtors' customer programs [Docket No. 460];

- Pay certain prepetition taxes and fees [Docket No. 463];

- Pay certain critical vendors and foreign vendors [Docket Nos. 465 and 468];

- Pay certain lien claimants [Docket No. 466];

- Establish procedures for transferring equity [Docket No. 469];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 467]; and

- Use cash collateral [Docket No. 586].

### C.    Injunctive Motions

On the Petition Date, the Debtors also filed a complaint and motion for injunctive relief pursuant to 11 U.S.C. § 105 seeking relief in respect of certain prepetition proceedings commenced against the Debtors [Docket No. 2 in Adv. Pro. No. 20-50850] (the "*Voluntary Injunction Motion*").  Subsequently, on October 21, 2020, the Debtors filed an Amended Complaint and Supplemental Motion for Injunctive Relief Pursuant to 11 U.S.C. § 105, seeking relief in respect of certain prepetition proceedings commenced against third parties inextricably bound to the Debtors [Docket No. 16 in Adv. Pro. No. 20-50850].  On November 23, 2020, the Bankruptcy Court granted both motions, entering 270-day injunctions staying government

plaintiffs and certain other plaintiffs from pursuing claims against the Debtors and certain non-debtor parties [Docket No. 164 in Adv. Pro. No. 20-50850].

### D.    Procedural Motions

The Debtors have filed and received approval of various motions regarding procedural issues common to other chapter 11 cases of similar size and complexity, including approval of a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals [Docket No. 770], a motion for entry of an order extending the time for the Debtors to file their schedules and statements until December 24, 2020 [Docket No. 461] and a motion for entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business [Docket No. 474].

### E.    Appointment of Unsecured Creditors' Committee

On October 27, 2020, the Official Committee of Unsecured Creditors (the "*UCC*") was appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases [Docket No. 306]. The members of the UCC originally were: New PharmaTop LP, Acument Global Technologies, Inc., Commodore Bowens, Jr., as Administrator for Estate of Commodore Bownes, U.S. Bank Trust National Association, and AFSCME District Council 47 Health and Welfare Fund. New PharmaTop LP subsequently resigned from the UCC after its claim was paid in full in connection with the Debtors' assumption of its executory contract as part of the IP Restructuring (described further below). The UCC has retained Cooley LLP and Robinson & Cole LLP, as co-counsel, Alvarez & Marsal and Dundon Advisers LLC as co-financial advisors.

### F.    Appointment of Opioid Claimants' Committee

On October 27, 2020, the Official Committee of Opioid Related Claimants (the "*OCC*") was appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases [Docket No. 308]. The members of the OCC are: Garrett Hade, Lyda Haag, Kathy Strain, Brendan Berthold, Life Point Health System, Blue Cross and Blue Shield Association, Michael Masiowski, M.D, The Chicago Board of Education is an "ex officio" member of the OCC. The OCC has retained Cole Schotz P.C. and Akin Gump Strauss Hauer & Feld LLP, as co-counsel, Cassels Brock & Blackwell Retention as Canadian counsel, Jefferies LLC, as investment banker, and Province, Inc. as financial advisor.

### G.    Bar Date Motion

On October 20, 2020, the Debtors filed a motion seeking entry of an order establishing deadlines to file proofs of claim in the Chapter 11 Cases and approval of related procedures. On November 30, 2020, the Bankruptcy Court entered an order [Docket No. 667] (the "*Bar Date Order*") establishing certain deadlines for the filing of proofs of claim in the Chapter 11 Cases. By the Bar Date Order, the Bankruptcy Court established February 16, 2021 at 5:00 p.m., prevailing Eastern Time (the "*General Bar Date*") as the general deadline for all Entities other than Governmental Units to file proofs of claim in the Chapter 11 Cases for all claims other than Opioid Claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including, but not limited to, secured claims, priority claims, asbestos-related claims, and claims arising under section 503(b)(9) of the Bankruptcy Code (each such claim, a "*General Claim*"), except as otherwise provided in the Bar Date Order. By the Bar Date Order, the Court also established April 12, 2021 at 5:00 p.m., prevailing Eastern Time (the "*Governmental Bar Date*") as the general deadline for all Governmental Units to file proofs of claim in the Chapter 11 Cases for all claims other than Opioid Claims against the Debtors that arose or are deemed to have arisen prior to the Petition

Date, except as otherwise provided in the Bar Date Order. No deadline to file Opioid Claims has been set by the Bankruptcy Court.

In addition to the General Bar Date and Governmental Bar Date described above, any Entity asserting claims arising from or relating to the Debtors' rejection of an executory contract or unexpired lease pursuant to an order of the Bankruptcy Court that is entered prior to confirmation of a plan of reorganization in the Chapter 11 Cases is required to file a proof of claim on or before the later of: (a) the General Bar Date; and (b) 5:00 p.m., prevailing Eastern Time, on the date that is 30 days after the effective date of rejection of such executory contract or unexpired lease. Further, as described in the Bar Date Order, if the Debtors amend or modify schedule D, E, or F of the schedules of assets and liabilities and statements of financial affairs filed in the Chapter 11 Cases to reduce the undisputed, non-contingent and liquidated amount or to change the nature or classification of any General Claim against the Debtors, the affected claimant may file a timely proof of claim or amend any previously filed proof of claim in respect of the amended scheduled claim on or before the later of (a) the General Bar Date or (b) 30 days after the date that notice of the applicable amendment to the schedules of assets and liabilities and statements of financial affairs is served on the affected claimant.

### H.    Approval of Certain Intercompany Restructuring Transactions

On November 2, 2020, the Debtors filed the Motion of Debtors for Order Authorizing Intercompany Restructuring Transactions [Docket No. 385] requesting authority to implement certain intercompany restructuring transactions relating to certain intellectual property of the Specialty Brands business. Following substantial negotiations with the Debtors' major creditor constituencies, the Court entered an order approving this motion on November 25, 2020 [Docket No. 633]. Thereafter, on December 24, 2020, the transactions contemplated by this motion and order were consummated.

### I.    The Debtors' Professional Advisor Retentions

The Debtors' primary professional advisors include the following:

- On October 12, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order Authorizing The Retention And Appointment Of Prime Clerk LLC As Claims And Noticing Agent For The Debtors* [Docket No. 19] (the "***Prime Clerk 156(c) Retention Application***"). On October 14, 2020, the Bankruptcy Court entered an *Order Authorizing The Retention And Appointment Of Prime Clerk LLC As Claims And Noticing Agent For The Debtors* thereby approving the Prime Clerk 156(c) Retention Application [Docket No. 219]. On November 2, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order Authorizing The Retention And Employment Of Prime Clerk LLC As Administrative Advisor Nunc Pro Tunc To The Petition Date* [Docket No. 378] (the "***Prime Clerk Retention Application***"). On November 19, 2020, the Bankruptcy Court entered an order approving the Prime Clerk Retention Application [Docket No. 563].

- On November 2, 2020, the Debtors filed the *Application Of Debtors To Employ And Retain Richards, Layton & Finger, P.A. As Co-Counsel To The Debtors, Nunc Pro Tunc To The Petition Date* [Docket No. 379] (the "***RLF Retention Application***"). On November 19, 2020, the Bankruptcy Court entered an order approving the RLF Retention Application [Docket No. 564].

- On November 2, 2020, the Debtors filed *Application Of Debtors For Entry Of An Order Authorizing The Employment And Retention Of Alixpartners, LLP As Financial Advisor For The Debtors Nunc Pro Tunc To The Petition Date* [Docket No. 371] (the "***AlixPartners Retention Application***"). On November 19, 2020, the Bankruptcy Court entered an order approving the AlixPartners Retention Application [Docket No. 560].

- On November 2, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order Authorizing The Employment And Retention Of Latham & Watkins LLP As Bankruptcy Counsel Nunc Pro Tunc To The Petition Date* [Docket No. 384] (the "**Latham Retention Application**"). On November 23, 2020, the Bankruptcy Court entered an order approving the Latham Retention Application [Docket No. 618].

- On November 2, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order Authorizing The Retention And Employment Of Wachtell, Lipton, Rosen & Katz As Co-Counsel For The Debtors And Debtors In Possession Effective As Of The Petition Date* [Docket No. 382] (the "**Wachtell Retention Application**"). On November 23, 2020, the Bankruptcy Court entered an order approving the Wachtell Retention Application [Docket No. 619].

- On November 2, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order Authorizing The Retention And Employment Of Ropes & Gray LLP As Special Litigation Counsel To The Debtors Effective As Of The Petition Date* [Docket No. 380] (the "**Ropes Retention Application**"). On November 23, 2020, the Bankruptcy Court entered an order approving the Ropes Retention Application [Docket No. 617].

- On November 2, 2020, the Debtors filed the *Debtors' Application For Entry Of An Order, Pursuant To Sections 327(a) And 328(a) Of The Bankruptcy Code, Authorizing The Retention And Employment Of Guggenheim Securities, LLC As Investment Banker For The Debtors And Debtors-In-Possession Effective As Of The Petition Date, And Modifying Certain Time-Keeping Requirements* [Docket No. 383] (the "**Guggenheim Securities Retention Application**"). On January 11, 2021, the Debtors filed the Supplemental Declaration of Brendan Hayes in Support of the Debtors' Application to Employ Guggenheim Securities as Investment Banker effective as of the Petition Date [Docket No. 1124]. On January 12, 2021, the Bankruptcy Court entered an order approving the Guggenheim Securities Retention Application [Docket No. 1142].

- On November 11, 2020, the Debtors filed the *Application Of Debtors For Authority To Retain And Employ Hogan Lovells US LLP As Special Counsel To The Debtors Nunc Pro Tunc To The Petition Date* [Docket No. 478] (the "**Hogan Lovells Retention Application**"). On December 7, 2020, the Bankruptcy Court entered an order approving the Hogan Lovells Retention Application [Docket No. 738].

- On January 21, 2021, the Debtors filed the *Application Of Debtors To Employ And Retain Arnold & Porter Kaye Scholer LLP As Special Counsel To The Debtors, Nunc Pro Tunc To The Petition Date* [Docket No. 1196] (the "**A&P Retention Application**"). On February 16, 2021, the Bankruptcy Court entered an order approving the A&P Retention Application [Docket No. 1394].

**J.      The Voluntary Injunction and Appointment of the Monitor**

Pursuant to the terms of the Restructuring Support Agreement, the Debtors agreed to seek entry of an injunctive order to be effective on the Petition Date, defining the manner in which the Debtors' opioid business may be lawfully operated by the Debtors or any successors thereto on a going-forward basis during the pendency of the Chapter 11 Cases. Specifically, the Restructuring Support Agreement required the Debtors within one week after the Petition Date to file with the Bankruptcy Court a motion seeking to impose a voluntary injunction on the Debtors to enjoin them from engaging in certain conduct related to the manufacture, marketing, sale, and distribution of opioids effective as of the Petition Date (the "**Voluntary Injunction**"). Further, the Restructuring Support Agreement requires that the Confirmation Order (or a separate order of the Bankruptcy Court) extend the Voluntary Injunction to govern the Reorganized Debtors' operations after the Effective Date. The Debtors engaged in negotiations over the

terms of the Voluntary Injunction with the Supporting Governmental Opioid Claimants (*i.e.*, the 50 U.S. states and territories that became parties to the Restructuring Support Agreement) and also consulted with the Supporting Unsecured Noteholders regarding same.  As such, pursuant to the Voluntary Injunction Motion filed on the Petition Date, the Debtors also voluntarily requested the Bankruptcy Court to subject certain Debtors, namely, Mallinckrodt Enterprises LLC, Mallinckrodt LLC, and SpecGx LLC (collectively, the "*VI-Specific Debtors*") to the terms of the Voluntary Injunction.

On January 8, 2021, the Bankruptcy Court entered the *Order Granting Certain Debtors' Motion For Injunctive Relief Pursuant To 11 U.S.C. § 105 With Respect To The Voluntary Injunction* [Docket No. 196 in Adv. Pro. No. 20-50850] (the "*Voluntary Injunction Order*") binding the VI-Specific Debtors to the terms of the Voluntary Injunction.  Specifically, the Voluntary Injunction provides, among other things and in pertinent part, that the VI-Specific Debtors shall not engage in the promotion of opioids or opioid products, including but not limited to, by:

- employing or contracting with sales representatives or other persons to promote opioids or opioid products to health care providers or patients or to persons that influence or determine the opioid products included in formularies; (b) using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for promotion of opioids or opioid products;

- sponsoring, or otherwise providing financial support or in-kind support to medical education programs relating to opioids or opioid products;

- creating, sponsoring, operating, controlling, or otherwise providing financial support or in-kind support to any website, network, and/or social or other media account for the promotion of opioids or opioid products;

- creating, sponsoring, distributing, or otherwise providing financial support or in-kind support for materials promoting opioids or opioid products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

- creating, sponsoring, or otherwise providing financial support or in-kind support for advertisements that promote opioids or opioid products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

- engaging in internet search engine optimization or other techniques designed to promote opioids or opioid products by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet.

Please refer to Annex I of the Voluntary Injunction Order for more details of the terms of the Voluntary Injunction.

Pursuant to section VI of the Voluntary Injunction, the VI-Specific Debtors were required to retain an outside, independent individual to evaluate and monitor their compliance with the Voluntary Injunction, who will serve at the cost and expense of the VI-Specific Debtors (the "*Monitor*").  Further, section VI.A.3 of the Voluntary Injunction required that the VI-Specific Debtors propose a list of three individuals, groups of individuals, or firms to serve as the proposed Monitor within 30 days of the Petition Date.

Shortly after the Petition Date, and in accordance with the terms of the Voluntary Injunction, the VI-Specific Debtors launched a search process for the selection of the proposed Monitor, and on November 11, 2020, the VI-Specific Debtors proposed three (3) highly qualified candidates to the Supporting Governmental Opioid Claimants.  On December 11, 2020, after careful consideration, the Supporting Governmental Opioid Claimants ultimately agreed to jointly support, with the VI-I Specific Debtors, the selection of Mr. R. Gil Kerlikowske as the Monitor.

On January 21, 2021, the Debtors filed the *Joint Motion Of Debtors And Governmental Plaintiff Ad Hoc Committee For Entry Of An Order (I) Appointing R. Gil Kerlikowske As Monitor For Voluntary Injunction And (II) Approving The Monitor's Employment Of Saul Ewing As Counsel At The Cost And Expense Of The Debtors* [Docket No. 1203] (the "**Monitor Motion**") seeking entry of an order (a) approving the Monitor, (b) permitting the VI-Specific Debtors to retain the Monitor pursuant to the terms set forth in a separate monitor agreement entered into by the Monitor and the VI-Specific Debtors, and (c) approving the Monitor's employment of legal counsel Saul Ewing Arnstein & Lehr LLP ("**Saul Ewing**").

Mr. Kerlikowske's long law enforcement and regulatory career made him uniquely qualified to serve as the Monitor.  Mr. Kerlikowske, among other things, served from 2009-2014 as the Director for the Office of National Drug Control Policy (ONDCP)—the Presidentially appointed "U.S. Drug Czar."  Pursuant to the Voluntary Injunction, Mr. Kerlikowske, as Monitor, is responsible for evaluating and monitoring the VI-Specific Debtors' compliance with the Voluntary Injunction, including by, among other things, filing periodic reports with the Bankruptcy Court regarding the VI-Specific Debtors' compliance with the Voluntary Injunction.

On February 8, 2021, the Bankruptcy Court entered the *Order (I) Appointing R. Gil Kerlikowske As Monitor For Voluntary Injunction And (II) Approving The Monitor's Employment Of Saul Ewing As Counsel At The Cost And Expense Of The Debtors* [Docket No. 1306] thereby appointing R. Gil Kerlikowske, through Gil Kerlikowske LLC as the Monitor and approving his retaining of Saul Ewing and his compensation and the monitor agreement.

Please refer to Exhibit C of the Monitor Motion and the Voluntary Injunction Order for more details of the terms of the Monitor's compensation, scope of authority, and responsibilities.

The Monitor has filed and will be filing periodic reports with the Bankruptcy Court as required by the Voluntary Injunction Order.  Any such reports may be found on the Bankruptcy Court docket.

### K.       [Opioid Claimant Mediation]

On February 3, 2021 the Debtors filed their *Motion for Entry of an Order (A) Appointing a Mediator and (B) Establishing Mediation Procedures as Set Forth in the Proposed Order* Filed [Docket No. 1276] requesting, among other things entry of an order (the "**Opioid Mediation Order**") (a) appointing Kenneth R. Feinberg to mediate the allocation of the Opioid MDT II Consideration, and (b) establishing mediation procedures as set forth in the Opioid Mediation Order.  The Bankruptcy Court entered the Opioid Mediation Order [Docket No. 1381] on February 11, 2021.

Mediation commenced on February 11, 2021.  The mediation parties included: (a) the Debtors; (b) the OCC; (c) the Ad Hoc Group of NAS Children; (d) a certain ad hoc group of personal injury claimants (the "**Ad Hoc Group of Personal Injury Claimants**"); (e) the Governmental Ad Hoc Committee; (f) the MSGE Group; (g) counsel to Life Point Health System and counsel to various hospitals, including a putative class of hospital claimants; (h) counsel to a putative class of emergency room physicians; (i) counsel to Blue Cross and Blue Shield Association, various third party payors and health insurance carrier plaintiffs; (j) counsel to Thornton Township High School District 205 and certain other public school districts as representatives of a putative class of school district class claimants; (k) counsel to the putative classes of purchasers of private health insurance represented by Stevens & Lee, P.C.; (l) the Federal Healthcare Agency Opioid Claimants (each as defined in the Opioid Mediation motion and Order); and (m) the FCR.

The mediation has been extended several times and remains ongoing and will continue as the parties continue to work on resolving various issues in connection with the allocation of the Opioid MDT II assets.

1.    **Proposed Settlement Amongst Certain Parties to the Mediation**[26]

As part of a proposed global settlement under Bankruptcy Rule 9019, the Ad Hoc Group of Personal Injury Claimants and the members of the OCC who hold personal injury claims (collectively, "***PI Members***"), the Future Claimants Representative, the Governmental Plaintiff Ad Hoc Committee [and the MSGE Group] (collectively, the "***Parties***") negotiated agreements in principle reached with the creditors with respect to the allocation of opioid-related assets to the holders of current and future personal injury claims (the "***PI Claims***"). These negotiated agreements in principle contemplate that the PI Claims will be channeled to a PI Trust for resolution and payment (the "***PI Trust***"). This PI Trust is separate and distinct from the Opioid MDT II established pursuant to the Plan and from any trusts to be established for the benefit of any other group of opioid-related claimants (including any public entities and any private non-personal injury groups).  The PI Trust will include a sub-trust structure for NAS related claims.

The negotiated agreements in principle contemplate that this PI Trust will be funded with 9.30% of all gross dollars received by the Opioid MDT II, or that are otherwise distributable as part of the Opioid Settlement, within five (5) business days of receipt of such funds.  More specifically, the PI Trust will receive 9.30% of any settlement cash flows, 9.30% from the sale of the New Opioid Warrants, or the sale of stock (less the cost of exercise) if the New Opioid Warrants are exercised; and 9.30% of any and all proceeds received by the Opioid MDT II on account of third-party claims (less the direct costs of outside professional in obtaining such receipts).  Under the negotiated agreements, the Opioid MDT II shall provide reports periodically, and at the request of the PI Trust, regarding any settlement payments, activity related to the New Opioid Warrants, and the status of the third-party claims, all in accordance with the terms of the Plan.

The negotiated agreements further contemplate that the PI Trust shall pay 5% of every $1.00 of any distribution otherwise payable to the holder of a PI Claim to a  common benefit fund (the "***Common Benefit Fund***"); *provided*, *however*, that if other parties pay a lesser percentage to the Common Benefit Fund, that lesser percentage will be percentage applicable to the PI Claims.  The PI Members and the Future Claimants Representative shall negotiate the relevant PI Trust Documents, including the trust agreement and trust distribution procedures, and shall select the trustee and claims administrator for the PI Trust, all subject to consultation with certain public entities. Conversely, the public entities shall negotiate the relevant trust documents for the Opioid MDT II and any public abatement trust and shall select the trustee and claims administrator for the PI Trust and any public abatement trust.  The PI Members and the Future Claimants Representative shall have consultation rights with respect to the Opioid MDT II Documents and the selection of the trustee and administrator for the Opioid MDT II; *provided* that the Future Claimants Representative shall be reasonably satisfied that the relevant Opioid MDT II Documents satisfy his fiduciary obligations to future claimants.

The negotiated agreements are subject to express conditions, including that a resolution is reached with the United States Department of Justice that is acceptable to certain public entities, the PI Members, and the Future Claimants Representative, and that the public entities reach agreement on allocation issues with a critical mass of private entities, to be determined in the sole discretion of the relevant public entities; *provided* that no such agreements shall reduce or increase the 9.30% allocation for PI Claims set forth in the negotiated agreements.

The negotiated agreements in principle are subject in all respects to the Parties reaching agreement on definitive documents, including the Plan and the relevant trust agreements and trust distribution protocols.

---

[26]    Under review and revision.

The Debtors and the Supporting Parties reserve all rights with respect to the proposed global settlement set forth in this section of the Disclosure Statement, and this proposed global settlement is subject to change.

### L.    First Lien Term Lender Joinder and Mandatory Prepayment

On February 17, 2021, the Debtors filed the *Debtors' Motion For Order (I) Authorizing Use Of Cash Collateral Other Than In The Ordinary Course Of Business, (II) Granting Limited Relief From The Automatic Stay, And (III) Granting Related Relief* [Docket No. 1441] (the "***ECF Prepayment Motion***"). Under the ECF Prepayment Motion, the Debtors sought to make a mandatory excess cash flow ("***ECF***") prepayment to the First Lien Term Lenders in the amount of $114 million that is required under the First Lien Credit Agreement.  The Debtors argued in the ECF Prepayment Motion that the prepayment of the ECF amounts was warranted in order to best position the Debtors in any plan confirmation litigation over reinstatement of the First Lien Term Loans by mooting arguments that there would be a default to the extent such payments were not made.

Before the Bankruptcy Court ruled on the ECF Prepayment Motion, on March 10, 2021, the Debtors announced it reached an agreement with the Ad Hoc First Lien Term Lender Group to support the Debtors' Restructuring Support Agreement and entered into that certain Joinder Agreement and Amendment to the Restructuring Support Agreement.  On that same day, the Debtors filed the *Notice of Filing of Joinder Agreement and Amendment to Restructuring Support Agreement, Dated as of March 10, 2021* [Docket No. 1631].

As discussed above, the Supporting Term Lenders Joinder Agreement was based on, among other things, providing new term loans financing to replace the First Lien Term Loans and settled several complex and open disputes between the Debtors and the First Lien Term Loan Lenders as to how such lenders are to be treated under the Plan, the amount of their Claims, among other issues, and served to extend near-term debt maturities and provide the Debtors with clear runway to refinance the First Lien Term Loan Claims at their option.

Further, as part of their broader integrated settlement and compromise, the Debtors and the Supporting Term Lenders agreed to settle under Rule 9019 of the Bankruptcy Rules their dispute with respect to the amount and manner of payment of the ECF prepayment required to be made to the First Lien Term Lenders under the First Lien Credit Agreement for fiscal year 2020. The parties agreed that the Debtors shall satisfy their obligation to make the 2020 ECF prepayment with a payment in cash in the amount of $114 million. The material terms of the treatment bargained for under the Supporting Term Lenders Joinder Agreement for the Ad Hoc First Lien Term Lender Group is included in the Plan.

After agreeing to the Supporting Term Lenders Joinder Agreement and settling the ECF prepayment, on March 11, 2021, the Debtors filed their *Debtors' Supplement To The Motion For Order (I) Authorizing Use Of Cash Collateral Other Than In The Ordinary Course Of Business, (II) Granting Limited Relief From The Automatic Stay, And (III) Granting Related Relief* [Docket No. 1659] (the "***Supplemental ECF Motion***") supplementing their prior request under the ECF Prepayment Motion to pay $114 million in ECF prepayments to the First Lien Term Lenders.

Under the Supplemental ECF Motion, the Debtors explained that after finalizing their fiscal 2020 reporting, they believed the proper ECF prepayment amount is $113.9 million.  Absent the settlement, the Supplemental ECF Motion stated that the First Lien Term Loan Lenders would potentially advocate for an ECF prepayment significantly greater amount than $114 million.  The Debtors proposed paying the settled $114 million amount to avoid further disputes regarding the amount of the ECF prepayment, and to settle any disputes regarding the manner in which the prepayment is made. The Supplemental ECF Motion

stressed that no other aspects of the Supporting Term Lenders Joinder Agreement are being sought to be approved under the ECF Prepayment Motion or Supplemental ECF Motion.

On March 16, 2021, the Bankruptcy Court entered the *Order Granting Motion For Order (I) Authorizing Use Of Cash Collateral Other Than In The Ordinary Course Of Business, (II) Granting Limited Relief From The Automatic Stay, And (III) Granting Related Relief* [Docket No. 1745] (the "***ECF Prepayment Order***") granting the Debtors' Supplemental ECF Motion to make the $114 million ECF prepayment to the First Lien Term Loan Lenders.  The ECF Prepayment Order was entered after the Debtors resolved an objection by the First Lien Agent.

Prior to the filing of this Disclosure Statement, the Debtors made the ECF prepayment in the amount of approximately $114 million to the First Lien Term Loan Lenders in accordance with the ECF Prepayment Order, and the Term Loans Outstanding Amount has been updated to reflect such payment.

## M.  **Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "***Exclusive Plan Period***").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "***Exclusive Solicitation Period***," and together with the Exclusive Plan Period, the "***Exclusive Periods***").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On February 9, 2021 the Debtors filed a motion for an order (a) extending the Exclusive Plan Period by 180 days through and including August 9, 2021, and (b) extending the Exclusive Solicitation Period by 180 days through and including October 11, 2021 [Docket No. 1341].  On February 25, 2021, the Bankruptcy Court entered an order granting the Debtors' motion thereby extending the Exclusive Periods.

## N.  **The Key Employee Incentive Plan**

As of the Petition Date, the Debtors employed approximately 3,000 employees in the U.S. and internationally.  The Debtors have historically maintained incentive and compensation programs designed to attract, retain, or incentivize key employees.

On March 9, 2021, the Debtors filed the *Motion Of Debtors For Order (I) Approving The Q4 2020 Payment Under The 2020 Key Employee Incentive Plan, (II) Approving The Debtors' 2021 Key Employee Incentive Plan, And (III) Granting Related Relief* [Docket No. 1628] (the "***KEIP Motion***"), seeking approval of the Debtors' key employee incentive programs (the "***KEIP***").

The Debtors' KEIP, as further described in the KEIP Motion, requested an Order (a) approving payment under the Debtors' 2020 KEIP (the "***2020 KEIP***") for twelve Insiders (as defined in the KEIP Motion) (collectively, the "***KEIP Participants***") for the Debtors' fourth fiscal quarter ending on December 25, 2020 ("***Q4***"); (b) approving the structure of the Debtors' 2021 KEIP (the "***2021 KEIP***," and together with the 2020 KEIP, the "***Compensation Plans***") for the KEIP Participants for the Debtors' 2021 fiscal year ending on December 31, 2021, subject to achievement of certain objectives, that appropriately incentivize the KEIP Participants in connection with the Debtors' restructuring efforts.  The United States Trustee, the UCC, and the OCC objected to the KEIP Motion.  Prior to the KEIP Motion hearing, the Debtors reached a settlement on the KEIP with the OCC.  The Bankruptcy Court held a hearing on the KEIP Motion on March 31 and April 1, 2021 and was provided with live testimony and documentary evidence.

On April 5, 2021, after hearing all of the evidence in connection with the contested hearing, the Bankruptcy Court overruled the United States Trustee's and the UCC's objections and entered the *Order (I) Approving The Q4 2020 Payment Under The 2020 Key Employee Incentive Plan, (II) Approving The Debtors' 2021 Key Employee Incentive Plan, And (III) Granting Related Relief* [Docket No. 1954] (the "**KEIP Order**") thereby approving the structure of the 2021 KEIP as well as the Q4 payment on account of the 2020 KEIP. Specifically, the Bankruptcy Court in the KEIP Order determined, among other things, that the KEIP is a true incentive plan with challenging metrics for participants to meet to qualify for the payments.  The KEIP Order also includes a clawback provision and provides the OCC with additional discovery in connection with its investigations.

The KEIP Motion and the KEIP Order, together, contain a fulsome description of the KEIP Participants, targets, and metrics of the Compensation Plans, and are all available on the Bankruptcy Court's docket at the above referenced docket numbers.

## O.    Appointment of a FCR

On October 13, 2020, the Debtors filed the *Motion Of Debtors For Entry Of An Order Appointing Roger Frankel, As Legal Representative For Future Claimants, Effective As Of The Petition Date* [Docket No. 189] (the "**Future Claimants Representative Motion**") seeking to appoint Roger Frankel as the FCR.  The role of the FCR is to represent "individuals who may assert in the United States a claim or claims in the future against a Debtor for harm arising out of the use of opioid products prior to the effective date of the Debtors' plan or plans of reorganization" and whose claim "is to be addressed by a trust established to assume the liabilities of the Debtors for damages allegedly caused by the use of opioid products."  The Debtors sought the appointment of the FCR effective as of the Petition Date.  The FCR has standing to represent such future claimants "in all matters" relating to the Debtors' case and the powers and duties of a committee appointed under Bankruptcy Code section 1103.

The Debtors believe that the appointment of the FCR is critically important to represent any future claimants' interests, including with respect to negotiating the Plan, the terms of the Opioid MDT II Documents, the Opioid MDT II, the Opioid Permanent Channeling Injunction, and the structure and terms of any compensation to such claim holders.

The Debtors chose Mr. Frankel to act as the FCR on February 24, 2020 after evaluating several potential candidates and after Mr. Frankel served as the prepetition representative of future claimants.  The FCR's professionals include the FCR's law firm, Frankel Wyron LLP, as well as Young Conaway Stargatt & Taylor, LLP, as counsel, Greenberg Traurig, LLP as special counsel, Ducera Partners LLC as investment banker, NERA Economic Consulting as consultant, and Laurence Westreich MD LLC, as medical consultant.

On November 28, 2020, the OCC filed *The Official Committee Of Opioid Related Claimants' (I) Request For Adjournment Of Or, In The Alternative, Objection To Motion Of Debtors To Appoint Future Claimants Representative And (II) Cross-Motion To Compel Debtors To Establish Bar Date And Noticing Program For Opioid Claimants* [Docket No. 658] (the "**OCC FCR Objection**").  The OCC FCR Objection asserted, among other things, that the appointment of the FCR was premature and undermined the OCC's mandate and responsibilities.

The Debtors agreed with the OCC, the Governmental Plaintiff Ad Hoc Committee and the MSGE Group to mediation and deferred litigation on the appointment of the FCR and prosecution of the OCC FCR Objection.

On March 16, 2021, the Bankruptcy Court entered an *Order Provisionally Appointing Roger Frankel As Legal Representative For Future Claimants* [Docket No. 1747] for the purposes of permitting the FCR to participate in an ongoing mediation over the allocation of the Opioid MDT II.  The Debtors' motion for the appointment of the FCR on a permanent basis remains pending.

Since the FCR's provisional appointment, the FCR has been in discussions with the Debtors and other parties with respect to the implementation of the Opioid Settlement, including with respect to the Opioid MDT II and the PI/NAS Trust, including, without limitation, the distribution procedures under the aforementioned trusts.  The FCR is still reviewing the Plan and draft documents relating to the Opioid MDT II and PI/NAS Trust. These documents are not final and remain subject to further negotiation. The FCR and other parties need more time to complete this process. Until these documents are further negotiated and the FCR is finished with its assessment, the FCR is not in a position to determine whether to support the Plan.

P.    **The Debtors' Diligence Related to the Plan Releases**

Prior to these Chapter 11 Cases, on June 28, 2013, Debtor Mallinckrodt plc and certain of its subsidiaries were formed through a spinoff from an entity named Covidien plc[27] (the "***Spin-Off***").  Since then, Debtor Mallinckrodt plc has grown considerably, including through strategic acquisitions of branded pharmaceutical and device products and its own research and development.  After the Spin-Off and in the ordinary course of business, Debtor Mallinckrodt plc undertook certain strategic and/or financial transactions in light of ordinary course business operations, including certain mergers, acquisitions, and the exchanges of debt (any such transaction or any combination of the foregoing, a "***Post Spin-Off Transaction***").

The Debtors' Plan contemplates the Debtor Release, which includes the Debtors' releasing, among other things, any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors against each of the Debtors' current and former directors and officers, each Debtor Entity and each of their current and former directors and officers, and certain other parties in connection with or related to, among other things, the Spin-Off, the Post Spin-Off Transaction, the Restructuring Support Agreement, the Chapter 11 Cases, and the Restructuring Transactions.

On numerous occasions during these Chapter 11 Cases, the UCC and OCC have both expressed their desire to investigate the propriety of the releases under the Plan, including the Debtor Release.  They have suggested that one of their goals during these Chapter 11 Cases is to determine if there are any claims in connection with, among other things, certain prepetition debt exchanges, the Restructuring Support Agreement and the Restructuring Transactions therein, the decision to commence the Chapter 11 Cases, and the proposed recoveries to general unsecured creditors and opioid claim holders under the Plan, that are improper or should not otherwise be included in the Plan's releases by the Debtors, including the Specialty Generics Debtors.

As such, on or around March 30, 2021, the Specialty Generics Debtors' Board of Directors resolved to conduct further due diligence to evaluate the various releases under the Plan, including the Debtor Release. Specifically, the Specialty Generics Debtors' Board of Directors delegated to the two Disinterested Managers the authority to conduct due diligence to evaluate the various releases under the Plan, including the Debtor Release, to determine whether they are in the best interests of the Specialty Generics Debtors and whether any matter arising in or related to the Spin-Off, the Post Spin-Off Transaction, the

---

[27]    Covidien plc was itself later acquired by an entity named Medtronic plc.

Restructuring Support Agreement, the Chapter 11 Cases, or the Restructuring Transactions gives rise to any Cause of Action or Claim on behalf of any of the Specialty Generics Debtors that should not be included in the Plan's releases. Similarly, at or around the same time, the Board of Directors for Debtor Mallinckrodt plc also determined to conduct due diligence to evaluate the various releases under the Plan, including the Debtor Release, in relation to Debtor Mallinckrodt plc. The Board of Directors for Debtor Mallinckrodt plc authorized two of its independent directors to conduct a similar due diligence process as to the releases to be given by the Debtors other than the Specialty Generics Debtors.

The objective of these due diligence exercises are two-fold: (a) to formulate a view on the propriety of the releases to be granted by the Specialty Generics Debtors and Debtor Mallinckrodt plc in favor of their directors and officers and Affiliates under the Plan and (b) for the Specialty Generics Debtors and Debtor Mallinckrodt plc to determine if any matter arising in or related to the Spin-Off, the Post Spin-Off Transaction, the Chapter 11 Cases, the Restructuring Support Agreement, or the Restructuring Transactions gives rise to any Cause of Action or Claim against any of the Specialty Generics Debtors or Debtor Mallinckrodt plc that should not be included in the releases under the Plan. These efforts are ongoing and will continue as the UCC and OCC pursue their respective investigations.

## Q.    Extension of the Challenge Period Under the Cash Collateral Order

On March 10, 2021, the UCC filed its *Motion Of The Official Committee Of Unsecured Creditors (1) For An Order Pursuant To Bankruptcy Rule 2004 Authorizing Discovery Of The Debtors And Third Parties, And (2) For An Order Extending Period To (A) Challenge The Debtors' Stipulations As Set Forth In The Final Cash Collateral Order And (B) Assert Related Claims Or Causes Of Actions* [Docket No. 1632] (the "***UCC 2004 Motion***"). Under the UCC 2004 Motion, the UCC sought (a) authority from the Bankruptcy Court to conduct discovery of the Debtors pursuant to Bankruptcy Rule 2004 and (b) an extension of the Challenge Period Termination Date (as defined in the Cash Collateral Order). The UCC asserted in that discovery of the Debtors was necessary to conduct its essential investigation of the Debtors' assets and liabilities, the merits of the Restructuring Support Agreement, and the prepetition conduct of the Debtors' directors, officers and secured lenders, including related to certain debt restructuring efforts in 2019 and 2020.

On April 5, 2021, the Debtors filed the *Debtors' Omnibus Objection To The Motion Of The Official Committee Of Unsecured Creditors (1) For An Order Pursuant To Bankruptcy Rule 2004 Authorizing Discovery Of The Debtors And Third Parties, And (2) For An Order Extending Period To (A) Challenge The Debtors' Stipulations As Set Forth In The Final Cash Collateral Order And (B) Assert Related Claims Or Causes Of Actions And To Humana Inc.'s Joinder Thereto* [Docket No. 1944] (the "***Rule 2004 Objection***"). Pursuant to the Rule 2004 Objection, the Debtors objected to the UCC's request for an extension to the Challenge Period Termination Date (as defined in the Cash Collateral Order) based on, among other things, that the extension was unwarranted.

Additional objections to the UCC 2004 Motion were filed by, among others, an ad hoc First Lien Notes group (filed April 5, 2021), the First Lien Agent (filed April 7, 2021), and the Ad Hoc First Lien Term Lender Group (filed April 7, 2021). These objections generally echoed the Debtor arguments in the Rule 2004 Objection, *i.e.*, that the Challenge Period Termination Date extension should be denied because the applicable parties have cooperated with all of the UCC's discovery requests and the requested extension is not warranted under the circumstances.

On the eve of the hearing by the Bankruptcy Court to consider the UCC 2004 Motion, the Debtors and UCC resolved their discovery disputes. As such, on April 13, 2020, the Bankruptcy Court entered the *Order (I) Extending The Challenge Period Termination Date Set Forth In The Final Cash Collateral Order And (II) Denying The Official Committee Of Unsecured Creditors' Motion To Extend The Challenge Period*

*Termination Date As Moot* [Docket No. 2022] (the "***Challenge Period Order***").  Pursuant to the terms of the Challenge Period Order, (a) the UCC 2004 Motion with respect to the relief related to the Challenge Period Termination Date (as defined in the Cash Collateral Order) was denied as moot and (b) the Challenge Period Termination Date (as defined in the Cash Collateral Order) was extended for 30 days (*i.e.*, an extension to May 19, 2021) with respect to certain types of collateral and certain potential avoidance actions, giving the UCC, the OCC, and the FCR additional time to receive and review documents in connection with its investigation.

On May 26, 2021, the Debtors, the Administrative Agent (as defined in the Cash Collateral Order), the First Lien Indenture Trustee (as defined in the Cash Collateral Order), the Second Lien Collateral Agent (as defined in the Cash Collateral Order), the UCC, the OCC, and the FCR entered into a *Stipulation Extending The Challenge Period Termination Date Set Forth In The Final Cash Collateral Order* [Docket No. 2576-1] (the "***Challenge Period Stipulation***") further extending the Challenge Period Termination Date (as defined in the Cash Collateral Order).  The Bankruptcy Court entered an Order approving the Challenge Period Stipulation on the same date [Docket No. 2576].

Specifically, under the Challenge Period Stipulation, the Challenge Period Termination Date (as defined in the Cash Collateral Order) applicable to the OCC and the FCR (if any, solely with respect to the right to intervene in any challenge litigation) was extended to June 6, 2021 solely in respect of those potential actions seeking avoidance of the guarantees of, and liens securing, the Prepetition Secured Indebtedness (as defined in the Cash Collateral Order) provided by Mallinckrodt LLC, SpecGx LLC, SpecGx Holdings LLC and Mallinckrodt APAP LLC that would have been preserved for the OCC pursuant to the Cash Collateral Order if the OCC had timely filed a motion seeking standing to file an adversary proceeding asserting the Challenges (as defined in the Cash Collateral Order) set forth in the draft complaint delivered by the OCC to the Debtors, the Administrative Agent, the First Lien Indenture Trustee and the Second Lien Collateral Agent on May 19, 2021 (which Challenges seek avoidance of the guarantees of, and liens securing, the Prepetition Secured Indebtedness (as defined in the Cash Collateral Order) provided by Mallinckrodt LLC, SpecGx LLC, SpecGx Holdings LLC and Mallinckrodt APAP LLC on the grounds that the granting of such guarantees and liens constituted constructive fraudulent transfers).

Further, under the Challenge Period Stipulation, the Challenge Period Termination Date (as defined in the Cash Collateral Order) applicable to the UCC and the FCR (if any, solely with respect to the right to intervene in any challenge litigation) was extended to July 2, 2021 solely in respect of potential actions challenging the validity, perfection, enforceability, priority or extent of any Prepetition Liens (as defined in the Cash Collateral Order) on (i) insurance receivables; (ii) assets held in a rabbi trust; (iii) the Deposit Accounts set forth in Exhibit 1 to the Challenge Period Stipulation; and (iv) tax refunds (if any) for tax years ending after the Petition Date (which, for the avoidance of doubt, would include the foreign tax year ended in December 2020 for Mallinckrodt plc and certain foreign Debtors, but would exclude the U.S. tax year ended in September 2020 for certain domestic Debtors).

       1.       **Potential Estate Causes of Action**

During the Chapter 11 Cases, various parties have asserted that the Estates may have meritorious Avoidance Actions in connection with the exchange transactions undertaken by the Debtors in December 2019 and April 2020 (*i.e.*, the December 2019 Exchange Offer and the April 2020 Private Exchange), as further described in section II.C.2-3 of this Disclosure Statement.  The Debtors disagree with that suggestion for a number of reasons, including that (a) the Debtors obtained substantial value in those transactions and (b) those transactions are likely subject to the safe harbor from avoidance provided under section 546(e) of the Bankruptcy Code.  Further, in May 2021, the UCC confirmed publicly its intent not to pursue any Avoidance Actions relating to the December 2019 Exchange Offer and the April 2020 Private Exchange transactions on behalf of the Estates.

Relatedly, various parties have asserted that certain of the Debtors' Estates may possess valuable Claims and Causes of Action, including Avoidance Actions, against other Debtors or the Non-Debtor Affiliates. As an initial matter, the Debtors have reviewed dozens of historical transactions amongst them and the Non-Debtor Affiliates and do not believe any of these Claims or Causes of Action would, if asserted, result in materially greater value being recovered by any individual creditor or group of creditors than the distributions contemplated by the Plan. Furthermore, the Debtors, through independent board members and counsel, are conducting two separate diligence processes—one for Specialty Generics and one for all the other Debtors—that will evaluate whether any material intercompany claims may be meritorious. Importantly, if any board of any Debtor determines that it would be inconsistent to release such Claims or Causes of Action (as contemplated by the Plan) in lieu of pursuing them, the Restructuring Support Agreement can be terminated by the Debtors' board. Please see section IV.P of this Disclosure Statement titled "The Debtors' Diligence Related to the Plan Releases" for more information regarding these diligence processes.

### R.    The SEC Letter Regarding the Debtors' Releases Under the Plan

On April 27, 2021, the SEC served the Debtors with a letter expressing its view on the Debtors' releases under the Plan. The SEC expresses in its letter that, among other things, in its view, requiring creditor-investors, public shareholders and holders of subordinated claims to opt out of the non-debtor third-party releases in the Plan renders such releases non-consensual. The Debtors disagree with the SEC's views on the non-debtor third-party release in the Plan.

### S.    Acthar Claims Related Litigation in these Chapter 11 Cases

Prior to the Petition Date, the Debtors faced, and continue to face, more than 25 claims seeking damages of over $15 billion, the majority of which are related to Acthar.

The Debtors and the plaintiffs in certain Prepetition Acthar Actions have been involved in claims related litigation in these Chapter 11 Cases. Specifically, these plaintiffs in the Prepetition Acthar Actions have filed Proofs of Claim, including putative class Proofs of Claim, in these Chapter 11 Cases against the Debtors for damages related to the sale and distribution of Acthar, including those claims asserted in the Prepetition Acthar Actions (the "**Acthar Claims**", and such claimants the "**Acthar Claimants**"). The Acthar Claims are among the largest claims asserted against the Debtors, and the Acthar business is the largest contributor to product sales in the Debtors' pharmaceutical portfolio.

Four of the Prepetition Acthar Actions are putative class actions: (a) *City of Rockford v. Mallinckrodt ARD, LLC*, No. 3:17-cv-50107 (N.D. Ill.) ("**Rockford**"), (b) *Steamfitters Local 420 v. Mallinckrodt ARD, LLC*, No. 2:19-cv-03047-BMS (E.D. Pa.) ("**Steamfitters**"), (c) *United Ass'n of Plumbers & Pipefitter Local 322 of S. N.J. v. Mallinckrodt ARD, LLC*, No. 1:20-cv-00188-RBK-KMW (D.N.J.) ("**Plumbers**"), and (d) *City of Marietta v. Mallinckrodt ARD LLC, et al.* No. 1:20-cv-00552-CC (N.D. Ga.) ("**Marietta**") (collectively, the "**Prepetition Class Acthar Actions**"). The putative class in Rockford is "All third party payors and their beneficiaries in the United States and its Territories that paid for Acthar from August 2007 through the present." *See* Rockford, Second Amended Complaint ¶ 165, Dkt. No. 98. The putative class in Steamfitters is a subset of the putative class in Rockford: "All third-party payors and their beneficiaries in the United States and its Territories that paid for Acthar from August 2007 through the present for any unapproved indication or dose." *See* Steamfitters, Complaint ¶ 445 (emphasis added), Dkt. No. 1. And the putative class in Plumbers is yet a different subset of the purported class in Rockford: "All third-party payors and their beneficiaries (1) who are current citizens and residents of the State of New Jersey, and (2) who, for purposes other than resale, purchased or paid for Acthar from August 27, 2007 through the present." *See* Plumbers, Amended Complaint ¶ 419, Dkt. No. 40. The putative class in Marietta is comprised of "all third-party payors and their beneficiaries that paid for Acthar from four years prior to the filing of the Complaint [on

February 6, 2020] until the date of trial" and a subclass consisting of "all third-party payors and their beneficiaries and people without insurance in Georgia that paid for Acthar from within four years prior to the filing of the Complaint until the date of trial." *See* Marietta, Complaint, ¶¶ 50, 51.

The Prepetition Acthar Actions allege, among other things, that the Acthar Claimants paid more for the drug Acthar than they otherwise would have paid, that the Debtors were unjustly enriched because of the illegal conduct, including preventing competition from entering the market that could have lowered the price of the drug, and violations of federal and state antitrust laws, federal RICO, and the consumer fraud laws of various states. The Debtors disagree with the aforementioned allegations. Notably, the two primary antitrust theories alleged in the Prepetition Acthar Actions have each been dismissed in certain of those actions, with the applicable courts accepting certain of the Debtors' arguments made in support of dismissal. For example, one court has rejected a claim based on the acquisition of a license for a product called Synacthen by the Debtors' predecessor, noting the claim for damages "at present appears to be entirely speculative and hypothetical" and explaining that the claimant "alleges neither that West has already secured FDA approval of Synacthen nor alleged any reasonable estimate regarding when the FDA will approve Synacthen or when Synacthen will actually be available for purchase in the U.S."[28] The same court also rejected the theory that the Debtors' relationship with its exclusive distributor for Acthar, Express Scripts, is anticompetitive, ruling "[t]he Court is not persuaded by Plaintiff's arguments that Defendant's actions to limit distribution to a single distributor, Express Scripts, artificially maintained the price of Acthar because it prevented multiple distributors from negotiating to lower prices, because Defendant was still the only producer of Acthar and could thereby set whatever price it wished regardless of the number of distributors i[t] dealt with."[29]

The parties asserting Acthar Claims include, among others, (a) Humana Inc. ("**Humana**"), which has asserted Acthar Claims arising from its purchase of over a billion dollars of Acthar, (b) Attestor Capital ("**Attestor**"), who has rights to participate in the Humana claim and also holds claims arising from over a billion dollars of other third party purchases of Acthar (Humana and Attestor, collectively referred to as the "**Acthar Insurance Claimants**"); (c) multiple individual plaintiffs and putative class representatives represented by the Haviland Hughes and Ciardi, Ciardi, & Astin firms (the "**Acthar Ad Hoc Group**"), which the Debtors understand from Rule 2019 statements includes one member of the UCC; and (d) the City of Marietta, Georgia.

### 1.    Class Proof of Claim Objections

On April 30, 2021, the Debtors filed their *Debtors' Omnibus Objection To Class Proofs Of Claim* [Docket No. 2164] and on May 8, 2021, the Debtors filed *Debtors' Objection to City of Marietta Class Proof of Claim* [Docket No. 2231] (collectively, the "**Class Proof of Claim Objections**") after the putative class of plaintiffs in the Prepetition Class Acthar Actions filed approximately 162 class Proofs of Claim. The Debtors' Class Proof of Claim Objections requested that the Bankruptcy Court disallow and otherwise bar the class Proofs of Claim filed in these Chapter 11 Cases by the plaintiffs in the Prepetition Class Acthar Actions. Specifically, the Debtors argued, among other things, that (a) the claims should be disallowed because they are procedurally improper, class treatment is unnecessary to protect the interests of putative class members, and they are burdensome to the Debtors' estates and reorganization process; (b) the Bankruptcy Code does not provide for class proofs of claim, and the Third Circuit has never held that they are allowed; (c) even if there is no categorical bar to a class proof of claim, they are permitted at the discretion of the Court only in narrowly-defined circumstances that are not present with the filed claims, *i.e.*, the claimants disobeyed proper procedure in filing the class Proofs of Claim; (d) no claimant had filed

---

[28]    Order on Demurrer and Motion to Strike in *Health Care Service Corp. v. Mallinckrodt ARD LLC, et al.*, Case No RG20056354 (Cal. Sup. Ct. for Alameda Ct'y Aug. 21, 2020).

[29]    *See id.*

a motion for class certification or obtained class certification in the Prepetition Class Acthar Actions before such litigation was stayed; and (e) the vast majority of the class Proofs of Claim were filed against Debtors that are not defendants in the underlying Prepetition Class Acthar Actions ("***Non-Defendant Debtors***"). The Class Proof of Claim Objections seeks to disallow approximately $10.5 billion in class Proofs of Claim against the Debtors. The Prepetition Class Acthar Action Claimants have filed responses to the Class Proof of Claim Objections on the grounds that (a) class proofs of claim are permitted in the Third Circuit and (b) sufficient cause exists for the Court to invoke Bankruptcy Rule 7023 and allow the class Proofs of Claim.

Relatedly, also on April 30, 2021, the Debtors filed their *Debtors' First Omnibus Objection To Unsubstantiated Claims (Substantive)* [Docket No. 2165] (the "***First Proof of Claim Objection***") whereby they sought to disallow and expunge other Acthar Claims related to the Prepetition Acthar Actions, specifically, Proofs of Claim filed by Humana, among others. The Debtors argued in their First Proof of Claim Objection that these Acthar Claims are duplicative and/or unsubstantiated against all Debtors other than Mallinckrodt plc and ARD, to the extent those parties are the named defendants in the Prepetition Acthar Actions. The Acthar Insurance Claimants, the Acthar Ad Hoc Group, Marietta, among others purportedly holding Acthar Claims, continue to pursue the allowance of their filed Proofs of Claim and class Proofs of Claim and believe their Claims are valid and should be Allowed. In particular, in the *Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims* [Docket No. 2577], the Acthar Insurance Claimants argue, among other things, that (a) the Acthar Insurance Claimants have met the relatively low threshold for establishing *prima facie* valid claims and (b) there is ample evidence supporting the Acthar Insurance Claimants' claims against entities outside of ARD and Mallinckrodt plc. The Debtors disagree and believe these Claims should be disallowed and/or otherwise expunged.

### 2. Discharge and Related Claim Litigation

Certain of the Acthar Claimants have also made other bankruptcy-specific arguments in the pursuit of their Acthar Claims, which caused the Debtors to commence litigation against the Acthar Claimants to respond to these arguments. Specifically, the Acthar Ad Hoc Group have maintained that the liabilities from the Acthar Claims may be non-dischargeable under section 1141(d)(6) of the Bankruptcy Code. The Debtors, in response, filed a *Complaint for Determination and Declaration of Dischargeability of Alleged Claims and Debts of City of Rockford* and a brief in support of summary judgment for their Complaint [Docket Nos. 1, 3 in Adv. Pr. No. 21-50428 (JTD)] (collectively, the "***Discharge Action***"). The Debtors' papers in the Discharge Action reject the Acthar Ad Hoc Group's position that any liability from the Acthar Claims are non-dischargeable under sections 1141(d)(6) and 523(a)(2) of the Bankruptcy Code as debts owed to a domestic governmental unit obtained by "false pretenses, a false representation, or actual fraud." The Debtors' Discharge Action seeks a determination that the City of Rockford's Acthar Claims are dischargeable. The Debtors' papers in the Discharge Action highlight that the City of Rockford's fraud claims in its Prepetition Acthar Action was dismissed for failure to adequately plead the components of a valid fraud claim. The City of Rockford subject to the Discharge Action filed a motion to dismiss the Discharge Action on procedural grounds asserting, among other things, that the City of Rockford has not moved to determine dischargeability [Docket No. 13 in Adv. Pr. No. 21-50428 (JTD)]. Also, under the Discharge Action, the Debtors seek to disallow $203 billion in unsubstantiated Proofs of Claim against the Non-Defendant Debtors because they do not reflect a present liability of the Debtors and are not supported by any basis stated in, or any documentation supplied with, the Proofs of Claim. This litigation remains ongoing before the Bankruptcy Court and will continue as the parties seek to resolve various issues in connection with this litigation.

On May 21, 2021, the City of Rockford in the Discharge Action filed the *Defendant's Brief In Opposition To Motion For Summary Judgment* [Docket No. 21 in Adv. Pr. No. 21-50428 (JTD)] (the "***Acthar Discharge Opposition***"). The City of Rockford maintains that the Debtors' Discharge Action simply seeks

a tactical advantage and that, in any event, they should be granted leave to amend their complaint forming the basis for fraud in the Prepetition Acthar Action, and that the Debtors are not entitled to summary judgment because there are unresolved factual disputes in the litigation that require discovery.

The Acthar Discharge Opposition also argues that the Bankruptcy Court should rule on its motion to dismiss the Debtors' Discharge Action before considering the Debtors' summary judgment motion in connection to the Discharge Action.  According to the Acthar Discharge Opposition, this is especially true, because the City of Rockford has requested substantial discovery related to the Debtors' summary judgment request. The City of Rockford maintains that a litany of material facts remain in dispute between the parties, including the following: (a) the Debtors allegedly promoted the use of Acthar off-label in violation of FDA regulations; (b) the Debtors' alleged fraudulent marketing efforts increased prescriptions for Acthar for off-label uses and in doses for which Acthar was not proven to be safe, effective or useful; and (c) the Debtors allegedly unlawfully promoted Acthar for usage in populations for which it had not received FDA approval and for which the safety and efficacy had not been established through adequate clinical evidence.

Further, the Acthar Discharge Opposition argues that the Debtors' omnibus claim objection to "unsubstantiated" claims embedded in their Discharge Action ignored the "substantiation" provided in alleged timely filed proofs of claim and exhibits. The City of Rockford contends that the Debtors failed to prove that they have standing to object to those claims.

### 3.    **The Humana Claims Motions**

On April 30, 2021, the Acthar Insurance Claimants filed two claims-related motions: (a) *Motion Of Attestor Limited And Humana Inc. For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A) And 502(C) (I) Authorizing Estimation Of Humana's Acthar-Related Claims And (II) Allowing Humana's Acthar-Related Claims For All Purposes In These Bankruptcy Cases* [Docket No. 2157] (the "**Estimation Motion**") and (b) *Motion Of Attestor Limited And Humana Inc. For Entry Of An Order Allowing And Compelling Payment Of Administrative Claims Pursuant To Section 503(B) Of The Bankruptcy Code* [Docket No. 2159] (the "**Administrative Claim Motion**").  The Acthar Insurance Claimants' Estimation Motion seeks to estimate their Acthar Claims and their Administrative Claim Motion seeks allowance of an administrative expense claim against the Debtors arising from amounts paid for Acthar since the Petition Date. According to the Acthar Insurance Claimants' motions, their general unsecured and alleged administrative Acthar Claims must be determined prior to confirmation because, among other reasons, the determination of the size of Humana's Acthar Claims is necessary to determine if the Plan meets the requirements of the Bankruptcy Code, including whether the Plan is feasible, whether it meets the "best interests of creditors" test and whether it does not unfairly discriminate amongst creditors.  The Acthar Insurance Claimants also assert that resolution of the Estimation Motion and Administrative Claim Motion is necessary to determine whether the Debtors will continue to incur significant liability after emergence because the Debtors have not lowered the allegedly artificially inflated, supracompetitive price of Acthar.  In the Administrative Claim Motion, the Acthar Insurance Claimants assert that the Debtors continue to practice illegal conduct in its sale of Acthar at overinflated prices which give rise to tens of millions of dollars of  administrative (or in the future, post-bankruptcy) claims each month arising from post-petition sales of Acthar (approximately $255.8 million through the end of March and averaging approximately $51.1 million each month).  The Debtors maintain that the claims set forth in Humana's Estimation Motion and Administrative Claim Motion are meritless because, among others, (a) applicable antitrust doctrines render them without merit, (b) there simply is no present continuation of the alleged conduct at issue, (c) any damages presently arising would merely be future damages from the original underlying action, (d) there is no generating of new claims currently, and (e) none of the Acthar Claimants, including the Acthar Insurance Claimants, has offered any evidence (nor is there any) that any alleged improper marketing is occurring now.

On May 21, 2021, the Debtors filed an objection to the Acthar Insurance Claimants' Estimation Motion and Administrative Claim Motion [Docket No. 2521] (the "***Humana Claims Objection***").  The Debtors argue in their Humana Claims Objection that the Estimation Motion and Administrative Claim Motion constitute an improper attempt by Attestor/Humana to estimate their administrative expenses and then have them allowed and paid immediately.  The Debtors assert that the motions should be denied because section 503 of the Bankruptcy Code explicitly allows only "actual" administrative expenses, not estimated amounts.  The Debtors also assert that no provision in the Bankruptcy Code requires immediate payment of administrative expenses, as requested by Attestor/Humana, as opposed to waiting until the plan Effective Date.

The Debtors contend that once these improper requests are set aside, the remaining aspects of the Estimation Motion and Administrative Claim Motion are either premature (such as estimating their administrative expenses for feasibility purposes) or unnecessary (such as estimating their pre-petition claims to determine feasibility or unfair discrimination).  According to the Debtors, the Initial Administrative Claims Bar Date (as defined below) and objection process will most efficiently allow the Bankruptcy Court to determine whether there are actual administrative expenses through the Initial Administrative Claims Bar Date.  At that point, if there are Administrative Claims, then it would be necessary to estimate any remaining administrative expenses through the plan confirmation process.  The Debtors conclude the Humana Claims Objection by requesting the Bankruptcy Court to deny the Estimation Motion and Administrative Claim Motion.

All of the above litigation remains ongoing before the Bankruptcy Court and will continue as the parties seek to resolve various issues in connection with this litigation.  The Debtors continue to oppose any and all allegations against them in the above referenced litigation.  All parties' rights in the above mentioned litigation remain reserved.

### 4.      Acthar Administrative Claims and the Setting of an Administrative Claim Bar Date and Post-Reorganization Liabilities

The Debtors have continued post-petition, and intend to continue post-reorganization, to operate their Acthar-related business generally consistent with their historical practices, including those practices that are the subject of the Acthar Claims. Since the Petition Date, the Debtors have sold $[ ● ] of Acthar using their historical pricing. The Acthar Claimants contend that such post-petition activity gives rise to post-petition claims entitled to administrative priority.  The Debtors disagree.

On May 20, 2021, the Court entered the Admin Claims Bar Date Order (as defined below) [*see* Docket No. 2480], setting June 28, 2021 (*i.e.*, Initial Administrative Claims Bar Date (as defined below)) as the deadline to file proofs of Administrative Claims.  The Acthar Claimants contend that Acthar Claimants' Administrative Claims may exceed $[ ● ]. Similarly, the Acthar Claimants contend that claims will continue to accrue post-reorganization.  The Debtors disagree with both of the latter contentions.

The Acthar Claimants believe that the Administrative Claims asserted by Acthar Claimants and post-reorganization liabilities owed to Acthar Claimants for continuing to operate their Acthar-related business generally consistent with historical practices might create a risk regarding the feasibility of the Plan.  The Debtors disagree and believe the Plan is feasible.  Alternatively, because the Debtors are dependent on the historical practices related to Acthar, the Acthar Claimants believe that it may not be possible to fund the Plan without engaging in what has been alleged to be actionable historical operating and sales practices.  The Debtors disagree with such assertion.

T.    **Generics Price Fixing Litigation**

Certain other plaintiffs in the prepetition Generics Price Fixing Actions have also filed class Proofs of Claim in these Chapter 11 Cases against the Debtors that relate to the Specialty Generics side of the Debtors' company, primarily against Debtor Mallinckrodt LLC (the "*Generics Price Fixing Claims*").   The claimants asserting Generics Price Fixing Claims include AFSCME District Council 47 Health and Welfare Fund ("*DC 47*"), which sits on the UCC, as will certain State Attorneys General in connection with their joint price fixing lawsuit against the Debtors and other generic drug manufacturers.[30]

The Debtors have no knowledge of any wrongdoing by them, by their employees, or by any other company or person, and neither the Debtors nor any of their current or former employees has been charged in connection with the Generics Price Fixing Actions. Moreover, none of the Debtors were added to the Generics Price Fixing Actions until December 2019–over three years after the litigation was filed. As of the Petition Date, there were eight cases pending against the Debtors: two putative class actions—filed by the End-Payer Plaintiffs ("*EPPs*") and Direct-Purchaser Plaintiffs ("*DPPs*"); one action by the State Attorneys General; four direct actions by private plaintiffs; and one action by Suffolk County, New York. The Debtors believe that the DPPs have not filed a class claim, but the EPPs have (without authorization from the court to do so). The Debtors intend to object to the filed class claim.

The Generics Price Fixing Claims present similar issues from a bankruptcy perspective as the Acthar Claims: dischargeability of the claims, continuing conduct (*i.e.*, administrative and post-bankruptcy claims), and the allowance of the class claims. This litigation remains ongoing before the Bankruptcy Court and will continue as the parties seek to resolve various issues in connection with this litigation.

1.    **Generics Price Fixing Lift Stay Motion**

On April 20, 2021, the EPPs filed their *End-Payer Plaintiffs' Motion For Declaratory Relief, Or In The Alternative, Relief From The Automatic Stay And Waiver Of The Stay Imposed By Fed. R. Bankr. P. 4001* (the "*EPP Lift Stay Motion*") [Docket No. 21 in Adv. Pr. No. 20-12522 (JTD)] seeking entry of an order declaring that the automatic stay does not preclude the discovery sought by the EPPs in the prepetition Generics Price Fixing Actions, and granting them relief from the automatic stay for cause. Pursuant to the EPP Lift Stay Motion, the EPPs argue that participation by the named Debtors in the Generics Price Fixing Actions is important and absent their ongoing meaningful participation, the plaintiffs in such actions risk substantial prejudice not only as to their case against the named Debtors, but also to a full and fair opportunity to prove their cases against the alleged co-conspirators in such cases.

The EPPs further argue that continuation of the Generics Price Fixing Actions against the named Debtors would allegedly not create any serious burden or prejudice to the Debtors' Plan. They maintain that the directives of the District Court in the Generics Price Fixing Actions will allegedly not force the Debtors to expend significant time or financial resources on the discovery process. Further, they argue that attention of high-ranking executives will not be diverted from the reorganization process. Additionally, they contend the majority of the Mallinckrodt-affiliated individuals involved in discovery in the Generics Price Fixing Actions are former employees, and none of the current employees identified as potential document custodians for discovery purposes are high-ranking directors or officers of Mallinckrodt known to be involved in the reorganization process. Finally, the EPPs maintain that litigation in the District Court will allegedly be less burdensome to all parties, including Mallinckrodt, than beginning proceedings from scratch in the bankruptcy forum.

---

[30]    *See generally In re Generic Pharm. Pricing Antitrust Litig.*, 16-MD-2724 (E.D. Pa. Aug. 5, 2016).

The Debtors disagree with the EPPs assertions in the EPP Lift Stay Motion and opposes any order seeking to lift the stay to proceed with the Generics Price Fixing Actions. The Debtors intend to file an objection to the EPP Lift Motion in the near future.

### U.   The Administrative Claims Bar Date

On April 30, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting an Initial Bar Date for Filing Proofs of Administrative Claim, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claim, (IV) Approving Notice of the Initial Administrative Claim Bar Date, and (V) Granting Related Relief* (the "***Admin Claims Bar Date Motion***") [Docket No. 2162] with the Bankruptcy Court.

A hearing to consider the relief requested in the Admin Claims Bar Date Motion was held before the Bankruptcy Court on May 20, 2021. At the hearing, the Bankruptcy Court indicated that it would approve the Admin Claims Bar Date Motion and enter the proposed order, subject to certain revisions being made to the proposed order. On that same date, the Bankruptcy Court entered the *Order (I) Setting An Initial Bar Date For Filing Proofs Of Administrative Claim (II) Establishing Administrative Claims Procedures, (III) Approving The Form And Manner Of Filing Proofs Of Administrative Claim, (IV) Approving Notice Of The Initial Administrative Claim Bar Date, And (V) Granting Related Relief* (the "***Admin Claims Bar Date Order***") [Docket No. 2480].

Pursuant to the Admin Claims Bar Date Order, each Person or Entity that asserts a claim (other than an Opioid Claim or VI Opioid Claim) (each as defined in the Admin Claims Bar Date Order) against the Debtors that arose after the Petition Date, but prior to April 30, 2021, at 11:59 p.m., prevailing Eastern Time, shall be required to file an original, written proof of Administrative Claim (a "***Proof of Administrative Claim***"). Except in the cases of certain exceptions explicitly set forth in the Admin Claims Bar Date Order, all Proofs of Administrative Claim for any Administrative Claim arising on or prior to April 30, 2021, at 11:59 p.m., prevailing Eastern Time, must be filed so that they are actually received by Prime Clerk by June 28, 2021, at 5:00 p.m., prevailing Eastern Time (the "***Initial Administrative Claims Bar Date***").

The Admin Claims Bar Date Order sets forth certain categories of claimants that are not required to file a Proof of Administrative Claim by the Initial Administrative Claims Bar Date, which includes, among others, (a) any person or entity whose postpetition claim has previously been allowed by order of the Court; (b) any person or entity holding an Opioid Claims or VI Opioid Claims; (c) any current or former officer, director, or employee of any Debtor for claims based on wages, benefits (including retirement, pension, and other postemployment obligations), indemnification, contribution, or reimbursement; and (d) the United States Trustee, on account of claims for fees payable pursuant to 28 U.S.C. § 1930. This list of categories is non-exhaustive. Please refer to the Admin Claims Bar Date Order for the complete list of categories of claimants who are not required to file a Proof of Administrative Claim by the Initial Administrative Claims Bar Date.

Nothing in the Plan or any other order of the Bankruptcy Court bars any party from asserting a Claim it believes to be an Administrative Claim. The Debtors reserve the right to object to any such Claim or Administrative Claim.

### V.   Contingent Claims Asserted Against the Debtors

A substantial number and amount of contingent Claims have been filed in these Chapter 11 Cases, including, substantial contingent Claims in connection with the Acthar Claims, Generics Price Fixing Claims, and Asbestos Claims, among others. For instance, the contingent litigation Claims in connection

with the Acthar Claims and Generics Price Fixing Claims are described above in section IV.S-T of this Disclosure Statement.

The Plan seeks to limit General Unsecured Claims recoveries to the General Unsecured Claims Recovery Pool, which provides a recovery pool with an aggregate value of $100,000,000 for all General Unsecured Claims. Under the Plan, the Debtors retain the right to assert objections to these contingent Claims (other than Opioid Claims or Claims Allowed under the Plan) and, as such, the Allowance or disallowance of these contingent Claims may not be decided until after you vote on the Plan.   The Allowance or disallowance of these contingent Claims (other than Opioid Claims or Claims Allowed under the Plan) either will be determined by, among other things, the Debtors' claims reconciliation process that will likely take place after the Confirmation Hearing, the outcome of the Acthar Claims-related litigation described in Article IV.S above, any mediation involving the Debtors and the Holders of these contingent Claims, and any estimation motions or claim objections filed by the Debtors. While the Debtors believe the determination can occur post-confirmation, the Acthar Insurance Claimants strongly contend that the claims must be determined prior to confirmation of the Plan, as they believe such determination affects the Plan's confirmability. The Allowance or disallowance of these contingent Claims, in whole or in part, will meaningfully affect recoveries and distributions to other Holders of General Unsecured Claims.

Further, Covidien plc, which owned certain of the Debtors' businesses, including the generic opioids business, before Debtor Mallinckrodt plc was spun off in 2013, has asserted that it is entitled to contingent Claims for indemnification from the Debtors in connection with prepetition opioid litigation matters pursuant to that certain separation agreement between the parties.  Covidien plc has been named as a defendant in certain prepetition opioid litigations.  Under the Plan, Covidien's claim for indemnification arising from the prepetition opioid litigations would be treated as an Other Opioid Claim in Class 9(g) and channeled to the Opioid MDT II trust and any recovery will come from the [Other Opioid Claims Reserve]. As described in the Plan, the MDT II Administrator will be responsible for resolving all such Other Opioid Claims and will be entitled to object to them on any grounds.

W.      [The Opioid Trusts][31]

Under the Plan, the vast majority of the funds directed to the various opioid trusts will be dedicated to programs to abate the opioid crisis.  Most of the opioid trusts will have a mission to fund abatement of the opioid crisis.  A substantial portion of the Opioid Settlement amount will flow into abatement trusts established for the benefit of states and localities, as well as other creditor groups such as Native American Tribes, hospitals, ratepayers, third-party payors, emergency room physicians, and children with a history of Neonatal Abstinence Syndrome and their guardians.  These abatement trusts will require that the funds be dedicated exclusively to opioid abatement efforts, and there will be transparency to so ensure.  There will also be a substantial portion of the Opioid Settlement amount that will be provided to a trust that will make distributions to qualified personal injury claimants.  Below is summary of these opioid trusts. Creditors should review the applicable trust documents, which will be filed with the Plan Supplement, for more information with respect to a particular trust including information regarding, among other things, the mission, funding, and distribution procedures of a particular opioid trust.

1.      [The Private Opioid Creditor Trusts]

*The PI/NAS Trust*. The PI/NAS Trust is not an abatement trust and Holders of certain personal injury claims are eligible to receive recoveries only from the PI/NAS Trust.  PI/NAS Opioid Claimants will receive

---

[31]   **THIS ENTIRE SECTION IV.W OF THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVIEW AND REVISION.   THIS SECTION WILL BE CONFORMED TO THE APPLICABLE PROVISIONS OF THE LATEST PLAN FILED CONTEMPORANEOUSLY HEREWITH.**

recoveries only from the PI/NAS Trust. The following requirements apply to you if you hold a PI/NAS Opioid Claim against a Debtor for an opioid-related personal injury or death, regardless of whether you are, or you represent, a NAS Child or other personal injury claimant, are a member of a Tribe, or are affiliated with any other group associated with a different Opioid Creditor Trust. In order to receive a payment from the PI/NAS Trust, you must complete, sign and timely submit a signed claim form and other required documents as set forth in the PI/NAS Trust Documents to be filed with Plan Supplement. The claim form will be attached to the PI/NAS Trust Documents in the Plan Supplement and will also be available on a website to be set up by the PI/NAS Trust.

You will be entitled to receive a recovery on your PI/NAS Opioid Claim only if you satisfy the requirements set forth in the PI/NAS Trust Documents and you (or, if applicable, the decedent whose opioid use is the subject of your claim, or, in the case of a NAS Child, the birth mother whose opioid use is the subject of your claim) can show that you used an opioid that was manufactured by the Debtors. Furthermore, unless you (or the relevant decedent or birth mother) were a minor when you initiated usage, you will be entitled to receive a recovery only if the opioid you used was prescribed to you and was not, for example, obtained by unlawful means or by a prescription to another person. You will need to submit evidence to show that you satisfy these criteria. If you represent a NAS Child, you will also be required to submit evidence that the child has neonatal abstinence syndrome ("**NAS**"), as set forth in the PI/NAS Trust Documents.

Once a claim form is submitted, the PI/NAS Trust will examine the evidence provided to determine whether the claim is compensable and, if so, the appropriate level of recovery. The amount you receive will depend, in part, on which payment election you make on your claim form and your compliance with the PI/NAS Trust Documents. You can choose between receiving either a fixed dollar amount or a variable award, the amount of which will be determined based upon the factors set forth in the PI/NAS Trust Documents. Choosing the fixed payment option will likely permit the PI/NAS Trust to distribute a payment to you more quickly, but choosing that option means that you will receive only the specified fixed-dollar amount and no more.

Variable awards are expected to range in value depending on, among other things, (i) proof that your opioid use disorder began with a Debtor opioid, (ii) the length of use of the Debtor opioid, and (iii) the severity of the PI/NAS Opioid Claimants' injuries. If you elect to submit your claim under the variable award process, then the PI/NAS Trust will review your claim and assign it "points" based on the nature of your claim. More severe injuries (including death from addiction to the Debtors' opioids) and longer use of the Debtors' opioids will generally result in more points being assigned to a compensable claim. The more points assigned to a compensable claim, the more money that claimant will be entitled to receive. The number of points assigned to each category of injury severity and length of use will be as set forth in the PI/NAS Trust Documents and the trust distribution procedures therein that will be included in the Plan Supplement.

The points assigned to a compensable claim will be converted to dollars using the point value determined by the PI/NAS Trust, which will determine the total amount of your distribution. The exact value of each point as well as the amount of the fixed payment is not yet known at this time; an estimate of the range of potential point values and the anticipated amount of the fixed payment will be set forth in the PI/NAS Trust Documents included in the Plan Supplement, based upon the information available at that time. The dollar value of each point will be estimated by the PI/NAS Trust from time to time, and may change over time, depending upon a number of factors, including how many PI/NAS Opioid Claims (including PI/NAS Opioid Claims anticipated to be filed in the future) are ultimately eligible for distribution, how many PI/NAS Opioid Claimants choose the fixed payment option, the value of the assets available and anticipated to become available for distribution by the PI/NAS Trust, and reserves for future PI/NAS Opioid Claims and PI/NAS Trust operating expenses. These same factors could cause the amount of the fixed payment to change.

Your distribution amount under the PI/NAS Trust Documents is expected to be a gross number that will be further reduced by a number of potential factors, including, where applicable, the fees and expenses of your own lawyer(s). Your distribution may also be subject to further reduction on account of certain liens held by health care insurance companies, also known as "third-party payors" or "TPPs," as well as by certain federal and state health insurers like Medicare, Tricare, VA, or Medicaid. The representatives of PI/NAS Opioid Claimants involved in the bankruptcy proceedings are negotiating with certain of the private TPPs with claims related to the Debtors' opioid products and with other parties which may have reimbursement liens and other rights, with respect to agreements that could resolve their liens on PI/NAS Opioid Claim recoveries through a "lien resolution procedure." Such a procedure may include voluntary reductions by those TPPs and others of their liens to a fixed percentage of the distribution or a cap on their recovery, and may include a waiver of all liens against distributions in certain smaller amounts. One of the goals of the representatives of PI/NAS Opioid Claimants involved in these negotiations is that those claimants who choose the fixed payment option will not have to pay any portion of their distribution to private TPPs, although they may still have to pay a portion to federal or state agencies. There can be no assurances, however, that the parties working to negotiate lien resolution procedures will be successful in their efforts. Additional information about the PI/NAS Trust, the trust distribution procedures and any agreed lien resolution procedures may be found in the PI/NAS Trust Documents to be filed with the Plan Supplement.

***Hospital Opioid Claims and the Hospital Trust***. The Hospital Trust is an abatement trust—all funds received from the Hospital Trust by any Holder of a Hospital Opioid Claim must be used for or applied to abatement purposes. The Hospital Trust shall contain the Hospital Opioid Claims Share to be used for Hospital Opioid Claims. Holders of Hospital Opioid Claims against the Debtors that are hospitals, including both acute-care hospitals and other treatment providers, will only be entitled to receive a recovery (if eligible under the procedures of the Hospital Trust Documents) from the Hospital Trust and Hospital Opioid Claims Share. For a Holder of a Hospital Opioid Claim to be eligible to receive a payment from the Hospital Trust, they must *either* (1) have filed a claim in accordance with the distribution procedures set forth in the Hospital Trust Documents *or* (2) be (x) a nonfederal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is required by law to provide inpatient acute care and/or fund the provision of inpatient acute care, in each of cases (x) and (y) that is listed on the national registry of hospitals maintained by the American Hospital Directory®. After the Effective Date, the Hospital Trust will send a notice to each such Holder of a Hospital Opioid Claim containing a hospital distribution form. **In order for a hospital to receive any payment from the Hospital Trust, a hospital must return the hospital distribution form within the deadline set forth on that notice, along with applicable evidence of their claim as described in the distribution procedures set forth in the Hospital Trust Documents.**

The applicable Opioid Creditor Trustee(s) will use the evidence provided by each eligible hospital that timely submits a form to calculate the amounts of such hospital's distributions using a proprietary algorithm. That algorithm is based on unreimbursed charges incurred by the hospital, and then applies a weighting formula based on the hospital's service area, opioid-related patient population, opioid-related unreimbursed charges and whether the hospital either timely filed a claim or is a Safety Net Hospital under the CARES Act. The Hospital Trust will then pro-rate the re-weighted amounts based on the total amounts for all distribution forms received from eligible hospitals to determine each eligible hospital's recovery. **Importantly, if you are a hospital that receives a distribution from the Hospital Trust, you *must* use or apply those payments for authorized abatement purposes only, as set forth in further detail in the distribution procedures in the Hospital Trust Documents to be filed with the Plan Supplement.**

***Third-Party Payor Opioid Claims and the Third-Party Payor Trust***. The Third-Party Payor Trust is an abatement trust—all funds received from the Third-Party Payor Trust by any Holder of a Third-Party Payor Opioid Claim must be used for or applied to abatement purposes. The Third-Party Payor Trust is an abatement trust—all funds received from the Third-Party Payor Trust by any Holder of a Third-Party Payor Opioid Claim must be used for or applied to abatement purposes. Holders of Third-Party Payor Opioid

Claims against the Debtors will only be entitled to receive a recovery from the Third-Party Payor Trust and the Third-Party Payor Opioid Claims Share therein. For a Holder of a Third-Party Payor Opioid Claim to be eligible to receive a payment from the Third-Party Payor Trust, they must file a claim form in accordance with the distribution procedures set forth in the Third-Party Payor Trust Documents that will be filed with the Plan Supplement. After the Effective Date, the Third-Party Payor Trust will send a notice to each such Holder of a Third-Party Payor Opioid Claim containing a third-party payor abatement claim form. **In order for a Holder of a Third-Party Payor Opioid Claim to receive a payment from the Third-Party Payor Trust, such Third-Party Payor Opioid Claimant must return the claim form within the deadline set forth on that notice, along with a calculation of their "Maximum Eligible Amount" which is based on their "Mallinckrodt-related Opioid Spend" as defined in the distribution procedures set forth in the Third-Party Payor Trust Documents filed with the Plan Supplement.**

After reconciliation of claims, removal of duplicates, and other administrative analysis, the applicable Opioid Creditor Trustee for the Third-Party Payor Trust will use the calculation of the [Maximum Eligible Amounts] provided by each eligible Third-Party Payor Opioid Claimant that timely submits a form to calculate the amounts of such claimant's abatement distributions, pro-rated based on the total amounts for all abatement claim forms received to determine each eligible claimant's percentage recovery from the available funds remaining in the Third-Party Payor Trust (or Third-Party Payor Opioid Claims Share). The distribution procedures set forth in the Third-Party Payor Trust Documents filed with the Plan Supplement provide a mechanism for challenging such determinations, as set forth in further detail in the Third-Party Payor Trust Documents to be filed with the Plan Supplement. **Importantly, if you are a Holder of a Third-Party Payor Opioid Claim that receives a distribution from the Third-Party Payor Trust, you must use or apply those payments for authorized abatement purposes only, as set forth in further detail in the Third-Party Payor Trust Documents to be filed with the Plan Supplement.**

***NAS Monitoring Opioid Claims and the Opioid MDT II.*** Claims have been asserted against the Debtors relating to medical monitoring support, educational support, vocational support, familial support or similar related relief, and not for an alleged personal injury suffered by a NAS Child. Such claims do not belong to a NAS Child but instead are asserted by other parties on their behalf who provide medical monitoring support, educational support, vocational support, familial support or similar services to NAS Children. All such claims are channeled to the Opioid MDT II and no claimant shall receive a direct recovery on account of those claims (although the holders of a PI/NAS Opioid Claim may be entitled to a recovery from the PI/NAS Trust as described above). The Other Opioid Claims Reserve that will be directed to the NAS Monitoring Opioid Claims must be used for abatement purposes, will not be distributed to NAS Children or their guardians but shall instead be used to make grants to organizations that combat the effects of NAS. Specifically, pursuant to the terms of the Opioid MDT II Documents, the Opioid MDT II will make grants in the aggregate amount of (1) no less than [ ● ]% of such distributions (net of attorneys' fees) for the purpose of (x) preparing children with a history of NAS to be ready to enter school, (y) informing through evidence the standard of care for children ages birth through six years old affected by NAS, with priority given to those ages three through six or (z) enhancing the mother-child dyad of children affected by NAS and (2) up to 5% of such distributions (net of attorneys' fees) to research institutions to conduct and publish the results of research into approaches for helping children and families in instances of fetal opioid exposure, in each case as set forth in more detail in the Opioid MDT II Documents that will be filed with the Plan Supplement, which includes the schedule for submission and review of grant proposals.

***Ratepayer Opioid Claims and the Opioid MDT II.*** Claims have been asserted against the Debtors arising out of or relating to the payment of health insurance by the Holder of such Claim. All such claims and liability therefor shall be assumed by the Opioid MDT II and satisfied solely by the Truth Initiative Contribution, which is a contribution to the Truth Initiative Foundation to be used for national opioid prevention and education efforts in an amount equal to [●]% of each of (a) the MDT II Initial Distributable Value, (b) any Other Opioid Claims Excess Reserve and (c) any MDT II Subsequent Distribution.

Ratepayer Opioid Claims shall be administered, liquidated and discharged pursuant to the Opioid MDT II Documents, and satisfied solely from contributions made by the Opioid MDT II as and to the extent provided in the distribution procedures contained in the Opioid MDT II Documents, which sets forth the manner in which the Opioid MDT II shall make the Truth Initiative Contribution.  Ratepayer Opioid Claims shall be fully discharged pursuant to the terms of the Opioid MDT II Documents filed with the Plan Supplement.

***Emergency Room Physicians Opioid Claims and the Emergency Room Physicians Trust.***  Claims have been asserted against the Debtors relating to emergency room physicians whose billing and revenue collections were entirely separate from the medical facility billing practices and were not employed by such medical facility.  All such claims and liability therefor shall be assumed by the Emergency Room Physicians Trust as of the Effective Date.   Emergency Room Physicians Opioid Claims shall be administered, liquidated and discharged pursuant to the Emergency Room Physicians Trust Documents, and satisfied solely from funds held by the Emergency Room Physicians Trust as and to the extent provided in the distribution procedures contained in the Emergency Room Physicians Trust Documents, which sets forth the manner in which the Emergency Room Physicians Trust shall make distributions to Holders of Emergency Room Physicians Opioid Claims that satisfy the eligibility criteria for Emergency Room Physicians Authorized Recipients (as defined in the Emergency Room Physicians Trust Documents).  Emergency Room Physicians Opioid Claims shall be fully discharged pursuant to the terms of the Emergency Room Physicians Trust Documents filed with the Plan Supplement.  The Emergency Room Physicians Authorized Recipients (as defined in the Emergency Room Physicians Trust Documents) are required to use all funds distributed to them from the Emergency Room Physicians Trust solely and exclusively for (i) the authorized abatement purposes set forth in the Emergency Room Physicians Trust Documents or (ii) the payment of attorneys' fees and costs of Holders of Emergency Room Physicians Opioid Claims [(including counsel to the Ad Hoc Group of Emergency Room Physicians)] as further detailed in the Emergency Room Physicians Trust Documents filed with the Plan Supplement.

## 2.   [The Public Opioid Creditor Trusts]

***Public Creditor Trusts.***  The Plan also provides for the establishment of two public creditor trusts, the National Opioid Abatement Trust II (the "***NOAT II***"), on account of the State Opioid Claims and the Municipal Opioid Claims, and the TAFT II, on account of the Tribe Opioid Claims. All value distributed to the NOAT II and the TAFT II will be exclusively dedicated to programs designed to abate the opioid crisis and for no other purpose (other than to fund administration of the programs themselves and to pay fees and costs). A schedule of the distributions to be received by the NOAT II and the TAFT II is set forth below:

| Aggregate Amount Distributable | Allocation Between the NOAT II and the TAFT II | |
|---|---|---|
| | NOAT II | TAFT II |
| $0 – $[ ] | | |
| over $[ ] – $[ ] | | |
| over $[ ] | | |

***National Opioid Abatement Trust II.***  The funds distributed to the NOAT II under the Plan will be allocated to each State for use within that State based on a detailed mediation and settlement framework for the NOAT II that resulted in a detailed methodology for determining the percentage of abatement funds allocated to each State, which is based on, among other things, prescription opioid sales, the prevalence of pain reliever use disorder, overdose deaths, population and other factors. That methodology resulted in the state-by-state percentage allocations set forth in the NOAT II Documents to be filed with the Plan

Supplement. Within-state allocations of those funds to local governments and other Municipal Units within each State will be determined either by a default allocation mechanic or a "Statewide Abatement Agreement" if the required level of support can be reached within the applicable State no later than two weeks following the Effective Date.[32] Under the default allocation mechanic, the within-state allocations of funds for abatement purposes shall be apportioned by region, and the specific abatement uses of the funds shall be determined by the state, with input from a consulting body that includes broad local government representation. Further detail on the inter-state allocation model and intra-state allocation mechanisms is described in the NOAT II Documents that will be filed with the Plan Supplement. Also, the core abatement purposes for which each State may allocate abatement funds are described in the NOAT II Documents distribution procedures, with priority given to the "core strategies" set therein.

The applicable NOAT II trustees shall distribute the NOAT II funds consistent with the allocation percentages set forth below and in accordance with the NOAT II Documents.

| State | Final Percentage Division of Funds |
| :---: | :---: |
| Alabama | 1.5958653635% |
| Alaska | 0.2283101787% |
| American Samoa* | 0.0171221696% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9322152924% |
| California | 9.9213830698% |
| Colorado | 1.6616291219% |
| Connecticut | 1.2938102647% |
| Delaware | 0.4420285052% |
| District of Columbia | 0.1799774824% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam* | 0.0480366565% |
| Hawaii | 0.3246488040% |
| Idaho | 0.4919080117% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7419256132% |
| Kansas | 0.7840793410% |
| Kentucky | 1.9963344879% |
| Louisiana | 1.4650905059% |
| Maine | 0.5293231313% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |

---

[32] The allocation of public funds within a Territory or the District of Columbia will be determined by its local legislative body within the time frame set forth in the procedures of the NOAT II Documents filed with the Plan Supplement, unless that legislative body is not in session, in which case, the allocation of public funds shall be distributed pursuant to the direction of the Territory's or District of Columbia's executive, in consultation – to the extent applicable – with its [government participation mechanism], all as set forth in the NOAT II Documents filed with the Plan Supplement.

| | |
|---|---|
| Mississippi | 0.8624327860% |
| Missouri | 2.0056475170% |
| Montana | 0.3125481816% |
| N. Mariana Islands* | 0.0167059202% |
| Nebraska | 0.4171546352% |
| Nevada | 1.2017657135% |
| New Hampshire | 0.5784834777% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.7989379794% |
| New York | 5.3903813405% |
| North Carolina | 3.2502525994% |
| North Dakota | 0.1700251989% |
| Ohio | 4.3567051408% |
| Oklahoma | 1.5322312508% |
| Oregon | 1.3741405009% |
| Pennsylvania | 4.5882419559% |
| Puerto Rico** | 0.7101195950% |
| Rhode Island | 0.4465429178% |
| South Carolina | 1.5393083548% |
| South Dakota | 0.1982071487% |
| Tennessee | 2.6881474977% |
| Texas | 6.2932157196% |
| Utah | 1.1466798699% |
| Vermont | 0.2544890561% |
| Virgin Islands* | 0.0315673573% |
| Virginia | 2.2801150757% |
| Washington | 2.3189040182% |
| West Virginia | 1.0567416533% |
| Wisconsin | 1.7582560561% |
| Wyoming | 0.1668134842% |

***Tribe Opioid Claims and the TAFT II.*** Distributions to the Tribes on account of Tribe Opioid Claims will be required to be used exclusively for abatement purposes and permitted administrative costs, and will be made through the TAFT II in accordance with the TAFT II Documents to be filed with the Plan Supplement.[33] The allocation of distributions among Tribes will be consistent with the allocation percentages set forth in the TAFT II Documents. The Tribes will use the tribal allocation of abatement funds for programs on the approved list of abatement strategies (*see* the TAFT II Documents and procedures therein to be filed with the Plan Supplement) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a tribe or tribal health organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached to the TAFT II Documents and referred to therein as the "*Tribal Abatement Strategie*s". The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American

---

[33]    TAFT II may consist of one or more trusts, limited liability companies, or other Persons or Entities, to be identified in the Plan Supplement.

Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.

Each of the NOAT II and the TAFT II shall (i) monitor the use of funds received by any applicable recipients in accordance with the NOAT II Documents and TAFT II Documents and (ii) prepare and deliver to the Opioid MDT II for publication annual reports on the disbursement, use and, to the extent feasible and cost-effective, efficacy of abatement distributions from such Trusts and the compliance by abatement distribution recipients with the authorized abatement purposes set forth in the applicable trust documents. The Debtors believe that funding these dedicated abatement funds is in the best interest of creditors and of the American public.

## X.     The Opioid Noticing Program

On [ ● ], 2021, the Debtors filed their *Additional Opioid Notice Plan* [Docket No. [ ● ]] (the "***Opioid Notice Plan***").  The Opioid Notice Plan provides that the Debtors will use multiple channels in the United States (including territories and tribes) and Canada to provide notice to known and unknown Holders of Opioid Claims.  The Debtors will implement a combination of direct mailings, media campaigns and advertising (*i.e.*, primarily television, online social/search media, and radio), print publications (*i.e.,* newspapers and magazines), and community outreach to provide notice to known and unknown Opioid Claimants.  The Debtors' Opioid Notice Plan will involve a direct notice strategy and a media and community outreach strategy.

### 1.     The Opioid Notice Plan - Direct Notice

The Debtors propose to send direct, mailed notice, and a Solicitation Package (including the applicable Ballot), to the following known Holders of Opioid Claims and/or their lawyers.

- ***Existing Opioid Plaintiffs***:  All plaintiffs with pending opioid lawsuits against the Debtors.

- ***Non-Plaintiff, Known Claimants***:  All persons and entities that have filed opioid-related Proofs of Claim in the Debtors' Chapter 11 Cases (if any), and all Persons and Entities that have appeared in the Debtors' Chapter 11 Cases on the basis of opioid-related claims, regardless of whether any of the foregoing have filed lawsuits against the Debtors relating to opioids.

- ***Co-Defendants***:  All co-defendants to the Debtors in their prepetition opioid litigations.

The Debtors will also send direct, mailed notice to the following potential Holders of Opioid Claims and/or their lawyers.  Such notice will include information on how to retrieve a Solicitation Package directly from the Notice and Claims Agent, and vote on the Debtors' Plan.

- ***Related Consolidated Third Party Payors***:  Collective group of more than 450,000 insurance payors who have filed Proofs of Claim in the Debtors' chapter 11 cases relating to Acthar® Gel and asserted generics price fixing claims—the Debtors understand that group entirely or nearly entirely overlaps with the consolidated group of payors that filed opioid claims in the chapter 11 cases for *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.).

- ***Opioid Claimants who filed a Proof of Claim in Purdue***:  The Debtors propose to utilize publicly available opioid claimant notice information from the Purdue Chapter 11 Cases, and to seek permission from the applicable bankruptcy court for Prime Clerk to utilize non-publicly available opioid claimant notice information, to send direct notice to such persons and entities.

- ***Putative Class Representatives***:  All putative class representatives to the various opioid claim classes in these Chapter 11 Cases (*e.g.*, the hospitals, ratepayers, ERP's, NAS, Public Schools, etc.).

### 2.    The Opioid Notice Plan - Media and Community Outreach Strategy

The Debtors will conduct the following media and community outreach noticing programs to provide notice to all unknown Opioid Claimants.  The following notice programs will disseminate information on how to obtain a Solicitation Package and an applicable Ballot, how to cast a vote on the Debtors' Plan, provide notice of all relevant deadlines for the Debtors' Chapter 11 Cases, and directions for how to contact the Notice and Claims Agent with any questions.

The Debtors and their Notice and Claim Agent will commence a media/advertising outreach campaign that will include:

- Television: Broadcast network and cable;

- Online Media:  Display internet banner advertising (United States and U.S. territories in both English and Spanish);

- Search: Key word and search terms (United States, U.S. territories and Canada in English, Spanish and French);

- Social Media:  Facebook, Instagram, Twitter, YouTube and TikTok (United States and U.S. territories in both English and Spanish) and Canada (English and French);

- Radio:  Tribal and Univision (United States and U.S. territories in Spanish); and

- Press Releases (released approximately 2 weeks after entry of the Disclosure Statement Order):  Releases in both United States (including U.S. territories and tribes in both English and Spanish) and Canada (in both English and French);

- Print (Newspapers and Magazines):

  - United States and U.S. territories:  *Wall Street Journal*, seventy-eight (78) local newspapers and over fifty (50+) tribal newspapers;

  - U.S. territories: six (6) local newspapers in Spanish and English; and

  - Canada:  *Maclean's, Canadian Living*, *Reader's Digest* (English) *and Reader's Digest* (French)

The Debtors' media outreach timeline will last between forty-five (45) and sixty (60) days before the Voting Deadline (*i.e.*, starting between [June 17, 2021 and July 2, 2021, and ending on August 16, 2021]).  This media outreach campaign is intended to target over ninety percent (90+%) of all adults eighteen and older regardless of age, gender, income, ethnicity or socio-economic condition in the United States and over eighty percent (80+%) of the same in Canada.

For television, the Debtors would propose a thirty-second (:30) television commercial, delivering information about the Debtors' Plan process and the potential right to vote, for viewers that may have a potential Opioid Claim against the Debtors. The commercial will direct viewers to a dedicated webpage where the Opioid Claimant could obtain relevant materials, including the Plan and Disclosure Statement, and cast a vote on the Plan.

In paper print media, the Debtors will use a simplified notice that will deliver key information alerting the reader to the Debtors' Plan process and their potential right to vote, if they believe they may have an Opioid Claim against the Debtors.

In online channels, the Debtors would further streamline the information conveyed in the primary advertisement by creating an online banner with information substantially in the form below:

> *If you or a family member has been harmed by the use of an opioid product, then any claim you may have against Mallinckrodt, which is an opioid manufacturer, may be impacted by Mallinckrodt's bankruptcy plan and channeled to a trust for any recovery. As a result, you may have the right to vote on Mallinckrodt's plan. If you want to vote on, or object to, Mallinckrodt's plan, you must do so by [August 16], 2021 at 4:00 p.m. (ET). Please visit the [Opioid Claimant Webpage] for more information and read Mallinckrodt's plan and disclosure statement to help you decide whether and how to vote and request and submit a ballot. **If you have questions about the information contained herein, you may also contact the Debtors at MallinckrodtInfo@primeclerk.com or the Official Committee of Opioid Related Claimants at MLNKOpioidcreditorinfo@primeclerk.com.***

The Debtors will also deliver notice through a community outreach program via a short simplified notice that will explain the Debtors' Chapter 11 Cases and the process for obtaining a Ballot and voting on the Plan if the recipient believes he or she may have an Opioid Claim and wishes to vote on the Plan. This community outreach notice is expected to reach over 330,000 parties in various categories of communities and organization, including without limitation, Addiction Treatment Centers; Public Schools; Church Organizations; Crisis Intervention Service, Help Lines, Intervention Centers; Dependency Information & Help Centers; Drug Abuse & Addiction Info & Treatment Centers; Emergency Rooms; Hospitals (For Profit, Psychiatry, Teaching, Veterans, Women's, Government Owned, Rehabilitation, Chemical Dependency, Children); Mental Health Clinics; NAS Support Groups; Native American Reservations & Tribes; and Opioid/Opiate Treatment Centers.

The Debtors and their Notice and Claims Agent are also investigating whether they could conduct a notice program with counties, cities, towns and other local governments in the United States. The notice would be similar to the community outreach notice above (*i.e.*, a short notice explaining the Debtors' chapter 11 cases and the process for obtaining a Ballot and voting on the Plan). The Debtors' investigation is still ongoing and, if it's possible, the Debtors will indeed provide notice to certain counties, cities, towns and other local governments in the United States.

## Y. The Canadian Recognition Proceedings

In parallel with these Chapter 11 Cases, Mallinckrodt Canada ULC, Mallinckrodt plc, Mallinckrodt Hospital Products Inc., Mallinckrodt LLC, and MNK 2011 LLC (collectively, the "***Canadian Filing Entities***") have commenced proceedings under Part IV of the Canadian Companies Arrangement Act (the "***Canadian Recognition Proceedings***") in the Ontario Superior Court of Justice (Commercial List) (the "***Canadian Court***") to recognize the Chapter 11 Cases as foreign main proceedings or foreign non-main proceedings, as applicable, in Canada and to recognize in Canada certain Orders of the Bankruptcy Court. In the Chapter 11 Cases, the Bankruptcy Court issued an order appointing Mallinckrodt Canada ULC as the foreign representative (the "***Foreign Representative***") of itself, Mallinckrodt plc, and the other Canadian Filing Entities.

On October 16, 2020, the Foreign Representative, under Part IV of the Companies' Creditors Arrangement Act (the "***CCAA***") applied for and was granted an Initial Recognition Order (Foreign Main Proceeding and Foreign Non-Main Proceeding) and a Supplemental Order as to Mallinckrodt ULC, Mallinckrodt plc, and

Mallinckrodt Hospital Products Inc. (together, the "***Initial CCAA Recognition Orders***").  On [ ● ], 2021 the Debtors filed an additional motion seeking to recognize Debtor Mallinckrodt LLC's and Debtor MNK 2011 LLC's Chapter 11 Cases in the Canadian Recognition Proceedings.  On [ ● ], 2021, the Canadian Court entered an order recognizing these two Chapter 11 Cases (together with the Initial CCAA Recognition Orders, the "***CCAA Recognition Orders***").

The Debtors initiated the Canadian Recognition Proceedings in order to (a) channel certain claims (the "***Canadian Opioid Claims***") related to the B.C. Class Action Litigation (as defined below) to the Opioid MDT II, and (b) to stay that and certain other litigation, including the Ontario Litigation (as defined below) and the Eaton Litigation (as defined below), during the pendency of the Chapter 11 Cases.

The Canadian Filing Entities are defendants in three actions in Canada (the "***Canadian Litigations***").  The Canadian Litigations are comprised of:

- a civil claim dated June 1, 2020, filed in the Supreme Court of British Columbia under the Class Proceedings Act (British Columbia) (the "***B.C. Class Action Litigation***") naming Mallinckrodt Canada ULC and Mallinckrodt plc (the "***B.C. Mallinckrodt Defendants***") as defendants and alleging, among other things, that following a switch from the generic methadone compound to Methadose: a) the B.C. Mallinckrodt Defendants knew that Methadose was less effective than the compounded generic methadone in question; b) the B.C. Mallinckrodt Defendants knew or ought to have known that restricting patient access to compounded generic methadone and the switch to Methadose could result in relapse and harms associated with relapse; and c) the B.C. Mallinckrodt Defendants – through acts or omissions – committed various wrongdoings, including making false representations regarding Methadose and the switch from compounded generic methadone, and failing to warn patients;

- a civil claim dated July 2, 2015, filed in the Ontario Superior Court of Justice (the "***Ontario Litigation***") naming Ikaria Inc. (a predecessor company to Mallinckrodt Hospital Products Inc.) as a defendant, alleging, negligence, conversion, interference with property and/or breach of contract in respect of the destruction of certain product stock; and

- a civil claim dated June 3, 2020, filed in the Federal Court of Canada in Toronto, Ontario, under the *Competition Act* (Canada) and the *Federal Courts Act* (*Kathryn Eaton v Teva Canada Limited et al.* – Court File No. T-607-20) (the "***Eaton Litigation***"), naming Mallinckrodt LLC, Mallinckrodt Canada ULC, Mallinckrodt plc and 71 other unrelated pharmaceutical entities, as defendants, and alleging, that the defendants participated in a conspiracy across North America to allocate the market, fix prices and maintain the supply of certain generic drugs.

After the Confirmation of the Plan by the Bankruptcy Court, applications will be made by the Canadian Filing Entities seeking orders from the Canadian Court recognizing the Confirmation Order as a matter of Canadian law, the effect of which, among other things, will be to channel all Canadian Opioid Claims to the Opioid MDT II pursuant to the terms of the Plan.  Notwithstanding the foregoing, the Debtors reserve the right to file additional Canadian Recognition Proceedings for Debtors other than the Canadian Filing Entities, to the extent necessary or advisable to consummate the Plan. Entry of an order by the Canadian Court recognizing the Confirmation Order in the Canadian Recognition Proceedings and giving full force and effect to the Confirmation Order in Canada (and such recognition order becoming a Final Order) is a condition precedent to the Effective Date under Article VIII of the Plan.

### Z.    The Irish Examinership Proceedings

In accordance with the Restructuring Support Agreement and the Plan, the Parent anticipates filing a petition to commence the Irish Examinership Proceedings following confirmation of the Plan.  The filing of the Irish Examinership Proceedings will commence the protection period during which the Parent will, under Irish law, have the benefit of protection against enforcement and other actions by its creditors for a period of up to 100 calendar days (or as otherwise amended under applicable Irish insolvency law).

The Parent intends to continue operating its business in the ordinary course during the protection period, save that an Examiner will be in place whose primary function will be to seek approval for its proposals for a Scheme of Arrangement in relation to the Parent.

The Irish Debtors believe that the terms of the proposals for a Scheme of Arrangement which will accompany the Irish Examinership Proceedings will, inter alia, deal with the: (i) cancellation of all Equity Interests; (ii) issue of New Mallinckrodt Ordinary Shares (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) to the Holders of Guaranteed Unsecured Notes Claims; and (iii) issue of New Opioid Warrants to the Opioid MDT II each on terms consistent with the Plan.

Notwithstanding anything to the contrary in the above, the Debtors reserve the right to file additional Irish Examinership Proceedings for Debtors other than Parent, to the extent necessary or advisable to consummate the Plan.

Furthermore, one of the Holders of ordinary shares of Mallinckrodt plc, the Buxton Helmsley Group ("**BHG**"), filed *The Buxton Helmsley Group, Inc.'s Joinder In Acthar Plaintiffs' Preliminary Objections To Debtors' Disclosure Statement* [Docket No. 2385] asserting, among other things, that the Debtors and their directors may have violated certain aspects of Irish law in connection with their restructuring and these Chapter 11 Cases.  Thus, according to BHG, Mallinckrodt plc may have undisclosed Claims against it that may interfere with the Debtors' ability to consummate the Irish Examinership Proceeding and, accordingly, to consummate the Plan.  The Debtors disagree with BHG's assertions in its joinder pleading.

#### 1.    Petition Hearing

On the petition hearing date of the Irish Examinership Proceedings, the Parent will apply to have the Examiner's appointment confirmed.  The Parent will be required to establish that it is insolvent and that there is a reasonable prospect of the survival of both the company and its undertaking.  It is intended that the petition will be accompanied by the Scheme of Arrangement.

#### 2.    Approval of Proposals for the Scheme of Arrangement

The Examiner will convene meetings of classes of creditors and the shareholders of the Parent.  The Scheme of Arrangement is required to be approved by in excess of 50% plus one in value and in number of at least one class of impaired creditors.

#### 3.    Approval by the High Court of Ireland

Once the requisite creditor classes have voted in favor of the Scheme of Arrangement, the Examiner will file a report containing details of the outcome of the votes of the class meetings with the High Court of Ireland and apply to the High Court of Ireland for a hearing date to confirm the Scheme of Arrangement.  At such hearing the Examiner will be required to establish that the proposals are fair and equitable to any

class of creditors which has not accepted the proposals and whose interests would be impaired by the proposals and that the proposals are not unfairly prejudicial to the interests of any interested party.

Entry of an order confirming the Scheme of Arrangement in the Irish Examinership Proceedings and the Scheme of Arrangement becoming effective in accordance with its terms (or becoming effective concurrently with effectiveness of the Plan) is a condition precedent to the Effective Date under Article VIII of the Plan.

### AA.    Disclosure Statement Objections

Various parties have filed objections to this Disclosure Statement and the Disclosure Statement Order. The Debtors have engaged with some of these objecting parties to resolve their objections and intend to continue engaging with objecting parties to resolve objections. Below are additional disclosures with respect to said Disclosure Statement objections.

As set forth in the *Objection of the Ad Hoc First Lien Notes Group to Approval of the Debtors' Disclosure Statement* [Dkt. No. 2377] and the *Objection of Columbus Hill Capital; Management, L.P. to Debtors' Motion for Approval of Disclosure Statement for Joint Plan of Reorganization of Mallinckrodt PLC and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Dkt. No. 2350], the ad hoc First Lien Notes group and Columbus Hill Capital Management, L.P. argue that the First Lien Notes may not be reinstated absent payment in full of the "Applicable Premium" under Section 6.02 of the First Lien Notes Indenture. The Debtors disagree with their position, and the other assertions in the objections, and submit that the First Lien Notes and the Second Lien Notes may be reinstated without paying any Applicable Premium and that the treatment of First Lien Notes and Second Lien Notes under the Plan is otherwise appropriate.

The UCC filed its *Preliminary Objection Of Official Committee Of Unsecured Creditors To Motion Of Debtors For Entry Of Order (I) Approving The Disclosure Statement And Form And Manner Of Notice Of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving The Form And Manner Of Notice To Attorneys And Solicitation Directive, (IV) Approving The Form Of Ballots, (V) Approving Form, Manner, And Scope Of Confirmation Notices, (VI) Establishing Certain Deadlines In Connection With Approval Of Disclosure Statement, And Confirmation Of Plan, And (VII) Granting Related Relief* [Docket No. 2392]. The UCC's objection asserts that it does not support the Plan.

In response to the UCC's objection, (a) the Debtors will include with the Solicitation Package correspondence from the UCC directed to Holders of General Unsecured Claims stating its position with respect to the Plan; (b) the Debtors believe the Asbestos Claims asserted against the Debtors primarily relate to a refractory product sold by a legacy affiliated entity prior to 1974; and (c) certain plaintiffs have also alleged premises liability Asbestos Claims against the Debtors.

Teva Pharmaceuticals USA, Inc. and certain of its affiliates (collectively, "***Teva***") filed their *Objection Of Teva Pharmaceuticals USA, Inc. And Certain Of Its Affiliates To Debtors' Motion For An Order Approving Disclosure Statement* [Docket No. 2473]. The Debtors have engaged Teva to discuss the following additional disclosures to resolve Teva's objection.

> *The Opioid Permanent Channeling Injunction under the Plan will enjoin any party from naming the Debtors or the Reorganized Debtors in any apportionment or allocation of liability in any litigation or proceeding, insofar as the claim or cause of action asserted in such litigation or proceeding is an Opioid Claim. Co-Defendant Claims will be channeled to the Opioid MDT II pursuant to Article IX.G of the Plan, including Co-Defendant Claims arising from any existing agreement between any Debtor and any counterparty, as contemplated by Article V.G of the Plan. Any Proof of Claim asserting such Co-Defendant*

*Claims will be deemed disallowed and expunged to the extent of such Co-Defendant Claims pursuant to the Plan on the Effective Date.*

*Co-Defendant Claims for indemnification under Executory Contracts will be treated in accordance with Article V.G of the Plan. Such Claims will be channeled to the Other Opioid Claims Reserve, unless the Holder of a Co-Defendant Claim objects to such treatment and (a) the Debtors do not reject the applicable Executory Contract or (b) the applicable Executory Contract is not amended by agreement between the parties thereto.*

The Acthar Ad Hoc Group and certain other Acthar Claimants filed their *Acthar Plaintiffs' Preliminary Objections To Debtors' Disclosure Statement* [Docket No. 2244] and their *Supplemental Preliminary Objections Of The Acthar Plaintiffs To Disclosure Statement For Joint Chapter 11 Plan Of Reorganization Of Mallinckrodt Plc And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code And Joinder* [Docket No. 2415]. The Debtors hereby include the following additional disclosures to resolve the Acthar Ad Hoc Group's objection.

*The Plan divides unsecured Claims into various Classes, specifically, Classes 5-11 and Class 13. Those Classes (inclusive of Classes identified with an enumerated sub-clause) are entitled to varying recoveries from varying sources under the Plan. The varying recoveries reflect (a) the interrelated settlements that underpin the Restructuring Support Agreement and that have been agreed during these Chapter 11 Cases and (b) the varying legal entitlements of the creditors within each Class, as demonstrated by (among other things) the Liquidation Analysis, which is filed at Docket No. 2285-2 and set forth in **Exhibit E** hereto. A material portion of the Debtors' profits were earned in connection with the sale of Acthar both pre- and post-petition. The Debtors will not be substantively consolidated for all purposes through the Plan. The Plan seeks to limit the Acthar Claimants' recovery to sharing in the General Unsecured Claims Recovery Pool. The Debtors intend to demonstrate at the Confirmation Hearing the propriety of the treatments applicable to different Classes of unsecured Claims, a position that is disputed by the Acthar Claimants and the Official Committee of Unsecured Creditors.*

*The Acthar Claimants, including multiple individual plaintiffs and putative class representatives represented by the Haviland Hughes and Ciardi, Ciardi, & Astin firms, have stated in their pleadings that they intend to pursue legal action against the Reorganized Debtors, the New Board, and Holders of the New Mallinckrodt Ordinary Shares after the Effective Date, for purported violations of antitrust and price fixing laws they assert will occur.*

*The Debtors have not appointed any non-employee directors to U.S. Specialty Brands subsidiaries of Debtor Mallinckrodt plc. Mallinckrodt plc's board of directors is comprised of a majority of independent directors.*

*The Debtors will disclose the assumption or rejection of any applicable Executory Contracts with Express Scripts or any of its affiliated entities in connection with the Plan Supplement, which will be filed twenty-one (21) days before the Voting Deadline. The consequences of such assumption or rejection will be as dictated by the Bankruptcy Code, including section 365 of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not expect that Article V.G of the Plan, which applies to opioid-related indemnification obligations, would apply to any such Executory Contracts. However, to the extent that any such Executory Contracts do give rise to Co-Defendant Claims (i.e., based on or in*

*connection with Opioid Claims), such indemnification obligations would be subject to Article V.G of the Plan.*

*From and after the Effective Date, the Debtors intend to continue operating their Acthar-related businesses generally consistent with their historical practices. The Acthar Claimants take the position that such historical practices form the basis for Administrative Claims that have accrued post-petition and will continue to accrue, and the Debtors disagree with that position.*

The Acthar Insurance Claimants filed their *Objection of Attestor Limited and Humana, Inc. to the Debtors' Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2384]. The Debtors hereby include the following disclosures, which have been drafted, proposed, and alleged by the Acthar Insurance Claimants, to resolve certain of the Acthar Insurance Claimants' objections to this Disclosure Statement. The Debtors do not necessarily agree with or endorse any of the statements or allegations in the following disclosures.

*The Acthar Insurance Claimants, holders of claims arising from nearly $2.4 billion in purchases of Acthar, have grave concerns regarding the Plan and, in their view, the Disclosure Statement, misstates, mischaracterizes, and plainly omits several of the key facts necessary for creditors to make an informed decision regarding the Plan. Accordingly, the information presented below summarizes Humana and Attestor's position and facts underlying such position, so that creditors have adequate information when deciding whether to vote to accept or reject the Plan. For the reasons set forth below, Humana and Attestor urge Class 6 creditors to vote to REJECT the Plan.*

*<u>History of Acthar</u>: Acthar is a naturally derived ACTH (adrenocorticotropic hormone) drug that was developed in the 1940s (and approved by the Food and Drug Administration in 1952), is administered by injection, and produced only by Mallinckrodt. While initially approved to treat a wide range of ailments, over time many alternative anti-inflammatory drugs have been developed, which are in pill form. Today, with the exception of infantile spasms, for which it is standard of care, Acthar typically is a last resort treatment when multiple other treatment options, including steroids, have failed, and for most indications, there is a lack of medical evidence to support Acthar's use over alternative, more convenient, and far cheaper treatments.*

*In 2001, the Debtors' predecessor, Questcor Pharmaceuticals, Inc., acquired exclusive rights to Acthar for a modest $100,000, and in 2014, the Debtors purchased Questcor for $5.6 billion. Since 2001, Questcor and the Debtors have leveraged their monopoly power to increase the price of a single vial of Acthar from $40 in 2001 to $23,269 in 2007, then continued to raise the price to $38,892 in 2018. This represents an overall price-hike of approximately 97,500%. Presently, for those indications where alternatives are available, a typical treatment course for Acthar costs approximately $120,000 per patient compared to less than $20 for first line alternatives.*

*<u>The Acthar Related Claims</u>: The Acthar Insurance Claimants, as well as a multitude of other private healthcare companies and governmental entities, have brought litigation and filed claims in these cases asserting that the Debtors have conducted a series of unlawful schemes over the past decade to illegally prop up the price of Acthar, ensuring that doctors would prescribe it in large volume, all while patients are insulated to the costs. Allegedly, as a result, prescribed volume for Acthar has increased dramatically, with sales volume increasing more than eightfold from 2011 to 2016 for Medicare spending alone. In*

*particular, among other things, the Debtors are alleged to have (1) acquired and eliminated Synacthen, which the Acthar Insurance Claimants allege to be Acthar's only potential direct competitor in the United States, by purchasing it from Novartis in 2013 and purposefully failing to commercialize it; (2) illegally paid patient co-pays for Acthar through certain allegedly "charitable" funds operated by the Chronic Disease Fund Inc. in violation of the federal Anti-Kickback Statute and False Claims Act, thereby allowing the Debtors to market Acthar as "free" to patients and physicians despite the enormously higher costs compared to possible alternative treatments; and (3) illegally paid kickbacks and bribes to physicians in exchange for their agreement to overprescribe Acthar. The Acthar Insurance Claimants believe that the result of this tri-partite scheme was to overprescribe an outdated and ineffective drug to innumerable patients—primarily elderly people covered by Medicare—while severely overbilling those patients' health insurers and other third-party payers. The Debtors maintain, among others, that Synacthen is not Acthar's only potential direct competitor in the United States, which is especially not true for infantile spasms. The drug Sabril was approved by the Food and Drug Administration to treat infantile spasms in August 2009. Acthar is considered the standard of care for infantile spasms, but there is another approved treatment for infantile spasms available in the U.S. other than Acthar.*

*On August 8, 2019, Humana initiated litigation against the Debtors, alleging violations of the Sherman Act, the federal RICO Act, and various state laws due to the Debtors' monopoly power over the U.S. market for long-acting ACTH drugs. This litigation was initially brought against Debtor Mallinckrodt ARD LLC, the entity which Humana purchased Acthar from, but the Acthar Insurance Claimants are continuing to investigate and seek discovery as to which Debtor entities are responsible and liable for the Debtors' illegal conduct. Mallinckrodt twice sought to dismiss Humana's claims, but the court overseeing the cases (the United States District Court for the Central District of California) denied such requests. However, the court did dismiss Humana's tortious interference claim against Mallinckrodt with prejudice. Besides Humana, multiple other parties, including federal and state governmental entities and regulators, have brought similar allegations based on the same facts, and the Debtors have previously entered into a $100 million antitrust settlement with the FTC and a $15 million settlement with the DOJ, both relating to their Acthar-related business practices.*

<u>*Continuing Acthar-Related Liability*</u>*: Despite facing such allegations and liability for years, the Acthar Insurance Claimants believe that the Debtors continue to engage in illegal business practices related to Acthar and the Debtors continue to charge them and others monopolistic prices for Acthar. Humana, for example, continues to spend an average of approximately $7.5 million per month for Acthar. In total, the Debtors' post-petition net sales of Acthar through the end of March (i.e., less than six months since the petition date) was approximately $255.8 million, averaging approximately $51.1 million each month. As described in the Administrative Claim Motion, the Acthar Insurance Claimants assert that the Debtors continue to accrue millions of dollars of administrative claims each month as a result of their continuing conduct. Such claims must be paid in full and in cash before the Debtors can emerge from bankruptcy. If the Acthar Insurance Claimants are able to successfully demonstrate ongoing anticompetitive or racketeering conduct by the Debtors, the Debtors will face significant challenges in confirming the Plan. Further, such ongoing conduct means that once out of bankruptcy, the reorganized Debtors will continue to accrue millions of dollars of additional liability each month post-reorganization, casting significant doubt on the feasibility of the Debtors' plan to successfully reorganize without another bankruptcy looming in the near future.*

*Other Serious Concerns With the Plan*: Despite Acthar's importance as the largest contributor to product sales in Mallinckrodt's pharmaceutical portfolio, and its ongoing contributions to Mallinckrodt's business that is vital to support its post-emergence capital structure, the Acthar Insurance Claimants and other parties that have paid billions of dollars for Acthar, and continue to pay millions each month, are being forced under the Plan to wrangle over a portion of a $100 million pot shared with other general unsecured creditors. This is a pittance in comparison to what unsecured creditors that are party to the Restructuring Support Agreement are receiving.

The holders of Opioid Claims, who only have claims against Debtors of the Specialty Generics business, which contributes only 25% of total Mallinckrodt revenues and an even lower share of its profits, and have no claims against the Specialty Brands and Acthar-related Debtors, are receiving $1.6 billion under the Plan in addition to new warrants for 19.99% of all outstanding shares in the Reorganized Debtors. The Acthar Insurance Claimants believe that the Specialty Generics business cannot possibly have the value to support this amount (which cash amount is sixteen times the value being ascribed to all other General Unsecured Claims including private Acthar Claims) without taking value away from the creditors of the Debtor entities where the real value resides. Further, the holders of the Federal/State Acthar Claims have been allocated a separate $260 million pool with no reasoning given by the Debtors. Lastly, the Debtors' unsecured bondholders are not only receiving $375 million (almost 25% of their total principal outstanding today) in new higher-priority secured notes, but also all of the equity of the reorganized Debtors upon emergence.

While these classes of unsecured claims are set to receive billions of dollars of value under the Plan, general unsecured creditors like the Acthar Insurance Claimants are left to divide $100 million among billions of dollars of asserted claims, meaning the Debtors believe that general unsecured creditors would receive essentially no value in a liquidation scenario. The Acthar Insurance Claimants believe that the Debtors' position is premised on an overly-conservative and flawed valuation and liquidation analysis and that it is prudent for the Debtors to reassess the Plan they developed almost a year ago given the red-hot state of the financing and mergers and acquisitions markets. Further consideration should be given by the Debtors to publicly available metrics related to both the Specialty Brands and Specialty Generics businesses, which the Acthar Insurance Claimants believe would result in implied consolidated enterprise values for the business of greater than $6 billion, and under some metrics greater than $7 billion (versus the narrow $5.2 billion to $5.7 billion range given by the Debtors). The Acthar Insurance Claimants also believe that higher going concern values for the Debtors' businesses and successful resolution of Acthar Claims against the Debtors' key Acthar-related entities would lead to gross recoveries to private Acthar-related claimants of many hundreds of millions of dollars on top of the already hundreds of millions of dollars that would be owed to them on account of the substantial administrative expense claims that arise from the Debtors' ongoing practices. The Acthar Insurance Claimants plan to demonstrate at the Confirmation Hearing that the Debtors analyses are fundamentally flawed and that the Plan cannot be confirmed.

Cotter Corporation filed its *Cotter Corporation (N.S.L.)'s Objection To Adequacy Of Mallinckrodt Plc's Disclosure Statement* [Docket No. 2380]. The Debtors hereby include the following additional disclosures to resolve Cotter Corporation's objection.

*The Debtors have agreed with the United States government that any of the Debtors' liabilities that are indemnified by the United States government arising from the West Lake Landfill site in the St. Louis, Missouri area and in connection with the Manhattan Project will not be discharged and will be assumed by the Reorganized Debtors on the Effective Date.*

The Buxton Helmsley Group, Inc., a registered investment adviser, and Alexander Parker, a representative of The Buxton Helmsley Group, Inc. filed *The Buxton Helmsley Group, Inc.'s Joinder In Acthar Plaintiffs' Preliminary Objections To Debtors' Disclosure Statement* [Docket No. 2385]. The Debtors hereby include the following additional disclosures to resolve the Buxton Helmsley Group, Inc.'s and Alexander Parker's joinder.

*One of the Holders of ordinary shares of Mallinckrodt plc, the Buxton Helmsley Group ("BHG"), filed The Buxton Helmsley Group, Inc.'s Joinder In Acthar Plaintiffs' Preliminary Objections To Debtors' Disclosure Statement [Docket No. 2385] asserting, among other things, that the Debtors and their directors may have violated certain aspects of Irish law in connection with their restructuring and these Chapter 11 Cases. Thus, according to BHG, Mallinckrodt plc may have undisclosed Claims against it that may interfere with the Debtors' ability to consummate the Irish Examinership Proceeding and, accordingly, to consummate the Plan. The Debtors disagree with BHG's assertions in its joinder pleading.*

Objecting creditors, Kenneth R. Greathouse, Stuart Rose, and Lloyd Glenn filed their *Objection Of Greathouse, Rose, And Glenn To The Disclosure Statement For Joint Chapter 11 Plan Of Reorganization Of Mallinckrodt Plc And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code* [Docket No. 2371]. The Debtors hereby include the following additional disclosures to resolve these objecting creditors' objection.

*Greathouse, Rose, and Glenn assert that the Financial Projections do not account for a return to pre-COVID net sales. The Debtors disagree with that assumption for the Financial Projections as it is speculative and unsubstantiated. The actual results of the business may be greater or lesser than those set forth in the Financial Projections and all holders of the new equity (including Class 6 holders) will inherently receive any increased value or share in any decreased value in the New Mallinckrodt Shares.*

Article V of the Plan contains provisions regarding the treatment of Executory Contracts and Unexpired Leases. The Debtors' position is that Article V provides sufficient disclosure to holders of such Executory Contracts and Unexpired Leases of their treatment. However, certain parties have filed objections to the Disclosure Statement and Disclosure Statement Order regarding the need for further clarification regarding the treatment of Insurance Contracts. The Debtors hereby include the following additional disclosure to resolve such objections:

*All executory contracts will be assumed by the Debtors on the Effective Date in accordance with Article V of the Plan. Certain Executory Contracts and Unexpired Leases, to be disclosed in the Rejected Executory Contract/Unexpired Lease List in the Plan Supplement (which will be filed twenty one (21) days before the Voting Deadline), will be rejected pursuant to the Plan. The consequences of such assumption (in the case of Executory Contracts), or rejection (in the case of the Rejected Executory Contract/Unexpired Lease List) will be as dictated by the Bankruptcy Code and applicable law, including section 365 of the Bankruptcy Code. The treatment of the Insurance Contracts and the Assigned*

*Insurance Rights under the Plan, and certain defined terms related thereto, remain subject to discussion among the Debtors and certain parties in interest.*

**V.**
**SUMMARY OF THE PLAN**[34]

**THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

**A.**     **Classification and Treatment of Claims and Interests under the Plan**

The Plan constitutes a separate chapter 11 Plan of reorganization for each Debtor. The provisions of Article III of the Plan governs Claims against and Interests in the Debtors. Except for the Claims addressed in Article II of the Plan (or as otherwise set forth therein), all Claims and Interests are placed in Classes for each of the applicable Debtors. For all purposes under the Plan, each Class will exist for each of the Debtors (i.e., there will be [x] Classes for each Debtor); *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.G of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, and Other Priority Claims as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2(a) | First Lien Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |

---

[34] **THIS ENTIRE SECTION V OF THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVIEW AND REVISION. THIS SECTION WILL BE CONFORMED TO THE APPLICABLE PROVISIONS OF THE LATEST PLAN FILED CONTEMPORANEOUSLY HEREWITH.**

| | | | |
|---|---|---|---|
| 2(b) | 2024 First Lien Term Loan Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 2(c) | 2025 First Lien Term Loan Clams | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 3 | First Lien Notes Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 4 | Second Lien Notes Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 5 | Guaranteed Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(a) | Acthar Claims | Impaired | Entitled to Vote |
| 6(b) | Generics Price Fixing Claims | Impaired | Entitled to Vote |
| 6(c) | Asbestos Claims | Impaired | Entitled to Vote |
| 6(d) | Legacy Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(e) | Environmental Claims | Impaired | Entitled to Vote |
| 6(f) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Trade Claims | Impaired | Entitled to Vote |
| 8(a) | State Opioid Claims | Impaired | Entitled to Vote |
| 8(b) | Municipal Opioid Claims | Impaired | Entitled to Vote |
| 8(c) | Tribe Opioid Claims | Impaired | Entitled to Vote |
| 8(d) | U.S. Government Opioid Claims | Impaired | Entitled to Vote |
| 9(a) | Third-Party Payor Opioid Claims | Impaired | Entitled to Vote |
| 9(b) | PI Opioid Claims | Impaired | Entitled to Vote |
| 9(c) | NAS PI Opioid Claims | Impaired | Entitled to Vote |
| 9(d) | Hospital Opioid Claims | Impaired | Entitled to Vote |
| 9(e) | Ratepayer Opioid Claims | Impaired | Entitled to Vote |
| 9(f) | NAS Monitoring Opioid Claims | Impaired | Entitled to Vote |
| 9(g) | Emergency Room Physicians Opioid Claims | Impaired | Entitled to Vote |
| 9(h) | Other Opioid Claims | Impaired | Entitled to Vote |
| 10 | Settled Federal/State Acthar Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 13 | Subordinated Claims | Impaired | Deemed to Reject |
| 14 | Equity Interests | Impaired | Deemed to Reject |

**B.     Acceptance or Rejection of the Plan; Effect of Rejection of Plan**

**1.     Presumed Acceptance of Plan**

Claims in Classes 1 and 2(a) are Unimpaired under the Plan and their Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 1 and 2(a) are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.[35]

---

[35]   The Plan provides for potential treatment which would render Claims in Classes 2(b), 2(c), 3, and 4 Unimpaired, in which case such Claims would be conclusively presumed to accept the Plan, and Holders of such Claims would not be entitled to vote.

2.        **Voting Classes**

Claims in Classes 2(b), 2(c), 3, 4, 5, 6(a)-(f), 7, 8(a)-(d), 9(a)-(h), and 10 are Impaired under the Plan and the Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan, including by acting through a Voting Representative.[36]

3.        **Deemed Rejection of the Plan**

Claims and Interests in Classes 13 and 14 are Impaired under the Plan and their Holders shall receive no distributions under the Plan on account of their Claims or Interests (as applicable) and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 13 and 14 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.

4.        **Presumed Acceptance of the Plan or Deemed Rejection of the Plan**

Claims and Interests in Classes 11 and 12 are either (a) Unimpaired and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and shall receive no distributions under the Plan and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims and Interests in Classes 11 and 12 are not entitled to vote on the Plan and votes of such Holders shall not be solicited.

5.        **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise; *provided* that, notwithstanding the foregoing, such Allowed Claims or Interests and their respective treatments set forth herein shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

6.        **Vacant and Abstaining Classes**

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.   Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

---

[36]   Holders of Claims in Classes 2(b), 2(c), 3, and 4 are entitled to vote, but the Plan provides for potential treatment which would render these Claims Unimpaired, in which case such Claims would be conclusively presumed to accept the Plan, and any votes by Holders of such Claims will be moot and disregarded.

### 7.    Intercompany Interests and Intercompany Claims

To the extent Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of such Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Interests on account of their Intercompany Interests or Intercompany Claims, but for the purposes of administrative convenience and to maintain the Debtors' (and their Affiliate-subsidiaries) corporate structure , for the ultimate benefit of the Holders of New Mallinckrodt Ordinary Shares, to preserve ordinary course intercompany operations, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

### C.    Means of Implementation of the Plan

Article IV of the Plan governs and describes the means of implementation of the Plan.

Article IV.A ("***General Settlement of Claims and Interests***") provides that in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion by the Debtors to approve such compromises and settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, their Estates and Holders of Claims and Interests, and are fair, equitable and within the range of reasonableness.  Subject to Article VI, distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

Article IV.B ("***Restructuring Transactions***") provides that on or prior to the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall, consistent with the terms of the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder, take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan), and as set forth in the Restructuring Transactions Memorandum, including:  (a) the creation of NewCo and/or any NewCo Subsidiaries that may, at the Debtors' or Reorganized Debtors' option in consultation with the Supporting Parties, acquire all or substantially all the assets of one or more of the Debtors; (b) the execution and delivery of appropriate agreements or other documents of sale, merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (c) the execution and delivery of the Transfer Agreement and any other appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (d) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other organizational documents with the appropriate governmental authorities pursuant to applicable law; and (e) all other actions that the Reorganized Debtors determine are necessary or appropriate.

The Restructuring Transactions shall not (a) adversely affect the recoveries under the Plan (i) of holders of Guaranteed Unsecured Notes Claims without the consent of the Required Supporting Unsecured Noteholders, and (ii) the holders of Opioid Claims without the consent of the Governmental Plaintiff Ad Hoc Committee and the MSGE Group, or (b) materially adversely affect the rights or recoveries under the

Plan of the holders of First Lien Term Loan Claims without the consent of the Required Supporting Term Lenders.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate Restructuring Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan).

Article IV.D ("***Vesting of Assets in the Reorganized Debtors***") provides that except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, including the Restructuring Transactions Memorandum, on the Effective Date, all property of each Debtor's Estate, including (a) all Causes of Action other than (i) the Assigned Third-Party Claims, and (ii) the Assigned Insurance Rights, and (b) any property acquired by any of the Debtors pursuant to the Plan, in each case, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan and the Opioid Operating Injunction, each Reorganized Debtor may operate its business and may use, acquire, encumber, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code. Reorganized Mallinckrodt shall not, and neither shall any of its other subsidiaries, other than the Reorganized VI-Specific Debtors, be involved in the sale or distribution of opioids classified as DEA Schedule II–IV drugs in the future.[37]

Article IV.F ("***Cancellation of Notes, Instruments, Certificates, Agreements, and Equity Interests***") provides that, except as otherwise provided for in the Plan and/or, as the case may be, the Scheme of Arrangement, on the later of the Effective Date and the date on which the relevant distributions are made pursuant to Article VI and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity: (1) (a) the obligations of the Debtors under the First Lien Credit Agreement, the Guaranteed Unsecured Notes Indentures, the 2013 Notes Indenture, the 1992 Ludlow Debentures Indenture, and the 1993 Ludlow Debentures Indenture, the Guaranteed Unsecured Notes, the 4.75% Senior Notes due 2023, the 8.00% Debentures due March 2023, the 9.5% Debentures due May 2022, and any other note, bond, indenture, or other instrument or document directly or indirectly evidencing or creating any indebtedness of the Debtors and (b) any certificate, equity security, share, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating an ownership interest in the Debtors shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors and their Affiliates shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors shall be released, terminated, extinguished, and discharged; except that the foregoing shall not affect any Intercompany Interests elected to be Reinstated in accordance with the Plan; *provided*, that the First Lien Credit Agreement, Guaranteed Unsecured Notes Indentures, and the Legacy Unsecured Notes Indentures and each agreement or other document related thereto, as applicable, will continue in effect for the limited purpose of allowing Holders of First Lien Credit Agreement Claims, Holders of Guaranteed Unsecured

---

[37]    This paragraph is qualified in its entirety by the Voluntary Injunction and the Opioid Operating Injunction, and for any inconsistency between this section and the Voluntary Injunction and the Opioid Operating Injunction, the Voluntary Injunction and the Opioid Operating Injunction, as applicable, will govern.

Notes Claims, and Holders of Legacy Unsecured Notes Claims thereunder, respectively, to receive, and allowing and preserving the rights of the First Lien Agent, the Guaranteed Unsecured Notes Indenture Trustee, the Legacy Unsecured Notes Indenture Trustee or other applicable Distribution Agents thereunder to make, or cause to be made the distributions under the Plan to the applicable Holders; *provided*, *further*, that, upon completion of the distribution with respect to a specific First Lien Credit Agreement Claim or, in the case of the Guaranteed Unsecured Notes Claims or the Legacy Unsecured Notes Claims, pursuant to Article VI.D.4 in respect of the distributions on the specific Allowed Guaranteed Unsecured Notes Claims or Allowed Legacy Unsecured Notes Claims, the First Lien Credit Agreement, the Guaranteed Unsecured Notes Indenture, or the Legacy Unsecured Notes Indentures in connection thereto and any and all documents, notes, securities and instruments issued in connection with the First Lien Credit Agreement Claim, such Guaranteed Unsecured Notes Claim, or such Legacy Unsecured Notes Claims, as applicable, shall terminate completely without further notice or action and be deemed surrendered; *provided*, *further*, that the Guaranteed Unsecured Notes Indentures and the Legacy Unsecured Notes Indentures and all documents, notes securities and instruments issued in connection therewith shall continue in effect for the limited purpose of allowing and preserving the rights, privileges, benefits, indemnities and protections of the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee (each acting in any capacity, including as a Distribution Agent) thereunder, including, without limitation, permitting the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee to exercise any lien granted to it under the applicable Guaranteed Unsecured Notes Indenture or Legacy Unsecured Notes Indenture against such distributions for payment of any fees and expenses of the Guaranteed Unsecured Notes Indenture Trustee or the Legacy Unsecured Notes Indenture Trustee, including any unpaid portion of the Indenture Trustee Fees. For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall in any way limit or affect the standing of the First Lien Agent, the Guaranteed Unsecured Notes Indenture Trustee, or the Legacy Unsecured Notes Indenture Trustee to appear and be heard in the Chapter 11 Cases or any other proceeding in which they are or may become party on and after the Effective Date, to enforce any provisions of the Plan or otherwise.

Article IV.G ("***Sources for Plan Distributions and Transfers of Funds Among Debtors***") provides that the Debtors shall fund Cash distributions under the Plan with Cash on hand, including Cash from operations. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors in accordance with Article VI of the Plan. Subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Governance Documents), the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan. From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Governance Documents and the New Takeback Term Loans Documentation), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

Article IV.L ("***Exemption from Certain Transfer Taxes and Recording Fees***") provides that, to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with

any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state, or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Article IV.O ("***Preservation of Rights of Action***") provides that, in accordance with section 1123(b) of the Bankruptcy Code, but subject to the releases set forth in this section and in Article IX of the Plan, all Causes of Action other than the Assigned Third-Party Claims and the Assigned Insurance Rights that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action other than the Assigned Third-Party Claims, and the Assigned Insurance Rights, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors, the Reorganized Debtors, or the Opioid MDT II will not pursue any and all available Causes of Action. The Debtors, the Reorganized Debtors, and the Opioid MDT II expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan,** and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

Notwithstanding any provision in the Plan or any order entered in these Chapter 11 Cases, as of and after the Effective Date, the Debtors and Reorganized Debtors forever waive, relinquish, and release any and all Causes of Action the Debtors and their Estates had, have, or may have (1) against any Released Party, or (2) that arise under section 547 of the Bankruptcy Code (and analogous non-bankruptcy law) against any Holder of a Trade Claim on account of such Trade Claims.

Article IV.P ("***Corporate Action***") provides that, (1) upon the Effective Date, all actions contemplated by the Plan and the Scheme of Arrangement shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1) assumption and rejection (as applicable) of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) the execution of the New Governance Documents, the Opioid MDT II Documents, the Opioid Creditor Trust Documents, the New Opioid Warrant Agreement, the Federal/State Acthar Settlement Agreements, the New Term Loan Documentation, the New AR Revolving Facility Documentation, the New Takeback Term Loans Documentation, the Takeback Second Lien Notes Documentation, the Management Incentive Plan, the Opioid Operating Injunction, the Registration Rights Agreement and, if applicable, the Cram-Down First Lien Notes and the Cram-Down Second Lien Notes; (4) the issuance and delivery of the New Mallinckrodt Ordinary Shares, Takeback Second Lien Notes, New Opioid Warrants, and, if applicable, the New Takeback Term Loans, the Cram-Down First Lien Notes, and the Cram-Down Second Lien Notes; (5) implementation of the Restructuring Transactions, and (6) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection

therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

Article IV.P further provides that, (2) prior to, on and after the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors, Reorganized Mallinckrodt, or any direct or indirect subsidiaries of Reorganized Mallinckrodt (including any president, vice-president, chief executive officer, treasurer, general counsel, secretary, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, memoranda and articles of association, certificates of incorporation, certificates of formation, bylaws, operating agreements, other organization documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the applicable Debtors or applicable Reorganized Debtors, including the (1) New Governance Documents, (2) Opioid MDT II Documents and Opioid Creditor Trust Documents, (3) New Opioid Warrant Agreement, (4) Takeback Second Lien Notes, (5) New Term Loan Documentation, (6) New AR Revolving Facility Documentation, (7) New Takeback Term Loans Documentation, (8) Cram-Down First Lien Notes, if applicable, (9) Cram-Down Second Lien Notes, if applicable, and (10) any and all other agreements, documents, securities, and instruments relating to or contemplated by the foregoing.  Prior to or on the Effective Date, each of the Debtors is authorized, in its sole discretion, to change its name or corporate form and to take such other action as required to effectuate a change of name or corporate form in the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor.  To the extent the Debtors change their names or corporate form prior to the closing of the Chapter 11 Cases, the Debtors shall change the case captions accordingly.

Article IV.Q ("*Effectuating Documents; Further Transactions*") provides that, prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the New Governance Documents, the Opioid MDT II Documents, the Opioid Creditor Trust Documents, the New Opioid Warrant Agreement, the Federal/State Acthar Settlement Agreements, and any Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan or the Restructuring Support Agreement.  For the avoidance of doubt, the New Governance Documents shall ensure that the Reorganized Debtors are able to issue the number of New Mallinckrodt Ordinary Shares needed to satisfy obligations of the General Unsecured Claims Recovery Pool.

Article IV.R ("*Listing of New Mallinckrodt Ordinary Shares*") provides that, the Debtors' board of directors shall use commercially reasonable efforts to list the New Mallinckrodt Ordinary Shares for trading on the NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange on the Effective Date. If no such listing has occurred as of the Effective Date, following the Effective Date and subject to the terms and conditions of the New Governance Documents, the Reorganized Board will direct the Reorganized Debtors to list the New Mallinckrodt Ordinary Shares for trading on the NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange as soon as reasonably practicable after the Effective Date.

Article IV.S ("*Payment of Fees and Expenses of the Supporting Parties and Indenture Trustee Fees*") provides that, notwithstanding anything to the contrary contained in the Restructuring Expenses Order, on the Effective Date, the Reorganized Debtors shall pay the Noteholder Consent Fee and the Term Loan Exit Payment pursuant to the terms of the Restructuring Support Agreement.

On the Effective Date with respect to invoices delivered prior to the Effective Date in accordance with the procedures in the following sentence (the "***Invoiced Restructuring Expenses***")) or as soon as reasonably practicable thereafter (with respect to all other Restructuring Expenses other than the Invoiced Restructuring Expenses), the Reorganized Debtors shall pay in Cash the Restructuring Expenses. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; *provided, however,* that such estimates shall not be considered an admission by any party or limitation with respect to such Restructuring Expenses. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses and Post Effective Date Implementation Expenses, as applicable, related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Restructuring Expenses shall not be subject to the Administrative Claims Bar Date. To the extent any person entitled to reimbursement of Restructuring Expenses or Post Effective Date Implementation Expenses is holding a retainer, such person shall be entitled to continue to hold such retainer until payment in full in Cash by the Reorganized Debtors of such person's Restructuring Expenses and Post Effective Date Implementation Expenses; *provided* that such retainer shall be applied to pay for such Restructuring Expenses unless such person elects, in its sole discretion, to keep a portion of such retainer solely to the extent needed to cover Restructuring Expenses in excess of any estimates provided in accordance with this paragraph and any reasonably expected Post Effective Date Implementation Expenses, and following the payment of Restructuring Expenses and Post Effective Date Implementation Expenses (if any), on reasonable request of the Debtors, the professionals shall return the remainder of the retainer to the Debtors.

On the Effective Date or as soon as reasonably practicable thereafter and upon the presentment of invoices in customary form (which may be redacted to preserve any confidential or privileged information), the Reorganized Debtors shall pay in Cash the Indenture Trustee Fees (whether accrued prepetition or postpetition, whether before or after the Effective Date of the Plan and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any party to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. From and after the Effective Date, the Reorganized Debtors will pay any Indenture Trustee Fees in full in Cash without further court approval.

Article IV.AA ("***Authority of the Debtors***") provides that, effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of the Plan, the Confirmation Order, the Scheme of Arrangement, the Irish Confirmation Order, the Restructuring Transactions, the Opioid MDT II Documents, and the Opioid Creditor Trust Documents.

Article IV.BB ("***Industry-Wide Document Disclosure Program***") provides that, the VI-Specific Debtors and/or the Reorganized VI-Specific Debtors shall participate in an industry-wide document disclosure program by disclosing publicly a subset of its litigation documents, subject to scope and protocols described in Article IV.BB of the Plan.

Article IV.CC ("***Monitor***") provides that the Confirmation Order will provide for the appointment of the Monitor for a term of five years from the Petition Date. If, at the conclusion of the Monitor's five-year term, the Settling States determine in good faith and in consultation with the Monitor that the Reorganized VI-Specific Debtors have failed to achieve and maintain substantial compliance with the substantive provisions of the Opioid Operating Injunction, the Monitor's engagement shall be extended for an additional term of up to two years, subject to the right of the Reorganized VI-Specific Debtors to commence legal proceedings for the purpose of challenging the decision of the Settling States and to seek preliminary

and permanent injunctive relief with respect thereto. The identity, duties and reporting, relief and cure, professionals and costs, and liability of the Monitor are set forth in further detail in Article IV.CC of the Plan.[38]

Article IV.DD ("***Trade Claimant Agreements***") provides that, as to any Trade Claimant that agrees by so indicating on its Ballot to maintain with the Debtors Favorable Trade Terms, the Plan shall constitute (i) if applicable, an amendment to such Trade Claimant's assumed or assumed and assigned Executory Contract between any Debtor and such Trade Claimant, instituting the foregoing trade terms in such Executory Contract, or (ii) otherwise, a contractual agreement by such Trade Claimant to maintain such trade terms for at least twelve (12) months after the Effective Date.

Article IV.EE ("***Federal/State Acthar Settlement***") provides that, as of the Effective Date, the Federal/State Acthar Settlement Agreements shall be executed by Parent, Mallinckrodt ARD LLC, the U.S. Government, and the States.  On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and/or the Reorganized Debtors will make the Initial Federal/State Acthar Settlement Payment, and thereafter, the Reorganized Debtors will make each of the Federal/State Acthar Deferred Cash Payments; provided, that the Federal/State Acthar Deferred Cash Payments shall bear interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds (published and available at www.ssa.gov/oact/ProgData/newIssueRates.html), measured as of each payment date and accruing from September 21, 2020.

Article IV.FF ("***Retainers of Ordinary Course Professionals***") provides that, upon the Effective Date, each Ordinary Course Professional may apply its retainer, if any, against any outstanding prepetition balances owed by the Debtors to such Ordinary Course Professional.

Article IV.GG ("***No Substantive Consolidation***") provides that, the Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### D.      Matters Related to the Opioid MDT II and Opioid Creditor Trusts

Article IV of the Plan also governs and describes the certain matters related to the Opioid MDT II.

Article IV.T ("***Creation of Opioid MDT II***") provides that on or prior to the Effective Date, the Debtors shall take all necessary steps to establish the Opioid MDT II in accordance with the Plan and the Opioid MDT II Documents.  As of the Effective Date, the Opioid MDT II Documents shall be executed by the Debtors and the Opioid MDT II Trustee(s), and the Opioid MDT II shall be created.  The Opioid MDT II is intended to be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under section 468B of the Internal Revenue Code.  The purpose of the Opioid MDT II shall be to, among other things: (1) resolve all asserted Opioid Claims (including Opioid Demands) channeled to the Opioid MDT II in accordance with the Plan, Opioid MDT II Documents, and the Confirmation Order; (2) preserve, hold, collect, manage, maximize, and liquidate the assets of the Opioid MDT II for use in resolving Opioid Claims (including Opioid Demands) channeled to the Opioid MDT II and funding the Opioid Creditor Trusts; (3) enforce, pursue, prosecute, compromise, and/or settle the Assigned Third-Party Claims and Assigned Insurance Rights; (4) pay all Trust Expenses as provided, and defined, in the Opioid MDT II Documents (for which the Reorganized Debtors and the Released Parties shall have no responsibility or liability); (5)

---

[38]    This section is qualified in its entirety by the Voluntary Injunction and the Opioid Operating Injunction, and for any inconsistency between this section and the Voluntary Injunction and the Opioid Operating Injunction, the Voluntary Injunction and the Opioid Operating Injunction, as applicable, will govern.

pay any and all administration and operating expenses of the Opioid MDT II, including the fees and expenses of any professionals retained by the Opioid MDT II; and (6) qualify at all times as a qualified settlement fund.

Article IV.U ("***Appointment of Opioid MDT II Trustee(s)***") provides that, on the Confirmation Date, and effective as of the Effective Date, in accordance with the Opioid MDT II Documents, the individual(s) selected as the Opioid MDT II Trustee(s) shall be appointed to serve as the Opioid MDT II Trustee(s) for the Opioid MDT II.

Article IV.V.1 ("***Settlements of Opioid Claims - Non-Precedential Effect for Holders of Opioid Claims***") provides that the Plan, the Plan Supplement, and the Confirmation Order constitute a good faith compromise and settlement of Opioid Claims and controversies based upon the unique circumstances of these Chapter 11 Cases (such as the unique facts and circumstances relating to these Debtors as compared to other defendants in the general opioid litigations, and the need for an accelerated resolution without litigation) and none of the foregoing documents, nor any materials used in furtherance of Confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent, or used by any party or Person in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction. The Plan, the Plan Supplement, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding involving Opioid Claims in which none of the Debtors, the Reorganized Debtors, the Opioid MDT II, or the Opioid Creditor Trusts is a party. Any Opioid Claimants' support of, or position or action taken in connection with, the Plan, the Plan Supplement, and the Confirmation Order may differ from his position or testimony in any other litigation or proceeding except in connection with these Chapter 11 Cases. Further, the treatment of Opioid Claims as set forth in the Plan is not intended to serve as an example for, or represent the parties' respective positions or views concerning any other chapter 11 cases relating to opioid products, nor shall it be used as precedent by any Entity or party in any other chapter 11 cases related to opioid products.

Article IV.V.2 ("***Settlements of Opioid Claims - Transferability of Opioid Claim Distribution Rights***") provides that any right of a Holder of an Opioid Claim to receive a distribution or other payment from the Opioid MDT II or the Opioid Creditor Trusts on account of an Opioid Claim shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Debtors, Reorganized Debtors, the Opioid MDT II, or the Opioid Creditor Trusts, as applicable. Further, any right of a Holder of an Opioid Claim to receive a Distribution or other payment from the Debtors, Reorganized Debtors, the Opioid MDT II, or the Opioid Creditor Trusts on account of an Opioid Claim shall be nontransferable and nonassignable except by will, intestate, succession or operation of law. Any rights of Holders of Opioid Claims to receive a Distribution or other payment from the Debtors, Reorganized Debtors, the Opioid MDT II, or the Opioid Creditor Trusts on account of Opioid Claims shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

Article IV.W.1 ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Transfer of Books and Records to the Opioid MDT II***") provides that, on the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, to the Opioid MDT II copies of all books and records necessary for, and for the sole purpose of enabling and to the extent necessary to enable, the defense of Opioid Claims (including

Opioid Demands) in accordance with the Cooperation Agreement,[39] including, for the avoidance of doubt, both privileged and non-privileged documents; *provided*, that, after the transfer of such books and records the Debtors or the Reorganized Debtors may destroy copies of such books and records in accordance with their record management policies.  The transfer of any privileged books and records provided to the Opioid MDT II necessary for the defense of Opioid Claims (including Opioid Demands) shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records.  No documents or communications subject to a privilege shall be publicly disclosed by the Opioid MDT II or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, unless such disclosure or communication is reasonably necessary to defend the Opioid Claims (including Opioid Demands).  Further, pursuant to the Plan and the Confirmation Order, none of the Debtors, the Reorganized Debtors, any of the Debtors' or the Reorganized Debtors' Affiliates or the Disinterested Managers shall be liable for violating any confidentiality or privacy protections as a result of transferring the books and records to the Opioid MDT II in accordance with the Cooperation Agreement, and the Opioid MDT II, upon receipt of the books and records, shall take appropriate steps to comply with any such applicable protections.

Article IV.W.2.a ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Funding the Opioid MDT II – Opioid MDT II Funding Amount***") provides that the Opioid MDT II shall be funded solely by the Opioid MDT II Consideration.  On the Effective Date, the obligations to provide the Opioid MDT II Consideration shall constitute legal, valid, binding, and authorized obligations of the applicable Reorganized Debtors, enforceable in accordance with the terms hereof.  The financial accommodations to be extended in connection with the Opioid MDT II Consideration are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

Article IV.W.2.b ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Funding the Opioid MDT II – Payments to the Opioid MDT II***") provides that, on the Effective Date, the Debtors and/or the Reorganized Debtors will make the Initial Opioid MDT II Payment, and thereafter, the Reorganized Debtors or Reorganized Mallinckrodt will make each of the Opioid Deferred Cash Payments subject to the Prepayment Option; *provided* after any sale of (i) Mallinckrodt Enterprises Holdings, Inc. and its subsidiaries (including, for the avoidance of doubt, its successors and assigns) or (ii) a material portion of their assets or businesses (including as a result of a merger, equity sale, or asset sale), subject to compliance with the Debtors' covenants under the agreements governing their funded indebtedness (as may be modified from time to time), 50% of the "net proceeds" of such sale (after, for the avoidance of doubt, compliance with then-existing covenants) shall be paid to the Opioid MDT II; and the amount of such net proceeds actually conveyed to the Opioid MDT II will be deemed a ratable repayment against the remaining Opioid Deferred Cash Payments that the Opioid MDT II is entitled to receive.  For the avoidance of doubt, the Debtors will not be under any obligation to undertake any such sale on any particular timeframe.  The Debtors intend that payments to the Opioid MDT II (whenever made, and from whatever source) will constitute "restitution . . . for damage or harm" within the meaning of Section 162(f) of the Internal Revenue Code, and will be so characterized for U.S. federal income tax purposes to the extent such payments are made to or at the direction of a government or governmental entity.  For the avoidance of doubt, the foregoing sentence is intended to apply to the tax characterization of payments to the Opioid MDT II on account of Opioid Claims, and such tax characterization shall not be construed to be dispositive for any non-tax purpose.  Nor shall such tax characterization be construed to mean that Debtors'

---

[39]    [**NTD**: Cooperation Agreement will provide for sharing of information with Opioid Creditor Trusts required for defense of Opioid Claims.]

payments satisfy the full extent of the liability associated with Opioid Claims, the satisfaction of which remains a valuable right assigned to the Opioid MDT II, nor that the remaining liability associated with Opioid Claims seeks restitution as a form of relief.

Article IV.W.2.c ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Funding the Opioid MDT II – New Opioid Warrants"***) provides that, on the Effective Date, Reorganized Mallinckrodt shall issue, and the Debtors shall cause to be transferred, the New Opioid Warrants to the Opioid MDT II.[40]

Article IV.W.2.d ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Funding the Opioid MDT II – Assigned Third-Party Claims and Assigned Insurance Rights"***) provides that, as of the Effective Date, the Debtors and/or the Reorganized Debtors shall be deemed to have assigned the Assigned Third-Party Claims and the Assigned Insurance Rights to the Opioid MDT II; *provided*, that the exercise of remedies (including rights of setoff and/or recoupment) by non-Debtor third parties against the Debtors or Reorganized Debtors (but not the Opioid MDT II) on account of any Assigned Third-Party Claims shall be enjoined and barred. The Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, to the Opioid MDT II copies of books and records necessary for, and for the sole purpose of enabling and to the extent necessary to enable, the prosecution of the Assigned Third-Party Claims and the Assigned Insurance Rights in accordance with the Cooperation Agreement, including, for the avoidance of doubt, both privileged and non-privileged documents; *provided*, that, after the transfer of such books and records the Debtors or the Reorganized Debtors may destroy copies of such books and records in accordance with their record management policies. Such transfer shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records. No documents or communications subject to a privilege shall be publicly disclosed by the Opioid MDT II or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, unless such disclosure or communication is reasonably necessary to preserve, secure, prosecute, or obtain the benefit of the Assigned Third-Party Claims and Assigned Insurance Rights. The Opioid MDT II shall be authorized to conduct Rule 2004 examinations, to the fullest extent permitted thereunder, to investigate the Assigned Third-Party Claims and the Assigned Insurance Rights, without the requirement of filing a motion for such authorization; *provided*, *however*, that no such Rule 2004 examinations shall be taken of the Debtors, the Reorganized Debtors, or any of their respective then-current or former employees, officers, directors or Representatives without further order of the Bankruptcy Court (if the Chapter 11 Cases remain open) after notice and an opportunity to object and be heard. Notwithstanding the foregoing, (i) employees, officers, directors or Representatives of Medtronic plc and/or its subsidiaries, and each of their predecessors, successors, and assigns, are not exempt from Rule 2004 examinations, and nothing herein shall interfere with the obligations of the Debtors, the Reorganized Debtors, or any of their respective then-current or former employees, officers, directors or Representatives to cooperate with the Opioid MDT II as set forth herein and in the Cooperation Agreement. In implementing the assignment of the Assigned Insurance Rights, the Debtors or the Reorganized Debtors, on the one hand, and the Governmental Plaintiff Ad Hoc Committee and the MSGE Group or the Opioid MDT II, on the other hand, shall cooperate and negotiate in good faith concerning (x) treatment of unsatisfied self-insured retentions under the applicable Insurance Contracts with the objective of minimizing adverse consequences to Mallinckrodt, Reorganized Mallinckrodt, and the Opioid MDT II (it being understood that the foregoing obligation shall not require the Debtors or Reorganized Debtors to satisfy all or any portion of any such self-insured retentions) and (y) any actions by the Debtors, Reorganized Debtors, or the Opioid MDT II to pursue or preserve the Insurance Contracts relating to the Assigned Insurance Rights. The Debtors and the Reorganized Debtors will use their reasonable best efforts to provide to the Opioid MDT II all documents,

---

[40]    Under review and revision.

information, and other cooperation that is reasonably necessary for the Opioid MDT II to pursue the Assigned Insurance Rights.

Article IV.W.3 ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Assigned Claims Cooperation***") provides that, during the pendency of the Chapter 11 Cases, the Debtors shall reasonably cooperate with counsel to the Governmental Plaintiff Ad Hoc Committee and counsel to the MSGE Group in connection with the investigation and preservation of the Assigned Third-Party Claims and Assigned Insurance Rights, including by providing non-privileged information (including, without limitation, documents, emails and access to individuals with information), at the reasonable request of counsel to the Governmental Plaintiff Ad Hoc Committee and counsel to the MSGE Group. The Debtors shall use reasonable efforts to provide all readily available, non-privileged information relating to the Assigned Third-Party Claims and Assigned Insurance Rights to counsel to the Governmental Plaintiff Ad Hoc Committee and to counsel to the MSGE Group during the Debtors' bankruptcy cases; *provided*, *however*, that such information shall be provided prior to entry of the Confirmation Order. On and after the Effective Date, the Reorganized Debtors shall provide reasonable cooperation to the Opioid MDT II in connection with the Opioid MDT II's investigation, preservation, and pursuit of the Assigned Third-Party Claims and the Assigned Insurance Rights. The terms and conditions of such cooperation shall be mutually agreed by the Debtors, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders and set forth in the Cooperation Agreement and included in the Confirmation Order. The Opioid MDT II shall reimburse the Reorganized Debtors for their documented and reasonable out-of-pocket costs and expenses incurred in connection with such reasonable cooperation from and after the Effective Date. Any request by the Opioid MDT II, the Governmental Plaintiff Ad Hoc Committee, or the MSGE Group for cooperation by the Debtors and Reorganized Debtors shall be on reasonable advance notice, and provided during normal business hours and otherwise in a manner that does not disrupt commercial operations.

Article IV.W.4 ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Vesting of the Opioid MDT II Consideration in the Opioid MDT II***") provides that, on the Effective Date or on the date which an Opioid Deferred Cash Payment is actually made, as applicable, pursuant to the Plan and in accordance with the Opioid MDT II Documents, the Opioid MDT II Consideration shall be transferred or issued to and vest in the Opioid MDT II free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than the Opioid Claims (including Opioid Demands)). The Opioid MDT II shall have no liability for, and the Opioid MDT II Consideration shall vest in the Opioid MDT II free and clear of, any pre-petition and post-petition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except for the Opioid Claims (including the Opioid Demands). From and after the Effective Date, all proceeds of the Opioid MDT II Consideration, including without limitation, amounts paid by Insurers under the Assigned Insurance Rights, shall be paid to the Opioid MDT II to be applied in accordance with the Opioid MDT II Documents.

Article IV.W.5 ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Assumption of Certain Liability and Responsibility by the Opioid MDT II***") provides that, in consideration for the property transferred to the Opioid MDT II pursuant to Article IV.W.2 and in furtherance of the purposes of the Opioid MDT II and the Plan, the Opioid MDT II shall assume all liability and responsibility, financial and otherwise, for all Opioid Claims (including Opioid Demands) not otherwise channeled to an Opioid Creditor Trust in accordance with Article IV.X.4, including U.S. Government Opioid Claims, Ratepayer Opioid Claims, and Other Opioid Claims, and the Debtors, the Reorganized Debtors, and the Released Parties shall have no liability or responsibility, financial or otherwise, therefor. The Opioid MDT II's liability for such Opioid Claims shall be limited to the U.S. Government Opioids Claim Share, the Truth Initiative Contribution, and the Other Opioid Claims Share. Except as otherwise provided in the Plan and

the Opioid MDT II Documents, the Opioid MDT II shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such Opioid Claims (including Opioid Demands) that the Debtors or the Reorganized Debtors has or would have had under applicable law.

Article IV.W.6 ("***Transfers of Property to and Assumption of Certain Liabilities by the Opioid MDT II – Institution of Maintenance of Legal and Other Proceedings***") provides that, as of the date upon which the Opioid MDT II is established, the Opioid MDT II shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Opioid MDT II, including in respect of the Assigned Third-Party Claims and Assigned Insurance Rights.  The Opioid MDT II shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Opioid MDT II Trustee(s).  The Opioid MDT II shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Opioid MDT II is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

Article IV.X.1 ("***Opioid Creditor Trusts and Settlements of Opioid Claims – Establishment and Purpose of the Opioid Creditor Trusts***") provides that, the Confirmation Order shall endorse and direct the establishment of the Opioid Creditor Trusts on or prior to the Effective Date in accordance with the terms of the respective Opioid Creditor Trust Documents.  The Opioid Creditor Trusts shall be independent from the Holders of Claims against the Debtors.  The Opioid Creditor Trusts shall be established for the purposes described in the Plan and any other purposes more fully described in the Opioid Creditor Trust Documents. Each Opioid Creditor Trust shall, as applicable and in each case, in accordance with the Plan, the Confirmation Order and the applicable Opioid Creditor Trust Documents: (a) hold, manage and invest all funds and other assets received by such Opioid Creditor Trust from the Opioid MDT II (including the New Opioid Warrants or the proceeds thereof), in each case, for the benefit of the beneficiaries of such Opioid Creditor Trust; (b) hold and maintain required reserves for such Opioid Creditor Trust in accordance with the applicable Opioid Creditor Trust Documents; (c) administer, process, resolve and liquidate Opioid Claims channeled to such Opioid Creditor Trust, in each case as provided in the applicable Opioid Creditor Trust Documents, as set forth in Article IV.Y of the Plan; and (d) pay all applicable Opioid Creditor Trust Operating Expenses.

Article IV.X.2 ("***Opioid Creditor Trusts and Settlements of Opioid Claims – Appointment and Role of the Opioid Creditor Trustees***") provides that, in furtherance of and consistent with the purposes of the Opioid Creditor Trusts and the Plan, the Opioid Creditor Trustees shall have the power and authority to perform all functions on behalf of the respective Opioid Creditor Trusts.  The Opioid Creditor Trustees shall undertake all administrative responsibilities as are provided in the Plan and the applicable Opioid Creditor Trust Documents.  The Opioid Creditor Trustees shall be responsible for all decisions and duties with respect to the respective Opioid Creditor Trusts.  In all circumstances, each Opioid Creditor Trustee shall be independent and disinterested and shall act in the best interests of the beneficiaries of such Opioid Creditor Trust, in furtherance of the purpose of such Opioid Creditor Trust and in accordance with the Plan and the applicable Opioid Creditor Trust Documents.  In accordance with the Opioid Creditor Trust Documents, each Opioid Creditor Trustee shall serve in such capacity through the earlier of (x) the date that the applicable Opioid Creditor Trust is dissolved in accordance with the applicable Opioid Creditor Trust Documents and (y) the date such Opioid Creditor Trustee resigns, is terminated or is otherwise unable to serve for any reason.  The identity of the initial Opioid Creditor Trustees shall be disclosed in the Plan Supplement.

Article IV.X.3 ("***Opioid Creditor Trusts and Settlements of Opioid*** Claims **- *Abatement Distributions***") provides that each Abatement Trust shall, in accordance with the Plan, the Confirmation Order and the

applicable Abatement Trust Documents, make Abatement Distributions to Authorized Recipients for Approved Uses.

Article IV.X.4 ("*Opioid Creditor Trusts and Settlements of Opioid Claims – Assumption of Obligations and Liabilities*") provides that, in consideration for the property transferred to the Opioid Creditor Trusts pursuant to Articles IV.5 and IV.6 of the Plan and in furtherance of the purposes of the Opioid MDT II, Opioid Creditor Trusts, and the Plan, the Opioid Creditor Trusts shall assume all liability and responsibility, financial and otherwise, for all Opioid Claims (including Opioid Demands) other than any U.S. Government Opioid Claims, Ratepayer Claims, and Other Opioid Claims, and the Debtors, the Reorganized Debtors, and the Released Parties shall have no liability or responsibility, financial or otherwise, therefor.  Except as otherwise provided in the Plan, the Opioid MDT II Documents, and the Opioid Creditor Trust Documents, the Opioid Creditor Trusts shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such Opioid Claims (including Opioid Demands) that the Debtors or the Reorganized Debtors has or would have had under applicable law.

Article IV.X.5 ("*Opioid Creditor Trusts and Settlements of Opioid Claims – Institution and Maintenance of Legal and Other Proceedings*") provides that, as of the date upon which the Opioid Creditor Trusts are established, the Opioid Creditor Trusts shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Opioid Creditor Trusts.  Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the applicable Opioid Creditor Trust.  The Opioid Creditor Trusts shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the applicable Opioid Creditor Trustee. The Opioid Creditor Trusts shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Opioid Creditor Trusts are established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

Article IV.X.6 ("*Opioid Creditor Trusts and Settlements of Opioid Claims – Opioid MDT II Distributions*") provides that, the Opioid MDT II shall make the MDT II Initial Distribution on the MDT II Initial Distribution Date and shall make the MDT II Subsequent Distributions, including any Truth Initiative Contribution, on any MDT Subsequent Distribution Date.  On the MDT II Initial Distribution Date and on any MDT II Subsequent Distribution Date, the Opioid MDT II shall fund the Opioid Attorneys' Fee Fund Share out of the Public Opioid Creditor Share.

Article IV.Y ("*Administration of Opioid Claims*") provides that, all Opioid Claims will be administered, liquidated and discharged pursuant to the applicable Opioid MDT II Documents or Opioid Creditor Trust Documents.  The Opioid MDT II Trustee(s) and Opioid Creditor Trustee(s), as applicable, shall determine the eligibility, amount and Allowance of the applicable Opioid Claims in accordance with the applicable Opioid MDT II Documents or Opioid Creditor Trust Documents.  The determination by the applicable Opioid MDT II Trustee(s) or Opioid Creditor Trustee(s) of the eligibility, amount and Allowance of each Opioid Claim (except for any Other Opioid Claims or Ratepayer Opioid Claims) shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth herein and in the Opioid MDT II Documents and Opioid Creditor Trust Documents.  Distributions in respect of Allowed Opioid Claims shall be made by the applicable Opioid MDT II Trustee(s) or Opioid Creditor Trustee(s), in accordance with the trust distribution procedures and other provisions of the applicable Opioid MDT II Documents or Opioid Creditor Trust Documents, from the applicable Opioid MDT II or Opioid Creditor Trust.  Distributions from the Opioid MDT II and Opioid Creditor Trusts shall be the sole source of recovery for Holders of Allowed Opioid Claims, and no Holder of an Opioid Claim shall have any other or further recourse to the Opioid Creditor Trusts, the Opioid MDT II, the Debtors or their Estates, the Reorganized Debtors, NewCo, any NewCo Subsidiaries, or the Released Parties.  Holders

of Disallowed Opioid Claims shall have no recourse to the Opioid Creditor Trusts, the Opioid MDT II, the Debtors or their Estates, the Reorganized Debtors, NewCo, any NewCo Subsidiaries, or the Released Parties in respect of such Disallowed Claims.

Article IV.Y.1 ("*Administration of Opioid Claims - Administration of Other Opioid Claims*") provides that, the MDT II Administrator shall implement procedures, subject to Bankruptcy Court approval, for the submission of Other Opioid Claims, including notice procedures with respect thereto. All Other Opioid Claims shall be Disputed Claims under the Plan. Only Other Opioid Claims that become Allowed Claims pursuant to the procedures contained in Article IV.Y.2 herein shall be entitled to distributions from the Other Opioid Claims Reserve, Pro Rata with other Allowed Other Opioid Claims. For the avoidance of doubt, Other Opioid Claims, whether Allowed or Disallowed, shall not be entitled to any distributions from the Opioid MDT II or any Abatement Trust or other Opioid Creditor Trust, other than from the Other Opioid Claims Reserve.

Article IV.Y.2 ("*Administration of Opioid Claims - Objections to Other Opioid Claims*") provides that, the MDT II Administrator shall be entitled to object to Other Opioid Claims. Any objections to Other Opioid Claims shall be served and filed on or before the later of (i) two-hundred and seventy (270) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court (as the same may be extended by the Bankruptcy Court for cause shown). The MDT II Administrator shall be entitled to use omnibus objections in compliance with Local Rule 3007-1 and may seek Bankruptcy Court approval to establish additional objection or estimation procedures as the MDT II Administrator believes appropriate.

Article IV.Y.3 ("*Administration of Opioid Claims - Resolution of Disputed Other Opioid Claims*") provides that, on and after the Effective Date the MDT II Administrator shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Other Opioid Claims and to compromise, settle, or otherwise resolve any Disputed Other Opioid Claims without approval of the Bankruptcy Court.

Article IV.Y.4 ("*Administration of Opioid Claims - Disallowance of Other Opioid Claims*") provides that, any Other Opioid Claims held by an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Other Opioid Claims may not receive any distributions on account of such Other Opioid Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

Article IV.Y.5 ("*Administration of Opioid Claims - Estimation of Other Opioid Claims*") provides that, the MDT II Administrator may determine, resolve and otherwise adjudicate all Other Opioid Claims in the Bankruptcy Court or such other court of the MDT II Administrator's choice having jurisdiction over the validity, nature or amount thereof. The MDT II Administrator may at any time request that the Bankruptcy Court estimate any Other Opioid Claims pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether the MDT II Administrator has previously objected to such Other Opioid Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Other Opioid Claim at any time during litigation concerning any objection to any Other Opioid Claim, including, during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Other Opioid Claim, that estimated amount shall constitute the maximum limitation on such Other Opioid Claim, and the MDT II Administrator may pursue supplementary proceedings to object to the ultimate allowance of such Other Opioid Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one

another.  Other Opioid Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of an Other Opioid Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Other Opioid Claim unless the holder of such Other Opioid Claim has filed a motion requesting the right to seek such reconsideration on or before twenty (20) calendar days after the date such Other Opioid Claim is estimated by the Bankruptcy Court.

Article IV.Y.6 ("***Administration of Opioid Claims - Periodic Distributions from Other Opioid Claims Reserve***") provides that, the Opioid MDT II Trustee(s) shall make distributions from time to time in their discretion from the Other Opioid Claims Reserve to holders of Allowed Other Opioid Claims, upon their determination that after distribution, and consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the Other Opioid Claims Reserve shall entitle such holder an aggregate amount equal to the Pro Rata Share of each distribution that would have been made to holders of Other Opioid Claims that remain Disputed and allocate such amount to the Other Opioid Claims Reserve as if each such Other Opioid Claim that remains Disputed were Allowed Claims, for each Other Opioid Claim in the amount equal to the least of (i) the filed amount of such Other Opioid Claim, (ii) the amount determined by a Final Order of the Bankruptcy Court for purposes of fixing the amount to be retained for such Other Opioid Claim, and (iii) such other amount as may be agreed upon by the Holder of such Other Opioid Claim and the MDT II Administrator.

Article IV.Y.7 ("***Administration of Opioid Claims - Administration and Resolution of Ratepayer Opioid Claims***") provides that, the MDT II Administrator shall implement procedures, subject to Bankruptcy Court approval, for the submission of Ratepayer Opioid Claims, including notice procedures with respect thereto. On and after the Effective Date the MDT II Administrator shall settle or otherwise resolve all Ratepayer Opioid Claims solely by the Truth Initiative Contribution without further approval of the Bankruptcy Court.

Article IV.Z ("***Indemnification by the Opioid MDT II and Opioid Creditor Trusts***") provides that, the Opioid MDT II and Opioid Creditor Trusts shall protect, defend, indemnify, and hold harmless each Protected Party from and against any Opioid Claim (including Opioid Demands).  Notwithstanding the forgoing, none of the Debtors, the Reorganized Debtors or any Affiliate of the Debtors may assert any claim against the Opioid MDT II or the Opioid Creditor Trusts for contribution, reimbursement, subrogation, or indemnification on account of or with respect to (a) any Opioid Claim paid by the Debtors or any of their respective Affiliates prior to the Petition Date or (b) the funding of the Opioid MDT II by the Debtors or the Reorganized Debtors.

## E.    Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies

Article V of the Plan governs the treatment of the Debtors' Executory Contracts and Unexpired Leases, among other things.

Article V.A ("***Assumption of Executory Contracts and Unexpired Leases***") provides on the Effective Date, except as otherwise provided in the Plan, each of the Executory Contracts and Unexpired Leases not previously rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court will be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (1) identified on the Rejected Executory Contract/Unexpired Lease List (which shall initially be filed with the Bankruptcy Court on the Plan Supplement Filing Date) as an Executory Contract or Unexpired Lease to be rejected, (2) that is the subject of a separate motion or notice to reject pending as of the Confirmation Date, or (3) that previously expired

or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

Further, on the Effective Date, the Restructuring Support Agreement shall be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code. The Restructuring Support Agreement shall be binding and enforceable against the parties to the Restructuring Support Agreement in accordance with its terms. For the avoidance of doubt, the assumption of the Restructuring Support Agreement under the Plan shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the Restructuring Support Agreement including, without limitation, any termination events or provisions thereunder.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions of the Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, consummation of the Restructuring Transactions shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan, (except for the Consent Rights of Supporting Parties in Article I.C of the Plan), the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Rejected Executory Contract/Unexpired Lease List in their discretion prior to the Confirmation Date (or such later date as may be permitted by Article V.B or Article V.E of the Plan), provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.

Article V.B ("***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases***") provides that any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on the Effective Date or as soon as reasonably practicable, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. No later than the Plan Supplement Filing Date, to the extent not previously Filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide notices of the proposed assumption and proposed Cure Costs to be sent to applicable counterparties, together with procedures for objecting thereto and for resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption or related Cure Cost must be Filed, served, and actually received by the Debtors by the date on which objections to confirmation are due (or such other date as may be provided in the applicable assumption notice).

Furthermore, any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such assumption and Cure Cost. Any timely objection to a proposed assumption or Cure Cost will be scheduled to be heard by the

Bankruptcy Court at the Reorganized Debtors' first scheduled omnibus hearing after the date that is ten (10) days after the date on which such objection is Filed. In the event of a dispute regarding (1) the amount of any Cure Cost, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code under any Executory Contract or the Unexpired Lease, and/or (3) any other matter pertaining to assumption and/or assignment, then such dispute shall be resolved by a Final Order; *provided* that the Debtors or Reorganized Debtors may settle any such dispute and shall pay any agreed upon Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that notwithstanding anything to the contrary in the Plan (except for the Consent Rights of Supporting Parties in Article I.C of the Plan), the Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease previously designated for assumption within forty five (45) days after the entry of a Final Order resolving an objection to the assumption or to the proposed Cure Cost.

Furthermore, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors, as applicable, will continue to honor all postpetition and post-Effective Date obligations under any assumed Executory Contracts and Unexpired Leases in accordance with their terms, regardless of whether such obligations are listed as a Cure Cost, and whether such obligations accrued prior to or after the Effective Date, and neither the payment of Cure Costs nor entry of the Confirmation Order shall be deemed to release the Debtors or the Reorganized Debtors, as applicable, from such obligations.

Article V.C ("***Claims Based on Rejection of Executory Contracts and Unexpired Leases***") provides that unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Notice and *Claims* Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be automatically disallowed without further order of the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan

Article V.D ("***Contracts and Leases Entered into After the Petition Date***") provides that any contracts or leases entered into after the Petition Date by any Debtor, including any Executory Contracts or Unexpired Leases assumed by any Debtor, will be performed by such Debtor or Reorganized Debtor, as applicable, liable thereunder in the ordinary course of business. Accordingly, such contracts and leases (including any Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to section 365 of the Bankruptcy Code) will survive and remain unaffected by entry of the Confirmation Order.

Article V.E ("***Reservation of Rights***") is a reservation of the Debtors' rights and provides that neither anything contained in the Plan nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X.C of the Plan.

Article V.F ("***Indemnification Provisions and Reimbursement Obligations***") provides that, on and as of the Effective Date, and except as prohibited by applicable law and subject to the limitations set forth in the Plan, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the New Governance Documents will provide to the fullest extent provided by law for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such current and former directors', officers', equity holders', managers', members' and employees' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as the Indemnification Provisions, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Governance Documents before or after the Effective Date to terminate or adversely affect any of the Indemnification Provisions.

Article V.G ("***Co-Defendant Indemnification Obligations***") provides that, as of the Effective Date, any term of any policy, contract or other obligation applicable to any Debtor shall be void and of no further force or effect to the extent such policy, contract or other obligation creates an obligation of any Debtor, or gives rise to a right under any Insurance Contract of any Debtor, for the indemnification or reimbursement of any Person other than the Opioid MDT II or any applicable Insurer for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to or in connection with, or in any manner arising from, in whole or in part, any Opioid Claim or any Opioid Demand (excluding any indemnification obligations expressly assumed pursuant to, or otherwise provided for in, the Plan). Notwithstanding the foregoing, nothing herein shall interfere with the Assigned Insurance Rights or the Opioid MDT II's exercise of the Assigned Insurance Rights.

The Plan shall constitute (i) an amendment to each assumed or assumed and assigned contract to sever any and all provisions thereof that give rise to any obligation or right described in Article V.G of the Plan and (ii) an agreement by each counterparty to release any and all obligations and liabilities arising under or relating to such severed provisions and any and all Co-Defendant Claims and Opioid Claims (including Opioid Demands) arising under such contract, including any Co-Defendant Claims and Opioid Claims (including Opioid Demands) that might otherwise be elevated to administrative status through assumption of such contract. The severed portion of each such contract shall be rejected as of the Effective Date, and any Claims resulting from such rejection shall be forever released and discharged, with no distribution on account thereof. Except to the extent included in the Rejected Executory Contract/Unexpired Lease List, each such contract, solely as amended pursuant to Article V.G of the Plan, shall be assumed by the applicable Debtor and, as applicable, may be assigned to NewCo (or one of the NewCo Subsidiaries). No counterparty or any other Person shall have or retain any Claim, Cause of Action or other right of recovery against the Debtors or any other Person, including without limitation NewCo or any Insurer, for or relating to any obligation or right described in Article V.G of the Plan, any Co-Defendant Claim or the amendment of any contract, or the severance and rejection of obligations and liabilities in connection therewith, described in Article V.G of the Plan. On the Effective Date, all Co-Defendant Claims arising under or related to any contract of the Debtors shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person, and any Opioid Claims arising under or related to any contract of the Debtors will be treated in accordance with Article III of the Plan. For the avoidance of doubt, no Co-Defendant Claim or Opioid Claim will be assumed by the Reorganized Debtors or NewCo, elevated to administrative priority status or otherwise receive modified

treatment as a result of the assumption or assumption and assignment of any contract pursuant to Article V.G of the Plan.

The Debtors shall provide notice to all known counterparties to any Executory Contract or Unexpired Lease of Article V.G of the Plan. To the extent an objection is not timely filed and properly served on the Debtors with respect to any contract of the Debtors in accordance with the Disclosure Statement Order, the counterparty to such contract and all other Persons shall be bound by and deemed to have assented to the amendment of such contract, the assumption or assumption and assignment of such amended contract and the severance and release of obligations, liabilities and Claims described in Article V.G of the Plan.

Article V.H ("***Employee Compensation and Benefits***") concerns the Debtors' Compensation and Benefit Programs and the Debtors' Workers' Compensation Programs.

Article V.H.1 provides that, subject to the provisions of the Plan, all Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards) shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. All Proofs of Claim Filed for amounts due under any Compensation and Benefits Program shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan. All collective bargaining agreements to which any Debtor is a party, and all Compensation and Benefits Programs which are maintained pursuant to such collective bargaining agreements or to which contributions are made or benefits provided pursuant to a current or past collective bargaining agreement, will be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements. For the avoidance of doubt, the Debtors and Reorganized Debtors, as applicable, shall honor all their obligations under section 1114 of the Bankruptcy Code. None of the Restructuring, the Restructuring Transactions, or any assumption of Compensation and Benefits Programs pursuant to the terms in the Plan shall be deemed to trigger any applicable change of control, vesting, termination, acceleration or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

Article V.H.2 provides that as of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable state workers' compensation laws; and (b) the Workers' Compensation Contracts. All Proofs of Claims filed by the Debtors' current or former employees on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Contracts; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy law and/or the Workers' Compensation Contracts.

Additionally, under the Plan, except with respect to the Opioid Insurance Policies and the Assigned Insurance Rights, the Debtors intend to assume all Insurance Contracts to the extent they are Executory Contracts, and to the extent they are not Executory Contracts, the vesting of all Estate assets in the Reorganized Debtors will include any non-executory rights under any Insurance Contracts or other insurance policies. Further, to the extent that any self-insured retentions are required and remain to be paid under any applicable Opioid Insurance Policy or in connection with any Assigned Insurance Rights, the obligation to make such payments will not be Impaired by the Plan.

F.        **Provisions Governing Distributions**

Article VI of the Plan sets forth the mechanics by which Plan distributions will be made.  As set forth more fully therein, Article VI of the Plan provides, among other things, that (a) subject to certain exceptions, distributions under the Plan of the full amount provided for thereunder (i) on account of Claims and Interests, other than Opioid Claims, Allowed on or before the Effective Date will generally be made on the Initial Distribution Date, and (ii) on account of Disputed Claims other than Opioid Claims, Allowed after the Effective Date will generally be made on the next Periodic Distribution Date that is at least thirty (30) days after the Claim is Allowed (VI.A-C).

Article VI.D.1 ("*Delivery of Distributions – Record Date for Distributions*") provides that for purposes of making distributions on the Initial Distribution Date only, the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims other than Opioid Claims reflected in the Debtors' books and records as of the close of business on the Confirmation Date; *provided*, *however*, that such record date will not apply to any distributions related to the First Lien Notes, Second Lien Notes, or Guaranteed Unsecured Notes maintained through DTC, and the record date for Holders of Allowed First Lien Term Loan Claims shall be the Effective Date.  Subject to the foregoing sentence, if a Claim other than an Opioid Claim is transferred (a) twenty-one (21) or more days before the Confirmation Date and reasonably satisfactory documentation evidencing such transfer is Filed with the Bankruptcy Court before the Confirmation Date, the Distribution Agent shall make the applicable distributions to the applicable transferee, or (b) twenty (20) or fewer days before the Confirmation Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is Filed with the Bankruptcy Court before the Confirmation Date and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

Article VI.D.2 ("*Delivery of Distributions – Delivery of Distributions in General*") provides that except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims other than Opioid Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim Filed by that Holder or, with respect to Holders of Allowed First Lien Term Loan Claims, the address recorded as of the Effective Date in the register maintained by the First Lien Agent, as applicable; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

Article VI.D.3 ("*Delivery of Distributions – Distributions by Distribution Agents*") provides that the Debtors and the Reorganized Debtors, as applicable, shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  Except in the case of the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee, each serving as a Distribution Agent, to the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims other than Opioid Claims, Guaranteed Unsecured Notes Claims, and Legacy Unsecured Notes Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; provided, that no Distribution Agent (including the Guaranteed Unsecured Notes Indenture Trustee) will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

Subject to Section Article VI.D.4 below, distributions on account of the Guaranteed Unsecured Notes Claims and the Legacy Unsecured Notes Claims will be made to or at the direction of the Guaranteed Unsecured Notes Indenture Trustee or Legacy Unsecured Notes Indenture Trustee, as applicable, and such

trustee will be, and will act as, the Distribution Agent with respect to the applicable Guaranteed Unsecured Notes Claims or Legacy Unsecured Notes Claims in accordance with the terms and conditions of the Plan and the applicable debt documents. Distributions on account of the Allowed First Lien Term Loan Claims will be made to the First Lien Agent or the New Takeback Term Loan Agent, as applicable, and the First Lien Agent or the New Takeback Term Loan Agent (as applicable) will be, and will act as, the Distribution Agent with respect to the Allowed First Lien Term Loan Claims in accordance with the terms and conditions of the Plan and the applicable debt documents.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall promptly pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

Article VI.D.4 ("***Delivery of Distributions – Distributions to Holders of Guaranteed Unsecured Notes Claims and Legacy Unsecured Notes Claims***") provides that the distributions of Takeback Second Lien Notes and New Mallinckrodt Ordinary Shares to be made under the Plan to Holders of Guaranteed Unsecured Notes Claims shall be deemed made by the Debtors or Reorganized Debtors, as applicable, to the Guaranteed Unsecured Notes Indenture Trustee which shall transmit (or cause to be transmitted) such distributions to such Holders as set forth below. Notwithstanding anything to the contrary in the Plan, the applicable Guaranteed Unsecured Notes Indenture Trustee, each in its capacity as Distribution Agent, may transfer or facilitate the transfer of such distributions through the facilities of DTC in exchange for the relevant Guaranteed Unsecured Notes. If it is necessary to adopt alternate, additional or supplemental distribution procedures for any reason including because such distributions cannot be made through the facilities of DTC, to otherwise effectuate the distributions under the Plan, the Debtors or Reorganized Debtors, as applicable, shall implement the Alternate/Supplemental Distribution Process. The Debtors or Reorganized Debtors (as applicable) shall use their best efforts to make the Takeback Second Lien Notes and New Mallinckrodt Ordinary Shares to be distributed to Holders of the Guaranteed Unsecured Notes eligible for distribution through the facilities of DTC.

The obligations of the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee under or in connection with the Plan, the Guaranteed Unsecured Notes Indentures, the Legacy Unsecured Notes Indentures, the Guaranteed Unsecured Notes, the Legacy Unsecured Notes, and any related notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents, shall be discharged and deemed fully satisfied upon the Effective Date. On and after the Effective Date, the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee, each in its capacity as trustee shall be appointed and act as a Distribution Agent with respect to the applicable Guaranteed Unsecured Notes Claims or Legacy Unsecured Notes Claims to facilitate the distributions provided for in the Plan to the applicable Holders of Allowed Guaranteed Unsecured Notes Claims or Allowed Legacy Unsecured Notes Claims. The obligations of each of the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Trustee, in its capacity as Distribution Agent, under or in connection with the Plan shall be discharged and deemed fully satisfied upon either: (i) DTC's

receipt of the distributions with respect to the Allowed Guaranteed Unsecured Notes Claims or Allowed Legacy Unsecured Notes Claims; or (ii) if the Alternate/Supplemental Distribution Process is utilized, upon the earlier of the completion of the Guaranteed Unsecured Notes Indenture Trustee's or Legacy Unsecured Notes Indenture Trustee's role in such process or in accordance with the terms of the Alternate/Supplemental Distribution Process and, in either case, the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee shall not, in any capacity, have liability to any person for having made, or facilitating the making of, the distributions through the foregoing items (i) and (ii). The Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee, each as a Distribution Agent under the Plan will be entitled to recognize and deal with for all purposes the Holders of the Guaranteed Unsecured Notes or Legacy Unsecured Notes to the extent necessary to facilitate the distributions with respect to Allowed Guaranteed Unsecured Notes Claims or Allowed Legacy Unsecured Notes Claims to such Holders. Regardless of which capacity it is acting, the Guaranteed Unsecured Notes Indenture Trustee or the Legacy Unsecured Notes Indenture Trustee in any capacity shall not be responsible for, and may conclusively rely on, the Alternate/Supplemental Distribution Process.

Notwithstanding any policies, practices or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by the Notice and Claims Agent, the Guaranteed Unsecured Notes Indenture Trustee, or the Legacy Unsecured Notes Indenture Trustee to facilitate distributions to Holders of Allowed Guaranteed Unsecured Notes Claims and Allowed Legacy Unsecured Notes Claims without requiring that such distributions be characterized as repayments of principal or interest. No Distribution Agent, including the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee in any capacity, shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Guaranteed Unsecured Notes Claims or Allowed Legacy Unsecured Notes Claims through the facilities of DTC.

Article VI.D.5 ("***Delivery of Distributions – Minimum Distributions***") provides that notwithstanding anything herein to the contrary, other than on account of Unimpaired Claims, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than $100 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars or distributions of fractions of a New Mallinckrodt Ordinary Share. Whenever any payment or distribution of a fraction of a dollar or a fraction of a New Mallinckrodt Ordinary Share would otherwise be called for, the actual payment or distribution will reflect a rounding down of such fraction to the nearest whole dollar or nearest whole New Mallinckrodt Ordinary Share.

Article VI.D.6 ("***Delivery of Distributions – Undeliverable Distributions***") provides that undeliverable distributions will remain in the possession of the Reorganized Debtors, subject to Article VI.D.5.b of the Plan, until such time as any such distributions become deliverable or are otherwise disposed of in accordance with applicable nonbankruptcy law. Undeliverable distributions will not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable. Nothing contained in the Plan requires the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim. Further, checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims are null and void if not negotiated within 90 days after the issuance of such check. Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Finally, as set forth more fully in the Plan, Article VI of the Plan provides, among other things, that (a) to the extent applicable, the Reorganized Debtors will comply with all tax withholding and reporting requirements, and all distributions pursuant to the Plan will be subject to such requirements (VI.E); (b) except as otherwise provided in the Plan, the applicability of Insurance Contracts (VI.F); (c) all distributions

to Holders of Opioid Claims (including Opioid Demands) shall be made by and from the Opioid MDT II and Opioid Creditor Trusts in accordance with the MDT II Documents and Opioid Creditor Trust Documents, as applicable (VI.G); (d) except with respect to the 2024 First Lien Term Loan Claims and the 2025 First Lien Term Loan Claims and as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any (VI.H); and (e) notwithstanding anything else in the Plan or the Confirmation Order, postpetition interest shall accrue and be paid on the First Lien Revolving Credit Facility Claims and the First Lien Term Loan Claims as set forth in the Plan, and unless otherwise specifically provided for in the Plan (including the preceding sentence and Article II.B.2 of the Plan), the Confirmation Order, the Cash Collateral Order, or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any other Claims and no Holder of any other Claims shall be entitled to interest accruing on or after the Petition Date on any Claim (VI.I).

### G.      Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests

Article VII.A ("***Allowance and Disallowance of Claims Other than Opioid Claims***") provides that, after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim other than Opioid Claims and any other Claims Allowed under the Plan (including the First Lien Term Loan Claims), including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code. The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim other than Opioid Claims or contingent or unliquidated Claim other than Opioid Claims in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

Article VII.B ("***Prosecution of Objections to Claims other than Opioid Claims***") provides that, after the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors will have the authority to File objections to Claims (other than Claims that are Allowed under the Plan or Opioid Claims) and settle, compromise, withdraw, or litigate to judgment objections to any and all such Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; *provided*, *however*, this provision will not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim other than Opioid Claims without any further notice to or action, order, or approval of the Bankruptcy Court. The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

Article VII.C ("***Estimation of Claims and Interests***") addresses estimation of claims.  It provides that before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim other than any Opioid Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or during the appeal relating to such objection; *provided* that if the Bankruptcy Court resolves the Allowed amount of a Claim,

the Debtors and Reorganized Debtors, as applicable, will not be permitted to seek an estimation of such Claim. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim subject to applicable law.

Article VII.D ("*No Distributions Pending Allowance*") provides that if any portion of a Claim other than an Opioid Claim is Disputed, no payment or distribution provided in the Plan shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim

Article VII.E ("*Time to File Objections to Administrative Claims*") provides that any objections to Administrative Claims shall be Filed on or before the Administrative Claims Objection Deadline, subject to any extensions thereof approved by the Bankruptcy Court.

Article VII.F ("*Procedures Regarding Opioid Claims*") provides that notwithstanding anything to the contrary herein, Articles VII.A through VII.E shall not apply to any Opioid Claims, and all procedures for resolving contingent, unliquidated, and disputed Opioid Claims (including Opioid Demands) shall be governed by the Opioid MDT II Documents and Opioid Creditor Trust Documents, as applicable.

Article VII.G ("*No Filing of Proofs of Claim for Opioid Claims or VI Opioid Claims*") provides that, except as otherwise provided in the Plan, Holders of Opioid Claims or VI Opioid Claims shall not be required to File a Proof of Claim or a request for payment of an Administrative Claim on account of such Holder's Opioid Claims or VI Opioid Claims, and no such Holders should File such a Proof of Claim or such request for payment; *provided*, *however*, that a Holder of an Opioid Claim or VI Opioid Claim that wishes to assert Claims against the Debtors that are not Opioid Claims or VI Opioid Claims must File a Proof of Claim or a request for payment of an Administrative Claim with respect to such Claims which are not Opioid Claims or VI Opioid Claims on or before the applicable Claims Bar Date. The Opioid MDT II and Opioid Creditor Trusts will make distributions on account of Opioid Claims in accordance with the Opioid MDT II Documents and Opioid Creditor Trust Documents, as applicable. Within sixty (60) days after the Effective Date, the Reorganized Debtors shall File a report identifying all Proofs of Claim that are reasonably determined by the Debtors, in consultation with the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Opioid MDT II Trustee(s), to be on account of any Opioid Claim, and upon the Filing of such report and notice to the Holders of such Proofs of Claim who shall have 14 days to object to such determination, all identified Proofs of Claim shall be deemed withdrawn and removed from the applicable claims register; *provided* that Proofs of Claim on account of Opioid Claims filed after the Effective Date shall automatically be deemed withdrawn and expunged; *provided*, *further*, that upon a motion and hearing with notice to the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, the Future Claimants Representative, the Opioid MDT II Trustee(s), and, solely in the case of clause (b) below, the Holders of affected Proofs of Claim, the Debtors (a) may seek an extension to the deadline to File such report from the Bankruptcy Court and (b) may seek determination by the Bankruptcy Court that any Proof of Claim is on account of any Opioid Claim.

Article VII.H.1 ("*Disputed General Unsecured Claims Reserve*") provides that on or after the Effective Date, the Reorganized Debtors shall have the right, but are not required, to establish a Disputed General Unsecured Claims Reserve in Cash from the General Unsecured Claims Recovery Pool and the Trade Claim Cash Pool Unallocated Amount. Such Disputed General Unsecured Claims Reserve may also include New Mallinckrodt Ordinary Shares issuable from the General Unsecured Claims Recovery Pool that will be issued by the Reorganized Debtors if and when needed for distributions from the Disputed General

Unsecured Claims Reserve. For the avoidance of doubt, the New Governance Documents shall ensure that the Reorganized Debtors are able to issue the number of New Mallinckrodt Ordinary Shares needed to satisfy obligations of the General Unsecured Claims Recovery Pool. The Debtors reserve the right to estimate the value of Disputed General Unsecured Claims in the Bankruptcy Court for distribution purposes and to reduce the Disputed General Unsecured Claims Reserve in a manner consistent with any such estimation.

Article VII.H.2 provides that subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Reorganized Debtors shall treat the Disputed General Unsecured Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes. All parties (including, to the extent applicable, the Debtors, the Reorganized Debtors, and Holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

Article VII.H.3 provides that the Reorganized Debtors shall hold in the Disputed General Unsecured Claims Reserve all distributions to be made on account of (a) Disputed General Unsecured Claims and (b) Disputed Trade Claims whose Holders (i) vote to reject the Plan or (ii) do not agree to maintain Favorable Trade Terms in accordance with the requirements set forth in the Disclosure Statement Order, for the benefit of all Holders Claims entitled to receive a General Unsecured Claims Distribution. All taxes imposed on the assets or income of the Disputed General Unsecured Claims Reserve shall be payable by the Reorganized Debtors from the assets of the Disputed General Unsecured Claims Reserve.

Article VII.H.4 provides that in the event assets in the Disputed General Unsecured Claims Reserve are insufficient to satisfy all of the Disputed General Unsecured Claims that have become Allowed, such Allowed Claims shall be satisfied pro rata from such remaining assets in the Disputed General Unsecured Claims Reserve. After all assets have been distributed from the Disputed General Unsecured Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims. At such time as all Disputed General Unsecured Claims have been resolved, any remaining assets in the Disputed General Unsecured Claims Reserve shall be distributed pro rata to Holders of Allowed General Unsecured Claims.

Article VII.H.5 provides that the Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed General Unsecured Claims Reserve for all taxable periods through the date on which final distributions are made.

Article VII.I ("***Distributions After Allowance***") provides that to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

Article VII.J ("***Disallowance of Certain First Lien Credit Agreement Claims, First Lien Notes Claims, and Second Lien Notes Claims***") provides that notwithstanding anything to the contrary in the Plan (except for the *Consent Rights of Supporting Parties* in Article I.C), the following Claims shall be disallowed on the Effective Date except as otherwise ordered by a Final Order of the Bankruptcy Court before the Effective Date: (a) any First Lien Credit Agreement Claims (i) for default rate interest under Section 2.13(c) of the First Lien Credit Agreement in excess of the non-default rate applicable under Sections 2.13(a) or (b) of the First Lien Credit Agreement, or (ii) for interest based on the asserted conversion of any

"Eurocurrency Borrowing" to an "ABR Borrowing" (each as defined in the First Lien Credit Agreement) under Section 2.07(e) of the First Lien Credit Agreement, to the extent such interest exceeds the interest payable on such borrowing as a Eurocurrency Borrowing; provided that, notwithstanding the foregoing, the Allowed First Lien Term Loan Claims shall include the applicable amount of First Lien Term Loans Accrued and Unpaid Interest and such First Lien Term Loans Accrued and Unpaid Interest shall not be subject to disallowance; (b) any First Lien Notes Claims (i) for any principal premium in excess of the principal amount of such Claims outstanding immediately before the Petition Date, including for any "Applicable Premium" (as defined in the First Lien Notes Indenture) or optional redemption premium, (ii) for any "Additional Amounts" (as defined in the First Lien Notes Indenture), or (iii) for default rate interest under Section 2.11 of the First Lien Notes Indenture; (c) any Second Lien Notes Claims (i) for any principal premium in excess of the principal amount of such Claims outstanding immediately before the Petition Date, including for any "Applicable Premium" (as defined in the Second Lien Notes Indenture) or optional redemption premium, (ii) for any "Additional Amounts" (as defined in the Second Lien Notes Indenture), or (iii) for default rate interest under Section 2.11 of the Second Lien Notes Indenture; and (d) any Claims for payment of any amounts payable pursuant to the Cash Collateral Order arising after the Effective Date. The Debtors will file an objection to such Claims consistent with the foregoing in advance of the Confirmation Hearing, and the Bankruptcy Court's determination of such objection shall be set forth in the Confirmation Order. The Debtors will file an objection to such Claims consistent with the foregoing in advance of the Confirmation Hearing, and the Bankruptcy Court's determination of such objection shall be set forth in the Confirmation Order.

### H.    Conditions Precedent to the Effective Date

Article VIII of the Plan sets forth the conditions precedent to the Effective Date, and related matters. The conditions precedent set forth at Article VIII.A of the Plan ("***Conditions Precedent to the Effective Date***") include that:

1.    The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith.

2.    The Bankruptcy Court or another court of competent jurisdiction shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement, such order shall be a Final Order, and to the extent such order was not entered by the District Court, the District Court shall have affirmed the Confirmation Order.

3.    The Bankruptcy Court or another court of competent jurisdiction shall have entered the Opioid Operating Injunction Order, such order shall be a Final Order, and to the extent such order was not entered by the District Court, the District Court shall have affirmed the Opioid Operating Injunction Order.

4.    All documents and agreements necessary to implement the Plan (including the Definitive Documents, the Opioid MDT II Documents, the Opioid Creditor Trust Documents, the New Opioid Warrant Agreement, the Federal/State Acthar Settlement Agreements, and any documents contained in the Plan Supplement) shall have been documented in compliance with the Restructuring Support Agreement (to the extent applicable), executed and tendered for delivery. All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (which may occur substantially concurrently with the occurrence of the Effective Date).

5.    All actions, documents, certificates, and agreements necessary to implement the Plan (including the Definitive Documents and any other documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and,

to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

6.  All authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated herein shall have been obtained, and there shall have been no determination by the Debtors, including by the Disinterested Managers, to not grant any of the releases to Released Parties set forth in Article IX of the Plan.

7.  All conditions precedent to the consummation of the Opioid Settlement (as defined in the Restructuring Support Agreement) and related transactions, including establishment of the Opioid MDT II and Opioid Creditor Trusts and authorization for payment of the Opioid MDT II Consideration, have been satisfied or waived by the party or parties entitled to waive them.

8.  The final version of the Plan, Plan Supplement, the Opioid MDT II Documents, the Opioid Creditor Trust Documents, and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement.

9.  The Bankruptcy Court shall have confirmed that the Bankruptcy Code authorizes the transfer and vesting of the Opioid MDT II Consideration, notwithstanding any terms of any Insurance Contracts related to the Assigned Insurance Rights or provisions of non-bankruptcy law that any Insurer may otherwise argue prohibits such transfer and vesting.

10. The Canadian Court shall have issued an order recognizing the Confirmation Order in the Recognition Proceedings and giving full force and effect to the Confirmation Order in Canada and such recognition order shall have become a Final Order.

11. The High Court of Ireland shall have made the Irish Confirmation Order and the Scheme of Arrangement shall have become effective in accordance with its terms (or shall become effective concurrently with effectiveness of the Plan).

12. The Irish Takeover Panel shall have either: (a) confirmed that an obligation to make a mandatory general offer for the shares of Parent pursuant to Rule 9 of the Irish Takeover Rules will not be triggered by the implementation of the Scheme of Arrangement and the Plan; or (b) otherwise waived the obligation on the part of any Person to make such an offer.

13. Any civil or criminal claims asserted by or on behalf of the Department of Justice (other than those resolved pursuant to the Federal/State Acthar Settlement) have been resolved on terms reasonably acceptable to the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group.

14. The Debtors shall have paid in full all professional fees and expenses of the Debtors' Retained Professionals (including the Retained Professionals of the Disinterested Managers) that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses.

15. The Professional Fee Escrow Account shall have been established and funded in Cash in accordance with Article II.A.2 of the Plan.

16.     The Debtors shall have paid the Restructuring Expenses including the Transaction Fees, in full, in Cash.

17.     The Debtors shall have paid (A) the Noteholder Consent Fee, (B) the outstanding invoices on account of any Indenture Trustee Fees delivered to the Debtors (or their counsel) at least two (2) business days before the Effective Date, and (C) the Term Loan Exit Payment (and the First Lien Term Lenders shall have received such Term Loan Exit Payment), and the foregoing payments shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.

18.     The Cash Collateral Order shall have remained in full force and effect.

19.     The Restructuring to be implemented on the Effective Date shall be consistent with the Plan, the Scheme of Arrangement, and the Restructuring Support Agreement.

Article VIII.B ("*Waiver of Conditions*") provides that subject to and without limiting or expanding the respective rights of each party to the Restructuring Support Agreement, the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Group, and the MSGE Group may collectively waive any of the conditions to the Effective Date set forth in Article VIII.A at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action; *provided* that (a) the conditions set forth in Article VIII.A.14 and VIII.A.15 of the Plan may be waived by only the Debtors with the consent of the affected Retained Professionals; (b) the waiver of Article VIII.A.4 of the Plan (with respect to the New Takeback Term Loan Documentation and other documents to which the Supporting Term Lenders have consent rights under the Restructuring Support Agreement), Article VIII.A.16 of the Plan (with respect to the Restructuring Expenses payable to the advisors of the Ad Hoc First Lien Term Lender Group), and Article VIII.A.17(C) of the Plan shall require the consent of the Required Supporting Term Lenders, and (c) the waiver of the condition set forth in Article VIII.A.17(B) of the Plan shall also require the consent of the Guaranteed Unsecured Notes Indenture Trustee.

Article VIII.C ("*Effect of Non-Occurrence of Conditions to the Effective Date*") addresses the effect of non-occurrence of the Effective Date. It provides that if the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall:   (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

Article VIII.D ("*Substantial Consummation*") provides that "Substantial consummation" of the Plan, as defined in section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## I.      Release, Injunction, and Related Provisions

Article IX of the Plan addresses releases, injunctions, exculpatory provisions and related provisions, and are highlighted below:  *Discharge of Claims, Opioid Claims (including Opioid Demands), and Interests and Compromise and Settlement of Claims, Opioid Claims (including Opioid Demands), and Interests under the Plan* (IX.A); *Releases by the Debtors* (IX.B); *Releases by Non-Debtor Releasing Parties Other Than Opioid Claimants* (IX.C); *Releases by Holders of Opioid Claims* (IX.D); *Exculpation* (IX.E); *Permanent Injunction* (IX.F); *Opioid Permanent Channeling Injunction* (IX.G); *Opioid Operating Injunction* (IX.H); and *Setoffs and Recoupment* (IX.I).

Article IX.C of the Plan contains a third-party release by all Non-Debtor Releasing Parties Other Than Opioid Claimants.  Pursuant to Article IX.C of the Plan, the following are deemed to grant a third-party release: (a) the Holders of all Claims who vote to accept the Plan, (b) the Holders of all Claims that are Unimpaired under the Plan, (c) the Holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth herein, (d) the Holders of all Claims or Equity Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, and (e) all other Holders of Claims and Equity Interests to the maximum extent permitted by law; *provided*, that the plaintiffs in Shenk Suit shall not be Non-Debtor Releasing Parties until such time as the Shenk Settlement is approved on a final basis by the United States District Court for the District of Columbia and upon such approval such plaintiffs shall be Non-Debtor Releasing Parties; *provided, further*, that Opioid Claimants, solely in their capacity as Opioid Claimants, shall not be Non-Debtor Releasing Parties.

Article IX.D. of the Plan provides each Opioid Claimant will be deemed to be granting releases to third parties under the Plan with respect to any and all Claims (including Opioid Claims and Opioid Demands).  Pursuant to Article IX.G of the Plan, from and after the Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims (including Opioid Demands) based upon or arising from the Debtors' pre-confirmation conduct or activities shall be to the Opioid MDT II or the Opioid Creditor Trusts, and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claims (including Opioid Demands) against any Protected Party or any property or interest in property of any Protected Party.  Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the applicable Opioid Creditor Trusts.  The Opioid Creditor Trusts are binding on the holders of all Opioid Claims (including Opioid Demands).

1.    Releases

The following definitions are important to understanding the scope of the releases being given under the Plan:

"**Exculpated Party**" means, in each case, in its capacity as such: (a) the Debtors (and their Representatives); (b) the Reorganized Debtors (and their Representatives); (c) the Official Committee of Unsecured Creditors; (d) the Official Committee of Opioid-Related Claimants; (e) the Future Claimants Representative (if appointed); and (f) the Guaranteed Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee, each solely in its capacity and to the extent it serves as a Distribution Agent.

"*Protected Party*" means (a) the Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled Affiliates, respective heirs, executors, Estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person's respective current and former officers and directors, principals, members, employees, financial advisors, attorneys (including attorneys retained by any director in his or her capacity as a director or manager of a Person), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as a director or manager of a Person), consultants, experts and other professionals (including any professional advisor retained by any director in his or her capacity as a director or manager of a Person) or other representatives of the Persons described in clauses (a) through (d), *provided* that consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date.  Notwithstanding anything to

the contrary herein, none of the following Persons, in their respective following capacities, shall be Protected Parties: (1) Medtronic plc or Covidien plc, (2) any subsidiaries or Affiliates of Medtronic plc or Covidien plc that existed as a subsidiary or Affiliate of Medtronic plc or Covidien plc after July 1, 2013, (3) any successors or assigns of any Entity described in clause (1) or clause (2) that became such a successor or assign after July 1, 2013 (excluding, for the avoidance of doubt, the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates), (4) any former subsidiaries or Affiliates of Covidien plc that ceased being such a subsidiary or Affiliate before July 1, 2013, and any successor or assign to such subsidiary or Affiliate of Covidien plc, and (5) any Representative of any Entity described in the foregoing clauses (1) through (4) except to the extent such Representative is described in clause (d) and (e) of this definition of "Protected Party."

"**Released Party**" means (a) the Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled Affiliates, respective heirs, executors, Estates, and nominees, in each case solely in their capacity as such; (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person's respective current and former officers and directors, managers, principals, members, partners, employees, agents, advisors (including financial advisors), attorneys (including attorneys retained by any director in his or her capacity as a director or manager of a Person), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as a director or manager of a Person), consultants, experts and other professionals (including any professional advisor retained by any director in his or her capacity as a director or manager of a Person) or other representatives of the Persons described in clauses (a) through (d); (f) each member of the Guaranteed Unsecured Notes Ad Hoc Group in their capacity as such, (g) each Supporting Unsecured Noteholder in their capacity as such, (h) the Opioid MDT II and the Opioid Creditor Trusts, (i) each member of the Governmental Plaintiff Ad Hoc Committee in their capacity as such, (j) each Supporting Governmental Opioid Claimant in their capacity as such; (k) each member of the MSGE Group in their capacity as such; (l) each Supporting Term Lender in its capacity as such; (m) each member of the Ad Hoc First Lien Term Lender Group in its capacity as such; (n) each Prepetition Secured Party (as defined in the Cash Collateral Order), (o) the Guaranteed Unsecured Notes Indenture Trustee; (p) the Legacy Unsecured Notes Indenture Trustee; and (q) with respect to each of the foregoing Persons in clauses (f) through (p), each such Person's Representatives. Notwithstanding anything to the contrary herein, none of the following Persons, in their respective following capacities, shall be Released Parties: (1) Medtronic plc or Covidien plc, (2) any subsidiaries or Affiliates of Medtronic plc or Covidien plc that existed as a subsidiary or Affiliate of Medtronic plc or Covidien plc after July 1, 2013, (3) any successors or assigns of any Entity described in clause (1) or clause (2) that became such a successor or assign after July 1, 2013 (excluding, for the avoidance of doubt, the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates), (4) any former subsidiaries or Affiliates of Covidien plc that ceased being such a subsidiary or Affiliate before July 1, 2013, and any successor or assign to such subsidiary or Affiliate of Covidien plc, and (5) any Representative of any Entity described in the foregoing clauses (1) through (4) except to the extent such Representative is described in clause (d) and (e) of this definition of "Released Party."

## a.    Releases by the Debtors (IX.B)

**Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement (as defined in the Restructuring Support Agreement) and the restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates**

from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof and as such Entities existed prior to or after the Petition Date), their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security or indebtedness of the debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Effective Date, the Definitive Documents, the Opioid MDT II, Opioid MDT II Documents, the Opioid Creditor Trusts, the Opioid Creditor Trust Documents, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020 and all matters and potential transactions described therein, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition and postpetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Effective Date in connection with the creation of the Opioid MDT II, the Opioid Creditor Trusts, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of confirmation (including the solicitation of votes on the Plan), the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Effective Date related or relating to any of the foregoing; *provided*, *however*, that the Debtors do not release, and the Opioid MDT II shall retain, all Assigned Third-Party Claims and Assigned Insurance Rights; *provided*, *further*, that the Debtors do not release, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments,

127

damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding anything to the contrary in the foregoing, the releases by the Debtors set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are reinstated pursuant to the Plan. The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person, and the Confirmation Order shall permanently enjoin the commencement or prosecution by any person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release.

The Reorganized Debtors, the Opioid MDT II, and the Opioid Creditor Trusts shall be bound, to the same extent the Debtors are bound, by the releases set forth in Article IX.B of the Plan. For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to Article IX.B of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article IX.B of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their Estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or person asserting any Claim or Cause of Action released by Article IX.B of the Plan.

### b.    Releases by Non-Debtor Releasing Parties Other than Opioid Claimants (IX.C)

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement (as defined in the Restructuring Support Agreement) and restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein, by the Non-Debtor Releasing Parties, in each case, from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, managers,

accountants, attorneys, representatives, consultants, agents, and any other persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof and as such entities existed prior to or after the Petition Date), their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any Security or indebtedness of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Effective Date, the Definitive Documents, the Opioid MDT II, the Opioid MDT II Documents, the Opioid Creditor Trust, the Opioid Creditor Trust Documents, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020 and all matters and potential transactions described therein, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition and postpetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Effective Date in connection with the creation of the Opioid MDT II, the Opioid Creditor Trusts, the prepetition documents, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of confirmation (including the solicitation of votes on the Plan), the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Effective Date related or relating to any of the foregoing, other than Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to Article IX.C of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases by the Non-Debtor Releasing Parties set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are reinstated pursuant to the Plan.  The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person, and the Confirmation Order shall permanently enjoin the commencement or prosecution by any person, whether directly, derivatively,

or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall (x) release, discharge, or preclude the enforcement of any liability of a Released Party to a Governmental Unit arising out of, or relating to, any act or omission of a Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act or (y) release or discharge a consultant or expert having been retained to provide strategic advice for sales and marketing of opioid products who has received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any state attorney general on or after January 1, 2019 through the Petition Date.

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan or Confirmation Order, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor person or non-Debtor entity in any forum.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Non-Debtor Releasing Parties set forth in Article IX.C of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) given in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Article IX.C of the Plan; (c) in the best interests of the Debtors, their Estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any Entity or person asserting any Claim or Cause of Action released by Article IX.C of the Plan; (g) consensual; and (h) essential to the confirmation of the Plan.

c.        Releases by Holders of Opioid Claims (IX.D)

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Protected Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement (as defined in the Restructuring Support Agreement) and restructuring, each Opioid Claimant (in its capacity as such) is deemed to have released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, each Debtor, Reorganized Debtor, and Protected Party from any and all Claims (including Opioid Claims and Opioid Demands), counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, liens, remedies, losses, contributions, indemnities, costs, liabilities, or attorneys' fees and expenses whatsoever, including any derivative claims asserted, or assertable on behalf of the Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors

(including the management, ownership, or operation thereof and as such Entities existed prior to or after the Petition Date), their Estates, the Opioid Claims (including Opioid Demands), the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Effective Date, the Opioid MDT II, the Opioid MDT II Documents, the Opioid Creditor Trusts, the Opioid Creditor Trust Documents, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020 and all matters and potential transactions described therein, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Protected Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Effective Date in connection with the creation of the Opioid MDT II, the Opioid Creditor Trusts, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of confirmation (including the solicitation of votes on the Plan), the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases by the Opioid Claimants set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any post-Effective Date transaction contemplated by the restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any claims or causes of actions against any co-defendant of the Debtors (other than any Protected Party) in any opioid-related litigation.  The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person, and the Confirmation Order shall permanently enjoin the commencement or prosecution by any person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release by Opioid Claimants.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this release by Opioid Claimants, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that this release is: (1) essential to the confirmation of the Plan; (2) given in exchange for the good and valuable consideration provided by the Released Parties; (3) a good-faith settlement and compromise of the Claims released by Article IX.D of the Plan; (4) in the best interests of the Debtors, their Estates, and all Opioid Claimants; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any Opioid Claimant asserting any Claim or Cause of Action released pursuant to Article IX.D of the Plan.

For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to article IX.D of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases by the Opioid Claimants set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are reinstated pursuant to the Plan.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall (x) release, discharge, or preclude the enforcement of any liability of a Protected Party to a Governmental Unit arising out of, or relating to, any act or omission of a Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act perpetrated by the applicable Protected Party or (y) release or discharge a consultant or expert having been retained to provide strategic advice for sales and marketing of opioid products who has received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any state attorney general on or after January 1, 2019 through the Petition Date.

### d.      Exculpation (IX.E)

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any person for any Claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, filing, administering, confirming or effecting the confirmation or consummation of the Plan, the Disclosure Statement, the Opioid Settlement (as defined in the Restructuring Support Agreement), the Opioid MDT II Documents, the Opioid Creditor Trust Documents, the "agreement in principle for global opioid settlement and associated debt refinancing activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition transactions, or any contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Disclosure Statement or confirmation or consummation of the Plan, the Opioid Settlement (as defined in the Restructuring Support Agreement), the Opioid MDT II Documents, or the Opioid Creditor Trust Documents, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Causes of Action arising from actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or

regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person or Entity.

### e.      Permanent Injunction (IX.F)

Except as otherwise expressly provided in the Confirmation Order or Plan, from and after the Effective Date all persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from: (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, or subrogation of any kind; and (e) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any person so released, discharged or exculpated (or the property or estate of any person so released, discharged or exculpated).  All injunctions or stays provided in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the confirmation date, shall remain in full force until the Effective Date.  Article IX.F of the Plan shall not apply to Opioid Claims, which shall be subject to Article IX.G of the Plan.

### f.      Opioid Permanent Channeling Injunction (IX.G)

*TERMS.*  Pursuant to section 105(a) of the Bankruptcy Code, from and after the Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims (including Opioid Demands) based upon or arising from the Debtors' pre-confirmation conduct or activities shall be to the Opioid MDT II or the Opioid Creditor Trusts, as applicable, pursuant to Article IX.G of the Plan and the Opioid MDT II Documents or the Opioid Creditor Trust Documents, as applicable, and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claims (including Opioid Demands) against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all Opioid Claimants, including Future Opioid PI Claimants, shall be permanently and forever stayed, restrained, barred, and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Opioid Claim (including Opioid Demand) based upon or arising from the Debtors' pre-confirmation conduct or activities other than from the Opioid MDT II or the Opioid Creditor Trust pursuant to the Opioid MDT II Documents or the Opioid Creditor Trust Documents, as applicable:

- Commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

- Enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any

**judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;**

- **Creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

- **Setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; or**

- **Proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Opioid MDT II or the Opioid Creditor Trusts, as applicable, except in conformity and compliance with the applicable Opioid MDT II Documents and Opioid Creditor Trust Documents.**

*RESERVATIONS.*  **The foregoing injunction shall not stay, restrain, bar, or enjoin (a) the rights of Opioid Claimants to assert Opioid Claims (including Opioid Demands) against the Opioid MDT II or the Opioid Creditor Trusts, as applicable, in accordance with the Plan, the Opioid MDT II Documents, and the Opioid Creditor Trust Documents, as applicable; and (b) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Opioid MDT II.**

*MODIFICATIONS.*  **There can be no modification, dissolution, or terminations of this Opioid Permanent Channeling Injunction, which shall be a permanent injunction.**

*NON-LIMITATION OF CHANNELING INJUNCTION.*  **Nothing in the Plan, the Opioid MDT II Documents, or the Opioid Creditor Trust Documents shall be construed in any way to limit the scope, enforceability, or effectiveness of the Opioid Permanent Channeling Injunction issued in connection with the Plan.**

*BANKRUPTCY RULE 3016 COMPLIANCE.*  **The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.**

### g.    Opioid Operating Injunction (IX.H)

From and after the date on which the Opioid Operating Injunction Order is entered by the Bankruptcy Court or another court of competent jurisdiction, the VI-Specific Debtors and/or Reorganized VI-Specific Debtors, as applicable, and any successors to the VI-Specific Debtors' and/or Reorganized VI-Specific Debtors' business operations relating to the manufacture and sale of opioid product(s) in the United States and its territories shall abide by the Opioid Operating Injunction as set forth in the Plan Supplement.

The VI-Specific Debtors and Reorganized VI-Specific Debtors, as applicable, consent to the entry of a final judgment or consent order upon the Effective Date imposing all of the provisions of the Opioid Operating Injunction in the state court in each of the Supporting Governmental Opioid Claimants.  After the Effective Date, the Opioid Operating Injunction will be enforceable in the state court in each of the Supporting Governmental Opioid Claimants. The VI-Specific Debtors and Reorganized VI-Specific Debtors agree that seeking entry or enforcement of such a final judgment or consent order will not violate any other injunctions

or stays that it will seek, or that may otherwise apply, in connection with its Chapter 11 Cases or Confirmation.

### h.    Setoffs and Recoupment (IX.I)

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor or the Opioid MDT II of any such Claims, rights, and Causes of Action; *provided*, *further*, that the exercise of rights of setoff and/or recoupment by non-Debtor third parties against the Debtors or Reorganized Debtors on account of any Assigned Third-Party Claims shall be enjoined and barred, to the extent permitted by applicable law.

## VI.
## CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF REORGANIZED DEBTORS

### A.    Summary of Capital Structure of Reorganized Debtors

#### 1.    Post-Emergence Capital Structure

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan and provide for, among other things, their post-Effective Date working capital needs.  This summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the relevant Definitive Documents.

| Instrument | Amount | Description |
|---|---|---|
| New Term Loan Facility | Approximately $900 million if only the First Lien Revolving Credit Facility is refinanced | [Terms to be determined].<br><br>The New Term Loan Facility is to be entered into by the Reorganized Debtors on, prior to, or after the Effective Date and will be used to refinance the First Lien Revolving Credit Facility, and may be used to refinance the First Lien Term Loans, the First Lien Notes, and the Second Lien Notes. |
| New AR Revolving Facility | Approximately $[200 million] | The New AR Revolving Facility is a new accounts receivable revolving credit facility in the aggregate principal amount of $[200] million to be entered into by the Reorganized Debtors on or after the Effective Date. |
| The New Takeback Term Loan Facility | Approximately $1.8 billion | The New Takeback Term Loan Facility is a new senior secured first lien term loan facility in an original principal amount equal to the Term Loans Outstanding Amount. |

| | | The 2024 First Lien Term Loan and the 2025 First Lien Term Loan shall be, at the Debtors' option, either (a) replaced by the New Takeback Term Loans, or (b) be paid in full in Cash with funds raised through the New Term Loan Facility.<br><br>If issued, the New Takeback Term Loan Facility will be due the earlier of (a) September 30, 2027 and (b) 5.75 years following the Effective Date. The New Takeback Term Loan Facility will be payable in cash at L+525, with respect to the 2024 First Lien Term Loan, and L+550, with respect to the 2025 First Lien Term Loan, both subject to a 75 bps LIBOR floor. |
| 10.000% First Lien Senior Secured Notes due April 2025<br><br>or<br><br>Cram-Down First Lien Notes | Approximately $495 million if Reinstated<br><br>or<br><br>Up to approximately $598 million if Cram-Down First Lien Notes are issued | Allowed First Lien Notes Claims will be Reinstated or the Allowed First Lien Notes Claims will receive the Cram-Down First Lien Notes in a face amount equal to the amount of such Allowed First Lien Notes Claims. |
| 10.000% Second Lien Senior Secured Notes due April 2025<br><br>or<br><br>Cram-Down Second Lien Notes | Approximately $323 million if Reinstated<br><br>or<br><br>Up to approximately $390 million if Cram-Down Second Lien Notes are issued | Allowed Second Lien Notes Claims will be Reinstated or the Allowed Second Lien Notes Claims will receive the Cram-Down Second Lien Notes in a face amount equal to the amount of such Allowed Second Lien Notes Claims. |
| Takeback Second Lien Notes | $375 million | Payable in cash at 10.00%; maturity of seven (7) years following the Effective Date; *pari passu* with the second lien security interests as with existing Second Lien Notes. |

### 2.    New Credit Facilities, New Takeback Term Loans, Takeback Second Lien Notes, Cram-Down First Lien Notes, and Cram-Down Second Lien Notes

Article IV.H.1 of the Plan ("***New Credit Facilities, New Takeback Term Loans, Takeback Second Lien Notes, Cram-Down First Lien Notes, and Cram-Down Second Lien Notes - The New Credit Facilities and Approval of the New Term Loan Documentation and New AR Revolving Facility Documentation***") provides that, to the extent required and subject to the occurrence of the Effective Date, Confirmation of the Plan shall be deemed to constitute authorization and approval by the Bankruptcy Court (a) of the New Credit Facilities, (b) of the New Term Loan Documentation and New AR Revolving Facility Documentation (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein), and (c) subject to the occurrence of the Effective Date, for the applicable Reorganized Debtors to enter into and perform their obligations under the New Term Loan Documentation and New AR Revolving Facility Documentation and such other

documents as may be reasonably required or appropriate. For the avoidance of doubt, the incurrence of (x) the New Term Loan Facility shall utilize the baskets for Revolver Replacement Term Loans (as defined in the Supporting Term Lenders Joinder Agreement) and (y) the New AR Revolving Facility shall utilize the baskets for Qualified Receivables Facilities (as defined in the Supporting Term Lenders Joinder Agreement), in each case, set forth in the negative covenants limiting the incurrence of indebtedness and liens under the New Takeback Term Loan Documentation.

Furthermore, on the Effective Date, the New Term Loan Documentation and New AR Revolving Facility Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Term Loan Documentation and New AR Revolving Facility Documentation are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted under the New Term Loan Documentation and New AR Revolving Facility Documentation (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Term Loan Documentation and New AR Revolving Facility Documentation, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Article IV.H.2 of the Plan ("*New Credit Facilities, New Takeback Term Loans, and Takeback Second Lien Notes - New Takeback Term Loans and Approval of New Takeback Term Loans Documentation*") provides that to the extent required and subject to the occurrence of the Effective Date, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Takeback Term Loans and the New Takeback Term Loans Documentation (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the New Takeback Term Loans and the payment of all fees, payments, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the New Takeback Term Loans Documentation and such other documents as may be reasonably required or appropriate.

Further, on the Effective Date, the New Takeback Term Loans Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Takeback Term Loans Documentation are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential

transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted under the New Takeback Term Loans Documentation (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the New Takeback Term Loans Documentation and shall rank senior in priority to any Liens and security interests securing the Takeback Second Lien Notes and the Second Lien Notes or the Cram-Down Second Lien Notes (as applicable), (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Article IV.H.3 of the Plan ("*New Credit Facilities, New Takeback Term Loans, and Takeback Second Lien Notes - Takeback Second Lien Notes and Approval of Takeback Second Lien Notes Documentation*") provides that to the extent required and subject to the occurrence of the Effective Date, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Takeback Second Lien Notes and the Takeback Second Lien Notes Documentation (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Takeback Second Lien Notes Documentation and such other documents as may be reasonably required or appropriate.

Further, on the Effective Date, the Takeback Second Lien Notes Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Takeback Second Lien Notes Documentation are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted under the Takeback Second Lien Notes Documentation (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the Takeback Second Lien Notes Documentation, and shall be *pari passu* in priority to any Liens and security interests securing the Second Lien Notes, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all

other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Article IV.H.4 of the Plan ("*New Credit Facilities, New Takeback Term Loans, and Takeback Second Lien Notes - Cram-Down First Lien Notes and Approval of Cram-Down First Lien Notes Documentation*") provides that to the extent required and subject to the occurrence of the Effective Date, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Cram-Down First Lien Notes and the Cram-Down First Lien Notes Documentation (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Cram-Down First Lien Notes and the payment of all fees, payments, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations under the Cram-Down First Lien Notes Documentation and such other documents as may be reasonably required or appropriate.

Further, on the Effective Date, the Cram-Down First Lien Notes Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Cram-Down First Lien Notes Documentation are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted under the Cram-Down First Lien Notes Documentation (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the Cram-Down First Lien Notes Documentation, and shall rank senior in priority to any Liens and security interests securing the Takeback Second Lien Notes and the Second Lien Notes or the Cram-Down Second Lien Notes (as applicable), (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non bankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Article IV.H.5 of the Plan ("*New Credit Facilities, New Takeback Term Loans, and Takeback Second Lien Notes - Cram-Down Second Lien Notes and Approval of Cram-Down Second Lien Notes Documentation*") provides that to the extent required and subject to the occurrence of the Effective Date, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Cram-Down Second Lien Notes and the Cram-Down Second Lien Notes Documentation (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Cram-Down Second Lien Notes and the payment of all fees, payments, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized

Debtors to enter into and perform their obligations under the Cram-Down Second Lien Notes Documentation and such other documents as may be reasonably required or appropriate.

Further, on the Effective Date, the Cram-Down Second Lien Notes Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Cram-Down Second Lien Notes Documentation are being extended, and shall be deemed to have been extended, and all related payments made in connection therewith shall have been made, in each case, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted under the Cram-Down Second Lien Notes Documentation (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the terms of the Cram-Down Second Lien Notes Documentation, and shall be *pari passu* in priority to any Liens and security interests securing the Takeback Second Lien Notes, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non bankruptcy law. The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.    New Mallinckrodt Ordinary Shares and New Opioid Warrants

Pursuant to Article IV.I.1 of the Plan ("***Reorganized Debtors' Ownership - New Mallinckrodt Ordinary Shares and New Opioid Warrants***"), on the Effective Date, Reorganized Mallinckrodt shall (a) issue or reserve for issuance all of the New Mallinckrodt Ordinary Shares (including all New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) issuable in accordance with the terms of the Plan and, where applicable, the Scheme of Arrangement and as set forth in the Restructuring Transactions Memorandum and (b) enter into the New Opioid Warrant Agreement and issue all of the New Opioid Warrants to the Opioid MDT II in accordance with the terms of the Plan.[41]  The issuance of the New Mallinckrodt Ordinary Shares (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) and any New Opioid Warrants by Reorganized Mallinckrodt pursuant to the Plan is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the New Mallinckrodt Ordinary Shares shall be listed on or immediately following the Effective Date. All of the New Mallinckrodt Ordinary Shares (including, when issued, any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. The New

---

[41]    Under review and revision.

Opioid Warrants and the New Opioid Warrant Agreement shall be valid and binding obligations of Reorganized Mallinckrodt, enforceable in accordance with their respective terms.

Pursuant to Article IV.I.2 of the Plan ("***Reorganized Debtors' Ownership - Registration Rights Agreement***"), on the Effective Date, Reorganized Mallinckrodt and certain Holders of the New Mallinckrodt Ordinary Shares (including the New Mallinckrodt Ordinary Shares issuable upon the exercise of the New Opioid Warrants) shall enter into the Registration Rights Agreement in substantially the form included in the Plan Supplement. The Registration Rights Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms.

Pursuant to Article IV.I.3 of the Plan ("***Reorganized Debtors' Ownership – Certain Debtors Subject to Dissolution***"), as to any Debtors identified in the Restructuring Transactions Memorandum as being subject to Article IV.I.3 of the Plan, the Debtors shall take such steps as are necessary or advisable to provide, as of the Effective Date, (a) for a new equity interest holder or holders (either as to each such Debtor individually or as to all such Debtors together) (i) to receive and hold all new equity interests in such Debtors and (ii) to manage the dissolution of such Debtors after consummation of all distributions to the Holders of Claims against such Debtors contemplated by the Plan and (b) for any necessary or advisable changes to the organizational documents of such Debtors in furtherance of their contemplated dissolution.

## 4.      Exemption from Registration Requirements

Pursuant to Article IV.J of the Plan ("***Exemption from Registration Requirements***"), the offering, issuance, and distribution of any Securities, including the New Mallinckrodt Ordinary Shares (including any New Mallinckrodt Ordinary Shares issuable upon the exercise of the New Opioid Warrants) and the New Opioid Warrants in exchange for Claims pursuant to Article III of the Plan and the Confirmation Order and, where applicable, in accordance with the terms of the Scheme of Arrangement and the Confirmation Order shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code. Any and all such New Mallinckrodt Ordinary Shares (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants) and New Opioid Warrants so issued under the Plan and, where applicable, the Scheme of Arrangement, will be freely tradable under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

The Reorganized Debtors need not provide any further evidence other than the Plan, the Confirmation Order, the Scheme of Arrangement, or the Irish Confirmation Order with respect to the treatment of the New Mallinckrodt Ordinary Shares or New Opioid Warrants under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no Person or Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Takeback Second Lien Notes, the Cram-Down First Lien Notes or Cram-Down Second Lien Notes (if any), the New Mallinckrodt Ordinary Shares (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants), and the New Opioid Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. All such Persons and Entities including DTC shall be required to accept and conclusively rely upon the Plan, the Confirmation Order, the Scheme of Arrangement, or the Irish Confirmation Order in lieu of a legal opinion regarding whether the Takeback Second Lien Notes, the New Mallinckrodt Ordinary Shares (including any New Mallinckrodt Ordinary

Shares issuable upon exercise of the New Opioid Warrants), and the New Opioid Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**B.**   **Corporate Governance and Management of the Reorganized Debtors**

**1.**   **Debtors' Organizational Matters**

Article IV.C of the Plan ("***Corporate Existence***") provides that, except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by the Plan, by the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

Article IV.E of the Plan ("***Indemnification Provisions in Organizational Documents***") provides that as of the Effective Date, each Reorganized Debtor's memorandum and articles of association, bylaws, and other New Governance Documents shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current and former managers, directors, officers, equity holders, members, employees, accountants, investment bankers, attorneys, other professionals, or agents of the Debtors and such current and former managers', directors', officers', equity holders', members', employees', accountants', investment bankers', attorneys', other professionals' and agents' respective Affiliates to the same extent as set forth in the Indemnification Provisions, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  None of the Reorganized Debtors shall amend and/or restate its memorandum and articles of association, certificate of incorporation, bylaws, or similar organizational document after the Effective Date to terminate or adversely affect, in relation to conduct occurring prior to the Effective Date, (1) any of the Indemnification Provisions or (2) the rights of such current and former managers, directors, officers, equity holders, members, employees, or agents of the Debtors and such current and former managers', directors', officers', equity holders', members', employees', and agents' respective Affiliates referred to in the immediately preceding sentence.

Article IV.K of the Plan ("***Organizational Documents***") provides that, subject to Articles IV.E and IV.F of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by the New Governance Documents applicable to it.  From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code, as applicable.  On or immediately before the Effective Date, each Reorganized Debtor will file its New Governance Documents with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Governance Documents to become effective.

### 2.    Directors and Officers of the Reorganized Debtors

Article IV.M.1 of the Plan (***"Directors and Officers of the Reorganized Debtors – The Reorganized Board"***) provides that, prior to the Effective Date, the Debtors will undertake any necessary or advisable steps to have the Reorganized Board in place immediately prior to the Effective Date. The occurrence of the Effective Date will serve as ratification of the appointment of the Reorganized Board.

The Reorganized Board will initially consist of at least seven (7) members, which shall be comprised of the Chief Executive Officer of the Reorganized Debtors, and six (6) other directors, which shall be designated by the Required Supporting Unsecured Noteholders; *provided*, that, the members of the Reorganized Board, other than the Reorganized Debtors' Chief Executive Officer, shall be independent under applicable listing standards and shall be independent of the Supporting Unsecured Noteholders, unless the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Debtors otherwise consent; *provided*, *further*, that if the Reorganized Board is not fully selected by the Effective Date then the members of the Reorganized Board selected as of the Effective Date shall select the remaining members in consultation with the Required Supporting Unsecured Noteholders.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of Confirmation the identity and affiliations of any person proposed to serve on the Reorganized Board.  The occurrence of the Effective Date shall have no effect on the composition of the board of directors or managers of each of the subsidiary Debtors.

### 3.    Senior Management

Article IV.M.2 of the Plan ("***Directors and Officers of the Reorganized Debtors – Senior Management***") provides that the existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the Reorganized Board to remove or replace them in accordance with the New Governance Documents and any applicable employment agreements that are assumed pursuant to the Plan.

### 4.    Management Incentive Plan

Article IV.M.3 the Plan (***"Directors and Officers of the Reorganized Debtors – Management Incentive Plan"***) provides that, on the Effective Date, equity grants under the Management Incentive Plan shall be reserved for management, key employees, and directors of the Reorganized Debtors.

### 5.    Disinterested Managers

Article IV.M.4 the Plan (***"Directors and Officers of the Reorganized Debtors – Disinterested Managers"***) provides that, following the Effective Date, the Disinterested Managers shall retain authority solely with respect to matters related to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan. The Disinterested Managers, in such capacity, shall not have any of their respective privileged and confidential documents, communications or information transferred (or deemed transferred) to the Reorganized Debtors.

### 6.    Directors and Officers Insurance Policies

Article IV.N the Plan ("***Directors and Officers Insurance Policies***") provides that, on the Effective Date the Reorganized Debtors will be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation of the Plan will not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory

Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary and in consultation with the Required Supporting Unsecured Noteholders. For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or prior to the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Liability Insurance Policies, which shall not be altered.

## VII.
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

### A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing is scheduled for [August 27], 2021 at 10:00 a.m. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge John T. Dorsey, together with proof of service thereof, and served upon all of the below parties.

| Debtors |
|---|
| Mallinckrodt plc<br>c/o ST Shared Services LLC<br>675 McDonnell Blvd.<br>Hazelwood, Missouri 63042<br>Attn: Mark Casey |

| Counsel to the Debtors | Counsel to the Supporting Governmental Plaintiff Ad Hoc Committee |
|---|---|

| | |
|---|---|
| Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn: Mark Collins, Michael Merchant, Amanda Steele, and Brendan Schlauch<br><br>and<br><br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, New York 10020<br>Attn: George Davis, George Klidonas, Anu Yerramalli, and Andrew Sorkin<br><br>and<br><br>Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Attn: Jeffrey Bjork<br><br>and<br><br>Latham & Watkins LLP<br>330 North Wabash Avenue, Suite 2800,<br>Chicago, Illinois 60611<br>Attn:  Jason Gott<br><br>and<br><br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Attn: Philip Mindlin and Neil M. Snyder | Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, New York 10036<br>Attn: Kenneth Eckstein and Daniel Eggermann<br><br>and<br><br>Brown Rudnick LLP<br>Seven Times Square<br>New York, New York 10019<br>Attn: David Molton and Steven Pohl<br><br>and<br><br>Gilbert LLP<br>700 Pennsylvania Ave, SE, Suite 400<br>Washington, D.C. 20003<br>Attn: Scott Gilbert and Kami Quinn |
| **United States Trustee** | **Counsel to the Ad Hoc<br>First Lien Term Lender Group** |
| Office of the United States Trustee for the<br>District of Delaware<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801<br>Attn: Jane M. Leamy, Esq. | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue New York, New York 10166<br>Attn: Scott J. Greenberg and Michael J. Cohen<br><br>and<br><br>Troutman Pepper Hamilton Sanders LLP<br>Hercules Plaza, Suite 5100<br>1313 N. Market Street, P.O. Box 1709<br>Wilmington, Delaware 19899-1709<br>Attn: David M. Fournier and Kenneth A. Listwak |
| **Counsel to the Supporting Unsecured<br>Noteholders** | **Counsel to the MSGE Group** |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas | Caplin & Drysdale, Chartered, Seitz, Van Ogtrop &<br>Green, P.A |

| New York, NY 10019<br>Attn: Andrew N. Rosenberg, Alice Belisle<br>Eaton, Claudia R. Tobler and Neal Paul<br>Donnelly | One Thomas Circle, NW, Suite 1100 \|<br>Washington, DC 20005<br>Attn: Kevin Maclay and Todd Phillips |
|---|---|
| **Counsel to the Supporting Term Lenders** ||
| Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166-0193<br>Attention: Scott J. Greenberg and Michael J. Cohen ||
| **Counsel to the FCR** ||
| Young Conaway Stargatt & Taylor, LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, DE 19801<br>Attn: James L. Patton, Jr.<br><br>and<br><br>Frankel Wyron LLP<br>2101 L St., NW, Suite 800<br>Washington, DC 20037<br>Attn: Richard Wyron ||

### B.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

### 1.    Confirmation Requirements

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must

146

have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding 5 years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

### a.    Acceptance

Claims in Classes 2(b) (unless otherwise Unimpaired in accordance with the Plan), 2(c) (unless otherwise Unimpaired in accordance with the Plan), 3 (unless otherwise Unimpaired in accordance with the Plan), 4 (unless otherwise Unimpaired in accordance with the Plan), 5, 6(a)-(f), 7, 8(a)-(d), 9(a)-(h), and 10 are Impaired under the Plan and are entitled to vote to accept or reject the Plan; Classes 1 and 2(a) are Unimpaired and are therefore conclusively deemed to accept the Plan; Classes 13 and 14 are Impaired and will receive no distributions under the Plan and therefore are conclusively deemed to reject the Plan; Claims and Interests in Classes 11 and 12 will either be Unimpaired or Impaired and receive no distributions, and will be conclusively deemed to accept or to reject the Plan, as applicable.

With respect to any Class of Claims or Interests that rejects (or is deemed to reject) the Plan, the Debtors will be required to demonstrate that the plan satisfies the requirements for nonconsensual confirmation under section 1129(b) of the Bankruptcy Code (which are discussed immediately below). While the Debtors believe the Plan satisfies such requirements with respect to all Classes of Claims and Interests that may reject the Plan, there can be no assurance that the Bankruptcy Court will determine that the Plan meets such requirements. The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class.

### b.     Unfair Discrimination and Fair and Equitable Test

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are similar to those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

### c.     Feasibility; Financial Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. Under the terms of the Plan, the Allowed Claims potentially being paid in whole or in part in Cash are the Other Secured Claims, General Unsecured Claims, Trade Claims, Opioid Claims, and the Settled Federal/State Acthar Claims. As shown in Exhibit D to this Disclosure Statement, the Debtors anticipate emerging with over $1 billion in cash on the balance sheet to be used to satisfy over $800 million in cash payments on the Effective Date, leaving the Reorganized Debtors with approximately $200 million cash on hand. Along with access to a [$200] million New AR Revolving Facility and cash generation post-Effective Date, the Reorganized Debtors expect sufficient liquidity to address its post-emergence obligations and to also deleverage over time.

In connection with developing the Plan, the Debtors have prepared detailed financial projections (the "***Financial Projections***"), as filed at Docket No. 2285-1 and set forth in **Exhibit D** hereto, which demonstrate among other things, the financial feasibility of the Plan. The Financial Projections indicate, on a *pro forma* basis, that the projected level of Cash flow is sufficient to satisfy all of the Reorganized Debtors' future debt and debt related interest cost, research and development, capital expenditure and other

obligations during this period.[42]  Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

**THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.  THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE IX. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS**.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  The Financial Projections have not been examined or compiled by independent **accountants**.  Moreover, such information has not been prepared in accordance with accounting principles generally accepted in the United States ("*GAAP*").  The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved may vary from the projected results and the variations may be material.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

### 2.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Reorganized Debtors, which estimate is filed at Docket No. 2285-3 and set forth in **Exhibit F** attached to this Disclosure Statement (the "*Valuation Analysis*").  The value of the Reorganized Debtors' equity is included in the Valuation Analysis (*see* Valuation Analysis at 3) as well as the assumptions used to calculate that value.  The Valuation Analysis should be considered in conjunction with the risk factors discussed in Section IX of this Disclosure Statement, entitled "Risk Factors to Consider Before Voting," and the Financial Projections.  The Valuation Analysis was conducted as of April 16, 2021, and is based on data and information as of that date.  The Valuation Analysis assumes the Effective Date occurs on September 24, 2021.  The Valuation Analysis is subject to various important qualifiers and assumptions that are filed at Docket No. 2285-3 and set forth in **Exhibit F**, and holders of Claims and Interests should carefully review the information at Docket No. 2285-3 and set forth in **Exhibit F** in its entirety.

Various parties have asserted that the Debtors' Financial Projections and Valuation Analysis should be split between the Specialty Brands Debtors and the Specialty Generics Debtors.  The Debtors do not believe that

---

[42]    The Financial Projections were prepared assuming the First Lien Notes Makewhole Claims and Second Lien Notes Makewhole Claims are not Allowed.  To the extent these Claims are Allowed, the Debtors would issue Cram-Down First Lien Notes and Cram-Down Second Lien Notes that would lead to interest savings of up to $30 million per year.

doing so is necessary to make an informed vote on the Plan or to Confirmation because the Plan's distributions to Class 6 and Class 7 are not reliant in any way on the valuation or projections of the two businesses separately.

### 3.    Best Interests Test

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 on the Effective Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

The Cash that would be available for satisfaction of Claims and Interests would consist of the proceeds from the disposition of the assets and properties of the Debtors, augmented by the existing Cash held by the Debtors.  Such Cash amount would be: (i) reduced by the amount of Allowed First Lien Revolving Credit Facility Claims, Allowed 2024 First Lien Term Loan Claims, Allowed 2025 First Lien Term Loan Claims, Allowed First Lien Notes Claims, Allowed Second Lien Notes Claims, and Allowed Other Secured Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a chapter 7 trustee and the fees payable to professionals that such trustee might engage) and such additional administrative claims that might result from the termination of the Debtors' business; and (iii) third, reduced by the amount of the General Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Other Priority Claims.  Any remaining net Cash would be allocated to creditors and stakeholders in strict order of priority contained in section 726 of the Bankruptcy Code.  Additional claims would arise by reason of the breach or rejection of obligations under unexpired leases and executory contracts.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts discussed above, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan and any distribution in a chapter 7 case would not occur for a substantial period of time.  It is likely that a liquidation of the Debtors' assets could take close to or more than a year to complete, and distribution of the proceeds of the liquidation could be delayed for up to nine months after the completion of such liquidation to resolve claims and prepare for distributions.  In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors, with the assistance of their financial advisors and legal counsel, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests in the event of liquidation on or around September 30, 2021 (the "***Liquidation Analysis***"), which is filed at Docket No. 2285-2 and set forth in **Exhibit E** hereto. The Liquidation Analysis provides: (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates, and (b) the expected recoveries of Holders of Claims and Interests under the Plan.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized. The chapter 7 liquidation period is assumed to last 12 to 21 months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations as going concerns or as individual assets, the collection of receivables and the finalization of tax affairs. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### C.    Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### D.    Consummation

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan (*see* Article [V.H] hereof and Article VIII of the Plan) have been satisfied or waived pursuant to the Plan. The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

### E.    Exemption from Certain Transfer Taxes

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state, or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

F.    **Dissolution of Committees**

On the Effective Date, the UCC and the OCC shall be dissolved and the members of each shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases and its implementation.

G.    **Modification of Plan**

Subject to the terms of the Restructuring Support Agreement and the limitations contained in the Plan, the Debtors or Reorganized Debtors reserve the right to, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement: (1) amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; (2) amend or modify the Plan after the entry of the Confirmation Order in accordance with section 1127(b) of the Bankruptcy Code and the Restructuring Support Agreement upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any  inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan upon order of the Bankruptcy Court.

H.    **Revocation or Withdrawal of the Plan; Reservation of Rights**

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, or if the Restructuring Support Agreement terminates in accordance with its terms, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

I.    **Post-Confirmation Jurisdiction of the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- except as provided in the Opioid MDT II Documents with respect to Opioid Claims, allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party o with respect to

which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (3) any dispute regarding whether a contract or lease is or was executory or expired;

- except as provided in the Opioid MDT II Documents with respect to Opioid Claims, ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Confirmation Order;

- adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- adjudicate, decide, or resolve any and all matters related to Causes of Action;

- adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- except as provided in the Opioid MDT II Documents with respect to Opioid Claims, resolve any cases, controversies, suits, or disputes that may arise in connection with any Claims, including claim objections, allowance, disallowance, estimation, and distribution;

- enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Confirmation Order, or the Disclosure Statement, including the Restructuring Support Agreement;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan or the Confirmation Order;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Confirmation Order, or the Disclosure Statement;

- enter an order or final decree concluding or closing the Chapter 11 Cases;

- except as provided in the Opioid MDT II Documents with respect to Opioid Claims, adjudicate any and all disputes arising from or relating to distributions under the Plan;

- consider any modification of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX of the Plan;

- resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Claims Bar Date established in the Chapter 11 Cases, or any deadline for responding or objection to a Cure Cost, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

- enforce all orders previously entered by the Bankruptcy Court; and

- hear any other matter not inconsistent with the Bankruptcy Code, the Plan, or the Confirmation Order;

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

Additionally, the Bankruptcy Court will retain jurisdiction to adjudicate, decide, or resolve issues raised by the Monitor, but such jurisdiction will not be exclusive and the Monitor shall retain the right to seek relief in all other courts

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article X of the Plan, the provisions of Article X of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided in the Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization and/or a sale of substantially all of the Debtors' assets, (B) a liquidation under chapter 7 of the Bankruptcy Code, or (C) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests to pursue available non-bankruptcy remedies.  These alternatives to the Plan are not likely to benefit Holders of Claims and Equity Interests.

### A.    Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan or sell all or substantially all of their assets outside of a plan.  Such a scenario might entail a reorganization and continuation of the Debtors' business, or an orderly liquidation of their assets; in either case, the Debtors expect that recoveries to their stakeholders would be diminished relative to those available under the Plan.

### B.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis filed at Docket No. 2285-2 and set forth in **Exhibit E** attached hereto.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### C.      Dismissal of Chapter 11 Cases.

If the Chapter 11 Cases are dismissed, Holders of Claims or Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Interests in the Debtors. However, in that event, Holders of Claims or Interests would be faced with the costs and difficulties of attempting, each on its own, to recover from a non-operating entity.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

**IX.**
**RISK FACTORS TO CONSIDER BEFORE VOTING**[43]

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, IN ADDITION TO THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.**

### A.      Certain Bankruptcy Law Considerations

#### 1.      General

While the Debtors believe that the Chapter 11 Cases will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the duration of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers, suppliers and employees.  The process will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.      Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for confirmation or that such mortifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization or otherwise.

---

[43]    This Article IX, *Risk Factors To Consider Before Voting*, of this Disclosure Statement remains subject to review and revision.

### 3.    Non-Consensual Confirmation

If any impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements, but there can be no assurance that the Bankruptcy Court will reach the same conclusion and confirm the Plan on a non-consensual basis.

### 4.    Financial Projections

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions, as filed at Docket No. 2285-1 and set forth in **Exhibit D** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demands for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.

### 5.    Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.

6.      **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

7.      **Releases, Injunctions, Exculpation Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

8.      **Risk of Non-Occurrence of Channeling of Opioid Claims**

Under the terms of the Plan, all Opioid Claims shall automatically be channeled exclusively to the Opioid MDT II and, this will, among other things, bar the assertion of any of these Claims against any Protected Party.  Although the Plan and the Opioid MDT II Documents all have been drafted with the intention of complying with section 105(a) of the Bankruptcy Code, there is no guarantee that all Opioid Claims shall automatically be channeled to the Opioid MDT II or section 105(a) or the channeling of the all Opioid Claims to the Opioid MDT II will not be challenged, either before or after confirmation of the Plan.  While the Debtors believe that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Cases.

9.      **Risk of Non-Occurrence of Effective Date**

Although the Debtors believe that the Effective Date will occur on the timeline envisaged by the Restructuring Support Agreement, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article VIII of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

10.      **Risks of Termination of the Restructuring Support Agreement**

The Restructuring Support Agreement contains certain provisions that give the parties thereto the ability to terminate the applicable agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

11.      **Conversion into Chapter 7 Cases**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under

chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 12. Risks of Non-Dischargeability of Claims

Certain creditors have taken or may take the position their claims are non-dischargeable. Such creditors may make such allegations at any time, notwithstanding the existence of deadlines established by the Bankruptcy Rules or applicable Court order, entry of the Confirmation Order, or the occurrence of the Effective Date. Such assertions of non-dischargeablility could result in denial of confirmation, changes to the Plan, or, if asserted after occurrence of the Effective Date, the Reorganized Debtors being required to honor such claims.

### 13. Channeling Injunction

The Opioid Permanent Channeling Injunction, which, among other things, bars any Entity that has held or asserted, or that holds or asserts Opioid Claims (including any Opioid Demands), is a necessary element of the Plan. While the Debtors believe that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged (including by the FCR) against the Plan on grounds that the requirements of the Bankruptcy Code and applicable law are not met, including arguments that substantial support by each affected class is required. Overcoming such objections is a burden that could potentially be difficult to meet given the unique facts of applicable Chapter 11 Cases. The Debtors believe that the Plan provides a sufficient basis for the issuance of the Opioid Permanent Channeling Injunction under section 105(a) of the Bankruptcy Code. However, there is no guarantee that the validity and enforceability of the Opioid Permanent Channeling Injunction or the application of the Opioid Permanent Channeling Injunction to the Opioid Claims (including any Opioid Demands) arising out of or related thereto will not be challenged, either before or after Confirmation of the Plan.

### 14. Amendment of Plan Prior to Confirmation by Debtors

The Debtors, subject to the terms and conditions of the Plan and the terms of the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for confirmation. The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### 15. Distributions under the Opioid MDT II and Opioid Creditor Trusts

Opioid Claims will be resolved pursuant to the Opioid MDT II Documents and Opioid Creditor Trust Documents and the distribution procedures therein, and their treatment will be based upon, among other things, estimates of the number, types, and amount of Opioid Claims (including Opioid Demands), the value of the assets of the Opioid MDT II and Opioid Creditor Trusts, the liquidity of these trusts, the expected future income and expenses, and other matters. There can be no certainty as to the precise amounts that will be distributed by the Opioid MDT II and Opioid Creditor Trusts in any particular time period or when Opioid Claims will be resolved by the Opioid MDT II and Opioid Creditor Trusts.

### 16. Pending and Future Litigation

As discussed in this Disclosure Statement, the Debtors are involved various litigation, including but not limited to, the Acthar Lawsuits and Generics Price Fixing Claims—which so long as it remains unresolved represents a legal issue and potential Claim for monetary damages. Additionally, there is a risk of future

litigation. Pending litigation or future litigation could result in a material judgment against the Debtors or the Reorganized Debtors. Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtors.

### B.   Risks Relating to the Capital Structure of the Reorganized Debtors

#### 1.   Variances from Financial Projections

The Financial Projections filed at Docket No. 2285-1 and set forth in **Exhibit D** hereto reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize, particularly given the current difficult economic environment and product-specific market conditions. Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower volume, lower pricing, increases in production costs, technological changes, environmental or safety issues, litigation, workforce disruptions, competition, regulatory decisions about pipeline products, or changes in the regulatory environment, could result in significant differences from the Financial Projections. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Debtors' and the Reorganized Debtors' ability to initiate the endeavors and meet the financial benchmarks contemplated by the Plan. Therefore, the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

#### 2.   Leverage

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will have approximately $3.9 billion in secured funded indebtedness and none in unsecured funded indebtedness.

The degree to which the Reorganized Debtors will be leveraged could have important consequences because, among other things, it could affect the Reorganized Debtors' ability to satisfy their obligations under their indebtedness following the Effective Date; a portion of the Reorganized Debtors' cash flow from operations will be used for debt service and settlement obligations under the Plan and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to obtain additional debt financing or equity financing, or pursue mergers, acquisitions and asset sales, may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their businesses may be severely limited.

#### 3.   Ability to Service Debt

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations.  The Reorganized Debtors' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be

available to pay off the Reorganized Debtors' debt obligations. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

### 4.    Obligations Under Certain Financing Agreements

The Reorganized Debtors' obligations under the New Credit Facilities, the New Takeback Term Loan Facility, the First Lien Notes, Second Lien Notes, the Takeback Second Lien Notes, the Cram-Down First Lien Notes, and Cram-Down Second Lien Notes are secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth therein). If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the New Term Loan Documentation, the New AR Revolving Facility Documentation, the New Takeback Term Loans Documentation, the First Lien Notes, the Second Lien Notes, the Cram-Down First Lien Notes, or the Cram-Down Second Lien Notes, and payment on any obligation thereunder is accelerated, the lenders under and holders of the New Credit Facilities, the New Takeback Term Loan Facility, the First Lien Notes, the Second Lien Notes, the Cram-Down First Lien Notes, or the Cram-Down Second Lien Notes would be entitled, subject to the applicable intercreditor agreements and other applicable credit documents, to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

### 5.    Restrictive Covenants

The financing agreements governing the Reorganized Debtors' indebtedness will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of their assets. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

### 6.    Market for Securities

There is currently no market for the New Mallinckrodt Ordinary Shares and there can be no assurance as to the development or liquidity of any market for such securities. There can also be no assurance that the New Mallinckrodt Ordinary Shares will be listed or traded on any securities exchange on or after the Effective Date. Therefore, there can be no assurance that the securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for,

the Reorganized Debtors.  Accordingly, holders of the securities may bear certain risks associated with holding securities for an indefinite period of time.

### 7.    Potential Dilution

The ownership percentage represented by the New Mallinckrodt Ordinary Shares distributed under the Plan as of the Effective Date will be subject to dilution from the equity issued in connection with the (a) Management Incentive Plan, (b) New Opioid Warrants, (c) any other equity that may be issued post-emergence, and (d) the exercise or conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.  In the future, similar to all companies, additional equity financings or other equity issuances by Reorganized Mallinckrodt could adversely affect the value of the New Mallinckrodt Ordinary Shares.  The amount and dilutive effect of any of the foregoing could be material.

### 8.    Significant Holders of New Mallinckrodt Ordinary Shares

Certain holders of Allowed Guaranteed Unsecured Notes Claims are expected to acquire a significant ownership interest in the New Mallinckrodt Ordinary Shares.  Thus, such holders could be in a position to control the outcome of all actions of Reorganized Mallinckrodt requiring the approval of equity holders, including the election of directors or managers, without the approval of other equity holders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of Reorganized Mallinckrodt and, consequently, have an impact upon the value of the New Mallinckrodt Ordinary Shares.

### 9.    Interests Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of Reorganized Mallinckrodt, the New Mallinckrodt Ordinary Shares would rank below all debt claims against Reorganized Mallinckrodt.  As a result, holders of the New Mallinckrodt Ordinary Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of Reorganized Mallinckrodt until after all applicable holders of debt have been paid in full.

### 10.    Estimated Valuations of the Debtors and the New Mallinckrodt Ordinary Shares, and Estimated Recoveries to Holders of Guaranteed Unsecured Notes Claims Are Not Intended to Represent Potential Market Values

The Debtors' estimated recoveries to Allowed Holders of Guaranteed Unsecured Notes Claims are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including, among others:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships.

### 11.    Dividends

Reorganized Mallinckrodt may not pay any dividends on the New Mallinckrodt Ordinary Shares .  In such circumstances, the success of an investment in the New Mallinckrodt Ordinary Shares  will depend entirely upon any future appreciation in the value of the New Mallinckrodt Ordinary Shares.  There is, however, no guarantee that the New Mallinckrodt Ordinary Shares will appreciate in value or even maintain their initial value.

12. **Restrictions on Ability to Resell New Mallinckrodt Ordinary Shares and/or New Opioid Warrants**

Holders of securities issued pursuant to the exemption from registration under section 1145 of the Bankruptcy Code who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code ("***Section 1145 Underwriters***") will be subject to resale restrictions. Section 1145 Underwriters, should be aware that they may be required to bear the financial risk of an investment in the affected New Mallinckrodt Ordinary Shares and/or the New Opioid Warrants for an indefinite period of time.

13. **If a United States Person is Treated as Owning At Least 10% of the New Mallinckrodt Ordinary Shares, Such Holder May be Subject to Adverse U.S. Federal Income Tax Consequences.**

Many of Mallinckrodt plc's non-U.S. subsidiaries are classified as "controlled foreign corporations" for U.S. federal income tax purposes due to the application of certain ownership attribution rules within a multinational corporate group. If a United States person is treated as owning (directly, indirectly or constructively) at least 10% of the value or voting power of Reorganized Mallinckrodt's shares, such person may be treated as a "United States shareholder" (a "***10% U.S. Holder***") with respect to one or more of Reorganized Mallinckrodt's controlled foreign corporation subsidiaries. In addition, if the New Mallinckrodt Ordinary Shares are treated as owned more than 50% (by voting power or value) by 10% U.S. Holders, Reorganized Mallinckrodt itself would be treated as a controlled foreign corporation. A 10% U.S. Holder may be required to annually report and include in its U.S. taxable income, as ordinary income, its pro rata share of "Subpart F income," "global intangible low-taxed income" and investments in U.S. property by controlled foreign corporations, whether or not Reorganized Mallinckrodt makes any distributions to such 10% U.S. Holder. An individual United States shareholder generally would not be allowed certain tax deductions or foreign tax credits that would be allowed to a corporate United States shareholder. A failure by a 10% U.S. Holder to comply with its reporting obligations may subject the 10% U.S. Holder to significant monetary penalties and may extend the statute of limitations with respect to the 10% U.S. Holder's U.S. federal income tax return for the year for which such reporting was due. Reorganized Mallinckrodt cannot provide any assurances that it will assist investors in determining whether it or any of its non-U.S. subsidiaries are controlled foreign corporations. Reorganized Mallinckrodt also cannot guarantee that it will furnish to 10% U.S. Holders information that may be necessary for them to comply with the aforementioned obligations. The risk of being subject to increased reporting and compliance obligations and taxation could impact the demand for, and value of, New Mallinckrodt Ordinary Shares.

C.    <u>Risks Relating to the Debtors' Business Operations and Financial Conditions</u>

**THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE DEBTORS' BUSINESSES. HOWEVER, THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE. ADDITIONAL RISK FACTORS CONCERNING THE DEBTORS' BUSINESSES ARE CONTAINED IN THE DEBTORS' PREVIOUSLY-FILED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 25, 2020.**

1. **The Debtors' Chapter 11 Cases May Negatively Impact Future Operations.**

While the Debtors believe that they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtors' emergence from chapter 11. Additionally, notwithstanding the support of the signatories to the Restructuring Support Agreement, the Chapter 11 Cases may adversely affect the Debtors' ability to maintain relationships with existing customers and suppliers and attract new customers.

2.    **The Debtors' Business May Be Adversely Affected by Public Health Crises and Epidemics/Pandemics, Including the Recent Coronavirus Outbreak.**

A pandemic, epidemic or outbreak of an infectious disease occurring in the U.S. or elsewhere in the world could result in the Debtors' business being adversely affected.  Specifically, in December 2019, the SARS-CoV-2 virus which causes COVID-19 was identified in China, and subsequently spread to countries throughout the world, including Ireland, the United Kingdom, and the U.S., resulting in the World Health Organization declaring the COVID-19 outbreak a pandemic in March 2020.  The Debtors' business performance was significantly impacted by COVID-19, and the Debtors expect to continue to see pandemic-related challenges while the pandemic persists and likely during the aftermath and recovery, which could last for several years.

The Debtors may experience significant and unforeseen increases or decreases in demand for certain of their products as the needs of health care providers and patients evolve during this pandemic.  For example, as the Debtors are among the world's largest manufacturers of bulk acetaminophen and the only producer of acetaminophen in the North American and European regions, the Debtors could experience an increase in demand which the Debtors may not be able to meet in accordance with the needs of the market. Additionally, the Debtors' INOmax product is a potential treatment for acute respiratory distress syndrome (ARDS), which is a known clinical manifestation of infection with many respiratory viruses including the SARS-CoV-2 coronavirus that causes COVID-19, and which could be subject to similar dynamics. Alternatively, because many non-critical and elective medical treatments were deferred or de-prioritized during the pandemic, demand for the Debtors' Ofirmev product was negatively affected from the second quarter of 2020 onward.  The Debtors also experienced and may continue to experience reduced demand for Therakos due to the phenomenon of immunosuppressed patients who would normally receive Therakos ECP therapy in a clinic setting, but who were instructed to or who chose to stay at home and/or pursue other treatment alternatives (even if less effective) to decrease risk of COVID-19 infection.

Furthermore, in 2020, then-U.S. President Trump invoked emergency powers under the Defense Production Act, which allows the U.S. government to direct private companies to meet the needs of the nation in the time of an emergency, and in early 2021, U.S. President Biden continued to invoke the same powers.  Given the critical nature of some of the products the Debtors manufacture, as well as the Debtors' pharmaceutical and medical device manufacturing capabilities, the Debtors may be impacted by governmental action taken under this or similar legislative or executive action.

Many countries around the world have imposed quarantines and restrictions on travel and mass gatherings to slow the spread of the virus.  Such disruptions could materially delay potential FDA approval with respect to the Debtors' clinical trials and product candidates.  Other factors caused by COVID-19 have already impacted and could materially delay or otherwise impact clinical trials the Debtors are conducting related to our products, including the ability to recruit and retain patients and principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19.  Furthermore, business pressures driven by the ongoing COVID-19 pandemic have led the Debtors to prioritize certain investments over others, resulting in the termination of two Phase 4 studies related to Acthar Gel, and such pressures could result in similar decisions across the rest of the product portfolio.  Any delays in the Debtors' clinical trials or regulatory review resulting from such disruptions could materially affect the development or approval of pipeline product candidates or the Debtors' lifecycle management efforts.

In addition, the economic impact of the spread of COVID-19, which has caused a broad impact globally, has adversely impacted and may continue to adversely affect the Debtors' businesses.  In particular, COVID-19 has affected demand for the Debtors' products due to limitations on the ability of its sales representatives to meet with physicians, and a reduction in patient visits to their doctors and pharmacists in

order to receive prescriptions for the Debtors' products, all of which may continue so long as the pandemic continues.  There is also an increased risk of supply interruption at the Debtors' third-party suppliers to deliver components as well as the Debtors' manufacturing facilities to produce finished products on a timely basis, which could result in business or operational disruption.  Additionally, while the potential long-term economic impact of COVID-19 may be difficult to assess or predict, the COVID-19 pandemic has resulted in significant disruption of global financial markets, which could reduce the Debtors' ability to access capital, thereby negatively affecting the Debtors' liquidity.  The extent to which the COVID-19 pandemic impacts the Debtors' results will depend on future developments that are highly uncertain and cannot be predicted.

Given the rapid and evolving nature of the COVID-19 pandemic, the full extent to which it will directly or indirectly impact the Debtors' businesses, results of operations and financial condition will depend on future developments that are highly uncertain and cannot be predicted.

3.      **Sales of the Debtors' Products Are Affected by the Reimbursement Practices of Governmental Health Administration Authorities, Private Health Coverage Insurers and Other Third-Party Payers, and the Debtors May Be Negatively Impacted by any Changes to Such Reimbursement Practices.**

Sales of the Debtors' products depend, in part, on the extent to which the costs of the Debtors' products are reimbursed by governmental health administration authorities, private health coverage insurers and other third-party payers.  The ability of patients to obtain appropriate reimbursement for products and services from these third-party payers affects the selection of products they purchase and the prices they are willing to pay.  In the U.S., there have been, and the Debtors expect there will continue to be, a number of state and federal proposals that limit the amount that third-party payers may pay to reimburse the cost of drugs, for example with respect to Acthar Gel.  The Debtors believe the increasing emphasis on managed care in the U.S. has and will continue to put pressure on the usage and reimbursement of Acthar Gel.  The Debtors' ability to commercialize their products depends in part on the extent to which reimbursement for the costs of these products is available from government healthcare programs such as Medicaid and Medicare, private health insurers, and others.  The Debtors cannot be certain that, over time, third-party reimbursements for the Debtors' products will be adequate for the Debtors to maintain price levels sufficient for realization of an appropriate return on their investment.

Reimbursement of highly-specialized products, such as Acthar Gel, is typically reviewed and approved or denied on a patient-by-patient, case-by- case basis, after careful review of details regarding a patient's health and treatment history that is provided to the insurance carriers through a prior authorization submission, and appeal submission, if applicable.  During this case-by-case review, the reviewer may refer to coverage guidelines issued by that carrier.  These coverage guidelines are subject to on-going review by insurance carriers.  Because of the large number of carriers and variations in the coverage offered by the various plans offered by those carriers, there are a large number of guideline updates issued each year.

Furthermore, demand for new products may be limited unless the Debtors obtain reimbursement approval from governmental and private third-party payers prior to the introduction or launch of those products in the market. Reimbursement criteria, which vary by country, are becoming increasingly stringent and require management expertise and significant attention to obtain and maintain qualification for reimbursement.

4.    **Reimbursement Criteria or Policies and the Use of Tender Systems Outside the U.S. Could Reduce Prices for the Debtors' Products or Reduce the Debtors' Market Opportunities.**

Markets in which the Debtors operate have implemented or may implement tender systems in an effort to lower prices.  Under such tender systems, manufacturers submit bids which establish prices for products.  The company that wins the tender receives preferential reimbursement for a period of time.  Accordingly, the tender system often results in companies underbidding one another by proposing low pricing in order to win the tender.  Certain other countries may consider implementation of a tender system.  Even if a tender system is ultimately not implemented, the anticipation of such could result in price reductions.  Failing to win tenders, or the implementation of similar systems in other markets leading to price declines, could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.  The Debtors are unable to predict what additional legislation or regulation or changes in third-party coverage and reimbursement policies may be enacted or issued in the future or what effect such legislation, regulation and policy changes would have on their business.

5.    **The Failure of the Acthar Settlement May Subject the Debtors to Additional Risk and Uncertainties.**

The failure of the Acthar settlement in principle may subject the Debtors to additional risk and uncertainties that could adversely affect the Debtors' business prospects, including, the decision by CMS to exclude the Debtors from Medicare and/or Medicaid.  Doing so may have an adverse impact on the Debtors' business, financial condition, results of operations, cash flows and ability to consummate the Plan.

6.    **The Debtors May Be Unable to Protect Their Intellectual Property Rights or Their Intellectual Property Rights May Be Limited.**

The Debtors rely on a combination of patents, trademarks, trade secrets, proprietary know-how, market exclusivity gained from the regulatory approval process, and other intellectual property to support their business strategy, most notably in relation to Acthar Gel, INOmax, Therakos and Amitiza products.  However, the Debtors' efforts to protect their intellectual property rights may not be sufficient. If the Debtors do not obtain sufficient protection for their intellectual property, or if the Debtors are unable to effectively enforce their intellectual property rights, or if there is a change in the way courts and regulators interpret the laws, rules and regulations applicable to our intellectual property, the Debtors' competitiveness could be impacted, which could adversely affect their competitive position, business, financial condition, results of operations and cash flows.

Furthermore, the Debtors' pending patent applications may not result in the issuance of patents, or the patents issued to or licensed by us in the past or in the future may be challenged or circumvented by competitors.  Existing patents may be found to be invalid or insufficiently broad to preclude the Debtors' competitors from using methods or making or selling products similar or identical to those covered by the Debtors' patents and patent applications.  Regulatory agencies may refuse to grant the Debtors the market exclusivity that they were anticipating, or may unexpectedly grant market exclusivity rights to other parties.  In addition, the Debtors' ability to obtain and enforce intellectual property rights is limited by the unique laws of each country.  In some countries, it may be particularly difficult to adequately obtain or enforce intellectual property rights, which could make it easier for competitors to capture market share in such countries by utilizing technologies and product features that are similar or identical to those developed or licensed by the Debtors.  Competitors also may harm the Debtors' sales by designing products that mirror the capabilities of our products or technology without infringing our patents, including by coupling separate technologies to replicate what our products accomplish through a single system.

Competitors may diminish the value of the Debtors trade secrets by reverse engineering or by independent invention. Additionally, current or former employees may improperly disclose such trade secrets to competitors or other third parties. The Debtors may not become aware of any such improper disclosure, and, in the event the Debtors do become aware, the Debtors may not have an adequate remedy available.

### 7.    Debtors May Be Subject to Claims that they Infringe on the Intellectual Property Rights of Others.

The Debtors operate in an industry characterized by extensive patent litigation, and the Debtors may from time to time be a party to such litigation. The pursuit of or defense against patent infringement is costly and time-consuming and the Debtors may not know the outcomes of such litigation for protracted periods of time. The Debtors may be unsuccessful in efforts to enforce their patent or other intellectual property rights. In addition, patent litigation can result in significant damage awards, including the possibility of treble damages and injunctions. Additionally, the Debtors could be forced to stop manufacturing and selling certain products, or they may need to enter into license agreements that require the Debtors to make significant royalty or up- front payments in order to continue selling the affected products. Given the nature of the Debtors' industry, the Debtors are likely to face additional claims of patent infringement in the future. A successful claim of patent or other intellectual property infringement against the Debtors could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

### 8.    The Loss of One or More of Reorganized Mallinckrodt's Key Personnel Could Disrupt Operations and Adversely Affect Financial Results

The Debtors are, and the Reorganized Debtors will be, highly dependent upon the availability and performance of their executive officers. Accordingly, the loss of services of any of the Debtors' executive officers could materially and adversely affect the Reorganized Debtors' business, financial condition and operating results.

### 9.    Extensive Laws and Regulations Govern the Industry in Which the Debtors Operate and Any Failure to Comply with Such Laws and Regulations, Including Any Changes to Those Laws and Regulations May Materially Adversely Affect the Debtors.

The development, manufacture, marketing, sale, promotion, and distribution of the Debtors' products are subject to comprehensive government regulations that govern and influence the development, testing, manufacturing, processing, packaging, holding, record keeping, safety, efficacy, approval, advertising, promotion, sale, distribution and import/export of our products.

Under these laws and regulations, the Debtors are subject to periodic inspection of their facilities, procedures and operations and/or the testing of their products by the FDA, the DEA and similar authorities within and outside the U.S., which conduct periodic inspections to confirm that the Debtors are in compliance with all applicable requirements. The Debtors are also required to track and report adverse events and product quality problems associated with our products to the FDA and other regulatory authorities. Failure to comply with the requirements of FDA or other regulatory authorities, including a failed inspection or a failure in our adverse event reporting system, or any other unexpected or serious health or safety concerns associated with our products, including their Debtors' opioid pain products and Acthar Gel, could result in adverse inspection reports, warning letters, product recalls or seizures, product liability claims, labeling changes, monetary sanctions, injunctions to halt the manufacture and distribution of products, civil or criminal sanctions, refusal of a government to grant approvals or licenses, restrictions on operations or withdrawal of existing approvals and licenses. Any of these actions could cause a loss of

customer confidence in the Debtors' products, which could adversely affect the Debtors' sales, or otherwise have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows. In addition, the requirements of regulatory authorities, including interpretative guidance, are subject to change and compliance with additional or changing requirements or interpretative guidance may subject us to further review, result in product delays or otherwise increase our costs, and thus have a material adverse effect on the Debtors' competitive position, business, financial condition, results of operations and cash flows.

10.    **The Debtors May be Unable to Successfully Develop, Commercialize or Launch New Products or Expand Commercial Opportunities for Existing Products or Adapt to a Changing Technology.**

The Debtors' future results of operations will depend, to a significant extent, upon the Debtors' ability to successfully develop, commercialize and launch new products or expand commercial opportunities for existing products in a timely manner.  There are numerous difficulties in developing, commercializing and launching new products or expanding commercial opportunities for existing products, including:

- developing, testing and manufacturing products in compliance with regulatory and quality standards in a timely manner;

- the Debtors' ability to successfully engage with the FDA or other regulatory authorities as part of the approval process and to receive requisite regulatory approvals for such products in a timely manner, or at all;

- the availability, on commercially reasonable terms, of raw materials, including API and other key ingredients;

- developing, commercializing and launching a new product is time-consuming, costly and subject to numerous factors, including legal actions brought by our competitors, that may delay or prevent the development, commercialization and/or launch of new products;

- unanticipated costs;

- payment of prescription drug user fees to the FDA to defray the costs of review and approval of marketing applications for branded and generic drugs;

- experiencing delays as a result of limited resources at the FDA or other regulatory authorities;

- changing review and approval policies and standards at the FDA or other regulatory authorities;

- potential delays in the commercialization of generic products by up to 30 months resulting from the listing of patents with the FDA;

- effective execution of the product launches in a manner that is consistent with expected timelines and anticipated costs; and

- identifying appropriate partners for distribution of our products, including any future over-the-counter commercialization opportunities, and negotiating contractual arrangements in a timely manner with commercially reasonable terms.

As a result of these and other difficulties, products currently in development by the Debtors may or may not receive timely regulatory approvals, or approvals at all.  This risk is heightened with respect to the development of proprietary branded products due to the uncertainties, higher costs and length of time

associated with R&D of such products and the inherent unproven market acceptance of such products. Moreover, the FDA regulates the facilities, processes and procedures used to manufacture and market pharmaceutical products in the U.S. Manufacturing facilities must be registered with the FDA and all products made in such facilities must be manufactured in accordance with cGMP regulations enforced by the FDA. Compliance with cGMP regulations requires the dedication of substantial resources and requires significant expenditures. The FDA periodically inspects both our facilities and procedures to ensure compliance with regulatory standards. The FDA may cause a suspension or withdrawal of product approvals if regulatory standards are not maintained. In the event an approved manufacturing facility for a particular drug is required by the FDA to curtail or cease operations, or otherwise becomes inoperable, obtaining the required FDA authorization to manufacture at the same or a different manufacturing site could result in production delays, which could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

Furthermore, the market perception and reputation of the Debtors' products are important to their business and the continued acceptance of their products. Any negative press reports or other commentary about the Debtors' products, whether accurate or not, could have a material adverse effect on their business, reputation, financial condition, results of operation or cash flows or could cause the market value of our common shares and/or debt securities to decline.

With respect to generic products for which the Debtors are the first developer to have its application accepted for filing by the FDA, and which filing includes a certification that the applicable patent(s) are invalid, unenforceable and/or not infringed (known as a "Paragraph IV certification"), the Debtors' ability to obtain and realize the full benefits of 180-days of market exclusivity is dependent upon a number of factors, including, being the first to file, the status of any litigation that might be brought against the Debtors as a result of our filing or not meeting regulatory, manufacturing or quality requirements or standards. If any of the Debtors products are not approved timely, or if the Debtors are unable to obtain and realize the full benefits of the respective market exclusivity period for their products, or if their products cannot be successfully manufactured or commercialized timely, the Debtors' results of operations could be materially adversely affected. In addition, the Debtors cannot guarantee that any investment they make in developing products will be recouped, even if the Debtors are successful in commercializing those products. Finally, once developed and approved, new products may fail to achieve commercial acceptance due to the price of the product, third-party reimbursement of the product and the effectiveness of sales and marketing efforts to support the product.

> 11.     **The Debtors' Businesses May Face Risks Related to Opioid Litigation If Required to Assume Certain Executory Contracts**

The Debtors' businesses may face risks relating to opioid litigation if they are required to assume Executory Contracts with any opioid co-defendant and honor indemnification provisions thereunder after the Effective Date.  Instead of assuming any such Executory Contracts, the Debtors may determine to reject them, in which case the Debtors' businesses may face risks around distribution channels and their ability to sell their products.  Either of these risks could substantially impair the Debtors' profitability after the Effective Date.

> D.     <u>**Certain Risk Factors Related to the Irish Examinership Proceedings**</u>

> 1.     **General**

The Irish Examinership Proceedings in relation to the Irish Debtors, will be of shorter duration than the Chapter 11 Cases and will run concurrently with the Chapter 11 Cases.  It will entail the same risks with regard to the Debtors' business.  Further, as discussed in this Disclosure Statement, the filing of the Irish Examinership Proceedings will commence a protection period during which the Parent will, under Irish

169

law, have the benefit of protection against enforcement and other actions by its creditors for a period of up to 100 calendar days (or as otherwise amended under applicable Irish insolvency law).  In the event the Irish Examinership Proceedings are unsuccessful, the High Court of Ireland could potentially order the winding up of the Irish Debtors or convert the Irish Examinership Proceedings to a liquidation proceeding.

> **2.**      **Parties in Interest May Object to the Appointment of an Examiner to the Irish Debtors.**

Section 509 of the Companies Act 2014 (Ireland) provides that the High Court of Ireland may appoint an examiner to an Irish registered company if it is insolvent, has not been put into liquidation, no receiver has been appointed for three consecutive days prior to the presentation of  the petition and that there is a reasonable prospect of the survival of both the company and its undertaking.  In the case of the latter proof, the Parent, as the ultimate parent company of the Debtors, will be required to satisfy the High Court of Ireland that it has an undertaking in its own right and that there is a reasonable prospect of survival of its undertaking as a going concern.  The Parent believes that it will be possible to satisfy each of these proofs but there can be no assurance that the High Court of Ireland will reach the same conclusion.

> **3.**      **The Examiner May Not Put the Proposals Before the Members and Creditors of the Irish Debtors and Seek their Approval by the High Court of Ireland.**

The examiner, when appointed, will be an independent officer of the High Court of Ireland and will be free to adopt or decline to adopt the terms of the proposals for a scheme of arrangement accompanying the petition to have an examiner appointed to the Irish Debtors.  The Debtors believe that the examiner will adopt and put the proposals before meetings of the Irish Debtors' shareholders and creditors and subsequently seek their approval by the High Court of Ireland, because the proposals will mirror the Plan and the Plan represents the best solution achievable for the Debtors, their creditors and shareholders.  There can be no assurance however that the examiner will reach the same conclusion.

> **4.**      **Parties in Interest May Object to the Examiner's Classification of Claims.**

The examiner will be required, pursuant to section 539 of the Companies Act 2014 (Ireland), to place creditors in classes of creditors and provide equal treatment for each claim within a particular class unless the holder of a particular claim agrees to less favorable treatment.  It is likely that in considering any objection to the basis upon which classes have been formulated the High Court of Ireland would take the view that each class must be confined to those parties whose rights are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.  There can be no assurance that the High Court of Ireland will decide that the examiner's formulation of classes was correct.

> **5.**      **The Examiner May Not Be Able to Secure Confirmation of the Proposals for a Scheme of Arrangement.**

Section 541 of the Companies Act 2014 (Ireland) provides that the High Court of Ireland is precluded from confirming proposals for a scheme of arrangement unless it is satisfied that the proposals are fair and equitable in relation to any class of members or creditors that has not accepted the proposals and whose interests or claims would be impaired by implementation of the proposals and not unfairly prejudicial to the interests of any interested party.  Whether proposals are fair and equitable or not unfairly prejudicial to any party will usually be assessed by reference to how such party would be treated in a liquidation, pursuant to Part 11 of the Companies Act 2014 (Ireland), of the Irish Debtors.  A shareholder or creditor should not be unfairly prejudiced and a class of shareholders or creditors should not be  considered to have been treated unfairly or inequitably if that party's treatment approximates to, or is better than, the manner in which such party would be treated in a liquidation of the Irish Debtors.  Any creditor or shareholder whose interests

would be impaired by the proposals if implemented and who did not vote in favor of the proposals may object to the proposals in the High Court of Ireland at the hearing convened to confirm the proposals. The Debtors believe that the terms of the Plan insofar as they relate to the Irish Debtors would not, if mirrored in a scheme of arrangement pursuant to Part 10 of the Companies Act 2014 (Ireland), be unfair or inequitable to any class of shareholders or creditors of the Irish Debtors and would not be unfairly prejudicial to the interests of any interested party. There is no assurance however that the High Court of Ireland will reach the same conclusion.

### E.    Certain Risk Factors Related to the Canadian Recognition Proceedings

#### 1.    Risk that the Canadian Court Will or Grant Recognition of the Confirmation Order.

Prior to the Effective Date, the Canadian Filing Entities intend to seek recognition of the Confirmation Order in Canada. There is a risk that the Canadian Court will not grant such recognition, which may affect the Canadian Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order in Canada and channel the Canadian Opioid Claims to the Opioid MDT II.

### F.    Additional Factors

#### 1.    Debtors Could Withdraw Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

#### 2.    Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 4.    No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## X.
## SECURITIES LAW MATTERS

### A.    Issuance & Transfer of 1145 Securities

### 1.    Issuance

The Plan provides for the offer, issuance, sale or distribution of shares of the New Mallinckrodt Ordinary Shares and New Opioid Warrants (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) pursuant to, among other things, the Guaranteed Unsecured Notes Claims and Opioid MDT II distributions.   The Debtors believe that the offer, issuance, sale or distribution by Reorganized Mallinckrodt of the New Mallinckrodt Ordinary Shares and New Opioid Warrants (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) as distributions on the Guaranteed Unsecured Notes Claims and to the Opioid MDT II (the "*1145 Securities*") will be exempt from registration under section 5 of the Securities Act and under any state or local laws requiring registration for offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code, except with respect to an entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code (see below).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the securities must be in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for such a claim or interest , or "principally" in exchange for such claim or interest and "partly" for cash or property.

The issuance of the New Mallinckrodt Ordinary Shares and New Opioid Warrants (including any New Mallinckrodt Ordinary Shares issuable upon exercise of the New Opioid Warrants as of the Effective Date, without regard to any limitations on the exercise of the New Opioid Warrants) on account of Guaranteed Unsecured Notes Claims and to the Opioid MDT II satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code.

The exemptions of section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters":  (A) a Person who purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest ("accumulators"); (B) a Person who offers to sell securities offered or sold under a plan for the holders of such securities ("distributors"); (C) a Person who offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is: (i) with a view to distributing such securities; and (ii) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of

securities under the plan; and (D) a Person who is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, includes Persons directly or indirectly controlling, controlled by or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Such Persons are referred to as "affiliates" of the issuer.

Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be an issuer for these purposes and therefore an underwriter. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who receives ten percent or more of a class of securities of a reorganized debtor may be presumed to be in a relationship of "control" with the reorganized debtor and, therefore, an underwriter, although the staff of the Securities and Exchange Commission (the "**SEC**") has not endorsed this view.

## 2.    Subsequent Transfers

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a) are deemed to have been issued in a public offering. In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities. A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.

Notwithstanding the provisions of section 1145(b) regarding accumulators and distributors referred to above, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a)    (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b)    the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a Bankruptcy Court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c)    the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any persons intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

To the extent that Persons who receive 1145 Securities pursuant to the Plan are deemed to be underwriters (and who do not qualify for the treatment of "ordinary trading transactions" described above), resales by such Persons of 1145 Securities would not be exempted from registration under the Securities Act or other applicable laws by reason of section 1145 of the Bankruptcy Code and section 4(a)(1) of the Securities Act. However, Persons deemed to be underwriters may be permitted to resell such 1145 Securities without registration pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act or another available exemption under the Securities Act.

Generally Rule 144 of the Securities Act permits the public sale of securities if certain conditions are met, including a required holding period, certain current public information regarding the issuer being available and compliance with the volume, manner of sale and notice requirements.  If the issuer is not subject to the reporting requirements of section 13 or 15(d) of the Securities Exchange Act of 1934 (the "*Exchange Act*"), adequate current public information as specified under Rule 144 is available if certain company information is made publicly available, as specified in section (c)(2) of Rule 144. Reorganized Mallinckrodt will not be subject to the reporting requirements of section 13 or 15(d) of the Exchange Act. However, the Debtors currently expect that Reorganized Mallinckrodt will continue to be a voluntary filer and that current public information will be available to allow resales in accordance with Rule 144.  The staff of the SEC has taken the position that Persons who are deemed to be underwriters solely because they are affiliates of a reorganized debtor are not subject to the holding period requirements of Rule 144.  Accordingly, affiliates of Reorganized Mallinckrodt that receive 1145 Securities under the Plan may resell those securities following the Effective Date in reliance on Rule 144, subject to applicable volume, manner of sale and notice requirements.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the 1145 Securities or any other security to be issued pursuant to the Plan depends upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving 1145 Securities or any other securities under the Plan would be considered an "underwriter" under section 1145(b) of the Bankruptcy Code with respect to such securities, or whether such Person may freely resell such securities or the circumstances under which they may resell such securities.

Should the Reorganized Debtors elect on or after the Effective Date to cause the New Mallinckrodt Ordinary Shares and/or the New Opioid Warrants to be eligible for book-entry treatment under the facilities of the Depository Trust Company ("*DTC*"), the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Mallinckrodt Ordinary Shares and/or the New Opioid Warrants under applicable securities laws. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan under applicable securities laws, including, for the avoidance of doubt, whether the New Mallinckrodt Ordinary Shares and/or the New Opioid Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Mallinckrodt Ordinary Shares and/or the New Opioid Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKES ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF ANY SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN OR ANY OTHER AGREEMENT.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

## XI.
## CERTAIN U.S. INCOME TAX CONSEQUENCES OF THE PLAN

A.    **Introduction**

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to MEH, Inc. and its subsidiaries included in its U.S. federal consolidated income tax group (collectively, the "***U.S. Tax Group***") and Holders of First Lien Term Loan Claims, First Lien Notes Claims, Second Lien Notes Claims, and Guaranteed Unsecured Notes Claims (such Claims, collectively, the "***Prepetition Debt***"), General Unsecured Claims, Trade Claims and Other Opioid Claims. It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or non-U.S. tax laws or U.S. federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "***IRS***"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that Holders of Prepetition Debt have held such property as "capital assets" within the meaning of Section 1221 of the Tax Code (generally, property held for investment) and will hold the New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Takeback Second Lien Notes and New Mallinckrodt Ordinary Shares as capital assets.  This discussion also assumes that the debt instruments to which any of the Debtors are, or Reorganized Debtors will be, a party will be respected as debt for U.S. federal income tax purposes.

This discussion does not address all U.S. federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances, including the impact of the tax on net investment income imposed by Section 1411 of the Tax Code and the effects of Section 451(b) of the Tax Code conforming the timing of certain income accruals to financial statements. In addition, it does not address considerations relevant to Holders subject to special rules under the U.S. federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, Governmental Claimants, Holders of Settled Federal/State Acthar Claims, Holders subject to the

175

alternative minimum tax, Holders who utilize installment method reporting with respect to their Claims, Holders holding Prepetition Debt, New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Takeback Second Lien Notes or New Mallinckrodt Ordinary Shares as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Tribes (as defined below), Non-U.S. Holders of Other Opioid Claims, U.S. Holders (as defined below) who have a functional currency other than the U.S. dollar, and, with limited exceptions, Holders that are "United States shareholders" as defined by Section 951(b) of the Tax Code with respect to Reorganized Mallinckrodt ("*10% U.S. Holders*"). This discussion also does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim. This summary also does not discuss the treatment of the receipt of New Mallinckrodt Ordinary Shares pursuant to the Management Incentive Plan. Any 10% U.S. Holder is urged to contact its own tax advisers as to the U.S. federal income tax consequences of the Plan to it and tax considerations relating to the ownership of New Mallinckrodt Ordinary Shares.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF NEW TAKEBACK TERM LOANS, CRAM-DOWN FIRST LIEN NOTES, CRAM-DOWN SECOND LIEN NOTES, TAKEBACK SECOND LIEN NOTES AND/OR NEW MALLINCKRODT ORDINARY SHARES RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR NON-U.S. TAX LAWS, OR ANY OTHER U.S. FEDERAL TAX LAWS. THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NOT BE LIABLE TO ANY PERSON WITH RESPECT TO THE TAX LIABILITY OF A HOLDER OR ITS AFFILIATES.

### B.    U.S. Federal Income Tax Consequences to the U.S. Tax Group and the Trusts

The tax consequences of the implementation of the Plan to the U.S. Tax Group may differ depending on the nature of the Restructuring Transactions, including whether the Restructuring Transactions include one or more taxable or non-taxable asset transfers by members of the U.S. Tax Group or any partnership wholly or partially owned by the U.S. Tax Group (the "*Alternative Structure*"). Except where noted below, this discussion assumes that the consummation of the Plan occurs without implementing any Alternative Structure (the "*Recapitalization Structure*"). The Restructuring Transactions Memorandum, which will be included with the Plan Supplement, will describe the manner in which those transactions will be implemented.

### 1.    Cancellation of Indebtedness and Reduction of Tax Attributes

Mallinckrodt plc owns all of the stock of Mallinckrodt International Finance SA ("*LuxCo*"). LuxCo owns all of the units of Mallinckrodt CB LLC ("*Lux DRE*"), an entity disregarded as separate from its owner under the Tax Code, and all of the stock of MEH, Inc. Mallinckrodt plc, LuxCo, Lux DRE and MEH, Inc. are Debtors. LuxCo and Lux DRE are not engaged in any trade or business in the United States. MEH, Inc. owns (directly and indirectly) all of the equity in the remaining active U.S. subsidiaries. MEH, Inc. is the parent of the U.S. Tax Group. LuxCo and Lux DRE are the original issuers of the Prepetition Debt, however, all of the First Lien Term Loan Claims are now characterized for U.S. federal income tax purposes as obligations of MEH, Inc. Members of the U.S. Tax Group are also party to Intercompany Claims owing to Debtors outside of the U.S. Tax Group.

A taxpayer generally should realize cancellation of indebtedness ("*COD*") income to the extent the adjusted issue price of debt being compromised exceeds the sum of the adjusted issue price of any new debt issued

in exchange therefor and any cash plus the fair market value of any property (including stock) paid with respect to the debt being compromised (other than cash or property paid on account of accrued and unpaid interest with respect thereto). Accordingly, the U.S. Tax Group generally should realize COD income to the extent of the sum of (i) the adjusted issue price of the First Lien Term Loan Claims, and (ii) the adjusted issue price of the Intercompany Claims described above which are not Reinstated exceeds the sum of (x) the issue price of the New Takeback Term Loans, (y) the Cash paid to Holders of First Lien Term Loan Claims (other than Cash paid on account of accrued and unpaid interest on such Claims), and (z) the value of property and any cash transferred with respect to the Intercompany Claims (other than with respect to accrued and unpaid interest). The amount of COD income that will be realized by the U.S. Tax Group is uncertain because it will depend on the issue price of the New Takeback Term Loans, but is expected to be substantial predominantly due to the amount of Intercompany Claims and the likely treatment thereof.

Under Section 108 of the Tax Code, COD income realized by a debtor will be excluded from gross income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan of reorganization approved by the court (the "***Bankruptcy Exception***"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the U.S. Tax Group will be entitled to exclude from gross income any COD income realized as a result of the implementation of the Plan.

Under Section 108(b) of the Tax Code, a debtor that excludes COD income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. Attributes subject to reduction include net operating losses ("***NOLs***"), NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). The reduction in a debtor's tax basis in its assets generally is limited to the excess of (i) its tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness (the "***Liability Floor***"). NOLs for the taxable year of the discharge and NOL carryforwards to such year generally are the first attributes subject to reduction. However, a debtor may elect under Section 108(b)(5) of the Tax Code (the "***Section 108(b)(5) Election***") to reduce its basis in its depreciable property first. If a debtor makes a Section 108(b)(5) Election, the Liability Floor does not apply to the reduction in basis of depreciable property. The U.S. Tax Group has not determined whether or not to make the Section 108(b)(5) Election.

As of the end of its tax year ending September 27, 2019, the U.S. Tax Group had approximately $982.3 million of NOL carryforwards. The U.S. Tax Group believes that it has generated additional NOL carryforwards of approximately $1.8 billion from the tax year ending September 25, 2020, and may generate additional NOLs for the tax year ending September 24, 2021. The amount of the U.S. Tax Group's NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the U.S. Tax Group's NOLs ultimately may vary from the amounts set forth above.

If the Recapitalization Structure is utilized and assuming that a Section 108(b)(5) Election is not made, the U.S. Tax Group currently anticipates that the application of Section 108(b) of the Tax Code will result in a reduction of a significant amount of its NOLs and a substantial reduction in asset basis. However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by the U.S. Tax Group. If certain Alternative Structures are used, members of the U.S. Tax Group may transfer, sell or be deemed to sell their assets to newly formed entities. Accordingly, in certain of these structures, such entities may not succeed to all or a portion of the tax attributes of the U.S. Tax Group, including any remaining consolidated NOLs or interest deductions suspended under Section 163(j) of the Tax Code. However, such Alternative Structures may mitigate the amount of asset basis reduction of the U.S. Tax Group under Section 108(b) of the Tax Code as compared to the Recapitalization Structure.

### 2.    Section 382 Limitation on Net Operating Losses and Built-In Losses

The Tax Code applies certain limitations to the Reorganized Debtors' ability to utilize the tax attributes remaining after the reduction pursuant to excluded COD income described above. Specifically, under Section 382 of the Tax Code, if a corporation or a consolidated group of corporations with NOLs or NOL carryforwards, interest deductions suspended under Section 163(j) of the Tax Code (collectively with NOLs and certain other tax attributes, the "***Pre-Change Tax Attributes***") or built-in losses (a "***loss corporation***") undergoes an "ownership change," the loss corporation's use of its Pre-Change Tax Attributes and recognized built-in losses ("***RBILs***") generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "***Ownership Change***"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a loss corporation's use of its Pre-Change Tax Attributes and RBILs is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the loss corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions). If a loss corporation has a net unrealized built-in gain ("***NUBIG***") immediately prior to the Ownership Change, the annual limitation may be increased as certain gains are recognized (or treated as recognized pursuant to the safe harbors provided in IRS Notice 2003-65) during the five-year period beginning on the date of the Ownership Change (the "***Recognition Period***"). Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. If a loss corporation has a net unrealized built-in loss ("***NUBIL***") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of Pre-Change Tax Attributes that could be used by the loss corporation during the Recognition Period.

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets (or, if greater, the amount of a loss corporation's relevant liabilities) and its tax basis in the assets, subject to a statutorily-defined threshold amount. The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-change period if recognized during the Recognition Period. The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules which may apply to members of the consolidated group that were acquired from a different consolidated group (the "***Subgroup Rules***").

If a loss corporation has a NUBIG immediately prior to an Ownership Change, any recognized built-in gains ("***RBIGs***") will increase the annual limitation in the taxable year the RBIG is recognized. An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the Ownership Change. However, the annual limitation will not be increased to the extent that the aggregate amount of all RBIGs that are recognized during the Recognition Period exceed the NUBIG. On the other hand, if a loss corporation has a NUBIL immediately prior to an Ownership Change, any RBILs will be subject to the annual limitation in the same manner as Pre-Change Tax Attributes. An RBIL generally is any loss (and certain deductions) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the Ownership Change. However, once the aggregate amount of all RBILs that are recognized during the Recognition Period exceeds the NUBIL, such excess RBILs are not subject to the annual limitation. RBIGs

and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed. At this time the Debtors are not certain whether the U.S. Tax Group will have a NUBIG or NUBIL on the Effective Date, as this will depend on the nature of certain pre-Effective Date transactions that may occur involving members of the U.S. Tax Group, the application of the complex Subgroup Rules and the fair value of the assets of the U.S. Tax Group on the Effective Date.

The Debtors expect the consummation of the Plan will result in an Ownership Change of MEH, Inc. Because the Ownership Change will occur in a case brought under the Bankruptcy Code, one of the following two special rules should apply in determining the ability of the Reorganized Debtors to utilize in post-Effective Date tax periods Pre-Change Tax Attributes and RBILs attributable to tax periods preceding the Effective Date provided there is no Ownership Change of the U.S. Tax Group prior to the Effective Date.

Under Section 382(l)(5) of the Tax Code, an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's Pre-Change Tax Attributes and RBILs arising during the Recognition Period if the stockholders and qualified creditors of the debtor receive at least 50% of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being stockholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three full taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the date of the Ownership Change attributable to the bankruptcy reorganization (the "***Plan Ownership Change***"). However, if any Pre-Change Tax Attributes and built-in losses of the debtor already are subject to an annual usage limitation under Section 382 of the Tax Code at the time of an Ownership Change subject to Section 382(l)(5) of the Tax Code, those Pre-Change Tax Attributes and built-in losses generally will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor continuously beginning at least eighteen months prior to the petition date through the Effective Date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt owned immediately before the Ownership Change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period.

A debtor may elect not to apply Section 382(l)(5) of the Tax Code to an Ownership Change that otherwise satisfies its requirements.  This election must be made on the debtor's U.S. federal income tax return for the taxable year in which the Ownership Change occurs. If Section 382(l)(5) of the Tax Code applies to an Ownership Change (and the debtor does not elect out), any subsequent Ownership Change of the debtor within the two-year period following the date of the Plan Ownership Change will result in the debtor being unable to use any pre- change losses in any taxable year ending after such subsequent Ownership Change to offset future taxable income.

If an Ownership Change pursuant to a plan of reorganization in chapter 11 does not satisfy the requirements of Section 382(l)(5) of the Tax Code, or if a debtor elects not to apply Section 382(l)(5) of the Tax Code, the debtor's use of its Pre-Change Tax Attributes and RBILs arising during the Recognition Period will be subject to an annual limitation as determined under Section 382(l)(6) of the Tax Code. In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (1.64% for ownership changes occurring in May 2021) and the value of the debtor's outstanding stock (in this case, the stock of MEH, Inc.) immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. However, if any Pre-Change Tax Attributes and built-in losses of the debtor

already are subject to an annual limitation at the time of an Ownership Change subject to Section 382(l)(6) of the Tax Code, those Pre-Change Tax Attributes and built-in losses will generally be subject to the lower of the two annual limitations.

The Debtors are unable to determine whether the Ownership Change expected to result from the consummation of the Plan satisfies the requirements of Section 382(l)(5) of the Tax Code, as such determination will depend on, among other things, the extent to which Holders of the Prepetition Debt immediately prior to consummation of the Plan may be treated as qualified creditors for purposes of Section 382(l)(5) of the Tax Code. If the Reorganized Debtors determine that the Ownership Change resulting from the consummation of the Plan may satisfy the requirements of Section 382(l)(5) of the Tax Code, the Reorganized Board, in consultation with the Supporting Unsecured Noteholders (and subject to any other consent and/or consultation rights in the Restructuring Support Agreement), will determine whether or not the U.S. Tax Group will elect out of Section 382(l)(5) of the Tax Code.  In the event that the U.S. Tax Group elects out of or fails to qualify for Section 382(l)(5) of the Tax Code, the U.S. Tax Group's Pre-Change Tax Attributes remaining after reduction for excluded COD income will, pursuant to Section 382(l)(6) of the Tax Code, be subject to an annual limitation generally equal to the product of the long-term tax-exempt rate for the month in which the Plan Ownership Change occurs and the value of the stock of MEH, Inc. (or its successor) immediately after consummation of the Plan. This base limitation is expected to limit the U.S. Tax Group's ability to use a material portion of its remaining Pre-Change Tax Attributes in each taxable period following the Effective Date. Subject to the application of the Subgroup Rules, the base limitation would then be increased by RBIGs recognized during the Recognition Period in the event that the U.S. Tax Group has a NUBIG. Pre-Change Tax Attributes not utilized in a given year due to the annual limitation generally may be carried forward for use in future years. To the extent the U.S. Tax Group's annual limitation following the Effective Date exceeds its taxable income (for purposes of Section 382) in a given year, the excess will increase the annual limitation in future taxable years.

### 3.    Alternative Structures

The Debtors and the Supporting Unsecured Noteholders, in consultation with the Supporting Parties, are evaluating the Alternative Structures, whereby the assets of some of the Debtors (including stock in their subsidiaries) would be transferred or deemed transferred to Reorganized Mallinckrodt and/or certain of its subsidiaries in  transactions that could be treated as taxable and/or non-taxable asset transfers for U.S. federal income tax purposes. Those Debtors which are members of the U.S. Tax Group which engage in taxable transfers (or are deemed to do so) pursuant to an Alternative Structure could recognize gain equal to the excess, if any, of the fair market value (as of the relevant closing date) of their assets over the tax basis in such assets (as of the relevant closing date).  Some or all of such gain may be offset with the Pre-Change Tax Attributes and losses recognized in the taxable asset transfers.  In certain of the Alternative Structures, the Reorganized Debtors, Reorganized Mallinckrodt or their Affiliates may not succeed to some or all of the remaining Pre-Change Tax Attributes, but the assets of some or all of the Reorganized Debtors would have basis equal to fair market value, which could result in greater depreciation and amortization deductions as compared to the Recapitalization Structure.

### 4.    The Trusts

The tax treatment of transfers of property by Debtors to the Opioid MDT II and any other trust formed in connection with the Restructuring Transactions (the "**Trusts**") will vary depending on the characterization of each of the Trusts, e.g., as a "grantor trust" as defined by Section 671 et seq. of the Tax Code, or as a "qualified settlement fund" ("**QSF**") as defined by Treasury Regulation Section 1.468B-1 et seq. The Restructuring Support Agreement requires that the Opioid MDT II be treated as a QSF for U.S. federal income tax purposes, and the Debtors currently expect that the other Trusts formed in connection with the Restructuring Transactions will be treated as QSFs.  Assuming that each of the Trusts is treated as a QSF,

the U.S. Tax Group should be entitled to a deduction for the payments it makes or is deemed to make to the Trusts in the taxable year in which such payment was made to the same extent it would have been entitled to a deduction if such amounts had been paid directly to the Holder of an Opioid Claim.  Accordingly, the determination of whether the payments to the Trusts are deductible will depend upon a number of factors, including (i) the extent to which such payments are made or deemed to be made by the U.S. Tax Group, (ii) the identity of the Holders of Opioid Claims and allocation of payments among such Holders, (iii) the permitted uses of such payments by the Holders of Opioid Claims pursuant to the Opioid MDT II Documents and (iv) if the U.S. Tax Group has a NUBIL, the extent to which the payments to the Trusts are treated as subject to any limitation on RBILs.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Opioid MDT II shall treat the Other Opioid Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, to the extent applicable, the Opioid MDT II and Holders of Other Opioid Claims) shall be required to report for tax purposes consistently with the foregoing.

If the Trusts are QSFs, they will be treated as separate taxable entities. Their modified gross income will consist generally of investment earnings and gains on assets recognized by the Trusts (less administrative fees and related costs). Each Trust's modified gross income will generally be subject to U.S. federal income tax at the maximum rate applicable to trusts, which is currently thirty-seven percent (37%); provided that the income of certain of the Trusts may be exempt from U.S. federal income tax, including pursuant to Section 115 of the Tax Code, and certain of the Trusts may seek guidance from the IRS to that effect. For purposes of determining the Trusts' modified gross income, payments to the Trusts from the Debtors and payments from the Trusts to Claimants in settlement of their Claims will not be taken into account. The Trusts' basis of the assets received will generally be the fair market value of such assets at the time of transfer.

## C.  U.S. Federal Income Tax Consequences to Holders of Certain Claims

### 1.  Definition of U.S. Holder and Non-U.S. Holder

A "U.S. Holder" is a beneficial owner of the Prepetition Debt, New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Takeback Second Lien Notes or New Mallinckrodt Ordinary Shares, that for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source;

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes;

- the government of the United States, any state, political subdivision or territory thereof or the District of Columbia; or

- any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. section 5130, and as periodically listed by the U.S.

Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. section 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. section 5304(l) ("***Tribes***").

A "Non-U.S. Holder" means a beneficial owner of the Prepetition Debt, New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Takeback Second Lien Notes or New Mallinckrodt Ordinary Shares that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity classified as a corporation for U.S. federal income tax purposes), estate or trust.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds Prepetition Debt, New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Takeback Second Lien Notes or New Mallinckrodt Ordinary Shares, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Beneficial owners of the Prepetition Debt, New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Takeback Second Lien Notes or New Mallinckrodt Ordinary Shares who are partners in a partnership holding any of such instruments should consult their tax advisors.

## 2.    U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))

### a.    Term Loan Exchange

*Debtors' Option*. At the Debtors' option, the First Lien Term Loans will be (i) exchanged for (A) the New Takeback Term Loans, (B) repayment in full in Cash of the First Lien Term Loans Accrued and Unpaid Interest, and (C) the Term Loan Exit Payment (the "***Term Loan Exchange***") or (ii) paid in full in Cash.

*Significant Modification*. An actual exchange of debt instruments will be treated as an exchange, rather than as a continuation of the old debt instrument, for U.S. federal income tax purposes if the differences between the old and new debt instrument constitute a "significant modification" of the old debt instrument under applicable Treasury Regulations. A "significant modification" occurs if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant."

Prior modifications to the First Lien Term Loans, including in connection with the Chapter 11 Cases, may have resulted in one or more significant modifications.  Further, on the basis of these Treasury Regulations, the Term Loan Exchange should result in a "significant modification" of the First Lien Term Loans and thus an exchange for U.S. federal income tax purposes of the First Lien Term Loans for the New Takeback Term Loans.

*Treatment as Security*. The U.S. federal income tax consequences of the Term Loan Exchange will also depend on whether the First Lien Term Loans and New Takeback Term Loans constitute "securities" for purposes of the provisions of the Tax Code relating to tax-free transactions. The test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors. Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities.  Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is senior to or subordinated to other liabilities of the issuer. Generally, the more senior the debt obligation, the less likely it is to be a security.

Although the matter is not free from doubt, the Debtors intend to take the position that each of the 2024 First Lien Term Loans and 2025 First Lien Term Loans constitute securities for U.S. federal income tax

purposes because each had an original term which exceeded ten years. While the First Lien Term Loans may have been significantly modified one or more times prior to the Effective Date, the Debtors currently intend to take the position that such significant modifications should not alter the conclusion that the First Lien Term Loans constitute securities, consistent with IRS Revenue Ruling 2004-78, though there can be no assurances that the IRS won't take a contrary position. Although the matter is not free from doubt, the Debtors intend to take the position that the New Takeback Term Loans constitute securities for U.S. federal income tax purposes because they have a term of greater than five years. If the First Lien Term Loans and New Takeback Term Loans are each securities, the Term Loan Exchange will be a nontaxable exchange for U.S. federal income tax purposes, except as discussed below under "—*Issuer for Tax Purposes*" and "—*Nontaxable Exchange—Recognition of Gain or Loss*". However, if the First Lien Term Loans and/or the New Takeback Term Loans are not securities, the Term Loan Exchange will be a taxable exchange for U.S. federal income tax purposes.

*Issuer for Tax Purposes*. As noted above, all of the First Lien Term Loans are now characterized for U.S. federal income tax purposes as obligations of MEH, Inc. If no action is taken prior to the Effective Date, the Debtors also intend to treat all of the New Takeback Term Loans as obligations of MEH, Inc. However, the Debtors or Reorganized Debtors continue to evaluate which entity or entities should be characterized as the issuer of the New Takeback Term Loans for U.S. federal income tax purposes and may take certain actions the effect of which would be to designate all or a portion of the New Takeback Term Loans as obligations of LuxCo, LuxDRE or a direct or indirect subsidiary of LuxCo domiciled outside the United States (each, a "***Non-U.S. Subsidiary***"). Except as noted below, this discussion assumes that the New Takeback Term Loans will not be issued by a Non-U.S. Subsidiary.

If all or a portion of the New Takeback Term Loans are treated as obligations of a Non-U.S. Subsidiary, (i) the Term Loan Exchange with respect to such New Takeback Term Loans would be a taxable exchange for U.S. federal income tax purposes, and (ii) a U.S. Holder of such New Takeback Term Loans would be subject to special U.S. tax considerations, discussed below under "—*New Takeback Term Loans*".

**A U.S. Holder should contact its tax advisor if all or a portion of the New Takeback Term Loans are treated as obligations of a Non-U.S. Subsidiary.**

(1)    Nontaxable Exchange

*Recognition of Gain or Loss.* If the Term Loan Exchange generally qualifies as a nontaxable exchange, a U.S. Holder should not recognize income, gain or loss except that (i) a U.S. Holder should recognize interest income to the extent that the Cash received in the Term Loan Exchange is allocable to accrued interest (discussed below under "—*Accrued but Untaxed Interest*") and (ii) a U.S. Holder should recognize gain (but not loss) to the extent of the lesser of the remaining Cash received in the Term Loan Exchange and the amount of gain, if any, realized in the Term Loan Exchange. The character of such gain or loss as capital or ordinary will be determined by a number of factors, including (but not limited to) the tax status of the U.S. Holder, whether the First Lien Term Loans constitutes a capital asset in the U.S. Holder's hands, whether the First Lien Term Loans have market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction with respect to the First Lien Term Loans. Gain realized must be calculated separately for each identifiable block of First Lien Term Loans surrendered in the Term Loan Exchange, and the deductibility of capital losses is subject to limitations. Any capital gain recognized in the Term Loan Exchange will generally be long-term capital gain if the U.S. Holder has held the First Lien Term Loans for more than one year as of the date of disposition. A U.S. Holder's tax basis in the New Takeback Term Loans should generally be equal to the U.S. Holder's tax basis in the First Lien Term Loans surrendered in the non-taxable exchange, increased by any gain recognized on the exchange and decreased by Cash received in exchange for the First Lien Term Loans. A U.S. Holder's holding period for the New

Takeback Term Loans will include the holding period of the First Lien Term Loans surrendered in exchange.

*Term Loan Exit Payment*. The tax treatment of the receipt of the Term Loan Exit Payment by a U.S. Holder is subject to uncertainty because there are no cases or published rulings that directly address the treatment of such payments. Subject to the discussion below regarding accrued but untaxed interest, any amount received by a holder on retirement of a debt instrument generally is treated for U.S. federal income tax purposes as being received in exchange for the debt instrument. We therefore intend to treat the Term Loan Exit Payment as additional consideration received by a U.S. Holder in exchange for its First Lien Term Loans. There can be no assurance, however, that the IRS will agree with such treatment. If so treated, the Term Loan Exit Payment would be taken into account in determining the amount of gain or loss, if any, on the Term Loan Exchange, in the manner described in the discussion above. It is also possible that the Term Loan Exit Payment may be treated as a separate fee rather than as additional consideration for a First Lien Term Loan, in which case the Term Loan Exit Payment could be subject to tax as ordinary income. U.S. Holders are encouraged to consult their tax advisors as to the proper treatment of the Term Loan Exit Payment.

*Accrued but Untaxed Interest*. To the extent a Holder of a First Lien Term Loan Claim receives consideration that is attributable to unpaid accrued interest on the First Lien Term Loan Claim, the Holder may be required to treat such consideration as a payment of interest. In this regard, the Plan provides that (i) Cash paid in respect of the First Lien Term Loans Accrued and Unpaid Interest shall be allocated first to the unpaid interest that has accrued on the First Lien Term Loans Claims, with any excess allocated to the principal amount of such Claims (in each case as determined for U.S. federal income tax purposes) and (ii) all distributions in full or partial satisfaction of Allowed Claims (other than First Lien Term Loans Claims) shall be allocated first to the principal amount of Allowed Claims (other than First Lien Term Loans Claims), with any excess allocated to unpaid interest that accrued on such Claims (in each case as determined for U.S. federal income tax purposes). Notwithstanding the Plan provision, there is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest (including but not limited to the Cash paid in respect of the First Lien Term Loans Accrued and Unpaid Interest), a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. Although not entirely clear, such a loss may be treated as an ordinary loss rather than a capital loss.

**HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.**

*Market Discount*. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount ("**OID**"), its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all

remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the disposition of a First Lien Term Loan Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). Any accrued but unrecognized market discount on the First Lien Term Loan Claims after the application of the prior sentence will not have to be recognized as income at the time of the Term Loan Exchange. However, such accrued market discount will generally carry over to the New Takeback Term Loans received by the U.S. Holder in the Term Loan Exchange and any gain recognized on a subsequent taxable disposition of the New Takeback Term Loans may have to be treated as ordinary income to the extent of such accrued but unrecognized market discount. In addition, if a U.S. Holder acquired the First Lien Term Loan at market discount, the New Takeback Term Loan may be treated as acquired at a market discount as discussed below.

(2)    Taxable Exchange

*Recognition of Gain or Loss*. If the Term Loan Exchange constitutes a taxable exchange, the U.S. Holder should recognize gain or loss equal to the difference between (i) the sum of the fair market value of New Takeback Term Loans and any Cash, in each case, received in the taxable exchange (other than the amount of New Takeback Term Loans or Cash, in each case, allocable to accrued interest, discussed above under "*—Non-Taxable Exchange—Accrued but Untaxed Interest*") and (ii) the U.S. Holder's adjusted tax basis in the First Lien Term Loans Claims surrendered in the taxable exchange for such New Takeback Term Loans. The character of such gain or loss as capital or ordinary will be determined by a number of factors, including (but not limited to) the tax status of the U.S. Holder, whether the First Lien Term Loan Claims constitute capital assets in the U.S. Holder's hands, whether the First Lien Term Loan Claims have been held for more than one year, whether the First Lien Term Loan Claims have market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction with respect to the First Lien Term Loan Claims. Gain or loss realized must be calculated separately for each identifiable block of First Lien Term Loan Claims surrendered in the Term Loan Exchange, and the deductibility of capital losses is subject to limitations. A U.S. Holder's tax basis in New Takeback Term Loans (other than New Takeback Term Loans, if any, allocable to accrued interest) should equal the fair market value of New Takeback Term Loans on the Effective Date. A U.S. Holder's holding period for the New Takeback Term Loans should begin on the day following the Effective Date.

*Market Discount*. Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder in the Term Loan Exchange may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such U.S. Holder's First Lien Term Loans Claims (unless the U.S. Holder elected to include "market discount" in income as it accrued). In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

**b.**    New Takeback Term Loans

*Issue Price*. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered "traded on an established market" ("publicly traded"). If the New Takeback Term Loans are treated as "publicly traded" for U.S. federal income tax purposes, the

"issue price" of the New Takeback Term Loans will be the fair market value of the New Takeback Term Loans as of their issue date. If the 2024 First Lien Term Loans and/or 2025 First Lien Term Loans are, but the New Takeback Term Loans are not, treated as publicly traded for U.S. federal income tax purposes, then the issue price of the New Takeback Term Loans received in exchange for the relevant First Lien Term Loans will be the fair market value of the First Lien Term Loans exchanged for the New Takeback Term Loans, as determined on the issue date of the New Takeback Term Loans. If neither the First Lien Term Loans nor the New Takeback Term Loans are treated as publicly traded, then the issue price of the New Takeback Term Loans issued in exchange for the First Lien Term Loans will be the principal amount of such New Takeback Term Loans.

The New Takeback Term Loans will be considered to be publicly traded if, at any time during the 31-day period ending 15 days after their issue date, the New Takeback Term Loans are traded on an "established market." The New Takeback Term Loans will be considered to trade on an established market if (i) there is a price for an executed purchase or sale of the New Takeback Term Loans that is "reasonably available" within a reasonable period of time after the sale; (ii) there is at least one price quote for the New Takeback Term Loans from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Takeback Term Loans (a "firm quote"), or (iii) there is at least one price quote for the New Takeback Term Loans other than a firm quote, available from at least one such broker, dealer, or pricing service.

Treasury Regulations require the Reorganized Debtors to make a determination as to whether the First Lien Term Loans or New Takeback Term Loans are publicly traded, and if the Reorganized Debtors determine that the First Lien Term Loans or New Takeback Term Loans are publicly traded, to determine the fair market value of the New Takeback Term Loans on their issue date which will establish their "issue price." The Treasury Regulations require the Reorganized Debtors to make such determinations available to U.S. Holders in a commercially reasonable fashion, including by electronic publication, within 90 days of the issue date of the New Takeback Term Loans. The Treasury Regulations provide that each of these determinations is binding on a Holder unless the Holder satisfies certain conditions. Certain rules apply as to whether a sales price or quote may establish the fair market value of the New Takeback Term Loans and under what conditions the Reorganized Debtors may otherwise establish the fair market value of the New Takeback Term Loans.

Because the relevant trading period for determining whether the First Lien Term Loans and New Takeback Term Loans are publicly traded and the issue price of the New Takeback Term Loans has not yet occurred, the Debtors are unable to determine the issue price of the New Takeback Term Loans at this time. It appears likely that New Takeback Term Loans will be publicly traded during the relevant period, in which case the issue price of the New Takeback Term Loans will be their fair market value as of their issue date.

*Payments of Qualified Stated Interest*. Payments of qualified stated interest on a New Takeback Term Loan generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes. Such interest income will be treated as U.S. source to the extent the New Takeback Term Loans are treated as obligations of the U.S. Tax Group, and will generally be treated as foreign source if treated as an obligation of a Non-U.S. Subsidiary. Qualified stated interest generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

*Contingent Payment Debt Instruments*. Under certain circumstances, the Reorganized Debtors may become obligated to make prepayments of principal on the New Takeback Term Loans prior to their stated maturity date. The obligation to make these payments may implicate the provisions of the Treasury Regulations

relating to contingent payment debt instruments. Treasury Regulations provide special rules for contingent payment debt instruments which, if applicable, could cause the timing, amount and character of a holder's income, gain or loss with respect to the New Takeback Term Loans to be different from the consequences discussed herein. Although the issue is not free from doubt, the Debtors currently intend to take the position that the possibility of the payment of such partial prepayments will not result in the New Takeback Term Loans being treated as a contingent payment debt instrument under the applicable Treasury Regulations, but such determination will ultimately have to be based on the relevant facts and circumstances on the Effective Date. The Debtors' position is binding on a holder subject to U.S. federal income taxation unless such holder discloses on its tax return that such holder is taking a contrary position. This position is not binding on the IRS, which may take a contrary position and treat the New Takeback Term Loans as a contingent payment debt instrument. The remainder of this discussion assumes that the New Takeback Term Loans are not treated as contingent payment debt instruments. Holders should consult with their tax advisors about the potential tax consequences if the New Takeback Term Loans is determined to be a contingent payment debt instrument.

*Original Issue Discount*. The New Takeback Term Loans will be treated as issued with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" exceeds their "issue price" (see "—*Issue Price*" above) by an amount equal to or more than a statutorily defined de minimis amount (generally, 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated redemption price at maturity" of the New Takeback Term Loans is the total of all payments to be made under the New Takeback Term Loans other than qualified stated interest.

If the New Takeback Term Loans were treated as having been issued with more than de minimis OID, U.S. Holders would be required to include the OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. Any such OID will generally be treated as U.S. source to the extent the New Takeback Term Loans are treated as obligations of the U.S. Tax Group, and will generally be treated as foreign source if treated as an obligation of a Non-U.S. Subsidiary.  A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held a Loan during the taxable year. To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period. An accrual period may be of any length and the length of the accrual periods may vary over the life of the New Takeback Term Loan, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the New Takeback Term Loan must occur on either the first day or last day of an accrual period. The amount of OID allocable to an accrual period will equal (A) the product of (i) the New Takeback Term Loan's adjusted issue price at the beginning of the accrual period and (ii) the New Takeback Term Loan's yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period.

A New Takeback Term Loan's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such New Takeback Term Loan accrued for each prior accrual period and decreased by the amount of payments on such New Takeback Term Loan other than payments of qualified stated interest. A New Takeback Term Loan's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the New Takeback Term Loan, produces an amount equal to the New Takeback Term Loan's original issue price.

*Amortizable Bond Premium and Acquisition Premium*. To the extent a U.S. Holder's initial tax basis in a New Takeback Term Loan is greater than its stated redemption price at maturity, the U.S. Holder generally will be considered to have acquired the New Takeback Term Loan with amortizable bond premium (and would not be required to accrue any OID on the New Takeback Term Loan). Generally, a holder that acquires a debt obligation at a premium may elect to amortize bond premium from the acquisition date to

the debt's maturity date under a constant yield method. Once made, this election applies to all debt obligations held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. The amount amortized in any taxable year generally is treated as an offset to payments of qualified stated interest on the related debt obligation.

If a U.S. Holder's initial adjusted tax basis in New Takeback Term Loan is less than its stated redemption price at maturity but greater than its issue price, the U.S. Holder generally will be considered to have acquisition premium with respect to the New Takeback Term Loans. In such case, the U.S. Holder may reduce the accrual of OID on the New Takeback Term Loans by a fraction the numerator of which is the excess of the U.S. Holder's initial adjusted basis over the issue price and the denominator of which is the stated redemption price over such issue price.

*Market Discount.*  If the Term Loan Exchange qualifies as a non-taxable transaction and in the Exchange the US Holder exchanges a First Lien Term Loan with accrued market discount, then (i) the accrued market discount, except to the extent recognized as ordinary income, will carry over to the New Takeback Term Loan received by the US Holder in the Exchange and (ii) such New Takeback Term Loan should also have market discount to the extent its issue price exceeds the US Holder's initial tax basis (increased solely for these purposes by the accrued market discount described in (i)) by more than the statutorily defined *de minimis* amount.  In such case, a U.S. Holder may elect to accrue such market discount over the term of the New Takeback Term Loan. In addition, such U.S. Holder may be required to defer, until the maturity of the New Takeback Term Loan  or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry the New Takeback Term Loan, in the absence of an election to accrue market discount currently. Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the New Takeback Term Loan unless a U.S. Holder elects to accrue on a constant yield method. A U.S. Holder may elect to include market discount in income currently as it accrues, on either a ratable or constant yield method.

*Sale, Retirement or Other Taxable Disposition*. A U.S. Holder of a New Takeback Term Loan will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Takeback Term Loan equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the New Takeback Term Loan. Any gain or loss on the sale, redemption, retirement or other taxable disposition of the New Takeback Term Loans generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Takeback Term Loan for more than one year as of the date of disposition. However, any accrued market discount carried over from the First Lien Term Loan (as discussed above under "—*Term Loan Exchange—Non-Taxable Exchange—Market Discount*") or accrued on the New Takeback Term Loan (as discussed above under "—*Market Discount* ") will be treated as ordinary income to the extent of any gain, unless previously recognized as ordinary income. The determination of a U.S. Holder's basis and holding period is discussed above in "—*Term Loan Exchange—Non-Taxable Exchange—Recognition of Gain or Loss*" and "—*Term Loan Exchange—Taxable Exchange—Recognition of Gain or Loss*". U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

**c.**    Information Reporting and Backup Withholding.

A U.S. Holder generally will be subject to information reporting and backup withholding when the U.S. Holder receives Cash or other consideration in connection with the Term Loan Exchange, payments on a

New Takeback Term Loan or proceeds from the sale or other taxable disposition (including a redemption or retirement) of a New Takeback Term Loan, and may be subject to information reporting (but not backup withholding) with respect to accruals of OID, if any. Certain U.S. Holders are exempt from backup withholding, including corporations and certain tax-exempt organizations. A U.S. Holder will be subject to backup withholding with respect to such payments and proceeds if the U.S. Holder is not otherwise exempt and:

- the U.S. Holder fails to furnish the U.S. Holder's taxpayer identification number, which for an individual is ordinarily his or her social security number;

- the U.S. Holder furnishes an incorrect taxpayer identification number;

- the applicable withholding agent is notified by the IRS that the U.S. Holder previously failed to properly report payments of interest or dividends; or

- the U.S. Holder fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS. U.S. Holders should consult their tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

In the event that all or portion of the New Takeback Term Loans are not treated as obligations of the U.S. Tax Group, certain U.S. Holders who are individuals and who hold an interest in "specified foreign financial assets" (as defined in Section 6038D of the Code) will be required to report information relating to an interest in all or such portion of the New Takeback Term Loans, subject to certain exceptions (including an exception for New Takeback Term Loans held in accounts maintained by certain financial institutions). Under certain circumstances, an entity may be treated as an individual for purposes of the foregoing rules. U.S. Holders should consult their tax advisors regarding the effect, if any, of this requirement on their ownership and disposition of the New Takeback Term Loans.

     **3.**     **U.S. Holders of First Lien Notes Claims and Second Lien Notes Claims (Classes 3 and 4)**

          **a.**     Secured Notes Exchanges

*Cram-Down Treatment*. The treatment of the First Lien Notes Claims and Second Lien Notes Claims depend upon whether the First Lien Notes Makewhole Claims and the Second Lien Notes Makewhole Claims, respectively, are Allowed. If the First Lien Notes Makewhole Claims and/or the Second Lien Notes Makewhole Claims are not Allowed, the First Lien Notes Claims and/or Second Lien Notes Claims, respectively, would be Reinstated, and would be Unimpaired. If the First Lien Notes Makewhole Claims are Allowed, the First Lien Notes Claims would be exchanged for the Cram-Down First Lien Notes, and if the Second Lien Notes Makewhole Claims are Allowed, the Second Lien Notes Claims would be exchanged for the Cram-Down Second Lien Notes (such exchanges, if applicable, the "**Secured Notes Exchanges**"), and the First Lien Notes Claims and/or Second Lien Notes Claims would be Impaired. Accordingly, the discussion below is limited to the Secured Notes Exchanges.

*Treatment as Security.* The treatment of the Secured Notes Exchanges will depend, in part, on whether the First Lien Notes Claims, Second Lien Notes Claims, Cram-Down First Lien Notes and/or Cram-Down Second Lien Notes constitute "securities" for purposes of the provisions of the Tax Code relating to tax-free transactions, which will be determined in the manner described above under "—*U.S. Holders of First Lien Notes Term Loan Claims (Classes 2(b) and 2(c))—Term Loan Exchange—Treatment as Security*". Although the matter is not free from doubt, the Debtors intend to take the position that each of the First Lien Notes and Second Lien Notes constitute securities for U.S. federal income tax purposes because each had an original term in excess of five years. Although the matter is not free from doubt, the Debtors anticipate taking the position that the Cram-Down First Lien Notes and Cram-Down Second Lien Notes constitute securities for U.S. federal income tax purposes because it is expected that their term will exceed five years. Accordingly, the Debtors currently intend to take the position that the Secured Notes Exchanges will be nontaxable exchanges for U.S. federal income tax purposes, except as discussed below.

*Other Consequences of the Exchange.* Assuming that the Secured Notes Exchanges constitute nontaxable exchanges for U.S. federal income tax purposes, except as described below, the consequences of such exchange to U.S. Holders of First Lien Notes Claims and/or Second Lien Notes Claims should be subject to the rules and considerations discussed in "—*U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—Term Loan Exchange—Non-Taxable Exchange*".

In addition, if any ordinary income is recognized in connection with the Secured Notes Exchange, such income will generally constitute foreign source income for foreign tax credit limitation purposes. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For this purpose, interest income or ordinary income arising in connection with market discount, in each case, recognized in the Secured Notes Exchange, will generally constitute "passive category income." The rules relating to the determination of the foreign tax credit are complex, and U.S. Holders should consult their tax advisors regarding the availability of a foreign tax credit in their particular circumstances.

      **b.**        Cram-Down First Lien Notes and Cram-Down Second Lien Notes

Except as set forth below, the rules and considerations applicable in determining the issue price of the Cram-Down First Lien Notes and Cram-Down Second Lien Notes and the tax consequences of the receipt of qualified stated interest, OID, market discount, amortizable bond premium and gain or loss on the disposition of the Cram-Down First Lien Notes and Cram-Down Second Lien Notes, in each case, discussed above in "—*U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—New Takeback Term Loans.*"

Qualified stated interest paid and OID and market discount, if any, accrued with respect to the Cram-Down First Lien Notes and Cram-Down Second Lien Notes will generally constitute foreign source "passive category income" for foreign tax credit limitation purposes.

Certain U.S. Holders who are individuals and who hold an interest in "specified foreign financial assets" (as defined in Section 6038D of the Code) will be required to report information relating to an interest in the Cram-Down First Lien Notes and Cram-Down Second Lien Notes, subject to certain exceptions (including an exception for Cram-Down First Lien Notes and Cram-Down Second Lien Notes held in accounts maintained by certain financial institutions). Under certain circumstances, an entity may be treated as an individual for purposes of the foregoing rules. U.S. Holders should consult their tax advisors regarding the effect, if any, of this requirement on their ownership and disposition of the Cram-Down First Lien Notes and Cram-Down Second Lien Notes.

4.  **U.S. Holders of Guaranteed Unsecured Notes Claims (Class 5)**

  **a.**  Exchange of Guaranteed Unsecured Notes Claims for Takeback Second Lien Notes

While not free from doubt, the Debtors intend to take the position that the exchange of certain Guaranteed Unsecured Notes Claims for Takeback Second Lien Notes (the "**Unsecured Notes Exchange**") will be treated as an exchange separate from the exchange of Guaranteed Unsecured Notes Claims for New Mallinckrodt Ordinary Shares (the "**Notes/Shares Exchange**"). Although the matter is not free from doubt, the Debtors intend to determine the portion of the Guaranteed Unsecured Notes Claims that is exchanged in each of the Unsecured Notes Exchange and the Notes/Shares Exchange based on the relative fair values of the Takeback Second Lien Notes and the New Mallinckrodt Ordinary Shares. The Debtors intend to promptly determine this allocation after the Effective Date and will make this information available to the holders of the Takeback Second Lien Notes and the New Mallinckrodt Ordinary Shares.

*Treatment as Security.* The treatment of the Unsecured Notes Exchange will depend, in part, on whether the Guaranteed Unsecured Notes Claims and/or the Takeback Second Lien Notes constitute "securities" for purposes of the provisions of the Tax Code relating to tax-free transactions, which will be determined in the manner described above under "*—U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—Term Loan Exchange—Non-Taxable Exchange—Treatment as Security*". Although the matter is not free from doubt, the Debtors intend to take the position that each of the 5.75% Senior Notes due 2022, the 5.500% Senior Notes due 2025 and the 5.625% Senior Notes due 2023 constitute securities for U.S. federal income tax purposes because each had an original term in excess of five years. Although the matter is not free from doubt, the Debtors also intend to take the position that the Takeback Second Lien Notes constitute securities for U.S. federal income tax purposes because their term will exceed five years. Accordingly, the Debtors currently intend to take the position that the Unsecured Notes Exchange will be a nontaxable exchange for U.S. federal income tax purposes, except as discussed below.

*Other Consequences of the Exchange.* Assuming that the Unsecured Notes Exchange constitutes a nontaxable exchange for U.S. federal income tax purposes, except as described below, the consequences of such exchange to U.S. Holders of Guaranteed Unsecured Notes Claims should be subject to the rules and considerations discussed in "*—U.S. Holders of First Lien Notes Claims and Second Lien Notes Claims (Classes 3 and 4)—Secured Notes Exchanges—Other Consequences of the Exchange*".

  **b.**  Exchange of Guaranteed Unsecured Notes Claims for New Mallinckrodt Ordinary Shares

*Recognition of Gain or Loss.* The Notes/Shares Exchange, as contemplated, appears to meet the requirements of Section 351 of the Tax Code and be subject to Section 367 of the Tax Code in light of Reorganized Mallinckrodt being a non-U.S. corporation. As such, a U.S. Holder of a Guaranteed Unsecured Notes Claim should be treated as receiving New Mallinckrodt Ordinary Shares in a transaction governed by Section 351 of the Tax Code. Section 351 of the Tax Code, when applicable, generally prevents recognition of both gains (subject to the rules regarding accrued but untaxed interest and market discount, discussed below under "*—Accrued but Untaxed Interest*" and "*—Market Discount*") and losses. However, because Reorganized Mallinckrodt is not a United States corporation, Section 367 of the Tax Code will override the gain (but not the loss) deferral provisions of Section 351 of the Tax Code with respect to the Notes/Shares Exchange (i) for all U.S. Holders, if the Guaranteed Unsecured Notes Claims are not "securities" (discussed above in "*—Exchange of Guaranteed Unsecured Notes for Takeback Second Lien Notes—Treatment as Security*") or (ii) solely with respect to U.S. Holders who will own (directly, indirectly or constructively) more than five percent of the New Mallinckrodt Ordinary Shares at the time of the Notes/Shares Exchange, subject to the discussion below regarding "gain recognition agreements." Such

gain recognized by a U.S. Holder should equal the excess (if any) of (i) the fair market value of the New Mallinckrodt Ordinary Shares received on account of such Guaranteed Unsecured Notes Claim over (ii) such U.S. Holder's adjusted tax basis in the Guaranteed Unsecured Notes Claim contributed (or deemed contributed) in exchange for such New Mallinckrodt Ordinary Shares. In general, with respect to a Guaranteed Unsecured Notes Claim for which gain is recognized, the character of such gain and such U.S. Holder's basis and holding period in the New Mallinckrodt Ordinary Shares received with respect to such Claim should be determined pursuant to the same rules described above in "—*U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—Term Loan Exchange—Non-Taxable Exchange—Recognition of Gain or Loss*". In the event that (i) the U.S. Holder's adjusted tax basis in the Guaranteed Unsecured Notes Claim contributed (or deemed contributed) in exchange for such New Mallinckrodt Ordinary Shares exceeds (ii) the fair market value of the New Mallinckrodt Ordinary Shares received on account of such Guaranteed Unsecured Notes Claim, no loss will be recognized, and, subject to the rules regarding accrued but untaxed interest, the U.S. Holder's basis in the New Mallinckrodt Ordinary Shares received with respect to such Guaranteed Unsecured Notes Claim should equal the U.S. Holder's basis in such Guaranteed Unsecured Notes Claim surrendered therefor, and such U.S. Holder's holding period in the New Mallinckrodt Ordinary Shares received should include the holding period for the exchanged Guaranteed Unsecured Notes Claim. In general, a U.S. Holder will not be able to use unrecognized losses attributable to the Notes/Shares Exchange to offset recognized gains attributable to the Notes/Shares Exchange.

A U.S. Holder who will own (directly, indirectly or constructively) more than five percent of the New Mallinckrodt Ordinary Shares may be able to avoid current recognition of gain under Section 367 of the Tax Code if it enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under Section 367 of the Tax Code and certain other conditions are met. Pursuant to the "gain recognition agreement," the U.S. Holder would agree to recognize the gain realized but not recognized in the Notes/Shares Exchange if a specified gain recognition event (a triggering event) occurs within a five-year period after the transfer and no exception to gain recognition applies with respect to such triggering event. Because Reorganized Mallinckrodt will, or should be deemed to, contribute all the Guaranteed Unsecured Notes it receives in the Notes/Share Exchange to LuxCo in extinguishment of the Notes, a U.S. Holder should enter into an additional "gain recognition agreement" with respect to the LuxCo shares issued, or deemed issued, in exchange for the Guaranteed Unsecured Notes and similar rules as discussed above should apply with respect to the such shares. A U.S. Holder which enters into a "gain recognition agreement" would nevertheless be subject to the rules regarding accrued but untaxed interest and market discount, discussed below under "—*Accrued but Untaxed Interest*" and "—*Market Discount*".

**U.S. Holders are urged to consult their tax advisors regarding the application of Section 367 of the Tax Code, including gain recognition agreements.**

*Accrued but Untaxed Interest.* The determination of whether a U.S. Holder of a Guaranteed Unsecured Notes Claim receives consideration in the Notes/Shares Exchange that is attributable to unpaid accrued interest on the Claim, and the resulting tax consequences, should be subject to the rules and considerations described in "—*U.S. Holders of Guaranteed Unsecured Notes Claims (Class 5)— Exchange of Guaranteed Unsecured Notes Claims for Takeback Second Lien Notes—Other Consequences of the Exchange*", above.

**HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.**

*Market Discount.* Under the "market discount" provisions of the Tax Code, the gain realized by a U.S. Holder in the Notes/Shares Exchange may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such U.S. Holder's Guaranteed Unsecured Notes Claims. Such market discount generally must be recognized as ordinary income to the extent of the gain realized

notwithstanding any other nonrecognition provision. Although there are several exceptions to the aforementioned rule, because the Notes/Shares Exchange is a contribution to a corporation other than the issuer, a U.S. Holder of Guaranteed Unsecured Notes Claims should be required to recognize accrued market discount to the extent of gain realized in the Notes/Shares Exchange.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of a Guaranteed Unsecured Notes Claim that was acquired with market discount should be treated as foreign source ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**c.**     Takeback Second Lien Notes

The tax considerations applicable to the Takeback Second Lien Notes are similar to those applicable to the Cram-Down First Lien Notes and Cram-Down Second Lien Notes discussed in "—*U.S. Holders of First Lien Notes Claims and Second Lien Notes Claims (Classes 3 and 4)—Cram-Down First Lien Notes and Cram-Down Second Lien Notes*".

**d.**     New Mallinckrodt Ordinary Shares

*Distributions*. Subject to the discussion of PFIC and CFC rules below, a U.S. Holder of New Mallinckrodt Ordinary Shares generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Mallinckrodt Ordinary Shares to the extent such distributions are paid out of Reorganized Mallinckrodt's current or accumulated earnings and profits, determined under U.S. federal income tax principles. "Qualified dividend income" received by a non-corporate U.S. Holder is subject to preferential tax rates. Distributions not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. Holder's adjusted tax basis in the New Mallinckrodt Ordinary Shares, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Mallinckrodt Ordinary Shares. Because Reorganized Mallinckrodt is not a U.S. corporation, holders that are corporations and are not 10% U.S. Holders will generally not be entitled to claim a dividends-received deduction with respect to distributions they receive from Reorganized Mallinckrodt. Distributions taxable as dividends generally will be treated as foreign source "passive category income".

*Sale or Other Taxable Disposition*. Subject to the discussion of PFIC and CFC rules below, a U.S. Holder of New Mallinckrodt Ordinary Shares will recognize gain or loss upon the sale or other taxable disposition of New Mallinckrodt Ordinary Shares equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the New Mallinckrodt Ordinary Shares.  Subject to the recapture rules under Section 108(e)(7) of the Tax Code, any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Mallinckrodt Ordinary Shares for more than one year as of the date of disposition.  Under the Section 108(e)(7) recapture rules, a U.S. Holder may be required to treat gain recognized on the taxable disposition of New Mallinckrodt Ordinary Shares as ordinary income if the U.S. Holder took a bad debt deduction with respect to the Guaranteed Unsecured Notes Claims exchanged therefor. U.S. Holders should consult their tax advisors

193

regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

*Passive Foreign Investment Company Status*. Reorganized Mallinckrodt will be a passive foreign investment company for U.S. federal income tax purposes (a "**PFIC**") if either (i) 75% or more of its gross income in a taxable year consists of "passive income" (generally including dividends, interest, gains from the sale or exchange of investment property) or (ii) at least 50% of its assets in a taxable year (averaged over the year and generally determined based upon either value or tax basis depending on the application of certain tests) produce or are held for the production of passive income. For purposes of determining whether Reorganized Mallinckrodt will be a PFIC, Reorganized Mallinckrodt will be treated as earning and owning a proportionate share of the income and assets, respectively, of its subsidiaries that have made U.S. tax elections to be disregarded as separate entities from Reorganized Mallinckrodt as well as of any other corporate subsidiary in which Reorganized Mallinckrodt owns (directly, indirectly or constructively) at least 25% of the value of the subsidiary's stock. For purposes of these tests, income derived from the performance of services does not constitute passive income. By contrast, royalties and rental income would generally constitute passive income unless Reorganized Mallinckrodt were treated under specific rules as deriving its royalties and rental income in the active conduct of a trade or business.

If Reorganized Mallinckrodt is treated as a PFIC with respect to a U.S. Holder of New Mallinckrodt Ordinary Shares for any taxable year, such holder generally would suffer adverse tax consequences, that may include having gains realized on the disposition of the New Mallinckrodt Ordinary Shares treated as ordinary income rather than capital gain and being subject to punitive interest charges on the receipt of certain distributions and on the proceeds of the sale or other disposition of the New Mallinckrodt Ordinary Shares. In addition, the U.S. Holder would be deemed to own shares in any of Reorganized Mallinckrodt's subsidiaries that are also PFICs and generally would be subject to the treatment described above with respect to any distribution on or disposition of such shares. If Reorganized Mallinckrodt is considered a PFIC, a U.S. Holder of New Mallinckrodt Ordinary Shares will also be subject to information reporting requirements on an annual basis. U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to them.

Based on the past and anticipated future operations of Reorganized Mallinckrodt and the Debtors, the Debtors do not believe that Reorganized Mallinckrodt will be a PFIC with respect to future taxable years. However, no assurance can be given that the IRS or a court of law will accept this position, and there is a risk that the IRS or a court of law could determine that Reorganized Mallinckrodt is a PFIC. Moreover, there can be no assurance that Reorganized Mallinckrodt will not become a PFIC in any future taxable year because (i) there are uncertainties in the application of the PFIC rules, (ii) the PFIC test is an annual test, and (iii) although Reorganized Mallinckrodt intends to manage its business so as to avoid PFIC status to the extent consistent with its other business goals, there could be changes in the nature and extent of operations in future years.

*Controlled Foreign Corporation Status*. If more than 50% of the total value or total combined voting power of all classes of Reorganized Mallinckrodt's stock is owned, directly, indirectly, or constructively by 10% U.S. Holders, Reorganized Mallinckrodt would be treated as a "controlled foreign corporation" ("CFC"). Moreover, regardless of whether Reorganized Mallinckrodt is a CFC, the non-U.S. direct and indirect corporate subsidiaries of Reorganized Mallinckrodt are expected to be classified as CFCs in light of the application of attribution rules that became applicable as a result of changes to the Tax Code enacted in 2017.  This classification results in the application of many complex rules, including the required inclusion in income by 10% U.S. Holders of their pro rata share of any "Subpart F income," "global intangible low-taxed income" and any investments in "U.S. property" (each as defined by the Tax Code) of Reorganized Mallinckrodt. In addition, under Section 1248 of the Tax Code, if Reorganized Mallinckrodt was a CFC at any time during the five-year period ending with the sale or exchange of its stock by a 10% U.S. Holder,

gain from such sale or exchange would generally be treated as dividend income to the extent of Reorganized Mallinckrodt's earnings and profits attributable to the shares sold or exchanged. If Reorganized Mallinckrodt was to become a CFC, the PFIC rules discussed above would generally not apply with regard to any 10% U.S. Holder.

In addition to the rules described above, if Reorganized Mallinckrodt or any of its non-U.S. direct or indirect corporate subsidiaries is a CFC, 10% U.S. Holders would be subject to special information reporting requirements. A failure by a 10% U.S. Holder to comply with these reporting obligations may subject the 10% U.S. Holder to significant monetary penalties and may extend the statute of limitations with respect to the 10% U.S. Holder's U.S. federal income tax return for the year for which such reporting was due. Reorganized Mallinckrodt cannot provide any assurances that it will assist investors in determining whether it or any of its non-U.S. direct and indirect subsidiaries are controlled foreign corporations. Reorganized Mallinckrodt also cannot guarantee that it will furnish to 10% U.S. Holder information that may be necessary for them to comply with the aforementioned obligations.

Because of the complexity of the rules regarding Subpart F income and global intangible low-taxed income, a more detailed review of these rules is beyond the scope of this discussion and any holder that may become a 10% U.S. Holder should consult its tax advisor.

*Information Reporting and Backup Withholding*. U.S. Holders may be subject to information reporting and backup withholding as described above under *"—U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—Information Reporting and Backup Withholding*". U.S. Holders are urged to consult their tax advisors regarding the effect, if any, of this requirement on their ownership and disposition of the New Mallinckrodt Ordinary Shares.

### 5. U.S. Holders of General Unsecured Claims and Trade Claims (Classes 6 and 7)

A U.S. Holder of a General Unsecured Claim or Trade Claim (collectively, the "***Unsecured Claims***") will receive Cash and, in some cases, New Mallinckrodt Ordinary Shares. Although the matter is not free from doubt, the Debtors intend to take the position that the exchange of Unsecured Claims for Cash (the "***Unsecured Cash Exchange***") will be treated as an exchange separate from the exchange of Unsecured Claims for New Mallinckrodt Ordinary Shares (the "***Unsecured Shares Exchange***"). Although the matter is not free from doubt, where applicable, the Debtors intend to determine the portion of the Unsecured Claims that is exchanged in each of the Unsecured Cash Exchange and the Unsecured Shares Exchange based on the ratio of the Cash received to the fair value of the New Mallinckrodt Ordinary Shares received (calculated based on the General Unsecured Claims Total Implied Equity Valuation). While not free from doubt, the Debtors intend to treat any Unsecured Claims exchanged in the Unsecured Shares Exchange as contributed to Reorganized Mallinckrodt in exchange for the New Mallinckrodt Ordinary Shares.

The Unsecured Cash Exchange and, to the extent the relevant Unsecured Claims are against Debtor Mallinckrodt plc, the Unsecured Shares Exchange, in each case, should generally be treated as taxable exchanges under Section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of Unsecured Claims exchanged in such taxable exchanges should recognize gain or loss equal to the difference between (a) the amount of Cash plus the fair value of the New Mallinckrodt Ordinary Shares (calculated based on the General Unsecured Claims Total Implied Equity Valuation) received in exchange for such Unsecured Claims, and (b) such U.S. Holder's adjusted basis, if any, in such Unsecured Claims. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Unsecured Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Tax Code.

While not free from doubt, the Debtors intend to take the position that the exchange of an Unsecured Claim against a Debtor other than Mallinckrodt plc in the Unsecured Shares Exchange meets the requirements of Section 351 of the Tax Code and would accordingly be subject to Section 367 of the Tax Code in light of Reorganized Mallinckrodt being a non-U.S. corporation.  The tax consequences of such exchange are described above in "—*U.S. Holders of Guaranteed Unsecured Notes Claims (Class 5)—Exchange of Guaranteed Unsecured Notes Claims for New Mallinckrodt Ordinary Shares—Recognition of Gain or Loss*"; provided, for the avoidance of doubt, the Unsecured Claims are not expected to constitute securities for U.S. federal income tax purposes.

The character of any gain or loss recognized in the aforementioned exchanges as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Unsecured Claim; (ii) the tax status of the U.S. Holder of such Unsecured Claim; (iii) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such Unsecured Claim; and (iv) whether such Unsecured Claim was acquired at a market discount. A U.S. Holder that purchased its Unsecured Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code, described above in "—*U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—Term Loan Exchange—Taxable Exchange—Market Discount*".

A portion of the consideration received by a U.S. Holder of an Unsecured Claim may be attributable to accrued interest on such Unsecured Claim, which would be subject to the rules and considerations set forth in "—*U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))—Term Loan Exchange—Taxable Exchange—Accrued but Untaxed Interest*" above.

### 6.    U.S. Holders of Other Opioid Claims (Class 9(h))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of the Opioid Claims, the Opioid MDT II shall receive Opioid MDT II Consideration, which includes the (a) Initial Opioid MDT II Payment; (b) the New Opioid Warrants; (c) the Opioid Deferred Cash Payments; (d) the Assigned Third-Party Claims and (e) the Assigned Insurance Rights and (ii) as of the Effective Date, all Opioid Claims shall be channeled to, and liability for all Opioid Claims shall be assumed by, the Opioid MDT II without further act or deed and shall be satisfied solely by funds or other property held by the Opioid MDT II.  Holders of Other Opioid Claims are entitled to receive their Other Opioid Claims Share from the Opioid MDT II. The Plan further provides that the Opioid MDT II is intended to be treated as a QSF.

Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of Opioid Claims generally is not expected to be treated as receiving a distribution from the Opioid MDT II unless and until the holder is entitled to receive that distribution directly (or a distribution is made in satisfaction of an obligation of such Holder), and any amounts received by a U.S. Holder of an Opioid Claim from the Opioid MDT II generally are expected to be treated by such holder as if received directly from the Debtors. The U.S. federal income tax consequences to a U.S. Holder of Opioid Claims—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—generally will depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder is an entity exempt from taxation and whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Opioid Claims will depend on facts particular to each holder, all U.S. Holders of Opioid Claims are urged to consult their own tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

### 7.        **Non-U.S. Holders**

Except where noted below, the following discussion assumes that: (i) no portion of any gain recognized by a Non-U.S. Holder with respect to the Prepetition Debt, Unsecured Claims, New Takeback Term Loans, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Guaranteed Unsecured Notes, Takeback Second Lien Notes and New Mallinckrodt Ordinary Shares is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which gain is attributable), and (ii) no Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition of any of the above-mentioned securities and meets certain other requirements.  If the assumptions set forth above are not applicable to a Non-U.S. Holder, such Non-U.S. Holder should consult their tax advisor regarding the tax consequences applicable to them with respect to the Term Loan Exchange, Secured Notes Exchanges, Unsecured Notes Exchange, the Notes/Shares Exchange, Unsecured Cash Exchange or Unsecured Shares Exchange or the ownership or disposition of consideration received in connection therewith.

Because the issuers of the First Lien Notes, Second Lien Notes, Cram-Down First Lien Notes, Cram-Down Second Lien Notes, Guaranteed Unsecured Notes, Takeback Second Lien Notes and New Mallinckrodt Ordinary Shares (in each case as determined for U.S. federal income tax purposes) are entities organized outside of the United States, there generally should not be any U.S. federal income tax consequences to Non-U.S. Holders with respect to the Secured Notes Exchanges, Unsecured Notes Exchange or the Notes/Shares Exchange, or the ownership or disposition of consideration received in connection therewith. Similarly, there generally should not be any U.S. federal income tax consequences to Non-U.S. Holders with respect to the ownership or disposition of any New Takeback Term Loans treated as an obligation of a Non-U.S. Subsidiary.

*Contingent Payment Debt Instruments.* This discussion assumes that the New Takeback Term Loans will not be treated as contingent payment debt instruments for U.S. federal income tax purposes. See "—*U.S. Holders of First Lien Term Loan Claims (Classes 2(b) and 2(c))— New Takeback Term Loans—Contingent Payment Debt Instruments*".

*Payments of Interest on New Takeback Term Loans.* Interest (including, for purposes of this section, any OID) paid on the New Takeback Term Loans to a Non-U.S. Holder that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income tax, or withholding tax of 30% (or such lower rate specified by an applicable income tax treaty), provided that:

- the Non-U.S. Holder does not, actually or constructively, own 10% or more of the total combined voting power of all classes of MEH, Inc. voting stock;

- the Non-U.S. Holder is not a controlled foreign corporation related to MEH, Inc. through actual or constructive stock ownership; and

- either (1) the Non-U.S. Holder certifies in a statement provided to the applicable withholding agent under penalties of perjury that it is not a United States person and provides its name and address; (2) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the New Takeback Term Loans on behalf of the Non-U.S. Holder certifies to the applicable withholding agent under penalties of perjury that it, or the financial institution between it and the Non-U.S. Holder, has received from the Non- U.S. Holder a statement under penalties of perjury that such holder is not a United States person and provides a copy of such statement to the applicable withholding agent; or (3) the Non-

U.S. Holder holds the New Takeback Term Loans directly through a "qualified intermediary" (within the meaning of applicable Treasury Regulations) and certain conditions are satisfied.

If a Non-U.S. Holder does not satisfy the requirements above, such Non-U.S. Holder may be entitled to a reduction in or an exemption from withholding on such interest as a result of an applicable tax treaty. To claim such entitlement, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.

If interest paid to a Non-U.S. Holder is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such interest is attributable), the Non-U.S. Holder will be exempt from the U.S. federal withholding tax described above. To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that interest paid on the New Takeback Term Loans is not subject to withholding tax because it is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

Any such effectively connected interest generally will be subject to U.S. federal income tax at the regular graduated rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected interest, as adjusted for certain items.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

*Information Reporting and Backup Withholding on New Takeback Term Loans*.  Payments of interest (including OID) generally will not be subject to backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know the holder is a United States person and the holder certifies its non-U.S. status as described above under "—*Payments of Interest on New Takeback Term Loans*." However, information returns are required to be filed with the IRS in connection with any interest paid to the Non-U.S. Holder, regardless of whether any tax was actually withheld.

Copies of information returns that are filed with the IRS may also be made available under the provisions of an applicable treaty or agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

### 8.    Additional Withholding Tax on Payments Made to Non-U.S. Accounts

Withholding taxes may be imposed under Sections 1471 to 1474 of the Tax Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "***FATCA***") on certain types of U.S. source payments, including dividends and interest, made to a "foreign financial institution" or a "non-financial

foreign entity" (each as defined in the Tax Code), unless (1) the foreign financial institution undertakes certain diligence, reporting and withholding obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or nonfinancial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence, reporting and withholding requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Prior to the issuance of proposed Treasury Regulations, withholding under FATCA would have also applied to payments of gross proceeds from the sale or other disposition of property on or after January 1, 2019. However, the proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

**THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## XII. IRELAND INCOME TAX CONSEQUENCES

### A.    Irish Tax Consequences To The Plan

#### 1.    Introduction

The following is a summary of certain material Irish tax considerations for, among others, the Debtors and for Non-Irish Holders (as defined below) as a result of the implementation of the Plan and the consummation of the Restructuring Transactions. The summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to the Debtors and each of the Non-Irish Holders. The summary relates only to the position of persons who are the absolute beneficial owners of the Prepetition Debt or the Equity Interests and may not apply to certain other classes of persons such as dealers in securities or shares.

The summary is based upon Irish tax laws and the practice of the Irish Revenue Commissioners as at the date of the Plan. Changes in law and/or administrative practice may result in alteration of the tax considerations described below.

This summary does not constitute tax advice and is intended only as a general guide. The summary is not exhaustive and Non-Irish Holders should consult their own tax advisors about the Irish tax consequences (and tax consequences under the laws of other relevant jurisdictions) of the Plan.

##### a.    Definition of Non-Irish Holder

"Non-Irish Holder" means any Holder of Prepetition Debt or Equity Interests that is not resident or ordinarily resident in Ireland for tax purposes and who does not hold their Prepetition Debt or Equity Interests in connection with a trade or business carried on in Ireland.

2. **Irish Tax Consequences to the Debtors and the Impact on Holders of Equity Interests in Connection with the Cancellation of the Equity Interests**

a. **Cancellation of the Equity Interests**

Due to the fact that the Irish Parent is a publicly-listed company, the cancellation of the Equity Interests for no consideration under the Plan and pursuant to the Restructuring Transactions should be considered a capital disposal of the Equity Interests in the Parent upon their cancellation, and not a distribution by the Parent to the Holders of the Equity Interests.

The Irish tax treatment of the disposal of the Equity Interests by any existing Holder of Equity Interests will depend on whether they are a Non-Irish Holder or not and whether they hold the Equity Interests as a trading asset or capital asset.

Where the Equity Interests are held as a capital asset, any gain arising to an Irish tax resident Holder of Equity Interests should be subject to Irish capital gains tax ("*CGT*") at a rate of 33% (unless participation exemption is available). However, on the understanding that the Equity Interests will be cancelled for no consideration, a capital loss should arise for an Irish tax resident Holder of Equity Interests (not applicable where participation exemption is available).

On the basis that the shares in the Parent are quoted at the time of the transaction, Non-Irish Holders who hold Equity Interests should not be subject to Irish CGT on any gain arising on the disposal.

Where the Equity Interests are held as a trading asset by an Irish tax resident company, or a Non-Irish Holder company that carries on a trade in Ireland through a branch, then the disposal of the Equity Interests should form part of the taxable profits of the Parent and be subject to Irish corporation tax at 12.5%.

In addition, where the Equity Interests are held by a regulated fund, then any income or gains arising to the fund may be exempt from Irish tax.

b. **Stamp Duty and Value-Add Tax ("*VAT*")**

The rate of stamp duty (where applicable) on transfers of shares of Irish incorporated companies is 1% of the price paid or the market value of the shares acquired, whichever is greater. Where Irish stamp duty arises it is generally a liability of the transferee. Generally, no stamp duty should arise for the Holders of Equity Interests on the cancellation of their Equity Interests. Further, the cancellation of the Equity Interests should be considered outside the scope of Irish VAT.

3. **Irish Tax Consequences to the Parent in Connection with the Cancellation of the Equity Interests and the Transfer/Assignment of the Guaranteed Unsecured Notes Claims In Exchange for the New Mallinckrodt Ordinary Shares**

a. **Irish Capital Gains Tax ("*CGT*")**

The transfer/assignment of the Guaranteed Unsecured Notes Claims from the Holders of such Guaranteed Unsecured Notes results in the acquisition of a chargeable asset by the Parent. However, on the basis that

200

the Guaranteed Unsecured Notes Claims are contributed to Mallinckrodt International Finance SA ("*LuxCo*") by the Parent on the same day on which they are assigned to the Parent by the Holders of the Guaranteed Unsecured Notes, and the value of the shares issued by Mallinckrodt plc equal the market value of the receivables on the date of the transaction no Irish CGT should arise.  To the extent they are not transferred on the same day, or the value of the shares issued does not equal the market value of the receivables, then Irish CGT may arise on any increase in the value of the Guaranteed Unsecured Notes (including taking into account foreign exchange).

### b.        Stamp Duty

The transfer/assignment of the Guaranteed Unsecured Notes Claims from the Holders of such Guaranteed Unsecured Notes to the Parent will fall within the charge to Irish stamp duty.  However, the transfer/assignment of the Guaranteed Unsecured Notes Claims from the Holders of such Guaranteed Unsecured Notes to the Parent should be subject to the loan capital exemption from Irish stamp duty (provided that certain conditions are met).

### c.        Irish VAT

The Equity Interests are outside the scope of VAT.  Any VAT on costs that relate to the issue of such shares may be deductible to the extent that such costs have a direct and immediate link to the economic activities of the issuer.

### 4.        Irish Tax Consequences to Holders of New Mallinckrodt Ordinary Shares in Connection with the Cancellation of the Equity Interests and the Transfer/Assignment of the Guaranteed Unsecured Notes Claims In Exchange for the New Mallinckrodt Ordinary Shares

#### a.        Irish Tax on the Transfer/Assignment of the Guaranteed Unsecured Notes Claims

Non-Irish tax resident Holders of Guaranteed Unsecured Notes Claims should not be subject to Irish CGT on the disposal of the Guaranteed Unsecured Notes Claims.

The treatment of the transfer/assignment of the Guaranteed Unsecured Notes Claims for an Irish tax resident Holder of Guaranteed Unsecured Notes Claims will depend on whether the Guaranteed Unsecured Notes Claims are held as a trading asset or capital asset.  Where the Guaranteed Unsecured Notes Claims are held as a trading asset, the transfer/assignment of the Guaranteed Unsecured Notes Claims should form part of the taxable profits of the Holder and subject to Irish corporation tax at 12.5%.

Where the Guaranteed Unsecured Notes Claims are held as a capital asset, Irish tax law specifies that those debts are regarded as chargeable assets for Irish CGT purposes.  The transfer/assignment of the Guaranteed Unsecured Notes Claims to the Parent, by any Irish tax resident Holder of Guaranteed Unsecured Notes Claims, should be considered, prima facie, disposals chargeable to Irish CGT, taxable at 33%.

#### b.        Irish CGT Base Cost of New Mallinckrodt Ordinary Shares

The base cost for Irish CGT purposes of the New Mallinckrodt Ordinary Shares should be the market value of same at the date of issuance.  This is only relevant for Irish tax resident shareholders.

#### c.        Irish Dividend Withholding Tax ("*DWT*") on Future Dividends

Dividends or distributions paid by the Parent may be subject to Irish DWT. DWT is applied at a rate of 25%. There are a number of exemptions that allow dividends to be paid without the deduction of DWT. For DWT purposes, a distribution includes any distribution that may be made by the Parent to its Holders of Equity Interests including cash dividends, non-cash dividends and additional stock taken in lieu of a cash dividend. Where an exemption does not apply in respect of a distribution made to a particular shareholder, the Parent is responsible for withholding DWT prior to making such distribution.

### d.   Stamp Duty

No stamp duty should arise on the issue of the New Mallinckrodt Ordinary Shares to the Holders of Guaranteed Unsecured Notes Claims.

### e.   VAT

Any Irish VAT incurred on costs associated with the Restructuring Transactions by Holders of Equity Interests or holders of the New Mallinckrodt Ordinary Shares may not be recoverable by any Irish VAT registered shareholders.

## XIII. LUXEMBOURG INCOME TAX CONSEQUENCES

### A.   Luxembourg Tax Consequences To The Plan

#### 1.   Introduction

The purpose of this section of the Disclosure Statement is to outline the main Luxembourg income tax aspects related to the Disclosure Statement (and, in particular, the Waiver and Repayment in Kind (each as defined below)) and not to provide a comprehensive review of all Luxembourg tax considerations.

This section is strictly limited to Luxembourg income tax considerations, so that any legal, financial, regulatory or other aspects whatsoever as well as any foreign law aspects (if applicable) have not been reviewed nor covered by this section. Moreover, this section does not address Luxembourg net wealth tax considerations or any other direct or indirect Luxembourg tax considerations.

The information contained in this section deals with the Restructuring Transactions described in the Plan and the Disclosure Statement and, accordingly, is necessarily general and the applicability or effect of matters developed may vary if the Restructuring Transactions are implemented in a manner other than described in the Plan and Disclosure Statement.

This section is based on the Luxembourg laws currently in force, the regulations thereto, relevant judicial decisions and our understanding of the current administrative practices as of the date of this section. The law and the administrative practices are subject to change. In the event of such changes, the content of this section may be adversely affected. The Debtors assume no responsibility (i) to update this section for any such changes or (ii) to monitor the continuing relevance or suitability of this section for the purposes for which it was delivered.

No assurance can be given that the Luxembourg income tax authorities (Administration des contributions directes) ("***Lux Tax Authorities***") or any other tax authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not constitute tax advice and is intended only as a general guide. The summary is not exhaustive and Holders of Prepetition Debt or Equity Interests should consult their own tax advisors about

the Luxembourg tax consequences (and tax consequences under the laws of other relevant jurisdictions) of the Plan.

### 2.    Preliminary Debt Assumption By LuxCo Prior to the Waiver or Repayment of the Prepetition Debt

As part of the Restructuring Transactions under the Plan, LuxCo would assume [ ● ] of the obligations of the First Lien Term Loan Claims at face value from MEH, Inc. (the "***Debt Assumption***"). LuxCo will not assume any Prepetition Debt fees as part of the Debt Assumption.

The Debt Assumption would be executed such that LuxCo will assume [ ● ] of the Prepetition Debt of MEH, Inc. at face value in exchange for an increase of the acquisition price of MEH, Inc. (*i.e.*, the Debt Assumption will be enacted as an equity contribution from LuxCo equivalent to the amount of the Debt Assumption). Subsequent to the increase of the equity value of MEH, Inc. as the result of the Debt Assumption, an impairment test should be made to conclude whether or not a durable impairment on LuxCo's participation in MEH, Inc. has to be recorded through the profit and loss account. The Debt Assumption is not expected to lead to adverse Luxembourg tax consequences.

Any subsequent impairment that could be booked for accounting purposes would be tax deductible, but will be subject to certain Luxembourg tax deduction limitation rules.

Any interest to accrue on the debt or associated debt charges (such as external fees) relating to the Debt Assumption should be tax deductible subject to various Luxembourg tax deduction limitation rules (*i.e.*, mainly interest limitation rules and recaptures rules).

### 3.    Luxembourg Tax Consequences in Connection with the Transfer/Assignment of the Guaranteed Unsecured Notes Claims in Exchange for the New Mallinckrodt Ordinary Shares

#### a.    At the Level of LuxCo

There will be a transfer/assignment of the Guaranteed Unsecured Notes Claims from the Holders of such Guaranteed Unsecured Notes to Mallinckrodt Plc via the issuance of Mallinckrodt Plc shares, either structured as: (a) an exchange where Mallinckrodt Plc transfers shares in exchange for the Prepetition Debt held by the creditors towards LuxCo or (b) the creditors of LuxCo are contributing their Prepetition Debt to Mallinckrodt Plc in exchange for the shares issuance (the "***Repayment in Kind***"). After the Repayment in Kind, LuxCo should recognise a change of creditors as Mallinckrodt Plc will hold directly the Guaranteed Unsecured Notes Claims towards LuxCo. Immediately following the Repayment in Kind, Mallinckrodt Plc will contribute the Guaranteed Unsecured Notes Claims to LuxCo in exchange for newly issued shares of LuxCo (the "***Settlement***").

The Repayment in Kind (*i.e.*, the acquisition of the Prepetition Debt of LuxCo by Mallinckrodt Plc from the creditors of LuxCo) should not create any adverse Luxembourg tax consequences to the extent that the subsequent settlement of the Guaranteed Unsecured Notes Claims (via the equity contribution from Mallinckrodt Plc to LuxCo) is carried out at face value and related accrued interest, and for an equivalent consideration.

The Settlement (whereby Mallinckrodt Plc contributes the Guaranteed Unsecured Notes Claims to LuxCo in exchange for shares) must be carried out at fair value. If the fair value of the Guaranteed Unsecured Notes Claims under the Settlement is lower than its face value, such a transaction should lead to an increase of LuxCo's wealth and hence, is a taxable event (for the amount by which the face value exceeds the fair

value) at the level of LuxCo from a Luxembourg corporate income tax perspective. In this scenario, the Settlement should lead to an increase of the equity of LuxCo and realization of a commercial profit (for the difference between the contribution value and the face value of the Guaranteed Unsecured Notes Claims) which should be subject to Luxembourg tax at the global income tax rate of 24.94% (for the fiscal year 2021).  As of the date of this Disclosure Statement, Luxembourg should have the right to tax such a capital gain (if any) without specific limitations.  However, such taxable income may be offset with the available tax losses carried forward of LuxCo.  Considering the amount of tax losses of LuxCo, this scenario would likely be anticipated as the amounts of tax losses is expected to exceed any gain resulting from the Settlement.

Under Luxembourg Income Tax Law (the "**_Luxembourg ITL_**"), for any tax losses incurred starting from the tax year 2017, the carry-forward of those losses is limited to 17 years.  The carry-forward is unlimited for older tax losses, with such older tax losses being deducted first.

By derogation, Article 52 of the Luxembourg ITL sets forth that the net gain realized by a Luxembourg fully taxable corporation (such as LuxCo), upon total or partial debt forgiveness that has occurred in the framework of a debt reorganization aiming at the financial recovery of the business of the debtor (the so called "_gain d'assainissement_"), is to be eliminated from the taxable result.

Since Mallinckrodt Plc is treated as a corporation for Luxembourg tax purposes, dividend distributions or any assimilated flow of funds to be carried out by LuxCo to Mallinckrodt Plc should be exempt from withholding tax as the relevant conditions provided by Article 147 of the Luxembourg ITL should be met.

Under 156 (8) of Luxembourg ITL, non-residents are subject to capital gains tax in Luxembourg if they dispose of shares in important participations within a period of six months. Because Mallinckrodt Plc has been a shareholder of LuxCo for more than six months, there should be no application of the non-resident capital gains taxation in Luxembourg.

### b.      At the Level of the Creditors

As a general rule, the repayment of a claim at face value to a creditor does not lead to an increase or decrease of his wealth and, hence, should not be a tax event at his/her level from a Luxembourg income tax perspective.

However, if the terms of payment is a payment in kind (such as the delivery of the Mallinckrodt Plc shares under the Repayment in Kind) made at the FMV (not the same as the face value) on the transfer date and if cumulatively, the transferee is either a Luxembourg tax resident or a non-Luxembourg tax resident who has a permanent establishment in Luxembourg to which his stake in the Guaranteed Unsecured Notes Claims is allocated, the Repayment in Kind amount should be expected to be a taxable event (gain or loss recognition). The tax treatment of such gain or loss will depend on the specific tax position of each creditor. Moreover, with respect to the Mallinckrodt Plc shares transferred to such creditor, the initial acquisition price set at the Repayment in Kind date should be one of the elements to assess the eligibility of Mallinckrodt Plc to the Luxembourg participation exemption regime at the level of such creditors.

While the intent is not to have any Holders of the Prepetition Debt becoming direct shareholders of LuxCo, it has to be noted that if such a situation materializes, Luxembourg withholding tax implications should be considered. Double Tax Treaties ("**_DTT's_**") may provide for a reduced rate of 5% withholding tax provided amongst other provisions that the beneficiaries of dividend distributions are capital companies owning either 10% (DTT between the United States and Luxembourg dated April 3, 1996) or 25% (DTT between Ireland and Luxembourg dated January 14, 1972) of LuxCo shares.

Also, while the intent is not to have any Holders (non-Luxembourg resident) of the Guaranteed Unsecured Notes Claims become direct shareholders of LuxCo, it has to be noted that if such a situation materializes, the non-resident capital gains taxation rules should only apply if the shares in LuxCo would be disposed of by a given shareholder within a period of 6 months after the acquisition of the LuxCo shares (participation of 10% or more).

However, the taxation right of Luxembourg is restricted by the DTT's signed between Luxembourg and foreign jurisdictions. Subject to the availability of the tax conventions, Article 14 (5) of the DTT between the United States and Luxembourg dated April 3, 1996 grants exclusive taxing rights over any capital gain to the United States. In this context, the application of 156 (8) of the Luxembourg ITL should be overridden by Article 14 (5) of the DTT US-Lux. In addition, Article 12 of the DTT between Ireland and Luxembourg dated January 14, 1972 grants exclusive taxing rights over any capital gain to Ireland. In this context, the application of 156 (8) of the Luxembourg ITL should be overridden by Article 12 of the DTT Irish-Lux.

The present section does not provide for an in-depth analysis of all the conditions to benefit from the double tax treaties and the related reduced withholding tax rates (a case-by-case assessment has to be carried out).

Regarding any non-Luxembourg tax residents creditors that do not have a permanent establishment in Luxembourg (to which their stake in the Guaranteed Unsecured Notes Claims is allocated), the Repayment in Kind should not generate Luxembourg income tax implications at their level. The above withholding tax and non-resident capital gains consideration have to, however, be further assessed.

## XIV.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 2(b) (unless otherwise Unimpaired in accordance with the Plan), 2(c) (unless otherwise Unimpaired in accordance with the Plan), 3 (unless otherwise Unimpaired in accordance with the Plan), 4 (unless otherwise Unimpaired in accordance with the Plan), 5, 6(a)-(f), 7, 8(a)-(d), 9(a)-(h), and 10 to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

**Mallinckrodt plc (on behalf of itself and all other Debtors)**

By:  _/s/_ _____

Name:

Title: