<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2
                                      .   Chapter 11
 3   IN RE:                           .
                                      .   Case No. 20-12522 (JTD)
 4   MALLINCKRODT PLC, et al.,        .
                                      .
 5                 Debtors.           .
     _____.
 6   MALLINCKRODT PLC, et al.,        .   Adv. Pro. No. 20-50850
                                      .
 7               Plaintiffs,          .
                                      .
 8        v.                          .   Courtroom No. 5
                                      .   824 King Street
 9   STATE OF CONNECTICUT, et al.,    .   Wilmington, Delaware
     19801
10                                    .
                 Debtors.             .   August 25, 2021
11   . . . . . . . . . . . . . . . .      1:00 P.M.
12         TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE HEARING
              BEFORE THE HONORABLE JOHN T. DORSEY
13                 UNITED STATES BANKRUPTCY JUDGE
14
     TELEPHONIC APPEARANCES:
15
     For the Debtor:        Michael Merchant, Esquire
16                          Robert Maddox, Esquire
                            Robert Stearn, Jr., Esquire
17                          RICHARDS, LAYTON & FINGER, P.A.
                            Rodney Square
18                          920 N. King Street
                            Wilmington, Delaware 19801
19

20
     Audio Operator:        Leslie Murin, ECRO
21
     Transcription Company: Reliable
22                          1007 N. Orange Street
                            Wilmington, Delaware 19801
23                          (302)654-8080
                            Email: gmatthews@reliable-co.com
24
25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
</pre>

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the Debtors:          Anupama Yerramalli, Esquire
                              George Davis, Esquire
 3                            LATHAM & WATKINS LLP
                              1271 Avenue of the Americas
 4                            New York, New York 10020

 5                            - and -

 6                            Jason Gott, Esquire
 7                            LATHAM & WATKINS LLP
                              330 North Wabash Avenue, Suite 2800
 8                            Chicago, Illinois 60611rnia 90017

 9  For the Committee:        Cullen Speckhart, Esquire
                              COOLEY LLP
10                            1299 Pennsylvania Avenue, NW
                              Suite 700
11                            Washington, DC 20004

12                            - and -

13
                              Sara Brauner, Esquire
14                            AKIN GUMP STRAUSS HAUER & FELD LLP
                              One Bryant Park
15                            New York, New York 10036

16  For Acthar Plaintiffs:    David Haviland, Esquire
                              HAVILAND HUGHES
17                            112 Haddontowne Court, Suite 202
                              Cherry Hill, New Jersey 08034
18
19  For the Securities        Jarett Sena, Esquire
    Opt-Out Plaintiffs:       ROLNICK KRAMER SADIGHI LLP
20                            1251 Avenue of the Americas
                              New York, New York 10020
21
    For the FCR:              Jaime Luton Chapman, Esquire
22                            YOUNG CONAWAY STARGATT & TAYLOR LLP
                              Rodney Square
23                            1000 North King Street
                              Wilmington, Delaware 19801
24

25
```

TELEPHONIC APPEARANCES (Cont'd):

For the Governmental        Megan Wasson, Esquire
Ad Hoc Committee:           KRAMER LEVIN NAFTALIS & FRANKEL LLP
                            177 Avenue of the Americas
                            New York, New York 10036

For the State of Rhode      Louis Bograd, Esquire
Island:                     MOTLEY RICE LLC
                            401 9th Street NW, Suite 1001
                            Washington, DC 20004

For Deerfield:              Benjamin Beller, Esquire
                            SULLIVAN & CROMWELL LLP
                            125 Broad Street
                            New York, New York 10004

1  <u>MATTERS GOING FORWARD</u>:

2  15. Debtors' Motion to Extend Injunctive Relief Pursuant to
   11 U.S.C. Section 105 [Adv. Docket No. 224 - filed August 10,
3  2021]

4      **Ruling:  Matter Taken Under Advisement**

5  12. Motion of Darrel Edelman, a Party-in-Interest, for an
   Order Establishing a Bar Date for Opioid Claimants in Classes
6  8(a) (State Opioid Claims); 8(b) (Municipal Opioid Claims);
   8(c) (Tribe Opioid Claims); 8(d) (U.S. Government Opioid
7  Claims); 9(a) (Third Party Payor Opioid Claims); 9(b) (PI
   Opioid Claims); 9(c) (NAS PI Opioid Claims); 9(d) (Hospital
8  Opioid Claims); 9(d) (Hospital Opioid Claims); 9(e) (Other
   Opioid Claims); 9(f) (NAS Monitoring Opioid Claims); 9(g)
9  (Emergency Room Physicians Opioid Claims); and 9(h) (Other
   Opioid Claims) [Docket No. 3313 - filed July 20, 2021]
10

11     **Ruling:  199**

12

13 <u>DEBTORS' WITNESS(s)</u>:

14 **STEPHEN WELCH**

15     Direct Examination by Mr. Maddox        22

16     Cross Examination by Mr. Haviland       47

17     Cross Examination by Mr. Sena           75

18     Cross Examination by Mr. Bograd         89

19     Redirect Examination by Mr. Maddox      93

20

21 <u>EXHIBITS</u>                              <u>I.D.</u>    <u>REC'D</u>

22 Debtor Exhibits 1 through 3                        16

23 Debtor Exhibit 5 and 7                             16

24 Debtor Exhibits 8 through 32 34                    16

25 Debtor Exhibits 43 through 49                      21
        (Proceedings commence at 1:06 p.m.)

1         THE COURT:  Good afternoon, everyone.  This is

2   Judge Dorsey.  We're on the record in Mallinckrodt PLC, Case

3   Number 20-12522.

4         I apologize for being a few minutes late, we had

5   some technical difficulties, but we've worked those out.

6         I'll go ahead and turn it over to debtors' counsel

7   to run the agenda.  I think you can hear me (indiscernible)

8         MR. MERCHANT:  Good afternoon, Your Honor.

9   Michael Merchant of Richards, Layton & Finger on behalf of

10   the debtors.

11         Your Honor, for purposes of today's hearing, I

12   think we'd like to begin the hearing with Ms. Yerramalli

13   updating the Court as to some significant case developments.

14   After that, if acceptable to the Court, we'd like to take

15   things a little bit out of order.

16         We'd like to start the agenda with Agenda Item

17   Number 15, which is the motion to extend the injunctive

18   relief, and then handle Mr. Edelman's motion at the end of

19   the hearing.  I understand that there is a Purdue hearing

20   going on at the same time, and counsel for the OCC has

21   expressed an interest in Mr. Edelman's motion and asked that

22   we deal with it at the end of the hearing, hopefully allowing

23   them to participate at that time.

24         THE COURT:  That's fine.  Thank you.

25         MR. MERCHANT:  Okay.  With that, Your Honor, I'll

1  cede the podium to Ms. Yerramalli.

2           THE COURT:  All right.  Ms. Yerramalli.

3           MS. YERRAMALLI:  Good afternoon, Your Honor.  Anu

4  Yerramalli of Latham & Watkins on behalf of the debtors.

5           Your Honor, we're pleased to report that, after

6  months of hard-fought negotiations and mediation before Judge

7  Sontchi, the UCC and the debtors' management team reached a

8  plan settlement construct overnight.  The UCC has approved it

9  and the debtors' management team and advisors are

10 recommending this construct to the debtors' boards, and are

11 also in the process of seeking approval of it from the RSA

12 parties.  Once the debtors have obtained the necessary

13 approvals, we will file the terms of the settlement with the

14 Court.  But Your Honor, while this process unfolds, the

15 debtors and the UCC have agreed to a litigation standstill

16 with respect to the UCC's experts and plan issues.

17          Your Honor, we believe this is a significant step

18 forward in these cases and really appreciate the efforts of

19 Judge Sontchi to push the parties to reach this deal.

20          In addition, the debtors have also reached an

21 agreement in principle with the majority second lien

22 noteholders, holding more than two-thirds of the second lien

23 notes, to resolve their make-whole litigation and plan

24 treatment.  This settlement will also be memorialized in an

25 amended plan.  And while we do that, we have also agreed to a

1  standstill on litigation with respect to plan experts and

2  plan discovery with the two elements.

3         The debtors are working with these constituents to

4  finalize the documentations.  With that, we can announce the

5  terms of the settlement in the coming days.

6         And we also wanted to note for Your Honor and the

7  Court that we are in ongoing negotiations with the OCC and

8  the other opioid constituents, and hope that those

9  discussions will be successful, as well.

10         And unless Your Honor has any specific questions

11  for us, I can cede the podium and go on with the rest of the

12  agenda.

13         THE COURT:  No, I don't have any questions, Ms.

14  Yerramalli.  I'm glad to hear that we're making some

15  progress.

16         Ms. Speckhart, I see you've raised your hand.

17         MS. SPECKHART:  Thank you, Your Honor.  Cullen

18  Speckhart from Cooley appearing on behalf of the UCC.

19         THE COURT:  I can --

20         MS. SPECKHART:  I am --

21         THE COURT:  I can barely hear you, Ms. Speckhart.

22         MS. SPECKHART:  Can you hear me now, Your Honor?

23         THE COURT:  A little --

24         MS. SPECKHART:  I can be --

25         THE COURT:  -- bit better.

1              MS. SPECKHART:  -- a little louder.  Okay.

2         I am pleased to confirm that the UCC has reached

3    an agreement in principle with the debtors, which we expect

4    will be tendered to the record and included and reflected in

5    an amended plan of reorganization in the very near term.

6         The settlement itself was achieved with the

7    assistance of Judge Sontchi, our mediator, who was absolutely

8    critical to our process of getting a resolution that includes

9    the plan and providing what we believe is fair and equitable

10   treatment for general unsecured creditors, thereby

11   positioning the UCC to support the debtors in achieving

12   confirmation of the plan.

13        I would like to note, Your Honor, that the

14   settlement involves a carefully constructed and heavily

15   negotiated balancing of many diverse interests.  Its terms

16   are highly integrated, in the sense that the settlement

17   contemplates the creation of a GUC trust on the effective

18   date of the plan, which will receive certain forms of

19   consideration from the debtors, which will then be allocated

20   and distributed to creditors according to a rational and

21   reasoned methodology, to which the UCC has agreed as a key

22   element of the overall deal.

23        And as Ms. Yerramalli indicated, this resolution

24   was reached within a matter of hours prior to the hearing,

25   and the parties do have a fair number of details to work

1  through.  But we certainly view this as a pivotal moment for

2  the UCC and its creditor constituency.

3  　　　　　And we are more than grateful to our committee

4  members and the parties and especially Judge Sontchi for

5  their tireless work over the last couple of months in dealing

6  with a host of very complicated issues as we move

7  consensually toward the conclusion of what has been a

8  successful process of mediation among the parties involved.

9  Thank you, Your Honor.

10  　　　　　THE COURT:  Thank you, Ms. Speckhart.

11  　　　　　Mr. Beller, I see you've raised your hand.

12  　　　　　MR. BELLER:  Thank you, Your Honor.  Can you hear

13  me all right?

14  　　　　　THE COURT:  Yes, go ahead.

15  　　　　　MR. BELLER:  Thank you.  Benjamin Beller from

16  Sullivan & Cromwell on behalf of Deerfield.

17  　　　　　I just wanted to thank the debtors and note for

18  the record that we're glad to have had constructive

19  discussions with the debtors to reach the terms of the

20  settlement, and we look forward to moving forward to document

21  that deal.  Thank you.

22  　　　　　THE COURT:  All right.  Thank you, Mr. Beller.

23  　　　　　Anyone else before we move on to the motions?

24  　　　(No verbal response)

25  　　　　　THE COURT:  All right.  Mr. Merchant?

1      MR. MERCHANT:   Thank you, Your Honor.

2      Turning to Agenda Item Number 15, the motion to

3  extend the injunctive relief, my colleagues Robert Stearn and

4  Robert Maddox will be handling those matters for the debtors,

5  so I'll cede the podium to Mr. Stearn at this time.

6      THE COURT:   Okay.  Mr. Stearn.

7      MR. STEARN:   Good afternoon, Your Honor.  May it

8  please the Court, Bob Stearn from Richards, Layton & Finger,

9  on behalf of the debtors.  Your Honor, can you hear me okay?

10      THE COURT:   Yes, thank you.

11      MR. STEARN:   Your Honor, we have some evidence to

12  present to you today in the form of documents and testimony

13  from Stephen Welch, the debtors' Chief Transformation

14  Officer.  I suggest we hear that evidence and then go to

15  argument.

16      But before we get to that evidence, I'd like to

17  see if we can streamline the proceedings a bit today.  Your

18  Honor, the debtors' view is that the evidence presented to

19  the Court in November, both documents and testimony, remains

20  both relevant and before the Court today, as today's hearing

21  is, in effect, a continuation of the prior injunction

22  proceeding.  And so what we would propose to do today is, by

23  way of evidence, essentially kind of a bring-down from last

24  November.

25      But if that's not where we find ourselves today,

1    we'd like to know that now because that will shape our

2    evidentiary submissions today and require a more robust

3    evidentiary presentation because we'll have to repeat some of

4    what we did in November.  So I guess we're seeking the

5    Court's guidance as to whether the November evidence remains

6    before the Court for purposes of today's --

7              THE COURT:  Well, let me hear if there's any

8    objections to that first.  Does anyone wish to be heard on

9    whether or not we can incorporate the evidence from the

10   November hearing into this hearing?

11             MR. HAVILAND:  Yes, Your Honor.  Don Haviland for

12   the Ad Hoc Acthar Group.

13             THE COURT:  Go ahead, Mr. Haviland.

14             MR. HAVILAND:  Thank you, Your Honor.

15             I'm not quite sure what Mr. Stearn is asking.  We

16   have had in place a preliminary injunction the Court entered

17   on November 23rd, which expired of its own volition last

18   Thursday at midnight.  It's our position that there is no

19   preliminary injunction.

20             As to the record that took place back in November,

21   Your Honor will recall that was three days of hearings with

22   multiple witnesses who testified.  The current application

23   has no evidence, no declaration, no support.  Obviously, our

24   clients object to the extension.  We've made that clear, and

25   we're not alone at this time, Judge.  We've been joined by

1  the State of Rhode Island and certain securities opt-out

2  plaintiffs.

3         It's our position the debtors have had 270 days,

4  in fact, more than 270 days, and the time has come to allow

5  these nondebtor claims, and that's what the injunction seeks

6  to stay, Judge, is to continue the stay as to nondebtors.  In

7  our case, it's the Express Scripts entities.

8         So we don't agree to just shoehorning evidence in

9  without there being some kind of proffer as to how it's

10  relevant, now 270 days later.

11         So we got this morning -- as I know your clerk

12  did, Your Honor -- about 50 some exhibits.  I don't know

13  what's being offered in what context with what witnesses.  We

14  only learned the other day that Mr. Welch was going to

15  testify.  So I'd ask that the evidence come in, in the

16  context of the hearing.

17         THE COURT:  Mr. Stearn?

18         MR. STEARN:  I'm not quite sure how to respond to

19  that.  Obviously, we'll deal with the legal arguments about

20  the purported expiration of the injunction in a few minutes,

21  or at least after Mr. Welch's testimony.  I think Your Honor

22  will give that argument fairly short shrift.

23         THE COURT:  You're fading out on me Mr. Stearn.

24  I'm having -- I don't know if it's on my end or the parties'

25  ends, but I'm having a hard time hearing people today.

1           MR. STEARN:  I will try again.  Can Your Honor

2  hear me any better now?

3           THE COURT:  Yes.

4           MR. STEARN:  Okay.  I'll try to lean forward a

5  little bit as I'm speaking.

6           So, as I was saying, we'll deal with legal

7  arguments such as whether or not the injunction expired of

8  its own volition, so to speak, or not.  I think Your Honor

9  will give that argument fairly short shrift.  But

10  nonetheless, the goal here was to streamline the proceedings.

11          What Mr. Haviland -- what Mr. Haviland received by

12  way of our exhibit list was a list of the exhibits that had

13  been admitted previously, which we denominated as such, and

14  then a list of less than 10 additional exhibits, which we

15  would propose to admit today.  The numbers do skip around a

16  bit.  There's not 50 because we tried to keep the original

17  numbering and skip the exhibits that were not admitted last

18  time, so that's why you see the numbers sort of skip a bit in

19  our exhibit list.  And then we tacked some on at the end,

20  specifically denominated as, you know, not admitted last

21  time.

22          And our proposal was to, rather than go through

23  all those exhibits again and seek to have them admitted

24  again, recognizing that they were admitted previously, rely

25  on that prior record, both in terms of its testimony and its

1   exhibits, and not have to go through that exercise again, so

2   that, for example, Mr. Welch's testimony would be more

3   truncated than if we had to basically start from scratch and

4   create a record all over again.  That was -- that's our

5   proposal.  It would seem logical, especially because this is,

6   in effect, a continuation of the proceedings that started

7   last fall.

8          THE COURT:  All right.  I'm satisfied that the

9   record from the previous hearing can be incorporated by

10  reference into this hearing.  This is a motion to continue or

11  extend the previous order.  The parties can argue in closings

12  as to the significance of the evidence from the prior hearing

13  and how it applies to the extension motion in closing

14  arguments.  But for matters of judicial economy and the fact

15  that all the parties were involved in the -- or at least the

16  objecting parties were involved in the previous motion, I see

17  no reason not to incorporate that evidence by reference.

18         MR. STEARN:  Thank you, Your Honor.

19         And with that, I'll turn it over to Mr. Maddox,

20  who is going to present Mr. Welch.

21         MR. HAVILAND:  Your Honor, before we do that, may

22  I just make a point of order that the first exhibit I see is

23  a declaration by Mr. Eisenberg, and I don't believe he's

24  testifying today.  So I want to just renew our objection,

25  we're not being given the opportunity to cross-examine the

1   witnesses.  I just want to make that point.

2         MR. STEARN:  Your Honor, I guess if I could

3   briefly respond to that, Mr. Eisenberg appeared -- can Your

4   Honor hear me, by the way?

5         THE COURT:  Yes, go ahead.

6         MR. STEARN:  Mr. Eisenberg appeared in person

7   previously, and was cross-examined.  So I really don't

8   understand the point that Mr. Haviland is making.  But

9   nonetheless, I believe Your Honor already has ruled.

10        THE COURT:  Yes, the -- to the extent that was an

11  objection, Mr. Haviland, it's overruled.  Mr. Eisenberg did

12  appear and testify, and he was -- you were given a full

13  opportunity to cross-examine him at that time.  And as I

14  said, you'll have the opportunity to argue about the

15  relevance of that prior testimony to this motion when we get

16  to closing arguments.

17        MR. STEARN:  Thank you, Your Honor.

18        So, again, with that, I cede the virtual podium to

19  Mr. Maddox.

20        THE COURT:  Okay.  Mr. Maddox.

21        MR. MADDOX:  Thank you, Your Honor.  May it please

22  the Court, Robert Maddox from Richards, Layton & Finger, on

23  behalf of the debtors.

24        In light of Your Honor's ruling, I would like now

25  to move those documents into evidence.  We've provided a list

1  of exhibits to the objectors sent to the Court.  And so I

2  would move the previously admitted exhibits, which are

3  numbered 1, 2, 3, 5, 7; then Exhibits Number 8 through 32 and

4  34 into evidence.

5          THE COURT:  Are those all exhibits from the prior

6  hearing, Mr. Maddox?

7          MR. MADDOX:  Yes, Your Honor, they are.

8          THE COURT:  All right.  I've already ruled they're

9  admitted in this hearing.

10          MR. MADDOX:  Thank you, Your Honor.

11      (Debtors' Exhibits 1 through 3 received in evidence)

12      (Debtors' Exhibit 5 received in evidence)

13      (Debtors' Exhibit 7 received in evidence)

14      (Debtors' Exhibits 8 through 32 received in evidence)

15      (Debtors' Exhibit 34 received in evidence)

16          MR. HAVILAND:  Your Honor, if I may, just I want

17  to renew the objection on grounds of hearsay as to the

18  declaration of Mr. Eisenberg and the Express Scripts

19  pleadings.  There's no one here to attest to the veracity of

20  those pleadings, Exhibit 5, Exhibit 14, Exhibit 15, Exhibit

21  16.

22          THE COURT:  Overruled.

23          MR. MADDOX:  In addition, Your Honor, there are a

24  handful of documents that were not previously admitted that

25  the debtors would like to admit today, and I will go through

1  those briefly.  That begins on Page 4 of the exhibit list.

2           Exhibit 43, which is the complaint filed on

3  October 8th, 2020 in the Rhode Island v. Trudeau action.

4           Exhibit Number 44, the disclosure statement that's

5  been filed in these cases, identified at Docket Item 2917.

6           The joint plan of reorganization of Mallinckrodt

7  PLC and its debtor affiliates, which has been filed in these

8  cases at Docket Item 2916.

9           THE COURT:  I'm sorry.  I couldn't hear the

10  exhibit number from that last exhibit, Mr. Maddox.

11           MR. MADDOX:  I'm sorry, Your Honor.  Exhibit

12  Number 45, the joint plan of reorganization of Mallinckrodt

13  PLC at Docket Item 2916.

14           Exhibit Number 46, the order approving the

15  disclosure statement in these proceedings, located at Docket

16  Item 2911.

17           Exhibit Number 47, the Proof of Claim Number 4197,

18  filed by Evernorth Health, Incorporated.

19           MR. HAVILAND:  Your Honor, I'm not sure if we're

20  taking objections in order.  But at this point, I would

21  object to that exhibit as hearsay.  There's no witness here

22  to sponsor the positions, especially the factual positions

23  taken by Evernorth in that document.

24           THE COURT:  Mr. Maddox.

25           MR. MADDOX:  Yes, Your Honor, if I may respond.

1  That exhibit is not being offered for the truth of the

2  allegations that are made within it, but rather, for the fact

3  that the allegations themselves are being made.

4              THE COURT:  All right.

5              MR. HAVILAND:  Your Honor --

6              THE COURT:  It will be --

7              MR. HAVILAND:  -- the under --

8              THE COURT:  Go ahead, Mr. Haviland.

9              MR. HAVILAND:  I was going to say the underlying

10 proof of claim, other than the form, makes arguments about

11 indemnity, which is the very issue before the Court.  The

12 entire pleading is hearsay, unless there's a witness here to

13 testify for Express Scripts.

14             THE COURT:  Okay.  I'm going to admit the document

15 for the sole purpose of showing that the claim was actually

16 made.  It's a public document filed with the Court.

17             MR. MADDOX:  Thank you, Your Honor.

18             The next exhibit is Exhibit Number 48, and that is

19 the complaint filed on May 26th, 2020, in the action

20 captioned Law Enforcement Health Benefits, Inc. v. Trudeau.

21             MR. HAVILAND:  Your Honor, we would object to that

22 pleading being entered into evidence.  The pleading does not

23 name any debtor entity covered by Your Honor's injunction.

24             THE COURT:  Mr. Maddox?

25             MR. MADDOX:  Yes, Your Honor.  While it doesn't

1 name a debtor entity, it does name Mr. Trudeau, who, as you

2 know, is the debtors' Chief Executive Officer.

3          MR. HAVILAND:  Your Honor, as Mr. Maddox I'm sure

4 knows, Mr. Trudeau was dismissed from the action without

5 prejudice by agreement with the debtor.

6          MR. MADDOX:  We understand -- Your Honor, I'm

7 sorry.  It's my understanding that I believe Mr. Welch has

8 not been dismissed from that matter yet.

9          MR. HAVILAND:  That's correct, Your Honor.  As

10 debtors' counsel well knows, Mr. Welch is not covered by the

11 injunction, as agreed to by the debtors.  This is the

12 problem, Your Honor, I have with offering the exhibits

13 without a witness.  You're ruling in a vacuum about hearsay

14 evidence.  That pleading does not involve any debtor entity

15 covered by Your Honor's injunction, as I first stated.

16          THE COURT:  Mr. Maddox.

17          MR. MADDOX:  However, it does name Mr. Welch, who

18 is and continues to be indemnified by the debtors.

19          MR. HAVILAND:  Your Honor, again, Mr. Welch is not

20 covered by the 105 injunction, nor is AlixPartners, nor are

21 the other nondebtor entities that are named in it, nor is --

22 the defendants in that case are not covered -- the -- Mr.

23 Welch, AlixPartners, and the nondebtor entities are not

24 covered by Your Honor's injunction.

25          If the argument is this is an extension, then the

1 extension can only be as to what was originally ordered, not

2 as to anything new.  And we would vehemently object to

3 extending it to any party that wasn't before the Court back

4 in November.

5        THE COURT:  Mr. Maddox, go ahead.

6        MR. MADDOX:  Yes, Your Honor.  And it is my

7 understanding -- and we're happy to provide additional

8 briefing to the Court on this -- that Mr. Welch was added, as

9 were others, after the judgment was put into place, and

10 therefore couldn't have been expressly subject to it.  But

11 because he is an officer and director of the company and

12 subject to the indemnification obligations, he certainly --

13 the claims against him certainly were intended to be covered

14 by that injunction.

15        MR. HAVILAND:  Your Honor, whatever the debtors'

16 intentions were, we had three days of hearing and they had

17 plenty of opportunity to make their intentions clear as to

18 who was covered by that injunction.  Your Honor has now

19 admitted, over objections, the entire record of that

20 proceeding.  You will not find anywhere I those pleadings,

21 proceedings, or evidence any mention of Mr. Welch anywhere.

22        THE COURT:  Well, we can -- you can argue that

23 later.  I'm going to admit it just for the purpose of showing

24 that this complaint was filed, and you can argue what the

25 significance of it is in closing.

1          MR. MADDOX:  Thank you, Your Honor.

2          The debtors' next exhibit, 49, the amended

3  complaint filed on February 20th, 2020 in United Association

4  of Plumbers and Pipe Fitters Local 322.

5          And as Your Honor has already ruled that the prior

6  evidence comes in, we have included the transcripts of the

7  hearings from November 16th, 2020, that's Docket Item 152;

8  from November 17, 2020, that's Docket Item 153l; and from

9  Your Honor's ruling on November 23rd, 2020 at Docket Number

10  168.

11          THE COURT:  All right.

12          MR. MADDOX:  Thank you, Your Honor.

13      (Debtors' Exhibits 43 through 49 received in evidence)

14          MR. MADDOX:  The debtors would like to call

15  Stephen Welch to testify.

16          THE COURT:  All right.  Mr. Welch, please raise

17  your right hand.  State your full name for the record and

18  spell your last name.

19      (No verbal response)

20          THE COURT:  You're muted, Mr. Welch.

21          THE WITNESS:  Stephen Welch, W-e-l-c-h.

22  STEPHEN WELCH, WITNESS FOR THE DEBTORS, AFFIRMED

23          THE COURT:  All right.  Mr. Maddox, go ahead.

24          MR. MADDOX:  Thank you, Your Honor.

25                    DIRECT EXAMINATION

1 BY MR. MADDOX:

2 Q    Good afternoon, Mr. Welch.

3 A    Good afternoon, Mr. Maddox.

4 Q    Could you please describe for the Court your educational

5 background?

6 A    Yes.  I have a law degree from Georgetown University Law

7 Center and a Bachelor of Arts in Political Science from

8 California State University Bakersfield.

9 Q    And Mr. Welch, are you a practicing lawyer now?

10 A    I am an active member of the California Bar and U.S. Tax

11 Court, but I do not consider myself to be a practicing

12 attorney.

13 Q    And Mr. Welch, when did you first start working for

14 Mallinckrodt?

15 A    I joined the company in the Fall of 2012.

16 Q    And would you please describe your roles at Mallinckrodt

17 since joining in 2012?

18 A    I will do it very briefly, given the time period.  I

19 started in the tax department as Director of Tax Planning,

20 and then became Chief of Staff to our President and CEO.  For

21 a period of time after that, I became Vice President of

22 Corporate Transactions, that was actually concurrent with the

23 Chief of Staff role.  I then became Vice President of

24 Corporate Strategy.

25        And then of most relevance, in 2019, after we announced

1  that we were not going to be able to spin off our specialty

2  generics unit, I became Chief Transformation Officer,

3  responsible for overseeing specialty generics and the

4  restructuring process.  I've subsequently taken on an

5  additional title in Decameter of 2020 as Chief Financial

6  Officer of Specialty Generics.

7  Q    Thank you, Mr. Welch.

8       And can you describe in a little more detail what your

9  job duties are as Chief Transformation Officer?

10 A    Yes.  As Chief Transformation Officer, I've been one of

11 the primary responsible parties for the debtors for the

12 oversight and administration of these Chapter 11 cases and

13 all of the processes leading up to the filing from the Summer

14 of 2019.  So I reviewed and approved the engagement letters

15 for almost every party that's involved in this case that the

16 debtors are paying for.  I chair regular meetings with our

17 advisors and members of the company and am involved in

18 meetings on a daily, if not hourly, basis with respect to the

19 restructuring.

20 Q    Thank you.

21      And are you a member of the board of directors of any

22 of the debtor entities?

23 A    I'm a member of the board of directors at each of the

24 specialty generic debtor entities, but none of the specialty

25 brands.

1  Q     And in your role as a director, do you receive updates

2  or give updates with respect to the debtors' restructuring?

3  A     I both receive and give updates, yes.

4  Q     And in your capacity as a board member, do you receive

5  updates on the company's financials?

6  A     I -- I give updates on the company's financial

7  performance to my fellow specialty generics directors, yes.

8  Q     And outside of board meetings, do you have regular

9  meetings with the debtors' officers, directors, and other

10 executives?

11 A     I do, I meet with them regularly and I update on these

12 Chapter 11 cases, as well as the performance of the specialty

13 generics segment.

14 Q     And do you also have meetings concerning the debtors'

15 financials with the executives and other members of

16 Mallinckrodt?

17 A     I do, I am -- I'm intimately aware of the debtors'

18 financial position.

19 Q     About how often would you say you review the debtors'

20 financial information?

21 A     On a daily basis.

22 Q     Thank you.

23        Do you recall, in November 2020, you previously

24 testified in support of the imposition of the preliminary

25 injunction?

