## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re: Docket No. 4054** |

## MEMORANDUM OPINION AND ORDER

On April 30, 2021, Attestor Limited, on behalf of itself and its affiliated entities,

("**Attestor**"), and Humana, Inc. ("**Humana**") (collectively the "**Acthar Insurance Claimants**"

or "**AICs**"), creditors of the Debtors, filed a Motion for Entry of an Order Allowing

Administrative Expense Claims pursuant to Section 503(b) of the Bankruptcy Code (the

"**Administrative Expense Motion**").[1]  The Debtors objected to the Administrative Expense

Motion (the "**Objection**"),[2] and on August 31, 2021, filed a Motion for Partial Summary

Judgment on the Objection (the "**Motion**").[3]  The Motion was fully briefed,[4] and a hearing was

held on September 22, 2021.  For the reasons set forth below, and as I ruled at the hearing held

on September 29, 2021, the Motion is denied.

## BACKGROUND

### I.    The Parties

The Debtors operate a global specialty biopharmaceutical company that produces and

sells both generic and branded pharmaceutical products.[5]  The Debtors' flagship product and the

---

[1] D.I. 2159.  See also D.I. 2496, 3399, and 4436, indicating that since the Administrative Expense Motion was filed, Attestor has acquired the rights to the claims of other insurers, including United Healthcare, CVS, and Aetna.
[2] D.I. 3529.
[3] D.I. 4054.
[4] D.I. 4054, 4243, 4301.
[5] Declaration of Stephen A. Welch, Chief Transformation Officer, In Support of Chapter 11 Petitions and First Day Motions, D.I. 128.

most valuable product in their portfolio is H.P. Acthar Gel ("**Acthar**").  Acthar is a natural adrenocorticotropic hormone (ACTH) drug that is used in the treatment of infantile spasms, lupus, rheumatoid arthritis, and certain ophthalmic conditions such as uveitis.[6]  At more than $38,000 per vial, sales of Acthar represent 30% of the Debtors' overall business.  Perhaps unsurprisingly, the high price of Acthar has spawned several lawsuits, which I will discuss in detail below.  While relatively small in number, the Acthar-related lawsuits assert as much as $15 billion in liabilities.

In addition to Acthar and other less controversial drugs, the Debtors also produce and sell opioids.  With the rise of the opioid abuse and overdose crisis in this country, the Debtors saw an onslaught of lawsuits asserting claims that the Debtors overstated the benefits of opioids while understating their risks and marketed the drugs in a manner that increased addiction, misuse, and abuse.  As of the Petition Date, the Debtors had been named in over 3,000 such suits.  Defending this number of lawsuits fast became cost prohibitive and impacted the Debtors' ability to finance all of their businesses, contributing in large part to their need to reorganize.

The AICs are plaintiffs in some of the Acthar-related lawsuits.[7]  The AICs provide healthcare services, including insuring the risk of prescription drug costs, to more than seventeen million members throughout the United States.[8]  Since 2010, the AICs have paid billions of dollars for prescriptions for Acthar for their members.[9]

---

[6] *Id.*

[7] In addition to lawsuits initiated by insurance companies who pay for Acthar prescribed to their patients, there are also lawsuits initiated by private or "third party" payors.  Those plaintiffs are not seeking to have administrative expense claims allowed here.

[8] D.I. 2159 at 2.

[9] D.I. 2159, 2496, 3399, and 4436.

## II.    The Acthar-Related Prepetition Lawsuits

On August 8, 2019, the AICs initiated litigation against Mallinckrodt alleging that the Debtors engaged in "one of the most outrageous price-gouging schemes in the history of American medicine."[10]  This alleged scheme began in 2001, when Mallinckrodt's predecessor Questcor Pharmaceuticals, Inc. acquired the exclusive right to manufacture and sell Acthar from Aventis Pharmaceuticals for $100,000.  Because the drug was expensive to make, had limited uses and was not fetching a high price, Aventis had been considering discontinuing production of Acthar.[11]  At the time of the acquisition, Acthar was sold for $40 a vial.[12]

The Complaint alleges that immediately after their acquisition of Acthar, the Debtors began to increase the price of the drug, raising it immediately to $750, then to $1,650 shortly thereafter and again in 2007, at which time it jumped up to $23,269 per vial.  The price was then increased eight more times between 2007 and 2018, until the price reached $38,892 per vial. Since treatment with Acthar usually requires at least three vials, a single course of treatment can cost nearly $120,000.[13]

