## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **MALLINCKRODT PLC, et al.,** | : | **Case No. 20-12522 (JTD)** |
| | : | |
| **Debtors[1]** | : | **(Jointly Administered)** |
| | ; | **(Re: D.I.Nos. 4186, 4593, 4594, 4597, 4600)** |

### REPLY TO DEBTORS' CROSS-MOTION AND OBJECTION TO THE MOTION OF DARREL EDELMAN TO AUTHORIZE OBJECTIONS TO CERTAIN CLAIMS AGAINST THE DEBTORS

The Movant hereby submit this Reply to the Debtors' cross-motion and reply ("Cross-Motion and Objection") [**D.I. 4593**] to the Motion of Darrel Edelman, A Party-In-Interest, for this Court to Authorize Objections to Any Claims Against the Debtor Under The Plain Language Of Local Rule 3007-1 Omnibus Objection To Claims, a Portion of Which has Been Modified in The Debtors' Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Plan [**D.I. 291**]) Which Would Preclude Objections to Opioid Claims Contrary To Local Rule 3007-1 [**D.I. 4186**] (the "Motion") filed by Mr. Darrel Edelman ("Movant") [**D.I. 4186**] and request entry of an order substantially in the form attached hereto as Exhibit A (the "Proposed Order") adjourning a hearing on the Motion until the Confirmation Hearing. In addition, the Movant also replies to the Objection of the Future Claimants' Representative (FCR) [**D.I. 4594**], the Objection of the Official Committee of Opioid Related Claimants (OCC) [**D.I. 4597**] and the Joint Objection of the Multi-State Governmental Entities Group (MSGE) [**D.I. 4600**].    In this Reply, the Movant respectfully states as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

## PRELIMINARY STATEMENT

1.     The Debtors incorrectly state that the Movant is seeking approval from the Court to file omnibus objection(s) to opioid claims.  This mischaracterizes the Motion as filed.  The Movant was asking this Court to answer a fundamental question of Bankruptcy law by affirming the application of Local Rule 3007-1 as written verses the Rule contained in the Disclosure Statement Docket No. 2075. Do these Debtors have the right to ***unilaterally*** modify Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to avoid having claims objected to as allowed by *Rule 3007-1 Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "**Local Rules**")?  That is a question that this Court was asked to address.  The proposed order simply stated: ***2.  All Parties-In-Interest may file claims objections based on Local Rule 3007-1 Omnibus Objections to Claims and not based on the modification to Local Rule 3007-1 outlined in the Debtors' Disclosure Statement Docket No. 2075.*** Having a confirmed right to take action does not mean that action will be taken.  If these Debtor, or any other Debtor(s) can simply enjoy the advantages of the Bankruptcy rules they like  such as the automatic stay) and dispense with the rules they don't like, there is no need for a Bankruptcy Code or Bankruptcy Rules.

## CROSS MOTION

2.     The Cross-Motion of the Debtors is shown on P3 at I. and states:  **The Motion is a Continuation of Movant's Challenge of the Global Opioid Settlement Contained in the Plan and Should Be Heard in Connection with Plan Confirmation.** The Debtors further state the Movant's motive is to "to challenge the validity of opioid claims against the Debtors—the logical endgame of his efforts is not one-by-one litigation of every opioid claim, but instead a challenge to the merits of the pending settlement of all of the opioid claims. Thus, the Debtors move that the Motion be considered in connection with confirmation of the Debtors' Plan and approval of the opioid settlement contained

2

therein."¶4 In the Objection itself, the Debtors state "The Debtors believe that this request ultimately should be denied because Movant has ignored a fundamental fact: the Scheduled Opioid Claims do not provide sufficient basis for a claims objection."¶5 The Debtors also argue that "holders of opioid claims do not need to file proofs of claims in order to obtain recoveries on account of their claims. Accordingly, the Scheduled Opioid Claims cannot be challenged in the same manner as other creditor proofs of claims…"¶6 The Debtors further state that "Relatedly, and importantly, because the Scheduled Opioid Claims are listed as "disputed, contingent, and unliquidated" they are not "deemed filed" and therefore cannot be challenged in the manner requested by the Motion on that basis." ¶8 Perhaps sensing that the Movant may in fact have a legitimate basis for the Order requested, the Debtors footnote on P.8 *"Should this Court find that Local Rule 3007-1 is applicable, Debtors reserve all rights to argue that the Scheduled Claims have a basis in the Debtor's books and records, notwithstanding that they are contingent, unliquidated, and disputed."*

