# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MALLINCKRODT PLC, *et al.*,[1] | § | Case No. 20-12522 (JTD) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | Re: Docket No. 4508 |

**STATEMENT OF DEERFIELD PRIVATE DESIGN FUND IV, L.P., DEERFIELD SPECIAL SITUATIONS FUND, L.P., AND DEERFIELD PARTNERS L.P. IN SUPPORT OF CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Deerfield Private Design Fund IV, L.P., Deerfield Special Situations Fund, L.P., and Deerfield Partners L.P. (collectively, "Deerfield") by and through their undersigned counsel hereby submit this statement (the "Statement") in support of confirmation of the Debtors' *First Amended Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 4508] (with the Plan Supplement and all other exhibits and schedules thereto and as it may be amended, modified or supplemented from time to time, the "Plan")[2] and in response to the 1L Note Objections (as defined below). In support of the Plan and in response to certain objections included in the 1L Note Objections, Deerfield respectfully states as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

**PRELIMINARY STATEMENT**

1.  Deerfield is a substantial holder of Second Lien Notes and supports confirmation of the Debtors' Plan. The Plan represents significant progress in these Chapter 11 Cases. It reflects the diligent efforts of the Debtors and their advisors and the good faith engagement in these cases by an overwhelming majority of the Debtors' creditor constituencies. Importantly, since the Court approved the Disclosure Statement, the Debtors have garnered crucial additional support for the Plan from the Official Committee of Opioid-Related Claimants, the Official Committee of Unsecured Creditors, and Deerfield, which has been a constructive participant in the Chapter 11 Cases since the Petition Date. As a result of the mutual efforts of the Debtors and those creditors, the Plan now enjoys comprehensive support throughout the Debtors' capital structure, including from all financial creditors other than holders of First Lien Notes (the "<u>1L Noteholders</u>"). Confirmation of the Plan, even without complete consensus, is the necessary next step in the Debtors' path to reorganization. Confirmation is supported by the facts and the law, as set forth in the Debtors' forthcoming brief in support of confirmation, which Deerfield hereby joins and incorporates herein to the extent not inconsistent.

2.  Notwithstanding overwhelming support of the Plan on the eve of the confirmation hearing, certain creditor groups continue to press their parochial challenges to confirmation. Specifically, the Ad Hoc First Lien Notes Group[3] and Columbus Hill Capital Management, L.P. each filed a confirmation objection primarily arguing (as they have since the beginning of these

---

[3] Based on the disclosures contained in (i) the most recent Rule 2019 statement of the Ad Hoc First Lien Notes Group, dated May 20, 2021 and (ii) as applicable, the most recent Rule 2019 statement for the Unsecured Notes Ad Hoc Group, dated July 13, 2021 [Dkt. No. 3211], the members of the Ad Hoc First Lien Notes Group hold less than 50% of the outstanding principal of First Lien Notes. At least half of the members of the Ad Hoc First Lien Notes Group are cross-holders of the Debtors' other financial debt, including Guaranteed Unsecured Notes. In addition, as set forth in the Debtors' preliminary declaration with respect to plan voting [Dkt. No. 4955], nearly 50% in number of holders of First Lien Notes Claims that voted did so to accept the Plan.

cases) that 1L Noteholders are entitled to receive a "makewhole" premium provided for in the First Lien Notes Indenture (the "Applicable Premium") if the First Lien Notes are reinstated.[4] Although the Applicable Premium dispute is between the 1L Noteholders and the Debtors, the 1L Note Objections also argue that the Plan improperly deprives 1L Noteholders of purported intercreditor claims against holders of Second Lien Notes Claims (the "2L Noteholders") under the existing Second Lien Intercreditor Agreement, dated December 6, 2019 (the "ICA"), primarily under the "turnover" provision of the ICA (such argument, the "1L Intercreditor Objection").

