**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) |
|  | ) |

**DECLARATION OF MARC J. BROWN IN SUPPORT OF CONFIRMATION
OF THE JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND
ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Marc J. Brown, hereby declare under penalty of perjury:

1.      I am a Managing Director at AlixPartners, LLP ("*AlixPartners*"), which maintains its principal office at 909 3rd Avenue, New York, NY 10022 as well as other offices located throughout the world.  On November 19, 2020, the United States Bankruptcy Court for the District of Delaware (the "*Court*") entered an order [Docket No. 560] approving the employment and retention of AlixPartners as financial advisor to the above-captioned debtors and debtors-in-possession (collectively, the "*Debtors*") in these chapter 11 cases (these "*Chapter 11 Cases*").

2.      I submit this declaration (this "*Declaration*") in support of confirmation of the Debtors' *First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code*, filed on September 29, 2021 [Docket No. 4508] (as amended, modified, or supplemented in accordance with its terms, the "*Plan*").[2]

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

3.      Through my role as financial advisor to the Debtors, I am familiar with the Debtors' business, financial affairs, current and anticipated post-emergence capital structure, creditors, and related matters.  I am also familiar with the terms of the Debtors' Plan[3] and the Disclosure Statement.

4.      Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by employees of AlixPartners; (d) information provided to me by, or discussions with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (e) my general experience and knowledge.  I am authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## QUALIFICATIONS

5.      I am AlixPartners' Valuation Services Global Practice Coordinator and have more than 25 years of professional experience in financial analysis, with a primary focus on valuing private and public companies, assets, and related securities.  I have extensive experience in valuing companies, assets, and securities in connection with mergers and acquisitions, divestitures, strategic planning, financial reporting, tax reporting and planning, bankruptcies, reorganizations, and workout situations, as well as in litigation and other disputes.  In addition to business enterprise valuations, I have valued debt instruments, warrants, options and other derivative securities, common and preferred stock, as well as limited partner interests, intellectual property ("*IP*"), and intangible assets.  I have advised law firms, creditors, investors, government agencies, and public and private companies of all sizes, both domestically and internationally.

---

[3] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

6.      I have significant experience conducting valuations and providing expert testimony in the healthcare, medical device, and pharmaceutical industries. I have previously valued and provided expert analysis related to pharmaceutical products and medical devices at various stages of their life cycle in a variety of contexts.

7.      I have also advised companies and creditors operating in workout and in-court bankruptcy situations on a variety of financial and operational matters including performing valuation analyses, in both going-concern and liquidation contexts, as well as assessing solvency and credit worthiness.  As an advisor, I have conducted numerous liquidation analyses for various companies, including for SIGA Technologies, Inc., Aceto Corporation, Caesar's Entertainment Operating Company, General Motors, Reader's Digest, CGG Holding (U.S.), Pacific Drilling S.A., Oasis Petroleum Inc., Bruin E&P Partners, LLC, Linn Energy, Inc., McDermott International, Inc., Basic Energy Services, C&J Energy Co., Tidewater, Inc., General Motors Corp., and Paragon Offshore PLC and I have also performed liquidation analyses as an investment analyst at a distressed debt hedge fund.

8.      I have been qualified as a valuation and financial expert in federal district and state courts and a valuation, liquidation analysis and solvency expert in bankruptcy courts.  In addition, I have provided buy-side and sell-side merger and acquisition advisory assistance and calculated and testified to damages for litigation, arbitration, and mediation purposes.

9.      I have a B.S. in Finance (with high honors) from the University of Illinois at Urbana-Champaign and an MBA (with honors) from the University of Chicago Graduate School of Business with concentrations in Accounting, Finance, and Strategic Management.  I am a CFA charterholder and a member of the CFA Institute, as well as the CFA Society of Chicago, the American Bankruptcy Institute, the Turnaround Management Association, AIRA, and the

Business Valuation Association.  I also served on the AIRA Standards for Distressed Business Valuation independent review committee.  I have presented to diverse audiences on a variety of valuation, solvency, and other financial topics.

10.     Since August 2019, the Debtors have engaged AlixPartners as their financial advisor and to provide the Debtors with general restructuring and financial advice.  Since its engagement, AlixPartners has worked closely with the Debtors' management and other professionals with respect to their strategic alternatives and, ultimately, these Chapter 11 Cases, and AlixPartners has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## LIQUIDATION ANALYSIS

11.     As described in the Disclosure Statement, to demonstrate that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "Best Interests Test," AlixPartners prepared a hypothetical liquidation analysis which is attached as Exhibit E to the Disclosure Statement (the "*Liquidation Analysis*") presenting recoveries that may be obtained by Holders of Claims and Interests upon a disposition of assets in a hypothetical chapter 7 liquidation as an alternative to recoveries provided under the Plan.  The Liquidation Analysis was based on financial information and projections provided by the Debtors' management, and other publicly available third-party information.

12.     The Liquidation Analysis assumes (i) an initial 90-day period post-conversion for the rapid disposition of (a) INOmax, Amitiza, and the Specialty Generics' APAP active pharmaceutical ingredient (API) operations (the "*APAP-API*") as going concern operating units, including the intellectual property or product know-how, inventory, and the owned manufacturing facilities used to manufacture these products (collectively, the "*Liquidated Operations*"), and

(b) individual distressed sales of remaining branded products Acthar, Therakos, and StrataGraft, including the associated IP, inventory, and fixed assets for these products (the "***Liquidated Product IP***," and together with the Liquidated Operations, the "***Liquidated Assets***")); (ii) non-Debtor affiliates will wind-down and liquidate in conjunction with the Debtors' liquidation; (iii) during the 90-day liquidation sales period, the chapter 7 trustee will continue ordinary course operation of manufacturing and distributing product for certain of the Debtors' Specialty Brands products, as well as the APAP-API business in an effort to maximize recoveries; (iv) the chapter 7 trustee would discontinue manufacturing and distribution of all other generics products, including opioid manufacturing and distribution; and (v) an additional nine (9) months to wind-down the estates under the supervision of the chapter 7 trustee.

