## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |
|  | **Re: Dkt. Nos. 4690, 4692, 4694, 4695, 4698, 4699, 4718** |

## GOVERNMENTAL PLAINTIFF
## AD HOC COMMITTEE'S REPLY TO PLAN OBJECTIONS

---

[1] A complete list of the Debtors in these Bankruptcy Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................... 2

RELEVANT BACKGROUND ............................................................................................. 6

PLAN AMENDMENTS ....................................................................................................... 9

REPLY TO CERTAIN OBJECTIONS ................................................................................ 10

**I.** The Third-Party Release Should Be Approved ................................................................ 10

    **A.** Contrary to the U.S. Trustee's (and Others') Assertions, the Third-Party
    Release Is Reasonable and Justified by Truly Unusual Circumstances..................... 10

    **B.** Rhode Island's Objection to the Third-Party Release Should Be Overruled.............. 13

**II.** Rhode Island's Objection Regarding the Best Interests Test Should be Overruled ........ 15

**III.** The Attorneys' Fees Provisions of the Plan Should Be Approved ................................... 17

    **A.** The Fee Fund Provisions Are an Integral Component of the Settlements
    Embodied in the Plan and, as Such, Are Subject to Review Under Bankruptcy
    Rule 9019 ......................................................................................................... 18

    **B.** The Fee Fund Provisions Are Not Subject to Review Under Bankruptcy Code
    Section 503(b) or Section 1129(a) ............................................................................ 20

    **C.** The Fee Fund Provisions Meet any Requisite Standard of Reasonableness ............. 23

**IV.** The Court Should Overrule the Insurers' Objections ...................................................... 26

    **A.** The Plan Does Not Impermissibly Alter the Insurers' Rights ................................... 30

    **B.** The Insurance Provision Is Appropriate and Consistent with Applicable Law ......... 31

**V.** The Court Should Overrule the Co-Defendant's Insurance-Related Objections.............. 35

    **A.** This Court Has the Authority to Enter the Insurer Injunction. ................................... 35

    **B.** Any Right to Payment for the Additional Insured DMPs Claims Effectively
    Will Be Eliminated by the Bankruptcy Code. ........................................................... 38

    **C.** The Modification Provisions of the Insurer Injunction Provide the Additional
    Insured DMPs with Adequate Protection .................................................................. 41

    **D.** The Permanent Injunction.......................................................................................... 41

The Governmental Plaintiff Ad Hoc Committee (the "**Ad Hoc Committee**"), which consists of (i) seven States, and (ii) the court-appointed Plaintiffs' Executive Committee in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio) (the "**MDL**"),[2] hereby submits this reply (the "**Reply**") in support of confirmation of the chapter 11 plan (the "**Plan**") [Dkt. No. 4508][3] proposed by the above-captioned debtors (the "**Debtors**") and in response to certain objections interposed by various parties (the "**Objections**" and the "**Objectors**," respectively), including:

- The objection filed by the state of Rhode Island (the "**RI Objection**") [Dkt. No. 4690];

- The objections filed by certain insurers (the "**Insurers**"), including the Chubb Companies, Continental, American Centennial, Liberty Mutual, LMI, and Berkshire Hathaway, and Ironshore Specialty Insurance Company [Dkt. Nos. 4694, 4695, 4698];

- The objections filed by certain distributors, manufacturers, and pharmacies (the "**DMPs**," and the "**DMP Objection**," respectively) [Dkt. No. 4692];

- The objection filed by the United States Trustee (the "**U.S. Trustee**" and the "**UST Objection**," respectively) [Dkt. No. 4718]; and

- The limited objection filed by Covidien Limited ("**Covidien**," and the "**Covidien Objection**," respectively) [Dkt. No. 4699].

In support of this Reply and confirmation of the Plan, the Ad Hoc Committee intends to introduce various witness declarations, including witness declarations from: (i) John Guard, Chief Deputy Attorney General for the State of Florida, (ii) Gary Gotto, counsel to various non-federal, non-state Governmental Opioid Claimants in this chapter 11 case, and (iii) Jayne Conroy of Simmons, Hanly, Conroy, court appointed co-lead counsel in the MDL.

---

[2] The Ad Hoc Committee's Amended Rule 2019 Statement was filed at Dkt. No. 496. The Ad Hoc Committee files this reply solely on behalf of the members of the Ad Hoc Committee, and not on behalf of any other Governmental Opioid Claimants that are party to the Restructuring Support Agreement or otherwise.

[3] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan and the Debtors' Reply, as applicable.

## PRELIMINARY STATEMENT

1.    The Plan satisfies the relevant standards for confirmation and incorporates multiple interrelated settlements addressing the Debtors' overwhelming opioid liabilities, and should therefore be confirmed.  Among other things, by and through the Plan, the Debtors will dedicate more than one billion dollars towards abatement of the opioid epidemic that they helped to cause. For the States, Municipal Units, and Tribes whose interests are represented by the Ad Hoc Committee, the Plan represents the culmination of extensive efforts over several years to achieve a resolution of Mallinckrodt's opioid liability that will deliver the most value, most effectively, to the parties most in need.  Accordingly, the Ad Hoc Committee supports confirmation of the Plan.

2.    As the Debtors have acknowledged, the country is "in the midst of an illicit opioid abuse and overdose crisis."  Declaration of Stephen Welch (the "**Welch First Day Declaration**") [Dkt. No. 128] ¶ 75.  This crisis affects every corner of the country, and Governmental Units in nearly every State and Territory have commenced litigation against the Debtors related to their opioid liabilities.  The opioid crisis was fueled by the introduction, marketing and supply of prescription opioids, and the Debtors have historically had the largest market share for domestic production of opioids, producing approximately 38% of available opioids or nearly 29 billion pills.[4]  Given the Debtors' outsized role in contributing to the opioid epidemic, it is no surprise that pending opioid litigation against the Debtors numbers in the thousands of cases.  As of October

---

[4] *See* Scott Higham, Sari Horwitz, Steven Rich, *76 billion opioid pills: Newly released federal data unmasks the epidemic*, Washington Post, July 16, 2019, available at: https://www.washingtonpost.com/investigations/76-billion-opioidpills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86ddd7f0e60391e9_story.html (describing SpecGx's market share for the years 2006-2012); *see also* Mallinckrodt plc Form 10-K, FY Sep. 27, 2013 at 5 ("In calendar year 2012, our Generics business had an approximate 30% market share of DEA Schedules II and III opioid, oral solid doses."); *and* Mallinckrodt plc Form 10-K, FY Sep. 26, 2014 at 5 (same); and Mallinckrodt plc Form 10-K, FY Sep. 25, 2015 at 5 (noting that for calendar year 2014, Mallinckrodt's Specialty Generics business had an approximately 21% market share of DEA Schedules II and III opioid and oral solid dose medications.").

7, 2020, more than 3,000 opioid-related cases had been filed against the Debtors, approximately 2,700 of which are part of the MDL.  Welch First Day Declaration ¶ 76.  Approximately 250 additional cases are pending in state courts.  *Id*.

3.      The Opioid Settlement embodied in the Plan resolves these liabilities in a constructive manner, providing much-needed funds to continue the important work of addressing the national health crisis to which the Debtors contributed, and ensuring, through the Voluntary Injunction, that the Debtors will never again contribute to the opioid epidemic.  The Plan has received unprecedented levels of support from the Debtors' Opioid Claimants, and is supported by the Ad Hoc Committee, the OCC, the FCR and the MSGE Group.  Out of the thousands of opioid claimants voting on the Plan, the overwhelming majority of each class of Opioid Claimants — with the sole exception of Class 9(h), Other Opioid Claimants (i.e., claims of co-defendants who themselves contributed to the opioid crisis) — have voted in favor of the Plan.[5]  The remarkable level of consensus that has been reached is due, in large part, to the fact that many of the major Opioid Claimants in these Chapter 11 Cases have agreed to forgo traditional recoveries in favor of the deployment of funds for programs designed to advance the public interest.  The amount of funds so deployed is substantial – the Plan will dedicate more than one billion dollars to abatement of the national opioid crisis.  And the issues resolved are complex and once seemingly intractable – the Plan constitutes an integrated settlement of multifaceted controversies between and among the Debtors, Governmental Opioid Claimants, and numerous groups of private Opioid Claimants.

4.      While the Opioid Settlement is laudable, it bears repeating that Opioid Claimants are receiving only $1,725,000,000 in cash on account of trillions of dollars in claims, paid out over

---

[5] *Preliminary Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Dkt. No. 4955] (the "**Preliminary Voting Report**").

eight years, and other contingent forms of consideration.[6]  Based on the trillions of dollars of damages asserted by Governmental Opioid Claimants in the Purdue bankruptcy proceedings, the specific consideration allocated to those creditors under the Plan would translate to a fraction of a percentage point recovery on account of their claims.  The assertions made by certain objectors (*e.g.*, Acthar claimants and equity holders) that Opioid Claimants are recovering too much are patently absurd.

5.     As set forth in more detail in the Debtors' reply (the "**Debtors' Reply**") and as will be demonstrated at the hearing on confirmation (the "**Confirmation Hearing**"), the Opioid Settlement, including the scope of the third-party releases, is reasonable and in the best interests of the Debtors and their creditors (both opioid and non-opioid alike).  In exchange for the Opioid MDT II Consideration, the Debtors are buying widespread peace, putting an end to overwhelming, value-destructive litigation, and obtaining global releases of all entities — branded and generic — in the Debtors' enterprise.  The third-party releases eliminate the risk of the Reorganized Debtors, as well as their officers, directors, employees and other related parties, being pulled into collateral litigation against the Protected Parties, which could result in significant indemnification claims against the Debtors that would not only create enormous financial liabilities for the Reorganized Debtors, but also distract the Reorganized Debtors' directors and officers.  That, in turn, may thereby diminish the value of the Reorganized Debtors, which is the source of the overwhelming majority of funds to be used for distribution to creditors.

6.     Among other things, the Opioid Settlement resolves complex litigation claims that the Opioid Claimants would assert against the Specialty Brands Debtors, which would allow

---

[6] As will be shown at the Confirmation Hearing, the Debtors have estimated the $1.725 billion in cash payments to have a net present value of approximately $1.325 billion, assuming a 10% discount rate.

