**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*,<br><br>Debtors.[1] | §   Chapter 11<br>§<br>§   Case No. 20-12522 (JTD)<br>§<br>§   (Jointly Administered)<br>§<br>§   Re: D.I. 4508 and 4709<br>§<br>§<br>§ |

**THE AD HOC FIRST LIEN TERM
LENDER GROUP'S (I) STATEMENT IN SUPPORT OF
CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF
REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR
AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
AND (II) REPLY TO THE FIRST LIEN NOTES OBJECTIONS**

The Ad Hoc First Lien Term Lender Group[2] hereby files this (a) statement in support of

confirmation of the *First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor*

*Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 4508] (as may be further modified,

amended, or supplemented from time to time, and together with all exhibits and schedules thereto,

the "***Plan***")[3] and (b) reply to the (i) *Objection and Response of the Ad Hoc First Lien Notes Group*

*to (a) First Amended Joint Plan of Reorganization of Mallinckrodt PLC and Its Debtor Affiliates*

*Under Chapter 11 of the Bankruptcy Code and (b) Debtors' Objection to Funded Debt Claims*

[D.I. 4709] (the "***Ad Hoc First Lien Notes Group Objection***") and (ii) *Columbus Hill Capital*

*Management, L.P.'s (A) Objection to Confirmation of Debtors' Joint Plan of Reorganization and*

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]    The members of the Ad Hoc First Lien Term Lender Group are as reflected in the *Third Amended Verified Statement of the Ad Hoc First Lien Term Lender Group Pursuant to Bankruptcy Rule 2019* [Docket No. 1691].

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement, the Restructuring Support Agreement, the First Lien Credit Agreement, or the First Lien Notes Objections, as applicable.

*(B) Response to Objection to Funded Debt Claims* [D.I. 4729] (the "***Columbus Hill Objection***" and together with the Ad Hoc First Lien Notes Group Objection, the "***First Lien Notes Objections***"; the Ad Hoc First Lien Notes Group and Columbus Hill Capital Management, L.P., collectively, the "***Objecting First Lien Noteholders***") (this "***Statement and Reply***"). In support of this Statement and Reply, the Ad Hoc First Lien Term Lender Group respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Plan should be confirmed and all objections to it, including the First Lien Notes Objections, should be overruled.  The Plan is the culmination of years of hard fought negotiations between the Debtors and their major stakeholders and represents the type of compromise that is at the very heart and purpose of the chapter 11 process.  Getting to this point was no easy task and certainly not guaranteed at the outset of these chapter 11 cases.  The Debtors filed these chapter 11 cases with a Restructuring Support Agreement in place, but without the support of its largest secured creditors, including the First Lien Term Lenders.  This particular issue was remedied when the Debtors, the Ad Hoc First Lien Term Lender Group, and the other parties to the Restructuring Support Agreement entered into the *Joinder Agreement and Amendment to Restructuring Support Agreement, dated as of March 10, 2021* (the "***Supporting Term Lenders Joinder Agreement***"), pursuant to which, the Ad Hoc First Lien Term Lender Group agreed to support the Debtors' Plan.

2.      The Supporting Term Lenders Joinder Agreement, the terms of which are incorporated into the Plan, represents a comprehensive and interlocking settlement of all disputes between the Debtors and the First Lien Term Lenders (the "***First Lien Term Loan Settlement***"), and includes components now embodied in treatments under the Plan for the First Lien Term Loan Claims in the form of the New First Lien Term Loans that will replace the existing First Lien Term

Loans on the Effective Date and the Term Loan Exit Payment (*i.e.*, an exit payment of 0.5% of the outstanding amount of First Lien Term Loans (*i.e.*, $8.5 million), which amount increases to 1.0% if the First Lien Term Loans are not paid in full prior to the Effective Date (*i.e.*, $17 million)).[4] The settlement of these disputes allowed the Debtors to avoid what would have been protracted and expensive litigation with the Ad Hoc First Lien Term Lender Group around confirmation – litigation in which the Debtors had no guarantee of success.

3.      An integral element of the First Lien Term Loan Settlement under the Plan is the Term Loan Exit Payment, a portion of which the Objecting First Lien Noteholders have alluded to as an impairment of their rights under Section 2.01(a) of the First Lien Intercreditor Agreement.[5] This argument, however, is simply incorrect.[6]

4.      ***To begin***, the First Lien Intercreditor Agreement governs the relationship between the First Lien Term Loans and the First Lien Notes as it relates to Shared Collateral,[7] and how the

---

[4]   The Court has previously approved two elements of the compromise memorialized in the Supporting Term Lenders Joinder Agreement: (a) the 2020 ECF Payment, *see Order Granting Motion for Order (i) Authorizing Use of Cash Collateral Other than in the Ordinary Courte of Business, (ii) Granting Limited Relief from the Automatic Stay, and (iii) Granting Related Relief* [D.I. 1745] and, as correctly noted by the Ad Hoc First Lien Notes Group in the Ad Hoc First Lien Notes Group Objection, (b) the first 0.5% of the Term Loan Exit Payment, *see Order (i) Modifying Cash Collateral Order with Respect to Adequate Protection Terms, (ii) Permitting the Debtors to Pay Certain Amounts, and (iii) Granting Related Relief* [D.I. 2021].

