**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |

**THE MULTI-STATE GOVERNMENTAL ENTITIES GROUP'S REPLY IN SUPPORT OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND RESPONSE TO CERTAIN OBJECTIONS THERETO**

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.   The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................................1

Background ...................................................................................................................................2

Argument .....................................................................................................................................2

I.  The Third-Party Release in Article IX.D of the Plan Is Necessary and Appropriate and
    Should Be Approved ...........................................................................................................2

   A.  The Third Circuit Permits Non-Consensual Third-Party Releases in Appropriate
       Circumstances ..............................................................................................................3

   B.  The Release in Article IX.D Is Integral to the Debtors' Reorganization Strategy ..............5

   C.  The UST's Notice Objections to Article IX.D Are Without Merit ...................................7

II.  The UST's Objection to the Fee Settlement Funds Is Unavailing .......................................7

   A.  Section 503(b) Is Not the Applicable Standard for Evaluating Article IV.X.9 of the
       Plan ..............................................................................................................................8

      1.  Section 503(b)(4) Is Not the Applicable Standard for Evaluating Article IV.X.9 of
          the Plan ...................................................................................................................8

      2.  Numerous Courts Have Held that Section 503(b) Is Not the Standard for
          Evaluating Similar Fee Provisions .........................................................................9

   B.  Article IV.X.9 of the Plan Is Eminently Reasonable ......................................................11

III.  Other Miscellaneous Objections Should Be Denied .........................................................14

   A.  The Plan Permissibly Classified Opioid Claims and Correctly Designated Their
       Classes as Impaired .....................................................................................................14

   B.  The Implementation of the Plan and Opioid Settlement Is Not a *Sub Rosa*
       Substantive Consolidation ...........................................................................................17

   C.  The Plan Does Not Unfairly Discriminate Under 11 U.S.C. § 1129(b)(1).......................18

   D.  The Plan Meets the Best Interests of Creditors Test ......................................................20

   E.  Darrel Edelman's Arguments Regarding the Opioid Settlement Should Be Rejected .....21

Conclusion .................................................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 160 Royal Palm, LLC*,
No. 18-19441-EPK, 2020 WL 4791955 (Bankr. S.D. Fla. Feb. 3, 2020) ..............................23

*In re Adelphia Communications Corp.*,
441 B.R. 6 (Bankr. S.D.N.Y. 2010) .....................................................................................10

*In re Airadigm Commc'ns, Inc.*,
519 F.3d 640 (7th Cir. 2008) ................................................................................................4

*In re Akorn, Inc.*,
No. 20-11177 (KBO), 2021 WL 4306222 (D. Del. Sept. 22, 2021) ...............................15, 16

*In re AMR Corp.*,
497 B.R. 690 (Bankr. S.D.N.Y. 2013) ................................................................................14

*In re Blitz U.S.A.*,
No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) .............................4

*In re C.P. Hall Co.*,
513 B.R. 540 (Bankr. N.D. Ill. 2014) ..................................................................................23

*In re C.S. Mining, LLC*,
574 B.R. 259 (Bankr. D. Utah 2017) ...................................................................................23

*In re Coastal Broad. Sys., Inc.*,
570 F. App'x 188 (3d Cir. 2014) ........................................................................................15

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000) .............................................................................................3, 5

*David v. Weinstein Co. Holdings, LLC*,
No. CV 21-171 (MN), 2021 WL 979603 (D. Del. Mar. 16, 2021) .......................................4

*In re DVR, LLC*,
582 B.R. 507 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019).....................23, 24

*In re Exide Holdings, Inc.*,
No. 20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021)...........................................4

*In re Flintkote Co.*,
No. 04-11300 (MFW), 2015 WL 4762580 (Bankr. D. Del. Aug. 12, 2015).........................10

*In re Futterman*,
No. 17-12899 (MEW), 2019 WL 2553614 (Bankr. S.D.N.Y. June 20, 2019)......................23

*In re Glob. Indus. Techs., Inc.*,
   645 F.3d 201 (3d Cir. 2011) ............................................................................3

*In re Heartland Publ'ns, LLC*,
   No. 09-14459(KG), 2010 WL 2745973 (Bankr. D. Del. Apr. 16, 2010)................................4

*In re Heritage Org., LLC*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007) ................................................................24

*In re Indianapolis Downs, LLC.*,
   486 B.R. 286 (Bankr. D. Del. 2013) ............................................................3, 17

*In re Journal Register Co.*,
   407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................14

*In re Kaiser Aluminum Corp.*,
   339 B.R. 91 (D. Del. 2006)................................................................................23

*In re Lehman Bros. Holdings Inc.*,
   508 B.R. 283 (S.D.N.Y. 2014)..........................................................................8

*Luo v. Melinta Therapeutics, Inc.*,
   No. CV 20-600 (MN), 2021 WL 965614 (D. Del. Mar. 15, 2021)........................16

*In re Millennium Lab Holdings II, LLC.*,
   945 F.3d 126 (3d Cir. 2019) ........................................................................3, 4

*In re Nortel Networks, Inc.*,
   522 B.R. 491 (Bankr. D. Del. 2014) ................................................................24

*In re Nuverra Env't Sols., Inc.*,
   590 B.R. 75 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021) ........................ 15, 19, 20

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005) ..........................................................................20

*In re Parker*,
   391 B.R. 411 (Bankr. S.D. Ohio 2008) ............................................................22

*In re Purdue Pharma L.P.*,
   No. 19-23649 (RDD), 2021 WL 4240974 (Bankr. S.D.N.Y. Sept. 17, 2021) ...............*passim*

*In re Stearns Holdings, LLC*,
   607 B.R. 781 (Bankr. S.D.N.Y. 2019) ......................................................9, 10, 11

*In re Tribune Co.*,
   972 F.3d 228 (3d Cir. 2020) ..........................................................................19, 20

*In re Tucker*,
   174 B.R. 732 (Bankr. N.D. Ill. 1994)................................................................22

*In re W.R. Grace & Co.*,
    446 B.R. 96 (Bankr. D. Del. 2011) ........................................................................................4

**Statutes**

11 U.S.C. § 502 ..........................................................................................................22, 24

11 U.S.C. § 503(b) ..............................................................................................8, 9, 10, 11

11 U.S.C. § 524(e) ..............................................................................................3, 4, 5

11 U.S.C. § 1122 ..............................................................................................14, 15

11 U.S.C. § 1122(a) ..........................................................................................14

11 U.S.C. § 1124 ..............................................................................................16

11 U.S.C. § 1124(1) ..........................................................................................15

11 U.S.C. § 1129(a)(4) ......................................................................................13, 14

11 U.S.C. § 1129(a)(7)(A)(ii) ............................................................................20

11 U.S.C. § 1129(b)(1) ......................................................................................18, 19, 20

**Other Authorities**

Fed. R. Bankr. P. 9019 ......................................................................................11, 14, 24

Fed. R. Evid. 702 ..............................................................................................25

The Multi-State Governmental Entities Group ("**MSGE Group**"),[2] by and through its undersigned counsel, submits this reply memorandum ("**Reply**") in support of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, dated September 29, 2021 [D.I. 4508] ("**Plan**"), and in response to certain objections made to the Plan by the United States Trustee ("**UST**"),[3] the Ad Hoc Acthar Group ("**AHAG**"),[4] and others as identified herein.  Capitalized terms not defined herein have the meanings ascribed to them in the Plan, as applicable.  For the reasons explained below, the Court should overrule the objections and confirm the Plan.

