**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: ECF No. 4508, 4718, 5010** |

**AD HOC COMMITTEE OF NAS CHILDREN'S (I) REPLY TO THE UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) JOINDER IN SUPPORT OF STATEMENT OF THE OFFICIAL COMMITTEE OF OPIOID RELATED CLAIMANTS IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

The Ad Hoc Committee of NAS Children (the "**NAS Committee**") respectfully submits this (i) reply (the "**Reply**") to the *United States Trustee's Objection to Confirmation of the First Amended Joint Plan of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**UST Objection**") [Docket No. 4718] to the attorney fee provisions set forth in Section IV.X.8 of the *First Amended Joint Plan of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 4508] (the "**Plan**")[2] and (ii) Joinder (the "**Joinder**") *in Support of Statement of the Official Committee of Opioid Related Claimants in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**OCC Reply**") [Docket No. [5010].  For its Reply, the NAS Committee respectfully submits the

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.

[2]    Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

*Declaration of Scott R. Bickford in Support of Ad Hoc Committee of the NAS Children's Reply to the United States Trustee's Objection to Confirmation of the First Amended Joint Plan of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**Bickford Decl.**"), attached hereto as <u>Exhibit 1</u>, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The NAS Committee files this (i) Reply in support of the work it performed on behalf of the NAS Children (children born with the condition known as neonatal abstinence syndrome ("**NAS**"))  – present and future – over the last three years that led to the establishment of the NAS Monitoring Trust, compensation for NAS Children through the PI Trust, and its efforts to bring awareness of the plight of the NAS Children to the nation's attention, both before and after the Petition Date;[3] and (ii) Joinder to the OCC Reply in support of confirmation of the Plan.

2.      The private attorney fee provisions set forth in section IV.X.8 of the Plan should be approved as they are substantially identical to those recently approved in <u>In re Purdue Pharma L.P.</u>, No. 19-23649 (RDD), 2021 WL 4240974, at *8–9 (Bankr. S.D.N.Y. Sept. 17, 2021).  The <u>Purdue</u> court clearly and unambiguously rejected the UST's arguments that the private attorney fee provisions in the Plan should be governed by section 503(b) of the Bankruptcy Code when ruling that such fees should be approved under Bankruptcy Rule 9019 (related to contingency fees) or section 1129(a)(4) of the Bankruptcy Code (hourly fees for private ad hoc committees).  While the NAS Committee believes that all of its fees should be approved under Bankruptcy Rule 9019, alternatively, the Court should follow the holding in <u>Purdue</u> and approve the NAS Monitoring

---

[3]      For the avoidance of doubt, this Reply does not address payment of contingency fees for the representation of the NAS Children in connection with their NAS PI Opioid Claims (which are in addition to the fees described herein), as such fees are being paid pursuant to contract and were not the subject of the UST Objection.

Trust Fees under Bankruptcy Rule 9019 and approve the NAS PI Fees under section 1129(a)(4) of the Bankruptcy Code, as opposed to section 503(b) of the Bankruptcy Code as argued by the UST.

3.       Regardless of the standard, the NAS Committee Fees should be approved.  The NAS Monitoring Trust is a remarkable feat and one of the first of its kind in the country.  It is designed to provide grants to entities that provide services to those most in need – caretakers of children born with NAS who live in some of the most underserved areas of the United States. Section IV.X.8.C of the Plan (the "**NAS Monitoring Attorney Fee Provision**") sets forth the compensation for the NAS Committee for its fees (the "**NAS Monitoring Trust Fees**") related to the NAS Monitoring Trust.

4.       As recognized by Kenneth Feinberg (the "**Mediator**"), the groundwork for the Plan, as it relates to distributions to opioid claimants, took place in the Purdue case.  See *Mediator's Report* [Docket No. 4946] (the "**Mediator's Report**") at ¶ 6.  In fact, the settlement that resulted in the separate classification, trust distribution procedures, and pool of funds in the Debtors' Chapter 11 Cases occurred within days of a similar resolution in Purdue.  Compensating the NAS Children through a separate class will enable them to recover significantly more than they would have had their claims been consolidated with the other personal injury claimants.  Section IV.X.8.F of the Plan (the "**NAS PI Fee Provision**" and collectively with the NAS Monitoring Attorney Fee Provision, the "**NAS Attorney Fee Provisions**") sets forth the compensation for the NAS Committee for its fees (the "**NAS PI Fees**" and collectively with the NAS Monitoring Trust Fees, the "**NAS Committee Fees**") related to the NAS PI Opioid Claims.  Achieving these results both took thousands of hours of fact-finding, education, and negotiation by the NAS Committee.

5.       Perhaps in recognition of this great achievement, and more generally, the hard fought intercreditor settlement that resulted in the agreed-upon allocations among a number of

different sets of opioid claimants, which paved the way for funds to be used for opioid abatement and compensation of victims, of the approximately ten objections related to the opioid provisions of the Plan, only one party, the United States Trustee (the "**UST**"), specifically objected to the NAS Attorney Fee Provisions, despite the fact that the payment of such fees was explicitly disclosed in the *Disclosure Statement for Joint Chapter 11 Plan of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2917] (the "**Disclosure Statement**") and *Mallinckrodt Opioid Personal Injury Trust Agreement* [Docket No. 3610-1] (the "**PI Trust Agreement**").  See Disclosure Statement at p. 13; PI Trust Agreement, § 2.1(c)(xvi).

6.      The UST, however, alleges that the NAS Attorney Fee Provisions were not part and parcel of a global plan settlement notwithstanding the fact that it was the product of numerous mediations and other negotiations among the NAS Committee, the Debtors, and numerous private and public parties-in-interest.  As set forth in the OCC Reply, such allegations are not consistent with the facts of these Chapter 11 Cases.  See OCC Reply.  Regardless, each class of Opioid creditors (except the holders of Other Opioid Claims) that voted on the Plan voted overwhelmingly to accept the Plan after full and complete disclosure of the attorney fee provisions in the Plan.  See *Preliminary Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, Exhibit A [Docket No. 4955] (the "**Balloting Report**").

7.      Under well-established law and Bankruptcy Rule 9019, a settlement need not result in the best possible outcome for the debtors, but instead "need only be above the lowest point in the range of reasonableness."  In re Washington Mut., Inc., 442 B.R. 314, 328 (Bankr. D. Del. 2011).  Payment to counsel of the NAS Monitoring Trust Fees, consisting of 15% (net of the

Common Benefit Fund contribution) of each distribution made by the Opioid MDT II to the NAS Monitoring Trust, is well within the realm of reasonableness for class action-type cases and the typical attorneys' fee awards in similarly sized settlements, especially given that the NAS Monitoring Trust (along with one in <u>Purdue</u>) is one of the nation's first.[4]  In fact, the NAS Monitoring Trust Fees are substantially lower than the typical 20% or more awarded in similar class action cases.

