## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

## DEBTORS' (A) MEMORANDUM OF LAW
## IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT
## PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND
## ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY
## CODE AND (B) OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION

---

[1]  A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http: //cases.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

## TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................5

I.     Prepetition Litigation Against the Debtors and Related Parties. ............................5

II.    Prepetition Negotiations, the Restructuring Support Agreement, the Federal/State Acthar Settlement, and the Opioid Settlement. .................................7

III.   Filing of the Chapter 11 Cases, the Initial Plan of Reorganization, Disclosure Statement, and Related Documents. ........................................................9

IV.   Postpetition Developments, Negotiations, and Settlements. ................................11

V.    The Voting Report. ..............................................................................14

THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION UNDER THE BANKRUPTCY CODE ............................................................................................16

I.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(1) of the Bankruptcy Code. ...........................16

    A.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. .....................................................................17

    B.    The Plan Satisfies the Seven Requirements of Section 1123(a) of the Bankruptcy Code. .....................................................................22

    C.    The Discretionary Contents of the Plan are Appropriate. ..........................25

    D.    The Settlement, Release, Injunction, and Exculpation Provisions are Integral Components of the Plan. ............................................................26

II.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(2) of the Bankruptcy Code. ...............93

III.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Accordance with Section 1129(a)(3) of the Bankruptcy Code. ...........94

IV.   The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments in Accordance with Section 1129(a)(4) of the Bankruptcy Code. ........97

V.    The Debtors Will Disclose the Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy in Accordance with Section 1129(a)(5) of the Bankruptcy Code. ..............................................................................98

VI.      The Plan Does Not Require Governmental Regulatory Approval in Accordance with Section 1129(a)(6) of the Bankruptcy Code.................................................100

VII.     The Plan is in the Best Interests of Creditors and Interest Holders in Accordance with Section 1129(a)(7) of the Bankruptcy Code.................................................100

VIII.    Acceptance of Impaired Classes in Accordance with Section 1129(a)(8) of the Bankruptcy Code. ............................................................................................103

IX.      The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims in Accordance with Section 1129(a)(9) of the Bankruptcy Code.................................................................................................................104

X.       At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders, in Accordance with Section 1129(a)(10) of the Bankruptcy Code. ............................................................................................106

XI.      The Plan is Feasible in Accordance with Section 1129(a)(11) of the Bankruptcy Code.................................................................................................................106

         A.      The Plan's Post-Emergence Structure is Feasible. ...................................108

         B.      The Plan's Treatment of Claims that May be Filed in the Future is Proper and the Provisions Establishing Trusts to Address Purported Claims are Feasible. ...................................................................................................111

XII.     The Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 in Accordance with Section 1129(a)(12) of the Bankruptcy Code..........................115

XIII.    The Plan Provides for Continued Payment of All Retiree Benefits in Accordance with Section 1129(a)(13) of the Bankruptcy Code.............................................115

XIV.     Sections 1129(a)(14), (a)(15), and (a)(16) of the Bankruptcy Code are Inapplicable......................................................................................................116

XV.      The Plan Satisfies the "Cramdown" Requirements of Section 1129(b) of the Bankruptcy Code. .............................................................................................116

         A.      The Plan is Fair and Equitable with Respect to Each Impaired Class that Has Not Voted to Accept the Plan..........................................................117

         B.      The Plan Does Not Unfairly Discriminate with Respect to Any Impaired Class that Has Not Voted to Accept the Plan. .........................................118

XVI.     The Purpose of the Plan is Not the Avoidance of Taxes or the Avoidance of the Securities Laws in Accordance with Section 1129(d) of the Bankruptcy Code..141

OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION ................................................142

         I.      The Pension Trust's Section 1123(a)(4) Argument Should be Overruled. .........143

II.     The Objections to the Plan as Not Satisfying the Best-Interests Test in Accordance with Section 1129(a)(7) of the Bankruptcy Code Should be Overruled. ...................................................................................................146

        A.      The Debtors Fail to Provide Any Plausible Evidence that They Would Receive More Value in a Chapter 7 Liquidation than Under the Plan. ...147

        B.      The Debtors Rightfully Excluded the Claims Released Pursuant to the Third-Party Releases from the Best-Interests Analysis Because They are Not Claims Against the Debtors. ............................................................148

        C.      The Released Rights and Claims of Rhode Island and the DMPs are Too Speculative to be Included in the Debtors' Liquidation Analysis Even if it Were Appropriate to Do So. .................................................................151

        D.      Even Assuming the Trudeau Claims were Not Too Speculative to be Included in the Liquidation Analysis, the Plan Would Still Satisfy the Best-Interests Test. .................................................................................156

        E.      Sanofi Would Not Receive a Greater Recovery in Chapter 7 Than it Will Under the Plan. ......................................................................................160

III.    The Objections to the Plan as Not Satisfying the Feasibility Requirement in Accordance with Section 1129(a)(11) of the Bankruptcy Code Should be Overruled. ...................................................................................................161

        A.      The Acthar Insurance Claimants' Request for Administrative Expense Claims Will Not Affect the Feasibility of the Plan. ................................161

        B.      The Debtors Will Have Sufficient Cash on Hand on the Effective Date to Pay Any Allowed Administrative Claims. .............................................162

        C.      A Continued Obligation to Make Royalty Payments to Sanofi Will Not Adversely Affect the Feasibility of the Plan. ...........................................162

        D.      The DMP Group's Threat to Discontinue Business with the Debtors Will Not Adversely Affect the Feasibility of the Plan. ....................................163

        E.      The Ad Hoc Acthar Group's Arguments Against Plan Feasibility Have No Merit. .................................................................................................164

IV.     The Objections to the MIP are Meritless and Should be Overruled. ...................166

        A.      The MIP Does Not Violate the Absolute Priority Rule. ..........................166

        B.      The MIP Was Proposed in Good Faith. ..................................................168

V.      The Plan's Treatment of Insurance is Consistent with Applicable Law. ............170

        A.      Insurers Have No Right to an Insurance "Neutral" Plan. ........................170

US-DOCS\126024798.18

B.    The Additional Concerns Raised by the Insurers Do Not Render the Plan Unconfirmable. .......................................................................................173

VI.    Payment of the Plan Fees is Appropriate.............................................................176

VII.    The Pension Trust Does Not Have Standing to Object to the Third-Party Releases. ...............................................................................................................183

A.    The Pension Trust Does Not Have Standing to Object to the Third-Party Releases Because it Has Already Opted Out of Such Releases...............183

B.    The Pension Trust Does Not Have Standing to Opt Out of the Third-Party Releases or Object to the Plan on Behalf of the Putative Class. ....184

VIII.    The Allegations Raised by Darrel Edelman Do Not Render the Plan Unconfirmable. ..................................................................................................187

CONCLUSION.............................................................................................................191

US-DOCS\126024798.18

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re 203 N. LaSalle St. Ltd. P'ship*,
    190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. 203 N. LaSalle II*,
    526 U.S. 434 (1999) .................................................................................................127

*In re 710 Long Ridge Rd. Operating Co., II LLC*,
    No. 13-13653, 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ..............................................84

*In re A.H. Robins Co., Inc.*,
    880 F.2d 694 (4th Cir. 1989) ...........................................................................76, 80

*In re AAI Pharma*,
    No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) .................................................39, 40, 42

*In re Adelphia Bus. Sols., Inc.*,
    341 B.R. 415 (Bankr. S.D.N.Y. 2003) ................................................................................114

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................................107

*In re Adelphia Commc'ns Corp.*,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) ....................................................................................188

*Aetna Cas. & Sur. Co. v. Clerk of U.S. Bankr. Court (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ................................................................................................19

*In re Am. Fam. Enterprises*,
    256 B.R. 377 (D.N.J. 2000) .................................................................................76, 80, 91

*In re American Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ................................................................................105

*In re AMR Corp.*,
    497 B.R. 690 (Bankr. S.D.N.Y. 2013) .........................................................................187, 188

*In re Anna Holdings, Inc.*,
    Case No. 19-12551 (CSS) (Bankr. D. Del. Dec. 16, 2019) ..................................................187

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ..........................................................................................77

*In re Arclin Us Holdings Inc.*,
    Case No. 09-12628, 2011 WL 6013665 (Bankr. D. Del. Nov. 24, 2011) .......................26, 105

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ............................................................................17, 113, 129

i

*In re Armstrong World Industs., Inc.*,
    432 F.3d 507 (3d Cir. 2005)...............................................................................176

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................130

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999).................................................................101, 106, 125, 131

*Bank of N.Y., Mellon Trust Co., N.A. v. Becker (In re Lower Bucks Hosp.)*,
    488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ................77

*In re Bergman*,
    585 F.2d 1171 (2d Cir. 1978).............................................................................114

*In re Blitz U.S.A., Inc.*,
    No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014)...................79, 93

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) ..................................................................127

*In re Boy Scouts of Am. and Delaware BSA, LLC*,
    Case No. 20-10343 (Bankr. D. De. Sept. 28, 2021) ............................................181

*Brandhorst v. Trudeau, et al.*,
    Case No. 19-cv-02778 (D.D.C.) ..................................................................75, 162

*In re Capmark Fin. Grp. Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ....................................................................36

*Case v. L.A. Lumber Prods. Co.*,
    308 U.S. 106 (1939).............................................................................................29

*In re Cellular Information Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994).................................................................31

*Celotex Corp. v. Edwards*,
    514 U.S. .........................................................................................................72, 73

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)....................................................... *passim*

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015)...................................................................61

*In re Checkout Holding Corp.*,
    Case No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019).....................................176

*In re City of Detroit*,
    524 B.R. 147 (Bankr. E.D. Mich. 2014)..............................................................144

*In re Clarkson*,
    767 F.2d 417 (8th Cir. 1985) ................................................................................114

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004)............................................................... *passim*

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................194

*In re Continental Airlines*,
    203 F.3d 203 (3d Cir. 2000)............................................................... *passim*

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ..................................................100

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ..........................................19, 67

*CoreStates Bank, N.A. v. United Chem. Tech., Inc.*,
    202 B.R. 33 (E.D. Pa. 1996) ...............................................................114

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.*
    *Chinery*,
    330 F.3d 548 (3d Cir. 2003)................................................................79

*In re Dana Corp.*,
    412 B.R. 53 (Bankr. S.D.N.Y. 2008) .................................................155

*David v. Weinstein Co. Holdings, LLC*,
    2021 WL 979603 (D. Del. March 16, 2021)...........................75, 87, 88

*In re David's Bridal, Inc.*,
    Case No. 18-12635 (LSS) (Bankr. D. Del. Jan. 4, 2019)....................176

*In re DBSD North America, Inc.*,
    419 B.R. 114 (Bankr. S.D.N.Y. 2009) ................................................40

*In re Dendreon Corp.*,
    Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014)................188

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
    634 F.3d 79 (2d Cir. 2010)..................................................................172

*In re Ditech Holding Corp*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019).............................158, 160, 163

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) ...............................................................80

*In re Dow Corning Corp.*,
    287 B.R. 396 (E.D. Mich. 2002)..........................................................80

*In re Dow Corning Corp.*,
    86 F.3d 482 (6th Cir. 1996) ......................................................................95

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................103, 107, 115

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)...............................................................80, 109

*In re DRW Prop. Co. 82*,
    60 B.R. 505 (Bankr. N.D. Tex. 1986).........................................................18

*In re Dune Deck Owners Corp.*,
    175 B.R. 839 (Bankr. S.D.N.Y. 1995)......................................................172

*In re Duro Dyne Nat'l Corp.*,
    No. 3:19-cv-15433 (D.N.J. Oct. 23, 2020) ..................................................95

*In re DVR, LLC*,
    582 B.R. 507 (Bankr. D. Colo. 2018) ...............................................199, 200

*In re Dynegy, Inc.*,
    770 F.3d 1064 (2d Cir. 2014)............................................................193, 194, 195

*Earth Pride Organics, LLC v. Off. Comm. of Unsecured Creditors of EarthPride Organics, LLC*,
    No. BR 17-13816, 2021 WL 1553787 (E.D. Pa. Apr. 20, 2021)...........................130

*In re Eddington Thread Mfg. Co.*,
    181 B.R. 826 (E.D. Penn. 1995) ...........................................................114

*In re Elsinore Shore Assocs.*,
    91 B.R. 238 (Bankr. D.N.J. 1988) ................................................103, 160

*In re Emerge Energy Services LP*,
    Case No. 19-11563 (KBO) (Bankr. D. Del. Dec. 18, 2019)..................................176

*In re Emerge Energy Servs. LP*,
    2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) (KBO)..........................54, 61, 62

*In re Energy Future Holdings Corp.*,
    648 F. App'x 277 (3d Cir. 2016) ...........................................................154

*In re Energy Future Holdings Corp.*,
    Case No. 14-10979 (Bankr. D. Del. Dec. 8, 2015) ................................................82

*In re EV Energy Partners, L.P.*,
    Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) ..................................187

*In re EV Energy Partners, L.P.*,
    No. 18-10814 (Bankr. D. Del. May 17, 2018).......................................46, 63, 176

*In re EveryWare Glob., Inc.*,
No. 15-10743 (Bankr. D. Del. May, 22, 2015) .........................................................................46

*In re Exide Holdings, Inc.*,
2021 WL 3145612 (Bankr. D. Del. 2021) ...........................................................................151

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ............................................................................125, 131

*In re Extraction Oil & Gas, Inc.*,
Case No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) ...................................................188

*In re Fallbrook Technologies Inc.*,
Case No. 18-10384 (MFW) (Bankr. D. Del. Jun. 11, 2018)...................................................176

*In re Federal-Mogul Global Inc.*,
2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) .....................................................181, 184

*In re Federal-Mogul Global, Inc.*,
684 F.3d 355 (3d Cir. 2012)..................................................................................................185

*Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*,
209 F.3d 252 (3d Cir. 2000).........................................................................................163, 164

*In re FormTech Indus., LLC*,
439 B.R. 352 (Bankr. D. Del. 2010) .....................................................................................163

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2007) ...................................................................................100

*In re Freedom Rings, L.L.C.*,
No. 05-14268 (Bankr. D. Del. May 9, 2006) (CSS) ........................................................38, 66

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................................127

*Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993)......................................................................................................19

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014).......................................................................75, 76, 86

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) .............................................................................. *passim*

*Gentry v. Circuit City Stores, Inc. (In re Circuit City Stores, Inc.)*,
*439 B.R. 652* (E.D. Va. 2010) .................................................................................................61

*In re Gibson Brands*,
Case No. 18-11025 (Bankr. D. Del.) (CSS)............................................................................47

US-DOCS\126024798.18

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) (*en banc*) ...................................................................79

*In re Global Indus. Techs., Inc.*,
    No. 02-21626, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013).......................79

*In re GNC Holdings, Inc., et al.*,
    Case No. 20-11662 (Bankr. D. Del.) ....................................................................28

*Grogan* v. *Garner*,
    498 U.S. 279 (1991).............................................................................................17

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) ..................................................................155

*In re Heritage Org., LLC*,
    375 B.R. 230 (Bankr N.D. Tex. 2007)................................................199, 200, 201

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ........................................................ *passim*

*In re Insys Therapeutics, Inc.*,
    Case No. 19-11292 (Bankr. D. Del.) (KG) ...........................................................47

*In re Insys Therapeutics, Inc.*,
    Case No. 19-11292 (KG) ......................................................................................64

*In re J.T. Thorpe, Inc.*,
    No. 2:05-cv-02412 (C.D. Cal., Jan. 17, 2006) ......................................................95

*Matter of Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)...............................................................................22

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993).........................................................................18, 124

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009)................................................................148

*In re JRV Group USA L.P.*,
    Case No. 19-11095 (Bankr. D. Del.) (CSS).........................................................46

*In re Kaiser Aluminum Corp.*,
    No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006).............19, 79, 184

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)...............................................................................194

*In re Kaplan*,
    104 F.3d 589 (3d Cir. 1997)...............................................................................114

US-DOCS\126024798.18

*United States of America et al. ex rel. Landolt v. Mallinckrodt Pharmaceuticals Inc.*,
    No. 18-11931-PBS (D. Mass.) ................................................................................6

*Law Debenture Tr. Comp. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*,
    339 B.R. 91 (D. Del. 2006) .............................................................................199

*In re Leslie Controls*,
    2011 WL 1901547 (Bankr. D. Del. Jan. 18, 2011) .............................................181

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ....................................................113, 115

*In re Libbey Glass Inc.*,
    Case No. 20-11439 (LSS) (Bankr. D. Del. Oct. 20, 2020) ..................................176

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) .....................103

*In re Louise's, Inc.*,
    211 B.R. 798 (D. Del. 1997) ..............................................................................30

*In re Lyondell Chemical Co.*,
    Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 17, 2010) ..............................189

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) .........................................................................80, 95

*In re Machne Menachem, Inc.*,
    371 B.R. 63 (Bankr. M.D. Pa. 2006) ................................................................115

*In re Magnatrax Corp.*,
    No. 03-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003) ..............19, 21

*In re Marvel Entm't Group, Inc.*,
    222 B.R. 243 (D. Del. 1998) .......................................................................30, 39

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ...........................................38, 76, 87, 91

*In re Mattress Firm, Inc.*,
    Case No. 18-12241 (CSS) (Bankr. D. Del. Nov. 16, 2018) ................................176

*In re Mayer Pollack Steel Corp.*,
    174 B.R. 414 (Bankr. E.D. Pa. 1994) ...............................................................114

*In re Medford Crossings N., LLC*,
    Case No. 07-25115, 2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011) ...................77

*Mercedes Homes*,
    431 B.R. at 881 .......................................................................................82, 83

*In re Mesa Air Grp., Inc.*,
   Case No. 10-10018 MG, 2011 WL 182450 (Bankr. S.D.N.Y. Jan. 20, 2011) ........................99

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005)...........................................................................................80

*Meyers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996)........................................................................................30, 39

*In re Millennium Lab Holdings II, LLC*,
   543 B.R. 703 (Bankr. D. Del. 2016) ...............................................................................80, 83

*In re Millennium Lab Holdings II, LLC*,
   562 B.R. 614 (Bankr. D. Del. 2016) ....................................................................................73

*In re Millennium Lab Holdings II, LLC*,
   575 B.R. 252 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re
   Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019) ..........................................73

*In re Millennium Lab Holdings II, LLC*,
   591 B.R. 559 (D. Del. 2018)...............................................................................................80

*In re Millennium Lab Holdings II, LLC.*,
   945 F.3d 126 (3d Cir. 2019).......................................................................................... *passim*

*In re MPM Silicones, LLC*,
   Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014).............................................189

*In re MPM Silicones, LLC*,
   No. 14-25503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014).........................77

*Mt. McKinley Ins. Co. v. Pitt. Corning Corp.*,
   518 B.R. 307 (W.D. Pa. 2014).........................................................................................181

*Mullarkey v. Tamboer (In re Mullarkey)*,
   536 F.3d 215 (3d Cir. 2008)..............................................................................................73

*In re Neshaminy Office Bldg. Assocs.*,
   62 B.R. 798 (E.D. Pa. 1986) .............................................................................................30

*In re New Power Co.*,
   438 F.3d 1113 (11th Cir. 2006) .......................................................................................153

*In re NII Holdings, Inc.*,
   288 B.R. 356 (Bankr. D. Del. 2002) .................................................................................113

*In re Northwest Hardwoods, Inc.*,
   Case No. 20-13005 (CSS) (Bankr. D. Del. Jan. 6, 2021) ...................................................176

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988)........................................................................................................125

*In re Nuverra Env't Sols., Inc.*,
    590 B.R. 75 (D. Del. 2018), aff'd, 834 F. App'x 729 (3d Cir. 2021) .............130, 131, 142, 147

*In re Orlando Investors, L.P.*,
    103 B.R. 593 (Bankr. E.D. Pa. 1989) ..................................................................193

*In re Orleans Homebuilders, Inc.*,
    561 B.R. 46 (Bankr. D. Del. 2016) .......................................................................99

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984), *rev'd on other grounds*.................................38, 72, 73

*In re Paragon Offshore PLC*,
    Case No. 16-10386 (CSS) (Bankr. D. Del. June 7, 2017) ....................................187

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1102 (3d Cir. 1979).........................................................................29, 30

*In re Penn Virginia Corporation*,
    No. 16-32395 (Bankr. E.D. Va. June 13, 2016).................................................191

*In re Philadelphia Newspapers, LLC*,
    407 B.R. 606 (E.D. Pa. 2009) ..............................................................................76

*In re Plant Insulation Co.*,
    No. 09-31347 (Bankr. N.D. Cal. Feb. 28, 2014)..................................................95

*In re PNG Ventures, Inc.*,
    Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010)........................................84, 89

*In re PNG Ventures, Inc.*,
    No. 09-13162, 2010 WL 2745952 (Bankr. D. Del. Mar. 12, 2010) ......................98

*Prin Corp. v. Altman (In re Altman)*,
    265 B.R. 652 (Bankr. D. Conn. 2001) ................................................................199

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968).............................................................................29, 30, 39

*In re Purdue Pharma L.P.*,
    No. 19-23649, 2021 WL 4240974 ............................................................ *passim*

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).........................................................99, 100, 176, 194

*In re QHB Holdings, LLC*,
    Case No. 09-14312, 2010 WL 2859780 (Bankr. D. Del. Jan. 15, 2010)................99

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................158, 160, 162

US-DOCS\126024798.18

*In re Quigley Co., Inc.*,
  676 F.3d 45 (2d Cir. 2012)..............................................................74, 95

*In re Quiksilver Inc.*,
  No. 15-11880 (Bankr. D. Del. Jan. 29, 2016)...........................................46

*In re Residential Cap., LLC*,
  508 B.R. 838 (Bankr. S.D.N.Y. 2014)...................................................84

*In re Resorts Int'l, Inc.*,
  372 F.3d 154 (3d Cir. 2004)............................................................73

*In re Retail Group, Inc.*,
  2021 WL 962553 (Bankr. E.D. Va. 2021)..........................................193, 194

*In re Reva Medical, Inc.*,
  Case No 20-10072 (JTD) (Bankr. D. Del. Feb 19, 2020).........................................99

*Rhode Island v. Mark C. Trudeau*,
  C.A. No. PC 2020-7056 (R.I. Super. Ct.).......................................75, 169

*Rhode Island v. Mark C. Trudeau. C.A.*,
  No. PC 2020-7056 (R.I. Super. Ct., Oct. 8, 2020).....................................87

*In re River Vill. Assocs.*,
  161 B.R. 127 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) ........................102

*RWNIH-DL 122nd St. 1 LLC v. Futterman (In re Futterman)*,
  2019 Bankr. LEXIS 1872 (Bankr. S.D.N.Y. Jun. 20, 2019) .................................199

*In re S & W Enter.*,
  37 B.R. 153 (Bankr. N.D. Ill. 1984) ..................................................18

*In re S.S. Body Armor I Inc.*,
  961 F.3d 216 (3d Cir. 2020)...........................................................189

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016).................................................189

*In re Sea Launch Co., L.L.C.*,
  No. 09-12153, 2010 Bankr. LEXIS 5283 (Bankr. D. Del. July 30, 2010) ..........................123

*Seaside Eng'g*,
  780 F.3d 1070 (11th Cir. 2015) ..............................................82, 83, 90

*In re Seventy Seven Fin. Inc.*,
  No. 16-11409 (Bankr. D. Del. July 14, 2016).........................................46

*Solomon v. Mallinckrodt Public Limited Company, et al.*,
  Case No. 17-cv-01827 (D.D.C.) .......................................................75

x

*Solomon v. Mallinckrodt Public Limited Company, et al.*,
    Case No. 17-cv-02042 (E.D. Mo.) .................................................................75, 162

*In re Southeastern Grocers, LLC*,
    No. 18-10700 (MFW) (Bankr. D. Del. May 14, 2018)......................................187

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) .............................................................. *passim*

*In re Stearns Holdings, LLC*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019)................................................................189

*Strougo v. Mallinckrodt Public Limited Company, et al.*,
    Case No. 19-cv-07030 (S.D.N.Y.)...............................................................75, 162

*Strougo v. Mallinckrodt Public Limited Company, et al.*,
    Case No. 20-cv-10100 (D.N.J.) ...........................................................................75

*In re Sun Edison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)..................................................................61

*In re T-H New Orleans Ltd. P'ship*,
    116 F.3d 790 (5th Cir. 1997) ..............................................................................114

*In re TerraVia Holdings, Inc.*,
    Case No. 17-11655 (CSS) (Bankr. D. Del. January 8, 2018) ..............................187

*In re Terrestar Networks Inc.*,
    No. 10-15446 (SHL) (Bankr. S.D.N.Y. Oct. 19, 2010)......................................188

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) .................................................................114

*In re The Weinstein Company Holdings, LLC*,
    Case No. 18-10601 (Bankr. D. Del.) ....................................................................28

*Things Remembered, Inc. v. Petrarca*,
    516 U.S. 124 (1995)..............................................................................................73

*In re Thorpe Insulation Co.*,
    No. 07-20016 (Bankr. C.D. Cal. Feb. 1, 2010).....................................................95

*In re TK Holdings Inc.*,
    Case No. 17-11375 (Bankr. D. Del.) (BLS) .....................................................76, 81

*In re TK Holdings Inc.*,
    Case No. 17-11375 (BLS), 2018 WL 1306271 (Bankr. D. Del. Mar. 13, 2018) ...................82

*In re TK Holdings Inc.*,
    No. 17-11375 (Bankr. D. Del. Feb. 21, 2018) .......................................................80

US-DOCS\126024798.18

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) ............................................................... *passim*

*In re Tribune Co.*,
   972 F.3d 228 (3d. Cir. 2020)................................................................127, 128, 130

*In re Tribune Co.*,
   972 F.3d 242 ..................................................................................................130, 142

*In re Tribune Co.*,
   972 F.3d 242-243 .......................................................................................................131

*In re Tribune Co.*,
   972 F.3d 243 ..................................................................................................129, 134

*In re Tribune Co.*,
   972 F.3d 245 ..............................................................................................................128

*In re U.S. Fidelis, Inc.*,
   481 B.R. 503 (Bankr. E.D. Mo. 2012) ......................................................................80

*In re U.S. Truck Co.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ...................114

*U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*,
   No. 02 Civ. 2854 (MBM), 2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. July 28, 2003) ...........189

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990)..........................................................................................79, 114

*In re USEC Inc.*,
   Case No. 14-10475 (CSS) (Bankr. D. Del. Apr. 21, 2014) ...................................188

*In re VER Techs. Holdco LLC*,
   No. 18-10834 (Bankr. D. Del. July 26, 2018)..........................................................46

*In re Verso Corp.*,
   No. 16-10163 (Bankr. D. Del. June 23, 2016)..........................................................46

*In re W.R. Grace & Co.*,
   446 B.R. 96 (Bankr. D. Del. 2011) ..................................................................89, 99

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012)........................................................................... *passim*

*In re W.R. Grace & Co.*,
   Case No. 01-01139 (KG), 2016 WL 6137275 (Bankr. D. Del. Oct. 17, 2016).......................74

*In re W.R. Grace & Co.*,
   No. 01-1139 (JKF), 2011 WL 381942 (Bankr. D. Del. Jan. 31, 2011) ...................82

US-DOCS\126024798.18

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
  591 F.3d 164 (3d Cir. 2009)..............................................................72

*In re W.T. Grant & Co.*,
  699 F.2d 599 (2d Cir. 1983)..............................................................30

*In re Wash. Mut. Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...........................................*passim*

*In re Wash. Mut., Inc.*,
  461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part* 2012 WL 1563880
  (Bankr. D. Del Feb. 24, 2012) ........................................................100

*In re Washington Mut., Inc.*,
  Case No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012)...........26, 105

*In re Waterlink*,
  No. 03-11989 (Bankr. D. Del. July 7, 2004)........................................68

*White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*,
  450 B.R. 504 (Bankr. D. Del. 2011) ................................................61

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
  434 F.3d 639 (3d Cir. 2006)......................................................30, 39

*In re World Health Alts., Inc.*,
  344 B.R. 291 (Bankr. D. Del. 2006) ............................................29, 30

*In re WorldCom, Inc.*,
  No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)...............99, 103, 114

*In re Xerium Techs., Inc.*,
  Case No. 10-11031(KJC), 2010 WL 3313079 (Bankr. D. Del. May 12, 2010)...................99

*In re Zenith Electronics Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ......................................38, 61, 67, 82

## STATUTES

11 U.S.C. 1141(c) ..................................................................185

11 U.S.C. § 363(f)..................................................................169

11 U.S.C. § 502(a) .................................................................198

11 U.S.C. § 1123(a)(7)...........................................................25, 26

11 U.S.C. § 1129(b)(2)(B)(ii) ......................................................175

11 U.S.C. § 1129(b)(2)(C)(ii) ......................................................175

28 U.S.C. § 157(b)(1) ...............................................................73

28 U.S.C. § 157(b)(2)(L) ............................................................................77

28 U.S.C. § 1334(b) .............................................................................38, 72

28 U.S.C. § 1930 ......................................................................................122

Bankruptcy Code § 101(31) ....................................................................104

Bankruptcy Code § 105(a) ........................................................72, 79, 184

Bankruptcy Code § 363 ...........................................86, 133, 140, 169

Bankruptcy Code § 363(b) ...............................................................188, 189

Bankruptcy Code § 363(b)(1) ..................................................................191

Bankruptcy Code § 363(b) .......................................................................188

Bankruptcy Code § 502 .........................................197, 198, 199, 200

Bankruptcy Code § 503 ............................................................................187

Bankruptcy Code § 503(b) ...............................................................187, 188

Bankruptcy Code § 503(b)(3)(D) ............................................................188

Bankruptcy Code § 503(b)(4) ..................................................................188

Bankruptcy Code § 507(a) .......................................................................110

Bankruptcy Code § 1102 ...........................................................................10

Bankruptcy Code § 1103 ..........................................................................121

Bankruptcy Code § 1108 ...........................................................................10

Bankruptcy Code § 1114 ..........................................................................123

Bankruptcy Code § 1122 ..............................................17, 18, 19, 21

Bankruptcy Code § 1123 .....................................................................17, 18

Bankruptcy Code § 1123(a) ...................................................23, 25, 185

Bankruptcy Code § 1123(a)(1) ..................................................................24

Bankruptcy Code § 1123(a)(2) ..................................................................24

Bankruptcy Code § 1123(a)(3) ..................................................................24

Bankruptcy Code § 1123(a)(4) ....................................................... *passim*

Bankruptcy Code § 1123(a)(5) ....................................................... *passim*

US-DOCS\126024798.18

Bankruptcy Code § 1123(a)(6) ...........................................................................25

Bankruptcy Code § 1123(b) ..........................................................26, 27, 28, 29

Bankruptcy Code § 1123(b)(3)(A)........................................................... *passim*

Bankruptcy Code § 1123(b)(6) .....................................................27, 37, 188

Bankruptcy Code § 1125 .................................................................99, 100

Bankruptcy Code § 1125(e)........................................................97, 98, 99

Bankruptcy Code § 1126(c) .........................................................................109

Bankruptcy Code § 1126(f) ................................................................15, 109

Bankruptcy Code § 1126(g).....................................................16, 110, 135

Bankruptcy Code § 1129 .................................................................17, 126

Bankruptcy Code § 1129(a) .........................................................123, 124

Bankruptcy Code § 1129(a)(1) ...........................................................17, 18

Bankruptcy Code § 1129(a)(2) ...................................................................99

Bankruptcy Code § 1129(a)(3) .....................................................100, 102, 178

Bankruptcy Code § 1129(a)(4) ............................................................... *passim*

Bankruptcy Code § 1129(a)(5) .....................................................104, 105, 106

Bankruptcy Code § 1129(a)(5)(A)........................................................104, 105

Bankruptcy Code § 1129(a)(6) .........................................................................106

Bankruptcy Code § 1129(a)(7) ............................................................... *passim*

Bankruptcy Code section 1129(a)(7)(A) .........................................157, 158, 159, 160

Bankruptcy Code § 1129(a)(8) .....................................................109, 110, 124

Bankruptcy Code § 1129(a)(9) .....................................................110, 113

Bankruptcy Code section 1129(a)(9)(A) .........................................................189

Bankruptcy Code § 1129(a)(9)(C)........................................................112

Bankruptcy Code § 1129(a)(10) .....................................................110, 113, 126

Bankruptcy Code § 1129(a)(11) .....................................................113, 118, 122, 170

Bankruptcy Code § 1129(a)(12) .........................................................................122

Bankruptcy Code § 1129(a)(13) .......................................................................... 123

Bankruptcy Code §§ 1129(a)(14)-(16) ............................................................... 123

Bankruptcy Code § 1129(b) ........................................................................ *passim*

Bankruptcy Code Section 1129(b)(1) ................................................. 126, 128, 132

Bankruptcy Code § 1129(b)(2)(B)(ii) ...................................................... 124, 125

Bankruptcy Code § 1129(b)(2)(C)(ii) ...................................................... 124, 125

Bankruptcy Code § 1129(d) .................................................................... 149, 150

Bankruptcy Code section 1141(c) ..................................................................... 185

## RULES

Bankruptcy Rule 9019 ................................................................................ *passim*

Bankruptcy Rule 9019(a) ............................................................... 29, 39, 42

Bankruptcy Rule 9019 and (b) ........................................................................... 38

Fed. R. Civ. P. 23 .............................................................................................. 194

Local Rule 3007-1 ............................................................................................. 197

## TREATISES

Restatement (Second) of Contracts § 19 (Am. Law Inst. 1981) ......................... 54

## OTHER AUTHORITIES

1 Collier on Bankruptcy P 3.01 (16th 2021) ..................................................... 73

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 228 (1998) ............................................................................................. 128

5 *Collier on Bankruptcy* ¶ 553.10 (16th 2021) ............................................... 164

H.R. Rep. No. 95-595 (1977) ............................................................................. 18

*Marc. J. Brown in Support of Confirmation of the Joint Plan of Reorganization of Mallinckrodt plc and its Affiliate Debtors Under* ........................................................................ 1

S. Rep. No. 95-989 (1978) ................................................................................. 18

US-DOCS\126024798.18

1.      The debtors and debtors in possession in the above-captioned cases (the "***Debtors***")

file this Memorandum of Law (this "***Memorandum***") in support of confirmation of the *First*

*Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter*

*11 of the Bankruptcy Code* [Docket No. 4508] (as may be amended or modified from time to time,

the "***Plan***") to seek confirmation of the Plan pursuant to section 1129 of title 11 of the United

States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***").[2]  In further support of confirmation

and the arguments set forth in this Memorandum, the Debtors rely upon the Confirmation

Declarations.[3]

## PRELIMINARY STATEMENT

2.      The Plan the Debtors seek to confirm can only be characterized as a momentous

accomplishment.  At the very outset of these Chapter 11 Cases, the Debtors informed the Court

that they filed chapter 11 to efficiently restructure the Claims brought against the Debtors and

---

[2]    Capitalized terms used but not otherwise defined in this Memorandum have the meanings ascribed to them in the Plan.  In light of potential supplemental objections to the Plan and the extended-length of the Confirmation Hearing, the Debtors reserve all rights to supplement this Memorandum (and any exhibits or addenda attached hereto) at a later date.

[3]    The "***Confirmation Declarations***" consist of (a) the following declarations filed contemporaneously herewith: (i) the *Declaration of Punit Mehta in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 5000] (the "***Mehta Declaration***"), (ii) the *Declaration of Marc. J. Brown in Support of Confirmation of the Joint Plan of Reorganization of Mallinckrodt plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "***Brown Declaration***"), (iii) the *Declaration of James Daloia of Prime Clerk LLC in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 4999] (the "***Daloia Declaration***"), and (iv) the *Declaration of Brendan Hayes* [Docket No. 5001]; and (b) the following declarations that will be filed over the course of the Confirmation Hearing:  (i) the *Declaration of Randall S. Eisenberg in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "***Eisenberg Declaration***"), (ii) the *Declaration of Stephen A. Welch in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "***Welch Declaration***"), (iii) the *Declaration of Frederic W. Selck in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, (iv) the *Declaration of Charles H. Mullin in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, and (v) the *Declaration of Douglas J. Friske in Support of the Management Incentive Plan* (the "***Friske Declaration***").

eliminate the overhang on their businesses from enterprise-threatening litigation on multiple fronts. The Plan accomplishes these objectives. It delevers the Debtors' balance sheet by over $1 billion, restructures significant funded debt, and consensually resolves both the deluge of opioid litigation that the Debtors faced prior to their bankruptcy filing and the Acthar pricing-related disputes with federal and state governments (including the Center for Medicare & Medicaid Services ("*CMS*")). Confirmation of the Plan will enable the Debtors to emerge from bankruptcy as a financially-sound company poised for continued success as an innovation-driven biopharmaceutical company focused on improving outcomes for underserved patients with severe and critical conditions. Confirmation will also allow the Debtors to meet the distribution obligations they have agreed to fund under the settlements they have reached with their various creditors.

3.      But this Plan is about more than the Debtors' success—it is about helping abate the opioid-addiction crisis. The Plan will facilitate the delivery of recoveries to those who have been affected by the crisis and provide much-needed funding to the state, tribal, and local governmental entities who will continue to combat the crisis for years to come. The Plan, and the Opioid Settlement in particular, serves the public interest and represents an important and positive development in our nation's efforts to recover from this crisis together.

4.      All of this was made possible by two years of virtually non-stop, good-faith negotiations among the Debtors and hundreds of parties that were willing to come to the table and reconcile their diverging views on a wide range of high-stakes and complex issues. These parties recognized that, in a case with thousands of creditors and a seemingly limitless universe of potentially litigable issues (as evidenced by the confirmation trial being comprised of several complex "mini-trials"), a willingness to compromise was essential to avoiding the massive value

destruction that would occur if each and every party myopically pursued their own interests at any cost. This spirit of collaboration and cooperation led to a series of highly interdependent settlements reached over time, with numerous parties making concessions for the benefit of other constituents, and it culminated in a Plan that is mostly consensual (except with respect to a few litigious creditors). Indeed, there is no better evidence of the tremendous value of the Plan than the significant support it has from the Debtors' creditors. *Every* estate fiduciary and almost every organized creditor group in the Chapter 11 Cases supports the Plan, including (a) the Official Committee of Unsecured Creditors (the "*UCC*"); (b) the Official Committee of Opioid-Related Claimants (the "*OCC*"); and (c) the Supporting Parties, which include (i) over 84 percent of the Debtors' fulcrum class of noteholders (*i.e.*, the Holders of the Guaranteed Unsecured Notes), (ii) the Ad Hoc First Lien Term Lender Group holding approximately $1.3 billion of the Debtors' outstanding First Lien Term Loan Claims, (iii) the Ad Hoc Second Lien Notes Group holding a majority of the outstanding Second Lien Notes Claims, (iv) 50 attorneys general and the United States Department of Justice (the "*DOJ*") in addition to the Plaintiffs' Executive Committee appointed in the MDL (which represents more than 1,300 plaintiffs in the MDL), (v) the Future Claimants' Representative, and (vi) the MSGE Group (which represents more than 1,300 counties, cities, other municipal entities, and other plaintiffs in the nationwide opioid litigation against the Debtors). All told, as of the date of this Memorandum, over 88% of voting creditors by value have voted to accept the Plan.[4]

5.      However, in a case of this size and complexity, unanimous support is impossible, and, against the backdrop of significant support, a small group of objectors (collectively, the

---

[4]    It should be noted that, as explained in greater detail in paragraph [24] hereof, the Notice and Claims Agent is continuing to tabulate and reconcile the results of votes received on the Plan. The Debtors will file a supplemental Voting Report by October 29, 2021 at 4:00 p.m. (Eastern Time).

"**Objectors**") have filed objections ("**Confirmation Objections**") raising several arguments in opposition to confirmation. A few Objectors take aim at the Plan's provision for the release of actual and potential claims by non-debtor third parties against non-debtor individuals and entities. The theme of these arguments is all the same: such releases are non-consensual and do not meet the Third-Circuit standard for non-consensual releases set out in *In re Continental Airlines*.[5] But such arguments amount to nothing more than attacks on well-established Third-Circuit law and ignore that the releases are fair to all parties and play an indispensable role in the Debtors' reorganization, as they ensure that billions of dollars of value will be distributed to Opioid Claimants, facilitate the recoveries to other Classes, and safeguard the global resolution underpinning the Plan.

6.      Other Objectors advance a variety of arguments as to why the Plan purportedly should not be confirmed, including arguments that the Plan unfairly discriminates between Classes of creditors, the Plan provides unequal treatment to some creditors, and the Plan does not satisfy the best-interests test. For the reasons set forth herein, such arguments should be rejected. The consensus around the Plan was not built on the backs of the objecting creditors; to the contrary, the Debtors, as fiduciaries for all their stakeholders, considered the rights and interests of the parties ***not at the bargaining table*** in negotiating the panoply of settlements at the heart of the Plan and took care to ensure that none of those settlements left other creditors with less than they deserve based on their legal entitlements. In the end, what many of these objectors seek is something more than their fair share of the value in these Estates. Their efforts should be rejected, and their objections overruled.

---

5    203 F.3d 203 (3d Cir. 2000).

7.     As described below, the Plan satisfies all applicable elements of section 1129 of the Bankruptcy Code and otherwise complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law.   The Debtors respectfully request that the Plan be confirmed so that they can get back to doing what they do best:   developing and providing underserved patient populations with critical branded therapies as well as supplying critical active pharmaceutical ingredients and finished generic medications that treat a variety of medical conditions.

## BACKGROUND[6]

### I.     Prepetition Litigation Against the Debtors and Related Parties.

8.     The Debtors and their Non-Debtor Affiliates (collectively, "***Mallinckrodt***" or the "***Company***") operate a global specialty biopharmaceutical company that produces and sells both generic and branded products.[7]   Mallinckrodt plc, the lead Debtor, is an Irish public limited company and is the publicly traded, ultimate parent of the Mallinckrodt global enterprise headquartered in Dublin, Ireland.[8]   The Mallinckrodt global enterprise operates as two separate businesses:  (a) the "***Specialty Brands***" business, and (b) "***Specialty Generics***" business.[9]   The Specialty Brand business is operated by various Debtors and certain foreign Non-Debtor Affiliates and focuses on autoimmune and rare diseases in specialty areas, such as neurology, rheumatology, nephrology, pulmonology and ophthalmology, as well as immunotherapy and neonatal respiratory

---

[6]   The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 128] (the "***First Day Declaration***") filed on the Petition Date, which declaration is fully incorporated herein by reference.

[7]   First Day Declaration ¶ 1.

[8]   *Id.*

[9]   *Id.* ¶ 2.

5

critical care therapies and non-opioid analgesics.[10]   On the other hand, the Specialty Generics business offers a portfolio of over twenty specialty generic product families, most of which are controlled substances regulated by the Drug Enforcement Administration, and is operated by Debtors Mallinckrodt LLC, Mallinckrodt Enterprises LLC, SpecGx LLC, and Mallinckrodt APAP LLC, in addition to certain other Debtors and Non-Debtor Affiliates that act as foreign distributors.[11]

9.      In the years leading up to the commencement of the Chapter 11 Cases, certain Mallinckrodt entities, primarily associated with the Specialty Generics business, were named in over 3,000 lawsuits stemming from the Debtors' production and sale of opioid medications (collectively, the "***Opioid Litigation***").[12]   At the same time, the Specialty Brands business was facing more than 25 material litigations and government investigations (collectively, the "***Federal/State Acthar Litigation***")—including (a) the rebate-related litigation (the "***CMS Action***") brought by the Debtors to resolve a dispute with CMS, (b) a related *qui tam* False Claims Act action filed in the District of Massachusetts (the "***FCA Action***")[13] in which the DOJ had intervened, and (c) a separate DOJ-intervened *qui tam* pending in the Eastern District of Pennsylvania concerning donations made by the Debtors to independent charitable foundations (the "***EDPA Action***").[14]   The CMS Action, the FCA Action, and the EDPA Action all centered

---

[10]    *Disclosure Statement for the Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2904] (as may be amended or otherwise modified from time to time, the "***Disclosure Statement***") Art. II.B.1.a.

[11]    *Id.* at Art. II.B.1.b.

[12]    First Day Declaration ¶ 12.

[13]    *United States of America et al. ex rel. Landolt v. Mallinckrodt Pharmaceuticals Inc.*, No. 18-11931-PBS (D. Mass.).

[14]    First Day Declaration ¶ 18.

6

around the Debtors' key branded product, Acthar® Gel ("*Acthar*"):  a complex, injectable biopharmaceutical product FDA-approved to treat (a) 19 serious conditions, including infantile spasms, nephrotic syndrome, sarcoidosis, and uveitis, and (b) refractory conditions such as acute exacerbations of multiple sclerosis or rheumatoid arthritis.[15]

10.    It ultimately became clear that case-by-case litigation on the scale that the Debtors were facing was untenable and would result in the financial and operational destruction of the Debtors' businesses.[16]  The Debtors realized that they needed to file for chapter 11 protection to halt the immense destruction of value associated with continued litigation and productively orient their creditors toward a value-maximizing and equitable global resolution of the litigation.[17]

## II.    Prepetition Negotiations, the Restructuring Support Agreement, the Federal/State Acthar Settlement, and the Opioid Settlement.

11.    In February 2020, after many months of negotiation, the Debtors announced that they had reached the principal terms of a comprehensive opioid settlement supported by more than forty Attorneys General (representing states, Washington D.C., and three U.S. territories) and the Plaintiffs' Executive Committee.[18]  Several months after that announcement, the Debtors, the Plaintiffs' Executive Committee, the Guaranteed Unsecured Notes Ad Hoc Group, and each of their advisors negotiated the final terms of a comprehensive opioid settlement (the "***Original Opioid Settlement***"), which are generally consistent with the principal terms announced in February 2020.[19]  The Original Opioid Settlement provided that one or more trusts (the "***Opioid***

---

[15]    *Id.*

[16]    *Id.* ¶ 91.

[17]    *Id.* ¶ 92.

[18]    *Id.* ¶ 13.

[19]    *Id.*  The principal terms of the Original Opioid Settlement are attached as Schedule 1 to the Restructuring Support Agreement (the "***Original Opioid Settlement Term Sheet***").

7

*Trust(s)*") would be created for the benefit of opioid claimants and funded with (a) $1.6 billion in structured Cash payments, with a prepayment option for the first year after emergence that could significantly accelerate funding if exercised by the Debtors, (b) warrants to acquire 19.99% of the public common stock of the Mallinckrodt group's ultimate parent, Reorganized Debtor Mallinckrodt plc, and (c) certain other assets of the Debtors.[20]

12.     In September 2020, the Debtors reached (a) an agreement in principle with CMS and the DOJ, contingent upon a chapter 11 filing by Mallinckrodt plc, to resolve most Acthar-related claims and investigations of the federal government against the Debtors, and (b) an agreement in principle with each of the 50 states, Washington, D.C., and Puerto Rico aimed at resolving the Medicaid back-rebate related claims asserted in the FCA Action.  These agreements comprise the Federal/State Acthar Settlement that has been memorialized in the definitive settlement agreements filed on August 6, 2021 as Exhibit Q in the Plan Supplement[21] and as may be amended pursuant to the terms of such agreements.  The deal, in short, calls for the Debtors to make Cash payments in eight installments, beginning on the Plan's Effective Date and on each of the first seven anniversaries thereof, totaling $260 million to the DOJ and various states.[22]  In return, the Debtors would be released by the relevant governmental agencies for these Acthar-related claims.[23]

13.     While the Debtors were negotiating the Federal/State Acthar Settlement, they also began discussions with the Guaranteed Unsecured Notes Ad Hoc Group, the Ad Hoc First Lien Term Lender Group, an ad hoc group of the Debtors' revolving lenders, and the administrative

---

[20]   *Id.* ¶ 95.

[21]   Docket No. 3602.

[22]   Plan, Ex. 3.

[23]   *Id.*

agent under the Debtors' credit facility.  After extensive diligence and negotiations over the course of several months, the Debtors and the Guaranteed Unsecured Notes Ad Hoc Group reached agreement on a comprehensive restructuring (the "***Noteholder Restructuring Agreement***"). Under the Noteholder Restructuring Agreement, the Debtors would reinstate the Debtors' secured debt and issue new secured takeback second lien notes and equity interests in reorganized Mallinckrodt to holders of the Debtors' fulcrum unsecured notes.

14.     The Debtors memorialized the Original Opioid Settlement and the Noteholder Restructuring Agreement in the Restructuring Support Agreement, which (as of the Petition Date) was signed by:  (a) the Debtors; (b) Holders of the Guaranteed Unsecured Notes holding more than 84 percent of the fulcrum unsecured notes; (c) 50 Attorneys General of states, Washington, D.C., and U.S. territories with respect to their Opioid Claims; and (d) the Plaintiffs' Executive Committee.[24]

### III.   Filing of the Chapter 11 Cases, the Initial Plan of Reorganization, Disclosure Statement, and Related Documents.

15.     On October 12, 2020 (the "***Petition Date***"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "***Court***") commencing cases for relief under chapter 11 the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

16.     On October 27, 2020, the United States Trustee appointed, pursuant to section 1102 of the Bankruptcy Code:  (a) the UCC [Docket No. 306] and (b) the OCC [Docket No. 308].

17.     The Debtors filed the initial iteration of the Plan [Docket No. 2074] and the Disclosure Statement [Docket No. 2075] on April 20, 2021, a second iteration of the Plan [Docket

---

[24]   First Day Declaration ¶ 15.

9

No. 2767] and the Disclosure Statement [Docket No. 2769] on, respectively, June 8 and June 9, 2021, and a third iteration of the Plan [Docket No. 2863] and the Disclosure Statement [Docket No. 2864] on June 15, 2021.  On June 17, 2021, the Debtors filed the Disclosure Statement and a fourth iteration of the Plan [Docket No. 2903].  The Court approved the Disclosure Statement and certain solicitation procedures (the "*Solicitation Procedures*") by order dated June 17, 2021 [Docket No. 2911] (the "*Disclosure Statement Order*") and the initial confirmation schedule (the "*Initial Confirmation Schedule*") by order dated June 24, 2021 [Docket No. 2988] (the "*Initial Confirmation Schedule Order*").[25]  On June 18, 2021, the Debtors filed the solicitation versions of the Plan and Disclosure Statement [Docket Nos. 2916, 2917].

18.    On August 6 and 7, 2021, as contemplated by the Plan, the Disclosure Statement, and the Initial Confirmation Schedule, the Debtors filed drafts of certain of the documents comprising the Plan Supplement [Docket Nos. 3596–3602, 3604–3606, 3610, 3613, 3614].  On September 3 and 4, 2021, and October 8 and 11, 2021, the Debtors further supplemented the Plan Supplement [Docket Nos. 4147, 4149, & 4639].  The Plan Supplement contains, among other things, the New Governance Documents [Docket No. 3606, Ex. A], the Management Incentive Plan [Docket No. 4147, Ex. D] (the "*MIP*"), the Opioid MDT II Documents and the Opioid Creditor Trust Documents [Docket Nos. 4149 & 4639], the New Opioid Warrant Agreement [Docket No. 3598, Ex. E], the Registration Rights Agreement [Docket No. 3598, Ex. F], the Takeback Second Lien Notes Documentation [Docket No. 3613, Ex. H], the New Term Loan Facility Documentation (Term Sheet) [Docket No. 3613, Ex. I], the New AR Revolving Facility Documentation (Term Sheet) [Docket No. 3613, Ex. J], the New Takeback Term Loans

---

[25]  The Court approved the final confirmation schedule (the "*Confirmation Schedule*") by order dated October 21, 2021 [Docket No. 4864] (together with the Initial Confirmation Schedule Order, the "*Confirmation Schedule Order*").

Documentation [Docket No. 3613, Ex. K], the Schedule of Retained Causes of Action [Docket No. 3600], the Opioid Operating Injunction [Docket No. 3601, Ex. M], the Opioid Deferred Cash Payment Terms [Docket No. 4147, Ex. C], the Restructuring Transactions Memorandum [Docket No. 3605], the amended Rejected Executory Contract/Unexpired Lease List [Docket No. 4640], the amended Assumed Executory Contract/Unexpired Lease List [Docket No. 4641], and the Hospital Trust Agreement and the Emergency Room Physicians Trust Agreement [Docket No. 4147, Exs. B and C].

## IV.    Postpetition Developments, Negotiations, and Settlements.

19.    After the Petition Date, the Debtors continued negotiations with the MSGE Group and the Holders of First Lien Term Loan Claims.  As a result of these negotiations, the MSGE Group and the Supporting Term Lenders (holding more than 66.7% of each class of the Debtors' outstanding First Lien Term Loan Claims) joined the Restructuring Support Agreement on March 10, 2021.  With the joinder of the MSGE Group and the Supporting Term Lenders, the Debtors garnered the support of more than 1,300 governmental opioid claimants and holders of approximately 70% in principal amount of the Debtors' First Lien Term Loan Claims.  Moreover, the Debtors' agreement with the Supporting Term Lenders consisted of a settlement of several integrated and complex disputes related to the First Lien Term Loan Claims.  This settlement has been implemented, in part, through the  treatment of such Claims under the Plan, pursuant to which Holders of such Claims will receive their *pro rata* share of New Takeback Term Loans and the Term Loan Exit Payment.

20.    On September 2, 2021, the Debtors reached an agreement in principle with the UCC (*i.e.*, the UCC Settlement), an agreement in principle with the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the OCC (*i.e.*, the OCC Settlement), and an agreement in

principle with holders (the "***Settling Second Lien Noteholders***") of more than two-thirds of the

outstanding Second Lien Notes (the "***Second Lien Notes Settlement***").

   21. Pursuant to the OCC Settlement (together with the Original Opioid Settlement, the

"***Opioid Settlement***"),[26] the OCC agreed to support the Plan in exchange for:

    (a) the parties agreed that the Plan would not provide for the assignment of any insurance rights other than the Opioid Insurance Policies to the Opioid Trust(s);

    (b) the Debtors were permitted to offer and negotiate full mutual releases with certain co-defendants in opioid-related actions, notwithstanding the original contemplation that certain Causes of Action that would be released as a result of such negotiations would have been assigned third-party Claims;

    (c) the Debtors agreed to make an additional $125 million contribution in Cash to the Opioid Trust(s) on the eighth anniversary of the effective date of the Plan (in addition to the $1.6 billion contribution contemplated by the Original Opioid Settlement), increasing the aggregate Cash contributions to the Opioid Trust(s) to $1.725 billion;

    (d) the $450 million Initial Opioid MDT II Payment to be made by the Debtors and/or the Reorganized Debtors on the Effective Date would be paid as follows:  (a) $445 million to the Opioid MDT II, and (b) $5 million to the Public Schools' Special Education Initiative;

    (e) the Debtors agreed to contribute, in addition to the other assets set forth in the Plan, 50% of the Debtors' interest in certain claims arising from the Debtors' 2015–2018 share repurchase program;

    (f) Opioid Claimants would receive a release from the Debtors and certain other parties;

    (g) the Debtors' option to prepay the Cash contributions to the Opioid Trust(s) (as provided for in the Original Opioid Settlement) would be modified, including to extend the Debtors' right to prepay such claims at a specified discount until 18 months (increased from 12 months) after the effective date of the Plan;

---

[26] The principal terms of the OCC Settlement are set out in the Global Opioid Settlement Term Sheet [Docket No. 4121-2]; *see also* Original Opioid Settlement Term Sheet.

(h)     the terms of the New Opioid Warrants (as provided for in the Original Opioid Settlement) would be modified so as to be exercisable for six years from the effective date of the Plan in all cases; and

(i)     the Debtors and the Opioid Claimants agreed in principle on the covenants to be set forth in the Opioid Deferred Cash Payments Terms.

22.     The UCC Settlement, which was the product of weeks of judicial mediation, provides a significant increase in value from the $100 million of value (split between Cash and equity in the Reorganized Debtors) that prior iterations of the Plan had provided for the Holders of Class 6 General Unsecured Claims. Specifically, under the UCC Settlement,[27] in exchange for the UCC's agreement to support the Plan, the Debtors agreed to establish the General Unsecured Claims Trust for the benefit of the Holders of General Unsecured Claims against the Debtors, into which the Debtors would contribute the following:

(a)     $135 million in Cash;

(b)     certain potential preference actions;

(c)     $20 million in Cash, contingent upon both (a) the Debtors' receipt of regulatory approval of the product Terlivaz by the U.S. Food and Drug Administration, and (b) the Debtors reaching $100 million of cumulative net sales of Terlivaz;

(d)     all avoidance actions arising out of the Debtors' prepetition acquisition of Sucampo Pharmaceuticals, Inc. against selling shareholders;

(e)     50% of the Debtors' interest in certain claims arising from the Debtors' 2015–2018 share repurchase program;

(f)     all proceeds of the Debtors' 63% ownership interest in the priority review voucher related to VTS-270, a product currently in development; and

(g)     35% of the proceeds of a sale of Debtors' priority review voucher related to the product Stratagraft®.

---

[27]   The principal terms of the UCC Settlement are set out in the Mallinckrodt GUC Settlement Term Sheet [Docket No. 4121-1].

23.     Subsequent to the UCC Settlement, the UCC further mediated amongst its constituents, which resulted in the allocation set forth in the UCC Appendix attached as Exhibit 6 to the Plan.

24.     Finally, pursuant to the Second Lien Notes Settlement,[28] the Settling Second Lien Noteholders agreed to support the Plan in exchange for:  (a) the Holders of Second Lien Notes receiving under the Plan new 10.000% Second Lien Senior Secured Notes due 2025 that would have the same principal amount and other economic terms as the Second Lien Notes, but would have covenants substantially equivalent to those set forth in the Takeback Second Lien Notes Indenture; and (b) payment of reasonable and documented out-of-pocket fees and expenses of the Settling Second Lien Noteholders, the Second Lien Notes Indenture Trustee, and the Second Lien Notes Collateral Agent.

## V.     The Voting Report.

25.     The Debtors filed the current version of the Plan on September 29, 2021.  On October 22, 2021, the Debtors' Notice and Claims Agent, Prime Clerk LLC, filed a report detailing the initial results of the Plan voting process [Docket No. 4955] (the "*Voting Report*").  The Debtors will file a supplement to the Voting Report by October 29, 2021 at 4:00 p.m. (prevailing Eastern Time) providing additional voting results, particularly for the Classes of Opioid Claimants whose voting deadline was October 20, 2021 at 4:00 p.m. (prevailing Eastern Time).

26.     Holders of Claims and Interests in Classes 1 and 2(a) are Unimpaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims and

---

[28]     The principal terms of the Second Lien Notes Settlement are set out in the *Settlement Second Lien Notes Summary Terms* [Docket No. 4121-3].

Interests in Classes 4 through 9(h) and 10 are Impaired and entitled to vote to accept or reject the Plan. Holders of Claims and Interests in Classes 2(b), 2(c), and 3 are either (a) Impaired, in which case they are entitled to vote to accept or reject the Plan, or (b) Unimpaired, in which case they are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan. As set forth in the Voting Report, Classes 2(b), 2(c), 4, 5, 6(c), 6(d), 6(g), 7-9(g), and 10 each voted to accept the Plan.

27.     Holders of Claims and Interests in Classes 11 and 12 either are (a) Unimpaired, in which case they are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (b) Impaired, in which case they are deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code and, therefore, in each case are not entitled to vote to accept or reject the Plan.

28.     Holders of Claims and Interests in Classes 9(i), 13, and 14 (together with Holders of Claims in Classes 11 and 12, to the extent Impaired under the Plan, the "***Deemed Rejecting Classes***" and, together with Classes 4 – 10, the "***Impaired Classes***") are Impaired under the Plan, shall receive no distribution under the Plan, and are therefore conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In addition, Holders of Claims and Interests in Classes 3, 6(a), 6(b), 6(e) (solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC, Mallinckrodt plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC), 6(f) (solely as to Mallinckrodt ARD LLC, Mallinckrodt Hospital Products, Inc., Mallinckrodt LLC, Mallinckrodt Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and ST Shared Services LLC), and 9(h) (the "***Voting Rejecting Classes***" and, together with the Deemed Rejecting Classes, the "***Rejecting Classes***") have voted to reject the Plan. The votes of Holders of Claims and Interests in Classes 8 and 9 are still being tabulated and

15

audited.[29]  As discussed below, the Debtors satisfy section 1129(b)'s "cramdown" requirements with respect to the Rejecting Classes, and such rejection should not prevent the Court from confirming the Plan.

## THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION UNDER THE BANKRUPTCY CODE

29.     To confirm the Plan, the Court must find that the provisions of section 1129 of the Bankruptcy Code have been satisfied by a preponderance of the evidence.[30]  The Debtors submit that based on the record during the Chapter 11 Cases, the Confirmation Declarations, and the Debtors' arguments set forth herein, the applicable burden is clearly satisfied and the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.  In particular, the Plan fully complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code.  This Memorandum addresses each requirement individually below.

## I.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(1) of the Bankruptcy Code.

30.     Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  A principal objective of section 1129(a)(1) of the Bankruptcy Code is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan.  Consequently, the determination

---

[29]  Please note that the Notice and Claims Agent's tabulation and quality assurance efforts remain ongoing and an additional declaration setting forth a final tabulation of voting results will be provided on or prior to the October 29, 2021 supplemental voting report deadline set out in the Confirmation Schedule.  The final tabulation may contain different voting and opt-out results.

[30]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Tribune Co.*, 464 B.R. 126, 151-52 (Bankr. D. Del. 2011).  Preponderance of the evidence requires just enough evidence to show that that the fact the claimant seeks to prove is, more likely than not, true.  *See Grogan* v. *Garner*, 498 U.S. 279, 286 (1991) ("The preponderance-of-the-evidence standard results in roughly equal allocation of the risk of error between litigants.") (citations omitted).

16

of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis

of sections 1122 and 1123 of the Bankruptcy Code.[31]  As explained below, the Plan complies with

sections 1122 and 1123 of the Bankruptcy Code in all respects.

> **A.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

31.    The Plan satisfies the classification requirements of section 1122 of the Bankruptcy

Code.  Section 1122 of the Bankruptcy Code provides as follows:

> (a)    Except as provided in subsection (b) of this section, a plan
> may place a claim or an interest in a particular class only if
> such claim or interest is substantially similar to the other
> claims or interests of such class.
>
> (b)    A plan may designate a separate class of claims consisting
> only of every unsecured claim that is less than or reduced to
> an amount that the court approves as reasonable and
> necessary for administrative convenience.[32]

32.    Claims or interests in a class need not be identical, but should be substantially

similar in nature to each other.[33]  The Third Circuit has recognized that plan proponents have

significant flexibility in placing similar claims into different classes so long as there is a rational

basis.[34]  Courts have identified grounds justifying separate classification, including where

members of a class possess different legal rights[35] and where there are good business reasons for

---

[31]   *See In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) (determining that the provisions of section 1129(a)(1) of the Bankruptcy Code are aimed most directly at sections 1122 and 1123 of the Bankruptcy Code); *see also* S. REP. NO. 95-989, at 126 (1978); H.R. REP. NO. 95-595, at 412 (1977).

[32]   11 U.S.C. § 1122.

[33]   *In re DRW Prop. Co. 82*, 60 B.R. 505, 511 (Bankr. N.D. Tex. 1986).

[34]   *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that a classification is proper as long as each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed").

[35]   *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243, at *5–6 (Bankr. D. Del. Feb. 6, 2006) (permitting a classification scheme after consideration of the characteristics of each class and creditors' legal rights); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) (noting that "Section 1122 . . . provides that

17

separate classification.[36]   Article III.A of the Plan designates the following Classes of Claims and

Interests for each Debtor entity:

*[Remainder of page intentionally left blank]*

---

claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes").

[36]   *See Aetna Cas. & Sur. Co. v. Clerk of U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (finding that the debtor must have a legitimate reason supported by credible proof to justify separate classification of similar, unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); *In re Magnatrax Corp.*, No. 03-11402, 2003 WL 22807541, at *4 (Bankr. D. Del. Nov. 17, 2003) (permitting separate classification based on valid business, factual, and legal reasons).

US-DOCS\126024798.18

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2(a) | First Lien Revolving Credit Facility Claims | Unimpaired | Presumed to Accept |
| 2(b) | 2024 First Lien Term Loan Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 2(c) | 2025 First Lien Term Loan Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 3 | First Lien Notes Claims | Unimpaired or Impaired | Presumed to Accept or Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | Guaranteed Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(a) | Acthar Claims | Impaired | Entitled to Vote |
| 6(b) | Generics Price Fixing Claims | Impaired | Entitled to Vote |
| 6(c) | Asbestos Claims | Impaired | Entitled to Vote |
| 6(d) | Legacy Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6(e) | Environmental Claims | Impaired | Entitled to Vote |
| 6(f) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6(g) | 4.75% Unsecured Notes Claims | Impaired | Entitled to Vote |
| 7 | Trade Claims | Impaired | Entitled to Vote |
| 8(a) | State Opioid Claims | Impaired | Entitled to Vote |
| 8(b) | Municipal Opioid Claims | Impaired | Entitled to Vote |
| 8(c) | Tribe Opioid Claims | Impaired | Entitled to Vote |
| 8(d) | U.S. Government Opioid Claims | Impaired | Entitled to Vote |
| 9(a) | Third-Party Payor Opioid Claims | Impaired | Entitled to Vote |
| 9(b) | PI Opioid Claims | Impaired | Entitled to Vote |
| 9(c) | NAS PI Opioid Claims | Impaired | Entitled to Vote |
| 9(d) | Hospital Opioid Claims | Impaired | Entitled to Vote |
| 9(e) | Ratepayer Opioid Claims | Impaired | Entitled to Vote |
| 9(f) | NAS Monitoring Opioid Claims | Impaired | Entitled to Vote |
| 9(g) | Emergency Room Physicians Opioid Claims | Impaired | Entitled to Vote |
| 9(h) | Other Opioid Claims | Impaired | Entitled to Vote |
| 9(i) | No Recovery Opioid Claims | Impaired | Deemed to Reject |
| 10 | Settled Federal/State Acthar Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 12 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 13 | Subordinated Claims | Impaired | Deemed to Reject |
| 14 | Equity Interests | Impaired | Deemed to Reject |

US-DOCS\126024798.18

Case 20-12522-JTD    Doc 5016    Filed 10/27/21    Page 41 of 212

33.     The Plan's classification of Claims and Interests into 14 Classes and 32 sub-Classes[37] for each Debtor satisfies the requirements of section 1122 of the Bankruptcy Code because the Claims and Interests in each Class differ from the Claims and Interests in each other Class based on the different rights and attributes of the respective Holders as well as to facilitate the different types of consideration provided to different Classes (*i.e.*, equity, debt, Cash).[38]  Thus, valid business, factual, and legal reasons exist for classifying separately the various Claims and Interests under the Plan.  Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Thus, the Plan satisfies section 1122 of the Bankruptcy Code.

34.     sanofi-aventis U.S. LLC ("*Sanofi*") baselessly asserts in its Confirmation Objection [Docket No. 4702] (the "*Sanofi Objection*") that (a) the Debtors separately classified Trade Claims in Class 7 to gerrymander an accepting Class for Plan-voting purposes,[39] and (b) the Plan improperly classifies its Claims as Class 6(f) Claims instead of Class 7 Trade Claims.[40]  The Sanofi Objection has no merit but rather is a bald attempt to obtain a recovery to which Sanofi is not entitled and, thus, should be overruled.  *First*, the Debtors did not separately classify Trade Claims to gerrymander votes; rather, they did so to distinguish Trade Claimants—who have a go-forward business relationship with the Debtors and "provide goods and services necessary for the

---

[37]  The Plan contains 14 Classes of Claims and Interests, designated as Classes 1 through 14, with Class 2 divided into three sub-Classes, Class 6 divided into seven sub-Classes, Class 8 divided into four sub-Classes, and Class 9 divided into nine sub-Classes.  *See* Plan Art. III.A.

[38]  *Id.*

[39]  Sanofi Objection ¶ 22.

[40]  *Id.* ¶¶ 19-26.

20

US-DOCS\126024798.18

Debtors['] continued operations"[41]—from other general unsecured claims.[42]  *Second*, Sanofi does

not provide goods or services to the Debtors and thus does not qualify for Class 7.  In fact, the

Debtors are seeking to **reject** their agreements with Sanofi, including an asset purchase agreement

(the "**Sanofi Agreement**")—because those agreements impose a **burden** on the Debtors' Estates.[43]

Thus, the Debtors have exercised their valid business judgment in classifying Sanofi's Claim in

Class 6(f) as opposed to Class 7.[44]

35.    Relatedly, the Ad Hoc Acthar Group[45] argues in their Confirmation Objection

[Docket No. 4704] (the "**Acthar Group Objection**") that the Debtors have separately classified the

Guaranteed Unsecured Notes from the Ad Hoc Acthar Group and other Acthar-related Claimants

to gerrymander an accepting vote from the Holders of Guaranteed Unsecured Notes.[46]  The

Debtors did not separately classify Guaranteed Unsecured Indenture Notes to gerrymander an

accepting class; they did so because of the inherent differences between (a) Claims that arise from

Guaranteed  Unsecured  Notes  and  (b) Claims  that  arise  from  litigation  or  operational

---

[41]  *See* Plan Art. I.A.426.

[42]  *See, e.g.*, *Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (approving separate classification of trade claims from other unsecured claims because of "the reasonableness of distinguishing the claims of physicians, medical malpractice victims, employee benefit plan participants, and trade creditors").

[43]  *See Rejected Executory Contract/Unexpired Lease List* [Docket No. 3721-1].

[44]  *See Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (approving separate classification of trade claims from other unsecured claims because of "the reasonableness of distinguishing the claims of physicians, medical malpractice victims, employee benefit plan participants, and trade creditors").

[45]  The "**Ad Hoc Acthar Group**" consists of the following:  the City of Rockford ("**Rockford**"), Steamfitters Local Union No. 420 ("**Steamfitters Local 420**"), the International Union of Operating Engineers Local 542, United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("**Plumbers Local 322**") and Acument Global Technologies, individually and on behalf of the classes of third party payors and their beneficiaries that Rockford, Steamfitters Local 420 and Plumbers Local 322 seek to represent in their respective cases currently pending in federal district courts in the Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey, respectively.

[46]  Acthar Group Objection at 14.

relationships—which courts have held is a valid justification.[47]   The Holders of Guaranteed Unsecured Notes Claims are undisputed and liquidated and arise out of contract, whereas the Ad Hoc Acthar Group's claims are disputed and unliquidated and arise out of litigation naming specific Debtors.  Thus, the separate classification is appropriate.

## B.     The Plan Satisfies the Seven Requirements of Section 1123(a) of the Bankruptcy Code.

36.     The Plan meets the seven mandatory requirements of section 1123(a) of the Bankruptcy Code.  Specifically, section 1123(a) of the Bankruptcy Code requires that a plan:

(a)     designate classes of claims and interests;

(b)     specify unimpaired classes of claims and interests;

(c)     specify treatment of impaired classes of claims and interests;

(d)     provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(e)     provide adequate means for implementation of the plan;

(f)     provide for the prohibition of the issuance of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(g)     contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.[48]

37.     Article III of the Plan satisfies the first three requirements of section 1123(a) of the Bankruptcy Code by:     (a) designating Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code; (b) specifying the Classes of Claims and Interests that

---

[47]   *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 264 (Bankr. S.D.N.Y. 2009) ("First, the claims of the CCI General Unsecured Creditors arise from litigation, employment, or operational relationships, while claims of the CCI Noteholders arise from the holding of CCI Notes.")

[48]   11 U.S.C. § 1123(a).

22

are Unimpaired under the Plan, as required by section 1123(a)(2) of the Bankruptcy Code; and (c) specifying the treatment of each Class of Claims and Interests that is Impaired, as required by section 1123(a)(3) of the Bankruptcy Code.

38.    The Plan also satisfies section 1123(a)(4) of the Bankruptcy Code—the fourth requirement—because the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest within that Class, unless the Holder agrees to a less favorable treatment on account of its Claim or Interest.[49]

39.    Article IV and various other provisions of the Plan provide adequate means for the Plan's implementation, thus satisfying the fifth requirement, which is set forth in section 1123(a)(5) of the Bankruptcy Code.[50]  Specifically, such provisions of the Plan provide for, among other things:  (a) the effectuating of the Restructuring Transactions; (b) the vesting in the Reorganized Debtors of all property of each Debtor's Estate; (c) the cancellation of certain notes, instruments, certificates, agreements and Interests; (d) sources for distributions made under the Plan; (e) entry into the New Credit Facilities, the New Takeback Term Loans, the Takeback Second Lien Notes, the Cram-Down First Lien Notes, and the New Second Lien Notes; (f) the issuance or reservation for issuance of the New Mallinckrodt Ordinary Shares and the issuance of the New Opioid Warrants to the Opioid MDT II; (g) entry into the Registration Rights Agreement; (h) steps for new equity interest holders to dissolve certain Debtors; (i) authorization to enter into

---

[49]  As expressed *infra* ¶¶ 255-261, the Confirmation Objections challenging the Plan's satisfaction of this requirement are baseless.

[50]  *See id.* § 1123(a)(5); Plan Art. IV. Section 1123(a)(5) specifies that adequate means for implementation of a plan may include:  (A) retention by the debtor of all or part of its property; (B) the transfer of property of the estate to one or more entities; (C) merger or consolidation of the debtor with one or more persons; (D) sale or distribution of property of the estate; (E) satisfaction or modification of any lien; (F) cancellation or modification of any indenture; (G) curing or waiving of any default; (H) extension of a maturity date or a change in an interest rate or other term of outstanding securities; (I) amendment of the debtor's charter; or (J) issuance of securities for Cash, for property, for existing securities, in exchange for claims or interests, or for any other appropriate purpose.  11 U.S.C. § 1123(a)(5).

US-DOCS\126024798.18

the New Governance Documents and to amend corporate governance documents to implement the terms of the Plan; (j) effectuation of the MIP; and (k) the ability, following confirmation and prior to the Effective Date, of the then-current officers and directors of each of the Debtors to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.  As a result thereof, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

40.     The sixth requirement of section 1123(a) of the Bankruptcy Code—that a plan prohibit the issuance of nonvoting equity securities—is satisfied, as the organizational documents of each Debtor will, upon their effectiveness, prohibit the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.[51]

41.     The seventh requirement of section 1123(a) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[52]   The Debtors will disclose the identities of the members of the Reorganized Board prior to the Effective Date and have already disclosed that "[t]he existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the Reorganized Board to remove or replace them in accordance with the New Governance Documents and any applicable employment agreements that are assumed pursuant to the Plan."[53]   The selection process of the Reorganized Board was negotiated at arm's-length by the Supporting Parties and will comply with

---

[51]   *See* Docket No. 3606.

[52]   11 U.S.C. § 1123(a)(7).

[53]   Plan Art. IV.M.2.

24

the independence requirements for public securities exchanges and, therefore, is consistent with the interests of Holders of Claims and Interests and public policy.  The Plan thus satisfies section 1123(a)(7) of the Bankruptcy Code.[54]

### C.   The Discretionary Contents of the Plan are Appropriate.

42.   Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan.  For example, a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts or unexpired leases,[55] (c) provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest,"[56] (d) provide for the sale of substantially all of the property of the estate and for the distribution of the proceeds of any such sale,[57] (e) "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims,"[58] and (f) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[59]

---

[54]   *See, e.g.*, *In re Washington Mut., Inc.*, Case No. 08-12229 (MFW), 2012 WL 1563880, at *14 (Bankr. D. Del. Feb. 24, 2012) (approving plan's designation of board of directors of reorganized debtors as of the effective date of the plan and reorganized board's selection of officers as of or after the effective date of the plan); *In re Arclin Us Holdings Inc.*, Case No. 09-12628, 2011 WL 6013665 (Bankr. D. Del. Nov. 24, 2011) (approving plan's designation of board of directors and officers of reorganized debtors as of the effective date of the plan).

[55]   *Id.* § 1123(b)(1), (2).

[56]   *Id.* § 1123(b)(3)(A), (B).

[57]   *Id.* § 1123(b)(4).

[58]   *Id.* § 1123(b)(5).

[59]   *Id.* § 1123(b)(6).

25

43.    Here, the Plan employs various provisions in accordance with the discretionary authority set out in section 1123(b) of the Bankruptcy Code.  For example, the Plan provides for the treatment of the Executory Contracts and Unexpired Leases,[60] provides a structure for Claim allowance and disallowance,[61] sets forth a process for distributions under the Plan to Holders of Allowed Claims,[62] and provides for the implementation of release, exculpation, and injunction provisions.[63]

### D.    The Settlement, Release, Injunction, and Exculpation Provisions are Integral Components of the Plan.

44.    Article IX of the Plan provides for (a) the settlement of all Claims, Opioid Claims, Opioid Demands, or Interests resolved under the Plan, (b) releases to Debtors and certain other parties in interest, (c) injunction provisions prohibiting parties from pursuing Claims and Causes of Action released under the Plan, and (d) an exculpation provision absolving the Debtors and certain other parties in interest of any Claims or Causes of Action arising from the Petition Date to the Effective Date.  These provisions are proper because, among other things, they (as applicable) are:  (a) the product of arm's-length negotiations; (b) consensual; (c) fair to the releasors and necessary to the reorganization; (d) critical to obtaining the support of the various constituencies for the Plan; (e) supported by the creditors that voted in favor of the Plan; and (f) in the best interests of the Debtors and the Chapter 11 Cases.  Most importantly, these provisions maximize the value of the Estates and, more specifically, help those affected by the opioid-addiction crisis by implementing a global settlement of litigation of those Claims.  Furthermore,

---

[60]    *See* Plan Art. V.

[61]    *See id.* Art. VII.A.

[62]    *See id.* Art. VI.

[63]    *See id.* Art. IX.B and IX.C.

US-DOCS\126024798.18

the other settlements (*i.e.*, the funded debt compromises) are contingent on the Debtors obtaining

a fresh start from the morass of litigation it faced from the Opioid Claimants, Acthar Claims, and

other Claims.  These global settlements are possible only because the Plan provides for the release

of all actual and potential Claims by third parties against the Debtors and certain non-Debtor

individuals and entities arising from or relating to the Debtors' businesses, with limited exception.

Without such releases, all of the settlements embodied in the Plan could not have been reached

because creditors would have no faith in their settlement allocations, debt instruments, or Cash

payment streams if the Released Parties would be exposed to future litigation.

45.    The Debtors have received several Confirmation Objections to these Plan

provisions, but not one of these provisions is inconsistent with the Bankruptcy Code.  Therefore,

the Plan satisfies the requirements of section 1123(b) of the Bankruptcy Code.  Furthermore,

contrary to the Ad Hoc Acthar Group's assertion otherwise [Docket No. 4704], the Releases are

not overbroad or vague; they are narrowly tailored to the facts and circumstances of these Chapter

11 Cases.[64]

### 1.    Settlement of Claims, Opioid Claims, Opioid Demands, and Interests

46.    In accordance with section 1123(b) of the Bankruptcy Code, the Plan provides for

the settlement of all prepetition and pre-Effective Date Claims, Opioid Claims, Opioid Demands,

or Interests of any nature whatsoever resolved pursuant to the Plan (such settlements, collectively,

---

[64]    The Ad Hoc Acthar Group argues that the Plan should specifically list who is being released and of what.  The releases, however, are sufficiently detailed by identity and scope and similar to release provisions in other bankruptcy plans.  *See generally, e.g.*, *In re Purdue Pharma L.P.,* et al., Case No. 19-23649 (Bankr. S.D.N.Y.) [Docket No. 3726] (confirmed plan); *In re The Weinstein Company Holdings, LLC,* Case No. 18-10601 (Bankr. D. Del.) [Docket No. 3203-1] (same); *In re GNC Holdings, Inc., et al.,* Case No. 20-11662 (Bankr. D. Del.) [Docket No. 1415-1] (same); *In re TK Holdings Inc.,* et al., Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018)  [Docket No. 2056] (same).

US-DOCS\126024798.18

the "***Plan Settlements***").  The Plan Settlements include the Opioid Settlement,[65] the Federal/State

Acthar Settlement,[66] the OCC Settlement,[67] the UCC Settlement,[68] and the settlements reflected in

the Restructuring Support Agreement.

47.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may "provide

for . . . the settlement or adjustment of any claim or interest belonging to the debtor or the estate."

Bankruptcy Rule 9019(a) further provides, in relevant part, that "[o]n motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement."  Compromises and

settlements are "a normal part of the process of reorganization."[69]  The compromise or settlement

of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged

and "generally favored in bankruptcy."[70]  "[T]he decision whether to approve a compromise under

Bankruptcy Rule 9019 is committed to the sound discretion of the Court, which must determine if

the compromise is fair, reasonable, and in the interest of the estate."[71]  Courts should not, however,

substitute their judgment for that of the debtor, but instead canvas the issues to see whether the

compromise falls below the lowest point in the range of reasonableness.[72]

---

[65]    *See id.* Art. IV.V.

[66]    *See id.* Art. IV.DD.

[67]    *See id.* Art. I.D.

[68]    *See id.* Art. I.E.

[69]    *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

[70]    *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979).

[71]    *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997) (declining to approve a settlement found to be a *sub rosa* plan).

[72]    *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Health*, 344 B.R. at 296.

48.     The Third Circuit has enumerated four factors (*i.e.*, the *Martin* factors) that should be considered in determining whether a compromise should be approved:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[73]  The test boils down to whether the terms of the proposed compromise fall "within a reasonable range of litigation possibilities."[74]  "The court must also consider 'all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.'"[75]  Accordingly, at its core, "the ultimate inquiry [in determining whether to approve a compromise is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'"[76]

49.     The Plan Settlements satisfy the *Martin* factors and should be approved.

### a.     Probability of Success in Litigation

50.     The Plan Settlements satisfy the first *Martin* factor, the purpose of which is "not to make findings of fact and conclusions of law, but to canvass the issues to assess the risks associated with prosecuting the [litigation]."[77]  Here, the risks of participating in the litigation underlying the Plan Settlements are simply enormous.

---

[73] *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424 (1968); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (finding that proposed settlement held in best interest of the estate).

[74] *Penn Cent. Transp. Co.*, 596 F.2d at 1114 (citations omitted).

[75] *Marvel Entm't Grp., Inc.*, 222 B.R. at 249 (quoting *TMT Trailer Ferry*, 390 U.S. at 424).

[76] *Id.* (quoting *In re Louise's, Inc.*, 211 B.R. at 801); *see also In re Wash. Mut. Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" (citation omitted)).

[77] *Tribune*, 464 B.R. at 159 (quoting *In re Cellular Information Sys., Inc.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994)).

US-DOCS\126024798.18

51.     As will be presented in the Welch Declaration, if the Debtors do not settle the nearly-endless prepetition litigation matters asserted against the Debtors, the Debtors risk being unable to continue to operate as a going concern.  While the Debtors believe they have meritorious defenses to the more-than 3,000 existing lawsuits asserted against them, there is inherent uncertainty associated in litigating any lawsuit, let alone in litigating over 3,000 lawsuits simultaneously.  The Plan Settlements—which are the byproducts of arduous negotiations between the Debtors and a plethora of constituents including, but not limited to, numerous States Attorneys General, the Plaintiffs' Executive Committee, the DOJ, and the Office of Inspector General—eliminate this overwhelming uncertainty by resolving more than 3,000 existing lawsuits that were brought by and against the Debtors.[78]

52.     Without the Plan Settlements, the Debtors would have to continue to devote significant energy and resources away from running and growing their businesses to litigating the massive number of complex lawsuits with the inevitable result that they would have to pay huge legal fees while undergoing reduced business operation.  Since 2017 alone, the Debtors have spent more than $100 million defending the Opioid Litigation and committed $30 million in order to settle just two (of the more than 3,000) such cases.[79]  Beyond the astronomical amount of expenses (and potential damages) that would be associated with the Opioid Litigation if it were to proceed, without the Federal/State Acthar Settlement, the Debtors would also face the possibility of incurring more than $1.9 billion in liabilities because of the False Claims Act's provision for treble punitive damages.  Moreover, without the Federal/State Acthar Settlement, CMS could exclude the Debtors from participating in federally funded healthcare programs.  Such exclusion would

---

[78]    *See* First Day Declaration ¶ 12.

[79]    *Id.*

preclude the excluded Debtors from receiving payments from any federal healthcare program for products or services rendered and, thus, (a) irreparably damage the Debtors' reputation, (b) put at risk about 20% of the Debtors' annual net sales, and (c) raise the possibility of incurring significant civil monetary penalties.  Thus, litigating the Causes of Action underlying the Plan Settlements would be so time-consuming and costly that the expenses and potential damages associated with doing so would render the Debtors unable to remain solvent and functioning.

53.    In addition, the UCC Settlement and the OCC Settlement were integral in minimizing litigation during these Chapter 11 Cases, which could have derailed the Plan Settlements as well as the timeline of these Chapter 11 Cases.  Specifically, by obtaining the support of the UCC, the UCC Settlement reduced the risk of costly Plan litigation because all Class 6 subclasses likely would have rejected the Plan (at the UCC's recommendation) absent the UCC Settlement.  Similarly, by obtaining the support of the OCC, the OCC Settlement reduced the risk of costly plan litigation with the OCC, enabled the Debtors to resolve certain open issues under the Opioid Settlement that could have otherwise resulted in additional litigation, and garnered the support of private Opioid Claimants for the Plan who may have otherwise litigated the Plan. Moreover, these settlements are supported by the two official committees that were formed to protect the interests of general unsecured creditors.

54.    Similarly, the integrated settlements set forth in the Supporting Term Lenders Joinder Agreement represent a good-faith compromise of several complex disputes related to the allowance of various components of the First Lien Term Loan Claims and the treatment of such Claims under the Plan—which now provides for, among other things, issuance of the New Takeback Term Loans that have longer maturity dates than the existing term loans.  Absent the settlements reflected in the Supporting Term Lenders Joinder Agreement and the compromises

31

contained therein, the Debtors would have faced a litigious confirmation process with respect to the treatment of First Lien Term Loan Claims and far-shorter debt maturities.

55.     As the evidence will demonstrate at the Confirmation Hearing, it is clear that proceeding with the litigation underlying the Plan Settlements will destroy value for the Debtors' stakeholders and pose tremendous risk.  Thus, the Debtors respectfully submit that the Plan Settlements satisfy the first *Martin* factor.

> ### b.     Difficulties Associated with Collection

56.     The second *Martin* factor is inapplicable here.  Difficulties associated with collection is not a concern that either supports or undermines approval of the Plan Settlements, as the Plan Settlements are not predicated on certain amounts recovered by the Debtors.

> ### c.     Complexity of Litigation and Expense, Inconvenience, and Delay

57.     The Plan Settlements also satisfy the third *Martin* factor.  *First*, the Opioid Litigation and the Federal/State Acthar Litigation are extremely complicated, expensive, and—if left unresolved—lengthy.  If the Debtors were not able to settle the Opioid Litigation and the Federal/State Acthar Litigation, the Debtors would need to defend and litigate over 3,000 lawsuits—many of which have already been going on for years—in what would likely be a protracted, highly contentious, and expensive chapter 11 case.  What makes matters worse is that, absent the Opioid Settlement, the Debtors would likely face the threat of additional opioid-related lawsuits post-emergence, notwithstanding any bankruptcy discharge, from individual and entities holding "future" claims or demands.  The costs of defending such post-emergence opioid litigation would materially deplete the Debtors' enterprise-wide liquidity and the Debtors likely would be unable to refinance their debt or obtain new capital, as financers likely would be troubled by the risks and costs of the more-than-3,000 opioid lawsuits.  And that assessment does not even take into consideration the amounts that would be owed under settlements and judgments and the fact

that the cost to the Debtors of having to manage the litigation and ultimate resolution of over 3,000 opioid lawsuits.

58.    Moreover, as will be set forth at the Confirmation Hearing, the Opioid Settlement and the Federal/State Acthar Settlement are inextricably intertwined because, absent a comprehensive resolution of the Debtors' opioid exposure (including potential liabilities to the state and federal government entities party to the Federal/State Acthar Settlement), the government would not have been willing to resolve the Claims at the heart of the Federal/State Acthar Settlement and take the risk associated with receiving a stream of deferred payments from the Debtors.  Together, these settlements serve as the backbone of the Plan.  Without them, the Guaranteed Unsecured Notes Ad Hoc Group most likely would not have been willing to support the Plan (and the conversion of their debt to equity thereunder) if the Reorganized Debtors were saddled with either the Opioid Litigation or the Federal/State Acthar Litigation, and the Debtors could not achieve the purpose of the restructuring:  deleveraging the significant funded debt on the balance sheet and eliminating the thousands of complex lawsuits that were depleting the Debtors' Cash flows and undermining the ability of the Debtors to operate their businesses.[80]

59.    *Second*, absent the settlements set forth in the Restructuring Support Agreement, the UCC Settlement, and the OCC Settlement, any Plan litigation with the UCC or the OCC would be expensive, severely inconvenience the Debtors, and delay the timeline of these Chapter 11 Cases, which could jeopardize the existing support for the Plan and thereby unwind the entire restructuring.  Accordingly, under the facts and circumstances of the Chapter 11 Cases, including the almost-incomprehensible amount of litigation faced by the Debtors, the Debtors may have been unable to finalize a workable plan of reorganization absent the Plan Settlements enabling the

---

[80] First Day Declaration ¶ 11.

Debtors to resolve the copious amount of litigation.  The Plan Settlements are instrumental to Plan confirmation and in avoiding protracted, complicated, and expensive litigation.  Further, the Plan Settlements provide a significant level of certainty regarding the treatment of Claims and Causes of Action under the Plan, as compared to the uncertainty of litigating the over 3,000 lawsuits brought against the Debtors.

60.     It is indisputable that the Plan Settlements will promote efficiency and result in cost savings by obviating the need for the Debtors to litigate each and every Cause of Action brought against the Debtors.  The Plan Settlements allow the Debtors to conserve financial resources while resolving thousands of lawsuits that would otherwise result in costly and protracted litigation.  Thus, the Debtors respectfully submit that Plan Settlements satisfy the third *Martin* factor.

### d.     Paramount Interest of Creditors

61.     Finally, the Plan Settlements satisfy the fourth *Martin* factor as they are in the best interests of creditors.  *First*, as will be shown at the Confirmation Hearing, the Plan Settlements allow the Debtors to maximize enterprise value to the benefit of all creditors.  Without either the Opioid Settlement or the Federal/State Acthar Settlement, the value available for distribution to creditors would be meaningfully lower.  Absent such settlements, the Debtors would need to defend over 3,000 lawsuits, including the False Claims Act lawsuits.  Not only would the costs associated with such litigation be administrative costs that would reduce recoveries to creditors, but the litigation would also divert the attention of the Debtors' management and professionals away from the restructuring, thereby seriously delaying these Chapter 11 Cases.

62.     *Second*, the time, value, and efforts spent establishing the various components of the Plan Settlements—including the establishment of the various opioid trusts and the distributions that will be made pursuant to the UCC Settlement and the OCC Settlement—will enable an equitable distribution of the Debtors' Estates to their creditors and ensure that secured creditors

34

and unsecured creditors receive some recovery on their Claims (which they most likely would not if the litigation were to proceed against the Debtors).[81]

63.     The Plan Settlements clearly satisfy all of the foregoing factors.  As of the date of this Memorandum, over 88% of voting creditors by value have voted to accept the Plan.  Such support for and the manifest benefits of the settlements and compromises that comprise the foundation of the Plan are clear indicators of the hard-fought, arm's-length nature of those agreements.  Accordingly, the Debtors respectfully submit that the Plan Settlements satisfy the fourth *Martin* factor and that the Plan appropriately reflects, and should be approved as, a settlement of all Claims, Interests, Causes of Action, and other controversies resolved therein, as permitted by section 1123(b)(6) of the Bankruptcy Code.

### 2.     Releases By (a) Debtors and (b) Non-Debtor Releasing Parties (Other Than Opioid Claimants)[82]

64.     The Plan provides for releases by the Debtors and the Non-Debtor Releasing Parties for the benefit of the Released Parties with respect to certain Claims and Causes of Action arising from or relating to, among other things, the Debtors and their businesses, their Estates, and certain restructuring related transactions and occurrences (including transactions or occurrences relating to the Opioid Settlement), except to the extent such Claims or Causes of Action arise out of a

---

[81]    *See In re W.R. Grace & Co.*, 475 B.R. 34, 79 (D. Del. 2012) ("A resolution of all these issues is highly valuable. . . . This infusion of tangible and abstract value into Grace's bankruptcy estate, in turn, is in the paramount interest of Grace's creditors because it enlarges the pool of funds available to all creditors and ensures greater guaranteed recovery"); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 519-20 (Bankr. D. Del. 2010) (finding a plan settlement in the "paramount interests of creditors" because it provided "numerous tangible and intangible benefits," and resulted from "arm's length good-faith negotiation with the secured lenders and the [committees] were given appropriate notice and an ample opportunity to conduct discovery in preparation for the [confirmation] [h]earing.").

[82]    Releases by Holders of Opioid Claims are addressed in Section I.D.3 of this Memorandum.

Released Party's actual fraud, gross negligence, or willful misconduct, all as more fully described in Article IX.B and IX.C of the Plan.[83]

65.     The releases by the Debtors reflect the Debtors' business judgment in facilitating many of the Plan's global settlements and should be approved, especially in light of the fact that the Debtors are not aware of any viable Causes of Action against the Released Parties that are worth pursuing.  In addition, the Releases by the Non-Debtor Releasing Parties (which exclude Opioid Claimants) should be approved because they are consensual, as the Non-Debtor Releasing Parties had an opportunity to opt out of such releases either through the Ballot or Opt-Out Form. Finally, this Court has jurisdiction to grant the releases under its "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Third Circuit's decision in *Pacor, Inc. v. Higgins*,[84] because the releases are integral to the Plan.[85]

a.      *Releases by the Debtors*

66.     Under the Plan, the Debtors and their Estates will release certain entities from the Debtors' Claims and Causes of Action that have arisen on or before the Effective Date, with certain exceptions (collectively, the "***Debtor Releases***").[86]  Each of the Released Parties is a stakeholder and/or a critical participant in the Plan process that is typically released from claims of debtors in a chapter 11 plan.[87]

---

[83]  *See* Plan Art. IX.

[84]  743 F.2d 984 (3d Cir. 1984), *rev'd on other grounds*.

[85]  *See* Tr. of Hr'g Held on Apr. 20, 2006 at 114, *In re Freedom Rings, L.L.C.*, No. 05-14268 (Bankr. D. Del. May 9, 2006) [Docket No. 385] (CSS) ("[T]here is a jurisdictional nexus between the proposed releases to non-Debtor third parties and the Debtor.  The entire Plan hinges on the releases, and the evidence is uncontroverted that without the releases, there is little prospect of confirming a Plan.").

[86]  The Debtor Releases are contained in Article IX.B of the Plan.

[87]  The Released Parties are listed in Article I.A.361 of the Plan.

US-DOCS\126024798.18

67.      The Debtors respectfully request that the Court approve the Debtor Releases because they satisfy both (a) the principles governing compromises under section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and (b) the five-factor test set forth in *In re Master Mortgage Investment Fund, Inc.*[88] and applied in *In re Zenith Electronics Corp.*[89]

> i.      *The Debtor Releases Satisfy Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019*

68.      Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or the estate," and Bankruptcy Rule 9019(a) further provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  In the context of a plan, the debtor "can elect to release claims as part of the plan and as part of the fresh start, concentrating on the business affairs and forgetting about litigation that may have questionable value or no value at all, just to settle past scores of charges and expressions of discontent."[90]  "[T]he debtor should be given considerable latitude in addressing" whether to release claims as part of its plan.[91]

69.      The *Martin* factors govern whether a compromise of a debtor's claim should be approved.[92]  The Debtors propose that the compromises embodied in the Debtor Releases satisfy

---

[88]   *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937-38 (Bankr. W.D. Mo. 1994).

[89]   *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

[90]   Tr. of Hr'g Held on Jan. 18, 2006 at 44-45, *In re AAI Pharma*, No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) [Docket No. 893].

[91]   Tr. of Hr'g Held on January 18, 2006 at 45, *In re AAI Pharma*, No. 05-11341.

[92]   *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424 (1968); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (proposed settlement held in best interest of the estate).

US-DOCS\126024798.18

the *Martin* factors as they are fair and equitable, are in the reasonable range of potential litigation outcomes, and obviate the expense, delay, inconvenience, and uncertainty to any litigation against the Released Parties.  This is bolstered by the fact that no party has directly objected to the Debtor Releases.

70.    The Debtors are not aware of any viable Causes of Action they might have against any of the Released Parties that are worth pursuing.[93]  For the Debtors' Specialty Brands businesses, two independent directors of Mallinckrodt plc oversaw an investigation into whether the Debtors had viable claims against the Released Parties.  The directors instructed Latham & Watkins LLP to evaluate whether any such claims existed for events or transactions that occurred on or before June 30, 2019, the date on which the Debtors engaged Latham & Watkins LLP to assist the company in its Chapter 11 planning.  The directors instructed Richards, Layton & Finger, PA to evaluate whether any such claims existed for events or transactions that occurred from and after July 1, 2019.  After a thorough investigation involving, among other things, approximately 650,000 documents and interviews of various witnesses, Latham & Watkins LLP and Richards, Layton & Finger, PA prepared two memoranda spanning several hundred pages in length with their analysis.  As will be shown at the Confirmation Hearing, after reviewing such memoranda, the two independent directors concluded that (a) the Debtor Releases would not extinguish valuable claims worth pursuing and (b) the Debtor Releases are necessary to the successful emergence from Chapter 11 because they will allow the company to emerge chapter 11

---

[93] *See In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (noting that "the record does not reflect that there is any pending litigation in [that] case that would be discontinued by such a release" and citing *In re DBSD North America, Inc.*, 419 B.R. 179, 217(Bankr. S.D.N.Y. 2009), which "approv[ed] a debtor's release of third parties when the debtor testified that it was unaware of any significant potential claims that were being released," *aff'd in part*, 627 F.3d 496 (2d Cir. 2010)); Tr. of Hr'g held on Jan. 18, 2006 at 44, *In re AAI Pharma*, No. 05-11341 (Bankr. D. Del. Feb. 22, 2006) [Docket No. 893] (noting that there was "nothing in this case that would suggest that there is any serious cause of action out there that the debtor is giving up").

proceedings without diverting substantial resources to claims that are unlikely to succeed and that would create additional and highly costly financial burdens for the Company.

71.     Similarly, the Specialty Generics Debtors are not aware of any Claims against the Released Parties that are worth pursuing.  Sherman K. Edmiston and Marc A. Beilinson were appointed on August 30, 2019, as disinterested managers of the Specialty Generics Debtors and Non-Debtor Affiliates to conduct an independent investigation into whether the Debtor Releases are in the best interests of the Specialty Generics Debtors and whether they are being given in exchange for adequate consideration (the "***Generics Investigation***").  To assist in fulfilling their duties, the Disinterested Managers retained Katten Muchin Rosenman LLP ("***Katten***") as independent counsel.  As part of the Generics Investigation, Katten (at the direction of the Disinterested Managers) performed, *inter alia*, the following:  (a) submitted at least 83 targeted diligence requests to the Debtors seeking documents and information relevant to the Generics Investigation including, among other requests, copies of board materials and minutes, intercompany transactions, and opioid-related litigation; (b) analyzed more than 50 depositions of Company representatives taken in the opioid-related cases, as well as all exhibits used therein; (c) reviewed more than 153,000 additional documents—nearly 2.7 million pages—produced by the Debtors in response to document requests from the UCC and the OCC, among others; and (d) conducted multiple interviews of Company representatives and employees knowledgeable of the issues pertinent to the opioid litigation.  Based on the result of the extensive Generics Investigation, and as will be shown at the Confirmation Hearing, the Disinterested Managers found, *inter alia*, that the Claims released by the Debtor Releases are not worth pursuing because they would face significant obstacles and would involve extremely costly and time-consuming litigation that could undermine the value of the settlements embodied in the Plan.  Thus, the

39

Disinterested Managers concluded that the Debtor Releases are reasonable and the Specialty Generics Debtors are receiving fair consideration in exchange for the Debtor Releases, which are necessary for the Specialty Generics Debtors to emergence from chapter 11.

72.     The Debtor Releases reflect the important contributions, concessions, and compromises made by the Released Parties in the process of formulating and supporting the Plan and the Plan Settlements.  The Debtors believe that the Released Parties, including the Debtors' stakeholders, likely would not have participated in the negotiations and compromises that led to the Restructuring Support Agreement, the Plan Settlements, and, ultimately, the Plan without the Debtor Releases.  The Debtors negotiated the terms of the Debtor Releases in good faith and at arm's-length with the Released Parties and the Supporting Parties, including Holders of Guaranteed Unsecured Notes Claims who, as the future owners of the ordinary shares of NewCo or Reorganized Parent, as applicable, would otherwise be the beneficiaries of the released potential Causes of Action.[94]

73.     Accordingly, because the Debtor Releases are a sound exercise of the Debtors' business judgment, are a valid compromise of litigation, are a critical component of the Plan, and are in the best interests of the Debtors, their Estates and their creditors, the Debtor Releases should be approved pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

---

[94]  *See Spansion*, 426 B.R. at 143 ("The Debtor Releasees were actively involved in negotiating and formulating the Plan.  It is a valid exercise of the Debtors' business judgment to include a settlement of any claims it might own against such parties as a discretionary provision of the plan."); Tr. of Hr'g Held on Jan. 18, 2006 at 44, *In re AAI Pharma*, No. 05-11341 (Bankr. D. Del. Feb. 22, 2006) [Docket No. 893] (recognizing that a plan's debtor releases are in the best interests of creditors when the releases ae the result of good-faith negotiations among the various plan constituencies).

40

ii.     *The Debtor Releases Satisfy the Master Mortgage/Zenith
Factors*

74.     The Debtor Releases are also appropriate because they satisfy all five of the *Master
Mortgage/Zenith* factors.  These factors include:  (a) whether an identity of interest between the
debtors and the releasees exists, such that a suit against the releasees is, in essence, a suit against
the debtors or would deplete assets of the estates; (b) the contribution of the releasees since the
petition date; (c) the essential nature of the releases to the approval of the plan; (d) whether a
substantial majority of the impacted creditors support the plan; and (e) whether the plan pays
substantially all of the claims of the impacted creditors.[95]  The *Master Mortgage/Zenith* factors do
not comprise a rigid test; rather, the court should "engage[] in a fact specific review, weighing the
equities of [the individual] case."[96]  Nevertheless, all of the *Master Mortgage/Zenith* factors weigh
in favor of approving the Debtor Releases under the Plan.

75.     *First*, the Released Parties could be entitled to indemnification, contribution, or
reimbursement from the Debtors, whether pursuant to the Debtors' organizational documents,
contractual arrangements with such parties, or under various theories of state or other applicable
law.  Therefore, a lawsuit against the Released Parties could result in litigation against the Debtors,
which could deplete the Debtors' assets and their resources.

76.     *Second*, all the Released Parties have made significant contributions to these cases.
The Debtors' officers and directors, as well as their other managers, principals, members, partners,
employees, agents, advisors, attorneys, accountants, investment bankers, consultants, experts, and
other related parties, have been absolutely critical in negotiating the settlements underpinning this
restructuring and ensuring that the Debtors will emerge from chapter 11.  Further, the efforts of

---

[95]   *See* 168 B.R. at 935–36.

[96]   *See id.* at 935.

41

the Supporting Parties (and their principals, agents, and advisors) in developing a consensual framework for the Debtors' restructuring and in facilitating its execution in the Chapter 11 Cases are not only laudable in their own right, but are the genesis of the significant support for the Debtors' reorganization.  Likewise, each of the other Released Parties has played an active and important role in implementing this restructuring, which accrues to the benefit of the Debtors' other stakeholders.

77.    *Third*, the Debtor Releases have been a critical aspect of the Plan since the beginning, all the way back to the very first term sheets and draft definitive documents underlying the Restructuring Support Agreement, which has served as the foundation for the Debtors' success here.  The Debtor Releases are not only important to the Debtors or the Released Parties but also the go-forward stakeholders of the Reorganized Debtors.  Without the Debtor Releases, the Reorganized Debtors would not have the benefit of a fresh start because the Released Parties would be exposed to litigation that would require the Reorganized Debtors to expend resources instead of focusing on their businesses.  This is not what the Supporting Parties, and particularly the Holders of Guaranteed Unsecured Notes (as the owners of the equity of the Reorganized Debtors), bargained for.  Thus, the Debtor Releases were a significant aspect of the negotiated Plan.

78.    *Fourth*, of the votes tabulated thus far, over 88% of voting creditors by value have voted to accept the Plan.  It is important to note that the majority of dissenting creditors do not engage with Debtors on a commercial and have taken a litigious posture since the start of the Chapter 11 Cases.

79.    *Fifth*, while the Plan will not result in full payment of all Impaired creditors, the Plan does provide Impaired creditors with far higher recoveries than they would receive in a liquidation and such recoveries reflect the best result achievable under the circumstances, which

was only made possible as a result of extensive negotiation between, among other parties, the Debtors, the Supporting Parties, the OCC, and the UCC.  Thus, all of the *Master Mortgage/Zenith* factors support the Debtor Releases here.

80.    Furthermore, the *Master Mortgage/Zenith* analysis must be conducted in light of the potential value of the Claims to be released[97] and, as stated *supra* ¶¶ 71-72, the Debtors do not believe that they will be releasing any worthwhile Claims or Causes of Action.[98]

81.    Accordingly, because the Debtor Releases satisfy section 1123(b)(3)(A) of the Bankruptcy Code, Bankruptcy Rule 9019, and the *Master Mortgage/Zenith* factors, the Debtors respectfully request that the Court approve the Debtor Releases.

   b.    <u>Releases by Non-Debtor Releasing Parties Other than Opioid Claimants</u>

82.    The Plan also provides for customary third-party releases by the Non-Debtor Releasing Parties (which do not include Opioid Claimants), subject to the terms thereof and the Confirmation Order.[99]  In particular, pursuant to Article IX.C of the Plan, Non-Debtor Releasing Parties are releasing the Released Parties from all Claims and Causes of Action against such entities that have arisen before the Effective Date (the "***Third-Party Releases***").  As shown below, the Third-Party Releases—which are an integral part of the Plan and the Plan Settlements—should be approved because (a) they are consensual and should be approved and (b) even if the Court

---

[97] *See Tribune I*, 464 B.R. at 187 ("Because I have already decided that the Settlement meets the standard for approval [under Bankruptcy Rule 9019], I likewise conclude that the Settling Parties' consideration for the Debtors' Release is sufficient.").

[98] The Welch Declaration, the *Declaration of Paul R. Carter in Support of Confirmation of the Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, and the *Declaration of Sherman K. Edmiston III in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, each of which will be filed before the Confirmation Hearing, will provide ample evidentiary support for the Debtor Releases and, if necessary, the Debtors will supplement the record at the Confirmation Hearing.

[99] The Non-Debtor Releasing Parties are listed in Article I.A.260 of the Plan.

43

were to find that they are not consensual, they nonetheless satisfy the standard for nonconsensual releases to the extent parties have not opted out of the releases.

i.      *The Third-Party Releases are Consensual*

83.     The Third-Party Releases are consensual because the Non-Debtor Releasing Parties had an opportunity to opt out of such releases.  Courts in this jurisdiction have recognized (a) that a chapter 11 plan may include releases of non-debtors by other non-debtors when such releases are consensual[100] and (b) that non-debtor releases are consensual when holders of claims or equity interests had an opportunity, but chose not, to opt out of such releases.[101]  Those two principles hold true up-and-down the voting ladder.

---

[100] *See, e.g., In re Seventy Seven Fin. Inc.*, No. 16-11409 (Bankr. D. Del. July 14, 2016) (approving substantially similar third-party releases); *In re Quiksilver Inc.*, No. 15-11880 (Bankr. D. Del. Jan. 29, 2016) [Docket No. 740] (same); *In re EveryWare Glob., Inc.*, No. 15-10743 (Bankr. D. Del. May, 22, 2015) (same); *Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual"); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (collecting cases).

[101] *See, e.g., In re VER Techs. Holdco LLC*, No. 18-10834 (Bankr. D. Del. July 26, 2018) [Docket No. 647] (overruling objection from the United States Trustee where defined term "Releasing Parties" included "all Holders of Claims or Interests that are deemed to reject the plan that do not affirmatively elect to 'opt out' of being a releasing party by timely objecting to the Plan's third-party release provisions"); *In re EV Energy Partners, L.P.*, No. 18-10814 (Bankr. D. Del. May 17, 2018) [Docket No. 238] (overruling objections of the United States Trustee, Securities Exchange Commission, and others where defined term "Releasing Parties" included "each holder of a Claim or Existing Equity Interest that is deemed to reject the Plan that does not affirmatively elect to 'opt out' of being a Releasing Party by timely objecting to the Plan's third-party release provision"); *In re Verso Corp.*, No. 16-10163 (Bankr. D. Del. June 23, 2016) [Docket No. 1223] (confirming plan of reorganization in which the defined term "Releasing Parties" included "each holder of a Claim or Equity Interest deemed to have rejected the Plan but does not send a notice to the Debtors to opt out of the releases set forth in Article 12.4 of the Plan"); *In re JRV Group USA L.P.*, Case No. 19-11095 (Bankr. D. Del.) (CSS), Transcript from Confirmation Hearing (June 19, 2020) (overruling objection from the United States Trustee and approving third-party release because "people have been given reasonable notice, consistent with due process; an opportunity to object or opt-out, they've chosen not to do so [and] I believe that's constructive consent"); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (Bankr. D. Del.) (KG) [Docket No. 1121] (approving shareholder release with opt-out option); *In re Gibson Brands*, Case No. 18-11025 (Bankr. D. Del.) (CSS), Transcript from Confirmation Hearing (October 2, 2018) (overruling objection from the United States Trustee and holding that "to consent to something, [ ] it's sufficient to say, Here's your notice, this is what's going to happen and if you don't object, you'll have been deemed to consent").

US-DOCS\126024798.18

84.    Unimpaired creditors—who are being paid in full—can be bound to third-party releases when they have not objected to the Plan, as their silence constitutes consent.[102]  "As for impaired creditors who abstained from voting on the Plan or who voted to reject the Plan and did not otherwise opt out of the releases," third-party releases "may be properly characterized as consensual and will be approved" when "the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots."[103]  Last, Impaired creditors and equityholders not entitled to vote on (*i.e.*, deemed to reject) a plan are bound by a third-party release if the claimant had an opportunity to opt out of the third-party release but did not do so.[104]

85.    In accordance with the Disclosure Statement Order, the Debtors sent solicitation packages to Holders of Claims and Interests against the Debtors containing, as applicable, Notices of Non-Voting Status (as defined in, and attached as, Exhibits 4.4 through 4.7 and 4.12 to the Disclosure Statement Order), Opt-Out Forms[105] that enabled relevant Holders to opt out of the Third-Party Releases, Ballots (as defined in the Disclosure Statement), the Disclosure Statement, and/or the Plan.[106]  As discussed in more detail below, these solicitation packages included the proposed Third-Party Releases, prominent instructions on how to opt out of them, and conspicuous

---

[102]  *See Spansion*, 426 B.R. at 144 (overruling an objection to a release that bound unimpaired creditors, noting that "no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan" and the "silence of the unimpaired classes on this issue is persuasive").

[103]  *Indianapolis Downs*, 486 B.R. at 306.

[104]  *See supra* n. 101.

[105]  The "***Opt-Out Forms***" are, as applicable, the Opt-Out Form for Class 13 Subordinated Claims (attached to the Disclosure Statement Order as Exhibit 4.5A); the Registered Holder Opt-Out Form for Class 14 Equity Interests (attached to the Disclosure Statement Order as Exhibit 4.6A); Beneficial Holder Opt-Out Form for Class 14 Equity Interests (attached to the Disclosure Statement Order as Exhibit 4.6B); and the Master Opt-Out Form for Nominee of Beneficial Holders of Class 14 Equity Interests (attached to the Disclosure Statement Order as Exhibit 4.6C) (the "***Master Opt-Out Form***").

[106]  Affidavit/Declaration of Mailing of James Daloia Regarding Solicitation Materials [Docket No. 3210].

disclaimers that these releases will be binding on all such Holders if they did not timely opt out of them.  Thus, the Third-Party Releases are appropriate in these Chapter 11 Cases.

86.    Several Objectors argue or suggest in their Confirmation Objections that the Court should not approve the Third-Party Releases on the grounds that they are not consensual.  Case law supports the Debtors' opt-out mechanism and the Debtors' noticing process complied with all applicable notions of fairness and due process and, thus, such Confirmation Objections should be overruled.

A.    <u>Unimpaired Claimants and Claimants Entitled to Vote</u>

87.    The United States Trustee argues that the Third-Party Releases are not consensual with respect to (a) Unimpaired claimants and (b) claimants who are entitled to vote but do not opt out of the Third-Party Releases because, according to the United States Trustee, the failure of such Holders to object to the Plan or opt out of the Third-Party Releases—after either voting to reject the Plan or abstaining from voting on the Plan—is not tantamount to consent.[107]  The Court has already rejected the United States Trustee's argument in *Spansion*, 426 B.R. at 144 (with respect to Unimpaired creditors) and *Indianapolis Downs*, 486 B.R. at 306 (with respect to creditors entitled to vote).

88.    In *Spansion*, the Court held that "no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan" and the "silence of the unimpaired classes on this issue is persuasive."[108]  In *Indianapolis Downs*, the Court held that third-party releases were consensual with respect to Impaired creditors "who abstained from voting on the Plan or who voted to reject the Plan and did not otherwise opt out of the releases," such as

---

[107]  Docket No. 4718 (the "***UST Objection***") ¶ 69.

[108]  426 B.R. at 144.

the Holders of Class 6 General Unsecured Claims, because the debtors provided such parties with "detailed instructions on how to opt out" and such parties "had the opportunity to do so by marking their ballots."[109]  Accordingly, the United States Trustee's objection should be overruled.

B.     Impaired Claimants Not Entitled to Vote

89.     Additionally, the United States Trustee, the SEC, and the Canadian Elevator Industry Pension Trust Fund (the "**Pension Trust**")[110] argue that the Third-Party Releases are nonconsensual with respect to the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests because such Holders are not receiving a recovery under the Plan and thus deemed to reject the Plan but are nonetheless required to affirmatively opt out of the Third-Party Releases.[111] According to the SEC and the United States Trustee, the Third-Party Releases are only consensual with respect to the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests if such Holders **opt in** to such releases.[112]  That is not the law.  Nor should it be.

90.     The Objectors' insistence that such a blanket rule should apply in the Chapter 11 Cases ignores the statements of this Court that the Third-Party Releases and opt-out mechanic may be upheld if the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests obtain a "full and fair opportunity" to receive an Opt-Out Form and understand the rights being

---

[109]  486 B.R. at 306.

[110]  Without standing to do so, the Pension Trust raises a number of arguments on behalf of itself and the putative class of plaintiffs (the "**Strougo Plaintiffs**") in a securities class action pending in the United States District Court for the District of New Jersey captioned *Barbara Strougo v. Mallinckrodt Public Limited Company*, et al., Case No. 20-cv-10100.  As discussed *infra* ¶¶ 325-332, the Debtors respectfully submit that the Court should not entertain any of the Pension Trust's arguments on behalf of the Strougo Plaintiffs because they lack the standing to do so.  Out of an abundance of caution, however, the Debtors address the Pension Trust's arguments herein in case the Court were to disagree with the Debtors' position that the Pension Trust lacks such standing.

[111]  *See* Docket No. 4148 (the "**SEC Objection**") at 3; Docket No. 4090 (the "**Pension Trust Objection**") at 16-20; UST Objection ¶¶ 58-71.  It should be noted that the Pension Trust's arguments are limited to the Strougo Plaintiffs in their capacities as Holders of Class 13 Subordinated Claims.

[112]  SEC Objection at 5; UST Objection ¶ 68.

US-DOCS\126024798.18

relinquished under the release.[113]   As will be adduced at the Confirmation Hearing, the Debtors

provided notice to such Holders in a manner that is customary in large chapter 11 cases.

91.     Overall, the objections to the Third-Party Releases with respect to the Holders of

Class 13 Subordinated Claims and Class 14 Equity Interests should be overruled because the

Debtors provided clear and conspicuous notice (actual and constructive) to such Holders with

explicit information about the Third-Party Releases and the consequences of not opting out.

Indeed, the Debtors received *2,100 shareholder Opt-Out Forms*, demonstrating that the Opt-Out

Forms provided clear and conspicuous instructions and that current and former shareholders

understood that their silence would be taken as consent.[114]

92.     *Notice Provided in Notices of Non-Voting Status and Opt-Out Forms*.  The Holders

of Class 13 Subordinated Claims and Class 14 Equity Interests did, in fact, obtain a full and fair

opportunity to receive the Opt-Out Form and understand the Plan's Third-Party Releases and opt-

out mechanic.   The Debtors stood by the promise they made to this Court at the Disclosure

Statement hearing to make the Opt-Out Forms (a) "simple" such that "people who are deemed to

reject [the Plan] are going to have an opportunity [to opt out] and make it crystal clear that they

have an opportunity to submit a form to opt-out of the third-party releases,"[115] and  (b) "available"

---

[113]  *In re Mallinckrodt PLC, et al.*, Case No. 20-12522, *Transcript of Telephonic Disclosure Statement Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge* (June 16, 2021), 13: 3–16 ("I don't want to prejudge the issue at this point.  I do think it is a confirmation issue, but it is one that I am interested in and I think it does depend on the facts and circumstances and how the noticing is done, and whether or not I believe at the end of the day parties had a full and fair opportunity to receive and understand this opt-out and be able to obtain the proper form to be able to submit that opt-out, but we will deal with that at confirmation.").

[114]  Daloia Declaration ¶ 13.

[115]  *In re Mallinckrodt PLC, et al.*, Case No. 20-12522, *Transcript of Telephonic Disclosure Statement Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge* (June 16, 2021) at 12: 21–24.

such that the forms could "be obtained by contacting the noticing agent or visiting the case website."[116]

93.     *First*, the Notices of Non-Voting Status and Opt-Out Forms were clear and understandable.   The Notices of Non-Voting Status for the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests informed such Holders (a) in capitalized text (that contained a box around it to make it stick out from the nearby text) that the Plan contains release, exculpation, and injunction provisions that such Holders "are advised and encouraged to carefully review and consider," and (b) in bold text—and in no less than two places—that such Holders "must affirmatively opt-out of the releases and submit the opt-out form . . . if [they] wish to opt-out of the releases."[117]   The Notices of Non-Voting Status also contained the full release, injunction and exculpation provisions and related definitions so such Holders could easily review them.[118]

94.     The Opt-Out Forms that the Debtors included with the Notices of Non-Voting Status informed such Holders in bold and capitalized text (that contained a box around it to make it stick out from the nearby text) that "unless [they] check the box on this opt-out form below and follow all instructions, [they] will be held to forever release the Released Parties in accordance with the Plan."[119]   The Opt-Out Form added that "[e]ven though you are deemed to reject the Plan, you will nevertheless be deemed to consent to the Releases set forth in Article IX.C of the Plan unless you clearly indicate your decision to opt-out of the Releases by checking the box in Item 1 of this Opt-Out Form" and warned that "**[i]f you submit your Opt-Out Form without this box checked, then you will be deemed to <u>CONSENT</u> to the Releases set forth in <u>Article IX.C</u> of**

---

[116]  *Id.* at 13: 3–5.

[117]  *See* Exhibits 4.5 and 5.6 of the Disclosure Statement Order [Docket No. 2911].

[118]  *Id.*

[119]  *Id.*

the Plan. **PLEASE BE ADVISED THAT BY NOT CHECKING THE BOX BELOW YOU ELECT TO GRANT THE RELEASES IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR EQUITY INTEREST IN, ANY OF THE DEBTORS. YOU MUST AFFIRMATIVELY CHECK THE BOX BELOW IN ORDER TO OPT-OUT OF THE RELEASES.**"[120]

95.     Additionally, in light of this Court's comments at the Disclosure Statement hearing, the Debtors added language in the publication version of the Confirmation Hearing notice to provide additional notice with respect to the opt-out procedures. In particular, the Debtors added paragraph 8 to the notice, stating that a Holder of a Claim or Interest "may elect **not** to grant the [Third-Party] Releases" and that if they "would like to so elect and [ ] have not already received an opt-out form," they should contact the Debtors' Notice and Claims Agent and must submit their Opt-Out Form by the then-deadline of September 3, 2021.

96.     In addition, the Debtors notified former shareholders who may hold Claims pursuant to the *Notice of (I) Deadline to Vote on Debtors' Joint Plan of Reorganization, (II) Hearing to Consider Confirmation of Debtors' Joint Plan of Reorganization, and (III) Related Matters* (the "**Notice to Former Shareholders**").[121]  The Notice to Former Shareholders is substantively the same as the form of Publication Notice approved by the Court, and also contained the full release, injunction, and exculpation provisions and related definitions so such Holders could easily review them.[122]

---

[120]  *Id.* (emphasis in original).

[121]  *See* Affidavit of Service [Docket No. 3129]; Affidavit of Service [Docket No. 3259]; Affidavit of Service [Docket No. 3603].

[122]  *Compare* Affidavit of Service [Docket No. 3129], Ex. B, *with* Disclosure Statement Order, Ex. 4.2.

97.    _Procedures for Opting Out_.  Even though the Debtors included these clear and attention-grabbing directions in the Opt-Out Forms and notices, they went one step further and attached instructions to the Opt-Out Form that (a) provided steps for the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests to follow to properly submit the Opt-Out Form and (b) included (once again) the full release, injunction, and exculpation provisions and related definitions so such Holders could easily review them.  Thus, the Debtors gave the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests abundant "reason to understand that assent may be manifested by silence or inaction" and that their silence enables "the Court to infer consent" to the Third-Party Releases.[123]

98.    _Notice Provided to Holders_.  The Debtors also used reasonable efforts to ensure that Holders of Class 13 Subordinated Claims[124] and Class 14 Equity Interests received the Court-approved notice of the Confirmation Hearing, the Third-Party Releases, directions as to how to opt-out of the Third-Party Releases, and the consequences of not opting out.  Whether the Debtors are required to provide actual or constructive notice to a creditor turns on whether the creditor is

---

[123]  _In re Emerge Energy Servs. LP_, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (KBO) ("For the Court to infer consent from the nonresponsive creditors and equity holders, the Debtors must show under basic contract principles that the Court may construe silence as acceptance because (1) the creditors and equity holders accepted a benefit knowing that the Debtors, as offerors, expected compensation; (2) **the Debtors gave the creditors and equity holders reason to understand that assent may be manifested by silence or inaction, and the creditors and equity holders remained silent and inactive intending to accept the offer**; or (3) acceptance by the creditors and equity holders can be presumed due to previous dealings between the parties." (emphasis added) (citing Restatement (Second) of Contracts § 19 (Am. Law Inst. 1981); Klaassen v. Allegro Dev. Corp., 106 A.3d 1035, 1045-48 (Del. 2014))).

[124]  While no Holders of Class 13 Subordinated Claims existed as of the Voting Record Date, the Pension Trust did file an Opt-Out Form to Holders of Impaired Claims in Class 13 (Subordinated Claims).  Daloia Declaration ¶ 14. The Pension Trust mistakenly alleges that the Debtors did not send the Court-approved notice materials to the Holders of Class 13 Subordinated Claims based on the fact that the affidavit of service filed by the Notice and Claims Agent did not separately state that notices were served on Holders of Class 13 Claims.  Pension Trust Objection at 21.  Given that there were no Claims in Class 13 as of the Voting Record Date, however, the Debtors served current and former shareholders who potentially hold Class 13 Claims in accordance with the Disclosure Statement Order and due process, as discussed herein.

51

"known" or "unknown" to the Debtors.  A known creditor is one whose identity is either known or "reasonably ascertainable by the debtor."[125]  Only those claimants who are identifiable through a "reasonably diligent" search of debtor's records are reasonably ascertainable and hence known creditors entitled to actual notice.[126]  Conversely, an unknown creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge of the debtor."[127]  Publication notice is sufficient for "unknown creditors."[128]  In order to ascertain and serve potential shareholders—including registered shareholders, beneficial holders, and unknown shareholders—the Debtors worked closely with the Notice and Claims Agent as follows.[129]

99.     With respect to registered shareholders, as will be set forth in the Welch Declaration, the Debtors have access to a registered shareholder list through the Debtors' transfer agent and registrar:  Computershare Trust Company, N.A. and Computershare Inc. (collectively, "***Computershare***").  The Notice and Claims Agent worked with Computershare to obtain a list of (a) current registered shareholders and (b) parties that held Equity Interests between January 1, 2019 and June 8, 2021 (the "***Former Shareholder Notice Period***").[130]  In accordance with the Solicitation Procedures, the Notice and Claims Agent then served the Confirmation Hearing Notice, Notice of Non-Voting Status and Registered Holder Opt-Out Form (along with a pre-

---

[125]  *Chemetron Corp. v.* Jones, 72 F.3d 341, 346 (3d Cir. 1995).

[126]  *Id.*

[127]  *Id.*

[128]  *Id.*

[129]  As this Court previously acknowledged, "reasonable diligence, however, does not require impracticable or extended searches in the name of due process."  Class Claim Ruling, 24: 15-17.

[130]  Daloia Declaration ¶ 9.

addressed, postage paid return envelope, for use by current registered holders to return their Registered Holder Opt-Out Forms to Prime Clerk) via first class mail on all registered holders directly.[131]  In addition, the Notice and Claims Agent served parties that held Equity Interests during the Former Shareholder Notice Period with the Notice to Former Shareholders via first class mail.[132]

100.    With respect to beneficial holders of Equity Interests through a bank, broker, or other financial institution (a "*Nominee*") holding the equity "in street name" at The Depository Trust Company ("*DTC*"), the Notice and Claims Agent served the Confirmation Hearing Notice, Notice of Non-Voting Status, Master Opt-Out Form, and Beneficial Holder Opt-Out Form (along with pre-addressed, postage paid return envelopes, for use by current beneficial holders to return their Beneficial Holder Opt-Out Forms to Prime Clerk, in sufficient quantities for distribution to beneficial holders), via overnight courier on Notice and Claims Agent's comprehensive list of Nominees and those Nominees' mailing agents, including Broadridge Financial Solutions, Inc., with instructions to forward the materials within five (5) business days of receipt to their beneficial holder clients that held Equity Interests as of the Voting Record Date (as defined in the Disclosure Statement Order).[133]  The instructions also provided that Nominees were to execute and return to Prime Clerk the Master Opt-Out Form on behalf of beneficial holders that returned a Beneficial Holder Opt-Out Form to the Nominee. [134]  All of the foregoing actions by Notice and Claims Agent were taken in accordance with and in furtherance of the Solicitation Procedures.  In addition, the Notice and Claims Agent served the Notice to Former Shareholders, in sufficient quantities for

---

[131]  *See* Affidavit of Service of Solicitation Materials [Docket No. 3210]; Daloia Declaration ¶ 9.

[132]  *See* Affidavit of Service [Docket No. 3129]; Daloia Declaration ¶ 9.

[133]  See Affidavit of Service of Solicitation Materials [Docket No. 3210]; Daloia Declaration ¶ 10.

[134]  *See* Affidavit of Service [Docket No. 3129]; Daloia Declaration ¶ 10.

distribution to beneficial holders, via overnight courier on Prime Clerk's comprehensive list of Nominees and those Nominees' mailing agents, including Broadridge Financial Solutions, Inc., with instructions to forward the materials within five (5) business days of receipt to their beneficial holder clients that held Equity Interests during the Former Shareholder Notice Period.[135]   In addition, noticing information of current and former beneficial holders of Debtors' Equity Interests who hold the equity "in street name" at DTC through a Nominee is confidential at the Nominee and not available to third parties unless provided by the Nominee.[136]  Accordingly, consistent with industry practice, Prime Clerk served the Nominees and those Nominees' mailing agents, including Broadridge Financial Solutions, Inc., with instructions to serve the beneficial Holders as described above.[137]

101.    As an additional method to notify any potential Holders of Claims and Interests whose identities the Debtors were unable to obtain through the above efforts, the Notice and Claims Agent also published the approved form of Publication Notice in *USA Today* and in the national editions of the *New York Times and Wall Street Journal*.[138]  Furthermore, all of the notices described above were posted on the Notice and Claims Agent's case website at restructuring.primeclerk.com/Mallinckrodt, as well as served on certain domestic and international depositories listed in the Affidavit of Service of Solicitation Materials [Docket No. 3210], with instructions to post the materials on their respective online noticing platforms, as well as DTC's Legal Notice System.[139]

---

[135]  Daloia Declaration ¶ 11.

[136]  *Id.* ¶ 10.

[137]  *Id.*

[138]  *Certificate of Publication of Kaitlin Okimoto Regarding Notice of Voting Deadline and Confirmation Hearing* [Docket No. 3072].

[139]  Daloia Declaration ¶ 12.

US-DOCS\126024798.18

102. To satisfy the requirement expressed by the Court at the Disclosure Statement hearing that the opt out be crystal clear, the Debtors amended the Publication Notice to include the following paragraph:

> If you are the Holder of a Claim against or Interest in the Debtors, you may elect not to grant the Releases of certain non-Debtor parties contained in Article IX.C of the Plan. If you would like to so elect and you have not already received an opt-out form, please contact the Debtors' Notice and Claims Agent, Prime Clerk LLC, by: (a) visiting the website maintained by the Notice and Claims Agent at http: //restructuring.primeclerk.com/Mallinckrodt; (b) calling the Debtors' restructuring hotline at 877-467-1570 (US/Canada) or 347-817-4093 (International) or (c) writing to (i) Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (ii) mallinckrodtinfo@primeclerk.com. You must complete and submit your opt-out form so that it is actually received by the Notice and Claims Agent on or before September 3, 2021, at 4:00 p.m. (prevailing Eastern Time).

103. In the event any of the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests did not receive actual notice of the Opt-Out Forms, such Holders still received ample constructive notice of the Chapter 11 Cases through public filings and media attention.[140] Given the extensive actual and constructive noticing in the Chapter 11 Cases and the availability of the Opt-Out Forms on the Debtors' restructuring website, it cannot be denied that the Debtors provided more than sufficient notice and opportunity for the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests to opt out of the Third-Party Releases.

---

[140] Furthermore, while not directed at holders of Subordinated Claims or Equity Interests, the existence of these Chapter 11 Cases were further publicized by the Debtors' Opioid Notice Plan, which advertised the Cases on broadcast network and cable, the internet with general banner advertising (in English and Spanish), search websites, social media like Facebook, Instagram, Twitter, YouTube, and TikTok (in English, Spanish, and French), radio (Tribal and Univision), the Wall Street Journal, 78 local newspapers, over 50 tribal newspapers, six local newspapers in U.S. territories, and various magazines in Canada. *See* Exhibit 5 to Disclosure Statement Order.

104.    _Actual Notice Is Not Required For All Holders_.  The Pension Trust's argument that all Holders of Class 13 Subordinated Claims were required to receive actual notice is without merit for numerous reasons.[141]  As discussed in the preceding section, the Debtors did provide actual notice to potential Strougo Plaintiffs by distributing the Confirmation Hearing notice and Notice of Non-Voting Status to the Holders of Equity Interests, or Notice to Former Shareholders to parties that held Equity Interests during the Former Shareholder Notice Period.  The Pension Trust does not have standing to assert objections for any other Holders of Class 13 Subordinated Claims and so has no basis for making this argument.

105.    Contrary to the Pension Trust's assertions, the Holders of Class 13 Subordinated Claims were not all known or reasonably ascertainable.[142]  Thus, for the unknown Holders of Class 13 Subordinated Claims—_i.e._, one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge of the debtor"[143]—the Debtors broadly published the notices in accordance with Third Circuit precedent.[144]

106.    Indeed, the Pension Trust's only argument in support of its assertion that the Holders of Class 13 Subordinated Claims were all known or reasonably ascertainable is illogical.  Specifically, the Pension Trust argues that the Debtors conceded that the Holders of Class 13 Subordinated Claims are reasonably ascertainable because the Shenk Settlement requires that the Debtors provide **all** members of the putative class in the Shenk Suit (the "**Shenk Plaintiffs**") with

---

[141]   Pension Trust Objection at 22.

[142]   _Id._

[143]   _Chemetron Corp. v._ Jones, 72 F.3d 341, 346 (3d Cir. 1995).

[144]   _Id._ (holding that publication notice is sufficient for "unknown creditors").

actual notice of the settlement and so the Debtors must be able to provide actual notice to the remainder of the Holders of Class 13 Subordinated Claims.[145]  How that conclusion follows from those premises when the Shenk Plaintiffs do not make up the entirety of Class 13 is not explained by the Pension Trust, nor is why the Pension Trust is making arguments on behalf of the Shenk Plaintiffs.[146]  In any event, the assertion that it would be ***possible*** to investigate and obtain claimant information has no bearing on the relevant standard for due process in these circumstances, which is whether, "although [the claimants] could be discovered upon investigation, [they] do not ***in due course of business*** come to knowledge of the debtor."[147]

107.    Moreover, the Pension Trust has misstated the notice requirements under the Shenk Settlement and, when such requirements are accurately examined, it is clear that they only demand constructive notice to the Shenk Plaintiffs.  The Shenk Settlement states:

> Lead Counsel shall cause the Claims Administrator to mail, or provide in whatever other form that may be ordered by the Court, the Notice and Proof of Claim and Release Form to those members of the Class at the address of each such person ***who may be identified through reasonable effort***.  Lead Counsel will cause to be published the Summary Notice pursuant to the terms of the Preliminary Approval Order or in whatever other form of manner might be ordered by the Court.
>
> . . .
>
> Mallinckrodt shall use its ***best efforts*** to obtain and provide or cause to be provided to Lead Counsel, or the Claims Administrator [ ] a list of stockholders of record [ ] for the relevant Mallinckrodt common stock during the Class Period.[148]

---

[145]  Pension Trust Objection at 22.

[146]  Additionally, the Debtors submit that the agreed notice procedures under a separate settlement have no bearing on whether the Debtors undertook a "reasonably diligent" search for Holders of Class 13 Claims as required by *Chemetron*.

[147]  *Chemetron*, 72 F.3d at 346.

[148]  Shenk Settlement ¶ 19 (emphasis added).

57

108.     Finally, the Pension Trust's argument completely fails to recognize that the Shenk Plaintiffs are likewise unknown creditors as many courts have found that unnamed members of a broad *uncertified* class, such as the Shenk Plaintiffs, are unknown creditors entitled to publication notice only, even where the debtor was aware of the putative class action and had contact information for unnamed class members.[149]

109.     Based on the foregoing, the Debtors provided the Holders of Class 13 Subordinated Claims with sufficient notice as they used reasonable efforts to ensure that the Holders of Class 13 Subordinated Claims received Court-approved notice of the Confirmation Hearing and Notices of Non-Voting Status and Opt-Out Form.

110.     <u>*The Case Law Support the Opt-Out Mechanism*</u>.  The reliance of the SEC,[150] the United States Trustee,[151] and the Pension Trust[152] on *Emerge Energy* and *Washington Mutual* for the proposition that the silence (with respect to a release) of a party deemed to reject a plan cannot be considered consent is misplaced for two reasons.[153]  *First*, the *Emerge Energy* Court explicitly

---

[149] *See e.g., Gentry v. Circuit City Stores, Inc. (In re Circuit City Stores, Inc.), 439 B.R. 652, 660* (E.D. Va. 2010) (holding that unnamed class members were unknown creditors where defined class was broad and would have required the debtors to serve all employees or spend resources determining which employees would be covered by the class); *White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.), 450 B.R. 504, 512* (Bankr. D. Del. 2011) (a debtor's possession of contact information of a customer does not make that party a known creditor).

[150] SEC Objection at 2-3.

[151] UST Objection ¶¶ 59-63.

[152] Pension Trust Objection at 16-18.

[153] These Objectors also cite in their Confirmation Objections the following cases and rulings in support of their argument: *Zenith*, 241 B.R. at 111, *RTW Retailwinds, Inc.*, 20-18445 (Bankr. D.N.J., Dec. 9, 2020), *Cloud Peak Energy*, 19-11047 (Bankr. D. Del., Dec. 5, 2019), the bench recommendation in *Windstream Holdings*, 19-22312 (Bankr. S.D.N.Y., May 8, 2020), statements made at the disclosure statement hearing in *AAC Holdings*, *In re Sun Edison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017), and *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015).  Not one of those cases is binding and should not sway the Court because they did not have the publicity and longevity that the Debtors' Chapter 11 Cases have had and thus did not provide, and could not have provided, the same opportunity for claimants and shareholders to be on notice.

58

recognized that its holding is "a **minority** amongst the judges of this District."[154]    *Second,* the

Objectors failed to recognize that this Court indicated that it is not beholden to the *Emerge Energy*

ruling because the validity of the Third-Party Releases in these Chapter 11 Cases is dependent

upon the specific facts surrounding the Debtors' solicitation process.[155]    And the facts and

circumstances surrounding these Chapter 11 Cases are paradigmatic of one of the instances in

which the *Emerge Energy* court indicated (under its non-binding view) that the silence of a party

that is deemed to reject a plan can be considered consent.    Specifically, the *Emerge Energy* court

stated that it may infer consent to third-party releases from "nonresponsive creditors and equity

holders" if the Debtors "show under basic contract principles that the Court may construe silence

as acceptance because . . . [among other reasons (a)] the Debtors gave the creditors and equity

holders reason to understand that assent may be manifested by silence or inaction, and [(b)] the

creditors and equity holders remained silent and inactive intending to accept the offer."[156]

111.    Both of those requirements are met here.    With respect to the first requirement, the

Debtors gave the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests every

reason to understand that assent may be manifested by silence or inaction.    As expressed above,

the Notices of Non-Voting Status and the Opt-Out Forms clearly and concisely stated in numerous

locations that such Holders "must affirmatively opt-out of the releases and submit the opt-out form

. . . if [they] wish to opt-out of the releases."[157]    Notably, the Debtors received 2,100 shareholder

---

[154]  2019 WL 7634308, at *18 (emphasis added).

[155]  Case No. 20-12522, *Transcript of Telephonic Disclosure Statement Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge* (June 16, 2021), 14: 4–7 ("I am aware of Judge Owens decision in *Emerge*.  At this point my view is, as I said, this all depends on the facts and circumstances and how this is played out in the solicitation process.").

[156]  *Emerge Energy*, 2019 WL 7634308, at *18.

[157]  *See* Exhibits 4.5 and 5.6 of the Disclosure Statement Order [Docket No. 2911].

Opt-Out Forms from current and former Holders of Equity Interests, demonstrating that the Opt-Out Forms provided clear and conspicuous instructions and that current and former shareholders understood that their silence would be taken as consent.[158]

112.    With respect to the second requirement, despite the Notices of Non-Voting Status and Opt-Out Forms (and other notices concerning the Chapter 11 Cases) that the Debtors distributed to all of the Holders of Class 13 Subordinated Claims and certain beneficial holders and registered holders of Class 14 Equity Interests, certain of such Holders remained silent and inactive, displaying their intent to accept the Third-Party Releases.  While the Objectors would like to persuade the Court that the opt-out mechanism takes advantage of certain creditors and shareholders who are asleep at the proverbial wheel, that argument mischaracterizes the reality that the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests are not helpless individuals who involuntary or unknowingly became associated with the Debtors.  To the contrary, the Holders of Class 14 Equity Interests are investors who intentionally and affirmatively chose to purchase the Company's stock and become subject to all the rights—and responsibilities—that come with being an investor, including responsibilities such as reading and responding to legal notices as appropriate.[159]

113.    All of the above rings particularly true in "a case of great notoriety," such as the Debtors' Chapter 11 Cases, in which "[p]eople knew about the existence of the bankruptcy case

---

[158]  Daloia Declaration ¶ 13.

[159]  *See* Confirmation Hr'g (May 16, 2018) Tr. at 214:8-12, *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 25, 2018) [Docket No. 252] (In holding that failure to opt out constitutes consent for a release, stating "[i]t's very clear in the notice, you know, shareholders and creditors have to read legal notices; that's just the way it is. And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.").

and they knew they would have to act because there was a bankruptcy case."[160]  It cannot be denied that the Chapter 11 Cases haves been widely publicized since they commenced over a year ago on October 12, 2020.  The Debtors have made countless public statements and filings concerning the Chapter 11 Cases, and the media has extensively covered the Chapter 11 Cases, all of which should have (and did) put the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests on high alert with respect to notices sent to them by the Debtors.  In fact, the shareholders have actively participated in the Chapter 11 Cases by, among other things, (a) seeking the appointment of an equity committee,[161] (b) creating an unofficial ad hoc consortium of equity holders,[162] (c) filing numerous objections, including several objections to the Plan,[163] and (d) writing frequent letters to the Court.[164]   In light of such far-reaching publicity, noticing, and shareholder involvement, any failure to opt out of the Third-Party Releases by such Holders can be nothing other than intentional and consensual.

114.    Ultimately, even if shareholder and creditor inaction exists in a chapter 11 case, the law still allows for consent by inaction.[165]  Moreover, there is nothing in the record here that suggests that the failure of the Holders of Class 13 Subordinated Claims and Class 14 Equity Interests to opt out was the result of carelessness, inattentiveness, or mistake.  Indeed, quite the opposite has been demonstrated by the ***over 2,000 shareholders*** that have chosen to opt-out of the

---

[160] *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG), Confirmation Hr'g Tr. (Jan. 16, 2020) 110: 10-17 [Docket No. 1121] (referring to the *Insys* bankruptcy and approving shareholder release with opt-out option).

[161] *See Motion to Appoint Equity Committee* [Docket No. 763].

[162] *See, e.g.*, *Notice of Appearance of Ad Hoc Consortium of Equity Holders of Mallinckrodt plc* [Docket No. 2612]; *Rule 2019 Statement of Ad Hoc Consortium of Equity Holders of Mallinckrodt plc* [Docket No. 2617].

[163] *See, e.g.*, Docket Nos. 302, 367, 368, 369, 370, 400, 401, 416, 472, 494, 527, 4230, 4277, 4796, 4831, and 4840.

[164] *See, e.g.*, Docket Nos. 268, 285, 286, 292, 293, 294, 349, 250, 398, 399, 413, 424, 425, 432, 515, 669, and 839.

[165] One obvious example of this is that bar-date notices bar claims that claimholders do not timely submit.

Third Party Releases and the several shareholders that have objected to the Plan and otherwise taken positions in the Chapter 11 Cases.[166]

115.    Thus, the Debtors respectfully submit that, based on the above facts and authority, the Third-Party Releases are consensual.  The Disclosure Statement, the Ballots (as defined in the Disclosure Statement), the Notices of Non-Voting Status, and the Opt-Out Forms provided parties-in-interest with timely, sufficient, appropriate and adequate notice of the releases.  More than 88% of voting creditors by value have voted to accept the Plan.  Moreover, each Holder of a Claim in Classes 1 and 2(a) is, and some of the Holders of a Claim or Interest in Classes 2(b), 2(c), 3, 11, and 12 are, Unimpaired and therefore deemed to accept the Plan and, in turn, deemed to consent to the Third-Party Releases.  In addition, the Notices of Non-Voting Status and Opt-Out Forms, which were approved by this Court, included the Third-Party Releases and contained prominent instructions that such releases would bind Holders of fully Impaired Claims and Interests if such Holders did not timely object.  Given the extensive disclosure and opportunity to either opt out or object to the Plan, the Debtors submit that the Third-Party Releases are, and ought to be treated as, consensual.

ii.    *The Third-Party Releases Satisfy the* Continental *Factors*

116.    Even if this Court deems the Third-Party Releases non-consensual, they nonetheless satisfy the factors applied by this Court and the "fairness and necessity" guidelines for approving non-consensual releases discussed by the Third Circuit in *Continental*[167] to the extent parties have not opted out of such releases.  As discussed below, there is substantial overlap in the *Master Mortgage/Zenith* factors outlined above and the *Continental* guidelines.  Because the

---

[166]  Daloia Declaration 13.

[167]  203 F.3d 203.

Released Parties have provided significant value to the Plan, the Third-Party Releases are proper under either standard.

117.    In *Continental*, the Third Circuit surveyed the case law regarding plan releases but declined to establish its own rule regarding plan releases and injunctions.[168]  The Third Circuit, however, focused on the fairness of releases, the necessity to the reorganization, and the specific factual findings regarding fairness and necessity.[169]  Thus, this Court has held that, under *Continental*:

> to meet the burden of establishing that the third party releases are fair and necessary to the reorganization, . . . Plan proponents must establish by a preponderance of the evidence that, [1] there is material, specific and identifiable consideration flowing from the releasees to the releasors, either directly or through the Plan, that is a fair exchange for the releases being granted, and [2] that it is unlikely that the Debtor will be able to confirm a Plan, not necessarily the specific Plan before the Court, absent such releases.[170]

118.    Under both the *Master Mortgage/Zenith* and *Continental* standards, third-party releases are appropriate where material consideration is provided by the releasees that results in a distribution to unsecured creditors through the plan in exchange for the release of potential Claims that are unlikely to be pursued.[171]  *First*, each of the Released Parties has participated in the Plan process and made significant contributions to the Plan, including, as applicable, (a) compromising Claims and accepting diminished recoveries, (b) permitting the use of encumbered assets and Cash

---

[168]  *Id.* at 212-14.

[169]  *See* Tr. of Hr'g held on Apr. 20, 2006 at 114-15, *In re Freedom Rings, L.L.C.*, No. 05-14268 (Bankr. D. Del. May 9, 2006) [Docket No. 385].

[170]  *See id.*

[171]  *See id.* at 116-17 (finding that third-party releases are proper when the releasees provided significant consideration that flowed to the benefit of the third-party releasors through the plan of reorganization in exchange for the release of potential claims that were unlikely to be asserted given the small size of the case and small size of the average claim).

US-DOCS\126024798.18

collateral during the Chapter 11 Cases, (c) negotiating and supporting the Restructuring Support Agreement and the Plan, and (d) in the case of directors, officers, and employees, their efforts on behalf of the Debtors prior to and throughout the Chapter 11 Cases.

119.    *Second*, the Released Parties share an identity of interest with the Debtors, in particular as a result of the liability, indemnification, or contribution the Debtors may owe to them with respect to the released Claims.  Moreover, the Debtors and the Released Parties "share the common goal of confirming the . . . Plan," which is the culmination of negotiations among and settlements between the Debtors and the Supporting Parties from the start of the Chapter 11 Cases.[172]  These constituencies invested substantial time and effort in negotiating and drafting the Plan, and as major prepetition creditors and future equityholders or creditors of the Debtors, have a significant stake in the successful implementation of the Plan and the Debtors' success generally.[173]

120.    *Third*, the significant and substantial work performed by Debtors' directors, officers, employees, advisors, and other agents—which has been absolutely critical in securing the numerous capital commitments that have underpinned this restructuring—constitutes compelling circumstances to support the release of such parties.[174]  Recognizing the importance of these parties' efforts to the Debtors' value in the Chapter 11 Cases, the Debtors sought and obtained the Supporting Parties' support for the Third-Party Releases relating to these key persons in exchange for their efforts during the Chapter 11 Cases.[175]  Thus, the Third-Party Releases, including for

---

[172]    *See Tribune I*, 464 B.R. at 153.

[173]    *See, e.g., id.* at 187 (finding that debtors and their secured lenders shared an identity of interest because they "share the common goal of confirming the . . . [Plan]"); *Coram Healthcare Corp.*, 315 B.R. at 335 (same); *In re Zenith*, 241 B.R. at 110 (parties being released "who were instrumental in formulating the Plan, similarly share an identity of interest [with the Debtor] in seeing the Plan succeed").

[174]    *See* Tr. of Hr'g held on June 30, 2004 at 17, *In re Waterlink*, No. 03-11989 (Bankr. D. Del. July 7, 2004).

[175]    *See* Disclosure Statement, Exhibit B.

64

these key parties, have been an integral part of the Debtors' negotiations with the Supporting Parties, starting long before the filing of the Chapter 11 Cases and culminating in the largely consensual Plan.  Releases for those parties are critical in the Debtors' restructuring and in the process of reorganizing distressed companies more generally.  If all such individuals in similar situations knew they would face the prospect of threatened or actual liability for their engaging with businesses in need, such individuals would refuse to work with those businesses and those businesses would struggle to find the internal, external, and professional support they need to survive.

121.    *Finally*, the Third-Party Releases are given in exchange for the substantial contributions by the various settling parties—including, among others, the Supporting Parties, the UCC, and the OCC—who have played an extensive and integral role in these Chapter 11 Cases, including by, among other things, agreeing to the consensual use of cash collateral, supporting the Debtors in their negotiations with their various creditor constituencies, making various concessions to facilitate negotiations, and agreeing to support the Plan and the confirmation thereof.  All parties in interest have benefited from the significant contributions of these settling parties, which constitute valuable consideration in exchange for the Third-Party Releases.

122.    For the reasons explained above, the Debtor Releases and Third-Party Releases are proper under section 1123(b)(3)(A) of the Bankruptcy Code, Bankruptcy Rule 9019, and applicable case law in this jurisdiction.  The releases are fair and equitable and, as part of the Plan and part of the entire course of arm's-length negotiations with the Supporting Parties, are integral to Debtors' consensual resolution of the Chapter 11 Cases.  As will be shown at the Confirmation Hearing, there are no significant potential Claims and Causes of Actions to be released, and the Released Parties have provided significant value during the Chapter 11 Cases.  As such, the Plan

and the releases have received overwhelming support from the creditors, including those creditors who would benefit most directly from the proceeds of the potential Claims and Causes of Action released under the Plan.

123. Accordingly, in light of all of the circumstances, the Plan's releases are consensual in nature, satisfy the applicable standards, are fair to the Released Parties, and are otherwise appropriate. For all of these reasons, the Plan's releases should therefore be approved.

### 3. Releases by Holders of Opioid Claims; Opioid Permanent Channeling Injunction

124. Articles IX.D (Releases by Holders of Opioid Claims) and IX.H (the Opioid Permanent Channeling Injunction) of the Plan provide for the release and permanent injunction of Opioid Claims and Opioid Demands against the Protected Parties[176] in exchange for a mutual

---

[176] The Protected Parties consist of the following: (a) the Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled Affiliates, respective heirs, executors, Estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person's respective current and former officers and directors, managers, principals, members, partners, employees, agents, advisors (including financial advisors), attorneys (including attorneys retained by any director in his or her capacity as a director or manager of a Person), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as a director or manager of a Person), consultants, experts and other professionals (including any professional advisor retained by any director in his or her capacity as a director or manager of a Person) or other representatives of the Persons described in clauses (a) through (d), *provided* that consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date. "Protected Party" also includes each Settling Opioid Insurer, but shall not include the Opioid MDT II or any Opioid Creditor Trust. Notwithstanding anything to the contrary herein, none of the following Persons, in their respective following capacities, are Protected Parties: (1) Medtronic plc or Covidien plc, (2) any subsidiaries or Affiliates of Medtronic plc or Covidien plc that existed as a subsidiary or Affiliate of Medtronic plc or Covidien plc after July 1, 2013, (3) any successors or assigns of any Entity described in clause (1) or clause (2) that became such a successor or assign after July 1, 2013 (excluding, for the avoidance of doubt, the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates), (4) any former subsidiaries or Affiliates of Covidien plc that ceased being such a subsidiary or Affiliate before July 1, 2013, and any successor or assign to such subsidiary or Affiliate of Covidien plc, (5) current or former shareholders of Mallinckrodt plc to the extent that they are subject to Share Repurchase Claims, other than any of the Debtors' current and former officers, directors, or employees, and (6) any Representative of any Entity described in the foregoing clauses (1) through (5) except to the extent such Representative is described in clause (d) and (e) of this definition of "Protected Party," and (7) any Released Co-Defendant. Plan Art. I.A.342

66

release of certain Claims the Protected Parties could have otherwise asserted against the Opioid

Claimants under Article IX.E (Release of Opioid Claimants) of the Plan.  Pursuant to the Opioid

Permanent Channeling Injunction set out in Article IX.H of the Plan, the sole recourse of any

Opioid Claimant on account of its Opioid Claims (including Opioid Demands) will be to the

Opioid MDT II or the Opioid Creditor Trusts, as applicable, and such Opioid Claimant will have

no right whatsoever at any time to assert its Opioid Claims (including Opioid Demands) against

any Protected Party or any property or interest in property of any Protected Party.[177]  The Opioid

Permanent Channeling Injunction, however, does not stay, restrain, bar, or enjoin:  (a) the rights

of Opioid Claimants to assert Opioid Claims (including Opioid Demands) against the Opioid MDT

II or the Opioid Creditor Trusts, as applicable; and (b) the rights of Entities to assert any Claim,

debt, obligation, or liability for payment of Trust Expenses against the Opioid MDT II.[178]

125.    The Releases by Holders of Opioid Claims and the Opioid Permanent Channeling

Injunction facilitate a comprehensive process for resolving Opioid Claims (including Opioid

Demands) arising from the Debtors' pre-Effective Date conduct in a speedy, transparent, and fair

manner.  Indeed, once an Opioid Claim is filed with the Opioid MDT II or the Opioid Creditor

Trusts, it will be evaluated on the basis of clear, evidence-based criteria, to determine

compensability.[179]  As discussed above, and as will be adduced at the Confirmation Hearing

through the testimony of Mr. Welch, the release of all Opioid Claims and Opioid Demands is not

---

[177]  Plan Art. IX.H

[178]  *Id.*

[179]  *See generally Notice of Filing of Trust Distribution Procedures* [Docket No. 3282], Exhibit A-1 (TPP Trust Distribution Procedures), § 4 (criteria for compensation); Exhibit B-1 (Hospital Trust Distribution Procedures), §§ 3, 4 (same); Exhibit C-1 (Mallinckrodt Opioid Personal Injury Trust Distribution Procedures for NAS PI Claims), § 3 (same); Exhibit D-1 (NAS Monitoring Trust Distribution Procedures), §§ 2–4 (same); Exhibit E-1 (Independent Emergency Room Physician Trust Distribution Procedures), §§ 3, 4 (same).

only fundamental to the Debtors' restructuring but also the primary motivator of the restructuring because, without such a release and the channeling of Opioid Claims and Opioid Demands, the Reorganized Debtors would be required to participate in, and pay for, the same litigation that drove the Debtors to chapter 11 in the first instance.[180]

126.    Out of the more than 793,000 creditors that have voted in favor of the Plan thus far, only a small number of Objectors have filed Confirmation Objections to the Releases by Holders of Opioid Claims.  The primary Confirmation Objections appear to be from the State of Rhode Island ("*Rhode Island*"), the United States Trustee, and Johnson & Johnson, all of whom object on generally similar grounds—that the Court lacks jurisdiction and authority and that the releases are not fair nor necessary.[181]  For the reasons below, those objections and all other objections to the Releases by Holders of Opioid Claims should be overruled.

a.    Subject Matter Jurisdiction

127.    Before evaluating the propriety of a proposed non-debtor release or channeling injunction, the Court must first determine whether it has subject matter jurisdiction to grant the requested relief.[182]  The United States Supreme Court has stated, "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate, and that the 'related to'

---

[180]  *See* First Day Declaration ¶ 92.

[181]  Other parties (such as the Ad Hoc Acthar Group, the Glenridge Principals, and Sanofi) also appear to object to the non-consensual releases, but such parties are not Opioid Claimants, and the non-consensual release is limited to Opioid Claims.  It is not clear whether such parties believe their release is non-consensual or otherwise still object to the Releases by Holders of Opioid Claims despite not having any Opioid Claims.  Whatever the reason, their objections should be overruled for the reasons herein.

[182]  *See, e.g.*, *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 170 (3d Cir. 2009) ("[B]efore considering the merits of any § 105(a) injunction, a bankruptcy court must establish that it has subject matter jurisdiction to enter the injunction." (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 n.35 (3d Cir. 2004) (describing same as the bankruptcy court's "threshold jurisdictional inquiry"))).

language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simply proceedings involving the property of the debtor or the estate."[183]   Bankruptcy courts have subject matter jurisdiction over four types of matters:   "(1) cases under title 11; (2) proceedings arising under title 11; (3) proceedings arising in a case under [title] 11; and (4) proceedings related to a case under [title] 11."[184]   A proceeding is "related to" a bankruptcy case where "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*," meaning that "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."[185]

128.    Here, the Court has jurisdiction to enjoin the Opioid Claims asserted against the Protected Parties.   As an initial matter, the Court's ability to confirm a plan that contains third-party releases falls comfortably within its "arising under" or "arising in" jurisdiction.[186]   These

---

[183] *Celotex Corp. v. Edwards*, 514 U.S. at 308 (quoting *Pacor*, 743 F.2d at 994) (internal quotations and citations omitted).

[184] *See In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016); *see also Mullarkey v. Tamboer (In re Mullarkey)*, 536 F.3d 215, 220 (3d Cir. 2008) ("A bankruptcy court has subject matter jurisdiction over 'all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . .'") (quoting 28 U.S.C. § 157(b)(1)).

[185] *Pacor*, 743 F.2d at 994 (emphasis in original); *see also Combustion Eng'g*, 391 F.3d at 226.   Although certain aspects of the *Pacor* decision were overruled by the United States Supreme Court in *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995), the analysis of "related to" jurisdiction in *Pacor* remains good law that continues to be cited favorably by the Third Circuit and other courts around the country.   *See, e.g.*, *In re Resorts Int'l, Inc.*, 372 F.3d 154, 164 n.6 (3d Cir. 2004).   Indeed, the Supreme Court agreed with the *Pacor* court's analysis of the scope of "related to" jurisdiction in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995).

[186] *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 261 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019) (holding that confirmation of a plan that contains third-party releases is a proceeding "arising in and arising under title 11" and thus a core proceeding that the Court has jurisdiction over); 1 Collier on Bankruptcy P 3.01 (16th 2021) (explaining that matters "arising under" title 11 include "confirmation of a plan under chapters 9, 11, 12 or 13").

releases and injunction are not only critical to the Plan and the Debtor's reorganization, but also the primary motivator for the reorganization.[187]

129.    The Court's "related to" jurisdiction provides a separate basis for the Releases by Holders of Opioid Claims because Opioid Claims *could conceivably* impact the Debtors' Estates in multiple ways.  *First*, any Opioid Claim asserted against the Debtors would necessarily impact the Estates by requiring the Debtors to expend resources in defending or settling such Claim.

130.    *Second*, litigation of Opioid Claims could deplete the value of certain insurance policies—including the Company's director & officer liability policies—under which the Debtors share coverage with various Protected Parties.  If any of the persons covered by the insurance policies must pay damages or defense costs associated with litigating Opioid Claims, the amounts available to the Debtors and Non-Debtor Affiliates would decrease or, more probably, be nonexistent.  Therefore, if Opioid Claims against such persons or entities were to succeed, "or even if they merely require [those parties] to incur defense costs in litigating against them," that would undeniably "directly affect [the Debtors'] bankruptcy estate."[188]

131.    *Third*, Opioid Claims asserted against many of the Protected Parties (*e.g.*, the Debtors' current and former directors and professionals) would ultimately result in such Protected Parties asserting Claims against the Debtors' Estates for the cost of defending such Claims and for indemnification of losses.  The Debtors' current and former directors, officers, employees, and

---

[187]  *Millennium Lab*, 945 F.3d at 137 (holding that the bankruptcy court has constitutional authority to confirm a plan granting third-party releases when such releases are "integral to the restructuring of the debtor-creditor relationship.").

[188]  *See In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (holding third-party claims' effects on insurance policy shared by debtor and released nondebtor sufficed to create "related to" jurisdiction); *In re W.R. Grace & Co.*, Case No. 01-01139 (KG), 2016 WL 6137275, at *12 (Bankr. D. Del. Oct. 17, 2016) (holding that the bankruptcy court had jurisdiction over third-party claim against insurance company because such claim could "affect the *res* of the Debtors' estate.").

various professionals, among others, have rights of indemnification and reimbursement against the

Debtors and the Reorganized Debtors pursuant to one or more of the following:  (a) specific board

actions or resolutions; (b) articles of incorporation or articles of organization (as applicable);

(c) bylaws and operating agreements; (d) employment agreements; (e) engagement letters; or

(f) statute or common law.[189]   In addition to indemnification Claims, the litigation of Opioid

Claims against any of the Protected Parties could also lead to common-law or statutory

contribution Claims against the Debtors.  As a result of such indemnification and contribution

rights, a lawsuit against many of the Protected Parties is in essence a lawsuit against the

Reorganized Debtors as the Reorganized Debtors could be required to indemnify, or participate in

any litigation against, such Protected Parties—especially in light of the fact that there is already

active litigation[190] against the directors and officers[191] and all Compensation and Benefits

Programs (other than equity awards), including any indemnification obligations thereunder, shall

---

[189] *See, e.g., In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) ("Thus, the Court will approve third party releases to align with indemnification obligations of the Debtors that existed before the filing of these bankruptcy cases by virtue of employment agreements, bylaws, retentions, or other loan agreements.").

[190] *See, e.g., Rhode Island v. Mark C. Trudeau*, C.A. No. PC 2020-7056 (R.I. Super. Ct.); *Strougo v. Mallinckrodt Public Limited Company, et al.*, Case No. 20-cv-10100 (D.N.J.) (defendants include Debtors' chief executive officer/director, chief financial officer, chief legal officer, corporate controller, chairman of board, and two other directors); *Strougo v. Mallinckrodt Public Limited Company, et al.*, Case No. 19-cv-07030 (S.D.N.Y.) (defendants include Debtors' chief executive officer/director and chief financial officer); *Healthcor Offshore Master Fund, L.P., et al., v. Mallinckrodt Plc*, et al., Case No. 20-cv-02834 (D.D.C.) (defendants include Debtors' chief executive officer/director); *Brandhorst v. Trudeau, et al.,* Case No. 19-cv-02778 (D.D.C.) (defendants include Debtors' chief executive officer/director, chief commercial and operations officer, chairman of the board, and other directors); *Solomon v. Mallinckrodt Public Limited Company, et al.,* Case No. 17-cv-01827 (D.D.C.) (defendants include Debtors' chief executive officer/director, corporate controller, chairman of the board, and other directors); *Solomon v. Mallinckrodt Public Limited Company, et al.,* Case No. 17-cv-02042 (E.D. Mo.) (defendants include Debtors' chief executive officer/director, corporate controller, chairman of the board, and other directors).

[191] *See David v. Weinstein Co. Holdings, LLC*, 2021 WL 979603 (D. Del. March 16, 2021) (affirming the Court's finding that the non-consensual third-party releases of the former officers and directors were necessary to the Plan because of indemnification obligations and distinguishing *Continental* because tort actions were already being pursued against the debtors' directors and officers rather than being merely hypothetical).

be assumed under the Plan.[192]  Allowing post-Effective Date litigation to be pursued against such Protected Parties would essentially be *de facto* litigation against the Reorganized Debtors, requiring their time, efforts, involvement, and indemnification.[193]  Eliminating the overhang of litigation against the Debtors and the Protected Parties was a crucial consideration in the negotiations with the Supporting Parties and is an integral component of the various treatments agreed to by the Debtors' creditors.

132.    *Fourth*, Opioid Claims asserted against the Protected Parties (particularly the Debtors' officers and directors, managers, principals, members, partners, employees, agents, advisors, attorneys, accountants, investment banker, consultants, experts and other professionals) would distract such officers, directors, employees, and professionals from the Chapter 11 Cases and could ultimately require the Debtors to expend resources on obtaining replacements who are unfamiliar with the Chapter 11 Cases and could not provide efficient management or services.[194]

---

[192]  *See* Plan Art. V.H.

[193]  *See, e.g., In re TK Holdings Inc.*, Case No. 17-11375 (Bankr. D. Del.) (BLS) (approving release/channeling injunction in part because of indemnification rights, and stating that "many, if not all of the release parties, including officers and directors of the debtor entities, are parties that would have meaningful indemnification rights. . . .  So, the fact of the matter is . . . litigation against the debtor is often litigation against multiple parties. . . .  I am satisfied that the identity of interest prong has been satisfied."); *Genco Shipping & Trading*, 513 B.R. at 271 ("Second, the Court will permit Third Party Releases for claims that would trigger indemnification or contribution claims against the Debtors and thus impact the Debtors' reorganization. . . .  Indeed, the Debtors represented that certain pre-petition credit agreements as well as bylaws covering the directors and officer, which, if respected, would eradicate many of the benefits of the Plan."); *Master Mortg.*, 168 B.R. at 937 ("The non-debtor Affiliates have a right of indemnification against *Master Mortgage* pursuant to pre-petition contracts.  This indemnity relationship extends to all of the possible lawsuits proposed to be enjoined by the permanent injunction.  Factor one weighs in favor of an injunction favoring the non-debtor Affiliates."); *In re Am. Fam. Enterprises*, 256 B.R. 377, 391–92 (D.N.J. 2000) ("Simply put, the Funding Parties are willing to fund the settlement only for a complete and final resolution of disputes against every Defendant, not for a piecemeal settlement that only partly resolves the claims against some of the parties.  Accordingly, there is an identity of interest between the Debtors and the non-Debtor Defendants as well as the other Indemnitees, such that a suit against any such non-Debtor either is, in essence, a suit against one or more of the Debtors, or will otherwise deplete the assets of the Debtors' estates."); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 702 (4th Cir. 1989) ("the entire reorganization hinges on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor").

[194]  *See, e.g., In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 614 (E.D. Pa. 2009) (holding that bankruptcy court had jurisdiction over state-court plaintiffs' defamation claims against debtors' chief executive officer and

For the foregoing reasons, the Debtors respectfully submit that this Court has "related to" jurisdiction to enjoin third parties from commencing litigation that would give rise to such Claims and thereby impact the administration of the Chapter 11 Cases.[195]

133.    Thus, this Court has jurisdiction to approve the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction established under the Plan.

> b.    The Court Has the Statutory Authority to Confirm the Plan and the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction

134.    The confirmation of the Plan is a "core proceeding."[196]  Accordingly, numerous courts—including this one—have held that where, as here, a bankruptcy court considers non-consensual third-party releases in connection with the confirmation of a proposed plan of reorganization, it acts pursuant to its core authority.[197]  Contrary to the position of the United States Trustee and Rhode Island,[198] the Court has constitutional authority to confirm a plan granting the

---

employees because continuance of those actions would distract such employees from their proper role of assisting with the reorganization).

[195] *See, e.g., Bank of N.Y., Mellon Trust Co., N.A. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 312 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ("We conclude that the Bankruptcy Court had 'related to' jurisdiction over the third party release provision as part of LBH's plan of reorganization.  This is because the filing of the class action against BNYM had an immediate effect on LBH's bankruptcy estate when it triggered BNYM's claim for defense costs against LBH."); *In re Medford Crossings N., LLC*, Case No. 07-25115, 2011 WL 182815, at *13 (Bankr. D.N.J. Jan. 20, 2011) ("[T]he potential liability arising from express indemnification provisions herein described as well as the identity of interests of Debtors and other third parties, confer related to jurisdiction in this case.").

[196] *See* 28 U.S.C. § 157(b)(2)(L).

[197] *See In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 137 (3d Cir. 2019) (in appeal from confirmation of plan containing nonconsensual third-party releases, holding that "[t]he Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan"); *In re MPM Silicones, LLC*, No. 14-25503 (RDD), 2014 WL 4436335, at *1, *34 (Bankr. S.D.N.Y. Sept. 9, 2014) ("I firmly believe that I have jurisdiction over this [third-party release] issue . . . and that I can issue a final order on it within the confines of *Stern v. Marshall*, given that this is in the context of the confirmation of the plan, and pertains ultimately to the debtors' rights under the Bankruptcy Code."); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law . . . [a]lthough the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings.").

[198] UST Objection n. 17; Docket No. 4235 (the "**Rhode Island Objection**") ¶¶ 27-28.

Releases by Holders of Opioid Claims because such releases are "integral to the restructuring of the debtor-creditor relationship."[199]   Just as was the case in *Millennium Lab*, in which the Third Circuit found the Court had authority to grant nonconsensual third-party releases, the Releases by Holders of Opioid Claims are critical to the success of the Plan.[200]   Indeed, the Debtors would not have commenced these Chapter 11 Cases if the Releases by Holders of Opioid Claims were limited to just the Debtors.   These releases are, and always were, critical to the Chapter 11 Cases, and obtaining such releases was a central motivation driving the commencement of the Chapter 11 Cases and accompanying settlement negotiations.[201]   Without the releases, and the enforcement of such releases through the Plan's injunction provisions, the Reorganized Debtors would still be forced to deal with, and pay for, opioid litigation on account of indemnification and contribution obligations that the Debtors and Reorganized Debtors owe the Protected Parties, thereby negating the finality that is contemplated by the Plan and critical to the success of the Plan and the Reorganized Debtors.   Without the releases, this fundamental purpose and benefit of the Plan— fully and finally resolving opioid litigation against the Debtors—would be eviscerated and the Reorganized Debtors would be left with an opioid-litigation overhang on their businesses.[202]

   c.   Standard for Imposition of the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction

   135.   Bankruptcy courts, "as courts of equity, have broad authority to modify creditor-debtor relationships."[203]   To effectuate these broad equitable powers, section 105(a) of the

---

[199]  *Millennium Lab*, 945 F.3d at 137.

[200]  *Id.*

[201]  First Day Declaration ¶ 94.

[202]  *Id.*

[203]  *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

US-DOCS\126024798.18

Bankruptcy Code vests a bankruptcy court with broad authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[204]

136.    Consistent with the Court's broad equitable authority under section 105(a) of the Bankruptcy Code, the Third Circuit has held multiple times that non-consensual, non-debtor releases and channeling injunctions are appropriate when they are fair and necessary to the reorganization.[205]    Courts in this Circuit have approved non-debtor releases and channeling injunctions when such requirements were satisfied.[206]  Similarly, courts outside of the Third Circuit have repeatedly recognized—consistent with the Third Circuit's decisions—that non-debtor releases and channeling injunctions are appropriate under similar circumstances.[207]  Indeed, these

---

[204]  *See* 11 U.S.C. § 105(a); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (recognizing that bankruptcy courts "are able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain").

[205]  *See Continental*, 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]"); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (*en banc*) (explaining that suit injunctions must be "both necessary to the reorganization and fair"); *Millennium Lab Holdings*, 945 F.3d at 139 (same (citing *Continental* and *Global Industrial*)).

[206]  *See, e.g.*, *In re TK Holdings Inc.*, et al., Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (releasing and channeling to a trust personal injury and wrongful death claims related to defective components in debtor-manufacturer's airbags); *In re Blitz U.S.A., Inc.*, No. 11-13603, 2014 WL 2582976, at *19–21 (Bankr. D. Del. Jan. 30, 2014) (releasing and channeling to a trust personal injury and wrongful death claims related to explosions involving debtor-manufacturer's defective gasoline cans asserted against, among others, the debtors' subsidiaries and affiliates, debtors' directors and officers, and the debtors' largest customer); *In re Global Indus. Techs., Inc.*, No. 02-21626, 2013 WL 587366, at *40 (Bankr. W.D. Pa. Feb. 13, 2013) (releasing and channeling to a trust silica personal injury claims related to debtor-manufacturer's refractory products and materials asserted against, among others, debtors' subsidiaries and affiliates, debtors' directors and officers, and transferees of debtors' assets (including any party providing financing in connection therewith)); *In re Kaiser Aluminum Corp.*, No. 02-10429(JKF), 7312, 2006 WL 616243, at *25 (Bankr. D. Del. Feb. 6, 2006) ("*Kaiser Aluminum I*")(releasing and channeling to a trust personal injury claims related to debtor-aluminum producer's (1) silica dust, (2) coal tar pitch volatile products, and (3) noise (which induced hearing loss) asserted against, among others, debtors' subsidiaries and affiliates, debtors' directors and officers, and transferees of debtors' assets (including any party providing financing in connection therewith)), *aff'd*, 343 B.R. 88 (D. Del. 2006) ("*Kaiser Aluminum II*"); *In re American Fam. Enters.*, 256 B.R. 377, 406–08 (D.N.J. 2000) (releasing and channeling to a trust consumer fraud claims related to debtor-publishing company's sweepstakes mailing and billing practices asserted against, among others, debtors' subsidiaries and affiliates, debtors' directors and officers, and debtors' general partners).

[207]  *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–43 (2d Cir. 2005); *In re Dow Corning Corp.*, 280 F.3d 648, 657–59 (6th Cir. 2002) ("*Dow Corning II*") (releasing and channeling to a trust personal injury claims related to debtor-manufacturer's defective silicone gel breast implants asserted against insurers and shareholders); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir. 1992) ("*Drexel Burnham II*")

---

75

sorts of non-consensual, non-debtor releases and channeling injunctions have played a

foundational role in the resolutions of some of the most complex mass-tort bankruptcies in history

because they enable the global resolution of otherwise intractable litigation against debtors and

their related parties in a way that ensures a value-maximizing outcome for contingent tort

creditors.[208]

137.    While a channeling injunction must ultimately satisfy the "fair and necessary"

requirement, the *Master Mortgage* factors are "helpful guideposts" for the Court to determine

whether this requirement has been satisfied.[209]

        d.    <u>Propriety of the Releases by Holders of Opioid Claims and the</u>
              <u>Opioid Permanent Channeling Injunction</u>

138.    The evidence before the Court demonstrates that the Releases by Holders of Opioid

Claims and the Opioid Permanent Channeling Injunction satisfy the hallmarks required under

*Continental*, as guided by the *Master Mortgage* factors, and therefore should be approved.

139.    The Releases by Holders of Opioid Claims and the Opioid Permanent Channeling

Injunction meet the first *Master Mortgage* factor—*i.e.*, identity of interest between the

Reorganized Debtors and the Protected Parties.  The Protected Parties have an identity of interest

---

(releasing and channeling to a trust securities claims related to debtor-investment banking firm's illegal transactions in "junk bonds" asserted against debtors' directors and officers); *A.H. Robins*, 880 F.2d at 702 (releasing and channeling to a trust personal injury claims related to debtor-manufacturer's defective "Dalkon Shield" birth control devices asserted against, among others, debtors' subsidiaries and affiliates and debtors' directors and officers); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 535 (Bankr. E.D. Mo. 2012) (releasing and channeling to a trust consumer fraud claims related to debtor-automobile warranty company's marketing of vehicle service contracts asserted against, among others, debtor's directors and officers and debtor's principal financier of said vehicle service contracts).

[208]  *See, e.g.*, *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018) [Docket No. 2120] (use of third-party releases to resolve mass-tort bankruptcy); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir. 1988) (same); *In re Dow Corning Corp.*, 287 B.R. 396, 402–17 (E.D. Mich. 2002) (same).

[209]  *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del. 2018) (referring to the *Master Mortgage* factors as "helpful guideposts" even if they are not dispositive); *In re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 711 (Bankr. D. Del. 2016) ("In making that determination, I considered the factors articulated in *In re Master Mortgage* …, but ultimately returned to the *Continental* hallmarks.")

76

with the Reorganized Debtors because:  (a) certain of the Protected Parties are the Debtors and the

Reorganized Debtors themselves or their Non-Debtor Affiliates, all of which are corporate entities

related to the Reorganized Debtors; (b) many of the remaining Protected Parties (current and

former officers and directors, managers, principals, members, partners, employees, agents,

advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals

or representatives of the foregoing (subject to certain limitations in the Plan)), share an identity of

interest with the Reorganized Debtors from a litigation perspective because of indemnification or

contribution rights against the Reorganized Debtors such that a lawsuit against such Protected

Parties is in essence a lawsuit against the Reorganized Debtors as the Reorganized Debtors could

be required to indemnify or contribute to, and participate in any litigation against, such Protected

Parties;[210] and (c) the Debtors and the Protected Parties share a common interest in confirming and

implementing the Plan and maximizing the value of the Debtors' Estates, all of which would not

be possible without the active and significant contributions of the Protected Parties in formulating

the Plan.[211]

---

[210]    *See, e..g., In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del.) [Docket No. 2109] ("[T]here are **indemnification obligations** that are running in every possible direction; in addition, many, if not all of the release parties, including officer and directors of the debtor entities, are parties that would have meaningful indemnification rights. . . . So, the fact of the matter is . . ., litigation against the debtor is often litigation against multiple parties. . . .  I am satisfied that the ***identity of interest prong*** has been satisfied." (emphasis added)). Courts in this district make clear that an "identity of interest" can arise through not only contractual indemnification or contribution rights, but also through common law indemnification or contribution rights. *See In re W.R. Grace & Co.*, No. 01-1139 (JKF), 2011 WL 381942, at *7 (Bankr. D. Del. Jan. 31, 2011), *report and recommendation adopted*, 468 B.R. 81 (D. Del. 2012) (finding "[a]n identity of interests exists among the Debtors and the Asbestos Protected Parties such that an Asbestos PI Claim . . . asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity (***contractual or otherwise***) and/or contribution; and an Asbestos PD Claim or CDN ZAI PD Claim . . . asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity (***contractual or otherwise***) and/or contribution." (emphasis added)).

[211]    *In re TK Holdings Inc.*, Case No. 17-11375 (BLS), 2018 WL 1306271, at *16 (Bankr. D. Del. Mar. 13, 2018) (finding there was an identity of interest between the Debtors and the Protected Parties because "[t]he Debtors and the Protected Parties jointly formulated the Plan over a period of over one (1) year and share a common interest in having the Plan confirmed, thereby ensuring an identity of interest with the Debtors. Absent the involvement of each of the Protected Parties, none of the settlements and contributions required for, or entered

140.    The Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction meet the second *Master Mortgage* factor—*i.e.*, contribution to the reorganization—as the Protected Parties (including the Debtors' directors, officers, and advisors) have devoted untold resources, including their time and services, toward negotiating and facilitating the implementation and execution of the Debtors' restructuring.[212]    Additionally, some of the Debtors' officers will serve as officers for the Reorganized Debtors after emergence, which further favors approval of the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction because such officers' services are critical to the reorganization and unlocking the enterprise value.[213]

141.    While several of the Confirmation Objections object to the non-consensual releases on the grounds that insufficient contribution is being provided by the Protected Parties, contribution is just one of the five *Master Mortgage/Zenith* factors.    And the *Master*

---

into in connection with, the confirmation of the Plan would be possible, and few, if any, assets would be available for distribution to the Debtors' creditors."); *Zenith*, 241 B.R. at 111 (granting release of parties "who were instrumental in formulating the Plan, similarly share an identity of interest [with the Debtor] in seeing the Plan succeed.").

[212] *See, e.g.*, *Zenith*, 241 B.R. at 111 (finding that debtors' officers and directors provided substantial contribution by, among other things, negotiating the financial restructuring); Hr'g Tr. at 68*, In re Energy Future Holdings Corp.*, Case No. 14-10979 (Bankr. D. Del. Dec. 8, 2015) [Docket No. 7255] (finding that debtors' directors and officers made critical contribution to the plan based on extensive participation in board and committee meetings); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1079–80 (11th Cir. 2015) (finding that debtors' professionals provided substantial contribution in the form of labor and services); *In re Mercedes Homes, Inc.*, 431 B.R. 869, 881 (Bankr. S.D. Fla. 2009) (finding substantial contribution in the form of debtors' directors' and officers' expertise and knowledge).

[213] *See, e.g.*, *Millennium Lab*, 543 B.R. at 710 ("I specifically found that (x) there was consideration for the releases and (y) the Debtors' officers and directors not only contributed services to the Debtors, but that management's continued services to the reorganized Debtors was critical to unlocking total enterprise value."); *Mercedes Homes*, 431 B.R. at 881 ("The Directors and Officers of the Debtors are going to continue to manage and run the reorganized company as the directors and officers of the reorganized company. . . .  Based on their specialized knowledge and expertise, the Directors and Officers are critical to the Debtors' ability to operate within the business plan that underlies the Plan. . . .  Furthermore, the Directors and Officers, if not retained by the Reorganized Debtors, could use their special knowledge and expertise to compete against the Debtors."); *Seaside Eng'g*, 780 F.3d at 1080 (approving third-party release because, among other reasons, "[a]s other findings of the bankruptcy court make clear, the contribution of their services to the reorganized entity is the very 'life blood of the reorganized debtor'").

US-DOCS\126024798.18

*Mortgage/Zenith* factors do not comprise a rigid test; rather, the court should "engage[] in a fact specific review, weighing the equities of [the individual] case."[214] The Debtors believe that sufficient consideration has been provided by the Protected Parties, but to the extent the Court finds otherwise, the Debtors submit that the other *Master Mortgage/Zenith* factors outweigh this one.

142.    The Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction also meet the third *Master Mortgage* factor—*i.e.*, essential nature of the releases/injunction to the reorganization—as the restructuring is conditioned upon adequately addressing the Opioid Claims and Opioid Demands.[215] The Restructuring Support Agreement, the Plan, and the various settlements embodied therein—particularly the grant of equity in the Reorganized Debtors—are conditioned on the Reorganized Debtors and the Protected Parties being free from opioid litigation by having such claims permanently channeled to the opioid trusts. As will be shown at the Confirmation Hearing and in the Welch Declaration, without such relief, the entirety of the reorganization will unravel.

143.    The Releases by Holders of Opioid Claims were, and are, central to the Opioid Settlement, as all relevant parties (the Debtors, the Restructuring Support Agreement counterparties, the Plaintiffs' Executive Committee, the Guaranteed Unsecured Notes Ad Hoc

---

[214] *See id.* at 935.

[215] *See, e.g.*, *In re 710 Long Ridge Rd. Operating Co., II LLC*, No. 13-13653, 2014 WL 886433, at *15–16 (Bankr. D.N.J. Mar. 5, 2014) (approving third-party releases, in part, because "[s]imply put, without the releases, there is no chance of reorganization or recovery for any creditor"); *see also* Hr'g Tr. at 75, *In re PNG Ventures, Inc.*, Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Docket No. 368] (approving third-party release where "plan would not happen" in their absence); *In re Residential Cap., LLC*, 508 B.R. 838, 849 (Bankr. S.D.N.Y. 2014) (approving non-debtor release that was the "lynchpin of the Plan, without which the cases would devolve into endless litigation, the Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan would not exist"); *In re Charter Commc'ns*, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012) (approving non-debtor releases that were an "integral part of the plan" where the releases were included in the first strawman restructuring proposal and were never negotiated away).

79

Group, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the OCC) recognized that the Opioid Settlement and the associated releases and channeling injunction were the best way to maximize the value of the Debtors' estates, for the benefit of all claimants. These releases were thoroughly negotiated and their approval is essential to the success of the Plan and these Chapter 11 Cases.

144.    For example, the Restructuring Support Agreement excluded the D&O Liability Insurance Policies from the assets contributed for the benefit of Opioid Claimants.[216]  Indeed, the release of the Debtors' directors and officers and exclusion of the D&O Liability Insurance Policies from the assets contributed to the Opioid MDT II were essential elements to the terms of the Opioid Settlement, including the increased consideration provided to the Opioid MDT II in September 2021, as they bring finality to the massive amount of litigation against the Debtors, including by way of Claims against the Debtors' directors and officers.  This was a logical trade given that, due to the Debtors' obligations to indemnify directors and officers, a post-emergence Claim against the Debtors' directors and officers would effectively be a Claim against the Reorganized Debtors in contravention of the "fresh start" intended under the Bankruptcy Code.

145.    If the Reorganized Debtors are required to participate in, and pay for, post-Effective-Date opioid litigation against the Protected Parties (because of indemnification or contribution obligations), then the Plan—and all of its settlements (particularly the Opioid Settlement)—will lose its critical feature of providing finality to the Debtors and Reorganized

---

[216]    *See* definition of "Assigned Insurance Rights" on Schedule 1 of Restructuring Support Agreement.  The settlement reached with the OCC contained the same exclusion.  Global Opioid Settlement Term Sheet [Docket No. 4121-2] at 4.  And all versions of the Plan the Debtors filed contained such an exclusion as well.  *See*, as applicable, definitions of  "Opioid Insurance Policies" and "Assigned Insurance Rights" in Docket Nos. 2074, 2903, 2916, 4508.  Indeed, the exception of the D&O Liability Insurance Policies from the assets contributed for the benefit of Opioid Claimants was an essential element to the Plan, as it would bring finality to the massive amount of litigation against the Debtors.

Debtors with respect to opioid litigation. Such finality is a cornerstone of the Plan and its settlements, as the post-Effective-Date capital structure assumes the Reorganized Debtors will be free of the onslaught of opioid litigation.

146. Indeed, as indicated in the Mehta Declaration, if the release of Opioid Claims and thus the Opioid Settlement fell apart, then the Debtors would have to pivot to a section 363 sale process, with some of the Debtors' businesses likely being sold as going concerns and others likely being sold in piecemeal liquidations.[217] Successfully consummating any such sale or series of sales in the near term would be difficult and challenging and, as will be shown in the Eisenberg Declaration, would result in creditor recoveries being less than those provided for under the Plan.

147. In short, the Plan and its settlements bought peace for the Reorganized Debtors—operational peace and financial peace, with the Reorganized Debtors not having to spend time or money to deal with Opioid Claims. But if the Protected Parties are not released from Opioid Claims, the Reorganized Debtors will still have to defend against, and pay for, opioid litigation because of their indemnification or contribution obligations with respect to the Protected Parties, which could cause an overhang on the Reorganized Debtors' businesses and enterprise value, much like it did to the Debtors before the Petition Date. In short, there would be no finality; there would be no peace; there would be no fresh start—the benefits of the Plan and the chapter 11 process would be eradicated.[218]

---

[217] *See* Mehta Declaration ¶ 13.

[218] *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) ("Second, the Court will permit Third Party Releases for claims that ***would trigger indemnification or contribution claims against the Debtors*** and thus impact the Debtors' reorganization. … Indeed, the Debtors represented that certain pre-petition credit agreements as well as bylaws covering the directors and officer, which, if respected, ***would eradicate many of the benefits of the Plan***.") (emphasis added).

US-DOCS\126024798.18

148.    Rhode Island, in its Confirmation Objection, quotes *Continental* for the proposition that a potential "indemnity claim sometime in the future, in some unspecified amount, does not make the release" necessary.[219]   But *Continental* is distinguishable here, just as it was in another recent mass-tort case in this Court (*Weinstein*).[220]   In *Weinstein*, the district court affirmed the Court's finding that the non-consensual third-party releases of the former officers and directors were necessary to the Plan because of indemnification obligations.   The court distinguished its case from *Continental* because, whereas the *Continental* court was concerned about *potential*, hypothetical tort claims and indemnification obligations, "tort actions against indemnified former officers and directors ha[d] already commenced" in *Weinstein*.[221]   Similarly, here, tort actions have already commenced.   For example, Rhode Island filed an action against the Debtors' CEO on October 8, 2020,[222] days before the Petition Date.[223]   Moreover, if Protected Parties are not released of Opioid Claims, other states and parties will likely follow suit.   Thus, tort actions against the Protected Parties and the Debtors' and Reorganized Debtors' indemnification obligations are not hypothetical like in *Continental*; they are very real.

149.    The Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction likewise meet the fourth (and most important[224]) *Master Mortgage* factor—*i.e.*, whether a substantial majority of the impacted creditors support the Plan.   Indeed, the strong support of relevant parties in interest, both on a global and individualized basis, weighs heavily in favor of

---

[219]   Rhode Island Objection ¶ 22.

[220]   *Weinstein*, 2021 WL 979603.

[221]   *Id.*  at *5.

[222]   *Rhode Island v. Mark C. Trudeau. C.A.*, No. PC 2020-7056 (R.I. Super. Ct., Oct. 8, 2020)

[223]   Rhode Island Objection ¶ 3.

[224]   *See Master Mortg.*, 168 B.R. at 938 (suggesting that support should be viewed as the "single most important factor" in determining whether to approve a non-debtor release or channeling injunction).

approval of the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction. As shown in the Voting Report, approximately 98.64% of votes from the Opioid Claimants that have been tabulated thus far voted to accept the Plan. Additionally, the OCC (*i.e.*, the group tasked with ensuring that the interests of Opioid Claimants are adequately protected), the Governmental Plaintiff Ad Hoc Committee (including State Attorney Generals) the Plaintiffs' Executive Committee (the committee appointed to represent the multitudinous opioid plaintiffs in the MDL), and the MSGE Group (which includes more than 1,300 governmental opioid claimants), the Future Claims Representative (the individual appointed to protect the interests of Holders of Opioid Demands), the UCC, among other creditors, support the Plan—including the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction. The Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction, as ultimately embodied in the Plan, were the product of intense, good-faith, and arm's-length negotiations between the Debtors and these constituencies that were aimed at ensuring that affected claimants received fair treatment. Accordingly, the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction clearly satisfy the requirements of the fourth *Master Mortgage* factor.

150. Finally, the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction meet the fifth *Master Mortgage* factor—*i.e.*, whether the Plan pays substantially all of the claims of the impacted creditors—as the Plan affords substantial recoveries to Opioid Claimants affected by the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction that would otherwise be unavailable.[225] Specifically, the Plan

---

[225] *See, e.g.*, *Weinstein*, 2021 WL 979603 at *6 ("Part of the inquiry into the fairness of non-consensual third-party releases is determining whether **reasonable** consideration is given in exchange for the releases. The consideration

provides Opioid Claimants with access to $1.725 billion in addition to new warrants for 19.99% of all outstanding shares in the Reorganized Debtors.[226]  Such consideration will be allocated to 13 classes as a result of a several-months-long mediation that included the participation of the OCC, the Future Claims Representative, and representatives of certain public and private Opioid Claimants.[227]   In addition, as mentioned above and in connection with the Opioid MDT II Documents, the Opioid Permanent Channeling Injunction allows for the Opioid Claims to be (a) resolved in a speedy, transparent, and fair manner and (b) evaluated on the basis of clear criteria to determine compensability, which will be the function of the trust distribution procedures negotiated by representatives of the Opioid Claimants for each Class of Opioid Claims that does not foreclose.  Such a process will allow for Opioid Claimants to avoid significant litigation costs that would otherwise be associated with prosecuting the Opioid Claims and prevents a race to the courthouse by thousands of Opioid Claimants or Opioid Demands, which costs would otherwise dilute their recoveries.  The creation of the Opioid Creditor Trusts and the trust distribution procedures provide a fair and efficient manner in which Opioid Claimants and Opioid Demands can access potential recoveries.  Accordingly, the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction satisfies the fifth *Master Mortgage* factor as well.[228]

---

provided is reasonable if under the proposed plan, recovery of the non-consenting creditors is greater than under a chapter 7 liquidation scenario." (emphasis added)).

[226]  *See* Global Opioid Settlement Term Sheet [Docket No. 4121-2]; Original Opioid Settlement Term Sheet.

[227]  *See* Mediator's Report [Docket No. 4946] ¶ 4.

[228]  *See, e.g.*, *In re W.R. Grace & Co.*, 446 B.R. 96, 138–39 (Bankr. D. Del. 2011) ("*W.R. Grace I*") (approving non-consensual third-party release provision in plan of reorganization where, absent the release and settlement, substantial expenses would be incurred by the estate and where creditors' recoveries after litigation were uncertain but their recoveries under the plan were certain and significant); Hr'g Tr. at 73–74, *In re PNG Ventures, Inc.*, Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Docket No. 368] (approving nonconsensual third-party release where, absent such release and settlement, unsecured creditors—who otherwise would be "out of the money"—would receive a distribution under the plan); *Seaside Eng'g*, 780 F.3d at 1079–81 (noting that the proposed "plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction" and finding that "[t]his factor weighs heavily in favor of the releases") (citations omitted).

84

151.    Thus, the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction satisfy the *Master Mortgage* factors and, consequently, the *Continental* hallmarks of fairness and necessity.

152.    The Confirmation Objections challenging the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction on the basis of not being "fair and necessary" in accordance with the requirements of *Continental* are flawed and should be overruled. In particular, the Rhode Island argues that the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction are (a) not fair because they deprive Rhode Island of a recovery on its state-law claims (the "***Trudeau Claims***") against the chief executive officer and president of the company (Mark C. Trudeau) when, according to Rhode Island, Mr. Trudeau's only contribution was the devotion of substantial time and energy to the bankruptcy process, and (b) unnecessary because Mr. Trudeau is protected by the D&O Liability Insurance Policies such that the reorganization is not jeopardized by the Trudeau Claims.[229]

153.    Such myopic views of fairness and necessity are unpersuasive.  With respect to the fairness requirement, the focus is not on whether the consideration provided by the Protected Parties is fair (as some Confirmation Objections try to suggest), but whether the ***consideration received*** by the Opioid Claimants under the Plan is fair.[230]  Here, the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction are fair because they are provided in exchange for (a) the Release of Opioid Claimants, (b) the Opioid Operating Injunction, (c) the

---

[229] Rhode Island Objection ¶¶ 17-19.

[230] *See Continental*, 203 F.3d at 210, 212 (expressing concern for plaintiffs who would be forced to "forfeit their claims against non-debtors with **no consideration in return**" and referring to plans that "provided *consideration to parties* who would be enjoined from suing non-debtors") (emphasis added); *Millennium Lab*, 945 F.3d at 144 (noting that "the question of **whether Voya received consideration** for the releases is a merits question" (emphasis added)).

85

$1.725 billion recovery provided under the Plan, (d) the warrants for 19.99% ownership of the Reorganized Debtors, (e) additional consideration, including certain Causes of Action, and (f) the efficient trust distribution procedures that will minimize claimants' litigation costs and maximize potential recoveries.[231]  Rhode Island's insistence that it is not receiving a recovery for the Trudeau Claims is simply incorrect:  it is entitled to its distribution under the opioid trusts just like every other Opioid Claimant and just like every other state that may have a Claim against Mr. Trudeau. Fairness cannot be more axiomatic than entitlement to a distribution on the same terms as all other similarly situated claimants.

154.    With respect to the necessity requirement, the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction are absolutely necessary here because, among the other reasons set forth above, the Supporting Parties would not support the Restructuring Support Agreement and the Plan without such releases and injunction and consummating the Plan would thus be impossible.[232]  Indeed, in agreeing to discharge their Claims against the Debtors, the Supporting Parties bargained for certain recoveries that would be undermined if Opioid Claims could be asserted against the Reorganized Debtors (whether it be through indemnification, contribution, or otherwise), their management, and other Protected Parties as soon as the Chapter 11 Cases are complete.

155.    Though the Confirmation Objections are correct that the Third Circuit has cautioned that non-consensual third-party releases and channeling injunctions should be imposed only in extraordinary circumstances, those are the exact circumstances here, which further

---

[231]  *See Master Mortg.*, 168 B.R. at 938 (suggesting that support should be viewed as the "single most important factor" in determining whether to approve a non-debtor release or channeling injunction).

[232]  *See Am. Fam. Enterprises*, 256 B.R. at 391–92 ("Simply put, the Funding Parties are willing to fund the settlement only for a complete and final resolution of disputes against every Defendant, not for a piecemeal settlement that only partly resolves the claims against some of the parties.").

distinguish this case from *Continental* (which was *not* a case with mass torts and did *not* feature a channeling injunction). In fact, *Continental* favorably discusses various mass-tort cases (*Drexel*, *Manville*, and *A.H. Robins*) that contained non-consensual releases of widespread claims against third parties, explaining that a "central focus of [those] three reorganizations was the global settlement of *massive liabilities*."[233]

156.    That is the exact situation here—a global settlement of massive liabilities. As of the Petition Date, Mallinckrodt entities were named in over 3,000 lawsuits stemming from the Company's production and sale of opioid medications.[234]    The Debtors burned more than $130 million defending and attempting to settle these suits prior to the Petition Date alone.[235]    Thus, the Debtors needed to file the Chapter 11 Cases to prevent the Opioid Claims and other litigation from causing significant value destruction. The Protected Parties (including the Company's chief executive officer, Mr. Trudeau) have been intimately involved with the Debtors' reorganization process—negotiating, formulating, and preparing to implement the Restructuring Support Agreement and the Plan, which includes the Opioid Operating Injunction as part of the Debtors' efforts to abate the opioid-addiction crisis and attempt to prevent future harm that could result from the promotion and marketing of opioid products. If Rhode Island and other governmental and private entities were permitted to bring Claims against the Protected Parties, Mr. Trudeau and the Debtors' other current and former directors and officers, the management of the Reorganized Debtors may be embroiled in litigation and the Reorganized Debtors would be saddled with astronomical indemnification and contribution Claims all at the very moment the Company should

---

[233]  *Cont'l Airlines*, 203 F.3d at 212 (emphasis added).

[234]  First Day Declaration ¶ 12.

[235]  *Id.*

be undertaking a "fresh start."  These circumstances—which are distinct from *Continental's* facts but similar to the mass-tort cases favorably cited in *Continental*—can be nothing other than extraordinary and, therefore, strongly weigh in favor of the approval of the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction.[236]

157.    Accordingly, for all of the reasons set forth above, the Debtors respectfully submit that the Releases by Holders of Opioid Claims and the Opioid Permanent Channeling Injunction are both fair and necessary and should be authorized by the Court.

### 4.    Permanent Injunction

158.    Section IX.G of the Plan provides that except as otherwise expressly provided in the Confirmation Order or Plan, from and after the Effective Date all persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from:  (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, or subrogation of any kind; and (e) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause

---

[236] *See Blitz U.S.A.*, 2014 WL2582976, at *19–20 (considering whether "Extraordinary Circumstances" exist as an additional factor in evaluating a proposed release and finding that "[a]fter months of arms-length, contentious negotiations . . . the Debtors, the Committee and the Protected Parties came to terms on a global settlement that formed the foundation of the Plan.  These extensive efforts and substantial contributions . . . constitute extraordinary circumstances warranting the Releases and Channeling Injunction set forth in the Plan."); *Charter Commc'ns*, 419 B.R. at 258–59 (noting that a settlement containing third-party releases was "negotiated at the height of the so-called 'Great Recession'" with parties who "were uniquely able to support the structure of the Plan" and that the Debtors' "structure is complex, its debt load enormous, and its bankruptcy is one of the largest prearranged cases ever filed" and concluding that "the unique manner in which value is being created, the sheer magnitude of the cases, and the once-in-a-lifetime market conditions in which this creative restructuring took place, in combination, justify approval of the Third Party Releases").

88

of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any person so released, discharged or exculpated (or the property or estate of any person so released, discharged or exculpated).[237]   This injunction is necessary to preserve and enforce the releases and exculpation granted by the Plan, and it is narrowly tailored to achieve that purpose.[238]   The Third Circuit in *Continental* indicated that fairness and necessity principles, including the *Master Mortgage/Zenith* factors, apply to both releases and the injunctions that effectuate such releases.[239]   As explained above, the releases are proper under applicable law in this jurisdiction and, accordingly, the injunction provision tailored thereto should be approved.

### 5.   The Opioid Insurer Injunctions

159.   The Plan generally enjoins all Persons (other than the Opioid MDT II) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claims based on, arising under or attributable to an Opioid Insurance Policy from taking any action for the purpose of collecting, recovering, or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an Opioid Insurance Policy from or against any Opioid Insurer, as set forth in Article IX.I of the Plan (the Opioid Insurer Injunction) and Article IX.J of the Plan (the Settling Opioid Insurer Injunction and, together with the Opioid Insurer Injunction, the "*Opioid Insurer Injunctions*").

160.   The Opioid Insurer Injunctions are necessary to preserve the value of the Opioid Insurance Policies for the benefit of the Holders of Claims channeled to the Opioid MDT II.   A

---

[237]   *See* Plan § IX.G.

[238]   *See id.*

[239]   *See Continental*, 203 F.3d at 217 & n.17.

89

debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction.[240]  Bankruptcy courts have jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate, such as claims against shared insurance policies.[241]

161.    Here, the Opioid Insurer Injunctions are necessary and integral to the Plan because the Opioid Insurance Policies are important assets of the Estates, and the injunctions are narrowly tailored for those purposes.  In light of these circumstances, the Debtors respectfully request that the Court approve these injunctions.[242]

### 6.    The Opioid Operating Injunction

162.    On January 8, 2021, the Court entered an order [Docket No. 196 in Adv. Pro. No. 20-50850] granting the Voluntary Injunction (*i.e.*, the Opioid Operating Injunction, which is attached to the order) against the VI-Specific Debtors that, among other things, enjoins such Debtors from engaging in the promotion of opioids or opioid products subject to certain exception. Pursuant to Article IX.K of the Plan and Exhibit M of the Plan Supplement, the VI-Specific Debtors and Reorganized VI-Specific Debtors, as applicable, consent to the entry of a final judgment or consent order upon the Effective Date imposing all of the applicable provisions of the Opioid Operating Injunction in the state court in each of the states that supports the Restructuring

---

[240]  *MacArthur Co.*, 837 F.2d at 91–92.

[241]  *Quigley*, 676 F.3d at 57, 58 ("We conclude that, where litigation of the Angelos suits against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate"); *In re Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996) ("*Dow Corning I*") ("The threat posed to those insurance policies if claims pending against Dow Chemical and Corning Incorporated are permitted to go forward in a separate manner supports a finding of 'related to' jurisdiction under [s]ection 1334(b).").

[242]  *See, e.g.*, *Order Approving & Adopting Bankr. Ct.'s Am. R. & R.'s*, *In re Duro Dyne Nat'l Corp.*, No. 3:19-cv-15433 (D.N.J. Oct. 23, 2020) [Docket No. 26] (confirming plan of reorganization with settling and non-settling insurer injunctions); *In re J.T. Thorpe, Inc.*, No. 2:05-cv-02412 (C.D. Cal., Jan. 17, 2006) [Docket No. 38] (same); *In re Plant Insulation Co.*, No. 09-31347 (Bankr. N.D. Cal. Feb. 28, 2014) [Docket No. 2722] (same); *In re Thorpe Insulation Co.*, No. 07-20016 (Bankr. C.D. Cal. Feb. 1, 2010) (same).

Support Agreement.  After the Effective Date, the Opioid Operating Injunction will be enforceable in the state court in each of the states of Supporting Governmental Opioid Claimants.

163.    Here, the Opioid Operating Injunction is necessary and integral to the Plan because it comprises an integral component to the Opioid Settlement, which the Plan is predicated upon, and is part of the Debtors' efforts to abate the opioid-addiction crisis and attempt to prevent future harm that could result from the promotion and marketing of opioid products.  The Opioid Operating Injunction was one of many important elements of the Plan Settlements that is coupled with the appointment of the Future Claims Representative, the channeling of Opioid Claims and Opioid Demands, and the significant consideration being afforded to the Opioid MDT II and the Opioid Creditor Trusts.  In light of these circumstances, the Debtors respectfully request that the Court approve this injunction, which they have been operating under since the Petition Date.[243]

### 7.    Exculpation

164.    The exculpation provisions are also integral parts of the negotiations among and global settlement between the Debtors and their constituents, as evidenced by the Restructuring Support Agreement, which culminated in the largely consensual Plan.

165.    By requesting that the Court approve the exculpation in Section IX.F of the Plan, the Debtors are essentially asking the Court to make a finding of fact that the Exculpated Parties[244] have participated in good faith and in compliance with the applicable laws with respect to the

---

[243]  *See, e.g.*, *Purdue I*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 17, 2021) [Docket No. 3787] (confirming plan of reorganization imposing voluntary operating injunction upon debtors and reorganized debtors).

[244]  The Exculpated Parties include (a) the Debtors (and their Representatives); (b) the Reorganized Debtors (and their Representatives); (c) the Official Committee of Unsecured Creditors (and its Representatives and the members thereto and their Representatives); (d) the Official Committee of Opioid-Related Claimants (and its Representatives and the members thereto and their Representatives); (e) the Future Claimants' Representative (and its Representatives); and (f) the Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, and the Legacy Unsecured Notes Indenture Trustee, each solely in its capacity and to the extent it serves as a Distribution Agent

Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan, and the distributions under the Plan, including all documents ancillary thereto, all decisions, any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors and all activities leading to the promulgation and confirmation of the Plan.[245]  Further, the scope of the exculpation is targeted and has no effect on liability that is determined to have resulted from actual fraud, gross negligence, or willful misconduct.[246]  Finally, the exculpation is expressly limited to the bounds of section 1125(e) of the Bankruptcy Code as to Exculpated Parties other than fiduciaries of the Debtors' estates.

166.    Only one party, the United States Trustee, has objected to the exculpation provision. The United States Trustee argues in the UST Objection that the Plan's definition of Exculpated Parties is too broad because it includes non-estate fiduciaries—namely, (a) "the Reorganized Debtors (and their Representatives)" and (b) "the Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, the Legacy Unsecured Notes Indenture Trustee, and [ ] the Second Lien Notes Indenture Trustee, *each solely in its capacity and to the extent it serves as a Distribution Agent*."[247]   Contrary to the United States Trustee's position, the Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, the Legacy Unsecured Notes Indenture Trustee, and the Second Lien Notes Indenture Trustee are

---

[245]  *See* Plan Art. IX.F.

[246]  *See id.*

[247]  UST Objection ¶¶ 72-72 (quoting Plan Art. I.A.118 (emphasis added)).

US-DOCS\126024798.18

estate fiduciaries to extent that any of them serves as Distribution Agent,[248] which is the only capacity in which they are an Exculpated Party.  In fact, the Court has recognized that distribution agents can be exculpated parties under a plan of reorganization.[249]

167.    Additionally, the Court frequently upholds the exculpation of reorganized debtors because reorganized debtors fall under the protection afforded under section 1125(e) of the Bankruptcy Code.[250]  In fact, this very Court has approved at least two plans that authorized the exculpation of reorganized debtors.[251]

168.    Thus, the Debtors respectfully request that the Court overrule the United States Trustee's argument and approve the exculpation provisions of Plan.

## II.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(2) of the Bankruptcy Code.

169.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of

---

[248] Article VI.D of the Plan provides that the Distribution Agent shall facilitate distributions on behalf of the Debtors and, thus, the Distribution Agent clearly qualifies as an estate fiduciary or representative.

[249] *In re PNG Ventures, Inc.*, No. 09-13162, 2010 WL 2745952, at *17 (Bankr. D. Del. Mar. 12, 2010) (stating in confirmation order that "the Disbursing Agent, together with its officers, directors, partners, employees, agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all causes of action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent (and each of its respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence").

[250] *See, e.g.*, *In re Xerium Techs., Inc.*, Case No. 10-11031(KJC), 2010 WL 3313079, at *10 (Bankr. D. Del. May 12, 2010) (applying section 1125(e) of the Bankruptcy Code to "the Reorganized Debtors"); *In re QHB Holdings, LLC*, Case No. 09-14312, 2010 WL 2859780, at *11 (Bankr. D. Del. Jan. 15, 2010) (same); *W.R. Grace I*, 446 B.R. at 132–33 (finding that exculpation clause that applied to "the Reorganized Debtors" met the "standard to be in accord with the standards for releases set forth in *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)"); *In re Orleans Homebuilders, Inc.*, 561 B.R. 46, 54 (Bankr. D. Del. 2016) (granting exculpation of "the Reorganized Debtors"); *see also In re Mesa Air Grp., Inc.*, Case No. 10-10018 MG, 2011 WL 182450, at *79 (Bankr. S.D.N.Y. Jan. 20, 2011) ("The Debtors, the Reorganized Debtors, the Liquidating Debtors and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.").

[251] *See Sustainable Restaurant Holdings, Inc.*, Case No. 20-11087 (JTD) (Bankr. D. Del July 16, 2020) [Docket No. 212]; *In re Reva Medical, Inc.*, Case No 20-10072 (JTD) (Bankr. D. Del. Feb 19, 2020) [Docket No. 114].

93

the Bankruptcy Code.  The case law and legislative history discussing section 1129(a)(2) of the

Bankruptcy Code indicate that this section principally embodies the disclosure and solicitation

requirements of section 1125 of the Bankruptcy Code.[252]  The Debtors have complied with

section 1129(a)(2) of the Bankruptcy Code by distributing their Disclosure Statement and

soliciting acceptances of the Plan through their Notice and Claims Agent, as authorized by the

Disclosure Statement Order and the Confirmation Schedule Order.  The Debtors have also satisfied

section 1125 of the Bankruptcy Code by obtaining Court approval of the Disclosure Statement as

containing adequate information and by complying with all noticing, solicitation, and tabulation

requirements described in the Solicitation Procedures.

### III.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Accordance with Section 1129(a)(3) of the Bankruptcy Code.

170.    Section 1129(a)(3) of the Bankruptcy Code requires that the Plan be "proposed in

good faith and not by any means forbidden by law."[253]  The Third Circuit has held that for a plan

to be proposed in good faith it must "fairly achieve a result consistent with the objectives and

purposes of the Bankruptcy Code."[254]  The determination of whether a plan has been proposed in

good faith requires a factual inquiry into the totality of the circumstances surrounding the plan's

proposal.[255]  Accordingly, the examination must be done on a case-by-case basis and the court is

---

[252]  *See In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) of the Bankruptcy Code requires plan proponents comply with applicable Bankruptcy Code provisions, including "disclosure and solicitation requirements under sections 1125 and 1126").

[253]  11 U.S.C. § 1129(a)(3).

[254]  *PWS Holding*, 228 F.3d at 242; *W.R. Grace II*, 475 B.R. at 87 (citing same); *In re Wash. Mut., Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011) (same), *vacated in part* 2012 WL 1563880 (Bankr. D. Del Feb. 24, 2012); *Combustion Eng'g*, 391 F.3d at 247 (same).

[255]  *W.R. Grace II*, 475 B.R. at 87.

94

given "considerable discretion in finding good faith."[256]  In the Third Circuit, to establish that a plan was proposed in good faith, a plan proponent must establish that "(1) [the plan] fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and (3) exhibited a fundamental fairness in dealing with the creditors."[257]  Here, each of these factors is met.

171.    *First*, the Plan fosters a result consistent with both of the Bankruptcy Code's two primary objectives:  reorganization and value maximization.[258]  Here, the Plan maximizes the value of the Debtors' Estates because it (a) resolves the enterprise-threatening litigation brought against the Debtors, (b) restructures the Claims brought against the Debtors and addresses near-term debt maturities, and (c) de-levers the Debtors' capital structure by more than $1 billion, which will allow the Reorganized Debtors to obtain a sustainable capital structure and continue to produce the medications and therapies that help patients in need.  The Plan also establishes certain agreed upon go-forward operational parameters for the Debtors' opioid business that will dramatically reduce the risk of future litigation for the Reorganized Debtors.  In particular, the Opioid Operating Injunction enjoins the Debtors and the Reorganized Debtors from engaging in the promotion of opioids or opioid products, which should foster the Company's goal of abating the opioid-addiction crisis and reduce future litigation risk for the Reorganized Debtors.

---

[256]  *Id.* (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

[257]  *Id.* at 87–88 (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)); Wash. Mut., 461 B.R. at 239; *accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

[258]  *See W.R. Grace II*, 475 B.R. at 88 ("The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as:  (1) preserving going concerns; and (2) maximizing property available to satisfy creditors.") (citing *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) ("*203 N. LaSalle II*")).

172.    *Second*, "[i]n analyzing whether a plan has been proposed for honest and good reasons, courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."[259]  Here, the Plan (including the Plan Supplement and all other documents necessary to effectuate the Plan) was negotiated at arm's-length among representatives of the Debtors, the Supporting Parties, the OCC, the UCC, the Future Claimants Representative, and their respective professionals solely for the purposes outlined above and the facts support no other conclusion.[260]  Indeed, there is no evidence of "misconduct in [the] bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court"[261] and not one Objector has made such allegations.[262]  Instead, as the Debtors will demonstrate at the Confirmation Hearing, the Plan is the product of extensive give and take by the various settling parties and incorporates the terms of each of the carefully-crafted Plan Settlements that are necessary for an effective reorganization.

173.    *Third*, the Supporting Parties, the UCC, and the OCC support confirmation of the Plan.  That the Plan has such significant support from the Debtors' major creditor constituencies

---

[259]  *W.R. Grace II*, 475 B.R. at 88 (citation omitted).

[260]  *See id.* at 89 ("There is no evidence that Grace was dishonest or had ulterior motives when it proposed the Joint Plan.  Nor is there any indication that Grace intended to abuse the judicial process.  Rather, the record shows that the Joint Plan was the result of years of litigation and extensive arms-length negotiations."); *see also In re Tribune I*, 464 B.R. at 156 ("Without any tangible evidence of actual wrongdoing or harm to the Debtors, suspicion of a potential conflict is not sufficient to demonstrate bad faith.") (citing *Washington Mut. I*, 442 B.R. at 327).

[261]  *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995).

[262]  As shown in **Exhibit A**, the only Confirmation Objections that challenged the Plan's ability to satisfy section 1129(a)(3) of the Bankruptcy Code have no unifying theme and do not come close to showing the Debtors did not propose the Plan in good faith.

demonstrates that the Plan is fundamentally fair to creditors.[263]   Accordingly, the Debtors have

proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

## IV.   The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments in Accordance with Section 1129(a)(4) of the Bankruptcy Code.

174.   Section 1129(a)(4) of the Bankruptcy Code requires bankruptcy court approval of

certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person

issuing securities or acquiring property under the plan.   Specifically, section 1129(a)(4) of the

Bankruptcy Code provides that:

> Any payment made or to be made by the proponent, by the debtor,
> or by a person issuing securities or acquiring property under the
> plan, for services or for costs and expenses in or in connection with
> the case, or in connection with the plan and incident to the case, has
> been approved by, or is subject to the approval of, the court as
> reasonable.[264]

This section of the Bankruptcy Code has been construed to require that all payments of

professional fees that are made from estate assets be subject to review and approval by the Court

as to their reasonableness.[265]

175.   All payments made or to be made by the Debtors for services rendered and expenses

incurred in connection with the Chapter 11 Cases have been approved by, or are subject to approval

of, the Court.   In particular, Article II of the Plan seeks approval for the payment only of ***Allowed***

General Administrative Claims and Professional Fee Claims.[266]

---

[263]   *See W.R. Grace II*, 475 B.R. at 89 ("Further, the Creditor Committee's participation in the settlement negotiations is highly relevant when considering whether the DCL Plan Settlements were negotiated in good faith.").

[264]   11 U.S.C. § 1129(a)(4).

[265]   *See, e.g.*, *In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *WorldCom*, 2003 WL 23861928, at *54; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) ("*Drexel Burnham I*").

[266]   *See* Plan Art. II; *see also In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that the plan of reorganization satisfied the requirements of section 1129(a)(4) of the Bankruptcy Code where the plan

97

176.    Finally, the Court will retain jurisdiction after the Effective Date to grant or deny certain applications for allowance of compensation or payment of expenses authorized pursuant to the Bankruptcy Code or the Plan.[267]    Thus, the Debtors submit that Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

## V.    The Debtors Will Disclose the Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy in Accordance with Section 1129(a)(5) of the Bankruptcy Code.

177.    Section 1129(a)(5)(A) of the Bankruptcy Code provides that the Court may confirm the Plan only if the Plan proponent discloses "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."[268]    With respect to the officers of the Reorganized Debtors, the Debtors have already disclosed that "[t]he existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the Reorganized Board to remove or replace them in accordance with the New Governance Documents and any applicable employment agreements that are assumed pursuant to the Plan."[269]    With respect to the directors of the Reorganized Debtors, prior to the Effective Date, the Debtors will disclose (a) the identity of the members of the Reorganized Board and (b) the nature and compensation for any insider who will be employed or retained by the Reorganized Debtors under section 101(31) of the Bankruptcy Code.[270]    The method of

---

provided for payment of only "allowed" administrative expenses).  The Debtors dispute certain Administrative Claims and such Claims will not be considered Allowed until the relevant dispute is resolved.

[267]    *See* Plan Art. X.

[268]    11 U.S.C. § 1129(a)(5)(A).

[269]    Plan Art. IV.M.2.

[270]    *Id.*

appointment of members of the Reorganized Board, as set forth in Article IV.M of the Plan and in the New Governance Documents, will be consistent with the interests of Holders of Claims and Interests and public policy.

178.    As part of their desperate scheme to gain settlement leverage over the Debtors by miring the Debtors in as many objections as possible, Kenneth R. Greathouse, Stuart Rose, and Lloyd Glenn (collectively, the "***Glenridge Principals***") filed a Confirmation Objection [Docket No. 4701] (the "***Glenridge Objection***") putting forth the trivial bipartite argument that the Plan does not comply with section 1129(a)(5) of the Bankruptcy Code because it does not "[a]'identify' each individual member of the Reorganized Board and [b] fails to disclose the 'nature of any compensation for such insider.'"[271]    The first part of the Glenridge Principals' argument simply misinterprets the plain language of section 1129(a)(5) of the Bankruptcy Code.  That section does not require that the Debtors identify each individual member of the Reorganized Board; rather, it requires that the Debtors disclose "the identity and affiliations of any individual ***proposed*** to serve, after confirmation of the plan, as a director."[272]    Accordingly, where "there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection [1129](a)(5)(A)(i)."[273]    The second part of the Glenridge Principals' argument is likewise wrong because the Debtors, in fact, did disclose the compensation of directors and officers in their 10-K

---

[271]  Glenridge Objection ¶ 63.

[272]  11 U.S.C. § 1129(a)(5)(A) (emphasis added).

[273]  *In re American Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988); *see also Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors.") (emphasis in original); *Washington Mut. II*, 2012 WL 1563880, at *14 (approving plan's designation of board of directors of reorganized debtors as of the effective date of the plan and reorganized board's selection of officers as of or after the effective date of the plan); *Arclin*, 2011 WL 6013665 (approving plan's designation of board of directors and officers of reorganized debtors as of the effective date of the plan).

for the fiscal year ended December 25, 2020.[274]  Based on the foregoing, the Debtors respectfully request that the Court overrule the Glenridge Principals' argument and find that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

## VI.    The Plan Does Not Require Governmental Regulatory Approval in Accordance with Section 1129(a)(6) of the Bankruptcy Code.

179.    The Bankruptcy Code permits confirmation of the Plan only if any regulatory commission that will have jurisdiction over the debtor subsequent to confirmation has approved any rate change provided for in the Plan.[275]  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

## VII.    The Plan is in the Best Interests of Creditors and Interest Holders in Accordance with Section 1129(a)(7) of the Bankruptcy Code.

180.    The Bankruptcy Code requires that, with respect to each class, each holder of a claim or an equity interest in such class either:

(a)    has accepted the plan; or

(b)    will receive or retain under the plan . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code].[276]

181.    This "best interests" test applies to individual dissenting holders of claims and interests rather than classes[277] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate

---

[274]  Mallinckrodt plc, Annual Report (Form 10-K/A (Amendment No. 1)), at 12-24, 27 (Apr. 19, 2021).

[275]  11 U.S.C. § 1129(a)(6).

[276]  *Id.* § 1129(a)(7)(A).

[277]  *203 N. LaSalle II*, 526 U.S. at 441–42 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

US-DOCS\126024798.18

against the estimated recoveries under that debtor's plan of reorganization.[278]  As the language of section 1129(a)(7) of the Bankruptcy Code makes clear, the best-interests test applies only to non-accepting Impaired claims or interests; if a class of claims or interests unanimously approves a plan, the best-interests test is deemed satisfied for all members of that class.[279]

182.    To find that the Plan satisfies the best-interests test, the Court must:  (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or an Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.[280]

183.    To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to chapter 7 cases.[281]  The Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Debtors would incur as a result of the ineffectiveness associated with replacing existing management and professionals.[282]  Such costs

---

[278]  *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (finding plan satisfied section 1129(a)(7) of the Bankruptcy Code where, under the terms of the plan, an impaired holder of a claim would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[279]  *Drexel Burnham*, 138 B.R. at 761.

[280]  *See Adelphia*, 368 B.R. at 251–52.

[281]  *See id.* at 251-54.

[282]  *Cf. id.* at 254 ("[T]he chapter 7 trustee's advisors would be entitled to reasonable compensation for services rendered and related expenses incurred, which would be entitled to treatment as administrative expense claims. Given the amount of time such professionals would be required to devote to become familiar with the Debtors and the issues related to these cases, such fees and costs would reduce overall recoveries." (footnote omitted)).

US-DOCS\126024798.18

would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.  In addition, in a liquidation scenario, recovery values on the Debtors' assets would likely be depressed relative to their values in the context of a reorganization.

184.    To demonstrate the Plan's compliance with the best-interests test, the Debtors, with the assistance of their advisors, prepared the hypothetical liquidation analysis attached as Exhibit E to the Disclosure Statement (the "***Liquidation Analysis***").  The Liquidation Analysis presents estimated recoveries that may be obtained by Holders of Claims and Interests upon a disposition of assets in a hypothetical chapter 7 liquidation as an alternative to estimated recoveries provided under the Plan.

185.    Here, the best-interests test is not relevant for the Holders of (a) Other Secured Claims in Class 1 and (b) First Lien Revolving Credit Facility Claims in Class 2(a) because such Classes of Claims are Unimpaired and presumed to accept the Plan.  Based upon the Liquidation Analysis, and as will be explained in further detail in the Eisenberg Declaration and adduced at the Confirmation Hearing, the estimated recoveries to each Impaired Class and sub-Class at each Debtor are greater than or equal to the recovery that such Holders would be able to recover in a chapter 7 liquidation.  Although several Objectors have challenged the Debtors' satisfaction of the best-interests test, those Confirmation Objections should be overruled for the reasons expressed in

102

paragraphs 263–288 below. Accordingly, the Debtors believe that the Plan satisfies the best-interests test of section 1129(a)(7) of the Bankruptcy Code.[283]

## VIII. Acceptance of Impaired Classes in Accordance with Section 1129(a)(8) of the Bankruptcy Code.

186.    Section 1129(a)(8) of the Bankruptcy Code requires that each Class of Claims or Interests must either accept the Plan or be Unimpaired under the Plan.[284] Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class that actually submit ballots to vote to accept the plan.[285] A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[286] Conversely, a class is deemed to have rejected a plan if the plan provides that the holders of claims or interests of such class are not entitled to receive or retain any property under the plan on account of such claims or interests.[287]

187.    As set forth in the Voting Report, Classes 2(b), 2(c), 4, 5, 6(c), 6(d), 6(g), 7, 8(a)-8(d), 9(a)-9(f), and 10 each voted to accept the Plan. While the Debtors have not satisfied section 1129(a)(8) of the Bankruptcy Code, the Plan is nevertheless confirmable because the Debtors have

---

[283] The Liquidation Analysis was developed using the Debtors' then-most recent financial projections, prior to the Debtors' development of the Refreshed Projections described herein. As the evidence adduced at or prior to the Confirmation Hearing will show, adjustments to the Liquidation Analysis to account for the Refreshed Projections would not materially alter the Debtors' conclusion that the estimated recoveries to each Impaired Class and Sub-Class at each Debtor are greater than or equal to the recovery that such Holders would be able to recover in a chapter 7 liquidation.

[284] 11 U.S.C. § 1129(a)(8).

[285] *Id.* § 1126(c).

[286] *Id.* § 1126(f); *see also Drexel Burnham II*, 960 F.2d at 290 ("If the claimholder's interests are unimpaired, the claimholder is conclusively presumed to have accepted the plan, and his participation in or approval of the reorganization plan is not necessary for the plan to gain confirmation by the bankruptcy court.") (internal quotation marks omitted).

[287] 11 U.S.C. § 1126(g).

103

satisfied sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.  As discussed more fully

below, the Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code—because at least

one Impaired Class accepted the Plan—and section 1129(b) of the Bankruptcy Code, because the

Debtors have satisfied the conditions needed to "cramdown" any rejecting classes.

## IX.     The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims in Accordance with Section 1129(a)(9) of the Bankruptcy Code.

188.     Section 1129(a)(9) of the Bankruptcy Code generally requires that persons holding

claims entitled to priority under section 507(a) of the Bankruptcy Code receive payment in full in

Cash unless the holder of a particular claim agrees to a different treatment with respect to such

claim.  As required by section 1129(a)(9) of the Bankruptcy Code, Article II.A of the Plan provides

that, except to the extent that a Holder of an Allowed General Administrative Claim and the

applicable Debtors or Reorganized Debtors, as applicable, agree to less favorable treatment with

respect to such Allowed General Administrative Claim, each Holder of an Allowed General

Administrative Claim shall receive, in full and final satisfaction of its General Administrative

Claim, an amount in Cash equal to the unpaid amount of such Allowed General Administrative

Claim in accordance with the following:  (a) if such General Administrative Claim is Allowed on

or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter

or, if not then due, when such Allowed General Administrative Claim is due or as soon as

reasonably practicable thereafter; (b) if such General Administrative Claim is Allowed after the

Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably

practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due

or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be

agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or

(d) at such time and upon such terms as set forth in an order of the Court; *provided* that Allowed

General Administrative Claims that arise in the ordinary course of the Debtors' businesses during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

189.    Under Article II.B of the Plan, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder; *provided* that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

190.    Pursuant to Article II.C of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor(s) against which such Allowed Other Priority Claim is asserted agree to a less favorable treatment, each Holder of an Allowed Other Priority Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after

105

the Effective Date, on account of such Claim:  (a) Cash in an amount equal to the amount of such

Allowed Other Priority Claim; or (b) Cash in an amount agreed to by the applicable Debtor or

Reorganized Debtor, as applicable, and such Holder.  To the extent any Allowed Other Priority

Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in

Cash in accordance with the terms of any agreement between the Debtors (or the Reorganized

Debtors, as applicable) and such Holder, or as may be due and payable under applicable non-

bankruptcy law or in the ordinary course of business.  Therefore, the Plan complies with section

1129(a)(9) of the Bankruptcy Code.

X.      **At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders, in Accordance with Section 1129(a)(10) of the Bankruptcy Code.**

        191.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an

impaired class of claims, at least one impaired class of claims must accept the plan, excluding

acceptance by any insider.  Here, Classes 2(b), 2(c), 4, 5, 6(c), 6(d), 6(g), 7, 8(a)-8(d), 9(a)-9(f),

and 10 voted to accept the Plan, and such acceptance does not include acceptance of the Plan by

an insider.  Therefore, the Plan satisfies the requirement of section 1129(a)(10) of the Bankruptcy

Code.

XI.     **The Plan is Feasible in Accordance with Section 1129(a)(11) of the Bankruptcy Code.**

        192.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that the

Plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine

that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[288]

---

[288]  *Id.* § 1129(a)(11).

193.    The statute requires the Court to determine whether a plan is workable and has a reasonable likelihood of success.[289]  To demonstrate that the Plan is feasible, it is not necessary for the Debtors to guarantee success of the Plan;[290] rather, the Debtors need only provide a ***reasonable assurance*** that the provisions of the Plan can be performed.[291]

194.    While the Debtors bear the burden of proving Plan feasibility, the applicable standard is by a preponderance of the evidence, which requires showing that a given fact is "more likely than not."[292]  A number of courts have held that this standard constitutes a "relatively low threshold of proof."[293]  Courts have also made clear that "speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds."[294]

---

[289]  *See Armstrong World Indus.*, 348 B.R. at 167; *In re NII Holdings, Inc.*, 288 B.R. 356, 364 (Bankr. D. Del. 2002); *In re Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997).

[290]  *See In re Kaplan*, 104 F.3d 589, 597 (3d Cir. 1997); *Energy Res.*, 495 U.S. at 549; *see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[291]  *See In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985) ("[T]he feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . .  The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'") (quoting *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978)); *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be reasonable assurance of commercial viability.").

[292]  *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *Briscoe Enters., Ltd., II (In re Briscoe Enter., Ltd., II)*, 994 F.2d 1160, 1164 (5th Cir. 1993); *CoreStates Bank, N.A. v. United Chem. Tech., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).

[293]  *In re Mayer Pollack Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the plan as a viable undertaking"); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (E.D. Penn. 1995) ("it is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement."); *see also Briscoe Enters., Ltd.*, 994 F.2d at 1166 (upholding the bankruptcy court's ruling that reorganization that had only a "marginal prospect of success" was feasible because only "a reasonable assurance of commercial viability" was required).

[294]  *See In re Indianapolis Downs, LLC*, 486 B.R. at 298 ("Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure will not defeat feasibility."); WorldCom*, Inc.*, 2003 WL 23861928, at *170; *see also In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.").

195.    Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

       (a)    the adequacy of the capital structure;

       (b)    the earning power of the business;

       (c)    economic conditions;

       (d)    the ability of management;

       (e)    the probability of the continuation of the same management;

       (f)    the availability of prospective credit, both capital and trade;

       (g)    the adequacy of funds for equipment replacements;

       (h)    the provisions for adequate working capital; and

       (i)    any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[295]

**A.    The Plan's Post-Emergence Structure is Feasible.**

196.    For purposes of determining whether the Plan satisfies feasibility standards, the Debtors thoroughly analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors prepared detailed financial projections annexed as Exhibit D to the Disclosure Statement (the "***Original Financial Projections***").  The Original Financial Projections include consolidated financial projections for the fiscal quarter ending December 31, 2021 through the fiscal year ending December 26, 2025 (the "***Projection Period***").  The Debtors prepared the

---

[295] *Leslie Fay Cos.*, 207 B.R. at 789; *see also In re Machne Menachem, Inc.*, 371 B.R. 63, 71 (Bankr. M.D. Pa. 2006). The foregoing list is neither exhaustive nor exclusive.  *Drexel Burnham II*, 138 B.R. at 763.

Original Projections on a consolidated basis, consistent with the Company's financial reporting practices, and include all Debtor and non-Debtor entities.

197.    In September 2021, the Debtors' management team issued an update to their projections (the "***Refreshed Projections***" and, together with the Original Projections, the "***Projections***") which were developed on a "top-down" basis to address material changes that became known subsequent to the filing of the Disclosure Statement and will impact the Company's businesses during the Projection Period.  Although the Refreshed Projections have not been approved by the Debtors' board of directors, they reflect the most current views of management regarding certain sales and cost assumptions.

198.    The Debtors update their annual forecast on a quarterly basis.  In July 2021, the Debtors performed such an assessment, which included a review of the Company's year-to-date results from the first half of 2021 and expectations for the second half of 2021.  Among other considerations, this review showed a reduction in anticipated performance for two Specialty Brands products, Acthar and INOmax®.  The Debtors' management team evaluated the reasons for the lower anticipated performance in 2021 and concluded that those drivers as well as other changes in market dynamics could impact the Debtors' financial performance during the Projection Period.  This resulted in the development of the Refreshed Projections, which incorporate material changes to the Original Projections known to management as of the date the Refreshed Projections were prepared.  Additional cost-saving opportunities may be identified through the Debtors' normal-course annual planning process.

199.    As part of developing the Refreshed Projections, the management team evaluated the Debtors' projections and identified certain material changes to assumptions associated with Acthar sales, INOmax sales, research and development savings, and operating-expense savings.

The net result of these changes is that Adjusted EBITDA is anticipated to be lower by approximately 5% to 7% per year as compared to the Original Projections.  Despite this reduction, the evidence presented at the Confirmation Hearing will confirm that the Plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtors or any successors to the Debtors.

200.    As set forth in the Disclosure Statement, the Projections are based upon certain assumptions that the Debtors believe to be reasonable under the circumstances.  Subject to the risk factors enumerated in Article IX of the Disclosure Statement, the Projections indicate, on a *pro forma* basis, that the projected level of Cash flow is sufficient to (a) satisfy all of the Reorganized Debtors' future obligations during the Projection Period, including payment obligations under the settlements, research and development, capital expenditure, operations, and other anticipated expenses, and (b) pay down certain debt obligations quicker than required under the Plan.

201.    As will be shown at the Confirmation Hearing, under the terms of the Plan, the Debtors have estimated the total amount of Cash payments they will need to make on the Effective Date to be approximately $853 million.  Based on the Projections, the Debtors are expected to have Cash on hand to satisfy these obligations on the Effective Date and to emerge from chapter 11 with $573 million of liquidity.  Moreover, the Projections indicate that the Debtors will have sufficient liquidity to satisfy debt service and their obligations under the settlements contained in the Plan.

202.    In addition, the Reorganized Debtors are expected to generate sufficient Cash flow, after debt service and settlement obligations, to affect a gradual deleveraging of the Reorganized Debtors' capital structure.  Based on the Projections, the Reorganized Debtors will have the ability to voluntarily pay down over $770 million of aggregate principal under the New Term Loan

Facility and New Takeback Term Loan Facility during the Projection Period using available Cash

on hand at emergence and aggregate Cash flow during the Projection Period.  The Projections also

indicate that the Debtors will have sufficient credit metrics to permit refinancing of the First Lien

Notes and Second Lien Notes, which are the only debts maturing during the Projection Period, to

the extent they are not paid down prior to maturity.

203.    It is, thus, not surprising that the Plan has obtained strong support from the

Supporting Parties, the UCC, the OCC, and other creditors.[296]  Accordingly, confirmation of the

Plan will not likely be followed by liquidation or the need for further financial reorganization of

the Debtors and, therefore, the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy

Code.

> **B.**    **The Plan's Treatment of Claims that May be Filed in the Future is Proper and the Provisions Establishing Trusts to Address Purported Claims are Feasible.**

204.    The Debtors have spent significant time preparing and undertaking numerous steps

designed to ensure that future Opioid Claims are properly treated and do not interfere with the

feasibility of the Plan.  Against this backdrop of significant effort, it is validating (but unsurprising)

that no one has objected to the Debtors' treatment of future Opioid Claims.

205.    In light of the fact that all Opioid Claims will be channeled to the Opioid MDT II

under the Plan with no bar date, the Debtors worked with many of their major creditor

constituencies—including the UCC, the OCC, the Governmental Plaintiff Ad Hoc Committee, and

the MSGE Group—to establish a solicitation notice program designed to reach potential Opioid

---

[296] *See Indianapolis Downs*, 486 B.R. at 298 ("The first, best indicator of feasibility is the position of the creditors whose economic interests are at stake.  The support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposal is more illuminating to the court than any expert report or accountant's projections.").

Claimants in a manner that was unprecedented in its scope. In accordance with the Disclosure

Statement Order, the Debtors sent solicitation packages and a notice (describing the Plan and how

to vote thereon) to known potential Opioid Claimants and/or their lawyers.[297] As indicated in the

Disclosure Statement, the Debtors filed an opioid notice plan (the "***Opioid Notice Plan***"), pursuant

to which the Debtors used multiple channels in the United States (including territories and tribes)

and Canada to provide notice to known and unknown Opioid Claimants.[298]  Specifically, the

Debtors implemented a combination of direct mailings, media campaigns and advertising (*i.e.*,

primarily television, online social/search media, and radio), print publications (*i.e.*, newspapers

and magazines), and community outreach to provide notice to known and unknown Opioid

Claimants.[299]  As a result, the Debtors have created substantial awareness of the Chapter 11 Cases

and the ability of the Opioid Claimants to assert Claims against the Opioid MDT II Trust. At the

same time, by not establishing a bar date for Opioid Claims, the Debtors have implemented a

carefully-chosen framework that ensures that all Opioid Claimants, even if they have not yet

received notice, receive ample opportunity to recover from the applicable trust created under the

Plan.

206.    In addition, the Debtors believe they should have no postpetition opioid liability

because they have, as discussed above, put in place the Opioid Operating Injunction, which enjoins

the Debtors from engaging in conduct—both during the Chapter 11 Cases and after the Effective

Date—related to the manufacture, marketing, sale, and distribution of opioids effective as of the

---

[297]  *See* Supplemental Affidavit of Service of Solicitation Materials [Docket No. 4479].

[298]  Disclosure Statement Art. IV.W.

[299]  *Id.*

Petition Date.[300]   The Debtors have also retained, pursuant to Court order [Docket No. 1306], the

Chapter 11 Monitor to serve as an outside, independent individual tasked with evaluating and

monitoring the Debtors' compliance with the Opioid Operating Injunction.[301]   Moreover, under

the Plan, the vast majority of the $1.725 billion of the Opioid Settlement will be channeled to

abatement trusts (*i.e.*, the Emergency Room Physician Trust, the NAS Monitoring Trust, the

Hospital Trust, the Third-Party Payor Trust, the NOAT II, and the TAFT II) that (a) are established

for the benefit of states and localities, as well as other creditor groups such as Native American

Tribes, hospitals, ratepayers, third-party payors, emergency room physicians, and children with a

history of Neonatal Abstinence Syndrome and their guardians, and (b) have the express mission to

exclusively fund abatement of the opioid-addiction crisis.[302]   Such abatement should reduce future

opioid liability for the Debtors.   Accordingly, the Debtors believe that the only conduct that could

give rise to an Opioid Claim occurred prepetition and such prepetition conduct is too remote to

give rise to future Claims.

207.    Understanding, however, that individuals may in the future elect to pursue Opioid

Claims, and in keeping with the concept of fully addressing Opioid Claims based on alleged

prepetition misconduct, the Debtors appointed the Future Claimants' Representative and the Plan

establishes trusts to address such Claims should they be brought.   On February 24, 2020, after

evaluating several potential candidates, the Debtors chose Roger Frankel to act as the Future

Claimants' Representative to represent "individuals who may assert in the United States a claim

or claims in the future against a Debtor for harm arising out of the use of opioid products prior to

---

[300]   [Docket No. 196 in Adv. Pro. No. 20-50850]; Disclosure Statement Art. IV.J.

[301]   Disclosure Statement Art. IV.J.

[302]   *Id.*

the effective date of the Debtors' plan or plans of reorganization" and whose claim "is to be addressed by a trust established to assume the liabilities of the Debtors for damages allegedly caused by the use of opioid products."[303]

208.    On October 13, 2020, the Debtors filed the Future Claimants' Representative Motion seeking to appoint Mr. Frankel as the Future Claimants' Representative effective as of the Petition Date.[304]  Pursuant to the Future Claimants' Representative Motion, the Future Claimants' Representative has standing to represent such future claimants "in all matters" relating to the Debtors' case and the powers and duties of a committee appointed under section 1103 of the Bankruptcy Code.[305]

209.    On March 16, 2021, the Court entered an *Order Provisionally Appointing Roger Frankel as Legal Representative for Future Claimants* [Docket No. 1747] for the purposes of permitting the Future Claimants' Representative to participate in an ongoing mediation over the allocation of the Opioid MDT II.  On June 11, 2021, the Court entered the *Order Appointing Roger Frankel, as Legal Representative for Future Claimants, Effective as of the Petition Date* [Docket No. 2813] (the "***FCR Order***") appointing the Future Claimants' Representative on a permanent basis.

210.    Since the provisional appointment of the Future Claimants' Representative, the Future Claimants' Representative has been, throughout the mediation and thereafter, in discussions with the Debtors and other parties—particularly, representatives for the Governmental Plaintiff Ad Hoc Committee and the Holders of PI/NAS Opioid Claims—with respect to the allocation of

---

[303] *Motion of Debtors for Entry of an Order Appointing Roger Frankel, as Legal Representative for Future Claimants, Effective as of the Petition Date* [Docket No. 189] (the "***Future Claimants' Representative Motion***") ¶ 5.

[304] *Id.*

[305] *Id.* ¶ 6.

Opioid Trust Consideration to the PI Trust, the implementation of the Opioid Settlement, including

with respect to the Opioid MDT II and the PI Trust and the trust distribution procedures thereunder.

In accordance with the FCR Order, the Future Claimants' Representative will continue to protect

the rights of Future Opioid PI Claimants after the Effective Date.  In addition, the Opioid MDT II

and the PI Trust will assume the liability of all applicable Opioid Claims, whether they exist now

or in the future.  Thus, the rights of Future Opioid PI Claimants are more than adequately protected.

211.    For the foregoing reasons, the Debtors respectfully submit that the Plan satisfies
the requirements of section 1129(a)(11) of the Bankruptcy Code.

## XII.    The Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 in Accordance with Section 1129(a)(12) of the Bankruptcy Code.

212.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees
payable under 28 U.S.C. § 1930.  Article XII.C of the Plan provides that all fees due and payable

pursuant to 28 U.S.C. § 1930 shall be paid for each quarter (including any fraction thereof) until

the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.[306]  The Plan,

therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

## XIII.    The Plan Provides for Continued Payment of All Retiree Benefits in Accordance with Section 1129(a)(13) of the Bankruptcy Code.

213.    Section 1129(a)(13) of the Bankruptcy Code requires that the Plan provide for
continued, post-confirmation payments of all retiree benefits at the levels established in accordance

with section 1114 of the Bankruptcy Code.  Article V.H of the Plan provides that the Reorganized

Debtors shall honor all of the Debtors' Compensation and Benefits Programs, including, without

---

[306]  Plan § XII.C.

US-DOCS\126024798.18

limitation, all retiree benefits programs (including, but not limited to, pension plans).[307]

Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**XIV.   Sections 1129(a)(14), (a)(15), and (a)(16) of the Bankruptcy Code are Inapplicable.**

214.   None of the Debtors are (a) required to pay any domestic support obligations, (b) individuals, or (c) nonprofit corporations or trusts.  Accordingly, sections 1129(a)(14) through (16) of the Bankruptcy Code are inapplicable.[308]

**XV.   The Plan Satisfies the "Cramdown" Requirements of Section 1129(b) of the Bankruptcy Code.**

215.   As set forth in the Voting Report, Classes 2(b), 2(c), 4, 5, 6(c), 6(d), 6(g), 7, 8(a)-8(d), 9(a)-9(f), and 10 each voted to accept the Plan.  Classes (a) 6(a), 6(b), 6(e) (solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC, Mallinckrodt plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC), 6(f) (solely as to Debtors Mallinckrodt ARD LLC, Mallinckrodt Hospital Products, Inc., Mallinckrodt LLC, Mallinckrodt Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and ST Shared Services LLC), and 9(h) voted to reject the Plan, and (b) 9(i), 13, and 14, and, to the extent Impaired under the Plan, Classes 11 and 12 were deemed to reject the Plan, requiring the Debtors to "cramdown" these Classes pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that if a plan of reorganization meets all applicable requirements of section 1129(a) (other than the requirement set out in section 1129(a)(8)) of the Bankruptcy Code, the plan may be confirmed so long as it does not

---

[307] *Id.* § V.G.

[308] *See In re Sea Launch Co., L.L.C.*, No. 09-12153, 2010 Bankr. LEXIS 5283, at *41 (Bankr. D. Del. July 30, 2010) ("Section 1129(a)(16) by its terms applies only to corporations and trusts that are not moneyed, business, or commercial.") (internal citations omitted).

discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[309]  Thus, to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[310]  The Debtors' satisfaction of these conditions is discussed in detail below.

A.    **The Plan is Fair and Equitable with Respect to Each Impaired Class that Has Not Voted to Accept the Plan.**

216.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain under the plan on account of such junior claim or interest any property.  This central tenet of bankruptcy law—known as the "absolute priority rule"—requires that, if the holders of claims or interests in a particular class that votes to reject a plan receive less than full value for their interests, then no holder of claims or interests in a junior class may receive

---

[309]  *See* 11 U.S.C. § 1129(b).

[310]  *See John Hancock Mut. Life*, 987 F.2d at 157 n.5 ("Under [Section 1129(b) of the Bankruptcy Code], the plan must also satisfy all of the requirements of [Section 1129(a) of the Bankruptcy Code] except for subsection (a)(8) . . . and must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan.").

117

property under the plan.[311]  Another condition under the absolute priority rule is that senior classes

cannot receive more than a 100 percent recovery for their claims.[312]

217.    The Plan satisfies the absolute priority rule with respect to all Impaired Classes of

Claims and Interests that have not voted in favor of the Plan.  No Holders of Claims and Interests

junior to the Claims and Interests in the Rejecting Classes will receive or retain any property on

account of their Claims and Interests,[313] and no Holders of Claims or Interests senior to the Claims

and Interests in the Rejecting Classes are receiving more than full payment on account of the

Claims and Interests in such Classes.

218.    Several Objectors have argued in their Confirmation Objections that the Debtors

have failed to satisfy sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code.  As

discussed below, such Confirmation Objections are meritless.  Accordingly, the Plan satisfies the

requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code and is

fair and equitable with respect to all classes of Claims and Interests.

**B.    The Plan Does Not Unfairly Discriminate with Respect to Any Impaired Class that Has Not Voted to Accept the Plan.**

219.    The Plan also does not discriminate unfairly with respect to Impaired Classes that

have rejected the Plan (specifically, the following voting classes that rejected the plan:  6(a), 6(b),

---

[311]  *203 N. LaSalle II*, 526 U.S. at 441–42 (explaining that, under the absolute priority rule, "a plan may be found to be 'fair and equitable' only if the allowed value of the claim [in a dissenting class of impaired unsecured creditors] is to be paid in full . . . or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property'") (citations omitted); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (stating that "the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan") (internal quotation marks and citations omitted).

[312]  *See In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003); *Genesis Health Ventures*, 266 B.R. at 612.

[313]  To the extent Intercompany Claims in Class 11 or Intercompany Interests in Class 12 are Reinstated, such treatment is for the Reorganized Debtors' administrative convenience only.

6(e) (solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC,

Mallinckrodt plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC), 6(f) (solely as to Debtors

Mallinckrodt ARD LLC, Mallinckrodt Hospital Products, Inc., Mallinckrodt LLC, Mallinckrodt

Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and

ST Shared Services LLC), and 9(h); and the following deemed rejecting classes: Class 9(i) (No

Recovery Opioid Claims, Class 11, Intercompany Claims, Class 12 Intercompany Interests,[314]

Class 13 Subordinated Claims, and Class 14 Equity Interests.

### 1.    The Legal Framework for Unfair Discrimination

220.    Section 1129(b)(1) of the Bankruptcy Code requires that a plan "does not

discriminate unfairly… with respect to each class of claims or interests that is impaired under, and

has not accepted, the plan."[315]  Like the other requirements of section 1129 of the Bankruptcy

Code, in the context of a joint plan, unfair discrimination should be analyzed on a debtor-by-debtor

basis.[316]  Accordingly, an "unfair discrimination" can only be between similarly situated creditors

having claims against the same debtor, not between creditors having claims against different

debtors.[317]

221.    The Bankruptcy Code does not provide a standard for determining when "unfair

discrimination" exists.[318]  Rather, courts typically examine the facts and circumstances of the

---

[314] Classes 11 and 12 are identified in the Plan as both Unimpaired or Impaired and Presumed to Accept or Deemed to Reject.

[315] 11 U.S.C. § 1129(b)(1).

[316] *See Tribune I*, 464 B.R. at 183 (finding that "absent substantive consolidation or consent, [section 1129(a)(10)] must be satisfied by each debtor in a joint plan").

[317] *See In re Tribune Co.*, 972 F.3d 228, 243 (3d. Cir. 2020) ("Sixth, in making an unfair discrimination determination, start by adding up all proposed plan distributions from the debtor's estate and divide by the number of creditors sharing the same priority.").

[318] *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) ("*203 N. LaSalle I*") (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a

particular case to determine whether unfair discrimination exists.[319]   The Third Circuit recently

addressed "unfair discrimination" in *Tribune*, emphasizing that the requirement does not prohibit

all disparities in recoveries and promotes flexibility in assessing unfair discrimination:

"'Discriminate unfairly' is simple and direct:  you can treat differently (discriminate) but not so

much as to be unfair.[320]   There is, as is typical in reorganizations, a need for flexibility over

precision.  The test becomes one of reason, circumscribed so as not to run rampant over creditors'

rights."[321]   At the conclusion of its *Tribune* opinion, the Third Circuit recognized that such

flexibility was critical in the chapter 11 context:

> Unfair discrimination is rough justice. It exemplifies the Code's
> tendency to replace stringent requirements with more flexible tests
> that increase the likelihood that a plan can be negotiated and
> confirmed.  This flexibility is balanced by the Code's inherent
> concern with equality of treatment. We seek to maintain this balance
> in our interpretation of § 1129(b)(1) here.[322]

222.   In *Tribune*, the Third Circuit endorsed the Tribune bankruptcy court's application

of the "rebuttable presumption" test for unfair discrimination (attributed to Professor Bruce

Markell).  Under that test:

> A rebuttable presumption of unfair discrimination exists when there
> is "(1) a dissenting class; (2) another class of the same priority; and
> (3) a difference in the plan's treatment of the two classes that results
> in either (a) a materially lower percentage recovery for the
> dissenting class (measured in terms of the net present value of all
> payments), or (b) regardless of percentage recovery, an allocation

---

Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. 203 N. LaSalle II*, 526 U.S. 434 (1999).

[319]  *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires the court to "consider all aspects of the case and the totality of all the circumstances").

[320]  *In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020).

[321]  *Id.*

[322]  *In re Tribune Co.*, 972 F.3d 245.

under the plan of materially greater risk to the dissenting class in connection with its proposed distribution."

…

Under this test, a presumption of unfair discrimination may be overcome if the court finds that "a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization. The presumption of unfairness based on differing risks may be overcome by a showing that the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties."[323]

223.    Although it endorsed the "rebuttable presumption" test, the Third Circuit made clear that bankruptcy courts have broad discretion in determining both (a) whether the presumption of unfair discrimination arises and (b) what is required to overcome such presumption.  With respect to whether a presumption exists, the Third Circuit noted:

…to presume unfair discrimination, there must be a "materially lower" percentage recovery for the dissenting class or a "materially greater risk to the dissenting class in connection with its proposed distribution."…The rebuttable presumption test intentionally leaves opaque what is, under the circumstances, "material."  Such line drawing has been left primarily to bankruptcy courts.  We too leave this for judicial development.[324]

Similarly, with respect to whether a presumption of unfair discrimination has been rebutted, the Third Circuit noted:

…if courts find plans materially discriminate against the dissenting class and follow the rebuttable presumption test or some variation, that finding is by definition presumptive and can be rebutted. Though we could make general suggestions for what qualifies as an adequate rebuttal (*e.g.*, contributions to the reorganization by a

---

[323]    *Id*. at 241 (quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 228, 249 (1998).

[324]    *In re Tribune Co.*, 972 F.3d 243 (internal citations omitted).

preferred class may rebut unfair discrimination), those determinations are for bankruptcy courts to decide initially.[325]

224.    Contrary to the assertions of Attestor Limited and Humana Inc. (together, the "**Acthar Insurance Claimants**"),[326] courts in the Third Circuit, both before and after *Tribune*, have found that the circumstances under which a presumption of unfair discrimination are rebutted are *not* limited to those outlined by Professor Markell in his articulation of the "rebuttable presumption" test. For example, the United States District Court for the District of Delaware has noted that "neither Markell nor any of the cases cited by Appellant suggest any limitations on the case-specific facts and circumstances which might rebut the presumption of unfair discrimination."[327] Other courts, noting that "the Third Circuit [in *Tribune*] did not explicitly adopt the Markell test to be applied under all circumstances," have emphasized commonalities amongst various tests, concluding that whether discrimination is unfair boils down to whether there is a "reasonable basis for discrimination":

> Under the four-factor test [articulated in *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989)], the majority of the discussion by the parties is based on the related first and fourth factors, and whether the settlement agreement provides "a reasonable basis for

---

[325]  *Id.* at 244 (internal citations omitted).

[326]  The Acthar Insurance Claimants appear to argue, incorrectly, that the presumption arising from recovery disparities can "only" be rebutted using the two bases identified by Professor Markell (*i.e.*, that such disparities are consistent with the parties' rights outside of bankruptcy or that the alleged preferred class had infused new value into the reorganization which offset its gain). *See* Docket No. 4508 (the "**Acthar Insurance Objection**") ¶ 35 ("If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted **only** 'by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain.'") (emphasis added). But neither the Third Circuit in *Tribune* nor the District Court in *Armstrong World Industries* quoted by the Acthar Insurance Claimants suggested that the methods suggested by Professor Markell were an exhaustive list. *See Armstrong World Indus.*, 348 B.R. at 121 ("If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted 'by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain.'").

[327]  *In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 92 (D. Del. 2018), aff'd, 834 F. App'x 729 (3d Cir. 2021), as amended (Feb. 2, 2021))

US-DOCS\126024798.18

discrimination."  Under the Markell test, the considerations are the same, if worded differently.[328]

225.    Another critical principle is that "unfair discrimination is determined from the perspective of the dissenting class."[329]  As the *Tribune* court observed, a comparison between the recovery of the preferred class and the dissenting class is often the typical, but not always the only acceptable, approach, and that "other measures that allow courts to assess the magnitude of harm to the dissenting class may also be appropriate in some cases."[330]  For example, courts in this district have found it appropriate to evaluate unfair discrimination by comparing a dissenting class's recovery under the proposed plan to its baseline entitlement under the absolute priority rule, and found no discrimination where the rejecting class's plan recovery exceeded its baseline entitlement, even where other classes of similarly situated creditors received recoveries that were far greater relative to their baseline entitlements.[331]  Put another way, the focus is on whether the dissenting class was actually *harmed* by the alleged discrimination – which requires a comparison between the class's plan recovery and its baseline entitlement.[332]

---

[328]  *Earth Pride Organics, LLC v. Off. Comm. of Unsecured Creditors of EarthPride Organics, LLC*, No. BR 17-13816, 2021 WL 1553787, at *7 (E.D. Pa. Apr. 20, 2021).  *See also Genesis Health Ventures*, 266 B.R. at 611 ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.").

[329]  *In re Tribune Co.*, 972 F.3d 242. (The Third Circuit noted that, "What this means, however, is subject to interpretation. Courts and commentators nearly always consider this a comparison between the allegedly preferred class and the dissenting class.")

[330]  972 F.3d 228, 242 (3d Cir. 2020).

[331]  *In re Nuverra Environmental Solutions, Inc.*, 590 B.R. 75, n. 12 (2018) ("*See also LaSalle*, 126 F.3d at 969 (factually predating Markell, and finding, in part, that, "the disparity between [the trade claims and the nonrecourse deficiency claims], with the trade creditors receiving 100 percent and Bank America receiving sixteen percent, is not unfair [because] Bank America does better than it would have under chapter 7, and the trade creditors do no worse."); *see also In re Tribune Co.*, 972 F.3d 242-243 ("a comparison between the recovery of the preferred class and the dissenting class is by far the preferred but not always the only acceptable approach. Other measures that allow courts to assess the magnitude of harm to the dissenting class may also be appropriate in some cases.").

[332]  *See In re Nuverra Enviro. Solutions Inc.*, 590 B.R. 75, 91 (D. Del. 2018) (endorsing the *Tribune* bankruptcy court's focus on "amount that reallocation decreased the recovery to the dissenting class" and not the "large

226.    These comparisons between plan recoveries and baseline entitlements are particularly useful and appropriate in the context of this Plan, which features 397 separate classes of unsecured claims, certain of which (*e.g.*, Class 5) represent Claims at virtually all Debtors, and many of which are comprised of claims at only one Debtor or a small subset of Debtors (some of such Claim assertions the Debtors would have objected to prior to the UCC Settlement). Accordingly, a comparison of bottom line recovery percentages reveals little about the "fairness" of the dissenting classes' treatment under the Plan.[333]  It is for this reason that the Debtors developed the UCC waterfall scenarios (collectively, the "***Waterfall Scenarios***") described below, and that will be introduced at the Confirmation Hearing.

227.    Applying the foregoing principles to the treatment of creditors under the Plan, and for the reasons described below it is clear that the dissenting classes are not unfairly discriminated against within the meaning of section 1129(b)(1).

## 2.    The Waterfall Scenarios:    A Model for Determining Baseline Entitlements

228.    For purposes of assessing the fairness of each class's treatment under the Plan, and ensuring throughout the Debtors' restructuring efforts that settlements with certain groups of creditors would not infringe upon the rights of non-settling creditors, the Debtors and their advisors developed a "waterfall" model (the "***Waterfall Model***") designed to show the natural recoveries that would flow to each class of creditors at each Debtor entity, i.e., the recoveries that would result from allocating the Debtors' value to each Debtor and applying the absolute priority rule to that value at each Debtor, with classes of equal priority receiving pro rata distributions from that

---

increase in recoveries to the other similarly-situated classes."); *see also Genesis Health Ventures*, 266 B.R. at 612; *Exide Techs.*, 303 B.R. at 77.

[333]  *See* Acthar Insurance Objection ¶¶ 37-39.

Debtor.  Such recoveries (the "***Entitled Recoveries***") can then be compared to Plan recoveries to ensure fairness of treatment between and among similarly situated classes at each Debtor.

229.    The Waterfall Model is premised on certain global assumptions (including those relating to allocation of asset value and funded debt liabilities, as well as treatment of intercompany claims) that will be described in testimony and other evidence adduced at the Confirmation Hearing.  Understanding that various parties have taken issue with certain of the fundamental premises underlying the Plan – most notably, with respect to issues of valuation and the necessity of honoring the Debtors' obligations under the Federal/State Acthar Settlement and Opioid Settlement (collectively, the "***Settlements***") in order to maximize the Debtors' enterprise value – the Debtors have adapted the Waterfall Model to show Entitled Recoveries in three scenarios in which assumptions regarding these issues differ.  The scenarios are as follows:

(a)    The first, referred to as the "***Waterfall Reorganization Scenario***" (attached hereto as **Exhibit C**), is premised on the Debtors' *reorganization* enterprise value (*i.e.*, $5.45 billion),[334] and gives effect to the Settlements by deducting from that starting enterprise value before Entitled Recoveries to other unsecured Classes are determined.  The Debtors believe that this scenario most closely reflects the reality of the Debtors' plan; specifically, for reasons discussed below and that will be supported by the Debtors' evidence adduced at or prior to the Confirmation Hearing, the Debtors simply could not achieve their reorganization enterprise value without the Settlements and, in their absence, would likely be forced to pursue a section 363 sale process yielding meaningfully lower value than the Plan.  Accordingly, the Debtors' ability to achieve full reorganization enterprise value, the Settlements must be satisfied in full for purposes of calculating Entitled Recoveries for the respective creditors.

(b)    The second, referred to as the "***Alternative Waterfall Scenario***" (attached hereto as **Exhibit D**), is intended to reflect a scenario where the Restructuring Support Agreement and Settlements underpinning the

---

[334] The $5.45 billion reorganization enterprise value adopted in certain of the Waterfall Scenarios was developed using the Debtors' then-most recent financial projections, prior to the Debtors' development of the Refreshed Projections described above.  As the evidence adduced at or prior to the Confirmation Hearing will show, adjustments to the Debtors' reorganization enterprise value to account for the Refreshed Projections would not materially alter the Debtors' conclusion, based on the Waterfall Scenarios, that all parties are receiving at least their Entitled Recoveries under the Plan.

Debtors' Plan are not in place resulting in a meaningful discount to enterprise value. Under such a scenario, enterprise value is assumed to be $4 billion, and the Classes that are parties to the Settlements (*i.e.*, Classes 9 and 10) (the "***Settlement Classes***") recover only their pro rata share of unsecured distributable value at the relevant Debtor entities, similar to other unsecured classes.

(c)     The third, referred to as the "***Second Alternative Waterfall Scenario***" (attached hereto as **Exhibit E**), is premised on the assumption that the Debtors *could* achieve their full reorganization enterprise value (*i.e.*, $5.45 billion) without respecting the Settlements, as certain constituents asserted prior to the UCC Settlement in arguing that Class 6 recoveries under the Debtors' initial Plan were too low. ***Although the Debtors vehemently disagree with this premise***, the Debtors present this scenario because it demonstrates that, even under these unrealistic and objector-favorable assumptions, no rejecting classes are harmed by the Settlements, as each rejecting Class still does at least as well under the Plan than it would under this scenario. That is because the shortfall in Entitled Recoveries to the Settlement Classes is made up for in its entirety by the voluntary reallocation of recoveries by the Holders of Guaranteed Unsecured Notes Claims to fund the Settlements in full. The Entitled Recoveries of the rejecting classes are not reallocated to support the Settlements but rather these classes receive more under the proposed Plan than their Entitled Recoveries.

230.     The Debtors' reliance on the Waterfall Model is consistent with the Third Circuit's suggestion that the unfair discrimination inquiry should "start by adding up the proposed plan distributions from the debtor's estate and divid[ing] by the number of creditors sharing the same priority" to establish a "pro rata baseline,"[335] with one difference: rather than aggregating "plan distributions" at each entity, the Waterfall Model shows the aggregate distributable value that is available for unsecured creditors at each Debtor entity (and the pro rata allocation of that value) following the absolute priority rule, *before* giving effect to intercreditor and inter-debtor settlements including across entities and between Classes, that largely shift recoveries from the Holders of Guaranteed Unsecured Notes to other creditors (as depicted in the table below and

---

[335] *See Tribune*, 972 F.3d at 243.

further described herein).  The Settlements allow the Debtors to maximize value available to all

creditors, and the Plan provides higher or similar recoveries to unsecured creditors as compared to

their Entitled Recovery.  Presenting the Waterfall Scenarios in this manner provides a clearer

picture of Entitled Recoveries in the context of this case, and allows for more precise quantification

of the recoveries being reallocated through such settlements, and is thus consistent with the

purpose of the baseline recovery analysis encouraged by the Third Circuit.

| Classification of Claims | Entitled Recovery | | | | | | Plan Recovery | |
|---|---|---|---|---|---|---|---|---|
| | Waterfall Reorganization Scenario | | Alternative Waterfall Scenario[1] | | Second Alternative Waterfall Scenario[2] | | | |
| | $ 000s | % | $ 000s | % | $ 000s | % | $ 000s | % |
| Class 2 & 3 - First Lien Claims[3] | $3,172,712 | 100% | $3,211,094 | 100% | $3,172,712 | 100% | $3,172,712 | 100% |
| Class 4 - Second Lien Notes Claims | $329,535 | 100% | $355,973 | 100% | $329,535 | 100% | $329,535 | 100% |
| Class 5 - Guaranteed Unsecured Notes | $1,376,773 | 89% | $1,330,526 | 86% | $1,647,876 | 107% | $1,148,266 | 74% |
| Class 6 - General Unsecured Claims | $22,547 | 0% | $21,793 | 0% | $191,686 | 3% | $210,000 | 4% |
| Class 7 - Trade Claims | $295 | 1% | $134 | 0% | $14,521 | 35% | $41,349 | 100% |
| Class 8 & 9 - Opioid Plaintiff Claims[4,5] | $1,325,200 | 5% | $132,357 | 1% | $1,032,673 | 4% | $1,325,200 | 5% |
| Class 10 - Settled Federal/State Acthar Claims | $177,700 | 28% | $0 | 0% | $10,905 | 2% | $177,700 | 28% |

*(1) Class 3 and Class 4 Claims are assumed to have makewhole claims asserted under an alternative sale scenario which differs from Plan treatment.*

*(2) Class 5 Guaranteed Unsecured Notes Claims include postpetition accrued interest if principal balance is satisfied in full.*

*(3) Class 2 & Class 3 - First Lien Claims includes the First Lien Credit Agreement Claims (Class 2) and the First Lien Notes Claims (Class 3)*

*(4) Recovery for Class 8 and Class 9 Claims assumes an opioid claim amount of $25 billion. This assumption is illustrative and the Holders of Class 8 and Class 9 Claims do not agree with such estimate and assert opioid claims far in excess of $25 billion.*

*(5) The Opioid Settlement of $1.325 billion represents the net present value of the cash payment stream payable under settlement discounted at 10%.  This estimate does not ascribe value to litigation claims, insurance rights, or other contingent assets being contributed as part of the Opioid Settlement.*

### 3.    The Plan Does Not Unfairly Discriminate

231.    As noted above, the following classes of creditors rejected the Plan:  6(a), 6(b), 6(e)

(solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC, Mallinckrodt

plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC), 6(f) (solely as to Debtors Mallinckrodt

ARD  LLC,  Mallinckrodt  Hospital  Products,  Inc.,  Mallinckrodt  LLC,  Mallinckrodt

Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and

ST Shared Services LLC), and 9(h).  The Plan does not unfairly discriminate against any such

Classes for the reasons that follow.

<u>Deemed Rejecting Classes (Class 9(i) (No Recovery Opioid Claims, Class 11, Intercompany Claims, Class 12 Intercompany Interests,[336] Class 13 Subordinated Claims, and Class 14 Equity Interests)</u>

232.    These classes of Claims and Interests are deemed to reject (or potentially deemed to reject) the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No party has asserted that the Plan unfairly discriminates against these classes.  Such classes are not unfairly discriminated against because they are not similarly situated to any other classes of Claims or Interests under the Plan that are receiving a recovery.  Specifically, such Classes are comprised of (a) Claims that are subordinated and/or disallowed (*i.e.*, Classes 9(i), 13), (b) Claims held by the Debtors themselves (*i.e.*, Intercompany Claims in Class 11), and (c) equity interests (*i.e.*, Classes 12 and 14).

<u>Rejecting Class 6 Subclasses (Classes 6(a), 6(b), 6(e) (solely as to Debtors Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt LLC, Mallinckrodt plc, Mallinckrodt US Holdings LLC, and MNK 2011 LLC, 6(f) (solely as to Mallinckrodt ARD LLC, Mallinckrodt Hospital Products, Inc., Mallinckrodt LLC, Mallinckrodt Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt plc, and ST Shared Services LLC)</u>

233.    All three of the Waterfall Scenarios demonstrate that Class 6's aggregate estimated recovery under the Plan (estimated to be $210 million, before estimated General Unsecured Trust ("**GUC Trust**") expenses)[337] meaningfully exceeds its aggregate Entitled Recovery, as set forth in the table below:

---

[336] Classes 11 and 12 are identified in the Plan as both Unimpaired or Impaired and Presumed to Accept or Deemed to Reject

[337] Pursuant to the UCC Settlement, the GUC Trust is to receive consideration comprised of (i) $135 million in Cash, (ii) the GUC Assigned Preference Claims, (iii) the GUC Terlivaz CVR, (iv) the GUC Assigned Sucampo Avoidance Claims, (v) the GUC Share Repurchase Proceeds, (vi) the GUC VTS PRV Share, and (vii) the GUC StrataGraft PRV Share.  Although the value of the non-Cash consideration is uncertain, the UCC conservatively estimates that such consideration will have a value range of at least $45 million to $85 million, for total GUC Trust gross consideration ranging from approximately $180 million to $220 million, and intend to introduce testimony in support of such estimate at trial.  Accordingly, the Waterfall Scenarios assume that the GUC Trust consideration would have an aggregate value of $210 million, less estimated GUC Trust expenses of $10 million, for an aggregate recovery to Class 6 creditors of $200 million.

128

| ($000s) | Class 6 Entitled Recovery | Estimated Class 6 Plan Recovery | Variance |
|---|---|---|---|
| Waterfall Reorganization Scenario ($5.45B TEV, With Settlements) | $22,547 | $210,000 | $187,453 |
| Alternative Waterfall Scenario ($4B TEV, Without Settlements) | $21,793 | $210,000 | $188,207 |
| Second Alternative Waterfall Scenario ($5.45B TEV, Without Settlements) | $191,686 | $210,000 | $18,314 |

Accordingly, it is clear that the aggregate amount of consideration being provided to Class 6 is fair under *any* reasonable set of assumptions (*i.e.*, the Waterfall Reorganization Scenario and Alternative Waterfall Scenario), and any alleged discrimination in favor of other Classes of unsecured creditors does not harm Class 6.  The Debtors will address objections based on the allocation of Class 6 recoveries among the Class 6 subclasses in a supplemental pleading if and when such objections are asserted.

234.    No objection on unfair discrimination grounds has been asserted by any member of Class 6(b) (Generics Price Fixing Claims), and the only unfair discrimination objection asserted on behalf of Classes 6(e) and 6(f) (leaving aside potential objections to the UCC Settlement and allocation contained therein)[338] is an objection by Sanofi based on the disparity in treatment between Class 6(f) and Class 7 (comprised of Trade Claims), which is addressed below.  Nor does any unfair discrimination exist.  Generics Price Fixing Claims are receiving an estimated recovery ($8,000,000) that significantly exceeds their Entitled Recoveries under the Waterfall Reorganization Scenario ($561,000) and Alternative Waterfall Scenario ($49,000).  The other

[338]  In addition to the objectors identified herein, each of the Department of Justice and the Glenridge Principals has indicated that it may or will object to the UCC Settlement; such objections may be on unfair discrimination grounds and, in any event, will be addressed in a supplemental filing by the Debtors.

Classes described in this paragraph likewise are expected to receive Plan recoveries[339] in excess of their Entitled Recoveries, *i.e.*:

    (a)    <u>Acthar Claims in Class 6(a)</u>:  (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $34 million);

    (b)    <u>Holders of Class 6(e) Claims against Mallinckrodt Brand Pharmaceuticals LLC</u>: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0);

    (c)    <u>Holders of Class 6(e) Claims against Mallinckrodt LLC</u>:  (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0);

    (d)    <u>Holders of Class 6(e) Claims against Mallinckrodt plc</u>: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0);

    (e)    <u>Holders of Class 6(e) Claims against Mallinckrodt US Holdings LLC</u>: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $3.6 million);

    (f)    <u>Holders of Class 6(e) Claims against MNK 2011 LLC</u>: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0);

    (g)    <u>Holders of Class 6(f) Claims against Mallinckrodt Pharmaceuticals Ireland Limited</u>:  (Entitled Recoveries of $21.8 million and $21.7 million under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $46.2 million);

    (h)    <u>Holders of Class 6(f) Claims against Mallinckrodt ARD LLC</u>:  (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0.15 million);

---

[339] Plan recoveries for Class 6 sub-classes set forth herein constitute estimates and are based on the allocation adopted pursuant to the UCC Settlement with current estimates of the aggregate allowable claims in Class 6(e) and 6(f) at the respective Debtor.

US-DOCS\126024798.18

(i)     Holders of Class 6(f) Claims against Mallinckrodt Hospital Products, Inc.: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0.4 million);

(j)     Holders of Class 6(f) Claims against Mallinckrodt LLC: (Entitled Recoveries of $0.001 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0.006 million);

(k)     Holders of Class 6(f) Claims against Mallinckrodt Pharmaceuticals Limited: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0);

(l)     Holders of Class 6(f) Claims against Mallinckrodt plc: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0.002 million); and

(m)     Holders of Class 6(f) Claims against ST Shared Services LLC: (Entitled Recoveries of $0 and $0 under the Waterfall Reorganization Scenario and Alternative Waterfall Scenario, respectively, and estimated plan recovery of $0.6 million).

235.    The most vociferous unfair discrimination objections from within Class 6 were asserted by two groups of Acthar Claimants in Class 6(a)—the Acthar Insurance Claimants and the Ad Hoc Acthar Group.  These objectors focus their objections on allegedly preferential treatment given to the holders of Class 8 and Class 9 Opioid Claims (based on the Opioid Settlement) and Class 5 Guaranteed Unsecured Notes.  Both objections are without merit, for several reasons.

236.    As an initial matter, as noted above, comparisons for unfair discrimination purposes should be made between creditors of the same Debtor, based on recoveries from that Debtor.  The Acthar Claimants are not entitled to recover from the "Specialty Brands Debtors," as the Acthar

131

Insurance Claimants suggest throughout their objection.[340]   Rather, the Acthar Claims of the objecting parties reside at only two Debtors (Mallinckrodt plc and Mallinckrodt ARD LLC)[341] and these entities have no value available for distribution to unsecured creditors in *either* the Waterfall Reorganization Scenario or Alternative Waterfall Scenario.   Thus, Entitled Recoveries to the Holders of Guaranteed Unsecured Notes Claims and Opioid Claims *at the two Debtors at which the Acthar claimants sit* are zero.   Given that their recourse is limited to two "empty boxes" and the Acthar claimants are nevertheless receiving a recovery under the Plan in excess of their Entitled Recoveries (to the extent their claims are allowed), the Acthar claimants are not being discriminated against, much less unfairly.   Put another way, the Acthar claimants (who have claims only against Mallinckrodt ARD LLC and Mallinckrodt plc) cannot demonstrate unfair discrimination by pointing to the recoveries of the Holders of Guaranteed Unsecured Notes Claims and Opioid Claims, who have claims against Debtors other than Mallinckrodt ARD LLC and Mallinckrodt plc.

a.    Opioid Settlement

237.    Even leaving aside that the Acthar claimants have no basis on which to object to the recoveries on account of Opioid Claims and Guaranteed Unsecured Notes Claims under the Plan, the evidence, including the Waterfall Scenarios, will show that such recoveries are independently justified and do not unfairly discriminate against the Acthar claimants or any other

---

[340]  *See* Acthar Insurance Objection ¶¶ 38-39.

[341]  *See Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive)* [Docket No. 3406].  Although the Acthar Insurance Claimants own other claims that were asserted at entities other than Mallinckrodt plc and Mallinckrodt ARD LLC, by stipulation with the Debtors dated October 19, 2021, the Acthar Insurance Claimants agreed that "unless otherwise ordered by the Court, the Prepetition Acthar Insurance Claims shall not be allowed for voting or plan confirmation purposes against any Debtor other than Mallinckrodt plc, Mallinckrodt LLC and Mallinckrodt ARD LLC."  *See* Stipulation Between the Debtors and the Acthar Insurance Claimants Regarding the Temporary Allowance of Certain Claims for Voting and Confirmation Purposes Only [Docket No. 4779-1] ¶ 1.

132

creditors. *First,* the Opioid Settlement and Federal/State Acthar Settlement, which are inextricably linked, are value-accretive, and together, ultimately *enhance* the recoveries that the Acthar Insurance Claimants and other objectors receive under the Plan relative to the recoveries they would receive in the absence of such settlements.   As the evidence will show, absent these settlements, the Debtors would likely be forced to pursue a sale under section 363 of the Bankruptcy Code, a process that would likely yield value representing a meaningful discount to the Debtors' reorganization value.[342]  This discount reflects (a) the fact uncertainty that would exist as a result of (i) the potential fallout (from the buyer's standpoint) as a result of the Debtors having failed to resolve their disputes with CMS at the time of the sale, (ii) the threat to the entire Mallinckrodt enterprise of ongoing opioid litigation absent the protection of the channeling injunction that is only possible with the assent of a critical mass of opioid claimants, and (iii) potential liabilities that could arise from the continuation of Specialty Generics' opioid sales in the absence of the voluntary injunction related protections that are part and parcel of the Debtors' consensual Opioid Settlement, as well as (b) the nature of a forced seller situation, in which (i) some of the Debtors' businesses would likely be sold in piecemeal distressed sales and (ii) some of the Debtors' key franchises would be sold before they can achieve the stability that the Debtors' management projects over time.

238.    The Alternative Waterfall Scenario presents estimates of the recoveries that creditors would receive in such a scenario.  That scenario assumes that the sale would yield $4 billion of proceeds from the sale of the Debtors' assets and businesses (in addition to

---

[342] *See Expert Report of Punit Mehta dated August 13, 2021* ("Based on my experience as an investment banker, including in connection with numerous M&A processes, I believe that, in the absence of the entry into definitive agreements memorializing the understandings set forth in the Federal/State Acthar Settlement and Opioid Settlement Term Sheet, any sale of the Company as a going concern would likely be at a meaningful discount to the estimated Total Enterprise Value of the Reorganized Debtors set forth in the Valuation Analysis.")

US-DOCS\126024798.18

approximately $1.4 billion of Cash on hand and other realizable assets)—an assumption that conservatively assumes that the 363 sale process in the absence of settlement would be under conditions meaningfully more favorable than (and yield proceeds greater than) the liquidation process contemplated by the Debtors' Liquidation Analysis (including the sale of certain operating businesses).  Unsurprisingly, at the lower enterprise value, all Holders of General Unsecured Claims (not just Holders of Acthar Claims) have Entitled Recoveries that are lower than their entitlements under the Waterfall Reorganization Scenario and their recoveries under the Plan, demonstrating that such creditors (including all rejecting Classes) are made no worse off by the Settlements and thus have not suffered the requisite harm necessary for a finding of unfair discrimination.[343]

239.    In addition, the Waterfall Scenarios demonstrate that any value that the Opioid Claimants are receiving through the Settlements above and beyond their Entitled Recoveries is *more than offset by the incremental value the Settlements (including the Opioid Settlement) create*.  Specifically:

(a)    The Alternative Waterfall Scenario demonstrates that the incremental value created by the Settlements is $1.45 billion, representing the loss of value between the Waterfall Reorganization Scenario (with settlements) and Alternative Waterfall Scenario.

(b)    The Alternative Waterfall Scenario also shows that Entitled Recoveries to the Settling Classes absent the Settlements (and taking into account the lower enterprise value resulting from the absence of the Settlements) would be $132 million, or roughly $1.37 billion less than the value of the Settlements.  That $1.37 billion shortfall is more than offset by the $1.45

---

[343]    *In re Nuverra Environmental Solutions, Inc.*, 590 B.R. 75, 90-91 (Bankr. D. Del. 2018) (finding that a gift "constituted no unfair discrimination because [the rejecting class] was indisputably out of the money and not, otherwise, entitled to any distribution under the Bankruptcy Code's priority scheme").

billion *increase* in the Debtors' total value arising as a result of the Settlement.

Thus, even if unfair discrimination in favor of the Opioid Claimants were presumed to exist under the rebuttable presumption test, that presumption is rebutted by the fact that any augmented recovery to the Opioid Claimants is the product of (and offset by) the value the Opioid Settlement (and the Federal/State Acthar Settlement) contributes to the reorganization.[344]

240.    *Second*, the quantum of the Opioid Settlement is reasonable in light of the fact that absent a settlement, the Opioid Claimants would almost certainly have pursued claims, causes of action and remedies (both direct and derivative) against the Specialty Brands Debtors, Non-Debtor Affiliates, and third parties for the benefit of the Opioid Claimants.  These include (a) potential avoidance actions and other causes of action arising from prepetition intercompany transactions; (b) direct opioid claims against the Specialty Brands Debtors based on various theories of liability; and (c) substantive consolidation of the Specialty Brands Debtors and Specialty Generics Debtors. Although the Debtors believe they (or the relevant third party defendants) would have valid defenses in connection with such actions and remedies, the pursuit of such actions and remedies would necessarily have entailed significant expense to the Specialty Brands Debtors (negatively impacting recoveries to their creditors) and, if successful, could have devastating effects on the creditors of the Specialty Brands Debtors (for example, in the case of substantive consolidation, having their claims diluted by billions or even trillions of dollars of opioid claims).  In addition, in the absence of settlement, the merits of the Opioid Claims *themselves*—including against Debtors other than the Specialty Generics Debtors—would likely need to be addressed through litigation

---

[344]    See *In re Tribune Co.*, 972 F.3d 242, citing Markell *supra* n. 328:  ("…a presumption of unfair discrimination may be overcome if the court finds that '… a greater recovery for the other class is offset by contributions from that class to the reorganization'").

or estimation, given the opioid claimants' inevitable resistance to having their recourse limited to the Specialty Generics Debtors. The objectors' suggestion that the Opioid Claims must be constrained by the value of the Specialty Generics Debtors ignores the reality that, absent the Opioid Settlement, these cases would devolve into a morass of litigation for the entire Mallinckrodt enterprise that would deplete, and potentially pose an existential threat to, the recoveries of all creditors, including the creditors of the Specialty Brands Debtors. The Opioid Settlement minimizes potential business risk and uncertainty while negating extensive litigation costs which would materially reduce value available to creditors and delay potential distributions to such creditors.

241. *Third*, the arguments advanced by the Acthar claimants against the Opioid Settlement ignore the reality that to obtain the benefits of the proposed channeling injunction against Opioid Claims under the Plan, the Specialty Brands Debtors must make a contribution of some kind for the benefit of the opioid claimants. Given that the Specialty Brands Debtors are not in the same position as other individual Protected Parties that have the ability to contribute by managing and building enterprise value, guiding this restructuring, and overseeing the successful implementation of the Opioid Settlement, any value in the Opioid Settlement that could be seen as "coming from" the Specialty Brands Debtors should equally be viewed as funding those Debtors' contribution to obtain the benefits of the channeling injunction.

242. Fortunately, the Opioid Settlement itself does not ignore that reality, and represents a fair and reasonable settlement of this potential litigation that justifies the treatment of Opioid Claims under the Plan. And while the Debtors do not take the position that Bankruptcy Rule 9019 allows a plan proponent to short-circuit the confirmation requirements, including those of section 1129(b), the reasonableness of this settlement is relevant. Indeed, courts have found that, "[t]he

136

factors that inform the reasonableness of each individual settlement [approved in connection with confirmation of a plan] are the same factors that inform the Court's judgment about whether the resulting discrimination is fair" and that where, as here, a plan is "largely a collection of interconnected settlements," each of which the Court finds reasonable, it follows that any discrimination resulting from such settlements is fair.[345]

243.    *Fourth*, even if the Court were to (a) assume that the Debtors could achieve their full reorganization value without the Settlements and (b) decide that the potential litigation claims that would be pursued in the absence of the Opioid Settlement do not justify the treatment of Opioid Claims under the Plan (which the Court should not), the Second Alternative Waterfall Scenario demonstrates that the rejecting creditor classes, including the Acthar claimants, *still* would not be harmed by the treatment of Opioid Claims under the Plan.  That scenario is premised on the Debtors realizing their full $5.45 billion enterprise value despite abandoning the Settlements; instead, the Settling Classes receive their pro rata recovery at the entities at which their claims sit.

244.    Under the Second Alternative Waterfall Scenario, the Guaranteed Unsecured Notes would have an Entitled Recovery of 100% plus postpetition interest, or approximately $1.648 billion.  Under the Plan, approximately $500 million of that Entitled Recovery to the Guaranteed Unsecured Notes would be reallocated to *all other Classes of Unsecured Claimants*, including, with respect to the Settling Classes, in amounts sufficient to bridge from the Settling Classes' Entitled Recoveries, under this Second Alternative Waterfall Scenario, to their recoveries under

---

[345] *In re City of Detroit*, 524 B.R. 147, 257 (Bankr. E.D. Mich. 2014) ("A final consideration suggests that this discrimination is not unfair. The Court has already observed that the City's plan is largely a collection of interconnected settlements. Counsel for the retiree committee astutely argued that if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair. Trial Tr. 171, Oct. 27, 2014. (Dkt. # 8156) The Court agrees.").

the Plan (and the Settlements).  Notably, Class 6 would be the beneficiaries of $18 million of redistributed recoveries from the Guaranteed Unsecured Notes, such that that Class would still receive higher aggregate recoveries under the Plan than their aggregate Entitled Recoveries. Accordingly, the Second Alternative Waterfall Scenario demonstrates that all value necessary to fund the Settlements in full would be coming out of the pockets of the Guaranteed Unsecured Notes – an accepting class – and not any of the rejecting Classes, such as Class 6.  And indeed this result makes sense – the Guaranteed Unsecured Notes have chosen to fund the Settlements because those Settlements maximizing the value of the Debtors.

245.    Put simply, the Waterfall Scenarios show that there is *no* unfair discrimination resulting from the Opioid Settlement (or, for that matter, the Federal/State Acthar Settlement). Objections to the contrary should be overruled.

b.    Guaranteed Unsecured Notes Recoveries

246.    Certain Holders of unsecured claims, including Holders of 4.75% Unsecured Notes Claims (specifically, Subha Vasudevan and Vasu Kalpat, Burlingame Investment Partners LP, Daniel Koppenhafer, and Aurelius Capital Master, LTD[346]) and the Acthar objectors (i.e., the Acthar Insurance Claimants and the Ad Hoc Acthar Group) argue that the Plan discriminates unfairly by providing an outsized recovery to Holders of Guaranteed Unsecured Notes Claims.  As the Debtors' evidence will show, the Holders of Guaranteed Unsecured Notes' higher recovery is attributable to the fact that they have approximately $1.5 billion of claims (excluding any potential postpetition interest) at more than 60 Debtor entities, including those Debtors with the greatest relative share of the Debtors' enterprise value (*i.e.*, the owners of the Debtors' intellectual property

---

[346] Aurelius Capital Master, LTD filed an objection to the solicitation version of the Plan prior to the Debtors reaching the UCC Settlement.  The Debtors believe that this objection is now moot.

assets), while other unsecured creditors have claims at only one Debtor or a subset of Debtors with more limited value.

247.    Under each of the Waterfall Scenarios, the Guaranteed Unsecured Notes are receiving a Plan recovery that is less than their Entitled Recovery – put another way, they are *relinquishing value* to other unsecured creditor Classes.  Accordingly, to the extent any Class is harmed by the recovery to the Guaranteed Unsecured Notes Claims under the Plan, it is the Guaranteed Unsecured Notes class itself, and not any of the rejecting Classes.  It should be noted that the Debtors and Guaranteed Unsecured Notes increased the value of consideration offered to the Class 6 General Unsecured Claims from $100 million to an estimated $200 million, and as a result provides an opportunity for the Class 6 sub-classes, including the Acthar claimants and the 4.75% Unsecured Notes Claims, to recover even more than their Entitled Recovery.  The higher recovery under the Plan for Holders of Guaranteed Unsecured Notes is a function of the differing entitlements of those creditors and is consistent with the results that they would obtain outside of bankruptcy.[347]  Accordingly, the treatment of the Guaranteed Unsecured Notes Claims under the Plan does not result in unfair discrimination as to the rejecting Classes.

c.    Class 7 Trade Claims

248.    Sanofi has asserted that the recovery provided to Class 7 Trade Claims unfairly discriminates against holders of Class 6 General Unsecured Claims.  However, the Debtors' ongoing relationships with trade creditors and their importance to the reorganized business justify the disparate treatment set forth in the Plan.  Several courts have approved increased recoveries

---

[347]  *Tribune*, 972 F.3d 241 (quoting Markell, *supra* n. 328:  "a presumption of unfair discrimination may be overcome if the court finds that…'a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy'").

for trade creditors as compared to other general unsecured creditors based on business justifications.[348] Such treatment is particularly appropriate where, as here, the increased recoveries to Class 7 are the result of the Guaranteed Unsecured Notes relinquishing a portion of their recoveries to Class 7.[349]

249.    Fundamentally, Sanofi objects to the fact that they are not treated as a Class 7 creditor.  But that is not Sanofi's decision to make.  As the evidence will show, the Debtors reviewed which vendors and service-providers (a) are essential to the Debtors' businesses, and (b) will provide such goods and services on favorable trade terms, to ensure that Class 7 Trade Claims are limited to vendors or service-providers that actually provide ongoing goods or services. As the Debtors will show in connection with pre-confirmation proceedings, even if Sanofi is viewed as giving up some ongoing benefit to the Debtors, that benefit is neither goods nor services and is simply the Debtors' contractual entitlement.  Moreover, and perhaps controlling for these purposes:  Sanofi has voted to reject the Plan and is vociferously opposing the Debtors' confirmation efforts, so even if it were properly classified in Class 7, it is clear it has decided to reject the opportunity given equally to all those in Class 7 anyway.

---

[348]  *See*, *e.g.*, *Nuverra*, 590 B.R. 75 (no unfair discrimination where trade creditors were paid more than general unsecured because unsecured creditors in general were out of the money, and the payment to trade creditors was only possible due to contributions of secured creditors to make distributions available to creditors important to the debtors' business); *Genesis Health Ventures*, 266 B.R. at 612 (finding disparate treatment justified where it resulted from a "permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled").

[349]  *See, e.g., In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009) (court approves secured lenders "gift" amount to unsecured trade creditors and not to other unsecured creditors despite all unsecured creditors being placed in one class as there was no unequal distribution from the perspective of the plan treatment).

### 4.    The Plan Provides a Fair Process for Reconciling Other Opioid Claims

250.    Covidien Limited ("*Covidien*")[350] has argued that the Plan unfairly discriminates against Class 9(h) Other Opioid Claims by providing a process for identifying and providing distributions to such claims that "necessarily provides a miniscule recovery."[351]   The Debtors disagree.   The Plan provides a mechanism (memorialized in the definition of "Other Opioid Claimant Pro Rata Share") that is designed to ensure that the holders of these Claims receive recoveries commensurate with (and proportionate to) the holders of other Opioid Claims.   That mechanism provides for a Holder of an Allowed Other Opioid Claim to receive an amount such that (a) the cumulative aggregate recovery to the Holder of such Allowed Other Opioid Claim divided by the total amount of Allowed Other Opioid Claims to date equals (b) the aggregate amount of distributions made by the Opioid MDT II to NOAT II divided by the Deemed NOAT II Opioid Claims Pool of approximately $3.1 trillion.[352]   This is a fair and practical mechanism for determining recoveries to Other Opioid Claims – which have yet to be asserted due to the Opioid Claimants being exempt from the bar date established in these cases, and in the case of Covidien, are by their nature contingent and unliquidated – as those claims are asserted and reconciled.

251.    In conclusion, the Plan does not unfairly discriminate against any dissenting class. As set forth above, the various classes' treatment under the Plan is a product of their Entitled Recoveries, and the reallocation of value from *consenting* classes to fund the Settlements, which are value-accretive and inure to the benefit of the *dissenting* classes.   For the foregoing reasons, the objections asserted on the basis of alleged unfair discrimination should be overruled.

## XVI.   The Purpose of the Plan is Not the Avoidance of Taxes or the Avoidance of the

---

[350]   Covidien filed an objection to confirmation of the Plan at Docket No. 4699 (the "*Covidien Objection*").

[351]   Covidien Objection p. 9.

[352]   Plan Art. I.A.308.

**Securities Laws in Accordance with Section 1129(d) of the Bankruptcy Code.**

252.     "[O]n request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[353]   The primary purpose of the Plan is not the avoidance of taxes or the avoidance of the application of the Securities Laws.  [Further, no party currently objects to confirmation of the Plan on the basis of section 1129(d) of the Bankruptcy Code.]   Accordingly, section 1129(d) of the Bankruptcy Code does not bar confirmation of the Plan.

## OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION

253.     In connection with confirmation of the Plan, certain parties filed Confirmation Objections with this Court, while others provided informal comments to the Debtors.  For the convenience of the Court, the Debtors have attached two response charts to this Memorandum (collectively, the "***Response Charts***"), with each Response Chart summarizing the material arguments of each Confirmation Objection and the Debtors' response thereto.  The first Response Chart attached hereto as **Exhibit A** responds to the Confirmation Objections.   The second Response Chart attached hereto as **Exhibit B** responds only to objections in connection with the proposed cure claim amounts included in the Assumed Executory Contract/Unexpired Lease List.[354]  With respect to certain significant Confirmation Objections, the Debtors have summarized their responses to those arguments below:

---

[353]  11 U.S.C. § 1129(d).

[354]  The Debtors will provide the Court with periodic updates to **Exhibit A** and **Exhibit B** as they continue to resolve or narrow outstanding objections.

US-DOCS\126024798.18

## I.     The Pension Trust's Section 1123(a)(4) Argument Should be Overruled.[355]

254.    The Pension Trust wrongly asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because it authorizes the Shenk Settlement, which provides one subset of Holders of Class 13 Subordinated Claims—*i.e.*, the Shenk Plaintiffs[356]—with the opportunity to recover on their Claims against certain Non-Debtor Affiliates (mainly the Debtors' directors and officers) in exchange for granting releases, but deprives the Pension Trust, the Strougo Plaintiffs, and other Holders of Class 13 Subordinated Claims of such an opportunity to recover on their claims.[357]   That argument is simply a misapplication of the statute.

255.    The Shenk Settlement does not invoke analysis under section 1123(a)(4) of the Bankruptcy Code because "[n]othing in the Bankruptcy Code requires a third party to make settlement payments or provide substantial contributions to similarly situated creditors in equal or prorated amounts"[358] and, pursuant to the terms of the Shenk Settlement, "no portion of the [Shenk] Settlement Amount [as defined below] is being paid by the Debtors."[359]   Rather, the Shenk Settlement Amount will be paid "solely from the proceeds of Shenk Defendants' D&O coverage

---

[355] As discussed *infra* ¶¶ 325-332, the Debtors respectfully submit that the Court should not entertain any of the Pension Trust's arguments on behalf of the Strougo Plaintiffs because they lack the standing to do so.  Out of an abundance of caution, however, the Debtors address the Pension Trust's arguments herein in case the Court were to disagree with the Debtors' position that the Pension Trust lacks such standing.

[356] The "**Shenk Plaintiffs**" consist of those plaintiffs in the Shenk Suit (*i.e.*, the securities fraud putative class action lawsuit brought by the State Teachers Retirement System of Ohio titled *Shenk v. Mallinckrodt plc*, No. 1: 17-cv-00145-DLF (D.D.C.) that is pending in the United States District Court for the District of Columbia) who reached the mediated Shenk Settlement with the Debtors.

[357] Pension Trust Objection at 23-25.

[358] *See In re Exide Holdings, Inc.*, 2021 WL 3145612, *15 (Bankr. D. Del. 2021) (Finding that $10 million settlement payments to creditors from non-Debtors did not violate section 1123(a)(4) because "[n]othing in the Bankruptcy Code requires a third party to make settlement payments or provide substantial contributions to similarly situated creditors in equal or prorated amounts").

[359] Shenk Settlement Motion ¶ 1.

143

policies for the June 2016 to June 2017 policy year."[360]  Accordingly, the Pension Trust's argument rings hollow because the Plan treats all Holders of Class 13 Subordinated Claims the same.[361]

256.    Even if the Shenk Settlement were factored into a section 1123(a)(4) analysis, the Plan would still satisfy section 1123(a)(4) of the Bankruptcy Code because the Pension Trust and the other Holders of Class 13 Subordinated Claims had the same treatment.  In *W.R. Grace & Co.*, the Third Circuit held that to receive the "same treatment" under section 1123(a)(4) of the Bankruptcy Code, "what matters . . . is not that claimants recover the same amount but that they have ***equal opportunity*** to recovery on their claims."[362]  A review of the Plan and history of these Chapter 11 Cases indicates that the Pension Trust and all other Holders of Class 13 Subordinated Claims had equal opportunity as the Shenk Plaintiffs to recover on their Claims.

257.    *First*, the Shenk Plaintiffs and all other Holders of Class 13 Subordinated Claims had equal opportunity to opt out of the Third-Party Releases.  Pursuant to the Shenk Settlement, the Shenk Plaintiffs have agreed to opt out of the Third-Party Releases contained in the Plan and will grant the releases contained within the Shenk Settlement if the Court authorizes the settlement. The Pension Trust and the Strougo Plaintiffs, likewise, each had an equal opportunity to opt out of the Third-Party Releases by completing and returning an Opt-Out Form.  Indeed, the Pension Trust did opt out of the Third-Party Releases, thus preserving the very opportunity to recover on its Claims against the Released Parties that it complains it is being deprived of.  The fact that some of the other Strougo Plaintiffs or Holders of Class 13 Subordinated Claims did not opt out after receiving notice and the opportunity to do so, as described *supra* ¶¶ 93-104, does not deny such

---

[360]  *Id.* ¶ 11(b).

[361]  "Subordinated Claims shall be discharged, cancelled, and extinguished on the Effective Date.  Each Holder of Subordinated Claims shall receive no recovery or distribution on account of such Subordinated Claims."  Plan Art. III.B.13.

[362]  729 F.3d 311, 327 (emphasis added).

Holders of the equal opportunity that both the Shenk Plaintiffs *and the Pension Trust* have seized upon.

258.    *Second*, payment of the settlement amount of $65,750,000 (the "***Shenk Settlement Amount***") by the Shenk Defendants' D&O insurers under the Shenk Settlement does not run afoul of section 1123(a)(4) of the Bankruptcy Code because all Holders of Class 13 Subordinated Claims had equal opportunity to recover on their Claims by opting out of the Third-Party Releases.  The only differences in treatment between the Shenk Plaintiffs and the other Holders of Class 13 Subordinated Claims are procedural difference and "[c]ertain procedural differences, such as 'delay in receipt of distributions' for some claims, 'do [ ] not alone constitute unequal treatment.'"[363]    The Pension Trust, and any other Strougo Plaintiff or Holder of Class 13 Subordinated Claims who opt out of the Third-Party Releases, will retain the opportunity to litigate its third-party Claims and accept whatever recovery it may receive in the future.  As for the Shenk Plaintiffs, if the Shenk Settlement is approved, the Shenk Settlement Amount will be paid into an escrow account for distribution in accordance with the terms of the Shenk Settlement.[364]  The Shenk Plaintiffs are simply electing to forego the delay and expense of litigating their claims in exchange for the greater certainty of recovery provided by the Shenk Settlement.  This difference in timing and certainty of recovery does not change the conclusion that both groups have equal opportunity to recover on their Claims.

259.    *Third*, the history of these Chapter 11 Cases show that the Pension Trust and the Strougo Plaintiffs had the same opportunity to negotiate a settlement of the Strougo Plaintiffs' Claims, just as the Shenk Plaintiffs and many other parties in interest have.  Leading up to and

---

[363]  *Id.* (quoting *In re New Power Co.*, 438 F.3d 1113, 1122-23 (11th Cir. 2006)).

[364]  Shenk Settlement Motion ¶ 11(b).

145

throughout these Chapter 11 Cases, the Debtors settled disputes with numerous parties in interest, including the Governmental Plaintiff Ad Hoc Committee, MSGE Group, the OCC, the UCC, Ad Hoc Second Lien Notes Group, CMS, the DOJ, and the States party to the Federal/State Acthar settlement. The Strougo Plaintiffs could have attempted to strike a deal with the Debtors, but did not. The Pension Trust and the Strougo Plaintiffs cannot now complain of unequal treatment simply because they are not content with their inability to strike a deal with the Debtors. Therefore, the fact that the Debtors settled with some Holders of Class 13 Subordinated Claims (but not all) does not result in unequal treatment in violation of section 1123(a)(4) of the Bankruptcy Code. Indeed, courts agree that, when certain Holders of Claims accept different treatment through settlement while others elect not to, the plan is not in violation of section 1123(a)(4) of the Bankruptcy Code.[365]

260.   It is clear from the foregoing that the Pension Trust's argument that the Plan violates section 1123(a)(4) of the Bankruptcy Code is meritless and the Debtors respectfully request that the Court overrule the Pension Trust Objection.

## II.   The Objections to the Plan as Not Satisfying the Best-Interests Test in Accordance with Section 1129(a)(7) of the Bankruptcy Code Should be Overruled.

261.   While several Objectors—the Ad Hoc Acthar Group, certain distributors, manufacturers, and pharmacies (each a "***DMP***" and, collectively, the "***DMP Group***"), the City of Marietta, the Glenridge Principals, Sanofi, and Rhode Island—have filed Confirmation Objections asserting that the Plan fails the best-interests test, such objections are without merit. The section 1129(a)(7) arguments made in the DMP's Confirmation Objection [Docket No. 4692] (the "***DMP***

---

[365]   *See Washington Mut. I*, 442 B.R. at 356 ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4)."); *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 284 (3d Cir. 2016) (noting that "mere differences in potential final outcomes resulting from choices made by individual creditors do not violate the equal treatment protections of § 1123(a)(4)"); *In re Dana Corp.*, 412 B.R. 53, 62 (Bankr. S.D.N.Y. 2008).

*Objection*"), the Rhode Island Objection, and the Sanofi should be overruled for the reasons expressed below and the remainder of the section 1129(a)(7) Confirmation Objections should be overruled for the reasons expressed in the Response Chart attached hereto as **Exhibit A**.

A.    **The Debtors Fail to Provide Any Plausible Evidence that They Would Receive More Value in a Chapter 7 Liquidation than Under the Plan.**

262.    Without putting forth any evidence to rebut the Debtors' Liquidation Analysis, a handful of the Objectors argue that they would receive a greater recovery under a chapter 7 liquidation than under the Plan.  The Objectors' baseless assertions are not sufficient for showing the Debtors did not satisfy section 1129(a)(7) of the Bankruptcy Code; rather, the Objectors needed provide their own facts and analysis to successfully challenge the Debtors' Liquidation Analysis,[366] which they did not do.

263.    For instance, although the Glenridge Principals argue that "the Debtors fail to accurately assess creditors' recovery in a hypothetical liquidation scenario as the Debtors' liquidation analysis is based on overly conservative assumptions and is highly suspect given the Debtors' profitable and continuous sale of the Acthar product,"[367] the Glenridge Principals at no point provide even a single assumption that is "overly conservative" or any evidence to support that conclusion.[368]

264.    The DMP Group likewise fails to provide any evidence in the DMP Objection to undermine the Liquidation Analysis.  While the DMP Group argues that the Plan eliminates certain

---

[366] *See In re Hercules Offshore, Inc.*, 565 B.R. 732, 765 (Bankr. D. Del. 2016) (overruling best interest objection because "even assuming the [released] claims have merit, the Equity Committee has offered no credible evidence that holders of [equity interests] would recover greater value in a chapter 7 case than they are to receive under the Plan"); *Charter Commc'ns*, 419 B.R. at 261–62.

[367] Glenridge Objection ¶ 71.

[368] And that is not surprising because, as will be discussed in the Eisenberg Declaration and the Liquidation Analysis, the Liquidation Analysis is based on reasonable assumptions that are favorable to creditors.

of the DMPs' Co-Defendant Defensive Rights and contractual rights of setoff and recoupment they would otherwise retain in a chapter 7 liquidation, the DMP Group provides no evidence or analysis that such value would exceed what the DMPs will recover under the Plan.  Nor could they.  The DMP Group argues that Plan limits Co-Defendant Defensive Rights because it precludes the DMPs from naming the Protected Parties on a verdict sheet at trial.[369]  Preclusion from naming a debtor on a verdict sheet does not fall under the best-interests test because such an act is not a Claim or Interest.[370]

265.    Accordingly, the Debtors submit that the Court should overrule the Glenridge Objection and the DMP Objection.

**B.    The Debtors Rightfully Excluded the Claims Released Pursuant to the Third-Party Releases from the Best-Interests Analysis Because They are Not Claims Against the Debtors.**

266.    Certain Objectors, including the DMP Group and Rhode Island, argue that the Plan fails the best-interests test because the Debtors did not include the value of certain rights and claims against third parties that are being released under the Plan in the Debtors' Liquidation Analysis. Specifically, Rhode Island argues in the Rhode Island Objection that the Debtors did not include the value of the Trudeau Claims in the Liquidation Analysis[371] and the DMP Group argues that the Liquidation Analysis does not account for the value of the DMPs' Co-Defendant Defensive Rights

---

[369]  *See* DMP Objection ¶ 46.

[370]  11 U.S.C. § 1129(a)(7) (With respect to each impaired class of claims or interests each holder of a claim or interest of such class has accepted the plan; or will receive or retain under the plan ***on account of such claim or interest*** property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.)

[371]  *See* Rhode Island Objection ¶ 1.

as to Protected Parties other than the Debtors (the "***Third-Party Defensive Rights***").[372]  Both of these objections should be overruled.

267.    The plain meaning of section 1129(a)(7)(A) of the Bankruptcy Code does not support Rhode Island's or the DMP Group's assertion that the Debtors must include the value of the released Trudeau Claims or Third-Party Defensive Rights in the Liquidation Analysis.[373]  The plain and unambiguous language of that section provides that the Court, when undertaking a best-interests analysis, only needs to consider those claims that impaired, non-consenting creditors hold against ***the Debtors*** in a hypothetical chapter 7 liquidation.[374]  Indeed the use of the word "so" in section 1129(a)(7) of the Bankruptcy Code confirms this construction.  The provision requires that an impaired creditor "receive or retain under the plan ***on account of such claim or interest*** property of a value, as of the effective date of the plan, that is not less than the amount that such holder would ***so*** receive or retain if the debtor were liquidated under chapter 7."[375]  The "so" refers to the "on account of such claim" that appear earlier in the sentence such that an impaired creditor must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would . . . receive or retain [***on account of such claim or interest***] if the debtor were liquidated under chapter 7."[376]

---

[372]  *See* DMP Objection ¶ 61.

[373]  *See* Rhode Island Objection ¶ 26.

[374]  *See In re Purdue Pharma L.P.*, No. 19-23649, 2021 WL 4240974, at ** (Bankr. S.D.N.Y Sept. 17, 2021) ("*Purdue II*").

[375]  11 U.S.C. § 1129(a)(7) (emphasis added).

[376]  *Id.; see also Purdue II*, 2021 WL 4240974 at *8 (holding that the plain language of section 1129(a)(7) does not require a liquidation analysis to include an analysis of a claimants' rights against third parties in a liquidation).

US-DOCS\126024798.18

What a creditor may "receive or retain" on account of claims against third parties in a liquidation is therefore irrelevant.

268.    The cases Rhode Island and the DMP Group cite to miss this significant distinction and are by no means binding.  Indeed, the Honorable Robert D. Drain specifically rejected the opinions rendered by the other judges in his district in *In re Ditech Holding Corp*[377] and *In re Quigley Co.*[378]—both of which are relied upon in the Rhode Island Objection and DMP Objection—because "neither of those decisions addresses the plain meaning argument" inherent to the language of section 1129(a)(7)(A) of the Bankruptcy Code.[379]  As Judge Drain found in *Purdue*:

> [S]ection 1129(a)(7) provides that for the holder of a claim that has not accepted its treatment under a plan, such holder must be projected to 'receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.'  As a matter of grammar, therefore, the comparison required by section 1129(a)(7) apparently is between the amount that the objecting creditor would receive under the plan on account of its claim and what it would 'so' receive—that is, also on account of its claim—if the debtor were liquidated under chapter 7.  *It would not, therefore, require analysis of the claimant's rights against third parties*.[380]

269.    Likewise, the Court should reject the holding of *In re Washington Mutual, Inc.*[381]—another case cited in Rhode Island Objection and the DMP Objection—because it also does not engage with the plain meaning of section 1129(a)(7)(A) of the Bankruptcy Code.  There, Judge

---

[377]  606 B.R. 544, 610-14 (Bankr. S.D.N.Y. 2019).

[378]  437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010).

[379]  *Purdue II*, 2021 WL 4240974 at *50.

[380]  *See id.*  at *50 (emphasis added) (internal citations omitted).

[381]  442 B.R. 314 (Bankr. D. Del. 2011).

Walrath stated that "[i]n a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."[382]  While that language suggests that released third-party claims should be included in a liquidation analysis, the Court often does not require that in practice.  In fact, ***Judge Walrath proceeded without considering the value of the released third-party claims in the liquidation analysis*** and held that, because other parties agreed to release $54 billion in claims they held against the debtors pursuant to the plan, the plan objectors (including holders of equity interests who were not likely to receive any recovery under the plan) would receive less recovery under a chapter 7 liquidation than under the plan.[383]  Accordingly, the plain meaning of section 1129(a)(7)(A) of the Bankruptcy Code necessitates that the Court not consider the Trudeau Claims or Third-Party Defensive Rights when undertaking the best-interests tests, as other judges in this district have done.[384]

### C.    The Released Rights and Claims of Rhode Island and the DMPs are Too Speculative to be Included in the Debtors' Liquidation Analysis Even if it Were Appropriate to Do So.

270.    Even if section 1129(a)(7)(A) of the Bankruptcy Code required that the Court consider released third-party claims against non-debtors in a debtor's liquidation analysis (which the Debtors dispute), any liquidation analysis should exclude claims that are "speculative [or]

---

[382]  *Id.* at 359–60.

[383]  *Id*. at 360.

[384]  While Rhode Island relies on *Washington Mutual*, it ignores a more recent case from this jurisdiction in which the court reached the opposite conclusion.  *See W.R. Grace II*, 475 B.R. at 149 ("Under the best interests of the creditors test, courts should only consider 'the dividend the creditor would receive from the Chapter 7 trustee – and only that amount – for comparison with the dividend available under the Chapter 11 plan.'").

incapable of estimation."[385]  The Debtors submit that, based on the evidence that will be set forth

in the Eisenberg Declaration and presented at the Confirmation Hearing, any estimated recovery

in a chapter 7 liquidation scenario to (a) Rhode Island on account of the Trudeau Claims and (b) the

DMPs on account of their Co-Defendant Defensive Rights and contractual rights of setoff and

recoupment is too speculative for inclusion in a liquidation analysis.

271.    The best-interests test requires that the Court make a "well-reasoned estimate of the

liquidation value that is supported by the evidence on the record."[386]  While "it is not necessary to

itemize or specifically determine precise values during this estimation procedure" a court must

make "an independent finding, based on the evidence and arguments presented, whether creditors

will receive as much under the plan as they would in a hypothetical Chapter 7 liquidation" and

"such independent findings must be based on proper evidence rather than mere assumptions or

assertions."[387]

272.    The Trudeau Claims, however, are too speculative to include in a well-reasoned

estimate of the liquidation value of the Debtors.  As an initial matter, the Trudeau Claims are based

upon "Trudeau's [alleged] role in the deceptive marketing and oversupply of opioids into Rhode

Island through Mallinckrodt plc and subsidiaries of the company"[388] and, therefore, clearly qualify

---

[385]  *See In re Quigley Co.*, 437 B.R. at 145; *Ditech Holding Corp.*, 606 B.R. at 615 ("It is true . . . that when weighing
specific claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation and should
exist on the date selected for valuation in a hypothetical chapter 7 case."); *Elsinore Shore Assocs.*, 91 B.R. at 271
(add parenthetical); *Charter Commc'ns*, 419 B.R. at 261–62 (declining to include additional liquidation value
because dissenting creditors' expert "engaged in a largely speculative exercise of listing possible incremental
recoveries and offered no reliable opinions as to the likelihood that any . . . possible extra value would ever
materialize").

[386]  *W.R. Grace II*, 475 B.R. at 142 (internal citations and quotations omitted).

[387]  *Id.* (internal citations and quotations omitted).

[388]  *See* Rhode Island Objection ¶ 3.

as "Opioid Claims"[389] that will be channeled to the opioid trusts.  Thus, determining Rhode

Island's potential recovery in a chapter 7 requires the Debtors to consider Rhode Island's recovery

not just on account of its claims against Mr. Trudeau directly but on account of its claims (and Mr.

Trudeau's indemnification or contribution claim) against the Debtors as well.[390]  To do so, it would

be necessary to determine the value of all Opioid Claims.

273.    The Opioid Claims are, however, unliquidated, contingent and disputed and, due to

their nature, the Debtors do not have enough information to estimate the amount of the Opioid

Claims and consequently the Trudeau Claims.[391]   In order to estimate recoveries to Opioid

Claimants in a chapter 7 scenario, the liquidation analysis would need to take into consideration a

multitude of unknown and incalculable factors including:  (a) the range of possible outcomes, costs

and time associated with the over three thousand pending opioid litigations that the Debtors

currently face; (b) the likelihood and risks that Opioid Claimants may not collect on account of

their Opioid Claims in such litigations; (c) any challenges brought by insurance carriers or other

parties in interest whose policies or assets may be implicated; and (d) the dilutive effects that future

lawsuits may have on recoveries to Opioid Claimants because, despite the Opioid Operating

Injunction, litigation could be initiated by all of the other creditors in the Chapter 11 Cases—

including all of the other states and governmental entities that are otherwise agreeing to the Plan

---

[389]  *See* Plan ¶ 269 (defining "***Opioid Claim***").

[390]  *See Purdue II*, 2021 WL 4240974 at *50 ("I have instead assessed, based on the record of the confirmation hearing, what I believe would be recovered by the objectors if the Debtors were liquidated in Chapter 7, both on account of their claims against the Debtors ***and*** on account of their third-party claims.") (emphasis in the original). Furthermore, estimating the value of Rhode Island's direct claims against the Debtors would necessarily entail estimating the value of all Opioid Claims.

[391]  Liquidation Analysis at 4.

and would have the same types of claims as Rhode Island does against Mr. Trudeau.[392]
Accordingly, the size, scope, and uncertainty associated with all of these factors collectively makes
any estimation of recoveries on account of the Opioid Claims—and, consequently, the Trudeau
Claims—entirely speculative.

274.    Finally, the cases cited by Rhode Island are inapplicable.  In *Quigley*,[393] the
bankruptcy court found that third-party claims were capable of estimation based on the debtor's
statements regarding a decades long history of prior settlements of similar claims, which is
something the Debtors do not have with respect to the Trudeau Claims.  *Ditech* is similarly
distinguishable.  There, the bankruptcy court found that the debtors failed to meet their evidentiary
burden of proving that the released unliquidated claims were incapable of estimation because the
debtors did not show why they could not estimate such unliquidated claims.[394]  Here, conversely,
the Debtors will show at the Confirmation Hearing and in the Eisenberg Declaration that there are
an incredibly large number of variables surrounding estimation of Opioid Claims recoveries that
make such estimation unachievable.  Indeed, it is telling that Rhode Island has not offered expert
testimony or other evidence on the value of the Trudeau Claims—a powerful concession that the
supposed value of these speculative claims is incapable of reliable estimation.  Accordingly, the

---

[392] Indeed, as of the Petition Date, there were at least five other lawsuits pending against Mr. Trudeau in his capacity as chief executive officer based on similar conduct alleged in in the Rhode Island litigation.  *See Strougo v. Mallinckrodt Public Limited Company, et al.*, Case No. 19-cv-07030 (S.D.N.Y.); *Healthcor Offshore Master Fund, L.P., et al., v. Mallinckrodt Plc*, et al., Case No. 20-cv-02834 (D.D.C.); *Brandhorst v. Trudeau, et al.,* Case No. 19-cv-02778 (D.D.C.); *Solomon v. Mallinckrodt Public Limited Company, et al.,* Case No. 17-cv-02042 (E.D. Mo.); *Shenk v. Mallinckrodt plc*, No. 1: 17-cv-00145-DLF (D.D.C.)

[393] 437 B.R. at 134, 146.

[394] 606 B.R. at 620-21.

US-DOCS\126024798.18

Debtors respectfully submit that the Trudeau Claims are too speculative for inclusion in a liquidation analysis.[395]

275.    The liquidation value of the DMPs' Co-Defendant Defensive Rights and contractual rights of setoff and recoupment is similarly incapable of estimation.  As an initial matter, recoupment and setoff rights "have no independent value separate and apart from a debtor's or purchaser's claim."[396]  The DMP Group itself admits this in the DMP Objection.[397]  Therefore, any estimate of the liquidation value of such rights would first require an estimate of the value of a separate, underlying claim held by a DMP against a Protected Party and then an estimate of the value of a Claim held by such Protected Party against the applicable DMP.[398]  Given that the DMP Group provides no indication that any such Claims or mutual debts exist from which the Debtors could perform such an estimate, the Debtors would need to make assumptions about the universe of potential future Claims each DMP could have against an individual Protected Party and Claims the same Protected Party may have against the same DMP.  The end result would be that the size and scope of the universe of mutual Claims required to exercise the DMPs' setoff or recoupment rights could be infinite and, thus, any estimation of recoveries on account of such rights would be entirely speculative.

---

[395] Furthermore, the Debtors dispute Rhode Island's assertion that, if all litigation Claims against the Debtors were in fact worthless, there would have been no reason for the Debtors to declare bankruptcy in the first place.  *See* Rhode Island Objection at 12 n.4.  As set forth in paragraphs 9 and 10 of this Memorandum, the Debtors' prepetition exposure to thousands of opioid lawsuits (and other litigation claims) threatened the Debtors' businesses as a going concern.  Rhode Island is merely conflating the ability to accurately estimate the value of all such litigation Claims for the purposes of the Liquidation Analysis with their impact upon the Debtors' businesses and operations.

[396] *In re FormTech Indus., LLC*, 439 B.R. 352, 361 (Bankr. D. Del. 2010); *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 260 (3d Cir. 2000).

[397] DMP Objection ¶ 62.

[398] *See* 5 *Collier on Bankruptcy* ¶ 553.10 (16th 2021) (stating that to exercise either a recoupment or setoff right, there must exist a mutual debt such that the debt the creditor owes to the Protected Party may be deducted from its claim against the Protected Party); *Folger Adam*, 209 F.3d at 260.

155

276.    For the sake of argument, even if the Court were to determine that the DMPs' Co-Defendant Defensive Rights should generally be included in a best-interests test, value of such rights is likewise too speculative for inclusion in the Liquidation Analysis.  As with the DMPs' recoupment and setoff rights, before determining the liquidation value of the DMPs' Co-Defendant Defensive Rights, the Debtors would first need to estimate the potential liability of the DMPs (and the Protected Parties) for third-party Claims that may be contingent, unliquidated, or not even in existence.

277.    Accordingly, the Debtors respectfully submit that the value of the DMPs' Co-Defensive Rights and recoupment and setoff rights are too speculative for inclusion in a liquidation analysis and their objections should be overruled.

> **D.**     **Even Assuming the Trudeau Claims were Not Too Speculative to be Included in the Liquidation Analysis, the Plan Would Still Satisfy the Best-Interests Test.**

278.    Assuming *arguendo* that the value of the Trudeau Claims that are being released under the Plan were included in the Liquidation Analysis, the Plan would still satisfy the best-interests test because Rhode Island would recover less under a hypothetical chapter 7 liquidation than under the Plan.

279.    Even based on information available to the Debtors, it is unlikely that Rhode Island could receive a greater recovery in a chapter 7 liquidation than under the Plan.  As noted in the assumptions to the Liquidation Analysis, if unliquidated, contingent, or disputed Claims are deemed Allowed Claims at the Debtor entities that are named defendants in the various lawsuits, the aggregate proceeds available to all Classes of unsecured claims against the relevant Debtor entities range from an approximate lower recovery of $2 million to an approximate higher recovery

156

of $54 million in aggregate.[399]  Therefore, **all** Opioid Claimants, including Rhode Island, would not recover more than $54 million on their Claims against the Debtors in a chapter 7 liquidation. This value would be distributed amongst the unsecured claims, including the Class 5 Guaranteed Unsecured Notes, at the relevant Debtor entities and is significantly less in aggregate than the $1.725 billion contributed to the Opioid Creditor Trusts under the Plan.  As will be shown at the Confirmation Hearing, Rhode Island is allocated 0.45% of the funds available through the NOAT II funds and is estimated to recover approximately $5 million under the Plan.  This amount is significantly more than the proceeds available under the Liquidation Analysis assuming a proportionate recovery as provided under the Plan.

280.    While Rhode Island suggests it may be able to recover up to $200 million under the D&O Liability Insurance Policies on account of the Trudeau Claims in a chapter 7 liquidation, this suggestion wrongly presumes that Rhode Island could be entitled to such an amount and ignores the practical realities of collecting such an amount.  In a chapter 7 scenario, litigation against the D&O policy may not be stayed and Rhode Island would need to litigate its claim and be awarded a judgment before seeking a recovery from the D&O Liability Insurance Policies.  This would be time consuming and expensive, and moreover the cost of litigation and defenses for Mr. Trudeau would be paid out of the insurance policy before any value is made available to creditors.

281.    Additionally, it is important to recognize that Rhode Island is not the only opioid plaintiff.  In fact, multiple other states have similar direct theories of liability against directors and officers and, therefore, it is reasonable to assume in a liquidation that other states (not to mention other Opioid Claimants) would make similar claims against Mr. Trudeau and/or other officers and

---

[399]  This assumes that Opioid Claims are asserted at SpecGx LLC, Mallinckrodt LLC, Mallinckrodt Enterprises LLC and Mallinckrodt plc. *See* Liquidation Analysis 11-12, 14.

directors in a Chapter 7 liquidation.  Any recovery Rhode Island may obtain from the D&O

Liability Insurance Policies would be diluted by these other claims in Chapter 7.  Finally, even

assuming the full $200 million D&O Liability Insurance Policies would be available to creditors,

Rhode Island's share of 0.45% (based on the proportionate share amongst State Opioid Claimants

only) would only provide a recovery of $0.9 million before any deduction for administrative legal

expenses.  Thus, Rhode Island's current treatment under the Plan provides significantly higher

recovery, combined with greater certainty of recovery, as compared to any hypothetical recovery

Rhode Island may recover in a Chapter 7 liquidation

282.    The circumstances in the Chapter 11 Cases are similar to those in *Washington

Mutual*, where the court found that, even if the Debtors did exclude third-party released claims

from their liquidation analysis, the plan still satisfied the best-interests test because the value of

the global settlement underlying the plan provided a higher return to the creditors than would come

from a liquidation analysis that included the value of the third-party released claims.[400]  Thus, the

Debtors submit that, even if the value of the Trudeau Claims were included in the Debtors'

liquidation analysis, Rhode Island would still recover less under a hypothetical chapter 7

liquidation than under the Plan given the size and scope of the claims held against the Debtors and

the consequences of breakdown of the Restructuring Support Agreement and global opioid

settlement.

283.    Ultimately, the Rhode Island Objection is nothing but a bad-faith, thinly veiled

attempt to circumvent the hard-fought opioid settlement set forth in the Plan and to seize the

proceeds of the Debtor's D&O Liability Insurance Policies at the expense of the thousands of other

---

[400]  442 B.R. at 360 ("Again, however, when the additional $54 billion in claims held by the FDIC and JPMC is considered, the Court concludes that the recovery under chapter 7 *even without the releases* would be less than the recovery under the Debtors' Plan.") (emphasis added).

Opioid Claimants.  As will be adduced at the Confirmation Hearing, Rhode Island (along with numerous other state and local governmental entities) engaged in months-long prepetition negotiations with the Debtors and their advisors regarding the consideration to be allocated to opioid claimants pursuant to the Plan.  The Restructuring Support Agreement excluded the D&O Liability Insurance Policies from the assets contributed for the benefit of Opioid Claimants because doing so brings finality to the massive amount of litigation against the Debtors, including by way of Claims against the Debtors' directors and officers.[401]  This was particularly important because, due to the Debtors' obligations to indemnify directors and officers, a post-emergence Claim against the Debtors' directors and officers would effectively be a Claim against the Reorganized Debtors in contravention of the "fresh start" intended under the Bankruptcy Code.  To compensate Opioid Claimants (including Rhode Island) for the exclusion of the D&O Liability Insurance Policies, the Debtors provided such claimants under the initial Restructuring Support Agreement with "Additional Insurance Rights," which consisted of additional rights and consideration to be agreed upon by the Debtors, the Governmental Plaintiff Ad Hoc Committee, and the Guaranteed Unsecured Notes Ad Hoc Group.[402]  As part of the recent negotiations with the Supporting Parties and the OCC that culminated in the OCC Settlement, those Additional Insurance Rights were exchanged for, among other things, the $125 million of additional Cash and certain litigation rights being contributed to the Opioid MDT II.[403]  As a result, the Opioid Claimants (including Rhode Island) received consideration for the exclusion of the D&O Liability Insurance Policies.

[401] *See supra* ¶ 145.

[402] *See* definition of "Additional Insurance Rights" on Schedule 1 of Restructuring Support Agreement.

[403] *See Global Opioid Settlement Term Sheet* [Docket No. 4121-2].

284.    Nevertheless, in a brazen attempt to benefit from both the Opioid Settlement and the D&O Liability Insurance Policies, Rhode Island commenced litigation against Mr. Trudeau on the eve of the Petition Date based upon the same alleged conduct covered by the Opioid Settlement in order to obtain recoveries from the Debtors' D&O Liability Insurance Policies for itself at the expense of the other Opioid Claimants and the Debtors' other creditors who validly assert claims against such policy.[404]    The objection in conjunction with the commencement of the Trudeau Action is a race to the court house by Rhode Island to grab at the proceeds of the Debtors' D&O Liability Insurance Policies to the detriment of the other Opioid Claimants and other creditors in violation of the spirit of the Plan and the Restructuring Support Agreement negotiations.

285.    Rhode Island's disingenuous—and frankly appalling—tactics should not be rewarded.    As such, the Debtors respectfully request that the Court deny the Rhode Island Objection in its entirety.

**E.    Sanofi Would Not Receive a Greater Recovery in Chapter 7 Than it Will Under the Plan.**

286.    In the Sanofi Objection, Sanofi incorrectly argues that the Plan does not satisfy the best-interests test because it would receive a greater recovery in a chapter 7 liquidation than it will under the Plan.  Specifically, Sanofi alleges that it would receive a greater recovery in a chapter 7 liquidation because Sanofi would continue receiving royalty payments under the Sanofi Agreement from whomever purchases the intellectual property thereunder via the liquidation. What Sanofi fails to recognize is that a chapter 7 trustee would reject the Sanofi Agreement just as the Debtors have done because the estate benefits from not making needless royalty payments in both a chapter 11 and chapter 7 scenario.  In addition, Sanofi's argument that a purchaser of the

---

[404]  The case against Mr. Trudeau is *Rhode Island v. Mark C. Trudeau*, C.A. No. PC 2020-7056 (R.I. Super. Ct., Oct. 8, 2020) (the "***Trudeau Action***").

intellectual property previously sold to the Debtors under the Sanofi Agreement would need to continue to make the royalty payments is entirely baseless.  It is axiomatic that a buyer under section 363 of the Bankruptcy Code takes assets free and clear of such claims or interests.[405]  Accordingly, Sanofi would not receive a higher recovery in a chapter 7 liquidation as compared to under the Plan and its objection should be overruled.

### III.    The Objections to the Plan as Not Satisfying the Feasibility Requirement in Accordance with Section 1129(a)(11) of the Bankruptcy Code Should be Overruled.

Several Objectors—the Acthar Insurance Claimants, the Glenridge Principals, Sanofi, the DMP Group, and the Ad Hoc Acthar Group—have filed Confirmation Objections asserting that the Plan is not feasible, but all such objections should be overruled for the reasons expressed below.

#### A.    The Acthar Insurance Claimants' Request for Administrative Expense Claims Will Not Affect the Feasibility of the Plan.

287.    The Acthar Insurance Claimants argue that feasibility of the Plan cannot be determined until the Court reaches a decision on the merits of the Acthar Insurance Claimants' request for Administrative Claims.[406]  The Court will hold a hearing to address this issue contemporaneously with the Confirmation Hearing.  As the Debtors have consistently stated,[407] the Acthar Insurance Claimants' arguments for Administrative Claims are without merit, and the Debtors anticipate a ruling consistent with that view.  Accordingly, the Debtors anticipate that the Acthar Insurance Claimants' request for Administrative Claims will have no impact on the feasibility of the Plan.

---

[405]  *See* 11 U.S.C. § 363(f).

[406]  Acthar Insurance Objection ¶ 45.

[407]  *See, e.g.*, Disclosure Statement Art. IV.R.4; *Debtors' Motion for Partial Summary Judgment on Administrative Claims Objection* [Docket No. 4054] ¶ 17.

US-DOCS\126024798.18

**B.    The Debtors Will Have Sufficient Cash on Hand on the Effective Date to Pay Any Allowed Administrative Claims.**

288.    Contrary to the assertion by the Glenridge Principals that the Debtors have not shown that the Plan is feasible because the Plan does not provide an estimate of the amount of Administrative Claims or evidence of the sources and uses of Cash on the Effective Date,[408] the Debtors have (as will be shown in the Eisenberg Declaration) estimated the total amount of Cash payments that they will need to make on the Effective Date, including the Debtors' estimate of Administrative Claims, to be approximately $853 million and will have sufficient Cash on hand to make such payments.  The Debtors dispute that the Glenridge Principals have Administrative Claims (and any other requests for Administrative Claims as of the date hereof) because the Glenridge Principals have not done anything to confer a benefit on the Estates during the Chapter 11 Cases and their Claims are merely prepetition contingent Claims under a prepetition contract. The Debtors also submit that they do not need to assume payment of administrative expenses that have not been Allowed by the Court.  Additionally, as will be presented in the Eisenberg Declaration, the Debtors expect to emerge from chapter 11 with $573 million of liquidity and thus will have sufficient Cash on hand in the event the Court orders the payment of additional Administrative Claims.  Accordingly, the Glenridge Objection should be overruled.

**C.    A Continued Obligation to Make Royalty Payments to Sanofi Will Not Adversely Affect the Feasibility of the Plan.**

289.    Sanofi incorrectly asserts in the Sanofi Objection that the Plan is not feasible because the Debtors' Projections are "premised predominately on the false notion that the Debtors will be able to sell Acthar following rejection of the [Sanofi] APA."[409]  Sanofi's argument is

---

[408]  Glenridge Objection ¶ 56.

[409]  Sanofi Objection ¶ 31.

premised on the position that the Debtors' cannot continue selling Acthar if they reject the Sanofi Agreement, pursuant to which the Debtors acquired certain intellectual property relating to Acthar, and cease making royalty payments under the Sanofi Agreement (or otherwise stop paying). The Court will hold a hearing on this issue prior to confirmation of the Plan. But, even in the unlikely event that the Court determines that the Debtors must continue making royalty payments to Sanofi, such ruling would not adversely affect the feasibility of the Plan. As will be adduced at the Confirmation Hearing, should the Court determine that the Debtors need to honor such an obligation going forward, the Debtors generate ample Cash to pay such royalty payments as they come due. Additionally, as will be shown in the Eisenberg Declaration, the Projections provide significant EBITDA cushion, indicating that the Debtors would generate sufficient Cash flow to satisfy all of their post-Effective Date obligations even in the face of unanticipated costs.

### D.    The DMP Group's Threat to Discontinue Business with the Debtors Will Not Adversely Affect the Feasibility of the Plan.

290.    While the DMP Group argues that the Plan is not feasible because it "proposes to eliminate many of the DMPs' substantive and procedural contractual rights in a manner that makes it unreasonable to assume their continued support,"[410] that argument is nothing but a disguised threat that will not affect the feasibility of the Plan. A threat by the DMPs that they will refuse to do business with the Reorganized Debtors if they do not obtain a greater recovery under the Plan resembles the sort of "untoward advantage" seeking that courts have consistently held warrants a finding of bad faith by a creditor.[411]    In addition, if the Court approves assumption of the DMPs'

---

[410]    DMP Objection ¶ 69.

[411]    *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 247 n.68 (3d Cir. 2004); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 845 (Bankr. S.D.N.Y. 1995) (explaining that where the record contains evidence that a creditor has acted to achieve some benefit or goal inconsistent with interests of the estate and its creditors, the Court must inquire into those motives in order to preserve the integrity of the chapter 11 process); *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 103 (2d Cir. 2010).

163

contracts by the Reorganized Debtors, the DMPs will continue to be bound by the terms thereunder; and if the Debtors opt to reject any of their contracts, such decision will reflect an exercise of sound business judgment that rejection is net-beneficial for their businesses.  It is nonsensical for the DMPs to suggest they can simply cease performing under the contracts just because they do not like the terms.  Accordingly, the DMPs' dissatisfaction with their recoveries under the Plan does not detract from its sound feasibility.

291.    Indeed, as the Debtors will show in connection with the Confirmation Hearing, while the DMPs' purchases contribute significantly to the Debtors' bottom line, it would not be fatal to the feasibility of the Plan to have to find other customers or to renegotiate their relationships with these parties.

### E.    The Ad Hoc Acthar Group's Arguments Against Plan Feasibility Have No Merit.

292.    The Ad Hoc Acthar Group advances a hodge-podge of flawed arguments, including that the Plan is not feasible because (a) it "relies upon improper and inappropriate marketing of Acthar for conditions for which it is not appropriate,"[412] (b) the Ad Hoc Acthar Group "has proffered the expert reports of five individuals who attest to concerns about the feasibility of the FAP's projections of Acthar revenue,"[413] and (c) "the Debtors fail to take into consideration the effect of certain bills moving through Congress [that] would gut the [alleged] illegal pricing of Acthar and render the [Plan] incapable of implementation."[414]

293.    As an initial matter, the Ad Hoc Acthar Group fails in any way to explain (a) how the Plan "relies upon improper and inappropriate marketing of Acthar," (b) what concerns its

---

[412]  Acthar Group Objection at 9.

[413]  *Id.* at 19.

[414]  *Id.* at 9.

experts have regarding the Debtors' Projections, and (c) how either of these things affect the feasibility of the Plan.  Presumably, the Ad Hoc Acthar Group is referring to an argument it has made in the past that Acthar is over-prescribed but, as will be adduced at the Confirmation Hearing, that assertion is unfounded and fails to consider how an individual multiple sclerosis patient's case evolves.  Additionally, the Ad Hoc Acthar Group has provided no causal connection between their views of alleged over-prescribing of Acthar and a future reduction in Acthar net sales.

294.    Regarding the Ad Hoc Acthar Group's allegation of "illegal pricing of Acthar," the Debtors deny that they have (and evidence adduced during the Confirmation Hearing will demonstrate they have not) engaged in any anticompetitive conduct in connection with pricing the therapy and maintain that their pricing policies have always been lawful; in addition, and there have been no judgments or rulings that have held the current pricing policies reflected in the Projections to be unreasonable.  Additionally, that the Ad Hoc Acthar Group provides no evidence that Congress will pass any bill that would affect Acthar pricing.  Simply put, a bill is not law and may never be law and, thus, is reasonably excluded from a feasibility analysis.  The Ad Hoc Acthar Group's assertion is pure speculation on multiple levels and, as discussed above, "speculative prospects of failure will not defeat feasibility."[415]

295.    Even if the Projections were revised to reduce Acthar net sales as the Ad Hoc Acthar Group and its experts suggest (*i.e.*, a $7 million negative impact on EBITDA), the alleged impact would not affect the feasibility of the Plan.  As the Debtors will show, the Projections provide much greater EBITDA cushion, indicating that the Debtors would generate sufficient Cash flow to satisfy all of their post-Effective Date obligations even in the face of this alleged decline

---

[415] *See Indianapolis Downs, LLC*, 486 B.R. at 298.

in Acthar revenue.   Accordingly, the Ad Hoc Acthar Group's feasibility arguments should be denied.

## IV.   The Objections to the MIP are Meritless and Should be Overruled.

296.   Certain Plan objections (the "***MIP Objections***")[416] object to the MIP on the bases that the MIP (a) violates the absolute priority rule and (b) was not proposed in good faith.   The Debtors address each argument below.

### A.   The MIP Does Not Violate the Absolute Priority Rule.

297.   All of the MIP Objections[417] essentially argue that the MIP violates the absolute priority rule, in what appears to be a misunderstanding of applicable bankruptcy law.[418]   As further discussed above, the Plan (including the MIP) does not violate the absolute priority rule.

298.   However, the absolute priority rule prohibits the Plan from providing treatment that is more favorable to junior creditors or interest holders that vote to reject a plan over more senior creditors or interest holders on account of the junior creditor or interest holders' claim against or interest in the Debtors.[419]   The absolute priority rule, therefore, does not prohibit the Plan from providing value to certain parties in consideration of things on account of the recipient's claim against or interest in the Debtors.[420]   Moreover, the MIP Participants[421] are not receiving awards

---

[416]   Docket Nos. 302, 367, 368, 369, 370, 400, 401, 416, 472, 494, 527, 4230, 4277.

[417]   Docket Nos. 302, 367, 368, 369, 370, 400, 401, 416, 472, 494, 527, 4230, 4277.

[418]   *E.g.*, Docket Nos. 4230 at 4, 4277 at 25.

[419]   *See* 11 U.S.C. § 1129(b)(2)(B)(ii) & (b)(2)(C)(ii).

[420]   *See In re Armstrong World Industs., Inc.*, 432 F.3d 507, 516 (3d Cir. 2005) ("[T]he 'on account of' language confirms that there are some cases in which property can transfer to junior interests not 'on account of' those interests but for other reasons.") (citing *In re PWS Holding Corp.*, 228 F.3d 224, 238 (3d Cir. 2000)) (internal quotes omitted).

[421]   "***MIP Participants***" means, collectively, the employees, non-employee consultants, and outside directors of the Debtors who will be eligible to participate in the MIP (each person who receives an award under the MIP, a "***MIP Participant***.").

under the MIP on account of any prepetition claim or interest in the Debtors, but rather for post-effective work that they will be performing.  Indeed, courts in this district routinely approve chapter 11 plans that permit reorganized boards to implement management incentive plans by reserving equity in the reorganized debtor.[422]

299.    This issue was addressed in *In re Genesis Health Ventures*, where the court found that the fair and equitable requirement was not violated by the terms of a management incentive plan pursuant to a proposed plan of reorganization.[423]  There, certain parties objected to the plan on the grounds that management incentive plan violated section 1129(b)(2)(B) and was not otherwise fair and equitable because the officers and directors would receive, among other things, equity under the plan on account of their prepetition equity interests for no additional consideration.[424]  The court ultimately overruled these objections, concluding that "the issuance of stock and warrants to management represents an allocation of the enterprise value otherwise distributable to the Senior Lenders, which the Senior Lenders have agreed to offer to the top executives as further incentive to them to remain and effectuate the debtors' reorganization.  The

---

[422]  *In re Northwest Hardwoods, Inc.*, Case No. 20-13005 (CSS) (Bankr. D. Del. Jan. 6, 2021) (confirming plan containing provision for implementation of management incentive plan with equity by reorganized board); *In re Libbey Glass Inc.*, Case No. 20-11439 (LSS) (Bankr. D. Del. Oct. 20, 2020) (same);  *In re Emerge Energy Services LP*, Case No. 19-11563 (KBO) (Bankr. D. Del. Dec. 18, 2019) (same);  *In re Checkout Holding Corp.*, Case No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same);  *In re David's Bridal, Inc.*, Case No. 18-12635 (LSS) (Bankr. D. Del. Jan. 4, 2019) (same);  *In re Mattress Firm, Inc.*, Case No. 18-12241 (CSS) (Bankr. D. Del. Nov. 16, 2018) (same); *In re EV Energy Partners, L.P.*, No. 18-10814 (Bankr. D. Del. May 17, 2018) (same); *In re Fallbrook Technologies Inc.*, Case No. 18-10384 (MFW) (Bankr. D. Del. Jun. 11, 2018) (same); *see also Genesis Health Ventures*, 266 B.R. 591.

[423]  266 B.R. at 618.

[424]  *Id.* at 616.

US-DOCS\126024798.18

Senior Lenders are free to allocate such value without violating the 'fair and equitable' requirement."[425]

300.    Similarly, here, the parties to the Restructuring Support Agreement have agreed to allocate a portion of their recovery to the MIP Participants, which they are free to do—and which does not violate the absolute priority rule.  Further, as will be shown in the forthcoming Friske Declaration, the MIP is structured to drive the MIP Participants' performance and aligns incentives in this regard.  Equity grants made from the Initial Grants[426] and future grants made from the MIP Reserve[427] are anticipated to be awarded to a key group of employees, non-employees, consultants, and outside directors to properly motivate their high performance on a post-emergence basis.  As such, any compensation under the MIP is a voluntary carveout of the recovery of the parties to the Restructuring Support Agreement, which has the purpose of incentivizing management and employees to increase the enterprise value of the Reorganized Debtors on a go-forward basis.

## B.    The MIP Was Proposed in Good Faith.

301.    The MIP Objections also contend, in baseless and conclusory fashion, that the MIP should not be approved because it was allegedly not negotiated in good faith.[428]  That is false.  The terms of the MIP are the result of extensive arms' length negotiations among the Debtors' key stakeholders in connection with the Restructuring Support Agreement.[429]  And, as extensively discussed herein, the Debtors have met their burden of showing that the Plan—including the

---

[425]  *Id.* at 618.

[426]  "***Initial Grants***" means those grants awarded under the MIP upon the Debtors' emergence from chapter 11.

[427]  "***MIP Reserve***" means the 10% of the fully-diluted New Mallinckrodt Ordinary Shares (as defined in the Plan) that will be reserved under the MIP, subject to certain adjustments.

[428]  Docket Nos. 302, 367, 368, 369, 370, 400, 401, 416, 472, 494, 527, 4230, 4277.

[429]  *See* Welch Decl. 38-43.

MIP—meets the good faith standard of section 1129(a)(3) of the Bankruptcy Code.[430]  The MIP Objections do not (and cannot) provide any evidence to the contrary.  Notwithstanding the MIP Objections' unfounded arguments to the contrary, the MIP is reasonable and consistent with market practice for companies in chapter 11.

302.    As will be shown in the Friske Declaration, comparison between the MIP and the management incentive plans implemented by reorganized debtors in other chapter 11 cases (such reorganized debtors, the "*Chapter 11 Peers*") shows that the design of the MIP is consistent with market practice for companies in chapter 11.  *First*, the 10% of the New Mallinckrodt Ordinary Shares reserved for compensation under the MIP is consistent with the median equity pool reserve observed among comparable chapter 11 debtors.  In fact, the median reserve among the Chapter 11 Peers is 10% of fully-diluted shares outstanding.  *Second*, among the Chapter 11 Peers that disclosed Initial Grants, the median Initial Grants equaled 49% of the equity reserved for their management incentive programs.  Granting a meaningful portion of the equity reserve upfront, while maintaining a portion of the pool for the go-forward equity plan and one-off situations, creates a strong performance incentive, alignment with shareholders, and retention on day one. *Third*, the three-year vesting schedule for the Initial Grants under the MIP is well in line with market practice, and the majority of the management incentive plans implemented by the Chapter 11 Peers included vesting periods of three years or less.  *Fourth*, the Debtors' use of stock options and restricted stock units is well in line with market practice among the Chapter 11 Peers that disclosed Initial Grants.  *Finally*, the Debtors' MIP eligibility parameters, which focus on employees, non-employees, consultants, and outside directors, are consistent with typical market practice and align with the Debtors' longstanding philosophy and plan design.

---

[430]  *See* supra ¶¶ 171-174.

169

Accordingly, the MIP Objections do not come close to establishing that the MIP violates the absolute priority rule or was not proposed in good faith.  Moreover, the substantial evidence that will be submitted by the Debtors (and not credibly refuted by any of the MIP Objections) will show that (a) the MIP is reasonable given the facts and circumstances of these chapter 11 cases and (b) the MIP will align the post-emergence interests of the MIP Participants and the Reorganized Debtors in a way that will maximize the enterprise value of the Reorganized Debtors. Therefore, this Court should overrule all the MIP Objections in their entirety.

**V.     The Plan's Treatment of Insurance is Consistent with Applicable Law.**

      **A.     Insurers Have No Right to an Insurance "Neutral" Plan.**

303.     Several insurers including Ironshore Specialty Insurance Company, together with its affiliates and subsidiaries, (collectively, "***Ironshore***") and ACE American Insurance Company, Illinois Union Insurance Company, Westchester Fire Insurance Company, Insurance Company of North America, ACE Property and Casualty Insurance Company, ACE Fire Underwriters Insurance Company, Pacific Employers Insurance Company, Federal Insurance Company, Pacific Indemnity Company, Vigilant Insurance Company, Great Northern Insurance Company, Chubb Insurance Company of New Jersey, Executive Risk Indemnity Inc., and ESIS, Inc. (collectively and together with each of their U.S.-based affiliates and successors, the "***Chubb***" and, together with Ironshore, the "***Insurers***") assert that the Plan is patently unconfirmable because it is not "insurance neutral."  The Insurers suggest that the Plan should not be confirmed unless it includes "insurance neutrality" language that is acceptable to the Insurers, and that absent such language,

170

the Plan and trust distribution procedures impair the Insurers' rights under the Opioid Insurance Policies.[431]

304.    At bottom, the Insurers confuse a doctrine of standing for a right to be exempt from the findings of this Court and the Bankruptcy Code.  "Insurance neutrality" is a judicially devised concept to limit the standing of a debtor's insurers from objecting to a reorganizational plan, and there is no provision of the Bankruptcy Code or relevant law holding that findings of fact or conclusions of law made in connection with the confirmation of a bankruptcy plan cannot be binding on insurance companies.[432]  And the Third Circuit's analysis of "insurance neutrality" has consistently been framed in the context of objecting insurers' standing to object to plan confirmation.[433]

305.    The Plan provides that "[n]othing in the Plan, the Plan Supplement, or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Opioid Insurance Policies," with the exception that the Opioid Insurance Policies will be subject to the Bankruptcy Code and applicable law, including the terms of the Plan and Confirmation Order and any findings made by this Court.[434]  .

---

[431] *See* Ironshore Objection ¶¶ 28-38; Chubb Objection ¶¶ 78-81.

[432] *See In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004) (finding that insurers lacked standing "to challenge all aspects of Plan confirmation" based on the debtor's inclusion of neutrality language designed to eliminate the insurers' standing to object to plan confirmation).

[433] *See, e.g.*, *Mt. McKinley Ins. Co. v. Pitt. Corning Corp.*, 518 B.R. 307, 329 (W.D. Pa. 2014) (affirming bankruptcy court's finding that insurers lacked standing where insurance neutrality provisions in the plan protected insurers' interests); *In re Leslie Controls*, 2011 WL 1901547, * 31 (Bankr. D. Del. Jan. 18, 2011) (noting that court had previously held that insurers lacked standing based on finding that the plan was "insurance neutral"); *In re Federal-Mogul Global Inc.*, 2007 WL 4180545, **41-42 (Bankr. D. Del. Nov. 16, 2007) (noting that insurers lacked standing where plan preserved insurers' pre-petition rights and was "insurance neutral"). Tr. of Zoom Hearing Before the Hon. Laurie Selber Silverstein, *In re Boy Scouts of Am. and Delaware BSA, LLC*, Case No. 20-10343 (Bankr. D. De. Sept. 28, 2021) at  32: 15–34: 3. (COURT: "I think the insurance companies are using *Global Industrial* a little bit differently than I read it. I read it to give the insurance companies bankruptcy standing to raise the issues they were not permitted to raise below in *Global Industrial*, but it doesn't mean that there's no confirmable plan out there simply because there may be some increase in quantum.").

[434] Plan Art. IV.W.9.

While the rights of the Insurers to contest coverage or raise applicable defenses in subsequent coverage proceedings will not be impaired by the Plan, the Insurers cannot exempt themselves from findings made in connection with confirmation of the Plan.

306.    In *Purdue*, Judge Drain confirmed insurance "neutrality" language that is a near mirror-image of the Debtors' proposed language, and rejected the insurers' argument that they should be exempt from the findings of the bankruptcy court:

> [T]here is no requirement that a Chapter 11 plan be "insurance neutral" in any respect.  And where a plan provides for the transfer of a debtor's insurance or insurance rights to a trust or successor, as here, the issue of transferability has been joined in the context of the confirmation hearing and can and should be resolved then. Similarly, the plan's settlement of claims that might be covered by insurance is integral to the plan – indeed, it is a fundamental purpose of a plan – and therefore the bona fides of that settlement are ripe for determination at confirmation.[435]

The Insurers have not been denied standing in these proceedings and, indeed, will have a full and fair opportunity to litigate issues before this Court in the context of plan confirmation.  The terms of the Plan and findings made in connection with confirmation will have the same binding effect on the Insurers as any party participating in these proceedings.

307.    The Insurers' contention that they are being deprived under the Plan and trust distribution procedures of their contractual rights to assert defenses or control the settlement process are coverage issues that will adjudicated in the context of post-Effective Date coverage litigation.[436]    There is no basis in the Bankruptcy Code or applicable law to require this Court

---

[435] *Modified Bench Ruling on Req. for Confirmation of Eleventh Am. Joint Chapter 11 Plan* at 16, *Purdue I*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 17, 2021) ]Docket No. 3786].

[436] *See* Ironshore ¶ 18; Chubb ¶ 75.

"control" how the terms of the Plan may be applied by different courts, by exempting the Insurers from the findings made by this Court.

308.     Similarly, the Insurers' ability to assert coverage defenses based on the existence of alleged "opioid exclusions" in the Opioid Insurance Policies will not be impaired by the Plan.[437] The neutrality language specifically provides that nothing in the Plan or Contribution Order will "supplement, change, decrease or modify the terms (including conditions, limitations and/or *exclusions*) of the Opioid Insurance Policies."[438]  The Insurers' defenses with respect to the terms of the Opioid Insurance Policies will be preserved notwithstanding the assignment of the Debtors' rights in the policies.[439]

### B.     The Additional Concerns Raised by the Insurers Do Not Render the Plan Unconfirmable.[440]

309.     Chubb argues that it may be compelled to provide insurance to any entity it did not agree to insure misreads the plain language of the Plan.[441]  The Plan explicitly provides that "nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall operate to require any Opioid Insurer to pay under any Opioid Insurance Policy the liability of any Person that ***was not an insured prior to the Petition Date***."[442]  The assignment of the Debtors' rights

---

[437]  *See* Chubb ¶ 76.

[438]  *See* Plan Art. IV.W.9 (emphasis added).

[439]  The Debtors are entitled to assign such policies pursuant to section 1123(a)(5) of the Bankruptcy Code, which requires that a plan "provide adequate means for the plan's implementation" including "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan."  *See* 11 U.S.C. § 1123(a)(5).

[440]  To the extent the Debtors have not already, the Debtors shall work with the Insurers to reach a resolution by including additional language in the Plan or Confirmation Order to address the objections of the Insurers.  If the Debtors are not able to reach a resolution, they will address the objection in a supplemental filing or at the Confirmation Hearing.

[441]  *See* Chubb ¶¶ 64-66.

[442]   Plan Art. IV.W.2.d (emphasis added).

173

under the Opioid Insurance Policies does not "add new entities" or require Chubb to pay the liability of an entity that was not an insured prior to the Petition Date.  Rather, the Plan *assigns* the Debtors' rights to proceeds under the Opioid Insurance Policies to the Opioid MDT II.

310.    Ironshore contends that the Opioid MDT II Trust Agreement improperly authorizes the Trustees to limit the scope of the Opioid Insurer Injunction, which would potentially "open[] the gates of litigation against the Debtors' insurers post-confirmation."[443]    This argument misapprehends the purpose of the Opioid Insurer Injunction.  The Opioid Insurer Injunction is sought to preserve the value of the Opioid Insurance Policies for the benefit of holders of claims channeled to the Opioid MDT II.  In furtherance of this goal, the Plan generally enjoins all persons other than the Opioid MDT II that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim based on, arising under or attributable to any of the Opioid Insurance Policies from attempting to collect or recover on account of such Claim from or against any Opioid Insurer.[444]  Because competition to recover against the Opioid Insurance Policies by parties other than the Opioid MDT II would deplete the proceeds available to holders of channeled claims, the Opioid Insurer Injunction is necessary to effectuate the Plan's overall distributional scheme.[445]   However, to the extent Opioid MDT II Trustees determine that some or all of the proceeds under the Opioid Insurance Policies are substantially unrecoverable by the Opioid MDT

---

[443]    *See* Ironshore Objection ¶ 18.

[444]    *See* Plan Art. IX.I..

[445]    Courts have relied on section 105(a) in other cases to justify similar injunctions.  *E.g.*, *Kaiser Aluminum Corp. I*, 2006 WL 616243, at *17–19 (holding that section 105(a) injunction concerning non-settling asbestos insurance companies was necessary to preserve asbestos personal injury trust's assets, so trust "can pursue [insurance coverage litigation] and negotiate settlements with insurers for the benefit of [the trust] and all holders of [asbestos personal injury claims]"); *In re Federal-Mogul Global Inc.*, No. 01-10578, 2007 WL 4180545, *34 (Bankr. D. Del. Nov. 16, 2007) (holding that section 105(a) injunction concerning non-settling asbestos insurance companies was "necessary to facilitate the [plan's] provisions for the treatment of [asbestos personal injury claims and demands].").

US-DOCS\126024798.18

II, and there is no value to preserve for the benefit of Opioid Claimants, the Plan authorizes the Opioid MDT II to terminate, reduce, or limit the scope of this Opioid Insurer Injunction upon written notice to any affected Opioid Insurer.[446]  Any incidental impact such a modification may have on the Opioid Insurers is irrelevant because the Opioid Insurers are not the intended beneficiaries of the Opioid Insurer Injunction.[447]  Thus, the Opioid MDT II Trustees should be entitled to unilaterally terminate, reduce, or limit the scope of the Opioid Insurer Injunction based on the need to preserve the value of the Opioid Insurance Policies.

311.    Chubb contends that the Plan improperly releases the Debtors' reimbursement obligations under certain insurance policies by providing for the transfer of the Debtors' rights under the Opioid Insurance Policies to the Opioid MDT II "free and clear" of any such pre- and post-petition claims.[448]  The assignment of the Debtors' rights in the policies "free and clear" of any claims or liability is explicitly authorized by section 1141(c) of the Bankruptcy Code, which provides that "after confirmation of a plan, the property dealt with by the plan is *free and clear* of all claims and interests of creditors, equity security holders, and of general partners in the debtor." *See* 11 U.S.C. 1141(c) (emphasis added).[449]  Any pre- or post-petition reimbursement claims that may exist against the Debtors constitute claims against the Debtors' estates and will be resolved

---

[446] *Id.*

[447] *See* Plan Art. IX.I.2 ("The provisions of this Opioid Insurer Injunction are not issued for the benefit of any Opioid Insurer, and no such insurer is a third-party beneficiary of this Opioid Insurer Injunction.").

[448] Chubb Objection, ¶¶ 43-45.

[449] The Third Circuit held that Section 1123(a)(5) permits the transfer of rights under a debtor's insurance policies to a post-confirmation trust, notwithstanding non-assignment provisions in the policies. *See In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 374 (3d Cir. 2012) ("[t]he plain language of § 1123(a) evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as 'adequate means' for the plan's implementation, including the transfer of property authorized by (a)(5)(B). The plan language also reaches private contracts enforced by state common law, and overcomes the presumption against preemption."). The assignment of the Debtors' rights in the Opioid Insurance Policies is necessary for the implementation of the Plan, and the Opioid MDT II is eligible to receive transfers under section 1123(a)(5).

in the context of the Plan.  Moreover, as of the Effective Date and pursuant to the assignment, any

future indemnification obligations that may exist under the policies will be obligations of the

Opioid MDT II.[450]  Thus, the "free and clear" transfer of the Debtors' right under the policies does

not prejudice the Opioid Insurers or otherwise modify the terms of the policies (including any

obligations thereunder).

## VI.        Payment of the Plan Fees is Appropriate.

312.    The United States Trustee mistakenly argues that the following provisions under

the Plan, and the relevant provisions implementing the results of the mediation of the Opioid

Settlement allocation, violate the Bankruptcy Code:

(a)        The Indenture Trustee Fees,[451]

(b)        The fees and expenses of the 4.75% Unsecured Notes Indenture Trustee,[452] and the Legacy Unsecured Notes Indenture Trustee[453] (collectively, the "***Remaining Trustee Fees***" and, together with the Indenture Trustee Fees, the "***Trustee Fees***");

(c)        The establishment of the Hospital Attorney Fee Fund for the payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals with respect to Hospital Opioid Claims,[454] the NAS Monitoring Attorney Fee Fund for the payment of attorneys' fees and costs of the NAS Committee with respect to the NAS Monitoring Opioid Claimants,[455] the Ratepayer Attorney Fee Fund for the payment of attorneys' fees and costs of the Emergency Room Physicians Opioid Claimants,[456] the Opioid Attorneys' Fee Fund for the payment of costs and expenses (including attorneys' fees) of the Opioid Claimants,[457] the Municipal and Tribe Opioid Attorneys' Fee Fund for the

---

[450]   *See* Plan Art. I.A.292.

[451]   *Id.* Art. IV.S.

[452]   *Id.* Art. IV.JJ.

[453]   *Id.*

[454]   *Id.* Art. IV.X.8.B.

[455]   *Id.* Art. IV.X.8.C.

[456]   *Id.* Art. IV.X.8.D.

[457]   *Id.* Art. IV.X.9.A.

payment of costs and expenses (including attorneys' fees) of Holders of Municipal Opioid Claims and Tribe Opioid Claims other than any amounts paid to counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group in accordance with the Plan and the Restructuring Support Agreement,[458] and the State Opioid Attorneys' Fee Fund for the payment of costs and expenses (including attorneys' fees) of the States (including any ad hoc group thereof) other than any amounts paid to counsel to the Governmental Plaintiff Ad Hoc Committee in accordance with the Plan and the Restructuring Support Agreement (such fees, collectively, the "***Opioid Attorneys' Fees***" and, together with the Trustee Fees, the "***Plan Fees***").[459]

313.    Specifically, the United States Trustee mistakenly argues that the Plan Fees violate section 503(b) of the Bankruptcy Code,[460] which conditions the allowance of administrative status for the expenses of "a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders" on satisfaction of the requirements under section 503 of the Bankruptcy Code—*i.e.*, (a) timely submission of a fee application, (b) notice and hearing before the Court, (c) showing the fees are actual and necessary, and (d) showing a substantial contribution to the Chapter 11 Cases).[461]   The Debtors, however, have satisfied other provisions of the Bankruptcy Code that authorize the payment of the Plan Fees.[462]

---

[458]   *Id.* Art. IV.X.9.B.

[459]   *Id.* Art. IV.X.9.C.

[460]   UST Objection ¶¶ 80-89.  The United States Trustee, alternatively, argues that the fees must satisfy section 503, but argues in the alternative that the Debtors still have not satisfied section 1129(a)(4).

[461]   *Id.* ¶ 83.

[462]   *See* Confirmation Hr'g Tr. 37: 23-38: 9, *In re Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. May 14, 2018) [Docket No. 492] ("With respect to the payment of expenses, [section] 503(b)(3)(D) is not the only way where such expenses can be approved and paid in a case.  And I think it is perfectly appropriate to agree prebankruptcy to the payment of those expenses without the necessity of the court having to approve them after the fact in order to get the parties to come the table and negotiate what ultimately in this case is a very successful reorganization of this entity.  So I think that the fact that the debtors agreed to that prebankruptcy was perfectly appropriate, and that there is no necessity that I review those expenses or otherwise interfere with that agreement."); *see also In re Anna Holdings, Inc.*, Case No. 19-12551 (CSS) (Bankr. D. Del. Dec. 16, 2019) [Docket No. 151] (confirming a plan which included the payment of the unsecured notes indenture trustee's fees as a condition precedent to the effective date); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [Docket No. 238] (confirming a plan and approved the payment of the indenture trustee's and noteholders' fees and expenses); *In re TerraVia Holdings, Inc.*, Case No. 17-11655 (CSS) (Bankr. D. Del. January 8, 2018) [Docket No. 480] (confirming a plan which provides for the payment of the indenture trustee's

314.    The payment of the Plan Fees is appropriate under sections 363(b), 365, 1123(b)(6), 1129(a)(4) of the Bankruptcy Code and Bankruptcy Rule 9019.    Under the "broad grant of authority" provided by section 1123(b)(6) of the Bankruptcy Code to "include any . . . appropriate provision not inconsistent with the applicable provisions of" chapter 11,[463] "reorganization plans, after they get the requisite assent, may allocate and distribute the value of the debtors' estates by a broad variety of means."[464]    In accordance with this grant of authority, section 1129(a)(4) of the Bankruptcy Code "endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual resolution and get a plan approved."[465] "Taken together, these two provisions contemplate payments as part of a plan of reorganization to be put before creditors for approval."[466]    Accordingly, the Court routinely approves under section 363(b) of the Bankruptcy Code debtors' decisions to pay creditors' fees and expenses without requiring a fee application or showing of substantial contribution.[467]    Notably, in *Bethlehem Steel*,

---

fees and expenses); *In re Paragon Offshore PLC*, Case No. 16-10386 (CSS) (Bankr. D. Del. June 7, 2017) [Docket No. 1614] (same).

[463]    *See* 11 U.S.C. § 1123(b)(6).

[464]    *See In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 18 (Bankr. S.D.N.Y. 2010).

[465]    *In re AMR Corp.*, 497 B.R. at 695.

[466]    *Id.*

[467]    *See, e.g.*, *In re Extraction Oil & Gas, Inc.*, Case No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (overruling the United States Trustee's objection that the Debtors violated sections 503(b) and 1129(a)(4) of the Bankruptcy Code by paying the fees and expenses of consenting noteholders and the indenture trustee and approving payment of same under section 363(b) of the Bankruptcy Code); *In reAltegrity, Inc.*, Case No. 115-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015) (approving payment of fees and expenses pursuant to section 363(b) of the Bankruptcy Code under assumed restructuring support agreement without requiring a showing of substantial contribution); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) (overruling the United States Trustee's objection that creditors must seek reimbursement for fees and expenses under sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code and approving payment of unsecured noteholders' professional fees and expenses pursuant to plan support agreements under section 363(b) of the Bankruptcy Code subject to providing the creditors' committee and the United States Trustee with copies of invoices); *In re USEC Inc.*, Case No. 14-10475 (CSS) (Bankr. D. Del. Apr. 21, 2014) (approving the assumption of plan support agreements and the payment of creditor fees and expenses without the need for further application or approval by the bankruptcy court); *see also In re Terrestar Networks Inc.*, No. 10-15446 (SHL) (Bankr. S.D.N.Y. Oct. 19, 2010) (approving stipulation pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 that provided for the

the District Court for the Southern District of New York held that "subsections 503(b)(3)(D) and (b)(4) do not bar a bankruptcy court from allowing a debtor in possession to reimburse a creditor for professional fees—provided, of course, that the standard for allowing transactions under § 363(b) has been met."[468] The court rejected the United States trustee's argument that the "sole statutory avenue for an individual creditor to have its professional fees reimbursed is as an administrative expense" and upheld the debtors' decision to pay the creditor's fees and expenses because it was "a good business reason and would help develop a reorganization plan."[469]  In addition, the Third Circuit and other courts have authorized the payment of creditor fees with estate assets under Bankruptcy Rule 9019 where, as is the case here, the payment of such fees was part of a settlement that conferred significant benefit upon the debtors and their estates.[470]

315.    With respect to the Indenture Trustee Fees, the Debtors are required under section 365 of the Bankruptcy Code to pay such fees.  This is because the Debtors are assuming the Restructuring Support Agreement pursuant to Article V.A of the Plan, and the Restructuring

---

debtors to reimburse the members of an ad hoc group of noteholders up to $2 million of professional fees by wire transfer upon entry of court orders approving various settlements).

[468] *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ. 2854 (MBM), 2003 U.S. Dist. LEXIS 12909, at *11 (S.D.N.Y. July 28, 2003).

[469] *Id.* at *38.

[470] *See In re S.S. Body Armor I Inc.*, 961 F.3d 216, 233 (3d Cir. 2020) (finding no abuse of discretion for approval under Bankruptcy Rule 9019 standard of plaintiff-creditors' attorney's fees as part of a settlement that was "extremely favorable" to the debtor and its estate); *Purdue*, 2021 WL 4240974 at *8 ("The U.S. Trustee's objection also is misplaced because the remaining fees to be paid under section 5.8 also are not being sought as an administrative expense payable on the plan's effective date (as would be required under section 1129(a)(9)(A) of the Bankruptcy Code if they were being sought as administrative expenses) but rather as part of a heavily negotiated compromise of those fees and the clients' obligation to pay them reached during the mediation in this case conducted by Kenneth R. Feinberg and Hon. Layn R. Phillips (ret.).  The settlements provided for in section 5.8 that resulted from the mediation are subject to this Court's review both under Bankruptcy Rule 9019 and, I believe -- although there are arguments to the contrary -- under section 1129(a)(4) of the Bankruptcy Code, as has been so recognized in this district." (citing *In re Stearns Holdings, LLC*, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016))).

Support Agreement requires that the Debtors pay the Indenture Trustee Fees.[471]   As such, the Debtors must cure any defaults under the Restructuring Support Agreement, including the payment of the Indenture Trustee Fees.[472]

316.    With respect to the Trustee Fees more generally, payment of such fees is in the best interests of the Debtors' businesses and restructuring efforts.  The Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, and the Legacy Unsecured Notes Indenture Trustee have provided invaluable contribution to the Chapter 11 Cases.  They have provided critical support to the Debtors' restructuring efforts by, among other things, entering into the Restructuring Support Agreement, agreeing to the Opioid Settlement and the UCC Settlement, agreeing to material concessions to make this reorganization a reality, and consistently contributing to the Plan and the Debtors' reorganization process.  Many of these contributions, taken alone, would be sufficient to justify the payment of the Supporting Fees and Expenses under the Plan.  Taken together, there is no doubt that these parties have made a substantial contribution to the Chapter 11 Cases.  The Debtors simply would not have been able to get all of the Supporting Parties to take a chair at the negotiating table and to ultimately obtain such substantial support for the Plan without agreeing to pay the Supporting Fees.

317.    Importantly, pursuant to their respective indentures, the Guaranteed Unsecured Notes Indenture Trustee, the 4.75% Unsecured Notes Indenture Trustee, and the Legacy

---

[471]  *See* Restructuring Support Agreement, Ex. A (Term Sheet) at 8.

[472]  *See* 11 U.S.C. § 365(b)(1)(A); *see also In re Altegrity,Inc.*, Case No. 15-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015) [Docket No. 208] (approving as part of the assumption of a restructuring support agreement payment of creditor fees and expenses pursuant to sections 363(b) and 365(a) of the Bankruptcy Code without requiring a showing of substantial contribution); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014)[Docket No. 215] (same); *In re USEC Inc.*, Case No. 14-10475 (CSS) (Bankr. D. Del. Apr. 21, 2014) [Docket No. 190] (same).

US-DOCS\126024798.18

Unsecured Notes Indenture Trustee can exercise a charging lien to secure repayment of their respective fees and expenses.[473]  These indenture trustees' charging-lien rights could adversely affect other creditors' recoveries, hindering the hard-fought negotiations and consensus reached by all of the relevant constituents.  Put another way, the charging lien gives the indenture trustees the right to take a portion of the applicable recovery to satisfy the owed fees and expenses.[474]  For example, with respect to the Guaranteed Unsecured Notes Indenture Trustee, that would entail liquidating the equity distribution or the New Second Lien Notes in order to have Cash to satisfy these fees and expenses rightfully owed to the trustee.

318.    Thus, payment of these fees and expenses are integral components to the global settlement embodied by the Plan, implement the charging-lien rights, and allow for timely distributions to the holders of the relevant claims.  In light of the benefits of the Plan (*i.e.*, the massive deleveraging of the Debtors' balance sheet and global resolution), payment of the Trustee Fees is well within the Debtors' sound business judgment under section 363(b)(1) of the Bankruptcy Code.[475]

---

[473] The United States Trustee concedes that the existence of a charging lien will allow payment of the Indenture Trustee Fees. *See* UST Objection at 34 n. 20 ("It is understood that the various Indenture Trust documents provide for the payment of such fees and expenses as part of the Indenture Trustee's charging liens.  To the extent that such fees and expenses are paid pursuant to and in accordance with the charging liens asserted upon the respective creditors Plan distributions, the U.S. Trustee has no objection where a particular creditor's plan distribution, subject to a proper and valid charging lien, is surcharged in accordance with such indenture as may be applicable.").

[474] For the avoidance of doubt, the Plan contemplates the payment of the reasonable and documented out-of-pocket fees and expenses of the 4.75% Unsecured Notes Indenture Trustee and the Legacy Unsecured Notes Indenture Trustee only through the Effective Date.  To the extent the General Unsecured Creditors Trust makes future distributions to these creditors, any relevant fees and expenses of the applicable indenture trustees will be paid through exercise of the applicable charging lien.  *See* Plan Art. IV.JJ.

[475] *See* Hr'g Tr. at 256-57, *In re Penn Virginia Corporation*, No. 16-32395 (Bankr. E.D. Va. June 13, 2016) (allowing payment of certain fees and expenses of the consenting noteholders pursuant to section 363(b)(1) of the Bankruptcy Code).

US-DOCS\126024798.18

319.    Payment of the Opioid Attorneys' Fees is likewise in the best interests of the Debtors' businesses and restructuring efforts.  The attorneys that acted on behalf of the numerous Opioid Claimants in the mediation provided invaluable contribution to the Debtors' reorganization efforts by significantly participating in negotiations regarding the Opioid Settlement, the OCC Settlement, and the restructuring transactions contemplated by the Plan.  Absent the commitment of these attorneys and other representatives, the Debtors would not have been able to secure the settlements and relevant allocations of value to each of the Opioid Claimant Classes that form the heart of the reorganization and the Debtors would be forced to litigate thousands of opioid lawsuits.

320.    In fact, the report filed by Kenneth R. Feinberg, as the mediator overseeing the Opioid Settlement allocation stated:

> All parties have informed the Mediator that these various fee resolutions are an integral and non-severable part of the overall settlements regarding allocation among public and private Opioid Claimants, and that the settlements reached regarding allocation indeed are dependent on the various agreements reached pertaining to contingency fees and common benefit funding.  I am not aware of any facts that would make me doubt the veracity of such representations.
>
> . . .
>
> Finally, in my experience, reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary part of reaching an agreement concerning overall allocation. This situation is no different. I, therefore, believe that the contingency fee and non-bankruptcy fee settlements documented in the Plan are fair, reasonable, appropriate and should be deemed to be an integral part of the Plan.[476]

321.    Moreover, the set-asides for the attorneys' fees for the contingency-fee plaintiffs' attorneys are a percentage of the distributions made to the claimants, as is customary in the tort

---

[476]  *See* Mediator's Report [Docket No. 4946] ¶¶ 13, 17.

system.   And, in accordance with the terms of the Opioid Settlement, the creditors whose recoveries are funding the Opioid Attorneys' Fees overwhelmingly voted in favor of the Plan.[477]

322.   Further, the Debtors will pay the Plan Fees only upon the occurrence of the Plan's Effective Date or will be allocated in accordance with the terms of the Plan which has been subject to a vote and review and objection deadline for the Plan.  Those impacted by these payments economically have not objected to them or the mechanics pursuant to which they will be paid.

323.   For the foregoing reasons, the Debtors submit that the Court should overrule the United States Trustee's argument that the payment of the Plan Fees violates the Bankruptcy Code.

## VII.   The Pension Trust Does Not Have Standing to Object to the Third-Party Releases.

324.   The Debtors respectfully request that the Court overrule the Pension Trust Objection because the Pension Trust lacks standing to (a) object to the Third-Party Releases on behalf of itself as it has already opted-out of such releases, and (b) opt-out of the Third-Party Releases or object to the Plan on behalf of the Strougo Plaintiffs.

### A.   The Pension Trust Does Not Have Standing to Object to the Third-Party Releases Because it Has Already Opted Out of Such Releases.

325.   The Court should overrule the Pension Trust's objections to the Third-Party Releases because the Pension Trust has already opted out of such releases and, therefore, its interests are unaffected by such releases.  "In the context of a confirmation hearing, creditors 'have standing *only* to challenge those parts of a reorganization plan that affect their direct interests.'"[478] "Where a party opts out of the non-debtor releases, the non-debtor releases do not affect their direct

---

[477]  *See, e.g.*, *Purdue*, 2021 WL 4240974 at *8.

[478]  *Indianapolis Downs*, 486 B.R. at 304 (emphasis in original) (quoting *In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989) (overruling objection to third-party releases because a creditor opted out and, thus, was no longer a releasing party)).

interests and, therefore, such party lacks the standing to object to the non-debtor releases."[479]  Here, the Pension Trust has already filed an Opt-Out Form on behalf of itself and, thus, is not a Releasing Party under the Plan.  Accordingly, the Pension Trust's interests are not affected by the Third-Party Releases and it does not have standing to object to them.

### B.    The Pension Trust Does Not Have Standing to Opt Out of the Third-Party Releases or Object to the Plan on Behalf of the Putative Class.

326.    The Pension Trust cannot opt out of the Third-Party Releases or object to the Plan on behalf of the Strougo Plaintiffs without first obtaining class certification from the Court.  A plaintiff generally lacks standing to assert the rights or interests of third parties.[480]  Parties seeking an exception from this general rule must do so by obtaining class certification pursuant to Fed. R. Civ. P. 23 ("*Rule 23*").[481]  The Pension Trust has not sought class certification from this Court as required.  Consequently, the Pension Trust Objection should be overruled and the submitted Pension Trust Opt-Out Form should be disregarded as to the other Strougo Plaintiffs.

327.    For the Pension Trust to be able opt out of the Third-Party Releases or object to the Plan on behalf of the Strougo Plaintiffs, it needed to have filed a motion to apply Rule 23 to its objection and Opt-Out Form that showed that it satisfied the requirements of Rule 23.[482]

328.    While the Third Circuit has not addressed the application of Rule 23 in the context of a plaintiff seeking to opt out of releases or object to a plan of reorganization on behalf of a putative class, other courts have held that the decision to apply such rule in this context falls within

---

[479] *In re Retail Group, Inc.*, 2021 WL 962553, *18 (Bankr. E.D. Va. 2021)); *see also In re Dynegy, Inc.*, 770 F.3d 1064, 1070 (2d Cir. 2014) (holding that named plaintiff did not have standing to object to non-debtor releases because he had personally opted out).

[480] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988)*; PWS Holdings*, 228 F.3d at 248.

[481] *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Dynegy*, 770 F.3d at 1068.

[482] *See Dynegy*, 770 F.3d at 1069; *Retail Group*, 2021 WL 863338, *6.

184

the discretion of the Court.[483] *Dynegy*,[484] for instance, is illustrative.  Similar to the facts here, the

debtor in *Dynegy* was a defendant in a pre-petition securities class action and the debtor's proposed

plan of reorganization "contained a binding release of non-debtor third parties—including the three

individual defendants in the securities class action—from liability unless a party opted out."[485]

Just like the Pension Trust here, the named plaintiff in *Dynegy* sought to opt out of and object to

the releases on behalf of the putative securities class.[486]  The Second Circuit held that the named

plaintiff's "failure to initiate class proceedings in compliance with the proper bankruptcy

procedures, despite having had more than two months to comply with the rules, rendered [him]

unable to represent a class that had never been designated by the bankruptcy court."[487]

329.    This Court took a similar approach when denying the Ad Hoc Acthar Group's and

City of Marietta's requests to file class proofs of claim.  At that time, the Court acknowledged that

"the proper procedure would be for claimants to first seek permission to file class proofs of claim

before filing those claims."[488]    The Court elaborated that "the burden of establishing class

certification is on the party seeking to assert class claims."[489]

330.    Based on the foregoing, the Pension Trust cannot opt out of the Third-Party

Releases or object to the Plan on behalf of the Strougo Plaintiffs without having initiated class

proceedings and obtaining class certification.  The Pension Trust had more than twelve months to

---

[483]  *See Dynegy*, 770 F.3d at 1069; *Retail Group*, 2021 WL 863338, *6.

[484]  770 F.3d 1064

[485]  *Id.* at 1066.

[486]  *Id.* at 1067.

[487]  *Id.* at 1069.

[488]  *Transcript of Zoom Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge* (June 29, 2021) (the "***Class Claim Ruling***"), 20:  17-19.

[489]  Class Claims Ruling, 20: 10-12.

do so while these Chapter 11 Cases have been ongoing.  Moreover, the Pension Trust received ample constructive notice that it needed to obtain class certification to act on behalf of the Strougo Plaintiffs:  (a) the Pension Trust's counsel first appeared in the Chapter 11 Cases on November 17, 2020, just over a month after the Petition Date;[490] (b) between April and June 2021, multiple parties filed briefs and the Court issued an opinion, all of which were served on the Pension Trust's counsel and addressed the allowance of class proofs of claim and, accordingly, the prerequisites for a party to seek authorization to represent a class in bankruptcy proceedings;[491] and (c) the Court held an evidentiary hearing on the issue on June 25, 2021 and gave its bench ruling on June 29, 2021 denying the class proofs of claim due to the lack of class certification.

331.    Any one of the foregoing events should have put the Pension Trust and its counsel on notice that it must seek permission of the Court before it can represent the interests of the Strougo Plaintiffs in these Chapter 11 Cases.  However, the Pension Trust has not taken such action and, once again, has failed to seek authority in the Pension Trust Objection or even explain why it should be allowed to exercise the rights of the other Strougo Plaintiffs.  Given that the Pension Trust had both ample opportunity to seek class certification and notice that it should do so but

---

[490] *Notice of Appearance, Request for Service of Papers, and Requests for Matrix Entry* [Docket No. 525], filed by Michael J. Joyce and Laurence May, Esq. as counsel to the Pension Trust.

[491] *See Debtors' Omnibus Objection to Class Proofs of Claim* [Docket No. 2164]; *Debtors' Objection to City of Marietta Class Proof of Claim* [Docket No. 2231]; *Response to Debtors' Objection to Class Proofs of Claim and Cross-Motion Under B.R. 7023* [Docket No. 2309]; *Memorandum of Law in Opposition to Debtors' Objection to Class Proof of Claim* [Docket No. 2539]; *Debtors' Omnibus Reply Brief in Support of the Omnibus Objection to Class Proofs of Claim and the Objection to City of Marietta Class Proof of Claim* [Docket No. 2965]; *Affidavit of Service of Jeff BloisseBaez of Debtors' Omnibus Objection to Class Proofs of Claim* [Docket No. 2221]; *Affidavit of Service of Linda Pham of Debtors' Objection to City of Marietta Class Proof of Claim* [Docket No. 2274].

186

failed to do so, the Debtors respectfully request that the Court deny the Pension Trust Objection in its entirety.[492]

## VIII.   The Allegations Raised by Darrel Edelman Do Not Render the Plan Unconfirmable.

332.     Shareholder Darrel Edelman has filed a number of pleadings seeking to have the Court confirm his right under Local Rule 3007-1 to file an omnibus claims objection to the opioid litigation claims listed on the Debtors' schedules of assets and liabilities (the "***Scheduled Opioid Claims***").[493]   The Debtors have previously briefed why Mr. Edelman's request, in actuality, constituted a challenge to the proposed treatment of Opioid Claims under the Plan and, therefore, an objection to the confirmation of the Plan itself.[494]   The Debtors have also previously briefed why the Scheduled Opioid Claims do not provide sufficient basis for a claims objection under Local Rule 3007-1.[495]  The Debtors will not repeat their arguments herein, however, in the Edelman Response, Mr. Edelman raises an additional argument that is worth addressing.  Specifically, Mr. Edelman asserts that section 502 of the Bankruptcy Code prohibits the Court from considering the

---

[492] Because the Pension Trust has not properly sought class certification pursuant to Rule 23, the Debtors submit that it is unnecessary to discuss the merits (or lack thereof) of such a request.  However, to the extent the Court permits the Pension Trust to argue application of Rule 23 would be appropriate in this case, the Debtors reserve all rights to object or otherwise respond to such a request.

[493] *See Motion of Darrel* Edelman*, A Party-In-Interest, for this Court to Authorize Objections to Any Claims Against The Debtor Under The Plain Language Of Local Rule 3007-1 Omnibus Objection To Claims, a Portion of Which has Been Modified in The Debtors' Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Plan (Docket 2917) Which Would Preclude Objections to Opioid Claims Contrary To Local Rule 3007-1* [Docket No. 4186] and *Response to Debtors' Cross-Motion and Objection to the Motion of Darrel Edelman to Authorize Objections to Certain Claims Against the Debtors* [Docket No. 4836] (the "***Edelman Response***").

[494] *See Debtors' Cross-Motion and Objection to the Motion of Darrel Edelman to Authorize Objections to Certain Claims Against the Debtors* [Docket No. 4593].  Mr. Edelman has not disputed going forward on his pleadings at the Confirmation Hearing.  *See* Edelman Response ¶ 29.

[495] Edelman Response ¶ 5-14.

Opioid Settlement under Bankruptcy Rule 9019 because, as a party-in-interest, his rights will be modified by the Opioid Settlement.[496]

333.    The Debtors dispute Mr. Edelman's assertions.    *First*, section 502 of the Bankruptcy Code is inapplicable because the plain language of that section requires that a valid claim must first be filed (or deemed filed) in order for a party in interest to object under that provision.[497]    Mr. Edelman admits as much in his response, stating, "[i]f a party objects ***to a claim***, then §502 provides that the court 'shall determine' the amount of the claim and 'shall allow' the claim in the determined amount."[498]    There are no filed proofs of with respect to the Opioid Claims in these Chapter 11 Cases, the Scheduled Opioid Claims cannot be "deemed filed" under the Bankruptcy Code, and the Mr. Edelman has not filed a claims objection – in fact he is now seeking confirmation of the right to file one.[499]    Accordingly, Mr. Edelman cannot invoke section 502 of the Bankruptcy Code at this point in time.

334.    *Second*, nothing in the case law mandates that the Debtors must seek a hearing on the merits of a claims objection before a hearing on a settlement settling such claims.    Indeed, courts have held that the requirements of section 502(b) are satisfied by a hearing with respect to a settlement under Bankruptcy Rule 9019, and that the two provisions are not in conflict.[500]    For

---

[496]    Edelman Response ¶ 5.

[497]    *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."); *see also In re Allegheny Intern.*, Inc., 954 F.2d 167, 173 (3d Cir. 1992) ("The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim.").

[498]    Edelman Response ¶ 5 (emphasis added).

[499]    Edelman Response ¶ 2.

[500]    *See, e.g., In re DVR, LLC*, 582 B.R. 507, 512 (Bankr. D. Colo. 2018) ("this Court does not read the phrase 'shall determine the amount' in § 502(b) as precluding a settlement.  If parties settle a claim objection by agreeing that a creditor will have a claim in a certain amount, and the court, after applying the Rule 9019 standard, approves the settlement, then it has 'determined' and 'allowed' the claim."); *Law Debenture Tr. Comp. v. Kaiser Aluminum*

188

example, in *In re Kaiser Aluminum Corp.*, the Bankruptcy Court held that, there is no justification for reading section 502 to require a hearing on the merits of a claims objection before a hearing on a settlement, and that doing so, would "undermine the important policy of promoting settlements in bankruptcy proceedings by requiring the parties to litigate the very issues that the settlement seeks to resolve."[501]

335.    Furthermore, the two cases cited in the Edelman Response are inapplicable because they both involved settlements that would have directly affected the objecting creditor's lien rights. Specifically, in *In re C.S. Mining, LLC*, the court refused to allow the trustee to settle an objection (filed long before the settlement) by a secured creditor against another secured creditor that sought to enforce an intercreditor agreement.[502]    The settlement, if approved, would have directly "compromised the objector's contractual lien rights under [this] inter-creditor agreement."[503] Similarly, in *In re C.P. Hall Co.*, the objecting creditor filed an adversary proceeding asserting a lien on certain insurance proceeds and challenging other creditors' asserted liens on the proceeds.[504] Afterwards, the trustee entered into a settlement with the defendant creditors that provided for the immediate payment to the defendant creditors out of the same insurance proceeds, and the court refused to approve the settlement without deciding the adversary proceeding.[505]

---

*Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 96 (D. Del. 2006) (finding no conflict between section 502 and Rule 9019); *In re Heritage Org., LLC*, 375 B.R. 230, 285 (Bankr N.D. Tex. 2007) ("Like the *Kaiser* court, this Court believes that the better way to harmonize § 502 and Rule 9019 is to read the 'notice and a hearing' requirement of Rule 9019 as satisfying the right to be heard with respect to a claim objection."); *RWNIH-DL 122nd St. 1 LLC v. Futterman (In re Futterman)*, 2019 Bankr. LEXIS 1872, *12-13 (Bankr. S.D.N.Y. Jun. 20, 2019) (allowing trustee to settle objection filed by creditor); *Prin Corp. v. Altman (In re Altman)*, 265 B.R. 652, 659 (Bankr. D. Conn. 2001) (approving a proposed settlement between the chapter 11 trustee and a creditor resolving the creditor's proof of claim, where the chapter 11 debtor had objected to the claim).

[501] 339 B.R. at 94 (internal citations and quotations omitted).

[502] 574 B.R. 259, 281-82 (Bankr. D. Utah 2017).

[503] *DVR*, 582 B.R. at 513 (explaining *CS Mining*).

[504] 513 B.R. 540 (Bankr. N.D. Ill. 2014).

[505] *Id.* at 545-46.

Here, Mr. Edelman has no lien rights let alone any rights to *any* recovery under the Plan, and he has not demonstrated to the contrary.

336.    The law is clear:  the Debtors can enter into settlements with their creditors under Bankruptcy Rule 9019, and creditors or other parties in interest cannot derail the settlement by seeking to interpose their own objections and insisting that those objections be heard before settlement approval.  Indeed, "to hold otherwise, would permit a creditor to hold the estate hostage to protracted litigation"[506] and lead to a preposterous result.[507]  In *In re Heritage Org., L.L.C.* the Bankruptcy Court realized the implication of such a ruling stating:

> Taken to its logical conclusion, the […] argument that § 502 confers not only a right to object to a claim but also a right to a ruling would mean that the Court could *never* permit a settlement of a claim objection—the Court would be required to deny the compromise and rule upon the merits, even though both the claimant and the objectant desired a different result.  In other words [. . .] the Trustee could not, even in the absence of opposition, compromise *his own* claim objection.  Yet courts routinely permit settlements of claim objections.

337.    The Debtors, "as fiduciar[ies] under the Code, [have] the duty to all creditors to resolve claims in the best interest of the estate,"[508] and by putting forth the Plan, the Debtors have done so.

*[Remainder of page intentionally left blank.]*

---

[506] *DVR*, 582 B.R. at 521.

[507] *Heritage Org.*, 375 B.R. at 285.

[508]  *Id.*

190

## **CONCLUSION**

For the reasons set forth herein, the Debtors submit that the Plan fully satisfies all requirements of the Bankruptcy Code and respectfully request that the Court confirm the Plan.

Dated:  October 26, 2021

/s/ Michael J. Merchant

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:                collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:
        george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com
                anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:    jeff.bjork@lw.com

- and -

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:                jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

191