**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Mallinckrodt PLC, *et al.*, | ) | No. 20-12522 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Docket No. 4718** |

**AUXILIARY AD HOC GROUP OF HOSPITALS' REPLY
TO THE OBJECTION OF THE UNITED STATES TRUSTEE
TO FIRST AMENDED JOINT PLAN
OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES**

The Auxiliary Ad Hoc Group of Hospitals (the "Hospital Group" or the "Hospitals")

submits this reply ("Reply") to the United States Trustee's Objection to Confirmation of the First

Amended Joint Plan of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the

Bankruptcy Code (the "UST Objection") [D.I. 4718], in particular "Argument F ("The Plan

Provision of Payment of Indenture Trustee Fees and other non-estate Professionals Does not

Comply with Section 503 of the Bankruptcy Code")[2] at pages 32-40 thereof.  In support, the

Hospitals incorporate the declaration of Don Barrett (Exhibit "1"), as well as the (final) Mediator's

Report [D.I. 4946] and state as follows:

---

[1]A complete list of the Debtors in these chapter 11 cases is available on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] UST Objection at 32-37. The Hospitals take no position regarding indenture trustee legal fees.

## I.  Summary of Argument

1.      The UST Objection misses the mark in part F[3] of its Objection when criticizing "the payment of the fees and expenses of the…professionals retained by various private claimants and public opioid claimants" under Article IV.X. 8 and 9 of the Plan, without complying with Section 503(b) of the Code.  The UST misapprehends the fee provisions and its objection is, therefore, misplaced.  As described in more detail below, the Plan is essentially the vehicle for implementing a whole series of good-faith, hard-fought, interdependent and closely integrated settlements.  Notably, and perhaps not fully acknowledged by the UST,  because the fees and expenses being paid to the Hospitals' counsel are coming from creditor distributions and not the estate, and paid out over the course of many years, as distributions are received by the Hospital Trust, Section 503(b) is simply inapposite, while Section 1129(a)(4), if applicable, is easily satisfied.[4] In short, under any standard, the contemplated fees and expenses are both eminently reasonable and cannot be severed from the overall settlements reflected in the Plan.

---

[3] The other portions of the UST Objection are devoted to critiques of the Plan as it relates to the third-party releases and other supposed infirmities; the Hospitals are relying on the Debtors, the Committee and other stakeholders to address those other portions of the UST Objections

[4] In our Argument herein, we focus on section 1129(a)(4).  The UST Objection's discussion of section 503(b)(4) relies solely on *In re Lehman Bros. Holdings, Inc.,* 508 B.R. 283, 289 (S.D.N.Y. 2014), which is an outlier case, contrary to the case law addressing a Court's ability to approve fees in the context of a plan of reorganization. Unlike in this case, the fees at issue in *Lehman* were not determined through a court order as part of a global plan settlement, but instead were those of committee member professionals, whose fees are otherwise not permitted to be paid (absent a substantial contribution) under the Bankruptcy Code. The UST Objection also fails to mention that this same argument was soundly rejected in the *Purdue Pharma* confirmation proceedings just a few weeks ago.

## II.    <u>Argument</u>

**A.  The Mallinckrodt Plan Provides For The Fees Of The Hospitals' Counsel To Be Paid Out Of Class 9(d) Abatement Distributions, <u>Not</u> Paid Directly By The Debtor Or Plan Proponent, So Bankruptcy Code Section 1129(a)(4) Is Inapplicable, Particularly Where The Plan Incorporates Complex, Interwoven And Non-Severable Settlements.**

2.       Courts that have considered the applicability of Bankruptcy Code section 1129(a)(4) have drawn a distinction between (i) non-estate compensated professional fees payable directly by the debtor or a plan proponent and (ii) non-estate compensated professional fees payable out of creditor distributions.  Bankruptcy Code section 1129(a)(4) does not apply to the latter.

3.       Bankruptcy Code section 1129(a)(4) provides that the court shall confirm a plan only if "any payment made or to be made *by the proponent, by the debtor*, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case . . . has been approved by, or is subject to the approval of, the court *as reasonable*."  11 U.S.C. § 1129(a)(4) (emphasis added).

4.       Consistent with the express language of Bankruptcy Code section 1129(a)(4), courts have held that this provision requires "all payments of professional fees that are made *from estate assets* be subject to review and approval as to their reasonableness by the Court."  *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at \*159 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added) (citing *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Ditech Holding Corp.*, 606 B.R. 544, 574 (Bankr. S.D.N.Y. 2019) ("Pursuant to [Bankruptcy Code section 1129(a)(4)], first there must be disclosure of the proposed payment, second the court must approve the reasonableness of payments.").

