IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br>**Obj. Deadline: TBD** |

### AD HOC ACTHAR GROUP'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER AND TO DESIGNATE BALLOTS

The Ad Hoc Acthar Group[2] (the "AHAG"), by and through its undersigned counsel, files

this Motion for entry of an order directing the appointment of an examiner pursuant to 11 U.S.C.

1104(c) ("Motion to Appoint Examiner"). While this bankruptcy case is replete with questions

about the decisions and management of these debtors-in-possession,[3] the AHAG submits that

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. *See* Debtors' Supplemental Motion for Injunctive Relief Pursuant to 11 U.S.C. § 105 at 1, n.1.

[2] The "Ad Hoc Acthar Group" consists of the following: the City of Rockford ("Rockford"), Steamfitters Local Union No. 420 ("Steamfitters Local 420"), the International Union of Operating Engineers Local 542 ("Local 542"), United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("Plumbers Local 322") and Acument Global Technologies ("Acument"), individually and on behalf of the classes of third party payors ("TPPs") and their beneficiaries that Rockford, Steamfitters Local 420 and Plumbers Local 322 seek to represent in their respective cases currently pending in federal district courts in the Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey, respectively.

[3] Previously, the AHAG filed a Motion for Appointment of a Trustee to address the serious issue of, *inter alia*, runaway ordinary course professional fees (D.I. 1241), which issue is presently on appeal, with the United States Trustee participating as an amicus, including and especially those of Arnold & Porter (presently the subject of a Motion for Contempt for its questionable, unethical discovery practices) (D.I. 3939 at Ex. A thereto). The Motion to Appoint Trustee was renewed on May 17, 2021 (D.I. 2358), raising additional issues of concern. Because the Court deferred ruling on the Trustee Motion until Plan confirmation, it was withdrawn. The Court also put off any hearing on the Arnold & Porter Motion until

1

there exists a significant issue that may or may not give rise to breaches of fiduciary duty, and concerns (a) the asbestos claimants, their proofs of claim, their voting rights and the claims process (hereinafter the "Bevan Situation") and the Debtors' and the UCC's refusal to investigate (despite being asked by the AHAG to do so), and (b) the UCC and the Debtor parsing out the funds in the GUC trust not based upon claim amount but based upon some other, undisclosed process for which each refuses to produce relevant discovery under the cloak of misinterpreted and misapplied privileges.

To be clear, these are also confirmation objections; however, the failure of the fiduciaries of the estate (the Debtors and the UCC) to investigate frivolous proofs of claim (under the clear standards this Court has laid down), or scheduled claims for which there is no basis or for which there is a potential double recovery for creditors who sit on the UCC and have been allocated a larger share of the GUC trust than their claims warrant, requires an examiner to be appointed. Such independent examiner is needed to investigate and report on a preliminary basis whether further investigation is warranted as to any potential violations and breaches of fiduciary duties by any professionals compensated with estate funds through their "acts" or "omissions" enabling and/or facilitating the below-described Bevan Situation should it be found to be violative of the Bankruptcy Code and rules, including the overarching policy of transparency. Moreover, given the multiple, substantive amendments made to the proposed Plan of Reorganization since the solicitation version was filed and served, and the unilateral control over the scheduling of the plan confirmation process by the Debtors and their "supporters", an examiner is needed to

---

after Plan confirmation. The issues identified in the Trustee Motions and Arnold & Porter Motion provide important context to the instant Motion, as "what's past is prologue". Wm. Shakespeare, *The Tempest*, Act 2, Sc. 1.

analyze and determine if re-solicitation is necessary to maintain the integrity of the plan confirmation process in these cases.

An examiner is the appropriate neutral to sort out these issues on an expedited basis.[4] Further, given the discovery taken to date by the AHAG and others, the claims of all the asbestos claimants have questionable validity. The ballots submitted by asbestos claimants have raised issues of validity, authority and amount. The Debtors and the UCC have completely failed to investigate the validity of the asbestos claims,[5] despite being explicitly asked to do so by the movants. As a result, this Court should designate and strike all ballots submitted by asbestos claimants under 11 U.S.C. Sec. 1126(e), as President Judge Silverstein did last month in *Imerys* where the same asbestos claimants filed the same, frivolous claims and voted in favor of the Plan or Reorganization, while the same Debtors' counsel and counsel to the Committee of Personal Injury Claimants sat by and refused to investigate or act. *See* October 13, 2021 Opinion in *In re Imerys* (attached hereto as **Exhibit "B"**).

