## Exhibit D

## Updated NAS Monitoring Trust Agreement

**PLEASE TAKE NOTICE** that certain documents, or portions thereof, contained in this Exhibit D and the Seventh Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors and such applicable interested parties reserve all of their respective rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement (as amended), with respect to the final form of such documents and to amend, revise, or supplement the Seventh Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

The latest copy of the NAS Monitoring Trust Agreement was filed on the Court's Docket titled "*Notice Of Filing Of Exhibit A (Updated Emergency Room Physicians Trust Agreement), Exhibit B (Updated Emergency Room Physicians Trust Distribution Procedures), Exhibit C (Updated NAS Monitoring Trust Agreement), Exhibit D (Updated Management Incentive Plan), Exhibit E (Identity Of General Unsecured Claims Trustee), And Exhibit F (Identity Of The Trustee For The PI Trust) Of The Fifth Plan Supplement For The Second Amended Joint Plan Of Reorganization Of Mallinckrodt Plc And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code*" [Docket No. 5665].

The attached is a further revised NAS Monitoring Trust Agreement with a redline against the version docketed at Docket No. 5665.

**NAS MONITORING TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

### SECTION I
### AGREEMENT OF TRUST

1.1 Creation and Name ..................................................................................3
1.2 Purpose.........................................................................................................4
1.3 Transfer of Assets .......................................................................................6
1.4 Definitions....................................................................................................7
1.5 Acceptance of Assets and Assumption of Liabilities ...............................9
1.6 Channeling Injunction...............................................................................11

### SECTION II
### POWERS AND TRUST ADMINISTRATION

2.1 Powers........................................................................................................12
2.2 General Administration.............................................................................17
2.3 Qualified Settlement Fund .......................................................................21
2.4 Claims Administration ..............................................................................23

### SECTION III
### ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1 Accounts .....................................................................................................24
3.2 Investments ................................................................................................26
3.3 Source of Payments....................................................................................26

### SECTION IV
### TRUSTEE; DELAWARE TRUSTEE

4.1 Number .......................................................................................................27
4.2 Term of Service..........................................................................................27
4.3 Appointment of Successor Trustee ..........................................................28
4.4 Liability of Trustee and Others ................................................................29
4.5 Compensation and Expenses of Trustee .................................................29
4.6 Indemnification of Trustee and Others ...................................................30
4.7 Lien .............................................................................................................31
4.8 Trustee's Employment of Experts ...........................................................31
4.9 Unauthorized Business..............................................................................32
4.10 Trustee Independence ...............................................................................32
4.11 Limitation of Trustee's Authority ...........................................................33
4.12 Confidentiality ...........................................................................................33
4.13 No Bond......................................................................................................33
4.14 Delaware Trustee .......................................................................................33

## SECTION V
## TRUST ADVISORY COMMITTEE

5.1  Members ............................................................................................38
5.2  Duties ...............................................................................................39
5.3  Term of Office ..................................................................................40
5.4  Appointment of Successors................................................................41
5.5  TAC's Employment of Professionals .................................................41
5.6  Compensation and Expenses of the TAC ...........................................43

## SECTION VI
## GENERAL PROVISIONS

6.1  Procedures for Consulting with or Obtaining Consent of the TAC............43
6.2  Irrevocability...................................................................................46
6.3  Term; Termination............................................................................46
6.4  Amendments ....................................................................................48
6.5  No Association, Partnership or Joint Venture......................................49
6.6  Severability .....................................................................................49
6.7  Notices ............................................................................................50
6.8  Successors and Assigns.....................................................................52
6.9  Limitation on Claim Interests for Securities Laws Purposes.................52
6.10  Entire Agreement; No Waiver ..........................................................52
6.11  Headings ........................................................................................53
6.12  Governing Law ...............................................................................53
6.13  Settlors' Representative and Cooperation...........................................54
6.14  Dispute Resolution..........................................................................54
6.15  Enforcement and Administration......................................................55
6.16  Effectiveness ..................................................................................55
6.17  Counterpart Signatures....................................................................55

EXHIBIT 1    Certificate of Trust
EXHIBIT 2    Trust Distribution Procedures

# NAS MONITORING TRUST AGREEMENT

This NAS Monitoring Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *Chapter 11 Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, dated [_____], 2021 (as it may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**, by Mallinckrodt PLC and its Debtor Affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust, N.A. (the **"Delaware Trustee"**); Donald R. Cravins, Jr. (the **"Trustee"**); and the members of the NAS Monitoring Trust Advisory Committee (the **"TAC"**) identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the **"Parties"**); and

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the NAS Monitoring TDP.

[2] The Debtors in these cases are as follows: Acthar IP Unlimited Company; IMC Exploration Company; Infacare Pharmaceutical Corporation; INO Therapeutics LLC; Ludlow LLC; MAK LLC; Mallinckrodt APAP LLC; Mallinckrodt ARD Finance LLC; Mallinckrodt ARD Holdings Inc.; Mallinckrodt ARD Holdings Limited; Mallinckrodt ARD IP Unlimited Company; Mallinckrodt Brand Pharmaceuticals LLC; Mallinckrodt Buckingham Unlimited Company; Mallinckrodt Canada ULC; Mallinckrodt CB LLC; Mallinckrodt Critical Care Finance LLC; Mallinckrodt Enterprises Holdings, Inc.; Mallinckrodt Enterprises LLC; Mallinckrodt Enterprises UK Limited; Mallinckrodt Group S.a.r.l.; Mallinckrodt Holdings GmbH; Mallinckrodt Hospital Products Inc.; Mallinckrodt Hospital Products IP Unlimited Company; Mallinckrodt International Finance SA; Mallinckrodt International Holdings S.a.r.l.; Mallinckrodt IP Unlimited Company; Mallinckrodt LLC; Mallinckrodt Lux IP S.a.r.l.; Mallinckrodt Manufacturing LLC; Mallinckrodt Pharma IP Trading Unlimited Company; Mallinckrodt Pharmaceuticals Ireland Limited; Mallinckrodt Pharmaceuticals Limited; Mallinckrodt Quincy S.a.r.l.; Mallinckrodt UK Finance LLP; Mallinckrodt UK Ltd; Mallinckrodt US Holdings LLC; Mallinckrodt US Pool LLC; Mallinckrodt Veterinary, Inc.; Mallinckrodt Windsor Ireland Finance Unlimited Company; Mallinckrodt Windsor S.a.r.l.; MCCH LLC; MEH, Inc.; MHP Finance LLC; MKG Medical UK Ltd; MNK 2011 LLC; MUSHI UK Holdings Limited; Ocera Therapeutics, Inc.; Petten Holdings Inc.; SpecGx Holdings LLC; SpecGx LLC; ST Operations LLC; ST Shared Services LLC; ST US Holdings LLC; ST US Pool LLC; Stratatech Corporation; Sucampo Holdings Inc.; Sucampo Pharma Americas LLC; Sucampo Pharmaceuticals, Inc.; Therakos, Inc.; Vtesse LLC; WebsterGx Holdco LLC; Mallinckrodt Equinox Finance LLC

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 20-12522 (JTD) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**) and known as *In re Mallinckrodt PLC, et al.*, Case No. 20-12522 (JTD).

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the NAS Monitoring Trust (the **"NAS Monitoring Trust"**);

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust shall be established to: (i) assume all liability for the NAS Monitoring Opioid Claims; (ii) hold the NAS Monitoring Opioid Claim(s) and collect the distribution of $1.5 million in cash from the Opioid MDT II and any additional payments; (iii) administer the submission, resolution, and distribution of the NAS Monitoring Opioid Claims; (iv) make distributions to Holders of NAS Monitoring Opioid Claims, in each case in accordance with the NAS Monitoring trust distribution procedures (the **"NAS Monitoring TDP"**), attached hereto as **Exhibit 2**; and (v) carry out such other matters as are set forth in the NAS Monitoring Trust Documents;

**WHEREAS**, the Plan provides that on the Effective Date, any and all liability of Mallinckrodt for any and all NAS Monitoring Opioid Claims shall automatically be channeled exclusively to, and all of Mallinckrodt's liability for NAS Monitoring Opioid Claims shall be assumed by, the NAS Monitoring Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the NAS Monitoring Trust shall: (i) hold, manage, and invest all funds and other Assets received by the NAS Monitoring Trust from the Opioid MDT II for the benefit of the beneficiaries of the NAS Monitoring Trust; (ii) hold and maintain the NAS Monitoring Trust Operating Reserve, as defined herein; and (iii) administer, process, resolve, and liquidate all NAS Monitoring Opioid Claims in accordance with the NAS Monitoring TDP;

2

**WHEREAS**, it is the intent of the Debtors, the Trustee, and the TAC that the NAS Monitoring Trust will evaluate the NAS Monitoring Opioid Claims and be in a financial position to make NAS Monitoring Grants (as defined in the NAS Monitoring TDP) to Grant Recipients or Grantees in accordance with the terms of this Trust Agreement and the NAS Monitoring TDP;

**WHEREAS,** all rights of the Holders of NAS Monitoring Opioid Claims arising under this Trust Agreement and the NAS Monitoring TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS**, pursuant to the Plan, the NAS Monitoring Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all NAS Monitoring Opioid Claims, and such injunction has been entered in connection with the Confirmation Order.

**NOW, THEREFORE,** it is hereby agreed as follows:

<div align="center">

**SECTION I**
**AGREEMENT OF TRUST**

</div>

**1.1    Creation and Name**. The Parties hereto hereby create a trust known as the "NAS Monitoring Trust," which is the NAS Monitoring Trust provided for and referred to in, *inter alia*, Article IV.X.1 of the Plan.  The Trustee of the NAS Monitoring Trust shall transact the business and affairs of the NAS Monitoring Trust in the name of the NAS Monitoring Trust, and references herein to the NAS Monitoring Trust shall include the Trustee acting on behalf of the NAS Monitoring Trust.  It is the intention of the Parties that the NAS Monitoring Trust constitute a

<div align="center">3</div>

statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the **"Act"**) and that this Trust Agreement shall constitute the governing instrument of the NAS Monitoring Trust. The Trustee and the Delaware Trustee executed and filed a Certificate of Trust with the Delaware Secretary of State, attached hereto as **Exhibit 1**.

  1.2    **Purpose**.

(a)    The purpose of the NAS Monitoring Trust is to expressly assume sole and exclusive responsibility and liability for the NAS Monitoring Opioid Claims channeled to the NAS Monitoring Trust in accordance with the Opioid MDT II and the Plan, as well as to, among other things:

> (i)    hold the NAS Monitoring Opioid Claims and collect the distribution of $1.5 million in cash from the Opioid MDT II and any additional payments due thereunder;

> (ii)    administer, process, resolve, and liquidate the NAS Monitoring Opioid Claims as provided in the NAS Monitoring Trust Documents by making NAS Monitoring Grants to Authorized Recipients; *provided, however*, that no Holders of NAS Monitoring Opioid Claims shall receive direct recoveries on account of their NAS Monitoring Opioid Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to Authorized Recipients in accordance with the NAS Monitoring TDP;

> (iii)    hold, manage, and invest all funds and other Assets received by the NAS Monitoring Trust from the Debtors and the Opioid MDT II, in each case, for the benefit of the beneficiaries of the NAS Monitoring Trust;

(iv)    qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(v)    pay qualifying attorney's fees pursuant to Article IV.X.8(c) of the Plan;

(vi)    pay assessments to the extent required by Article IV.X.8(a); (c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii)    otherwise comply in all respects with the NAS Monitoring Trust Documents.

(b)    The NAS Monitoring Trust is to use the NAS Monitoring Trust's Assets and income to:

(i)    make NAS Monitoring Grants to the Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP in such a way that such Grant Recipients and Grantees are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii)    hold and maintain reserves to pay the fees and expenses incurred with respect to administering the NAS Monitoring Trust (including the NAS Monitoring TDP) and managing the NAS Monitoring Trust Assets (together, the **"NAS Monitoring Trust Operating Expenses"**) of the NAS Monitoring Trust (such reserves, the **"NAS Monitoring Trust Operating Reserve"**), which shall be: (a) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust

Documents; and (b) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee;

(iii)    pay the NAS Monitoring Trust Operating Expenses from the NAS Monitoring Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the NAS Monitoring Trust, the NAS Monitoring Trust Operating Reserve from Cash held or received by the NAS Monitoring Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future NAS Monitoring Trust Operating Expenses in accordance with the NAS Monitoring Trust Documents;

(v)    pay all fees and expenses incurred with respect to, among other things, making NAS Monitoring Grants to Grant Recipients and Grantees, including attorneys' fees and costs (together with the NAS Monitoring Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Article IV.X.8(c) of the Plan, as applicable;

(vi)    pay qualifying attorney's fees pursuant to Article IV.X.8(c) of the Plan; and

(vii)    pay assessments to the extent required by Article IV.X.8(a) or Article IV.X.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.

**1.3    Transfer of Assets.** Pursuant to Article IV.X.7 of the Plan, the NAS Monitoring Trust has received a distribution of $1.5 million in cash from the Opioid MDT II on the Opioid MDT II Initial Distribution Date, to fund the NAS Monitoring Trust.[4]  In all events, the NAS Monitoring

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Trust Assets or any other assets to be transferred to the NAS Monitoring Trust under the Plan will be transferred to the NAS Monitoring Trust free and clear of all Claims, Liens, or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to the NAS Monitoring Trust as the Trustee may request to effectuate the transfer and assignment of any of the NAS Monitoring Trust Assets (as defined herein) to the NAS Monitoring Trust.

