## Exhibit B

**MNK Opioid Abatement Fund, LLC Limited Liability Company Operating Agreement**

**PLEASE TAKE NOTICE** that certain documents, or portions thereof, contained in this Exhibit B and the Nineteenth Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors and such applicable interested parties reserve all of their respective rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement (as amended), with respect to the final form of such documents and to amend, revise, or supplement the Nineteenth Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

---

**MNK OPIOID ABATEMENT FUND, LLC**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**Dated as of [●], 2022**

*Pursuant to the Debtors' Fourth Amended Joint Plan of*
*Reorganization (with Technical Modifications) Dated*
*February 18, 2022*

# TABLE OF CONTENTS

Page

ARTICLE I CERTAIN DEFINITIONS ................................................................. 2
1.1      Definitions.................................................................................................. 2
1.2      Interpretation. ............................................................................................ 5
ARTICLE II ORGANIZATIONAL MATTERS.................................................... 6
2.1      Formation ................................................................................................... 6
2.2      The Certificate............................................................................................ 6
2.3      Name ........................................................................................................... 6
2.4      Purpose........................................................................................................ 6
2.5      Principal Office; Registered Office............................................................ 7
2.6      Term ............................................................................................................ 7
2.7      No State-Law Partnership .......................................................................... 7
ARTICLE III BOARD OF MANAGERS; REPORTING...................................... 7
3.1      Management by the Board of Managers. .................................................... 7
3.2      Composition and Actions of the Board of Managers.................................. 8
3.3      Board Meetings and Actions by Written Consent. ..................................... 9
ARTICLE IV LLC INTERESTS; CAPITAL ACCOUNTS ................................. 10
4.1      Interest Holders. ......................................................................................... 10
4.2      Capital Accounts ........................................................................................ 10
4.3      Capital Contributions ................................................................................. 10
4.4      Negative Capital Accounts......................................................................... 11
4.5      No Withdrawal ........................................................................................... 11
ARTICLE V ALLOCATIONS; DISTRIBUTIONS ............................................. 11
5.1      Allocations of Profits and Losses .............................................................. 11
5.2      Distributions; Withholding. ....................................................................... 11
ARTICLE VI TRANSFER OF LLC INTERESTS ............................................... 13
6.1      No Transfers by Interest Holders .............................................................. 13
ARTICLE VII GENERAL RIGHTS AND OBLIGATIONS OF INTEREST
         HOLDERS ................................................................................................... 13
7.1      Limitation of Liability................................................................................ 13
7.2      Lack of Authority ....................................................................................... 13
7.3      No Right of Partition.................................................................................. 14
ARTICLE VIII RELIANCE, EXCULPATION AND INDEMNIFICATION ............. 14
8.1      Standard of Care; Exculpation. ................................................................. 14
8.2      Reliance by the Managers .......................................................................... 14
8.3      Indemnification. ......................................................................................... 14
ARTICLE IX BOOKS, RECORDS, ACCOUNTING AND REPORTS.................... 16
9.1      Records and Accounting ............................................................................ 16
9.2      Fiscal Year ................................................................................................. 16
9.3      Reports ....................................................................................................... 16
9.4      Financial Reporting.................................................................................... 17
ARTICLE X TAXES .............................................................................................. 17
10.1     Tax Returns ................................................................................................ 17
10.2     Partnership Treatment; Tax Elections........................................................ 17

10.3      Partnership Representative.................................................................................. 17
10.4      Irish-U.S. Tax Treaty Benefits............................................................................ 18
ARTICLE XI DISSOLUTION AND LIQUIDATION .................................................. 18
11.1      Dissolution .......................................................................................................... 18
11.2      Liquidation and Termination ............................................................................... 18
11.3      Cancellation of Certificate .................................................................................. 19
11.4      Reasonable Time for Winding Up ....................................................................... 19
ARTICLE XII GENERAL PROVISIONS ...................................................................... 19
12.1      Amendments ........................................................................................................ 19
12.2      Remedies Cumulative .......................................................................................... 19
12.3      Successors and Assigns........................................................................................ 19
12.4      Severability .......................................................................................................... 20
12.5      Applicable Law .................................................................................................... 20
12.6      Consent to Jurisdiction ........................................................................................ 20
12.7      Addresses and Notices ......................................................................................... 20
12.8      Creditors ............................................................................................................... 20
12.9      Waiver................................................................................................................... 20
12.10    Further Action ...................................................................................................... 21
12.11    Entire Agreement ................................................................................................. 21
12.12    Delivery by Electronic Transmission................................................................... 21

## MNK OPIOID ABATEMENT FUND, LLC

## AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of MNK Opioid Abatement Fund, LLC (the "**Company**"), dated as of [●], 2022 and entered into by and among the Persons identified on the signature pages hereto, implements certain of the terms of the *Debtors' Fourth Amended Joint Plan of Reorganization (with Technical Modifications) dated February 18, 2022* (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**") confirmed by an order entered on March 2, 2022 [Docket No. 66660] (the "**Confirmation Order**") by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in the Chapter 11 cases (the "**Chapter 11 Cases**") of Mallinckrodt plc and its affiliated Debtors[1] (each a "**Debtor**" and collectively, the "**Debtors**"). Each of the Persons identified as such on the signature pages hereto is hereby admitted to the Company as a "member" of the Company within the meaning of the Delaware Act (each such Person hereafter an "**Interest Holder**" and all such Persons collectively, the "**Interest Holders**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect;

