## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Obj. Deadline: March 14, 2023, at 4:00 p.m. (ET)** |
| | ) **Hearing Date: March 21, 2023, at 10:00 a.m. (ET)** |

## MOTION OF THE STATE OF TEXAS TO INTERPRET AND ENFORCE THE MALLINCKRODT PLAN AND CONFIRMATION ORDER

The State of Texas, through the Texas Attorney General's Office, in its capacity as a State Opioid Claimant[2] and State Beneficiary, files this *Motion of the State of Texas to Interpret and Enforce the Mallinckrodt Plan and Confirmation Order* (the "**Motion**"), seeking an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), holding that the plain and unambiguous terms of the Plan and Confirmation Order do not allow NOAT II Funds to be used as a source of payment for Holders of Municipal Opioid Claims' counsel. In support of the relief requested herein, the State of Texas respectfully states and alleges as follows:

### PRELIMINARY STATEMENT

As this Court is aware, the Plan embodies a global settlement reached between the Debtors and a consensus of the various opioid creditors that maximizes the funds committed to opioid abatement strategies – rather than to compensate for past losses – and minimizes the risk that such funds could be diverted to other uses. The specific terms and conditions in the Plan are clear and

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

unambiguous and were finalized after months of investigation, litigation, mediation, and negotiation by and among the Debtors, the Official Committee of Opioid-Related Claimants, State Attorneys General, local governments, and other opioid claimants. The Plan provides the mechanism by which settlement funds flow from the Reorganized Debtors to the Opioid Master Distribution Trust II and then to various Abatement Trusts. As set out in the Plan, each Abatement Trust has clear directives on how distributions are allocated to the respective trust beneficiaries and how trust beneficiaries must use the distributions to abate the harms caused by the opioid crisis.

Both State Opioid Claims and Municipal Opioid Claims are channeled to the National Opioid Abatement Trust II (NOAT II). The NOAT II Documents require that NOAT II Funds must be used only for certain "Approved Uses" intended to abate the opioid crisis. There is a list of specific "Approved Uses" <u>and</u> a requirement that Statewide Abatement Agreements allocate funds exclusively to "Approved Uses." Examples of "Approved Uses" include increasing distribution of naloxone or other FDA-approved drugs to reverse opioid overdoes to individuals who are uninsured or whose insurance does not cover the needed service and expanding training for first responders, schools, community support groups and families. Payment of attorneys' fees is NOT an "Approved Use." The Plan does not rely on or incorporate Statewide Abatement Agreements to define these "Approved Uses."

Apart from the funds allocated to the Abatement Trusts (whose use is limited solely to Approved Uses (i.e., abatement strategies), the Plan also recognizes the need for local governmental opioid creditors to pay their counsel and establishes a *separate* Municipal and Tribe Opioid Attorneys' Fee Fund to pay counsel for Holders of Municipal Opioid Claims. This fee

fund is the "exclusive" source of recoveries in the Plan for local governmental opioid creditors' counsel.

Notwithstanding the unambiguous terms of the Plan, the Texas Plaintiffs' Steering Committee, representing the Texas litigating subdivisions, filed a motion in the Texas Opioid MDL seeking to improperly divert NOAT II Funds for payment of Texas subdivision counsel. The relief sought in that motion, if granted, would violate the Plan and the Confirmation Order and the clear intent of the Plan to (i) limit the use of NOAT II Funds solely for abatement strategies (ii) channel attorneys' fees claims to the various attorneys' fee funds, including the Municipal and Tribe Opioid Attorneys' Fee Fund.

Importantly, this issue does not impact Texas alone. The Texas Plaintiffs' Steering Committee attached to its motion, as justification for the relief sought therein, an order entered by an Arkansas state court that improperly diverts NOAT II Funds for payment of Arkansas subdivision counsel in direct violation of the Plan and the Confirmation Order. As plaintiff subdivisions have now sought permission from two different state courts to improperly pay their attorneys' fees from funds earmarked to abate the opioid crisis, the State of Texas believes plaintiff subdivisions in other states may seek similar relief in their respective state courts.

