IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC., *et al.*, | ) | Case No. 20-12522 (JTD) |
| | ) | |
| Reorganized Debtors. | ) | **Re: D.I. 8582, 8599, 8604** |
| | ) | |

### MEMORANDUM OPINION AND ORDER

The State of Texas seeks to prevent its political subdivisions from recovering attorneys' fees from certain distributions under Mallinckrodt's Plan of Reorganization and related Trust Documents.[1] Specifically, Texas seeks to prevent the recovery of attorneys' fees from distributions provided by the National Opioid Abatement Trust II ("**NOAT II Trust**") designated as Abatement Distributions.[2] Texas argues that Abatement Distributions under NOAT II Trust can only be used for specified activities designed to abate the national opioid crisis. Instead, Texas contends, the Holders of Municipal Opioid Claims, including its own political subdivisions, must look to a separate fund established under the Plan which provides the exclusive source for the payment of attorneys' fees.[3] The Texas Plaintiffs Steering Committee (**"Texas PSC"**), on behalf of Texas Holders of Municipal Opioid Claims,[4] opposes the motion on two grounds: (i) the Bankruptcy Court does not have core jurisdiction to hear the Motion and should abstain from hearing it as a matter of comity to allow a Texas state court to determine

---

[1] Motion of the States of Texas to Interpret and Enforce the Mallinckrodt Plan and Confirmation Order (the "**Motion**"), D.I. 8582; Reply to the Response of the Texas Plaintiffs' Steering Committee in Opposition to the Motion of the State of Texas to Interpret and Enforce the Mallinckrodt Plan and Confirmation Order, D.I. 8604.

[2] Capitalized terms not defined in this opinion have the meaning ascribed to them in the Plan and related Trust Documents.

[3] The Reorganized Debtors and the Governmental Plaintiff Ad Hoc Committee joined Texas in opposing the payment of attorneys' fees from the Abatement Distributions. *See* D.I. 8607 and 8605.

[4] The Texas PSC filed a motion in a Texas state court multi-district litigation proceeding seeking the payment of attorneys' fees from Abatement Distributions under the Plan (**"Texas PSC State Court Motion"**). D.I. 8582 at 3, 10.

whether Abatement Distributions can be used to pay attorneys' fees; and (ii) even if the Court hears the Motion, the Plan allows for the payment of attorneys' fees from NOAT II Trust Abatement Distributions.[5] After considering the parties' submissions and oral arguments, and for the reasons discussed below, the Texas PSC's objections are overruled and Motion is granted as set forth below.

## JURISDICTION AND VENUE

Venue is proper pursuant to 28 U.S.C. § 1409(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.[6]

## BACKGROUND

The Mallinckrodt Plan of Reorganization established a number of trusts to administer and distribute a $1.725 billion fund to satisfy opioid related claims against the Debtors' estates. Under the Plan, different types of opioid related claims are channeled to various trusts for processing and payment. The Plan required the creation of a Master Distribution Trust ("**MDT II Trust**") to receive settlement funds and distribute them to the various trusts to which the different types of claims are channeled.[7] The NOAT II Trust, was created for the channeling of all State and Municipal Opioid Claims.[8] The purpose of the trust is to distribute funds to be used to abate the opioid crisis in states and municipalities throughout the United States, and to provide for the payment of costs, including attorneys' fees for those entities.

The Plan further provides that: "Distributions made by NOAT II in respect of Municipal Opioid Claims shall be used solely for Approved Uses, in accordance with the NOAT II

---

[5] Response of the Texas Plaintiff's Steering Committee in Opposition to the Motion of the State of Texas to Interpret and Enforce the Mallinckrodt Plan and Confirmation Order, D.I. 8599.
[6] The Texas PSC's jurisdictional arguments are addressed in greater detail below.
[7] D.I. 6510 at 94 (Plan Art. IV.T).
[8] D.I. 6510 at 68 (Plan Art. III.B.8).

