## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.,* | ) | Case No. 20-12522 (BLS) |
| | ) | (Jointly Administered) |
| _____Debtors._____ | ) | |
| OPIOID MASTER DISBURSEMENT | ) | |
| TRUST II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 22-50433(BLS) |
| | ) | |
| COVIDIEN UNLIMITED COMPANY | ) | |
| (formerly known as Covidien Ltd. and | ) | |
| Covidien plc), COVIDIEN GROUP | ) | |
| HOLDINGS LTD. (formerly known as | ) | |
| Covidien Ltd.), COVIDIEN | ) | |
| INTERNATIONAL FINANCE S.A., | ) | |
| COVIDIEN GROUP S.A.R.L., and DOE | ) | |
| DEFENDANTS 1-500, | ) | |
| | ) | |
| _____Defendants._____ | ) | **Re: Adv. D.I. 93**[1] |

## OPINION

Opioid Master Disbursement Trust II (the "**Trust**" or "**Plaintiff**"), commenced this action

asserting claims arising from the 2013 spinoff (the "**Spinoff**") of the debtors in the above-

captioned chapter 11 cases (collectively "**Debtors**" or "**Mallinckrodt**") from the corporate

enterprise of the defendants, Covidien.[2] The Trust seeks to avoid and recover several alleged

---

[1] References to filings in this adversary proceeding will be denoted as "Adv. D.I." and citations to entries on the docket in the bankruptcy will be denoted as "D.I."

[2] The term "**Covidien**" includes defendants Covidien Unlimited Company, formerly known as Covidien Ltd. and Covidien plc (hereinafter referred to as "**Covidien plc**"), Covidien Group Holdings Ltd., formerly known as Covidien Ltd. ("**Covidien Ltd**"), Covidien International Finance S.A. ("**CIFSA**"), and Covidien Group S.a.r.l. ("**Covidien SARL**"). Covidien SARL was a wholly owned subsidiary of CIFSA, which was a wholly owned subsidiary of Covidien Ltd., which was a wholly owned subsidiary of the ultimate parent, Covidien plc.

fraudulent transfers that were made either in connection with the Spinoff or in the years preceding it. The transfers at issue include (a) approximately $867 million in cash transfers; (b) Covidien's retention of approximately $721 million in proceeds from Mallinckrodt's issuance of senior unsecured notes; (c) Mallinckrodt's assumption of hundreds of millions of dollars of tax liability previously held by Covidien; (d) Mallinckrodt's assumption of indemnification obligations to Covidien; and (e) the value of the enterprise that was transferred away from the Debtors as a result of the Spinoff. Additionally, the Trust asserts other claims arising from the Spinoff, including indemnification/contribution and equitable subordination.

Portions of the original complaint were previously dismissed by the Court in ruling upon Covidien's motion to dismiss.[3] Following that ruling, the Trust filed an amended complaint (the "**Amended Complaint**")[4] and the Court directed the parties to engage in limited discovery solely on issues relevant to Covidien's Section 546(e) defense so that the Court could consider summary judgment motions on that issue. Following that discovery, Covidien filed its motion for summary judgment (the "**Motion**").[5] The Motion has been fully briefed, and oral argument was held on May 9, 2025.[6] This matter is ripe for disposition.

For the reasons set forth below, the Motion is denied in part and granted in part.

---

[3] Covidien moved to dismiss the fraudulent transfer claims pled in the original complaint pursuant to Section 546(e), but the Court denied that motion, finding there to be issues of fact that precluded resolution of the issue under Rule 12(b)(6). See Memorandum Opinion, Adv. D.I. 57.

[4] Adv. D.I. 59.

[5] Covidien's Motion for Summary Judgment Based on the Section 546(e) Safe Harbor, Adv. D.I. 93.

[6] See Transcript of May 9, 2025, Hearing, Adv. D.I. 179.

## FACTS AS ALLEGED IN THE AMENDED COMPLAINT[7]

In 2007, Mallinckrodt, a global conglomerate that developed, manufactured, and sold pharmaceutical products, became a part of the Covidien enterprise. Covidien is a global healthcare products company. While Mallinckrodt remained a separate corporate entity on paper, once it became a part of Covidien, it ceased operating as a standalone entity and was considered both internally and externally to be Covidien's pharmaceutical segment.[8]

Among Mallinckrodt's portfolio of pharmaceutical products were several opioid pain relievers. While opioids had traditionally been reserved for patients with the most serious conditions, pharmaceutical manufacturers began to engage in marketing campaigns in the 1990s that were designed to persuade prescribers and patients that opioids were in fact safe, effective, non-addictive, and appropriate for individuals experiencing virtually any type of chronic pain.[9] As a result, healthcare providers began to prescribe opioids in mass quantities.

Throughout the early 2000s, Mallinckrodt's opioid business was substantial, both in terms of production and market share.[10] Between 2006 and 2014, Mallinckrodt was the largest manufacturer, marketer, and producer of opioid products in the United States, with a 23% market share.[11] Mallinckrodt employed a sales force of hundreds of sales representatives who were incentivized to aggressively sell opioids as well as recruit physicians to help promote

---

[7] The Court would not typically rely only on the facts alleged in the Amended Complaint in considering a motion for summary judgment; however, because the Motion presented here follows discovery only upon issues related to Covidien's assertion of the securities safe harbor, the Court has not yet been presented with evidence regarding facts on other issues. Accordingly, the recitation of facts included herein is for background purposes only and it is not the Court's intention to imply that statements made in the fact section of this opinion include facts supported by the evidence. As this Motion is limited to one specific issue, the Court has included an abbreviated version of the facts. A detailed recitation of the facts alleged in the Amended Complaint can be found in the Memorandum Opinion on Covidien's Motion to Dismiss, found at Adv. D.I. 57, as well as in the Amended Complaint.

[8] Amended Complaint, ¶¶ 141, 161-62.

[9] *Id.* ¶ 35.

[10] *Id.* ¶ 33, 34.

[11] *Id.* ¶ 33.

Mallinckrodt's opioid products.[12]  Sales representatives received training on how to overcome prescribers' concerns about patient abuse of the company's opioids, patient safety, or legal and regulatory scrutiny.

