# EXHIBIT 2

**Tribal Opioid Abatement Use Report**
**2025 Distribution**

**Tribal Abatement Fund Trust II**
**Trust Agreement Pursuant to the Debtors' Fourth Amended Joint Plan of Reorganization of**
**Mallinckrodt plc and its Debtor Affiliates Under Chapter**

**Dated April 21, 2026**

**The Hon. Mary L. Smith**
**TAFT II Managing Director**

**Dr. Kathy Hopinkah Hannan**
**TAFT II Director**

**The Hon. Kevin K. Washburn**
**TAFT II Director**

**I.      INTRODUCTION**

This report is submitted pursuant to TAFT II Trust Agreement, Article 2, Powers and Trust Administration, Section 2.5, Tribal Opioid Abatement Reporting.

In 2025, TAFT II distributed a total of $32,940 to address the opioid crisis in Indian Country.

TAFT II abatement funds were disbursed to Tribal beneficiaries by year-end December 31, 2025. For successful distribution, beneficiaries were asked to provide a payment election form that specified whether the payment should be made by check or wire transfer, and if by wire transfer, adequate information to make the wire transfer.

Distributions to Alaska Tribes were automatically disbursed to their Tribal Health Organization ("THO"), unless they elected to receive their share directly. Distributions to California Tribes were automatically distributed to the tribes unless they elected to transfer all or a portion of their allocation to an Inter-Tribal Health Program, Inter-Tribal Health Organization, or Tribal Health Consortium. In instances in which the full allocation was sent to a Tribal Health Organization, an Inter-Tribal Health Program, Inter-Tribal Health Organization, or Tribal Health Consortium ("Consortium"), the responsibility to file a Tribal Opioid Abatement Use Report shifted to the entity receiving the distribution.

Distributed funds to Tribal beneficiaries under TAFT II should generally be used pursuant to the guidelines provided by Purdue Schedule B, Approved Uses and/or Schedule D, Tribal Abatement Strategies ("Purdue Approved Uses and Tribal Abatement").

Because many tribes lack personnel and resources to meet signifciant compliance responsibilities, the Directors sought to make the reporting process as minimally burdensome as possible. As a result of this minimal reporting approach, tribes may report their compliance by identifying broad categories of use or planned uses of funds. The directors believe that the reporting process serves compliance with the purposes of the settlements by reminding tribes of the imporance of adhering to the settlement purposes of prevention and abatement of opioid use disorder and related goals in deploying the funds.  Because tribes are not required to provide extensive reporting, however, the reporting process does not provide a fulsome national picture of the use of funds. Tribes do have the option in the reporting form of providing additional narration about the use of funds. The Directors are grateful to the tribes who have used that option to provide examples of the use of funds because these disclosures help make this report more substantive.

As of April 1, 2026, 337 tribes had submitted their Reporting Uses worksheet. Of the 54 tribes that had not filed their reports, 21 of these tribes were represented by legal counsel and 33 of the tribes were not represented by legal counsel. The Directors have repeatedly reached out to all non-reporting Tribes to obtain submission of their reports and will continue to seek reports.

Tribes and tribal entities that have not filed a report will not receive further distributions until they have filed a report.

## II.   Table of Reported Uses of Funds

Of the 337 tribes who responded to the requirement to report fund usage or planned usage, 234 tribes certified that they used the funds for approved uses and 103 reported that they were unable to use the funds provided by the January 2026 reporting deadline. A majority of the tribes who failed to utilize the abatement funds explicitly stated that they would use the funds for approved uses, with a number of groups identifying planned uses that are approved. Many tribes did not use all of their  abatement funds during the reporting period, and stated how they planned to use the remaining funds in the upcoming year.

Some tribes described how their planned use of funds aligned with evidence-based or evidence-informed strategies, with details unique to their cultural identity, geographic location, or existing abatement and treatment strategies. Reports from some other tribes were more terse, and echoed a full or partial list of the court-identified approved uses without additional narrative. Below is a summary of the reported uses and planned uses by the 337 reporting tribes.

| Certification of Use and Use Categories | Total | % of Tribes Reporting |
|---|---|---|
| Tribes that certified that they used funds for approved uses | 234 | 69.4% |
| Tribes that had not determined a final plan for using the funds | 103 | 30.6% |
| To treat Opioid Use Disorder (OUD) | 150 | 44.5% |
| To support people in treatment and recovery | 212 | 62.9% |
| To connect people who need help to the help they need (Connections to Care) | 146 | 43.3% |
| To address the needs of criminal justice-involved persons | 72 | 21.4% |
| To address the needs of pregnant or parenting women | 40 | 11.9% |
| To prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids | 44 | 13.1% |
| To prevent misuse of opioids | 136 | 40.4% |
| To prevent overdose deaths and other harms (Harm Reduction) | 129 | 38.3% |
| First responders | 45 | 13.4% |

| | | |
|---|---|---|
| Leadership, planning, and coordination | 97 | 28.8% |
| Training | 101 | 30.0% |
| Research | 28 | 8.3% |
| Tribal Abatement | 203 | 60.2% |
| Other | 42 | 12.5% |
| Undeclared or Vague Use | 44 | 13.1% |