1  A    I do recall that testimony, yes.

2  Q    And as of the time you testified, there were over 3,000

3  individual opioid cases pending against the debtors

4  (indiscernible) approximately 16 Acthar-related litigations,

5  as well as security lawsuits and investigations pending.  Do

6  you recall that?

7  A    I do recall that.

8  Q    And to your knowledge, sitting here today, have any of

9  those lawsuits been withdrawn or otherwise changed during the

10  pendency of the injunction?

11  A    No.

12  Q    And focusing specifically on the Acthar actions, are you

13  aware whether any of the pending private Acthar actions

14  against the debtors have been dismissed in the time that the

15  injunction has been pending?

16  A    No, they have not been.

17  Q    And in November, you testified that you believed that

18  there were approximately 15 million -- 15 -- I'm sorry --

19  billion dollars of damages that could potentially result in

20  Acthar litigations.  Do you recall that?

21  A    Yes.  I call them "alleged damages," but -- but in that

22  range, yes.

23  Q    And does that remain true today?

24  A    It does.

25  Q    And in November, you testified that there were at least

1  three governmental investigations going on, one by the SEC,

2  one by the Department of Justice in Florida, and one by the

3  attorney -- U.S. Attorney in Massachusetts.  Do you recall

4  that?

5  A    I do recall that testimony.

6  Q    And to your knowledge, have those investigations ceased

7  pending the injunction?

8  A    They still exist.

9  Q    All right.  If I use the term "supplemental 105

10  injunction," do you know what I'm referring to?

11  A    I do.

12  Q    And can you describe what actions are covered by the

13  supplemental 105 injunction?

14  A    Yeah, so the -- the supplemental 105 injunction is

15  intended to cover directors and officers, as well as related

16  parties involved, non -- nondebtor defendants in cases that

17  the company is involved in, most notably the Express Scripts

18  entities.

19  Q    Okay.  Are there any other actions included that have

20  claims against third parties that currently are subject to

21  the supplemental 105 injunction?

22  A    Yes, there are some security laws matters that are also

23  included in that.

24  Q    So, looking at those private securities actions that

25  were pending when the Court originally entered the

1  supplemental 105 order, did the order -- did the debtors

2  choose to exclude any of those securities actions from the

3  supplemental 105 injunction?

4  A   We sought limited relief with respect to the Shenk

5  matter.  As parties will recall, we were very close to

6  entering into mediation, mediation had, in fact, been briefed

7  at the time of the petition, and it was the debtors' view

8  that it was in the best interest of the estate to carry

9  forward that mediation to see if a settlement may be achieved

10  in that case.

11  Q   Was the mediation in Shenk successful?

12  A   It was.  There is an agreement in principle that -- that

13  has been reached between the parties.

14  Q   And what happened subsequent to reaching that agreement?

15  A   We filed a motion to bring that settlement through the

16  court process for approval.  Objections were filed to it.

17  And given that D&O insurance remains a topic of interest to

18  many parties in these cases, we determined that it was in our

19  best interest to continue that matter until post-confirmation

20  when it can be heard.

21  Q   Thank you, Mr. Welch.

22      And if I say "securities opt-out action," do you know

23  what I'm referring to?

24  A   I do.

25  Q   And can you describe a bit what the securities opt-out

1   action is?

2   A    Yes.  So, just seven days prior to our filing of the

3   petition, a number of parties dropped out of the Shenk matter

4   and -- and filed separately.  And you know, we did not seek

5   an exclusion with respect to that matter.

6   Q    So the securities opt-out action initially was included

7   in the supplemental 105 order.  Is that correct?

8   A    That's correct.

9   Q    And that inclusion was voluntary at the time.  Do you

10  recall?

11  A    Yeah.

12  Q    Had anything occurred in the securities opt-out action

13  prior to the debtors filing bankruptcy?

14  A    No.  The complaint was only a week old, so nothing had

15  happened in that case.

16  Q    So is that case close to being resolved?

17  A    No, it is not.

18  Q    Was it ripe for mediation?

19  A    No, it wasn't.

20  Q    Did the debtor believe that they had viable defenses to

21  the securities opt-out action?

22  A    We do.

23  Q    If the opt-out securities litigation is permitted to

24  proceed, do you expect that it would be resolved prior to the

25  proposed confirmation of the debtors' plan?

1  A    No, I do not.

2  Q    Are the debtors named as defendants in the securities

3  opt-out action?

4  A    Mallinckrodt PLC, our corporate parent, is named.

5  Q    And who are the other debtor defendant -- who are the

6  other -- apologies.

7       Who are the other defendants in the securities opt-out

8  action?

9  A    The D's and O's are -- are --

10  Q    Okay.  And are those defendants covered under the

11  debtors' directors and officers liabilities policies?

12  A    Yes, they are.

13  Q    I'd like to switch gears and talk about the Rhode Island

14  litigation for a second.  Do you know what I mean when I say

15  the "Rhode Island litigation"?

16  A    You broke up a little bit there.  But the Rhode Island

17  litigation is a suit that was filed against Mark Trudeau, our

18  President and Chief Executive Officer, just days before the

19  petition was filed, essentially alleging the same acts that

20  have been charged against the company in the opioid matter,

21  so it was applied against him on an individual basis.

22  Q    Okay.  I'd like to break that down a little bit if I

23  could.

24       You say the same allegations that were made against the

25  company.  Am I correct, as I understand then, that the Rhode

1  Island action is an opioid litigation?

2  A    That is correct, it's an opioid matter.

3  Q    And the allegations in the Rhode Island action, do they

4  implicate the debtors' actions at all?

5  A    They certainly do.  The -- yeah, the same set of actions

6  the company had been sued for being attributed to Mr. Trudeau

7  as the CEO.

8  Q    And had anything occurred in the Rhode Island action

9  prior to the debtor filing bankruptcy?

10  A    No, it was filed immediately before the petition

11  (indiscernible)

12  Q    And is Mr. Trudeau covered under the debtors' directors

13  and officers liability policies?

14  A    He is.

15  Q    And is he covered for the allegations made under the

16  Rhode Island action?

17  A    Yes, he is.

18  Q    I'd like to talk a little bit about the Acthar actions

19  and the claims against ESI and its affiliates.

20       If those Acthar actions are permitted to go forward and

21  they aren't stayed, what impact do you expect them to have on

22  Mallinckrodt's reorganization?

23  A    They would be a significant distraction and burden.  I

24  think, in November, I testified just to the scope of

25  discovery that the plaintiffs are looking for in that case.

1  I think we cited that, in the Rockford litigation, there is

2  an allowance for up to 100 depositions, of which 32 had been

3  noticed; that we had already provided 5.6 million pages of

4  information from 78 custodians; and yet, that wasn't

5  satisfactory and more custodians were being sought.

6        In other cases, there's an unlimited number of, you

7  know, potential depositions and interrogatories and

8  admissions that can be sought, based on the state law as it

9  applies in those cases.

10       So, if those matters were to go forward, it would be a

11 tremendous amount of work for the debtors at a time when

12 we're focused on confirmation.

13 Q    Thank you.

14       And in November, you had testified to the number of

15 outstanding document requests and depositions that were made

16 of the debtors.  To your knowledge, sitting here today, have

17 any of those discovery requests been withdrawn?

18 A    I'm not aware of any of them being withdrawn, no.

19            MR. MADDOX:  One moment.

20 Q    Mr. Welch, are you familiar with the letter that ESI

21 sent requesting indemnification and stating what its defenses

22 in the Acthar actions would be?

23 A    Yes, I'm aware of the contents of that letter.

24 Q    And are you also familiar with the proof of claim or one

25 of the proofs of claim that was filed by ESI in these

1  bankruptcy cases?

2  A    Yes, I've reviewed (indiscernible)

3          THE COURT:  I'm sorry, Mr. Welch.  You broke up a

4  little bit on that answer.  Could you repeat that, please?

5          THE WITNESS:  Yes.  I said I have reviewed that

6  proof of claim.

7          THE COURT:  Thank you.

8  BY MR. MADDOX:

9  Q    Now does the proof of claim indicate whether ESI will be

10  defending Mallinckrodt's actions or pointing to

11  Mallinckrodt's actions as responsible?

12  A    It clearly suggests that they will be pointing at

13  Mallinckrodt.  They cite five different potential contractual

14  avenues for indemnification, which suggests that they would

15  attempt to rely on those indemnification provisions that

16  they've negotiated historically.

17  Q    And based on that letter, do you have any expectation

18  that ESI, if the claims against it go forward, will defend

19  the appropriateness of pricing Acthar?

20          MR. HAVILAND:  Objection.  Calls for speculation.

21          THE COURT:  Mr. Maddox?

22          MR. MADDOX:  He's not speculating.  I believe that

23  the letter itself says that they intend to do it, but we can

24  let the letter speak for itself.

25          MR. HAVILAND:  Your Honor, my objection was as to

1   the witness testifying about E-S -- Express Script's intent,

2   not his own knowledge.

3          THE COURT:  Well, I think the letter speaks for

4   itself, Mr. Maddox.  I don't think Mr. Welch can testify as

5   to what's in the mind of ESI.

6          MR. MADDOX:  Thank you, Your Honor.

7   BY MR. MADDOX:

8   Q   Are the debtors aware, Mr. Welch, one way or another, of

9   the specific arrangements between ESI, United Biosource,

10  and/or Vista Capital Partners, regarding indemnification

11  rights?

12  A   No, we're not.

13  Q   Mr. Welch, do the debtors have potential defenses to the

14  ESI indemnification claims?

15  A   We do.

16  Q   Mr. Welch, do you know, sitting here today, whether the

17  debtors' defenses will succeed?

18  A   I don't know that.

19  Q   Thank you.

20       I'd like to talk to you a little bit about the

21  indemnification obligations the debtor may have to -- for the

22  third-party actions against directors and officers.

23       In a securities lawsuit, do the debtors have an

24  indemnification obligation to the officers and directors

25  named in that suit?

1  A     They do.

2  Q     In the Rhode Island litigation specifically, do the

3  debtors have any indemnification obligations to the officers

4  and directors?

5  A     Yes, an indemnification obligation is owed to Mr.

6  Trudeau with respect to that matter.

7  Q     And what were the sources of those indemnification

8  obligations?

9  A     At least twofold:  It would be the individual contracts

10 with the officers or directors that stipulate that there will

11 be, you know, coverage in the indemnification; and then also

12 in the corporate -- in corporation documents, the corporate

13 charters, in those documents it's provided that

14 indemnification will be provided to officers and directors of

15 those entities.

16 Q     In addition to indemnification, you testified earlier

17 that Mallinckrodt also arranged for insurance that covers the

18 officers and directors' liability in the securities cases and

19 in Rhode Island.  Is that correct?

20 A     That's correct.

21 Q     And do those policies also provide coverage for

22 Mallinckrodt for Mallinckrodt's liabilities?

23 A     They do.  So there are coverage towers that have

24 multiple types of coverage that covers both corporate acts

25 and individuals.

1    Q      Thank you.

2          I'd like to talk to you now a little bit about the

3    plan.  Obviously, the announcements at the beginning of

4    today's hearing are great news for the debtors and their

5    plan.  Now, as you know, one of the issues in obtaining a

6    preliminary injunction is whether the debtors are likely to

7    successfully reorganize.  I'd like to ask you a few questions

8    on that topic, if I could.

9          Mr. Welch, do you believe that it is likely that the

10   debtors will successfully reorganize under Chapter 11?

11   A      I do.

12   Q      And why is that?

13   A      We've made substantial progress in these cases.  We

14   entered with a really historic RSA that we only built on.  We

15   added the MSGE group early on.  We were able to negotiate

16   resolution with our first lien term holders, and they joined

17   the RSA.  The settlements that were discussed earlier in this

18   hearing with the UCC and the second lien noteholders, the

19   filing of our plan, the approval of our discovery statement

20   [sic], solicitation process commencing, all of that suggests

21   that we have very strong momentum heading into the

22   confirmation hearings that are on the Court's calendar.

23   Q      Thank you.

24          And my apologies.  I believe you just said the

25   "discovery statement," and that's probably my fault for

1  talking so much about discovery before.

2  A    The disclosure statement, yes.  Thank you for the

3  correction.

4  Q    Mr. Welch, at this point, for the restructuring support

5  agreement, what additional parties have signed on that were

6  not signed on at the time that the original 105 injunction

7  was entered?

8  A    As I mentioned, the MSGE group, which represents

9  municipalities across the country.  They were the first party

10 to join post-petition.  And then, notably, the deal reached

11 with our secured term loan lenders resulted in them joining

12 the RSA, as well.  So that constituency has expanded in --

13 over time.

14 Q    Has there been a settlement reached with respect to

15 treatment of certain claims under -- for the opioid trust?

16 A    Yes.  I believe that, in our plan supplement materials,

17 we filed trust distribution procedures.  That reflects a lot

18 of hard work behind the scenes and negotiations with the

19 parties, to make sure that the interests of various types of

20 opioid claimants would be appropriately protected, their

21 interests, as the trust settlement proceeds are -- are

22 distributed.

23 Q    Thank you.

24      And you mentioned that the debtors had been engaged in

25 negotiations with respect to the plan.  Based on the

1  announcement, it appears that those are ongoing.  Is it true

2  the debtors continue to negotiate with parties-in-interest to

3  try to reach a consensual resolution, to the extent they are

4  able, for the plan?

5  A    That does remain true, yes.

6  Q    And does that affect your opinion on whether the plan

7  will be successful?

8  A    It does.  We've been very pleased with the way that the

9  parties have worked together to try to hammer out issues to

10  reduce a number of issues that come ultimately before the

11  Court.  We're always cognizant, I'm always cognizant, seeing

12  the cash that moves out of the -- the debtors bank accounts

13  for this case, that resolution of the matters quickly is

14  ultimately saving money for -- for the estate.  And I

15  appreciate the hard work on various parties to -- to move

16  things along consensually.

17       From the debtors' perspective, emerging as

18  expeditiously as possible remains our highest objective.  And

19  we said at the very beginning of the case that doing that as

20  consensually as possible was a prime objective, and I'm

21  pleased that we've been able to do as much as we have on

22  that, and look forward to hopefully more deals being struck

23  as we work our way toward confirmation.

24  Q    Thank you, Mr. Welch.

25       You mentioned the debtors' cash flows.  Have the

1  debtors' cash flows remained constant since they entered

2  bankruptcy?

3  A    Cash was building up for some time, but has started to

4  decline.  There are a number of reasons for that.  One, the

5  costs for the case have inched up as more parties have joined

6  and litigations have -- have commenced.  But the -- the

7  company being in bankruptcy as long as it has, has

8  introduced, you know, some additional headwinds for us.  So

9  we are -- we do believe that the business will be on better

10  footing as soon as it's out of this process.

11 Q    Mr. Welch, does that change in cash position affect your

12 opinion as to whether the debtors can successfully

13 reorganize?

14 A    It doesn't.  It doesn't impair our ability to meet the

15 settlement obligations that we've been negotiating.  But it's

16 just recognizing that the company needs money to invest in a

17 -- in a future that will entail growth.  And the longer we're

18 in the process, having money leaving the estate for other

19 purposes than paying the settlements or investing in the

20 business, you know, the growth prospects will be impacted by

21 that.

22 Q    Thank you.

23     I'd like to talk a little bit about the 105 extension

24 motion if I can.  Are you aware that the debtors have two

25 injunctions currently in place?

1  A     I am aware of that, yeah.

2  Q     And can you describe what the two injunctions are?

3  A     Sure.  We've talked a little bit about the supplemental

4  105.  The other motion really covers governmental entities.

5  There are obviously certain police powers that those

6  government entities have, and there's a desire to have some

7  of that stayed to allow us to reorganize.  We were very

8  pleased to see the support of the governmental ad hoc opioid

9  plaintiffs agreeing to that stay, that -- that that wasn't

10  objected to.

11  Q     And to your knowledge, did any of the governmental

12  entities (indiscernible) by that first injunction object to

13  the extension of the injunction?

14  A     No, they did not.

15  Q     And that lack of objection, did that affect your view on

16  the potential success of the debtors' reorganization?

17  A     Yes.  Well, I -- I ultimately believe the reasons for

18  extending the stay are compelling.  But I -- their lack of

19  objection I think shows that they've been working with us in

20  good faith and -- and have confidence in the direction we're

21  headed.

22  Q     Let's talk about -- a little bit about the risks if

23  other litigations are permitted to proceed.  What new risks

24  would the debtors face in their restructuring effort of the

25  105 injunction with respect to the supplemental covered

1  actions isn't extended?

2  A    Mr. Eisenberg testified in November to the financial

3  impact of litigation being allowed to continue, so there's

4  certainly that element.  There's the distraction right now,

5  when we are so focused on preparing for confirmation.  And I

6  wrap into that the issues the Court has agreed need to come

7  before that, like the summary judgment motions with respect

8  to the Acthar antitrust issues and -- and other matters.

9  We're -- we have so much momentum.  Having the stay lifted

10  right now would just create a significant distraction from

11  the finish line, which seems to loom large before us.

12  Q    And would that be true if only the private Acthar

13  litigations were permitted to proceed?

14  A    It -- it would be true if any of them were permitted to

15  proceed -- proceed.  I -- I especially think it's true based

16  on the sheer litigation strategy that we've seen in terms of

17  flooding the zone with -- with documents from the Acthar

18  plaintiffs.  I think that would (indiscernible) distraction.

19  Q    And would the company continue to face the indemnity

20  claims from ESI if those actions were permitted to proceed?

21  A    We would.  And I talked a lot in -- in November that,

22  you know, Mallinckrodt manufactures Acthar, Mallinckrodt

23  establishes the price for Acthar.  An attack on Acthar is

24  ultimately an attack on Mallinckrodt, so we would be very

25  interested if that litigation were allowed to proceed against

1   ESI only.  But you know, we don't really care if ESI is sued

2   for other products, but if's the fact that they are being

3   sued with respect to Acthar in particular, the company's

4   interests are inseparable there.

5   Q    And what about the Rhode Island actions.  Are there any

6   specific harms that the debtors would experience if that's

7   permitted to proceed?

8   A    If the -- the opioid settlement reflected the support of

9   a broad number of governmental entities, you know, over 50

10  state and territorial AGs, you have the efforts of one state

11  to try to circumvent that settlement and gain incremental

12  compensation for itself, I think that could be disruptive,

13  overall, to the settlement.  I'm not sure that I fully

14  understand what the attempt there is, but I do believe it

15  would be injurious to the estate and the efforts to get this

16  plan confirmed.

17  Q    And if the plan is confirmed, do you understand what the

18  treatment of the claim that is being made in the Rhode Island

19  action would be?

20  A    Yes.  That would be channeled into the trust and

21  recoverable through trust procedures --

22  Q    And you --

23  A    -- (indiscernible)

24  Q    Thank you.  Sorry to interrupt.

25       You had previously testified that nothing had taken

1 place in the Rhode Island action to date.  Is that correct?

2 A    That's correct.

3 Q    And so, in your opinion, would it be harmful to the

4 debtors to gear up a nascent, dormant litigation so close to

5 potential plan confirmation?

6 A    Yes, it would be injurious.

7 Q    And what about the securities opt-out litigation.  Are

8 there specific harms that the debtors would experience if

9 that's permitted to proceed?

10 A    There would be.  I think we spent like $5 million in

11 legal fees on Shenk in the lead-up to the petition date, the

12 six months going forward.  So you extrapolate that many of

13 the issues are the same there.  You're talking potentially

14 millions of dollars of -- of legal fees that could deal with

15 that matter.

16 Q    And the legal fees in that matter, what would their

17 source of payment be?

18 A    Those would ultimately come from the D&O proceeds.  But

19 I've already testified that that insurance remains a source

20 of estate value that parties are very interested in

21 discussing as a potential source of recovery.

22 Q    And if the debtors' plan is successful, are you aware of

23 how the securities opt-out litigation would be treated?

24 A    I believe that they would be able to bring their claims

25 post-confirmation, so that there should be no harm to them,

1  you know, for a short incremental delay here.

2  Q    Will staying the lawsuits covered in the supplemental

3  motion allow the debtors' management to focus on maintaining

4  operations --

5  A    It will.

6  Q    -- in the (indiscernible) period requested?

7  A    It will.

8  Q    And is that important for the debtors right now?

9  A    It's very important for -- for us to remain focused.

10 Even as we're trying to get this restructuring done, remember

11 that we have a pharmaceutical business to run.

12 Q    And would the debtors incur substantial legal costs if

13 they were required to participate or if the actions were

14 permitted to proceed?

15 A    We would, yes.

16 Q    And there was prior testimony in November regarding the

17 estimates that those litigations would cost.  Do you have any

18 basis that those remain accurate today?

19 A    I have no basis for -- for doubting that that would

20 remain accurate, if -- if litigation were to commence now.

21 It probably would be more expensive, given inflation.

22 Q    All right.  I'd like to talk a little bit about the

23 effects on management presently.

24      Apart from the financial burden of the lawsuits, which

25 we just discussed, would there be an effect on the debtors'

1  senior management if these suits are permitted to proceed?

2  A    There would be.  It would be a significant drain on time

3  and (indiscernible)

4  Q    And are there any specific things that the debtors'

5  officers and directors are required to do to assist in

6  responding to discovery in these matters?

7  A    Yeah, I think that there's a lot of effort that goes

8  into just staying abreast of all of the developments,

9  reviewing pleadings, you know, engaging with counsel,

10  managing counsel, you know, that go beyond, you know,

11  answering interrogatories or preparing for depositions.  It's

12  just -- the nature of litigation is it -- it distracts.

13  Q    And outside of litigation, what are the directors and

14  officers' current tasks?

15  A    So what we're focusing, again, first and foremost on

16  running a pharmaceutical benefit company and benefitting our

17  patients with our -- with our products.  We're also focused

18  on the restructuring and reviewing the negotiations as they

19  happen, engaging with our advisors, understanding where we

20  should give, where we should hold the line, everything that

21  negotiations entail.  You know, the management team is fully

22  focused on preparing for confirmation and all the issues that

23  have been raised that will be heard around that time.

24  Q    And if the Acthar actions or Rhode Island action or the

25  securities opt-out action, any one or all of them are

1  permitted to proceed, would it distract the debtors'

2  officers, directors, and management from those tasks?

3  A    It would.

4  Q    Are you aware that the 105 extension motion asks for a

5  ninety-day extension of the injunctions that are currently in

6  place?

7  A    I am aware of that, yes.

8  Q    Based on the current confirmation schedule then, and

9  assuming that the debtors' plan is confirmed, would the

10  subject to the injunction be stayed after confirmation?

11  A    For a short period of time, yes.

12  Q    Why do the debtors need the injunctions to remain in

13  place after confirmation?

14  A    Well, confirmation is a U.S. process, but it's not our

15  only process.  There's a Canadian recognition proceeding, and

16  I think everybody is very aware that there's an Irish

17  examinership process that we would need to go through.  We're

18  not thinking that those would be resolved within that ninety-

19  day period, but that we could at least get started on those

20  and enjoy the -- the benefits of the stay in the early days.

21  Q    And in the interim, after plan confirmation, are there

22  any other actions that the debtors' management and directors

23  and officers are responsible for performing?

24  A    Can you -- I'm sorry.  Can you repeat the question one

25  more time, please?

1  A     Yep.  In the interim, after plan confirmation, are there
2  any other actions that the debtors' officers and directors
3  are required to carry out prior to the plan going effective?
4  A     So the plan calls for the formation of a -- of a new
5  board that the equitized bondholders are allowed to identify
6  and choose a new board.  And that board will, as I understand
7  it be -- become -- you know, be put in place on the effective
8  date.
9        And so, as that board is identified, the current
10 directors and current officers will undoubtedly be working to
11 orientate that new board, get them up to speed quickly on the
12 strategic initiatives that the company is undertaking,
13 helping them understand the business, educating them, you
14 know, transferring institutional knowledge.  And that --
15 that's a very important process that we will be undertaking
16 during the -- the Irish examinership period.
17 Q     And if the actions that are subject to the supplemental
18 105 action are permitted to proceed after confirmation, would
19 that distract the debtors' officers and management from
20 performing these tasks?
21 A     It would be a distraction.
22 Q     And do you believe that that would harm the debtors?
23 A     I do believe it would harm the debtors.
24            MR. MADDOX:  All right.  I believe that is all of
25 my questions.  Just give me one moment, please, to double

1   check.

2          (Pause in proceedings)

3              MR. MADDOX:  All right.  Thank you, Mr. Welch.

4              Your Honor, those are all the questions I have for

5   the witness at this time.

6              THE COURT:  All right.  Thank you, Mr. Maddox.

7              MR. MADDOX:  Reserve for rebuttal.

8              THE COURT:  Cross-examination, Mr. Haviland.

9              MR. HAVILAND:  Your Honor, I am one of three

10  opponents to the application.  I'm happy to defer to Rhode

11  Island's counsel and the securities counsel, so that we can

12  avoid overlap.  But I'll go on what other order -- whatever

13  order the Court or those parties like.  I could go first or

14  last.

15             THE COURT:  Well, whoever is ready to go, let's go

16  ahead.

17             MR. SENA:  Mr. Haviland, if you're ready to

18  proceed, go for it.

19             MR. HAVILAND:  Okey-doke.

20                        CROSS-EXAMINATION

21  BY MR. HAVILAND:

22  Q    Mr. Welch, can you hear me okay?

23  A    I can hear you, Mr. Haviland.

24  Q    When were you told you'd be testifying in this matter?

25  A    I don't recall.  It was in the last week or so.

1  Q    So, to be clear, it was after the debtors filed their

2  motion to extend the 105 injunctions, correct?

3  A    It -- it may have been.  I'm asked to testify on many

4  matters, as -- as you know.

5  Q    And how many times have you testified in the bankruptcy;

6  do you have a count?

7  A    I've actually -- I've -- I've lost track of how many

8  times.

9  Q    It's a lot.  It's a lot?  That's a -- that was a

10 question.

11            MR. MADDOX:  Objection.  Relevance.

12 Q    Well, we are going to get to the issue of harm and

13 burden.  And you've testified a fair amount, have you not,

14 sir?

15 A    I have.  It's obviously a role that's been granted to me

16 that allows this process to be less distracting to my

17 colleagues, and I'm proud to represent the company in these

18 matters.

19 Q    And your participation in that process has not imposed

20 upon you or the company any irreparable harm, has it?

21 A    No.

22 Q    Okay.  Now you haven't prepared a declaration or any

23 affidavit to attest to any factual statements in the debtors'

24 pleadings, have you, sir?

25 A    There was not a -- there was not a written statement,

1  no.

2  Q    Have you reviewed the pleadings?

3  A    I've reviewed the pleadings.

4  Q    And when did you do that?

5  A    In the last several days.  I read my hundred-and-ninety-

6  four-page transcript, just so I'm reminded what I -- what we

7  discussed last time.

8  Q    That transcript is from the November hearing, correct?

9  A    That's correct.

10  Q    Okay.  And you testified in support of the preliminary

11  injunction back then, right?

12  A    I did.

13  Q    And, sir, can you tell me why the debtors waited until

14  August 10 to seek to extend the injunctions?

15  A    Because the deadline was approaching, and we needed more

16  time, given that the confirmation, you know, was pushed back

17  relative to the initial schedule.

18  Q    I believe --

19  A    May I ask for one minute?  I've got --

20  Q    Yeah.

21  A    -- some shouting children in the background that I would

22  --

23  Q    Oh --

24  A    -- like to quiet.

25  Q    -- by all means.

1   A     Give me 30 seconds.

2           THE COURT:  Go ahead, Mr. Welch.

3   Q    By all means.

4        (Pause in proceedings)

5           THE WITNESS:  Thank you.

6           MR. HAVILAND:  I think we've all been there, Mr.

7   Welch.  So let's continue.

8   BY MR. HAVILAND:

9   Q     The debtors were aware some months ago, were they not,

10  that the plan confirmation hearing would be in September,

11  right?

12  A     Yes, I think it was made clear that it was not going to

13  be in August a few months ago.

14  Q     There's nothing that prevented the debtors from seeking

15  to extend the operative injunctions at that time to the date

16  of plan confirmation, is there?

17  A     I think that the filing of the motion, if timely, is

18  something that rests within the debtors' discretion.

19  Q     Okay.  And you've testified, sir, about a couple of

20  issues and I want to cover those issues and then a few others

21  that were only touched upon.  You said in relation to the

22  supplemental 105 -- and you agree, sir, that there are two

23  injunctions, right?

24  A     I do.

25  Q     There was one that was stipulated to by, I think, what

1  you call governmental entities, right?

2  A     That is correct.

3  Q     Then there is a separate one which is really the

4  subject of today that effects my clients, the Acthar

5  plaintiffs, Joe Rice's client the state of Rhode Island, and

6  then what are called the opt-out securities plaintiffs,

7  right?

8  A     That's correct.

9  Q     And each of those parties have not agreed to extend the

10 second injunction that is codified in a separate order at

11 Docket 180, right?

12 A     Yes.  I have reviewed each of the three objections.

13 Q     You said that that supplemental injunction was intended

14 to cover directors and officers.  Do you remember that?

15 A     I do.

16 Q     You're aware, sir, that at the time the debtors had to

17 make a showing to the court that the injunction was imposing

18 irreparable harm and that it was in the public interest and

19 other factors, right?

20 A     I recall that testimony, yes.

21 Q     And, in fact, the debtor, in those pleadings, made very

22 clear the actions they were seeking to enjoin and the

23 parties, the non-debtor parties, that were being effected,

24 right?

25 A     Based on what was known at the time, yes.

1  Q     So whatever was intended you agree with me the request

2  was codified in those pleadings and ultimately codified in

3  the court's order, right?