The Complaint alleges that the Debtors were able to effectuate this price increase and maintain it through three types of improper conduct.  First, they eliminated the competition by acquiring and then allegedly shelving the rights to Acthar's synthetic equivalent, a drug called Synacthen Depot ("**Synacthen**").  The Debtors allegedly outbid the competition for the right to

---

[10] Second Amended Complaint, *Humana v. Mallinckrodt ARD LLC*, Case No. 2:10-cv-06926 (C.D. CA) (the "**Complaint**"), D.I. 2159, Ex. B.  Though the suit was initiated by Humana alone, as discussed above, Humana has since entered into agreements with other insurers to share in the proceeds of any damages awards arising out of this action.  Accordingly, for ease of reference in this Opinion, I will refer to the allegations as made by the AICs.  Likewise, though the suit only named Mallinckrodt ARD and the AICs proofs of claim are only against Mallinckrodt ARD, for ease of reference in this Opinion I will refer to the defending party as "the Debtors."
[11] *Id.*
[12] *Id.*
[13] *Id.*

Synacthen, but then "rather than undertake the process of obtaining FDA approval for the only drug that was a direct competitor of its best-selling product, Mallinckrodt never seriously attempted to bring Synacthen to market for any clinical use for which Acthar was approved," keeping the price of Acthar artificially high.[14] Second, the Debtors allegedly increased demand for Acthar through the use of improper marketing techniques in violation of the False Claims Act, the Anti-Kickback Statute, and other laws.  Third, the Debtors "maintained this artificially high demand through a pervasive bribery scheme to doctors."[15]

While the AICs asserted multiple claims arising out of these allegations, including violations of state and federal antitrust laws, violations of the RICO Act, state unfair competition laws, state consumer fraud and deceptive trade practices laws, state insurance fraud claims, tortious interference claims, and unjust enrichment, the only claims at issue in this Motion are the antitrust claims (Counts I-III).[16] Count I is a claim for violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  Section 2 "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce."  *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966); 15 U.S.C. § 2.  The AICs allege that the Debtors violated section 2 by: (1) possessing monopoly power in the market for the sale of long-acting ACTH drugs in the United States; (2) intervening in the bidding process for Synacthen and purchasing the exclusive license to market Synacthen in the U.S., thereby eliminating the potential competitive threat posed by an independently owned Synacthen license (which contributed to the preservation of Mallinckrodt's monopoly power and monopoly pricing); (3)

---

[14] *Id.*

[15] *Id.*  The second and third parts of this scheme are not relevant to the antitrust claims and will therefore not be discussed further in this opinion.

[16] Count III involves alleged violations of various states' antitrust laws, but has not been raised by the parties and therefore will not be discussed here.

stabilizing or raising the price of Acthar to a higher level than it would have commanded in the absence of the monopolistic conduct; and (4) causing the AIC to suffer injuries when they paid those higher prices.[17]

Count II of the Complaint is a claim for violation of section 1 of the Sherman Antitrust Act, which provides that

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1.  The Complaint alleges the Debtors violated section 1 when they: (1) entered into an exclusive agreement with Novartis to license the right to market Synacthen in the U.S.; (2) which agreement restrained trade in the market for the sale of long-acting ACTH drugs in the U.S.; (3) thereby maintaining or raising the price of Acthar to a higher level than it would have commanded in the absence of the agreement; and (4) causing the AICs to suffer injuries when it paid those high prices.

### III.    The Debtors' Bankruptcy

When the Debtors filed for bankruptcy, the Acthar-related lawsuits were automatically stayed.  The parties agree that the claims based on those prepetition lawsuits are general unsecured prepetition claims.  However, because the Debtors continue post-petition to charge the allegedly supracompetitive price for Acthar, and the AICs continue to purchase Acthar as needed

---

[17]   Following Mallinckrodt's acquisition of Questcor in 2013, the U.S. Federal Trade Commission ("**FTC**"), along with several states, brought an action against the Debtors under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws.  *FTC v. Mallinckrodt ARD, Inc.*, 1:17-cv-00120 (D.C. D.C.). On January 18, 2017, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the suit and agreed to grant a license to West Therapeutic Development, LLC to develop and market Synacthen in the U.S.  D.I. 2159, Ex. E.  The FTC Action did not, however, result in a change in Acthar's price.

by their members, the AICs assert that they have accrued and are continuing to accrue new post-petition causes of action for antitrust violations with each and every sale.