## THE TRUST(S) AND PROPOSED SETTLEMENT(S)

3.      The Debtors state in ¶14: "The treatment of opioid claims as set forth in the Plan is the culmination of years long negotiations between the Debtors and *nearly all* [emphasis added] of their major creditor constituencies including, the Supporting Unsecured Noteholders, the Supporting Governmental Opioid Claimants, the MSGE Group, the Supporting Term Lenders, and the Official Committee of Opioid-Related Claimants. This global opioid claims settlement is value-maximizing, in the best interest of the Debtors, their creditors and their estates. See Hr. Tr. 181:21-24, Aug. 25, 2021 ("A key purpose of our plan is to settle all the opioid claims against Mallinckrodt and end the litigation.""[2]

4.      In their filings, the Debtors and other supporting filing parties continue to advance the arguments that the opioid claims, as a result of the way they are treated under the Plan, are not subject to

---

[2] On October 19, 2021 I was able to obtain a copy of the Mullin Report but have not had time to engage with the debtors, the author or any other parties to fully understand how the report was developed, the statistical models used, etc. Undertaking those activities may provide some further illumination into what has been a fairly dark, secretive and hidden process to date.

any review.  Because the claims have been accepted as valid there is no need to adjudicate.  In a new prong of attack, the OCC now states that the Movant may have no rights to challenge claims. The OCC states at ¶3 "…no provision of the Bankruptcy Code nor any applicable rule (including Local Rule 3007-1, as cited by Mr, Edelman) imbues a party in interest with an independent right to object to claims that may be—and, in this instance, have already been—settled by the Debtors (subject of course to any objections to such settlement raised in connection with confirmation of the Plan). As such, Mr. Edelman has not demonstrated—and cannot demonstrate—that he is entitled to the relief he seeks." [**D.I. 4597**]

5.        If a party objects to a claim, then § 502(b) provides that the court "shall determine" the amount of the claim and "shall allow" the claim in the determined amount. The mandatory language prohibits the Court from considering the Debtors' proposed settlement because a Party-In-Interests' rights would be abridged or modified by a settlement. Two courts agree with this positon. They have concluded that an objecting party's right to a ruling on the merits cannot be abridged or modified by a trustee's [DIP] settlement. *In re C.P. Hall Co. , 513 B.R. 540, (Bankr. N.D. Ill. 2014)* ; *In re CS Mining, LLC , 574 B.R. 259, 281 (Bankr. D. Utah 2017).*

6.        *In re Weinstein Co. Holdings, LLC, 595 B.R. 455, 463-64 (Bankr. D. Del. 2018)* (rejecting argument that section 502 does not grant creditors standing to object to claims of other creditors and is, instead, cause of action belonging to the trustee that other creditors may only bring derivatively); *In re QMect, Inc., 349 B.R. 620, 625 (Bankr. N.D. Cal. 2006)* (a "creditor or creditors' committee has standing independent of the trustee or debtor-in-possession to object to another creditor's claim"); *In re C.P. Hall Co., 513 B.R. 540, 543 (Bankr. N.D. Ill. 2014)* ("Section 502 governs the allowance of claims and interests and permits any 'party in interest' to object."). Even courts that have allowed the trustee to settle claim objections brought by other creditors concede that section 502(a) grants those non-settling creditors standing to bring their objections in the first instance. See *In re Futterman, No. 17-12899 (MEW), 2019 WL 2553614, at \*3 (Bankr. S.D.N.Y. June 20, 2019)* (non-settling creditor had standing to assert claim objection "because section 502 of the Bankruptcy Code provides that any 'party in interest'

4

in a bankruptcy case has the right to object to a proof of claim"); *In re DVR, LLC, 582 B.R. 507, 8 (Bankr. D. Colo. 2018)* ("In § 502, Congress gave the broadest possible standing to bring a claim objection to any 'party in interest' . . . .").

7.       While there may be grounds to ignore the plain language of section 502(a) if a trustee has been appointed to represent the "interests of all creditors," there is no basis to do so where the "law does not impose a duty on the debtor-in-possession to act in the best interest of all general creditors" and that, in such a circumstance, "the Court will not disregard the plain language of § 502(a) and limit the right of general creditors to object to the allowance of a proof of claim." *In re Charter Co., 68 at 228*[3]

8.       Under the plain language of the Bankruptcy Code, any party-in-interest that has standing under section 502(a) to object to claims "has a right to receive a ruling from the court on his objection notwithstanding [a] proposed settlement." *In re C.P. Hall Co., 513 B.R. 540, 544 (Bankr. N.D. Ill. 2014).* This is because "[s]ection 502(b)(1) declares that when a party in interest objects to a claim, the court shall determine the amount of such claim." *Id.* (internal quotations omitted) (emphasis in original). "The court's obligation to rule on a claim objection is mandatory, and the creditor's right to a ruling is also unqualified. Nothing in the [Bankruptcy] Code subordinates that right to the trustee's duty to administer the estate, let alone his agreement with a creditor that the creditor's claim will be allowed." Id. Similarly, in *In re CS Mining, LLC, 574 B.R. 259, 282 (Bankr. D. Utah 2017)*, the court adopted the holding of *C.P.*