3.  Those purported intercreditor claims are without merit under the clear language of the ICA and a straightforward application of the decisions by Judge Drain in *In re MPM Silicones, LLC*,[5] affirmed by the District Court on appeal, and by Judge Sontchi in *In re Energy Future Holdings Corp.*[6] (in which Judge Sontchi agreed with and applied Judge Drain's reasoning), affirmed by the District Court and by the Third Circuit on appeal.  Both cases are on all fours with respect to any purported "turnover" claim against the 2L Noteholders and drew a clear and fundamental distinction between a plan distribution on account of *claims* and one on account of *collateral* such that a turnover provision governing the latter is entirely inapplicable to the former. That is precisely the case here.  In fact, the Ad Hoc First Lien Notes Group concedes that the 2L

---

[4] *See Objection and Response of the Ad Hoc First Lien Notes Group to (A) First Amended Joint Plan Of Reorganization Of Mallinckrodt Plc And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code and (B) Debtors' Objection To Funded Debt Claims* [Dkt. No. 4725-1] (the "Ad Hoc 1L Group Objection") and *Columbus Hill Capital Management, L.P.'s (A) Objection to Confirmation of Debtors' Joint Plan of Reorganization and (B) Response to Objection to Funded Debt Claims* [Dkt. No. 4729]. Wilmington Savings Fund Society, FSB as trustee under the First Lien Notes Indenture also filed its *Statement in Support of the Objection and Response of the Ad Hoc First Lien Notes Group to (A) First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code and (B) Debtors' Objection to Funded Debt Claims* [Dkt. No. 4713] (together with the foregoing objections, the "1L Note Objections" and the objecting parties thereunder, the "1L Note Objectors").

[5] 518 B.R. 740, 752, 754 (Bankr. S.D.N.Y. 2014), *aff'd*, 596 B.R. 416 (S.D.N.Y. 2019) [hereinafter *Momentive*].

[6] 566 B.R. 669, 675 (Bankr. D. Del. 2017), *aff'd*, 585 B.R. 341 (D. Del. 2018), *aff'd*, 773 Fed. App'x 89 (3d Cir. 2019) [hereinafter *EFH*].

Noteholders' distributions under the Plan are on account of their *claims*, not on account of the collateral securing those claims.  *See* Ad Hoc 1L Group Obj. ¶ 88 ("[T]he Plan acknowledges that the New Second Lien Notes will be distributed to the [2L Noteholders] 'in full and final satisfaction, settlement, release, and discharge' of their claims on the existing Second Lien Notes—*__that is, on account of their secured claims against the Debtors__*." (emphasis added)).  The Court need not look further than the Ad Hoc First Lien Notes Group's own words and the decisions in *Momentive* and *EFH* to conclude that any purported turnover claim against the 2L Noteholders is entirely without merit.

4.    In addition, the 1L Note Objectors' assertion (notably, in a single footnote) that 2L Noteholders could somehow be obligated to "account" for the Applicable Premium in the event the Court determines that the Debtors have no obligation to pay such amount as a result of reinstatement under Section 1124(2) of the Bankruptcy Code fails for another, entirely separate reason.  If the 1L Notes are reinstated, the 1L Noteholders would be unimpaired (as determined by this Court) and would be receiving 100% of what is owed to them under the terms of the First Lien Notes Indenture.  The 1L Note Objectors' suggestion that in a reinstatement context the Applicable Premium would be transformed from a meritless claim against the Debtors to a valid "First Lien Obligation" under the ICA is illogical.  It makes no sense, even taking into account the language relied on by the 1L Note Objectors in the definition of "First Lien Obligations" under the ICA.  The 1L Note Objectors argue for a result that would lead to an absurd and incongruous outcome that is fundamentally inconsistent with principles of law, and would result in the very double recovery for 1L Noteholders that the Debtors object to in their Claim Objection.[7]

---

[7]    *See Debtors' Objection to Funded Debt Claims Pursuant to Article VII.J of the Debtors' Joint Plan of Reorganization (Fifth Omnibus Objection (Substantive))* [Dkt No. 3504] (the "Claim Objection") ¶ 42 ("[A] holding that the noteholders must receive both the scheduled interest payments under the reinstated indenture and the

5. As a result, the Plan does not modify or alter the 1L Noteholders' rights with respect to intercreditor issues. Rather, the Plan clarifies and confirms what those rights are based on the facts and the law before the Court (*i.e.*, that the 1L Noteholders' purported intercreditor claims are without merit).[8] Accordingly, the Court should overrule the 1L Intercreditor Objection and confirm the Plan.