13.    I and AlixPartners' professionals working under my direction performed an analysis of the liquidation value of the Liquidated Assets for inclusion in the Liquidation Analysis.[4] I performed my analyses using a valuation date consistent with a closing date of December 31, 2021 at the conclusion of the 90-day period assuming a conversion to chapter 7 on September 30, 2021.

14.    Solely for the purposes of the Liquidation Analysis, the Liquidated Assets have an estimated aggregate range of liquidation values between $2,459,570,000 and $2,870,313,000 with a midpoint of $2,664,942,000.

---

[4] It is my understanding that the Liquidation Analysis and the Plan's compliance with the "Best Interests Test" are discussed in further detail in the *Declaration of Randall S. Eisenberg in Support of Confirmation of the Joint Plan of Reorganization of Mallinckrodt plc and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code*, filed concurrently herewith.

## **METHODOLOGY AND ASSUMPTIONS**

15.      In preparing the estimates set forth in the Liquidation Analysis, I relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors. I did not attempt to independently audit or verify such information provided by the Debtors.

16.      In estimating the liquidation value of the Liquidated Assets, I primarily relied on two generally accepted valuation approaches that I believe were appropriate under the circumstances: (i) an Income Approach and (ii) a Market Approach.

17.      The Income Approach values a business or asset based on the value of the cash flows that the business or asset could be expected to generate in the future.  The Income Approach is often applied using a discounted cash flow analysis ("***DCF Analysis***").  DCF Analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The discount rate used in a DCF Analysis is typically determined based on a Weighted Average Cost of Capital ("***WACC***"), which is comprised of the weighted estimated cost of a company's equity and the estimated cost of debt.

18.      I valued the IP of selected branded products Acthar, Therakos, INOmax, and Amitiza (the "***Select Branded Products***") using a DCF Analysis, which is based on determining the present value of the estimated cash flows that the Select Branded Products are expected to generate in the future.  I also valued the IP of the Company's recently approved product, StrataGraft using a DCF Analysis.  In applying DCF Analyses, I relied on information provided by the Debtors, including, among others, the net sales projections prepared by management and

management's supplemental extrapolation of net sales through 2030,[5] as well as third party information and publicly available information.  To account for elevated risks associated with a sale process in chapter 7 liquidation or 363 sale, as well as the fact that StrataGraft was not yet approved at the time of my analysis, I applied a liquidation discount to the resultant value of the Select Branded Products and StrataGraft.  I also discounted the net liquidation value of inventory and the net liquidation value of the property plant and equipment (the "*PP&E*") to attain the liquidation value of the inventory, PP&E, and the standalone IP.

19.    The Market Approach is a way of valuing a business, business ownership interest, security, or intangible assets using one or more methods that compare the subject entity to similar businesses, business ownership interests, securities, or intangible assets that have been sold. In my experience, the Market Approach is a reasonable and customary approach for valuing individual pharmaceutical products. I employed the Guideline Company Method (also known as the "comparable company approach") to value the APAP-API businesses.  I did not rely on the Guideline Transaction Method (also known as the "precedent transaction approach") in preparing the Liquidation Analysis given no sufficiently comparable transactions exist due to the nature of the specific Liquidated Assets.

20.    Guideline Company Method provides an analysis of the market multiples of companies in the relevant industry—that is, the ratio between the companies' market values and various of their financial metrics, such as revenue or profits—which indicate investors' valuations of companies in the relevant industry and therefore provides an indication of value.  A set of publicly traded companies was selected based on similar business characteristics to the Debtors'

---

[5] It is my understanding that the Debtors revised the 2021-2025 net sales projections for Acthar and INOmax downward in September 2021.  I have reviewed the updated projections and have concluded that, all else equal, the updated projections would decrease the liquidation value of Acthar & INOmax.

APAP-API businesses.  The selected companies generally had a significant portion of their business dedicated to producing generic drugs.  In deriving value of the APAP-API businesses, I utilized forward EBITDA multiples as the valuation metric. To account for elevated risks associated with a sale process in chapter 7 liquidation, I applied a liquidation discount to the implied value of APAP-API's IP, inventory, and PP&E.

21.    Based on the above, and solely for the purposes of the Plan and the Disclosure Statement, I estimate as of December 31, 2021 the liquidation value of the Liquidated Assets to be between $2,459,570,000 and $2,870,313,000, with a midpoint of $2,664,942,000.[6]

*[Remainder of page intentionally left blank.]*

---

[6] I understand that sanofi-aventis U.S. LLC ("***Sanofi***") filed an objection to confirmation of the Plan relating, in part, to its pending dispute with the Debtors regarding whether the Debtors may reject the asset purchase agreement pursuant to which the Debtors acquired certain intellectual property relating to Acthar (the "***APA***") and, therefore, cease making royalty payments to Sanofi.  I also understand that Sanofi alleges it would receive a greater recovery in a Chapter 7 liquidation because a trustee would need to obtain Sanofi's consent to sell the intellectual property transferred under the APA, and Sanofi would continue receiving royalty payments under the APA.  Any obligation to make ongoing royalty payments would stand to decrease the liquidation value of Acthar, further diminishing the value from the sale of Acthar in a Chapter 7 liquidation scenario.

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information, and belief, and

after reasonable inquiry, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 26, 2021
Chicago, Illinois

/s/ *Marc J. Brown*
Marc J. Brown
Managing Director
AlixPartners, LLP