Opioid Claimants to recover more than just the value of Specialty Generics while diluting the recoveries to general unsecured creditors of the Specialty Brands Debtors. Those claims include avoidance actions on behalf of the Specialty Generics Debtors against the Specialty Brands Debtors and the Debtors' lenders (including causes of action related to the issuance and service of funded debt guaranteed by the Specialty Generics Debtors), and substantive consolidation of the Specialty Brands Debtors and Specialty Generics Debtors. This litigation, if pursued, would likely lead to additional consideration being provided to Opioid Claimants at the expense of other stakeholders.

7.      Notwithstanding the overwhelming benefits provided to the Debtors and their constituents through the Opioid Settlement, a number of parties in interest have objected to the Plan. The Ad Hoc Committee has reviewed those objections carefully, and, in consultation with the Debtors and other Plan supporters, has agreed to support various modifications to the Plan discussed in more detail below, that should significantly narrow (if not resolve) many of the objections to the Plan. To the extent that certain objectors, including Attestor Limited and Humana [Dkt. No. 4700] and the Ad Hoc Acthar Group [Dkt. No. 4704] object to the Opioid Settlement, those objections should be overruled for the reasons set forth herein and in more detail in the Debtors' Reply.

8.      The Ad Hoc Committee files this Reply to address the objections raised by the State of Rhode Island, the U.S. Trustee, and certain Insurers, which at bottom are attempts to unravel the delicate and interrelated settlements embodied in the Plan that have been overwhelmingly agreed to by the other parties in interest in these cases. The Debtors will comprehensively address each of these objections, and the Ad Hoc Committee joins in the Debtors' Reply with respect to these objections.

## **RELEVANT BACKGROUND**

9.     As noted above, as of the date of their bankruptcy filing, the Debtors were the subject of over 3,000 opioid-related lawsuits.  Contrary to certain Objectors' assertions that any opioid liabilities of the Debtors are speculative, the allegations made in these lawsuits extensively detail the Debtors' central role in contributing to the nationwide opioid epidemic.

10.     By way of example, the complaint filed against Debtors Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC by the Commonwealth of Kentucky in 2018 devotes forty-six pages to Mallinckrodt's contributions to the opioid epidemic.[7]  The Kentucky complaint describes in detail Mallinckrodt's deceptive advertising regarding the addictive nature of opioids, Mallinckrodt's efforts to convince physicians to prescribe high-dose opioids, and the deficiencies of Mallinckrodt's suspicious order monitoring programs.  The causes of action in the Kentucky complaint span requests for abatement of a continuing public nuisance, damages sought for violations of state consumer protection law, fraud, unjust enrichment, and various types of negligence, as well as punitive damages.  This is just one of more than 3,000 examples of well-pled opioid claims against the Debtors.

11.     Tellingly, other opioid manufacturers and distributors have recently agreed to settle opioid claims against them for billions of dollars, or have been faced with trial verdicts for hundreds of millions of dollars in damages.[8]  Within the one year prior to the Petition Date, the Debtors settled two cases brought by Ohio counties that were originally part of the MDL.

---

[7] *Commonwealth of Kentucky, ex rel. Andy Beshear, Attorney General v. Mallinckrodt plc, et al.* Case No. 18-CI-381, Madison County Circuit Court, attached hereto as **Exhibit A**.

[8] *See, e.g., In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. 2019), Dkt. No. 2983 at 2-3, Art. I.B ("it is expected that approximately $5 billion in value will be provided to trusts, each with a mission to fund the abatement of the opioid crisis."); *In re Insys Therapeutics Inc.*, No. 19-11292 (Bankr. D. Del. 2019), Dkt. No. 956 at § 1.4 (explaining the settlement of opioid-related claims pursuant to liquidating plan); *and* Jan Hoffman, *Drug Distributors and J&J Reach $26 Billion Deal to End Opioid Lawsuits*, The New York Times (July 21, 2021), https://www.nytimes.com/2021/07/21/health/opioids-distributors-settlement.html ("the country's three distributors

12.     Faced with staggering litigation costs and the risk of catastrophic liability, the Debtors commenced negotiations around a global opioid settlement with the Ad Hoc Committee in September 2019.  After many months of negotiations, the Debtors and the Ad Hoc Committee announced the initial terms of an opioid settlement in February 2020.  Welch First Day Declaration ¶ 13.  Due to intervening events after the initial settlement was reached, further negotiations were necessary, and the Debtors and the Ad Hoc Committee continued discussions on necessary modifications to the initial settlement throughout the summer and into the fall of 2020.  These discussions culminated in the Restructuring Support Agreement and the Opioid Settlement Term Sheet, which provided for the following consideration for Opioid Claimants:

- $1,600,000,000 in cash payments over a period of seven years (subject to a Prepayment Option);

- The New Opioid Warrants;

- The Assigned Third Party Claims; and

- The Assigned Insurance Rights, including the Additional Insurance Rights.

Welch First Day Declaration ¶¶ 211-221.  The Debtors also agreed to enter into the Voluntary Injunction, which governs the Debtors' and Reorganized Debtors' ability to market and sell opioids.  Opioid Settlement enabled the Debtors to commence these bankruptcy proceedings with the Restructuring Support Agreement, signed by fifty States and Territories and the Plaintiffs' Executive Committee in the MDL, representing more than 1,300 local governmental entities. However, certain material issues remained unresolved, including (1) how the consideration

---

[Cardinal Health, AmerisourceBergen and McKesson] would make payments totaling $21 billion over 18 years. Johnson & Johnson would pay $5 billion over nine years."); *see also* Jan Hoffman, *Johnson & Johnson Ordered to Pay $572 Million in Landmark Opioid Trial*, The New York Times (August 26, 2019), https://www.nytimes.com/2019/08/26/health/oklahoma-opioids-johnson-and-johnson.html (discussing verdict against Johnson & Johnson for $572 million in case brought by the State of Oklahoma).

provided under the Opioid Settlement would be allocated among the Debtors' various Opioid Claimants, (2) the terms of certain material documents, and (3) the Additional Insurance Rights that were principally related to the claims of opioid claimants against the Debtors' directors and officers and related directors' and officers' insurance policies. These remained open deal points that the Ad Hoc Committee and the Debtors were unable to resolve consensually prior to the Petition Date.

13. After the Chapter 11 Cases commenced, the Debtors and the Ad Hoc Committee, along with other parties in interest, including the MSGE Group, the OCC and the then-proposed Future Claimants' Representative, moved swiftly to establish a court-ordered mediation process, whereby representatives of the various different Opioid Claimant constituencies could negotiate a consensual resolution of how to allocate the Opioid MDT II Consideration amongst themselves. *Debtors' Motion for Entry of an Order (A) Appointing a Mediator and (B) Establishing Mediation Procedures as Set Forth in the Proposed Order* [Dkt. No. 1276].

14. The mediation was complex and, at times, contentious, but as described in the Mediator's Report [Dkt. No. 4946] (the "**Mediator Report**"), resulted in an agreement between the Debtors' Opioid Claimants on how the Opioid MDT II Consideration would be allocated. The significance of this agreement cannot be overstated. As a result, the Debtors have avoided incurring millions of dollars in estate professional fees in litigation over allocation between Opioid Claimants, and the Opioid Claimants have agreed that more than one billion dollars of the Opioid MDT II Consideration will be used to abate the opioid epidemic caused, in part, by the Debtors.

15. However, as noted above, more work remained to be done. The Debtors, the Ad Hoc Committee and the OCC, along with the MSGE Group and the FCR, continued negotiations over the Additional Insurance Rights, and modifications that could be made to the Opioid

Settlement to gain the OCC's support.  After months of discussions, these negotiations culminated in the OCC Settlement Term Sheet, which among other things increased the cash component of the Opioid MDT II Consideration from $1,600,000,000 to $1,725,000,000, in exchange for consideration including a waiver of any Additional Insurance Rights (allowing the Debtors to retain the benefit of $200 million of directors' and officers' insurance coverage).

## PLAN AMENDMENTS

16.     The Ad Hoc Committee understands that the Debtors will be making a number of amendments to the Plan to resolve certain of the objections that have been filed.[9]  For example, in the Covidien Objection, Covidien objects to the Plan on the grounds that the Plan (1) improperly limits its rights to claim reconsideration under Section 502(j) of the Bankruptcy Code (Covidien Objection at 3-6), (2) provides unfair and disparate treatment to its contingent Class 9(h) (Other Opioid Claims) (*id*. at 6-12), (3) improperly waives its rights to object to Rule 2004 discovery (*id*. at 12-13), and (4) improperly releases claims it may have against insurers (*id*. at 13-15).

17.     To address the Covidien Objection, the Ad Hoc Committee understands that the Plan will be amended to (1) preserve Covidien's Bankruptcy Code Section 502(j) claim reconsideration rights, (2) provide that the Opioid MDT II's costs incurred in connection with Class 9(h) claim allowance/disallowance will be absorbed by the Opioid MDT II and not the individual holders of Class 9(h) claims, (3) preserve the issue of unfair treatment of a Class 9(h) creditor to a date after such creditor's claim becomes allowed, if ever, and (4) require a Rule 2004 motion to be filed before the Opioid MDT II could pursue Rule 2004 discovery against Covidien.

---

[9] To the extent the amendments described below do not fully resolve the relevant objections, the Ad Hoc Committee reserves the rights to supplement this Reply to respond to any objections that continue to be pressed by the relevant objector.

The Ad Hoc Committee further understands that the Debtors intend to add language to the Confirmation Order to address the insurance-related issues raised by Covidien.

18.     Similarly, the DMPs object to the Plan on the grounds that the Plan (1) improperly strips their rights as insureds under certain insurance policies (DMP Objection ¶¶19-35), and (2) improperly strips and/or modifies contractual rights (*id*. at ¶¶ 36-45).  To resolve certain of those objections, the Ad Hoc Committee understands that the Debtors will amend the Plan to remove the provisions of the Plan that would otherwise effect a non-consensual modification of the contractual rights.

## REPLY TO CERTAIN OBJECTIONS

### I.     The Third-Party Release Should Be Approved

19.     The State Opioid Claims, Municipal Opioid Claims, and Tribe Opioid Claims (collectively, the "**Public Opioid Claimants**") are, in the aggregate, the largest claims against the Debtors and their estates, and also are the largest aggregate claims as against the Protected Parties. Although they would have the most to gain if the third-party releases were not granted, the Public Opioid Claimants recognize that the third-party release by Opioid Claimants of the Protected Parties is a critical component of the Opioid Settlement, and should be approved.