[5]   *See* Ad Hoc First Lien Notes Group Objection at ¶¶ 81-82; Columbus Hill Objection at ¶ 19.  Notably, the Objecting First Lien Noteholders only argue that 50% of the Term Loan Exit Payment is at issue as a result of the Court's prior approval of the first 50% of the Term Loan Exit Payment.  *See* Ad Hoc First Lien Notes Group Objection at ¶ 82, n. 21; Columbus Hill Objection at ¶ 19, n. 29.  A true and correct copy of the First Lien Intercreditor Agreement is attached as Exhibit 7 to the *Declaration of Donald Burke in Support of Objection and Response of the Ad Hoc First Lien Notes Group to (A) First Amended Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code and (B) Debtors' Objection to Funded Debt Claims* [D.I. 4719].

[6]   The First Lien Notes Objections are limited in their scope to illustrate impairment under the Plan (and opposition to the potential implementation of the Cram-Down First Lien Notes), and do not object to or otherwise challenge the treatment of the First Lien Term Loans under the Plan, including the Term Loan Exit Payment.  Accordingly, this Statement and Reply is intended in all respects to serve as a reservation of rights with respect to any challenge of or objection to the Term Loan Exit Payment (or any part of the First Lien Term Lenders' recovery under the Plan) by any party.

[7]   Under the First Lien Intercreditor Agreement, "<u>Shared Collateral</u>" means, "at any time, Collateral in which the holders of two or more Series of Pari Passu Obligations (or their respective Authorized Representatives or the

proceeds of such Shared Collateral (realized through a monetization event) should be applied to satisfy Pari Passu Obligations.[8]   The Term Loan Exit Payment, however, is not a Pari Passu Obligation because it does not arise under the First Lien Credit Agreement.[9]   Instead, the Term Loan Exit Payment is a separate contractual entitlement of the First Lien Term Lenders under the Supporting Term Lenders Joinder Agreement, which entitlement has been incorporated in the Plan and will be an obligation thereunder.[10]

5.     *Second*, even if the Court determines that the First Lien Intercreditor Agreement must be analyzed in connection with the Term Loan Exit Payment, the Objecting First Lien Noteholders' analysis of Section 2.01(a) and how it would apply to the Term Loan Exit Payment is simply incorrect.   As an initial matter, Section 2.01(a) of the First Lien Intercreditor Agreement is only applicable when an Event of Default has occurred and is continuing.   The Term Loan Exit Payment, however, will not be made until the Effective Date, a point in time in which any existing Events of Default, by definition, must be, and will have been, cured.   Additionally, Section 2.01(a) does not, as the Objecting First Lien Noteholders assert, govern the straight distribution of Shared Collateral.   Rather, it consists of a post-default waterfall (the "***Post-Default Waterfall***") under

---

Collateral Agent on behalf of such holders) hold a valid and perfected security interest at such time.  If more than two Series of Pari Passu Obligations are outstanding at any time and the holders of less than all Series of Pari Passu Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of Pari Passu Obligations that hold a valid and perfected security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series that does not have a valid and perfected security interest in such Collateral at such time." First Lien Intercreditor Agreement § 1.01 (def.).

[8]   *See id.* at § 2.01(a).

[9]   *See id.* at § 1.01 (def.) ("'Pari Passu Obligations' means (i) the Credit Agreement Obligations and (ii) each Series of Additional Obligations").

[10]   *See In re MPM Silicones, LLC*, 518 B.R. 740, 753 (Bankr. S.D.N.Y. 2014) (holding that payments made to a second lien debt holder in connection with a backstop fee while more senior secured obligations remained outstanding did not trigger the application of a waterfall under the applicable intercreditor agreement because the backstop fee was an independent obligation of the debtors that did not arise under the loan documents).

which Deutsche Bank AG New York Branch ("***Deutsche Bank***"), as Collateral Agent and Applicable Authorized Representative (as defined in the First Lien Intercreditor Agreement) under the First Lien Intercreditor Agreement, is authorized to apply "Proceeds" of Shared Collateral in satisfaction of Pari Passu Obligations.[11]   In order for Proceeds to arise under the First Lien Intercreditor Agreement, however, there must be a monetization event in connection with an exercise of remedies or the sale, collection, or other liquidation of Shared Collateral.[12] As no such monetization event has occurred, the use of the Debtors' cash to make the Term Loan Exit Payment (even if the First Lien Term Lenders have a perfected interest in such cash) does not trigger the Post-Default Waterfall.[13]

6.    ***Finally***, assuming *arguendo* that the First Lien Intercreditor Agreement is applicable to the Term Loan Exit Payment and that the Post-Default Waterfall is applicable in a non-monetization scenario, the First Lien Notes Objections with respect to the Term Loan Exit Payment still fail because their conclusory statements that all of the Debtors' cash constitutes Shared Collateral is incorrect and also fail to account for at least $1.1 billion in new external financing (namely, the New Term Loan Facility and $200 million New AR Revolving Facility) from which the Reorganized Debtors will satisfy the Term Loan Exit Payment on the Effective Date.

---

[11]   *See* First Lien Intercreditor Agreement at § 2.01(a) (stating that Proceeds "shall be applied: . . . (ii) SECOND, subject to <u>Section 1.04</u>, to the payment in full in cash of the Pari Passu Obligations of each Series on a ratable basis, **with such Proceeds to be applied** to the Pari Passu Obligations of a given Series in accordance with the terms of the applicable Secured Credit Documents") (emphasis added).