## PRELIMINARY STATEMENT

1.      Local governments, including those comprising the MSGE Group, have been at the front lines of the opioid crisis, enduring the crippling strain on municipal budgets and their personnel while their local communities and constituent families have been ravaged by the opioid epidemic.  Fighting back against the devastation the epidemic leaves in its wake, the MSGE Group's constituent members have taken a leading role in prosecuting opioid claims in cases across the country to ensure that desperately needed funds reach impacted communities.

2.      The strength of local governmental claims and the significant effort local governments expended zealously advocating for the validity of those claims resulted in mounting litigation pressure against the Debtors in the tort system.  That mounting litigation pressure created by MSGE Group members and others brought Mallinckrodt to the negotiating table and ultimately led to the Opioid Settlement and the Plan, which will provide meaningful funds toward abating the

---

[2]    The governmental entities comprising the MSGE Group were set forth in the V.S. of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Fed. R. Bankr. P., filed October 29, 2020 [D.I. 337].

[3]    The United States Trustee's Objection to Confirmation of the First Amended Joint Plan of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code [D.I. 4508, D.I. 4718] ("**UST Obj.**").

[4]    Ad Hoc Acthar Group's Initial Objection to the First Amended Joint Plan of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code [D.I. 4704] ("**AHAG Obj.**").

opioid crisis in communities throughout the country.  Accordingly, the MSGE Group supports confirmation of the Plan.

3.      To that end, the MSGE Group also opposes the various objections filed to the Plan. While the Debtors will provide a fulsome response to each unresolved objection, below the MSGE Group responds to selected objections while reserving its rights to raise additional arguments in response to any objections in connection with the Confirmation Hearing.  For all the reasons set forth herein, this Court should confirm the Plan and overrule the objections thereto.

## BACKGROUND

4.      The facts most relevant to the Plan's confirmation are set forth in the Plan itself and its related disclosure statement [D.I. 2917] (the "**Disclosure Statement**").  Additional facts relevant to specific objections are described in further detail below in the context of the MSGE Group's responses thereto.[5]

## ARGUMENT

**I.      THE THIRD-PARTY RELEASE IN ARTICLE IX.D OF THE PLAN IS NECESSARY AND APPROPRIATE AND SHOULD BE APPROVED**

5.      Article IX.D of the Plan provides that Opioid Claimants will be deemed to have released the Protected Parties from any Claims and Causes of Action relating to the Debtors and their restructuring and Chapter 11 Cases, among other things.  Disclosure Statement at 28.  The Protected Parties include, without limitation, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, and their directors, officers, employees, and advisors.  *Id.*

---

[5]      Further, pursuant to the Amended Scheduling Order, the MSGE Group anticipates submitting one or more declarations in support of this Reply and of confirmation of the Plan prior to Phase 2 of the Confirmation Hearing.  In addition, the MSGE Group reserves the right to rely on declarations submitted by other parties, and any other and further testimony and evidence adduced during or in connection with the Confirmation Hearing.

6.       The release in Article IX.D is a non-consensual third-party release; as such, Opioid

Claimants cannot opt-out of it.  *Id.*  The release is nonetheless appropriate here and should be

approved.[6]

A.       **The Third Circuit Permits Non-Consensual Third-Party Releases in Appropriate Circumstances**

7.       The UST objects to Article IX.D as a non-consensual third-party release.  UST Obj.

¶¶ 39-45.  The UST argues that non-consensual third-party releases may never be approved in the

Third Circuit because they run afoul of section 524(e) of the Bankruptcy Code.[7]  *Id.*  In doing so,

the UST relies on non-binding Fifth, Ninth, and Tenth Circuit precedent.  *See id.* ¶ 41 (citing *In re*

*Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.

1995); *In re Western Real Estate Fund Inc.*, 922 F.2d 592, 600-02 (10th Cir. 1990)).  However,

the Third Circuit and courts in this District have, time and again, explicitly recognized a

bankruptcy court's authority to approve such releases under appropriate circumstances.  *In re*

*Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 139-40 (3d Cir. 2019) (holding bankruptcy court

was constitutionally authorized to confirm plan containing non-consensual third-party releases);

*In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (finding non-consensual third-

party release could be approved "under our precedent" with showing that release was "both

necessary to the reorganization and fair"); *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000)

(holding that a third-party injunction would be proper under section 105(a) if the proponents of

---

[6]      While the Debtors will present a comprehensive case for the third-party releases in the Plan—including a separate third-party release in Article IX.C of the Plan—the MSGE Group writes separately to emphasize certain factors relevant to the approval of the release in Article IX.D.

[7]      The AHAG also objects to Article IX.D on this same basis in a solitary paragraph of its objection.  *See* AHAG Obj. at 22.  It, however, cites no authority in support for this argument and later concedes in its objection that such releases are appropriate in certain circumstances "under controlling Third Circuit case law."  *Id.* at 23.  Further, as Article IX.D applies only to Opioid Claimants, it has no effect on the AHAG.  Accordingly, it has no standing to object to Article IX.D.  *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) ("In the context of a confirmation hearing, creditors have standing only to challenge those parts of a reorganization plan that affect their direct interests." (internal quotation marks omitted)).

the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair); *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612, at *14 (D. Del. July 26, 2021) (affirming confirmation of plan containing non-consensual third-party releases where *Continental* standard was met); *David v. Weinstein Co. Holdings, LLC*, No. CV 21-171 (MN), 2021 WL 979603, at *4 (D. Del. Mar. 16, 2021) (denying motion for stay pending appeal where appellants could not show likelihood of success on argument that plan could not contain non-consensual third-party releases); *In re Blitz U.S.A.*, No. 11-13603 (PJW), 2014 WL 2582976, at *13-23 (Bankr. D. Del. Jan. 30, 2014) (approving a plan containing non-consensual third-party releases); *In re W.R. Grace & Co.*, 446 B.R. 96, 138 (Bankr. D. Del. 2011) (same); *In re Heartland Publ'ns, LLC*, No. 09-14459(KG), 2010 WL 2745973, at *4 (Bankr. D. Del. Apr. 16, 2010) (same).  In fact, the UST concedes that its argument is contrary to the law of this Circuit. UST Obj. ¶ 57 ("[The UST] reserves the right to argue in an appropriate venue that Third Circuit precedent should be reconsidered . . . ."); *see also id.* ¶ 52 n.17 ("[The UST] respectfully disagrees with the *Millennium* court's holding . . . .").