8.    The NAS PI Fees will likely follow the <u>Purdue</u> blueprint, which was the byproduct of difficult negotiations with the public entities as well as with the Ad Hoc Group of Individual Victims (the "**PI Ad Hoc**").  The NAS PI Fees will, of course, be substantially less than the fees the NAS Committee incurred to achieve the compromise that led to the creation of the NAS PI Opioid Claim subclass, including approximately $10.750 million to be distributed *solely* to the holders of NAS PI Opioid Claims pursuant to a separate TDP (which resulted from the NAS Committee's zealous advocacy and perseverance), significantly improving the distribution to the NAS Children.[5]

9.    Also, section 1129(a)(4) of the Bankruptcy Code only applies to payments of professional fees *from estate assets* as opposed to the fees to be paid out of *creditor distributions* such as the NAS Committee Fees. For the foregoing reasons alone, the NAS Committee Fees should be approved under Bankruptcy Rule 9019 and not subject to review under section 1129(a)(4) of the Bankruptcy Code.

---

[4]     While an NAS Monitoring Class was created in <u>In re Insys Therapeutics, Inc.</u>, Case No. 19-11292 (JTD) (Bankr. D. Del.), the trust distribution procedures were not and have not been drafted in that case.

[5]     While not yet determined, based on <u>Purdue</u>, this fee will likely equate to, at most, approximately 1% of the total consideration being provided to the NAS Children – well below what is typically paid for the type of services that the NAS Committee provided to the NAS Children prior to and during the Debtors' cases.

10.     Alternatively, the Court should follow the holding in Purdue Pharma and approve the NAS Monitoring Trust Fees under Bankruptcy Rule 9019 and the NAS PI Fees under section 1129(a)(4) of the Bankruptcy Code.  Assuming *arguendo* that Bankruptcy Rule 9019 does not apply to approval of the NAS Committee Fees, the NAS Committee easily satisfies the standards of, and therefore should be approved under, section 1129(a)(4) of the Bankruptcy Code, as opposed to section 503(b) of the Bankruptcy Code as argued by the UST.  First, In re Lehman Bros. Holdings, Inc., 508 B.R. 283, 289 (S.D.N.Y. 2014), relied upon by the UST in the UST Objection, is, as the Purdue Pharma case held, factually distinguishable from these Chapter 11 Cases and is contrary to the overwhelming case law addressing a Court's ability to approve fees in the context of a negotiated plan of reorganization overwhelmingly approved by those entitled to vote on such plan.  Unlike in the Plan, the fees at issue in Lehman were not determined through a court order as part of a global plan settlement.  Moreover, the fees sought to be paid in Lehman were those of committee member professionals, whose fees are not permitted to be paid (absent a substantial contribution) under sections 503(b)(3)(F) and 503(b)(4) of the Bankruptcy Code, neither of which are applicable to the NAS Committee.

11.     Instead, under section 1129(a)(4) of the Bankruptcy Code, the only prerequisites to approval of the NAS Committee Fees are that: (i) the proposal to pay such fees be disclosed and (ii) the court approve the reasonableness of such payments.  Here, the Plan, Disclosure Statement, and PI Trust Documents clearly and unambiguously discloses the payment of NAS Committee Fees.  See, e.g., Plan at § IV.X.8.C, IV.X.8.F; Disclosure Statement, V.D, p. 113-14; PI Trust Agreement, § 2.1(c)(xvi).  Such fees are also clearly reasonable, when one considers that, with respect to: (a) the NAS Monitoring Trust Fees, the amounts requested fall below the fee generally paid to counsel in typical class action mass tort cases and pale in comparison to the years of work

that was done to achieve this result; and (b) the NAS PI Fees are anticipated to be about 1% of the total distribution to NAS Children, which are: (i) miniscule when compared to all other fees in these Chapter 11 Cases; (ii) significantly less than those incurred by the NAS Committee defending the rights of the NAS Children for years and negotiating the PI Trust; and (iii) the byproduct of arms-length negotiations with the PI Ad Hoc.

12.     Consequently, because the UST's reliance on <u>Lehman</u> is misplaced and for the reasons set forth herein and the UCC Reply, the UST Objection should be overruled and the Plan should be confirmed.

## **BACKGROUND**

### A.     **The NAS Committee – Discovery of Impact of NAS**

13.     The three member NAS Committee, and their designees, have been the sole advocate of the interests of NAS Children both individual and in the abatement settlement in the Chapter 11 Cases, and have acted on behalf of the interests of a group of laws firms[6] (the "**NAS Attorney Group**") collectively representing the NAS Children.  See Bickford Decl. at ¶ 3.

14.     The Debtors, and other opioid manufacturers, are alleged to have ignored evidence of thousands of babies born with opioids in their system, failed to research the effects of their drugs, encouraged widespread use of their opioid-containing products in greater and greater doses, and failed to warn doctors and women of childbearing age of the consequences of dependency, addiction, and the long-term harm to children born with NAS.  Moreover, the Debtors promoted

---

[6]     The NAS Attorney Law Group consists of the following firms: Bart Bernard, P.A, Calvin C. Fayard, Jr. APC, Clayborne, Sabo and Wagner, LLP, Cooper Law Firm, LLC, Creadore Law Firm, P.C., Johnson Gray, LLC, Kent Harrison Robbins, P.A., LawCo USA, PLLC., Levenfeld Pearlstein, LLC, Lowe Stein Hoffman Allweiss & Hauver, LLP, Marioneaux & Williams, LLC, Markle DeLaCruz, LLP, Martzell Bickford & Centola, APC, MacFarlane Ferguson & McMullen, P.A., The Law Office of Stephen P. New, Perrin, Landry, deLaunay, Dartez & Ouellet, Piscitelli Law Firm, Porteous Hainkel & Johnson, LLP, Ron Austin & Associates, LLC, Schonekas, Evans, McGoey & McEachin, L.L.C, Sherrard Roe Voigt & Harbison, PLC, Thompson Barney PLLC, and Winch Law Firm, LLC.

an aggressive and misleading marketing scheme, made false reports concerning their drugs, and failed to prevent diversion and report suspicions opioid orders.

15.    The NAS Attorney Group represents approximately 3,500 NAS children and their caregivers who are located throughout the country.  Id. at ¶ 4.  Because the majority of these children were born to a mother with an opioid dependence problem, the family situations are not ideal.  Id.  Approximately half of these clients are in the care and custody of their grandparents or other family members, some have been adopted, and some are with their birth parents.  Id.

16.    To fully understand the impact of *in uetro* opioid exposure on NAS Children and their caregivers, the NAS Committee spent thousands of hours preparing and conducting interviews of hundreds of caregivers to identify patterns of acute and long-term complications; treatment for opioid withdrawal in infants; and social, educational, and interventional services used by its members' clients to address cognitive delays, developmental issues, and other social needs. Id. at ¶ 5.