5.       In *Johns-Manville*, the bankruptcy court concluded that Bankruptcy Code section 1129(a)(4) does <u>not</u> apply to a plan provision that provided for payment of asbestos claimants'

professional fees because such fees would be paid out of plan distributions on such claimants' allowed claims. *Matter of Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986). Specifically, the court held that it did not have jurisdiction to rule on the propriety of fee arrangements between tort claimants and their attorneys, noting that such fee arrangements did not "effect the administration of the Debtor's estate" and were "immaterial to these reorganization proceedings." *Id.* at 632.

6.      Other cases in which courts have found Bankruptcy Code section 1129(a)(4) applicable to plan provisions providing for the payment on non-estate professional fees have focused on the fact that the contemplated fees would be paid directly by the debtor or a plan proponent.   For example, in *TCI 2 Holdings*, the U.S. Trustee objected to a plan provision that required the debtors to pay the fees and expenses of an ad hoc committee of second lien noteholders, the second lien indenture trustee and the backstop parties, all without application by or on behalf of any such parties, and without notice and a hearing.  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145-46, 2010 Bankr. LEXIS 1169, at *55-57 (Bankr. D.N.J. Apr. 12, 2010).  The bankruptcy court refused to approve this provision, noting that approval of such fees would require disclosure and court approval under Bankruptcy Code section 1129(a)(4), and further held that the advisors seeking such fees would be required to apply for payment of their fees and expenses under Bankruptcy Code section 503(b).  *Id.*

7.      Accordingly, in this case, given the Plan's structure, and the fact that the legal fees in question are being paid from creditor distributions for a dedicated trust, the Court should conclude that Bankruptcy Code section 1129(a)(4) simply does not apply.

**B. If This Court Determines That Fees Contemplated To Be Paid To Non-Estate Professionals Must Satisfy Bankruptcy Code Section 1129(A)(4), The Hospitals Have Established That Such Payments Meet The Reasonableness Standard.**

      **(1) Relevant Case Law Supports Class 9(d)'S Conformity With Plan Requirements And The Reasonableness Of The Fees.**

8.      Courts have noted that the reasonableness inquiry is open-ended and involves consideration of the particular facts and circumstances of the case.  Courts generally review submissions from the party seeking reimbursement -- which may include disclosure of the amount of compensation sought and a description of the services provided (with varying levels of detail) -- and a declaration or other submission from the debtor or plan proponent in support of the reasonableness of the fees at issue.

9.      Most courts have agreed with the Fifth Circuit's statement in *Cajun Electric*, stating in pertinent part:

> [t]he determination whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments. . . .  [T]he issue of reasonableness will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.  In the typical case, payments that are not payable from, or reimbursable by, the bankruptcy estate should not engender anything like the judicial scrutiny devoted to those that are payable out of the bankruptcy estate . . . Bankruptcy courts . . . should be chary about succumbing to the exhortations of litigants to turn 1129(a)(4) into a mandate for an expensive and unnecessary inquiry. *In re Journal Register Co.*, 407 B.R. 520, 537-38 (internal quotations omitted) (approving post-emergence incentive plan for certain of the debtors' employees).

10.      There exists a wide range of inquiry with respect to the showing courts require in assessing the reasonableness of non-estate compensated professional fees requested under a plan pursuant to Bankruptcy Code section 1129(a)(4), depending primarily on whether any party objected to the fee provisions in question.  Perhaps not surprisingly, in cases where a plan's fee provisions were fully consensual, courts seem to require a less comprehensive showing than in

cases where parties objected to payment of fees. In cases where a party objected to the fee provisions, courts appear to require, at minimum, disclosure of the amount of fees requested and explanation of the services provided in connection with the requested fees, all of which is addressed below.

11.    In *In re Adelphia Communs. Corp.*, the bankruptcy court concluded that (i) payment of an ad hoc group's professional fees pursuant to a chapter 11 plan is permissible so long as the fees are reasonable and the plan provision is not inconsistent with the Bankruptcy Code, and (ii) the reasonableness requirement prohibits payment of fees incurred in connection with certain inappropriate conduct. *In re Adelphia Commc'ns Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010). In *Adelphia*, the chapter 11 plan incorporated a global settlement that resolved a highly contentious, protracted intercreditor dispute and that provided, among other things, for payment ***from the debtors' estates*** of the non-estate professional fees for fourteen ad hoc committees and certain individual creditors (collectively, the "Adelphia Applicants").