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. §1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. §§

---

[4] As the Hon. Chief Judge Silverstein noted in *Imersys* and involving similar issues as the Bevan Situation here, "…[a]nd I don't know how that works into this 3018 and designation issue, but it's opened, I would think, somewhat of a Pandora's box for the Plaintiffs' bar that you've put all of this in front of me. *See* September 21, 2021 *Imerys* Hrg. Tr. at p. 205, line 20 (at **Exhibit "A"** hereto). With the conduct of the deposition of Thomas Bevan in this case yesterday, this issue is now ripe in this case and should be investigated by a neutral other than the Debtors and the UCC who refuse to do so.

[5] There is no question that the Debtors and the UCC have selectively target the AHAG and AIC for objections. The asbestos claimants have filed proofs of claim which contain nothing more than lists of names of people with no description of the bases for the claims, no attached pleadings demonstrating any Debtor has been sued, no stated amounts for the claims, and no factual support or evidence that any Debtor is responsible for anything. If this Court were to apply the standards on class claims and claims substantiation which it applied to the claims filed by AHAG and the AIC, those asbestos claims and the corresponding votes would be disallowed and expunged, as they were in *Imerys*.

157(a) and (b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

## RELIEF REQUESTED

2. The AHAG seeks an order from this Court:

a. Directing the Office of the United States Trust to appoint an examiner pursuant to 11 U.S.C. § 1104(c).

b. The Examiner shall[6]: (a) investigate and report on a preliminary basis within twenty (20) days from appointment whether (i) further investigation is warranted as to any potential violations and breaches of fiduciary duties by any professionals compensated with estate funds, including those compensated outside of a plan, the formal fee application process or substantial contribution process, enabling through their "acts" or "omissions" the alleged Bevan Situation (as hereinafter described) should it be found to be violative of the Bankruptcy Code and rules, including the overarching policy of transparency; (ii) re-solicitation of the operative proposed Amended Plan for voting is required given the multiple substantive amendments proffered since the solicitation version was served; and (iii) the facially invalid claims filed by clients represented by Bevan & Associates and other law firms (*i.e.* asbestos claimants) at the behest of UCC counsel, and the votes cast in connection therewith at the invitation and direction of the same UCC counsel, detrimentally impact the claims and plan process precluding confirmation of the Amended Plan as presently proposed; and (b) otherwise perform the duties of an examiner set forth in Section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code (collectively the "Investigation"). The scope and conduct of the Investigation and the Examiner's budget shall

---

[6] This relief is taken from this Court's Order granting the U.S. Trustee's Motion to Appoint an Examiner in the matter of *In re: Cred Inc., et al., Case No. 20-12836* (Docket No. 281), which is attached hereto as **Exhibit "C".**

4

be further detailed in the Examiner's work plan, and the rights of parties in interest to be heard with respect to the work plan are fully reserved.

c. The Debtors and the UCC (including its members, their proxies, and its professionals) shall cooperate fully with the Examiner in the performance of any of the Examiner's duties and the Investigation, and the Debtors and the UCC shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, duplication of, or delay in the Investigation.

d. In connection with discharging its fiduciary obligations, the UCC may (with the Examiner's consent or, alternatively, by order of this Court after notice is given) participate in the Examiner's investigation in a limited capacity, including: (i) attending interviews and depositions conducted by the Examiner (with a maximum of one UCC professional permitted to attend); and (ii) receive status updates from the Examiner.

e. The Debtors and the UCC shall provide to the Examiner all non-privileged documents and information within their possession that the Examiner deems relevant to perform the Investigation. If the Examiner seeks the disclosure of documents or information as to which the Debtors assert a claim of privilege, or otherwise objects to disclosing, including on the basis that the request is beyond the scope of the Investigation, and the Examiner and the Debtors are unable to reach a resolution on whether or on what terms such documents or information should be disclosed to the Examiner, the matter may be brought before the Court for resolution.