**1.4    Definitions.**

(a)    **"Assumed Liability"** means the assumption of liability by the NAS Monitoring Trust for all NAS Monitoring Opioid Claims.

(b)    **"Award"** or **"Awarded"** or **"Awarding"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(c)    **"Birth Mother"** means the female who gave birth to an NAS Child, or who is pregnant and is using, or is suspected to be using, opioids, or who is dependent upon opioids, regardless of whether the Birth Mother is a Guardian of the NAS Child.

(d)    **"Grant Proposal"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(e)    **"Grant Recipient"** or **"Grantee"** have the meanings ascribed to such terms in the NAS Monitoring TDP.

(f)    **"Guardian"** means the individual or individuals who have physical custody of an NAS Child, or who exercise the duties and responsibilities attendant to daily care for an NAS Child. As used in this Trust Agreement, the term "Guardian" may include not only individual(s) who are legal or court-appointed guardians, but also natural parent(s), grandparent(s), relative(s)

of an NAS Child, child protective service appointees, and others to the extent such individual(s) have physical custody of an NAS Child or exercise the duties and responsibilities attendant to daily care for an NAS Child.

(g)    **"NAS"** means Neonatal Abstinence Syndrome or opioid dependency at birth.

(h)    **"NAS Abatement Program"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(i)    **"NAS Committee"** means the Ad Hoc Committee of NAS Children in the *First Amended Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 387].

(j)    **"NAS Monitoring Grants"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(k)    **"NAS Monitoring Trust Assets"** mean the gross and aggregate amount of money or the value of any property received by the NAS Monitoring Trust pursuant to the Plan, through payment(s) into the NAS Monitoring Trust through the Opioid MDT II, including the distribution of $1.5 million in cash from the Opioid MDT II, and additional payments due under the Plan, the Opioid MDT II Documents, the NAS Monitoring Trust Documents, or any other documents associated with Confirmation of the Plan.

(l)    "**NAS Monitoring Trust Operating Expenses**" means, with respect to the NAS Monitoring Trust, any and all costs, expenses, fees, taxes, disbursements, debts, or obligations incurred from the operation and administration of the NAS Monitoring Trust, including in connection with the reconciliation and administration of the NAS Monitoring Opioid Claims channeled to the NAS Monitoring Trust, working capital and all compensation, costs and fees of the Trustee of the NAS Monitoring Trust and any professionals retained by the Trustee.  The NAS

Monitoring Trust Operating Expenses shall not exceed a value equal to one and one-half percent (1.5%) of the Net Trust Assets (as defined herein) not yet Awarded.

(m)    "**NAS Monitoring Trust Operating Reserve**" means the Trust Subaccount to be established to pay the NAS Monitoring Trust Operating Expenses, which shall be: (i) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents; and (ii) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee.  The amounts held in the NAS Monitoring Trust Operating Reserve shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(n)    "**Net Trust Assets**" means the aggregate amount of the NAS Monitoring Trust Assets which remain after payment by the NAS Monitoring Trust of the fees and expenses of the attorneys to the NAS Committee pursuant to Article IV.X.8.C  of the Plan and the assessments required pursuant to IV.X.8.A of the Plan.  Net Trust Assets may also include any interest or income, which may accrue from any of the NAS Monitoring Trust Assets.

**1.5**    **Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust hereby expressly accepts the transfer to the NAS Monitoring Trust of the NAS Monitoring Trust Assets or any other transfers contemplated by the Plan and the Opioid MDT II Documents in the time and manner as, and subject to the terms, contemplated in the Plan and the Opioid MDT II Documents.

(b)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust expressly assumes all liabilities and responsibility for all NAS Monitoring Opioid Claims (except as set forth in the Plan) subject to the NAS Monitoring Trust Documents, and none of the

Debtors, the Protected Parties, or the Opioid MDT II shall have any further financial or other responsibility or liability therefor.  Except as otherwise provided in this Trust Agreement, the NAS Monitoring TDP, the Plan, or the Opioid MDT II Documents, the NAS Monitoring Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the NAS Monitoring Opioid Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors and the Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NAS Monitoring TDP shall be construed or implemented in a manner that would cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the NAS Monitoring TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the NAS Monitoring Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of NAS Monitoring Opioid Claims, provided that: (i) the Holders of NAS Monitoring Opioid Claims, as such Beneficial Owners, shall have only such rights with respect to the NAS Monitoring Trust and its assets as are set forth in the NAS Monitoring TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the NAS Monitoring Trust, shall be deemed to apply to the Holders of NAS Monitoring Channeled Claims in their capacity as Beneficial Owners.

(f)     The sole recourse of any Person on account of any NAS Monitoring Opioid Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as, and to the extent provided in the NAS Monitoring TDP.  Holders of NAS Monitoring Opioid Claims are enjoined from asserting against any Debtor or other Protected Party any future litigation, Claims, or Causes of Action arising out of or related to such NAS Monitoring Opioid Claims and may not proceed in any manner against any Debtor or other Protected Party on account of any Claim in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS Monitoring Opioid Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring TDP.  Notwithstanding the foregoing, no Beneficial Owner shall be entitled to an Abatement Distribution on account of its NAS Monitoring Opioid Claims but may be considered an indirect beneficiary of the NAS Monitoring Trust through an entity that is Awarded an NAS Monitoring Grant pursuant to the NAS Monitoring TDP.[5]

(g)     The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the NAS Monitoring TDP.

**1.6     Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the NAS Monitoring Trust's assumption of all liability for NAS Monitoring Opioid Claims.

---

[5] No natural person that is a Holder of an NAS Monitoring Channeled Claim may be considered a Grantee or Grant Recipient.

## SECTION II
## POWERS AND TRUST ADMINISTRATION

**2.1    Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the NAS Monitoring Trust in accordance with the provisions of this Trust Agreement, the NAS Monitoring TDP, the Plan and the Confirmation Order.  The Trustee shall, at all times, administer the NAS Monitoring Trust and the NAS Monitoring Trust Assets in accordance with the purposes set forth in Section  1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the NAS Monitoring Trust, including, without limitation, each power expressly granted in this Section  2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section  2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Subject to the limitations on the Trustee's powers as set forth herein, the Trustee's powers are exercisable solely in a fiduciary capacity and are to be consistent with and in furtherance of the purposes of this Trust Agreement and the NAS Monitoring TDP, and not otherwise.

(d)    Without limiting the generality of Section 2.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the NAS Monitoring Trust Assets and exercise all rights with respect thereto, including the right to vote, hold, and sell any securities

12

that are included in the NAS Monitoring Trust Assets or that may come into possession or ownership of the Trust;

(ii)     invest the monies held from time to time by the NAS Monitoring Trust, and/or contract with any qualified institution (including the institution serving as Delaware Trustee), to hold and invest the NAS Monitoring Trust's funds in federally insured and interest-bearing accounts; provided that any investment of monies held within a separate Trust Subaccount, as defined herein, be held separate and distinct from the investments relating to any other Trust Subaccount;

(iii)    enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the NAS Monitoring Trust to operate;

(iv)     pay liabilities and expenses of the NAS Monitoring Trust, including the indemnification obligations set forth in the Plan or herein;

(v)      establish such funds, reserves, and accounts within the NAS Monitoring Trust estate as required by the Plan or this Trust Agreement or as the Trustee otherwise deems necessary in carrying out the purposes of the NAS Monitoring Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)     initiate, prosecute, defend, and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the NAS Monitoring Trust;

13

(vii)   initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any Asset, liability, or responsibility of the NAS Monitoring Trust.  Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering, or defending against the NAS Monitoring Opioid Claims channeled to the NAS Monitoring Trust and for enforcing the rights of the NAS Monitoring Trust under the Plan, the NAS Monitoring Trust Documents, and related Plan documents;

(viii)  establish, supervise, and administer the NAS Monitoring Trust in accordance with this Trust Agreement and the NAS Monitoring TDP and the terms thereof;

(ix)    appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the NAS Monitoring Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the NAS Monitoring Trust;

(x)     pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the NAS Monitoring Trust in connection with its alternative dispute resolution activities);

14

(xi)     as provided herein: (a) compensate the Trustee, the Delaware Trustee, and the employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents of each of them; and (b) reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the NAS Monitoring Trust;

(xiii)   enter into such other arrangements with third parties as the Trustee deems necessary in carrying out the purposes of the NAS Monitoring Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying): (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, and (d) the officers, employees, consultants, advisors, and agents of each of the NAS Monitoring Trust, the Delaware Trustee, and the TAC, (each of those in (d) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability,

15

expense, claim, damage, or loss for which he or she is liable under Section 4.6 herein;

(xv)     consult with the TAC at such times and with respect to such issues relating to the purpose, conduct, and affairs of the NAS Monitoring Trust as the Trustee considers desirable;

(xvi)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the NAS Monitoring Trust, any claim, right, action, or cause of action included in the NAS Monitoring Trust Assets or which may otherwise hereafter accrue in favor of the NAS Monitoring Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided, however, that any settlement of any claims in litigation be approved by the Bankruptcy Court and/or a court of competent jurisdiction;

(xvii)   withhold or withdraw yet to be disbursed monies from any Fund (as defined herein) established for the purpose of funding of an NAS Abatement Program sponsored by a Grant Recipient or Grantee, in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Trust pertinent to such Awarded Grant, and/or to recover by all legal means the amount of any Disbursements made to a Grant Recipient or Grantee which has violated or failed to comply with the requirements of the NAS Monitoring Trust with respect to such Awarded and Disbursed Grant; and

(xviii)  exercise any and all other rights and take any and all other actions as are permitted, of the Trustee, in accordance with the terms of this Trust Agreement and the Plan.

(e)    The Trustee shall not have the power to guarantee any debt of other persons.

(f)    The Trustee agrees to take the actions of the NAS Monitoring Trust required hereunder.

(g)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections 2.1(d)(i) or (d)(vi) herein, and any act proposed to be performed or taken pursuant to Section  2.2(e) herein.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order, and the NAS Monitoring TDP.  In the event of a conflict between the terms or provisions of: (i) the Plan or the Confirmation Order and (ii) this Trust Agreement or the NAS Monitoring TDP, the terms or provisions of the Plan or the Confirmation Order shall control.  In the event of a conflict between the terms or provisions of this Trust Agreement and the NAS Monitoring TDP, the terms or provisions of the NAS Monitoring TDP shall control.  For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance of the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The NAS Monitoring Trust shall: (i) monitor the use of funds received by Grant Recipients or Grantees of NAS Monitoring Grants in accordance with the NAS Monitoring Authorized Abatement Purposes, and (ii) prepare and deliver to the Opioid MDT II for publication annual reports (each, an "**Annual Report**") on the disbursement and use of NAS Monitoring Grants from the NAS Monitoring Trust and the compliance by Grant Recipients or

Grantees with the NAS Monitoring Authorized Abatement Purposes set forth in the applicable NAS Monitoring Trust Documents.

(c)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(d)    The Trustee shall consult with the TAC on: (i) the general implementation and administration of the NAS Monitoring Trust; (ii) the general implementation and administration of the NAS Monitoring TDP; and (iii) such other matters as may be required under this Trust Agreement or the NAS Monitoring TDP.

(e)    The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change any aspect of the NAS Monitoring TDP;

(ii)    to establish and/or to change the Grant Proposal Form to be provided to be prepared and submitted by potential Grant Recipients or Grantees under the NAS Monitoring TDP;

(iii)    to enter into any agreement with any Grant Recipient or Grantee, including without limitation the Award of a Grant to such Grant Recipient or Grantee for funding of an NAS Abatement Program and the establishment of a Fund for such purpose;

(iv)    to terminate the NAS Monitoring Trust pursuant to Section 6.3 herein;

(v)    to change the compensation of the members of the TAC, the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to

reflect changes approved by the Bankruptcy Court as otherwise provided herein; provided that any change to the compensation of the Delaware Trustee shall also require the consent of the Delaware Trustee;

(vi)    to take actions to minimize any tax on the NAS Monitoring Trust Assets; provided that no such action may be taken if it prevents the NAS Monitoring Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes;

(vii)    to amend any provision of this Trust Agreement or the NAS Monitoring TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(viii)    to acquire an interest in, or to merge any claims resolution organization formed by the NAS Monitoring Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the NAS Monitoring TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the NAS Monitoring TDP, or permit any other party to join in any claims resolution organization that is formed by

the NAS Monitoring Trust pursuant to this Trust Agreement or the NAS Monitoring TDP; provided that such acquisition, merger, contract, or joinder shall not: (a) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the NAS Monitoring TDP; or (b) cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of NAS Monitoring Opioid Claims in accordance with the NAS Monitoring TDP;

(ix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the NAS Monitoring Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(f)    The Trustee shall meet with the TAC no less often than annually but shall meet with the TAC on the frequency required to obtain the consent and approval of a majority of the members of the TAC as required by this Trust Agreement.  Meetings between the Trustee and the TAC may be held in person, telephonically, or by video conferencing.

(g)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the NAS Monitoring Trust.  The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the NAS Monitoring Trust.

20

(h)     If a special meeting is requested by a majority of the members of the TAC, the Trustee shall notice, hold, and attend such meeting.  Reasonably prior to such meeting, the TAC shall provide the Trustee with an agenda of the issues for discussion or resolution at such special meeting.