**WHEREAS**, the Plan and the Confirmation Order provide, among other things, that on the Effective Date and prior to the effective time of this Agreement (the "**Effective Time**"), (i)

---

[1]   The Debtors in these cases are as follows: Mallinckrodt plc, Acthar IP Unlimited Company, IMC Exploration Company, Infacare Pharmaceutical Corporation, INO Therapeutics LLC, Ludlow LLC, MAK LLC, Mallinckrodt APAP LLC, Mallinckrodt ARD Finance LLC, Mallinckrodt ARD Holdings Inc., Mallinckrodt ARD Holdings Limited, Mallinckrodt ARD IP Unlimited Company, Mallinckrodt ARD LLC, Mallinckrodt Brand Pharmaceuticals LLC, Mallinckrodt Buckingham Unlimited Company, Mallinckrodt Canada ULC, Mallinckrodt CB LLC, Mallinckrodt Critical Care Finance LLC, Mallinckrodt Enterprises Holdings, Inc., Mallinckrodt Enterprises LLC, Mallinckrodt Enterprises UK Limited, Mallinckrodt Group S.a.r.l, Mallinckrodt Holdings GmbH, Mallinckrodt Hospital Products Inc., Mallinckrodt Hospital Products IP Unlimited Company, Mallinckrodt International Finance SA, Mallinckrodt International Holdings S.a.r.l., Mallinckrodt IP Unlimited Company, Mallinckrodt LLC, Mallinckrodt Lux IP S.a.r.l., Mallinckrodt Manufacturing LLC, Mallinckrodt Pharma IP Trading Unlimited Company, Mallinckrodt Pharmaceuticals Ireland Limited, Mallinckrodt Pharmaceuticals Limited, Mallinckrodt Quincy S.a.r.l., Mallinckrodt UK Finance LLP, Mallinckrodt UK Ltd, Mallinckrodt US Holdings LLC, Mallinckrodt US Pool LLC, Mallinckrodt Veterinary, Inc., Mallinckrodt Windsor Ireland Finance Unlimited Company, Mallinckrodt Windsor S.a.r.l., MCCH LLC, MEH, Inc., MHP Finance LLC, MKG Medical UK Ltd, MNK 2011 LLC, MUSHI UK Holdings Limited, Ocera Therapeutics, Inc., Petten Holdings Inc., SpecGx Holdings LLC, SpecGx LLC, ST Operations LLC, ST Shared Services LLC, ST US Holdings LLC, ST US Pool LLC, Stratatech Corporation, Sucampo Holdings Inc., Sucampo Pharma Americas LLC, Sucampo Pharmaceuticals, Inc., Therakos, Inc., Vtesse LLC, WebsterGx Holdco LLC, Mallinckrodt Equinox Finance LLC. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.

Mallinckrodt plc will issue or cause to be transferred warrants (the "**New Opioid Warrants**") to the Company, which at the time of issuance or transfer shall be a wholly-owned subsidiary of Opioid MDT II, each of which New Opioid Warrant will initially entitle the holder thereof to subscribe for one ordinary share, par value $0.01 per share (the "**Ordinary Shares**"), of Mallinckrodt plc, and which will collectively entitle the holder(s) thereof to subscribe for [3,290,675] Ordinary Shares (which is approximately equal to 19.99% of the outstanding Ordinary Shares at the time of the Effective Date, assuming the exercise in full of the New Opioid Warrants; and (ii) Mallinckrodt plc and the Company shall have entered into a Warrant Agreement governing the New Opioid Warrants;

**WHEREAS**, on the Effective Date prior to the Effective Time, Mallinckrodt plc issued or caused to be transferred the New Opioid Warrants to the Company and immediately thereafter, Opioid MDT II transferred the LLC Interests (directly or indirectly, as applicable) to the Interest Holders pursuant to the terms of the Plan;

**WHEREAS**, the New Opioid Warrants were, and the Ordinary Shares will be, issued pursuant to, and on the terms and subject to the conditions set forth in, the Plan in reliance on the exemption afforded by Section 1145 of the Bankruptcy Code from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and of any applicable state securities or "blue sky" laws;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the Company was established as a limited liability company to (i) at the Company's discretion, hold, exercise or sell the New Opioid Warrants and (ii) carry out such other matters as are set forth in this Agreement; and

**WHEREAS**, this Agreement amends and restates the original limited liability company agreement of the Company dated as of the date hereof and sets forth (a) certain rights and obligations relating to the respective ownership interests of the Interest Holders in the Company and (b) the terms governing the internal affairs of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**ARTICLE I**

**<u>CERTAIN DEFINITIONS</u>**

1.1    **<u>Definitions</u>**

Capitalized terms used but not otherwise defined herein shall have the following meanings, provided that any terms not defined herein or in this <u>Article I</u> shall have the meanings set forth in the Plan:

"**Affiliate**" of any particular Person means (a) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether

through the ownership of voting securities, by contract or otherwise, (b) if such Person is a partnership, any partner thereof, and (c) if such Person is a trust, the trustee or beneficiary of such trust.