A ruling by this Court is necessary to ensure the Plan and the Confirmation Order are interpreted and enforced consistently and in accordance with the clear and unambiguous requirement to use NOAT II Funds only for Approved Uses.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District

of Delaware, dated February 29, 2012.  Further, pursuant to the Confirmation Order, this Court, subject to certain limitations, has "retain[ed] exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including those matters set forth in Article X of the Plan."  Confirmation Order ¶ 320.  In *In re Continental Airlines, Inc.*, the court held "[i]n the bankruptcy context, courts have specifically, and consistently, held that the bankruptcy court retains jurisdiction, inter alia, to enforce its confirmation order." 236 B.R. 318, 326 (Bankr. D. Del. 1999).

2.     Enforcement of the Confirmation Order is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). *See, e.g., In re Swan Trans. Co.*, 596 B.R. 127, 132-33 (Bankr. D. Del. 2018); *In re TE Holdcorp, LLC*, Case No. 20-11442, 2021 WL 1961911, at *5-6 (Bankr. D. Del. May 14, 2021).  The State of Texas confirms its consent, pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Rule 9013- 1(f) to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue of the above-referenced bankruptcy cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

**A.  The Mallinckrodt Bankruptcy Cases**

4.     On October 12, 2020, Mallinckrodt plc and certain affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").

5.      During the bankruptcy proceedings, the State of Texas was a member of the Governmental Plaintiff Ad Hoc Committee (the "**AHC**") which included six (6) other states and the Plaintiffs' Executive Committee (the "**PEC**") appointed in *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804 (the "**MDL Court**").  *See* Docket Nos. 288 and 496.  The members of the AHC, along with forty-four other states, Washington, D.C., and U.S. territories, were parties to a Restructuring Support Agreement (the "**RSA**") which provided the framework for the settlement of all opioid claims against the Debtors.  *See* Docket No. 128.

6.      Other parties later joined the RSA, including the multi-state governmental entities group (the "**MSGE**") representing more than 1,300 local governmental opioid claimants.  *See* Docket No. 505.

7.      On March 2, 2022, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Court* (the "**Confirmation Order**").  *See* Docket No. 6660.  The following are pertinent parts of the Confirmation Order:

- "All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. All Holders of Claims who voted to accept the Plan and who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified and supplemented by the Plan Supplement." Confirmation Order, ¶7.

- "All documents and agreements necessary or appropriate to implement the Plan, including those contained in the Plan Supplement . . . have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution (subject to the terms of the Plan, as applicable), be valid, binding, and enforceable documents and agreements ***not in conflict with any federal, state, or local law***." Confirmation Order, ¶116 (emphasis added).

- "The terms of the Plan, the Plan Supplement, and the exhibits and schedules thereto are incorporated by reference into this Confirmation Order, and the

provisions of the Plan and this Confirmation Order are non-severable and mutually dependent." Confirmation Order, ¶132.

- "Beneficiaries of the Opioid MDT II and each of the Opioid Creditor Trusts shall have only such rights and interests in and with respect to the applicable trust assets as set forth in the Plan and the applicable Opioid MDT II Documents and Opioid Creditor Trust Documents." Confirmation Order, ¶179.

- "Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, except to the extent set forth in this Confirmation Order, in Article X of the Plan, and in the Opioid MDT II Documents and the Opioid Creditor Trust Documents, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including those matters set forth in Article X of the Plan." Confirmation Order, ¶320.

8.      On July 16, 2022, the *Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Plan**") became effective. *See* Docket No. 7652.

9.      The Plan incorporates the RSA and is the result of many months of pre- and post-petition negotiation among the Debtors, the Official Committee of Opioid-Related Claimants, State Attorneys General, local governments, and other opioid claimants to address and resolve, *inter alia*, the total settlement consideration to be provided by the Debtors; the allocation between public and private opioid claimants of that consideration; the interstate allocation of the consideration allocated to the States generally; intrastate allocation of the consideration allocated to each individual State; the use of the consideration allocated to the opioid creditors including the commitment among the public opioid creditors and certain private creditors to devote such consideration to abatement strategies; the manner and mechanism pursuant to which attorneys' fees will be paid; and the implementation of this global settlement. *See Declaration of Jayne Conroy in Support of Plan Confirmation* (Docket No. 5314); *Declaration of Gary A. Gotto in Support of Governmental Plaintiff Ad Hoc Committee's Reply to Plan Objections and Support of*

*Confirmation* (Docket No. 5316); *Declaration of John M. Guard in Support of Governmental Plaintiff Ad Hoc Committee's Reply to Plan Objections and Support of Confirmation* (Docket No. 5318); and *Declaration of Michael Atkinson in Support of Confirmation of the First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (Docket No. 5319).