2

Documents."[9] Approved Uses under the Plan is defined simply as Authorized Abatement Purposes.[10] Authorized Abatement Purposes, in turn, is defined to mean:

> with respect to any Abatement Trust, (i) an authorized opioid abatement purpose for which an Abatement Distribution from such Abatement Trust may be used, as set forth in the Abatement Trust Documents for such Abatement Trust, or (ii) the payment of attorneys' fees and costs of Holders of Opioid Claims channeled to such Abatement Trust (including any counsel to any ad hoc group or other group of such Holders, including any such counsel that is not a Retained Professional).[11]

In order to accomplish these twin goals while ensuring that the vast majority of the available funds went to abate the opioid crisis, the Plan required the establishment of separate funds for the payment of State, Municipal and Tribe[12] attorneys' fees.[13] Under the Plan, the Municipal and Tribe Opioid Attorneys' Fee Fund is to be funded in an amount not to exceed $110 million. The State Opioid Attorneys' Fee Fund is to be funded in an amount not to exceed $90 million. The Plan clearly and unequivocally states that:

> Payments from the Municipal and Tribe Opioid Attorneys' Fee Fund **shall be the exclusive means of payment** from the Public Opioid Creditor Trusts[14] for costs and expenses (including attorneys' fees) of any Holder of a Municipal Opioid Claim or Tribe Opioid Claim (or any ad hoc group consisting of any of the foregoing) or any attorney therefor, other than amounts paid in accordance with the order of the MDL Court establishing the Common Benefit Fund.[15]

---

[9] D.I. 6510 at 69 (Plan Art. III.B.8.b). "NOAT II Documents" means the documents governing: (a) the NOAT II; (b) the flow of consideration from the Opioid MDT II to the NOAT II; (c) submission, resolution, and distribution procedures in respect of all State Opioid Claims and Municipal Opioid Claims (including, in each case, Opioid Demands); and (d) the flow of Abatement Distributions to Authorized Recipients, including distributions, payments or flow of funds made from the NOAT II after the Effective Date. D.I. 6510 at 32 (Plan Art. I.A.263).
[10] D.I. 6510 at 9 (Plan Art. I.A.42).
[11] D.I. 6510 at 11 (Plan Art. I.A.58).
[12] D.I. 6510 (Plan Art. IV.X). Tribe Opioid Abatement Claims are channeled to a separate trust, the Tribal Abatement Fund Trust II ("**TAFT II**"). D.I. 7684 at 142 (TAFT II Documents § 1.2).
[13] D.I. 6510 at 106 (Plan Art. IV.X.9.A) ("Opioid Attorneys' Fee Fund. On the Effective Date, the Opioid Attorneys' Fee Fund shall be established, and thereafter funded pursuant to Article IV.X.7 for payment of costs and expenses (including attorneys' fees) as further set forth in this Article IV.X.9").
[14] Public Opioid Creditor Trusts means the NOAT II and TAFT II. D.I. 6510 at 43 (Plan Art. I.A.349).
[15] D.I. 6510 at 106 (Plan Art. IV.X.9.A) (emphasis added). Not all Abatement Trusts are required to establish a separate attorneys' fee fund under the Plan.

Consistent with the requirements set forth in the Plan, the MDT II Trust Agreement which is responsible for distribution of trust assets to the various Opioid Creditor Trusts, requires that all distributions from the MDT II Trust are to be in accordance with the Plan and the MDT II Trust Agreement.[16] Moreover, the MDT II Trust Agreement provides that the trustees must establish the "Municipal and Tribe Opioid Attorneys' Fee Fund in a single segregated account prior to making distributions of Public Opioid Creditor Share Distributable Value as set forth in Article IV.X.9. of the Plan."[17] The MDT II TDP provides that the MDT II Trust shall fund the State Opioid Attorneys' Fees Fund and the Municipal and Tribe Attorneys' Fee Fund in accordance with the requirements of the Plan as described above and reiterates that the Municipal and Tribe Attorneys' Fee Fund shall be established as a single segregated account prior to making distributions.[18]