By 2009, increasing sales of opioids remained the primary focus despite a growing concern at Mallinckrodt over a subpoena issued by government investigators and visits from regulatory officials.  With incidents of opioid abuse and misuse on the rise, regulatory officials began to require opioid manufacturers to design and implement monitoring systems for the purpose of detecting suspicious orders.[13]  But the system that Mallinckrodt had in place was both insufficient and easily manipulated.[14]  Making matters worse, Mallinckrodt gave its sales force the authority to both investigate and clear suspicious orders, even though the compensation scheme for such employees favored sales over compliance.[15]

By 2011, the opioid crisis had reached the boiling point.  Mallinckrodt was informed by the Department of Justice that its oxycodone tablets were the main illicit drug on the streets in New England.[16]  By spring of that year, there were settlements of approximately $750 million on record between the federal government and some of Mallinckrodt's competitors.[17]

At the same time, Covidien was exploring potential strategic options for Mallinckrodt.[18]  Covidien's board initially recommended that the company "pursu[e] 5 strategic buyers who would not require an audit, financing and would not dig."[19]  But it made little headway in its attempts to find a buyer due, at least in part, to Mallinckrodt's potential liabilities.  Covidien's

---

[12] *Id.* ¶¶ 38, 82-84.
[13] Amended Complaint ¶ 99-100.
[14] *Id.* ¶ 113, 118.
[15] *Id.* ¶¶ 114-15.
[16] *Id.* ¶ 129.
[17] *Id.* ¶ 198.
[18] *Id.* ¶¶ 248-249.
[19] *Id.* ¶ 249.

board noted that it would only a approve sale to prospective buyers if "they assume liabilities."[20] One prospective purchaser made an offer of $4 billion for Mallinckrodt but refused to assume any liabilities with the sale. Although Mallinckrodt's assets were only worth about $3.3 billion at the time, Covidien rejected the offer.[21] While Covidien had received one other bid, it was later withdrawn with the potential buyer citing "treatment of contingent liabilities" and "value expectations" as some of its reasons.[22]

In April 2011, the executive committee of Covidien's board received a presentation that laid out significant concerns about the company's opioid monitoring system and reported an increased frequency of penalties issued by the Drug Enforcement Administration (the "**DEA**"). The presentation warned that "Mallinckrodt is viewed as the kingpin within the drug cartel."[23] Indeed, a Covidien compliance officer noted that a DEA representative told her: "I am coming. You don't want me. I can 'tear you apart.' If [the] DEA can see where the drugs are going, Mallinckrodt knows full well where the drugs are going."[24]

On November 1, 2011, the Centers for Disease Control and Prevention declared an "opioid epidemic," noting that "the death toll from overdoses of prescription painkillers has more than tripled in the past decade."[25] On November 30, 2011, the DEA subpoenaed Mallinckrodt for documents related to its Monitoring Program.[26] On December 15, 2011, Covidien announced its plans to spin off its pharmaceutical segment into a standalone public company.[27]

---

[20] Amended Complaint ¶ 249.
[21] Id. ¶ 251-52.
[22] Id. ¶ 253.
[23] Id. ¶ 205.
[24] Id. ¶ 236.
[25] Amended Complaint ¶ 197.
[26] Id. ¶ 239.
[27] Id. ¶ 240.

The company came under intense scrutiny in the media. In June 2012, *Bloomberg Business Week* published an article stating that the most common form of [oxycodone or] "roxy" was little blue pills customers called "mallies" because they were made by "Mallinckrodt . . . the pharmaceuticals business of Dublin-based Covidien," which customers liked the most because they were the easiest to crush up, mix with water, and inject.[28] Another article stated that "[t]he most dangerous drug dealers in the world . . . are wearing suits and ties in the boardrooms of America[,]" adding that "[t]he nonmedical use of prescription opiates is the fastest growing drug abuse problem in the United States."[29]

Yet, with the Spinoff in mind, increasing sales of opioid products became more important than ever.[30] On July 25, 2012, Covidien's VP and general manager of specialty pharmaceuticals asked the sales team to "really turn up the volume on [Mallinckrodt's branded opioid product] EXALGO this quarter[,]" noting that it was the sales team's "last chance to make a run at the FY12 President's Club trip in Mexico," a trip for high-achieving sales people.[31] In August 2012, a regional sales director wrote that Exalgo was the "number 1 priority" of the pharmaceutical business and that performance evaluations would be based "almost exclusively . . . [on] Exalgo performance[.]"[32]

In addition to striving for as many new patients as possible, the company also worked to ensure that patients who had been prescribed opioids would stay on them and take increasingly higher doses. Sales representatives were applauded for suggesting tactics to prescribers for

---

[28] *Id.* ¶ 200.
[29] Amended Complaint ¶ 213.
[30] *Id.* ¶ 262.
[31] *Id.* ¶ 214.
[32] *Id.* ¶ 43.

overriding insurance quantity limits on opioids so that larger quantities of pills could be prescribed.[33]

In January 2013, Covidien's legal department drafted a memorandum regarding opioid abuse that discussed the changing regulatory environment, "inappropriate prescribing," "diversion," and other issues."[34] Nevertheless, the company continued to put pressure on sales representatives to sell more opioids, and underperforming representatives were threatened with termination.[35] As the sales force worked to increase opioid sales, the subpoenas kept coming.[36]

By mid-2013, the process of disentangling Mallinckrodt from the Covidien enterprise was nearly complete. But in addition to separating the pharmaceutical business from the non-pharmaceutical business, Covidien also took a series of steps that would increase the burdens on the newly independent Mallinckrodt.