III.     **Fund Uses Approved by the Court Settlement**

The court settlement document organized examples of treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions into several categories of evidence-based or evidence-informed programs or strategies. Schedules B and D of the settlement are summarized below:

**Schedule B: Approved Uses**

Part One: Treatment
   A.  To treat Opioid Use Disorder (OUD)
       ● Support treatment centers / expanding the availability of treatment.
       ● Fund MAT (Medication-Assisted Treatment) training.
   B.  To support people in treatment and recovery
       ● Provide wrap-around services (transportation, housing, family support).
       ● Hire counselors and other professional support staff.
   C.  To connect people who have or are at risk of developing OUD and co-occurring SUD/MH to the help they need (Connections to Care)
       ● Fund screening, brief intervention, and referral to treatment to reduce the transition from use to disorders, with a focus on pregnant women, youth, and young adults.
       ● Provide funding for peer support specialists or recovery coaches.
   D.  To address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system
       ● Support pre-arrest or pre-arraignment diversion and deflection strategies, including self-referral strategies.
       ● Support treatment and recovery courts and tribal courts.
       ● Support treatment, recovery, harm reduction, and other appropriate services for individuals with OUD who are incarcerated or are transitioning back to their communities.

- ● Provide training on best practices for addressing the needs of criminal-justice involved persons with OUD and any co-occurring SUD/MH conditions.

E.  Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS).

- ● Enhance family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.
- ● Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.
- ● Fund additional positions and services related to children's services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

Part II: Prevention

A.  To prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids

- ● Promote training and Continuing Education programs for healthcare providers prescribing opioids to patients.

B.  To prevent misuse of opioids

- ● Fund public education to prevent opioid misuse and related drug disposal methods through the media, school-based or youth-focused programs, and through community-based education programs and campaigns.

C.  To prevent overdose deaths and other harms (Harm Reduction)

- ● Increase availability and distribution of naloxone and other drugs that treat overdoses.
- ● Offer training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

Part III: Other Strategies

A.  First Responders

- ● Support law enforcement or other first responders with education regarding appropriate practices and precautions when dealing with fentanyl or other drugs, as well as wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

B.  Leadership, Planning and Coordination

- ● Support efforts to coordinate, plan, facilitate, and provide technical assistance to work with statewide, regional, local or community regional planning to address strategies to abate the opioid epidemic.
- ● Support the creation of a dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid or health-related indicators.

- Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing root causes of OUD and supporting treatment and other abatement strategies.

C. Training
- Provide funding for staff training or programs to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.
- Support infrastructure and staffing for collaborative cross-system coordination.

D. Research
- Support opioid abatement research.

**Schedule D: Tribal Abatement Strategies**

The court compiled a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic by using elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture.

Examples of culturally competent prevention programs include, but are not limited to, the following:
- Sweat lodges, talking circle, drum making, ceremonies.
- Tribal Wellness courts or Peacekeeping courts that establish judicial practices that are consistent with tribal values and needs, combining the resources and expertise of both systems and focusing on reintegration of tribal members into the community.
- Community Workforce Development and Training: In rural and remote tribal communities, it can be extremely difficult to recruit and retain qualified health care professionals. Cultural competency training and community workforce development can be a critical tool for addressing gaps in services.

IV. **Themes / Anecdotes / Examples of Planned Uses**

In reviewing the reporting form submissions, several common themes were identified regarding the strategies, tactics, and thought processes undertaken by the tribes when managing the settlement funds. These themes included:

5

## A. ADDRESSING ACCESSIBILITY TO CARE

Many tribes mentioned accessibility to care as a fundamental challenge when treating OUD/SUD and preventing related harms. Issues of accessibility ranged from high cost of treatment and lack of public access to harm reduction measures, to lack of care providers due to regional isolation of the tribe.

- The Alaska Native Tribal Health Consortium, acknowledging the costs associated with treatment, deployed abatement funds to support treatment expenses for tribal patients who lacked third-party insurance or payment resources.