4  A     I am not a bankruptcy lawyer so I don't know the extent

5  to which codification is necessary. I have reviewed the

6  orders.

7  Q     Okay.  You agree with me the debtors put a request in

8  front of the court and the court granted that request, and

9  that is what is the subject of the extension today, right?

10 A     Yes.

11 Q     They're not seeking to expand upon that relief, are

12 they?

13 A     I think, from my perspective, as representing the

14 debtors, that we believe that litigation involving our

15 directors and officers, litigation involving parties that are

16 intimate to our business, like Express Scripts, that that

17 litigation, if allowed to continue, would be harmful.

18 Q     Well my question was a little different, sir.  The

19 debtors are not seeking to expand, they're seeking to extent

20 what was already granted, correct?

21 A     Mr. Haviland, I don't know whether it's within the

22 court's purview to extend the stay order with respect to the

23 May 2021 lawsuit that you filed against me (indiscernible)

24 racketeering charges.  I don't know whether that's in scope

25 or out of scope. I do believe that that would be injurious to

1  go forward.  I'm glad that the Northern District of Illinois

2  stayed that matter.  We are requesting an extension of the

3  stay.

4  Q    Well, sir, you're aware of the fact that the plaintiffs

5  in that case and the defendants stipulated to a stay in the

6  Northern District, are you not?

7  A    I have not reviewed all of the filings in that case.  I

8  am just aware that I am a named party.

9  Q    And you are aware that that action is not covered by

10 the Judge's supplemental 105 order, are you not?

11          MR. MADDOX:  Objection; calls for a legal

12 conclusion.

13          THE COURT:  Sustained.

14 BY MR. HAVILAND:

15 Q    Do you know that, sir?

16          THE COURT:  Sustained.

17 BY MR. HAVILAND:

18 Q    Mr. Welch, what irreparable harm is befallen you today

19 by having to defend in that litigation, if it proceeds, if

20 the stay is lifted, the voluntary stay?

21 A    Mr. Haviland, I don't know that that harm to me is

22 irreparable.  I can tell you that it's the first time that

23 I've been sued personally with my home address listed in

24 Federal Court.  So I am very cognizant that that suit exists.

25 I think about it often.  So if it was allowed to go forward I

1  think I would be thinking about it even more.

2  Q    Alright, now you testified that, and I want to be

3  clear, the -- you said that one of the reasons why the

4  extension of the injunction is not that significant in terms

5  of harm to the parties effected was because certain parties

6  are permitted to go forward post-plan confirmation.  Do you

7  remember that?

8  A    I said that with respect to certain D&O issues, yes.

9  Q    Okay.  I want to be clear about that.  So in answering

10 counsel's question you said that the opt-out securities

11 plaintiffs will be able to proceed after plan confirmation.

12 It's just the hiatus, right?

13 A    That's my understanding.

14 Q    Now is that the case as to the cases brought by my

15 clients, the Acthar plaintiffs?

16 A    With respect to the claims that you have filed in this

17 case I would assume that those would be adjudicated pursuant

18 to the plan.

19 Q    Oh, your expectation is that the entirety of the Acthar

20 plaintiffs case is brought by the City of Rockford, Local

21 322, Local 542, Local 420 and Acumen are all going to be

22 adjudicated on the merits to finality in the bankruptcy as

23 part of the plan?

24 A    That is not what I said.  I said that a plan would

25 prescribe the treatment of those unliquidated unsecured

1 | claims.

2 | Q    I see and where is it in the plan that that is

3 | described, sir, that those claims are going to be resolved?

4 | A    I don't have the plan in front of me, Mr. Haviland.

5 | Q    But it's your understanding the plan is doing that, is

6 | resolving all of my clients' claims?

7 | A    I think the UCC shared with the court this morning that

8 | the settlement that reached, envisions that got trust.  We're

9 | in the early days of establishing trust procedures, I'm

10 | assuming, that your claims, as unsecured claims, would be

11 | treated under those trust provisions.

12 | Q    So am I clear that the request today is to extend the

13 | injunction 90 days to allow this private settlement that

14 | hasn't been described to get us through plan confirmation so

15 | the entirety of the claims in cases brought by my clients

16 | against anybody, including non-debtors, can be resolved in

17 | bankruptcy.  Is that right?

18 |         MR. MADDOX:  Your Honor, I object.  In addition to

19 | being compound it is a vague question that I have difficulty

20 | understanding myself.

21 |         THE COURT:  You want to restate it, Mr. Haviland?

22 |         MR. HAVILAND:  Certainly.

23 | BY MR. HAVILAND:

24 | Q    Let's walk it in steps.  The request is to go 90 days,

25 | I presume, from today, right?

1  A     I believe it, and this is a legal matter, 90 days from

2  the order.  So I think it would be dependent on when the

3  order is ultimately signed.

4  Q    So if the court were to extend today or grant the

5  request it would be effective at the point in time when the

6  court grants the request, fair?

7          MR. MADDOX:  Your Honor, I object.  He's asking

8  for a legal conclusion.  This is a fact witness.  Mr.

9  Haviland is going well beyond what the matters that we're

10  hearing today.  I'm not sure where this line of questioning

11  is going.

12          THE COURT:  Sustained.

13  BY MR. HAVILAND:

14  Q    So the request is for 90 days. I just want to

15  understand that, sir, because you are asking to push an

16  injunction beyond plan confirmation, right?

17  A     Mr. Haviland, I don't know whether the plan will be

18  confirmed and I don't when it will be confirmed.  I testified

19  that I am confident that we will be able to successfully

20  restructure, but I am aware that there is significant

21  territory to cover before we're done.  I am hopeful -- I

22  would love to see this confirmed shortly after the September

23  hearing commences, but I recognize that there is a lot

24  between now and then.  So I am not going to speculate as to

25  when we will be confirmed.

1  Q    Well I want to get to the 90 days because I want to be

2  clear that the debtors are asking for the minimum of what

3  they think is needed to extend the injunction.  Why haven't

4  the debtors asked for the injunction to go up to the date of

5  plan confirmation?

6  A    Well I think I testified just a few minutes ago that

7  there is more to this restructuring from a Mallinckrodt

8  perspective then just the US process.  We have the Irish

9  examiner, we have the Canadian recognition hearings.  It was

10  very involved in the early stages of securing stays in Canada

11  like in this process.

12        So to allow those initial matters post confirmation to

13  be heard in Canada and (indiscernible) respectively, we think

14  it's important for the debtors to be able to remain focused

15  on restructuring even after a confirmation order is entered.

16  Q    I just want to be clear, you understand, do you not,

17  sir, that the cases brought by the ad hoc Acthar group, my

18  clients, do not involve Canadian purchases or any foreign

19  purchases.  You are aware of that, right?

20  A    I am aware of that, yes.

21  Q    So this additional time, as you testified, as needed to

22  allow those processes outside of this court to proceed, is

23  that right?

24  A    (Indiscernible) for the benefit of the debtors who do

25  sell products outside of the United States.

1  Q      I want to ask you a little bit about your testimony

2  about the discovery and was your testimony about the

3  documents and the depositions to talk about the issue of

4  harm?

5  A      Yes.  I believe I testified both today and in November

6  that the volume of discovery, if allowed, would be harmful.

7  Q      So I want to understand that, sir, because you

8  testified that in the underlying Acthar litigation brought by

9  my clients the debtors have already produced 5.6 million

10 pages of documents, right?

11 A      I have.

12 Q      And you are aware, sir, that in the context of the

13 bankruptcy and plan confirmation the debtors have produced

14 additional documents, right?

15 A      At significant expense.  Yes, we have.

16 Q      And the debtors have also produced additional documents

17 in response to Humana's claims, right?

18 A      That is correct.

19 Q      And do you know the total volume of those additional

20 documents that have already been produced?

21 A      I suspect it grows every day.  I am not maintaining a

22 count, but it's voluminous.

23 Q      So are you able to quantify the volume of documents

24 that have yet to be produced in response to any request by

25 the plaintiffs in the ad hoc Acthar group?

1  A     I am not able to do any comparisons as to volume.

2  Q     Let's talk about depositions because one of the issues

3  you raised back in November was the distraction to corporate

4  officers of having to sit for depositions.  You have been

5  deposed many times, right?

6  A     That's correct.

7  Q     Mr. Trudeau was deposed in this case, right?

8  A     That's correct.

9  Q     Mr. O'Neill was deposed?

10 A     He was deposed.

11 Q     I'm not sure if I have the count right, but I believe

12 almost the entire board of directors is being deposed?

13 A     I think select directors.  I think we have agreed to

14 approximately 20 depositions to be taken with respect to the

15 confirmation matter.

16 Q     And a large number of executives, senior executives,

17 have been deposed as part of the bankruptcy proceedings,

18 correct?

19 A     That is correct.

20 Q     So all the harms you talked about in November about

21 those depositions having to proceed that harm is gone because

22 those executives have already been deposed, right?

23         MR. MADDOX:  Objection; this calls for a legal

24 conclusion.

25         THE COURT:  Sustained.

1  BY MR. HAVILAND:

2  Q    Do you know the substance of the questions that were

3  asked for the various executives in terms of whether or not

4  they covered issues pertaining to Acthar?

5  A    I have not reviewed the transcripts of all of the

6  depositions.  I am not aware of the full scope of the

7  question.

8  Q    So you can't tell us today what additional depositions,

9  if any, would need to be taken in any of the ad hoc Acthar

10 plaintiff groups that were a part of that original group you

11 talked about in November.  Is that fair?

12 A    I can't speculate as to (indiscernible) discovery.

13 Q    I want to talk to you a little bit, sir, about the

14 underlying issue that was touched upon, the indemnity claim

15 by Express Scripts.  You are familiar with that claim?

16 A    I am.

17 Q    Counsel referenced a proof of claim that we have

18 objected to since no one from Express Scripts is here, but

19 underlying that there were a number of contracts that were

20 originally put into evidence back in November.  You are

21 familiar with those contracts, right?

22 A    I am.  We spent time talking about them.

23 Q    Now, sir, which of those contracts have been assumed by

24 the debtors under the plan?

25           MR. MADDOX:  Objection, Your Honor.  It calls for

1   a speculation.

2          THE COURT:  I think he can answer whether any of

3   them have been assumed by the debtor or not.

4          THE WITNESS:  I am assuming that -- our default

5   was to assume rather than reject and Express Scripts remains

6   an important business partner.  As you know they're a

7   subsidiary.  CuraScript is the primary distributor.  That

8   excludes the distributor of Acthar, say, for certain

9   governmental entities where McKesson is the distributor.  So

10  they remain an integral part of our delivery of Acthar

11  (indiscernible).  I would assume that those contracts are

12  being assumed in some form.

13  BY MR. HAVILAND:

14  Q    Sir, I don't want you to assume.  I think we want to

15  know what you know.

16       Would it surprise you to learn that the exclusive

17  wholesale product purchase agreement signed between Questcor

18  and CuraScript, which is put in the record for the court

19  today, is not on the list of assumed contracts under the

20  plan?

21  A    I know that we continue to have discussions with them

22  around that contract.  I am not (indiscernible), so I don't

23  know the status of those conversations at this point in time.

24  Q    So if what I say is accurate and I'm sure the record

25  will show the plan, in particular Exhibit V, as in Victor,

1  that contract is not on there, there is no present

2  irreparable harm or indemnity claim that the debtors need to

3  be concerned about. Is that fair?

4            MR. MADDOX:  Objection, Your Honor.  It calls for

5  a legal conclusion.

6            THE COURT:  Sustained.

7  BY MR. HAVILAND:

8  Q      You are aware under the plan, Mr. Welch, the debtors

9  have the ability to assume or reject executory contracts,

10  right?

11  A      That is correct.

12  Q      And the debtors have the ability, under the language,

13  at page 97 and beyond of the plan document, to decide whether

14  or not to have indemnity provisions in any contracts assumed.

15  You are aware of that, right?

16  A      I believe that is correct, yes.

17  Q      In fact, the debtors have the power to say to Express

18  Scripts we're not going to recognize your indemnity claim,

19  isn't that right?

20  A      I believe that that is correct.

21  Q      And the debtors have not said that to Express Scripts

22  at all since November 23rd, isn't that correct?

23  A      As I mentioned, there are ongoing discussions with

24  Express Scripts around the contractual relationships.  So I

25  am not part of those on a day to day basis.  I am not sure

1  what has been communicated on that.

2  Q    I just want to be clear, nothing that the debtors have

3  put forward for the creditors to see has said to Express

4  Scripts we are telling you under the plan that we are not

5  going to assume your contract, right?  Nothing has been put

6  forward yet.

7         MR. MADDOX:  Objection.  Your Honor, he just

8  answered a question that he did not know the answer what

9  communications he heard between the parties and the

10 negotiations.

11        THE COURT:  Want to try something else, Mr.

12 Haviland?

13        MR. HAVILAND:  I just want to make sure I

14 understand what this fact witness is saying, Judge.  He's

15 been put forward as the debtors' representative today.  So I

16 want to know what he knows.  Let me just try to walk through

17 it.

18 BY MR. HAVILAND:

19 Q    The debtors have not, as of this date, August 25th,

20 2021, said to Express Scripts we are going to assume your

21 executory contracts intact with all the indemnity provisions.

22 Isn't that correct?

23        MR. MADDOX:  Same objection.

24        THE COURT:  Go ahead, Mr. Welch.

25        THE WITNESS:  To the best of my knowledge, Mr.

1  Haviland, no such public filing has been made to that effect

2  in this case.

3  BY MR. HAVILAND:

4  Q    Separate from that, given the debtor's ability under

5  the plan language, to modify contracts and to exclude

6  indemnity rights, as you sit here today, August 25th, the

7  debtors have not put forward any document that the court or

8  the creditors can see where the debtors have said to Express

9  Scripts we are going to assume your contracts, but we are not

10  going to recognize your indemnity claim.  Isn't that right?

11           MR. MADDOX:  Objection; compound.

12           THE COURT:  You can answer, Mr. Welch.  Go ahead.

13           THE WITNESS:  Yeah, I believe that that is

14  consistent with my prior statement.  There has been no such

15  statement filed in the public record in these cases/

16  BY MR. HAVILAND:

17  Q    I think you said that the reference by Express Scripts

18  was to a number of agreements.  I just want to touch upon

19  them.  You are familiar with the agreements, right?  So we

20  don't have to take the time to get them out.

21  A    It depends on the question that you are going to ask me

22  about them.  So I am aware that they are summarized in their

23  proof of claim, but I have not memorized them.

24  Q    Alright, well if you have to look at them, and I just

25  want to touch upon them because I don't want to talk about

1  the specific details, but I do want to be clear.  We talked

2  about the June 29th, 2007 exclusive wholesale product

3  purchase agreement with CuraScript, right?  That is the

4  distribution agreement.

5  A    That is correct.

6  Q    And that has not yet been assumed, right?

7  A    That is correct.

8  Q    The next series of agreements, you are familiar with

9  the agreements between Questcor and an entity known as

10 Express Scripts Specialty Distribution Services?

11 A    Yes, I am.

12 Q    And the debtor has them on their exhibit list beginning

13 at Exhibit 20.  There is two of them.  Express Scripts

14 Specialty Distribution Services is a separate company, it's a

15 Delaware corporation, is it not?

16 A    Yes.

17          MR. MADDOX:  Objection.

18 BY MR. HAVILAND:

19 Q    And the contract is a 2012 contract, right?

20 A    I believe that that is the date of that contract, yes.

21 Q    And 2012 is two years before Mallinckrodt purchased

22 Questcor, correct?

23 A    If you recall it was a merger transaction and so the

24 Questcor entity and its contractual matter survived that

25 transaction.

1    Q      And the second document that is referenced is a work

2    order that underneath that agreement the work order is dated

3    October 1st, 2014 between Questcor and Express Scripts

4    Specialty Distribution Services, Inc.  You are familiar with

5    that, right?

6    A      I am familiar with that.

7    Q      Now you are aware, sir, that that contract with Express

8    Scripts Specialty Distribution Services has a termination

9    provision, does it not?

10   A      I will take your word for it.  I don't have it in front

11   of me.

12          MR. MADDOX:  Your Honor, the document speaks for

13   itself.

14   BY MR. HAVILAND:

15   Q      I want to ask about termination.  Under Clause 13 it

16   says that the agreement will commence on the effective date

17   and shall continue for a period of three years or until

18   terminated in accordance with this section and the section

19   says through completion of the statement of work.  Are you

20   familiar with that?

21          MR. MADDOX:  Objection, Your Honor.  Mr. Haviland

22   hasn't put the document in front of my witness

23          THE COURT:  Well I think Mr. Welch was nodding

24   that he was familiar with it.  So go ahead, Mr. Welch, you

25   can answer.

1        THE WITNESS:  Yeah, that sounds familiar.  Again,

2  I have not seen the language, but I don't believe that you're

3  lying to me.

4  BY MR. HAVILAND:

5  Q    Okay.  I wouldn't do that to you, sir.

6        This October 2014 work order is seven years ago, right,

7  if my math is correct give or take a month.  Is it your

8  testimony under oath that that work order is still in effect

9  and that the debtor is still paying Express Scripts Specialty

10  Distribution Services for the services under this work order?

11  A    I am not aware of the extent to which services are

12  being performed under that particular work order, but I am

13  not aware of any termination of it.  I believe that it is

14  still active and the fact that its seven years ago doesn't

15  make it any less contractually binding given its age.

16  Q    My question was a little bit different. It terminates

17  when the work is done. Is it your testimony under oath that

18  that company, Express Scripts Specialty Distribution

19  Services, Inc., is still doing work for the debtors under

20  that work order?

21  A    So it very well may be that there have been internal

22  restructurings at Express Scripts where the obligations under

23  that agreement have been assumed by a different entity.

24  Q    Sir, I don't want you to speculate.  I want to be

25  clear.  I don't want you going and talking about Express

1  Scripts.  I want to know what you know.  I didn't mean to cut

2  you off, but I want to know what you know.

3         MR. MADDOX:  Your Honor, if I may, Mr. Haviland's

4  line of questioning strikes me as legal argument that he can

5  make with respect to the documents.  This line of questioning

6  of the witness is not going to be helpful with respect to

7  what the documents themselves say.

8         THE COURT:  I think it's pretty obvious Mr. Welch

9  does not know whether or not that particular contract is

10 still operative.  So with that let's move on.

11        MR. HAVILAND:  Alright, I will accept that.

12 BY MR. HAVILAND:

13 Q    Now you are familiar with an entity known as United

14 Biosource are you not, sir?

15 A    I am.

16 Q    And that is a separate company.  It's known as United

17 Biosource Corporation in Kansas City, Missouri, right?

18 A    That is correct.

19 Q    And they, in fact, have a separate contract with a

20 separate indemnity provision, right?

21 A    That is correct.  That is a different contract.

22 Q    And (indiscernible), sir, because the debtors put into

23 the record the answer to the complaint in the Rockford case

24 filed by Express Scripts where they said that Express Scripts

25 sold United Biosource in 2017.  You are familiar with that?

1          MR. MADDOX:  Objection, Your Honor, the document

2    speaks for itself.

3          THE COURT:  You can answer if you know, Mr. Welch.

4          THE WITNESS:  I believe that that is correct, Mr.

5    Haviland. There are a lot of documents there, but I think

6    what you said is accurate.

7    BY MR. HAVILAND:

8    Q    And you remember back in November the testimony related

9    to a letter from Express Scripts general counsel, October

10   14th, 2020, claiming indemnity on behalf of United Biosource,

11   right?  Do you remember that?

12   A    I believe that that is correct, yes.

13   Q    And general counsel to Express Scripts never said how

14   she had the authority to speak for a company that had been

15   sold three years ago, right?

16          MR. MADDOX:  Objection, Your Honor.  Is he asking

17   him to remember what was testified to in the record by

18   someone else in November.

19          MR. HAVILAND:  By Mr. Welch, Your Honor. I am

20   asking what he remembers.

21          THE COURT:  If you remember you can answer, if not

22   you don't.  Mr. Welch, go ahead.

23          THE WITNESS:  I don't remember.

24   BY MR. HAVILAND:

25   Q    Alright.  Sir, you testified at that point in time that

1  you were unaware whether or not Mallinckrodt had ever either

2  received an indemnity claim before that time or responded to

3  one. Do you remember that?

4  A    I do remember that.

5  Q    And, sir, since that time you have learned that, in

6  fact, there was an indemnity claim made by United Biosource

7  not Express Scripts, are you not?

8  A    I do believe I became aware of that subsequent to my

9  testimony.

10  Q    And you are aware of the letter by Elizabeth Marks, the

11  debtors' counsel, to Judge Dorsey on March 1st, 2021 at

12  Docket 209 where she told the court that there was an

13  oversight.  Do you remember that?

14  A    I do recall that letter.

15  Q    And attached to that letter was, in fact, two letters,

16  one from June 8th, 2020 from the general counsel of an entity

17  known as ACP Ulysses Buyer, Inc.  Are you familiar with that?

18  A    I don't recall that particular name, but --

19  Q    Well Ms. Marks attached to that letter -- to her letter

20  a letter dated August 17th, 2020 from Lauren Mishta

21  [phonetic] the associate general counsel of your company.

22  You know Lauren?

23  A    I do know Lauren.

24  Q    And you are familiar that Lauren in August of 2020, two

25  months before the bankruptcy filing, told United Biosource

1  you don't have an indemnity claim.  Do you remember that?

2          MR. MADDOX:  Objection.  He's asking my client

3  about something that someone else said in another document. I

4  think this is both hearsay and I am concerned about whether

5  it's even relevant to what we are hearing today.

6          THE COURT:  What is the relevance, Mr. Haviland,

7  and isn't it hearsay if you're asking what someone else wrote

8  in a document?

9          MR. HAVILAND:  No, Your Honor.  I want to

10 understand what the fact witness knows.  In fact, he

11 testified under oath that he was unaware of any claim of

12 indemnity or response thereto.  Your Honor went on that

13 record on the injunction.  We learned five months later that

14 there, in fact, had been one. I never gotten the opportunity

15 to ask a fact witness about that issue.

16         I am asking if this witness is aware at this time

17 that general counsel wrote to general counsel of United

18 Biosource telling them they don't have an indemnity claim

19 which is, at bottom, the issue for extending the injunction

20 as to Express Scripts, Your Honor.

21         THE COURT:  Mr. Welch, do you know the answer to

22 the question?

23         THE WITENSS:  The long question.  Mr. Haviland, I

24 recall in November that much was made of the timing of the

25 indemnification letter and that you suggested that it was

1  something that our counsel had fabricated on the eve of

2  bankruptcy.  Subsequently, it was discovered that there were

3  earlier indemnification claims made by Express Scripts and I

4  have no reason to dispute either Mallinckrodt's internal

5  lawyers that there were claims about whether indemnification

6  existed and, in fact, documents were shown.

7          I testified in November on the basis of the

8  information that I had access to at the time.  Clearly there

9  were earlier indemnification claims made, but that actually

10 just seems to strengthen the overall argument that

11 indemnification is a significant area of dispute between

12 Mallinckrodt and PSI which is what I testified to earlier

13 under direct examination from Mr. Maddox.

14 BY MR. HAVILAND:

15 Q    Well let me break it down.  So when you testified in

16 November you were unaware of this exchange of letters.  So

17 your testimony was incomplete on that topic.  Is that fair?

18          MR. MADDOX:  Objection, Your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes.  I am now aware that there were

21 even earlier indemnification claims made by entities that

22 either are currently or were previously owned by Express

23 Scripts.

24 BY MR. HAVILAND:

25 Q    Let's break that down.  The letter that came in from

1  United Biosource didn't come from Express Scripts, it came

2  from the company did it not?

3          MR. MADDOX:  Objection, Your Honor.  The letter

4  speaks for itself.

5          THE COURT:  He's asking for the source of the

6  letter.  Go ahead, Mr. Welch, if you know.

7          THE WITNESS:  Which company?

8  BY MR. HAVILAND:

9  Q    United Biosource, not Express Scripts.

10  A    I believe that is the (indiscernible), yes.

11  Q    And in response to that demand, that letter in June of

12  2020 Ms. Mishta, on behalf of your company, Mallinckrodt,

13  said you don't have an indemnity claim because you are

14  untimely.  Do you remember that?

15  A    Its been a while since I read that email, but, yes, I

16  believe that that was the claim that she made.

17  Q    And there was a second reason that you UBC is, itself,

18  alleged to have violated the antitrust laws and, therefore,

19  wouldn't have a claim for indemnity.  Do you remember that?

20  A    I don't recall that specifically. I did testify earlier

21  today that we believed that we had defenses to Express

22  Scripts indemnification claims.  I think that that is

23  consistent, Ms. Mishta's email is consistent with what I said

24  earlier.

25  Q    Thank you for that because that was my next question.

1  The debtors have not at any point in time since learning

2  about these letters in June of 2020, later in October taking

3  any position against UBC that they don't have an indemnity

4  claim in bankruptcy, right?

5  A    I don't think we have taken any specific action, no.

6  Q    Would it surprise you to learn that United Biosource

7  has not filed itself a proof of claim claiming indemnity?

8  A    I have not reviewed every proof of claim filed in this

9  case, but I will take your word that they have not done so.

10 Q    Okay.  And lastly Accredo.  You are familiar with that

11 contract that's been put before the court with the indemnity

12 provision?

13 A    Yes, I am.

14 Q    And do you know if that contract had been assumed by

15 the debtors?

16 A    I believe that that is also subject to ongoing

17 negotiations.

18 Q    And as we sit here today, sir, those contracts that

19 were reference in the general counsel's letter of October

20 14th, 2020 the debtor has not yet taken a position whether to

21 assume those executory contracts and/or strike the indemnity

22 provision that's the issue as to whether or not there is an

23 identity of interest between the parties.  Is that fair?

24 A    That's correct.  There has been no public filing to

25 that effect in this case.

1          MR. HAVILAND:  If you just give me a moment I

2   think I'm almost finished.  Thank you. I have no further

3   questions, Your Honor.

4          THE COURT:  Thank you, Mr. Haviland.

5          Anyone else wish to cross?

6          MR. SENA:  Yes, Your Honor.  May I request a brief

7   recess and then come back?

8          THE COURT:  Alright, we have been going for about

9   an hour and 40 minutes.  Let's recess until 2:50.

10         MR. SENA:  Thank you.

11       (Recess taken at 2:37 p.m.)

12       (Proceedings resumed at 2:51 p.m.)

13         THE COURT:  Okay.  We're back on the record.

14         Mr. Sena, are you ready to proceed with cross?

15         MR. SENA:  Yes, Your Honor.  Thank you.

16         THE COURT:  Go ahead.

17                      CROSS EXAMINATION

18   BY MR. SENA:

19   Q    Good afternoon, Mr. Welch.  My name is Jarett Sena.  I

20   am with the law firm of Rolnick Kramer Sadighi LLP and we

21   represent the securities opt-out plaintiffs.

22   A    Good afternoon.

23   Q    Good afternoon.

24        So you testified about the Shenk securities class

25   action today.  You are familiar with that action, right?

1   A     I am, yes.

2   Q     And you understand that the debtors reached a

3   settlement agreement in the Shenk class action for $65.75

4   million, right?

5   A     I am aware of that agreement, yes.

6   Q     And how far had the Shenk class action gone on before

7   it was (indiscernible)?

8   A     I believe -- before the petition date?  You broke up,

9   Q     I'm sorry. I will repeat the question.  How far had the

10  Shenk class action gone on before it was settled?

11  A     It had been multiple years.   I believe it was three

12  years.

13  Q     And that action survived the motion to dismiss, right?

14  A     As I testified earlier we carved out a requested, an

15  exclusion to allow the mediation to progress in that case.

16  Q     Sir, I don't think you understand my question.  So, the

17  Shenk class action survived the motion to dismiss prior to

18  mediation, right?

19  A     Yes, that's my understanding.

20  Q     But there was no summary judgment in that action,

21  right?

22  A     I am not aware of that, no.

23  Q     There was no class certification?

24  A     I don't recall.

25  Q     And you understand that the Shenk class action

1  settlement will be paid solely from the proceeds of the

2  debtors -- sorry, one more question on that.  There have been

3  no depositions, right, prior to the settlement in the Shenk

4  class action?

5  A    I am actually not close enough to the prepetition

6  litigation to know what discovery had or had not been taken.

7  Q    Well what do you know took place in the Shenk class

8  action (indiscernible)?

9  A    As I testified back in November when we were talking

10  about the rationale for allowing the mediation to go forward

11  I'm aware that the mediation briefs have been filed, the

12  dates had been selected for the mediation.  So from that

13  perspective parties had come to the table, but I am not --

14  and I read the original complaint, but the ins and outs of

15  the litigation (indiscernible) I didn't review all of that.

16  Q    So you testified about mediation, but it doesn't seem

17  as if you have knowledge as far as the interworking's of the

18  litigation itself as far as the progress in the actual

19  litigation of that?

20  A    That is correct. I did not oversee the Shenk litigation

21  that was handled by other colleagues within the company.

22  Q    So other than a motion to dismiss and a mediation you

23  are not aware of anything else that happened, right?

24  A    I don't have direct knowledge, no.

25  Q    And you understand that the Shenk class action

1  settlement will be paid solely from the proceeds of the

2  debtor's D&O coverage policies for the June 2016 to June 2017

3  policy, right?

4  A    That is my understanding, yes.

5  Q    And those D&O policies have side A, side B, and side C

6  coverage, right?

7  A    That's correct.

8  Q    What is the total amount of the side A, side B, and

9  side C?

10  A    I don't remember the individual amounts of the side off

11  the top of my head.  I believe the overall tower was 200 for

12  that insurance year.

13  Q    So the overall tower is 200.  Do you know what the

14  tower was for the side B and side C?