### IV.     The Administrative Expense Claim Motion

Spending an average of $7.5 million a month post-petition on Acthar, the AICs filed their Administrative Expense Claim Motion, asserting that their post-petition purchases of Acthar give rise to new claims for antitrust violations and any damages from those claims are entitled to priority status under the Supreme Court's holding in *Reading Co. v. Brown*, 391 U.S. 471 (1968).

Known as the *Reading* doctrine, the Court's holding provides that "a post-petition tort committed by a debtor-in-possession within the course and scope of its continued operation of the estate's business may, itself, be considered a cost of doing business and is, therefore, entitled to administrative expense priority under section 503(b)(1)(A)."  *In re Blanchard*, 547 B.R. 347, 353 (Bankr. C.D. Cal. 2016).  The *Reading* doctrine allows for post-petition tort claims as administrative expenses "if those claims arise from actions related to the preservation of a debtor's estate despite having no discernable benefit to the estate."  *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012), *as corrected* (Oct. 25, 2012).

In *Reading*, the bankruptcy receiver negligently caused a fire that destroyed an industrial building which was the debtor's only significant asset.  *Reading Co. v. Brown*, 391 U.S. 471, 473 (1968).  In finding that the receiver's negligence gave rise to an administrative expense claim, the Supreme Court held that "actual and necessary" costs should include "costs ordinarily incident to operation of a business." *Reading*, 391 U.S. at 483. The Court concluded that the statutory objective of fairness dictated that result, as the injured party "did not merely suffer

injury at the hands of the business: it had an insolvent business thrust upon it by operation of law." *Id.* at 478.

The AICs argue that the *Reading* doctrine applies here because the Debtors are continuing to charge a supracompetitive price for Acthar in violation of federal and state antitrust laws, thereby causing significant, ongoing harm to Acthar purchasers such as the AICs. In support of their position, the AICs cite to a number of cases where courts have applied the *Reading* doctrine to different types of claims.  *See, e.g.*, *Carter-Wallace Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2d Cir. 1971) (holding post-petition patent infringement would seem to qualify for administrative expense priority treatment); *In re Cambridge Biotech Corp.*, 186 B.R. 9, 14 (Bank. D. Mass. 1995) (same); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (allowing administrative expense claim for damages caused by debtors' post-petition parts-stripping of machinery done in the course of its business).

The AICs also cite to cases that they argue support the proposition that a claim can qualify for an administrative expense even if it originates from conduct that began prior to the petition date but continues post-petition. *See In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 202 (1st Cir. 1985) (allowing administrative expense claim for fines issued to the debtor for its continued violation of injunction post-petition); *In re Eagle-Picher Industries*, 447 F.3d 461, 462 (6th Cir. 2006) (allowing administrative expense claim for patent infringement damages arising out of pre-petition and post-petition purchases).

The AICs further argue that finding their claims qualify as administrative expense claims would be consistent with courts' treatment of antitrust violations generally.  They contend that "courts have held that a person suffers a cognizable injury every time that person is overcharged for a monopolized product, even though the conduct that gave rise to the monopoly in the first

place occurred at some point in the past."[18]  *See, e.g., In re Nexium (Esomeprazole) Antitrust Litigation*, 968 F. Supp. 2d 367, 400 (D. Mass 2013) ("[I]t is reasonable to assume here that, every time the Direct Purchasers were overcharged for brand Nexium, they suffered a cognizable injury.").  Lastly, they argue that at least one court has held that antitrust claims such as those at issue here may be entitled to administrative expense priority under the *Reading* doctrine.  *See DPWN Holdings (USA) v. United Air Lines, Inc.*, 246 F. Supp. 3d 680, 696 (E.D.N.Y. 2017) (finding "no procedural impediments to the consideration of DHL's administrative claim except that DHL never filed it…").

The Debtors objected to the Administrative Expense Claim Motion on several grounds, but the only one relevant to this Motion is that the AICs cannot establish that they are entitled to administrative priority because their claims accrued prepetition, not post-petition as section 503(b)(1)(A) of the Code requires.[19]  Specifically, the Debtors argue that all of the allegedly unlawful conduct – the Debtors' acquisition of Synacthen and related actions – occurred prepetition.  The only conduct occurring post-petition is their charging of a high price for Acthar.  Debtors argue, however, that high prices are not, in and of themselves, violative of the law.  For this reason, Debtors maintain that the *Reading* doctrine does not apply here.