---

[3] Courts discussing Thompson have similarly "emphasize[d] that the trustee, who is charged with the fiduciary duty to administer the estate expeditiously in the best interests of all creditors, is better suited than an individual creditor to judge whether to pursue a claim objection." In re DVR, LLC, 582 B.R. at 520 (emphasis added); In re Trusted Net Media Holdings, LLC, 334 B.R. 470, 476–77 (Bankr. N.D. Ga. 2005) ("Because the Trustee is properly discharging his duty, the Huffmans lack standing to file motions for summary judgment and to participate in the prosecution of the Trustee's objections."). Additionally, because section 502(a) applies to all "parties in interest," caselaw discussing a committee's or an individual creditor's standing to assert causes of action granted to "the trustee" (such as certain avoidance actions) is not directly applicable. It is instructive, however, that even in those cases (where there is no express statutory grant of standing) courts that limit committee standing do so in reliance on the trustee's fiduciary obligations. Accordingly, the First Circuit has explained that creditors have a "responsibility of looking to the Trustee in the first instance as their fiduciary and representative to vindicate their interests." In re Medomak Canning, 922 F.2d 895, 902 (1st Cir. 1990) (emphasis added). The Second Circuit has similarly explained that a committee's right to bring claims belonging to a debtor-in-possession is limited because the "debtor in possession has an obligation to pursue all actions that are in the best interests of creditors and the estate," which gives it a "close identity of interests" with the committee. In re Commodore Int'l Ltd., 262 F.3d 96, 99 (2d Cir. 2001) (emphasis added).

*Hall*, explaining that "concluding otherwise would strip creditors of their claim objection rights under the clear language of the Code." Accordingly, these courts require bankruptcy courts "to resolve claim objections before approving a settlement." *CS Mining, 574 B.R. at 281*. Section 502(b) entitles objecting creditors to a judicial determination on the merits of their claim; because consideration of a proposed compromise under Rule 9019 is, by definition, not a determination on the merits, the right to object to a proposed settlement under Rule 9019 can never satisfy a creditor's statutory rights under section 502(b). *CS Mining, 574 B.R. at 282*; see also *C.P. Hall Co., 513 B.R. at 545–46* ("a hearing under Rule 9019 would provide no solace to the objecting creditor").

9.      Rule 9019 is just that—a rule. As the Second Circuit explained in the context of section 1109(b), "forsaking the plain meaning of a provision of the Bankruptcy Code solely because that meaning conflicts with a bankruptcy rule would run afoul of 28 U.S.C. §2075."[4] *In re Caldor Corp., 303 F.3d 161, 170-71 (2d. Cir. 2002)*.[5] This same flaw defeats the argument that requiring a court to rule on the merits of a claim objection prior to considering a proposed settlement would undermine the bankruptcy policy of favoring compromises, *In re Kaiser Aluminum Corp., 339 B.R. 91, 94 (D. Del. 2006)*: However important this policy, it cannot simply eliminate rights given to creditors [Parties-In-Interest] by the plain and unambiguous language of the Bankruptcy Code. *C.P. Hall Co., 513 B.R. at 545*.[6] *In re DVR, 582 B.R. at 516, 521* (the "trustee owes his fiduciary obligations to a diverse group of parties in interest, including creditors (both secured and unsecured), the debtor, and equity holders").

---

[4] 28 U.S.C. § 2075 provides, in relevant part, that "[t]he Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11. Such rules shall not abridge, enlarge, or modify any substantive right."

[5] See also *In re Stoecker, 179 F.3d 546, 552 (7th Cir. 1999)* (subsequent history omitted) ("in a conflict between the Code and the rules, the Code controls").

[6] To be clear, preventing a debtor and an affected creditor from settling a claim objection brought by a Party-In-Interest does not undermine the bankruptcy policy of favoring compromises. To the contrary, such a rule would promote true compromises and settlement, as it would force the debtor and the affected creditor to engage with the objecting parties. This is especially important where, as here, the third party is unrepresented by a fiduciary.