## **ARGUMENT**

### A. The New Second Lien Notes Are Not Distributions "on Account of" or "in Respect of" Collateral and Therefore Are Not Subject to the Turnover Provision

6. The 1L Note Objections argue that the Plan will deprive 1L Noteholders of certain turnover claims pursuant to ICA Section 4.2(b) (the "Turnover Provision") of the New Second Lien Notes[9] to be distributed to 2L Noteholders under the Plan on account of their claims.[10]

---

makewhole would give them a double recovery.").

[8] The 1L Note Objectors do not argue that the Court lacks jurisdiction to address intercreditor issues through the Plan or that doing so is otherwise improper, and those parties should be estopped from doing so hereafter. Nevertheless, Deerfield submits that this Court can and should resolve these intercreditor matters in the context of confirmation of the Plan. The Debtors are parties to the ICA, and full and final resolution of all claims against 2L Noteholders as part of the bankruptcy proceedings is a critical component of Deerfield's support for the Debtors' Plan and is integral to achieving the finality for the Debtors and its creditor constituencies that has been the end-goal of the Debtors' reorganization efforts. Furthermore, the Court has authority to resolve the intercreditor dispute, if any, as part of confirmation. *See, e.g.*, *In re Energy Future Holdings Corp.*, 546 B.R. 566, 569-70 (Bankr. D. Del. 2016) (before transferring case to Delaware, New York bankruptcy court found it had jurisdiction over dispute concerning allocation under a reorganization plan and intercreditor agreement, because such claims "by their nature can emerge only in a bankruptcy proceeding are 'arising in' claims under [Bankruptcy Code] § 1334(b)," and "the court that resolves the allocation dispute may be called upon to consider the interaction between provisions of the Intercreditor Agreement and bankruptcy law and principles" (quoting *Delaware Tr. Co.* v. *Wilmington Tr., N.A.*, 534 B.R. 500, 515-17 (S.D.N.Y. 2015))); *see also In re Best Products Co., Inc.*, 68 F.3d 26, 31 (2d Cir. 1995) (dispute "involv[ing] enforcement of a contractual subordination agreement" was "essential to the administration of the estate," and "the power to prioritize distributions has long been recognized as an essential element of bankruptcy law").

[9] The 1L Note Objections refer only to the turnover of the New Second Lien Notes, but no distributions received by 2L Noteholders under the Plan are subject to the Turnover Provision under the same reasoning of *Momentive* and *EFH*, including, without limitation, any adequate protection payments received by 2L Noteholders, *see, e.g. EFH*, 773 Fed. App'x at 93 ("[A]dequate-protection payments are not payments of collateral," because "[a] payment of collateral reduces the amount of money owed on a debt," and "[t]he adequate-protection payments did not decrease the amount of money the subsidiary owed on the debts"; likewise, "the adequate-protection payments cannot be proceeds" of collateral if the "creditors do not identify a sale, collection, or disposition of collateral that happened before those payments."), or in connection with the Applicable Premium, as discussed herein.

[10] The Turnover Provision provides in relevant part that "so long as the Discharge of First Lien Obligations has

However, the plain language of the ICA unambiguously provides that the Turnover Provision applies only to distributions "in respect of or on account of" the relevant collateral, and by the 1L Note Objectors' own acknowledgment the Plan distributions to 2L Noteholders are distributions on account of their claims. The 1L Note Objections cite no relevant authority to the contrary for a simple reason—courts considering the issue, including in two chapter 11 cases on which the 1L Note Objectors heavily rely in arguing for the payment of the Applicable Premium by the Debtors, have reached exactly the opposite conclusion.

7. The decisions in *Momentive* and *EFH*, each as affirmed on appeal, interpreted turnover provisions governing collateral matters and underscored the distinction between distributions on claims and distributions on collateral in finding that the turnover provisions only governed the latter. In essence, both courts concluded that a traditional sale, liquidation or other collateral event gives rise to distributions on account of collateral that can be subject to turnover claims, while the issuance of new securities under a plan of reorganization (as is the case here) does not. As the District Court in *Momentive* succinctly explained, in order for a distribution to be on account of collateral, "[a]s a matter of economics, this Court finds that the literal exchange or transformation of the object comprising the collateral is necessary. Liened collateral cannot be extrapolated to include the debtor's other assets that do not relate to, or directly derive from, that collateral." 596 B.R. at 434-35.