#### A.     Contrary to the U.S. Trustee's (and Others') Assertions, the Third-Party Release Is Reasonable and Justified by Truly Unusual Circumstances

20.     As explained in more detail in the Debtors' Reply and as will be demonstrated at the Confirmation Hearing, the U.S. Trustee's (and others') argument that the third-party releases do not meet the required standard in the Third Circuit is unavailing.  UST Objection ¶¶ 46-57, Debtors' Reply ¶¶ 114-154.  The Ad Hoc Committee writes separately to explain why it supports the third-party releases and why those releases are appropriate in the context of these Chapter 11 Cases, the Plan and the Opioid Settlement.

21.     From the outset of negotiations between the Ad Hoc Committee and the Debtors in 2019, it was always contemplated that any opioid settlement would include a comprehensive channeling injunction and corresponding third-party release for the benefit of Mallinckrodt plc and each of its subsidiaries and related parties.  The initial February 2020 opioid settlement, which contemplated a "surgical" bankruptcy filing of only the Specialty Generics Debtors, expressly included such a provision.[10]

22.     The Opioid Settlement, as embodied in the Plan, has not changed on this point.  The Debtors bargained for a global resolution of their opioid liability, and the opioid liability of the Protected Parties as it relates to the Debtors' activities.  It was only in the context of that global resolution that the Debtors were willing to provide the Opioid MDT II Consideration.  Without a global resolution, the Reorganized Debtors would be at risk of a subsequent bankruptcy filing if the non-Debtor Protected Parties continued to be faced with opioid litigation and asserted indemnification claims against the Debtors.  In short, the channeling injunction and third-party releases benefit all stakeholders and are necessary for the Debtors' successful reorganization.

23.     While the U.S. Trustee takes issue with the alleged lack of consideration provided by the non-Debtor Protected Parties in exchange for the third-party releases, its objection misses the point.  UST Objection ¶¶ 46-57.  In negotiating the Opioid Settlement, the Ad Hoc Committee did not focus on which specific entities provided the consideration that is the basis of the Opioid Settlement – the Ad Hoc Committee simply focused on the *overall amount* and collectability of the Opioid MDT II Consideration.  For the Ad Hoc Committee and the Opioid Claimants benefitting from the Opioid Settlement, which entities are funding the Opioid Settlement should

---

[10] Mallinckrodt plc Form 8-K, Feb. 25, 2020 at 80 (Implementation of settlement to include "[c]hanneling injunction and nonconsensual release of all existing and future opioid-related claims for the benefit of Parent and all its subsidiaries (including SubCo entities) and their respective directors, officers, managers, employees and other customary related parties.").

be irrelevant – what matters is the amount of the settlement consideration that the Debtors were willing to provide in exchange for a global release, as a global release would maximize value not only for Opioid Claimants.  And the Debtors have recognized that contributing the Opioid MDT II Consideration and receiving the benefits of the Opioid Settlement, including the channeling injunction, benefits all of their respective creditor constituencies.

24.    Furthermore, a cursory review of the Preliminary Voting Report for Classes 8 and 9 undermines the U.S. Trustee's assertion that the releases being provided by Opioid Claimants are non-consensual.  Preliminary Voting Report, Exhibit A2.  The vast majority of Opioid Claimants in all but one class voted in favor of the Plan, and by extension, the third-party releases.

25.    The U.S. Trustee asserts that the opioid third-party releases will result in the "holders of Opioid Claims [] losing any and all of their claims against the Protected Parties related to the opioid crisis, because Opioid Claims as defined by the Plan may include claims unrelated to the Debtors."  UST Objection ¶ 36.  The U.S. Trustee is misreading the scope of the third-party releases granted by the Opioid Claimants.[11]  Opioid Claims are, by definition, limited to Claims against the Debtors.  *See* Plan, definition 71.  Holders of Opioid Claims, *in their capacity as such*, are releasing each "Debtor, Reorganized Debtor, and Protected Party from any and all Claims" (again limited, by definition, to claims against the Debtors) based on or relating to the Debtors, Opioid Claims, the restructuring, the bankruptcy cases, and agreements entered into between the Debtors and the Protected Parties.  Plan, Art. IX.D.

26.    Additionally, the Ad Hoc Committee negotiated for certain parties and certain categories of activity to be excluded from the scope of the third-party releases.  The claims

---

[11] For the avoidance of doubt, the Ad Hoc Committee agrees with the U.S. Trustee that the releases should solely be limited to claims related to the opioid-related activity of the Debtors.  To the extent that the releases can be read to release claims unrelated to the Debtors' opioid-related activity, the releases should be clarified.

excluded from the releases include (i) claims for actual fraud, willful misconduct or gross negligence, (ii) all claims held by Governmental Units that relate to criminal liability, and (iii) all claims against consultants or experts (a) retained to provide strategic marking advice relating to marketing opioid products, and (b) that have received a subpoena or other investigative demand from a State Attorney General after January 1, 2019.

27.    Accordingly, and as stated in more detail in the Debtors' Reply, the U.S. Trustee's and any other objections to the third-party releases by Opioid Claimants should be overruled.  The proposed releases are necessary to implement the Opioid Settlement, consensual, and narrowly tailored.

**B.    Rhode Island's Objection to the Third-Party Release Should Be Overruled.**

28.    The State of Rhode Island objects to the Plan on the grounds that it is receiving no consideration for releasing its claims against the Debtors' President, Mark Trudeau.  RI Objection ¶¶ 15-28.  This is simply untrue – Rhode Island, along with all Opioid Claimants, is benefiting from the additional consideration that the Debtors are contributing to the Opioid Settlement on account of the "Additional Insurance Rights" that were left unresolved at the outset of these Chapter 11 Cases.[12]

29.    Contrary to what Rhode Island suggests, Rhode Island's claims against Mr. Trudeau are not unique to Rhode Island.  As noted in its objection, RI Objection ¶¶ 3-4, Rhode Island filed a lawsuit against Mr. Trudeau just three days prior to the Petition Date, seeking "to impose liability on Trudeau personally for his role in the deceptive marketing and oversupply of

---

[12] As defined in the Joint Plan of Reorganization at 4 [Dkt. No. 2074] (the "**First Plan**"), Additional Insurance Rights means "additional rights with respect to or arising under any Insurance Contracts and/or other consideration to be agreed to by the Debtors, the Supporting Governmental Opioid Claimants, the MSGE Group, and Supporting Unsecured Noteholders holding no less than two thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement."

opioids into Rhode Island," on the basis that Rhode Island law allows executives to be held

personally liable for controlling a corporation that has caused a public nuisance. RI Objection ¶ 3.

30.     Rhode Island seeks to retain and assert claims against Mr. Trudeau that could just

have easily been asserted by any other State under comparable state law and by other Opioid

Claimants, and likely would have been asserted by other Opioid Claimants had the *Order Granting*

*the Debtors' Supplemental Motion for Injunctive Relief Pursuant to 11 U.S.C. § 105(a)* [Adv. Pro.

20-50850, Dkt. No. 180] not been entered, enjoining opioid litigation against the Debtors' directors

and officers, including Mr. Trudeau.

31.     Many other Opioid Claimants hold the same and similar claims that Rhode Island

objects to releasing, and all Opioid Claimants will be releasing claims against the Debtors'

directors and officers, including Mr. Trudeau, under the Plan.[13]

32.     Rhode Island's assertion that "it will receive no compensation whatsoever" on

account of its claims against Mr. Trudeau is disingenuous and misleading. RI Objection ¶ 17. As

Rhode Island admits in its objection, it is entitled to receive abatement funds from NOAT II, just

like any other State Opioid Claimant. RI Objection ¶ 9. NOAT II will be funded with its allocation

of the Opioid MDT II Consideration. The Restructuring Support agreement that fifty States and

Territories signed at the outset of these Chapter 11 Cases, including members of the Ad Hoc

Committee, provided for the Opioid MDT II Consideration to include "Additional Insurance

Rights." Welch First Day Declaration ¶ 219. The Additional Insurance Rights represented an

open point that the Ad Hoc Committee and the Debtors were unable to resolve prior to the Petition

Date. When the Debtors filed the First Plan in April 2021, it was clear that the Additional

---

[13] *See* Definition of "Protected Party", which includes the current and former officers and directors of the Debtors. Plan at 37.

14

Insurance Rights remained an open issue – the First Plan defined Additional Insurance Rights as "additional rights with respect to or arising under any Insurance Contracts and/or other consideration" to be provided to Opioid Claimants.  First Plan at 4.  Simply put, the Additional Insurance Rights represented the Ad Hoc Committee's request for either the Debtors' director and officer insurance policies to be transferred to the Opioid MDT II, for the Debtors to provide sufficient value to the Opioid MDT II in exchange for those insurance policies, or to carve directors and officers out of the scope of Protected Parties.

33.    The Debtors and the Ad Hoc Committee, as well as the MSGE Group and the OCC, have been engaged in discussions since the Petition Date regarding how to resolve the Additional Insurance Rights, which culminated in the Global Opioid Settlement reflected in the OCC Settlement.  As part of the OCC Settlement, the Debtors agreed to increase the cash component of the Opioid MDT II Consideration from $1.6 billion to $1.725 billion.  OCC Settlement at 2.  Rhode Island (along with all Opioid Claimants) receives the benefit of that $125 million increase in Opioid MDT II Consideration on account of the very director and officer insurance policies that Rhode Island continues to seek access to.  RI Objection ¶¶ 17-19.

34.    Rhode Island will receive consideration on account of the Debtors' director and officer insurance policies, as will all other Opioid Claimants.  Nothing more is required.  For the aforementioned reasons and as set forth in more detail in the Debtors' Reply, Rhode Island's objection should be overruled.

## II.    Rhode Island's Objection Regarding the Best Interests Test Should be Overruled

35.    As Rhode Island notes in its objection, the "best interests of creditors" test requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest has either (i) accepted the plan, or (ii) "will receive or retain under the plan on account of such

15

claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code]." 11 U.S.C. § 1129(a)(7). The best interests test focuses on individual creditors, not classes of claims. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 442 n.13 (1999). Rhode Island asserts that the Plan does not provide it more than it would receive in a chapter 7 liquidation because in a chapter 7 liquidation, it would retain its claims against Mr. Trudeau. RI Objection ¶¶ 25-26. Rhode Island is incorrect.

36.     As will be shown at the Confirmation Hearing, the Debtors' combined liquidation analysis (the "**Liquidation Analysis**") provides that in a hypothetical chapter 7, if all contingent claims against the Debtors are allowed (including Opioid Claims), approximately $3 million to $56 million would be available to distribute to unsecured creditors, the majority of which would inure to the benefit of Opioid Claimants and Class 5 Guaranteed Unsecured Notes Claims. Disclosure Statement [Dkt. No. 2917], Exh. E, at 15. Under the Plan, Opioid Claimants will receive in excess of $1.725 billion on a gross basis, not discounted to present value. Thus it is undisputed that Rhode Island will receive more under the Plan than in a liquidation.