[12]   *See id.* (defining "<u>Proceeds</u>" as "all proceeds of any ***sale, collection or other liquidation*** of any Shared Collateral and all such payments and proceeds of any such payment or distribution") (emphasis added).

[13]   *See In re Energy Future Holdings Corp.*, 773 Fed. Appx. 89, 94 (3d Cir. 2019) (holding that distributions under a plan did not trigger the waterfall under an applicable intercreditor agreement because the distributions were not made up of proceeds generated from a collateral agent's exercise of remedies).

7.      The Plan should be confirmed because it complies with all of the requirements of the Bankruptcy Code and represents a viable path forward to emergence from these chapter 11 cases for the Debtors.  The First Lien Notes Objections, in turn, must be overruled with respect to the Objecting First Lien Noteholders' efforts to argue that the satisfaction of the Term Loan Exit Payment on the Effective Date constitutes an impairment of their rights because such argument is premised on multiple inaccurate interpretations of the First Lien Intercreditor Agreement, including its application to the Term Loan Exit Payment in the first place.  As such, the First Lien Notes Objections' assertions on these issues must be denied.

## ARGUMENT

**I.      Approval of the Settlements Incorporated into the Plan Is in the Paramount Interests of the Debtors' Creditors and Should Be Approved.**

8.      The Plan incorporates the terms of many settlements among the Debtors and several constituencies – namely, the several settlements set forth in the Restructuring Support Agreement, which represents the culmination of months-long negotiations among the Debtors and the Supporting Parties, as well as settlements the Debtors have reached with other key constituents, including the UCC, the OCC, and the Ad Hoc Second Lien Notes Group. "[T]he standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. [9019]."[14]  The "ultimate inquiry" is "whether 'the compromise is fair, reasonable, and in the interest of the estate.'"[15]  "Compromises are favored in bankruptcy proceedings because they minimize litigation and expedite the administration of the

---

[14]  *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008).

[15]  *In re Marvel Ent. Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

bankruptcy estate."[16] Without each of the carefully crafted and value-maximizing settlements that lay at the heart of the Plan, the Debtors would incur significant delay and expense litigating myriad issues with various stakeholders who have distinct interests, which would undoubtedly have a deleterious impact on creditor recoveries and the Debtors' ability to reorganize.

9.      The Restructuring Support Agreement, in particular, provides the foundation for the Plan.  The Restructuring Support Agreement was designed to de-lever the Debtors' balance sheet by providing a framework for resolving not only the Debtors' funded debt obligations, but also their potential opioid and governmental Acthar liabilities.  The Restructuring Support Agreement also contemplates the incurrence of new exit financing, which will ensure that the Debtors emerge from chapter 11 with sufficient liquidity to meet their post-emergence obligations and ample cushion for post-emergence operations.  In fact, because of the settlements embodied in the Restructuring Support Agreement, holders of Trade Claims and General Unsecured Claims are receiving meaningfully larger recoveries than what they would have been entitled to under the Bankruptcy Code (and even more with the terms of the UCC Settlement incorporated into the Plan).[17]  The Restructuring Support Agreement has also allowed the Debtors to engage with other parties to build further consensus around the Plan, which now has the support of nearly all of the Debtors' key creditor constituencies, including the Supporting Governmental Opioid Claimants, the Supporting Unsecured Noteholders, the MSGE Group, the Supporting Term Lenders, the UCC, the OCC, and the Ad Hoc Second Lien Group.

---

[16]  *In re W.R. Grace & Co.*, 475 B.R. 34, 77 (D. Del. 2012) (citing *Myers v. Martin (In re Martine)*, 91 F.3d 389, 393 (3d Cir. 1996)).

[17]  *See* Disclosure Statement at § I.B ("[T]he Debtors believe Holders of Trade Claims and General Unsecured Claims in Classes 6 and 7, respectively, in the aggregate, would be entitled to approximately $34 million, as a midpoint, in the absence of any of the settlements embodied in the Restructuring Support Agreement and in a strict application of the absolute priority rule under the Bankruptcy Code, applied entity-by-entity among all the Debtors and Non-Debtor Affiliates. . . . Accordingly, the Debtors believe the Plan provides such creditors with multiples more than their entitlements by making available $150 million for these claimants.").

10.     The Restructuring Support Agreement has also resolved critical issues that would have potentially obstructed the Debtors' path to emergence to the detriment of all stakeholders. The integrated agreements set forth in the Supporting Term Lenders Joinder Agreement, in particular, are the product of extensive negotiations and represent a good faith compromise of several complex disputes related to the allowance of various components of the First Lien Term Loan Claims (including the rate of postpetition interest and issues related to principal repayments due under the First Lien Credit Agreement) and their treatment under the Plan, as well as whether the First Lien Term Loan Claims could be reinstated under the Bankruptcy Code.  Prior to execution of the Support Term Lenders Joinder Agreement, these disputes were the subject of contentious litigation in these chapter 11 cases, and the settlement of these disputes eliminates the risk and cost of continued litigation and potential impediments to confirmation of the Plan.

11.     Based on the foregoing, each of the settlements incorporated into the Plan, including the settlements reflected in the Restructuring Support Agreement, the UCC Settlement, the OCC Settlement, and the Second Lien Settlement, is fair, reasonable, and in the paramount interests of the Debtors' creditors.  Accordingly, each settlement satisfies the standard for approval under Bankruptcy Rule 9019 and should therefore be approved.