8.      The UST's attempts to buck precedent here should be rejected.  The foundation of the UST's contrarian argument—that a "plain reading" of section 524(e) "specifically prohibits" non-consensual third-party releases—is simply incorrect.  *See* UST Obj. ¶¶ 39, 41.

9.      Section 524(e) states that "[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  This provision "does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claim."  *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 656 (7th Cir. 2008) ("§ 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claim").  Instead, as the Third Circuit confirmed in *Continental*—in a passage that the UST quotes in

paragraph 45 of its objection—the plain language of this section merely provides that the discharge of a debtor under bankruptcy does not *automatically* discharge a non-debtor that is liable on the same debt. *Continental*, 203 F.3d at 211 ("Section 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities." (citing *Copelin v. Spirco, Inc.*, 182 F.3d 174, 182 (3d Cir.1999))). Indeed, this is why the Protected Parties and Released Parties must seek out third-party releases in the Plan: section 524(e) does not allow them to rely on the Debtors' discharges to affect their own liabilities.

10.     The UST's misreading of section 524(e) and reliance on out-of-circuit precedent should be rejected. Non-consensual third-party releases are permitted under the law of the Third Circuit and have been approved in the practice of this Court. Such releases in the Plan should also be approved here.

**B.     The Release in Article IX.D Is Integral to the Debtors' Reorganization Strategy**

11.     While appearing to accept that the Third Circuit permits non-consensual third-party releases, the State of Rhode Island nonetheless argues that this Court has no jurisdiction to approve certain of the non-consensual third-party releases here because they are not "integral to the restructuring of the debtor-creditor relationship." Objection of the State of Rhode Island to the Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code [D.I. 4235] ("**RI Obj.**") ¶¶ 27-28 (quoting *Millennium Lab Holdings II*, 945 F.3d at 137). Other objectors, including the UST, also argue that the releases should not be approved because they are not integral to the Debtors' reorganization. *See* UST Obj. ¶ 52 n.17; AHAG Obj. at 21-22. These objections should be rejected as well.

12.     The Debtors filed these cases seeking "a restructuring transaction that will resolve all the major litigation against them . . . ." Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions ¶ 11 [D.I. 128] ("**Welch Decl.**").

The Opioid Settlement aims to address the "enterprise-threatening litigation" arising out of the Debtors' opioid-related liabilities by, among other things, "establishing global economic terms for payment of all outstanding opioid-related liabilities." Welch Decl. ¶¶ 11, 12, 93. From the first day of these cases, the Debtors have stressed that it is "critical" that they implement the Opioid Settlement. Welch Decl. ¶ 16. And their "chapter 11 strategy" has been based around ensuring that the Opioid Settlement would become binding on all Opioid Claimants. Disclosure Statement at 50. Consequently, the Opioid Settlement is of foundational importance to this restructuring.

13.     The release of Protected Parties is, in turn, integral to the Opioid Settlement. The Opioid Settlement was "the result of months of hard-fought negotiations" between the Debtors and certain Opioid Claimants. Disclosure Statement at 51. And those negotiations resulted in an agreement by the Debtors to provide sorely needed funds for opioid abatement in exchange for, among other things, the release contained in Article IX.D of the Plan. *Id.* at 50-51. That release was set forth in the Opioid Settlement Term Sheet, which was fully incorporated into the Restructuring Support Agreement and filed on the first day of these cases.[8]  *See* Welch Decl., Ex. A (the "**RSA**"), Schedule 1 at 5 & Schedule 1, Ex. 1 at 1-2.

14.     Approving Article IX.D of the Plan is, therefore, part and parcel of implementing the full terms of the Opioid Settlement. And, requiring all Opioid Claimants to provide the release in Article IX.D, regardless of consent, is essential to the Debtors' goal in these cases to reorganize in a way that resolves all opioid litigation for all Opioid Claimants.

---

[8]    At the outset of the Chapter 11 Cases, the MSGE Group was not a party to the Restructuring Support Agreement. The MSGE Group's eventual joinder came after weeks of careful consideration of the rights and obligations that the governmental entities would incur upon joining the RSA. *See* Notice of Filing of Joinder Agreement with Multi-State Governmental Entities Group Relating to the Restructuring Support Agreement, dated as of October 11, 2020 [D.I. 505].

### C.    The UST's Notice Objections to Article IX.D Are Without Merit

15.    The UST's contends that the Plan's release provisions are "impenetrable" and "in no way reasonably convey the required information" about the releases to provide proper notice thereof.  UST Obj. ¶ 38.  The UST sets forth no support for this contention and this is an untimely attempt to litigate issues that it failed to raise at the Disclosure Statement stage.

16.    Further, the UST's contention is at odds with this Court's approval of the Debtors' notice program.  There, the Court specifically held that the Debtors' notice program provided all holders of claims and equity interests "with sufficient notice of the releases, exculpatory provisions, and injunctions in satisfaction of the requirements of Bankruptcy Rule 3016(c)."  Order Approving Disclosure Statement at 13 [D.I. 2911].  Moreover, the Court held that the Disclosure Statement used in soliciting the Plan provided "adequate information" of the Plan's provisions.  *Id.* at 2.  The UST has no basis to contest those rulings now.

## II.    THE UST'S OBJECTION TO THE FEE SETTLEMENT FUNDS IS UNAVAILING

17.    The UST objects to Article IV.X.9 of the Plan, which establishes funds to pay the costs and expenses, including attorneys' fees, of public opioid creditors.  Most, if not all, of the payments from these funds will go to compensate attorneys for public entity creditors for their prepetition work pursuing opioid-related claims against the Debtors and non-debtor third parties.  That work ultimately brought the Debtors to the negotiating table and laid the foundation for the Debtors' bankruptcy filing, the Opioid Settlement, and this Plan.  The UST's objection to these funds is without merit.

**A.      Section 503(b) Is Not the Applicable Standard for Evaluating Article IV.X.9 of the Plan**

18.     The UST objects to Article IV.X.9 of the Plan because it provides for the payment of public opioid creditors' attorneys' fees without regard to the requirements of section 503(b). Section 503(b) does not, however, apply to Article IV.X.9.