17.    The NAS Committee also identified a group of member clients who, energized by its efforts, developed a coalition of stakeholders who met regularly and provided feedback on the needs of its client population.  Id. at ¶ 6. The NAS Committee provided resources to this group, met with them regularly and used their feedback in developing an abatement fund to reach those who are often beyond the reach of governmental entities (the "**NAS Abatement Plan**").  Id.   The NAS Abatement Plan was the starting point for what eventually became the NAS Monitoring Trust. Id.  One of the revelations of client outreach was the realization that there is no national standard of care or protocol for families, physicians, or educators to follow to make sure that NAS Children are appropriately and timely evaluated for the constellation of delays/disabilities that frequently exist in the NAS population.  Id.  Absence of a national standard of care is particularly profound

as most NAS Children are being raised by their grandparents, long out of the loop of child rearing. Id. Social stigma attachments to the birth mothers and these children also created barriers to reaching out for education and medical services. Id. These two findings, the lack of standards and the stigma associated with rearing NAS Children, are primary issues the NAS Monitoring Trust intends to address. Id.

18.     To ensure that its efforts reached caregivers of children with NAS outside of the NAS Committee's client population, the NAS Committee monitored various online NAS support groups with thousands of caregivers, and collaborated with leaders of those groups to provide educational opportunities to their members about NAS and the ongoing opioid bankruptcy proceedings. Id. at ¶ 7. The NAS Committee hosted in-person and virtual town-hall meetings with NAS caregivers to learn more about their experience caring for a child with NAS. Id.

19.     To better understand the work being done to support families with NAS, the NAS Committee developed working relationships with representatives from a number of non-profit organizations serving children and families impacted by NAS, including the March of Dimes, Child Welfare League of America, National Association for Children of Addiction, SAFE Project, Catholic Committee of Appalachia, Love on Wheels, and Jason's House. Id. at ¶ 8.

20.     The NAS Committee also learned a great deal about the social stigma attached to this population which makes it difficult to identify children with NAS and address their significant needs. Id. at ¶ 9. In fact, many families avoid testing for cognitive and developmental delays associated with NAS because they do not want their children to be labeled, resulting in missed opportunities for early intervention. Id. This social stigma is one of the problems the NAS Committee hopes the NAS Monitoring Trust will seek to address. Id.

21.    Finally, the NAS Committee expended significant resources retaining a team of world-class experts with experience in NAS, child development, addiction, pain management, healthcare, and economics. These experts include Dr. Rahul Gupta (Chief Medical Officer of the March of Dimes)[7]; Dr. Kanwaljeet S. Anand (Stanford University Professor of Pediatrics (Pediatric Critical Care) and of Anesthesiology, Perioperative And Pain Medicine);  Dr. Charles L. Werntz III (board certified preventive medicine physician); Dr. Vyvyan Howard (fetal pathologist and toxicologist); Elizabeth Davis (life care planner); Dr. Gregory Skipper (addiction psychiatry); Dr. Harvey S. Rosen (economist); Dr. Paul Keckley (healthcare researcher and policy analyst); and Herb Kuhn (President and CEO of the Missouri Hospital Association).  See Bickford Decl. at ¶ 10. All of these individuals assisted in advocating for and developing what ultimately became the NAS Monitoring Trust.  Id.

22.    While most documented injuries resulting from the opioid epidemic (including death, despair, and dependence) impact all adults, women are more likely to become dependent than men because they are more likely to seek medical treatment for pain, resulting in an injured population consisting of children exposed to opioids in utero.[8]

23.    Recognizing that there are numerous aspects of injuries arising from in utero opioid exposure, two, one acute and one chronic, are particularly prominent.  See Bickford Decl. at ¶ 11. The first and most well-recognized is withdrawal - that the baby while in utero becomes dependent on the opioids and once separated from the placenta no longer receives the opioid exposure.  Id.

---

[7]    President Biden recently nominated Dr. Gupta as his drug czar: https://www.washingtonpost.com/health/2021/07/13/biden-gupta-drug-czar/

[8]    Neonatal Abstinence Syndrome, Illinois Department of Public Health, available at https://dph.illinois.gov/topics-services/prevention-wellness/prescription-opioids-and-heroin/neonatal-abstinence-syndrome.

This results in neonates being weaned by continued but diminishing opioid administration.  Id.  This usually includes extended acute care hospitalization.  Id.  Common withdrawal symptoms include gastrointestinal issues, nervous system irritability, and temperature instability.  Id.  In severe cases, NAS newborns may also experience seizures.  Id.  On average, an NAS newborn spends more days in the hospital and typically in the neonatal intensive care unit ("**NICU**") than a non-NAS newborn.  Id.  The costs associated with this initial hospitalization are very high.  Id.  Because there is no recognized standard of care for weaning these children, it is anticipated that the NAS Monitoring Trust will fund grants seeking to develop and fast track a standard of care.  It is hoped that his will reduce costs going forward. Id.

24.    Often, the harm which opioids have caused to an NAS Child manifests shortly after birth in a NICU.  Among other problems, NAS Children experience tremors, seizures, mottling, skin excoriation, regurgitation, agitation, pain, tachypnea, hyperactive reflexes, excessive yawning, stuffiness, vomiting, inability to sleep, high pitched crying, excessive runny nose, diarrhea, inability to thrive, weight loss, prematurity, hydrocephalus, heavy sweating, inability to suck, and low birth weight.[9]

25.    The second well recognized injury arises from the failure to fully understand that chronic injuries arise from *in utero* opioid exposure due, in part to the effect of opioids on development of bone and organ structures, including the brain.  See Bickford Decl. at ¶ 12.  This failure contributes to the overall incorrect perception that once discharged from the hospital after birth (and weaned from opioids), the baby was otherwise healthy.  Id.  Therefore, infants exposed to opiates in the womb have a propensity to suffer long-term consequences, such as developmental

---

[9]    See *Declaration of Dr. Kanwaljeet S. Anand* (the "Anand Declaration") (attached as Exhibit B to the *Declaration of Scott R. Bickford in Support of the NAS Ad Hoc Committee's Limited Objection to the Disclosure Statement and Solicitation Procedures Motion* [Docket No. 2746, Case No. 19-23649, Bankr. S.D.N.Y]) at ¶4.

delays, speech impairment, vision problems, motor problems, and behavioral or learning problems. Indeed, it is this constellation of injuries that makes NAS such a tenacious problem for healthcare providers, families, educators, and the like.  Id.

26.     While the effects of opioid use in adults is well-known and published, the long-term effects of opioid exposure in the womb is far less studied or understood.  Id. at ¶ 13.  The NAS Committee is convinced that NAS children have not and are not receiving the study and services required to fully understand their injuries.  Id.  Even knowing the actual NAS population size was not easily ascertainable as most states do not require reporting of an NAS diagnosis leading the CDC to only estimate the population.[10]  The initial governmental efforts to combat the epidemic were primarily focused on law enforcement that later branched out to other areas.[11]

27.     A reasonable review of this history reveals that the NAS population was late to be identified and late to receive services.  See Bickford Decl. at ¶ 14.  It is a fundamental of pediatric practice that early and sustained intervention for such children is the gold standard.[12]  Socialization and learning problems left undiagnosed or treated before these children are of school age is, may be in most cases, far too late.  See Bickford Decl. at ¶ 14.  There is no standard of care for weaning, nor for what interventions these children should be examined for and when.  Id.