12.    After the plan was confirmed and the effective date occurred, the Adelphia Applicants filed fee applications seeking reimbursement for approximately $88 million in fees, and the U.S. Trustee objected on the grounds that such fees are permissible only as administrative expense claims that comply with Bankruptcy Code section 503(b) and that the Adelphia Applicants' fees were unreasonable. *Id.* at 11. Overruling the first part of the U.S. Trustee's objection, the bankruptcy court concluded that reasonable fees may be recovered under Bankruptcy Code section 1129(a)(4) without satisfying the requirements set forth in Bankruptcy Code section 503(b)(3) or (4). *Id.* at 19.

**(2) The Litigation History Of The Hospitals And Their Counsel Further Supports The Appropriateness Of The Fees.[5]**

13.    The advent of healthcare data, specifically the uniform coding and maintenance of patient claims data, brought change to healthcare operations. As expected, diagnoses and treatment data permits healthcare professionals to identify trends. In particular, as a consequence of their mission, their patient volume and the Emergency Medical Treatment and Labor Act ("EMTALA"), hospitals uniquely acquire insights concerning their patient population and the costs associated with their treatment of patients.

14.    When there is a pandemic or an epidemic, like the opioid crisis, hospitals can utilize their massive data warehouse to objectively isolate factors that quantify the impact on hospitals and the communities they serve.  Of course, the processes and resources associated with making the data accessible and reliable for conducting such medical and "social autopsies" are intense and, for many, prohibitive, in terms of time, people, technology and expense. Counsel for the Hospital Group undertook that resource-intensive process.

15.    Significantly, Acute Care Hospitals were deep in the trenches of our country's opioid crisis. Indeed, when others could decline services or assistance to those who struggled with dependence on the offending pills, EMTALA obligated Acute Care Hospitals to accept and treat any and all patients, most significantly, those who suffered Opioid Use Disorder ("OUD"). Acute Care Hospitals effectively became ground zero for the overdosed patients, for pill-seeking patients including those who appeared otherwise functional, and for patients admitted for diagnoses most typically associated with opioid use.

---

[5] (See Decl. of Barrett, Ex. 1).

16.     Equally significant, Acute Care Hospitals were the front-line infrastructure in the fallout from the opioid crises, providing the clinical and support staff, professional services, equipment, programming, and support necessary for essentially all medical treatment. They were steady and reliable anchors in their communities.

17.     Eventually, the burden of the opioid crisis was overwhelming hospitals, as reflected in staff burnout, increased security needs and lost revenue attributable to the increased complexity, frequency and cost associated with treating OUD patients.

18.     Accordingly, though generally litigation-averse, so bad had conditions become, that hospitals sought the assistance of counsel for the purpose of asserting claims against manufacturers (including these Debtors) and distributors. Hospitals stepped out as leaders in securing relief for treatment providers.

19.     In the pre-litigation phase, the Hospitals conducted extensive research for the purpose of identifying viable causes of action. For example, counsel invested in data infrastructure (hardware and software) for the purpose of securely obtaining and maintaining the extensive claims data that served as the objective starting point for supporting the allegations against the Debtors.

20.     From the onset, the Hospitals engaged clinical experts to narrow relevant diagnoses and treatment codes, and engaged the chiefs of its various hospital-clients' clinical departments, including physicians and staff in emergency medicine, cardiology, nursing, critical care, psychiatry, addiction, obstetrics, the ICU and NICU, pharmacy and the Hospitals' IT staff. With this expertise assembled early on, in 2017, 2018 and 2019 (all pre-pandemic), the Hospital Group spent months each year (traveling weeks at a time) to meet with Hospitals for the purpose of correlating the first-hand clinical experience surrounding the opioid crisis with highly focused data

analyses. Unique to the Hospitals' cases, they isolated actual prescriptions for the various products, including those specifically manufactured by the Debtors. Thousands of hours were spent with representatives of a very substantial majority of the approximately 950 hospitals contractually represented by the Hospitals.

21.    After amassing and securing healthcare data and firsthand clinical and operational context, the Hospitals engaged the nation's foremost authority on the Racketeer Influenced and Corrupt Organization Act ("RICO"), University of Notre Dame Professor G. Robert Blakey and, with his disciplined expertise, prepared and filed the pleadings that constitute the basis for the several dozens of cases initiated against the Debtors (and now pending) in the Multi District Litigation (MDL No. 2804) and in many jurisdictions across the country.