f. The Examiner shall cooperate fully with any governmental agencies (such cooperation shall not be deemed a public disclosure as referenced above) including, but not limited to, any federal, state or local government agency that may be investigating the Debtors, its management or its financial condition, and the Examiner shall use best efforts to coordinate

with such agencies in order to avoid unnecessary interference with, or duplication of, any investigations conducted by such agencies.

       g.      Before commencing the Investigation, the Examiner shall meet and confer with representatives from the UCC, the Debtors, and any other party that the Examiner deems appropriate to discuss the Investigation.

       h.      Within seven (7) business days after entry of the order approving the appointment of the Examiner is entered on the docket in these cases, the Examiner shall propose a work plan and shall provide his or her budget for the Investigation consistent with this Order, which shall be subject to the approval of the Court on seven (7) days' notice to all parties that have requested notice pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the parties required to receive notice may waive such requirement in writing.

       i.      The Examiner shall have the standing of a "party-in-interest" with respect to the matters that are within the scope of the Investigation and shall be entitled to appear and be heard at any and all hearings in these cases; provided, however that the Examiner shall not have the standing or ability to prosecute any claim or cause of action absent further order of this Court.

       j.      All ballots submitted by all asbestos claimants shall be designated and stricken from voting on the Debtors' First Amended Plan (until further order of the Court).

## **BASIS FOR RELIEF**

3.      Creditors require an independent, conflict-free, experienced party investigating the conduct of the UCC and the Debtors regarding the allocation of the GUC Trust and support for the plan by certain UCC members and all of the ballots submitted by asbestos claimants.

4.      Four requirements for appointment of examiner are: (1) the debtor must still be in possession of estate, *i.e.*, a trustee must not have been appointed, (2) the plan must not have been

confirmed, (3) a party in interest must request appointment, and (4) one of conditions set out in numbered paragraphs of 11 U.S.C. § 1104(c) must be satisfied, either (a) appointment of examiner must be in the interests of estate, or (b) specified unsecured debts must exceed $5 million. Appointment of examiner is mandatory if four conditions are met. *In re UAL Corp., 307 B.R. 80*, 42 Bankr. Ct. Dec. (LRP) 219, 52 Collier Bankr. Cas. 2d (MB) 1018, 2004 Bankr. LEXIS 273 (Bankr. N.D. Ill. 2004); *see also Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004); *In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.C. 1980); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

5. This Court has authority under Code section 11 U.S.C. § 1104(c)(2) to specify (and thereby effectively limit) the appropriate scope of an examination. *See Loral,* 2004 WL 2979785, at *5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *see also UAL Corp.*, 307 B.R. at 85 n.2.

6. Further, this Court should direct the appointment of an examiner under section 1104(c)(1), as such appointment would be in the best interests of the Debtors' estates, their creditors and equity security holders.

7. The interests of the Debtors' estates and their creditors are best served by permitting an examiner to investigate (a) the Debtors' failure to investigate the asbestos claims, (b) the allocation to the asbestos claimants a substantial portion of the GUC Trust with no reasonable basis therefor, (c) the favorable, discriminatory treatment of asbestos claimants by

allowing late-filed claims to be included in the allocation of GUC Trust proceeds, (d) the allowance of approximately 43,000 votes in favor of the Amended Plan by asbestos claimants, largely by "Master Ballots" with no facial support therefor, and (e) the failure of the Debtors and UCC to investigate these issues, as well as the apparent double recovery of certain Opioid creditors for the same alleged damages for purchases of opioids. The Debtors desire the votes of all these creditors (ie. asbestos claimants and opioid claimants), and the asbestos creditors are represented on the UCC by Attorney Bevan, so neither fiduciary can properly investigate the conduct. Indeed, they have refused to do so upon being asked by the AHAG.