**2.3**     **Qualified Settlement Fund**.

(a)     The NAS Monitoring Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" within the meaning of the QSF Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the NAS Monitoring Trust or any Trust Subaccount (as defined herein) or Series (as defined herein) will be treated as a transfer to a trust satisfying the requirements of the QSF Regulations.

(b)     The Trustee shall be the "administrator" of the NAS Monitoring Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations, and shall: (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the NAS Monitoring Trust Operating Reserve, all taxes required to be paid by the NAS Monitoring Trust; (ii) comply with all applicable reporting and withholding obligations; (iii) satisfy all requirements necessary to qualify and maintain qualification of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; and (iv) take no action that could cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.  Even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes.

(c)     The Trustee shall be responsible for all of the NAS Monitoring Trust's tax matters, including, without limitation, tax audits, claims, defenses, and proceedings.  The Trustee may

request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the NAS Monitoring Trust for all taxable periods through the dissolution of the NAS Monitoring Trust.  The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the NAS Monitoring Trust that is required by any governmental unit and be responsible for payment, out of the NAS Monitoring Trust Assets, of any taxes imposed on the NAS Monitoring Trust or its assets.  Taxes shall not be considered expenses for the operation and administration of the NAS Monitoring Trust, which are subject to the limitation set forth in Section 3.3(a).

(d)    No provision in this Trust Agreement shall be construed to mandate any Abatement Distribution on any claim or other action that would contravene the Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of the QSF Regulations.

(e)    The NAS Monitoring Trust may withhold from any Abatement Distribution to a Grant Recipient or Grantee such sum or sums as may be necessary to pay any taxes or other charges which have been or may be imposed on the NAS Monitoring Trust under the income tax laws of the United States or of any state or political subdivision or entity by reason of any Abatement Distribution provided for herein or in the Plan or this Agreement, whenever such withholding is required by any law, regulation, rule, ruling, directive or other governmental requirement.  All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Grant Recipient or Grantee for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect such tax information from the Grant Recipient or Grantee (including tax identification numbers), as the Trustee in its sole discretion deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement.  In order to receive Abatement Distributions, all Grant Recipients or Grantees shall be required to provide tax information to the Trustee to the

extent the Trustee deem appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make an Abatement Distribution to a Grant Recipient or Grantee that fails to furnish such information in a timely fashion; provided, however, that, upon the delivery of such information by a Grant Recipient or Grantee, the Trustee shall make such Abatement Distribution to which such Grant Recipient or Grantee is entitled, without additional interest occasioned by such Grant Recipient's or Grantee's delay in providing tax information.  Notwithstanding the foregoing, if a Grant Recipient or Grantee fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Abatement Distribution shall irrevocably revert to the Trust, and any right of the Grant Recipient or Grantee to such Abatement Distribution shall be discharged and forever barred from assertion against the NAS Monitoring Trust or its property.

(f)     The Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this Section 2. Notwithstanding the foregoing, but without prejudice to the Trust's rights hereunder, a Grant Recipient or Grantee receiving an NAS Monitoring Grant shall have the right with respect to the United States or any state or political subdivision or entity to contest the imposition of any tax or other charge by reason of any Abatement Distribution hereunder or under the Plan to the extent permitted by law.

(g)     The Trustee shall file, or cause to be filed, any other statements, returns or disclosures relating to the NAS Monitoring Trust that are required by any governmental unit or applicable law.

**2.4    Claims Administration.** The Trustee shall promptly proceed to implement the NAS Monitoring TDP.

## SECTION III
## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1    Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the NAS Monitoring Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and the making NAS Monitoring Grants to Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**).  Any such Trust Subaccounts established by the Trustee shall be held as NAS Monitoring Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall establish, for bookkeeping purposes, a separate Trust Subaccount for each NAS Monitoring Grant Awarded, and the Abatement Distribution to a Grant Recipient or Grantee for funding of an NAS Abatement Program shall be paid from such Trust Subaccount established by the Trustee for such Grant Recipient or Grantee.  No Grant Recipient or Grantee shall have the right to make a claim against the NAS Monitoring Trust or any Trust Subaccount established by the Trust for the Award of a Grant until a specific monetary amount is Awarded to such Grant Recipient or Grantee for the funding of an NAS Abatement Program.

(c)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section  3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account,

24

and the payments from each such account in the Annual Reports to be provided to the Opioid MDT II pursuant to the Plan and Section 2.2 above.

(d)    With the exception of the NAS Monitoring Trust Operating Reserve, the amounts in which shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets, the Net Trust Assets of the NAS Monitoring Trust shall be reserved for the payment of amounts which the NAS Monitoring Trust Awards as Grants to fund NAS Abatement Programs. In no event shall any of the Net Trust Assets of the NAS Monitoring Trust be utilized or expended for payments on account of any NAS Monitoring Claims.

(e)    As authorized by sections 3804 and 3806 of the Act, the Certificate of Trust shall declare that any Fund established by this Trust Agreement shall constitute a separate and distinct Series of the NAS Monitoring Trust, such that the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Fund shall be enforceable against the assets of such Fund only, and not against the assets of the NAS Monitoring Trust generally or any other Fund established by the NAS Monitoring Trust.  To effectuate such enhanced liability limitation, the Trustee shall: (a) maintain separate and distinct records for each Fund; (b) hold and account for the assets of each Fund by separate and distinct accounts and records which are held and maintained separately from the other assets of the NAS Monitoring Trust and any other Fund thereof; and (c) set forth in the filed Certificate of Trust the terms and provisions of this paragraph so as to give legal notice of this enhanced liability limitation to all non-parties to this Agreement.  The terms "Fund," "Trust Subaccount," and "Series," as used in this Agreement, shall be synonymous.

**3.2** **Investments.** Though not anticipated, any investment of monies held in the NAS Monitoring Trust shall be administered by the Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3** **Source of Payments.**

(a)    All NAS Monitoring Trust expenses and payments, Awards of NAS Monitoring Grants and all liabilities with respect to NAS Monitoring Opioid Claims shall be payable solely by the Trustee out of the NAS Monitoring Trust Assets.  Neither the Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any Trust Expense or any other liability of the NAS Monitoring Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.  The Delaware Trustee shall not be liable for the payment of any NAS Monitoring Trust expense or any other liability of the NAS Monitoring Trust.

(b)    The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section  3.3.

(c)    The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the NAS Monitoring Trust.

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

**4.1**    **Number.** In addition to the Delaware Trustee appointed pursuant to Section 4.14, there shall be one (1) Trustee, which shall be the Person appearing on the signature page(s) of this Trust Agreement.

**4.2**    **Term of Service.**

(a)    The Trustee shall serve from the Effective Date until the earliest of: (i) the end of his or her term; (ii) his or her death; (iii) his or her resignation pursuant to Section 4.2(b) herein; (iv) his or her removal pursuant to Section 4.2(c) herein; or (v) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the Opioid MDT II Trustee(s).  Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    In the event that the Trustee becomes unable to discharge his or her duties hereunder due to an accident or physical or mental deterioration or for other good cause, the Trustee may be removed and replaced pursuant to an order of the Bankruptcy Court at the recommendation of a majority of the members of the TAC.  Good cause shall be deemed to include, without limitation, any substantial failure of the Trustee to comply with the provisions of this Trust Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the approval of the Bankruptcy Court and shall require the appointment of a successor Trustee by the Bankruptcy Court.

**4.3**    **Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the majority vote of the TAC.  In the event that the TAC fails to secure a majority vote for the appointment of a Successor Trustee, the Bankruptcy Court shall make the appointment.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of: (i) his or her death; (ii) his or her resignation pursuant to Section 4.2(b) herein; (iii) his or her removal pursuant to Section 4.2(c) herein; or (iv) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

(e)    The resignation or removal of the Trustee shall not operate to terminate the NAS Monitoring Trust or to revoke or invalidate any action taken by the Trust.

(f)    In the event of the resignation or removal of the Trustee, such Trustee shall: (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of the Trustee's capacity under this Trust Agreement and the conveyance of the assets then held by the Trustee to such

Trustee's successor; (b) deliver to the successor Trustee all documents, instruments, records and other writings related to the NAS Monitoring Trust as may be in the possession of the Trustee; and (c) otherwise assist and cooperate in effecting the assumption of his or her obligations and functions by such successor Trustee.

4.4     **Liability of Trustee and Others.** To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee, and the members of the TAC shall not have or incur any liability for actions taken or omitted in their respective capacities, or on behalf of the NAS Monitoring Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective capacities as Trustee, Delaware Trustee, or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of the Trustee, the Delaware Trustee, or members of the TAC shall be satisfied from the NAS Monitoring Trust.

4.5     **Compensation and Expenses of Trustee**.

(a)     Subject to the limitations set forth in Section 3.1, the Trustee may pay from the NAS Monitoring Trust Operating Reserve reasonable compensation to the Trustee and any employees,

contractors or professionals retained by the Trust. The amounts of such compensation shall be determined by a vote of the majority members of the TAC.

(b)    The NAS Monitoring Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The NAS Monitoring Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    To the maximum extent permitted by applicable law, the Trustee, members of the TAC, and the Delaware Trustee shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective capacities as Trustee, Delaware Trustee, or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence, or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, or members of the TAC shall be satisfied from the NAS Monitoring Trust.

(b)    Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from

which they are indemnified by the NAS Monitoring Trust pursuant to Section 4.6(a) herein, shall be paid by the NAS Monitoring Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable) is not entitled to be indemnified by the NAS Monitoring Trust.

(c)    The NAS Monitoring Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee, or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee, or Additional Indemnitee.

**4.7    Lien.** The Trustee, the Delaware Trustee, members of the TAC, and the Additional Indemnitees shall have a first priority lien upon the NAS Monitoring Trust Assets to secure the payment of any amounts payable to them pursuant to Section  4.6 herein or any undisputed compensation.

**4.8    Trustee's Employment of Experts.**

(a)    The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the NAS Monitoring Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense.

31

In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Unauthorized Business.** The Trustee shall not at any time on behalf of the NAS Monitoring Trust: (a) enter into or engage in any business not authorized by this Trust Agreement; (b) accept an assignment of any right of action from any individual or entity other than the Debtors or their respective insurers; or (c) assume any liabilities of any individual or entity other than the Debtors.  Furthermore, no part of the Trust, including its Net Trust Assets or its Trust Subaccounts, or interest or income derived therefrom, shall be used or disposed of by the Trustee in furtherance of any business, enterprise, objective or purpose other than as authorized by the Plan or this Trust Agreement.

**4.10    Trustee Independence.** The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Debtors.  The Trustee shall not be a director, officer, employee, agent, or participant in any NAS Abatement Program which may be funded by the NAS Monitoring Trust, and the Trustee shall not receive or derive, directly or indirectly, any money or economic benefit therefrom.  This limitation shall apply irrespective of whether the conduct of any such unauthorized business, enterprise, objective, or purpose is deemed by the Trustee to be necessary or proper for the operation, administration, conservation or protection of the NAS Monitoring Trust.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.11** **Limitation of Trustee's Authority.** Except as authorized by the Plan, the Confirmation Order, the Final Order, and/or this Trust Agreement, the NAS Monitoring Trust shall have no objective or authority to carry on or conduct any trade or business, or accept an assignment of any claim or right of action from, or assume liabilities of, any individual or entity other than the Debtors, including their predecessors and successors in interest.  No part of the Net Trust Assets, or revenue or income derived therefrom, shall be used or disposed of by the NAS Monitoring Trust in furtherance of any unauthorized trade or business.

**4.12** **Confidentiality.**  The Trustee shall, during the period that it serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Trustee's removal, incapacity or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the NAS Monitoring Trust Assets relate or of which it has become aware in its capacity as Trustee. Subject to requirements for public disclosure of information set forth in this Trust Agreement or under applicable law, the Trustee shall exercise his/her/its discretion in designating information as confidential.

**4.13** **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.14** **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.  The Delaware Trustee shall either be: (i) a natural person who is at least 21 years of age and a resident of the State of Delaware; or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law, and shall act through one or more persons

33

authorized to bind such entity.  The initial Delaware Trustee shall be Wilmington Trust, National Association.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section  4.14, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.14(c) herein.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the NAS Monitoring Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to: (i) accepting legal process served on the NAS Monitoring Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for acts or omissions of the Trustee.  Any permissive rights of the Delaware Trustee to do things enumerated in this Trust

Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the NAS Monitoring Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.14(d) herein; provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.14(d) herein.  If the Trustee does not act within such 60-day period,

the Delaware Trustee, at the expense of the NAS Monitoring Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.  The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the NAS Monitoring Trust in accordance with section 3810 of the Act.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the NAS Monitoring Trust.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)      The NAS Monitoring Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)      The Delaware Trustee shall be permitted to retain counsel as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

(i)      Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(j)      The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the NAS Monitoring Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may

assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities as to the validity, sufficiency, value, genuineness, ownership or transferability of any NAS Monitoring Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making nor be required to make, any representations thereto.

(k)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any change in law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; military disturbances; sabotage; loss or malfunctions of utilities, acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(l)     Notwithstanding anything to the contrary in this Agreement (other than Section 4.6 hereof), the NAS Monitoring Trust shall not be required to advance or reimburse any expense of the Delaware Trustee in excess of $500 to the extent that the Trustee has not approved such expense in writing; provided, however, such approval shall not be required with respect to the expense of filing any certificate required to be filed pursuant to the Act.