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Allowed**" has the meaning set forth in Article 1.A.40 of the Plan.

"**Annual Report**" has the meaning set forth in Section 9.1.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**BBA**" means Sections 6221 through 6241 of the Code and the Treasury Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any similar provisions or guidance for state, local or non-U.S. tax purposes

"**Board**" means the Board of Managers established pursuant to Section 3.2.

"**Capital Account**" has the meaning set forth in Section 4.2.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware and attached hereto as **Exhibit 2**.

"**CFC**" means the "controlled foreign corporation" regime under Section 951 through 965 of the Code and Treasury Regulations thereunder.

"**Chairman**" has the meaning set forth in Section 3.3(h).

"**Chapter 11 Cases**" has the meaning set forth in the introductory paragraph hereto.

"**Code**" means the United States Internal Revenue Code of 1986, as amended (including any successor statute).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Assets**" means all assets of the Company held from time to time, including those assets set forth on **Exhibit 1** hereto.

"**Company Operating Expenses**" has the meaning set forth in Section 2.4.

"**Covered Person**" has the meaning set forth in Section 8.1(a).

"**Damages**" has the meaning set forth in Section 8.3(b).

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq.*, as it may be amended from time to time, and any successor thereto.

"**Disbursement Agent**" has the meaning set forth in Section 5.2(a).

"**Distributions**" has the meaning set forth in <u>Section 5.2(a)</u>.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Fiscal Year**" has the meaning set forth in <u>Section 9.2</u>.

"**Governing Documents**" has the meaning set forth in <u>Section 2.4(e)</u>.

"**Interest Holder**" has the meaning set forth in the introductory paragraph hereto.

"**LLC Interest**" means all of the rights and interests of whatsoever nature of the Interest Holders in the Company (including their respective "limited liability company interest" as defined in the Delaware Act, and the right to receive distributions of funds and to receive allocations of income, gain, loss, deduction and credit).

"**Majority Holders**" means collectively those Interest Holders who have the right to receive, in the aggregate, at least fifty and 1/10th percent (50.1%) of any amounts distributed by the Company pursuant to <u>Section 5.2</u> hereof.

"**Manager**" means each manager serving on the Board.

"**NAS PI Trust**" means a sub-trust of the PI Trust (as defined in the Plan) established in connection with the PI Trust Documents (as defined in the Plan) to administer NAS PI Opioid Claims (as defined in the Plan).

"**New Opioid Warrants**" has the meaning set forth in the recitals hereto.

"**Officer**" has the meaning set forth in <u>Section 3.1(b)</u>.

"**Opioid MDT II**" means the master disbursement trust established in accordance with the Plan, the Confirmation Order, and the Opioid MDT II Documents.

"**Opioid MDT II Agreement**" means the Opioid MDT II Trust Agreement, dated as of the date hereof, as amended from time to time.

"**Other Opioid Claims**" has the meaning set forth in Article 1.A.314 of the Plan.

"**Other Opioid Claims Expense**" means an obligation of the Company, if any, to make a payment related to Allowed Other Opioid Claims as provided for in the Plan.

"**Partnership Representative**" has the meaning set forth in <u>Section 10.3</u>.

"**PFIC**" means the "passive foreign investment company" regime under Section 1291 through 1298 of the Code and Treasury Regulations thereunder.

"**Plan**" has the meaning set forth in the introductory paragraph hereto.

4

"**Plan Obligations**" means any obligation, expense, setoff, or reserve that must be paid or set aside prior to payment of the Opioid MDT II Subsequent Distribution (to the extent such obligation is not otherwise satisfied or subject to satisfaction by Opioid MDT II).

"**Profits**" or "**Losses**" for each Fiscal Year shall mean the net taxable income or net taxable loss of the Company, as determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding or other tax of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Tax Distribution Amount**" shall mean, with respect to a particular calendar year, the amount the Managers deem necessary (based on calculations provided by the applicable Interest Holder that contain sufficient detail to make such determination) to pay the U.S. federal, state and local income taxes (with respect to state and local income taxes, net of any federal income tax benefit) payable by an Interest Holder on all taxable income attributable to the New Opioid Warrants or the Ordinary Shares into which they are exercisable.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code.

## 1.2   <u>Interpretation.</u>

(a)     The Exhibits attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article or Exhibit means a Section or Article of, or Exhibit to, this Agreement unless otherwise expressly stated herein.

(b)     All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(c)     A defined term has its defined meaning throughout this Agreement and each Exhibit regardless of whether it appears before or after the place where it is defined.

(d)     The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(e)     The word "or" shall be disjunctive but not exclusive.

(f)      All references to prices, values or monetary amounts refer to United States dollars.

# ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1** **Formation.** The Company has been formed as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act and shall be governed in accordance with this Agreement.

**2.2** **The Certificate.** The Certificate was filed with the Secretary of State of the State of Delaware on May 2, 2022. The Managers hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.3** **Name.** The name of the Company shall be "MNK Opioid Abatement Fund, LLC". The Company's business may be conducted under its name or any other name or names deemed advisable by the Board.