10.     The Plan Supplement, incorporated into the Plan, includes the *National Opioid Abatement Trust II Agreement* dated as of June 16, 2022 (the "**NOAT II Agreement**") and the *National Opioid Abatement Trust II Distribution Procedures* (the "**NOAT II TDP**") attached to the NOAT II Agreement.  The final NOAT II Agreement and NOAT II TDP were filed at Docket No. 7684.  *See* definitions of "Plan," "Plan Supplement," "Opioid Creditor Trust Documents," and "NOAT II Documents" in the Plan.

11.     The State of Texas is a Holder of a State Opioid Claim and Texas subdivisions are Holders of Municipal Opioid Claims.  Pursuant to the Plan, both State Opioid Claims and Municipal Opioid Claims:

- are channeled exclusively to, and assumed by, NOAT II;

- shall be resolved solely in accordance with the terms, provisions, and procedures of the NOAT II Documents; and

- shall receive a recovery, if any, from the State and Municipal Government Opioid Claims Share through NOAT II.

Plan, pp. 64-69.

12. Further, pursuant to the Plan:

- the sole recourse for any State Opioid Claimant/Municipal Opioid Claimant on account of its State Opioid Claim/Municipal Opioid Claim shall be to NOAT II; and

- distributions made by NOAT II shall be used solely for Approved Uses, in accordance with the NOAT II Documents [which notably does not

include the payment of attorneys' fees that are addressed separately under the Plan].

Plan, pp. 64-69.

**B. The Statewide Abatement Agreement for the State of Texas**

13.     On July 20, 2022, the *Statewide Abatement Agreement Filed on Behalf of Texas* (the "**Texas SAA**") was filed.  *See* Docket No. 7857.  The Texas SAA references both the *Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet* (the "**Texas Term Sheet**") as well as Subchapter R titled "Statewide Opioid Settlement Agreement" of Chapter 403 of the Texas Government Code.  Pursuant to and for purposes of the Plan, the Texas SAA became effective fourteen (14) days after it was filed.  NOAT II TDP, p. 10.

14.     The Texas Term Sheet, executed on May 13, 2020, by the State of Texas and its political subdivisions, addressed the allocation of settlement proceeds for negotiated resolutions of claims of the State of Texas and its political subdivisions against manufacturers, marketers, promoters, distributors, and dispensers of opioids/opioid products.

15.     In May of 2021, the Texas Legislature[3] passed Senate Bill 1827, codified at Chapter 403 of the Texas Government Code, subchapter R, §§ 403.501–403.511, to govern statewide opioid settlements (the "**Texas Statute**").  The Texas Statute incorporates elements of the Texas Term Sheet, codifying the allocation and flow of funds for opioid settlement agreements and establishing the Texas opioid abatement fund council.

---

[3] The Texas Legislature convenes every two years.  TEX. CONST. Art. 3, § 5(a).

16.     The Texas Statute includes:

**§ 403.507. Deposit and Allocation of Settlement Money; Effect of Bankruptcy**

(a) Money obtained under a statewide opioid settlement agreement must be deposited as provided by this section and further allocated in accordance with the settlement agreement.

(b) Of money obtained under a statewide opioid settlement agreement:

    (1) 15 percent shall be deposited into the account; and

    (2) 85 percent shall be deposited into the fund.

(c) For the purposes of a statewide opioid settlement agreement in relation to a bankruptcy plan for a released entity, ***money is distributed in accordance with the bankruptcy plan***.

Tex. Gov't Code § 403.507 (emphasis added).

17.     The Texas Statute specifically provides that 15% of the total funds from a statewide opioid settlement agreement should be distributed to the opioid abatement account and 85% to the opioid abatement trust fund.  Moneys in the opioid abatement account may be appropriated only to a state agency for abatement of opioid-related harms (the "**State Share**").  Moneys in the opioid abatement trust fund are to be further allocated with 15% of the total settlement distributions directed to counties and municipalities to address opioid-related harms (the "**Subdivision Share**") and the remaining 70% of the total settlement distributions directed to the Texas opioid abatement council to ensure that money recovered by the State through an opioid settlement is allocated fairly and spent in affected regions to remediate the opioid crisis (the "**Abatement Share**").  *See* Tex. Gov't Code §§ 403.503, .505, .506.