Under the Plan, Abatement Distributions[19] are to be made in accordance with the trust documents, including the Trust Agreement and the Trust TDP for each individual trust. The NOAT II Trust Agreement provides that Abatement Distributions will not be made directly to Municipalities. Rather, the NOAT II Trust Agreement provides that:

> The Trustees shall make Abatement Distributions only as, and to the extent set forth in this Article 4 and the NOAT II TDP. For the avoidance of doubt, Abatement Distributions shall not be made directly to each and every NOAT II Beneficiary, but rather certain NOAT II Beneficiaries shall, by virtue of being a county, city, town, parish, village, municipality, or Region, that is a Local Government within a State, be an indirect beneficiary of certain Abatement Distributions in accordance with the provisions of the NOAT II TDP.[20]

---

[16] D.I. 7684-2 at 20– 21 (MDT II Trust Agreement Art. VII. § 7.01).
[17] D.I. 7684-2 at 17 (MDT II Trust Agreement Art. V. § 5.05).
[18] D.I. 7684-2 at 53 (MDT II TDP §§ 14.1, 14.2).
[19] The Plan defines Abatement Distributions as: "a distribution from an Abatement Trust [including NOAT II] to an Authorized Recipient for Approved Uses. D.I. 6510 at 7 (Plan Art. I.A.25–26).
[20] D.I. 7684-2 at 73 (NOAT II Trust Agreement § 4.1).

4

Instead, distributions of NOAT II Abatement Distributions are to be made:

> solely to (i) States, for further distribution within such State as set forth in the NOAT II TDP, (ii) Qualifying Block Grantees, pursuant to a Statewide Abatement Agreement if so directed therein or pursuant to Section 5(A)(1)(vi) of the NOAT II TDP, or (iii) Local Governments directly if so directed by a Statewide Abatement Agreement.[21]

The NOAT II TDP provides that NOAT II funds shall be distributed to the various states based upon a set percentage schedule.[22] Allocation of the funds within each state is then determined either by a Default Allocation Mechanism or pursuant to a Statewide Abatement Agreement ("**SAA**") between each state and its political subdivisions. Again, consistent with the Plan, the NOAT II TDP makes clear that allocated funds are to be "used only for **Approved Uses**."[23] Recognizing the requirement that the funds be used pursuant to the Plan, the NOAT II TDP state that: "NOAT II Funds distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses in Schedule B."[24] Unsurprisingly, given the requirement in the Plan for the establishment of a separate Municipal and Tribe Opioid Attorneys' Fee Fund, and that the Attorneys' Fee Fund shall be the exclusive source of payment of attorneys' fees from the NOAT II Trust, the list of uses in Schedule B does not include the payment of attorneys' fees as an Approved Use.

---

[21] D.I. 7684-2 at 73 (NOAT II Trust Agreement § 4.2(c)). Statewide Abatement Agreement is defined in the NOAT II TDP as follows: "Each State and its Local Governments will have until (60) sixty days after the Effective Date of the Plan (such date, the "SAA Filing Deadline") to file with the Bankruptcy Court or authorize the NOAT II Trustees to file with the Bankruptcy Court on their behalf, an agreed-upon allocation or method for allocating the NOAT II Funds for that State dedicated only to Approved Uses…." D.I. 7684-2 at 107 (NOAT II TDP § 5(A)(2)).
[22] D.I. 7684-2 at 102 (NOAT II TDP § 5).
[23] D.I. 7684-2 at 102 (NOAT II TDP § 5(A)(1)) (emphasis in original).
[24] D.I. 7684-2 at 100–01 (NOAT II TDP § 2). Schedule B provides the enumerated list of Approved Uses. D.I. 7684-2 at 118–128 (NOAT II TDP Schedule B)

5

## DISCUSSION

### I. Interpretation and Enforcement of a Plan and Related Orders is Subject to Core Jurisdiction

The Texas PSC argues that this Court lacks core jurisdiction over the State's Motion which seeks to interpret and enforce the Plan and related Trust Documents. According to the Texas PSC, because the Plan provides for the use of a State SAA to establish the allocation of Abatement Distributions within a state, and Texas has a State SAA, the interpretation of the Texas SAA is a matter of state law and, therefore, at best, this Court only has related to jurisdiction. The Texas PSC is wrong.