In the three years preceding the Spinoff, Covidien caused Mallinckrodt to make a series of cash transfers that totaled $867 million (the "**Cash Transfers**").[37] Covidien also caused Mallinckrodt to incur a substantial amount of debt and then transferred most of the proceeds from the debt offerings to Covidien. Specifically, Covidien caused MIFSA to issue a total of $900 million in senior unsecured notes (the "**Note Issuance**"), but $721 million of those proceeds (the "**Note Proceeds**") went to Covidien. Additionally, MIFSA was required to pay the $11 million in fees incurred in connection with the Note Issuance out of its share.[38]

Also in connection with the Spinoff, Mallinckrodt assumed hundreds of millions of dollars of what was previously Covidien's tax liability pursuant to a newly executed tax

---

[33] *Id.* ¶ 51.
[34] *Id.* ¶ 229.
[35] *Id.* ¶ 45.
[36] *Id.* ¶¶ 180, 241-43.
[37] Amended Complaint ¶ 254.
[38] *Id.* ¶ 273.

agreement (the "**Tax Matters Agreement**").[39]  The Tax Matters Agreement also mandated that Mallinckrodt take actions to restrict the size of its business for two years post-spin and obtain approval from Covidien to take other actions, such as launching new products.[40]

The terms of the Spinoff were set forth in a Separation and Distribution Agreement (the "**Separation Agreement**").  Pursuant to this agreement, Mallinckrodt plc assumed all liabilities stemming from the pharmaceutical business, as well as substantial liabilities relating to Covidien's legacy indebtedness.[41]  Mallinckrodt's newly appointed leadership team had concerns about certain aspects of the transaction, including the long-lasting impact of the Tax Matters Agreement as well as the amount of debt that Covidien was putting onto Mallinckrodt, but the new board was not given an opportunity to negotiate better terms.[42]

The disentanglement of the business segments took nearly two years, involved roughly 200 steps, and cost Covidien approximately $235 million to accomplish.  By the end of this process, the Covidien enterprise had been restructured into two distinct lines of entities under its ultimate parent company:  one that held all non-pharmaceutical assets and would remain with Covidien and one that held all the pharmaceutical assets and would be spun off as Mallinckrodt.[43]  In the final steps of the transaction, MIFSA redeemed its shares from Covidien plc in exchange for cash (specifically, $721 million from the Note Proceeds) and Covidien caused MIFSA to be transferred to Mallinckrodt plc, thus completing the Spinoff.  The Spinoff closed on June 28, 2013.[44]

---

[39] Amended Complaint ¶ 275-76.
[40] *Id.* ¶ 278.
[41] *Id.* ¶¶ 279-81.
[42] *Id.* ¶¶ 168-69, 274.
[43] *Id.* ¶ 271.
[44] *Id.*

Following the Spinoff, Mallinckrodt operated as a standalone entity with some success for several years. But by 2020, the "all-consuming tidal wave of litigation" that Mallinckrodt faced -- consisting of more than 3000 lawsuits arising out of the manufacture and sale of its opioid products -- overwhelmed the company.[45]  On October 12, 2020 (the "**Petition Date**"), Mallinckrodt filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "**Code**").

Upon Mallinckrodt's emergence from bankruptcy, the Trust was formed for the benefit of the individuals and entities that hold claims against Mallinckrodt arising out of its manufacture and sale of opioids.  On October 11, 2022, the Trust commenced this adversary proceeding.

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[45] D.I. 128, Declaration in Support of Chapter 11 Petitions, ¶ 76.  Reorganized Debtor Mallinckrodt plc and 60 of its affiliates filed for bankruptcy a second time in this Court in 2023.  See Case Number 23-11258.

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). And "[w]hen the moving party has carried its burden . . .the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original) (internal quotation omitted). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

In the instant Motion, Covidien asserts that summary judgment should be granted in its favor on all Counts of the Amended Complaint, except for Count IV.[46]

## ANALYSIS

Section 546(e), often referred to as the "securities safe harbor," was enacted to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir. 1990) (quoting H.R. Rep. 97-420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583). "If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading

---

[46] Covidien included Count IV (Cash Transfers) in its Motion but later withdrew its Motion as to that claim. Covidien also moved for summary judgment on Counts VI (equitable subordination), VII (Section 502(d) disallowance), and VIII (Section 502(e)(1) disallowance), but only to the extent the Court's ruling had the effect of leaving those counts as the only ones remaining in the case. As they are not the only remaining claims, the Motion with respect to them is denied.

obligations, placing other market participants and the securities markets themselves at risk."

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011). The

provisions of the safe harbor serve to limit this risk by prohibiting the avoidance of certain types

of securities transactions. *Id.* As the Supreme Court has explained, "§546(e) operates as an

exception to the avoiding powers afforded to the trustee under the substantive avoidance

provisions." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 379, 138 S. Ct. 883,

893 (2018).

> In relevant part, Section 546(e) provides that:

> Notwithstanding section [] 544. . . of this title, the trustee may not avoid a transfer
> that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . .
> financial participant, . . . or that is a transfer made by or to (or for the benefit of)
> a . . . financial participant . . . in connection with a securities contract . . . .

11 U.S.C. § 546(e). In simpler terms, the safe harbor provision applies when "(1) there is a

*qualifying transaction* (*i.e.*, there is a 'settlement payment' or a transfer payment . . . made in

connection with a securities contract), and (2) there is a *qualifying participant* (*i.e.*, the transfer

was made 'by or to (or for the benefit of) a . . . financial institution, [or financial participant]')."

*In re Quorum Health Corp.*, No. 20-10766, 2023 WL 2552399, at *5 (Bankr. D. Del. 2023 Mar.

16, 2023) (quoting *SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R.

505, 513 (Bankr. S.D.N.Y. 2020)) (alterations in original).

**Count I:  Avoidance of the Spinoff and Component Transfers**

In Count I of the Amended Complaint, the Trust seeks to "(a) avoid the transfers of assets

or property made in connection with the Spinoff, including, without limitation, the transfer of

Covidien and its direct and indirect subsidiaries as well as the Note Proceeds; and (b) recover the

value of assets or property transferred to Covidien, its affiliates, or third parties for the benefit of Covidien in connection with, or as a result of, the Spinoff, with interest."[47]

A.    Is There a Qualifying Transaction?

"Before a court can determine whether a transfer was made by or to or for the benefit of a covered entity, the court must first identify the relevant transfer to test in that inquiry." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 377-78, 138 S. Ct. 883, 892 (2018). "[T]he relevant transfer for purposes of the §546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Id.*

The transfers the Trust seeks to avoid in Count I are "the Spinoff and component transfers," which as noted above, refers to the transfer of all assets or property made in connection with the Spinoff, including but not limited to the transfer of the Note Proceeds.[48] The Trust argues that the Spinoff is not a qualifying transaction under Section 546(e) because only a few of the 231 steps that were required to complete the transaction could possibly constitute a "settlement payment" or a transfer made "in connection with a securities contract." In the Trust's view, the safe harbor can only be applied to the entire Spinoff if the Court ignores all of the steps that led up to the share redemption and focuses only upon that step in isolation. Doing so, the Trust argues, would be contrary to the Supreme Court's holding in *Merit Management* that "the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid." 583 U.S. 370 ("If a trustee properly identifies an avoidable transfer, . . . the court has no reason to examine the relevance of component parts[.]"). In essence, the Trust contends that any focus by the Court on the share redemption that was only one of many individual steps to

---

[47] Amended Complaint ¶ 317.
[48] *Id.* Count I.