- The Ketchikan Indian Community, citing the lack of adequate in-patient treatment facilities in their remote Alaskan island community, allocated a portion of its abatement funds to cover costs of critical in-patient treatment of opioid and co-occurring SUDs for tribal members..

- The Cherokee Nation used some of its abatement and prevention funds to expand its mobile outreach program to people in rural, traditionally hard-to-reach regions. Since the launch of the program, the Cherokee Nation has served 430 unique individuals from these often-overlooked areas of the Cherokee Nation reservation.

- To reduce opioid-related harms and deaths, the Flandreau Santee Sioux Tribe of South Dakota installed a health vending machine containing Naloxone and fentanyl strips, expanding public access to these harm reduction measures. The Tribe also provided community trainings so tribal citizens would know how to properly use the items in the vending machine.

## B. BLENDING MODERN & TRADITIONAL METHODOLOGIES

When treating, preventing, and managing OUD and co-occurring substance disorders, tribes often blended modern and traditional methods to provide holistic treatment plans for their members. These tribes cited the importance of combining available methodologies to effectively support their communities. Many reports outlined treatment and prevention plans intentionally pairing western therapies with traditional tribal abatement strategies.

- The Hoonah Indian Association plans to use the abatement funds to build a Healing Center that will incorporate traditional and modern healing techniques. The healing center will host modern-style counseling, AA, NA, and AL-anon support groups, while also including a sweat lodge and other means to support traditional healing methods.

- The Karuk Tribe reported activities integrating traditional cultural identity into modern treatment and prevention strategies. Tribal abatement strategies are implemented through drumming, sweat lodges, and ceremonies, and are complemented with modern treatment models and evidence-based medical care. The Karuk Tribe's prescription-monitoring programs work in collaboration with tribal health providers, pharmacists, and prescribers, allowing for

6

evidence-based guidelines to be adopted and reinforced by culturally-informed education campaigns.

- The Pueblo of Santa Clara established a contract with an existing inpatient OUD/SUD treatment facility to support individuals needing a high level of care. When selecting a facility, the Santa Clara Behavioral Health department sought a facility that would be culturally sensitive and serve tribal community members through a combination of modern and traditional therapeutic approaches.

### C.  EARLY PREVENTION THROUGH YOUTH-CENTERED PROGRAMMING

Several tribes deployed their abatement funds on creation and implementation of youth-centered programming, highlighting early intervention as key in preventing long-term opioid misuse. By providing tribal youth with alternative, drug-free activities, tribes sought to promote a sense of cultural belonging while simultaneously filling idle time that might otherwise spent engaging in dysfunctional activity.

- The Pueblo of San Felipe used funds for a youth internship program to provide work experience and workforce training during the summer months. Through this program, the Tribe created systems of positive reinforcement for their youth and kept them occupied in construvctive activityduring their summer school break that may have otherwise been spent engaging in drug use and other harmful behaviors.

- The Confederated Tribes of the Colville Reservation developed a Boys and Girls Club for their tribal youth, providing programs and services to enhance their development and instill a sense of competence, usefulness, belonging, and influence. The mission of the organization is to enable all young people, especially those most in need and at risk of dysfunctional behaviors, to reach their full potential in a safe, structured environment.

- Rather than duplicating existing treatment and prevention programs, the Pascua Yaqui Tribe focused on developing new programs to address infrastructure gaps and social disparities within their community. To address elevated risks of substance use, the lack of preventative infrastructure, and historical trauma from the opioid crisis, the Tribe is planning to develop a Tribal Youth Center that will serve as a  hub for preventing opioid misuse, providing effective treatment, and strengthening recovery and rabilitation support for youth.

- The Native Village of Port Graham is considering forming a Native Youth Olympics team to teach youth that there are healthier, more meaningful activities than using drugs, alcohol, or other substances. The Native Youth Olympics initiative will teach tribal youth on traditional survival skills like catching and processing fish. It will provide them a greater sense of community and give them an opportunity to compete with tribal youth from other areas.

### D. **TECHNOLOGY & DIGITAL INFRASTRUCTURE UPGRADES**

With a greater capacity to provide care due to the abatement funds, a number of tribes have deployed funds or developed plans to upgrade their technology and digital infrastructure. By making these upgrades, the tribes aimed to advance their ability to support tribal members receiving treatment, improve the coordination of care between medical providers, and better track the efficacy of treatment plans.

- The Makah Indian Tribe of the Makah Indian Reservation plans to use the funds to purchase, install, and implement a new electronic health records system that will allow the tribe to better record and track patient medical records and treatment information. The new system will streamline the ability to be in contact with other medical and treatment facilities and also improve real-time access to patient information. This will help providers and therapists to coordinate services to achieve more holistic  patient care.