15  A    I have in my head 50 for side A and the rest B and C,

16  but I don't really recall with precision on that.

17  Q    If you testified at a deposition that the side B and

18  side C were 150 million and side A was 50 does that sound

19  right to you?

20  A    That's what I just said, so, yes, I must be recalling

21  at least what I previously said at the deposition.

22  Q    And how much of that insurance is remaining after the

23  Shenk class action settlement?

24  A    Some of coverage year, as I understand it, has been

25  consumed by attorney's fees to date.  So I don't have for you

1  off the top of my head an exact number of after the

2  settlement, if approved, how much would be left over.

3  Q    Let's walk through it.  Let's back up a bit.

4       So the Shenk settlement is solely from the side B and

5  side C coverage, right?

6  A    That is my understanding.

7  Q    So if there was 150 million total, right, coverage --

8  and you're nodding your head yes.  That's a yes?

9  A    Yes.

10 Q    And there was 65.7 million that will be paid for the

11 Shenk class action, right?

12 A    That is correct.

13 Q    So if you subtract that, I'll get my calculator out

14 unless you're good at math, you're looking at 84.25 million,

15 right?

16 A    That math sounds accurate.

17       MR. MADDOX:  Your Honor, I'm going to object.

18 I've let this line of questioning go on, but I don't see the

19 relevance of it to base dispute whether the injunction should

20 be excluded.

21       THE COURT:  What is the relevance, Mr. Sena?

22       MR. SENA:  Your Honor, the debtors have claimed

23 irreparable harm to the estates if this matter will continue.

24 Our position is that this matter effects the D&O insurance

25 policy proceeds which are not property of the estate so,

1  therefore, there is no burden for continuing the matter.

2         THE COURT:  Well I don't know what relevance the

3  prior settlement has to do with that.  You can argue that

4  based on what we already know.

5         MR. SENA:  Well, Your Honor, if there's sufficient

6  insurance coverage to recover for our claims then there would

7  be no burden, no distractions of the debtors' estates.

8         THE COURT:  Well, I don't know that you have

9  established that you are the only other claim that's been

10  asserted against those proceeds.  So I still don't see the

11  relevance.

12         Let's move on, Mr. Sena.

13  BY MR. SENA:

14  Q    So you mentioned that there are cost and attorney fees

15  that are being spent on the D&O policies, right?

16  A    I believe what I said was that the insurance coverage

17  year had been diminished as a result of attorney fees that

18  had been incurred defending the Shenk matter.

19  Q    And what else of the D&O policy is being used to fund?

20         MR. MADDOX:  Objection, Your Honor; calls for

21  speculation.

22         THE COURT:  Well given that everything is stayed I

23  don't know what the D&O policies would be used for right now

24  in any event.  Let's ask another question, Mr. Sena.

25  BY MR. SENA:

1  Q      You understand that the payment in the Shenk class

2  action will dwarf any recovery in the securities opt-out

3  litigation, right?

4  A      The settlement has not been approved.  I noted that

5  there were multiple objections, other parties reserved

6  rights.  So I am not sure that that is ripe enough for me to

7  speculate on relative recoveries.

8  Q      But its your understanding that the Shenk class actions

9  at over $65.75 million, right?

10 A      The settlement in principal, yes.

11 Q      Settlement in principal.  And do you have any idea of

12 what the damages are of the securities opt-out plaintiffs?

13 A      I don't recall what the damages were alleged to be.

14 Q      So you are familiar with the action that was brought by

15 the securities opt-out plaintiffs, right?

16 A      That's correct.

17 Q      And you testified today that the debtors have viable

18 defenses as to the securities opt-out litigation.  Do you

19 recall that?

20 A      That is correct.

21 Q      And what are those defenses?

22 A      We would have to, kind of, go back through the

23 underlying case which involved multiple, kind of, theories.

24 One was that there was untimely -- let me see if I can recall

25 exactly what the -- one was that we filed a 10-K that was

1  shortly before the FTC settlement and that surely we should

2  have known when we filed the 10-K just a few months before

3  the FTC settlement that there was an investigation and

4  shareholders had known that then they might have made other

5  investment decisions.

6       So timeliness of disclosure.  I think there were

7  multiple theories in the case.  I do know that I am informed,

8  at least, by securities counsel that the settlement and

9  principal that was reached in the Shenk matter would be

10  dwarfed by, kind of, typical damages sought in these kinds of

11  actions.  So I am assuming that the opt-out plaintiffs'

12  claims would exceed even the $63.75 million Shenk settlement.

13 Q    And what is that assumption based on?

14 A    Again, just discussions with security council on these

15  kinds of actions and how they typically settle out.

16 Q    Understood.  Yeah, I don't know if you exactly answered

17  my question.  So what exactly -- I guess maybe I am unclear.

18  What are the defenses then relevant to the securities opt-out

19  litigation that the debtors argue (indiscernible)?

20 A    Yeah, so just --

21       THE COURT:  Hold on, Mr. Welch.  What is the

22  relevance of the merits of the underlying litigation?  I am

23  not deciding the merits of the litigation. I don't care what

24  the defenses are.  The issue here today is whether I am going

25  to allow the litigation to go forward or not.

1    MR. SENA:  Your Honor, I believe that the debtors

2  opened the door to this.  They did talk about the viable

3  defenses, the securities opt-out litigation and their case in

4  chief.  One of the points I will get to is to show the

5  interrelatedness between our litigation and the Shenk class

6  action which was resolved whereas our action has not been

7  resolved.

8    THE COURT:  Well, again, that is irrelevant

9  because the debtors can settle with whoever they want to

10  settle with.  The fact that they're not talking to you I

11  can't make them do that and it has nothing to do with the

12  issue of whether or not I am going to allow the litigation.

13    MR. SENA:  Okay.

14    THE COURT:  So let's move on.

15    MR. SENA:  Thank you, Your Honor.

16  BY MR. SENA:

17  Q    So you testified today about the financial impact of

18  the litigation, correct?

19  A    I did.

20  Q    There is no financial impact to the estates if the

21  securities opt-out plaintiff litigation is covered by the D&O

22  insurance policies, right?

23    MR. MADDOX:  Objection, Your Honor; calls for a

24  legal conclusion.

25    THE COURT:  Sustained.

1  BY MR. SENA:

2  Q     If there is a settlement in the securities opt-out

3  litigation that will be paid from the D&O policies, right?

4            MR. MADDOX:  Objection, Your Honor; calls for

5  speculation, calls for a legal conclusion.

6            THE COURT:  Sustained.

7  BY MR. SENA:

8  Q     The debtors were not with a process in the securities

9  opt-out litigation, correct?

10 A     I think I testified that that action was filed just a

11 week or so before we filed our petition in these cases.  So,

12 correct.

13 Q     So do you recall if the D&O defendants, that would be

14 Mark Trudeau and Matthew Harbaugh, if they effected waivers

15 of service in our litigation?

16 A     I don't know the answer to that.

17 Q     To your knowledge the debtors were not served with

18 process.  In fact, they refused to accept the service,

19 correct?

20 A     I am not aware of those facts.

21 Q     Mark Trudeau is the current CEO of Mallinckrodt, right?

22 A     Yes, he is.

23 Q     And how much time is Mr. Trudeau spending on

24 reorganization efforts?

25 A     I have not asked him specifically how much time he

1  spends on it.  The fact that there are several of us that

2  spend all of our time on it means that he does not need to

3  spend all of his time on it.  He is able to focus on engaging

4  with the business and other employees.

5       As I said, you know, we are trying to run a

6  pharmaceutical company through this process.  I don't have a

7  percentage of his time.  I do update him with some regularity

8  on it, but I don't know from a day to day perspective how

9  much of his time is occupied.

10 Q    So you said that because others, like yourself, focus

11 on the reorganization he spends less time on it.  Is that

12 correct?

13      (No verbal response)

14 Q    Sorry, I didn't hear that.

15 A    Yes, that's correct.

16 Q    So he spends far less time on it then you, correct?

17 A    I think that that's probably an accurate statement,

18 yes.

19 Q    And he spends far less time than a lot of other

20 executives at the company?

21 A    There are many folks within Mallinckrodt that spend an

22 inordinate amount of time on the restructuring effort.  I

23 suspect that their time exceeds Mr. Trudeau's given that he

24 has many different obligations as a public company CEO.

25 Q    And you said Mr. Trudeau is focused on the business

1  itself, right?

2  A    All aspects of the business, but certainly running the

3  day to day -- overseeing the day to day operations of the

4  company.

5  Q    And was Mr. Trudeau involved in briefing class motions

6  to dismiss in the Shenk class?

7  A    Could you repeat the question? I had a thunder strike

8  in the background, adverse weather.

9  Q    I'm sorry, you want me to repeat the question?

10 A    Yes, please.

11 Q    Is it fair to say -- withdrawn.

12      Was Mr. Trudeau involved in briefing the class motion

13 to dismiss the Shenk class action?

14           MR. MADDOX:  Objection; relevance.

15           THE COURT:  I'm sorry, what's the objection, Mr.

16 Maddox?

17           MR. MADDOX:  Relevance, Your Honor.

18           THE COURT:  You can answer if you can, Mr. Welch.

19           THE WITNESS:  To the best of my knowledge Mr.

20 Trudeau was not involved in drafting the briefs in this

21 matter.

22 BY MR. SENA:

23 Q    And it's fair to say that that was an exercise

24 conducted by his litigation counsel Wachtell Lipton, right?

25           MR. MADDOX:  Objection, Your Honor; calls for

1 speculation.

2        THE WITNESS:  Not merely outside counsel.  So when

3 we think about the burden on the company it's the burden on

4 those who engage with our outside advisors including external

5 attorneys who manage and oversee the day to day litigation

6 affairs.  So, you know, that burden would fall not merely on

7 Wachtell, but across the internal legal department as well.

8 BY MR. SENA:

9 Q    But that burden would not fall on Mr. Trudeau himself,

10 correct?

11 A    He would review matters, but he would not be the

12 primary drafter of briefing.

13 Q    Would he review the motion to dismiss?

14 A    I don't know whether he did in this case or not with

15 respect to Shenk.

16 Q    And Mr. Harbaugh he's the former CFO of Mallinckrodt,

17 correct?

18 A    That is correct.

19 Q    And he left the company over two years ago?

20      (No verbal response)

21 Q    Sorry, I didn't catch that.

22 A    Yes, he did.

23 Q    And he is not involved in bankruptcy at all, right?

24 A    He is not.

25 Q    No part of his time is involved in bankruptcy?

1  A    I believe he has been noticed for a deposition, so I

2  think he is certainly aware.  I have not talked to Mr.

3  Harbaugh about the restructuring at all.  I suspect that he

4  is fully -- he is a public company CFO and that his time

5  focused on his current employer.

6  Q    Are you aware that it took over a year to adjudicate

7  the motion to dismiss in the Shenk class action?

8  A    I am not aware of the exact timing.  I did testify

9  earlier that that issue -- that that case had been opened for

10  some time so that wouldn't surprise me.

11  Q    And are you aware that there was an automatic stay

12  under the PSLRA that prevented any discovery until that

13  motion to dismiss was decided?

14  A    No.  I don't have awareness of that specifically.

15  Q    So during the 90 day period for which the debtors' seek

16  an extension for do you know that there would be no discovery

17  burden at all in the securities opt-out litigation if they

18  were allowed to go forward?

19        MR. MADDOX:  Objection, Your Honor.  I'm not sure

20  I understood the double negative in that question.

21        THE COURT:  You want to rephrase it, Mr. Sena?

22        MR. SENA:  Sure.

23  BY MR. SENA:

24  Q    Are you aware -- withdrawn.

25        So the debtors are seeking an extension of the

1  preliminary injunction for 90 days, correct?

2  A    That is correct.

3  Q    And if the injunction was not granted with respect to

4  the securities opt-out litigation are you aware of any

5  discovery burden to the securities opt-out plaintiffs if that

6  were the case?

7  A    I think you just told me that (indiscernible) barred in

8  something in that case from pursuing discovery and I trust

9  you know more about the inner workings of that case then I

10 do.  So I will take your word for it that there would not be

11 discovery allowed in that 90 day period.

12         MR. SENA:  One second as I go over my notes.  Your

13 Honor, I pass the witness.  Thank you.

14         THE COURT:  Thank you, Mr. Sena.

15         Anyone else wish to cross?  Mr. Bograd?

16         MR. BOGRAD:  Thank you, Your Honor.

17                    CROSS EXAMINATION

18 BY MR. BOGRAD:

19 Q    Mr. Welch, good afternoon.  I should be fairly brief.

20 Lou Bograd representing the State of Rhode Island.

21         I believe you testified you were familiar with the

22 Rhode Island action versus Mark Trudeau?

23 A    Yes.  I read the complaint when it was originally

24 filed.  It's been some time ago.

25 Q    Okay.  So you are aware that the State of Rhode Island

1   is seeking damages from Mr. Trudeau for his role in creating

2   the opioid crisis?

3   A    I am.

4   Q    And I believe you testified earlier that Mr. Trudeau

5   and the claims against him brought by the State of Rhode

6   Island would be covered by the directors and officers

7   indemnification policy that's in place?

8   A    My speculation is that the action was brought precisely

9   to gain access to D&O coverage.

10  Q    And you are aware that the reorganization plan would

11  keep all of the existing D&O policies in place and in effect

12  with the new company assuming the policies?

13  A    I am aware of that, yes.

14  Q    So the claims against officers and directors would

15  still be subject to claims filed under the indemnification

16  policies?

17  A    That is consistent with my understanding.

18  Q    But unlike the other claims against officers and

19  directors that we've been discussing today are you aware that

20  the reorganization plan would release Rhode Island's claim

21  against Mr. Trudeau?

22  A    That is my understanding of what the impact of the

23  releases would be on all opioid related claims, yes.

24  Q    Including the claim brought against Mr. Trudeau?

25  A    That's correct.

1  Q     And it would do so without any separate compensation on

2  those claims as well in the State of Rhode Island. Is that

3  correct?

4  A     That is correct.

5          MR. MADDOX:  Objection, Your Honor.  The

6  consideration calls for a legal conclusion.

7          THE COURT:  He's already answered it.

8          Go ahead, Mr. Bograd.

9  BY MR. BOGRAD:

10 Q     And it would release those claims against Mr. Trudeau

11 even though those claims are subject to indemnification under

12 the D&O policy?

13 A     That's correct, yes.

14 Q     Okay.  Did Mr. Trudeau make any substantial -- himself

15 make any contribution to the resources being put into the

16 opioid trust to settle opioid claims in this case?

17          MR. MADDOX:  Objection, Your Honor; calls for a

18 legal conclusion.

19          THE COURT:  Well that is sustained.  Also, you're

20 going far afield of what is at issue for today, Mr. Bograd.

21 You are talking about plan confirmation issues and whether or

22 not the releases are acceptable to the court or not and that

23 issue is not before me today.

24          MR. BOGRAD:  I understand that, Your Honor.  I am

25 simply trying to understand the context in which the request

1  for the extension of the injunction applies.  I am just about

2  done here.

3              THE COURT:  I think we -- Mr. Welch, can you hear

4  us?

5        (No verbal response)

6              MR. BOGRAD:  He froze.

7              THE COURT:  I think we -- he seemed to indicate

8  that he had some severe weather going on.  I'm hoping we

9  haven't lost him.  He's off.  Let's see if he comes back on

10 here shortly.

11       (Pause)

12             THE COURT:  Mr. Davis?

13             MR. DAVIS:  Your Honor, I just spoke to Mr. Welch.

14 He had a power spike and lost the connection.  He is in the

15 process of dialing back in now.

16             THE COURT:  Alright, thank you.

17       (Pause)

18             THE COURT:  It looks like we have Mr. Welch back.

19             MR. BOGRAD:  I hope it wasn't something I said,

20 Mr. Welch.

21             THE WITNESS:  Apologies.  I do not control the

22 weather.  We're having a massive thunderstorm here.  So

23 hopefully the power will hold out for us.

24             MR. BOGRAD:  Your Honor, since you don't wish to

25 have me question further related to the scope of the relief I

1    am done with my questions for today.

2              THE COURT:  Thank you.

3              Anyone else wish to cross?

4         (No verbal response)

5              THE COURT:  Mr. Maddox, any redirect?

6              MR. MADDOX:  Yes, Your Honor, just a couple

7    redirect questions.

8              Before I start I neglected earlier to make a

9    formal request to the court that I could have capabilities to

10   share documents on the Zoom.  I think I'd like to be able to

11   do that in connection with the legal argument that's coming

12   next if the court would indulge.

13             THE COURT:  Yes.  We will give you co-hosting

14   rights so that you can share the screen at that time.

15             MR. MADDOX:  Thank you, Your Honor.

16                       REDIRECT EXAMINATION

17   BY MR. MADDOX:

18   Q     Mr. Welch, good afternoon again.

19         Mr. Sena asked you about Mr. Trudeau's duties during

20   the bankruptcy.  Do you recall that?

21   A     I do.

22   Q     And you testified that he was focusing his efforts

23   largely on operating the business.  Is that correct?

24   A     Yeah.  I think the question was, in part, comparing the

25   time that he spends on it to how much I spend on it.  I said

1  that he spends less time than I do.

2  Q    Right.  But its gets distracted from his efforts in

3  managing and operating the debtors' business because of

4  lawsuits that are levied against him for an associated

5  entities.  Would that harm the debtors as well?

6  A    It certainly would, yes.

7  Q    Just one more question.  In the securities opt-out

8  litigation were there claims that are made also against the

9  debtors.

10  A    Yes.  I believe that there are claims against

11  Mallinckrodt PLC, the parent company.

12  Q    And do the proof of claims against the directors and

13  against the company itself overlap?

14  A    Yes, it's the same underlying activity.

15  Q    Alright.  I'm sorry, I did have one final question.

16  Other than discovery when an action first starts are there

17  other actions that the company has to take in order to

18  respond to an action?

19  A    Yes, there are.  There are responsive pleadings that

20  would been to be prepared, filed and reviewed.

21           MR. MADDOX:  Thank you, Mr. Welch.  Nothing more.

22           THE COURT:  Thank you, Mr. Welch.  You are

23  excused.

24      (Witness excused)

25           THE COURT:  Mr. Maddox, any other evidence?

1          MR. MADDOX:  Let me confirm with Mr. Stearn to

2   make sure there is nothing I missed.  No more evidence from

3   the debtors, Your Honor.  We close our evidentiary

4   presentation.

5          THE COURT:  Thank you.

6          Any evidence from the objecting parties?  Mr.

7   Haviland?

8      (No verbal response)

9          THE COURT:  Mr. Haviland, you're muted.

10         MR. HAVILAND:  Sorry, Your Honor.  I have a two

11  mute function here.  I said none for the ad hoc Acthar group

12  other then what we have done with the witness.  Thank you.

13         THE COURT:  Thank you.

14         Mr. Sena?

15         MR. SENA:  No, Your Honor.  Thank you.

16         THE COURT:  Mr. Bograd?

17         MR. BOGRAD:  No, Your Honor.

18         THE COURT:  Thank you.

19         Alright, let's go to -- I'm getting an echo.  Can

20  everybody mute your lines please.  Let's go ahead and go to

21  closing arguments.

22         MR. STEARN:  Thank you, Your Honor.  Once again

23  Bob Stearn of Richards, Layton & Finger on behalf of the

24  debtors.

25         Can Your Honor hear me okay?

1          THE COURT:  Yes.

2          MR. STEARN:  Just by way of introduction, Your

3   Honor, as you are aware we had a rather robust hearing on the

4   two Section 105 injunctions last November.  We had two days

5   of evidence including testimony from Mr. Welch and Mr.

6   Eisenberg.  I won't repeat all that now because I think we

7   summarized some of that in our reply brief so we wouldn't

8   have to repeat it today.

9          We had another day of oral argument after which

10  the court took the matter under advisement.  Then we had a

11  separate hearing on November 23rd at which the court

12  announced its ruling including a series of findings and

13  holdings of the court's ruling.  Again, we summarized that in

14  our reply brief so we didn't have to do it now.

15         Thereafter Your Honor entered two orders.  On

16  November 25th, 2020 the court entered the first 105 order as

17  we defined in our papers which, essentially, enjoined

18  governmental units from proceeding against the debtors

19  pursuant to their purported police powers.  On December 4th,

20  2020 the court entered the supplemental 105 order which

21  enjoined actions against the debtors' co-defendants in

22  certain litigation including the securities and the Acthar

23  litigation.

24         Our co-defendants including the debtors D's & O's

25  as well as Express Scripts and some of its affiliates which

1  at risk of grossly oversimplifying, I'll call, the debtors

2  supplier of Acthar products to patients.  Both orders

3  provided that eh debtors could return to the court to seek an

4  extension of the injunctions which, of course, which is why

5  we are here today.

6          Your Honor, the fact that we have only three

7  objections to the debtors' motion to extend, notwithstanding

8  thousands of lawsuits pending against the debtors, is a

9  testament to the fact that the debtors' stakeholders

10  overwhelmingly agree that the injunction should remain in

11  place while the debtors continue their reorganization

12  efforts.

13          Your Honor, parenthetically, I will note there

14  were no objections to the extension of the first 105 order

15  thereby warranting an extension without further

16  (indiscernible).  And, Your Honor, before I turn to the

17  evidence supporting the extension of the injunctions I think

18  it's helpful to sweep away some of the, what I will call,

19  debris.

20          In particular, the ad hoc Acthar groups intention

21  that the supplemental 105 order somehow expired on August

22  20th, 2021 because that's (indiscernible) the court's

23  November 23rd oral ruling.  That argument is clearly wrong

24  and we know it's wrong because the court already said in its

25  January 27th, 2021 memorandum opinion denying the Canadian

1    Elevator Industry Pension Trust Fund's motion to -- excuse

2    me, to reargue the supplemental 105 order and what the court

3    said was the order or the injunction began to run on the date

4    of entry of the order, i.e. December 4th, 2020.

5              We also know the argument that the injunction has

6    expired is wrong because even if the debtors and the court

7    were incorrect that the 270 day injunction began to run on

8    December 4th and instead it began to run on November 23rd

9    (indiscernible) would extend the injunction period without a

10   need for a bridge order.

11             Your Honor, the ad hoc Acthar group's contention

12   that in prescribing the background for this case when denying

13   one of the ad hoc Acthar group appeals the District Court

14   somehow held that the injunction began to run on November

15   23rd, 2020 when the court issued its appeal, frankly, is just

16   (indiscernible).  When the ad hoc Acthar group was citing the

17   decision of Judge Stark it wasn't even citing the decision

18   denying its appeal of the Section 105 order.  It was citing

19   the decision of Judge Stark denying the ad  hoc Acthar

20   Group's appeal of the order quashing -- or Your Honor's order

21   quashing the subpoena to ESI's in-house counsel.

22             So having said that push that to the side, Your

23   Honor, because it's clearly incorrect that the order already

24   has expired because it supposedly began to run its 270 day

25   period on November 23rd and move onto things that matter

1  starting with the evidentiary record.  As I mentioned, we

2  already have a massive record before the court developed last

3  November supporting both the initial granting as well as the

4  extension of the 105 orders.  That, as I mentioned, is

5  discussed in the reply brief.  I won't repeat everything.

6  Instead, I want to talk about the record that has developed

7  here.

8        What Your Honor heard today is that nothing

9  material has changed with respect to the debtors need to

10  (indiscernible). If anything, the need for injunctive relief

11  is even more critical now.  The benefit of the Section 105

12  orders the debtors have made substantial progress in these

13  cases.  Your Honor is familiar with that progress because you

14  have overseen much of it.  It includes, among other things, a

15  fully consensual cash collateral order.  Adding parties to

16  support the plan as you heard today such as the multi state

17  governmental entity group, the ad hoc group of first lien

18  lenders.

19        You heard about the facilitation of the opioid

20  trust allocation mediation such that we now have a procedure

21  for allocation of the opioid trust (indiscernible).  Thanks

22  to Judge Sontchi we heard that the mediation with the UCC had

23  been successful and we now have a construct (indiscernible)

24  UCC settlement.  You also heard that there has been a

25  settlement with a majority of the second lien noteholders and

1    you heard that the debtors continue to negotiate with their

2    constituents to try to reach resolution (indiscernible).

3              Your Honor, all --

4              THE COURT:  Mr. Stearn, your voice is dropping

5    sometimes and I'm losing you.

6              MR. STEARN:  Some people might consider that a

7    benefit, Your Honor, but I'm going to see if I can bring

8    myself a little closer to the screen.  I will kind of lean

9    over a bit.  I will seem hunched when I do it, but hopefully

10   it will solve the problem.  Thank you for the alert.

11             Your Honor, has overseen the litigation of various

12   issues in furtherance of confirmation including dismissing

13   the unsubstantiated claims and the purported class claims to

14   help facilitate our path towards confirmation.  As Your Honor

15   is aware the debtors have filed a plan and disclosure

16   statement with the solicitation period scheduled to close

17   next week and the debtors now find themselves on the

18   precipice of confirmation proceeding.

19             Your Honor, all of this meaningful progress has

20   been made with the help of the court's Section 105 orders to

21   allow the debtors to focus on their restructuring and running

22   their business rather than dealing with (indiscernible).

23   Your Honor, when you consider these facts in light of the

24   applicable standards, which I'll discuss next, debtors

25   respectfully submit that the need for ongoing injunctive

1   relief is crystal clear.

2           Let me start, first, Your Honor, with the

3   observation that -- frankly, although you wouldn't know it

4   from the objections which are characterized the 90 day

5   extension that the debtors seek as extraordinary and

6   staggering (indiscernible) the relief the debtors seek today

7   is unremarkable.  It's not unusual, in fact it's typical for

8   debtors who have obtained Section 105 injunction to seek to

9   extend those injunctions to protect the reorganization

10  process.

11          We have cited some well-known cases in our briefs

12  in which the Section 105 injunctions in those cases were

13  extended; Purdue, Takata, in Boy Scouts it was even done by

14  stipulation notwithstanding the highly litigious nature of

15  that case.  In fact, Your Honor, as best as I can tell the

16  objectors have not cited a single case, not one, in which a

17  bankruptcy court refused to extend a Section 105 injunction

18  where the debtors were still engaged in the reorganization

19  process.  Your Honor, respectfully, this should not be the

20  first such case.

21          Let me touch just briefly on jurisdiction before I

22  move on.  The court already held it has subject matter

23  jurisdiction over the proceedings that are the subject of the

24  injunctions which is the law of the case.  Nothing has

25  changed that would alter that law of the case.  In fact, none

1   of the objectors really directly attacked the court's subject

2   matter jurisdiction to enter these injunctions.  The ad hoc

3   Acthar group directly attacks the court's jurisdiction with

4   the false narrative that the court's prior jurisdiction of

5   the examination was based solely on ESI indemnifications

6   coupled with the argument that ESI indemnifications

7   affordably is no longer a live issue.

8            Setting aside for the moment whether ESI

9   indemnification is a live issue it is clear that the ad hoc

10  Acthar group's argument that the court's subject matter

11  jurisdiction is based solely on ESI indemnification is simply

12  fabrication.  As reflected in pages 45 to 47 of the

13  transcript of the November 23rd, 2020 hearing court based

14  subject matter jurisdiction, not only on ESI indemnification,

15  but also on the burdens on the debtors and senior management

16  from discovery demands, the risk of collateral estoppel and

17  (indiscernible), the fact that ESI will defend the actions

18  against it based on the alleged conduct of the debtors, the

19  damage to the debtors business if the actions proceed while

20  the debtors are trying to reorganize including the impact on

21  employees, and also the disruption to the reorganization by

22  causing parties that agreed to stay to walk away including

23  (indiscernible) from --

24            THE COURT:  I'm losing you, again, Mr. Stearn,

25  unfortunately.

1            MR. STEARN:  I'm sorry.

2            So, Your Honor, I don't know why the ad hoc Acthar

3   group continues to argue that this Court's subject-matter

4   jurisdiction is based solely on ESI indemnification, which

5   disproven even by the most cursory reading of the

6   November 23, 2020, transcript and expressly was rejected by

7   Judge Stark on appeal.

8            Even the ad hoc Acthar group must know that that

9   argument is specious and that this Court's determination that

10  it had jurisdiction was based on much more than ESI

11  indemnification.  But in any event, Your Honor, as I'll

12  discuss momentarily, ESI indemnification remains a live issue

13  as the other reasons underlying the Court's subject-matter

14  jurisdiction.

15           Your Honor, I'm going to turn first to the unusual

16  circumstances as have been discussed --

17           THE COURT:  You keep fading out on me, Mr. Stearn.

18  I'm not sure what's happening.

19           MR. STEARN:  Okay.  I'm sorry, Your Honor.  I

20  think I have good internet.  I'm in my office.  Can you hear

21  me better now as I lean over further?

22           THE COURT:  Yeah, maybe you can turn up the

23  microphone on your computer.  If you're using your computer

24  microphone, you might need to increase the output for that.

25           MR. STEARN:  I will give that a shot, Your Honor.

1  My apologies for the delay.

2       (Pause)

3            MR. STEARN:  Your Honor, is that better?

4            THE COURT:  Much better, thank you.

5            MR. STEARN:  Okay.  Thank you, Your Honor, for the

6  technological tutorial on how to address this point.

7            So, Your Honor, in any event, as I was saying, I

8  want to move on to discuss the bases for continuing the

9  Section 105 orders, starting with the unusual circumstances.

10 Although demonstrating the unusual circumstances

11 (indiscernible) that's certainly one way to (indiscernible)

12 third-party action, as the Court held previously, the debtors

13 don't need to establish unusual circumstances when they also

14 meet the preliminary injunction standard.

15            Nonetheless, the debtors have demonstrated unusual

16 circumstances last November.  They've done so again today.