Rather, Debtors contend that under controlling Third Circuit law, specifically in *In re Grossman's,* the AICs' claims can only be prepetition claims because the Debtors' alleged unlawful conduct all occurred prepetition and the high prices that the AICs complain of here are, to the extent improper at all, merely post-petition injuries that flow from that prepetition conduct.  *In re Grossman's*, 607 F.3d 114, 127 (3d Cir. 2010) ("a 'claim' arises when an individual is

---

[18] D.I. 2159 at 11.
[19] D.I. 3529.

exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code.").

The Debtors also cite to cases for the proposition that, under applicable antitrust law, the AICs' alleged overpayment for Acthar post-petition is merely a "ripple effect" of the Debtors' allegedly unlawful prepetition acts which do not create new antitrust injuries but instead are continuing injuries. *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) ("the fact that [] injuries have a rippling effect into the future only establishes that [plaintiffs] might have been entitled to future damages. . . ."); *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594, 596 (6th Cir. 2014) ("[P]rofits, sales, and other benefits accrued as a result of an initial wrongful act are not treated as 'independent acts.' Rather, they are uniformly viewed as 'ripples' caused by the initial injury, not as distinct injuries.. . .").

Lastly, the Debtors argue that to the extent the Synacthen acquisition did have an anticompetitive effect, the Debtors remedied those effects when they sublicensed Synacthen to West four years before their bankruptcy or, at the very latest, when they terminated the Synacthen license three months before the petition date. The AICs disagree, arguing that the Debtors' unlawful conduct here is not simply their prepetition actions regarding the Synacthen license, but also the Debtors' ongoing decision to continue to sell Acthar at an inflated price. Specifically, they contend that the Debtors' "calculated decision" to continue to exploit their monopoly by charging the same monopolistic price for Acthar post-petition gives rise to a new and actionable antitrust claim with every sale.

## V.    <u>Summary Judgment Motion</u>

In an attempt to avoid a lengthy trial on the AICs' antitrust claims, the Debtors filed this Motion, seeking judgment that, as a matter of law, the AICs' claims cannot constitute

administrative expense claims under the Code. Specifically, the Debtors argue that the AICs

cannot satisfy section 503(b)(1)(A)'s requirement that there be a post-petition transaction

between the claimant and the estate because, under *Grossman's*, the AICs' claims arose when the

Debtors' alleged wrongful conduct occurred prepetition, not when the creditors' injuries from

that conduct manifested, post-petition.[20]

The AICs disagree, arguing that *Grossman's* does not apply here, let alone operate to bar

their claims. Instead, they assert that the Court can determine whether an administrative expense

claim is warranted by looking only at the requirements of section 503(b)(1)(A), which asks

simply whether a post-petition transaction between the claimant and the estate has occurred, and

whether the expenses yielded a benefit to the estate. They claim that both these elements are

satisfied here because each post-petition purchase of Acthar constitutes a transaction, and the

money the Debtors have received from those purchases is undeniably a benefit to the estate,

since it is a major source of steady income available to the Debtors to fund this bankruptcy.[21]

Both parties also argue that public policy demands that I find in their favor. The Debtors

contend that once they filed for bankruptcy protection, any liability for allegedly anticompetitive

pricing that arose out of their licensing of Synacthen was cut off and they are free to charge a

supracompetitive price because high price, in and of itself, is not a violation of the Sherman Act.

Because of the Bankruptcy Code's policy of providing Debtors with a fresh start, they argue,

they should be allowed to continue selling Acthar at whatever price they choose. The AICs argue

that public policy dictates the opposite result: that Debtors should not be granted what amounts

to immunity from their illegal prepetition conduct while funding their bankruptcy on the backs of

---

[20] D.I. 4054.
[21] D.I. 4243.

innocent creditors who are compelled to pay the Debtors' high price. I will discuss each of these positions below.

**JURISDICTION**

This Motion arises in and relates to the Debtors' chapter 11 cases, pending before this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), 11 U.S.C. § 101 et seq.  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

**ANALYSIS**

I.     **LEGAL STANDARDS**

A.  **Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). In considering whether summary judgment is appropriate, courts may consider pleadings, depositions, documents, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials that would be admissible or usable at trial.  *See* Fed. R. Civ. Proc. 56 and 10A Fed. Prac. & Proc. Civ. § 2721 (4th ed.).

When the moving party's evidence shows a lack of genuine issue, the burden shifts to the opposing party to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324-25 (1986) (internal

quotations omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (emphasis in original); *see also Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986) (non-moving party must "do more than simply show that there

is some metaphysical doubt as to the material facts.").