## GENERAL STANDARDS FOR APPROVAL OF A SETTLMENT

10.     The standards for settlements were addressed in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)*. Here the Court stated: "Compromises are "a normal part of the process of reorganization." *Case v. Los Angeles Lumber Prods. Co., 308 U. S. 106, 308 U. S. 130 (1939)*. In administering reorganization proceedings in an economical and practical manner, it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the "informed, independent judgment" of the bankruptcy court. *National Surety Co. v. Coriell, 289 U. S. 426, 289 U. S. 436 (1933)*. The requirements of §§ 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. §§ 574, 621(2), that plans of reorganization be both "fair and equitable," apply to compromises just as to other aspects of reorganizations. *Ashbach v. Kirtley, 289 F.2d 159 (C.A. 8th Cir.1961); Conway v. Silesian-American Corp., 186 F.2d 201 (C.A.2d Cir.1950)*. The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co., 196 F.2d 484 (C.A. 7th Cir.1952)*. There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer at P390 U.S. 424 425.*

11.      Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.[7]  In accordance with this policy, Congress promulgated **_Federal Rule of Bankruptcy Procedure 9019 (the "Bankruptcy Rules")_**, which governs settlements in a bankruptcy case[8] Rule 9019 gives a bankruptcy judge discretion to approve a proposed settlement and states in relevant part, that: "[o]n motion by the trustee, the court may approve a compromise or settlement."[9]  Rule 9019 applies to both settlements brought before the court on a standalone basis as well as those presented as part of a chapter 11 plan[10]. It is also a question about whether a bankruptcy judge can ever approve a settlement when it adversely affects rights of parties not involved in the settlement negotiations.[11]

12.      **The purpose of Rule 9019 is to "to prevent the making of concealed agreements that are unknown to the creditors and unevaluated by the court**."[12] The court must learn "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated," and to "make an informed and independent judgment as to whether a proposed compromise is "fair and equitable."[13] The Supreme Court has instructed that a bankruptcy judge should form an educated estimate of the "complexity, expense, likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."[14] While the court clearly has an obligation to investigate the factual situation, it is not necessary for the court to conduct a "mini-trial" of the facts or the merits underlying the dispute being settled.[15] Rather, the court should "canvass the issues and see

---

[7] 1 *In re Dewey & LeBoeuf LLP, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012)*
[8] Fed. R. Bankr. P. 9019(a).
[9] *Id.*
[10] *In re  Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 461 (2d Cir. 2007)* (quoting *In re Masters, Inc., 141 B.R. 13, 16 (Bankr. E.D.N.Y. 1992)*).
[11] *In re Miami Metals I, Inc., 603 BR 531, 531 (Bankr. S.D.N.Y. 2019)*
[12] *See In re Iridium Operating LLC, 478 F.3d at 461* (quoting In re Masters, Inc., 141 B.R. at 16).
[13] 7 *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)*
[14] *Id.*
[15] *In re Adelphia Commc'ns Corp., 327 B.R. 143, 158 (Bankr. S.D.N.Y. 2005).*

whether the **settlement fall[s] below the lowest point in the range of reasonableness."[16] Settlements must conform to the absolute priority rule in order to be deemed "fair and equitable"**.  Creditor's committee have a fiduciary duty to maximize recovery of an estate's assets, and if in pursuit of that duty it reaches a settlement that in some way impairs the rule of priorities, then it must state "specific and credible grounds to justify the deviation.[17] Here, the Settlement would not have adhered to the rule of absolute priority and the Creditor's Committee who would benefit most from the settlement could not provide the court with any reasoning for why they should be allowed to deviate from the rule of priorities.[18]

13.     **Rule 9019 Requires Settlements to be Fair and Equitable to Non-Settling Parties**: ''Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval . . . [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside.'[19] Notwithstanding the factors set out in *In re Iridium*, the Second Circuit has made it clear "that when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties."[20]

## SETTLEMENTS MUST FALL BELOW THE LOWEST RANGE OF POSSIBILITIES

4.     *In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983)* ("In undertaking an examination of the settlement, we emphasize that this responsibility of the bankruptcy judge, and ours upon review, is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement "fall[s] below the lowest point in the range of reasonableness", *Newman v. Stein, 464 F.2d 689, 693 (2 Cir.)*, cert. denied sub nom. *Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521,*

---

[16] *In re WT. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983).*
[17] *In re Iridium Operating LLC, 478 F.3d at 456 465*
[18] *Id.*
[19] *In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1026 (2d Cir. 1992)*
[20] *Stanwich Fin. Servs. Corp. v. Pardee (In re Stanwich Fin. Servs. Corp.), 377 B.R. 432, 437 (Bankr. D. Conn. 2007 ) (citing In re Drexel Burnham Lambert Grp., 995 F.2d 1138, 1146-47 (2d Cir. 1993)*

*34 L.Ed.2d 488 (1972).")* In this case, the Debtors and the Opioid Claimants have reached an "agreement" that amounts to nearly $1.8 billion with additional warrants, insurance proceeds and perhaps other actions to be taken.  The Debtors claim they are innocent and Opioid Claimants state that **the Debtors have accepted responsibility for their role in the opioid crisis.** At P3  [D.I. 4594] the FCR notes *"In owning up to its portion of liability in the opioid epidemic, and with the support of other constituencies after arm's-length and good faith negotiations, the Debtors have formed a Plan..."* Shareholders and those other constituents that will receive nothing under the Plan were not consulted.  If the Debtors truly wanted a broad based resolution to the issue, they could have proposed a general allocation of resources across the entire creditor base and other parties in interest to so that everyone would "suffer" the same and could have included very significant cash compensation to the Plan by the Executive and all other parties seeking broad indemnification.  Here they did not.  Here they simply looked to find the parties with the least amount of power and to punish them the most.