8. In *Momentive*, the intercreditor agreement at issue required turnover by junior secured creditors to senior secured creditors of "Common Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Common Collateral."

---

not occurred, if in any Insolvency or Liquidation Proceeding [the 2L Noteholders] shall receive any distribution of money or other property in respect of or on account of the Collateral," they must turn over "such money, other property or amounts . . . in the same form as received." ICA § 4.2(b).

-6-

518 B.R. at 752, 754. In evaluating the scope of that provision, Judge Drain considered the definition of "proceeds" under the New York Uniform Commercial Code, which defined proceeds to include "whatever is collected on, or distributed *on account of*, collateral." *Id.* at 754 (quoting N.Y. U.C.C. Law § 9-102(a)(64)(B)) (emphasis added).[11] Judge Drain flatly rejected senior creditors' argument that new stock to be distributed to junior creditors under the plan was a distribution "on account of" the collateral and therefore constituted proceeds of collateral subject to turnover, explaining as follows:

> From the perspective of the debtors, that stock [distributed under the plan] is not something that any currently secured party's existing lien would attach to . . . , because the new common stock comprises proceeds of the [junior creditors'] liens and claims, not the proceeds of the *debtors'* assets that constitute the Common Collateral. It is being received therefore on account of or based on rights arising out of the [junior creditors'] *liens and claims, not on account of the Common Collateral* or based on rights arising out of the Common Collateral.

*Id.* at 754-55 (second emphasis added). Judge Drain reasoned that the new securities issued to junior creditors could not constitute a distribution "on account of" the collateral because the "collateral will not have been diminished one iota by the distribution of new stock under the plan to the" junior creditors, and therefore "[t]here has been no economic event altering the nature of those assets that gives rise to proceeds." *Id.* at 755. That reasoning is squarely on all fours with the facts here.

9. Similarly, Judge Sontchi rejected an attempt to distinguish Judge Drain's *Momentive* decision in the context of a similar intercreditor dispute in *EFH*. *See* 566 B.R. at 675 (finding plan distributions of reorganization securities to junior secured creditors were not

---

[11] Although the decisions in *Momentive* and *EFH* did not need to consider whether the distributions at issue constituted distributions "in respect of" the collateral, as a matter of logic, a distribution must still somehow implicate collateral, and not just claims, in order to constitute a distribution "in respect of" collateral. Because the distributions to 2L Noteholders under the Plan are on account of their claims under the reasoning of *Momentive* and *EFH* (and as acknowledged by the Ad Hoc First Lien Notes Group), those distributions are neither "on account of" nor "in respect of" the collateral.

-7-

distributions of "Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral" and therefore senior creditors had no valid turnover claims under intercreditor agreement).  Under the plan in *EFH*, through a complex series of transactions structured for tax purposes, the assets serving as collateral were transferred to a third-party entity in exchange for that entity's common and preferred stock, which in turn would be distributed to creditors pursuant to the plan.  *Id.* at 679-80.  Agreeing with Judge Drain's reasoning in *Momentive*, Judge Sontchi concluded that the creditors receiving the new equity "received Plan Distributions by application of the . . . Plan in exchange for their *liens*, not on account of the conversion of the Debtors' *assets*."  *Id.* at 685-86 (emphasis added; quotations omitted).  Even though the transactions in *EFH* were far more similar to a true sale or collateral event than the standard debt-for-equity exchange in *Momentive*, Judge Sontchi rejected the attempt to distinguish the *Momentive* decision and held that the transactions were not "akin to a Section 363 sale" because they were "not permanently removing assets" from the reorganized debtor.  *Id.* at 685.  Concluding that the collateral "does not change in any way (other than a Step-Up Basis for tax purposes) as a result of the Plan Distributions," Judge Sontchi held that the plan distributions were not collateral or proceeds of collateral and therefore senior creditors had no turnover claims under the applicable intercreditor agreement.  *Id.* at 685-86.