37.     Rhode Island contends that the Liquidation Analysis is flawed as it fails to properly account for Rhode Island's direct claims against Mr. Trudeau, and that as Rhode Island would retain those claims in a liquidation, Rhode Island would receive more, not less, in a chapter 7 liquidation. RI Objection ¶¶ 25-26.

38.     Rhode Island ignores that in a liquidation, other Opioid Claimants would retain their ability to assert claims against the Debtors' directors and officers, including Mr. Trudeau, and likely would assert such claims. There is no credible hypothetical liquidation where only Rhode Island asserts Opioid Claims against the Debtors' directors and officers. Nor could Rhode

Island seriously contend that the value of those claims against Mr. Trudeau to Rhode Island (which as a practical matter would likely be capped at the value of available insurance after deducting defense costs) after competing with the myriad of other creditors that would pursue similar claims (or pursue the insurance), would be sufficient to offset the massive loss of value that would result from conversion to chapter 7. As discussed above, Opioid Claimants are receiving $1.725 billion on a gross, undiscounted basis, under the Plan, as compared to the $3-56 million of recoveries in a chapter 7 liquidation. It is inconceivable that claims against Mr. Trudeau could fill that gap – even if the entire value of the Debtors' director and officer insurance policies were available for Opioid Claimants, recovery in a chapter 7 would still be woefully less than under the Plan (ranging from $203 million to $256 million).

39.    Accordingly, Rhode Island's best interests of creditors objection should be overruled.

## III.    The Attorneys' Fees Provisions of the Plan Should Be Approved

40.    Article IV.X.8-9 of the Plan (the "**Fee Fund Provisions**") provides for the creation of several funds to pay attorneys' fees and costs of Opioid Claimants' counsel. These provisions do not provide for the payment of the professional fees incurred by the Ad Hoc Committee or the MSGE Group during these cases; those fees were separately approved by the Court and are not being paid pursuant to the Fee Fund Provisions. *See* Dkt. No. 1250. Instead, the Fee Fund Provisions compensate counsel for a variety of Opioid Claimant constituencies, including the Public Opioid Claimants, for their work pursuing claims against the Debtors outside of these Chapter 11 Cases.

41.    The U.S. Trustee objects to the Fee Fund Provisions on the ground that payment of these fees is improper unless the "substantial contribution" requirements of Bankruptcy Code

section 503(b), or alternatively the requirements of section 1129(a)(4), are satisfied. This contention is legally unfounded. As discussed in Sections III.A and III.B below, the proper legal standard governing review of the Fee Fund Provisions is Bankruptcy Rule 9019, not Bankruptcy Code sections 503(b) or 1129(a)(4), because the fee provisions are an integral element of the global Opioid Settlement between the Debtors and the Opioid Claimants. In any event, as discussed in Section III.C, even if it were proper to view these provisions in isolation, the Fee Fund Provisions applicable to the Public Opioid Claimants eminently satisfy any "reasonableness" standard.[14]

42.    Notably, only the U.S. Trustee has objected to the Fee Fund Provisions, and even that objection focuses not on the merits of the proposed awards, but only on the question of judicial oversight of those awards. No one, including the U.S. Trustee, contends that the fees to be paid are excessive or otherwise improper in any substantive respect. Moreover, the vast majority of Opioid Claimants — including over 83% of voting States and Territories,[15] 98.99% of voting Tribes, and 98.53% of voting Municipal Units — have voted to accept their treatment under the Plan, including the opportunity to recover attorneys' fees and costs under the Fee Fund Provisions of the Plan. *See* Preliminary Voting Report, Exhibit A2.

### A.    The Fee Fund Provisions Are an Integral Component of the Settlements Embodied in the Plan and, as Such, Are Subject to Review Under Bankruptcy Rule 9019

43.    As will be shown at the Confirmation Hearing, the Fee Fund Provisions are an essential element of the settlements embodied in the Plan. Absent these fee funds, the Debtors would not have been able to create the abatement funds that are so central to the Plan, because Public Opioid Claimants, needing to pay their counsel, could not have relinquished control over

---

[14] This Reply addresses only the Fee Fund Provisions applicable to the Public Opioid Claimants, not those applicable to private Opioid Claimants or other creditors.

[15] The Ad Hoc Committee understands that the percentage of accepting States and Territories is greater than 83%, as will be reflected in the next voting report.

the monies distributed on account of their claims.  Consequently, the operative standard for review of these provisions is Bankruptcy Rule 9019.

44.    The indispensability of the Fee Fund Provisions to the Plan follows from the centrality of abatement to the Plan's remedial scheme.  Unlike in most mass tort bankruptcies, the great majority of the Debtors' Opioid Claimants have agreed to commit their recoveries to abatement of the harms caused by the Debtors' conduct, namely, the opioid crisis.  This is a remarkable achievement, but it poses additional complexities in implementation, perhaps most significant of which is the payment of attorneys' fees.

45.    In the usual bankruptcy case, the attorneys responsible for delivering such massive value to their clients would be compensated out of their clients' recoveries.  *See In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) ("The fee arrangement between a claimant and his or her attorney is immaterial to these reorganization proceedings.").  But in this unusual case, in which there are (with limited exceptions) no traditional "recoveries" for Opioid Claimants, a different mechanism was required.  The solution was the Fee Fund Provisions in the Plan.  Under those provisions, three funds are established to pay attorneys for the Public Opioid Claimants:  (i) a Municipal and Tribe Fee Fund in an amount of 5.5% of recoveries to the Public Opioid Claimants, not to exceed $110 million; (ii) a State Fee Fund in an amount of 4.5% of recoveries to the Public Opioid Claimants, not to exceed $90 million; and (iii) a Common Benefit Escrow to be funded by assessments of 5% of each distribution made by the Private Opioid Creditor Trusts and the Ratepayer Account.

46.    As will be shown at the Confirmation Hearing, the Opioid Settlement – with its commitment of more than one billion dollars to abatement purposes, and the negotiated resolution of allocation disputes between and among the private and public claimants – would not have been

19

possible without the provision for payment of attorneys' fees. Absent an attorneys' fee fund, Public Opioid Claimants, who were subject to retainer agreements with their respective private attorneys, often on a contingency basis, would not have had the ability to relinquish control over monies distributed on account of their claims in favor of an abatement fund. The Fee Fund Provisions are the negotiated result of this understanding, which seeks to compensate claimants' counsel for the substantial contributions they made in laying the foundation for the $1.725 billion Opioid Settlement. *See also* Mediator Report ¶ 13 (the Fee Fund Provisions are "an integral and non-severable part of the overall settlements regarding allocation among public and private Opioid Claimants.").

47.     The settlement as a whole, including its attorneys' fees provisions, is therefore subject to this Court's review under Rule 9019. As discussed further in Section III.B below, the Third Circuit recently affirmed the use of Rule 9019 to review attorneys' fees paid pursuant to a settlement, *In re S.S. Body Armor I Inc.*, 961 F.3d 216, 233 (3d Cir. 2020), and Judge Drain recently reached the same conclusion in *Purdue Pharma*, reviewing fee provisions substantially identical to those here. *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD), Bankr. S.D.N.Y., Modified Bench Ruling [Dkt. No. 3786], at 24 (the "**Purdue Bench Ruling**").[16] *Accord, e.g.*, *In re Stearns Holdings, LLC*, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019) (approving payment of professional fees under Rule 9019 standard in context of global settlement).

**B.     The Fee Fund Provisions Are Not Subject to Review Under Bankruptcy Code Section 503(b) or Section 1129(a)**

48.     Despite the centrality of the Fee Fund Provisions to the Plan settlements, the U.S. Trustee contends these fee provisions are subject to the requirements of Section 503(b). A similar

---

[16] While Judge Drain's order confirming the plan in *Purdue Pharma* is currently being appealed, the aspect of the Bench Ruling approving establishment of the attorneys' fee funds is not the subject of appeal.

argument was recently rejected by the Third Circuit in *S.S. Body Armor*, as well as by Judge Drain in *Purdue Pharma.*

49.     In *S.S. Body Armor*, 961 F.3d at 232-33, the Third Circuit considered an objecting creditor's appeal of a settlement agreement that had, among other things, awarded class counsel $1.5 million in attorneys' fees.  The objecting creditor had argued to the bankruptcy court that it had to employ a "substantial contribution" analysis in approving the fees, but the bankruptcy court rejected that standard, applying Bankruptcy Rule 9019 instead.  On appeal, the objecting creditor continued to press its objection, arguing that "because Class Counsel failed to submit records as required under Delaware Local Rules and [Third Circuit] precedent, it was 'impossible' for the Bankruptcy Court to approve the fee award." *Id.* at 233.  The Third Circuit rejected this argument, concluding that no such analysis was required since "the Bankruptcy Court considered the payment to Class Counsel as part of its approval of the 2015 Settlement negotiated between Body Armor and various claimants." *Id.*  In doing so, the Third Circuit distinguished case law finding that attorneys' fees could only be paid pursuant to section 503(b), finding that those cases "involved independent applications for fees, rather than fees negotiated as part of a settlement."  The same holds true here.  The Fee Fund Provisions were negotiated as part of the Opioid Settlement and therefore should be approved pursuant to Rule 9019.

50.     In *Purdue Pharma*, the U.S. Trustee objected, on the same grounds it objects here, to the substantially similar fee provisions in the *Purdue Pharma* Plan, and Judge Drain squarely rejected the objection.  Purdue Bench Ruling at 21-28.  Judge Drain found the U.S. Trustee's Section 503(b) argument in *Purdue Pharma* to be "misplaced," because, among other reasons, the majority of the fees proposed to be paid under the *Purdue Pharma* plan were "not for postpetition work (and therefore not an 'administrative expense' covered by section 503(b)(3) and (4)) but

21

rather for prepetition work in raising and pursuing claims against the Debtors and to some extent

the Sacklers . . . ."

> Unsecured creditors' claims for collection of their prepetition costs, including of
> attorneys' fees and expenses, as well as rights under applicable non-bankruptcy
> law, such as on a 'common benefit' basis, are enforceable in bankruptcy without
> the need to comply with subsections 503(b)(3) and (4) of the Bankruptcy Code,
> which, again, apply only to administrative expenses.