## II.     The Third-Party Releases Are Permissible and Should Be Approved.

12.     Article IX.C of the Plan contains releases by certain Non-Debtor Releasing Parties of claims against the Released Parties, including the Supporting Parties, for liability relating to the Debtors, their affiliates, or these chapter 11 cases (such releases, the "***Third-Party Releases***"). The Third-Party Releases are reasonable, appropriate, and permissible under the Bankruptcy Code and applicable Third Circuit law and should be granted.

13.     As an initial matter, the Third-Party Releases are consensual because the Non-Debtor Releasing Parties have been provided with an opportunity to opt out of the releases and

either affirmatively opted out or are otherwise deemed to consent to the Third-Party Releases under

applicable Third Circuit authority.[18]  Courts in this District, including this Court, routinely approve

third-party releases with similar opt-out structures.[19]  The opt-out mechanism for the Third-Party

Releases under the Plan are no different and, therefore, are consensual under applicable law.

14.    Moreover, the Third-Party Releases are a product of extensive, arm's-length

negotiations and were a material inducement for the Supporting Parties' entry into the

---

[18]  *See*, *e.g.*, *Indianapolis Downs, LLC*, 486 B.R. 296, 305 (Bankr. D. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."); *id.* at 303-06 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved.").

[19]  *See*, *e.g.*, *In re AeroCentury Corp.*, Ch. 11 Case No. 21-10636 (JTD) (Bankr. D. Del. Aug. 31, 2021), *Findings of Fact, Conclusions of Law and Order Approving and Confirming the Combined Disclosure Statement and Joint Chapter 11 Plan of the Debtors* [D.I. 296] at ¶ O ("The releases . . . are consensual as they pertain to the Releasing Parties because they are given and made after due notice and an opportunity to object and be heard with respect thereto, as the Combined Disclosure Statement and Plan, the Confirmation Hearing Notice, and the Ballots each unambiguously state that (a) the Plan contains such releases, (b) affected parties may object to such releases, and (c) the Release Opt-Election may be exercised as provided for in the Plan."); *In re Cred Inc.*, Ch. 11 Case No. 20-12836 (JTD) (Bankr. D. Del. Mar. 11, 2021), *Order Confirming and Approving on a Final Basis Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [D.I. 629] at ¶ 27 ("all Holders of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the this release by timely submitting a Ballot or the Opt-Out Election Form shall be deemed to have released and discharged each Released Party from any and all claims and Causes of Action"); *In re RTI Holding Co., LLC*, Ch. 11 Case No. 20-12456 (JTD) (Bankr. D. Del. Feb. 17, 2021), *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Chapter 11 Plan, as Modified* [D.I. 1144] at ¶ O.(ix)b. ("[T]he Third Party Release is consensual as the Releasing Parties were given the opportunity to opt out of the Third Party Release, and the release provisions of the Plan were conspicuous in the Confirmation Hearing Notice, the Plan, the Disclosure Statement, the Ballots and Non-Voting Class Notice."); *In re AAC Holdings*, Ch. 11 Case No. 20-11648 (JTD) (Bankr. D. Del. Oct. 20, 2020), *Order Confirming Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and Its Debtor Affiliates* [D.I. 695] at ¶ 36 ("[E]ach Releasing Party was given due and adequate notice that they would be granting the Third Party Release by voting to accept the Plan, failing to opt out of the Third Party Release if voting against the Plan or abstaining from voting on the Plan, failing to object to the Third Party Release prior to the deadline to object to Confirmation of the Plan or as otherwise described in the Plan. Accordingly, the Third Party Release is consensual."); *In re PQ New York, Inc.*, Ch. 11 Case No. 20-11266 (JTD) (Bankr. D. Del. Sept. 25, 2020), *Finding of Fact and Conclusion of Law (I) Approving Disclosure Statement on a Final Basis; and (II) Second Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of PQ New York, Inc. and Affiliated Debtors Dated September 18, 2020* [D.I. 597] at ¶ OO at 17 ( "The releases . . . are binding on all (a) Creditors who are unimpaired, (b) Creditors who returned a Ballot and did not check the opt-out box on the Ballot, and (c) Creditors who were sent a solicitation package but did not vote and did not return a Ballot with the opt-out box checked").

Restructuring Support Agreement and continue to be a material condition for their support of the Plan. Because, absent the Third-Party Releases, the Supporting Parties would not have entered into the Restructuring Support Agreement, supported the Plan, and made the concessions in connection with such support, the Third-Party Releases are also essential to the Plan and the Debtors' ability to reorganize.

15.    Furthermore, the Third-Party Releases were granted in exchange for the concrete and substantial contributions of value by the Supporting Parties throughout these chapter 11 cases and are, therefore, supported by ample consideration. The Ad Hoc First Lien Term Lender Group, in particular, provided the Debtors with considerable support as Supporting Parties and otherwise, including by (i) agreeing to the use of hundreds of millions of dollars of cash collateral that have funded these cases, (ii) entering into the Restructuring Support Agreement, which has been crucial in paving a path forward in these chapter 11 cases, (iii) voting to accept the Plan in accordance with the Restructuring Support Agreement, (iv) supporting the Debtors in their negotiations of the various issues raised in these cases, and (v) making other concessions that have resulted in the settlements and compromises embodied in the Plan. As will be adduced at trial, all parties in interest have benefitted from these contributions and concessions, and thus the Ad Hoc First Lien Term Lender Group is entitled to the benefits of the release and injunction provisions under the Plan.[20]