*1.      Section 503(b)(4) Is Not the Applicable Standard for Evaluating Article IV.X.9 of the Plan*

19.     Importantly, the UST's objection is narrow in that it does not appear to take issue with any fee fund to the extent it provides for payment of fees earned for prepetition work.  *See, e.g.*, UST Obj. ¶ 89 ("To the extent these Plan provisions are intended to apply to attorneys' fees incurred *during the pendency of the case*, the creditors must file an application with the Court and meet their evidentiary burden for proving a substantial contribution pursuant to section 503(b)(3)(D)." (emphasis added)).  The UST argues only that "section 503 . . . is the 'sole source' of authority to pay *post-petition* professional fees on an administrative basis."  *Id.* ¶ 86 (emphasis added).[9]

20.     Here, however, as was the case with similar funds approved over the same objections in *In re Purdue Pharma L.P.*, "the bulk of the fees covered by [the fee funds] are not for postpetition work (and therefore not an 'administrative expense' covered by section 503(b)(3) and (4)) but rather *for prepetition work* in raising and pursuing claims against the Debtors . . . ."  *See* No. 19-23649 (RDD), 2021 WL 4240974, at *8 (Bankr. S.D.N.Y. Sept. 17, 2021) (emphasis

---

[9]     The *Lehman Brothers* case, cited by the UST, is distinguishable because it addressed whether a provision in that plan allowing payment of professional fees for members of the official committee of unsecured creditors violated section 503(b)(4).  *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 296 (S.D.N.Y. 2014).  The *Lehman Brothers* holding did not extend to payment of professional fees for members of unofficial creditor committees or other creditor constituencies, which makes the *Lehman Brothers* ruling inapposite.  *See id.*

added).  Therefore, section 503(b) is not the correct standard, much less the sole standard, for

evaluating most, if not all, payments from the Article IV.X.9 fee fund.

2.   *Numerous Courts Have Held that Section 503(b) Is Not the Standard for Evaluating Similar Fee Provisions*

21.    Additionally, the UST's assertion that section 503(b) supplies the "exclusive

avenue" for compensating professionals that have rendered services to creditors during these cases

is incorrect.  Indeed, just recently in *In re Purdue Pharma L.P.*, Judge Drain rejected this same

argument and approved fee provisions similar to those here for many of the same categories of

creditors present in these cases:

> The U.S. Trustee's objection also is misplaced because the remaining fees to be paid under section 5.8 [the analogous section of the *Purdue* plan] also are not being sought as an administrative expense . . . but rather as part of a heavily negotiated compromise of those fees and the clients' obligation to pay them reached during the mediation in this case . . . .  The settlements provided for in section 5.8 that resulted from the mediation are subject to this Court's review both under Bankruptcy Rule 9019 and, I believe -- although there are arguments to the contrary -- under section 1129(a)(4) of the Bankruptcy Code, as has been so recognized in this district.

*Id.* at *8.

22.    In *In re Stearns Holdings, LLC*, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019)—a case

upon which Judge Drain relied in his *Purdue* decision—the court similarly approved a chapter 11

plan that provided that the debtors would pay the reasonable and documented professional fees of

an indenture trustee.  The UST objected to this fee provision, arguing, *inter alia*, that it did not

provide for review of the fees under section 503(b).  *Id.* at 792.  The court in *Stearns* overruled the

UST's objection on the basis that the fee provision was a "crucial component" of the "Global

Settlement" that formed the basis of the plan.  *Id.* at 793.  The *Stearns* court held that, "where

consideration is paid pursuant to a settlement, the Court need not review such payment under

section 503(b) of the Bankruptcy Code." *Id.* (citing *In re Charter Commc'ns, Inc.*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009)).

23.     The court in *In re Adelphia Communications Corp.*, 441 B.R. 6, 12-13 (Bankr. S.D.N.Y. 2010), also rejected the UST's same objection to a plan that paid individual creditors' legal fees and other professional expenses without regard to the requirements of section 503(b). There, the court explicitly held that "section 503(b) does not provide, in words or substance that it is the *only* way by which fees of this character may be absorbed by an estate[ and therefore] the Court is free to look to other provisions of the Code that might also authorize a payment." *Id.*

24.     This Court has also confirmed plans that provide compensation to counsel for creditor groups, including contingency fees, without requiring the payments to meet the standards of section 503(b).  *See In re Flintkote Co.*, No. 04-11300 (MFW), 2015 WL 4762580, at *18 (Bankr. D. Del. Aug. 12, 2015).  These cases make plain that section 503(b) is not the sole, or even the appropriate, means for reviewing and authorizing payments from the fee funds at issue here.

25.     Here, as in *Purdue* and *Stearns*, the funds to be established under Article IV.X.9 are crucial components of the Opioid Settlement that forms the basis of the Plan.  Indeed, as Mr. Kenneth Feinberg observed in his recently filed mediator's report, the fee funds, including those in Article IV.X.9, are "an integral and non-severable part of the overall settlements regarding allocation among public and private Opioid Claimants, and that the settlements reached regarding allocation indeed are dependent on the various agreements reached pertaining to contingency fees and common benefit funding."  Mediator's Report ¶ 13 [D.I. 4946].  He further reported that "in [his] experience, reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary party of reaching an agreement concerning overall allocation[ and] [t]his situation is no different." *Id.* ¶ 17.  Accordingly, like the fee funds in *Purdue*

and *Stearns*, Article IV.X.9 is not subject to review under section 503(b), but rather a review for reasonableness under Rule 9019.

**B.     Article IV.X.9 of the Plan Is Eminently Reasonable**

26.     In *Purdue*, Judge Drain found that functionally identical, but substantially larger fee funds compensating public claimant attorneys were reasonable based on declarations describing the efforts of government plaintiffs' counsel and a mediator's report from Mr. Feinberg that discussed his findings as to the fee funds. 2021 WL 4240974, at *9. So too should the Court reach that result here.

27.     Here, Mr. Feinberg's mediator report specifically finds that the "contingency fee resolutions, as well as the common benefit assessments [in the fee funds], . . . are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement . . . ." Mediator's Report ¶ 14. Mr. Feinberg also "believe[s] that the common benefit assessments contemplated by the fee arrangements are reasonable in light of the substantial work of the public creditor contingency fee counsel in federal and state court litigation over the past several years (in some cases since 2012)[, which has] benefited the non-public creditor opioid claimant constituents . . . ." *Id.* ¶ 16.

28.     Mr. Feinberg's assertions will be buttressed by the evidence at the Confirmation Hearing, including testimony from J. Gerard Stranch IV, which will specifically demonstrate the significant role that MSGE Group members and their attorneys played in spearheading the prepetition opioid litigation that brought the Debtors to the negotiating table. For example, the evidence at the Confirmation Hearing will show that in *Staubus, et al. v. Purdue Pharma, L.P.*, No. 82CC3-2017-CK-41916 (Tenn. Cir. Ct. Sullivan Cnty.), local government plaintiffs significantly advanced the claims against Mallinckrodt plc in that case and in all opioid cases nationally. In that case, local government plaintiffs, including MSGE Group members, brought

11

causes of action under the Tennessee Drug Dealer Liability Act—a theory that had never before been tested—asserting that opioid manufacturers, including Mallinckrodt plc, facilitated the illegal drug market for their products and, therefore, could be held liable under the statute. Ultimately, these local government plaintiffs secured a decision from the Tennessee Supreme Court that opioid manufacturers could be held liable under that statute.