28.     Other damages to the NAS Children reach far beyond the weeks spent withdrawing from opioids.  Id. at ¶ 15.  Statistically significant numbers of these children are born with latent

---

[10]     JY Ko et al., Incidence of Neonatal Abstinence Syndrome — 28 States, 1999–2013, MMWR Morb Mortal Wkly Rep (August 12, 2016) 65:799–802.

[11]     Examining the Effects of the Painkiller Oxycontin, Focusing on Federal, State and Local Efforts to Decrease Abuse and Misuse of this Product while Assuring Availability for Patients who Suffer Daily from Chronic Moderate to Severe Pain, Hearing Before the Committee on Health, Education, Labor, and Pensions, 107th Cong. (2002).

[12]     Anand Declaration at ¶5.

heart defects, spina bifida, and congenital malformations like cleft palate, club foot, and anklioglossia (tongue-tie), all requiring painful and expensive surgeries.  Id.

29.    Beyond the NICU, NAS Children may be subject to a statistically significant risk of developmental delays that can ruin the rest of their lives.  The complications that NAS Children experience can include:

a.  1st Year – Growth retardation and psychomotor developmental delays.[13]

b.  One Year Old – Deficits in locomotor, personal/social, hearing and speech, hand/eye coordination and intellectual performance.[14]

c.  Two to Three Years Old – Deficits in motor, expressive language, and receptive language.[15]

d.  After Three Years Old – In addition, NAS Children can experience deficits in personality structure and functioning: decreased sense of well-being, responsibility, self-control, psychological mindedness, empathy, and social maturity.[16]

e.  Four to Five Years Old – Decreased language comprehension and expression.[17]

f.  Five to Twelve Years Old – Deficits in verbal, performance, externalizing and internalizing problems.[18]

g.  Late Childhood – IQ impairment, lower language abilities in exposed children, higher rates of behavioral problems that become worse with time.[19]

---

[13]    McGlone L, Mactier H., Infants of Opioid-Dependent Mothers: Neurodevelopment at Six Months, Early Hum. Dev. (Jan. 2015) 91:19-21.

[14]    Hans SL, Jeremy RJ., Postneonatal Mental and Motor Development of Infants Exposed In Utero to Opioid Drugs, Infant Mental Health J. (May 9, 2001) 22:300-15.

[15]    Conradt E, Flannery T, Aschner JL, et al. Prenatal Opioid Exposure: Neurodevelopmental Consequences and Future Research Priorities, Pediatrics (Sep. 2019) 144; see also Anand Declaration at ¶10.

[16]    Konijnenberg C, Sarfi M, Melinder A, Mother-Child Interaction and Cognitive Development in Children Prenatally Exposed to Methadone or Buprenorphine, Early Hum. Dev. (Oct. 2016) 101:91-7.

[17]    Fill MA, Miller AM, Wilkinson RH, et al., Educational Disabilities Among Children Born With Neonatal Abstinence Syndrome, Pediatrics (Sept. 2018) 142.

[18]    Id.

[19]    Id.; see also Bauman PS, Levine SA., The Development of Children of Drug Addicts, Int J. Addict (Aug. 1986) 21:849-63.

30.    In addition to the above, a significant number of NAS Children experience latent effects and damages, which may include: heart defects, brain damage, learning disabilities, behavioral and emotional disorders, attention deficit hyperactivity disorder, cognitive impairment, deficits in independent functioning, depression and anxiety disorders, and autism spectrum disorders.[20]

31.    One of the NAS Committee's important achievements in the mediation process in the Purdue and Mallinckrodt bankruptcy cases was to educate and convince the other participants that these non-acute injuries were indeed related to the in utero exposure and that standards of care needed to be developed to identify them early on.  See Bickford Decl. at ¶ 16.

**B.    The Mallinckrodt Mediation**

32.    Pursuant to the *Order (A) Appointing a Mediator and (B) Granting Related Relief* [Docket No. 1381], the NAS Committee was designated as a "Mediation Party."  In its role as a Mediation Party, the NAS Committee and its advisors spent significant time preparing for and attending numerous mediation sessions.  See Bickford Decl. at ¶ 17.  The NAS Committee's participation was twofold – seeking funding for the NAS Abatement Plan to assist those who are often beyond the reach of governmental entities and to negotiate compensation for the NAS personal injury victims (the "**NAS PI Plan**").  Id.

33.    The NAS Committee's initial focus was to educate the Future Claimants' Representative about NAS and injuries caused by in utero opioid exposure and the need for the

---

[20]    Broussard CS, Rasmussen SA, Reefhuis J, et al., Maternal Treatment with Opioid Analgesics and Risk for Birth Defects, Am. J. Obstet, Gynecol, (Apr. 2011) 204:314; Dawson AL, Razzaghi H, Arth A, et al., Maternal Exposures in the National Birth Defects Prevention Study: Time Trends of Selected Exposures, Birth Defects Res. A Clin. Mol. Teratol, (Aug. 2015) 103:703-12; Lind JN, Interrante JD, Ailes EC, et al., Maternal Use of Opioids During Pregnancy and Congenital Malformations: A Systematic Review, Pediatrics (Jun. 2017) 139.

NAS Abatement Plan.  Id. at ¶ 18.  The NAS Committee had educated the other Mediation Parties in the Purdue case.[21]  Id.

### 1.    The NAS Monitoring Trust

34.    The NAS Committee negotiated for a contribution to the NAS Monitoring Trust that was proportionately similar to the trust amount negotiated in Purdue.  See Bickford Decl. at ¶ 19.  The NAS Monitoring Trust will provide grants to those who advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the standard of care for all NAS Children ages zero to six, with priority given to NAS Children ranging in age from three to six; and/or (iii) enhancing the mother-child dyad.  Id.  To achieve this result took thousands of hours of attorney and expert time. Id.

### 2.    The NAS PI Plan

35.    The NAS PI Plan negotiation in Purdue was a far more arduous process than the negotiations that resulted in the NAS Monitoring Trust under the Plan.  Id. at ¶ 20.  The agreement for the NAS Monitoring Trust in Purdue was reached prior to the filing of the Debtors' Chapter 11 Cases.  Resolution of NAS PI Claims in Purdue, on the other hand, was not reached until about the same time agreement was reached with respect to the NAS PI Plan in the Debtors' Chapter 11 Cases.  Id.  In other words, negotiations with respect to the NAS PI Plan were occurring simultaneously.