22.    Once the litigation started, in support of the Hospitals' claims, they engaged in coordinated discovery across several states, engaging dozens of its attorneys in the review and coding of various production sets; assisted in the document review in the MDL (where Don Barrett, on behalf of the Hospitals, had ultimately been appointed to the Plaintiffs' Executive Committee by Judge Polster); conducted separate collection, review and coding of Hospital-specific discovery in response to discovery requests; and retained consulting experts in healthcare analytics, damages modeling, statistics, abatement planning, economics, addiction, critical care and trauma medicine, standard of care, pharmaceutical marketing and diversion.

23.    Importantly, in the course of discovery, the Hospitals were able to isolate the various products by manufacturer and distributor, determine the pill volume circulating in the service areas of the various hospitals and locate actual prescriptions, by pill brand, for virtually every OUD patient encounter at the various hospitals represented by the Hospitals. They then replicated and refined the process so that no uncertainty existed as to either causation or damages.

From 2017 to present, thousands of hours have been dedicated to the collection, processing, analysis and storage of some 2.79 terabytes of patient data. Doubtlessly, the Hospitals' data compiled in this litigation represents an exceedingly rare, if not historic, dataset.

24.    Once refined, other counsel for other hospitals reached out for assistance. The Hospitals expended significant resources, in terms of people, time and money, assisting other hospitals and their counsel with analyses of their data. Members of Class 9(d), and members of other groups inquiring, as well, were accommodated with analysis of their respective clients' data. There was no charge to the requestors at the time of analysis, because it was understood (as customary with analogous class allegations) that, if successful, the compensation for work that benefitted others who were not participating in litigation, would be reconciled in the context of disbursements.

25.    The Purdue Pharma and Mallinckrodt bankruptcy proceedings posed further opportunities for the Hospitals to advocate for healthcare's burden suffered in the crisis and their prominent role in abatement strategies. Though confident in their claims and their evidence, the Hospitals were not simply designated an allocation of proceeds from the Debtors' estates; nor was an allocation presumed. Instead, the Hospitals quickly mobilized to share their facts and evidence in support of a hospital-specific allocation. One consequence of that effort was the designation of the Hospitals, through its counsel Don Barrett, as a "Mediation Party."

26.    Tirelessly, Don Barrett, with his co-counsel, worked through several months of mediation and adversarial proceedings to ensure a meaningful allocation for all Acute Care Hospitals and holders of Class 9(d) Claims.  Though there was agreement amongst nearly all participants to the Hospital mediation that Acute Care Hospitals constituted anchors in their communities that were best-positioned to deliver abatement services, there was not immediate

consensus on the necessity and import of designating a specific trust for Class 9(d). Over many months, in phases, the Hospitals demonstrated their evidence in support of that necessity. The Hospitals presented experts, data and clinically-based abatement plan proposals.

27.     Throughout the proceedings, the Hospitals provided multiple demonstrations of the data and Trust Distribution Procedures, and permitted regularly scheduled access to its expert, William Legier. Further, the Hospitals championed the significance of the amassed OUD claims data and the value of its objectivity. They continued to coordinate with the clinical expertise and real experience of their clients, as well as their consulting experts.

28.     The mediation was extensive, rigorous and adversarial. The Hospitals' role in abating the crisis was expected to be expansive, but the recovery was not sufficient to satisfy the demands placed on Hospitals as a result of the crisis and the implications of EMTALA. At every turn, the Hospitals were challenged and the Hospital Group rose to those challenges with their supporting data. The Hospital Group withstood and leaned into the scrutiny with the strength of its objective evidence. For that reason, Class 9(d) will receive an allocation of 3.57% .

29.     The Hospitals have made themselves available to all Holders of Class 9(d) Claims. The Hospitals have worked diligently with the Debtors and the governmental entities to cohesively resolve all disputes that arose during the proceedings.

30.     As to the Hospital Group's fees, Article IV.X. 8 and 9 of the Plan, which is a product of the mediation, is reasonable, fair, and more than justified in light of the history of the Hospital litigation; the Hospitals' case work-up, including the development of objective and statistically reliable evidence that demonstrated the specific impact of opioids in the treatment provider context; as well as the service, accessibility and, ultimately, benefit provided by the Hospital Group to the Holders of Class 9(d) Claims.