8. Section 1126 (e) provides that the court "may designate any entity whose acceptance or rejection of such plan was not in good faith or was not solicited or procured in good faithor in accordance with the provisions of this title. 11 U.S.C. §1126 (e). The Court in *In re Dune Deck Owners Corp.* noted:

> Courts generally reserve designation for situations in which the evidence demonstrates an improper purpose or ulterior motive on the part of the voting creditor. For example, a creditor's vote maybe designated in the following instances:
>
> - a competitor purchases a blocking position in a class of claims after a plan is proposed inorder to control the bankruptcy process to pursue a strategic transaction with the debtor rather than maximize its return on its claim;
>
> - a vote to block a reorganization plan in order to acquire the debtor company for one's self;
>
> - the purchaser and potential voter of an impaired claim is a co-proponent of the plan and would become the general partner of the debtor upon confirmation;
>
> - the purchase of claims by an affiliate or an insider of the debtor for the sole purpose ofblocking the confirmation of a competing plan;
>
> - a vote to accept a plan motivated by financial incentives provided under a separate settlement agreement;

- a vote motivated by considerations not consistent with protecting the creditor's self-interest;

- a creditor's purposeful destruction of a debtor's business.

175 B.R. 839, 844 (interior citations omitted) (Bankr. S.D.N.Y. 1995). *See also* 7 Collier on Bankruptcy, i 1126.06 [2] (interior citations omitted) (16th ed. 2021).

9. Here, all asbestos claims filed are invalid and all ballots cast on behalf of said claims were without authority. There can be no doubt that the same disabling conditions present in *Imerys* are present in this case. In fact, it appears that *Imerys* and now this case represents the new "playbook" for gerrymandering votes by using the tens of thousands of unknown and unsubstantiated claims controlled by attorneys who sit outside the bankruptcy process. Fundamental fairness requires the application of the same standards applied to AHAG and AIC to the asbestos claimants. A facial review of the proofs of claim, ballots and support of the asbestos claimants conducted under the standards this Court applied to the claims of the AHAG and AIC reveals that such claims should be disallowed. That the Debtors and UCC abdicated that responsibility and looked the other way at facially invalid claims to obtain votes is a breach of fiduciary duty.

10. The Debtors' claims review and allocation decisions need to be reviewed by a disinterested person with clear authority to untangle the mess and provide transparency to all parties in interest. This is all the more important where the sums at stake are so high. As an example, attached hereto as **Exhibit "D"** is the proof of claim filed by attorney and UCC proxy Bevan on behalf of a long list of asbestos claimants. As the Court can see, the claim is invalid on its face: it fails to identify any basis for the aggregate claim on behalf of a list of names, its fails to state any amount for said claims, and it fails to provide any support therefor (either a filed complaint naming a debtor as a defendant or an addendum setting forth some factual basis for the

claim). If such claim were evaluated under the same standards as the class claims filed by members of the AHAG, surely the aggregate asbestos claim would be ruled an improper class or aggregate proof of claim. Further, if the asbestos claim were evaluated using the "unsubstantiated" claims objection standards applied to the both the AHAG and the AIC, it would be disallowed.

11. An impartial, independent examiner is needed in these cases to:

(a) investigate the above-identified issues to ensure the integrity of Amended Plan voting processes and procedures, the claims process and the upcoming hearing on confirmation of the Amended Plan, including, without limitation, to review all asbestos claims and voting ballots cast on those claims and determine whether these claims were properly authorized, and any ballots dismissed pursuant to 11 U.S.C. Section 1126 (e);

(b) analyze and determine whether re-solicitation of the Amended Plan is necessary;

(c) analyze and determine whether and to what extent any potential malfeasance has occurred;

(c) preliminary report to this Court the results of the Investigation and whether further investigation is warranted; and

(d) pursue any and all appropriate remedies as directed by this Court.

12. A court-appointed examiner is required because the Debtors-in-possession have affirmatively declined requests to investigate and the UCC has not responded to requests to investigate the serious issues raised by the Bevan Situation described herein, despite the fact that Mr. Bevan's similar conduct was recently investigated in Judge Silverstein's courtroom in the *Imerys* bankruptcy. *See generally*, D.I. 4428 (Sept. 21, 2021 Letter to Court describing the Bevan situation, and attaching a Law 360 article and the transcript of the Sept. 20, 2021 hearing in *Imerys*).

13. The AHAG directly asked the Debtors if they would undertake an investigation in light of the revelations about Bevan in Judge Silverstein's court. While the "noted the concerns raised … based upon … the *Imerys* hearing", they failed to act. *See* Sept. 23, 2021 email at **Exhibit "E"** hereto.

14. It is not surprising neither counsel for the Debtors or the UCC would investigate the Bevan Situation, as the same lawyers represent the Debtors in this case and *Imerys* (*ie*. Richards Layton and Latham) and the Unsecured Creditors' Committees in this case and *Imerys* (*ie*., Robinson Cole).