## SECTION V
## TRUST ADVISORY COMMITTEE

 **5.1**     **Members**. The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall consist at all times of three (3) members, who shall initially be: Dr. Kanwaljeet ("Sunny") Anand, Dr. Koraly Pérez-Edgar, and Dr. Reed Tuckson.  The initial members of the TAC, as well as any successor members of the TAC, shall be independent experts in medical,

epidemiological, or other scientific fields and knowledgeable with regard to opioids, opioid use disorder, NAS, NAS Children, and/or medical, governmental or societal outreach, counseling, or intervention programs that would serve to abate, mitigate, or treat the condition or occurrence of Neonatal Abstinence Syndrome.  Of the three (3) members of the TAC, the NAS Committee shall select experts for appointment to and service on the TAC.  The TAC, in its discretion, may appoint ex officio members by the affirmative vote of a majority of the TAC.  Ex officio members of the TAC shall not be entitled to vote.  Each ex officio member shall be subject to all restrictions contained in this Trust Agreement. Dr. Seema Gupta, Ms. Kathy Strain and Ms. Kara Trainor shall be ex officio members.

**5.2    Duties.** The members of the TAC shall serve in a fiduciary, scientific, technical, operational and advisory capacity to the NAS Monitoring Trust and shall assist the Trustee in the identification of NAS Abatement Programs for potential funding and in the determination of Awards of Grants to Grant Recipients or Grantees for the funding of NAS Abatement Programs in accordance with the NAS Monitoring TDP.  The TAC shall have no fiduciary obligations or duties except as set forth in the preceding sentence.  In addition, the members of the TAC will perform those functions which are necessary and which relate to issues or decisions which require the consent and approval of the TAC under the terms of this Trust Agreement.  The Trustee must consult with the TAC on matters identified in Section 2.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(e) herein.  Where provided in the NAS Monitoring TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the

TAC.  To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP, the Plan and the Confirmation Order).

**5.3    Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of: (i) his or her death; (ii) his or her resignation pursuant to Section 5.3(b) herein; (iii) his or her removal pursuant to Section 5.3(c) herein; (iv) the end of his or her term as provided herein; or (v) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause.  Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC or the NAS Monitoring Trustee.

**5.4    Appointment of Successors**.

(a)    In the event of death, resignation, or removal of a member of the TAC, a successor member shall be appointed such that the TAC shall continue to consist, at all times, of three (3) members.  A successor member of the TAC shall be selected by a majority vote of the remaining members of the TAC and the Trustee.

(b)    Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal, or (iv) the termination of the NAS Monitoring Trust pursuant to Section  6.3, below.  No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member.  No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5    TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the **"TAC Professionals"**).  The TAC and the TAC Professionals shall at all times have complete access to the NAS Monitoring Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the NAS Monitoring Trust or the Trustee.  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter

submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)     The NAS Monitoring Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder.  The NAS Monitoring Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that: (i) the TAC has first submitted to the NAS Monitoring Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice; and (ii) the NAS Monitoring Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied.  If the NAS Monitoring Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an NAS Monitoring Trust expense.  If the NAS Monitoring Trust declines to pay for the TAC Professional, it must set forth its reasons in writing.  If the TAC still desires to employ the TAC Professional at the NAS Monitoring Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 6.14 herein.

(c)     In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the NAS Monitoring Trust pays such counsel's fees and related expenses, any

42

communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the NAS Monitoring Trust pays such counsel's fees and related expenses.

**5.6    Compensation and Expenses of the TAC.** Subject to the limitations set forth in Section 4.5 above, each member of the TAC shall receive compensation from the NAS Monitoring Trust Operating Reserve for attendance at meetings or the performance of other Trust business at a reasonable hourly rate set and determined by a majority vote of the members of the TAC. The Trustee shall promptly reimburse each member of the TAC from the NAS Monitoring Trust Operating Reserve for any reasonable out-of-pocket fees and expenses incurred by him or her in connection with the performance of his or her duties as a member of the TAC. The NAS Monitoring Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be provided to the Opioid MDT II pursuant to Section 2.2.

<div align="center">

**SECTION VI**
**GENERAL PROVISIONS**

</div>

**6.1    Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to Trust Professionals and other experts retained by the NAS Monitoring Trust and

<div align="center">43</div>

its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the TAC or its members: (a) have any role, whether by consent, consultation or otherwise, in the NAS Monitoring Trust's selection of counsel, experts or other professionals to defend Trust Claims against the NAS Monitoring Trust; or (b) have any right to consult with or obtain information from the NAS Monitoring Trust or anyone employed by the NAS Monitoring Trust concerning the defense of any such NAS Monitoring Trust Claims.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.1, the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)   Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) herein, the NAS Monitoring TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating

44

that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)    The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree.  The TAC may not withhold its consent unreasonably.  If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then

consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.14. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the NAS Monitoring Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2    Irrevocability.**    To the fullest extent permitted by applicable law, the NAS Monitoring Trust is irrevocable.

**6.3    Term; Termination**.

(a)    The term for which the NAS Monitoring Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)    The NAS Monitoring Trust shall automatically dissolve on the earlier of the date (the **"Dissolution Date"**): (i) that is 24 months after the NAS Monitoring Trust receives its last Abatement Distribution from the MDT, unless the Trustee determines, after consulting with the TAC, to extend the Dissolution Date for an additional 12 months; or (ii) on which the Trustee determines to dissolve the NAS Monitoring Trust upon completion of its duties and the satisfaction of the purposes of the NAS Monitoring Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the NAS Monitoring Trust's affairs by the Trustee and payment of all the NAS Monitoring Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the NAS Monitoring Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that: (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD; and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code.    Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the NAS Monitoring Trust Assets, the NAS Monitoring Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the NAS Monitoring Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the NAS Monitoring Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)    After the termination of the NAS Monitoring Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until all duties under the Plan and this Trust Agreement have been fully performed.    Upon distribution of all of the assets of the NAS Monitoring Trust, or the proceeds thereof, the Trustee shall hold the books,

records and files delivered to or created by the Trustee for a period of four years after the last distribution of assets from the NAS Monitoring Trust is made.  All costs and expenses associated with the storage of such documents shall be paid by the Trust.  At the Trustee's discretion, all such records and documents may be destroyed at any time after four years from the distribution of all of the assets of the NAS Monitoring Trust.  Except as otherwise specifically provided herein, upon the distribution of all of the assets of the NAS Monitoring Trust, the Trustee shall have no further duties or obligations hereunder except to: (a) account and report as provided in Section  2.1 above; and (b) perform such other acts as may be required by law.

(f)    Upon termination of the Trust, the Trustee shall file an accounting with the Bankruptcy Court setting forth the amount the Trustee has collected and disbursed, as well as the fees and expenses incurred in administering the Trust, including the fees and expenses incurred by the Trustee and its professionals.  The Trustee shall seek the issuance and entry of any orders necessary to approve such accounting and discharge the Trustee, the Delaware Trustee, and members of the TAC from any and all liability for acts or omissions in administering the NAS Monitoring Trust or for serving in their designated capacities under the Plan and this Trust Agreement.  The Trust's professionals shall be required to maintain accurate time and expense records.

**6.4    Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section  6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the NAS Monitoring TDP; provided, however, that no amendment to the NAS Monitoring TDP shall: (i) be inconsistent with the Plan or this Trust Agreement; (ii) have a

48

material and adverse effect on Grant Recipients or Grantees' entitlements to NAS Monitoring Grants; or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the NAS Monitoring TDP to the contrary, neither this Trust Agreement, the NAS Monitoring TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify: (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the NAS Monitoring Trust; (ii) the efficacy or enforceability of the Opioid Permanent Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan; (iii) the treatment of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order.  Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.  Any material change to the NAS Monitoring Trust Agreement or the NAS Monitoring Trust shall be made known to the notice parties in accordance with Section  6.7 below.

   **6.5**    **No Association, Partnership or Joint Venture.** This Trust Agreement is not intended to create and shall not be interpreted as creating an association, partnership, or joint venture of any kind.

   **6.6**    **Severability.** Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.  If any term or provision so severed from this Trust shall be material to the purposes of the NAS Monitoring Trust or the fulfillment or execution thereof, the Trustee shall petition the Bankruptcy Court for amendment or reformation

of this Trust Agreement.  The remaining terms and provisions of this Trust Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Trust Agreement. Moreover, this Trust Agreement shall be construed so as to limit any term or provision so as to make it a legal, valid and enforceable provision; provided, however, that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

6.7    **Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the NAS Monitoring Trust in accordance with the NAS Monitoring TDP with respect to his or her NAS Monitoring Opioid Claim, or by such other means, including electronic notice, as may be agreed between the NAS Monitoring Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

To the NAS Monitoring Trust through the Trustee:

Donald R. Cravins, Jr., Esq.
c/o National Urban League
80 Pine Street
9th Floor
New York, NY 10005

With a copy to:

Harold D. Israel
Levenfeld Pearlstein, LLC

50

2 North LaSalle Street
Suite 1300
Chicago, IL 60602

To the Delaware Trustee:

Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE 19890
Attn: David Young
Email: DYoung@wilmingtontrust.com]

To the TAC:

Stanford University School of Medicine
770 Welch Road
Suite 435
Stanford, CA 94304
Attn: Dr. Kanwaljeet ("Sunny") Anan
Email: anandsunny108@gmail.com

Pennsylvania State University
270 Moore Building
University Park, PA 16802
Attn: Koraly Pérez-Edgar
Email: kxp24@psu.edu

Tuckson Health Connections, LLC
227 Sandy Springs Place
Suite D-346
Sandy Springs, GA 30328
Attn: Dr. Reed Tuckson
Email: drreed@tucksonhealthconnections.com

To the Plan Administration Trust:

M. Christina Ricarte
[c/o PurdueKnoa Pharma L.P.]LLC
201 Tresser BlvdBoulevard
Stamford, CT 06901
Email: christina.ricarte@pharma.com

With a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP

450 Lexington Ave Avenue
New York, NY 10017
Attn: Eli Vonnegut
Email: eli.vonnegut@davispolk.com

(c)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

6.8    **Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the NAS Monitoring Trust, the TAC, the Trustee, and the Debtors, any Grant Recipient or Grantee that is Awarded a Grant or receives an Abatement Distribution, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section  4.3 herein, the TAC members in accordance with Section  5.4 herein.

6.9    **Limitation on Claim Interests for Securities Laws Purposes**. NAS Monitoring Opioid Claims, and any interests therein: (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section  6.9 shall not apply to the holder of a claim that is subrogated to an NAS Monitoring Opioid Claim as a result of its resolution of such NAS Monitoring Opioid Claim.

6.10    **Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the NAS Monitoring TDP), and this Trust Agreement and such documents

52

supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

 **6.11   Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

 **6.12   Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the NAS Monitoring Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or

concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of assets of the NAS Monitoring Trust; (g) the existence of rights or interests (beneficial or otherwise), if any, in assets of the NAS Monitoring Trust; (h) the ability of beneficial owners, if any, or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the NAS Monitoring Trust.

 6.13  **Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.  The Debtors agree to cooperate in the creation of the NAS Monitoring Trust.

 6.14  **Dispute Resolution.**  Any disputes between the Trustee and the TAC that arise under this Trust Agreement or under the NAS Monitoring TDP shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) consisting of arbitration before a single arbitrator to be appointed by the Bankruptcy Court.  Should any party to the ADR process be dissatisfied with the decision of the arbitrator, that party may apply to the Bankruptcy Court for a judicial determination of the matter.  In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.

**6.15    Enforcement and Administration.**  The provisions of this Trust Agreement and the NAS Monitoring TDP shall be enforced by the Bankruptcy Court pursuant to Article X of the Plan and the Confirmation Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the NAS Monitoring TDP and are not resolved by alternative dispute resolution in accordance with Section  6.14 herein.

**6.16    Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.17    Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

**6.18    Rights of Holders of NAS Monitoring Opioid Claims.** Notwithstanding any provision of this Trust Agreement to the contrary, the Holders of NAS Monitoring Channeled claims shall not be deemed to be beneficiaries of the NAS Monitoring Trust except for the sole purpose set forth in Section 1.5(e) herein.

IN WITNESS WHEREOF, the parties have executed this NAS Monitoring Trust

Agreement this the [___] day of [_____], [20___].