**2.4** **Purpose.** The purposes of the Company shall be to:

(a)      hold the New Opioid Warrants;

(b)      exercise the New Opioid Warrants and borrow funds, as needed, from Opioid MDT II to pay the exercise price of the New Opioid Warrants;

(c)      sell the New Opioid Warrants ;

(d)      borrow funds from Opioid MDT II for the limited purpose of paying any Taxes (including imputed underpayments), fees and expenses incurred in administering the Company and managing the Company Assets (together, the "**Company Operating Expenses**");

(e)      use the Company Assets to:

(i)      make Distributions to the Interest Holders as set forth herein;

(ii)      pay the Company Operating Expenses;

(iii)      pay the Other Opioid Claims Expense to the Opioid MDT II; and

(iv)      pay the Plan Obligations, if any.

(f)      engage in any lawful act or activity, including, entering into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Plan, the Confirmation Order and this Agreement (the "**Governing Documents**"); and

(g)      engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order. In connection therewith, the Company shall hold, manage, protect and monetize the Company Assets in accordance with the terms of the Governing Documents, for the benefit of the Interest Holders.

**2.5     Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.6     Term.** The term of the Company commenced upon the date that the Certificate was filed in the office of the Secretary of State of the State of Delaware. The Company shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

**2.7     No State-Law Partnership.** The Interest Holders intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Interest Holder be a partner or joint venturer of any other Interest Holder by virtue of this Agreement (except for tax purposes as set forth in Section 10.2), and neither this Agreement nor any other document entered into by the Company or any Interest Holder relating to the subject matter hereof shall be construed to suggest otherwise.

## ARTICLE III

## BOARD OF MANAGERS; REPORTING

**3.1     Management by the Board of Managers.**

(a)      Authority of Board of Managers. The business and affairs of the Company shall be managed by or under the direction of the Board, subject to the limitations set forth in this Agreement and as otherwise required by the Delaware Act. The Board is vested the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company. Each Manager shall be a "manager" of the Company as defined in Section 18-101(12) of the Delaware Act. In the event of a conflict between the terms or provisions of the Plan, this Agreement or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement. For the avoidance of doubt, this Agreement shall be construed and

implemented in accordance with the Plan and the Confirmation Order, regardless of whether any provision herein explicitly references the Plan or the Confirmation Order.

(b)     Officers. Subject to direction of the Board, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Board. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Board. The Officers shall hold office until their successors are appointed by the Board, unless the Board specifies otherwise. Any Officer appointed by the Board may be removed by the Board at any time and any vacancy occurring in any office of the Company may be filled by the Board, in its discretion.

(c)     Obligations of Managers. The Managers shall take into account the interests of, and owe fiduciary duties to, each of the Interest Holders in making all decisions on behalf of the Company in accordance with the Plan.

**3.2     Composition and Actions of the Board of Managers.**

(a)     Number. The number of Managers on the Board shall be established at three (3). The initial Managers shall be those persons named on the signature page hereof. The Managers shall, at all times, be the same persons serving as the trustees of Opioid MDT II. For the avoidance of doubt, no Manager may resign from the Company without also resigning as a trustee of Opioid MDT II and none of the Members or the Managers hereunder have the authority to remove any Manager.

(b)     Term. The Managers shall have the same term as the trustees of Opioid MDT II.

(c)     Vacancies. In the event of the death, resignation or removal of a trustee of the Opioid MDT II, such individual's term as a Manager shall automatically terminate and a vacancy shall exist on the Board. The successor Manager shall be the same individual as the individual appointed to the board of trustees of Opioid MDT II as the successor to the trustee whose death, resignation or removal resulted in the vacancy, in accordance with the terms of the Opioid MDT II Agreement.

(d)     Reimbursement of Expenses. The Company shall reimburse all reasonable out-of-pocket costs and expenses incurred by each of the Managers in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Board. The amounts reimbursed to Managers for expenses shall be disclosed in the Annual Report.

(e)     Rights of Inspection. Every Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports and documents of every kind of the Company.

**3.3**     <u>**Board Meetings and Actions by Written Consent.**</u>

(a)     <u>Regular Meetings.</u> The Board shall hold regular meetings not less than annually, which may be held at such times and at such places as may be determined from time to time by the Board.

(b)     <u>Special Meetings.</u>  Special meetings of the Board may be called by any Manager by giving written notice to each other Manager not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, and be given to each Manager by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. If a Manager's address is not shown on such records or is not readily ascertainable, notice to the Manager may be given care of the principal office of the Company. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)     <u>Action and Quorum.</u> In all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn any Board meeting as provided in Section 3.3(f).

(d)     <u>Participation in Meetings by Telephone Conference.</u> Managers may participate in a meeting of the Board by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this Section 3.3(d) shall constitute presence in person at such meeting.

(e)     <u>Waiver of Notice.</u> Notice of a special meeting need not be given to any Manager who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with Company records or made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Board meeting need be specified in any waiver of notice.

(f)     <u>Adjournment.</u> A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g)     <u>Action by Unanimous Written Consent.</u> Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which may be executed in one or

more counterparts. Such writing or Electronic Transmission shall be filed with the meeting minutes of the Board.