18.     The Texas Term Sheet supplements the Texas Statute by providing the allocation for the "Subdivision Share" among all Texas counties and municipalities.  *See* Exhibit B to the Texas Terms Sheet.

### C.  The Texas PSC Motion

19.      On October 28, 2022, the Texas Plaintiffs' Steering Committee (the "**Texas PSC**")

filed the *Texas Plaintiffs' Steering Committee's Motion for Approval of Distribution Plan in the*

*Mallinckrodt Bankruptcy* (the "**Texas PSC Motion**") in the Texas Opioid MDL.[4]  A copy of the

Texas PSC Motion and the accompanying proposed order are attached as Attachment 1 to the

*Declaration of Bonnie Freymuth in Support of the Motion of the State of Texas to Interpret and*

*Enforce the Mallinckrodt Plan and Confirmation Order* (the "**Freymuth Declaration**") attached

hereto as **Exhibit B**.  Members of the Texas PSC include attorneys for Dallas County, Bexar

County, Harris County, Tarrant County, and others who were also members of the MSGE.[5]

20.      Incorrectly citing to the Plan and certain provisions in the Texas Term Sheet,[6] the

Texas PSC Motion asks the Texas Opioid MDL Court to enter an order directing 9.3925% of all

Plan distributions attributable to the combined "Subdivision Share" and "Abatement Share" into a

previously established qualified settlement fund to compensate Texas subdivision counsel.

21.      The Texas PSC Motion also asserts that the Texas Opioid MDL Court has exclusive

jurisdiction to hear the Texas PSC Motion and attaches an order entered on August 29, 2022, by a

state court judge in Arkansas granting similar relief as justification for the relief requested in the

---

[4] On June 18, 2018, the Texas MDL Panel in Docket No. 18-0358, styled *In re Texas Opioid Litigation*, ordered that all *In re Texas Opioid Litigation* cases, as well as future tag-along cases, be transferred to into the newly-formed Texas Opioid MDL. On September 5, 2018, this matter was assigned to the District Court, 152nd Judicial District, Harris County, Texas, when the MDL Panel appointed Judge Schaffer as the presiding judge over the Texas Opioid MDL. Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC were included as defendants in the Texas Opioid MDL. When Mallinckrodt plc commenced these bankruptcy cases, it also filed a *Notice of Suggestion of Pendency and Automatic Stay of Proceedings* in each action in the Texas Opioid MDL where it had been named as a defendant.  Plaintiffs in the Texas Opioid MDL subsequently filed motions to sever Mallinckrodt, which were granted by the court.
[5] *See* Section A.6. of the Texas Term Sheet and Docket No. 337.
[6] The Texas Term Sheet refers to the "Texas Opioid Fee and Expense Fund" to be funded first by any "National Fund" created for attorney's fees and expenses with a backstop made up of 12.5% of the "Subdivision Share" and 8.75% of the "Abatement Share."  *See* Section C of the Texas Term Sheet.

Texas PSC Motion.  The plaintiffs therein – Crittenden County, Arkansas, and City of West Memphis, Arkansas – were also members of the MSGE.[7]

22.    On November 30, 2022, the State of Texas timely filed the *Objection of the State of Texas to Texas Plaintiffs' Steering Committee's Motion for Approval of Distribution Plan in the Mallinckrodt Bankruptcy* (the "**Objection**") in the Texas Opioid MDL.  A copy of the Objection is attached as Attachment 2 to the Freymuth Declaration.  In the Objection, the State of Texas explains that an order granting the relief requested by the Texas PSC Motion would be in direct violation of the terms of the Plan and the Confirmation Order and that this Court retains exclusive jurisdiction regarding disputes that arise in connection with the interpretation or enforcement of the Confirmation Order and Plan.

23.    The State of Texas also filed a letter on November 30, 2022, advising this Court of the Texas PSC Motion and the Objection.  *See* Docket No. 8385.  A status conference was subsequently convened on December 8, 2022.

24.    After conferring with the Texas PSC, the hearing on the Texas PSC Motion has been continued indefinitely in the Texas Opioid MDL pending a resolution by this Court of this Motion.