The Third Circuit Court of Appeals recently reaffirmed the conclusion that while a bankruptcy court's jurisdiction narrows after confirmation of a plan, "'the Court continues to have jurisdiction over core and non-core proceedings.'" *In re TE Holdcorp LLC*, No. 22-1807, 2023 WL 418059, (3d Cir. Jan. 26, 2023) (quoting *In re Essar Steel Minnesota LLC*, 47 F.4th 193, 194, 197-98 (3d Cir. 2022)). A core proceeding, the Third Circuit noted, includes confirmation of plans and orders approving the sale of property. *Id.* (citing 28 U.S.C. § 157(b)(2)(L), (N)). A motion filed post-confirmation to enforce a confirmation or sale order does "not divest the Bankruptcy Court of jurisdiction because it [has] jurisdiction to interpret and enforce those prior orders." *Id.* (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("a bankruptcy court 'plainly ha[s] jurisdiction to interpret and enforce its own prior orders.'") and *Essar Steel*, 47 F.4th at 199–200 ("bankruptcy court had core jurisdiction to interpret 'the discharge injunction order in its own plan and confirmation order' post-confirmation.")).

Here, the question is whether the Plan allows for a State SAA to alter the Approved Uses to which Abatement Distributions from NOAT II can be put. Indeed, the Texas PSC itself argues that the Plan controls how and for what purpose distributions under NOAT II are to be

6

made.[25]  It is plainly obvious, therefore, that this Court has core jurisdiction over the Motion.

## II.    Abstention is Not Warranted

The general rule is that a bankruptcy court should decide matters involving core issues. *In re Indianapolis Downs, LLC*, 462 B.R. 104, 114 (Bankr. D. Del. 2011) (*citing In re Garland & Lachance Contr. Co*., 144 B.R. 586, 594-95 (Bankr. D.N.H. 1991) (noting that abstention is normally inappropriate if a matter is a core proceeding, "but the rule is not inflexible and that abstention may be appropriate for reasons of justice, comity with state courts, or respect for state law."). Nothing could be a more significant issue for a bankruptcy court than the interpretation of its own orders, including orders approving plans of reorganization.

The Texas PSC argues that even if core jurisdiction exists, abstention is appropriate because issues of state law predominate. Specifically, they argue that because Texas adopted an SAA pursuant to the Plan, the Texas SAA determines how distributions within Texas should be made and the state court is best suited to make those determinations. The Texas PSC's argument is not well taken. As noted above, even the Texas PSC admits that the Plan determines how distributions are made. As more fully discussed below, no State SAA could alter the Plan's dictates as to how Abatement Distributions can be used by any state or political subdivision. Moreover, the issues involved in the Motion extend well beyond the state of Texas. Indeed, it appears that a state court in Arkansas has already approved a distribution that may also be in violation of the Plan requirements.[26]  Therefore, I decline to grant permissive abstention to allow the Texas state court to determine the uses to which those distributions can be put.

---

[25] D.I. 8599 at 11.
[26] D.I. 8599 at 5.

### III. The Plan Does Not Allow NOAT II Distributions to be Used for Holders of Municipal Opioid Claims to Reimburse Attorneys' Fees

Despite the clear and unambiguous language in the Plan, the MDT II Trust Documents, and the NOAT II Trust Documents that the Municipal and Tribe Attorneys' Fee Fund shall be the exclusive source of payment of attorneys' fees from the NOAT II Trust, the Texas PSC attempts to advance several arguments why they should be able to recover attorneys' fees from the NOAT II Abatement Distributions. For the reasons discussed below, I find none of their arguments persuasive.[27]