12

effectuate the Spinoff would give undue weight to a component part of the transfer that the Trust seeks to avoid and therefore run afoul of *Merit*.

Covidien responds that it does not matter what percentage of the 231 steps involved in the Spinoff qualify as "settlement payments" because all of the steps were made pursuant to and were required by the Separation Agreement, which is a "securities contract" for purposes of Section 546(e). *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 421 (2d Cir. 2014) ("In the context of § 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract."); *Quorum*, 2023 WL 2552399, at *5-6 (transfers "referenced directly in and [that] occurred pursuant to the [spin separation agreement]" were "in connection with a securities contract"). The Court agrees with Covidien.

As the Second Circuit has observed, "the Bankruptcy Code defines 'securities contract' with 'extraordinary breadth' to include, for example, a 'contract for the purchase or sale of a security, including any repurchase transaction on any such security,' as well as 'any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph.'" *Kirschner v. Robeco Cap. Growth Funds - Robeco BP US Premium Equities (In re Nine W. LBO Sec. Litig.)*, 87 F.4th 130, 149-50 (2d Cir. 2023) (quoting *Tribune II*, 946 F.3d at 81 (cleaned up); *see also* 11 U.S.C. § 741(7)(A)(i), (vii)).

The Trust has defined the transfer that it seeks to avoid as the entire Spinoff. The Spinoff — including all of its 231 steps – is governed by the Separation Agreement. The Trust disagrees, arguing that the primary purpose of the Spinoff was to separate Covidien's pharmaceutical business from its non-pharmaceutical business. Thus, it argues, the Spinoff is more properly characterized as an asset transfer than a securities transaction. But while the Trust is correct that the Separation Agreement does, in large part, provide for an asset transfer, it also provides for

the distribution of shares. The Separation Agreement – notably titled Separation *and Distribution* Agreement – clearly contemplates a transaction that involves both the transfer of assets and the transfer of securities. It is therefore fairly characterized as a "securities contract" as that term is defined by the Code. 11 U.S.C. § 741(7) (broadly defining "securities contract" to include "a contract for the purchase, sale or loan of a security" as well as "any other agreement or transaction that is similar to" such agreement); § 101(49)(A) (defining the term "security," to include a "note," "stock," "transferable share," or "other claim or interest commonly known as 'security'").

Additionally, as the Separation Agreement specifically requires the completion of all 231 steps, it is appropriate to treat all 231 steps as transfers or actions made "in connection with" a "securities contract."[49] The fact that the vast majority of the individual steps may not themselves qualify as "settlement payments" has no bearing on this outcome. Section 546(e) requires a transfer to be either a settlement payment or made in connection with a securities transaction. It does not require both. 11 U.S.C. § 546(e) ("the trustee may not avoid a transfer that is a . . . settlement payment . . . *or* that is a transfer made . . . in connection with a securities contract") (emphasis added). The cases cited by the Trust in support of a contrary result are distinguishable on their facts. In *Mervyn's Holdings, LLC v. Lubert-Adler Group (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 500 (Bankr. D. Del. 2010), the Court declined to apply section 546(e) to a sale even though one part of the sale qualified as a "settlement payment" because the other transactions surrounding the sale did not. The issue of whether the transfers were made "in connection with a securities contract" was not before the Court. Similarly, in *Halperin v.*

---

[49] *See* Adv. D.I. 94, Declaration of Benjamin Wood ("**Wood Decl.**"), Ex. 1 (Separation Agreement) ¶ 2.1(a) & Schedule 2.1(a); Davis Tr. at 46:4-12 (conceding that the 231 transactions were "executed in connection with the Separation Agreement").

*Morgan Stanley Investment Management, Inc. (In re Tops Holding II Corp.)* 646 B.R. 617, 678-82 (Bankr. S.D.N.Y. 2022), defendants argued that the dividends the plaintiff sought to avoid were covered by the safe harbor even though the dividends themselves were not "securities contracts" because they were made using proceeds of a note issuance, which was a "securities contract." Stated differently, defendants attempted to rely on an intermediate step in the transaction (the notes issuance) to safe-harbor the final step (the dividends). The Court declined to do so on the ground that the plaintiff was only seeking to avoid the final step, not the intermediate one. *Id.* at 681 ("[B]ecause it is the 2009, 2012, and 2013 dividends that the Complaint seeks to avoid (transfers A→D), not the issuance of the private notes (transfers A→B), *Merit Mgmt.* requires that they not be safe-harbored under section 546(e)."). Here, in contrast, the transfer on which Covidien relies to assert the safe harbor (the share redemption) falls squarely within the transfer that the Trust seeks to avoid (the Spinoff).

For these reasons, the Court finds that the Spinoff (including its component parts) constitutes a qualifying transaction for purposes of Section 546(e).

B.    <u>Is There a Qualifying Participant?</u>

The second requirement for application of the safe harbor is that the transfer was made for or by (or for the benefit of) a qualifying participant, which can either be a "financial institution" or "financial participant," as those terms are defined by the Code. Each of the Covidien defendants asserts that it qualifies as a "financial participant." The term "financial participant" is defined in the Code as:

> an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) [11 USCS § 561(a)] with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount

outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition.[50]

The Court will consider the argument as to each of the Defendants here in turn.