- The Jena Band of Choctaw Indians procured technological resources to expand telehealth services and increase access to treatment for OUD and co-occurring SUD/MH conditions, primarily counseling and recovery support services.

- The White Earth Band of the Minnesota Chippewa Tribe purchased computers for treatment and support staff. According to their report, these upgrades were necessary to replace years-old equipment to guarantee effective overdose response tracking, and to achieve efficient delivery of services, including clinical documentation and care coordination..

- The Ponca Tribe of Nebraska strengthened its treatment, recovery, and connections-to-care infrastructure through the implementation of the CHESS Health digital recovery platform, paid for in part with abatement funds. This investment supports tribal members impacted by substance use disorder by expanding access to peer-based recovery support, education, and real-time connection to care in a culturally responsive manner. The CHESS Health platform provides 24/7 mobile access to peer recovery specialists with lived experience, recovery tools, and educational resources designed to support individuals across all stages of recovery. This investment enhanced the Tribe's capacity to reduce barriers to care, improve continuity of support, and meet individuals where they are through accessible, technology-enabled services.

- The Mashpee Wampanoag Tribe reported that its paper-based tracking system is no longer sufficient to effectively collect, analyze, and report data necessary for program oversight, compliance, and grant reporting. With the tribal abatement funds, the Tribe seeks to implement an Electronic Medical Records (EMR)/data management system well-suited for substance use disorder services, case management, suicide prevention tracking, and grant reporting requirements.

### E.   HOUSING SUPPORT

Recognizing homelessness as a root cause of opioid misuse and relapse, several tribes integrated housing into their opioid abatement strategies. Through this approach, tribes aim to reduce opioid-related harms within tribal communities, strengthen recovery pathways, and address the underlying social determinants that perpetuate drug use and addiction.

- The Nez Perce Tribe is currently working on strategies prioritizing culturally relevant, holistic, and community-based solutions that aim to prevent homelessness and provide safe housing options. Their outreach programs focus on building trust and authentic relationships within the community to identify and support tribal members experiencing housing instability. Their strategies also include the construction of tiny homes, which will serve as transitional housing linking residents to necessary support services.

- The Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation utilized funds to support an emergency shelter for individuals and families impacted by opioid and AODA issues. Its emergency shelter program assists clients with referrals to traditional healing pathways, mental health counseling, and medical services. This tribe also has a transitional housing program to guide clients in their recovery journeys.

- The Torres Martinez Desert Cahuilla Indians of California is planning to construct a Tiny Home Recovery Village - a transitional housing initiative designed to serve tribal members experiencing homelessness, many of whom are directly or indirectly impacted by substance use disorders. The Recovery Village will provide a stable environment that supports long-term recovery and prevention of relapse through comprehensive abatement strategies. Abatement funds will be used to establish and operate the facility which will include shelter and transitional housing units to provide immediate stability, daily meals and basic needs assistance to address food insecurity, wraparound case management and support services, and connection to culturally relevant healing programs.

### V.   Impacts of Continued Funding

A number of tribes used this year's report to elaborate on activities started with previously received abatement funds, highlighting the ongoing impact these funds have on their ability to counter the harms of the opioid epidemic within their communities.

- The Muscogee Creek Nation continues to use abatement funds to operate the Muscogee Healing and Recovery Clinic in Muskogee, Oklahoma, which was first made possible with these settlment funds. The facility is centrally located in an area with a large concentration of tribal citizens and helps the Muscogee Creek Nation provide sufficient treatment and support to OUD/SUD/MH individuals.

- The Lummi Tribe of the Lummi Reservation has used the abatement funds in the ongoing fight against drug abuse - targeting intervention and prevention of opioid and other substance use

9

disorders. The funds received in 2024 and 2025 helped the Lummi Tribe develop and refine the support systems necessary to promote community healing.

- The Miami Tribe of Oklahoma has used the abatement funds received over recentyears to host consistent, meaningful community outreach events promoting the prevention of opioid misuse and its harms. Between 2023 and 2025, the Tribe held 11 outreach events, including two "Lock Your Meds" events that had more than 100 people in attendance, as well as various programming aimed at community youth.

### VI.    NON-REPORTING TRIBES, THOs, AND CONSORTIUMS

The Directors will continue to work to secure Tribal Opioid Abatement Use Reports from the remaining Tribes / THOs / Consortiums. If a Use Report is not received at the time of the 2026 Distribution, the Directors will withhold the distribution until a Use Report is filed.

The Hon. Mary L. Smith
TAFT II Managing Director

Dr. Kathy Hopinkah Hannan
TAFT II Director

The Hon. Kevin K. Washburn
TAFT II Director