17            Your Honor is familiar with the unusual

18 circumstances test.  It asks two questions, which can be

19 decided alternatively; you only need to meet one element of

20 the test.  The test is whether either the nondebtor and the

21 debtor share an identity of interest, such that the suit

22 against the nondebtor essentially is a suit against the

23 debtor or the third-party action will have an adverse impact

24 on the debtors' ability to establish reorganization.

25            The unusual circumstances test continues to be

1  satisfied for the same reasons the Court found it satisfied

2  previously; in fact, Your Honor, the evidence only has

3  strengthened in favor of the unusual circumstances test.

4  Let's evaluate it (indiscernible).

5         The first is identity of interest.  The identity

6  of interest test, of course, Your Honor, does not require

7  that a debtor and a nondebtor essentially be the same legal

8  entity; rather, the question is whether the suit against the

9  debtor essentially is a suit against the debtor.  The Court

10  previously held that was the case and nothing has changed

11  since November.

12         Let's start out with the Acthar (indiscernible),

13  Your Honor.  We actually introduced those into evidence once

14  again.  Four of them were introduced at the last hearing.  We

15  introduced the final one today.  They're at Debtors' Exhibits

16  8, 9, 10, 11, and 41.  They have not changed at all since

17  last November.  They still seek or purport to seek billions

18  of dollars in damages.  They still make the same allegations

19  of conspiracy between the debtors and the nondebtor

20  defendants.

21         Let's take, for example, Rockford's second amended

22  complaint.  It is crystal clear that Rockford's claims are

23  based on a purported, concerted action between the debtors

24  and the ESI defendants.

25         I would ask Mr. Maddox if he would put up Debtors'

1    Exhibit 8 on the screen.

2              MR. MADDOX:  I am waiting for screen-share

3    capabilities.  It is currently saying I am disabled.

4              THE COURT:  One second.

5         (Pause)

6              THE COURT:  You have it now, Mr. Maddox.

7              MR. MADDOX:  Yes, Your Honor.  Thank you.

8              MR. STEARN:  Thank you, Mr. Maddox.

9              If you would go to the first substantive page of

10   the complaint, about three or four pages in after the table

11   of contents, I want to focus on -- there it is --

12   paragraph 1.  I don't know if you can blow it up.

13             So, Your Honor, nature of the case, paragraph 1.

14   Plaintiffs bring in action -- and, again, this is the City of

15   Rockford's complaint -- the plaintiffs bring this action on

16   their own behalf and on behalf of all of the government

17   payers and private payers similarly situated (indiscernible)

18   to challenge unjust, unfair, and anticompetitive scheme by

19   defendants Mallinckrodt, and then there's some entity names,

20   as well as Mallinckrodt's exclusive agent for the delivery of

21   its products, Express Scripts Holding Company and three other

22   Express Scripts entities:  CuraScript, Accredo, and United

23   BioSource.

24             The scheme alleged herein sought to maintain and

25   enhance Mallinckrodt's monopoly power in the U.S. market for

1  (indiscernible) --

2          THE COURT:  I'm starting to lose you again,

3  Mr. Stearn.  You're going to have to keep your voice up.

4          MR. STEARN:  Okay.  Sorry.

5          Can you hear me now, Your Honor?

6          THE COURT:  Yes.

7          MR. STEARN:  I know I sound like a bad telephone

8  commercial.

9          So, that's just in the introduction, Your Honor.

10  Now, although this complaint is lengthy, there's only three

11  surviving counts, because the defendants succeeded in

12  dismissing the vast majority of the counts.  Those three

13  surviving counts are Counts 6 through 8.  Let's take a quick

14  look at those counts.  Count 6 begins on page 52.

15          Your Honor, can you still hear me okay?

16          THE COURT:  Yes.

17          MR. STEARN:  You'll see at the bottom of page 52,

18  and that's where Count 6 starts.  On the very next page,

19  paragraph 219, Mallinckrodt has, at all relevant times, had

20  monopoly power in the market for the sale of A-c-t-h drugs in

21  the United States.  While the genesis of this monopoly power

22  may be natural, since 2007, Mallinckrodt has acted and

23  conspired with Express Scripts to maintain, enhance its

24  monopoly power (indiscernible).

25          Similarly, in paragraph 221, in 2007, Mallinckrodt

1   announced a new strategy for this group in order to maintain

2   and enhance its profit.  Its new strategy could not have

3   succeeded without the involvement of Express Scripts and

4   Mallinckrodt's (indiscernible).

5              Let's look at the next count, Count 7, starting on

6   page 56.  Thank you.  Paragraph 237, as set forth above,

7   Mallinckrodt has entered into exclusive agreements with the

8   agent for its largest customers, Express Scripts.  These

9   agreements preserved and extended Mallinckrodt's monopoly

10  power and allowed both, Mallinckrodt and Express Scripts to

11  raise the prices for Acthar to Express Scripts clients,

12  including Rockford.

13             And then on page 58, as part of this count, still,

14  paragraph 247, as a result, Express Scripts conspired and

15  agreed with Mallinckrodt to fix and charge artificially

16  inflated prices for Acthar through Express Scripts' clients

17  like Rockford.

18             Paragraph 248, at all relevant times,

19  Mallinckrodt's exclusive agreements with Express Scripts

20  assisted Mallinckrodt in, and then it goes on to describe

21  (indiscernible).

22             And then the final surviving count in this

23  complaint against the defendants is Count 8, which begins on

24  page 59.

25             And if I could just ask Mr. Maddox to just press

1   forward to page 61, paragraph 262, once again, as described

2   in this complaint, Mallinckrodt and Express Scripts agreed to

3   maintain the supracompetitive price of Acthar through the

4   ASAP program, limiting distribution of the drug

5   (indiscernible).

6           So, Your Honor, it's crystal clear, based on a

7   review of this complaint, that it is fundamentally based on a

8   purported conspiracy.  This is the Rockford complaint.  And

9   in fact, the judge who dismissed a majority of Rockford's

10  claims expressed a similar view of the nature of Rockford's

11  surviving claims.

12          Mr. Maddox, if you could go to Debtors'

13  Exhibit 12, please.

14          MR. MADDOX:  One moment.

15      (Pause)

16          MR. MADDOX:  That should be up, Exhibit 12.

17          MR. STEARN:  Thank you.

18          This is the Northern District of Illinois'

19  decision, as I said, dismissing the majority of Rockford's

20  claims.

21          And if you would go to page 9, please, Mr. Maddox.

22          MR. MADDOX:  We're there.

23          MR. STEARN:  Under the first heading, the gravamen

24  of Plaintiff's antitrust claims is that defendants acted and

25  conspired to raise Acthar prices exorbitantly high as part of

1  the vertical price-fixing (indiscernible) and then it goes

2  on.

3          Thank you, Mr. Maddox, you can take that down.

4          Your Honor, it's crystal year, and you see similar

5  allegations in the other complaints in the ad hoc Acthar

6  group, it's crystal clear that the allegations alleged by the

7  ad hoc Acthar group against ESI and the debtors are, as we

8  called them (indiscernible) inextricably intertwined and

9  (indiscernible).

10          THE COURT:  I'm losing you again, Mr. Stearn.

11          MR. STEARN:  I'm so sorry, Your Honor.  I don't

12  know why this is happening.  Let me check my microphone

13  again.

14      (Pause)

15          THE COURT:  You might just have to pretend you're

16  standing in the back of my courtroom with no microphone and

17  project.

18          MR. STEARN:  Well, I'm okay with that.  I am sort

19  of a loud guy, but for some reason, my mic keeps defaulting

20  back to its lower setting and I'll have to figure out how to

21  stop the default.

22          But can Your Honor hear me okay now?

23          THE COURT:  Yes.

24          MR. STEARN:  Again, my apologies, Your Honor.

25          So, and as before with the Rockford litigation and

1  the other ad hoc Acthar litigation, nothing has changed with

2  respect to the potential indemnification obligations that the

3  debtors have to ESI and to its affiliates.  I know the ad hoc

4  Acthar group wants to argue about whether ESI indemnification

5  claims supposedly were manufactured in some way and debate

6  the propriety of those claims under the contracts.

7         This isn't the time to do that and we don't need

8  to go down that rabbit hole.  ESI indemnification claims now

9  have been asserted in two proofs of claim.  They are

10  Claim 4197 against Mallinckrodt ARD and Claim 4150 against

11  Mallinckrodt PLC.  Those -- we included one of those proofs

12  of claim as an exhibit.

13         If I could ask Mr. Maddox to put up Debtors'

14  Exhibit 37.

15         Again, I know this isn't in for the truth; it's

16  just in to show you what plaintiffs --

17         MR. HAVILAND:  Your Honor, I would just renew my

18  objection.  I think Your Honor admitted the proof for the

19  fact of the proof that Mr. Stearn is now going to argue from

20  the proof.  He's arguing the evidence of the exhibit.

21         MR. STEARN:  I'm simply arguing what it is that

22  has been stated in the claim; a public document that speaks

23  for itself.  So, I'm not admitting it for its truth.  I

24  understand Mr. Haviland doesn't like the document, but that

25  doesn't mean (indiscernible).

1            MR. HAVILAND:  Your Honor, hearsay is hearsay.

2   It's got nothing to do whether I like or dislike it.

3            THE COURT:  You can argue it in your closing,

4   Mr. Haviland.

5            Go ahead, Mr. Stearn.

6            MR. STEARN:  Thank you, Your Honor.

7            So, you'll see by the little check mark in the

8   first page.  This is a claim against Mallinckrodt ARD.

9            And, Mr. Maddox, if you could flip ahead through

10  all of the boilerplate to the first page of the attachment.

11           And, by the way, Your Honor, this attachment, an

12  identical one was attached to the other proof of claim I

13  mentioned, the one that was filed against Mallinckrodt PLC,

14  which was Claim 45 (indiscernible) --

15           THE COURT:  You're fading out again, Mr. Stearn.

16           MR. STEARN:  I wish I could stop that from

17  happening.  At least I know how to fix it quickly.

18       (Pause)

19           MR. STEARN:  Your Honor, can you hear me better

20  now?

21           THE COURT:  Yes, thank you.

22           MR. STEARN:  Again, my ongoing apologies.

23           So, you'll see that this proof of claim on the

24  first page, was filed by (indiscernible), formerly known as

25  Express Scripts (indiscernible), Express Scripts, Inc.,

1 CuraScript, Priority Healthcare Corp., Priority Healthcare

2 Distribution, SD Specialty Distribution, Accredo Health, and

3 also United BioSource, know, it is filed on behalf of one of

4 the entities and Mr. Haviland (indiscernible), but

5 nonetheless, it's filed on behalf of a large number of ESI

6 entities and affiliates.

7 And if you look at, for example, page 3, and this

8 is simply what ESI is claiming, the indemnification that they

9 have been (indiscernible), they talk in paragraph 2 at the

10 top of page 3 about the debtors and the Express Scripts

11 entities being the subjects of multiple lawsuits held by

12 various entities, alleging the debtors were able to enhance

13 its monopoly power and charge supracompetitive prices for the

14 sale of Acthar by (indiscernible) sale, requiring certain

15 rights (indiscernible) competitor, and requiring that

16 prescriptions (indiscernible).

17 THE COURT:  When you start reading, Mr. Stearn,

18 that's when you tend to fade off and I didn't hear the last

19 of what you just read.

20 MR. STEARN:  I literally was just -- and Your

21 Honor can see it -- I was going through the summary that

22 exists in the first paragraph of page 3 and Your Honor can

23 see it and you don't need to hear my whiny voice say it, but

24 I'll finish with the note that at the end of paragraph 1 on

25 page 3, the Express Scripts entities have defended and intend

1  to continue defending themselves in these lawsuits by

2  challenging plaintiffs' abilities to hold the Express Scripts

3  entities liable for this alleged unilateral business conduct

4  of the debtors; in other words, they're going to blame the

5  debtors in the litigation.

6          And then you'll see, in connection with their

7  indemnification claim, the ESI entities expressly identify

8  each of the five ad hoc Acthar group litigations, plus the

9  MSP litigation as being the subject of their indemnification

10  (indiscernible); that's on pages 3 to 5.

11          And then I won't go into it, but then on pages 5

12  to 13, the ESI entities explain why it is they believe

13  they're entitled to indemnification.  Again, this is not the

14  time to litigate those indemnification claims, as Your Honor

15  previously has held.

16          Where we are is where we were back in November,

17  which is that prudence dictates that the debtors treat those

18  indemnification claims as real and (indiscernible).  And I

19  believe the ad hoc Acthar group argued -- well, it did argue

20  that it assumes that the reorganized debtors won't assume the

21  ESI indemnification obligations, although, frankly, that

22  misses the point, because the estate is going to have those

23  obligations, as we mentioned in our brief, regardless of

24  whether the obligations are assumed on a go-forward basis.

25          I'd also note, just parenthetically, with respect

1   to the status of the debtors' assumption (indiscernible) of

2   ESI contracts, regardless of whether anything expressly has

3   been (indiscernible) by the debtors, as noted in Article, I

4   think it's Roman numeral 5(a) of the plan, any executory

5   contracts that are not assumed as of the effective date are

6   deemed assumed.

7            The fact that no action has been taken so far, at

8   least not publicly, does not necessarily indicate anything

9   with respect to the ESI (indiscernible).

10           THE COURT:  You're fading out again, Mr. Stearn.

11           MR. STEARN:  I'm sorry, Your Honor.  I'll get as

12  close to the screen as I can, and I apologize to everyone who

13  has to view my face up this close.

14           Another argument that I believe the ad hoc Acthar

15  group made in one of its pleadings was that even if you

16  accept the ESI indemnification claims at face value, they're

17  not worth very much because ARD and PLC don't have much in

18  the way of assets.  But I do think we need to keep in mind

19  that some creditors are still seeking substantive

20  consolidation.  They are, frankly, apparently well-financed

21  and certainly well-represent creditors and we can't discount

22  the fact that that type of (indiscernible) could be

23  insolvent.

24           And as before, as I mentioned, ESI is still

25  blaming the debtors for any bad conduct.  So, we need to be

1  able to participate.  We're going to have to participate in

2  the litigations (indiscernible) against ESI.

3          Let's talk briefly about the securities

4  complaints, Your Honor.  Although the plaintiffs have changed

5  in terms of who is objecting to the Section 105 order -- last

6  time it was the (indiscernible) complaint in the order of the

7  trust -- this time it's the securities opt-out claimants and

8  the State of Rhode Island.

9          The complaint against Mallinckrodt PLC -- well,

10  let me start by talking about the securities opt-out issue.

11  That complaint is against Mallinckrodt PLC, Mr. Trudeau, in

12  his capacity as Mallinckrodt's CEO, president, and director,

13  and Mr. Harbaugh, in his capacity as Mallinckrodt's former

14  CFO, and it's all for purported securities law violations.

15          And the securities opt-out plaintiffs largely lump

16  all of the defendants, including the debtor, together.  And

17  let's just take a look at the securities opt-out plaintiffs'

18  complaint, which is Defendants' Exhibit 25.

19          Can Your Honor still hear me?

20          THE COURT:  Yes.

21          MR. STEARN:  Again, Your Honor, my ongoing

22  apologies.

23          MR. MADDOX:  Bob, can you repeat that number,

24  please.

25          MR. STEARN:  25.

1            MR. MADDOX:  Thank you.

2            Also, I believe somebody is on their way to help

3    you with your microphone.

4            MR. STEARN:  That's a good idea.  I can do it

5    once, but it just doesn't seem to stick.

6            Thank you for that.

7            Your Honor, let's just look at page 2 of this

8    complaint, the introduction.  I'm going to start -- thank

9    you -- I'm going to start halfway down the first paragraph.

10   Plaintiffs, through their undersigned attorneys, by way of

11   this complaint and jury demand bring this action against

12   Mallinckrodt and certain of its former and present officers,

13   Mark Trudeau and Matthew Harbaugh, have alleged the following

14   (indiscernible) other matters.

15           Plaintiffs' information and belief is based on

16   *inter alia* and investigation by its attorneys, its

17   investigation into some other things, and a review and

18   analysis of Mallinckrodt's filings with the SEC,

19   Mallinckrodt's press releases and public statements,

20   transcripts of Mallinckrodt's investment earnings goals,

21   media and analyst reports involving defendants, investor

22   presentations drafted by Mallinckrodt, pleadings in the Shenk

23   matter, and other publicly available documents and data

24   concerning Mallinckrodt.

25           So, it's clear right from the get-go in the

1   securities opt-out plaintiffs' action, that this matter,

2   although they have also named (indiscernible) Ds & Os as

3   defendants, really centers on Mallinckrodt.  And, Your Honor,

4   this complaint has four causes of action, only one of which

5   is brought solely against the individual defendants; that's

6   Count 2.

7              Mr. Maddox, can you press forward to page 62.

8              So, Your Honor, here you see the single count that

9   is brought solely against the individual defendants.  The

10  other counts are brought against all defendants

11  (indiscernible).

12             Mr. Maddox, would you go to the next page.  I'd

13  like to focus on paragraph 237.

14             Defendants Trudeau and Harbaugh culpably

15  participated in Mallinckrodt's violation of the securities

16  laws; in other words, Your Honor, the purported legal conduct

17  of the individual defendants is based on demonstrating that

18  the corporate defendant Mallinckrodt violated the securities

19  (indiscernible).  Not only is there an intertwining of the

20  allegations against Mallinckrodt --

21             Move forward, please.

22             -- but we know from prior injunction proceedings,

23  as Your Honor has already ruled, the securities actions

24  (indiscernible) -- excuse me -- the securities actions --

25             THE COURT:  Mr. Stearn, you're completely breaking

1  up now.

2            And I think we need to -- let's take a recess for

3  a short period of time to see if you can get your microphone

4  fixed, because I want to make sure that the record is clear

5  here.

6            MR. STEARN:  My sincere apologies, Your Honor.

7            THE COURT:  Mr. Edelman, I see you raised your

8  hand.  Do you have a question or something?

9        (No verbal response)

10           THE COURT:  No?  Okay.

11           Let's go ahead and recess for -- let's take a

12 recess until 4:10 and we'll see if Mr. Stearn can get his

13 microphone fixed.

14           In the meantime, can you stop sharing your screen,

15 Mr. Maddox.  Thank you.

16       (Recess taken at 3:55 p.m.)

17       (Proceedings resumed at 4:10 p.m.)

18           THE COURT:  Okay.  We are back on the record.

19           Mr. Stearn, hopefully, we've got your mic issues

20 fixed.

21           MR. STEARN:  Well, I think what I did, Your

22 Honor -- first of all, can you hear me okay?

23           THE COURT:  Yes.

24           MR. STEARN:  What I did was the great punt; I

25 simply grabbed a different device.

1           THE COURT:  Okay.

2           MR. STEARN:  And hopefully, I can figure out the

3    problems with my laptop some other day.

4           THE COURT:  All right.

5           MR. STEARN:  And thank you very much for the

6    break, Your Honor.  At least it allowed us to get past that

7    issue, and, again, my apologies to Your Honor and everyone on

8    this Zoom call for delaying these proceedings due to

9    technological problems.

10          So, Your Honor, I will try to pick up where I

11   think I left off and I will try to move things along a little

12   bit.  I think I'll do a little bit less screen share and just

13   refer to some documents and tell you what I think is

14   important, as opposed to taking the time to put them up on

15   the screen, given the hour.

16          So, we had just looked at a provision of the

17   securities opt-out plaintiffs' complaint to see the

18   allegation that Defendants Trudeau and Harbaugh culpably

19   participated in Mallinckrodt's violation of Section 10(b) and

20   Rule 10(b)(5), which of course in order to prove that

21   individual claim against Trudeau and Harbaugh, is going to

22   require a demonstration that the company, itself, violated

23   the securities laws.

24          So, not only is there an intertwining of the

25   allegations against Mallinckrodt and its officers, but as we

1  know from prior proceedings, and as Your Honor already ruled,

2  allowing the securities actions to proceed against the Ds and

3  the Os would trigger Mallinckrodt's indemnification

4  obligations and we have those exhibits as Debtors'

5  Exhibits 27 through 29, and it concerns D&O policy proceeds.

6          We have some examples of the D&O policies at

7  Debtors' Exhibits 30 and 31.

8          And let me just talk briefly about the Rhode

9  Island action, Your Honor.  That is Debtors' Exhibit 43, but

10 I'm not going to ask Mr. Maddox if he needs the time to put

11 it up on the screen.  This complaint nominally sues only

12 Mr. Trudeau in his capacity as Mallinckrodt's CEO, president,

13 and director.  But as Rhode Island notes in the complaint

14 itself, it's all footnote 7 on page 3, Rhode Island also had

15 sued Mallinckrodt, along with other opioid manufacturers and

16 distributors.

17         And just to give you a flavor for the types of

18 allegations that we have against Mr. Trudeau in this

19 complaint, paragraph 22 of Debtors' Exhibit 43 says,

20 Mallinckrodt can only act through its agent and its senior

21 leadership both, sets the company's strategic direction and

22 sets the tone of the (indiscernible) reorganization

23 concerning compliance with applicable laws and regulations.

24         Accordingly, Rhode Island brings this action to

25 hold Trudeau accountable; in other words, clearly, he's being

1   sued as an agent of Mallinckrodt, the debtor.  And when you

2   look at, for example, even the objection filed by the State

3   of Rhode Island, they say in paragraph 1, Rhode Island filed

4   the above action to address Mark Trudeau's role in the

5   deceptive marketing and oversupply of opioids into Rhode

6   Island through Mallinckrodt PLC and subsidiaries of the

7   company.  And the objection and the brief make similar

8   allegations.

9           So, not only do you, once again, have the

10  intertwining of the allegations, but even though there's two

11  separate actions that the State of Rhode Island has brought

12  against Rhode Island [sic] and Mr. Trudeau, I think it would

13  be reasonable to assume that discovery that the State of

14  Rhode Island obtained from one action is going to be used in

15  the other action and vice-versa, given the relationship of

16  the defendants.  And, of course, with Mr. Trudeau, even in a

17  single action, he had the same indemnification and D&O policy

18  insurance issues.

19          So, Your Honor, with these objectors' claims, we

20  have the same concerns about record taint and *collateral*

21  *estoppel*, given the intertwining of the claims against the

22  debtors, as well as the economic (indiscernible) of the

23  debtors, given the indemnification obligations and the use of

24  D&O policy proceeds that led the Court to issue the Section

25  105 injunction the first time.

1       And, Your Honor, I know that the ad hoc Acthar

2   group claims not to know what record taint is, but, frankly,

3   that it even exists, and disputes that *collateral estoppel*

4   could occur here, but the Court already has ruled against the

5   ad hoc Acthar group (indiscernible) its law of the case.

6       And the potential for *collateral estoppel* are well

7   recognized in Delaware in the Third Circuit as the reason to

8   enjoin litigation against the debtors' co-defendants.  Let me

9   just briefly cover what Judge Shannon said in <u>Takata</u>, where

10  he said, and this is the August 16th, 2017, ruling that we

11  cite in both, our opening brief and our reply brief at

12  page 26 and 27 of the transcript:

13      "I do find that the debtors have carried their

14  burden that they will suffer irreparable harm in the absence

15  of an injunction.  For the reasons that I stated a few

16  moments ago, I find that the task of monitoring hundreds of

17  lawsuits and the prospect of what's been collectively

18  described as record taint, including *collateral estoppel*, are

19  material risks for these debtors.

20      The objectors contend, as a matter of law, that

21  there is no risk of *collateral estoppel* if the debtors choose

22  to sit out the various lawsuits moving forward.

23      I understand that argument, as a technical

24  application of the definition of *collateral estoppel*, but as

25  a practical matter, I do not accept that these suits can

1  proceed with essential feature of every suit for the

2  unintended explosion of the debtors' airbag system without

3  material effect on the debtors down the line."

4         Your Honor, substitute the words "Acthar pricing"

5  for "airbag system" and you'll understand why we're also

6  concerned about *collateral estoppel*, record taint, and

7  similar issues, if any litigations go forward against ESI.

8         And, Your Honor, as a practical matter, regardless

9  of whether clever lawyers can come up with a technical way

10 around the *collateral estoppel* argument in another lawsuit,

11 how do the debtors avoid the disastrous impact on our

12 business of a judgment that ESI conspired with us and that

13 Acthar pricing was too high?

14        That would be an unavoidable problem for us, Your

15 Honor.

16        Another example of a Third Circuit and District of

17 Delaware case, and I'll just give you the cite, because I

18 won't take the time to read the quote, is In re W.R. Grace,

19 386 B.R. 17 (Bankr. D. Del. 2008), and at pages 34 to 35, not

20 only did the Bankruptcy Court essentially uphold and defend

21 the notions of record taint and *collateral estoppel*, but it

22 cited a Third Circuit opinion doing so, and even saying that

23 in this context, those concepts are effectively

24 (indiscernible) for purposes of determining whether third-

25 party litigation should proceed and where that would affect

1  the debtor.

2          And, Your Honor, when I think of record taint, I

3  think of the cautionary tale about someone who's not being in

4  the room when you're interests are at stake.  And I remember

5  the old quote, "If you're not at the table, you're probably

6  on the menu."

7          And in this circumstance, if the debtors are not

8  in the room when that litigation is occurring against ESI,

9  everyone is going to point their finger to the debtor.  So,

10  the debtors would need to participate in the litigation, in

11  all the litigation against their co-defendants to ensure that

12  the debtors' interests are protected, including the

13  development of the evidence because the debtor would need to

14  be there to cross-examine the witnesses giving that evidence

15  to ensure that the debtors' interest were protected.

16          Your Honor, it's also not hard to imagine any

17  finding that ESI engaged in a conspiracy with Mallinckrodt

18  being used in some future litigation against Mallinckrodt,

19  such as, for example, a future litigation that Mr. Haviland

20  has already said he's going to bring.  In Adversary Docket

21  Item 227, which was the ad hoc Acthar group's opposition to

22  the debtors' motion to expedite, the ad hoc Acthar group said

23  the following on page 4, quote:

24          "The ad hoc Acthar group will be pursuing post-

25  confirmation claims against Express Scripts and the debtors

1  once a single sale of Acthar occurs post-confirmation."

2          So, what are the debtors to do in a case like that

3  where they're sued jointly with ESI and perhaps at some point

4  in the future, because the ad hoc Acthar group is able to

5  proceed similarly against ESI and the debtors didn't

6  participate and there was some judgment against ESI, that it

7  was a conspirator and that the price of Acthar was too high.

8  What do the debtors do if the ad hoc Acthar group goes

9  (indiscernible) in the substantive case also involving the

10  debtors?

11          Obviously, it's a problem for us and that's why we

12  would ask to participate in any lawsuit against ESI that the

13  Court, that would go forward (indiscernible).

14          So, Your Honor, given these risks, we

15  (indiscernible), and it's also not hard to imagine any

16  judgment against the debtors' directors and officers in

17  securities litigation being used against the debtors,

18  themselves, when we're talking about the same statements

19  being made, essentially, by the debtors and the Ds & Os.  So,

20  Your Honor, in short, standing alone, without considering any

21  other tests for whether or not injunction is at issue, the

22  debtors' identity of interests with its co-defendants justify

23  continuing the injunctive relief.

24          The other element that could be evaluated under

25  the unusual circumstances test is adverse impact, which also

1   independently provides a basis for continuing the injunctive

2   relief.  It is clear, Your Honor, that the debtors are at a

3   critical stage of their reorganization.  They need to focus

4   on two things:  getting across the finish line on

5   reorganization while simultaneously running their business,

6   which is always a difficult task when in bankruptcy.

7           Your Honor, if we let slip, the dogs of litigation

8   war now, the debtors will experience the parade of horribles

9   that Your Honor issued the prior injunctions to protect them

10  from.  We would have to participate in time-consuming cost

11  and discovery or other pretrial (indiscernible) such as

12  motions to dismiss, which would affect both, the debtors and

13  their senior management.

14          You would also remember from the last hearing

15  that, for example, if the ad hoc Acthar group cases proceed,

16  the debtors are going to be burdened by discovery, even as

17  third parties in that litigation, whether they're actual

18  parties or not.  Even absent discovery obligations, the

19  debtors would need to participate on them, the debtors would

20  need to participate in order to protect themselves from

21  record taint and *collateral estoppel*.  And all of this

22  interferes with the debtors' ability to carry out jobs one

23  and two right now, not necessarily in this order, which is to

24  run the business and to reorganize the business.

25          And, Your Honor, that's just the tip of the

1 iceberg, because, remember, there are other plaintiffs out

2 there who voluntarily are holding their litigation in

3 abeyance to give the debtors a chance to reorganize.  If

4 these three objectors are permitted to pursue their

5 litigation, others may jump in as well, for fear of being

6 disadvantaged because these objectors are getting out ahead

7 of them.  And the race to the courthouse, which the automatic

8 stay was designed to prevent, would be on, and the debtors

9 would be faced with the same litigation barrage that they

10 entered bankruptcy (indiscernible).

11        Your Honor, the debtors are on the precipice of

12 successfully implementing a complex reorganization that

13 required, literally, (indiscernible) both, pre- and post-

14 petition, as well as the good faith participation of

15 literally thousands of stakeholders.  We can't jeopardize all

16 of that now to satisfy the parochial interests of three

17 objectors.

18        Lastly, Your Honor, let me just touch upon the

19 injunction standards, and those standards as they are applied

20 from the bankruptcy context of a Section 105 motion seeking

21 to enjoin litigation against the debtors' co-defendants.

22        As I mentioned previously, Your Honor, the same

23 evidence that supports identity of interest and adverse

24 impact under the unusual circumstances test, also

25 demonstrates that the debtors (indiscernible) or meet the

1   four-part injunction test.  On likelihood of success, as the

2   Court is aware, the issue here is whether the debtors are

3   likely to successfully reorganize.  That's generally measured

4   by whether the debtors are on track and have met their

5   challenges so far.  None of the objectors seriously disputes

6   the debtors' likelihood of success here and the evidence is

7   overwhelming that the debtors are on track and have met their

8   challenges.  Your Honor has heard about all of the progress

9   that the debtors have made so far in their bankruptcy.