## B.  Administrative Expense Claims

Section 503(b)(1) of the Bankruptcy Code provides, in relevant part, that, "there

shall be allowed administrative expenses . . . including . . . the actual, necessary costs and

expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Administrative claims are entitled

to priority payment under section 507(a)(2) of the Bankruptcy Code and are required to be paid

in full once allowed pursuant to section 1129(a)(9) of the Bankruptcy Code. *See id.* §§ 507(a)(2),

1129(a)(9).  To establish an administrative claim, a claimant must show that "(1) there was a

post-petition transaction between the claimant and the estate; and (2) those expenses yielded a

benefit to the estate." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021);

*see also In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532–33 (3d Cir. 1999) ("For a claim in

its entirety to be entitled to first priority under [§ 503(b)(1)(A)], the debt must arise from a

transaction with the debtor-in-possession . . . . [and] the consideration supporting the claimant's

right to payment [must be] beneficial to the debtor-in-possession in the operation of the

business.") quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976).

## II.    DISCUSSION

### A.  Do the AICs possess post-petition claims?

The Debtors' primary argument in both their Objection and their Motion is that the AICs

claims all arose prepetition and therefore can only be prepetition claims, not post-petition claims

as would be required for administrative expense claims. The AICs, on the other hand, argue that

they have both prepetition and post-petition claims and that the post-petition claims, those arising

from their post-petition purchase of Acthar, qualify for administrative expense priority.

Accordingly, before I resolve the question of whether the AICs claims can constitute an

administrative expense, I must first determine whether they are prepetition or post-petition

claims.  To do so, I will look to *Grossman's* and *Owens Corning*, which set forth the Third

Circuit's test for determining when a "claim" arises under the Bankruptcy Code.[22]

In *Grossman's* the Third Circuit redefined its view of when a "claim" arises under the

Bankruptcy Code, holding "a 'claim' arises when an individual is exposed prepetition to a

product or other conduct giving rise to an injury, which underlies a 'right to payment' under the

Bankruptcy Code."  *In re Grossman's*, 607 F.3d 114, 125 (3d Cir. 2010).  In so holding, the

Court overruled the longstanding *Frenville* test (also known as the accrual test), which provided

---

[22] The AICs argue that *Grossman's* does not apply here because it makes no mention of administrative claims and section 503 applies to post-petition transactions with a debtor.  I disagree.  Despite the absence of the word "claim" in section 503, it is well settled that expenses entitled to administrative priority are, in fact, a subset of "claims," as contemplated by the Bankruptcy Code. *See In re Javed* , 592 B.R. 615, 624 (Bankr. D. Md. 2018) ("Although section 503 speaks only to 'administrative expenses,' most courts view administrative expenses as a kind of claim in a bankruptcy case.") citing *In re Circuit City Stores, Inc.*, 426 B.R. 560, 568-69 (Bankr. E.D. Va. 2010) ("Administrative expenses appear to be a subset of 'claims.' Throughout the Bankruptcy Code, the term 'claim' is used to refer to administrative expenses.").  This makes sense since a "claim" is simply a right to payment.  While all administrative expense claims are post-petition claims, not all post-petition claims will qualify as administrative expense claims.  This is where section 503 comes in.  While the first step of determining when a claim arose may not be necessary in every case (for example, where a claim arises out of a transaction that involved no pre-petition conduct), it is necessary here, where the parties interacted extensively prepetition and fervently disagree about whether the claims at issue are prepetition or post-petition claims.

that a claim "arises" for bankruptcy purposes when the right to payment arises, *i.e.*, when the claim accrues, as determined by reference to the relevant non-bankruptcy law. *Id.* at 119, 121.

The claimant in *Grossman's* had purchased the debtor's asbestos-containing products prepetition, but her injuries did not manifest until post-petition. *Id.* at 117. Under the old test, she would not have held a "claim" subject to discharge under the Bankruptcy Code, since her injuries and therefore her right to payment, did not accrue until post-petition. *Id.* at 118. But applying its new test, which shifted the focus away from when the claim accrues to when it arises, the *Grossman's* Court held that the claimant did hold a claim under the Code because even though her right to payment did not accrue until post-petition, her claim <u>arose</u> when she purchased and was exposed to the products that caused her injuries, which occurred prepetition. *Id.* at 125.

The Third Circuit expanded *Grossman's* two years later in *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012), when it was confronted with a claim that involved a post-petition, pre-confirmation exposure. Finding that a failure to expand its holding would artificially separate individuals who are affected by a debtors' products or conduct prepetition from those who are affected post-petition but before confirmation, the Court restated the *Grossman's* test to include such exposure and held that "a claim arises when an individual is exposed pre-<u>confirmation</u> to a product or other conduct giving rise to an injury that underlies a right to payment under the Code." *Owens Corning*, 679 F.3d at 107.