15.      The Debtors have stated that they have been in intense, tough negotiations with the Opioid Claimants and the proposed settlement is fair and reasonable.  That is their business judgement and it is that settlement that is likely to come before the Court for confirmation.  The Debtors have released no settlement letters, documents, emails, etc. to support their claim that their business judgement is right. Releasing all the information into the public domain  is something that they and their supporting parties should do immediately in advance of any attempts to bring this settlement to the Court as part of the confirmation hearing.  As stated earlier in ¶6 "The purpose of Rule 9019 is to "to prevent the making of concealed agreements that are unknown to the creditors and unevaluated by the court".  The Debtors have fought, and continue to fight, against <u>ANY</u> challenges to the opioid claims preferring to punt this issue to the court during confirmation.

## CHANGES TO THE LEGAL LANDSCAPE

16.     This past year has brought numerous changes to the legal landscape in the opioid litigations.  Three of the largest distributors have offered global settlements ($7 Billion each payable over 18 years) and Johnson & Johnson has offered $5 Billion over 18 years.  While it is not clear how these amounts were arrived at, it can be looked at as a "social tax" as none of these settlements were achieved through court judgements.  To refute this assertion, the Debtors and the MSGE Group can release the documents, emails, etc. that show how these calculations were arrived at and how they relate to this bankruptcy.  All these firms have ample cash and cash flow to afford those settlements.  This Debtor does not.

17.     Lacking any specificity on how the settlements described in ¶16 above were "negotiated" alternates to the proposed settlement are valid.  Based on the settlement amounts and publicly disclosed data on Revenues, the various settlements, expressed as a percentage of revenue, are:

|  | Revenue $B in 2020 | Settlement $B | Settlement as % Sales |
|---|---|---|---|
| Cardinal | $  152.90 | $  7 | 4.58% |
| AmerisourceBergen | $  189.90 | $  7 | 3.69% |
| McKesson | $  231.60 | $  7 | 3.02% |
| J&J | $  82.59 | $  5 | 6.05% |
| Totals & Average % | $  656.99 | $  26 | 4.34% |
| MNK | $  3.16 | $  1.80 | 56.91% |

The settlement for the Debtors proposed in the Plan is **13.11 times higher** than the other settling parties.  Using the same "social tax" view, the Debtors Plan should only contemplate a maximum of $137,144,000.  This calculation is also prior to taking into account the actual Present Value of the

settlements as the first four are payable over 18 years and the Debtors are required to pay over eight years.[21]

18.    In addition to those global settlements, Endo Health Solutions recently settled with the State of New York and two counties for $50 Million.  Endo and these Debtors have opioid businesses that are similar in size.  In the last filing outlining the Trust distributions, On October 11, 2021, the Debtors filed their **NOTICE OF FILING OF EXHIBIT A (UPDATED NOAT II TRUST DISTRIBUTION PROCEDURES) AND EXHIBIT B (DRAFT GENERAL UNSECURED CLAIMS TRUST AGREEMENT) OF THE FOURTH PLAN SUPPLEMENT FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE [D.I. 4664]**.  Under Exhibit A, Updated NOAT II Trust Distribution Procedures New York would receive 5.39 % of the Debtors' settlement funds.  This percentage was arrived at utilizing the numerous, complex factors shown in the filing. **[D.I.4664-1 P31-36]**

19.    According to public reporting[22] and a press release from the NY Attorney General's Office on September 10, 2021[23], Endo Health Solutions settled all of the asserted claims by the AG and the counties of Suffolk and Nassau in New York State in exchange for a total payment of $50 million.  The settlement includes no admission of wrongdoing, fault or liability of any kind by Endo.  Endo's opioid sales are shown as $657 million in 2014 and $486 million in 2016 according to the Class Action Complaint filed in New Jersey in June of 2020.[24]  The average over the two years was $571.5 million.

---

[21] The Mullin Report uses a base of number of pills and MME's to perform its analysis.  This does not distinguish between legal opioid production and any proven causation with the opioid epidemic.