10. Here, there is no sale, liquidation or other collateral event triggering distributions to 2L Noteholders (or any other creditor of the Debtors).  The issuance of the New Second Lien Notes under the Plan is substantially farther removed from a sale than the *EFH* transactions.  Just as in *Momentive* and *EFH*, the existing collateral will not be "diminished one iota" by the distribution of the New Second Lien Notes.  *See Momentive*, 518 B.R. at 755.  As a result, the New Second Lien Notes are distributions on Second Lien Notes Claims, and not on account of or in

respect of collateral, and therefore are not subject to the Turnover Provision.  Because the collateral governed by the ICA is not implicated by the Debtors' Plan distributions to 1L Noteholders and 2L Noteholders under the holdings in *Momentive* and *EFH*, the Turnover Provision does not apply to any distributions received by 2L Noteholders.  1L Noteholders cannot rewrite the ICA simply because they are unhappy with their treatment under the Plan.[12]

11.  For similar reasons, the sole authority cited in the 1L Note Objections, *In re La Paloma Generating Co. LLC*, is inapposite.  609 B.R. 80 (D. Del. 2019).  There, the cash distributions flowed from the *liquidation* of collateral, the cash proceeds of which were then distributed to secured creditors (whose claims were in fact undersecured). *Id.* at 86-87.  That is the exact scenario contemplated by the *Momentive* and *EFH* courts as the paradigmatic example of distributions being made on account of or in respect of collateral, where the collateral has in fact been "exhausted, decreased, diluted or otherwise used up." *Momentive*, 596 B.R. at 434.  That scenario, however, bears no relevance to the facts here, which are entirely consistent with the facts in *Momentive* and *EFH* where the collateral was unchanged and unaffected by the applicable distribution and therefore the distribution was not "on account of" the collateral.  The 1L Noteholders' reliance on *Paloma*—in which there was an *actual liquidation* of the subject collateral and a distribution of cash to the secured creditors—does not withstand even cursory scrutiny.  Therefore, all of the authority cited by both the 1L Note Objectors and in this Statement

---

[12] Deerfield submits that the terms of the ICA are unambiguous.  Just as Judge Drain found in *Momentive*, the ICA relates to the parties' rights with respect to shared collateral and should be interpreted as such. *Momentive*, 518 B.R. 746 ("As I noted in my previous ruling on confirmation of the debtors' chapter 11 plan, the ICA is very clearly an intercreditor agreement pertaining to the parties' rights in respect of shared collateral.  That is the overall context of the Agreement, and it is in that context that the complaints' claims should be evaluated.").  Nevertheless, the parties' clearly intended for the ICA to govern only rights and priorities with respect to the collateral by establishing lien, and not payment, subordination. *See* ICA § 2.1 (titled "Relative Priorities" and governing the relative lien priority as between the liens securing the First Lien Notes and the Second Lien Notes and establishing lien, and not payment, subordination).

unequivocally demonstrates that the 2L Noteholders' Plan distributions—distributions to be received on account of their *claims*—are therefore outside the scope of the Turnover Provision and the 1L Noteholders have no valid turnover claims against the 2L Noteholders.

> **B.  If Reinstated, First Lien Note Claims Will Be Unimpaired and 2L Noteholders Have No Obligation to "Account" for 1L Noteholders' Claims Under the First Lien Notes Indenture Found Meritless by the Court**

12. Scraping the barrel in search of potential claims against the 2L Noteholders, tucked away in a footnote, the Ad Hoc First Lien Notes Group asserts that the ICA obligates the 2L Noteholders "to account for any portion of the Applicable Premium that is not allowed as a claim against the Debtors." Ad Hoc 1L Group Obj. ¶ 90 n.26. This position, unsupported by any operative provision of the ICA or authority, is meritless for two reasons.

13. *First*, as explained above, because 2L Noteholders are receiving only distributions on account of their claims, and not "on account of or in respect of" the collateral securing those claims, the Turnover Provision does not apply to any distributions received by 2L Noteholders or any claims of 1L Noteholders, and 1L Noteholders have no valid turnover claims (whether in the amount of principal, interest, or the Applicable Premium under the First Lien Notes Indenture, or whether such claims are allowed or disallowed).[13] *See supra* pt. A.