*Id.* at 23.  Judge Drain's ruling applies equally to the fee provisions of Mallinckrodt's Plan related

to Public Opioid Claimants.  Here, as in *Purdue Pharma*, the vast majority of the fees covered by

the Fee Fund Provisions relates to the extensive work undertaken by the Public Opioid Claimants

and their counsel prior to the bankruptcy filing — the work that ultimately brought Mallinckrodt

to the negotiating table and led to the Plan and the Opioid Settlement.

51.     Judge Drain's ruling is in accord with the holdings of numerous bankruptcy courts

that have addressed and approved fee provisions without reference to section 503(b).  *See, e.g.*, *In*

*re Sea Containers, Ltd.*, Case No. 06-11156 (KJC), 2008 Bankr. LEXIS 2363, *27-28 (Bankr. D.

Del. Sep. 19, 2008) (approving payment of fees as part of a settlement pursuant to Rule 9019); *In*

*re AMR Corp.*, 497 B.R. 690, 695 (Bankr. S.D.N.Y. 2013) (collecting additional cases).  These

cases hold that, whereas section 503(b) governs a *claimant's* request for fees, other provisions —

including Bankruptcy Rule 9019, as well as sections 363(b), 1129(a)(4) and 1123(b)(6) — govern

a *debtor's* affirmative decision to pay such fees as part of a chapter 11 plan or global settlement.

Section 503(b) has no application in cases of the latter sort.

52.     In *Purdue Pharma*, Judge Drain chose to review the plan's fee provisions under

Bankruptcy Code section 1129(a)(4) as well as Bankruptcy Rule 9019, while at the same time

acknowledging that "there are arguments" against application of the former provision.  Purdue

Bench Ruling at 24 (noting the existence of supporting authority in the Southern District of New

York).  The Ad Hoc Committee respectively submits that the better reading of section 1129(a)(4) is that it does not apply to settlements such as those at issue here.  Section 1129(a)(4), by its terms, applies only to work performed "in or in connection with the case" or "in connection with the plan and incident to the case."  11 U.S.C. § 1129(a)(4).  Here the fees due to attorneys for the Public Opioid Claimants reflect work undertaken in connection with prepetition litigation, rather than in connection with the bankruptcy case.  Moreover, none of the fees increase by even a penny the Debtors' aggregate distributions on account of its opioid liabilities.  Rather, these fee arrangements simply take a small portion of the aggregate consideration that the Debtors have agreed to pay in settlement of their opioid liabilities and allocate that portion to attorneys' fees rather than to abatement activities.  Because this is essentially a private contractual matter — an arrangement negotiated between the Opioid Claimants and their attorneys, which has no effect on distributions to other creditors — it does not implicate section 1129(a)(4).  *See Johns-Manville Corp.*, 68 B.R. at 632 (holding that section 1129(a)(4) did not apply to a plan provision providing for payment of attorneys' fees for tort claimants from those claimants' plan distributions).

### C.     The Fee Fund Provisions Meet any Requisite Standard of Reasonableness

53.     Even if the Court were to review the fees to be paid the Public Opioid Claimants' counsel under Section 1129(a)(4) or Section 503(b), the fees readily satisfy the reasonableness standards of those sections.

54.     As courts have noted, section 1129(a)(4) should not be turned into "a mandate for an expensive and unnecessary inquiry."  *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop, Inc.)*, 150 F.3d 503, 517 (5th Cir. 1998).  The section, by its terms, only requires a reasonableness determination.  As will be shown at the Confirmation Hearing, the Fee Fund Provisions are eminently reasonable.  The fee payments were heavily negotiated under the

23

Mediator's supervision, and the agreed amounts of 10% of Public Opioid Claimants' recoveries are substantially less than are typically provided for under the contingency fee agreements into which many Public Opioid Claimants entered.  In addition, the total fees and costs from Public Opioid Claimants' recoveries are capped at a maximum of $200 million, providing further assurance that fees will not materially diminish the funds available for abatement.  As stated in the report of the Mediator overseeing the resolution of the attorneys' fees issues, "the contingency fee resolutions, as well as the common benefit assessments, reached in this Mediation are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations . . .."  Mediator Report ¶ 14.  Thus, even if section 1129(a)(4) applies, the Fee Fund Provisions meet its requirements.  *See* Purdue Bench Ruling at 26-28 (approving those fee fund provisions that were supported by similar showings).

55.     Moreover, the Fee Fund Provisions satisfy even the "substantial contribution" requirements of Section 503(b) of the Bankruptcy Code, if the Court were somehow to find that provision applicable.  That section provides that the Court shall allow as an administrative expense "reasonable compensation for professional services rendered by an attorney" to "a creditor . . . in making a substantial contribution in a case under chapter . . . 11." 11 U.S.C. § 503(b)(3)(D), (b)(4). Payment for substantial contributions "is designed to promote meaningful participation in the reorganization process" while "discourag[ing] mushrooming administrative expenses."  *In re Granite Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) (collecting cases); *see also Leidos Eng'g, LLC v. Kior, Inc. (In re Kior, Inc.)*, 567 B.R. 451, 459 (D. Del. 2017) ("Thus, a substantial contribution award is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate.") (internal quotations omitted).  To constitute a "substantial contribution," there must be an "actual and demonstrable benefit to the

debtor's estate, its creditors." *Lebron v. Mechem Fin.*, 27 F.3d 937, 944 (3d. Cir. 1994); *see also*

*In re Bayou Grp., LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) ("most" substantial contribution

cases have "involved a creditor who actively facilitated the negotiation and successful

confirmation of the chapter 11 plan or, in opposing a plan, brought about the confirmation of a

more favorable plan."); *In re M & G USA Corp.*, 599 B.R. 256, 263 (Bankr. D. Del. 2019)

("Therefore, in some limited circumstances, creditor activities which result in meaningful

settlements and a consensual process may constitute a substantial contribution to reorganization.").

56.     There can be no question that the legal work compensated under the Plan was

integral to the Plan's global opioid settlements.  Equally clearly, the Plan's settlements — and the

legal work necessary to achieve them — preserved the value of the Debtors' estates, by substituting

an efficient global settlement process for many years of continued, value-destructive litigation.  A

more substantial contribution to this case is difficult to imagine.

57.     The fact that a great deal of this legal work occurred prior to the commencement of

the bankruptcy does not make the work any less deserving of compensation under Section

503(b)(4).  Unlike an allowance of fees and expenses for the costs of "preserving the estate" under

Section 503(b)(1)(A), which is limited to costs incurred during the pendency of bankruptcy

proceedings, compensation for making a "substantial contribution" can include pre-petition

activity.  *In re Bayou Grp., LLC,* 431 B.R.  at 562-63*; see also id.* at 559 ("It is the 'substantial

contribution,' not the activity, that must occur 'in a case' under chapter 11, and the [contrary]

argument assumes that activities conducted and expenses incurred before the filing of a chapter 11

petition cannot substantially contribute to the reorganization efforts during the pendency of a

chapter 11 case when, in fact, they can.") (quoting *Lebron v, Mechem Fin., Inc.,* 27 F.3d 937, 944

(3d Cir. 1994)); *see also In re Med General, Inc.,* 17 B.R. 13, 14 (Bankr. D. Minn. 1981).  As will

be shown at the confirmation hearing, the Plan directly grows out of, and substantially benefits from, this pre-petition activity, justifying an award of reasonable compensation for fees and expenses.

58.     Without the Fee Fund Provisions, which resolve long-disputed attorneys' fees issues, the painstakingly negotiated Plan settlements could be rendered untenable.  Lawyers who have invested many years and millions of dollars in this litigation could be left with no alternative but to seek recovery from their public clients under their agreed contingency fee arrangements, thereby jeopardizing the Plan's funding of critically needed abatement activities.  The Fee Fund Provisions were crafted to avoid such a result.  They are integral to the Plan settlements and should be enforced as written.

59.     For the foregoing reasons, the U.S. Trustee's objection to the Fee Fund Provisions should be overruled.

## IV.    The Court Should Overrule the Insurers' Objections

60.     A cornerstone of the Plan—and the Ad Hoc Committee's agreement to support the Plan—is the structure for resolving the Debtors' Opioid Claims.  Pursuant to sections 541(c), 1129(a)(1), and 1123(a)(5) of the Bankruptcy Code, the Debtors will channel their liabilities for the claims to a network of trusts for administration and payment.  The trusts will be funded by certain assets of the Debtors, including the rights to all proceeds of any insurance policies potentially applicable to Opioid Claims (the "**Opioid Insurance Policies**," as defined in the Plan). Since its genesis in *In re Johns-Manville* three decades ago, this structure has been used repeatedly

in mass tort bankruptcies to pay claims efficiently and equitably. Most recently, Bankruptcy Judge

Robert D. Drain approved a near-identical framework in *Purdue Pharma*.[17]

61.    Several provisions of the Plan work in tandem to implement the assignment of the

Debtors' insurance assets to those trusts and to preserve the value of those assets for the opioid

creditors, including the following:

- Article IV.W.2.d of the Plan transfers to the Opioid MDT II the Debtors' rights to, and

  all proceeds of the Opioid Insurance Policies (the "**Opioid Insurance Rights**

  **Transfer**").

- Article IV.W.9 of the Plan (the "**Insurance Provision**"[18]) preserves any obligations

  that the insurers owe to the Debtors under the pre-existing terms of the Opioid

  Insurance Policies, such that they will continue post-confirmation, as well as the

  insurers' pre-existing ability to raise any state law coverage defenses (i.e., those

  defenses that could have been raised pre-petition and are unrelated to the bankruptcy

  itself), subject to the Bankruptcy Code and applicable law. Specifically, the provision

  states:

> Nothing in the Plan, the Plan Supplement, or the Confirmation Order shall
> alter, supplement, change, decrease or modify the terms (including
> conditions, limitations and/or exclusions) of the Opioid Insurance Policies;
> provided that, notwithstanding anything in the foregoing to the contrary, the
> enforceability and applicability of the terms (including conditions,
> limitations and/or exclusions) of the Opioid Insurance Policies and thus the
> rights or obligations of any Insurer, the Debtors, and the applicable post-
> Effective Date Entities, including the Opioid MDT II, arising out of or under
> any Opioid Insurance Policy, whether before or after the Effective Date, are
> subject to the Bankruptcy Code and applicable law (including any actions

---

[17] *See* Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of
Reorganization, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 17, 2021), [Dkt. No.
3787] (the "**Purdue Confirmation Order**").