---

[20]    For the same reasons, the Court should approve payment of the Restructuring Expenses under Article IV.S of the Plan. But, to be clear, the Court has already approved payment of Restructuring Expenses incurred by the advisors to the Ad Hoc First Lien Term Lender Group pursuant to the Cash Collateral Order, such that no further approval by the Court for the payment of such Restructuring Expenses is necessary or required. *See* Cash Collateral Order at ¶ 4(g); Plan at § I.A.370 (defining "Restructuring Expenses" to include "all reasonable and documented fees and out of pocket expenses incurred prior to the Effective Date, . . . of . . . (3) solely to the extent not already provided herein, the professionals entitled to the payment of such fees and out of pocket expenses pursuant to the Cash Collateral Order (including the advisors to the Ad Hoc First Lien Term Lender Group . . . to the extent such fees and out of pocket expenses are not already paid pursuant to the Cash Collateral Order)").

16.     In sum, the Third-Party Releases are consensual, an integral component of, and a condition for the Supporting Parties' support for, the Plan, and given in exchange for the significant consideration and concessions provided by the Supporting Parties that inured not only to the benefit of the Debtors, but all stakeholders in these chapter 11 cases.  Accordingly, the Third-Party Releases are necessary, appropriate, and justified under applicable law, and should be approved.

III.     **Satisfaction of the Term Loan Exit Payment on the Effective Date Does Not Impair the First Lien Notes Claims Under the Plan.**

17.     The Objecting First Lien Noteholders assert that Class 3 (First Lien Notes Claims) is impaired, notwithstanding the proposed reinstatement of First Lien Notes, because, among other things, the Plan proposes to satisfy  the Term Loan Exit Payment on the Effective Date as part of the Plan's treatment of First Lien Credit Agreement Claims, while reinstating the First Lien Notes without a ratable allocation of such cash payment to the First Lien Noteholders.[21]  This argument, however, is premised on an incorrect interpretation of the First Lien Intercreditor Agreement as it relates to the Term Loan Exit Payment, and accordingly, should be overruled.

A.     **The Term Loan Exit Payment Is not Governed by the First Lien Intercreditor Agreement.**

18.     As an initial matter, the First Lien Intercreditor Agreement governs the relationship between Pari Passu Secured Parties (*i.e.*, the First Lien Agent, the First Lien Term Lenders, the First Lien Revolving Lenders, the First Lien Trustee, and the First Lien Noteholders) with respect to their respective rights to certain forms of common collateral that secure their respective Pari Passu Obligations (*i.e.*, Shared Collateral).  The First Lien Intercreditor Agreement does not apply to separate contractual entitlements such as the Term Loan Exit Payment, which arises solely under the Supporting Term Lenders Joinder Agreement and which has now been incorporated into the

---

[21]  *See* Ad Hoc First Lien Notes Group Objection at ¶¶ 81-84; Columbus Hill Objection at ¶¶ 18-22.

Plan.  Such a conclusion is not only consistent with even a cursory review of the First Lien

Intercreditor Agreement, but also comports with how courts have overruled similar challenges to

payment entitlements that fall outside of loan documents in other settings.[22]

19.     In *MPM Silicones*, the court faced challenges from first and 1.5 lien creditors to

certain actions taken by a group of second lien debt holders in seeming violation of an applicable

intercreditor agreement.[23]  According to the complaint in *MPM Silicones*, the second lien debt

holders, among other things, violated the intercreditor agreement by receiving a backstop fee in

connection with proposed exit financing while more senior secured obligations remained

outstanding.[24]  Dismissing these elements of the complaint, the court determined that the payment

of the backstop fee to the second lien debt holders did not violate the intercreditor agreement

because the backstop fee was not made "on account of a secured obligation but, rather, a separate,

unsecured obligation undertaken by the debtors to the defendants for backstopping new exit

financing for the debtors beyond the time provided in the Backstop Agreement."[25]  The second

lien debt holders, therefore, by receiving the backstop fee, "would not be exercising remedies as

secured creditors against the Common Collateral," and accordingly, the intercreditor agreement

did not apply.[26]

20.     Similarly here, the First Lien Term Lenders are not receiving any part of the Term

Loan Exit Payment in satisfaction of the obligations owed to them under the First Lien Credit

---

[22]  *See MPM Silicones*, 518 B.R. at 753 (holding that cash payment of second lien debt holders' backstop fee in connection with proposed exit financing when more senior obligations had not been paid in full did not violate an intercreditor agreement because the backstop fee arose out of a separate contractual entitlement outside of the applicable secured credit documents).

[23]  *See id.* at 745.

[24]  *See id.* at 746.

[25]  *See id.* at 753.

[26]  *See id.*

Agreement. Instead, the Term Loan Exit Payment is a separate contractual entitlement payable to the First Lien Term Lenders under the Plan on the Effective Date, which originated as an obligation under the Supporting Term Lenders Joinder Agreement. The First Lien Intercreditor Agreement, therefore, is not applicable to the Term Loan Exit Payment, and accordingly, any arguments by the Objecting First Lien Noteholders that they are somehow impaired because the Term Loan Exit Payment violates the First Lien Intercreditor Agreement must fail.