29.    Further, in the course of the *Staubus* litigation, counsel for certain MSGE Group members set up and maintained a document repository that hosted multiple terabytes of data, spanning well over a hundred million pages of documents. They also took or defended over 160 days of depositions, including taking over 37 depositions of Mallinckrodt witnesses. Additionally, MSGE Group member plaintiffs responded to 530 written discovery requests and requests for admission, and they produced over 14,500 opioid-related prosecution files and autopsies and 500,000 pages of files maintained by government offices. These plaintiffs' counsel also reviewed tens of millions of pages of records, including 56.5 gigabytes of files produced by the State of Tennessee in response to the opioid defendants' subpoenas. Furthermore, the *Staubus* plaintiffs attended more than 20 hearings, briefed over 70 contested motions (including multiple emergency motions) and litigated numerous emergency appeals, sometimes with emergency briefing occurring at every level of the Tennessee judiciary on an expedited basis.

30.    These efforts greatly expanded the body of evidence establishing that: (a) Mallinckrodt sales representatives regularly circulated warnings concerning pill mills, including a "pill mill list" generated by a sales manager, which senior managers ignored; (b) Mallinckrodt generated a list of "three star prescribers" to be targeted by salespeople and that contained numerous prescribers identified internally as pill mills; (c) Mallinckrodt was aware of the connection between certain notorious pill mills and the pharmacies dispensing its opioid pills but

took no meaningful action to report those entities or curtail their activities; (d) Mallinckrodt identified thresholds for reasonable opioid prescribing and dispensing levels, but failed to address prescribers and pharmacies that far exceeded those thresholds; and (e) Mallinckrodt failed to use geographic trends in its suspicious-order monitoring practices. Some of the most significant evidence against Mallinckrodt that was adduced through these efforts—including evidence addressing the failure of Mallinckrodt's purported anti-diversion efforts and the inadequacy of Mallinckrodt's suspicious-order monitoring program—had not been uncovered or addressed in other cases or forums.

31.     The evidence will show that the *Staubus* case and other prepetition litigation brought by members of the MSGE Group and others against Mallinckrodt played a significant role in bringing the Debtors to the negotiating table and in getting the Debtors to agree to contribute significant funds to abate the opioid crisis as part of the Opioid Settlement embodied in the Plan. The fee funds contemplated by Article IV.X.9 are designed to compensate counsel for this extensive and critical work. Such compensation is certainly reasonable under any standard.

32.     Indeed, the UST argues that fees paid from the funds established in Article IV.X.9 must be reasonable under section 1129(a)(4). UST Obj. ¶ 88. This section is largely, if not completely, irrelevant here because, under its plain terms, it applies only to payments for work performed "in or in connection with the case" or "in connection with the plan and incident to the case." *See* 11 U.S.C. § 1129(a)(4). Again, the vast majority of the fees contemplated by Article IV.X.9 of the Plan were earned by attorneys for public claimants in connection with prepetition litigation rather than in connection with these Chapter 11 Cases or the Plan itself.

33.     In any event, the fee funds contemplated by Article IV.X.9 of the Plan are reasonable under section 1129(a)(4) for the reasons discussed above. Section 1129(a)(4)'s

"reasonableness" standard does not carry a "mandate for an expensive and unnecessary inquiry." *In re Journal Register Co.*, 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009). And this "reasonableness" standard "endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual resolution and get a plan approved." *In re AMR Corp.*, 497 B.R. 690, 695 (Bankr. S.D.N.Y. 2013).

34.     Although it was unnecessary to do so, Judge Drain evaluated the fee funds in *Purdue* under a section 1129(a)(4) "reasonableness" analysis. 2021 WL 4240974, at *8-10. However, that analysis was virtually identical to his analysis under Rule 9019 and came to the same result: the public creditor attorney fee funds were reasonable. *Id.* Therefore, for the same reasons stated above, the fee funds contemplated by Article IV.X.9 meet the reasonableness standard required by 1129(a)(4).

For all the reasons set forth above, the Court should overrule the UST's objection to Article IV.X.9.

## III.    OTHER MISCELLANEOUS OBJECTIONS SHOULD BE DENIED

### A.    The Plan Permissibly Classified Opioid Claims and Correctly Designated Their Classes as Impaired

35.     The AHAG argues that the Plan does not comply with section 1122 of the Bankruptcy Code because "there is no justification for classifying the . . . litigation claims involving Acthar" in Class 6, while separately classifying Opioid Claims in classes 8 and 9. AHAG Obj. at 12. The AHAG appears to assert that, instead, these claims should all have been lumped together in one class because they are all tort claims. *Id.* This argument, however, has no merit in law or in fact.

36.     Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such

class."  "Although not explicit in § 1122, a corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'" *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) (quoting *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987)).  Accordingly, debtors have "significant flexibility in classifying claims and interests into different classes as long as a rational legal or factual basis for separate classification exists." *In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 96 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021).

37.     Here, the rationale is clear:  the AHAG's claims asserting liability arising from the pricing and sale of Acthar are of a completely different nature than the Opioid Claims asserting public nuisance, personal injury, and other liabilities from the Debtors' manufacture, sale, and marketing of various opioid products.  Further, the Third Circuit has approved of separating unsecured creditors into distinct classes when one class's claims are uniquely subject to an agreement setting forth the treatment of their claims. *In re Coastal Broad. Sys., Inc.*, 570 F. App'x at 193.  Here, the Opioid Claims are uniquely subject to the Opioid Settlement.  On this basis alone, separate classification of the Opioid Claims was reasonable and, therefore, permissible under section 1122.

38.     Further, the AHAG erroneously argues that the classes of Opioid Claims, including Class 8(b) for Municipal Opioid Claims, are unimpaired.  *See* AHAG Obj. at 15.  The AHAG, as the objector to an impairment designation, bears the burden of rebutting the Bankruptcy Code's presumption of impairment. *In re Akorn, Inc.*, No. 20-11177 (KBO), 2021 WL 4306222, at *8 (D. Del. Sept. 22, 2021).  It plainly fails to rebut that presumption here.

39.     Section 1124(1) states that a class is impaired unless a plan "leaves unaltered the legal, equitable, or contractual rights" of each claim in the class.  "It is well established that *any*

alteration of a creditor's rights constitutes impairment." *Akorn*, 2021 WL 4306222, at \*8 (citing 7 *Collier on Bankruptcy* ¶ 1124.03 (16th ed.)).  The Municipal Opioid Claims in Class 8(b), which include, those of the MSGE Group's members are plainly altered under the Plan, and therefore impaired.  In particular, rather than retaining their rights to press their claims in the tort system against the relevant Debtors, Municipal Opioid Claims in Class 8(b) will be enjoined and channeled to the NOAT II, which, in turn, will disburse funds to pay for abatement in accordance with the applicable trust distribution procedures.  Plan Art. III.B.8.b.