---

[21]    The parties that negotiated the NAS Monitoring Trust and the resolution of the NAS PI Opioid Claims in the Debtors' cases are substantially similar to those that negotiated the practically identical provisions in the Purdue chapter 11 cases.  Further, the same Mediator mediated both cases.  The primary difference in the Debtors' Chapter 11 Cases was the presence of the Future Claimants' Representative.  The hourly fees being sought pursuant to the NAS PI Fee Provision, however, relate solely to the Debtors' Chapter 11 Cases.

36.    Under the NAS PI Plan, **all** NAS Children who have: (i) been diagnosed by a licensed medical provider with a medical, physical, cognitive, or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS, which diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center; and (ii) filed a proof of claim, are entitled to a recovery.  See, e.g., Disclosure Statement at I.A.204, p. 21.

37.    The only evidence required to be submitted is evidence showing that the NAS Child who is the subject of the claim was diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to NAS.  See, e.g., *Mallinckrodt Opioid Personal Injury Trust Distribution Procedures for NAS PI Claims* [Docket No. 3282-3] (the "**NAS PI TDP**") at ¶ 4.2(b).

38.    Those satisfying this comparatively light burden are expected to be allocated approximately a gross $2,300 per claimant, before deductions and holdbacks for costs, fees, and expenses.  Id.  Like many constituencies in this case, the NAS Committee hoped to achieve a higher distribution for its clients.  However, as set forth in the Mediator's Report, the settlement is certainly reasonable under the circumstances.  See Mediator's Report at ¶ 8 (noting that the resolution between the PI Ad Hoc and NAS Committee was "fair and appropriate and consistent with my understanding of what is a reasonable award for certain types of personal injury victims within a wider group of general personal injury victims").

**ARGUMENT**

I.    **The NAS Attorney Fee Provisions are Plan Settlements that are Appropriate and may be Approved Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019**

39.    Section 1123(b)(3)(A) of the Bankruptcy Code states that: "…a plan may—provide for—the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).  Therefore, a settlement embodied in a plan may be approved by the Bankruptcy Court.  "The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  In re Coram Healthcare Corp., 315 B.R. 321, 334-35 (Bankr. D. Del. 2004) (internal quotations omitted)).

40.    Bankruptcy Rule 9019(a) provides that, "after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  In determining whether to approve a settlement as fair and equitable under Bankrupt Rule 9019, courts in the Third Circuit apply the following factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  In re Martin, 91 F.3d 389, 393 (3d Cir. 1996).

41.    Contrary to the UST's contention that the Plan is not a settlement that is subject to approval under Bankruptcy Rule 9019, the NAS Attorney Fee Provisions are, as set forth in the OCC Reply, a settlement of all opioid claims against the Debtors.  For example, the Plan explicitly states:

> In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of

Action and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion by the Debtors to approve such compromises and settlements (including but not limited to the UCC Settlement and the OCC Settlement) pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, their Estates and Holders of Claims and Interests, and are fair, equitable and within the range of reasonableness.

Plan at § IV.A.

42.    A settlement under Bankruptcy Rule 9019 need not result in the best possible outcome for the debtors but "need only be above the lowest point in the range of reasonableness." In re Washington Mut., Inc., 442 B.R. 314, 328 (Bankr. D. Del. 2011).  In determining the range of reasonableness, the bankruptcy court need only "to decide the numerous questions of law and fact raised by [objections] but rather to canvass the issues."  In re Neshaminy Off. Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).  Indeed, the bankruptcy court is "not supposed to have a 'mini-trial' on the merits."  In re Key3Media Grp., Inc., 336 B.R. 87, 93 (Bankr. D. Del. 2005) (internal quotations omitted).

43.    Ultimately, the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court.  Coram, 315 B.R. at 329 ("Under Rule 9019 of the Federal Rules of Bankruptcy Procedure, the approval of a compromise settlement is within the sound discretion of the bankruptcy court.").

44.    A court should exercise its discretion in favor of a settlement wherever possible, as settlements are generally favored in bankruptcy.  In re Woodbridge Grp. of Companies, LLC, 592 B.R. 761, 772 (Bankr. D. Del. 2018) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy.") (internal quotations omitted); In re

Adelphia Commc'ns Corp., 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged")

45.     The Plan and the settlements set forth therein, including the NAS Attorney Fee Provisions, represent a fair and equitable compromise that is in the best interest of the Debtors' estates and creditors, falls well within the range of reasonableness, and satisfies each of the relevant 9019 factors.

46.     As the Court is aware, the Mediator is a leading expert in mediation and dispute resolution, and "is one of the most well-respected mass tort mediators in the country and has experience mediating [opioid cases] in particular."  *Debtors' Motion for Entry of an Order (A) Appointing a Mediator and (B) Establishing Mediation Procedures as set forth in the Proposed Order* [Docket No. 1276] at ¶ 5.

47.     With respect to the fee issues, including the NAS Attorney Fee Provisions, the Mediator stated the following:

- In general, legal fees for each Private Opioid Claimant group will be paid exclusively out of its agreed distribution or by other agreements with individual claimants (and not by the Debtors' estates). In my opinion, based on my decades of experience and involvement in mediating mass tort litigations and settlements, I believe that the contingency fee resolutions, as well as the common benefit assessments, reached in this Mediation are consistent with fee awards, arrangements and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement based on the work engaged in by all Mediation participants.

- I believe that the fee settlements reached between the Ad Hoc Group of Hospitals and the Non-Federal Governmental Opioid Claimants, as well as between the Ad Hoc Group of NAS Children and the Non-Federal Governmental Opioid Claimants, are consistent with my experience and involvement in similar mass tort situations where certain contingency fee counsel assume the responsibility of negotiating awards for a much larger group of constituents after engaging in years of pre-settlement work. I believe that the percentages agreed upon in this matter are well within the range I am familiar with for comparable situations.

- [I]n my experience, reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary part of reaching an agreement

concerning overall allocation. This situation is no different. I, therefore, believe that the contingency fee and non-bankruptcy fee settlements documented in the Plan are fair, reasonable, appropriate and should be deemed to be an integral part of the Plan.

See Mediator's Report at ¶¶ 14, 15, 17.

48.     The NAS Attorney Fee Provisions are also fair, reasonable, and appropriate in light of the significant services provided by the NAS Committee over the last three years as set forth in the Background section above, including: (i) massive efforts to discover and understand the longstanding impact of opioids on children born with such opioids in their systems; (ii) educating the public about those harms; (iii) employing experts in child development, addiction, pain management, healthcare, and economics to treat NAS Children and prevent future harm; and (iv) actively participating in the Debtors' Chapter 11 Cases, including by negotiating resolution of bar date and notice issues, being a Mediation Party, and attending formal and informal mediation sessions, filing pleadings when necessary, and negotiating the NAS Monitoring Trust Documents and the PI Trust Documents.