**(3) The 20% Contingent Fee (Essentially Reduced To 15% By Means Of The Common Benefit Fund) (a) Is At The Low End Of The Spectrum Of Contingency Fees, Whether In Bankruptcy Cases Or Otherwise; And (b) Was Disclosed To And Approved By Class 9(d) Creditors**

31.     The proposed fees in Class 9(d) are well within the realm of reasonableness for class action-type cases and the typical attorneys' fee awards in larger cases.  There are numerous recent cases holding that larger awards are reasonable.  <u>See</u>, <u>e.g.</u>, *Stinson v. City of New York*, 256 F. Supp. 3d 283 (S.D.N.Y. 2017) (awarding 24.6% of a $56.5 million settlement fund in attorneys' fees); <u>see</u> <u>also</u> *Mediator Report* [D.I. 4946] at ¶¶14-15.  Additionally, given all the work that preceded this chapter 11 filing, the 15% fee is easily supported by the factors the Court might otherwise consider in a lodestar fee application.  <u>See</u>, <u>e.g.</u>, *In re Busy Beaver Bldg Centers, Inc*., 19 F.3d 833 (3d Cir. 1994)

32.     Moreover, the UST Objection entirely overlooks the fact that <u>*all*</u> of the attorney fee provisions set forth in the Plan, including the fees in Class 9(d), were integral parts of a global plan settlement that was the product of numerous mediations and other negotiations among the Debtors, the Hospitals and the numerous private and public parties-in-interest.  Additionally, while the results of balloting are incomplete, upon information and belief, Class 9(d) overwhelmingly voted to accept the Plan, after full and complete disclosure of the attorney fee provisions.

**(4) The Mediator's Statement Confirms Both The Reasonableness Of The Fees And The Fact That This Issue Is An Integral Part Of A Non-Severable Agreement**

33.     Since the commencement of this chapter 11 case, and even before, with the assistance of the Mediators, as well as in other discussions, the Hospitals' counsel have participated in numerous conference calls and Zoom sessions aimed at resolving the issue of legal fees for Class 9(d) counsel.

12

34.     That resolution is the result of good-faith, arms'-length discussions and mediations. At the conclusion of these negotiations and discussions, compromises and settlements were reached between and among all parties, regarding all of the fee-related issues. The various fee resolutions described in Article IV.X. 8 and 9 of the Plan and elsewhere are an integral and non-severable part of the overall settlements on allocation among public and private claimants, and the settlements reached on allocation are dependent on the various agreements reached pertaining to contingency fees and common benefit funding.

37.     The Mediators' Report [D.I. 4946 at ¶¶12-18] confirms that the legal fee resolutions are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement based on the work engaged in by all mediation participants; the private side group counsel fee settlements, reached between the Ad Hoc Group of Hospitals and the public entity creditors, are consistent with similar mass tort situations where certain contingency fee counsel assume the responsibility of negotiating awards for a much larger group of constituents, after engaging in years of pre-settlement work; the percentages agreed upon in this matter are well within, if not at the lower end of, the range for comparable situations and that reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary part of reaching an agreement concerning overall allocation; and the fee settlements documented in the Plan are fair, reasonable, appropriate, and should be deemed to be an integral part of the Plan.

38.     Bankruptcy Rule 9019(a) provides that, "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In determining whether to approve a settlement as fair and equitable under Bankrupt Rule 9019, courts in the Third Circuit consider four criteria: (a) the probability of success in litigation, (2) the likely difficulties in

collection, (3) the complexity of litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. See *In re Martin, 91 F.3d 389* (3d Cir. 1996). In other words, the Court must find that the settlement is above the lowest threshold of reasonableness, which is surely the case here.

39.     At this point in this case, it is widely accepted, and effectively self-evident, that the Plan, and all of the settlements embodied therein, including the resolution of Class 9(d) legal fees, represent a fair and equitable compromise that is in the best interest of the Debtors' estates and creditors, falls well within the range of reasonableness, and satisfies each of the relevant *Martin* factors.

WHEREFORE, the Hospitals request that the UST Objection be overruled and that the Court grant such other and further relief as it deems proper.

Dated: October 26, 2021
       Wilmington, DE

SULLIVAN · HAZELTINE · ALLINSON LLC

*/s/  E.E. Allinson III*
Elihu E. Allinson, III, Esq. (DE 3476)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: zallinson@sha-llc.com

and

Michael P. O'Neil (*Pro Hac Vice* Motion Forthcoming)
**TAFT STETTINIUS & HOLLISTER LLP**
One Indiana Square Suite 3500
Indianapolis, IN  46204
Tel: (317) 713-3561
Fax: (317) 713-3699
Email: moneil@taftlaw.com

*Counsel for Auxiliary Ad Hoc Group of Hospitals*[6]

---

[6] Group listing attached as Exhibit 2.