15. Instead, the Debtors and UCC settled with the asbestos claimants for $18 million, agreeing to pay Bevan's clients more than any other litigation creditor group. Attached hereto as **Exhibit "F"** is the term sheets of the analysis of the UCC financial advisor on the amounts of claims. Based upon this document, the UCC clearly understood that both the asbestos claims and the opioid antitrust claims were receiving more than they would receive if the GUC Trust were allocated on a proportional basis, as would have been done under the "pot plan" originally proposed.

16. Since the settlement was announced last month, the Debtors and UCC have been avoiding discovery into the UCC settlement and the allocation of settlement proceeds. *See* D.I. 4336 (Letter from Humana/Attestor relating to outstanding discovery into the UCC settlement).

17. Only late in the day on October 6, 2021 did they begin to produce documents and agree to produce witnesses on dates certain, despite the fact that such discovery was served one month ago. *See* D.I. 4150, 4151, 4152, 4153, 4154, 4155, 4169, 4170. But, those commitments were illusory. Immediately after the hearing on October 25, 2021, counsel for UCC member proxy, Edmund George, abruptly cancelled his deposition set for the next day – at *his* request.

18. Only an independent examiner can force the discovery that is needed to sort through the morass of potential conflicts of interest and issues surrounding the UCC settlement, especially Bevan's direct role in securing a favorable settlement worth nearly three times the amount allocated to the Acthar claimants, the purchasers of the Debtors most important product. Discovery is ongoing, and if an independent examiner is appointed, said examiner should review the transcript of the deposition of Mr. Bevan conducted on October 28, 2021 and the documents produced in connection therewith.

## **ARGUMENT**

19. AHAG respectfully submits the Bevan Situation establishes a basis for the appointment of an examiner at this critical juncture in these bankruptcy cases.

### **The Bevan Situation**

20. On October 20, 2020, the Office of the United States Trustee's (the "UST") a Notice of Appointment of Creditors' Committee with this Court naming five (5) members of the UCC. D.I. No. 306.

21. Among these five (5) appointed member is Mr. Bevan's client, Commodore Bowens, Jr., Administrator for the Estate of Commodore Bowens, Sr. whom is a claimant in this bankruptcy, *Imerys*, and likely other asbestos litigation and bankruptcies in other courts.

22. Mr. Bevan, with the blessing of the UCC, settled his asbestos clients' "claims" for $18 million. *See* D.I. 4121, 4508. It appears from records produced that the settlement was consummated by August 24, 2021.

23. He did so without filing Rule 2019 statement and without filing legitimate proofs of claim. Indeed, he testified under oath that he does not believe he is obligated to file a Rule 2019 statement until ordered by a Court to do so.

24. Despite that settlement, Commodore Bowens, Jr. remains on the UCC. This is in contrast to the post-settlement removal of UCC member New PharmaTop LP, who was removed from the UCC when it settled its dispute with the Debtors last year.

25. Unlike New PharmaTop, LP, UCC member Commodore Bowens, Jr. and his proxy Mr. Bevan, remains on the UCC after he settled with the Debtors.

26. When asked if he would withdraw from the Committee, Bevan refused to respond.

27. Mr. Bevan is also counsel to over 15,000 asbestos claimants in the *In re Imerys Talc America, Inc. et al.* bankruptcy currently pending before the Hon. Chief Judge Silverstein of this Court.

28. In the *Imerys* bankruptcy, Mr. Bevan claimed to represent 15,719 claimants ("<u>Bevan Imerys Claimants</u>"), according to his Rule 2019 Statement. *See In re Imerys Talc America, Inc., et al.*, Bankr. Del., Case No 19-10289 [Dkt. No. 3741]. He claims to represent the same number of clients in this case.