MALLINCKRODT PLC

By: _____

Title: _____

Donald R. Cravens, Jr., solely in his/her/its capacity as TRUSTEE

By: _____

Title: _____

WILMINGTON TRUST, NATIONAL ASSOCIATION, solely in its capacity as DELAWARE TRUSTEE

By: _____

Title: _____

TRUST ADVISORY COMMITTEE:

Dr. Kanwaljeet ("Sunny") Anand, solely in his capacity as a member of the TRUST ADVISORY COMMITTEE

_____

Dr. Koraly Pérez-Edgar, solely in his capacity as a member of the TRUST ADVISORY COMMITTEE

_____

Dr. Reed Tuckson, solely in his capacity as a member of the TRUST ADVISORY COMMITTEE

_____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**Exhibit 2**

**TRUST DISTRIBUTION PROCEDURES**

**NAS MONITORING TRUST AGREEMENT**

**DATED AS OF [☐], 2021**

# TABLE OF CONTENTS

## SECTION I
## AGREEMENT OF TRUST

1.1  Creation and Name ................................................................................. 3
1.2  Purpose .................................................................................................. 4
1.3  Transfer of Assets .................................................................................. 6
1.4  Definitions .............................................................................................. 7
1.5  Acceptance of Assets and Assumption of Liabilities .............................. 9
1.6  Channeling Injunction ............................................................................ 11

## SECTION II
## POWERS AND TRUST ADMINISTRATION

2.1  Powers .................................................................................................. 12
2.2  General Administration ........................................................................... 17
2.3  Qualified Settlement Fund ..................................................................... 21
2.4  Claims Administration ............................................................................ 23

## SECTION III
## ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1  Accounts ............................................................................................... 23
3.2  Investments ........................................................................................... 25
3.3  Source of Payments .............................................................................. 26

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

4.1  Number .................................................................................................. 26
4.2  Term of Service ..................................................................................... 26
4.3  Appointment of Successor Trustee ........................................................ 27
4.4  Liability of Trustee and Others .............................................................. 28
4.5  Compensation and Expenses of Trustee ............................................... 29
4.6  Indemnification of Trustee and Others .................................................. 29
4.7  Lien ....................................................................................................... 30
4.8  Trustee's Employment of Experts .......................................................... 31
4.9  Unauthorized Business .......................................................................... 31
4.10  Trustee Independence ......................................................................... 31
4.11  Limitation of Trustee's Authority .......................................................... 32
4.12  Confidentiality ..................................................................................... 32
4.13  No Bond ............................................................................................... 33
4.14  Delaware Trustee ................................................................................. 33

## SECTION V
## TRUST ADVISORY COMMITTEE

5.1  Members .................................................................................................. 35
5.2  Duties ...................................................................................................... 36
5.3  Term of Office ........................................................................................ 37
5.4  Appointment of Successors .................................................................... 37
5.5  TAC's Employment of Professionals ...................................................... 38
5.6  Compensation and Expenses of the TAC ................................................ 40

## SECTION VI
## GENERAL PROVISIONS

6.1  Procedures for Consulting with or Obtaining Consent of the TAC ........... 40
6.2  Irrevocability .......................................................................................... 43
6.3  Term; Termination .................................................................................. 43
6.4  Amendments ........................................................................................... 45
6.5  No Association, Partnership or Joint Venture .......................................... 46
6.6  Severability ............................................................................................ 46
6.7  Notices ................................................................................................... 47
6.8  Successors and Assigns ........................................................................... 48
6.9  Limitation on Claim Interests for Securities Laws Purposes .................... 48
6.10  Entire Agreement; No Waiver ............................................................... 49
6.11  Headings ............................................................................................... 49
6.12  Governing Law ...................................................................................... 49
6.13  Settlors' Representative and Cooperation .............................................. 50
6.14  Dispute Resolution ................................................................................ 50
6.15  Enforcement and Administration ........................................................... 51
6.16  Effectiveness ......................................................................................... 51
6.17  Counterpart Signatures .......................................................................... 51

**EXHIBIT 1**    **Certificate of Trust**
**EXHIBIT 2**    **Trust Distribution Procedures**

ii

## NAS MONITORING TRUST AGREEMENT

This NAS Monitoring Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *Chapter 11 Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, dated [_____], 2021 (as it may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan"**), by Mallinckrodt PLC and its Debtor Affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust, N.A. (the **"Delaware Trustee"**); Donald R. Cravins, Jr. (the **"Trustee"**); and the members of the NAS Monitoring Trust Advisory Committee (the **"TAC"**) identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the **"Parties"**); and

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the NAS Monitoring TDP.

[2] The Debtors in these cases are as follows: Acthar IP Unlimited Company; IMC Exploration Company; Infacare Pharmaceutical Corporation; INO Therapeutics LLC; Ludlow LLC; MAK LLC; Mallinckrodt APAP LLC; Mallinckrodt ARD Finance LLC; Mallinckrodt ARD Holdings Inc.; Mallinckrodt ARD Holdings Limited; Mallinckrodt ARD IP Unlimited Company; Mallinckrodt ARD LLC; Mallinckrodt Brand Pharmaceuticals LLC; Mallinckrodt Buckingham Unlimited Company; Mallinckrodt Canada ULC; Mallinckrodt CB LLC; Mallinckrodt Critical Care Finance LLC; Mallinckrodt Enterprises Holdings, Inc.; Mallinckrodt Enterprises LLC; Mallinckrodt Enterprises UK Limited; Mallinckrodt Group S.a.r.l.; Mallinckrodt Holdings GmbH; Mallinckrodt Hospital Products Inc.; Mallinckrodt Hospital Products IP Unlimited Company; Mallinckrodt International Finance SA; Mallinckrodt International Holdings S.a.r.l.; Mallinckrodt IP Unlimited Company; Mallinckrodt LLC; Mallinckrodt Lux IP S.a.r.l.; Mallinckrodt Manufacturing LLC; Mallinckrodt Pharma IP Trading Unlimited Company; Mallinckrodt Pharmaceuticals Ireland Limited; Mallinckrodt Pharmaceuticals Limited; Mallinckrodt Quincy S.a.r.l.; Mallinckrodt UK Finance LLP; Mallinckrodt UK Ltd; Mallinckrodt US Holdings LLC; Mallinckrodt US Pool LLC; Mallinckrodt Veterinary, Inc.; Mallinckrodt Windsor Ireland Finance Unlimited Company; Mallinckrodt Windsor S.a.r.l.; MCCH LLC; MEH, Inc.; MHP Finance LLC; MKG Medical UK Ltd; MNK 2011 LLC; MUSHI UK Holdings Limited; Ocera Therapeutics, Inc.; Petten Holdings Inc.; SpecGx Holdings LLC; SpecGx LLC; ST Operations LLC; ST Shared Services LLC; ST US Holdings LLC; ST US Pool LLC; Stratatech Corporation; Sucampo Holdings Inc.; Sucampo Pharma Americas LLC; Sucampo Pharmaceuticals, Inc.; Therakos, Inc.; Vtesse LLC; WebsterGx Holdco LLC; Mallinckrodt Equinox Finance LLC

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 20-12522 (JTD) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**) and known as *In re Mallinckrodt PLC, et al.*, Case No. 20-12522 (JTD).

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the NAS Monitoring Trust (the **"NAS Monitoring Trust"**);

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust shall be established to: (i) assume all liability for the NAS Monitoring Opioid Claims; (ii) hold the NAS Monitoring Opioid Claim(s) and collect the distribution of $1.5 million in cash from the Opioid MDT II and any additional payments; (iii) administer the submission, resolution, and distribution of the NAS Monitoring Opioid Claims; (iv) make distributions to Holders of NAS Monitoring Opioid Claims, in each case in accordance with the NAS Monitoring trust distribution procedures (the **"NAS Monitoring TDP"**), attached hereto as **Exhibit 2**; and (v) carry out such other matters as are set forth in the NAS Monitoring Trust Documents;

**WHEREAS**, the Plan ~~and Opioid MDT II provide~~**provides** that on the Effective Date, any and all liability of Mallinckrodt for any and all NAS Monitoring Opioid Claims shall automatically~~, and without further act, deed, or court order, be channeled to and assumed by the Opioid MDT II solely for the purpose of effectuating the relevant NAS Monitoring Trust Documents, and further provide that immediately thereafter, any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed, or court order,~~ be channeled exclusively to, and all of Mallinckrodt's liability for NAS Monitoring Opioid Claims shall be assumed by, the NAS Monitoring Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the NAS Monitoring Trust shall: (i) hold, manage, and invest all funds and other Assets received by the NAS

2

Monitoring Trust from the Opioid MDT II for the benefit of the beneficiaries of the NAS Monitoring Trust; (ii) hold and maintain the NAS Monitoring Trust Operating Reserve, as defined herein; and (iii) administer, process, resolve, and liquidate all NAS Monitoring Opioid Claims in accordance with the NAS Monitoring TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee, and the TAC that the NAS Monitoring Trust will evaluate the NAS Monitoring Opioid Claims and be in a financial position to make NAS Monitoring Grants (as defined in the NAS Monitoring TDP) to Grant Recipients or Grantees in accordance with the terms of this Trust Agreement and the NAS Monitoring TDP;

**WHEREAS,** all rights of the Holders of NAS Monitoring Opioid Claims arising under this Trust Agreement and the NAS Monitoring TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS**, pursuant to the Plan, the NAS Monitoring Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all NAS Monitoring Opioid Claims, and such injunction has been entered in connection with the Confirmation Order.

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I
## AGREEMENT OF TRUST

**1.1    Creation and Name**. The Parties hereto hereby create a trust known as the "NAS Monitoring Trust," which is the NAS Monitoring Trust provided for and referred to in, *inter alia*, Article IV.X.1 of the Plan.  The Trustee of the NAS Monitoring Trust shall transact the business and affairs of the NAS Monitoring Trust in the name of the NAS Monitoring Trust, and references herein to the NAS Monitoring Trust shall include the Trustee acting on behalf of the NAS Monitoring Trust.  It is the intention of the Parties that the NAS Monitoring Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the **"Act"**) and that this Trust Agreement shall constitute the governing instrument of the NAS Monitoring Trust.  The Trustee and the Delaware Trustee ~~are hereby authorized and directed to execute and file~~executed and filed a Certificate of Trust with the Delaware Secretary of State ~~in the form,~~ attached hereto as **Exhibit 1**.

**1.2    Purpose**.

(a)    The purpose of the NAS Monitoring Trust is to expressly assume sole and exclusive responsibility and liability for the NAS Monitoring Opioid Claims channeled to the NAS Monitoring Trust in accordance with the Opioid MDT II and the Plan, as well as to, among other things:

(i)    hold the NAS Monitoring Opioid Claims and collect the distribution of $1.5 million in cash from the Opioid MDT II and any additional payments due thereunder;

(ii)    administer, process, resolve, and liquidate the NAS Monitoring Opioid Claims as provided in the NAS Monitoring Trust Documents by making NAS Monitoring Grants to Authorized Recipients; *provided, however*, that

4

no Holders of NAS Monitoring Opioid Claims shall receive direct recoveries on account of their NAS Monitoring Opioid Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to Authorized Recipients in accordance with the NAS Monitoring TDP;

(iii)   hold, manage, and invest all funds and other Assets received by the NAS Monitoring Trust from the Debtors and the Opioid MDT II, in each case, for the benefit of the beneficiaries of the NAS Monitoring Trust;

(iv)   qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(v)   pay qualifying attorney's fees pursuant to Article IV.X.8(c) of the Plan;

(vi)   pay assessments to the extent required by Article IV.X.8(a); (c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii)   otherwise comply in all respects with the NAS Monitoring Trust Documents.

(b)   The NAS Monitoring Trust is to use the NAS Monitoring Trust's Assets and income to:

(i)   make NAS Monitoring Grants to the Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP in such a way that such Grant Recipients and Grantees are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

5

(ii)     hold and maintain reserves to pay the fees and expenses incurred with respect to administering the NAS Monitoring Trust (including the NAS Monitoring TDP) and managing the NAS Monitoring Trust Assets (together, the **"NAS Monitoring Trust Operating Expenses"**) of the NAS Monitoring Trust (such reserves, the **"NAS Monitoring Trust Operating Reserve"**), which shall be: (a) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents; and (b) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee;

(iii)    pay the NAS Monitoring Trust Operating Expenses from the NAS Monitoring Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the NAS Monitoring Trust, the NAS Monitoring Trust Operating Reserve from Cash held or received by the NAS Monitoring Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future NAS Monitoring Trust Operating Expenses in accordance with the NAS Monitoring Trust Documents;

(v)     pay all fees and expenses incurred with respect to, among other things, making NAS Monitoring Grants to Grant Recipients and Grantees, including attorneys' fees and costs (together with the NAS Monitoring Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Article IV.X.8(c) of the Plan, as applicable;

(vi)     pay qualifying attorney's fees pursuant to Article IV.X.8(c) of the Plan; and

(vii)     pay assessments to the extent required by Article IV.X.8(a) or Article IV.X.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.

**1.3**     **Transfer of Assets.** Pursuant to Article IV.X.7 of the Plan, the NAS Monitoring Trust has received a distribution of $1.5 million in cash from the Opioid MDT II on the Opioid MDT II Initial Distribution Date, to fund the NAS Monitoring Trust.[4]  In all events, the NAS Monitoring Trust Assets or any other assets to be transferred to the NAS Monitoring Trust under the Plan will be transferred to the NAS Monitoring Trust free and clear of all Claims, Liens, or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person.  The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to the NAS Monitoring Trust as the Trustee may request to effectuate the transfer and assignment of any of the NAS Monitoring Trust Assets (as defined herein) to the NAS Monitoring Trust.

**1.4**     **Definitions.**

(a)     **"Assumed Liability"** means the assumption of liability by the NAS Monitoring Trust for all NAS Monitoring Opioid Claims.

(b)     **"Award"** or **"Awarded"** or **"Awarding"** has the meaning ascribed to such term in the NAS Monitoring TDP.

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(c)    **"Birth Mother"** means the female who gave birth to an NAS Child, or who is pregnant and is using, or is suspected to be using, opioids, or who is dependent upon opioids, regardless of whether the Birth Mother is a Guardian of the NAS Child.

(d)    **"Grant Proposal"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(e)    **"Grant Recipient"** or **"Grantee"** have the meanings ascribed to such terms in the NAS Monitoring TDP.

(f)    **"Guardian"** means the individual or individuals who have physical custody of an NAS Child, or who exercise the duties and responsibilities attendant to daily care for an NAS Child. As used in this Trust Agreement, the term "Guardian" may include not only individual(s) who are legal or court-appointed guardians, but also natural parent(s), grandparent(s), relative(s) of an NAS Child, child protective service appointees, and others to the extent such individual(s) have physical custody of an NAS Child or exercise the duties and responsibilities attendant to daily care for an NAS Child.