      (h)    <u>Chairman.</u> At their first meeting, the initial Managers shall designate one of their number to serve as the Chairman of the Board (the "**Chairman**"), with such administrative and other duties as the Managers may determine. The Managers may change the designation of the individual to serve as Chairman from time to time. The Chairman or, in the Chairman's absence, another Manager selected by the Managers shall preside at meetings of the Managers. If no person is otherwise designated, the Chairman, or the Manager presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Managers.

## ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS

**4.1**    <u>Interest Holders.</u>

      (a)    <u>Admission of Interest Holders.</u> The Interest Holders are those parties set forth on **Exhibit 3** and each such Interest Holder has been admitted as a member upon such Interest Holder's execution of this Agreement.

      (b)    <u>Interest Holder Information.</u> The LLC Interests held by each Interest Holder shall represent (i) all of such Interest Holder's rights, title and interest in the Company and (ii) all of such Interest Holder's rights under this Agreement, including their rights to receive Distributions in accordance with <u>Section 5.2</u> hereof. The LLC Interests held by each Interest Holder are set forth opposite the name of such Interest Holder on **Exhibit 3.** Each Interest Holder's interest in the Company, including such Interest Holder's interest in Profits, Losses and Distributions of the Company, shall be based upon its right under <u>Section 5.2</u> hereof. All LLC Interests shall be uncertificated.

      (c)    <u>Limited Voting Rights.</u> The Interest Holders shall only have such voting rights with respect to the management of the Company as required by non-waivable provisions of applicable law, in which case any such action shall be approved by the Majority Holders.

**4.2**    **Capital Accounts**. A separate capital account (each, a "**Capital Account**") shall be maintained for each Interest Holder in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified to cause the allocations of Profits, Losses, income, gain and credit pursuant to <u>Article V</u> to have substantial economic effect under the Treasury Regulations.

**4.3**    **Capital Contributions**. On the Effective Date, as of the Effective Time, each Interest Holder shall be credited with the capital contributions set forth in the books and records of the Company, which shall equal the fair market value of the property deemed to be contributed to the Company by the applicable Interest Holder. No Interest Holder shall be required to make any additional capital contribution to the Company.

**4.4**    **Negative Capital Accounts**. No Interest Holder shall be required to pay to any other Interest Holder, the Company or any other Person any deficit or negative balance which may exist from time to time in such Interest Holder's Capital Account (including upon and after dissolution of the Company).

**4.5**    **No Withdrawal**. No Interest Holder shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

### ARTICLE V

### ALLOCATIONS; DISTRIBUTIONS

**5.1**    **Allocations of Profits and Losses**. Profits and Losses for each Fiscal Year or other period shall be allocated among the Interest Holders for such Fiscal Year or other period in a manner such that the Capital Account of each Interest Holder, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the Distributions that would be made to such Interest Holder pursuant to Section 11.2 if (a) the Company were dissolved and terminated; (b) its affairs were wound up and the Company Assets were sold for cash; and (c) the net assets of the Company were distributed in accordance with Section 11.2 to the Interest Holders immediately after giving effect to such allocation.  The Board may, in its discretion, make such other assumptions (whether or not consistent with the above assumptions) as it deems necessary or appropriate in order to effectuate the intended economic arrangement of the Interest Holders.  Notwithstanding the foregoing, any special allocations required to be made pursuant to the Treasury Regulations promulgated under Section 704 of the Code, including those related to minimum gain chargebacks and qualified income offsets, shall be made prior to the allocations set forth in the preceding sentences and in the order of priority set forth in the Treasury Regulations.

**5.2**    **Distributions; Withholding.**

   (a)    The Managers shall make, or shall authorize an agent retained by the Company (the "**Disbursement Agent**") to make on their behalf, distributions to the Interest Holders ("**Distributions**") only as, and to the extent set forth in this Section 5.2 and Section 11.2.

   (b)    The Company shall endeavor to notify the Interest Holders of the intended Distribution date by any means determined appropriate by the Managers not less than ten (10) business days prior to such date; provided, however, that the Managers may shorten such notice period in their discretion.

   (c)    After paying Company Operating Expenses and any other Company liabilities or obligations, including but not limited to the Other Opioid Claims Expense and the Plan Obligations (if any), the Managers shall direct Distributions of any remaining amounts to be made to the Interest Holders in a manner consistent with Article IV.X.7 of the Plan, taking into account any prior distributions received pursuant to such provision.

(d)      Distributions may be made by the Managers or by the Disbursement Agent, which may be, without limitation, Opioid MDT II. Distributions shall be made on the dates approved for distribution by the Managers.

(e)      All Distributions under this Agreement shall be made in accordance with the electronic transfer information or address provided by the Interest Holders from time to time. Changes to such electronic transfer information or address, as applicable, must be provided to the Company or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Distribution date; provided, however, that the Managers and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Interest Holders regarding the transfer information of Distributions under this Agreement.

(f)      In the event that any Distribution to an Interest Holder is undeliverable, no further Distribution shall be made to such Interest Holder unless and until the Managers have been notified of the then current electronic transfer information or address by such Interest Holder, at which time such Distribution shall be made without interest. The Managers shall make reasonable efforts to obtain electronic transfer information or addresses for any Interest Holders with respect to any undeliverable Distribution but shall have no obligation to make further inquiry with respect to designated recipients of such Interest Holders.