## ARGUMENT AND SUPPORT THEREOF

25.    The State of Texas and the Texas PSC appear to agree on the *allocation* of NOAT II Funds pursuant to the Plan and the Texas SAA – 15% to the <u>account</u> for the "State Share" and 85% to the <u>fund</u> which is then further allocated 15% of total settlement distributions for the "Subdivision Share" and the remaining 70% of total settlement distributions for the "Abatement Share."

---

[7] *See* Docket No. 337.

26.     However, the State of Texas and the Texas PSC disagree on the *approved uses* of NOAT II Funds.  The Texas PSC asserts that the Texas Term Sheet – including the provisions setting up the "Texas Opioid Fee and Expense Fund" to be funded by the "National Fund" with a backstop of 9.3925% to come out of the combined "Subdivision Share" and "Abatement Share" from the settlement of claims against manufacturers, marketers, promoters, distributers, and dispensers of opioids/opioid products – is incorporated into the Plan.  The Texas PSC ignores the definition of Approved Uses in the Plan and erroneously concludes that directing a percentage of the NOAT II Funds for the combined "Subdivision Share" and "Abatement Share" to a previously established qualified settlement fund for payment of Texas subdivision counsel is authorized by the Plan.

27.     The Texas PSC is mistaken.  While the Texas Term Sheet acts as a part of the overall intrastate allocation scheme for Texas by supplementing the Texas Statute and, in Exhibit B to the Texas Term Sheet, providing the allocation for the "Subdivision Share" among all Texas counties and municipalities, it is not a source of "Approved Uses" for NOAT II Funds.  The Plan requires NOAT II Funds to be used *solely* for opioid abatement strategies (which do not include payment of attorneys' fees and costs).  Rather, the Plan establishes a separate attorneys' fee fund as the *exclusive* source of recoveries for Texas subdivision counsel and other local and municipal counsel.

**A.  Funds Distributed by NOAT II Must Be Used Solely to Abate the Opioid Crisis – The Term "Approved Uses" Does Not Include Payment of Attorneys' Fees and Costs for Holders of Municipal Opioid Claims.**

28.     The Plan states that "[e]ach Abatement Trust [including NOAT II] shall, in accordance with the Plan, the Confirmation Order, and the applicable Abatement Trust

Documents, make Abatement Distributions to Authorized Recipients solely for *Approved Uses*."

Plan, p. 99 (emphasis added).

29.　　The Plan defines "**Approved Uses**" as "Authorized Abatement Purposes and other

uses approved in the Abatement Trust Documents."[8]  Plan, p. 5.

30.　　The Plan defines "**Authorized Abatement Purposes**" as:

> with respect to any Abatement Trust, (i) an authorized opioid abatement purpose
> for which an Abatement Distribution from such Abatement Trust may be used, as
> set forth in the Abatement Trust Documents for such Abatement Trust, or (ii) the
> payment of attorneys' fees and costs of Holders of Opioid Claims ***channeled to
> such Abatement Trust*** (including any counsel to any ad hoc group or other group
> of such Holders, including any such counsel that is not a Retained Professional).

Plan, p. 7 (emphasis added).  While (ii) above may appear to permit attorneys' fees and costs of

Holders of Municipal Opioid Claims to be paid by NOAT II, those attorneys' fees and costs are

not channeled to NOAT II, which, as discussed below, are unlike the attorneys' fees of private

creditors which are channeled to the relevant Abatement Trusts.

31.　　The Opioid MDT II funds the Opioid Attorneys' Fees Fund which consists of (a)

the Municipal and Tribe Opioid Attorneys' Fee Fund and (b) the State Opioid Attorneys' Fee Fund

out of the Public Opioid Creditor Share.  *See* Plan, pp. 100, 102-103.  In comparison, the attorneys'

fees and costs of Private Opioid Creditors are channeled to the Private Opioid Creditor Trusts, as

they are funded by and administered by the respective Private Opioid Creditor Trusts.[9]  *See* Plan,

---

[8] The Plan defines "Abatement Trust Documents" as, collectively, the NOAT II Documents, the TAFT II Documents, the Third-Party Payor Trust Documents, the Hospital Trust Documents, the Emergency Room Physician Trust Documents, and the NAS Monitoring Trust Documents. *See* Plan, p. 3.  This definition does not incorporate the Texas Term Sheet.