First, the Texas PSC contends that the term Approved Uses is defined under the Plan as Authorized Abatement Purposes which in turn is defined as including "the payment of attorneys' fees and costs of Holders of Opioid Claims channeled to such Abatement Trust."[28] The Texas PSC then argues that because the NOAT II TDP provides that 100% of the funds distributed must be used for Approved Uses, which the TDP defines as comprising only certain scheduled opioid/substance use disorder related projects or programs and the costs of selecting and administering distributions but not attorneys' fees, the NOAT II TDP limits the purpose and uses of NOAT II distributions in contravention of the Plan.[29] The Texas PSC's argument completely ignores the provisions of the Plan that mandate the establishment of a separate fund under the NOAT II Trust for the payment of attorneys' fees, and that that fund shall be the exclusive means by which the Holder of a Municipal or Tribe Opioid Claim can recover attorneys' fees. That is precisely what the NOAT II Trust and the NOAT II TDP do. The Plan requires two separate funds under the NOAT II Trust: (i) a fund to pay claims for the abatement of the opioid crisis to which the bulk of the settlement funds are directed, and (ii) a limited fund to pay attorneys' fees

---

[27] The Texas PSC asserts the Plan controls how funds are to be distributed. I agree.
[28] D.I. 6510 at 11 (Plan Art I.A.58).
[29] D.I. 8599 at 11.

related to claims filed by municipalities. The Texas PSC's argument, therefore, is without merit.

Second, the Texas PSC points to the Texas SAA Term Sheet which it contends allows for the payment of attorneys' fees from any opioid settlement funds received by the State of Texas from any Pharmaceutical Supply Chain Participant.[30] The SAA Term Sheet, which was filed with the Court, as required under the Plan, provides that 9.3925% of settlement funds shall be set aside to cover expenses, including attorneys' fees, for political subdivisions.[31] The Term Sheet was entered into well before the confirmation of the Plan and was intended to cover all opioid settlements, not specifically the Mallinckrodt Plan. Because the term Abatement Trust Documents in the Plan includes any SAA, the Texas PSC alleges, the SAA Term Sheet can alter the uses for which Abatement Distributions can be used. This argument is baseless in several respects.

Foremost, nothing in the Plan authorizes any state to alter the uses for which NOAT II Abatement Distributions can be used through an SAA. Indeed, no state has the authority to simply modify the terms of a confirmed bankruptcy plan of reorganization through legislation or otherwise. *See In re Federal-Mogul Global*, 402 B.R. 625, 634 (D. Del. 2009) (quoting *Integrational Solutions, Inc. v. Serv. Support Specialties*, 124 F.3d 487, 493 (3d Cir. 1997); *In re Active Steel Erectors, Inc.*, 53 B.R. 851, 853 (Bankr. D. Alaska 1985)). Moreover, the argument is nonsensical in that it would render the clear and unequivocal mandate in the Plan that the Municipal and Tribe Attorneys' Fees Fund be the exclusive source for the payment of attorneys' fees for the Holders of Municipal and Tribe Opioid Claims a complete nullity. *See Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (holding that under Delaware law, contracts cannot be interpreted to read a nullity); *Nomura Home Equity Loan, Inc., Series 2006-*

---

[30] D.I. 8599 at 11–13.
[31] D.I. 8599 at 11–13.

*FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (N.Y. 2017) (holding that under New York law, contracts cannot be interpreted to read a nullity).[32]

Finally, even assuming the Texas PSC's position was tenable, it completely ignores the Texas statute governing the statewide opioid settlements.[33] As Texas points out, the statute "incorporates elements of the [SAA] Term Sheet, codifying the allocation and flow of funds for opioid settlement agreements and establishing the Texas Opioid Abatement Fund Council."[34] The statute provides in pertinent part:

> (a) Money obtained under a statewide opioid settlement agreement must be deposited as provided by this section and further allocated in accordance with the settlement agreement.
> (b) Of money obtained under a statewide opioid settlement agreement: (1) 15 percent shall be deposited into the account; and (2) 85 percent shall be deposited into the fund.
> (c) For the purposes of a statewide opioid settlement agreement in relation to a bankruptcy plan for a released entity, **money is distributed in accordance with the bankruptcy plan**.[35]

As previously noted, the Plan provides an exclusive means for the payment of attorneys' fees that does not include payment from Abatement Distributions. Thus, the Texas legislature recognized that any settlement funds received through an approved bankruptcy plan must be distributed in accordance with that plan. Any argument, therefore, that the SAA Term Sheet was a part of and modified the terms of the Plan is completely without merit.