    1. *CIFSA*

We start with CIFSA, a Luxembourg-based holding company and wholly-owned subsidiary of Covidien Ltd. Covidien argues that CIFSA qualifies as a financial participant because it had "securities contracts" on June 28, 2013 (the "**Spin Date**"), in the principal amount of at least $5 billion. Specifically, Covidien points to CIFSA's issuance of seven series of senior notes (the "**Notes**") pursuant to a base indenture and five supplemental indentures (the "**Indentures**") with a non-affiliate counterparty – Deutsche Bank Trust Company Americas, as trustee for the third-party holders of the Notes.[51] The Notes and Indentures had a combined outstanding principal amount of $5 billion and contained call and put options (the "**Options**") that gave (1) CIFSA the option to redeem the notes; and (2) the noteholders the right to require CIFSA to purchase the notes upon a change of control, for a price equal to the outstanding principal amount. Together, Covidien contends, the Notes and Indentures constitute "securities contracts," because the Notes are "securities" as that term is defined in the Code, and the Options are "contract[s] for ... an option to purchase or sell ... any ... security," "including any repurchase ... transaction on any such security," or any "agreement or transaction that is similar to" such an agreement. *See* 11 U.S.C. §101(49) & § 741(7)(A)(i), (vii). In support of its

---

[50] 11 U.S.C. § 101(22A) (alterations in original). Here, the relevant dates are: (1) June 28, 2013 (the Spin Date), when the parties entered into the Separation Agreement (a "securities contract," as discussed above), (2) October 12, 2020 (the Petition Date), or (3) any date within the 15 months before the Petition Date, i.e., July 12, 2019, through October 11, 2020.

[51] Wood Decl. ¶¶ 11-19.

position, Covidien cites to *In re Quebecor World (USA) Inc.*, 719 F.3d 94, 98-99 (2d Cir. 2013) (finding note purchase agreements "were clearly 'securities contracts' because they provided for both the original purchase and the 'repurchase' of the Notes") and *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 80-81 (2d Cir. 2019) (noting that "[t]he term 'redemption,' in the securities context, means 'repurchase'" and holding that payments made to repurchase shares were made "in connection with securities contract").

The Trust counters that CIFSA's Indentures cannot be used to qualify it as a financial participant because they are not securities contracts. Specifically, the Trust argues that the Indentures do not include any of the hallmarks of an agreement for the "purchase, sale, or loan of a security" in that they do not include an actual buyer of securities or the terms of any specific sale. They are, instead, merely a contract between the issuer and indenture trustee. Moreover, the Trust argues, the options embedded within the Indentures do nothing to transform them into securities contracts. Such options are commonplace in indentures and yet Congress did not include indentures in the list of things that constitute either a security or a securities contract. Accordingly, argues the Trust, holding that the Indentures qualify as "securities contracts" would inappropriately expand the scope of Section 546(e).

In support of its position, the Trust cites to a decision from this Court, *EPLG I, LLC v. Citibank (In re Qimonda Richmond, LLC)*, in which Judge Walrath determined that an indenture does not fall within the definition of "securities contract" in the Bankruptcy Code. 467 B.R. 318, 323 (Bankr. D. Del. 2012) (concluding that, while indentures are contracts, they are not securities contracts as defined by the Bankruptcy Code). The Trust also relies on *In re MPM Silicones, LLC*, in which the Bankruptcy Court for the Southern District of New York, citing the *Qimonda* decision, also held that indentures do not qualify as securities contracts. *See* No. 14-

17

22503-rdd, 2014 WL 4436335, at *21 (Bankr. S.D.N.Y. Sept. 9, 2014) (finding that indentures at issue "are not contracts for the purchase, sale or loan of a security; they instead set forth the terms under which the underlying notes will be governed and the role of the trustees in connection therewith"), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds, and remanded*, 874 F.3d 787 (2d Cir. 2017).

Having reviewed the documents submitted by Covidien, as well as the case law, the Court finds that Covidien has not met its burden in establishing that CIFSA qualifies as a financial participant for purposes of Section 546(e).

As noted above, to qualify as a financial participant, Covidien must establish that CIFSA had "securities contracts" in the requisite amount and during the relevant time frames. In relevant part, the Code defines "securities contracts" as, among other things,

> (i)    a contract for the purchase, sale, or loan of a security, a certificate of deposit a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101 [11 USCS § 101])

> (vii)   any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

> (ix)    any option to enter into any agreement or transaction referred to in this subparagraph; [52]

The indentures relied upon by CIFSA here do not meet this definition.

---

[52] 11 U.S.C. § 741(7) (emphasis added).

While there is no binding authority directly on point, the Court finds the two rulings cited by the Trust to be persuasive. In *Qimonda*, Judge Walrath considered whether the challenged transfer – a payment on a letter of credit - was one that was made "in connection with a securities contract" in satisfaction of the "qualifying transaction" prong of Section 546(e). *EPLG I, LLC v. Citibank (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 323 (Bankr. D. Del. 2012). Defendant argued that because the letter of credit was an enhancement to an indenture and indentures are securities contracts, the transfer was protected. The Court disagreed, stating that "[a]lthough it is settled law that bonds and indentures are <u>contracts,</u> the Court is not persuaded that the Bonds and Indenture are <u>securities contracts</u> within the definitions in the Bankruptcy Code." *Id.* (emphasis in original).

Similarly, in *MPM Silicones,* Judge Drain stated that he had "serious doubts that the indenture itself is a securities contract as defined in section 741(7)(A) of the Bankruptcy Code[.]" *In re MPM Silicones, LLC*, No. 14-22503-rdd, 2014 Bankr. LEXIS 3926, at *59-60 (Bankr. S.D.N.Y. Sep. 9, 2014) *aff'd,* 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds, and remanded,* 874 F.3d 787 (2d Cir. 2017). In considering the defendant's argument that sending a rescission notice to decelerate notes would constitute "liquidating a securities contract," as permitted by section 555 of the Code, Judge Drain observed that:

> [g]enerally speaking, section 741(7) of the Code's definition of "securities contract," which is lengthy, states that it is a contract for the purchase, sale or loan of a security. Clearly, the indentures themselves are not contracts for the purchase, sale or loan of a security; they instead set forth the terms under which the underlying notes will be governed and the role of the trustees in connection therewith. *See In re Qimonda Richmond, LLC*, 467 B.R. 318, 323 (Bankr. D. Del. 2012), holding, albeit without much discussion, that an indenture does not fall within the definition of section 741(7)(A).