10          In terms of irreparable harm to the debtors, this

11  Court already has concluded that allowing litigation against

12  the debtors' co-defendants (indiscernible) would irreparably

13  harm the debtor and the material facts underlying that

14  decision haven't changed.  Again, they include things like

15  the consequences of discovery and participating in other

16  pretrial proceedings, including the substantial expense and

17  (indiscernible) of the debtors and their senior officers,

18  risks of record taint and *collateral estoppel*, requiring the

19  debtors to participate in the litigation as if they were

20  (indiscernible), indemnification claims and insurance

21  (indiscernible), damage to the business, including loss of

22  customers and employees -- we talked about that at the last

23  hearing -- and the opportunity for indirect (indiscernible)

24  reorganization, which we talked about a lot at the last

25  hearing, as well.

1        Your Honor, to avoid irreparable harm, the debtors

2   need to extend the 105 orders for 90 days as we've requested.

3   I recognize that we're scheduled to be in confirmation

4   proceedings in about a month.  It's uncertain whether the

5   debtors will complete their confirmation proceedings at that

6   time, certainly, although, we believe we're on track to

7   commence the confirmation proceedings and hopefully complete

8   them in September.  As the Court is aware, there is a lot on

9   our plate in September.  We've heard about some of the

10  summary judgment proceedings that recently were scheduled,

11  for example.  We remain hopeful that we can wrap up in

12  September, but there's no guarantee that we can do so.

13       And even post-confirmation, Your Honor, there are

14  important (indiscernible) critical conditions to the

15  effective date that must be addressed and the senior

16  management will play an important role in satisfying.  I was

17  going to put some documents up on the screen.  I'll save us

18  some time, Your Honor, and I'll just tell you where you can

19  find some of the evidence concerning that.  For example, in

20  our plan, which is Debtors' Exhibit 45, on pages 110 to 112,

21  you're going to see something like 19 conditions through

22  effective date that the debtors need to satisfy.  They

23  include things like, you know, completing certain

24  transactions, completing proceedings in Canada and Ireland.

25  In fact, we require approval of, I think it's the Irish High

1  Court in order to complete our complex reorganization

2  proceedings and the debtors need to be able to focus on at

3  least getting those processes started in order to get

4  ourselves out of bankruptcy, and we really need management's

5  full time and attention devoted to that.

6          I'll also note, Your Honor, that pages 86 to 87 of

7  our disclosure statement, which is the Debtors' Exhibit 44,

8  discussing some of what needs to be done in Ireland.  And

9  these really are significant issues, Your Honor, because

10 remember, at the end of the day, the debtors' parent company

11 is incorporated in Ireland.  So, there is important work to

12 do, Your Honor, even after confirmation, if this

13 reorganization is going to be successful.

14         Contrast the irreparable harm that the debtors

15 would experience if the injunctions were not extended to the

16 absence of irreparable harm to the objectors if the

17 injunctions were granted.  The primary harm, Your Honor, that

18 the objectors complain of is delay, but as a matter of law,

19 delay, alone, is not irreparable harm.  We've cited to cases

20 to that in our brief.

21         And as a factual matter, Your Honor, we're only

22 talking about, at this time, an incremental 90-day delay and

23 no objector has demonstrated that it would be legally harmed

24 in a cognizable way, or a meaningful way, over 90 days.  And

25 even if that delay was harmful in some way, it certainly

1    would not outweigh the irreparable harm to the debtors if the

2    injunctions were to terminate.

3            Briefly on Rhode Island, Your Honor, as we discuss

4    in our reply brief, if the plan is confirmed, Rhode Island's

5    claim against Mr. Trudeau will be released and enjoined and

6    Rhode Island will have the right to recover, as provided in

7    the plan.  Rhode Island will not be entitled to recover

8    against the debtors' D&O policies, which are being assumed

9    under the plan and will continue to protect the debtors and

10   their directors and officers.

11           As far as the securities opt-out plaintiffs, Your

12   Honor, they complain that we're not treating their litigation

13   like the Shenk litigation in which the debtors

14   (indiscernible).  Of course, Shenk was filed, it's actually

15   almost four years before the bankruptcy, and that case had

16   proceeded fairly significantly and that the parties were

17   actually on the cusp of mediation on the petition date.  The

18   debtors simply decided to let that process play out and they

19   were successful.

20           And although the securities opt-out plaintiffs'

21   complaint is based on the same alleged wrongdoing as Shenk, I

22   think it's important to keep in mind that the securities opt-

23   out plaintiffs sat on their hands for almost four years and

24   then filed the complaint a week before bankruptcy.  There've

25   been literally no proceedings in the securities opt-out

1  plaintiffs' action and they would likely -- excuse me -- and

2  no valid basis to compare that action to the Shenk action.

3        And, Your Honor, given the objections to the Shenk

4  settlement, if nothing happened to the D&O policy proceeds

5  that the securities opt-out plaintiffs want to race to the

6  courthouse to try to get.  And even if we settled with the

7  securities opt-out plaintiffs, they would likely draw similar

8  (indiscernible).

9        So, at the end of the day, Your Honor, I think the

10  securities opt-out plaintiffs are just upset that we won't

11  settle with them now.  Their objection, effectively, was a

12  leverage play by (indiscernible) who invested in the

13  Mallinckrodt entities and is trying to force Mallinckrodt

14  into a settlement agreement, but that is precisely why we

15  have Section 105 injunction, so the debtors can focus on

16  their reorganization and their business and not have to deal

17  with aggressive (indiscernible).

18        Your Honor, let me turn finally to the final

19  consideration for a preliminary injunction.  In the

20  bankruptcy context, as you know, this means promoting a

21  successful reorganization.  This one, Your Honor, is,

22  frankly, a no-brainer.  Continuing the breathing spell

23  afforded to the debtors by the Section 105 order would afford

24  them a meaningful opportunity to complete their

25  reorganization.  That for many months, the complex

1  negotiations, both pre- and post-petition, this plan, which

2  is on the precipice of confirmation proceedings, provides a

3  framework for the implementation of the global restructuring

4  for the benefit of the debtors and (indiscernible).

5          The debtors will emerge a stronger company in a

6  better position to serve their patients with critical care

7  and necessary drugs.  Equally, if not more importantly, Your

8  Honor, it does something else, and I don't mean to be overly

9  dramatic here, but I think this is important.  We probably

10  all know someone who has been affected in some way by the

11  opioid epidemic.  A friend of mine lost his son.

12          The debtors' plan provides for a comprehensive

13  opioid settlement of well over a billion dollars which would

14  be devoted to the abatement of the opioid epidemic.  Your

15  Honor, we can't risk squandering this once-in-a-lifetime

16  opportunity because three objectors are (indiscernible) and

17  getting in the way.  So, for these reasons, Your Honor, the

18  debtors respectfully request that Your Honor extends the 105

19  order for 90 days.

20          Does the Court have any questions for me?

21          THE COURT:  No, thank you, Mr. Stearn.

22          But just so you know, we did pick you up on the

23  recording, but for about half of the time it sounded like you

24  were talking to me from inside a closet.  So, you're still

25  having some audio issues.  I'm not sure what it is, but maybe

1   you can address it.

2           MR. STEARN:  My apologies, Your Honor.  I will.

3           THE COURT:  All right.  Let me hear from Mr.

4   Haviland.  Go ahead.

5           MR. HAVILAND:  Thank you, Your Honor.

6           I'm going to try to go in reverse order to

7   Mr. Stearn's commentary.  Let me start with the headline.

8   This reorganization shouldn't finance one problem and set of

9   victims on the backs of another.

10          What Mr. Stearn just said is very stark.  They

11  want to take money out of the company to give to the opioid

12  victims on the back of the Acthar Plaintiffs.  Our clients

13  are no less victims by this company.  The City of Rockford,

14  you've heard from them throughout the course of these

15  proceedings, but that's exactly what you've heard in the last

16  two weeks, Judge, is they want to finance the opioid epidemic

17  on the backs of the Acthar Plaintiffs.

18          And they want to do it in a very interesting way.

19  They want a permanent injunction, and I listened really

20  intently to what Mr. Stearn said, and when he says things

21  like, it's a no-brainer, public interest is a no-brainer

22  here, well, I would have expected the District of Delaware or

23  the Third Circuit to have said, yeah, it's a no-brainer,

24  public interest, sure, you might as well just grant an

25  injunction the day it's asked for and don't pretend it's a

1  preliminary injunction, because that's what's going on here.

2  They're pretending this is preliminary injunction.

3          It's not.  It's a final injunction to take us well

4  past plan approval so that the Acthar Plaintiffs never have

5  their day in court, never have a jury trial, never get to try

6  the case against Express Scripts, the largest PBM in America.

7  And I can't help but look to the connectivity very little,

8  though, of Purdue, the owners of the company, who are putting

9  up four and a half billion dollars in exchange for a release.

10          But this company wants a release of the largest

11  PBM in America.  And Mr. Welch said, well, we don't care what

12  Express Scripts is doing with other drugs and other drug

13  companies, but we care what they're doing with us.  And all

14  we're asking to do is finally let us go, let us go against

15  Express Scripts.

16          You've heard time and, again, that there are no

17  merits to these claims.  Then, where is the fear?  Where is

18  the risk?  Where is the harm?

19          And it is a no-brainer that the public interest is

20  at stake, because the public has an interest in making sure

21  the companies doing bad things don't skirt the law through

22  the bankruptcy process and that's what's going on here.

23  These nondebtor entities -- and that's all we're talking

24  about, Your Honor, nondebtors -- from the first point we

25  appeared before the Court with Express Scripts, they want to

1 shut it down and carry it well through plan confirmation.

2 And we're finally, after all these months, seeing it for what

3 it is.  We're hearing it for what they really, really want:

4 a permanent injunction.  It's not 90 days.  It's going to

5 take you past plan confirmation.

6           Now, let me start with the back, up:  harm to the

7 ad hoc Acthar group, another no-brainer to Mr. Stearn.  Well,

8 that permanent injunction is going to ensure that we never

9 get that jury trial.  And I listened very intently last week

10 to Your Honor's comments about if you want a jury trial, the

11 Court is inclined to send us back to the District for that

12 trial.  If you want a claim against Express Scripts, the

13 Court is not inclined to rule upon that in any context.

14           And I believe the Court when it says that, because

15 I believe that the Court is looking at this issue as a

16 bankruptcy, involving Mallinckrodt and the debtors and not

17 giving a free ride to large corporations, who are fully

18 capable of funding a settlement in litigation, if and when we

19 get to that.

20           And the sweeping nature of these arguments, Judge,

21 they just gloss over things.  You didn't hear once today

22 about (indiscernible) claim against Dr. Tomlin (phonetic) in

23 Tennessee, not once.  Are they just going to sweep that under

24 the rug?  Doctors are going to get released?  Patients can't

25 sue their doctors?

1          Because that's where this is all headed.  It's all

2    getting kicked down the road to another day that will never

3    be, because it's all going to be part of plan confirmation.

4    It will all be cleaned up and everything will be equitably

5    moot.

6          Well, the Eighth Circuit recently said there's

7    nothing equitable about equitable mootness and they scrubbing

8    it from the lexicon.  But that's what's going on here.  We're

9    being pushed another four weeks to a point in time so they

10   can then argue to the Third Circuit -- and I love that we

11   have an appellate judge in a dissent saying:  enough.  This

12   is a judge-made doctrine, equitable mootness, and it's not

13   equitable.

14         This is not equitable, what's going on here.  We

15   are not looking to pursue these debtors.  We are respecting

16   the stay and the process to go forward to plan confirmation,

17   but to argue that somehow there's irreparable harm by

18   allowing my clients who contracted with the largest PBM in

19   America to have their day in court, I shudder to think where

20   the jurisprudence is heading if that's what bankruptcy is

21   becoming.  That you can release large corporate actors like

22   that.  But that's what you're being asked to do, Judge.

23         And when counsel says that it's debris, it's

24   clearly wrong that we say, Your Honor, enjoined us on

25   November 23rd.  Debris?  We walked out of court that day

1  knowing that Your Honor had enjoined the Express Scripts

2  case.

3          I shudder to think -- Mr. Maddox is smiling -- if

4  we had gone to Rockford on November 24th and argued for a

5  deposition what might have happened.  That injunction was

6  effective the day Your Honor came back from the hearings and

7  announced your decision.

8          And the reason why the debtors moved to expedite

9  to August 19th is because they can count.  August 19th was

10 270 days.  The injunction expired of its own volition on

11 midnight, and that's not me saying it, Judge; it's the Third

12 Circuit Court of Appeals in the Victory v Berks County case,

13 it said, "An injunction that has expired is a nullity."

14         Now, they want to argue to you about a bridge

15 order and how the bridge somehow gave them a chance to just

16 kick it to this hearing.  Well, they asked Your Honor to set

17 it for the 19th.  Your Honor did not do that; in fact, in

18 your order, which is at Docket 228, Your Honor ruled that the

19 terms and conditions of the 105 order at 170 will remain

20 effective until the Court's ruling on the motion.  Not 180.

21 Not 180.

22         So, now they want you to say, well, Judge, you

23 must have been wrong about that, because you clearly intended

24 to include 182.

25         Well, you didn't say that, and that's where I get

1  lost when the debtors say things like, It's clear.  It's

2  clear.

3         I had a mentor a long time ago say, when a lawyer

4  is starting to argue clear, then nothing is clear, because

5  they don't have the facts and they don't have the law, so

6  they're just going to argue about we all should know that

7  something is clear.

8         And like the matter of subject-matter

9  jurisdiction, they just gloss over that, and they point out

10 that Your Honor found that back in November, but then they

11 say, Judge, don't even think about it today.  Well, the

12 appellate precedents say the Court must always look at its

13 jurisdiction, must always satisfy itself that it has

14 jurisdiction.

15        And now you're being asked to either extend -- and

16 we say it's expired, and the Third Circuit says it's a

17 nullity -- or put in place a new injunction, or worse, expand

18 it to Mr. Welch there, and who the heck knows else, and I

19 don't even know, Judge, because I can't see that in their

20 papers.  Nowhere in their papers do they mention Mr. Welch

21 and say, Judge, we want you to enjoin claims against

22 Mr. Welch.

23        So, now I have concern about due process because

24 they don't even tell the Court and the opposing parties, this

25 is what we really want.  We really want you to not just

1   extend but expand.

2         And they haven't given you a record, and Mr. Welch

3   freely admitted he's not irreparably harmed.  He may be

4   upset, but he's not irreparably harmed by having to sit for

5   that case, which has been voluntarily stayed.  And they

6   didn't point that out for you, Judge, and we've agreed to

7   stay until plan confirmation.

8         But see, facts don't matter if they're not

9   convenient.  They don't tell you things like that.  That's

10  why they didn't tell you, Mr. Maddox didn't tell you that

11  Mr. Trudeau was dismissed by agreement.

12        So, subject-matter jurisdiction is really

13  important, because it starts the Court in understanding

14  whether it can do -- not whether it wants to do -- but

15  whether it can do what they ask you to do.  And the factors

16  that Mr. Stearn pointed out to you:  discovery, record taint,

17  damage to the business, and disruption, well, let me go

18  through those.

19        Discovery, we heard from Mr. Welch, more than five

20  million pages have been produced in the Rockford litigation.

21  We heard that untold, I believe it's millions more, have been

22  produced through the bankruptcy.  He couldn't tell you what

23  more needed to be produced, but that's their burden.  I have

24  to tell you that the questions that were outstanding back in

25  October remain outstanding and haven't been satisfied.  They

1    haven't told you that that's an open question.  It's pure

2    conjecture.

3              But this is not the time for that.  It's a time

4    for facts and evidence.  And all they had was one witness who

5    couldn't answer that question.  The same with the

6    depositions.  The first time I met Your Honor, we came

7    expecting we were going to get a deposition of Mr. Trudeau

8    and Mr. O'Neill.  You entered an agreed-upon stay of that

9    issue until we came up with the injunction phase.

10             But they've been deposed.  So, they didn't point

11   out to you, well, they're going to need to be deposed again

12   or that we didn't satisfy their obligations in any respect.

13   Again, it's another thing you're going to be asked to assume

14   and it's constantly assume -- assume, Judge, that what you

15   heard in November remains true.  Well, 275 days, 275 days

16   have passed and all of that record was relevant back then.

17             When the Appellate Court tells us a breathing

18   spell is necessary, these debtors have inhaled and exhaled

19   time and, again, through the holidays.  They've gotten

20   through all the issues they needed to with plan.  The plan is

21   out there.

22             And now we're at the final phase and now they say

23   to you, well, we need a further breathing spell.  Well,

24   that's not a breathing spell; they want to get to plan

25   confirmation.  And there's no case that says that, that they

1  can just leapfrog from a preliminary injunction to another

2  preliminary injunction to get to some point as plan

3  confirmation.

4         And that's why I asked Mr. Welch, why 90 days?  If

5  Your Honor were to confirm in September, why not end it then?

6  What's the harm then -- and I'll get to that in a moment.

7  The pre-petition claims that are a part of a pod plan, that

8  now, apparently, the UCC signed off on -- so, we'll get to

9  harm in a moment, but why so much time?

10         And that's where they're really running afoul of

11  the jurisprudence.  There's no case they've cited to you, no

12  binding precedents that says, you can just arbitrarily and

13  capriciously say 90 days because they asked for 90 days.

14  It's not narrowly tailored to what they say they need; it is

15  just kick it down to Thanksgiving.  That's what it's done.

16  And it says to my clients, no, you can wait until

17  Thanksgiving until you get your chance to tell the PBM that

18  you contracted with, you've done wrong and we want to hold

19  you accountable.

20         And there'll be another day whether or not they

21  can get that released through the Bankruptcy Court.  But when

22  the debtor says that my clients might sue down the road,

23  we'll only do that if Express Scripts doesn't do what it's

24  supposed to do, okay.  That's the issue.  They want to

25  conjecture whether or not Express Scripts is going to

1  continue to do things wrong by my clients.

2          Well, I guess they want to get a future release.

3  That would be an interesting one.  We don't even have a

4  future claims representative on Acthar as you do on opioids,

5  but they want to give a release in perpetuity that Express

6  Scripts will never be sued by anybody with whom they

7  contract.  They will become the largest PBM in the America,

8  Judge, I can guarantee you, Judge.  There will be no other

9  PBM because they will swallow up the market.  I don't think

10 Your Honor is going to do that, but that's what they're

11 asking you to do by taking you down this pathway.

12         There was very little time spent on the actual

13 factors for a preliminary injunction and I want to just go

14 through them because I've already touched upon the, why does

15 it matter under a pot plan, which I'm glad Judge Sontchi was

16 able to finish his work and get that piece done -- this is

17 news to us -- but the bottom line is that Express Scripts is

18 an unsecured creditor and I want to get to the indemnity in a

19 moment, whether or not it is even a claim.  But if it is a

20 claim, it's an unsecured claim no different than any other.

21 It goes in the pot.

22         And I have to ask the question, why doesn't

23 Express Scripts want that claim liquidated now so it can

24 participate in the claim now?

25         You put it to past Thanksgiving, and then it's

1  going to go to sometime in 2022.  They may not have the

2  ability to participate in that process.  So, you have to ask

3  yourself, why isn't Express Scripts asking to get their day

4  in court?

5              Because there's something else going on here.

6  They're trying to get something else.  It has nothing to do

7  with this indemnity, which I'm going to go to right now,

8  because the argument is that nothing has changed.  That's

9  important because those contracts that came into

10 bankruptcy -- and we didn't fully understand going into the

11 first hearing what they were saying.  Now we do, because now

12 we have a full record.  Ms. Marks (phonetic) gave Your Honor

13 the argument from before by United BioSource's general

14 counsel -- and it's in the record, Judge; it was sent to you,

15 it's part of the court file in this adversary -- UBC is a

16 different corporation than Express Scripts.  Their general

17 counsel said, we want indemnity in the summer of 2020 and

18 Mallinckrodt said, No, you're out of time.  You have to

19 timely come under the contract within 20 days and you didn't

20 do it because you knew about these lawsuits three or four

21 years ago.

22             So, you have to ask yourself, when is the debtor

23 going to actually make that argument in this court?

24             Well, see, they don't want to do that, Judge,

25 because they want to continue in the bubble fiction that this

1  is a serious and substantial issue.  Well, not if they

2  actually say what Ms. Doll (phonetic) said in the responsive

3  letter:  you're out of time.  You have no indemnity claim.

4           They can't manufacture a claim.  And Your Honor

5  asked in November, well, maybe now is not the time for that.

6           Well, when is?  I have to ask an answer to my

7  question, when is?  When are we going to find out whether or

8  not there's a legitimate claim?

9           They haven't assumed these indemnity contracts.

10  That indemnity list goes on and on and on, Judge.  It's

11  Exhibit B.  It's huge.  The plan is huge.  You've got all

12  sorts of executory contracts in there, but why not these,

13  these important ones, these so-critical ones?  They're not

14  listed in there.

15           And we're going to wait until some other day or --

16  I don't even know how this one plays out -- we're going to

17  assume -- this is what page 97 says:

18           "If it hasn't been expressly assumed or rejected,

19  you can assume that it's going to be accepted."

20           Well, if that applies to Express Scripts

21  contracts, what other contracts are in there?  How are the

22  creditors going to be able to evaluate whether to vote, let

23  alone, object or appear at a plan confirmation hearing,

24  because we're just going to assume that all these large

25  contracts -- and there was a point in time when you heard the

1  Express Scripts contract was a ten-billion-dollar claim --

2  we're going to assume that that is going to show up at some

3  point during the plan.  You're just going to assume that it

4  gets accepted and then it gets litigated past plan

5  confirmation.

6          I don't know how they can do that, Judge.  How

7  they could assume that these executory contracts with large

8  institutional players don't have to be clearly told the

9  creditors' group, we're assuming or rejecting that.

10         But that's the argument.  You're being asked to

11 assume there's a real and substantial issue where they

12 haven't even assumed the contract.  So, the facts have

13 changed.  I disagree with Mr. Stearn; they have changed.

14         Back in November, the debtors didn't take a

15 position, but now they have.  They have a plan.  They have an

16 Exhibit B, which has been amended, at least once, to list

17 contracts and creditors are monitoring that, seeing whether

18 or not the contracts that they're interested in are being

19 assumed.  So, Your Honor shouldn't assume that.

20         This is the time for evidence.  This motion to

21 extend is effectively a permanent injunction.  We didn't have

22 a TRO.  We had a preliminary injunction that has expired and

23 now you're being asked to make it permanent through plan

24 confirmation.  You're being effectively asked to not have the

25 Acthar claimants have their claims against Express Scripts,

1  Dr. Tomlin or other doctors, any other nondebtor companies,

2  any third-party company.  The scope of this is untethered.

3  You're not being asked to give a narrowly tailored injunction

4  or even extended.  You've been given a record today and asked

5  without the support of the factors to just give a blanket

6  injunction against anything having to do with Acthar.  That's

7  the request today.

8          Now, the papers, and starting with their motion

9  at 224 in the brief, says nothing about that, which is why I

10  complain about due process, Judge.  We didn't hear until

11  today that the debtors wanted to expand the injunction, not

12  extend it.  They relied upon their brief -- and I'm at page 3

13  of Docket 224 -- their brief, the details of the factual

14  legal basis from the prior proceedings, including Mr. Welch's

15  prior declaration and evidence today.

16          And the evidence today is the prior record,

17  nothing new, and Mr. Welch's testimony.  And I hope Your

18  Honor listened carefully, and I know you did.  You didn't

19  hear irreparable harm from Mr. Welch.  You heard, well, it

20  would be inconvenient, it would be distracting.

21          But you haven't heard a clear record that all that

22  has gone on since November, all the documents, all the

23  depositions, all the attorneys' fees.  Your Honor asked

24  Mr. Harris when he said it was take $7 million in attorneys'

25  fees to litigate the Acthar cases, you said, well, at some

1  point, the debtors are going to have to spend those funds.

2         Judge, the burn rate in the debtors' papers, they

3  said in the footnote, the burn rate is a million dollars a

4  day.  Thirty dollars [sic] a month they're spending.  Seven

5  million dollars, which pales in comparison, and that's if

6  they had to fully participate in the underlying Acthar

7  litigations.

8         We're not suggesting that.  If they had to

9  participate in discovery at all because they wanted to,

10  that's a fraction of $7 million.  And Express Scripts, by the

11  way, has been participating, has been showing up at hearings,

12  has been asking questions.  We've been objecting because

13  they're effectively trying to litigate here.

14         All we're asking Your Honor to do, and I said this

15  for Mr. Shaffer, Express Scripts' counsel last week, agree

16  with us and let Judge Johnson hear your case.  You'll

17  liquidate your claim and you'll be able to make a claim

18  against the unsecured creditors pool; otherwise, you're

19  pushing that down the road, unless there is something else

20  going on here.

21         I want to go through those agreements because they

22  weren't covered and you can't just assume the United

23  Biosource contract, Judge, is from a company that was sold by

24  Express Scripts.  They have not filed a proof of claim.  Yes,

25  they wrote a letter in the summer of 2020, but they haven't

1  filed a proof of claim and that is where bankruptcy does

2  matter.  If you don't file a proof of claim -- and, Your

3  Honor, I've been on the tail end of that I am not so happy to

4  say.  You don't file or you don't do it right you don't have

5  a claim.

6         UBC has no claim.  They haven't made a claim for

7  indemnity.  Apart from whether or not they actually had a

8  claim in the first instance which counsel for Mallinckrodt

9  said in the letter at Docket 2009 let's get to the issue of

10 the entity that's -- I don't know why they are in there, but

11 I asked Mr. Welch about this entity and there's two contracts

12 in there, Judge, in the record.  It's a company called, I'm

13 going to read it to you again, Express Scripts Specialty

14 Distribution Services, Inc.  The Acthar plaintiffs didn't sue

15 that company.

16        I have listened to Your Honor many, many times how

17 you ruled that the corporate form matters and then it needs

18 to be honored.  And in the corpus of that agreement from 2014

19 it says that Express Scripts Specialty Distribution Services,

20 Inc., is a Delaware corporation.  Now it says nothing about

21 Express Scripts, the PVM.  It says that company is a Delaware

22 corporation, happened to sign a contract, October 1st, 2014

23 with Questcor.

24        Now the debtors just want you to take Questcor

25 into the debtor organization.  They haven't explained that

1  part of it, but I'm focused on the fact that there is a

2  company here that hasn't been sued and has no claim for

3  indemnity because, by the way, Express Scripts Specialty

4  Distribution Services, Inc., did not file a proof of claim

5  and finally none of the letters that you have seen, including

6  the Express Scripts letter, talks about that entity and that

7  entity is right.  So there is no indemnity to claim or right

8  that comes out of that contract to inform the court about

9  this situation.

10         We didn't fully understand it back in November.

11 We do now and we can make that definitive point.  Accredo,

12 the third company, we haven't heard that it's been assumed.

13 That's a 2018 contract.  Judge, I pointed out the agedness of

14 these contracts.  You got a contract from 2007 the

15 distribution agreement, a contract from 2014 the UBC

16 contract, and an Accredo contract from 2018.  These debtors

17 want you to assume that a sophisticated multi-national

18 corporation just lets these old contracts roll over.

19         Now maybe they have been amended, maybe there have

20 been changes, but you don't have that record in front of you,

21 Judge.  You can't just, again, assume that a 2007 contract

22 which is 14 years ago is still operative and is going to be

23 assumed by the debtors at some point in time beyond August

24 25th, but you are being asked to suspend your disbelief and

25

1  say, yeah, okay, I'm going to buy that but the 2007 contract

2  is still operative today.

3          That is your record today, Judge.  Back in

4  November you had a more robust record.  You had three days of

5  hearings.  Today you have had about four hours.  The debtors

6  chose to rely upon Mr. Welch with all his knowledge and lack

7  of knowledge.  I respect Mr. Welch, he testifies a lot for

8  the debtors.  Today he just doesn't have personal knowledge

9  about these issues and that is the debtors' issue, not ours.

10  It is their burden to establish the elements of a preliminary

11  injunction.  They haven't done it.  They haven't demonstrated

12  irreparable harm by allowing these claims against Express

13  Scripts to go forward.

14          Judge, I'm going to finish because we're almost at

15  five o'clock.  Military reference has come up a lot and I was

16  thinking about this last night.  You know, this is like the

17  debtors' Dunkirk.  You know, all the creditors though are

18  sitting in Normandy Beach, you know, waiting for that boat.

19  Your Honor said one time to Mr. Ciardi, I think it was, that,

20  you know, why are we leading the charge.  Well, we're not,

21  we're not.

22          You see today the State of Rhode Island, one of

23  the sovereign states objecting.  You see security equity

24  interests objecting.  The debtors like to sometimes say that

25  it's nefarious that by our representing our clients we're

1  evil because we just don't agree with them and their agenda,

2  but we're not leading the charge; we're on the beach.  Rhode

3  Island is getting on a boat to get off Normandy.  The

4  securities plaintiffs are getting on a boat.  Not just that,

5  Judge, just in the last 48 hours the three largest

6  wholesalers who distribute this company's products, McKesson,

7  AmerisourceBergen, and Cardinal have all objected to these

8  debtors and their treatment of their executory contracts.

9          In particular, Judge, and I want to point out the

10  docket references for you, Docket 3951 is McKesson, 3959 is

11  AmerisourceBergen, and 3948 is Cardinal.  Those big

12  institutional distributors of drugs, CuraScript is a

13  distributor of Acthar, have said we don't agree with these

14  debtors and that blanket language you have been cited to

15  where you are being asked to assume that they're going to

16  accept the contracts and they particularly object to

17  indemnity because they fear these debtors are going to try to

18  reform the contract and take away their indemnity rights.