Owens Corning, like the debtor in *Grossman's* manufactured a product –roofing shingles -- the sale of which gave rise to several lawsuits. One of the claimants had purchased the debtor's product after the petition date, but before confirmation. However, his injury did not occur until after confirmation, when he first discovered leaks in his roof. *Id.* at 103. Applying

14

the expanded *Grossman's* test, the Court held that because the claim <u>arose</u> when the claimant

purchased the product from the debtor pre-confirmation, he held a "claim" under the Code, even

though his right to payment did not <u>accrue</u> until after confirmation. *Id.* at 107.

Applying those holdings here, the Debtors argue that the AICs are like the claimants in

*Grossman's*, holding claims that arose prepetition when the Debtors' allegedly unlawful conduct

occurred. Specifically, Debtors argue that because any alleged conspiracy over the development

of a synthetic version of Acthar ended when they terminated their Synacthen license agreement

three months before the petition date, there can be no post-petition violation of Section 1 of the

Sherman Act. Similarly, because there is no allegation that the Debtors took any willful action to

acquire or maintain monopoly power post-petition, they argue that there can be no claims under

Section 2 of the Sherman Act for antitrust violations. So, the Debtors argue, while they continue

to sell Acthar at the same high price that was allegedly created through their unlawful

anticompetitive conduct, that high price is not itself a violation of the Sherman Act, and

therefore, there are no post-petition torts being committed.

Debtors equate the claimants' purchasing of their product here to the asbestos plaintiffs'

manifestation of symptoms from their exposure – calling it merely the "injury." But that is not

the right comparison. While the AICs' alleged overpayment for Acthar may be their "injury,"

that only tells us when the claim accrues (or became mature and legally ripe for payment), not

when it arises (or comes into existence), which is what *Grossman's* instructs us to focus on.

Under *Grossman's* a claim arises when a claimant is exposed to the debtors' product/conduct. In

both *Grossman's/Owens Corning* and here, the claimants were exposed to the product when the

debtors sold it to them. *See Grossman's* 607 F.3d at 125 and *Owens Corning*, 679 F.3d at 107.

While the claims in *Grossman's* and *Owens Corning* did not <u>accrue</u> until several years after the debtors sold the product (when the claimants' injuries became known to them), the AICs' claims <u>accrued</u> instantaneously at the time of sale. But this fact does not alter the conclusion that *Grossman's* compels, which is that the claim <u>arose</u> when the claimants were exposed to the Debtors' product/conduct, which was also at the time of sale. Accordingly, to the extent the AICs have claims based on the Debtors' sale of Acthar to them after the petition date, such claims <u>arose</u> after the petition date and are thus post-petition claims – even though, by nothing more than coincidence they also <u>accrued</u> at the same time.

## B. <u>Continuing Antitrust Violations</u>

In finding that the Debtors are not entitled to summary judgment here, I necessarily reject their argument that post-petition sales cannot, as a matter of law, constitute continuing violations of the Sherman Act. While the Debtors cite to several cases for the proposition that "monopolistic" pricing is not, by itself, anticompetitive conduct,[23] that is beside the point. The AICs have not alleged that the high price of Acthar is, in and of itself, the sole basis for the antitrust violation, but rather have alleged that the sales at the alleged supracompetitive price constitute overt acts in furtherance of a course of conduct that is, all together, a continuing violation of antitrust laws.

One of the cases that the Debtors themselves rely on makes this point clear. The Debtors cite to *In re Travel Agent Commission Antitrust Litigation*, 583 F.3d 896 (6th Cir. 2009), where the Sixth Circuit declined to find that debtor United Airlines' decision to maintain a 0%

---

[23] D.I. 4054, citing, among others, *BanxCorp v. Bankrate, Inc.* 847 F. App'x 116, 120 (3d Cir. 2021) ("price increases, without more, do not constitute supra-competitive pricing"); *In re Allergan ERISA Litig.*, 975 F.3d 348, 355 (3d Cir. 2020) ("price increases . . . without more, do not by themselves indicate the existence of an illegal conspiracy"); *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) ("setting a high price may be a use of monopoly power, but it is not in itself anticompetitive").