[22]    https://www.prnewswire.com/news-releases/endo-settles-new-york-state-opioid-cases-and-provides-update-on-remaining-opioid-litigation-301373074.html

[23]    https://ag.ny.gov/press-release/2021/attorney-general-james-secures-50-million-opioid-abatement-drug-manufacturer-endo

[24] *Case 2:20-cv-07536-MCA-MAH Document 1 Filed 06/19/20*

20.     The Debtors also produce opioid products.  For Fiscal Year Ended December 28, 2018 the Debtors reported sales as:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 28, 2018 | December 29, 2017 | Percentage Change |
| Hydrocodone (API) and hydrocodone-containing tablets | $        65.9 | $        85.3 | (22.7)% |
| Oxycodone (API) and oxycodone-containing tablets | 66.1 | 88.0 | (24.9) |
| Acetaminophen (API) | 192.7 | 185.5 | 3.9 |
| Amitiza | 183.8 | — | — |
| Other controlled substances | 343.8 | 412.0 | (16.6) |
| Other | 57.1 | 98.8 | (42.2) |
| Specialty Generics and Amitiza | $       909.4 | $       869.6 | 4.6 |

Total Debtor opioid product sales in 2018 were $475.8 million of which $343.8 million was not related to Hydrocodone or Oxycodone.  The reported sales of those two products were $134 million.  It is unclear what the Other control substances sales are as they are not disclosed in the Debtors' filings.

21.     The Debtors sales were 83.2% of Endo's sales for the period noted.  If the Debtor and Endo engaged in the same illegal practices (which both deny) at the same time and at the same level, the Debtor's settlement with the State of NY and the counties would have been $41,600,000.  Based on the Debtors' submission and calculation of the percentage allocation to New York State of 5.39% the upper range of settlement on a National basis would be $771,180,000.  This is a very long ways for the $1.8 Billion proposed for the settlement.

## PEOPLE OF THE STATE OF CALIFORNIA v. Perdue Pharm, et. al.

22.     The above noted trial (*People of the State of California v. Purdue Pharma, et al., Orange County Superior Court, Case No. CGC-13-534108*) recently concluded in California.  Reuters reported on September 30, 2021[25] that "**California judge questions counties' opioid case against drug makers at trial's end**" stating that "Wilson, the Orange County Superior Court judge presiding over the non-jury

---

[25] https://www.reuters.com/world/us/california-judge-questions-counties-opioid-case-against-drugmakers-trials-end-2021-09-30/

trial, said <u>the plaintiffs lacked evidence showing the marketing caused doctors to write inappropriate,</u> <u>rather than appropriate, prescriptions. Wilson said policymakers seemed to have known an increase in</u> <u>prescriptions of U.S. Food and Drug Administration-approved opioids could result in "regrettable" abuse</u> <u>yet accepted that as a trade-off to ensure pain was treated. "It's the dearth of evidence by a single doctor, a</u> <u>single patient, a single person to say 'I changed my practices because...,' or 'I did something different</u> <u>because...,'" he said. "That's the inference I'm being asked to draw."</u>    In evaluating any proposed Settlement, this court should consider this as well.

23.    The cases against the Debtors are based on the same premises as those against the drug makers in the California action.  If the California counties are unable to prove their allegations and the lawsuits are dismissed, the requirement that **Settlements Must Fall Below the Lowest Range of Possibilities** would have a significant impact on this case and could severely impact all the opioid claims against the Debtor.  <u>There is no provision for payments to any creditor under the Bankruptcy Code for</u> <u>unproven or unallowed claims.</u>

24    It is clear from the above (lacking any other realistic information to evaluate) that the "range of settlements" could range from $0 to less than $771,180,000 in spite of the Opioid Claimants stating they have claims in the **$2.1 TRILLION** range.  There are ***no proven claims*** against the Debtors as the Debtors and the Opioid Claimants have done their very best to defeat the claims processes in the Code and Rules and, as such, there is no concrete way to do claims estimation and the court is reluctant to do so.  Because no Proofs of Claims have been submitted there is little more than speculation to each parties position on settlement.  It will be up to this court to make that determination in keeping with the Supreme Court guidelines outlined in *Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)*.  As noted earlier, there can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim

14

be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."

25.     Difficulty of collection of a debt is a consideration as noted above[26]. Here, the Debtors are not being substantively consolidated.  As stated in the AD HOC ACTHAR GROUP'S INITIAL OBJECTION TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE [D.I. 4704]  P4 at "(2) the "Debtors Specialty Generics business (where the opioid liabilities reside) cannot, on its own, fund the Opioid Settlement necessary to satisfy the multitude of Opioid Claims" because "the $1.6 billion value of the Opioid Settlement exceeds the combined enterprise value of all Specialty Generics Debtors"[27]". At P6 (b.)  The FAP pays the Opioid creditors over 1.2 billion dollars [estimate is $1.8 Billion+] despite the fact that the Specialty Generics business is worthless. A straight liquidation of the Debtors would give the Opioid creditors a *zero recovery* [emphasis added] and allow the AHAG to recover a much higher percentage

26.     The Mullin Report states at Page C-1: " In the chance that the parties do not settle and litigate, there will be a significant depletion of assets available to the creditors due to high litigation

---

[26] The Mullin Report does not fully account for the fact that there is little value in the SpecGenx to pay any opioid claims or the Price Fixing Claims should they be proven.