14. *Second*, even assuming *arguendo* that 1L Noteholders could assert turnover claims against 2L Noteholders, if the Court determines that the Debtors are not required to pay the

---

[13] In support of the assertion that 2L Noteholders could be required to "account" for any portion of the Applicable Premium that is not allowed as against the Debtors, the Ad Hoc 1L Group Objection merely cites to the ICA's definition of "First Lien Obligations" and does not identify any operative provision of the ICA giving rise to such an obligation. *See* Ad Hoc 1L Group Obj. ¶ 90 n.26. Deerfield presumes the Ad Hoc 1L Group to be arguing that if the Applicable Premium constitutes "First Lien Obligations" under the ICA, then the amount of any turnover claim by 1L Noteholders against 2L Noteholders would include the relevant amount of the Applicable Premium. That argument fails for the reasons set forth herein. To the extent 1L Noteholders attempt to argue that any provision of the ICA other than the Turnover Provision somehow creates an obligation for 2L Noteholders to "account" for any portion of the Applicable Premium, 1L Noteholders should be estopped from doing so hereafter and Deerfield reserves all rights, defenses and claims with respect thereto.

-10-

Applicable Premium under the First Lien Notes Indenture and the First Lien Notes are reinstated, such turnover claims cannot include amounts corresponding to the Applicable Premium.  In that scenario, 1L Noteholders would be unimpaired under the Plan and would receive 100% of what is owed to them under the First Lien Notes Indenture.  As such, the Applicable Premium cannot constitute "First Lien Obligations" as a matter of contract or common sense for any purpose, including under the ICA.  Requiring 2L Noteholders to pay the Applicable Premium to the 1L Noteholders when the Debtors are not obligated to pay it under the First Lien Notes Indenture would lead to the same windfall for 1L Noteholders identified by the Debtors in their Claim Objection in support of reinstatement of the First Lien Notes without the Applicable Premium. Here, the 1L Noteholders argue to receive a double recovery—*both* scheduled interest payments under the reinstated First Lien Notes Indenture from the Reorganized Debtors *and* the Applicable Premium from the 2L Noteholders.  As the Debtors have argued in their Claim Objection, such a result "would never be available outside of bankruptcy and would violate the cardinal rule that a creditor should not obtain a 'windfall merely by reason of the happenstance of bankruptcy.'" Claim Obj. ¶ 42 (quoting *Butner* v. *United States*, 440 U.S. 48, 55 (1979)).

15. The Ad Hoc First Lien Notes Group points to language in the definition of "First Lien Obligations" relating to "disallowed" 1L Noteholder claims as a basis to turn the Applicable Premium, having been found not owed by the Debtors as a result of reinstatement, into a valid obligation under the ICA.  This argument fails as that language still requires an amount claimed by 1L Noteholders to be contractually payable under the First Lien Notes Indenture, even if then disallowed.  *See* ICA, Definition of "First Lien Obligations" ("In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) ***to be paid by a First Lien Obligor pursuant to the First Lien Financing Documents*** . . .

are disallowed by order of any court of competent jurisdiction," such amounts "continue to accrue and be added to the amount to be calculated as the 'First Lien Obligations.'" (emphasis added)). Put simply, if the Court determines that the First Lien Notes can be reinstated without payment of the Applicable Premium, the 1L Noteholders' claim for the Applicable Premium will not be an otherwise payable obligation that has been disallowed. As no Applicable Premium is payable under the First Lien Notes Indenture in a restatement scenario, no Applicable Premium can be a "First Lien Obligation" for any purpose. *In re Onco Inv. Co.*, 316 B.R. 163, 167 (Bankr. D. Del. 2004) (reinstatement pursuant to Section 1124(2) "roll[s] back the clock to the time before the default existed" and that roll-back "should be read to be a roll-back as to *all parties* and for *all purposes*") (emphasis added); *accord In re Energy Future Holdings Corp.*, 551 B.R. 550, 562-63 (Bankr. D. Del. 2016).[14]

16.     Accordingly, if the Court agrees with the Debtors that reinstatement under Section 1124(2) of the Bankruptcy Code does not require the Debtors to pay the Applicable Premium, the Applicable Premium cannot then be recoverable against the 2L Noteholders under the ICA under the exact same legal theory that the Court rejected. If they are reinstated under the Plan, the 1L Noteholders have "no cause to complain," whether to the Debtors, the 2L Noteholders or otherwise. Claim Obj. ¶ 36 (quoting S. Rep. No. 95-989, at 120 (1978)).