[18] Article IV.W.9 is identified in the Plan as the "Insurance 'Neutrality' Provision," but given the Insurers' misuse of
the term "neutrality" in these proceedings and others (as set forth in more detail below), this Reply uses the term
"Insurance Provision" to avoid confusion.

or obligations of the Debtors thereunder), the terms of the Plan, the Plan Supplement, the Confirmation Order (including the findings contained therein or issued in conjunction therewith) and[, to the extent the Insurers have or had adequate notice from any source,] any other ruling made or order entered by the Bankruptcy Court.

Plan, Art. IV.W.9.[19]

62.     The record in this case demonstrates that the Plan's proposed settlement framework constitutes a reasonable, good-faith compromise satisfying all statutory requirements of the Bankruptcy Code.  Nonetheless, and notwithstanding the Plan's preservation of their state law-based coverage defenses, certain of the Debtors' Insurers have objected to the Plan, arguing that various Plan provisions unlawfully impair their rights or limit their defenses in post-confirmation coverage litigation.[20]  In addition, the Insurers assert that the Debtors must replace the Insurance Provision with what they deem "traditional insurance neutrality language"—a provision stating, in essence, that neither the Bankruptcy Code, the Plan, the Confirmation Order, nor any rulings by this Court may affect the Insurers.

63.     The Insurers' arguments are meritless.  The Plan does not impermissibly impair the Insurers' rights under the Opioid Insurance Policies, and many of the Insurers' concerns appear to

---

[19] The bracketed language in the Insurance Provision ("to the extent the Insurers have or had adequate notice from any source") will be added to the Insurance Provision at the Insurers' requests to conform to the Insurance Provision in *Purdue Pharma.*

[20] The following Insurers filed objections to the Plan:
- "The Chubb Companies."  *See Objection of the Chubb Companies to the First Amended Joint Plan of Reorganization of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, [Dkt. No. 4694] (the "**Chubb Objection**").
- "Continental, American Centennial, Liberty Mutual, LMI, and Berkshire Hathaway."  *See Objection to Confirmation of Plan Filed by Liberty Mutual Insurance Company, American Centennial Insurance Company, Berkshire Hathaway Specialty Insurance Company, Certain Underwriters at Lloyds, London and Certain London Market Insurance Companies, Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company*, [Dkt. No. 4695] (the "**Combined Insurer Objection**").
- "Ironshore."  *See Objection of Ironshore Specialty Insurance Company to Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, [Dkt. No. 4698] (the "**Ironshore Objection**").

AIG also raised potential objections, which were resolved before the objection deadline.  Finally, Covidien included an insurance-related issue in its objection.  *See* Covidien Objection at 13-16.

stem from a misreading of the Plan.  Indeed, since the Insurers filed their objections, negotiations between the parties have resulted in clarifying Plan language or stipulations that either already have mooted, or likely will moot prior to confirmation, all or nearly all of the Insurers' concerns regarding the Plan's treatment of the policies.

64.     The Insurers' assertion that the Plan must contain "traditional insurance neutrality language" to be confirmable is similarly meritless.  There is no provision of the Bankruptcy Code, nor a single case, that requires such "traditional" language.  Indeed numerous plans in the mass tort context have been confirmed without such language.  Instead, "insurance neutrality" is a debtor-created concept used to prevent insurer interference with plan confirmation by depriving them of standing to raise plan objections.  Here, there has been no effort to limit the Insurers' standing, the Insurers have had every opportunity to object to the Plan (and indeed have raised numerous objections, as noted above), and those objections are being addressed by negotiation or, if necessary, will be addressed through litigation at confirmation.  Accordingly, there is no basis for the Insurers to impose their apparent preference for "neutrality" in this case, and the Insurers are bound by any rulings of this Court and by any plan that ultimately is confirmed—just as any other party-in-interest would be bound.

65.     What the Insurers really are seeking is a special exemption from fundamental principles of res judicata and collateral estoppel.  However, the law does not entitle the Insurers to pretend that the bankruptcy never occurred.  As Judge Drain noted in rejecting the same arguments by the insurers in the *Purdue Pharma* proceedings, "[I]nsurers can't sit back and say everything that happens in a bankruptcy case on notice to us doesn't matter.  You know, the normal rules of

judicial estoppel, collateral estoppel, and law of the case just don't matter for insurers. That's just—that's not right."[21]

A.    **The Plan Does Not Impermissibly Alter the Insurers' Rights**

66.    Through their objections, the Insurers identified six rights that they fear the Plan impermissibly alters. The Plan does not alter these rights—as many of the Insurers already have acknowledged following negotiation:

- Certain of the Insurers object that they are entitled to receive notice of the rulings made or orders entered by the Bankruptcy Court that will be binding on them.[22] The Ad Hoc Committee believes that the Insurers are on notice of everything that occurs in the Chapter 11 Cases. Nonetheless, it has agreed to revise the Insurance Provision to address the Insurers' concern. One of the Insurers already has agreed that this revision moots their objection, and the Ad Hoc Committee anticipates that the remaining Insurers will as well.

- One of the Insurers sought to confirm that, pursuant to the Insurance Provision, their rights are reserved regarding the enforceability of the arbitration provisions in their Insurance Contracts.[23] The Ad Hoc Committee agreed to that, with regard to this Plan, and the associated objection was not submitted to the Court.

- Certain of the Insurers and Covidien objected that the Plan cannot add new entities as "insureds" under the Opioid Insurance Policies, and cannot transfer to the Opioid MDT II rights under those policies beyond those that the Debtors hold.[24] The Ad Hoc Committee believes that is already clear in the Plan.[25] Nonetheless, it has agreed to memorialize as much for the record. Covidien already has agreed in principle that memorialization will moot its objection, and the Ad Hoc Committee anticipates that the Insurers will as well.

- Certain of the Insurers objected that the rights and obligations under the Opioid Insurance Policies must flow together.[26] The Ad Hoc Committee believes that, to the extent necessary, this is already is clear in the Plan.[27] Nonetheless, they have agreed to memorialize as much for the record. Certain of the Insurers already have agreed in

---

[21] Hr'g Tr. 196:14-18, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Aug. 25, 2021), attached hereto as **Exhibit B**.

[22] Chubb Objection ¶ 58. AIG also raised this issue, but following discussions with the Debtors and the Ad Hoc Committee, did not file a Plan objection on this basis (or any other basis).

[23] AIG raised this issue, but following discussions with the Debtors and the Ad Hoc Committee, did not file a Plan objection on this basis (or any other basis).

[24] Ironshore Objection ¶ 19; Chubb Objection ¶¶ 51, 61, 65; Covidien Objection at 13-15.

[25] *See, e.g.,* Art. IV.W.2.d.

[26] Combined Insurer Objection ¶¶ 20-22; Ironshore Objection ¶ 20; Chubb Objection ¶¶ 43-45.

[27] *See, e.g.,* Art. IV.W.2.d.

principle that memorialization will moot their objection, and the Ad Hoc Committee anticipates that the remaining Insurers will as well.

- Ironshore objected that the PI Trust Distribution Procedures (the "**PI TDP**") improperly exclude Ironshore from administration of the PI Opioid Claims in purported violation of its policies, and proposed a revision to the PI TDP to resolve its concern.[28]  The Ad Hoc Committee disagrees with Ironshore's views concerning its rights and any purported violations thereof.  In any event, the Plan and PI TDP preserve Ironshore's ability to argue that coverage is unavailable based on alleged violations of any rights Ironshore may have under its policies (including claims-handling rights).  Moreover, the Ad Hoc Committee has agreed in principle to Ironshore's suggested revisions, including to provide that nothing in the Plan or Confirmation Order, or any rulings by the Bankruptcy Court in connection with confirmation, shall themselves constitute a coverage adjudication as to the effect of the Plan on the parties' rights and obligations under the Opioid Insurance Policies.

- Chubb objected that its right to handle workers' compensation and direct action claims may be altered by the Plan.[29]  The Ad Hoc Committee does not believe that the Plan alters those rights.[30]  Nonetheless, it has agreed to memorialize appropriate clarifications to address Chubb's concerns.

67.    To the extent the parties are unable to resolve any of these issues, the Ad Hoc Committee reserves all rights to address them at confirmation.

## B.    The Insurance Provision Is Appropriate and Consistent with Applicable Law

68.    The Insurers assert that the Plan cannot be confirmed unless it contains what they deem "true neutrality language"— that is, language "clarifying" that the Insurers' rights and obligations under their policies are not subject in any way to the Bankruptcy Code, the Plan, the Confirmation Order, and rulings by this Court.[31]    Indeed, the Insurers assert that the Plan must

---

[28] Ironshore Objection ¶ 18.

[29] Chubb Objection ¶ 48.

[30] *See, e.g.,* Art. V.H.2 (Workers' Compensation Programs); Art. IX.J.

[31] *See* Chubb Objection ¶¶ 56, 59, 75, 81 ("[T]he Plan cannot . . . affect any of the defenses, rights, and obligations of the Debtors and the Chubb Companies with respect to coverage, denial of coverage, or the proper court, forum, or jurisdiction for any disputes regarding . . . the Chubb Companies' rights and obligations under the Insurance Programs . . . .  The Plan must . . . clarify that nothing in the Plan, Plan Supplement, or the Confirmation Order, including, but not limited to, those provisions identified above, shall modify, alter or impair the Insurance Programs, including the rights and obligations of the Chubb Companies and the Debtors or their successors or assignees thereunder, and the coverage provided thereunder, and that, for all issues relating to insurance coverage, including all rights and obligations under the Insurance Programs, the terms and conditions of the Insurance Programs shall control."); Ironshore Objection ¶ 33 (asserting that insurance neutrality language is "super-preemptory" and must apply

exempt them from otherwise applicable principles of res judicata or collateral estoppel and uniquely entitle them to appear, litigate, file claims, objections, and motions, and then operate as if the bankruptcy never occurred.

69.    This is not "neutrality."  What the Insurers are seeking is a special exemption from rulings made by this Court in connection with confirmation of the Plan that otherwise would be binding on them, just as they would be on any other party-in-interest.  Neither the Bankruptcy Code nor state law entitles the Insurers to such an exemption.

70.    In the Third Circuit, "[a] plan's preclusive effect is a principle that anchors bankruptcy law:  '[A] confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation.'"  *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989)); see also *In re USN Commc'ns., Inc.*, 280 B.R. 573, 592 (Bankr. D. Del. 2002) ("a confirmed plan acts as a binding contract on all the parties thereto").  This principle applies to insurers as it applies to all other parties to a bankruptcy.