> **B.**     **Even if the First Lien Intercreditor Agreement Is Applicable to the Term Loan Exit Payment, the Term Loan Exit Payment Is not Governed by the Post-Default Waterfall.**

21.     If the Court determines that the First Lien Intercreditor Agreement is applicable to the Term Loan Exit Payment, then the Objecting First Lien Noteholders' impairment argument must still fail because it is premised on an incomplete, and therefore, inaccurate read of Section 2.01(a) of the First Lien Intercreditor Agreement. According to the Objecting First Lien Noteholders, Section 2.01(a) of the First Lien Intercreditor Agreement requires a pro rata distribution on account of all first lien claims "if an Event of Default has occurred and is continuing, and . . . any distribution is made in respect of any Shared Collateral" in any bankruptcy case.[27] This oversimplification of Section 2.01(a) (and conclusory statement that an Event of Default will be continuing when the Term Loan Exit Payment is made) is problematic for multiple reasons.

22.     *First*, as a simple matter of timing, the Post-Default Waterfall will not be applicable with respect to the Term Loan Exit Payment if the First Lien Notes are being reinstated because, at the time the Term Loan Exit Payment will be made, no Event of Default will be outstanding for

---

[27]     *See* Ad Hoc First Lien Notes Group Objection at ¶ 82; Columbus Hill Objection at ¶ 19.

purposes of the First Lien Intercreditor Agreement.  Indeed, the Term Loan Exit Payment will be made on the Effective Date,[28] at which time the Debtors will have emerged from bankruptcy and, by necessity, no Events of Default under either the First Lien Credit Agreement or the First Lien Notes Indenture will be continuing if the First Lien Notes are reinstated.[29]  This simple fact vitiates any argument that Section 2.01(a)'s Post-Default Waterfall can be applicable to a payment made pursuant to the Plan on the Effective Date.

23.     *Second*, the Objecting First Lien Noteholders' description of Section 2.01(a) glosses over the provision's actual purpose in a post-default setting, which is to (a) direct the application of proceeds generated from the monetization of Shared Collateral by Deutsche Bank or another Pari Passu Secured Party while exercising remedies, and (b) to ensure that any payments resulting from the sale or liquidation of Collateral made to a Pari Passu Secured Party under the Second Lien Intercreditor Agreement (or any other intercreditor agreement other than the First Lien Intercreditor Agreement) be applied ratably among the other Pari Passu Secured Parties.  At bottom, the fundamental purpose of this provision is to address how proceeds generated from the sale or liquidation of Shared Collateral (whether following remedy enforcement or voluntary sale or liquidation by the Debtors), solely while an Event of Default is outstanding, are to be allocated among the Pari Passu Secured Parties.  The first of these purposes – remedy enforcement – is not applicable in the context of a plan distribution, and the second, of course, is not relevant when analyzing the Term Loan Exit Payment because that payment is not in respect of the sale or liquidation of any Shared Collateral.

---

[28]   *See* Plan at § III.B.2.a(iii) ("All Allowed First Lien Revolving Credit Facility Claims shall receive, on the Effective Date, . . . repayment in full in Cash."); *id.* at § III.B.2.b(iii) & c(iii) ("All Allowed [2024/2025] First Lien Term Loan Claims shall receive on the Effective Date" their distribution under the Plan"); *id.* at § I.A.194 ("any applicable distributions under this Plan on account of First Lien Term Claims will be made to the applicable Distribution Agent on the Effective Date").

[29]   *See* 11 U.S.C. § 1124(2).

24.     ***Third***, the Objecting First Lien Noteholders' focus on the phrase "or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case" to justify a supposed entitlement to a portion of the Term Loan Exit Payment is misplaced because this phrase cannot be read in a vacuum.  Instead, it must be read in conjunction with the next standalone phrase (the "***Monetization Phrase***") in Section 2.01(a), which identifies what is subject to the Post-Default Waterfall and its accompanying requirement for ratable payments (*i.e.*, "the proceeds of any sale, collection or other liquidation of any such Shared Collateral by the Collateral Agent or any other Pari Passu Secured Party on account of such enforcement of rights or remedies or distributions in respect thereof in any Bankruptcy Case or any other Insolvency or Liquidation Proceeding").[30]

25.     By selecting piecemeal aspects of Section 2.01(a) to serve their own purposes, the Objecting First Lien Noteholders' interpretation contravenes the established principle of contract interpretation that  "[a] court should not consider the meaning of contract terms in isolation, but rather in the context of the document as a whole and the circumstances in which it was executed, attempting to understand the parties' intentions as expressed in the document."[31]   Reading a contractual provision as a whole ensures that the intent of the contracting parties, as well as the actual text of the applicable contract, is interpreted clearly.  To further illustrate this point, looking to just the portions of Section 2.01(a) selectively quoted in the First Lien Notes Objections, the provision would read as follows – and incompletely say:

> **"[I]f an Event of Default has occurred and is continuing . . . or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case or any other Insolvency or Liquidation Proceeding of the Parent, any Borrower, or any other Grantor**

---

[30]   *See* First Lien Intercreditor Agreement at § 2.01(a).

[31]   *Princeton Ins. Co. v. Converium Reinsurance (N. Am.) Inc.*, 344 F. App'x 759, 461 (3d Cir. 2009) (citing *Kass v. Kass*, 91 N.Y. 2d 554, 565, 696 N.E. 2d 174, 180 (1998)).