40.    Nonetheless, the AHAG argues that the Opioid Claims classes are not impaired because they include RSA parties, like the MSGE Group, that have agreed to support the Plan and the Opioid Settlement.  *See* AHAG Obj. at 15.  However, the AHAG has not cited any authority, and the MSGE Group is aware of none, supporting the proposition that the MSGE Group's status as an RSA party is at all relevant to whether Class 8(b) is impaired.  Indeed, the case law of this District is to the contrary.  For example, in *Luo v. Melinta Therapeutics, Inc.*, the district court affirmed a bankruptcy court's finding that a class of lenders was impaired over objection. No. CV 20-600 (MN), 2021 WL 965614, at \*10 (D. Del. Mar. 15, 2021).  Like some of the members of Class 8(b), the members of the lender class in *Luo* had entered into a restructuring support agreement and an initial term sheet reflecting a preliminary global settlement of their claims.  *Id.* at \*2.  The district court acknowledged as much, and yet still found the class impaired for the simple fact that its members' "rights were altered under the Plan." *Id.* at \*10.  So too here.

41.    Moreover, even if the AHAG were correct that agreeing to support a plan cured impairment, Class 8(b) would nonetheless remain impaired.  Not every Municipal Opioid Claimant is an RSA party, and a class is unimpaired only if "each claim" in the class is unimpaired.  11 U.S.C. § 1124.

**B.      The Implementation of the Plan and Opioid Settlement Is Not a *Sub Rosa* Substantive Consolidation**

42.      The AHAG and Attestor/Humana (together, the "**Acthar Claimants**") both argue that the Opioid Settlement represents an improper *sub rosa* substantive consolidation, claiming it unfairly siphons funds from the Specialty Brands Debtors to pay for the Opioid Settlement even though the enterprise's opioid liability allegedly lies only with the Specialty Generics Debtors. AHAG Obj. at 18-19; *see also* Preliminary Objection of Attestor Limited and Humana Inc. to Confirmation of Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code ¶ 39 [D.I. 4700] (the "**Attestor/Humana Obj.**").

43.      Despite their insistence otherwise, the Acthar Claimants do not have claims or rights to recover against the Specialty Brands Debtors generally, as this Court disallowed their claims against all Debtor entities other than Mallinckrodt plc and Mallinckrodt ARD LLC. *See* Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive) [D.I. 3406].  As the evidence at the Confirmation Hearing will show, these two entities would not have any value for distribution to unsecured creditors, irrespective of the Opioid Settlement.  The Plan nonetheless provides a recovery to the Acthar Claimants.  Plan Art. III.B.6.a. Accordingly, the implementation of the Opioid Settlement has no adverse effect on the Acthar Claimants' treatment under the Plan, and they have no standing to raise this objection. *Indianapolis Downs, LLC.*, 486 B.R. at 304 ("In the context of a confirmation hearing, creditors have standing only to challenge those parts of a reorganization plan that affect their direct interests." (internal quotation marks and citation omitted)).

44.     Regardless, the Acthar Claimants' claim of a *sub rosa* substantive consolidation fails to account for the scope of both the Debtors' potential opioid liability across the enterprise and of the Opioid Settlement itself.  Consequently, the argument has no merit.

45.     The Opioid Settlement is not only with the Specialty Generics Debtors, but also with the Specialty Brands Debtors.  Indeed, prior to the Petition Date, Mallinckrodt plc and the Specialty Generics Debtors agreed to the terms of a global settlement with certain governmental and other opioid plaintiffs to resolve all of those entities' outstanding opioid liabilities.  *See* Disclosure Statement at 60.  However, the negotiations for that settlement were later reopened to account for the Debtors' decision to also pursue chapter 11 filings for the Specialty Branded Debtors.  *Id.* at 61.  The Opioid Settlement embodied in the RSA was the product of these reopened negotiations.  *Id.* at 53-54; Welch Decl. at ¶ 13.

46.     As will be shown at the Confirmation Hearing, absent the Opioid Settlement, the Specialty Brands Debtors would almost certainly have been subject to both direct and derivative opioid-related claims, including actions for avoidance of intercompany transactions, substantive consolidation, and direct opioid claims based on various theories of liability.  Accordingly, the contribution of the Specialty Brands Debtors to the Opioid Settlement is not the result of a *sub rosa* substantive consolidation, but rather consideration in settlement of their own opioid-related litigation risks.

**C.      The Plan Does Not Unfairly Discriminate Under 11 U.S.C. § 1129(b)(1)**

47.     The Acthar Claimants also argue that their claims have been unfairly discriminated against vis-à-vis the Opioid Claims, which are "treated differently, separately, and more generously."  AHAG Obj. at 13; *see also* Attestor/Humana Obj. ¶¶ 37-39.  But a plan's disparate treatment of dissimilar claims is not *unfair* discrimination—and therefore not prohibited under

section 1129(b)(1)—if the complaining class is not actually harmed by the dissimilar treatment. The Acthar Claimants are not so harmed here and, therefore, their objections should be overruled.

48.     Section 1129(b)(1) requires that a plan "does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The Third Circuit recently noted that the phrase "'[d]iscriminate unfairly' is simple and direct: you can treat differently (discriminate) but not so much as to be unfair.  There is, as is typical in reorganizations, a need for flexibility over precision.  The test becomes one of reason circumscribed so as not to run rampant over creditors' rights."  *In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020).  In other words, section 1129(b)(1) does not require that all classes be treated the same, but only that differing treatment not harm any class.

49.     Accordingly, courts in this District have opted to test for unfair discrimination by assessing whether the alleged discriminatory treatment actually harmed the dissenting class, focusing on whether that class's recovery under a plan is less than the hypothetical recovery it would be entitled to receive under the absolute priority rule.  *Nuverra Envtl. Sols., Inc.*, 590 B.R. at 91 (finding that there was no unfair discrimination where "distributions to holders of Trade and Business-Related Claims have no impact on the distributions to holders of unsecured claims . . . ."); *see also Tribune Co.*, 972 F.3d at 242 (affirming a finding of no unfair discrimination where the lower court considered "the difference between what the dissenting class argues it is entitled to recover and what it actually received under the plan.").  Under this test, these courts have rejected claims of unfair discrimination from classes whose recoveries exceed their hypothetical recoveries under the absolute priority rule, notwithstanding that other classes' recoveries may have exceeded their respective hypothetical recoveries by a greater margin.  *See Nuverra Envtl. Sols., Inc.*, 590 B.R. at 91 (focusing test on "amount that reallocation decreased the

recovery to the dissenting class" and not the "large increase in recoveries to the other similarly-situated classes").

50.     Under this test, the Acthar Claimants' objection fails.  As discussed above in section III.B, *supra*, evidence at the Confirmation Hearing will show that the two Debtor entities against which the Acthar Claimants have claims would not have any value for distribution to unsecured creditors, irrespective of the Opioid Settlement.  Thus, that the Plan provides the Acthar Claimants with any recovery at all (Plan Art. III.B.6.a.) means that they cannot complain of unfair discrimination under section 1129(b)(1).  *See Tribune Co.*, 972 F.3d at 242; *Nuverra Envtl. Sols., Inc.*, 590 B.R. at 91.