49.     For the reasons set forth above, and in the OCC Reply, the NAS Attorney Fee Provisions satisfy each of the applicable Bankruptcy Rule 9019 factors as well as the relevant factors applied with respect to settlements in the Third Circuit as follows:

     a.  First, the NAS Attorney Fee Provisions were and are being heavily negotiated and properly balances each party's respective litigation position on potential damages and considers the litigation risk undertaken by the Mediation Parties and their attorneys.

     b.  Second, avoiding costly protracted litigation over Confirmation of the Plan, which would consume significant estate resources at this critical juncture is in the best interests of all the Debtors' stakeholders, as it maximizes the Estates' value and will not consume the Estates' resources.

     c.  Third, the material terms of the NAS Attorney Fee Provisions have been shared with all parties-in-interest in the Disclosure Statement and were the result of intensive negotiations between all interested parties.  All key constituencies favor the settlements embodied in the Plan, as opposed to continued and lengthy

litigation over such provisions, evidenced by their votes to accept the Plan after notice of the NAS Attorney Fee Provisions.

d. Lastly, the Mediation Parties were represented by competent and experienced counsel. Such counsel negotiated at arm's-length for a considerable period of time, through multiple rounds of compromise and discussion, including numerous negotiation sessions. The parties eventually worked in good faith towards the Plan settlement and private entity settlements, both of which are in the best interests of all stakeholders.

50. The NAS Committee therefore respectfully requests that the Bankruptcy Court approve the NAS Attorney Fee Provisions in connection with Confirmation of the Plan.

## II. To the Extent Required, the NAS Attorney Fee Provisions Should be Approved under Sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code

51. In the event Court approval is required, the NAS Attorney Fee Provisions certainly meet the requirements of sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code.

52. Section 1123(b) of the Bankruptcy Code identifies a number of discretionary provisions that may be included in a plan. Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Courts interpret section 1123(b)(6) very broadly and generally permit the inclusion of any provision in a reorganization plan so long as such provision is not contrary to an explicit provision of the Bankruptcy Code. See In re Lehman Bros. Holdings Inc., 487 B.R. 181, 186 (Bankr. S.D.N.Y. 2013). As set forth above, given the Plan settlement, the payments contemplated under the NAS Attorney Fee Provisions are properly included in the Plan under this section of the Bankruptcy Code.

53. Assuming, *arguendo*, that the NAS Attorney Fee Provisions are not simply subject to approval under Bankruptcy Rule 9019, they may also be approved under section 1129(a)(4) of the Bankruptcy Code. This section provides that:

Any payment made or to be made by the **proponent, by the debtor**, or by a person issuing securities or acquiring property under the

plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4) (emphasis added).

54.    To be clear, the NAS Committee asserts that this section does not apply to the NAS Attorney Fee Provisions, as the payments are being made from creditor distributions, not estate assets or directly from the Debtors.  Indeed, "[s]ection 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court."  In re Worldcom, Inc., No. 02-13533(AJG), 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added); In re Ditech Holding Corp., 606 B.R. 544, 574 (Bankr. S.D.N.Y. 2019).

55.    In these Chapter 11 Cases, the payment of attorneys' fees will not be coming from the Debtors but instead from Abatement Distributions (in the case of the NAS Monitoring Attorney Fee Provision) and the PI Trust (in the case of the NAS PI Fee Provision).  At least one court has held that section 1129(a)(4) did not apply to a plan provision that provided for payment of asbestos claimants' professional fees because the fees were paid out of plan distributions on claimants' allowed claims and such an arrangement "does not effect the administration of the Debtor's estate." Matter of Johns-Manville Corp., 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986), aff'd sub nom. In re Johns-Manville Corp., 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom. Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); see also In re Vail Plaza Development, No. 08-26920 (HRT), 2010 WL 749801, at *3 (Bankr. D. Colo. Jan. 4, 2010) (court overruled an objection to a chapter 11 plan that did not include a "provision that the attorney's fees would be subject to [the] [c]ourt's review for reasonableness" and confirmed such plan; the plan provided that certain creditors' attorneys' fees would be reimbursed  out of the distribution to the creditors and the court concluded

22

that it was "an arrangement between third parties" that "does not violate [Bankruptcy Code] section [1129](a)(4).")

56.    Thus, similar to Johns-Manville and Vail, the Court is not required to determine whether the NAS Attorney Fee Provisions or the fees associated therewith are acceptable, as they are part of a global settlement and any payments will not be made directly from the Debtors to counsel for the NAS Committee.

57.    If the Court disagrees, the NAS Committee Fees clearly satisfy section 1129(a)(4). "The requirements under [section] 1129(a)(4) are two-fold.  First, there must be disclosure. Second, the court must approve of the reasonableness of payments." In re Journal Register Co., 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (quoting 7 Collier on Bankruptcy ¶ 1129.03[4]). Although most cases under section 1129(a)(4) "relate to fees of professionals, the subsection also governs other payments 'for services . . . in connection with the case.'"  Journal Register, 407 B.R. at 537 (holding that incentive plan paid after the effective date of the plan from assets owned by the secured lenders complied with 1129(a)(4)).

58.    In this case, the NAS Attorney Fee Provisions have been adequately disclosed as required by section 1129(a)(4).  See Plan at § IV.X.8.C, IV.X.8.F; Disclosure Statement, V.D, p. 113-14; NAS PI TDP, § 4.4(e); PI Trust Agreement, § 2.1(c)(xvi); *Mallinckrodt Opioid Personal Injury Trust Distribution Procedures for Non-NAS PI Claims* [Docket No. 3282-3] (the "**PI TDP**"), § 4.4(d).

59.    Next, courts may approve fees contemplated to be paid under a plan of reorganization pursuant to Bankruptcy Code section 1129(a)(4) so long as such fees are reasonable and are not made from assets of the estate.  In re Congoleum Corp., No. BR. 03-51524, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) ("[T]he inquiry is 'open-ended'" and "a payment may be

approved if it is reasonable in relation to other costs incurred in the case, reasonable in relation to other cases, or reasonable in relation to the fee structure of the individual or entity requesting payment.") (quoting 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (16th ed. 2021)); In re Burlington Motor Holdings, 217 B.R. 711, 716 (Bankr. D. Del. 1997) ("In determining a reasonable payment . . . the court will consider all relevant circumstances.").  The NAS Committee Fees are reasonable in light of the extreme complexity of these Chapter 11 Cases and the efforts and resources the NAS Committee have expended to reach a consensual settlement with respect to the Plan as more fully described above.  In addition, the NAS Attorney Fee Provisions were heavily negotiated among the Mediation Parties, through formal mediation and informal discussions between the parties which resulted in the Plan settlement.