29. On March 25, 2021, the Bevan *Imerys* Claimants apparently voted to reject the Ninth Amended Joint Chapter 11 Plan of Reorganization. *Id.*

30. However, on March 29, 2021, Mr. Bevan communicated to Prime Clerk that the Bevan *Imerys* Claimants wished to withdraw their Master Ballot, citing communications with Natalie Ramsey of Robinson Cole (who serves as counsel to the Committee). *Id.*

31. On April 6, 2021, the Bevan *Imerys* Claimants changed their votes to approve the Plan. *Id.* This was done after Mr. Bevan had telephone conversations with Attorney Ramsey, counsel to the UCC in this bankruptcy. *See* Sept. 20, 2021 Hrg. Tr. at p. 87, lines 14-25; p. 88, line 1 at Exhibit "A" hereto.

32. On June 15, 2021, Mr. Bevan filed a Declaration of Counsel. (*See In re Imerys* at Dkt. No. 3684).

33. On June 25, 2021, Mr. Bevan filed a Motion to Affirm the Votes Changes (*See In re Imerys* at Dkt.4 No. 3744).

34. During a hearing in *In re Imerys* on September 20, 2021 (Ex. "A"), Mr. Bevan confirmed that he "didn't talk to any clients before" voting to reject the plan. *Ex. A,* p. 93, lines 5-13. Mr. Bevan also confirmed that he "didn't talk to any clients to decide to withdraw the votes" or "to then decide to accept the plan." *Id.*

35. Mr. Bevan further confirmed that it is his practice ***not*** to speak to his clients about how they will vote (either for or against a plan) and that he does not recall any bankruptcy where he submitted a "split ballot" on their behalf. *Id. at p. 101, line 5-8.*

36. Here, in this bankruptcy, Mr. Bevan's clients also submitted a unanimous vote in favor of settlement of the asbestos "claims" against the Debtors to the detriment of all other creditors, some of whom would receive much less from the estate despite having claims multiple-times larger than Mr. Bevan's clients' unliquidated claims, many of which are filed as claims in *Imerys*, including a claim for UCC Committee member, Commodore Bowen's Jr.

37. On , Mr. Bevan testified under oath at his deposition that his conduct in this case has been no different that it was in *Imerys*. The asbestos cancer that has infected *Imerys* has now infected this case.

38. Serious questions have been raised about the propriety of Mr. Bevan's conduct in bankruptcy proceedings.

39. An examiner must be appointed to analyze (i) the Bevan Situation, and determine, *inter alia*, if any acts or omissions give rise to precluding the right, if any, of Mr. Bevan's clients

to participate in this bankruptcy, to vote on the Amended Plan and to obtain an $18 million settlement out of the limited proceeds for all unsecured creditors; (ii) whether the claims filed by the asbestos claimants should be objected to and the voting ballots cast be dismissed; and (iii) whether re-solicitation is necessary.

40. The AHAG respectfully submits that if any parties in interest, whether joining in the relief requested in this Motion to Appoint Examiner, or not, believe the scope of examination should be broadened they may wade in and so advise this Court

## **CONCLUSION**

Based on the foregoing compelling reasons, the Motion to Appoint Examiner should be granted.

Dated: October 29, 2021
Wilmington, Delaware

**CIARDI CIARDI & ASTIN**
*/s/ Daniel K. Astin*
Daniel K. Astin (No. 4068)
1204 North King Street
Wilmington, DE 19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com

-and-

Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
(Admitted *pro hac vice*)
CIARDI CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Donald E. Haviland, Jr., Esq.
(Admitted *pro hac vice*)
*haviland@havilandhughes.com*
William H. Platt II, Esq.
(Admitted *pro hac vice*)
*platt@havilandhughes.com*
**HAVILAND HUGHES**
201 South Maple Ave., Suite 110
Ambler, Pennsylvania 19002
T: 215-609-4661
F: 215-392-4400

-and-

Dion G. Rassias, Esq. (No. 2829)
*dgr@beasleyfirm.com*
Jillian E. Johnston, Esq.
*(Admitted pro hac vice)*
*Jill.johnston@beasleyfirm.com*
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
T: 215-592-1000

-and-

James Bartimus, Esq.
*(Admitted pro hac vice)*
jb@bflawfirm.com
Anthony DeWitt, Esq.
(*Admitted pro hac vice*)
ALDewitt@bflawfirm.com
**BARTIMUS, FRICKLETON, ROBERTSON, RADAR PC**
11150 Overbrook Road, Suite 200
Leawood, Kansas 66211
T: 913-266-2300
F: 913-266-2366

*Counsel for the Ad Hoc Acthar Group*