(g)    **"NAS"** means Neonatal Abstinence Syndrome or opioid dependency at birth.

(h)    **"NAS Abatement Program"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(i)    **"NAS Committee"** means the Ad Hoc Committee of NAS Children in the *First Amended Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 387].

(j)    **"NAS Monitoring Grants"** has the meaning ascribed to such term in the NAS Monitoring TDP.

8

(k)    **"NAS Monitoring Trust Assets"** mean the gross and aggregate amount of money or the value of any property received by the NAS Monitoring Trust pursuant to the Plan, through payment(s) into the NAS Monitoring Trust through the Opioid MDT II, including the distribution of $1.5 million in cash from the Opioid MDT II, and additional payments due under the Plan, the Opioid MDT II Documents, the NAS Monitoring Trust Documents, or any other documents associated with Confirmation of the Plan.

(l)    "**NAS Monitoring Trust Operating Expenses**" means, with respect to the NAS Monitoring Trust, any and all costs, expenses, fees, taxes, disbursements, debts, or obligations incurred from the operation and administration of the NAS Monitoring Trust, including in connection with the reconciliation and administration of the NAS Monitoring Opioid Claims channeled to the NAS Monitoring Trust, working capital and all compensation, costs and fees of the Trustee of the NAS Monitoring Trust and any professionals retained by the Trustee.  The NAS Monitoring Trust Operating Expenses shall not exceed a value equal to one and one-half percent (1.5%) of the Net Trust Assets (as defined herein) not yet Awarded.

(m)    "**NAS Monitoring Trust Operating Reserve"** means the Trust Subaccount to be established to **the** pay **the** NAS Monitoring Trust Operating Expenses, which shall be: (i) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents; and (ii) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee.  The amounts held in the NAS Monitoring Trust Operating Reserve shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(n)    **"Net Trust Assets**" means the aggregate amount of the NAS Monitoring Trust Assets which remain after payment by the NAS Monitoring Trust of the **attorneys'** fees and

9

expenses **of the attorneys** to the NAS Committee ~~identified in Exhibit 3~~**pursuant to Article IV.X.8.C  of the Plan and the assessments required pursuant to IV.X.8.A of the Plan**.  Net Trust Assets may also include any interest or income, which may accrue from any of the NAS Monitoring Trust Assets.

    **1.5**    **Acceptance of Assets and Assumption of Liabilities**.

        (a)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust hereby expressly accepts the transfer to the NAS Monitoring Trust of the NAS Monitoring Trust Assets or any other transfers contemplated by the Plan and the Opioid MDT II Documents in the time and manner as, and subject to the terms, contemplated in the Plan and the Opioid MDT II Documents.

        (b)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust expressly assumes all liabilities and responsibility for all NAS Monitoring Opioid Claims (except as set forth in the Plan) subject to the NAS Monitoring Trust Documents, and none of the Debtors, the Protected Parties, or the Opioid MDT II shall have any further financial or other responsibility or liability therefor.  Except as otherwise provided in this Trust Agreement, the NAS Monitoring TDP, the Plan, or the Opioid MDT II Documents, the NAS Monitoring Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the NAS Monitoring Opioid Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors and the Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

        (c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NAS Monitoring TDP shall be construed or implemented in a manner that

would cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)     In this Trust Agreement and the NAS Monitoring TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the NAS Monitoring Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of NAS Monitoring Opioid Claims, provided that: (i) the Holders of NAS Monitoring Opioid Claims, as such Beneficial Owners, shall have only such rights with respect to the NAS Monitoring Trust and its assets as are set forth in the NAS Monitoring TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the NAS Monitoring Trust, shall be deemed to apply to the Holders of NAS Monitoring Channeled Claims in their capacity as Beneficial Owners.

(f)     The sole recourse of any Person on account of any NAS Monitoring Opioid Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as, and to the extent provided in the NAS Monitoring TDP.  Holders of NAS Monitoring Opioid Claims are enjoined from asserting against any Debtor or other Protected Party any future litigation, Claims, or Causes of Action arising out of or related to such NAS Monitoring Opioid Claims and may not proceed in any manner against any Debtor or other Protected Party on account of any Claim in any forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS Monitoring Opioid Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS

11

Monitoring TDP.  Notwithstanding the foregoing, no Beneficial Owner shall be entitled to an Abatement Distribution on account of its NAS Monitoring Opioid Claims but may be considered an indirect beneficiary of the NAS Monitoring Trust through an entity that is Awarded an NAS Monitoring Grant pursuant to the NAS Monitoring TDP.[5]

(g)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the NAS Monitoring TDP.

**1.6    Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the NAS Monitoring Trust's assumption of all liability for NAS Monitoring Opioid Claims.

---

[5] No natural person that is a Holder of an NAS Monitoring Channeled Claim may be considered a Grantee or Grant Recipient.

## SECTION II
## POWERS AND TRUST ADMINISTRATION

**2.1    Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the NAS Monitoring Trust in accordance with the provisions of this Trust Agreement, the NAS Monitoring TDP, the Plan and the Confirmation Order.  The Trustee shall, at all times, administer the NAS Monitoring Trust and the NAS Monitoring Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the NAS Monitoring Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Subject to the limitations on the Trustee's powers as set forth herein, the Trustee's powers are exercisable solely in a fiduciary capacity and are to be consistent with and in furtherance of the purposes of this Trust Agreement and the NAS Monitoring TDP, and not otherwise.

(d)    Without limiting the generality of Section 2.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the NAS Monitoring Trust Assets and exercise all rights with respect thereto, including the right to vote, hold, and sell any

13

securities that are included in the NAS Monitoring Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the NAS Monitoring Trust, and/or contract with any qualified institution (including the institution serving as Delaware Trustee), to hold and invest the NAS Monitoring Trust's funds in federally insured and interest-bearing accounts; <u>provided</u> that any investment of monies held within a separate Trust Subaccount, as defined herein, be held separate and distinct from the investments relating to any other Trust Subaccount;

(iii)    enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the NAS Monitoring Trust to operate;

(iv)    pay liabilities and expenses of the NAS Monitoring Trust, including the indemnification obligations set forth in the Plan or herein;

(v)    establish such funds, reserves, and accounts within the NAS Monitoring Trust estate as required by the Plan or this Trust Agreement or as the Trustee otherwise deems necessary in carrying out the purposes of the NAS Monitoring Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)    initiate, prosecute, defend, and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the NAS Monitoring Trust;

(vii)   initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any Asset, liability, or responsibility of the NAS Monitoring Trust.  Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering, or defending against the NAS Monitoring Opioid Claims channeled to the NAS Monitoring Trust and for enforcing the rights of the NAS Monitoring Trust under the Plan, the NAS Monitoring Trust Documents, and related Plan documents;

(viii)  establish, supervise, and administer the NAS Monitoring Trust in accordance with this Trust Agreement and the NAS Monitoring TDP and the terms thereof;

(ix)    appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the NAS Monitoring Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the NAS Monitoring Trust;

(x)     pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the NAS Monitoring Trust in connection with its alternative dispute resolution activities);

15

(xi)     as provided herein: (a) compensate the Trustee, the Delaware Trustee, and the employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents of each of them; and (b) reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the NAS Monitoring Trust;

(xiii)   enter into such other arrangements with third parties as the Trustee deems necessary in carrying out the purposes of the NAS Monitoring Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying): (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, and (d) the officers, employees, consultants, advisors, and agents of each of the NAS Monitoring Trust, the Delaware Trustee, and the TAC, (each of those in (d) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability,

expense, claim, damage, or loss for which he or she is liable under Section 4.6 herein;

(xv)     consult with the TAC at such times and with respect to such issues relating to the purpose, conduct, and affairs of the NAS Monitoring Trust as the Trustee considers desirable;

(xvi)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the NAS Monitoring Trust, any claim, right, action, or cause of action included in the NAS Monitoring Trust Assets or which may otherwise hereafter accrue in favor of the NAS Monitoring Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided, however, that any settlement of any claims in litigation be approved by the Bankruptcy Court and/or a court of competent jurisdiction;

(xvii)   withhold or withdraw yet to be disbursed monies from any Fund (as defined herein) established for the purpose of funding of an NAS Abatement Program sponsored by a Grant Recipient or Grantee, in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Trust pertinent to such Awarded Grant, and/or to recover by all legal means the amount of any Disbursements made to a Grant Recipient or Grantee which has violated or failed to comply with the requirements of the NAS Monitoring Trust with respect to such Awarded and Disbursed Grant; and

(xviii) exercise any and all other rights and take any and all other actions as are permitted, of the Trustee, in accordance with the terms of this Trust Agreement and the Plan.

(e)    The Trustee shall not have the power to guarantee any debt of other persons.

(f)    The Trustee agrees to take the actions of the NAS Monitoring Trust required hereunder.

(g)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections 2.1(d)(i) or (d)(vi) herein, and any act proposed to be performed or taken pursuant to Section 2.2(e) herein.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order, and the NAS Monitoring TDP.  In the event of a conflict between the terms or provisions of: (i) the Plan or the Confirmation Order and (ii) this Trust Agreement or the NAS Monitoring TDP, the terms or provisions of the Plan or the Confirmation Order shall control.  In the event of a conflict between the terms or provisions of this Trust Agreement and the NAS Monitoring TDP, the terms or provisions of the NAS Monitoring TDP shall control.  For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance of the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The NAS Monitoring Trust shall: (i) monitor the use of funds received by Grant Recipients or Grantees of NAS Monitoring Grants in accordance with the NAS Monitoring Authorized Abatement Purposes, and (ii) prepare and deliver to the Opioid MDT II for publication annual reports (each, an "**Annual Report**") on the disbursement and use of NAS Monitoring Grants from the NAS Monitoring Trust and the compliance by Grant Recipients or

Grantees with the NAS Monitoring Authorized Abatement Purposes set forth in the applicable NAS Monitoring Trust Documents.

(c)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(d)    The Trustee shall consult with the TAC on: (i) the general implementation and administration of the NAS Monitoring Trust; (ii) the general implementation and administration of the NAS Monitoring TDP; and (iii) such other matters as may be required under this Trust Agreement or the NAS Monitoring TDP.

(e)    The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section  6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

> (i)    to determine, establish, or change any aspect of the NAS Monitoring TDP;
>
> (ii)    to establish and/or to change the Grant Proposal Form to be provided to be prepared and submitted by potential Grant Recipients or Grantees under the NAS Monitoring TDP;
>
> (iii)    to enter into any agreement with any Grant Recipient or Grantee, including without limitation the Award of a Grant to such Grant Recipient or Grantee for funding of an NAS Abatement Program and the establishment of a Fund for such purpose;
>
> (iv)    to terminate the NAS Monitoring Trust pursuant to Section  6.3 herein;
>
> (v)    to change the compensation of the members of the TAC, the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to

reflect changes approved by the Bankruptcy Court as otherwise provided herein; provided that any change to the compensation of the Delaware Trustee shall also require the consent of the Delaware Trustee;

(vi)    to take actions to minimize any tax on the NAS Monitoring Trust Assets; provided that no such action may be taken if it prevents the NAS Monitoring Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes;

(vii)    to amend any provision of this Trust Agreement or the NAS Monitoring TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(viii)    to acquire an interest in, or to merge any claims resolution organization formed by the NAS Monitoring Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the NAS Monitoring TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the NAS Monitoring TDP, or permit any other party to join in any claims resolution organization that

is formed by the NAS Monitoring Trust pursuant to this Trust Agreement or the NAS Monitoring TDP; provided that such acquisition, merger, contract, or joinder shall not: (a) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the NAS Monitoring TDP; or (b) cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of NAS Monitoring Opioid Claims in accordance with the NAS Monitoring TDP;

(ix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the NAS Monitoring Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(f)    The Trustee shall meet with the TAC no less often than annually but shall meet with the TAC on the frequency required to obtain the consent and approval of a majority of the members of the TAC as required by this Trust Agreement.  Meetings between the Trustee and the TAC may be held in person, telephonically, or by video conferencing.

(g)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration

21

by the NAS Monitoring Trust.  The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the NAS Monitoring Trust.

(h)     If a special meeting is requested by a majority of the members of the TAC, the Trustee shall notice, hold, and attend such meeting.  Reasonably prior to such meeting, the TAC shall provide the Trustee with an agenda of the issues for discussion or resolution at such special meeting.

**2.3     Qualified Settlement Fund**.

(a)     The NAS Monitoring Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" within the meaning of the QSF Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the NAS Monitoring Trust or any Trust Subaccount (as defined herein) or Series (as defined herein) will be treated as a transfer to a trust satisfying the requirements of the QSF Regulations.

(b)     The Trustee shall be the "administrator" of the NAS Monitoring Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations, and shall: (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the NAS Monitoring Trust Operating Reserve, all taxes required to be paid by the NAS Monitoring Trust; (ii) comply with all applicable reporting and withholding obligations; (iii) satisfy all requirements necessary to qualify and maintain qualification of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; and (iv) take no action that could cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.  Even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the NAS Monitoring Trust's tax matters, including, without limitation, tax audits, claims, defenses, and proceedings.  The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the NAS Monitoring Trust for all taxable periods through the dissolution of the NAS Monitoring Trust.  The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the NAS Monitoring Trust that is required by any governmental unit and be responsible for payment, out of the NAS Monitoring Trust Assets, of any taxes imposed on the NAS Monitoring Trust or its assets.  Taxes shall not be considered expenses for the operation and administration of the NAS Monitoring Trust, which are subject to the limitation set forth in Section 3.3(a).