(g)      To the fullest extent permitted by law, none of the Company Assets or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(h)      Any Taxes that the Company withholds or pays on behalf of or with respect to any Interest Holder pursuant to applicable law shall be treated as having been distributed to such Interest Holder for all purposes of this Agreement and shall reduce Distributions which such Interest Holder would otherwise be entitled to receive pursuant to this Agreement.

(i)      In the event Distributions to an Interest Holder in any given calendar year are less than the Tax Distribution Amount applicable to such Interest Holder for such calendar year and to the extent (i) the Company has cash that is not otherwise required (A) to pay Company Operating Expenses, liabilities, or obligations or (B) for reserves reasonably determined by the Managers to be required, (ii) such cash is legally available for distribution, and (iii) requested in writing by the applicable Interest Holder, the Managers shall declare and pay a Distribution to such requesting Interest Holder up to the Tax Distribution Amount for such calendar year.  Any amounts distributed to an Interest Holder pursuant to this Section 5.2(i) shall be treated as an advance of, and shall reduce dollar-for-dollar, subsequent Distributions to such Interest Holder under Section 5.2.  Notwithstanding anything to the contrary herein, the Company will not be required to make a Distribution pursuant to this Section 5.2(i) if (1) the Company would be required to incur a debt or other obligation in order to fund such Distribution, (2) the Distribution would be in violation of any provision of the Plan, (3) the Interest Holder requesting such Distribution has not demonstrated to the Company that it will be required to make an out-of-pocket payment with respect to the tax liability on which such Distribution is based, (4) the Managers reasonably determine that making such Distribution would subject it to an unreasonable administrative burden, or (5) the Managers reasonably determine that such Distribution would cause the requesting Interest Holder to receive aggregate Distributions (including any past Distributions and Distributions made pursuant to any other provision of this

Agreement) in excess of the aggregate Distributions it would have been entitled to receive pursuant to this Agreement if this Section 5.2(i) were not present.

**ARTICLE VI**

**TRANSFER OF LLC INTERESTS**

**6.1**     **No Transfers by Interest Holders**. No Interest Holder shall transfer any of its LLC Interests. Any purported transfer of any LLC Interests shall be null and void, no such transfer shall be recorded on the Company's books and the purported transferee in any such transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such LLC Interests for all purposes of this Agreement.

**ARTICLE VII**

**GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS**

**7.1**     **Limitation of Liability.**

         (a)     Except as otherwise required by applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Interest Holder shall be obligated for any such debt, obligation, commitment or liability of the Company solely by reason of being a member of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing liability on the Interest Holders for debts, obligations, commitments or liabilities of the Company. For the avoidance of doubt, the Interest Holders shall have no liability hereunder to the fullest extent permitted by law.

         (b)     It is the intent of the Interest Holders that no Distribution to any Interest Holder pursuant to Article V or Article XI hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Distribution to an Interest Holder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Interest Holder receiving any such Distribution shall not be required to return it, in whole or in part, to any Person. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Interest Holder is obligated to return some or all of such Distribution to any Person, such obligation shall be the obligation of such Interest Holder and not of any other Interest Holder.

**7.2**     **Lack of Authority**. Except as expressly set forth herein, no Interest Holder in its capacity as such has the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditures on behalf of the Company, and the Interest Holders hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

**7.3** **No Right of Partition**. No Interest Holder shall have the right to seek or obtain partition by court decree or operation of law of any Company Asset, or the right to own or use particular or individual Company Assets.

## ARTICLE VIII

## RELIANCE, EXCULPATION AND INDEMNIFICATION

**8.1** **Standard of Care; Exculpation.**

(a)     As used herein, the term "**Covered Person**" shall mean each Manager and Officer and each of their respective members, officers, employees, professionals and consultants (in each case exclusive of counsel), or a Designated Indemnitee.  For the avoidance of doubt, "**Covered Person**" shall not include any outside counsel to any Manager, Officer, or the Company unless such outside counsel is a "Designated Indemnitee."

(b)     As used herein, the term "**Designated Indemnitee**" shall mean any counsel (including any outside counsel) designated by action of the Board as a Designated Indemnitee. The Board may delegate to any Manager or Officer its authority to designate individuals as Designated Indemnitees subject to any such limitations as the Board may specify in such delegation; provided, however that no Person shall be a "Designated Indemnitee" with respect to such Person's service in any role prior to the Effective Date, including as an employee, agent or representative of any Debtor or any Subsidiary of any Debtor.

(c)     To the maximum extent permitted by applicable law, a Covered Person shall not have or incur any liability for actions taken or omitted in their capacity as a Covered Person, or on behalf of the Company, except those acts found by Final Order to be arising out of their wilful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or this Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their wilful misconduct, bad faith, gross negligence or fraud.

**8.2** **Reliance by the Managers**. Except as otherwise provided in this Agreement, the Plan or the Confirmation Order, each Manager may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by such Manager to be genuine and to have been signed or presented by the proper party or parties having relevant authority or expertise.

**8.3** **Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Covered Persons shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of

or due to the implementation or administration of the Plan or this Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their wilful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Covered Persons shall be satisfied from the Company.

(b)     The Company shall indemnify and reimburse any Covered Person for reasonable fees and expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the wilful misconduct, bad faith, gross negligence or fraud by or of such Covered Person.