[9] By way of example, for the Emergency Room Physicians Trust, the Plan states: "On the Effective Date, *the Emergency Room Physicians Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the Emergency Room Physicians Opioid Claimants*. The Emergency Room Physicians Attorney Fee Fund shall be *funded with (i) 20% of each distribution made by the Emergency Room Physicians Trust less* (ii) the amount of such Distributions payable to the Common Benefit Escrow and the Common Benefit Fund under Article IV.X.8.A. *The Emergency Room Physicians Attorney Fee Fund shall be administered by the Emergency Room Physicians Trust* as set forth in this Article IV.X.8. Except as expressly set forth in this Article IV.X.8, nothing in the Plan shall impair or otherwise affect any contingency fee contract between any Holder of a Claim (or any ad hoc group of Holders of Claims) and such Holder's (or ad hoc group's) counsel." Plan, page 102 (emphasis added).

pp. 101-102.   To illustrate the foregoing, attached hereto as **Exhibit C** is page 79 from the

*Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and Its*

*Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2971].[10]

32.   For distributions from NOAT II, the "Approved Uses" are identified in the NOAT

II TDP.  Specifically, in Section 2, the NOAT II TDP states its Purpose as follows:

> Virtually all governmental creditors in the Mallinckrodt Chapter 11 Cases recognize the need for and value in developing a comprehensive abatement strategy to address the opioid crisis as the most effective use of the Non-Federal Governmental Opioid Claims Share of the MDT II Consideration provided by Mallinckrodt under the Plan on account of opioid claims (including without limitation cash, insurance proceeds, proceeds of sales of warrants or Mallinckrodt stock, and proceeds of claims against certain third parties). Because of the unique impact the crisis has had throughout all regions of the United States, **distribution of the Non-Federal Governmental Opioid Claims Share of the MDT II Consideration should occur through an established governmental structure, with the use of such funds *strictly limited to abatement purposes as provided herein***. This approach recognizes that funding abatement efforts – which would benefit most creditors and the public by reducing future effects of the crisis through treatment and other programs – is a much more efficient use of limited funds than dividing thin slices among all opioid creditors with no obligation to use it to abate the opioid crisis. Because maximizing abatement of the opioid crisis requires coordination of efforts by all levels of government, particularly when the abatement needs far exceed the available funds, this structure requires a collaborative process between each State and its Local Governments.
>
> **These distribution procedures (these "National Opioid Abatement Trust II Distribution Procedures") are intended to establish the mechanisms for the distribution and allocation of funds distributed by NOAT II to the States and Local Governments. All funds described in the foregoing sentence are referred to herein as "NOAT II Funds." *100% of the NOAT II Funds distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof.*** Specifically, (i) no less than ninety five percent (95%) of the NOAT II Funds distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses Schedule B (the "Approved Opioid Abatement Uses"); (ii) priority should be given to the core abatement strategies ("Core Strategies") as identified on Schedule A; and (iii) no more than five percent (5%) of the NOAT II Funds may be used to fund expenses incurred in administering

---

[10] The flowchart is provided for illustrative purposes only and may not reflect non-material modifications implemented by the Confirmation Order and/or Plan.

the distributions for the Approved Opioid Abatement Uses, including the process of selecting programs to receive distributions of NOAT II Funds for implementing those programs and in connection with the Government Participation Mechanism **("Approved Administrative Expenses") and together with the other Authorized Abatement Purposes set forth in Approved Uses and Core Strategies, "Approved Uses"**.

***NOAT II shall, in accordance with the Plan, the Confirmation Order and the NOAT II Documents, distribute NOAT II Funds to States and Local Governments exclusively for Approved Uses.***

NOAT II TDP, pp. 1–2 (emphasis added).

33.     The NOAT II TDP is absolutely clear that 100% of funds distributed by NOAT II (referred to as "**NOAT II Funds**") are to be used to abate the opioid crisis for "Approved Uses" only.  As shown above, the term "**Approved Uses**" (as defined by the NOAT II TDP) includes certain Approved Administrative Expenses (no more than 5% of NOAT II Funds), the "Core Strategies" listed on Schedule A to the NOAT II TDP, and "Approved Uses" on Schedule B to the NOAT II TDP.

34.     Not surprisingly, neither Schedule A nor Schedule B to the NOAT II TDP permit payment of attorneys' fees and costs of Holders of State Opioid Claims or Municipal Opioid Claims.  *See* NOAT II TDP, pp. 16–29.  Those fees and costs are to be paid separately under the Plan.