Finally, the Texas PSC argues that a "PEC/MSGE Mallinckrodt Fee Allocation Agreement," which is attached to and made a part of the Plan "does not preclude applicants from

---

[32] The plan elects New York law. D.I. 6510 at 164 (Plan Art. XII.J). The MDT II elects Delaware law. D.I. 7684-2 at 30 (MDT II Agreement Art. X § 10.2). NOAT II elects Delaware law. D.I. 7684-2 at 89(NOAT II Agreement Art. VI § 6.13).
[33] Tex. Gov. Code § 403.503 (2021). The Texas PSC referred only to the Texas Term Sheet and ignored the Texas statute that modified its terms.
[34] D.I. 8582 at 8.
[35] Tex. Gov. Code § 403.507 (2021) (emphasis added).

10

participating in any 'fee funds or backstops' established in state specific MOU's or agreement."[36] Claiming that the SAA Term Sheet is a state MOU or agreement providing for a backstop for attorneys' fees, the Texas PSC contends that the Plan allows for the payment of attorneys' fees from NOAT II Abatement Distributions. The Texas PSC is wrong. First, as already noted, (i) no state SAA could modify the plain and unequivocal language in the Plan, and (ii) the Texas legislature made clear that any funds received in relation to a bankruptcy plan are to be distributed in accordance with that bankruptcy plan.

Moreover, the Texas PSC once again completely ignores the plain language of the Plan. The only reference in the Plan to the PEC/MSGE Mallinckrodt Fee Allocation Agreement is in Article IV.9.B. That provision provides in relevant part that:

> Payments from the Municipal and Tribe Opioid Attorneys' Fee Fund shall be the exclusive means of payment from the Public Opioid Creditor Trusts for costs and expenses (including attorneys' fees) of any Holder of a Municipal Opioid Claim or Tribe Opioid Claim (or any ad hoc group consisting of any of the foregoing) or any attorney therefor, other than amounts paid in accordance with the order of the MDL Court establishing the Common Benefit Fund. Except as otherwise agreed to in writing by the MSGE Group and the MDL Plaintiffs' Executive Committee, **the PEC/MSGE Mallinckrodt Fee Allocation Agreement shall be and remain fully enforceable, and shall apply to the Municipal and Tribe Opioid Attorneys' Fee Fund**.[37]

As is absolutely clear from this language, the PEC/MSGE Mallinckrodt Fee Allocation Agreement is applicable <u>only</u> to the Municipal and Tribe Opioid Attorneys' Fee Fund and nothing more. Any argument that the PEC/MSGE Mallinckrodt Fee Allocation Agreement allows for the payment of attorneys' fees from the NOAT II Abatement Distributions is wholly unfounded.

---

[36] D.I. 8599 at 13.
[37] D.I. 6510 at 107 (Plan Art X.9.B) (emphasis added).

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

For the foregoing reasons, the Motion is GRANTED as follows:

1. The Texas PSC shall take all necessary steps to withdraw the Texas PSC State Court Motion with prejudice within 5 business days following the date upon which this Order becomes final and non-appealable.

2. Any further actions inconsistent with the findings herein, including continued prosecution of the Texas PSC State Court Motion or similar motions, are prohibited by the Confirmation Order and may result in the imposition of sanctions for willful violation of that Order.

3. The Court retains jurisdiction over the Holders of State Opioid Claims and Municipal Opioid Claims and any other party with respect to any matters relating or arising from the Motion or the implementation of this Order.

Dated:  April 19, 2023

_____
JOHN T. DORSEY, U.S.B.J.