*In re MPM Silicones, LLC*, No. 14-22503-rdd, 2014 Bankr. LEXIS 3926, at *60-62 (Bankr. S.D.N.Y. Sep. 9, 2014).

A third case, also out of the Bankruptcy Court for the Southern District of New York, though not cited by the parties, offers additional insight on this issue. In *In re Extended Stay, Inc.*, the defendant argued that dividend distributions made pursuant to an LLC agreement were made "in connection with a securities contract" because the distributions were made on securities issued pursuant to the LLC Agreement. Nos. 09-13764-JLG, 11-02254-JLG, 2020 Bankr. LEXIS 2128, at *276 (Bankr. S.D.N.Y. Aug. 8, 2020). Noting that the defendants' argument was essentially that "any payment made in connection with a security or a contract that involves a security is a safe harbored payment made 'in connection with a securities contract[,]'" Judge Garrity held that "[t]hat is too broad a reading of the statute." *Id.* The Court explained that:

> [A]n LLC operating agreement is the essential contract that governs the affairs of a limited liability company. In that way, it serves the same purpose as an indenture does in respect of the underlying bonds. *Compare Lorenz v. CSX Corp.*, 1 F.3d 1406, 1409 n.1 (3d Cir. 1993) ("An 'indenture' is a contract between the issuing corporation and indenture trustee pursuant to which debentures are issued."). The BHAC LLC Agreement is no different. Among other things it speaks to the rights of its members (Article 3), the management of the LLC (Article 4), the distribution of capital and non-capital proceeds (Article 5) and the dissolution and liquidation of the LLC (Article 9). *See* BHAC LLC Agreement. Neither that agreement, nor the Units representing the membership interests in BHAC issued under the agreement call for the purchase and sale of securities.

*Id.* at *279-80. This Court agrees with the observations and holdings of these cases and finds that the Indentures on which Covidien relies are not securities contracts.

The Indentures put forth by Covidien here refer to the purchase and sale of securities, but they are not themselves contracts "for the purchase, sale, or loan of a security" or even an option to enter into such a contract, as Section 741 requires. They are, instead, documents that govern the underlying securities contracts, such as the note purchase agreements. The cases cited by Covidien do not compel a different result. Neither case even considers the question of whether an indenture is a securities contract. *See Official Comm. of Unsecured Creditors of Quebecor*

*World (U.S.A) Inc. v. Am. Life Ins. Co. (In re Quebecor World (U.S.A.) Inc.)*, 719 F.3d 94, 98 (2d

Cir. 2013) (finding note purchase agreements "were clearly 'securities contracts' because they

provided for both the original purchase and the 'repurchase' of the Notes"); *Deutsche Bank Tr.

Co. Ams. v. Large Private Ben. Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946

F.3d 66, 80 (2d Cir. 2019) (concluding that LBO payments, "including those connected to the

redemption of shares, were 'in connection with a securities contract'"). Unlike the documents at

issue in these cases, the Indentures offered by CIFSA here are not evidence of specific securities

transactions. For that reason, they are not sufficient to establish that CIFSA is a "financial

participant" for purposes of applying the Section 546(e) defense to the Trust's claims.

     2.   *Covidien plc and Covidien Ltd.*

Covidien next argues that Covidien plc and Covidien Ltd. (together the "**Guarantors**")

also qualify as "financial participants" under the same Indentures and Notes offered by CIFSA

because they were guarantors on the Indentures and Notes and were jointly and severally liable

for the full amount. *See* 11 U.S.C. § 741(7)(A)(xi) (defining "securities contract" as "any

security agreement or arrangement or other credit enhancement related to any agreement or

transaction referred to in this subparagraph, including any guarantee . . . ."). For the same reason

that the Indentures are not "securities contracts" for purposes of qualifying CIFSA as a "financial

participant," they are also not "securities contracts" for the purpose of qualifying the Guarantors.

     3.   *Covidien SARL*

Covidien SARL was a wholly-owned subsidiary of CIFSA. Covidien argues that

Covidien SARL qualifies as a "financial participant" because it had currency forward contracts

and swap contracts (collectively, the "**Currency Contracts**") with unaffiliated counterparties

that had a total gross dollar value in excess of $2.5 billion in notional amount as of April 23, 2020, a date within 15 months of the Petition Date.[53]

In its opposition, the Trust again challenges whether the contracts submitted by Covidien SARL are of a type that can be used to establish its status as a financial participant, but for a slightly different reason. The Trust does not question that the Currency Contracts are "securities contracts" but instead questions whether they can be used to satisfy the $1 billion "in notional or actual principal amount outstanding" threshold contained in Section 101(22A). *See* 11 U.S.C. § 101(22A) (requiring a "total gross dollar value of not less than $1,000,000,000 in <u>notional or actual principal amount</u> outstanding) (emphasis added). Specifically, the Trust argues that the Currency Contracts are a type of instrument known as an "FX forward," which it contends "do[es] not involve the exchange of interest payments" and therefore has only a "notional amount," not a "notional <u>principal</u> amount."[54] According to the Trust, the Code's inclusion of the word "principal" in its threshold requirement means that only interest-bearing contracts or instruments can be used to satisfy the notional amount. In the Trust's view, "because FX forwards are not contracts or instruments involving notional principal amounts, Covidien SARL cannot qualify as a financial participant by relying on them."[55]

Covidien replies that the Trust's reading of Section 101(22A) cannot be squared with the statute's text. It notes that the word "interest" does not appear anywhere in the definition of "financial participant" and that the word "principal" refers simply to the face amount of the instrument. *See, e.g.*, Black's Law Dictionary (12th ed. 2024) (defining "principal" to mean "[t]he amount of a debt, investment, or other fund, not including interest, earnings, or profits").

---

[53] Declaration of Tim Husnik ("Husnik Decl."), Adv. D.I. 95 at ¶¶ 7, 13.
[54] Opposition Brief, Adv. D.I. 146 at 19; Declaration of Frank Risler ("**Risler Decl.**"), Adv. D.I. 146-1 at § 5.
[55] Opposition Brief, Adv. D.I. 146 at 19.