19          Now I know that those companies are putting up $26

20  billion to settle opioids.  Well I got to think they want to

21  go after Mallinckrodt for a piece of that, but the debtors,

22  they fear, are going to take away that indemnity right.  So

23  this indemnity issue, Judge, is a serious one. It is not to

24  be lightly treated.  You just say, oh, okay, there is going

25  to be indemnity and there's a unity of interest.

1          So if you are being asked to agree that there is a

2    unity of interest between Mallinckrodt and the distributor of

3    Acthar, CuraScript, that 2007 agreement, if they're so

4    intertwined because they distribute the product then why

5    doesn't it apply to McKesson, Cardinal and AmerisourceBergen;

6    they have the same language.  I think Mr. Welch testified at

7    one point we use the same language, it's an indemnity

8    provision that Mallinckrodt has always had.  So that issue is

9    coming before the court, but just because those entities

10   agreed at one point to an injunction and a stay doesn't mean

11   they are agreeing with the debtors on what they're doing

12   right now.  That is why evidence matters.

13         In final, Judge, you know it just seems to me that

14   we have been singled out here for this type of treatment.

15   The debtors want to have their cake and eat it too with all

16   of their institutional players, but here they are not seeking

17   a release against McKesson, Cardinal, and AmerisourceBergen,

18   but they are for Express Scripts.

19         So the original predicate that we're leading the

20   charge, no, we have a lot of company right now in terms of

21   our concern about these debtors and their contract

22   relationships and how the indemnity issue plays out.  In

23   hindsight it sounds like, you know, that comment is more

24   hyperbole because we were always in the same positon as other

25   creditors, we just didn't know it at the time.

1          The final point I want to make, Judge, is there

2    was some discussion about whether this hearing should take

3    place today versus September 14th.  We have scheduled for

4    Your Honor a motion to lift the injunction.  Now the debtors

5    didn't want to agree to maintain the status quo, our argument

6    not their argument, and so we're having the hearing today.

7    We did not agree to 90 days.  We tried to get the debtors to

8    agree to just September 14th so Your Honor could have the

9    chance to rule on a full record that we would present, not

10   just listening to what they are arguing today with a witness

11   that was deposed 48 hours ago.

12          So if you are going to do anything, Judge, and I

13   don't agree that extending, adding to, expanding, or imposing

14   an injunction is appropriate.  I would ask you to deny it

15   today. If you're going to do anything in terms of extension

16   we ask you not to extend it past September 14th or you will

17   have, effectively, prejudged papers that are not before you.

18   I am not suggesting, Judge, but we have papers that haven't

19   been answered to.  There has been no hearing.  There has been

20   no evidence on our positions in our motion to lift.  That

21   hearing is September 14th.  Granting 90 days, effectively,

22   prejudges that and takes us past plan confirmation.

23          I am on the front side of five o'clock.  I

24   appreciate Your Honor's indulgence.  Thank you.

25          THE COURT:  Thank you, Mr. Haviland.

1              The securities opt-out plaintiffs wish to make an

2  argument?  Mr. Sena?

3              MR. SENA:  Yes, Your Honor. I am cognizant that it

4  is just about to be five o'clock.  Can I take a two minute

5  bathroom break and then come back or do you just want me to

6  go forward?  My argument will be brief.

7              THE COURT:  How long is your argument going to be?

8              MR. SENA:  Under ten minutes.

9              THE COURT:  Can you wait the ten minutes and --

10             MR. SENA:  Sure --

11             THE COURT:  Okay --

12             MR. SENA:  -- sure.

13             THE COURT:  -- let's do that.

14             MR. SENA:  Yes, Your Honor.  Okay.

15             Your Honor, we represent the securities opt-out

16 plaintiffs, which consists of the four funds listed in our

17 objection.  Our clients invest on behalf of university

18 endowments, charitable foundations, pensions, and

19 individuals.  They have suffered significant investment

20 losses, nearly $50 million as a result of misstatements made

21 by the debtors, as well as misstatements made by one current

22 and one former officer and director, Mark Trudeau and Matthew

23 Harbaugh.  Our litigation arises out of substantially similar

24 conduct as alleged in the securities class action, which

25 today has been referred to as the Shank action.

1        To give the Court some background, the securities

2   opt-out plaintiffs voluntarily agreed to the preliminary

3   injunction for the initial period of 270 days and we believe

4   we are reasonable in doing this.  We realized that the

5   debtors needed to focus on reorganization and that they were

6   attempting to resolve the class action.  The purpose for the

7   stay has now been served.  The debtors have resolved the

8   class action and they've gotten their house in order and they

9   are nearing confirmation.  Meanwhile, our case has not

10  progressed at all.

11       We reached out to the D&O defendants about

12  mediation before the same mediator as the Shank class action,

13  they didn't respond.  We reached out to the debtors about the

14  remaining insurance policy proceeds for the 2016-2017

15  policies.  They said they would get back to us, they did not.

16  In fact, this past week, they said they would provide us

17  information and then they retracted that statement.  So we

18  never have gotten the information we requested.

19       The debtors now say in reply they have no interest

20  in resolving our claims because we aren't far enough along;

21  we're not past the motion to dismiss, we're not at the

22  document discovery like the Shank class action was.  Well, if

23  that's the case, then we absolutely have to litigate our

24  action and we will be prejudiced if we don't.

25       It is the debtors' burden to show irreparable harm

1   to the estates, they have not done that.  There is no burden

2   during the 90-day period for which they seek an extension.

3   To illustrate this, I think it would be helpful to walk

4   through the Court a brief time.

5          So we effected service on the D&O defendants in

6   November of 2020.  If the stay is lifted, the D&O defendants

7   would have about three weeks to respond either by a motion to

8   dismiss or an answer.  We likely would agree to a briefing

9   schedule that would give them more time to respond.  But, in

10  any event, there will be no discovery until the motion to

11  dismiss is decided under the PSLRA stay.

12         So, again, there's simply no burden, no

13  interference to the debtors during the 90-day period; there

14  will be no discovery.  If there's a motion to dismiss, that

15  will be an exercise for the litigation counsel and, as Mr.

16  Welch testified, not an exercised for Mr. Trudeau, the

17  current CEO.  All we're trying to do here is just get the

18  ball rolling.

19         Second, we seek to recover against only one

20  current officer for actions that he took at the company

21  prepetition.  The debtors do not even mention Harbaugh, the

22  former officer, in reply.  At the hearing today, Mr. Welch

23  conceded that he has no involvement in the reorganization.

24  So there's absolutely no distraction there.

25         Third, we reasonably expect that any recovery can

1   be covered by the D&O insurance proceeds.  These proceeds are

2   not part of the estate.  In fact, that's what the debtors

3   told this Court in seeking approval of the Shank settlement.

4   They said that the settlement maximizes the available

5   insurance coverage and it will not impact the estate.

6         Now, in closing, Mr. Stearn argued this action

7   centers around Mallinckrodt, PLC, but the truth of the matter

8   is the debtors were never served.  The claims against

9   Mallinckrodt, PLC here will be discharged post-bankruptcy.

10  So the relevant question here is what will the debtors have

11  to do during the 90 days?  And the answer, as I've explained,

12  is nothing.

13        The debtors also mention the Strogough (ph)

14  securities class action -- actually, I don't know if there's

15  a class action suit -- securities action, that was an

16  entirely different case.  The motion to dismiss in that

17  action was already filed; it was for the initial period of

18  270 days, so there was a good chance there would be

19  discovery.  That's not the case here.  The debtors have

20  gotten their house in order, they're nearing confirmation,

21  there's no burden to the debtors' estate.

22        Mr. Stearn also said we're just trying to extract

23  leverage, that is absolutely not true.  We have an obligation

24  to our clients to move this case forward.  To move this case

25  forward means either to resolve it or litigate it.  The

1  debtors have no interest in resolving it, so our option is we

2  have to litigate it.  The problem is the debtors are

3  preventing both options.  They're saying they don't want to

4  resolve it and they're saying we can't litigate it because

5  they want to extend the stay, so -- and this is what really

6  prejudices us.

7            So, in conclusion, we respectfully request that

8  the Court deny the motion.  In the alternative, if the Court

9  is inclined to grant the motion, we request that the

10 extension be limited to the earlier of the effective date of

11 the debtors' plan or November 22nd, 2021.  Thank you.

12           THE COURT:  Thank you, Mr. Sena.

13           Mr. Bograd?

14           MR. BOGRAD:  Thank you, Your Honor.  I'll try to

15 brief, but let me start by simply endorsing the arguments of

16 my colleagues so that I don't need to repeat anything that

17 they said.

18           Rhode Island is the only state that pursued an

19 independent action against an officer or director of

20 Mallinckrodt, in addition to its action against the company

21 itself.  We took the deposition of Mr. Trudeau in connection

22 with the ongoing litigation against the company prior to the

23 initiation of the bankruptcy proceedings and developed the

24 evidence that we believe supports an independent claim

25 against Trudeau himself.  We seek in the action against Mr.

1  Trudeau damages that are not sought in the state action which

2  seeks abatement relief, as provided for in the plan.

3          Unlike the other actions at issue in the

4  supplemental injunction, the current plan proposes not a

5  resolution of Rhode Island's claim against Mr. Trudeau, but

6  its elimination.

7          I understand that Your Honor has said, and I

8  agree, that this is not the appropriate time to discuss the

9  scope of the release.  We will be preparing an objection to

10 the plan, objecting to the release of the state's claims

11 against Mr. Trudeau, if the plan continues in its current

12 form.  Nevertheless, because of the availability of the D&O

13 policy, which will be foreclosed to us once the plan -- if

14 the plan is approved in its current -- confirmed in its

15 current form, we think it is necessary to proceed now with

16 the opportunity to pursue remedies against Mr. Trudeau

17 himself.  There's no justification for the stay given the

18 availability of the D&O policies.  Any burden on the debtor

19 in the next 90 days would be minimal and, for that reason, we

20 contend that the injunction should not be extended.

21          Thank you.

22          THE COURT:  Thank you, Mr. Bograd.

23          Mr. Stearn, any brief reply?

24          MR. STEARN:  Yes, Your Honor.  Thank you.  I will

25 try to keep them brief, but let me ask the critical question,

1    can you hear me?

2              THE COURT:  Yes, so far.

3              MR. STEARN:  Thank you.  Thank you, Your Honor.

4              THE COURT:  Hopefully, you don't step into the

5    closet again.

6              MR. STEARN:  I'll try to stay out of it.

7              Your Honor, I think I'll respond mostly to Mr.

8    Haviland.  I think what we've already said applies to Rhode

9    Island and the securities opt-out plaintiffs and I don't need

10   to repeat it.  I just have basically a half a dozen bullet

11   points.

12             First, I think what you heard from Mr. Haviland is

13   mostly a confirmation objection about how the debtors' assets

14   are being allocated, and there will be a time for that, but

15   today is really not that day.  I don't understand his

16   argument about us seeking a permanent injunction on its face,

17   we've asked for a 90-day injunction.  In connection with

18   that, I don't understand this notion that we're releasing

19   ESI.  My knowledge is, and I believe this is accurate,

20   there's no release of ESI under the plan, so I don't really

21   know what he's talking about.

22             He's further speculating as to why we filed on --

23   why we asked for a hearing on August 19th because we

24   supposedly believe that the injunction ran out on August

25   20th, that's just wrong.  We were just trying to get before

1  Your Honor, frankly, as soon as we thought was reasonable to

2  get in front of you, and we still rely on the arguments that

3  we made in the briefing as to why an order entered on

4  December 4 doesn't expire until August 31.

5         Let me clarify the record on one thing.  I want to

6  help Mr. Haviland with his concern about the LEHB complaint,

7  that's Debtors' Exhibit 48.  That was the action that the --

8  one of the ad hoc -- well, Law Enforcement Health Benefits

9  filed in May in the Northern District of Illinois, frankly,

10  in violation of the automatic stay.  We're not seeking today

11  to extend the scope of the injunction beyond any actions that

12  were covered in November; we're only seeking to extend its

13  length.  So the injunction that's at issue today does not

14  involve the LEHB action, there's no due process issue here

15  for Mr. Haviland.

16         As I said, LEHB filed that complaint in violation

17  of the automatic stay.  Ultimately, they dismissed

18  voluntarily the debtors and I believe some other defendants,

19  and that action right now is voluntarily being held in

20  abeyance.  If the plaintiffs would seek to start that action

21  up, we'll be back in front of you seeking to actually extend

22  the scope of the 105 injunction, but that's not the state of

23  the affairs right now.  So that's why we weren't seeking to

24  expand the injunction's scope, just its length.

25         Just a couple of points about ESI indemnification.

1   First, I'm not really sure why Mr. Haviland was talking about

2   the contract, including provider.  The reason that the claims

3   against ESI and the debtors are intertwined is because of the

4   nature of the claim that the ad hoc Acthar group has brought,

5   in other words, the conspiracy claim.  It may relate in some

6   way to the contract, but it doesn't arise out of

7   (indiscernible) contract, it's based on the allegation, and

8   that's why these arguments about McKesson things like that

9   just don't matter.

10          The last two things I'll say quickly, Your Honor,

11   is the notion that there's no evidence before you is

12   difficult to rectify with the facts, which is that we had two

13   days of evidence in November that are before you today, as

14   well as a half a day of evidence again today.

15          And the last thing I'll say is we need 90 days.

16   We don't need some shortened period, we need 90 days because

17   there's a lot to do, even assuming we get the confirmation

18   hearing in September and even assuming we get the

19   confirmation order in September, both of which assumptions

20   may not -- may or may not be reasonable under the

21   circumstances.  We would ask the Court to extend the

22   injunction for 90 days.

23          Thank you, Your Honor.

24          THE COURT:  All right.  Thank you, Mr. Stearn.

25   And you did step back into the closet while you were

1  speaking.  Maybe next --

2           MR. STEARN:  Sorry.

3           THE COURT:  -- for future hearings, there is a way

4  to dial in by telephone as well as being on Zoom.  So you

5  could be on Zoom for the video and on telephone for the

6  audio, that might be -- for whatever reason, you're having

7  some problems with your computer equipment, apparently.

8           MR. STEARN:  Again, my apologies.

9           THE COURT:  All right.  Mr. Edelman has been

10  patiently waiting.  I'm going to take this matter under

11  advisement.  I'm going to come back tomorrow morning and give

12  you my ruling on that.

13           Mr. Edelman, I'll give you the option, we can

14  either go forward now or I'll hear your motion tomorrow

15  morning after I rule on the extension of the injunction.

16           You're muted, Mr. Edelman.

17       (Pause)

18           MR. EDELMAN:  Am I un-muted now?

19           THE COURT:  You are.  Thank you.

20           MR. EDELMAN:  All right.  Because I take care of

21  grandchildren on a fairly frequently basis, it's difficult

22  for me to find time, I found it today.  So, if it's okay, I

23  would like to go ahead.

24           THE COURT:  All right.  Let me just check with my

25  courtroom staff.  Are you okay?  Okay.

1          We're good.  You can go ahead, Mr. Edelman.

2          MR. EDELMAN:  All right.  I've just got some

3  prepared remarks because I'm -- you know, as everybody knows,

4  I'm not a lawyer, I'm just a note shareholder.  So I'll just

5  read through my remarks and then, if you have any questions,

6  I'd be more than happy to answer what I can.  But, first of

7  all, thank you, Your Honor, for allowing me the opportunity

8  to speak to my motion.

9          Before the Court today is my motion as a party in

10  interest for an order establishing a bar date for opioid

11  claimants in Classes 8 through, basically, 9, through 9H, in

12  the Mallinckrodt bankruptcy case.  Three parties have

13  submitted objections to this motion, the debtors, the MSGEG

14  Group, and the Future Claims Representative Group.  There are

15  only -- these are the only three parties that have objected

16  to the motion.  In response -- oh, sorry, in my response to

17  the objections for those, of those three parties, I attempted

18  to summarize for the Court the essence of their objections.

19          First, the debtors' objections.  The movant is

20  requesting to substitute his judgment on how to administer

21  these cases (indiscernible) of the debtors.  There's no

22  requirement under the bankruptcy code or bankruptcy rules

23  that a bankruptcy court must establish a bar date for all

24  claims.  The movant claims that under Section 501 of the

25  bankruptcy code creditors, including mass tort claimants,

1  must file a proof of claim, but that argument is directly

2  contradicted by the explicit language of Section 501(a),

3  which states, "A creditor may file a proof of claim."  The

4  movant's argument that an opioid bar date must be set ignores

5  commonplace practice in complex Chapter 11 cases.  It is

6  common for bar date orders to exempt many categories of

7  claims from its scope, such as funded debt claims,

8  intercompany claims, and others.

9          The debtor-in-possession is charged with

10  administering its Chapter 11 case.  Accordingly, the debtor

11  is entitled to seek a bar date or not, but (indiscernible)

12  reorganization.  The proposed framework in the plan is

13  perfectly consistent with achieving the key goal of the bar

14  date enabling the making of claims against the bankruptcy

15  estate.

16          While arguing that a bar date for opioid claims

17  must be set, the movant cites no authority for that

18  proposition.  The movant notes the uncontroversial point that

19  the bankruptcy code authorizes bankruptcy courts to set a bar

20  date by which claimants must file their proof of claim, but

21  that is not the same as a bar date for all claims being

22  mandated.

23          Second, the multi-state government entities

24  group's objection.  The Court has discretion to decline to

25  set a bar date for opioid claimants.  The bar date for opioid

1  claims should not be set here because it would serve no

2  purpose.  The movant has no relevant due process rights here.

3         In the event the Court sets a bar date for opioid

4  claims, it must nonetheless deny the movant's request for a

5  modified proof of claim form.

6         Third are the future claimants' representative

7  objections:  an opioid-related bar date is not necessary to

8  resolve these cases; with plan confirmation on the horizon,

9  Mr. Edelman's bar date moving is untimely; an opioid-related

10  bar date would result in unwarranted cost, burden, and delay.

11         In support of their objections, the parties have

12  referenced many cases, but the vast majority of those are

13  asbestos cases.  Were this an asbestos case, those cases

14  would be helpful in determining the issue of the motion;

15  unfortunately, they are not.  For that reason, both cases

16  should be ignored.

17         The Bankruptcy Reform Act of 1994 amended the code

18  to allow companies with significant asbestos liabilities to

19  seek bankruptcy protection for future claims.  Those

20  amendments were referenced to -- or were referenced often as

21  the Manville amendments.  The 1994 amendments were modeled

22  after the Manville Trust.  They established a way for the

23  companies to settle future claims through the creation of

24  special bankruptcy trusts.

25         In 2006, Congress introduced the Fairness in

1   Asbestos Injury Resolution Act, which was the most

2   comprehensive effort to address compensation for asbestos

3   claimants.  Federal lawmakers have introduced multiple

4   versions of the bill in the U.S. House and the Senate during

5   the past decade, but the FAIR Act never became law.

6          There is no amendment to the bankruptcy code to

7   accommodate opioid claimants.  One should not consider

8   asbestos and opioid cases as being the same or even similar.

9   Disease may not manifest itself for years or even decades

10  from exposure to asbestos.  It has been suggested that

11  addiction can occur from the very first exposure to an opioid

12  produce to a more subtle or gradual development of addiction.

13  This is a significant difference.

14         Additionally, it seems that most opioid claims are

15  based on the concept of public nuisance, as opposed to

16  personal injury claims in the asbestos cases.

17         I submit that it is not necessary for the Court to

18  rely on what was done in the past in asbestos cases to answer

19  the question before it today.  Simply put, does the Federal

20  Rules of Bankruptcy Practice 3003(c)(3) mean what the plan

21  language says?  Analysis of this motion begins here.  Federal

22  Bankruptcy P. 3003(c)(3) states that "The Court shall fix and

23  for cause shown may extend the time within which proofs of

24  claim or interest may be filed."  That's re Energy Future

25  Holdings court.

1    So Rule 3003 says shall and may extend, it does

2 not say that establishment of a bar date is discretionary all

3 together.

4    What the debtors' objection states in B is there's

5 no requirement under the bankruptcy code or bankruptcy rules

6 that a bankruptcy court must establish a bar date for all

7 claims.  And that's at paragraph 6.  In looking at the

8 debtors' objections, this objection may be partially

9 explained by the confusing nature of the word "shall," which

10 has also been said to mean "may, will, or must."

11    Legal reference books like the Civil Rules of

12 Civil Procedure no longer use the word "shall."  Even the

13 Supreme Court ruled that when the word "shall" appears in

14 statutes it means "may."

15    The Federal Registry in its document drafting

16 legal documents, principles of clear writing, recognized this

17 issue and has instructed those who draft legal documents to

18 use "must" instead of "shall."  It was said that "shall"

19 imposes an obligation to act, but may be confused with

20 prediction of future actions, whereas must imposes

21 obligation, indicates a necessity to act.

22    Because of this legal confusion, federal

23 departments do not have the time or resources to go through

24 all their documents, regulations, and statutes to replace all

25 the "shalls" with "must."  And, under the Federal Rules of

1 Bankruptcy, the existing ones as of today, "shall" is written

2 in those rules 143 times.  So any attempt to, I guess, say

3 that "shall" didn't have the meaning that it used to have

4 would affect 143 cases -- or 143 points in those rules.

5           According to (indiscernible) dictionary it asks

6 what is "shall."  It was used in statutes and similar

7 instruments, the word is generally imperative or mandatory.

8 Further, Black's Law Dictionary 4th Edition states that

9 "shall" is used in statutes, contracts, or the like, this

10 word is generally imperative or mandatory.

11          In the 9th Edition of Black's Law Dictionary,

12 "shall" is defined as a duty to, more broadly, is required

13 to.  The requester shall send notice, notice shall be sent.

14 This is the mandatory sense the drafters typically intend and

15 that courts typically uphold.

16          There has been no amendments to Rule 3003 of the

17 Federal Rules of Bankruptcy Procedure since December 1st,

18 2008, which predates the Federal Registry Drafting Legal

19 Documents Guide, published August 22, 2016.  The Court should

20 rely on the practices used in drafting legal documents at the

21 time Rule 3003 was drafted rather than seek to question the

22 meaning of "shall" in today's terms and to change "shall" to

23 "must" for clarity of actions to be taken.

24          If the Court concurs with the objectors that the

25 word "shall" means "may," then this motion will fail.

1 Failure of the motion will not, however, prove of much

2 benefit to the objectors.  They may have avoided having a bar

3 date set, but that alone does not mean that they have found a

4 way to pay the opioid claimants as the claims process is a

5 different and distinct process than the bar date.  The bar

6 date simply provides notice to all creditors of the

7 requirement to file claims by a certain date in order to

8 participate in voting and to receive any distributions from

9 the estate.

10        The debtors state at paragraph 7 of their

11 objections that the movant claims that under Section 501 of

12 the bankruptcy code creditors, including mass tort claimants,

13 must file proofs of claim, but that argument was directly

14 contradicted by the explicit language of 501(a), which states

15 "a creditor may file a proof of claim."

16        So U.S.C. Code 11, U.S. Code, states that 501(a),

17 "A creditor or an indenture trustee may file a proof of

18 claim, an equity security holder may file a proof of

19 interest."

20        The plain language of 501 supports the objections

21 raised by the motion.  Taken as written, it is an option for

22 a creditor to file a proof of claim.  Some creditors may feel

23 that their claim is too small to warrant the time and effort

24 to do so; other creditors may find that their claims are

25 listed accurately on the debtors' schedules, both in terms of

1 classification and amount.  It is true then that the

2 creditors may file a proof of claim, the question then -- the

3 question that then must be answered is what happens if the

4 creditor does not file a proof of claim.

5          The objectors would lead the Court to believe that

6 if the creditors filed no proof of claims.  The debtors,

7 acting alone, or the debtor in consultation or negotiations

8 with the creditors and other parties in interest, but not all

9 the parties in interest, can create a unique class of

10 creditors they can compensate from the assets of estate as

11 they feel free to without being subject to any oversight by

12 the other creditors or other parties in interest.

13          Here, the parties refer to the restructuring

14 support agreement as a legal vehicle to accomplish what the

15 opioid claimants -- or accomplish for the opioid claimants

16 what they would otherwise hope to accomplish by filing proofs

17 of claim.  If this is good, fair, and equitable for the

18 opioid claimants, surely it should also be good, fair, and

19 equitable for the Acthar and third party payers or -- yeah,

20 third party claimant -- payers claimants as well.

21          As a hypothetical, if this plan fails and a new

22 plan is proposed by another party that swaps the Acthar

23 claims by establishing some trust for those claims and moves

24 the opioid claims to a general pool offered for the unsecured

25 creditors, then the opioid claimants would be bound to not

1   object to that arrangement.  That should be the result.

2           Oversight of claims is provided for 11 U.S.C.

3   502(a), which states, "The claim or interest which is filed

4   under 501 of this title is deemed allowed unless a party in

5   interest, including a creditor of a general partner in a

6   partnership that is a debtor in the case under Chapter 7 of

7   this title objects."  There's nothing in the code that

8   provides any oversight through a restructuring support

9   agreement that excluded any parties in those negotiations,

10  which amounts to the sidestepping of 11 U.S. Code 502(a).

11          Further, 5-0 -- sorry -- further, Rule 3002 of the

12  bankruptcy code is crystal clear:  (a), "Necessity for

13  Filing.  A secured creditor, unsecured creditor, or equity

14  security holder must file a proof of claim or interest for

15  the claim or interest to be allowed, except as provided by

16  Rules 1019(3), 3003, 3004, and 3005," none of which are

17  applicable here.  "A lien that secures a claim against the

18  debtor is not void due only to the failure of any entity to

19  file a proof of claim."

20          In this case, the creditors are shown on Schedule

21  (indiscernible) as non-priority and contingent.  It is not

22  even clear from the debtors' schedules that all of these

23  creditors are even on the schedules.

24          Further, Rule 3003 is the hangman to the arguments

25  of the debtors and the objectors.  Rule 3003(c)(2) is

1  unequivocal:  "Who must file" a claim.  Any creditor whose

2  claim or interest is not scheduled as contingent shall file a

3  proof of claim, or interest within the time prescribed by

4  Section (c)(3).  The time for filing the court shall fix.

5       Under this rule, "Any creditor who fails to do so

6  shall not be treated as a creditor with respect to such claim

7  for the purposes of voting and distribution."

8       The notes of the advisory committee on rules -- on

9  the rules in 1993 further states, subdivision (c), "This

10  subdivision permits in paragraph 1 the filing of a proof of

11  claim, but does not make it mandatory.

12       "Paragraph (2) requires, as does the Code, filing

13  when a claim is scheduled as disputed, contingent, or

14  unliquidated as to amount.  It is the creditor's

15  responsibility to determine if the claim is accurately

16  listed.

17       "Notice of the provision of this rule is provided

18  for in Official Form No. 16, the order for the meeting of

19  creditors.  In an appropriate case, the court may order

20  creditors whose claims are scheduled as disputed, contingent,

21  or unliquidated be notified of that fact that that procedure

22  is left to the discretion of the court."

23       The Department of Justice Civil Resource Manual

24  provides for the guidance on this matter here in Part 64.

25  "Creditors' claims in bankruptcy proceedings -- the debtor-

1   creditor relationship in bankruptcy -- allowance and payment

2   of claims; (a), Necessity of Filing.  (1) General rule,

3   filing is required.  The only claims allowed to share in the

4   bankruptcy estate are those for which proofs have been

5   filed."  And that's Wilson v. Allegheny.  "When in doubt,

6   file proof of claim."

7          "Whether or not a proof of claim is filed, filing

8   is required only to permit creditor's participation in the

9   case," and that is Grynberg v. United States.

10          Two, set by courts in Chapter 9 and 11.  "When to

11  file a proof of claim in a bankruptcy case.  (a) Bar date.

12  The bar date establishes the date by which claims must be

13  filed against the estate.  A bar order serves the important

14  purpose of enabling a party to the bankruptcy case to

15  identify with reasonable promptness the identity of those

16  making claims against the bankruptcy estate and the general

17  amount of the claims, a necessary step in achieving the goal

18  of a successful reorganization.  Thus, a bar order does not

19  function merely as a procedural ground gauntlet, but as an

20  integral part of the reorganization process."

21          And there they quote First Fidelity Bank v.

22  Hooker.

23          If the Court denies the motion to set a bar date

24  for the opioid claimants, either because the debtors have not

25  requested one or their objections overcome this motion, then

1  the Court should also clarify what the language of 3003(c)(2)

2  means in the context of this case.  Will the Court hold that

3  "any creditor who fails to file a proof of claim shall not be

4  treated as a creditor with respect to such claim for the

5  purposes of voting and distribution."

6          To avoid being locked out of voting and

7  distribution, creditors may invoke their rights under U.S.C.

8  Code 501(a) to ensure their claims are entitled to

9  recognition under Rule 3003(c)(1), while also putting their

10  claims to review under 11 U.S.C. Code 502(a).

11          Then there is this informal proof of claim.  "A

12  failure to comply with the bankruptcy code's claim filing

13  requirements is not necessarily the death knell for a

14  misguided or inattentive creditor.  The bankruptcy court may

15  allow a Chapter 11 claim when a disallowance of the claim

16  would produce an unfair result through no fault of the

17  creditor.  Allowance of such claim upon the manifestation of

18  the intent to hold the estate liable through the debt has

19  come to be known as an informal proof of claim.  The informal

20  proof of claim must be in writing and must be a demand by the

21  creditor on the estate.  It must evidence an issue, evidence

22  an intent to hold the creditor liable.  The claim must be

23  filed with the bankruptcy court and allowance of the claim

24  must be equitable under the facts of the case."