commission policy constituted an overt act sufficient for the continuing violation doctrine to apply. The plaintiffs in *Travel Agent* argued that United Airlines' liability in a price fixing case – a conspiracy with other airlines to cut out travel agents' commissions – was not discharged in United's bankruptcy case under a continuing violation theory because United decided to not pay commissions after it emerged from bankruptcy – effectively rejoining the conspiracy that began prepetition.  The Debtors point out the Court's observation that even though an antitrust cause of action accrues each time a defendant commits an act that injures the plaintiff's business, the focus of the inquiry is on the timing of the conduct that caused the injury, "'i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *Id.* at 902, quoting *Peck*, 894 F.2d at 849.  The Sixth Circuit rejected the plaintiffs' arguments that United's decision to maintain its 0% commission policy constituted an overt act, stating that:

> Although United's participation in the alleged conspiracy would certainly create a rippling effect, plaintiffs assert that United's final act to effectuate that conspiracy occurred in 2002, long before United emerged from bankruptcy. We also cannot ignore the consequence of concluding that an overt act occurred under these facts. If we were to adopt plaintiffs' continuing violation theory, the applicable limitations period for a § 1 claim would be infinite -- an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct.

*Id*.  The Debtors argue that this precise reasoning applies here and that, applying fundamental bankruptcy principles regarding when claims arise leads to the conclusion that the alleged anticompetitive conduct of the Debtors ended when they permanently suspended the Synacthen license prepetition, thus precluding a finding of the post-petition conduct needed to support an administrative expense claim.  I disagree.

In their analysis of *Travel Agent*, the Debtors skip over the most critical sentence in the Court's opinion which is that "'[s]ince the Supreme Court decided *Zenith*, federal courts have uniformly defined a continuing antitrust violation as one in which <u>the plaintiff's interests are</u>

repeatedly invaded.'" *Id.* quoting *Peck*, 894 F.2d at 849 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (emphasis added)).  Since United's decision to stop paying the commissions occurred before it emerged from bankruptcy, the mere failure to act to reverse that decision was not a continuing violation.  Here, by contrast, the Debtors continue to sell Acthar post-petition at what is alleged to be an anticompetitive price.  If true, then the AICs' interests are repeatedly invaded with every sale and a continuing antitrust violation therefore exists.[24]

At least one other court has reached the same conclusion on a similar set of facts.  In *In re Automotive Parts Antitrust Litigation*, post-confirmation debtor, Lear, faced antitrust lawsuits for its continued sales of automotive wire harness systems at supracompetitive prices as part of a conspiracy to rig bids and fix prices.  *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2013 U.S. Dist. LEXIS 80335 (E.D. Mich. June 6, 2013).  The bankruptcy court had enjoined the lawsuits to the extent they arose out of conduct that predated the bankruptcy but held that claims that arose out of post-confirmation conduct could proceed.  While the plaintiffs argued that Lear's continued sales of the price-fixed products after discharge constituted a continuing violation of antitrust laws, Lear moved to dismiss those claims, arguing that the sales alone did not constitute overt acts.  Pointing to the *Travel Agent* decision for support, Lear argued that "the relevant predicate act in bid-rigging is submitting the anticompetitive bid itself; subsequent payments received do not constitute separate relevant acts giving rise to a continuing violation." *Id.* at *40.  The Court disagreed:

> In contrast to the plaintiffs' reliance on rippling effects as a basis for their antitrust claim in *In re Travel Agent*, here, Plaintiffs allege that Lear engaged in overt acts by selling wire harness systems after it emerged from bankruptcy in

---

[24] Further, the *Travel Agent* Court's concerns regarding eviscerating the limitations period simply do not apply here, where the limitations period is triggered by an affirmative act (the sale of the debtors' product), not a negative one (the failure to pay a commission).

November 2009 at supracompetitive prices. This conduct, [*sic*] thereby giving rise
to a new § 1 claim. The complaints allege that the guilty pleas by other
Defendants included admissions that the conspiracies continued "at least" through
February 2010. Based on these admissions, an inference arises that Lear had
ample time and opportunity to conspire post-discharge. Further, Plaintiffs do not
allege that Lear's conduct was merely a reaffirmation of an initial
agreement. They do not allege that the final act to effectuate the conspiracy
occurred before the discharge. They allege that each sale was an overt act
"pursuant to and as part of its participation in furtherance of the conspiracy."
These allegations distinguish the conduct at issue here from that challenged in *In
re Travel Agent*. Because a defendant does not pay a zero percent commission—
its continuation of the policy involved no overt act, but merely "reflect[ed] or
implement[ed] a prior refusal to deal." In contrast to United Airlines continued
policy of zero percent commission which involved no overt act, in the case before
this Court, each time Lear charged for a sale it committed an overt act.