[27] The UCC objection further stated that, "[t]o solve this problem, the Plan improperly siphons hundreds of millions of dollars from the far more valuable Specialty Brands business (where many of the UCC's constituents possess claims) to fund the Opioid Settlement…". Id.at 3. Under the FAP, this problem has only been exacerbated insofar as (1) $125 million more has been "siphoned off" to pay unsecured opioids creditors, and (2) the Generics Antitrust opioids plaintiffs will be paid $8 million out of the UCC settlement, instead of the Opioids Settlement where such claims belong, thereby reducing the available funds for Acthar claimants. In fact, as has been made clear by the statements of counsel for the opioids claimants and term lenders, the FAP further "robs Peter to pay Paul" (id.) by impermissibly seeking Court approval to maintain the antitrust price fixing scheme to benefit the such creditors

expenses. Mallinckrodt projects that the first three years will cost a total of $125–$150 million, with an additional $30–$34 million in the first twelve months." . This statement does not reflect that the Court has the option to use Rule 42 to affect litigation quickly and cost effectively.[28]

## SUMMARY

27.     It is evident that the Debtors and their Opioid supporting parties believe they have a "Workaround Plan" totally sanctioned by this court related to Opioid claims and give little thought or credence to the issues the Movant has raised. The Movant has no belief that anything will change in the future.   On Discovery, the Movant made a formal request for documents related to several issues including the Bar Date seeking to understand why the Debtors would choose the path they took.   The initial request was sent on July 26, 2021, Response and Objection received August 20, Protective Order received Sept 2, followed up for documents on September 23, received documents on September 28, asked for Privilege Log on October 2, followed up and advised on October 11 that Debtors were working on the Privilege Log.  No log received to date.  Having been on most hearing calls, this is a problem not unique to just this party.

## SECTION 1106 - APPOINTMENT AND ROLE OF AN EXAMINER

28.     The appointment of an examiner in a chapter 11 case is rare. The role of an examiner is generally more limited than that of a trustee. The examiner is authorized to perform the investigatory functions of the trustee and is required to file a statement of any investigation conducted. If ordered to do

---

[28] Through Bankruptcy Rule 7042, Federal Rule of Civil Procedure 42 under Chapter 11. Rule 42(a) "confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate causes for trial as may facilitate the administration of justice." The "broad grant of authority" found in Rule 42 "has been applied liberally" to avoid unnecessary costs or delay by resolving common issues in unified proceedings. In particular, courts addressing mass tort claims have suggested this procedure as a means of resolving threshold issues common to asserted claims both inside and outside of Chapter 11."

so by the court, however, an examiner may carry out any other duties of a trustee that the court orders the debtor in possession not to perform. *11 U.S.C. § 1106*. Each court has the authority to determine the duties of an examiner in each particular case. In some cases, the examiner may file a plan of reorganization, negotiate or help the parties negotiate, or review the debtor's schedules to determine whether some of the claims are improperly categorized. <u>Sometimes, the examiner may be directed to determine if objections to any proofs of claim should be filed or whether causes of action have sufficient merit so that further legal action should be taken.</u> The examiner may not subsequently serve as a trustee in the case. *11 U.S.C. § 321*. The Examiner would review the relationship between the Debtors and the Opioid Claimants, the "Workaround" developed by the two parties, all the correspondence, documents, etc. including Privilege and Work Product documents to ensure that the settlement has TRULY been an arm's length process, fair, reasonable and equitable to all parties and provide those findings to the Court at confirmation. Due to the highly charged nature of this case, an independent third party can be the honest broker required.

29.     Carrying this discourse on at this point will serve no one's interest. On that basis, the Movant will challenge the issues at the Confirmation Hearing in spite of the fact that the Movant believes these are pre-confirmation issues that should be addressed now.

## RESERVATION OF RIGHTS

30.     The Movant reserves all rights to articulate a final position upon hearing all evidence and argument at the Confirmation Hearing (Final dates to be determined, including any changes in position based on other legal proceedings, court findings, settlements and other actions taken or decided on the Opioid litigations underway in any Court in the United States. The Movant further reserves all rights for related to the confirmation of the Debtors' Plan.