---

[14] The alternative conclusion proposed by the 1L Note Objectors would lead to absurd results: as an example, if 1L Noteholders asserted claims for fees and expenses against the Debtors unquestionably in excess of what they in fact were entitled under the terms of the First Lien Notes Indenture and such claims were "disallowed" by the Court, those claims would not constitute "First Lien Obligations" under the ICA. Nor would any meritless claim asserted by 1L Noteholders against the Company outside of bankruptcy and disallowed by a court of competent jurisdiction be deemed "First Lien Obligations" under the ICA.

### C. The ICA Does Not Require 2L Noteholders to "Pay-Over" Any Amounts Received During the Chapter 11 Cases to 1L Noteholders

17. Finally, the 1L Note Objections also assert claims for pay-over of adequate protection payments received by 2L Noteholders during these Chapter 11 Cases in exchange for reinstated First Lien Notes (or, as applicable, Cram-Down First Lien Notes) equal in value to such payments pursuant to ICA Section 6.3(b)(ii) (the "AP Pay-Over Provision").[15] The AP Pay-Over Provision requires 2L Noteholders to pay an amount to 1L Noteholders in certain circumstances equal to the lesser of (x) the amount of adequate protection payments received and "(y) the amount of the short fall (the "Short-Fall") in *payment in full* of the First Lien Obligations." (emphasis added). The 2L Noteholders do not have any obligation to 1L Noteholders under the AP Pay-Over Provision because, under the Plan, the 1L Noteholders will receive payment in full either in the form of reinstatement of the First Lien Notes (which pursuant to the Bankruptcy Code renders them unimpaired) or receipt of the Cram-Down First Lien Notes (in which case the Court will have determined that 1L Noteholders are receiving the indubitable equivalent of the full value of their claims). In either scenario, 1L Noteholders will receive distribution of 100% of what 1L Noteholders are entitled to under the First Lien Notes Indenture—in other words, "payment in full." Accordingly, the "Short-Fall" under the AP Pay-Over Provision is zero and there is no pay-over obligation.

18. Separate and in addition to the above, 2L Noteholders should not be required to pay over any amounts to the 1L Noteholders under the AP Pay-Over Provision because there has not been any "Diminution in Value" (as defined in the Cash Collateral Order) rendering 2L Noteholders undersecured, and therefore the payments received by 2L Noteholders under the Cash Collateral Order are properly characterized as Plan distributions rather than adequate protection payments. Because the adequate protection granted to 2L Noteholders (as well as the other

Prepetition Secured Parties) was granted "solely for and equal in amount to the Diminution in Value resulting from the Debtors' sale, lease, or use of the Prepetition Collateral," Cash Collateral Order ¶ 5(a), and without prejudice to "whether any such payments should be recharacterized or reallocated pursuant to the Bankruptcy Code as payments of principal, interest or otherwise," *id.* ¶ 5(d)(z), the Debtors could determine to claw back the "Second Lien Adequate Protection Payments" (as defined in the Cash Collateral Order) in the absence of any "Diminution in Value," in which case the Debtors would then be obligated to repay such amounts under the Plan (effectively roundtripping such amounts and converting them from adequate protection to Plan distributions). If the Debtors were to do so, 2L Noteholders would not have received any "adequate protection payments," and the AP Pay-Over Provision would be inapplicable.[16] While the Debtors have not (yet) taken the administrative steps to claw back adequate protection payments at this point (including, presumably, because of the inefficiency of roundtripping certain clawed back amounts to the applicable Prepetition Secured Party given the treatment of such parties under the Plan), characterizing any of the payments received by 2L Noteholders during the pendency of these cases as "Second Lien Adequate Protection Payments" is fundamentally inconsistent with the