71.    The carve-out from this principle that the Insurers seek—and call "neutrality"—is a tool developed by debtors and their creditors in mass tort cases to limit the ability of a debtor's insurers to frustrate or delay the process of confirming a chapter 11 plan.  This concept, first approved in the Third Circuit's ruling in *In re Combustion Engineering*, has been implemented by agreement among debtors and creditors to minimize the ability of insurers to derail chapter 11 cases by:  (a) limiting or eliminating the issues that insurers have standing to contest in connection with confirmation, and (b) providing a basis for appellate courts to find that the insurers are not

---

"notwithstanding anything to the contrary in [the confirmation order], the Plan or any of the Definitive Documents") (internal citation omitted).

"persons aggrieved" and thus lack standing to appeal the bankruptcy court's confirmation order. See *In re Combustion Eng'g*, 391 F.3d 190, 214-18 (3d Cir. 2004).

72.     Contrary to the Insurers' assertions, no court has ever held that insurers have a right to a "neutral" plan.  The United States Bankruptcy Court for the Southern District of New York recently rejected this precise argument in *Purdue Pharma's* bankruptcy proceedings, confirming a plan with language identical to that proposed by the Debtors here, and ruling that the plan and confirmation order were binding on the insurers.  Purdue Bench Ruling at 16 ("There is no such concept or requirement that a plan be insurance neutral.").[32]

73.     The cases cited by the Insurers do not hold otherwise.  In all of those cases, the plan proponents chose to include neutrality language, based on the specific circumstances of each case, to eliminate insurer standing to object to the plan.  In all cases, the relevant question was whether the neutrality provisions included in the plan were sufficiently unambiguous to achieve that purpose—not whether the law required "neutrality."[33]  Here, such cases are irrelevant.  As in

---

[32] *See* Eleventh Am. Joint Chapter 11 Plan of Reorganization at 89, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Aug. 31, 2021), Dkt. No. 3706. ("Plan § 5.10 *Insurance Neutrality*. Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and, to the extent the Insurance Companies have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents or the Confirmation Order shall operate to require any Insurance Company to pay under any Purdue Insurance Policy the liability of any Person that was not an insured prior to the Petition Date.").

[33] *See, e.g.*, *In re Combustion Eng'g*, 391 F.3d at 218 (concluding that the insurers had no standing because the plan "does not impair their rights or increase their burdens under the subject insurance policies"); *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 212-15 (3d Cir. 2011) (holding that plan was not "insurance neutral" and remanding to provide insurers "an opportunity to challenge the Plan in the Bankruptcy Court"); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir 2012) ("The plan is therefore not insurance neutral, which provides the non-settling insurers with party in interest standing under § 1109(b)."); *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 589 (Bankr. W.D. Pa. 2011) ("*If the goal of the Debtor is to create a plan with insurance neutrality*, the insurance neutrality language must follow

*Purdue Pharma*, the Insurers have had the opportunity to object to aspects of the Plan that they contend may improperly impair their rights.  The parties either will resolve the concerns raised by the Insurers in advance of confirmation, or they will seek a ruling from this Court at confirmation as to the appropriateness of the relevant Plan provisions.[34]  But the law does not entitle the Insurers to ignore any such rulings post-confirmation.  Chief Judge Silverstein recently underscored this principle in *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS) (Bankr. D. Del.):

> I'm not aware of any case, at least nobody has pointed me to one, that says that because a plan isn't insurance-neutral — or at least that the argument—the insurance companies have standing, therefore they get to participate, but they aren't — once they choose to participate, they aren't bound by whatever decisions are made in the bankruptcy case.

*See* May 19, 2021 Hr'g Tr. at 225:16-22, attached hereto as **Exhibit C**; *see also* Hr'g Tr. 196:14-18, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Aug. 25, 2021), attached hereto as **Exhibit B** ("[I]nsurers can't sit back and say everything that happens in a bankruptcy case on notice to us doesn't matter.  You know, the normal rules of judicial estoppel, collateral estoppel, and law of the case just don't matter for insurers.  That's just — that's not right.").[35]

---

the *Combustion Engineering* analysis . . . Because the purported insurance neutrality provisions . . . are ambiguous as currently drafted, we find that the . . . Plan is not insurance neutral. . . . [A]s a result, we find that [insurer] has the necessary standing to prosecute its objections to the confirmation of" the plan) (emphasis added).

[34] Ironshore's reliance on *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 971-72 (2006) as an example of the "dangers" of "inadequate" neutrality language is misplaced for this reason.  Ironshore Objection ¶ 36.  As Ironshore itself notes, in *Fuller-Austin*, the court found that the plan's "traditional" insurance neutrality language was sufficient to deprive the insurers of standing to object to aspects of the plan that they believed unlawfully impaired their rights.  *Id.*  Here, the Insurers have full opportunity to be heard on those issues.

[35] The Insurers are demonstrably wrong to state, as a general matter, that a Plan may *never* alter their rights under their policies.  It is well-established that section 1123(a)(5) of the Bankruptcy Code preempts any anti-assignment provisions that would impede the transfer of a debtor's insurance rights.  *See In re Fed. Mogul Glob., Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (ruling that "[t]he plain language of § 1123(a) evinces Congress's clear intent to preempt state law" with respect to transfer of the debtor's insurance rights in bankruptcy).  Ironshore concedes this point expressly, and the remaining Insurers have not argued otherwise — no Insurer has challenged the Opioid Insurance Rights Transfer or the Plan provision requiring a finding in the Confirmation Order as to the validity of the Opioid Insurance Transfer notwithstanding any otherwise applicable anti-assignment provisions.  *See also* Purdue Confirmation Order at L(e).

34

74. Accordingly, the Insurers' objection to the Insurance Provision should be denied.

## V. The Court Should Overrule the Co-Defendant's Insurance-Related Objections

75. Certain Co-Defendant distributors, manufacturers and pharmacies, (the Additional Insured DMPs, as defined in the DMP Objection), allege that the Insurer and Permanent Injunctions in the Plan improperly deprive them of valuable insurance rights. DMP Objection ¶ 19. The Additional Insured DMPs allege that their claims "are based on contractual indemnification rights, rights of common law contribution and common law indemnity and other contractual and common law rights related to the Opioid Litigation and other litigation (such as product liability claims) involving the Debtors' other Products." *Id.* ¶12. The DMPs also allege that their claims include, "hundreds of millions of dollars in liquidated amounts, based on, among other things, contractual arrears, settlement payments and/or attorneys' fees that have been incurred or paid in connection with Opioid Litigation." *Id.* ¶ 13. Despite these alleged liquidated claims, however, the Additional Insured DMPs do not purport to have any pending claims under the Opioid Insurance Policies, nor do they allege to have ever tendered a claim to any Opioid Insurance Policy. Rather, they seek to hold the Debtors' assets hostage based on theoretical claims that may, or may not, materialize in the future. The DMP's objections are without merit and should be overruled.

### A. This Court Has the Authority to Enter the Insurer Injunction.

76. First, the Additional Insured DMPs argue that the Court does not have the authority to enjoin their rights to pursue the Opioid Insurance Policies. The Additional Insured DMPs are wrong.

77. The Additional Insured DMPs' alleged rights to coverage (1) are expressly limited to claims "related to the Debtors products," and (2) are derivative of the Debtors' rights as the

primary insured, thus, the DMPs' alleged rights fall squarely within the Bankruptcy Court's jurisdiction over property of the estate that may appropriately be subject to the injunction.  *See, e.g., MacArthur Co. v. Johns-Manville Corp*., 837 F.2d 89 (2d Cir. 1988); see also *In re Pittsburgh Corning Corp*., 417 B.R. 289, 293–94 (Bankr. W.D. Pa. 2006) (where a claim is based on joint and several liability the claims against the non-debtor entities are derivative and can be channeled under § 524(g)).

78.    In *MacArthur*, faced with remarkably similar facts, the Second Circuit addressed whether the bankruptcy court had jurisdiction to enjoin claims against Manville's insurers by an asbestos distributor (MacArthur) when the distributor claimed to be coinsured with Manville under "vendor endorsements" contained in the Manville policies.  *Id*. at 91–93. The Court concluded that it did.  837 F.2d at 91- 93.  MacArthur advanced the same argument that the DMPs advance here, i.e., that "because its own rights are separate from Manville's, its claims under the vendor endorsements are too remote from the Chapter 11 proceeding to permit the Bankruptcy Court to exercise jurisdiction."  *Id*.   The Court held, to the contrary, that because "[t]he vendor endorsements cover only those liabilities resulting from the vendor's status as a distributor of Manville's products," (1) "[t]he endorsements are limited by the product liability limits of the underlying Manville policies and are otherwise subject to all of the terms of the underlying policies," and (2) "MacArthur's rights as an insured vendor are completely derivative of Manville's rights as the primary insured." *Id*. at 92.  Thus, the Second Circuit reasoned that, "[s]uch derivative rights are no different . . . from those of the asbestos victims who have already been barred from asserting direct actions against the insurers," *id*. (citing *In re Davis*, 730 F.2d 176, 183 (5th Cir.1984) (per curiam)), and consequently found the bankruptcy court's exercise of jurisdiction

proper.  *In re Quigley Co., Inc*., 676 F.3d 45, 55 (2d Cir. 2012) (quoting *MacArthur*, 837 F2d at 92).

79.     The broad equitable powers granted by Section 105(a) of the Bankruptcy Code permit this court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C § 105(a).  This provision has been construed liberally to enjoin suits that might impede the reorganization process.  *MacArthur Co*., 837 F.2d at 93 (*citing Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.))*, 801 F.2d 60, 64 (2d Cir. 1986)); *In re Davis*, 730 F.2d 176, 183–84 (5th Cir. 1984).  Here, as in *Johns-Manville*, the injunctive order is necessary to ensure that claims to the proceeds of the Opioid Insurance Policies are channeled to the trust and cannot be asserted directly against the insurers."  *MacArthur Co.*, 837 F.2d at 93.