> **. . . shall be applied: . . . (ii) SECOND, subject to Section 1.04, to the payment in full of cash of the Pari Passu Obligations of each Series on a ratable basis, with such Proceeds to be applied to the Pari Passu Obligations of each Series in accordance with the terms of the applicable Secured Credit Documents . . ."[32]**

Therefore, the omission of the Monetization Phrase, which otherwise naturally leads into the words "shall be applied," makes Section 2.01(a) grammatically incorrect, and only by including the Monetization Phrase does the Post-Default Waterfall become workable as a matter of contract interpretation.

26.     The key to Section 2.01(a), therefore, is not simply that a distribution is made in connection with a bankruptcy case, but that this distribution is made with proceeds of Shared Collateral generated from a monetization event.  As further evidence of this point, one need only look to the definition of "Proceeds" under the First Lien Intercreditor Agreement, which is the term actually used in the Post-Default Waterfall as the precise amounts that are the subject of allocation on a ratable basis among the Pari Passu Secured Parties, and is defined as "all proceeds of any sale, collection or other liquidation of any Shared Collateral and all such payments and proceeds of any such payments or distribution."[33]  Because there has been no monetization event, the Post-Default Waterfall is not applicable to the Term Loan Exit Payment, and accordingly, the First Lien Notes Objections should be overruled – a conclusion that would be consistent with analogous case law in this Circuit.[34]

27.     In *Energy Future Holdings*, the Court was faced with an adversary proceeding seeking a declaratory judgment from the Court that the waterfall provision of an intercreditor

---

[32]   First Lien Intercreditor Agreement at § 2.01(a).

[33]   *See id.*

[34]   *See In re Energy Future Holdings Corp.*, 585 B.R. 341 (D. Del. 2018), *aff'd* 773 Fed. Appx. 89 (3d Cir. 2019).

agreement would govern the allocation among first lien creditors of any distributions under a confirmed plan – relief that the Court subsequently denied.[35]  On appeal to the district court, the movants sought reversal of the Court's order.[36]

28.     Under *de novo* review, the district court, analyzing a waterfall provision remarkably similar in effect to the Post-Default Waterfall,[37] affirmed the bankruptcy court's decision.[38]  In reaching its decision, the district court analyzed the various elements of the waterfall and certain conditions precedent for the applicability of the waterfall that had been identified by the bankruptcy court, one of which was that the collateral or the proceeds of collateral distributed "must have resulted from a sale or other disposition of, or collection on," such collateral.[39]  Finding that a distribution under a confirmed plan did not constitute a "sale or disposition" of collateral, the district court determined that the conditions precedent to the application of the waterfall had not occurred and that the waterfall did not apply "to the distribution of any of the Plan Distributions."[40]

29.     The movants then appealed to the Third Circuit, where the district court's decision was affirmed, with the Third Circuit determining, among other things, that the payments and distributions under the plan were not "proceeds" under the waterfall provision because they were

---

[35]  *See id.* at 346.

[36]  *See id.* at 343.

[37]  The applicable waterfall provision provided, in relevant part, as follows: "Regardless of any Insolvency or Liquidation Proceeding which has been commenced by or against the Borrower or any other Loan Party, Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies under the Security Documents by the Collateral Agent shall be applied in the following order . . . ." *See id.* at 344.

[38]  *Id.* at 343.

[39]  *Id.* at 349.

[40]  *See id.* at 358.

"not part of a remedy implemented by the collateral agent."[41]  In explaining its holding, the Third

Circuit stated:

> **The 2011 creditors claim that the collateral agent's participation in the bankruptcy counts as a remedy.  But even if the collateral agent's actions in the bankruptcy were a remedy, the restructuring was not part of this remedy.  The creditors, not the collateral agent, voted for the restructuring.   And the bankruptcy court approved it.  This corporate restructuring, blessed by the bankruptcy court, is a far cry from a collateral agent's typical remedy: selling the collateral at a foreclosure sale.  Because the restructuring was not a remedy implemented by the collateral agent, the plan distributions are not proceeds under the waterfall.[42]**

The Third Circuit, therefore, saw clearly that a waterfall provision under an intercreditor agreement

served a very specific purpose: to govern the distribution of collateral proceeds among creditors

subsequent to a monetization event by an agent.  This Court, if it even determines that the First

Lien Intercreditor Agreement applies to the Term Loan Exit Payment, should reach a similar

conclusion, and accordingly, the First Lien Notes Objections with respect to the Term Loan Exit

Payment should be overruled.

> ### C.    The Debtors Can Pay the Term Loan Exit Payment with Cash that Does Not Constitute Shared Collateral.

30.    Even if this Court determines that the First Lien Intercreditor Agreement is

applicable to the Term Loan Exit Payment and that the Term Loan Exit Payment could be subject

to the Post-Default Waterfall, the First Lien Notes Objections should still be overruled because the

Term Loan Exit Payment can be made with cash that does not constitute Shared Collateral under

the First Lien Intercreditor Agreement.  For instance, on the Effective Date, the Debtors will use

---

[41]  *See Energy Future*, 773 Fed. Appx. at 93.

[42]  *See id.* at 94.

the external funds from the issuance of the New Term Loan Facility and the New AR Facility – cash that will not fall within the scope of the definition of Shared Collateral – to satisfy the Term Loan Exit Payment at emergence.[43]  The Objecting First Lien Noteholders' conclusory allegations that any cash distributed under the Plan will, in all circumstances, constitute Shared Collateral, therefore, are incorrect and not supported by the facts as they will exist on the Effective Date. Accordingly, even under the Objecting First Lien Noteholders' flawed reading of Section 2.01(a), the Objecting First Lien Noteholders have failed to meet their burden of proving that the cash distributions under the Plan will constitute Shared Collateral and their objection should be overruled.