**D.     The Plan Meets the Best Interests of Creditors Test**

51.     Rhode Island and the AHAG object to the Plan as failing to meet the "best interest of creditors test."  RI Obj. ¶¶ 25-26; AHAG Obj. at 7, 8, 13, 20-21.  The "best interests of creditors" test requires that each claimant in an impaired class of claims or interests that does not vote to accept the Plan "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code]."  11 U.S.C. § 1129(a)(7)(A)(ii).  This test is generally satisfied if a dissenting claimant will receive a recovery under a plan of reorganization that would equal or exceed that same claimant's recovery in a hypothetical chapter 7 liquidation.  *In re Owens Corning*, 419 F.3d 195, 208 n.14 (3d Cir. 2005).

52.     Rhode Island and the AHAG group's members will, however, each receive property under the Plan in excess of what they would receive under a chapter 7 liquidation.  Based upon the liquidation analysis that was attached as Exhibit E to the Disclosure Statement, approximately $3 million to $56 million in aggregate proceeds would be available for pro rata distribution to

unsecured creditors, including the Opioid Claimants, in a liquidation.  Disclosure Statement, Ex. E at 15.  And, as will be further shown at the Confirmation Hearing, the AHAG members would recover nothing on account of their claims in a liquidation scenario.  Under the Plan, however, Opioid Claimants like Rhode Island will collectively share over a billion dollars and the Acthar Claimants in Class 6(a) will receive a distribution.  So, there can be little question that these objectors would receive more under the Plan than in a Chapter 7 liquidation.

53.    Notwithstanding that Opioid Claimants will collectively receive over a billion dollars more under the Plan than in a Chapter 7 liquidation, Rhode Island argues that a Chapter 7 liquidation would allow Rhode Island to retain the ability to assert certain claims against the Debtors' officers and directors, which are released under Article IX.D of the Plan.  RI. Obj. ¶¶ 25-26.  Rhode Island fails, however, to provide any basis to suggest that the value of any such claims would offset—let alone exceed—the enormous loss of value to Opioid Claimants that would result from converting these cases to a hypothetical chapter 7 liquidation.

54.    What is more, Rhode Island fails to account for the fact that in a liquidation, all Opioid Claimants would retain their ability to assert claims against the Debtors' officers and directors, and Rhode Island would likely have to share, or compete with others over, the value of its claims with others.  For these reasons, the objections to the Plan based on the best interests of creditors test should be denied.

**E.    Darrel Edelman's Arguments Regarding the Opioid Settlement Should Be Rejected**

55.    Darrel Edelman, an admittedly out-of-the-money equity holder, previously filed a motion seeking authority to file an omnibus objection to all Opioid Claims in these cases.[10]  The

---

[10]    Motion of Darrel Edelman, A Party-In-Interest, for this Court to Authorize Objections to Any Claims Against The Debtor Under The Plain Language Of Local Rule 3007-1 Omnibus Objection To Claims, a Portion of Which has Been Modified in The Debtors' Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc

MSGE Group and others responded, and the MSGE Group incorporates its response by reference herein.[11]   In reply, Mr. Edelman raises new arguments against the approval of the Opioid Settlement embodied in the Plan.[12]

56.   Mr. Edelman argues that the Bankruptcy Code prohibits this Court from considering or approving the Opioid Settlement unless it first decides Mr. Edelman's objections to the Opioid Claims under section 502 of the Code.  Edelman Reply ¶ 5.  This argument has no merit for myriad reasons.  First, contrary to his assertion, Mr. Edelman has no right to object to the Opioid Claims under section 502.  Any right to object to claims under section 502 is subject to the relevant claims being filed in the first place.  *See In re Parker*, 391 B.R. 411, 416 (Bankr. S.D. Ohio 2008) ("The Debtor was unable to object to the Claim prior to confirmation, because the Claim had not yet been filed."); *In re Tucker*, 174 B.R. 732, 741 (Bankr. N.D. Ill. 1994) ("This analysis ignores the requirement of § 502(a) that the conditions of § 501 must be satisfied before § 502(b) is applicable.").  And, as Mr. Edelman concedes, the Opioid Claims have not been filed in these cases.  Edelman Motion ¶ 22.

57.   Second, Mr. Edelman has not actually filed any objections against the Opioid Claims.  So, to the extent that Mr. Edelman's argument that the Court is required to decide all objections to Opioid Claims before approving the Opioid Settlement holds water—and it does not—it still would not impede the Court's approval of the Opioid Settlement here.  There are simply no pending objections for the Court to adjudicate.

---

and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Plan (Docket 2917) Which Would Preclude Objections to Opioid Claims Contrary To Local Rule 3007-1 ¶ 21[D.I. 4186] (the "**Edelman Motion**").

[11]   The Multi-State Governmental Entities Group's Objection, and Joinder to the Debtors' Cross-Motion and Objection, to Darrel Edelman's Motion to Authorize Objections to Claims under Local Rule 3007-1 [D.I. 4600].

[12]   *See generally* Response to Debtors' Cross-Motion and Objection to the Motion of Darrel Edelman to Authorize Objections to Certain Claims Against the Debtors [D.I. 4836] (the "**Edelman Reply**").

58.    Third, Mr. Edelman is wrong that the Court is required to decide claims objections before considering the estate's settlement of relevant claims.   The case law is clear that Mr. Edelman's right, if any, to object to Opioid Claims is subordinate to the Debtors' authority to seek approval of the Opioid Settlement.   *See, e.g.*, *In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (D. Del. 2006) (affirming bankruptcy court's approval of a settlement by a chapter 11 trustee of one creditor's proof of claim despite another creditor's objection to the claim); *In re 160 Royal Palm, LLC*, No. 18-19441-EPK, 2020 WL 4791955, at *5 (Bankr. S.D. Fla. Feb. 3, 2020) ("A trustee or debtor in possession may settle claims against the estate even if other parties in interest objected to those claims."); *In re Futterman*, No. 17-12899 (MEW), 2019 WL 2553614, at *4 (Bankr. S.D.N.Y. June 20, 2019) ("So long as the Court approves, the Trustee has the authority to settle claims, and that is true even if other parties in interest have filed objections to those claims.").   The Court is under no obligation to hold off approving the Opioid Settlement (and, thus, the Plan) just because doing so would moot Mr. Edelman's unfiled objections to unfiled Opioid Claims.   *See In re DVR, LLC*, 582 B.R. 507, 522 (Bankr. D. Colo. 2018) (court could approve trustee's settlement of claim even though settlement would render third-party objection to claim moot), *aff'd*, 606 B.R. 80 (D. Colo. 2019).   Any rule to the contrary "would undermine the important policy of promoting settlements in bankruptcy proceedings by requiring the parties to litigate the very issues that the settlement seeks to resolve."   *In re Kaiser Aluminum Corp.*, 339 B.R. at 94.