60.    Most importantly, the NAS Monitoring Trust Fees are well within the realm of reasonableness for class action-type cases and the typical attorneys' fee awards in larger cases. There are numerous recent cases holding that larger awards are reasonable.  See, e.g., In re Bristol-Myers Squibb Sec. Litig., No. 06-2964, 2007 WL 2153284, at *2 (3d Cir. July 27, 2007) (awarding 21.7% of a $185 million settlement fund in attorneys' fees); In re AT & T Corp., 455 F.3d 160, 163 (3d Cir. 2006) (awarding 21.5% of $100 million settlement fund in attorneys' fees); In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 260 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004) (awarding 25% of $44.5 million settlement in attorneys' fees); Rochester Drug Co-Operative, Inc. v. Braintree Lab'ys, Inc., No. CV 07-142-SLR, 2012 WL 13224508, at *4 (D. Del. May 31, 2012) (awarding 33% of 17.25 million settlement fund in attorneys' fees).  Given this precedent, the NAS Monitoring Trust Fees of 15% (net of the Common Benefit Fund contribution) are clearly reasonable.

61.     Similarly, with respect to the NAS PI Fees, the contemplated payments are not intended to fully compensate the NAS Committee for its efforts to negotiate a separate fund to be distributed to the holders of NAS PI Opioid Claims pursuant to the separate NAS PI TDP, which included participating in mediation sessions and drafting the PI Trust Documents.  Instead, it is the product of a negotiated settlement with the PI Ad Hoc and the other Mediation Parties and is significantly less than the fees incurred by the NAS Committee in connection with the PI Trust and minuscule compared to the fees of other constituency in these Chapter 11 Cases.

62.     Finally, bankruptcy courts have approved plan provisions similar to the payments contemplated by the NAS Attorney Fee Provisions.  See, e.g., In re Purdue Pharma L.P., No. 19-23649 (RDD), 2021 WL 4240974, at *8–9 (Bankr. S.D.N.Y. Sept. 17, 2021) (discussed in Section III below); In re Adelphia Commc'ns Corp., 441 B.R. 6, 22 (Bankr. S.D.N.Y. 2010) (noting that section 1129(a)(4) permits payment of "reasonable fees" of certain creditors where, as here, "the provision for fees is an element of a chapter 11 reorganization plan"); In re AMR Corp., 497 B.R. 690, 694-96 (Bankr. S.D.N.Y. 2013) (following Adelphia and concluding that professional fees for individual committee members provided for in a plan that was overwhelmingly accepted by creditors were permitted under sections 1129(a)(4) and 1123(b)(6) and would be approved); In re Paragon Offshore PLC, Case No. 16-10386 (CSS) (Bankr. D. Del. June 7, 2017) [Docket No. 1614], ¶ Q (holding that creditor attorneys' fees were acceptable under similar circumstances). Moreover, the AMR court specifically noted that section 1129(a)(4) "endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual resolution and get a plan approved." AMR, 497 B.R. at 695.

63.     In this case, the case law clearly establishes the reasonableness of the NAS Attorney Fee Provisions, as does the fact that the Plan was overwhelmingly accepted by Opioid Claimants.

Balloting Report, pp. 9-38. Accordingly, such provisions and the payments contemplated thereby can and should be approved in connection with Confirmation of the Plan.

### III.    The UST Objection's Reliance on <u>Lehman</u> is Misplaced, as the NAS Committee Fees Need not be Approved under Section 503 of the Bankruptcy Code

64.    The UST Objection alleges that the NAS Committee Fees must be analyzed under section 503 of the Bankruptcy Code notwithstanding the fact that a mere six weeks ago the <u>Purdue</u> court expressly rejected the remarkably similar argument by the UST in confirming the Purdue plan.  Specifically, the court in <u>Purdue</u> held:

> The U.S. Trustee's objection is misplaced in two respects. First, the bulk of the fees covered by section 5.8 are not for postpetition work (and therefore not an "administrative expense" covered by section 503(b)(3) and (4)) but rather for prepetition work in raising and pursuing claims against the Debtors and to some extent the Sacklers, including in the multi-district litigation that was pending prepetition in the United States District Court for the Northern District of Ohio. Unsecured creditors' claims for collection of their prepetition costs, including of attorneys' fees and expenses, as well as rights under applicable non-bankruptcy law, such as on a "common benefit" basis, are enforceable in bankruptcy without the need to comply with subsections 503(b)(3) and (4) of the Bankruptcy Code, which, again, apply only to administrative expenses. <u>In re United Merchs. & Mfrs., Inc.</u>, 674 F.2d 134, 138 (2d Cir. 1982).
>
> The U.S. Trustee's objection also is misplaced because the remaining fees to be paid under section 5.8 also are not being sought as an administrative expense payable on the plan's effective date (as would be required under section 1129(a)(9)(A) of the Bankruptcy Code if they were being sought as administrative expenses) but rather as part of a heavily negotiated compromise of those fees and the clients' obligation to pay them reached during the mediation in this case conducted by Kenneth R. Feinberg and Hon. Layn R. Phillips (ret.).
>
> The settlements provided for in section 5.8 that resulted from the mediation are subject to this Court's review both under Bankruptcy Rule 9019 and, I believe -- although there are arguments to the contrary -- under section 1129(a)(4) of the Bankruptcy Code, as has been so recognized in this district.  <u>See</u> <u>In re Stearns Holdings, LLC,</u>

607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019); In re Sabine Oil & Gas Corp., 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016).

The U.S. Trustee relies upon a case that is clearly distinguishable, Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings, Inc.), 508 B.R. 283 (S.D.N.Y. 2014), in which the district court noted that Congress specifically precluded in Bankruptcy Code section 503(b)(3)(D) recovery by official creditors' committee members of their postpetition fees and expenses, and therefore any settlement of those expenses would have been an improper workaround of that provision. Id. at 288-91.

Purdue Pharma, 2021 WL 4240974 at *8–9.[22]

65.    The UST makes no effort to distinguish this case from Purdue, likely because the facts are identical.  See OCC Reply.  As in Purdue, section 503(b)(3) is not applicable as the NAS Committee Fees as such fees are not being allowed under the Plan as administrative expenses pursuant to section 503(b)(3) of the Bankruptcy Code.  Rather, the fees are being paid as part of the distributions to creditors pursuant to the overarching Plan settlement.  In the absence of these proposed payments and related settlements, the Debtors would likely not have been able to achieve consensus with respect to payment of Opioid Claims under the Plan.

66.    The UST Objection alleges that section 503(b)(3) of the Bankruptcy Code is only way in which the NAS Committee Fees may be paid.  This, however, is not the case.  See Purdue Pharma, 2021 WL 4240974 at *8–9; Adelphia, 441 B.R. at 12 ("But importantly, section 503(b) does not provide, in words or substance, that it is the only way by which fees of this character may be absorbed by an estate").  Indeed, as set forth above and by the Purdue court, the NAS Committee Fees may be paid pursuant to section 1123(b)(6) of the Bankruptcy Code, which provides that a plan may contain "any other appropriate provision not inconsistent with the applicable provisions

---

[22]    While the Purdue Pharma decision is under appeal, none of the appellants (including the UST) are appealing the approval of the NAS attorney fee provisions.

of this title." 11 U.S.C. § 1123(b)(6). This is a "broad grant of authority" and "reorganization plans, after they get the requisite assent, may allocate and distribute the value of the debtors' estates by a broad array of means." <u>Adelphia</u>, 441 B.R. at 18.