(d)    No provision in this Trust Agreement shall be construed to mandate any Abatement Distribution on any claim or other action that would contravene the Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of the QSF Regulations.

(e)    The NAS Monitoring Trust may withhold from any Abatement Distribution to a Grant Recipient or Grantee such sum or sums as may be necessary to pay any taxes or other charges which have been or may be imposed on the NAS Monitoring Trust under the income tax laws of the United States or of any state or political subdivision or entity by reason of any Abatement Distribution provided for herein or in the Plan or this Agreement, whenever such withholding is required by any law, regulation, rule, ruling, directive or other governmental requirement.  All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Grant Recipient or Grantee for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect such tax information from the Grant Recipient or Grantee (including tax identification numbers), as the Trustee in its sole discretion

deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement.  In order to receive Abatement Distributions, all Grant Recipients or Grantees shall be required to provide tax information to the Trustee to the extent the Trustee deem appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make an Abatement Distribution to a Grant Recipient or Grantee that fails to furnish such information in a timely fashion; provided, however, that, upon the delivery of such information by a Grant Recipient or Grantee, the Trustee shall make such Abatement Distribution to which such Grant Recipient or Grantee is entitled, without additional interest occasioned by such Grant Recipient's or Grantee's delay in providing tax information. Notwithstanding the foregoing, if a Grant Recipient or Grantee fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Abatement Distribution shall irrevocably revert to the Trust, and any right of the Grant Recipient or Grantee to such Abatement Distribution shall be discharged and forever barred from assertion against the NAS Monitoring Trust or its property.

(f)     The Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this Section 2. Notwithstanding the foregoing, but without prejudice to the Trust's rights hereunder, a Grant Recipient or Grantee receiving **aan** NAS Monitoring Grant shall have the right with respect to the United States or any state or political subdivision or entity to contest the imposition of any tax or other charge by reason of any Abatement Distribution hereunder or under the Plan to the extent permitted by law.

(g)     The Trustee shall file, or cause to be filed, any other statements, returns or disclosures relating to the NAS Monitoring Trust that are required by any governmental unit or applicable law.

**2.4     Claims Administration.** The Trustee shall promptly proceed to implement the NAS Monitoring TDP.

<div align="center">

**SECTION III**
**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

</div>

**3.1     Accounts**.

(a)     The Trustee may, from time to time, create such accounts and reserves within the NAS Monitoring Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and the making NAS Monitoring Grants to Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**).  Any such Trust Subaccounts established by the Trustee shall be held as NAS Monitoring Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)     The Trustee shall establish, for bookkeeping purposes, a separate Trust Subaccount for each NAS Monitoring Grant Awarded, and the Abatement Distribution to a Grant Recipient or Grantee for funding of an NAS Abatement Program shall be paid from such Trust Subaccount established by the Trustee for such Grant Recipient or Grantee.  No Grant Recipient or Grantee shall have the right to make a claim against the NAS Monitoring Trust or any Trust Subaccount

<div align="center">25</div>

established by the Trust for the Award of a Grant until a specific monetary amount is Awarded to such Grant Recipient or Grantee for the funding of an NAS Abatement Program.

(c)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the Annual Reports to be provided to the Opioid MDT II pursuant to the Plan and Section 2.2 above.

(d)    With the exception of the NAS Monitoring Trust Operating Reserve, the amounts in which shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets, the Net Trust Assets of the NAS Monitoring Trust shall be reserved for the payment of amounts which the NAS Monitoring Trust Awards as Grants to fund NAS Abatement Programs. In no event shall any of the Net Trust Assets of the NAS Monitoring Trust be utilized or expended for payments on account of any NAS Monitoring Claims.

(e)    As authorized by ~~Sections~~sections 3804 and 3806 of the Act, the Certificate of Trust shall declare that any Fund established by this Trust Agreement shall constitute a separate and distinct Series of the NAS Monitoring Trust, such that the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Fund shall be enforceable against the assets of such Fund only, and not against the assets of the NAS Monitoring Trust generally or any other Fund established by the NAS Monitoring Trust.  To effectuate such enhanced liability limitation, the Trustee shall: (a) maintain separate and distinct records for each Fund; (b) hold and account for the assets of each Fund by separate and distinct accounts and records which are held and maintained separately from the other assets of the NAS Monitoring Trust and any other Fund thereof; and (c) set forth in the filed Certificate of Trust the

26

terms and provisions of this paragraph so as to give legal notice of this enhanced liability limitation to all non-parties to this Agreement. The terms "Fund," "Trust Subaccount," and "Series," as used in this Agreement, shall be synonymous.

**3.2** **Investments.** Though not anticipated, any investment of monies held in the NAS Monitoring Trust shall be administered by the Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3** **Source of Payments.**

(a) All NAS Monitoring Trust expenses and payments, Awards of NAS Monitoring Grants and all liabilities with respect to NAS Monitoring Opioid Claims shall be payable solely by the Trustee out of the NAS Monitoring Trust Assets. Neither the Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any ~~NAS Monitoring~~ Trust ~~expense~~**Expense** or any other liability of the NAS Monitoring Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents. The Delaware Trustee shall not be liable for the payment of any NAS Monitoring Trust expense or any other liability of the NAS Monitoring Trust.

(b) The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c) The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the NAS Monitoring Trust.

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

**4.1    Number.** In addition to the Delaware Trustee appointed pursuant to Section 4.14, there shall be one (1) Trustee, which shall be the Person appearing on the signature page(s) of this Trust Agreement.

**4.2    Term of Service.**

(a)    The Trustee shall serve from the Effective Date until the earliest of: (i) the end of his or her term; (ii) his or her death; (iii) his or her resignation pursuant to Section 4.2(b) herein; (iv) his or her removal pursuant to Section 4.2(c) herein; or (v) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the Opioid MDT II Trustee(s). Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    In the event that the Trustee becomes unable to discharge his or her duties hereunder due to an accident or physical or mental deterioration or for other good cause, the Trustee may be removed and replaced pursuant to an order of the Bankruptcy Court at the recommendation of a majority of the members of the TAC. Good cause shall be deemed to include, without limitation, any substantial failure of the Trustee to comply with the provisions of this Trust Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall require the appointment of a successor Trustee by the Bankruptcy Court.

**4.3**    **Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the majority vote of the TAC.  In the event that the TAC fails to secure a majority vote for the appointment of a Successor Trustee, the Bankruptcy Court shall make the appointment.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of: (i) his or her death; (ii) his or her resignation pursuant to Section  4.2(b) herein; (iii) his or her removal pursuant to Section 4.2(c) herein; or (iv) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

(e)    The resignation or removal of the Trustee shall not operate to terminate the NAS Monitoring Trust or to revoke or invalidate any action taken by the Trust.

(f)    In the event of the resignation or removal of the Trustee, such Trustee shall: (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of the Trustee's capacity under this Trust Agreement and the conveyance of the assets then held by the Trustee to such Trustee's successor; (b) deliver to the successor Trustee all documents, instruments, records and

other writings related to the NAS Monitoring Trust as may be in the possession of the Trustee; and (c) otherwise assist and cooperate in effecting the assumption of his or her obligations and functions by such successor Trustee.

**4.4     Liability of Trustee and Others.** To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee, and the members of the TAC shall not have or incur any liability for actions taken or omitted in their respective capacities, or on behalf of the NAS Monitoring Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective capacities as Trustee, Delaware Trustee, or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.   Any valid indemnification claim of the Trustee, the Delaware Trustee, or members of the TAC shall be satisfied from the NAS Monitoring Trust.

**4.5    Compensation and Expenses of Trustee**.

(a)    Subject to the limitations set forth in Section 3.1, the Trustee may pay from the NAS Monitoring Trust Operating Reserve reasonable compensation to the Trustee and any employees, contractors or professionals retained by the Trust.    The amounts of such compensation shall be determined by a vote of the majority members of the TAC.

(b)    The NAS Monitoring Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The NAS Monitoring Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    To the maximum extent permitted by applicable law, the Trustee, members of the TAC, and the Delaware Trustee shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective capacities as Trustee, Delaware Trustee, or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence, or fraud.    Any valid indemnification claim of the Trustee, the Delaware Trustee, or members of the TAC shall be satisfied from the NAS Monitoring Trust.

31

(b)     Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the NAS Monitoring Trust pursuant to Section 4.6(a) herein, shall be paid by the NAS Monitoring Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable) is not entitled to be indemnified by the NAS Monitoring Trust.

(c)     The NAS Monitoring Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee, or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee, or Additional Indemnitee.

**4.7     Lien.** The Trustee, the Delaware Trustee, members of the TAC, and the Additional Indemnitees shall have a first priority lien upon the NAS Monitoring Trust Assets to secure the payment of any amounts payable to them pursuant to Section  4.6 herein or any undisputed compensation.

**4.8    Trustee's Employment of Experts.**

(a)    The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the NAS Monitoring Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Unauthorized Business.** The Trustee shall not at any time on behalf of the NAS Monitoring Trust: (a) enter into or engage in any business not authorized by this Trust Agreement; (b) accept an assignment of any right of action from any individual or entity other than the Debtors or their respective insurers; or (c) assume any liabilities of any individual or entity other than the Debtors.  Furthermore, no part of the Trust, including its Net Trust Assets or its Trust Subaccounts, or interest or income derived therefrom, shall be used or disposed of by the Trustee in furtherance of any business, enterprise, objective or purpose other than as authorized by the Plan or this Trust Agreement.

**4.10   Trustee Independence.** The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other

professional for the Debtors.  The Trustee shall not be a director, officer, employee, agent, or participant in any NAS Abatement Program which may be funded by the NAS Monitoring Trust, and the Trustee shall not receive or derive, directly or indirectly, any money or economic benefit therefrom.  This limitation shall apply irrespective of whether the conduct of any such unauthorized business, enterprise, objective, or purpose is deemed by the Trustee to be necessary or proper for the operation, administration, conservation or protection of the NAS Monitoring Trust.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.11   Limitation of Trustee's Authority.** Except as authorized by the Plan, the Confirmation Order, the Final Order, and/or this Trust Agreement, the NAS Monitoring Trust shall have no objective or authority to carry on or conduct any trade or business, or accept an assignment of any claim or right of action from, or assume liabilities of, any individual or entity other than the Debtors, including their predecessors and successors in interest.  No part of the Net Trust Assets, or revenue or income derived therefrom, shall be used or disposed of by the NAS Monitoring Trust in furtherance of any unauthorized trade or business.

**4.12   Confidentiality.**  The Trustee shall, during the period that it serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Trustee's removal, incapacity or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the NAS Monitoring Trust Assets relate or of which it has become aware in its capacity as Trustee.  Subject to requirements for public disclosure of information set forth in this Trust Agreement or under applicable law, the Trustee shall exercise his/her/its discretion in designating information as confidential.

**4.13   No Bond.**   Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.14   Delaware Trustee.**

(a)   There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.  The Delaware Trustee shall either be: (i) a natural person who is at least 21 years of age and a resident of the State of Delaware; or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law, and shall act through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be Wilmington Trust, National Association.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section  4.14, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.14(c) herein.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)   The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the NAS Monitoring Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to: (i) accepting legal process served on the NAS Monitoring Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting

solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for acts or omissions of the Trustee.  Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the NAS Monitoring Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

36

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.14(d) herein; provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.14(d) herein.  If the Trustee does not act within such 60-day period, the Delaware Trustee, at the expense of the NAS Monitoring Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust

Agreement.  The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the NAS Monitoring Trust in accordance with section 3810 of the Act.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the NAS Monitoring Trust.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The NAS Monitoring Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)     The Delaware Trustee shall be permitted to retain counsel as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

(i)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(j)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been

38

provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the NAS Monitoring Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or ~~employee~~**employees**, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities as to the validity, sufficiency, value, genuineness, ownership or transferability of any NAS Monitoring Trust Asset, written instructions, or any other documents in connection therewith, and will not~~,~~ be regarded as making nor be required to make, any representations thereto.

(k)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any change in law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; military disturbances; sabotage; loss or malfunctions of utilities, acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(l)     Notwithstanding anything to the contrary in this Agreement (other than Section 4.6 hereof), the NAS Monitoring Trust shall not be required to advance or reimburse any expense of

the Delaware Trustee in excess of $500 to the extent that the Trustee has not approved such expense in writing; provided, however, such approval shall not be required with respect to the expense of filing any certificate required to be filed pursuant to the Act.