(c)     The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 8.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 8.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     The indemnification provided by this Section 8.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)     The Company shall maintain appropriate liability insurance for the Covered Persons, as determined by the Board in its discretion.

(f)     Notwithstanding anything contained herein to the contrary, any valid indemnification claim of any of the Covered Persons by the Company relating to the matters covered in this Section 8.3 shall be provided out of and to the extent of Company assets only, and no Interest Holder (unless such Interest Holder otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)     If this Section 8.3 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 8.3 to the fullest extent permitted by any applicable portion of this Section 8.3 that shall not have been invalidated.

(h)      The provisions of this <u>Section 8.3</u> shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 8.3</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this <u>Section 8.3</u> that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent.

(i)      The provisions of this <u>Article VIII</u> shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**9.1**   **Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable laws. The detail of these books and records and the duration the Company shall keep such books and records shall be such as to allow the Board to make a full and accurate accounting of all of the Company Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Company, including the assets and liabilities of the Company as of the end of each Fiscal Year and the additions, deductions and cash flows for such Fiscal Year (the "**Annual Report**"); <u>provided, however</u>, that the Managers shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and Distributions among the Interest Holders pursuant to and in accordance with <u>Article V</u> and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement or in the Plan or Confirmation Order, shall be determined by the Board.

**9.2**   **Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**9.3**   **Reports**. Within sixty (60) days after the end of each Fiscal Year, the Company shall cause each Interest Holder to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss of the Company for such period, and a statement of the Company's cash flow for such period, as provided in <u>Section 9.4</u>. Within forty-five (45) days after the end of each fiscal quarter (other than the last fiscal quarter of each year), the Company shall cause each Interest Holder to be furnished with a copy of a quarterly update in form deemed reasonable by the Board.

**9.4**   **Financial Reporting**. Within one hundred and twenty (120) days following the end of each calendar year, the Managers shall provide a copy of the Annual Report to the Opioid MDT II and the Interest Holders.

## ARTICLE X

## TAXES

**10.1**   **Tax Returns**. The Company shall prepare and file, or cause to be prepared and filed, all necessary federal and state income Tax returns and any other required Tax returns. The Company shall use its reasonable efforts to deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was an Interest Holder at any time during such Fiscal Year a Schedule K-1 (or equivalent form) and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income Tax returns.

**10.2**   **Partnership Treatment; Tax Elections**. The Interest Holders intend that the Company shall be treated (i) prior the Effective Time, as an entity disregarded as separate from Opioid MDT II and (ii) after the Effective Time, as a partnership for federal and, if applicable, state or local income tax purposes, consistent with the principles of Section 301.7701-3(f)(2) of the Treasury Regulations, and that each Interest Holder and the Company shall file any and all Tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Section 301.7701-3 of the Treasury Regulations (or any successor regulation or provision) and, if applicable, state and local income tax purposes. Subject to the foregoing, the Company shall make any Tax election the Board may deem appropriate and in the best interests of the Interest Holders, provided, however, that the Company shall not make, and the Board shall cause the Company not to make, any election under the PFIC regime under Sections 1291 through 1298 of the Code and Treasury Regulations thereunder or the CFC regime under Sections 951 through 965 of the Code and Treasury Regulations thereunder, without the prior written consent of each of the Members.  The Company shall not make any tax election which would adversely affect the status of Opioid MDT II as a "qualified settlement fund" under Treasury Regulations Section 1.468B-1 et seq.

**10.3**   **Partnership Representative**.   The Chairman shall be the Company's partnership representative, as described in Section 6223 of the Code ("Partnership Representative") and any analogous capacity under applicable state or local law. The Partnership Representative shall have all powers and responsibilities provided for a "partnership representative" in Section 6221 of the Code et seq. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such. In case of an audit or other proceeding under BBA, the Company shall use commercially reasonable efforts to mitigate exposure under BBA without making a "push-out" election under Section 6226 of the Code (or any comparable election under state or local laws) to the extent  (a) such audit or other proceeding commences prior to the sale of the New Opioid Warrants (or the Ordinary Shares into which they are exercisable, in case the New Option Warrants were exercised) and (b) there are substantial distributions still expected to be made by the Opioid MDT II to its beneficiaries.

17

Other than in circumstances described in the prior sentence, the Company shall retain full discretion in making a push-out election. If a push-out election is not made and the Company is required to pay Taxes (including imputed underpayments), subsequent distributions to applicable Interest Holders from the Company will be reduced by the amount of such Taxes that such applicable Interest Holder would have been responsible for, if a push-out election were made (the "**Interest Holder Taxes**"). To the extent payment of such Taxes were both (a) funded by the Company's borrowings from Opioid MDT II as contemplated by Section 2.4(d) hereof and (b) not fully recouped by the Company through a reduction of subsequent distributions to the applicable Interest Holder from the Company as contemplated by the immediately preceding sentence, then the Company will promptly inform Opioid MDT II of the same and Opioid MDT II will be repaid such borrowing by reducing, pursuant to Section 7.01(c) of the Opioid MDT II Agreement and without duplication, any subsequent distributions that the applicable Interest Holder might otherwise be entitled to from Opioid MDT II in an amount equal to the excess of the Interest Holder Taxes over the aggregate amounts by which the Company reduced distributions to such Interest Holders on the account of Interest Holder Taxes.