35.     In fact, Section 4 of the NOAT II TDP states:

Pursuant to Article IV.X.9 of the Plan, among other things, the Plan will establish the Opioid Attorneys' Fee Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of State Opioid Claims, Municipal Opioid Claims, and Tribe Opioid Claims (including ad hoc groups thereof).

NOAT II TDP, p. 3.

36.     Moreover, reporting requirements are imposed on recipients to ensure that NOAT II Funds are only being used for "Approved Uses."  Section 7 of the NOAT II TDP states:

3. As applicable, each State or Local Government shall impose reporting requirements on each recipient to ensure that NOAT II Funds are only being used for Approved Uses, in accordance with the terms of the allocation.

NOAT II TDP, p. 14.

37.    For these reasons, the Plan and the NOAT II TDP are clear that all NOAT II Funds must be used solely for identified "Approved Uses" which do not include attorney's fees and costs for Holders of Municipal Opioid Claims.

**B.  While the Texas SAA Supplements How NOAT II Funds are Allocated Between a State and Its Local Governments, It is <u>Not</u> a Source of "Approved Uses."**

38.    The Plan, the NOAT II Agreement, and the NOAT II TDP define how NOAT II is established and funded, the allocation percentages to each of the states and territories,[11] and the "Approved Uses" for NOAT II Funds.

39.    Separately, the NOAT II TDP allows each state and its local governments to reach their own agreement on intrastate allocation, providing a default mechanism in cases where an agreement cannot be reached.  References to Statewide Abatement Agreements are made in Section 5 of the NOAT II TDP titled "Division of NOAT II Funds" and in Schedule C to the NOAT II TDP in a section titled "Intrastate Allocation of NOAT II Abatement Funds."

40.    The Texas SAA is a Statewide Abatement Agreement as such term is defined in the NOAT II TDP.  However, nothing in the NOAT II TDP permits a Statewide Abatement Agreement to supersede the clear mandate set forth that 100% of NOAT II Funds are used for abatement strategies.  Moreover, nothing in the NOAT II TDP allows provisions of a Statewide Abatement Agreement to be substituted or incorporated as an "Approved Use."

---

[11] As stated in Schedule C to the NOAT II TDP, the allocation percentages among the states and territories "are based on a formula developed through extensive negotiations among the Attorneys General of various states."  The allocation percentage for the State of Texas is 6.2932157196%. NOAT II TDP, p. 30.

41.    In fact, Section 5 of the NOAT II TDP provides:

2. Statewide Abatement Agreement. Each State and its Local Governments will have until (60) sixty days after the Effective Date of the Plan (such date, the "SAA Filing Deadline") to file with the Bankruptcy Court or authorize the NOAT II Trustees to file with the Bankruptcy Court on their behalf, an agreed-upon allocation or method for allocating the NOAT II Funds for that State *dedicated only to Approved Uses* (each a "Statewide Abatement Agreement" or "SAA"). …

NOAT II TDP, p. 8 (emphasis added).

42.    Because this provision is clear that a Statewide Abatement Agreement must dedicate NOAT II Funds only to "Approved Uses," a Statewide Abatement Agreement – such as the Texas SAA – is only relied upon and referenced to determine the intrastate allocation. Moreover, the NOAT II TDP requires that a Statewide Abatement Agreement dedicate NOAT II Funds entirely to "Approved Uses."  Otherwise, a Statewide Abatement Agreement could be used to create an end-run around the Plan and the express requirements of the NOAT II and the intent that NOAT II Funds be used solely for opioid abatement.

### C. The Municipal and Tribe Opioid Attorneys' Fee Fund is the Exclusive Source of Recoveries for Attorneys' Fees and Costs for Holders of Municipal Opioid Claims.

43.    The following provision of the Plan establishes the Municipal and Tribe Opioid Attorneys' Fee Fund:

Municipal and Tribe Opioid Attorneys' Fee Fund. On the Effective Date, the Municipal and Tribe Opioid Attorneys' Fee Fund shall be established for the payment of costs and expenses (including attorneys' fees) of Holders of Municipal Opioid Claims and Tribe Opioid Claims (including any ad hoc group consisting of any of the foregoing), other than any amounts paid to counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group in accordance with the Plan and the Restructuring Support Agreement. The Municipal and Tribe Opioid Attorneys' Fee Fund shall be funded in an aggregate amount **not to exceed $110 million** from periodic distributions of 5.5% of each distribution on account of the Public Opioid Creditor Share. **Payments from the Municipal and Tribe Opioid Attorneys' Fee Fund shall be the *exclusive* means of payment from the Public Opioid Creditor Trusts for costs and expenses (including attorneys' fees) of any Holder of a Municipal Opioid Claim or Tribe Opioid Claim (or any ad hoc group consisting of any of the foregoing)** or any attorney therefor, other than amounts