Further, Covidien argues, given that Section 101(22A) allows for the use of other non-interest bearing agreements such as securities contracts, the Trust's interpretation cramps the definition of "financial participant" in a way that makes no sense.

The Court agrees with Covidien. The Trust's position that FX forwards are not the type of financial instrument that can be valued by reference to notional amount is contradicted by the plain language of the statute. Section 101(22A) expressly includes "forward contracts" among the type of agreements that can be considered. *See* 11 U.S.C. § 101(22A) (defining "financial participant" as an entity that ... has one or more agreements or transactions described in ... section 561(a)"); *id.* § 561(a) (listing securities contract, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements). The Trust does not suggest that FX forwards do not qualify as "forward contracts" as that term is defined by the Code. Rather, it argues that the phrase "notional or actual principal amount" must be read so that the word "principal" applies to both the notional and the actual amount. In other words, under the Trust's interpretation, the statute must be read to say, "notional principal amount or actual principal amount" as opposed to "notional amount or actual principal amount." But none of the evidence cited by the Trust supports such an interpretation.

The Trust cites to tax and finance literature, along with the testimony of its expert, indicating that the term "notional amount" is the correct one to apply to FX forwards and that "notional principal amount" can only be used when an instrument is interest-bearing. But for every source the Trust cites in support of its proposed interpretation, Covidien cites a source for the contrary position.[56] Accordingly, the only reasonable conclusion to be drawn from the

---

[56] *See, e.g.,* Declaration of Joel Millar ("**Millar Decl.**"), Adv. D.I. 154, Ex. 4 (Shani Shamah, *A Foreign Exchange Primer* 81 (2d ed. 2008)) (in nondeliverable "foreign currency forward contract," "[a] (notional) principle amount, ... [is] agreed"); *id.*, Ex. 5 (Alphabet Inc., Form 10-K, year ended Dec. 31, 2019), 66-67 (reporting "notional principal" of "foreign currency forwards and option contracts"); *id.*, Ex.

evidence presented is that the two phrases are used interchangeably in the market. Even the Trust's own expert acknowledged that the Currency Contracts could be described, "from a market practitioner standpoint,"as having a notional amount of in excess of $1 billion.[57] For this reason, the Court finds that Covidien may use the Currency Contracts to establish Covidien SARL's status as a "financial participant."

Covidien having produced qualifying contracts that fall within the relevant time frame and meet the threshold dollar requirement, the burden then shifts to the Trust, as non-movant, to submit evidence sufficient to demonstrate the existence of an issue of material fact. *In re Bamboo Abbott, Inc.*, Nos. (Chapter 7) (MBK), 09-28689, 11-02139, 2012 Bankr. LEXIS 3097, at *5-6 (Bankr. D.N.J. July 5, 2012) ("Once the moving party establishes the absence of a genuine issue of material fact, . . . the burden shifts to the non-moving party to do more than simply show that there is some metaphysical doubt as to the material facts. A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that 'would be

---

6 (Apple Inc., Form 10-K, year ended Sept. 28, 2013), 58-59 (reporting "notional principal amounts" of "foreign exchange contracts," including "foreign currency forward and option contracts"); 30(b)(6) Tr. at 91:10-95:8, 96:4-14, 96:18-99:25 (testimony of Mr. Husnik, Senior Treasury Director in charge of foreign currency risk-management at Covidien and affiliates for $15 billion in foreign revenues, that he and counterparts in currency forward markets use "notional amount" and "notional principal amount" synonymously, and that the price of a currency forward is derived in part from the difference in the two currencies' interest rates); Millar Decl., Ex. 7 (Errata 30(b)(6) Dep., Husnik) at 2. "Notional principal amount" is also used for other non-interest-bearing instruments. *See, e.g.*, Millar Decl., Ex. 8 (John C. Hull, *Options, Futures, and Other Derivatives* (9th ed. 2014)), at 180 (volatility swap); *id.* at 572 (credit default swap); *id.* at 767 (equity swap).

[57] Millar Decl. at pdf pg 52 (Risler testimony):

> Q. And you agree that that $1 billion number, more than $1 billion number could be appropriately described as the notional amount of S.A.R.L.'s FX forward agreements?
> A. From a market practitioner standpoint, you can describe it as a notional -- what I discuss in my report is that it's different from the principal notional amount.
> Q. We'll get to that in a second, sir. But I just want to make sure that we have agreement here. You agree that the notional amount of S.A.R.L.'s FX forward agreements was greater than $1 billion?
> A. From my recollection, believe so but -- and, yes, it's in my report, Section 5.1.

admissible in evidence,' establishing the existence of a genuine issue of material fact for trial.")
(internal citations omitted); *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982)
("Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions,
conclusory allegations or suspicions."). The evidence submitted by the Trust, even when viewed
in the light most favorable to it, does not create a genuine issue of material fact. The Trust has
not cited to anything that would support the conclusion that Congress intended to limit the phrase
"notional or actual principal amount" in the way that the Trust suggests. Accordingly, the Trust
has not met its burden. The Motion with respect to Count I as against Covidien SARL is
therefore granted.

## Counts II and III – Tax and Indemnity Obligations

Covidien next argues that it is entitled to summary judgment on Counts II and III of the
Amended Complaint, to the extent they seek to recover any payments that Mallinckrodt allegedly
made on account of the Tax and Indemnity Obligations that it assumed in the Spinoff.[58]
Covidien argues that because the Tax and Indemnity Obligations were incurred by Mallinckrodt
in the Separation Agreement, and because the Separation Agreement is a "securities contract,"
any payments made with respect to the Tax and Indemnity Obligations would necessarily be
transfers made "in connection with a securities contract" and therefore protected by Section
546(e).[59]

The Trust responds that due to the limited discovery completed to date, it lacks the
necessary facts to oppose Covidien's Motion on these Counts. In support, the Trust submitted a

---

[58] Covidien concedes that Section 546(e) only applies to "transfers" not "obligations". While the body of
the Amended Complaint refers to the avoidance of the tax and indemnity obligations, the prayer for relief
refers to the recovery of payments made on account of avoided tax and indemnity liability.