25          "Whether the writing must be filed with the court

1   is subject to controversy.  An informal letter to the debtor

2   trustee was sufficient for informal proof of claim and

3   review.  So, to constitute an informal claim, there must be a

4   writing which makes a demand on the estate and/or expresses

5   an intent to hold the estate liable for the debt."  In re

6   Cole bankruptcy, Southern District of New York, 1995.  "An

7   informal proof of claim requires a timely written assertion

8   or pleading which apprises the court of the existence,

9   nature, and amount of the claims."

10           Rule 3021, "Distribution Under the Plan."  Federal

11   Rules of Bankruptcy Procedure -- the Federal Rules of

12   Bankruptcy Procedure, the 2021 edition provides, "Except as

13   provided in Rule 3020(e), after a plan is confirmed,

14   distribution shall be made to creditors whose claims have

15   been allowed to interest holders whose interests have not

16   been disallowed and to indenture trustees who have filed

17   claims under Rule 3003(c)(5) that have been allowed."

18           The opioid litigation has been going on for well

19   over five years and, if Congress wanted to create special

20   rules and modify the bankruptcy code to accommodate the

21   issues that were likely to arise from the litigation and

22   resulting bankruptcies, they could have done so.  As they

23   have not, the Court is left only with what is in the

24   bankruptcy code and the Federal Rules of Bankruptcy

25   Procedure.

1          Without a bar date, the outer limits of the claims

2   against the debtor will forever be unknown in terms of the

3   breadth and scope of the claims, as well as the claimed

4   amounts.  Workarounds using a trust to avoid filing proofs of

5   claim against the debtor and its claim that claims will be

6   against the trust and not the debtor, and subjecting those

7   claims to the scrutiny of parties without subjecting -- sorry

8   -- and not the debtor, and subjecting those claims to the

9   scrutiny of (indiscernible) and the court is a novel solution

10  to what should not be a problem.

11         If the debtor follows the bankruptcy code, the

12  Federal Rules of Bankruptcy Procedures, and past precedent of

13  cited asbestos cases, it should support the establishment of

14  opioid claims bar date.

15         As noted in my response to the objections, the

16  only other two opioid bankruptcy cases filed to date, Purdue

17  Pharma and Insys Therapeutics, have both included bar dates

18  for all opioid claims.  This case should be no different.

19         Circling back to the statement of one of the

20  debtors' objections is important.  What the debtor says in F,

21  paragraph 10, is "the proposed framework in the plan is

22  perfectly consistent with achieving the key goal of the bar

23  date, enabling the making of claims against the bankruptcy

24  estate."

25         In the past, the debtors have said that there is

1  no need for a bar date as opioid claimants are not making

2  claims against the estate but making claims against the

3  trust.  The proposed plan does not allow opioid claimants to

4  make claims against the bankruptcy estate.

5          As it has been stated already, a bar -- stated

6  earlier, "A bar order serves the important purpose of

7  enabling the parties of the bankruptcy case to identify with

8  reasonable promptness the identity of those making claims

9  against the bankruptcy estate and the general amount of the

10  claims, a necessary step in achieving the goal of successful

11  reorganization.  Thus, a bar date does not function merely as

12  a procedural gauntlet, but is an integral part of the

13  reorganization."

14          Second, "it is not mandatory that creditors file

15  proofs of claim, but when they do not they give up any

16  entitlement to recognition for voting and for distribution."

17          I thank Your Honor for the time today, and what I

18  know will be a thoughtful and open-minded consideration by

19  the Court of the motion which I submitted.  I respectfully

20  request that the Court issue a written ruling on this matter.

21          Thank you.

22          THE COURT:  All right.  Thank you, Mr. Edelman.

23          Let me hear from the debtors.

24          MR. GOTT:  Good afternoon, Your Honor, Jason Gott

25  from Latham & Watkins for the debtors.  Can you hear me okay?

1         THE COURT:  I can.  Thank you.

2         MR. GOTT:  Your Honor, I'll be fairly quick with

3   my argument.  I have four factual thematic points and then a

4   very quick recap of the legal principles that we laid out in

5   our objection.

6         Point number 1, an opioid claims bar date is not

7   part of our global opioid settlement or our plan, and that

8   makes the opioid claims in this case just like the categories

9   of claims and equity interests in many other Chapter 11 cases

10  for which no bar date is set.  The examples that we've cited

11  do include a number of asbestos mass tort cases, but that

12  feature is also commonplace in prepackaged, pre-arranged, and

13  in other cases; in other words, it's common not to have a bar

14  date for specific claims or, frankly, for any claims under

15  (indiscernible) and there's an underlying principle there

16  that ties those no-bar date cases all together, which is that

17  the bar date simply doesn't serve a useful purpose in those

18  circumstances and so none was sought or approved.

19        And here too an opioid claims bar date isn't

20  necessary or even useful to our plan and settlement

21  structure.  A key purpose of our plan is to settle all the

22  opioid claims against Mallinckrodt and end the litigation.

23  The parties in the settlement all agreed that resolution as

24  set out in our plan was value-maximizing.

25        Point number two, and somewhat complementary to

1  point number one, the key reasons for usually setting a bar

2  date aren't applicable here as to the opioid claims.  We

3  don't need more information about the opioid claims to

4  formulate a plan.  There's a plan on file, it's out for

5  solicitation, and it will soon be up for confirmation.  And

6  neither the debtors nor really any other party in interest

7  really needs more information about the substance of the

8  opioid (indiscernible) everyone who has been involved in

9  these cases has heard a lot about the claims and knows how to

10  learn more about them.  There are more than 3,000 complaints

11  pending against Mallinckrodt, there are hundreds of thousands

12  of opioid claims filed against Purdue Pharma in its

13  bankruptcy, we have every reason to expect a bar date in

14  these cases would yield a very similar body of claims filed

15  against Mallinckrodt.

16          And the states here, just for their part, are

17  already on record in these cases that their claims alone seek

18  $2 trillion.  So we think it's not persuasive in the

19  slightest to suggest that more information is required to

20  understand the scope and extent of opioid claims against the

21  debtors.  They would number many thousands; they would assert

22  liabilities in the trillions.

23          I would also point out that even the substantive

24  effect of the bar date, which is cutting off the

25  (indiscernible) claims that could be asserted against the

1   estates is irrelevant here because we are pursuing a

2   channeling injunction to enjoin not just the current claims

3   against the company, but future claims as well.  And we have

4   a future claims representative in the negotiation of the

5   details and mechanics of the opioid settlement to ensure the

6   integrity of that solution.

7            Point number three, setting a bar date and then

8   litigating the hundreds of thousands of opioid claims we

9   would expect to be filed, or waiting for another party in

10  interest such as Mr. Edelman to litigate all of those claims,

11  will obviously create a tremendous burden on the estates.  In

12  fact, it was that burden of litigating the few -- at least

13  few by comparison -- 3,000 opioid complaints one by one

14  outside of bankruptcy was a major driver of these Chapter 11

15  cases.  Even without the opioid litigation, these cases are

16  costing the estates upwards of $1 million.  The burden and

17  the cost there speaks for itself.

18           Point number four, we are on the eve of

19  confirmation, with the consensus behind our plan growing more

20  and more as the day of confirmation gets closer.  The movant

21  here, Mr. Edelman, would stop these cases in their tracks to

22  litigate from a completely out-of-the-money position, all in

23  the hope of running the gamut of defeating all of these

24  claims.

25           The company, in its role as fiduciary to all

1  stakeholders, recognized the risks inherent to that strategy

2  and that's why we have the global opioid deal we have.

3  Stretching out these cases for years, if not decades, to

4  litigate opioid claims is not a value-maximizing solution; it

5  is a surefire way to ensure everyone ends up worse off.  So,

6  in this posture, it's hard to imagine a more inequitable

7  outcome for the debtors, stakeholders and (indiscernible).

8          Now, against the backdrop of those thematic

9  points, we submit that jurisprudence here and Chapter 11

10  precedent clearly excuses the imposition of an opioid claims

11  bar date.  Most relevant, we think, is the admonition from

12  the Third Circuit in the Energy Future Holdings decision, 949

13  F.3d 806, that the debtor's decision there to institute a bar

14  date in that case for un-manifested asbestos claims was a,

15  quote, "strategic choice," unquote, that unnecessarily led to

16  litigation expense and adverse effects on (indiscernible).

17          Now, Mr. Edelman's reply and his argument today

18  attempt to minimize the impetus of the Third Circuit's

19  statements by arguing that they were only relevant to un-

20  manifested asbestos claims, which he distinguishes in his

21  papers from, quote, "present claimants," end quote.  But that

22  is both an inaccurate characterization of the ruling and a

23  misinterpretation of why the court's statements are important

24  to this dispute.

25          First, the EFH decision did concern present

1  claims.   The court's opinion explains in detail that un-

2  manifested asbestos claimants who were exposed to asbestos

3  prepetition are indeed present petition claimants in the

4  bankruptcy, as was held in the Third Circuit's decision in

5  the Grossman's case.  Indeed, that was the whole point of the

6  debtor's approach in EFH.  They sought a bar date and

7  discharged those claims without trying to include future

8  asbestos demands by instituting a trust or using a future

9  claims representative.  So it is not correct to say that the

10 EFH opinion didn't concern (indiscernible) second, the EFH

11 opinion clearly expresses support from the Third Circuit for

12 the notion that bar dates for present claims are not strictly

13 mandatory.  If the court had a different view, its commentary

14 that the bar date there was a strategic choice and referring

15 to that choice as a regrettable one wouldn't make sense.

16         Your Honor, we've cited further support for that

17 proposition that a bar date is not strictly required in our

18 papers and I won't repeat those cases and holdings now, but I

19 would note that all the cases demonstrate a single and

20 factual threat, which is that debtor's determinations about

21 what bar dates are or are not needed to formulate

22 (indiscernible) their Chapter 11 plan tend to be what

23 (indiscernible) and I want to be sure to respond to a few

24 other arguments made in Mr. Edelman's reply and argument

25 today.

1          To start, he's argued that an opioid bar date

2    should be set here because one was set in the Insys case and

3    the Purdue Pharma case, but those cases were completely

4    different on all the key factual points that I walked through

5    at the beginning of my presentation.  There were no fleshed-

6    out opioid settlements or restructuring support agreements at

7    the outset for those cases, there were no future claims

8    representatives.  The bar dates were set early on, not on the

9    eve of plan confirmation, and neither of those cases had the

10   benefit at the time the bar dates were set with learning and

11   information (indiscernible) own claims filing process that

12   Mallinckrodt's record (indiscernible) so those cases aren't

13   persuasive despite the opioid (indiscernible) --

14          THE COURT:  You're starting to break up a little

15   bit, Mr. Gott.

16          MR. GOTT:  I apologize.  Is that any better if I

17   lean forward a little bit?

18          THE COURT:  So far, yeah.  It kind of just cuts

19   out on a word here and there.  It's kind of weird.

20          MR. GOTT:  My apologies.  I'm just about wrapped

21   up, so hopefully no more major issues.

22          And I think the last legal point is Mr. Edelman

23   argues that our reliance on asbestos cases is misplaced

24   because Section 524(g) exists for asbestos claims, but not

25   for opioid claims.  Now, this argument is unavailing for at

1   least two reasons.  First, Section 524(g) doesn't say

2   anything about bar dates, and so there isn't anything about

3   its existence or its content that supports the notion that a

4   bar date must be set for all claims except for asbestos

5   claims.

6           And, second, courts in this district and others

7   have approved many plans that contain analogs to Section

8   524(g) outside the asbestos context, including the use of

9   channeling injunctions, trusts, and future claims

10  representatives.  Chief example in this district is the

11  (indiscernible) case.  So the suggestion that a concept that

12  is applicable under 524(g) cannot be applicable outside

13  asbestos cases is simply not correct.

14          Putting all those points together, the law and the

15  facts and circumstances of these cases presents a more than

16  adequate justification for not setting an opioid claims bar

17  date.  We don't really concede that a particular level of

18  justification is even necessary.  As we noted in our papers,

19  our view is that requesting the setting of a bar date is

20  really the purview of the party administering the cases,

21  which here is the debtors.  But, if a justification is

22  needed, I would submit that we've shown it, the debtors have

23  shown it, and we would request that the motion be denied.

24          Your Honor, if you have any questions, I'm happy

25  to answer them.  I've also been asked by counsel for the OCC

1  to note they would appreciate five minutes to make comments

2  at the appropriate time in this --

3           THE COURT:  All right.  I see there's a number of

4  people that have turned on their cameras.  Does everybody

5  wish to speak?  All right, I'll just go -- I'll just pick the

6  first one who raised their hand.

7           Ms. Brauner, go ahead.

8           MS. BRAUNER:  Good afternoon, Your Honor.  Thank

9  you.  Sara Brauner, Akin Gump Strauss Hauer & Feld, on behalf

10 of the Official Committee of Opioid-Related Claimants.  With

11 the Court's permission, I would just like to make some very

12 limited remarks, under five minutes, regarding Mr. Edelman's

13 motion in light of the paramount importance of these issues

14 to the OCC and its constituents, namely all of the opioid

15 claimants in these cases.  I assure you, I will not take up

16 much of the Court's time.

17          The OCC supports the debtors' position, to be

18 clear, that Mr. Edelman's motion should be denied, but as we

19 made clear at the outset of these cases and reiterated more

20 recently in our plan position letter, we've always had

21 concerns about the debtors' decision to not establish a bar

22 date for opioid claimants in these cases.  Indeed, as the

23 Court likely recalls, in November of last year the OCC took a

24 rather strong position regarding the importance of a bar date

25 for opioid claimants.  Specifically in response to the

1  debtors' motion to appoint an FCR, the OCC filed an objection

2  and request for adjournment, and at the same time cross-moved

3  for the establishment of the bar date.  For the Court's

4  reference, that was at Docket Number 658.  We also filed a

5  reply in respect of the cross-motion at 773.

6         After filing the objection and cross-motion, and

7  as we've done throughout the cases, the OCC worked diligently

8  with the debtors and their advisers, along with the proposed

9  FCR, the RSA parties, and various representatives of the 11

10 or more categories of opioid claimants in these cases, in an

11 effort truly to resolve consensually all of the issues

12 related to the FCR motion and our cross-motion for the

13 establishment of the bar date.  As the Court may also recall,

14 in advance of the hearing to consider our cross-motion, the

15 OCC, the debtors, the governmental plaintiffs ad hoc

16 committee, and numerous other parties reached an agreement,

17 pursuant to which the debtors' FCR motion (indiscernible)

18 pending the then-ordered allocation mediation, again,

19 hopefully, to moot the issues raised by our motion and our

20 concerns with the debtors' motion through that allocation.

21        The mediation, as the Court knows, was largely

22 successful and resulted in agreements in principle between

23 and among many of the various opioid claimant groups, public

24 and private.  And it is because the claimants were able to

25 reach these resolutions and in an effort to ensure that the

1  cases continued to proceed efficiently that the OCC

2  determined that it no longer needed to pursue its bar date

3  cross-motion, not because its position regarding the

4  conceptual importance of a bar date changed.  And, consistent

5  with these views, the OCC has worked closely and

6  collaboratively with the debtors and their advisers to

7  establish and implement a noticing program.  We appreciate

8  very much the debtors' efforts to work with us on this and

9  ensure that the noticing program is broad and robust and

10 reaches as many opioid claimants as possible.

11          Turning very briefly to the motion at hand.  Based

12 on the unique facts and circumstances of these cases, as Mr.

13 Gott outlined, and most importantly the stage of these

14 proceedings and the outcome achieved in the allocation

15 mediation, the OCC does not dispute the debtors' position,

16 which was echoed by other parties in these cases, including

17 the FCR and various state groups, that Mr. Edelman's motion

18 should be denied.  Indeed, establish a bar date and

19 litigating all of these claims now, as Mr. Edelman requests,

20 would be inappropriate and unduly burdensome of the debtors'

21 estates and certainly could delay distributions to claimants

22 who need those distributions desperately when and if the plan

23 is confirmed.

24          Thus, the OCC believes that Mr. Edelman's motion

25 is largely moot and should be denied.  However -- and this is

1  the critical point from our perspective -- the OCC does not

2  agree with the opinion expressed or at least implied by

3  certain of the objections that a bar date is almost never

4  appropriate in non-asbestos mass tort bankruptcies, such that

5  establishing a bar date here would be categorically

6  inappropriate.  In the words of the MSGEG, it would serve no

7  meaningful purpose.  The OCC simply does not agree.  And,

8  therefore, the OCC would urge the Court, to the extent it

9  determines to deny Mr. Edelman's motion, to do so

10 specifically based on the facts and circumstances of these

11 cases in which a resolution of allocation issues has been

12 achieved and to ensure that such determination is not

13 intended to carry a broader weight or service precedent for

14 facts that are dramatically different from those present

15 here.

16         Thank you, Your Honor.

17         THE COURT:  Thank you, Ms. Brauner.

18         Ms. Wasson.

19         MS. WASSON:  Thank you, Your Honor.  Can you hear

20 me all right?

21         THE COURT:  Yes, thank you.

22         MR. WASSON:  Thank you, Your Honor.  Megan Wasson

23 from Kramer Levin on behalf of the Governmental Plaintiffs Ad

24 Hoc Committee.

25         Your Honor, I hope --

1          THE COURT:  I lost my screen.

2          MS. WASSON:  -- you have been able to read --

3    excuse me?

4          THE COURT:  Hold on, I just lost one of my screens

5    here.  Hold on.  I can still see you, go ahead.  I'll just

6    look over this way.

7          MS. WASSON:  Thank you, Your Honor.  Okay.  I hope

8    you've been able to read all of the papers that were put in

9    in opposition to Mr. Edelman's motion, including our joinder

10   to the debtors' objection, which we filed at Docket Number

11   3556.  I'm not sure if Mr. Edelman saw our joinder, but we

12   did file a pleading in opposition to this motion.  I don't

13   want to belabor the points that others have made today in

14   argument or in their pleadings, I just want to quickly, under

15   two minutes, highlight some of the points we made in our

16   joinder.

17         First, in paragraphs 41 through 50 of his motion,

18   Mr. Edelman attempts to lay some portion of the blame for the

19   opioid epidemic on the federal government, the states, and

20   the local government entities.  We obviously vehemently

21   disagree with that contention.  We think it is irresponsible

22   and uninformed to blame the states for causing the opioid

23   crisis when they are clearly victims of it as well.  But

24   today, of course, is not the time or the place to litigate

25   who is ultimately responsible for the opioid epidemic, so

1    I'll move on from that.

2            Second, I just wanted to emphasize that Mr.

3    Edelman's issue is really with the opioid settlement as

4    embodied in the plan.  The reason there is no opioid bar

5    date, as Mr. Gott pointed out, is because the debtors, like

6    many other opiate distributors and manufacturers, have chosen

7    to settle those claims.  As part of that settlement, claims

8    will be channeled to various opioid trusts.  Those trusts are

9    funded with a fixed pot of consideration and will make

10   distributions to opioid claimants that will be largely used

11   to fund abatement programs.  Setting an opioid bar date would

12   not impact the amount of consideration going to those trusts

13   because it would not impact the underlying settlement.

14           So, in short, the costly and lengthy process Mr.

15   Edelman is asking for is precisely what the debtors sought to

16   avoid in entering into the opioid settlement in the first

17   place.

18           And then, finally, I just want to note that Mr.

19   Edelman raised the same objection at the disclosure statement

20   hearing, to which Your Honor said -- I believe this is page

21   34, line 23 of the transcript from June 16th, I quote, "The

22   issues that you are raising are whether the plan itself

23   should be confirmed once we get to the confirmation hearing,

24   that is not going to happen until September.  So those are

25   issues that are preserved for you at this point and we will

1   have to deal with them when we get to confirmation."

2            We would submit today that nothing has changed,

3   Your Honor.  This is still a confirmation objection, it's

4   just now in the guise of opioid bar date motion.

5            Thank you, Your Honor.

6            THE COURT:  Thank you, Ms. Wasson.

7            Mr. Davis?

8            MR. DAVIS:  Good afternoon -- or good evening, at

9   this point, Your Honor.  Kevin Davis from Caplin & Drysdale

10  for the Multi-State Governmental Entities Group.  We too

11  don't wish to belabor the points that have been made.  We

12  agree with the legal points that the debtors made concerning

13  the lack of a requirement that the Court set a bar date, and

14  as well as the consistent pattern of mass tort cases, both

15  asbestos and otherwise, declining to set bar dates for mass

16  tort claims, especially when those claims are, like the

17  opioid claims here, to be channeled to a trust as part of a

18  larger resolution under a plan.

19            Indeed, and because of that resolution and because

20  of the plan, there's no chance that the -- at least under

21  this plan, when and if it is confirmed, any of these opioid

22  claims will ever be adjudicated before this Court and, as

23  such, any bar date to set up the allowance proceedings that

24  Mr. Edelman desires here would, I think we called in our

25  motion, be simply be empty theater.  Mr. Edelman cited to the

1   Hooker opinion for the point that a bar date should not be a

2   procedural gauntlet, but that's exactly what he wants the

3   Court to erect here is essentially a requirement that

4   thousands and thousands of opioid claims with trillions of

5   dollars at stake would file claims in this court and

6   potentially have them heard even when, as Ms. Wasson put,

7   none of them will affect the ultimate resolution of the

8   opioid settlement and none of them will affect how much money

9   the debtors and other entities are ultimately contributing to

10  opioid claims as part of the plan.  As such, the bar date --

11  setting a bar date and forcing allowance proceedings will not

12  have any effect on the estate and will not form any

13  meaningful purpose.

14        Mr. Edelman pointed out in his reply a number of

15  potential purposes for setting a bar date here that he didn't

16  put in his motion, but we would submit that none of those

17  purposes are appropriate or meaningful, and especially not in

18  this case.  For example, he asks that a bar date be set so

19  that duplicative claims are identified, but since these

20  claims will be made to the trust, it will be the trust who

21  will deal with whether claims are duplicative and determine

22  how to pay them out according to their TDPs.

23        I think that Mr. Edelman also points out that this

24  information might be helpful for future insurers of the

25  reorganized debtor to understand what kind of liability they

1   might be under.  But, again, the idea that thousands of

2   opioid claimants should have to file their claims and go

3   through a kabuki litigation for the purpose of future

4   potential insurers having more information is just a

5   nonstarter.

6           And, again, Mr. Edelman also puts forward and this

7   was part of his due process argument, which in his reply he

8   directed to the MSGE group, is that somehow his right to

9   object to claims that are filed means that he has some sort

10  of due process right to demand that they be filed in the

11  first place.  He offers no support for that and it's contrary

12  to case law and common practice.  Indeed, I believe he cites

13  for the -- in support of his proposition a case called In re

14  3333 Main, LLC, stating that it allowed for objections to be

15  made to unfiled claims, but I believe that's a misreading of

16  the case, which stands for the unremarkable position that a

17  party can object to a claim even when it is unfiled so long

18  as it is scheduled as liquidated, non-contingent, and

19  undisputed, and therefore deemed filed under the code.  It

20  does not support any right to object to claims that have not

21  been filed or to force claims to be filed simply so that your

22  objection may be heard, especially when those objections will

23  have no impact on the estate and how much it's paying for

24  claims that have already been resolved under the opioid

25  settlement and will be given distributions from trusts rather

1  than out of the estate, and out of a fixed pot given to those

2  trusts.

3          Furthermore, we would note that Mr. Edelman can't

4  insist that the Court set a bar date simply so he can object

5  because the debtors' right to resolve the claims, the debtor

6  as the debtor-in-possession here, is over and above,

7  supersedes his right to object to the claims.  As many courts

8  have held, where a party in interest has objected to a claim

9  that has been filed, the debtor nonetheless has the right to

10 moot out that objection by settling the claim.  The opioid

11 settlement here is already in place, it is already part of

12 the plan, and there is no reason to go through allowance

13 proceedings that would be immediately mooted upon the plan's

14 confirmation.

15          I also just wanted to touch very briefly, because

16 I don't think that this was mentioned by any other speaker

17 here, the issue of the claim form.  I believe that Mr.

18 Edelman in his reply essentially admitted that that was a

19 premature request, but we wanted to make clear that

20 Bankruptcy Rule 9009's plain language prohibits the

21 alteration of official forms, which is what he's requesting.

22 We cited to a case, In re Catholic Diocese of Buffalo, for

23 the proposition that 9009 does not allow for separate claim

24 forms to be required.  Mr. Edelman noted that in that case

25 the court did allow for a supplemental information -- excuse

1  me, a sexual abuse claim supplement to be sent out to

2  claimants, but we did want to note that the court only said

3  that filling that out was optional and that in order to file

4  a claim all that was required was to fill out claim 410 --

5  Official Form 410.

6          Furthermore, Mr. Edelman's appeal to the case of

7  In re Catholic Diocese of Wilmington where there was an

8  alternative claim form created -- that was done in 2010 when

9  Rule 9009 was more permissive.  It was, of course, changed in

10  2017 to prohibit changes to the official forms, or at least

11  requiring other forms other than the official forms to be

12  filled out in order for someone to file a claim.

13          With that, I think we've covered all of our

14  points.  We agree with all of the objectors who have spoken

15  here that we don't think that a bar date should be set,

16  there's no requirement that it be set and there is no purpose

17  to set one here; indeed, all it would do is engender costs

18  and delay on the eve of confirmation.

19          With that, Your Honor, that concludes my remarks.

20  Thank you.

21          THE COURT:  All right.  Thank you, Mr. Davis.

22          Ms. Chapman?

23          MS. CHAPMAN:  Good evening, Your Honor, Jaime

24  Chapman of Young Conaway Stargatt & Taylor on behalf of Roger

25  Frankel, the future claimants' representative appointed in

1  these cases.

2          As Mr. Gott states, unlike some of the cases Mr.

3  Edelman referenced, there is a future claimants'

4  representative in these cases.  And I would just like to note

5  that the FCR has been active in the negotiation and

6  development of the claims process for the personal injury

7  opioid claims that are under the plan to be channeled to the

8  trust.  And so, for the reasons that the debtor stated today

9  on the record and as set forth in our papers, the FCR

10  requests that Mr. Edelman's motion be denied.

11          THE COURT:  All right.  Thank you, Ms. Chapman.

12          Anyone else?

13      (No verbal response)

14          THE COURT:  All right.  Well, Mr. Edelman, I have

15  to compliment you on your skills at researching and

16  presenting very specific issues relating to the bankruptcy

17  code, especially in light of the fact that you are not a

18  lawyer, and I think you did an admirable job.  However, I do

19  not believe that the code requires the setting of a bar date

20  in all circumstances and it certainly is not required in this

21  case where the debtors' plan of reorganization that they are

22  proposing establishes a future claimants -- establishes a way

23  -- a trust, excuse me, for opioid claims to be channeled to

24  that would address all current and future opioid claims.  And

25  I don't agree with Mr. Edelman that there's -- unlike

1   asbestos claims where things might manifest later, certainly

2   there could be some delay in someone who is in --

3   unfortunately, in the throes of their addiction, at this

4   point, to know that they would have to make a claim.  So I

5   think it's a good thing that there is a way for folks who

6   have a future claim who don't know about it right now, but

7   could bring it later, would have an option under this plan to

8   be able to pursue that.

9          So -- and I agree with the objectors who argued

10  that by setting a claims bar date now and allowing objections

11  to individual opioid claims would just extend this case well

12  beyond anything we anticipate at this point.  The number of

13  claims would be massive, the debtors already have an

14  understanding of how many those claims are.  We have an

15  official committee of opioid claimants who supports the

16  debtors' position that there should not be a bar date at this

17  point even though they initially took the position that there

18  should be one.

19         And, therefore, I'm going to sustain the

20  objections to your motion, Mr. Edelman, and deny the

21  requirement that the debtors set a bar date.

22         Mr. Merchant, anything further for today?

23         MR. MERCHANT:  Your Honor, there were a couple of

24  additional items that we were going to raise today, but given

25  the time and given that we have to come back tomorrow for

1  Your Honor's ruling anyway -- I can touch on them briefly to

2  let you know what they are and then we can deal with them

3  tomorrow.

4          First is Agenda Item 8.  I just wanted to note for

5  the record that that motion to seal has been adjourned to the

6  hearing on the underlying motion, so no need to address that

7  today.

8          On Agenda Item Number 13, there is a proposed

9  resolution that we were going to address with Your Honor.  We

10 can raise that tomorrow.

11         And then in connection with Agenda Item Number 16,

12 which is the status conference, there were some scheduling-

13 related issues that we were going to address.  We can address

14 those tomorrow as well.

15         THE COURT:  All right.  I did say tomorrow morning

16 when I mentioned we could come back, but I do have another

17 hearing tomorrow morning and it's an evidentiary hearing.  I

18 don't know how long it's going to take.  I suspect that it

19 will not take all day, for sure.  So let's set tomorrow at 3

20 o'clock to come back, and I'll give my ruling then and we can

21 address the remaining issues on today's agenda.

22         MR. MERCHANT:  Thank you, Your Honor.  We'll get

23 an amended agenda on file noting the time tomorrow.

24         THE COURT:  All right.  Thank you.

25         Anything else before we adjourn?

1          MR. MERCHANT:  I don't believe so, Your Honor.

2     Thank you for your time.

3          THE COURT:  All right.  Thank you all.  We're

4     adjourned, have a good evening.  I'll see everyone tomorrow.

5          COUNSEL:  Thank you, Your Honor.

6        (Proceedings concluded at 6:06 p.m.)

7

8                         CERTIFICATE

9

10        We certify that the foregoing is a correct transcript

11    from the electronic sound recording of the proceedings in the

12    above-entitled matter.

13

14    /s/Mary Zajaczkowski            August 26, 2021
      Mary Zajaczkowski, CET**D-531

15

16    /s/William J. Garling            August 26, 2021
      William J. Garling, CE/T 543

17

18    /s/ Tracey J. Williams            August 26, 2021

19    Tracey J. Williams, CET-914

20

21

22

23

24

25