Each sale after November 2009 allegedly involved an unlawfully inflated price, so
conduct by Lear after bankruptcy confirmation may fall within the ambit of the
conspiracy. If Plaintiffs succeed in proving these allegations, Lear's conduct post-
bankruptcy cannot be protected by the discharge.

*Id.* at *43-44 (internal citations omitted).  Here, while the AICs claims against the Debtors

involve post-petition and not post-confirmation conduct, the analysis is the same.  The Debtors

have not met their burden here of establishing that the AICs cannot, as a matter of law, establish

that the Debtors' post-petition sales of Acthar are overt acts in furtherance of continuing antitrust

violations.

## C.  **Public Policy Concerns**

As the parties correctly point out, this case presents an intersection between two

competing federal statutory schemes.  On one hand there is the Bankruptcy Code, which

advances as its purpose the opportunity for a breathing spell from the weight of a debtor's

liabilities and the promise of a fresh start.  On the other hand, there is the Sherman Act, which

was designed to curb concentrations of power that interfere with trade and lessen economic

competition.  The Debtors argue that where these intersections occur courts appear to uniformly

give priority to bankruptcy principles over antitrust considerations and that I must do the same

here.

   The Debtors assert that having returned the Synacthen license to Novartis just before the

petition date, thereby terminating all their rights to Synacthen and eliminating the alleged

anticompetitive conduct, there can be no argument that they are not entitled to the fresh start that

the Bankruptcy Code provides.  They suggest that allowing an administrative expense claim in

these circumstances would discourage future debtors from taking similar steps to cease unlawful

conduct prepetition.  The AICs, on the other hand, argue that public policy demands that an

administrative claim be allowed.  They assert that if I rule that as a matter of law an

administrative expense claim is not allowed here, and it turns out that the Debtors are in fact

violating antitrust law by continuing to charge a supracompetitive price for Acthar, then not only

are the Debtors getting a fresh start, but they would in essence be getting immunity from liability

for their continued illegal conduct.  I agree.

   While the Debtors are correct that the "fresh start" is of paramount importance in

bankruptcy cases, it is not without its limits.  As the Supreme Court has explained:

> a central purpose of the Code is to provide a procedure by which certain
> insolvent debtors can reorder their affairs, make peace with their creditors, and
> enjoy "a new opportunity in life with a clear field for future effort, unhampered
> by the pressure and discouragement of pre-existing debt." But in the same breath
> that we invoke this "fresh start" policy, we have been careful to explain that the
> Act limits the opportunity for a completely unencumbered new beginning to the
> "honest but unfortunate debtor."

*Grogan v. Garner*, 498 U.S. 279, 286 (1991), superseded by statute on other grounds as stated in

*Osborne v. Kakas* 2018 U.S. Dist. LEXIS 42729 (E.D. Tx 2018) (quoting *Local Loan Co. v.*

*Hunt*, 292 U.S. 234, 244 (1934).  Equally, the Third Circuit has recognized that "although

bankruptcy is concerned with giving debtors a new beginning, 'there are circumstances where

20

giving a debtor a fresh start in life is not the paramount concern and protection of the creditor becomes more important.'" *In re Mehta*, 310 F. 3d 308, 311 (3d Cir. 2002) quoting *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000).  This case presents one such circumstance.

The "fresh start" provided by the Bankruptcy Code cannot be both a sword and a shield. The Debtors made the decision to wield the sword when they filed for bankruptcy in order to escape the crushing volume of litigation they faced.  But they also decided to continue, post-petition, to sell Acthar at the prepetition price despite the allegations of that price violating antitrust law, because the high price was needed to fund the bankruptcy.  If it turns out that they are violating the law by doing so, they cannot then use the Code's "fresh start" policy as a shield to escape liability for that decision.  The policy of the "fresh start" does not give a debtor immunity to continue to violate the law at the expense of captive creditors who have no alternative but to pay the Debtors' high price.

Assuming that the AICs can prove their claims for violations of the Sherman Act and, therefore, that they hold post-petition claims, the question remains whether those claims qualify for administrative expense priority under section 503.  To answer that, I will need to resolve several questions of fact, including whether the Debtors' conduct violated Sections 1 and 2 of the Sherman Act and, if so, whether the post-petition sales meet the requirements for administrative priority under section 503. This I cannot do on a motion for summary judgment.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT** for all these reasons, Debtors' Motion for Partial Summary Judgment on Administrative Claims Objection is DENIED.

Dated:  October 19, 2021

JOHN T. DORSEY, U.S.B.J.