Respectfully submitted,

By: _____

Darrel Edelman, Shareholder, Party-in-interest

Dated: October 20, 2021

      Kamloops, B. C. Canada

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELEWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| **MALLINCKRODT PLC, et. al[1].,** | ) |
| | ) |
| | ) |
| Debtors. | ) |
| | ) |

Chapter 11

**Case No. 20-12522 (JTD)**
**(Jointly Administered)**

## CERTIFICATE OF SERVICE

I, Darrel S. Edelman, hereby certify that on OCTOBER 20, 2021 a copy of the attached REPLY TO DEBTORS' CROSS-MOTION AND OBJECTION TO THE MOTION OF DARREL EDELMAN TO AUTHORIZE OBJECTIONS TO CERTAIN CLAIMS AGAINST THE DEBTORS was served by electronic mail to the parties below.

Dated: October 20, 2021
Kamloops, B. C. Canada

Darrel S. Edelman
Email: darreledelman@aim.com

## SERVICE LIST

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042

**BY EMAIL**

Jeffrey R. Waxman
Brya M. Keilson, Sarah Ennis
Morris James LLP
500 Delaware Avenue, Ste 1500
Wilmington, DE 19801
Jwaxman@morrisjames.com; Bkeilson@morrisjames.com; Sennis@morrisjames.com

Kenneth H. Eckstein; Daniel M.
Eggermann; Megan M. Wasson
Kramer Levin Naftalis & Frankel LLP
1177 6th Ave
New York, NY 10036
Keckstein@Kramerlevin.Com; Deggermann@Kramerlevin.Com; mwasson@kramerlevin.com

Arik Preis, Mitchell P. Hurley,
Sara L. Brauner
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
apreis@akingump.com; mhurley@akingump.com; sbrauner@akingump.com

George A. Davis , George Klidonas,
Andrew Sorkin, & Anupama Yerramalli
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
George.Davis@Lw.Com; George.Klidonas@Lw.Com;andrew.sorkin@Lw.Com; Anu.Yerramalli@Lw.Com

Jason B. Gott
Latham & Watkins LLP
330 N. Wabash Avenue, Ste 2800
Chicago, IL 60611
Jason.Gott@Lw.Com

Jeffrey E. Bjork
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071
Jeff.Bjork@Lw.Com

Cullen D. Speckhart
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700

Washington, DC 20004
cspeckhart@cooley.com

Richard S. Cobb
Landis Rath & Cobb LLP
919 Market Street
Suite 1800
Wilmington, DE 19801
Cobb@lrclaw.com

James L. Patton, Jr.
Robert S. Brady
Edwin J. Harron
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Willmington, DE 19801
bankfilings@ycst.com; jpatton@ycst.com;rbrady@ycst.com; eharron@ycst.com

David M. Fournier
Kenneth A. Listwak
Troutman Pepper Hamilton Sanders LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
David.fournier@troutman.com; ken.listwak@troutman.com

Jeffrey M. Schlerf
Fox Rothschild LLP
919 N. Market Street, Ste 300
Wilmington, DE 19801
jschlerf@foxrothschild.com

Mark D. Collins, Michael J. Merchant,
Amanda R. Steele, & Brendan J. Schlauch
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Collins@Rlf.Com;  Merchant@Rlf.Com; Steele@Rlf.Com; Schlauch@Rlf.Com

Natalie D. Ramsey
Jamie L. Edmonson
Robinson & Cole LLP
1201 N. Market Street, Suite 1406
Wilmington, DE 19801
Nramsey@rc.com;  jedmonson@rc.com

Justin R. Alberto, Seth Van Aalten,

Sarah A. Carnes, Andrew J. Roth-Moore
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
jalberto@coleschotz.com;
svanaalten@coleschotz.com;
scarnes@coleschotz.com;
 arothmoore@coleschotz.com

Cathy Hershcopf, Michael Klein, Lauren
A. Reichardt
Cooley LLP
55 Hudson Yards
New York, NY 10001
Chershcopf@cooley.com ; mklein@cooley.com

Scott J. Greenberg, Michael J. Cohen
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
sgreenberg@gibsondunn.com; mcohen@gibsondunn.com

Oscar Garza
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 93612-4412
Ogarza@gibsondunn.com

Scott Greissman, Andrew T. Zatz,
Michele J. Meises, Sam Lawand
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
sgreissman@whitecase.com; azatz@whitecase.com;
sam.lawand@whitecase.com; michele.meises@whitecase.com

Andrew N. Rosenberg; Alice Belisle
Eaton; Claudia R. Tobler; &
Neal Paul Donnelly
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of The Americas
New York, NY 10019-6031
Arosenberg@Paulweiss.Com;
Aeaton@Paulweiss.Com;
Ctobler@Paulweiss.Com;
Ndonnelly@Paulweiss.Com

Jane M. Leamy, Esq.
Office of the United States Trustee
844 King Street Suite 2207
Lockbox 35
Wilmington, DE 19801
Jane.M.Leamy@Usdoj.Gov