---

[15] The AP Pay-Over Provision provides in relevant part: "If any Second Lien Claimholder is entitled by order of a court of competent jurisdiction to receive or receives adequate protection payments for post-petition interest and/or fees and expenses in an Insolvency or Liquidation Proceeding ('Second Lien Adequate Protection Payments'), and the First Lien Claimholders do not receive payment in full in cash of all First Lien Obligations upon the effectiveness of the plan of reorganization or similar dispositive restructuring plan for, or conclusion of, that Insolvency or Liquidation Proceeding, then an amount shall be paid over by Second Lien Claimholders to the First Lien Claimholders (the 'Pay-Over Amount') equal to the lesser of (x) the Second Lien Adequate Protection Payments received by the Second Lien Claimholders and (y) the amount of the short fall (the 'Short-Fall') in payment in full of the First Lien Obligations; provided that to the extent any portion of the Short-Fall represents payments received by the First Lien Claimholders in the form of promissory notes, equity or other property equal in value to the cash paid in respect of the Pay-Over Amount, the First Lien Claimholders shall, upon receipt of the Pay-Over Amount, transfer those promissory notes, equity or other property, equal in value to the cash paid in respect of the Pay-Over Amount, to the applicable Second Lien Claimholders pro rata in exchange for the Pay-Over Amount."

[16] As described above, the ICA governs collateral matters, and not claim matters; as a matter of logic, in the absence of any "Diminution in Value," the collateral is simply not implicated from the perspective of the Prepetition Secured Parties (as defined in the Cash Collateral Order), and therefore none of the payments received by 2L Noteholders are subject to the ICA.

terms of the Cash Collateral Order. Deerfield submits that the Court should not elevate form over substance (or require the Debtors to take unnecessary administrative steps with respect to such payments) and should accordingly conclude, consistent with the above, that 2L Noteholders have no obligations under the AP Pay-Over Provision.[17]

## CONCLUSION

19. In an obvious attempt to garner leverage in their dispute with the Debtors, the 1L Note Objectors have concocted untenable claims under the ICA against 2L Noteholders. Each of the claims identified in the 1L Note Objections is without merit. Most prominently, the decisions in *Momentive* and *EFH* (glaringly unacknowledged and unaddressed in the 1L Note Objections) make clear that the 1L Noteholders have no valid turnover claims under the ICA. The ICA's scope is limited to the rights and priorities relating to the collateral and does not impose obligations on 2L Noteholders to guarantee or insure the Debtors' obligations or to provide 1L Noteholders with a second source of recovery.

20. Consistent with the fundamental objectives of the Bankruptcy Code, 2L Noteholders (and the Debtors, who are parties to the ICA and who would necessarily be implicated by any post-emergence litigation under the ICA) are entitled to post-emergence certainty through the Plan. That certainty is a critical component of Deerfield's support for the Plan. The Court should not countenance 1L Note Objectors' objection to confirmation premised on meritless claims under the ICA. Accordingly, Deerfield respectfully requests that the Court overrule the 1L Intercreditor Objection and confirm the Plan.

---

[17] Deerfield reserves all rights with respect to 1L Noteholders' obligation to provide new notes or other non-cash plan distributions from 1L Noteholders in an amount equal in value to any amounts 2L Noteholders are required to pay over to 1L Noteholders pursuant to Section 6.3(b)(ii) of the ICA. *See* ICA, § 6.3(b)(ii); *see also* Ad Hoc 1L Note Group Obj. ¶ 89 n.25.

## **RESERVATION OF RIGHTS**

21. Deerfield expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the 1L Intercreditor Objection, the Plan or any other issue in these Chapter 11 Cases, and to supplement, modify, and amend this Statement, and to raise additional arguments in writing or orally, or examine witnesses, as appropriate, at the hearing on the Plan.

Dated: October 26, 2021
Wilmington, Delaware

Respectfully submitted,

/s/ *D. Ryan Slaugh*
**POTTER ANDERSON & CORROON LLP**
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
D. Ryan Slaugh (No. 6325)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801-3700
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
csamis@potteranderson.com
astulman@potteranderson.com
rslaugh@potteranderson.com

-and-

**SULLIVAN & CROMWELL LLP**
James L. Bromley (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004-2498
Tel: 212-558-4000  Fax: 212-558-3588
bromleyj@sullcrom.com
bellerb@sullcrom.com

**COUNSEL FOR DEERFIELD PRIVATE DESIGN FUND IV, L.P., DEERFIELD SPECIAL SITUATIONS FUND, L.P., AND DEERFIELD PARTNERS L.P.**