80.     *In re Adelphia Commc'ns Corp*., 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007), on which the DMPs rely for the proposition that this court cannot enjoin their rights, actually supports the entry of an injunction in this case.  In declining to approve a settlement enjoining claims by the company's directors and officers under director and officer insurance policies, the *Adelphia* court specifically distinguished *Manville* because, "neither… involved a D&O policy, and more fundamentally, each … attempt[ed] to deal with the unique problems present in mass tort cases – where it is often desirable, if not essential, to tap insurance policies to help create trusts or funds to provide a funding resource for the present and future tort claims that must be satisfied." *Id*. at 529.  In this case the Opioid Insurance Policies under which the DMPs claim rights, are comprehensive general liability policies, not director and officer policies.  And, this is precisely the type of mass tort case in which the court in *Adelphia* recognized that an injunction is proper

37

because it is "desirable, if not essential" that the insurance policies be used to create a funding resource for victims.  *See id.*

81.    Without such an injunction, the joint-tortfeasor DMPs could race to the courthouse (post-confirmation) to attempt to obtain a judgment against an Opioid Insurer (to be paid at 100%) for the payment of a claim related to the Debtors' products and the DMPs' own conduct as joint-tortfeasors.  If such a result were permitted it would impede the reorganization process by (1) unjustly enriching the DMPs while diminishing the recoveries of their victims and (2) facilitating disparate treatment among Debtors' creditor by awarding to the Additional Insured DMPs a windfall of 100 cents on the dollar for their own liability as joint tortfeasors, skirting the Bankruptcy Code's priority waterfall which specifically serves to prevent such inequitable treatment. *See* 11 U.S.C. §§ 502(e)(1), 509(c).

**B.      Any Right to Payment for the Additional Insured DMPs Claims Effectively Will Be Eliminated by the Bankruptcy Code.**

82.    The Additional Insured DMPs also are not entitled to the relief they seek because, as joint tortfeasors with the Debtors, the Additional Insured DMPs' claims will be disallowed or hopelessly subordinated by operation of the Bankruptcy Code. See 11 U.S.C. §§ 502(e)(1), 509(a), 509(c).

83.    The Additional Insured DMPs are joint tortfeasors and co-defendants of the Debtors in the Opioid litigation.  *See* DMP Objection ¶¶ 12-13.  Sections 509 and 502(e) of the Bankruptcy Code apply to claims of "an entity that is liable with the debtor on" the claim of a creditor.  11 U.S.C. §§ 502(e)(1), 509(a), 509(c).  Co-debtor status involves a "sharing of a liability, although [the] source of liability may differ, each debtor must be liable to the same party for essentially the same claim." *LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 154 B.R. 416, 420 (S.D.N.Y. 1993), *aff'd*, 53 F.3d 478 (2d Cir. 1995) (citation omitted); *see In re Provincetown-Bos.*

38

*Airlines*, 72 B.R. 307, 310 (Bankr. M.D. Fla. 1987) ("[A] claim for contribution presupposes a sharing of liability and thus [creates] a co-debtor relationship.") (alteration in original) (quoting *In re Baldwin-United Corp*., 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985)); *Al Tech Specialty Steel Corp. v. Allegheny Int'l, Inc. (In re Allegheny Int'l, Inc.)*, 126 B.R. 919, 922 (W.D. Pa. 1991), *aff'd*, 950 F.2d 721 (3d Cir. 1991) ("The natural reading of [Section 502(e)(1)(B)] demonstrates that Congress intended to exclude claims where the claimant and the debtor are jointly liable to a third party."); *In re Fiesole Trading Corp.*, 315 B.R. 198, 205 (Bankr. D. Mass. 2004) ("[L]iability with the debtor may exist in non-contractual relationships such as that between joint tortfeasors."); *In re Wedtech Corp*., 87 B.R. 279, 283 (Bankr. S.D.N.Y. 1988) ("[J]oint tortfeasors' contingent claims must be disallowed.")

84.     Under section 502(e)(1) of the Bankruptcy Code, a joint tortfeasors' contingent claims for reimbursement or contribution must be disallowed.  11 U.S.C §502(e)(1); *see also In re Caribbean Petroleum Corp.*, No. 10-12553 (KG), 2012 WL 1899322, at *3 (Bankr. D. Del. May 24, 2012) (finding that a claim for indemnification is "functionally the same as [a] claim[] for reimbursement or contribution").  In this case, the Additional Insured DMPs do not allege to have made any claim against the Opioid Insurance Policies to date (in other words, the claims are contingent, at best), and should they choose to do so in the future, any such claim would necessarily seek to recover from the bankruptcy estate for the Additional Insured DMPs conduct as a joint tortfeasor.  Any such claims are thus disallowed pursuant to Section 502(e)(1).

85.     If such claims were to be allowed, compensation to opioid victims would be delayed and this reorganization, and any resulting trust, would be paralyzed by the mere potential for claims which may or may not ever materialize.  Section 502(e)(1) is intended to prevent exactly this danger and to allow a debtor to move forward with distributions to unsecured creditors without

forcing them to establish a "reserve" for contingent claims which may or may not ever come to fruition and which could take years to litigate or settle. *In re Caribbean Petroleum Corp.*, 2012 WL 1899322, at *2 (*citing In re Wedtech Corp.*, 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988)). Because the Additional Insured DMPs' contingent claims would be disallowed under section 502(e)(1) of the Bankruptcy Code, it cannot be said that the Insurer Injunction does anything to prejudice the rights of the Additional Insured DMPs.

86.     Even assuming arguendo that all contingencies could be resolved, section 509(c) does not permit a joint tortfeasor like the Additional Insured DMPs to compete with their own victims for recovery from another joint tortfeasor's bankruptcy estate.  Section 509(c) provides that the court "shall subordinate to the claim of a creditor" — here any one of the opioid victims — "an allowed claim . . . for reimbursement or contribution" of "an entity that is liable with the debtor on . . . such creditor's claim" — here the Additional Insured DMPs as joint tortfeasors — "until such creditor's claim is paid in full, either through payments under this title or otherwise." 11 U.S.C. § 509(c); *see Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.)*, 89 F.3d 942, 947 (2d Cir. 1996) (party seeking contribution entitled to assert non-subordinated subrogation claim under section 509 where party fully discharged entire subclass of claims to which it was co-liable with the debtor).

87.     The policy reflected in section 509(c) of the Bankruptcy Code also applies in this case. The Additional Insured DMPs, who each had a role in the creating and perpetuating the opioid crisis, should not have their liability and defense costs resulting from those tortious acts paid for from the limited funds established to pay their own victims.

88.     In this case where any reasonable estimate of the liability exceeds the potentially available assets including the insurance proceeds by many multiples, it is a practical certainty that

Opioid Claimants will not ever be paid in full and thus any claims by the Additional Insured DMPs will be hopelessly subordinated. Because the Additional Insured DMPs have no realistic prospect for recovery on their hypothetical potential claims, the Insurer Injunction poses no threat to the rights of the Additional Insured DMPs and is necessary for the full realization of the asset for the benefit of victims. The Insurers' objection to the Insurer and Permanent Injunctions is therefore without merit and should be overruled.

C.    **The Modification Provisions of the Insurer Injunction Provide the Additional Insured DMPs with Adequate Protection**

89.    The Additional Insured DMPs also argue that the Plan makes no provision for, and does not adequately protect, their purported rights under the Opioid Insurance Policies. *See* DMP Objection ¶35. Even if, in the most unlikely of circumstances, the Opioid Insurance Policies are not exhausted in satisfaction of the Opioid Liabilities, the rights of the Additional Insured DMPs are adequately protected. The Insurance Injunction does not eliminate their rights; it merely enjoins them from pursuing those rights pending recovery by the victims of the opioid crisis. Under the terms of the Injunction, to the extent the Opioid Insurance Policies are not exhausted or released, and the proceeds are not recoverable by the Opioid MDT II, the Opioid MDT II has the authority to terminate, reduce or limit the scope of the insurer injunction. In such a case, the Additional Insured DMPs may be permitted to pursue any rights they may have in the Opioid Insurance Policies. *See* Plan, Art. IX.I.3.

D.    **The Permanent Injunction**

90.    The Additional Insured DMPs object that the Permanent Injunction set forth in Article IX.G of the Plan improperly deprives them of their rights with regard to non-opioid claims that the DMPs may hold under any Insurance Contract. DMP Objection ¶ 21. The Plan is clear; the Permanent Injunction enjoins claims only, "with respect to any Claim, demand, liability,

41

obligation, debt, right, Cause of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any person so released, discharged or exculpated (or the property or estate of any person so released, discharged or exculpated)." Plan, Art. IX.G. By its own terms, therefore, the Permanent Injunction does nothing to deprive the Additional Insured DMPs of any rights with regard to non-Opioid Claims and the Additional Insured DMPs cannot realistically contend that they should be permitted to pursue the Insurance Contracts in connection with claims that are released by the Plan. Further the Permanent Injunction is limited by its own terms to "the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code." Plan, Art. IX.G. This self-limiting language ensures that any potential claims by the Additional Insured DMPs are enjoined only to the extent of this Court's jurisdiction and as provided for by the Bankruptcy Code. The Additional Insured DMPs' objections to the Permanent Injunction are contrary to the express language of the Plan and should be overruled.

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court overrule the Objections and confirm the Plan.

Dated: October 26, 2021
          New York, New York

MORRIS JAMES LLP

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman, Esquire
Eric J. Monzo, Esquire
Brya M. Keilson, Esquire
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
E-mail: Jwaxman@morrisjames.com
E-mail: Emonzo@morrisjames.com
E-mail: Bkeilson@morrisjames.com

KRAMER LEVIN NAFTALIS
& FRANKEL
Kenneth H. Eckstein, Esq.
Philip Bentley, Esq.
Daniel M. Eggermann, Esq.
Megan M. Wasson, Esq.
1177 Avenue of the Americas
New York, NY 10036
Phone: (212) 715-9100
E-mail: keckstein@kramerlevin.com
E-mail: pbentley@kramerlevin.com
E-mail: deggermann@kramerlevin.com
E-mail: mwasson@kramerlevin.com

GILBERT LLP
Scott D. Gilbert, Esq.
Kami E. Quinn, Esq.
Emily P. Grim Esq.
700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
Phone: (202) 772-2200
E-mail: gilberts@gilbertlegal.com
E-mail: quinnk@gilbertlegal.com
E-mail: grime@gilbertlegal.com

BROWN RUDNICK LLP
David J. Molton, Esq.
Gerard T. Cicero, Esq.
7 Times Square
New York, NY  10036
Phone: (212) 209-4800
E-mail: dmolton@brownrudnick.com
E-mail: gcicero@brownrudnick.com

Steven D. Pohl, Esq.
One Financial Center
Boston, MA  02111
Phone: (617) 856-8594
E-mail: spohl@brownrudnick.com

Eric R. Goodman, Esq.
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
Phone: (202) 536-1740
E-mail: egoodman@brownrudnick.com

*Counsel for the Governmental Plaintiff Ad Hoc Committee*