> **D.    The Objecting First Lien Noteholders' Objection to the Implementation of the Cram-Down First Lien Notes Should Also Be Overruled.**

31.    Because the Debtors' obligation to satisfy a cash payment under the Plan on account of First Lien Term Loan Claims on the Effective Date does not violate the First Lien Intercreditor Agreement, the Ad Hoc First Lien Notes Group's objection that the issuance of Cram-Down First Lien Notes is not "fair and equitable" under section 1129(b) of the Bankruptcy Code should also be overruled.[44]  Accordingly, the Ad Hoc First Lien Notes Group Objection as it relates to the effect of the Term Loan Exit Payment in the context of the Cram-Down First Lien Notes should be overruled.

---

[43]    There are also other sources of cash that does not constitute Shared Collateral.  Section 2.01(c) of the First Lien Intercreditor Agreement provides that "(i) any Collateral consisting of cash and cash equivalents . . . held by the Collateral Agent . . . shall not constitute Shared Collateral."  First Lien Intercreditor Agreement at § 2.01(c) (emphasis added).  Pursuant to the Debtors' most recent Monthly Operating Report (for the period ended Sept. 24, 2021), *see* D.I. 4850 at 10-11, at least $17.7 million of the Debtors' cash – an amount sufficient to make the Term Loan Exit Payment – sits in bank accounts held by the Collateral Agent.

[44]    *See* Ad Hoc First Lien Notes Group Objection at ¶¶ 117-21.

**E.    The First Lien Term Lenders Constitute "First Lien Claimholders" under the Second Lien Intercreditor Agreement and Reserve All of Their Rights Under the Second Lien Intercreditor Agreement.**

32.    In further support of their arguments for impairment, the Objecting First Lien Noteholders assert that they are entitled to any amounts paid to the Second Lien Noteholders until the "Discharge" of all of the Debtors' first lien obligations in full.  To be clear, the term "First Lien Claimholders" under the Second Lien Intercreditor Agreement includes the First Lien Term Lenders, who would, therefore, be entitled to their ratable share of any amounts received in connection with any turnover remedy sought from the Second Lien Noteholders.  Accordingly, the members of the Ad Hoc First Lien Term Lender Group reserves all of their rights and remedies with respect to the foregoing, including all of their rights and remedies under the First Lien Intercreditor Agreement and Second Lien Intercreditor Agreement, respectively.

## CONCLUSION

33.    The Plan should be confirmed and the settlements contained therein (as well as their respective terms, including the Term Loan Exit Payment) should be approved because it is in the best interests of the Debtors' estates, complies with all of the requirements of the Bankruptcy Code, and, most importantly, ensures an equitable and proper resolution to these chapter 11 cases.  The Debtors and their major stakeholders, including the Ad Hoc First Lien Term Lender Group, have worked tirelessly to get to this point and stand on the precipice of a remarkable achievement and a path forward to emerge from these chapter 11 cases.  Nothing in any of the objections, particularly the First Lien Notes Objections, should compel this Court to deny confirmation of the Plan, and each objection not otherwise consensually resolved by the Debtors should therefore be overruled.

## **RESERVATION OF RIGHTS**

34.     The Ad Hoc First Lien Term Lender Group reserves the right to (a) amend or supplement this Statement, and otherwise take any additional or further action with respect to the Plan or the matters addressed therein, and (b) be heard before the Court with respect to the Plan. The Ad Hoc First Lien Term Lender Group's support for the Plan is based on, among other things, (a) the existing terms of the Restructuring Support Agreement, (b) the valuations and financial projections included in the Debtors' current Disclosure Statement, and (c) the current projections with respect to other claims in these chapter 11 cases, including all Administrative Claims, remaining consistent.  The Ad Hoc First Lien Term Lender Group reserves all of its rights to modify both this Statement and Reply, and all of its rights and remedies under the Restructuring Support Agreement, its rights and remedies with respect to any other plan or any modification to the Plan and under the First Lien Credit Agreement and any other Loan Documents (including, but not limited to, the First Lien Intercreditor Agreement and Second Lien Intercreditor Agreement, respectively), the Bankruptcy Code, and applicable law.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, for the reasons set forth herein, the Ad Hoc First Lien Term Lender Group respectfully requests that the Court enter an order overruling the objections to confirmation of the Plan, confirming the Plan, and granting such other and further relief as the Court may deem just and proper.

Dated: October 26, 2021
         Wilmington Delaware

Respectfully submitted,

*/s/ David M. Fournier*
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, Delaware  19899-1709
Telephone:     (302) 777-6500
Facsimile:      (302) 421-8390
E-mail:          david.fournier@troutman.com
                    kenneth.listwak@troutman.com

-and-

Scott J. Greenberg *(admitted pro hac vice)*
Michael J. Cohen *(admitted pro hac vice)*
Matthew L. Biben *(admitted pro hac vice)*
Jennifer L. Conn *(admitted pro hac vice)*
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone:     (212) 351-4000
Facsimile:      (212) 351-4035
E-mail:          sgreenberg@gibsondunn.com
                    mcohen@gibsondunn.com
                    mbiben@gibsondunn.com
                    jconn@gibsondunn.com

*Attorneys for the Ad Hoc First Lien Term Lender Group*