59.    The two cases that Mr. Edelman cites *In re C.S. Mining, LLC*, 574 B.R. 259 (Bankr. D. Utah 2017), and *In re C.P. Hall Co.*, 513 B.R. 540 (Bankr. N.D. Ill. 2014)—are inapposite. Edelman Reply ¶¶ 8-9.  Both cases involved settlements that would have directly and adversely affected the lien rights of third-party secured creditors, who had raised those lien rights in objections to the claims to be settled.  But Mr. Edelman's proposed objections have nothing to do

with any substantive rights he might have; he merely seeks to argue that Opioid Claimants are ineligible for distributions in these cases.  *See generally* Edelman Motion.

60.     "When a claim objection involves the individual rights of the objecting creditor, such as a dispute over competing lien rights, it is intrinsically different from a claim objection that only disputes a creditor's entitlement to a distribution from an estate or its assets."  *In re DVR, LLC*, 582 B.R. at 512-13.  And when an objection falls squarely into the latter category, as Mr. Edelman's proposed objections would here, the Court is under no obligation to consider the objection before approving a settlement of the relevant claims; "[t]o hold otherwise, would permit [Mr. Edelman] to hold the estate hostage to protracted litigation."  *Id.* at 522; *see also In re Heritage Org., LLC*, 375 B.R. 230, 285 (Bankr. N.D. Tex. 2007) ("Taken to its logical conclusion, the . . . argument that § 502 confers not only a right to object to a claim but also a right to a ruling would mean that the Court could *never* permit a settlement of a claim objection . . . even though both the claimant and the objectant desired a different result.").

61.     In addition, Mr. Edelman also generally challenges the amount of the Opioid Settlement, arguing that it is too high.  Edelman Reply ¶¶ 14-26.  This challenge must fail; it is founded on a misunderstanding of the law and a faulty analysis of the settlement amount itself.

62.     Mr. Edelman asserts that Rule 9019 requires that settlements "must fall below the lowest range of possibilities."  *Id.* ¶ 14.  This is exactly the opposite of what is required for the approval of a settlement under Rule 9019:  "The Court need only conclude that the settlement falls *within* the reasonable range of litigation possibilities *somewhere above the lowest point* in the range of reasonableness."  *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (emphasis added).  To the extent that Mr. Edelman's challenge rests on an argument that the

amount of the Opioid Settlement fails to fall *below* the range of reasonableness, it is fundamentally flawed and must be rejected.

63.    Moreover, the Court should also reject Mr. Edelman's challenge because it relies on nothing more than his own admittedly incomplete and otherwise flawed opinions of the settlement amount. *See* Edelman Reply ¶¶ 16-26; *see also id.* ¶ 24 (noting a lack of information to evaluate the Opioid Settlement as well as a reliance on "speculation"). More specifically, Mr. Edelman sets forth his opinions about the proper amount of the Opioid Settlement by analyzing the amounts of the opioid-related settlements of other entities. *Id.* ¶¶ 16-21. For example, he opines that the Opioid Settlement amount is a higher percentage of the Debtors' 2020 revenue than selected other opioid-related settlements are of those settling parties' 2020 revenue. *Id.* ¶ 17. However, he provides no information as to why this metric is relevant, why the settlements he selected are appropriate comparisons, where he got the information about other settlements and the parties thereto, or why he is at all qualified to perform this comparison.[13]

64.    Moreover, Mr. Edelman's armchair analysis is incomplete and incorrect, even on its own terms. For example, he compares the Opioid Settlement with the opioid-related settlement between Endo Pharmaceuticals, and the State of New York and two of its counties. He claims:

> The Debtors [*sic*] sales were 83.2% of E[ndo]'s sales for the period noted. If the Debtor and Endo engaged in the same illegal practices . . . at the same time and at the same level, the Debtor's [*sic*] settlement with the State of NY and the counties would have been $41,600,000. Based on the Debtors' submission and calculation of the percentage allocation to New York State of 5.39% the upper range of the settlement on a national basis would be $771,180,000.

Edelman Reply ¶ 21.

---

[13]    For these reasons, Mr. Edelman's opinion certainly fails to meet the standard for expert opinion testimony under Federal Rule of Evidence 702 and is therefore inadmissible in any event.

65.     This analysis extrapolates the value of the Endo settlement to a nationwide basis without first extrapolating it to cover all of New York's population.  That is, the analysis incorrectly assumes that a settlement with New York and two of its counties should be valued the same as a settlement—like the Opioid Settlement—that would cover the opioid-related claims of New York and all 62 of its counties.  Thus, even assuming that all of his assumptions and calculations are otherwise correct—and nothing suggests they are—Mr. Edelman's extrapolation of the Endo settlement necessarily provides an erroneously low value.

66.     Furthermore, Mr. Edelman repeatedly claims that any settlement here should be a "social tax" rather than an actual reckoning for the Debtors and their opioid liability.  Edelman Reply ¶¶ 16-17.  Consequently, his analysis of the Opioid Settlement amount appears to proceed from the assumption that Mallinckrodt has little or no opioid-related liability.  That assumption is incorrect.  As discussed above in section II.B, *supra*, and as Mr. Stranch's declaration will show, the prepetition litigation against the Debtors uncovered significant evidence of specific opioid-related wrongdoing by the Debtors.  Mr. Edelman's analysis should be wholly disregarded and his objection to the Opioid Settlement overruled.

[*remainder of page intentionally left blank*]

## **CONCLUSION**

For the reasons set forth above, this Court should overrule the Plan objections, confirm the

Plan, and grant such further relief as this Court deems just and appropriate.


Dated: October 26, 2021                    Respectfully submitted,


                                          */s/ James S. Green, Jr.*
                                          R. Karl Hill (DE 2747)
                                          James S. Green, Jr. (DE 4406)
                                          Jared T. Green (DE 5179)
                                          Seitz, Van Ogtrop & Green, P.A.
                                          222 Delaware Avenue, Suite 1500
                                          Wilmington, DE 19801
                                          Tel: (302) 888-0600
                                          Fax: (302) 888-0606
                                          khill@svglaw.com
                                          jsgreen@svglaw.com
                                          jtgreen@svglaw.com

                                          */s/ Kevin C. Maclay*
                                          Kevin C. Maclay, Esq. (admitted *pro hac vice*)
                                          Todd E. Phillips, Esq. (admitted *pro hac vice*)
                                          Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
                                          Kevin M. Davis, Esq. (admitted *pro hac vice*)
                                          Nathaniel R. Miller, Esq. (admitted *pro hac vice*)
                                          Caplin & Drysdale, Chartered
                                          One Thomas Circle, NW, Suite 1100
                                          Washington, DC 20005
                                          Tel: (202) 862-5000
                                          Fax: (202) 429-3301
                                          kmaclay@capdale.com
                                          tphillips@capdale.com
                                          jliesemer@capdale.com
                                          kdavis@capdale.com
                                          nmiller@capdale.com

                                          *Counsel for the Multi-State Governmental*
                                          *Entities Group*