67.     Moreover, the funds will be paid out of creditor distributions pursuant to the NAS Monitoring Attorney Fee Fund and the PI Trust. Significantly, as in <u>Purdue Pharma</u> and <u>Adelphia</u>, the payment of the relevant professional fees was negotiated during the settlement discussions and is an integral part of the Plan and Plan settlement. <u>Purdue Pharma</u>, 2021 WL 4240974 at *8–9; <u>Adelphia</u>, 441 B.R. at 9-10; <u>see also</u> <u>Mediator's Report</u> at ¶ 13 ("All parties have informed the Mediator that these various fee resolutions are an integral and non-severable part of the overall settlements regarding allocation among public and private Opioid Claimants, and that the settlements reached regarding allocation indeed are dependent on the various agreements reached pertaining to contingency fees and common benefit funding"). Thus, the NAS Committee Fees "may be paid, where . . . the provision for fees is an element of the chapter 11 reorganization plan." <u>Adelphia</u>, 441 B.R. at 9; <u>see also</u> <u>Purdue Pharma</u>, 2021 WL 4240974 at *8–9.

68.     In addition, all parties with an economic stake agreed to the amounts and payments of the NAS Committee Fees as part of lengthy and contentious mediation, evidenced by the fact that no creditor or other party with a material economic stake in these Chapter 11 Cases objected to the NAS Committee Fees. <u>See also</u> <u>In re AMR Corp.</u>, 497 B.R. 690, 695-96 (Bankr. S.D.N.Y. 2013) (citing <u>Adelphia</u> and finding that reasonable professional fees contemplated under a consensual plan were permissible under sections 1129(a)(4) and 1123(b)(6) and "approved given the overwhelming support of the [p]lan by creditors.").[23]

---

[23]     The <u>AMR</u> court further stated that section 1129(a)(4) "**endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual** resolution and get a plan approved. Taken together [with Bankruptcy Code section 1123(a)(6)], these two provisions contemplate payments as part of a plan of reorganization to be put before creditors for approval. <u>AMR</u>, 497 B.R. at 695 (emphasis added).

69.     Ignoring Purdue Pharma, Adelphia and AMR, the UST instead relies on In re

Lehman Bros. Holdings Inc., 508 B.R. 283, 286 (S.D.N.Y. 2014), a decision which, to the best of

the NAS Committee's knowledge, has not been followed by any other court and is of no

precedential value in this case.  However, a number of cases post-Lehman have allowed creditor

fees to be paid through a consensual plan.  For example, with respect to certain noteholders'

attorneys' fees, Judge Sontchi noted that:

> I am going to endorse, however, Judge Gerber's holding in
> Adelphia, and find that, under 1123(b)(6) and 1129(a)(4), these fees
> can be paid as a piece of this global settlement of this case, which
> was a tremendous accomplishment; a result of a lot of hard work, a
> lot of compromise, a lot of hard work by Judge Carey, but a lot of
> hard work by the professionals and the businesspeople for the
> various constituents. So I think that to blow that up wouldn't serve
> anybody's purposes, except that of chaos, and this case has had
> enough chaos. So I will endorse Judge Gerber's holding in Adelphia.

In re Paragon Offshore PLC, Case No. 16-10386 (CSS) (Bankr. D. Del.), June 7, 2017 Hr'g. Tr.,

at 148:10-25, 149:1-2.  At least one other court has held the same.[24]  Similarly, as in Paragon, the

Plan settlement in the Chapter 11 Cases was the result of the hard work of numerous parties,

including the NAS Committee and the Mediator.

70.     As recognized by the Purdue Pharma court, Lehman is also factually

distinguishable as it dealt with the payment of individual official creditor committee member

attorneys' fees, which that court found was "explicitly exclude[d]" from payment as administrative

expenses by the Bankruptcy Code.  Lehman, 508 B.R. at 290; Purdue Pharma, 2021 WL 4240974

---

[24]     See, e.g., In re Legend Parent, Inc., Case No. 14-10701 (RG) (Bankr. S.D.N.Y. July 21, 2014) [Docket No.
390, ¶ 58] ("Notwithstanding any provision in the Plan to the contrary, on the Effective Date or as soon thereafter as
agreed to by the Debtors, the First Lien Agent and the Required Consenting Holders, the Debtors shall promptly pay
in full in Cash…the accrued, unpaid, reasonable, invoiced fees and out-of-pocket expenses incurred by the
professionals retained by the Consenting Noteholders, Blackstone Advisory Partners L.P., and Akin Gump Strauss
Hauer & Feld LLP in their respective capacities as such through the Effective Date, in each case, without the need of
such parties to file fee applications with the Bankruptcy Court or motions seeking payment of such fees as
administrative claims pursuant to Bankruptcy Code section 503(b)…").

at *8–9; Also, unlike in <u>Lehman</u>, the NAS Committee's fees are not being paid as proposed administrative expenses, but are being paid out of creditor distributions, as set forth above.

71.    Thus, given the paramount importance of Plan settlement, in addition to the disclosure and reasonableness of the NAS Committee's fees, the UST Objection should be overruled and the Plan should be confirmed.

**IV.    Joinder to OCC Reply**

72.    The NAS Committee hereby joins the OCC Reply and its arguments as if fully set forth herein and requests that the Court confirm the Plan.

## <u>CONCLUSION</u>

73.    The NAS Committee respectfully requests that the Court deny the Objection, confirm the Plan, and approve the NAS Attorney Fee Provisions included therein.

Dated:    October 26, 2021          Respectfully submitted
          Wilmington, Delaware
                                     BIELLI & KLAUDER, LLC

                                     <u>/s/ *David M. Klaude*r</u>
                                     David M. Klauder (No. 5769)
                                     1204 N. King Street
                                     Wilmington, DE 19801
                                     Telephone: 302-803-4600
                                     Email: dklauder@bk-legal.com

                                     LEVENFELD PEARLSTEIN, LLC
                                     Harold D. Israel
                                     2 North LaSalle St., Suite 1300
                                     Chicago, Illinois 60602
                                     Telephone: 312-346-8380
                                     Facsimile: 312-346-8434
                                     hisrael@lplegal.com

                                     MARTZELL, BICKFORD & CENTOLA
                                     Scott R. Bickford (LA 1165)
                                     Spencer R. Doody (LA 27795)
                                     338 Lafayette Street
                                     New Orleans, LA 70130

Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com
srd@mbfirm.com

LAW OFFICES OF KENT HARRISON
ROBBINS, P.A.
242 Northeast 27th Street
Miami, FL 33137
Telephone: 305-532-0500
Facsimile: 305-531-0150
khr@khrlawoffices.com

CREADORE LAW FIRM PC
450 Seventh Avenue, 14th Floor
New York, NY 10123
Telephone: 212.355.7200
Donald Creadore, Esq. (NY 2090702)
donald@creadorelawfirm.com


*Counsel to the NAS Committee*