## SECTION V
## TRUST ADVISORY COMMITTEE

**5.1** **Members**. The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall consist at all times of three (3) members, who shall initially be: Dr. Kanwaljeet ("Sunny") Anand, Dr. Koraly Pérez-Edgar, and Dr. Reed Tuckson.  The initial members of the TAC, as well as any successor members of the TAC, shall be independent experts in medical, epidemiological, or other scientific fields and knowledgeable with regard to opioids, opioid use disorder, NAS, NAS Children, and/or medical, governmental or societal outreach, counseling, or intervention programs that would serve to abate, mitigate, or treat the condition or occurrence of Neonatal Abstinence Syndrome.  Of the three (3) members of the TAC, the NAS Committee shall select experts for appointment to and service on the TAC.  The TAC, in its discretion, may appoint ex officio members by the affirmative vote of a majority of the TAC.  Ex officio members of the TAC shall not be entitled to vote.  Each ex officio member shall be subject to all restrictions contained in this Trust Agreement. **Dr. Seema Gupta, Ms. Kathy Strain and Ms. Kara Trainor shall be ex officio members.**

**5.2** **Duties.** The members of the TAC shall serve in a fiduciary, scientific, technical, operational and advisory capacity to the NAS Monitoring Trust and shall assist the Trustee in the identification of NAS Abatement Programs for potential funding and in the determination of Awards of Grants to Grant Recipients or Grantees for the funding of NAS Abatement Programs in accordance with the NAS Monitoring TDP.  The TAC shall have no fiduciary obligations or duties except as set forth in the preceding sentence.  In addition, the members of the TAC will

perform those functions which are necessary and which relate to issues or decisions which require the consent and approval of the TAC under the terms of this Trust Agreement. The Trustee must consult with the TAC on matters identified in Section 2.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(e) herein. Where provided in the NAS Monitoring TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP, the Plan and the Confirmation Order).

**5.3    Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of: (i) his or her death; (ii) his or her resignation pursuant to Section 5.3(b) herein; (iii) his or her removal pursuant to Section 5.3(c) herein; (iv) the end of his or her term as provided herein; or (v) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)      A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause.  Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC or the NAS Monitoring Trustee.

**5.4     Appointment of Successors**.

(a)      In the event of death, resignation, or removal of a member of the TAC, a successor member shall be appointed such that the TAC shall continue to consist, at all times, of three (3) members.  A successor member of the TAC shall be selected by a majority vote of the remaining members of the TAC and the Trustee.

(b)      Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal, or (iv) the termination of the NAS Monitoring Trust pursuant to Section  6.3, below.  No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member.  No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5    TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the **"TAC Professionals"**).    The TAC and the TAC Professionals shall at all times have complete access to the NAS Monitoring Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the NAS Monitoring Trust or the Trustee.    In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The NAS Monitoring Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder.    The NAS Monitoring Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that: (i) the TAC has first submitted to the NAS Monitoring Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ

such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice; and (ii) the NAS Monitoring Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied.  If the NAS Monitoring Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an NAS Monitoring Trust expense.  If the NAS Monitoring Trust declines to pay for the TAC Professional, it must set forth its reasons in writing.  If the TAC still desires to employ the TAC Professional at the NAS Monitoring Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 6.14 herein.

(c)    In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the NAS Monitoring Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the NAS Monitoring Trust pays such counsel's fees and related expenses.

**5.6**    **Compensation and Expenses of the TAC.** Subject to the limitations set forth in Section 4.5 above, each member of the TAC shall receive compensation from the NAS Monitoring Trust Operating Reserve for attendance at meetings or the performance of other Trust business at a reasonable hourly rate set and determined by a majority vote of the members of the TAC.  The Trustee shall promptly reimburse each member of the TAC from the NAS Monitoring Trust Operating Reserve for any reasonable out-of-pocket fees and expenses incurred by him or her in

connection with the performance of his or her duties as a member of the TAC.   The NAS Monitoring Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be provided to the Opioid MDT II pursuant to Section 2.2.

## SECTION VI
## GENERAL PROVISIONS

**6.1    Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the TAC or its members: (a) have any role, whether by consent, consultation or otherwise, in the NAS Monitoring Trust's selection of counsel, experts or other professionals to defend Trust Claims against the NAS Monitoring Trust; or (b) have any right to consult with or obtain information from the NAS Monitoring Trust or anyone employed by the NAS Monitoring Trust concerning the defense of any such NAS Monitoring Trust Claims.

(ii)    In determining when to take definitive action on any matter subject to the consultation process set forth in this Section  6.1, the Trustee shall take into consideration the time required for the TAC, if its members so wish,

46

to engage and consult with its own independent financial or investment advisors as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)    Consent Process.

(i)    In the event the Trustee is required to obtain the consent of the TAC pursuant to Section  2.2(f) herein, the NAS Monitoring TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action.  The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree.  The TAC may not withhold its consent unreasonably.   If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section  6.14. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the NAS Monitoring Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2**     **Irrevocability.**   To the fullest extent permitted by applicable law, the NAS Monitoring Trust is irrevocable.

**6.3    Term; Termination**.

(a)    The term for which the NAS Monitoring Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)    The NAS Monitoring Trust shall automatically dissolve on the earlier of **the** date (the **"Dissolution Date"**): (i) that is 24 months after the NAS Monitoring Trust receives its last Abatement Distribution from the MDT, unless the Trustee determines, after consulting with the TAC, to extend the Dissolution Date for an additional 12 months; or (ii) on which the Trustee determines to dissolve the NAS Monitoring Trust upon completion of its duties and the satisfaction of the purposes of the NAS Monitoring Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the NAS Monitoring Trust's affairs by the Trustee and payment of all the NAS Monitoring Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the NAS Monitoring Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that: (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD; and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code.    Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

49

(d)     Following the dissolution and distribution of the NAS Monitoring Trust Assets, the NAS Monitoring Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the NAS Monitoring Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the NAS Monitoring Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)     After the termination of the NAS Monitoring Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until all duties under the Plan and this Trust Agreement have been fully performed.  Upon distribution of all of the assets of the NAS Monitoring Trust, or the proceeds thereof, the Trustee shall hold the books, records and files delivered to or created by the Trustee for a period of four years after the last distribution of assets from the NAS Monitoring Trust is made.  All costs and expenses associated with the storage of such documents shall be paid by the Trust.  At the Trustee's discretion, all such records and documents may be destroyed at any time after four years from the distribution of all of the assets of the NAS Monitoring Trust.  Except as otherwise specifically provided herein, upon the distribution of all of the assets of the NAS Monitoring Trust, the Trustee shall have no further duties or obligations hereunder except to: (a) account and report as provided in Section 2 above; and (b) perform such other acts as may be required by law.

(f)     Upon termination of the Trust, the Trustee shall file an accounting with the Bankruptcy Court setting forth the amount the Trustee has collected and disbursed, as well as the fees and expenses incurred in administering the Trust, including the fees and expenses incurred by the Trustee and its professionals.  The Trustee shall seek the issuance and entry of any orders

necessary to approve such accounting and discharge the Trustee, the Delaware Trustee, and members of the TAC from any and all liability for acts or omissions in administering the NAS Monitoring Trust or for serving in their designated capacities under the Plan and this Trust Agreement. The Trust's professionals shall be required to maintain accurate time and expense records.

**6.4     Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the NAS Monitoring TDP; provided, however, that no amendment to the NAS Monitoring TDP shall: (i) be inconsistent with the Plan or this Trust Agreement; (ii) have a material and adverse effect on Grant Recipients or Grantees' entitlements to NAS Monitoring Grants; or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the NAS Monitoring TDP to the contrary, neither this Trust Agreement, the NAS Monitoring TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify: (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the NAS Monitoring Trust; (ii) the efficacy or enforceability of the Opioid Permanent Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan; (iii) the treatment of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware

Trustee shall require the Delaware Trustee's written consent.  Any material change to the NAS Monitoring Trust Agreement or the NAS Monitoring Trust shall be made known to the notice parties in accordance with Section  6.7 below.

**6.5**     **No Association, Partnership or Joint Venture.** This Trust Agreement is not intended to create and shall not be interpreted as creating an association, partnership, or joint venture of any kind.

**6.6**     **Severability.** Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.  If any term or provision so severed from this Trust shall be material to the purposes of the NAS Monitoring Trust or the fulfillment or execution thereof, the Trustee shall petition the Bankruptcy Court for amendment or reformation of this Trust Agreement.  The remaining terms and provisions of this Trust Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Trust Agreement. Moreover, this Trust Agreement shall be construed so as to limit any term or provision so as to make it a legal, valid and enforceable provision; provided, however, that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

**6.7    Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the NAS Monitoring Trust in accordance with the NAS Monitoring TDP with respect to his or her NAS Monitoring Opioid Claim, or by such other means, including electronic notice, as may be agreed between the NAS Monitoring Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

(c) To the NAS Monitoring Trust through the Trustee:

> Donald R. Cravins, Jr., Esq.
> c/o National Urban League
> 80 Pine Street
> 9th Floor
> New York, NY 10005

With a copy to:

> Harold D. Israel
> Levenfeld Pearlstein, LLC
> 2 North LaSalle Street
> Suite 1300
> Chicago, IL 60602

To the Delaware Trustee:

> Wilmington Trust, National Association
> 1100 North Market Street
> Wilmington, DE 19890
> Attn: David Young
> Email: DYoung@wilmingtontrust.com]

To the TAC:

> ~~Dr. Kanwaljeet ("Sunny") Anan~~
> **Stanford University School of Medicine**
> 770 Welch Road
> Suite 435
> Stanford, CA 94304
> **Attn: Dr. Kanwaljeet ("Sunny") Anan**
> **Email: anandsunny108@gmail.com**

> ~~Koraly Pérez-Edgar~~
> ~~The~~ Pennsylvania State University
> 270 Moore Building
> University Park, PA 16802
> **Attn: Koraly Pérez-Edgar**
> **Email: kxp24@psu.edu**

> ~~Dr. Reed~~ Tuckson **Health Connections, LLC**
> 227 Sandy Springs Place
> Suite D-346
> Sandy Springs, GA 30328
> **Attn: Dr. Reed Tuckson**
> **Email: drreed@tucksonhealthconnections.com**

To the ~~Debtors~~**Plan Administration Trust**:

> **M. Christina Ricarte**
> **[c/o ~~Purdue~~Knoa Pharma L.P.]LLC**
> **201 Tresser ~~Blvd~~Boulevard**
> **Stamford, CT 06901**
> **Email: christina.ricarte@pharma.com**
> **[_____]**

With a copy **(which shall not constitute notice)** to:
> **[_____]**

> **Davis Polk & Wardwell LLP**
> **450 Lexington ~~Ave~~ Avenue**
> **New York, NY 10017**
> **Attn: Eli Vonnegut**
> **Email: eli.vonnegut@davispolk.com**

(c) (d) All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.8** **Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the NAS Monitoring Trust, the TAC, the Trustee, and the Debtors, any Grant Recipient or Grantee that is Awarded a Grant or receives an Abatement Distribution, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.9** **Limitation on Claim Interests for Securities Laws Purposes**. NAS Monitoring Opioid Claims, and any interests therein: (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 6.9 shall not apply to the holder of a claim that is subrogated to an NAS Monitoring Opioid Claim as a result of its resolution of such NAS Monitoring Opioid Claim.

**6.10** **Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the NAS Monitoring TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.

No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

 **6.11   Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

 **6.12   Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the NAS Monitoring Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the

permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of assets of the NAS Monitoring Trust; (g) the existence of rights or interests (beneficial or otherwise), if any, in assets of the NAS Monitoring Trust; (h) the ability of beneficial owners, if any, or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement.   Section 3540 of the Act shall not apply to the NAS Monitoring Trust.

**6.13   Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.  The Debtors agree to cooperate in the creation of the NAS Monitoring Trust.

**6.14   Dispute Resolution.**  Any disputes between the Trustee and the TAC that arise under this Trust Agreement or under the NAS Monitoring TDP shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) consisting of arbitration before a single arbitrator to be appointed by the Bankruptcy Court.  Should any party to the ADR process be dissatisfied with the decision of the arbitrator, that party may apply to the Bankruptcy Court for a judicial determination of the matter.  In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement.  Should the

dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.

**6.15   Enforcement and Administration.**   The provisions of this Trust Agreement and the NAS Monitoring TDP shall be enforced by the Bankruptcy Court pursuant to Article X of the Plan and the Confirmation Order.   The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the NAS Monitoring TDP and are not resolved by alternative dispute resolution in accordance with Section  6.14 herein.

**6.16   Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.17   Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

**6.18   Rights of Holders of NAS Monitoring Opioid Claims.** Notwithstanding any provision of this Trust Agreement to the contrary, the Holders of NAS Monitoring Channeled claims shall not be deemed to be beneficiaries of the NAS Monitoring Trust except for the sole purpose set forth in Section 1.5(e) herein.

IN WITNESS WHEREOF, the parties have executed this NAS Monitoring Trust

Agreement this the [__] day of [________________________], [20__].

MALLINCKRODT PLC

By: ____________________________

Title: ____________________________

Donald R. Cravens, Jr., solely in his/her/its capacity as TRUSTEE

By: ____________________________

Title: ____________________________

WILMINGTON TRUST, NATIONAL ASSOCIATION, solely in ~~his/her/~~its capacity as DELAWARE TRUSTEE

By: ____________________________

Title: ____________________________

TRUST ADVISORY COMMITTEE:

Dr. Kanwaljeet ("Sunny") Anand**, solely in his capacity as a member of the TRUST ADVISORY COMMITTEE**

____________________________

Dr. Koraly Pérez-Edgar**, solely in his capacity as a member of the TRUST ADVISORY COMMITTEE**

____________________________

Dr. Reed Tuckson**, solely in his capacity as a member of the TRUST ADVISORY COMMITTEE**

_____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**TRUST DISTRIBUTION PROCEDURES**

**Exhibit 3**

**MEMBERS AND FIRMS CONSTITUTING THE NAS COMMITTEE**

**Martzell, Bickford & Centola, for the benefit of the Opioid Justice TeamAttention: Scott R. Bickford**

**The Creadore Law Firm, P.C.**
**Attention:  Donald Creadore**
**Law Offices of Kent Harrison Robbins**
**Attention:  Kent Harrison Robbins**