**10.4    Irish-U.S. Tax Treaty Benefits**. If the Board determines that a material dividend subject to non-US withholding tax will or is expected to be received by the Company, the Board shall notify the Interest Holders. If an Interest Holder makes a written request, the Company shall use commercially reasonable efforts to cooperate with a requested action that is (i) reasonable and (ii) expected to result in such Interest Holders being able to access any Interest Holder-level U.S. tax treaty benefits. For the avoidance of doubt, the Company shall not be required to take any action that will have an adverse impact on any non-requesting Interest Holder or the Company, unless such adverse impact is immaterial.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

**11.1    Dissolution**. The Company shall not be dissolved by the admission of Interest Holders or by the bankruptcy or dissolution of an Interest Holder. The Company shall automatically dissolve and its affairs shall be wound up as soon as practicable (but no later than ninety (90) days) after the date on which the Bankruptcy Court approves the dissolution of the Company due to the completion of its duties and the satisfaction of its purposes wherein (i) all assets expected by the Board to be received by the Company have been received, (ii) all Distributions have been made to the extent set forth in the Section 5.2 hereof, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Company Operating Expenses consistent with the Governing Documents and the Delaware Act and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

**11.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the

liquidators may reasonably determine) and shall promptly distribute the remaining assets to the Interest Holders in accordance with <u>Section 5.2</u> hereof; <u>provided, however</u>, that if the Board determines, in its discretion, that making such Distributions is not cost-effective with respect to the final amounts to be distributed to the Interest Holders, the Board shall have the authority to direct such final Distributions, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Board in the Board's discretion.

**11.3**    **Cancellation of Certificate**. On the completion of the Company's duties and the satisfaction of the Company's purposes as provided in <u>Section 11.1</u> herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be cancelled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until the effective time of a Certificate of Cancellation of the Company is filed pursuant to this <u>Section 11.3</u>.

**11.4**    **Reasonable Time for Winding Up**. Subject to Section 11.1, a reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to <u>Section 11.2</u> in order to minimize any losses otherwise attendant upon such winding up.

**ARTICLE XII**

**<u>GENERAL PROVISIONS</u>**

**12.1**    **Amendments**. Material modifications to this Agreement may be made by the Board only pursuant to an order of the Bankruptcy Court; provided, however, that the Managers then in office may amend this Agreement by unanimous consent of the Managers from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor correcting or clarifying amendments necessary to enable the Managers to effectuate the provisions of this Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity.  Notwithstanding the foregoing proviso, no amendment or waiver of this Agreement shall modify this Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor correcting or clarifying amendments as necessary to enable the Managers to effectuate the provisions of this Agreement.  The Managers shall provide notice to the Interest Holders of any proposed modification to this Agreement, whether material or minor, not less than ten (10) business days before such modification becomes effective; provided, however, that the Board may shorten such notice period in its discretion.

**12.2**    **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**12.3**    **Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors,

administrators, successors, legal representatives and permitted assigns, whether so expressed or not, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Agreement except, in the case of the Company and the Managers, as otherwise contemplated herein or in the Plan or the Confirmation Order.

**12.4**    **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**12.5**    **Applicable Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**12.6**    **Consent to Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Company pursuant to the Plan; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; provided further, that notwithstanding the foregoing, the Board shall have the power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**12.7**    **Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1) business day after delivery to a reputable express courier service (charges prepaid) or (c) on the business day telecopied or electronically transmitted to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if by telecopy or electronic transmission before 5:00 p.m. New York time, and otherwise on the next business day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.5.

**12.8**    **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, and no creditor who makes a loan to the Company may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Distributions, capital or property other than as a secured creditor.

**12.9**    **Waiver**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent

upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**12.10  Further Action**. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.11  Entire Agreement**. The Governing Documents, and those documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**12.12  Delivery by Electronic Transmission**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

[Signature pages follow.]

The undersigned Managers have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**MANAGERS:**

[_____]

By: _____
Name: _____
Title: _____

[_____]

By: _____
Name: _____
Title: _____

[_____]

By: _____
Name: _____
Title: _____

**INTEREST HOLDERS**:

[_____]

By: _____
Name: _____
Title: _____

[_____]

By: _____
Name: _____
Title: _____

[_____]

By: _____
Name: _____
Title: _____

1

## **EXHIBIT 1**

### **COMPANY ASSETS**

The New Opioid Warrants and cash, if any.

**<u>EXHIBIT 2</u>**

**CERTIFICATE**

## Exhibit 3

## INTEREST HOLDERS AND LLC INTERESTS[2]

| Interest Holder | LLC Interests |
|---|---|
| National Opioid Abatement Trust II | 83,910 |
| Tribal Opioid Abatement Fund, LLC | 2,595 |
| Hospital Trust (as defined in the Plan) | 3,570 |
| PI Trust (as defined in the Plan) | 9,925 |
| **Total** | **[100,000]** |

64134731 v22-WorkSiteUS-036517/0012

---

[2] **NTD**: LLC Interests are roughly based on percentage distributions to which the parties are entitled to under the Plan.