paid in accordance with the order of the MDL Court establishing the Common Benefit Fund. Except as otherwise agreed to in writing by the MSGE Group and the MDL Plaintiffs' Executive Committee, the PEC/MSGE Mallinckrodt Fee Allocation Agreement shall be and remain fully enforceable, and shall apply to the Municipal and Tribe Opioid Attorneys' Fee Fund. All modifications of the Municipal and Tribe Opioid Attorneys' Fee Fund that directly impact reimbursement of costs and expenses of Holders of Tribe Opioid Claims shall be reasonably acceptable to the Tribal Leadership Committee.

Plan, pp. 102-103 (emphasis added).

44.     The Municipal and Tribe Opioid Attorneys' Fee Fund is the "exclusive" means of payment for attorneys' fees and costs of any Holder of Municipal Opioid Claim "other than amounts paid in accordance with the order of the MDL Court and the Common Benefit Fund." The "MDL Court" refers to the opioid multidistrict litigation pending in Ohio. Plan, p. 24. The "Common Benefit Fund" is defined in the Plan as "a common benefit fund established by order of, and administered by, the MDL Court, which order shall be consistent with this Plan." Plan, p. 11. In other words, a Holder of a Municipal Opioid Claim is not precluded from also participating in any Common Benefit Fund established by the MDL Court. But nothing in the Plan authorizes NOAT II Funds to be diverted to attorneys' fees and costs.

45.     The above provision of the Plan above also refers to the "PEC/MSGE Mallinckrodt Fee Allocation Agreement" which is attached as Exhibit 7 to the Plan. The Texas PSC mistakenly contends that the statement "[p]articipation in [this fee fund] does not preclude applicants from participating in the MDL Common Benefit Fund or any fee funds or 'backstops' established in state specific MOU's or agreements" was intended to override the requirements in the Plan and the NOAT II TDP that NOAT II Funds be used exclusively for "Approved Uses." The agreement between the PEC and the MSGE, however, only applies to the allocation within the Municipal and Tribe Opioid Attorneys' Fee Fund between the PEC and the MSGE and has no bearing on the NOAT II TDP and the directive that NOAT II Funds are to be used only for "Approved Uses."

**CONCLUSION**

46.    The Plan and the NOAT II TDP clearly state that NOAT II Funds must be used exclusively for "Approved Uses" and that any Statewide Abatement Agreement must dedicate NOAT II Funds to "Approved Uses" only.  Payment of attorneys' fees and costs is NOT an "Approved Use."  A Statewide Abatement Agreement, such as the Texas SAA, is relied upon for intrastate allocation and not for acceptable uses of NOAT II Funds.  The Municipal and Tribe Opioid Attorneys' Fee Fund is the exclusive source of recoveries for attorneys' fees and costs for Holders of Municipal Opioid Claims.

47.    For the reasons set forth above, the State of Texas respectfully requests that this Court enter an order substantially in the form of the Proposed Order (i) holding that the plain and unambiguous terms of the Plan and Confirmation Order do not allow NOAT II Funds to be used as a source of payment for Holders of Municipal Opioid Claims' counsel; and (ii) granting such other relief as the Court deems just and proper.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: February 28, 2023,

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil
Litigation

RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

*/s/ Rachel R. Obaldo*
RACHEL R. OBALDO
Texas State Bar No. 24041617
Assistant Attorney General
rachel.obaldo@oag.texas.gov

*/s/ Stephanie Eberhardt*
STEPHANIE EBERHARDT
Texas Bar No. 24084728
Assistant Attorney General
stephanie.eberhardt@oag.texas.gov
Consumer Protection Division

Office of the Attorney General of Texas
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2173
Facsimile: (512) 936-1409

**ATTORNEYS FOR THE STATE OF
TEXAS**

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on February 28, 2023.

/s/ Rachel R. Obaldo
RACHEL R. OBALDO
Assistant Attorney General