[59] The above discussion regarding each defendant's status as a qualifying participant applies with equal
force to the claims in Counts II and III. Accordingly, the only question with respect to Counts II and III is
whether there is a qualifying transaction.

declaration pursuant to Federal Rule of Civil Procedure 56(d), indicating that it "the Trust has virtually no information about [tax or indemnity] payments, including when they were made, how much they were, and whether they were made at all. To adequately address whether those payments were transfers made in connection with a securities contract, the Trust requires discovery and adequate time to conduct it."[60]

Covidien replies that the Separation Agreement is all the evidence needed because any tax or indemnity payments made were made pursuant to that agreement and therefore "in connection with" a securities contract. Nevertheless, Covidien notes in its reply that it has responded to the Trust's interrogatories attesting that the questioned tax payments totaled approximately $252,944.[61]

The Court finds that the Trust lacks the facts essential to oppose Covidien's Motion with respect to the Tax and Indemnity Obligations and payments. The Court recognizes that because the Tax and Indemnity Obligations were incurred by Mallinckrodt in the Separation Agreement any payments made on account of those Obligations are *likely* to be transfers made "in connection with" a securities contract. However, it is not possible to conclusively determine that issue on the record that currently exists. Unlike the transfers at issue in Count I (the Spinoff and component transfers), which were all clearly set forth in the Separation Agreement, the details of the payments at issue in Counts II and III cannot be found within that document or even in the related Tax Matters Agreement. Accordingly, it is impossible to know from the face of the applicable agreements whether the payments ultimately made (about which there is no information, aside from the total dollar amount) were ones made "in connection with" the Separation Agreement. The Trust is therefore entitled to take discovery regarding the details of

---

[60] Declaration of Quincy M. Crawford, Adv. D.I. 146-4, at ¶ 6.
[61] See D.I. 154 at 123 (excerpt of Interrogatory Responses).

the individual payments.  Fed. R. Civ. Proc. 56(d) (The Court may deny a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]").  For these reasons, the Motion with respect to Counts II and III of the Amended Complaint is denied.[62]

**Count V:  Reimbursement, Indemnification, or Contribution**

In Count V of the Amended Complaint, the Trust asserts a claim for reimbursement, indemnification, or contribution, alleging that Covidien is jointly and severally liable with the Debtors for the more than $2 billion in opioid-related liabilities and expenses that Debtors have incurred to date on the grounds that Mallinckrodt was Covidien's alter ego and that, at the time the liability was incurred, Covidien exercised complete domination and control over Mallinckrodt.

Covidien argues that this claim, while not directly barred by Section 546(e), is nevertheless foreclosed by it indirectly in that it precludes the Trust from avoiding the release provided by Mallinckrodt in the Separation Agreement.   The relevant provision states that Mallinckrodt "release[d] ... [Covidien] ... from any and all Liabilities whatsoever ... arising from any acts or events occurring or failing to occur . . . or any conditions existing ... on or before the Effective Time" of the spinoff.[63]  Covidien argues that unless this release can be avoided as a fraudulent transfer, it bars the Trust's alter ego claim.  Section 546(e) prohibits the avoidance of the release, Covidien contends because (1) it was a disposition of property and therefore constitutes a "transfer" as that term is defined in the code, see 11 U.S.C. § 101(54)(D)

---

[62] Because the Court finds that Covidien has not established that there is a qualifying transaction with respect to Counts II or III, these claims cannot yet be dismissed as to Covidien SARL, even though the Court has found that Covidien SARL has established its status as a "financial participant" for purposes of Section 546(e).

[63] Wood Decl., ¶ 8 and Ex. 1 (Separation Agreement) § 4.1.

and *In re World Health Alternatives Inc.*, 385 B.R. 576, 596-97 (Bankr. D. Del. 2008) (noting "the unremarkable proposition that a debtor's release of a cause of action … is a transfer of property of the debtor"); and (2) it was made "in connection with" the Separation Agreement, which, as noted above, is a "securities contract" for purposes of Section 546(e).

The Trust responds that it is not seeking to avoid Mallinckrodt's release under any provision of the Code but is instead asserting a claim for Covidien's alter ego liability under common law principles that fall outside the safe harbor provided by Section 546(e). While it disagrees with Covidien's contention that the only path to liability is avoiding the release as fraudulent, the Trust argues that it need not establish the sufficiency of its claim as a matter of law at this point because the scope of the motion presently before the Court is limited to the applicability of Section 546(e) to its claims.

The Court agrees with the Trust. The claim asserted in the Amended Complaint is one for reimbursement, indemnification, or contribution, which arises under state law, not the Code. As Section 546(e) is a limitation on a trustee's avoidance powers, it applies only to claims asserted under the Code. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 379, 138 S. Ct. 883, 893 (2018) ("§546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions."). "While the safe harbors of section 546(e) exist to protect the capital markets and should be strictly construed as written to carry out their salutary objectives, they are not so exalted as to trump and preemptively block every other legal theory that a creative adversary might choose to employ when seeking relief from conduct of a market participant that is outside the norms of ordinary market behavior and that is claimed to be egregious." *Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings)*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012).

While Covidien may be free to argue later that the release operates as a complete defense to this claim, that issue is not properly before the Court now. The Court directed that summary judgment motions were to be limited to the question of whether and to what extent the Trust's claims were barred by section 546(e), and denied requests for broader discovery related to the release on that basis.[64] It would, accordingly, be manifestly unfair to require the Trust to put forth evidence in support of the merits of its claim at this time. For these reasons, the Motion with respect to Count V is denied.

## CONCLUSION

For the reasons set forth above, the Motion is DENIED, except with respect to Count I as against Covidien SARL, which is GRANTED. The parties shall submit an order consistent with this Opinion under certification of counsel within 14 days.

Dated: Wilmington, Delaware
      August 20, 2025

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

---

[64] Adv. D.I. 126, Transcript of September 5, 2024, Hearing at 27-29 ("Mr. Anker has represented that the motion is limited to only deciding whether or not 546(e) is applicable on the release issue. So discovery on the release issue is limited to 546(e), as well.").